```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                            22 CR 673 (LAK)

SAMUEL BANKMAN-FRIED,

                Defendant.              Conference
------------------------------x
                                        New York, N.Y.
                                        February 9, 2023
                                        10:35 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DANIELLE SASSOON
     NICOLAS ROOS
     ANDREW ROHRBACH
     DANIELLE KUDLA
     Assistant United States Attorneys

COHEN & GRESSER, LLP
     Attorneys for Defendant
BY:  MARK S. COHEN
     CHRISTIAN R. EVERDELL

Also Present:
Jonathan Lettieri, U.S. Pretrial Services
```

1               (Case called)
2               MS. SASSOON:  Good morning, your Honor, Danielle
3    Sassoon, Nicholas Roos, Andrew Rohrbach, and Danielle Kudla for
4    the United States.  We are also joined by Jonathan Lettieri
5    from pretrial services.
6               THE COURT:  Good morning.
7               MR. COHEN:  Good morning, your Honor, Mark Cohen,
8    Cohen & Gresser, for the defendant.
9               MR. EVERDELL:  Good morning, your Honor, Christian
10   Everdell from Cohen & Gresser for the defendant.
11              THE COURT:  Good morning.
12              First of all, since I didn't have this case when it
13   was first filed, I know that there are Rule 5(f) orders on the
14   docket.  Was the oral admonition ever given?
15              MS. SASSOON:  No, your Honor.  Thank you for raising
16   that.
17              THE COURT:  It is about to be.
18              I direct the prosecution to comply with its obligation
19   under *Brady v. Maryland* and its progeny to disclose to the
20   defense all information, whether admissible or not, that is
21   favorable to the defendant, material either to guilt or to
22   punishment, and known to the prosecution.
23              Possible consequences for noncompliance may include
24   dismissal of individual charges or the entire case, exclusion
25   of evidence and professional discipline or court sanctions on

1  the attorneys responsible.

2  There has already been entered a written order more
3  fully describing this obligation and the possible consequences
4  of failing to meet it, and I direct the prosecution to review
5  and comply with that order.

6  Does the prosecution confirm that it understands its
7  obligations and will fulfill them?

8  MS. SASSOON:  Yes, your Honor.

9  THE COURT:  Lest anybody misunderstand, this is a
10  statement that's required by an amendment to the rules that was
11  passed, I believe, last year by Congress on the theory that
12  it's not enough for the Supreme Court to say, well, this.  I
13  have to read it to the prosecution in every criminal case.

14  That being accomplished, obviously, you know I've
15  received your proposed resolution of the government's motion
16  and it has done nothing but spark more questions in my mind,
17  anyway.

18  First of all, why shouldn't whatever exemptions from
19  the no-contact condition the government has agreed to be part
20  of the order and explained to me.

21  Ms. Sassoon.

22  MS. SASSOON:  Yes, your Honor.  I believe the initial
23  proposal by the government was a condition that said, to the
24  extent anyone is exempted by the Court or the government, it
25  won't apply, so we were engaging in that type discussion.  But

1  to the extent that the Court wants any exemptions to be run
2  through the Court, the government has no objection to that.
3  The nature --
4          THE COURT:  That really isn't the point.  The point
5  is, I understand that the government has already exempted some
6  people, assuming I approve this condition.  Why shouldn't I
7  know who they are and why I have exempted them?
8          MS. SASSOON:  The government has no issue with that,
9  and I can describe in broad strokes the nature of those who
10 were exempted.
11         THE COURT:  OK.
12         MS. SASSOON:  The defense provided us a list of people
13 whom they wanted exempted because the defendant considered them
14 close friends or wanted to maintain a personal relationship
15 with them.  The government reviewed that list and did not
16 approve certain people on that list who the government knew to
17 be represented, who the government knew did not want to be
18 contacted by the defendant, or who the government viewed as
19 potential witnesses at the trial.
20         The individuals the government did approve to be
21 exempted were people who, although they had some connection to
22 FTX, we were confident did not fall within the core conduct or
23 the government's investigation such that we don't expect them
24 to be trial witnesses.  So the specter of witness tampering
25 that we are concerned about did not pertain to those

1    individuals.  And we made clear to defense counsel that
2    although we don't think these people fall within the purpose of
3    the no-contact provision, obviously, we don't countenance
4    harassment or intimidation of anybody who does not want to be
5    contacted by the defendant.
6           THE COURT:  Looking down the road, I could anticipate
7    the possibility of disputes about who has been exempted and on
8    the basis of what information they were exempted.  Wouldn't it
9    make sense to have the names of who has been exempted of record
10   and part of the order?  If there is a good reason for it to be
11   sealed, I can understand that argument.  What about that?
12          MS. SASSOON:  The exemptions were communicated in
13   writing, so it's documented in emails between defense counsel
14   and the government.  In the government's view, that's
15   sufficient.  I take it that defense counsel is operating in
16   good faith.  To the extent that anything is in writing, the
17   government does not anticipate any dispute about that.  So
18   perhaps it would help to include in the order exempted in
19   writing by the government or the Court.
20          THE COURT:  What about that, Mr. Cohen?
21          MR. COHEN:  Your Honor, we don't have any objection to
22   the Court having the names.  We would ask -- I think
23   Ms. Sassoon described the dialogue between us accurately.  The
24   way the current condition is drafted, it says the government or
25   the Court, but we have no objection to it.  We would ask, your

1  Honor, if the names could be submitted to you in camera.

2  THE COURT:  I am not sure.  As long as it's limited to
3  in writing by the government or the Court, then I don't have a
4  need for the names unless something happens, right?

5  MR. COHEN:  Yes.

6  THE COURT:  That's item number 1.

7  How is the government -- I'll ask the same question of
8  the defendant -- I think I know what encrypted means.  But what
9  exactly does the government mean?  I read all the spy novels
10 too.

11 MS. SASSOON:  It's my understanding that encrypted
12 pertains to applications that it's difficult for the government
13 to monitor or to obtain by way of, for example, a search
14 warrant.  Because there is some ambiguity there, that's why our
15 proposal now includes clarity about what specific programs we
16 believe the defendant should be permitted to use and which he
17 cannot.

18 And then with respect to WhatsApp, this monitoring --

19 THE COURT:  I read last night that there have recently
20 been discovered 57 letters written by Mary, Queen of Scots in
21 the 16th century that were encrypted without the use of any app
22 and before the invention of computers, and they finally cracked
23 the encryption.

24 We are being a little shortsighted in focusing only on
25 apps.

1            MS. SASSOON:  To the extent that the defendant decides
2   to communicate in handwritten code, that's not something the
3   government anticipated or that we are particularly concerned
4   about.  I think here the concern really pertains to electronic
5   communications, particularly given the history we laid out in
6   our letter of what we view as obstructive conduct through the
7   use --
8            THE COURT:  You don't think this defendant is bright
9   enough to encrypt something without a computer?
10           MS. SASSOON:  To the extent that that's done in a
11  document that then --
12           THE COURT:  You expect you will find it.
13           MS. SASSOON:  Yes, your Honor.
14           THE COURT:  Maybe you will be able to decrypt it.
15           What about ephemeral.
16           MS. SASSOON:  Ephemeral describes the feature of some
17  of these applications which are often also encrypted
18  applications that results in auto deletion.  So that could be a
19  feature that's activated on the application, such that after a
20  certain number of days it will disappear, or my understanding
21  of applications like Snapchat is, they automatically disappear
22  as they are sent.  So, again, this is an issue about
23  preservation.  To the extent that there is auto deletion, the
24  government, with this condition, seeks to prevent that.
25           THE COURT:  Don't some of the things that you are

1  proposing now to allow permit auto deletion?

2  MS. SASSOON:  I believe that's true of WhatsApp.  But
3  in our discussions with the defense, they articulated some
4  reasons why this application was important to the defendant's
5  ability to communicate, and they propose this monitoring
6  technology, which, if they are able to implement, would resolve
7  the concerns about auto deletion.

8  THE COURT:  Doesn't iMessage allow a user to delete
9  any message he has sent or received within two minutes?

10  MS. SASSOON:  My understanding is that while some of
11  these applications allow you to delete these messages on your
12  own device, it's not as simple to delete it off another
13  person's device, which was the feature --

14  THE COURT:  Not as simple.  Is that what you said?

15  MS. SASSOON:  I'm not aware of that feature.

16  Your Honor, I may not understand the full scope of all
17  these different applications, but we don't want to completely
18  eliminate the defendant's ability to communicate.  So we
19  identified the applications that we think are susceptible to
20  better monitoring.  For example, with iMessage, even if things
21  are deleted, there are ways of detecting deletion.  There is
22  iCloud preservation.  There are toll records and there are
23  other things that are discernible, unlike with encrypted
24  applications.

25  THE COURT:  Are you telling me that you would be able

1  to ascertain that there was a message and it was deleted but
2  not what it said?
3              MS. SASSOON:  Sometimes that's the case, your Honor,
4  off of his own device.  But, again, I'm not aware of a feature
5  to have the message delete off the other side's device.
6              THE COURT:  Mr. Cohen, what do you say to that?
7              MR. COHEN:  Yes, your Honor.
8              With the Court's permission, we would ask that
9  Mr. Everdell be able to respond.
10             THE COURT:  OK.
11             MR. COHEN:  He is meaningfully younger than me and
12 understands this a lot better than I do.
13             MR. EVERDELL:  Thank you, your Honor.
14             I think the Court is correct that there is a little
15 ambiguity in the language here.  I think we were trying to come
16 up with a practical solution that allowed Mr. Bankman-Fried to
17 use certain communications platforms, including ones that he
18 prefers to use, encrypted-messaging apps like WhatsApp, and
19 still eliminate the concern about deleting messages, because we
20 understand that's the government's concern.  We are trying to
21 work with them on that, which is why we had done a fair amount
22 of work to try to figure out a solution for WhatsApp, and we
23 think we have come up with one.
24             If the issue is the deletion, we can simply deal with
25 that by itself and just have a condition that he can't delete

any of his messages. But we were trying to work out a practical solution with the government that worked for both sides.

THE COURT: Isn't iMessage, by default, ephemeral?

MR. EVERDELL: With iMessage, your Honor, I confess it actually changes with the different operating systems that get updated. I don't know if there is a feature with iMessage that allows the user to delete from his device and also the receiver's device. It may be on the new ones there is.

But I also don't know whether Apple is able to keep those messages in its own servers, and the government can request them from Apple, as opposed to getting them from the devices itself. I don't know the answer to that. This was a platform the government was comfortable with, so we were comfortable with it as well.

To be clear, your Honor, Mr. Bankman-Fried not is going to use any of the deletion features. He is not going to auto delete or anything like that.

THE COURT: I am far less interested in the defendant's convenience, given the record here, and his preferences than I am in avoiding what the government's proffer indicates to me is a very real risk of misuse. And the fact that you have negotiated something that makes the government sort of comfortable and makes you and your client comfortable I'm not sure is going to make me comfortable.

1      MR. EVERDELL:  Understood, your Honor.

2      THE COURT:  There is still snail mail and there is
3 still email and there are all kinds of ways to communicate that
4 don't present the same risks.

5      MR. EVERDELL:  Your Honor, I think the risk that
6 animated this concern was the risk that he is going to reach
7 out improperly to potential witnesses in this case.  I suppose
8 you could do that using any method of communication, but the
9 issue I think they are raising with the femoral apps is that
10 there won't be a record of it later.

11      THE COURT:  Exactly.

12      MR. EVERDELL:  So we are trying to find the methods
13 that don't present that problem.

14      With respect to WhatsApp, your Honor, because that's
15 something I think we did a fair amount of work on, I think we
16 have found a solution, which I can describe to you briefly, we
17 are still working out a bit of the details, but there are
18 companies, we found one in particular, that provide a
19 compliance app that gets put on the phone that automatically
20 archives messages sent to and from a WhatsApp to a cloud-based
21 archive.  This company provides this solution to major
22 companies who, for example, want to give their employees the
23 ability to use WhatsApp for work-related communications, but
24 they want those communications preserved for compliance
25 purposes, for regulatory compliance.  So this is a solution

1  that exists out on the market.

2  We can put that on Mr. Bankman-Fried's iPhone and then
3  those messages will automatically be preserved. In case the
4  government ever wants to issue a search warrant for those, they
5  will be on a cloud archive that are accessible.

6  I think that solution addresses the issue that
7  everybody is concerned about, which is that we don't want these
8  messages being deleted. They will be there and accessible.

9  THE COURT: I will be a lot happier if that was
10 coextensive with the permitted means of communication.

11 MR. EVERDELL: Yes, your Honor.

12 THE COURT: That kind of solution.

13 MR. EVERDELL: On that, your Honor, I think what may
14 benefit is some additional discussions between us and the
15 government about which platforms are usable, which allay the
16 Court's concerns, and then propose a list to the Court in a
17 subsequent submission.

18 THE COURT: Ms. Sassoon, make sense?

19 MS. SASSOON: Yes. To the extent that this monitoring
20 technology can be applied to other applications, I take your
21 Honor's point that it would make sense to apply it to other
22 applications as well.

23 THE COURT: What I will do is to extend the order I
24 entered on February 1, at least pending the receipt of whatever
25 further submission you want to make, and I have gotten enough

1   time to chew on it a little bit.
2            When do you propose to make a further submission?
3            MR. EVERDELL:  Your Honor, I think we could possibly,
4   subject to what the government says, make a submission by
5   Monday.
6            MS. SASSOON:  Yes, your Honor.
7            THE COURT:  I am going to extend the February 1 order
8   to and including a week from Tuesday at 11:59 p.m. to take
9   account of the President's Day holiday.
10           Does somebody have a calendar and can tell me what a
11  week from Tuesday is?  February 21.
12           I will enter a written order later, but it is now
13  extended to and including 11:59 p.m. on February 21, and I will
14  look forward to your submission Monday.  If you need a little
15  more time, you will let me know.
16           MR. EVERDELL:  Thank you, your Honor.
17           THE COURT:  I just also wanted to make sure we are
18  still on track with everything else we have talked about in
19  terms of preparation.
20           Defendant's motions, April 3; government's response,
21  April 24; and so on.
22           We are still on track.  Any problems?
23           MR. EVERDELL:  Yes, your Honor.  I think we are on
24  track at this point.
25           THE COURT:  Ms. Sassoon, yes?

1              MS. SASSOON:  Yes, your Honor.  If you'd like a more
2     detailed update about discovery, we can provide it.
3              THE COURT:  No, no.  I've got extremely able counsel
4     on both sides here, and I don't need to have that.  As long as
5     you tell me you're on track, you're on track.
6              Anything else?
7              MS. SASSOON:  Not from the government.  Thank you,
8     your Honor.
9              MR. COHEN:  Not from the defense, your Honor.
10             THE COURT:  Thank you.
11             (Adjourned)