N2GKBANC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 16, 2023
 9                                        2:30 p.m.

10   Before:

                        HON. LEWIS A. KAPLAN,
11
                                          District Judge
12
                              APPEARANCES
13

14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     NICOLAS ROOS
16   DANIELLE SASSOON
     ANDREW ROHRBACH
17   SAMUEL RAYMOND
     DANIELLE M. KUDLA
18        Assistant United States Attorneys

19   MARK COHEN
     CHRISTIAN R. EVERDELL
20        Attorneys for Defendant

21   ALSO PRESENT:  JOHN MOSCATO, Pretrial Services

22

23

24

25
```

N2GKBANC

1              (Case called)

2              THE DEPUTY CLERK:  Government, are you ready?

3              MR. ROOS:  Yes.

4              Good afternoon, your Honor.  Nic Roos, Danielle

5     Sassoon, Sam Raymond, Andrew Rohrbach, and Danielle Kudla, for

6     the United States.

7              THE COURT:  Good afternoon.

8              THE DEPUTY CLERK:  Defendant, are you ready?

9              MR. COHEN:  Yes, we are.

10             Good afternoon, your Honor.  Mark Cohen, Cohen &

11    Gresser, for the defendant.

12             MR. EVERDELL:  Good afternoon, your Honor.  Christian

13    Everdell, Cohen & Gresser, for the defendant.

14             THE COURT:  Good afternoon, Mr. Everdell.

15             Mr. Roos, are you going to do the honors this

16    afternoon?

17             MR. ROOS:  Yes, your Honor.

18             THE COURT:  Do you want to begin?

19             MR. ROOS:  Sure.

20             So, your Honor --

21             THE COURT:  Use the lectern, if you don't mind.

22             MR. ROOS:  Your Honor, before you, you have a few

23    pending bail modification requests.  There were several

24    requests, two made by the government and one made by defense

25    counsel, earlier this year, and then, more recently, with the

N2GKBANC

1    discovery of the defendant's use of a VPN, the government

2    proposed a broader set of conditions relating to the

3    defendant's use of devices, that is, cell phones, tablets,

4    computers, as well as the internet, and the defense, as an

5    alternative, what I would describe as, more narrowly tailored

6    proposal related to the use of VPN.  I would like to address,

7    if your Honor is okay with it, the government's new proposed

8    broader condition, which I think subsumed within it are many of

9    the other outstanding or pending or temporary conditions that

10   are discussed in the parties' letters.

11        Let me just start with a description of why,

12   generally, in a case like this, it would be appropriate to

13   restrict the defendant's use of computers and the internet.

14        The nature of the case involves a business that was

15   highly computer and internet dependent.  Many of the aspects of

16   the crime are tied up in the way in which computer code treated

17   a particular entity, Alameda Research, and how it was given

18   special privileges, records in this case were stored

19   electronically, oftentimes in web pages built by the defendant

20   and his coconspirators or in Google folders or Google drives,

21   some of which are not, and may never be, accessible to the

22   government.  Communications were ephemeral and encrypted.  The

23   defendant, as your Honor knows from our prior briefing,

24   emphasized the use of Signal with auto delete set and Slack

25   with auto delete, and deemphasized the use of email.

N2GKBANC

1          The use of cryptocurrency, which, of course, was the

2     entire business model, exacerbates the risks associated with

3     the use and access to computer infrastructure.  In particular,

4     because crypto wallets are anonymous and can be accessed

5     without the use of a traditional banking system, an individual

6     like the defendant could log in with the right keys, access

7     wallets anywhere in the world, using any computer, and move

8     funds, funds that belong to victims in the case.  And there are

9     still, let me say, wallets in this case that are believed to be

10    out there, unaccounted for, or inaccessible.

11         Now, in this case, there have been at least two

12    instances where funds have moved that belong to the FTX estate,

13    the debtor, or to victims.  There was one instance shortly

14    right around the time when the FTX entities declared bankruptcy

15    in which millions of dollars were taken out of the estate

16    through a hack, and, more recently, as your Honor knows from

17    our prior briefing, in January, there was an instance in which

18    several wallets associated with Alameda began having transfers.

19         Now, the government, as your Honor knows from our

20    briefing, has done work to see whether or not the defendant was

21    responsible for those transfers, and, in part, that work relies

22    heavily on tracing through the use of other associated wallets

23    and IP addresses.  I mention this because it really then gets

24    to the issue before the Court now, which is against this

25    backdrop of extensive use of internet infrastructure and

N2GKBANC

1    inherent risks in the case in which ways in which access to the

2    internet or to computers could undermine the evidence, could

3    lead to obstruction, could lead to dissipation of assets, we

4    now have before the Court several instances of specific conduct

5    since the initial bail conditions were set that favor a

6    modification of the bail terms.

7            The first, which your Honor is familiar with, is the

8    use of an encrypted Signal communication to contact a witness

9    in the case.  And this has been briefed, and your Honor had a

10   preliminary ruling on it, so I won't go into detail on it, but

11   I'll note that's one instance of the use of an encrypted

12   messaging platform to contact a witness, creating a risk of

13   witness tampering, of obstruction.

14           And now, as we were working through that condition,

15   there has been a second situation or set of facts that showed

16   just sort of how great of a risk the defendant's use and access

17   to computers and the internet poses to the case.  And that's

18   the use of a VPN.

19           So, let me say there, the use of the VPN exacerbates

20   the risks of everything I described before.  It means the

21   defendant could access cryptocurrency wallets, Google drives,

22   websites, without being subjected to surveillance, without

23   having his identity attached to transactions or movements.  It

24   means that monitoring technology, whether it be a pen register

25   or some other form of technology, will not necessarily be able

N2GKBANC

1    to capture the defendant's communications, his interactions.

2    It's a way in which he could move generally, obscure, any

3    attempts, by either pretrial or the government, to exercise

4    oversight.

5            So, for that reason, the government proposed a broader

6    set of conditions, a more, what we view as, narrowly tailored,

7    but appropriate, set of conditions that would apply universally

8    to his use of devices and the internet.  And quite simply, your

9    Honor, a broader set of rules is appropriate here.  We can't

10   keep engaging in some sort of Whac-A-Mole approach where he

11   uses one app, and then we switch to another, and we continue on

12   this road of modifying the bail conditions.  It's necessary

13   here, given the contours of the case and the specific instances

14   of the last two months, to have sort of a more clear rule about

15   the defendant's use of devices of the internet and appropriate

16   restrictions to curtail the risks of obstruction and spoliation

17   and just general circumvention of monitoring.

18           So, on pages 4 and 5 of the government's submission

19   from a day ago — this is ECF 73 — we've outlined the proposals.

20   The baseline rule here would be the defendant is prohibited

21   from using cell phones, tablets, computers.  And let me say, to

22   the extent that there is ambiguity, these things would be

23   described broadly to include things like smart watches, video

24   game consoles, that allow people to log onto the internet, or

25   anything else that would approximate cell phone, tablet, or

N2GKBANC

1    computer.

2             THE COURT:  Smart TVs?

3             MR. ROOS:  Smart TVs.

4             I would say maybe, broadly speaking, electronic

5    devices that allow access to the internet or to radio or

6    cellular networks might be a better way to describe it,

7    narrowed to these three categories.  I think your Honor

8    understands, broadly speaking, we're seeking to restrict the

9    ways in which he can use electronic devices to access the

10   internet.

11            THE COURT:  Let me start off right away with a

12   question.

13            You later on jump to allowing him to use these devices

14   in certain circumstances, yes?

15            MR. ROOS:  Yes.

16            THE COURT:  You are putting an awful lot of trust in

17   him, aren't you?

18            MR. ROOS:  Well, your Honor, this is something we've

19   thought a lot about — what's the way in which we can allow for

20   really three things — the defendant's communications with his

21   counsel, his ability to review discovery and prepare his

22   defense, and exercise of his First Amendment rights.

23            Beyond those three things, we are focused on ways --

24            THE COURT:  Let's maybe deal with the third one last.

25   The implication of your reference to the First Amendment here

N2GKBANC

1   implies, doesn't it, that somebody who's detained pretrial in a

2   federal institution has a constitutional right to access to the

3   internet?  I don't think so.

4          MR. ROOS:  Your Honor, the way I think we should be

5   looking about the First Amendment issue is not that there is

6   necessarily an unlimited right, but that, of course, the

7   restriction needs to be narrowly tailored and needs to be

8   balanced against countervailing interests.  So, I absolutely

9   agree with you, in the context of a federal institution, there

10  are various restrictions.  And I think the government is

11  proposing here certain restrictions on the total free exercise

12  of some of those rights.  We're trying to find the right

13  balance in terms of --

14         THE COURT:  Well, I understand there may be a balance

15  to be struck here, but there are defendants, pretrial

16  defendants, from time to time, in the federal system who are

17  detained and asked to prepare their cases without access to the

18  internet, and there are various ways of doing that, right?

19         MR. ROOS:  That's correct.

20         THE COURT:  So, in order to differentiate between this

21  defendant, on home confinement, and those defendants for First

22  Amendment reasons, you would have to justify the restriction on

23  internet access on the pretrial detainees by something unique

24  to the detention environment, right?

25         MR. ROOS:  I agree with that, your Honor.  I think,

N2GKBANC

1    actually, here, part of the reason why we're comfortable with

2    any access to the internet is not so much the First Amendment

3    consideration, but the implications that it would have on

4    discovery, with the full restrictions.

5              THE COURT:  Okay.  So let's move to that.  That's

6    where I was going.

7              Now, there's reference in the submissions to access to

8    a database, yes?

9              MR. ROOS:  That's correct.

10             THE COURT:  And the database is where?

11             MR. ROOS:  The database is hosted in the cloud.  It's

12   a massive, multiterabyte database that existed previously for

13   FTX and now has been stood up in a read-only form by the FTX

14   debtor estate through its counsel and various consultants.  And

15   so the government doesn't have in its possession these

16   terabytes of data; rather, the government has internet access

17   to the cloud-hosted database.  What we've done, in

18   conversations with the defense and with counsel for FTX, is to

19   get the defense the same type of access the government has.

20             THE COURT:  Okay.  So I understand that, too.

21             But from a technical point of view, it would be

22   entirely possible, would it not, to replicate that database on

23   a server or some other appropriate device with sufficient

24   memory that would be physically in the defendant's hands, and

25   if he had a device to access that duplicated database, with a

N2GKBANC

1    device that had no communication capability, wouldn't that

2    solve the problem of database access?

3              MR. ROOS:  So, I think there are two potential issues

4    with that.

5              The first is purely like a logistical practical one,

6    which is the sheer size of this type of drive, which looks like

7    a suitcase, takes a long time to load, and so just in terms of

8    delay of getting discovery.

9              But I think more the issue, actually, is that the FTX

10   debtor, as I understand it, has, as a condition to given

11   access, put in place various things like read-only technology,

12   monitoring of the types of searches and access that's being

13   given.  So I haven't had the specific conversation or played

14   out that scenario with them, with the counsel, but I think one

15   potential concern would be actually we'd be giving the

16   defendant more access, with less supervision, than access to

17   the cloud-hosted version.

18             THE COURT:  Well, I hear the concern.  I'm not sure

19   it's real, and I'm not sure it isn't, but let's go on.

20             MR. ROOS:  So, in terms of the discovery, there is

21   that database.  Everything else, the government is putting on

22   hard drives or has been transmitting it through one of these

23   FTP sites, although we certainly could put it on hard drives.

24   So I don't think that inherently requires the internet.  We

25   could, for instance, put a copy, a second copy, on a second

N2GKBANC

1    hard drive for the defendant or for his counsel to pass along

2    to the defendant.

3              THE COURT:  And to just revert for a minute to the

4    last subject, if you had a suitcase-sized server, and enough

5    care were devoted to constructing or to loading it, to what's

6    loaded into it, or, alternatively, the security measures for

7    pieces of the data in there to which access is not being given

8    to the defendant, the separate server or drive, whatever you

9    want to call it, is a viable option for giving him individually

10   access to the database that the FTX receiver has made available

11   to the government; yes?

12             MR. ROOS:  I think so.  Like I said, I haven't had

13   this exact conversation with them, so there may be technical

14   issues that are not coming to mind for me.

15             The other thing I would say is, I think, just so your

16   Honor understands sort of what's in the database, the database

17   has a number of sort of files and tables and ledgers relating

18   to FTX as the entity.  It also has all of the data for all of

19   the customers of FTX, including their wallets, so I think that

20   is one of the reasons why the FTX debtor, through its counsel,

21   is so concerned about the risks of turning over something like

22   this.

23             THE COURT:  I imagine that it would be possible to

24   create a duplicate with the exception of the customer wallets,

25   no?  It's a question of which files you copy.

N2GKBANC

1          MR. ROOS:  At this point, I would be speculating, but

2     it's certainly something we could run down.

3          THE COURT:  Okay.  Let's get on.

4          MR. ROOS:  I'm happy to walk through more of this, but

5     I think your Honor has actually already hit on a lot of the

6     points here.  We're proposing a broad condition with narrow

7     exceptions to accomplish those specific sort of interests, and

8     then layered over on top of that, sort of two forms of

9     monitoring:  One is the pen register that would be set up by

10    the government, and the second would be monitoring, computer

11    monitoring, through technology that's available to U.S.

12    pretrial services.

13         THE COURT:  What computers would be monitored?

14         MR. ROOS:  So, on that, as I understand it — and John

15    Moscato is here, and we've had a few conversations about this —

16    the technology can be set up for, like, a laptop computer and

17    also for cell phones.  It's better on certain types of cell

18    phones than others.  We would propose that it would be enabled

19    on a single cell phone and a single laptop, and that the

20    defendant, at least without a further motion to your Honor,

21    would be precluded from using any other electronic devices.

22         THE COURT:  Would I be wrong in assuming that his

23    parents have computers and cell phones?

24         MR. ROOS:  I don't know for certain, but I'm almost --

25    in the world we live in, you would assume.

N2GKBANC

1          THE COURT:  A couple of Stanford Law professors, it

2     would be pretty likely, yeah?

3          MR. ROOS:  I would think so.

4          THE COURT:  And you suppose there's a VPN in the

5     house?

6          MR. ROOS:  So, in terms of the VPN, I think there's

7     certainly one --

8          THE COURT:  Excuse me, I misspoke.  I meant to say a

9     Wi-Fi network.

10         MR. ROOS:  Yes, well, I know for certain that there is

11    some form of internet network just from the records the

12    government has.

13         THE COURT:  So, putting all this monitoring on one

14    cell phone and one computer for the defendant leaves him in a

15    house with a whole bunch of unmonitored devices that are

16    perfectly capable of doing what you're trying to stop him from

17    doing.

18         MR. ROOS:  That, I agree with.  Frankly, I don't know

19    that there's a great solution for third parties' devices in the

20    same home as the defendant.

21         THE COURT:  Well, you know, there is a solution, but

22    it's not one anybody's proposed yet.

23         MR. ROOS:  I think beyond -- in terms of devices,

24    beyond the you're not allowed to touch any other devices,

25    there's not a device-tailored solution.

N2GKBANC

1              THE COURT:  But we are dealing with somebody who, on

2        the basis of your proffer anyway, has done things that suggest

3        to me that there may very well be probable cause to believe

4        that he either committed or attempted to commit a federal

5        felony while on release, namely, witness tampering or attempted

6        witness tampering.  And I explained why that might be in what I

7        wrote a week or so ago.

8              Why am I being asked to turn him loose in this garden

9        of electronic devices, where he is in home detention, in light

10       of that background?

11             MR. ROOS:  So, I don't disagree with your Honor about

12       how you're characterizing the facts.  We've taken the same

13       position in our letter briefing.  I think in terms of the

14       broader question, of the defendant's release, the government is

15       attuned to finding a solution that is narrowly tailored under

16       the Bail Reform Act, but guards against these risks going

17       forward.

18             I think like a more drastic alternative, while the

19       defendant would still be on release, would be to have no access

20       to any form of electronic device, and not to allow him to be

21       around them, but, of course, there are countervailing issues,

22       namely, access to his attorneys and to discovery.  And I think,

23       in part, having him live with his parents is a check against

24       some other risks, which is risks that come from being

25       unmonitored and by yourself.

N2GKBANC

1          THE COURT:  All right.

2          Anything else you want to add?

3          MR. ROOS:  No, your Honor.  Well, let me just check

4    with my cocounsel one second.

5          (Pause)

6          MR. ROOS:  Nothing else, your Honor.

7          THE COURT:  Okay.

8          Mr. Cohen?

9          MR. COHEN:  Thank you, your Honor.

10          Like Mr. Roos, I don't think I should repeat

11    everything in the letters.  This has been, I know, extensively

12    briefed by your Honor.

13          What we're asking, your Honor, is for the Court to

14    adopt the conditions that we proposed in our letter of

15    yesterday.  There are a couple of things here that I think need

16    to be focused on that were not really emphasized in counsel's

17    presentation.

18          First, this is a very draconian proposal.  Under the

19    government's proposal — and I had to read it twice to

20    understand it myself, and I'm still not sure I fully understand

21    it, your Honor — our client would not be able to use the

22    internet at all.  He would not be able to do Google research.

23    He would not be able to use something called Google Docs, which

24    is something that we work with clients all the time, where you

25    set up a shared document with your lawyer, and you can have a

N2GKBANC

1   living document where you exchange ideas and attorney-client

2   communications, which we have used with our clients.  He would

3   not be able to use Microsoft Word to type anything up.  In a

4   case, when we finally get to it, that's going to involve a lot

5   of financial analysis and statistical analysis, he wouldn't be

6   able to use any of the computational programs that are

7   available on sites.  He would not be able to participate in a

8   Zoom call with a witness if we went through the process we

9   talked about with your Honor — counsel had contacted a witness

10  who was willing to speak with us, and the defendant, he would

11  not be able to be on that call.

12          And the exchange your Honor just brought out, counsel

13  brought into the fold, he wouldn't be able to access this

14  extensive database that has all the financial records --

15          THE COURT:  Well, it may be possible to arrange for

16  him to have that access.

17          MR. COHEN:  Your Honor, with respect, I'm not sure

18  that it is.  I'm certainly willing to hear from counsel, but

19  we're now at the end of February, we have motions due before

20  your Honor in April --

21          THE COURT:  But, look, Mr. Cohen, it isn't the

22  government who contacted the witness, it isn't the government

23  who instructed his people to use encrypted software for

24  communication, and it wasn't the government who, at least

25  according to Ms. Ellison's proffer, said that it's best not to

N2GKBANC

1    have documents or anything you can look at because legal cases

2    are built out of them.  Your client did all that.

3              MR. COHEN:  Your Honor --

4              THE COURT:  Excuse me.

5         And your client is at liberty on quite extraordinary

6    conditions, and I mean that in the sense of not draconian

7    conditions, but liberal conditions.

8         Moreover, I think the onus is on you to establish to

9    my satisfaction that whatever conditions I might contemplate,

10   in fact, will be effective in protecting the public from

11   witness tampering and whatever else is at risk by virtue of

12   giving him all this access.

13             MR. COHEN:  I understand, your Honor.  And that

14   actually takes me to my next point, but I should say, I

15   understand your Honor's prior ruling on a preliminary basis,

16   but for record purposes, we dispute that that's what he was

17   trying to do with the communication with Witness 1.

18             THE COURT:  Well, I assume that you do dispute it.

19             MR. COHEN:  And also, frankly, the proffer as to

20   Ms. Ellison, we have a very different view of what happened.

21   That's for trial, your Honor, but that's not what happened.

22             THE COURT:  Well, look, maybe so, but were this a

23   revocation proceeding — and at the moment, it isn't, but it

24   could get there conceivably — all the evidence has to establish

25   is probable cause of the commission of a felony, and then the

N2GKBANC

1    presumption shifts to detention.

2            MR. COHEN:  Even though we're not in that proceeding,

3    let me try to take on that obligation to your Honor, if I

4    might.

5            I think the best way to do it is to go condition by

6    condition, and I apologize if I repeat a little bit of what we

7    talked about with your Honor last time.

8            THE COURT:  You have my full attention.

9            MR. COHEN:  Thank you.

10           The first thing that brought us before your Honor, was

11   at our initial appearance after the matter was transferred to

12   your Honor, was the allegation that there had been a transfer

13   from wallets of assets.  That was on January 3rd in the

14   proceeding before your Honor.

15           When we learned about that, our client immediately

16   denied it, we denied it.  We contacted the government and

17   offered to help.  And at the first appearance before your

18   Honor, the government said, well, essentially, we don't believe

19   your client, fine, we're investigating.  They have since only

20   offered the Court not proffer, not proffered evidence,

21   speculation that he was involved with that.

22           The bottom line is here we are at the end of February,

23   and there's no evidence that he had any involvement in that,

24   because he didn't, and the point for today's purposes under

25   3142(c)(3), that's not a basis for a further modification.

N2GKBANC

1    Let's talk now about the no-contact rule, the no

2   contact condition.  When we were last before your Honor, we

3   thought your Honor made an excellent suggestion, and we put it

4   in our draft to your Honor, which was:  He's not allowed to

5   contact anyone, any witness or potential witness, without

6   counsel, and then we had worked out this exemption procedure,

7   and your Honor said, how do we know -- how do we have a record

8   of that, we need to have a record of that, and right after the

9   Court, we said, that's right.  So we proposed adding that

10   condition with a requirement in writing.

11    Respectfully, we think that addresses the concern that

12   was raised before the Court last week and is itself not a

13   factor under 3142(c) for further modification.

14    Which brings us to the apps and the VPN.  The reason

15   we put the declaration in before your Honor — believe me, I am

16   probably the least technical person in this courtroom, one of

17   them anyway — is just to show that this wasn't an effort -- in

18   watching the Super Bowl by using a VPN, it wasn't an effort to

19   get around the Court or get around the government.  It's

20   different technology.

21    THE COURT:  Look, I know the difference between a VPN

22   and -- right?  But let's talk about that for a minute.

23    MR. COHEN:  Sure.

24    THE COURT:  I read your affidavit or declaration from

25   Dr. Sun — I forget his title, but whatever — and he tells me,

N2GKBANC

1    and I certainly have no dispute, VPNs are used for different

2    purposes and all of that.  What he does not say is VPNs do not

3    involve the use of encryption.  He didn't say it because, as I

4    understand it, they do.  And the condition was no encryption.

5           Now, I'm not quoting it exactly, I understand that,

6    but if there is one person in this courtroom who knew, I'm

7    pretty confident, without having to look up the difference

8    between a VPN and these encrypted messaging services, that the

9    VPN involved encryption, I'm betting it's your client.

10          MR. COHEN:  With respect, people who grew up in the

11   technology world, like my client, actually if you ask them —

12   and we spoke to a number of people before we spoke to Dr. Sun,

13   but with the press of time, the reaction was they're just very

14   different things.

15          THE COURT:  Well, I understand that.

16          MR. COHEN:  I don't think by doing that, anyone with

17   that background would think, oh, I'm in contrast or conflict

18   with the limitation on the use of the Signal app.  That's all

19   we were trying to say to your Honor.

20          The point is that, as well, can be addressed by a

21   condition, and what we tried to do in our submission is narrow

22   even further what could be used.  And, frankly, one issue I had

23   with the government's presentation is, it starts from the

24   presumption, let's put in the most restrictive set of

25   conditions we can think of and then give a few carveouts.  And

N2GKBANC

1   it's actually the opposite of the standard under the Bail

2   Reform Act for bail conditions in the first place, and it

3   doesn't address the standard for modification.  If that's the

4   only thing they've offered for modification, and it doesn't

5   carry their burden of even showing improper activity, then this

6   extensive set of new conditions, which at least as of today,

7   would prevent our client from even reviewing the database,

8   there's not a predicate for it, your Honor.

9        The other thing I meant to mention is they're also

10  asking for, basically, a permanent pen register.  I'm not sure

11  we would object to that, but just stop and think about that,

12  without ever having to go to a judicial officer, without ever

13  having to make a showing under the pen register statute or

14  renewing.  I'm not sure we would object to that, but I'm just

15  trying to illustrate the scope.

16       So, your Honor, we think, and we leave it to the

17  Court — obviously, we tried to work things out, but the Court

18  is going to have to rule — we think there's something that can

19  be fashioned here.  And, with respect, my client understands

20  what's at stake here.  He is literally on trial for his life.

21  We need him to work on this defense.  We cannot go through all

22  of these extensive financial records without him being able to

23  participate.  We cannot go through all the records of the

24  company without participating.  We can't speak to defense

25  witnesses who are willing to speak to us after we go through

N2GKBANC

1      the process that the government has laid out without him being

2      able to participate.  We can't work with him if he can't use

3      something like Google Docs.

4              So, we're not saying further conditions shouldn't be

5      imposed, we agree with your Honor, and that's what we tried to

6      do in our letter.

7              So I think that's really all I had in the

8      presentation, but if I might consult with my cocounsel?

9              (Pause)

10             MR. COHEN:  I'm corrected by my technology people.

11             THE COURT:  You've been demoted, Mr. Everdell.

12             MR. COHEN:  In fact, Mr. Everdell, why don't you just

13     tell the Court this instead of me trying to.

14             MR. EVERDELL:  Your Honor, I just want to make one

15     correction or clarification.  The condition that existed was a

16     prohibition against using any encrypted or ephemeral call or

17     messaging application.

18             THE COURT:  I understand that, and that's why I

19     qualified what I said to Mr. Cohen.  I'm well aware of that.

20             MR. EVERDELL:  Thank you.

21             MR. ROOS:  And I think your Honor had a great line

22     last time about Mary, Queen of Scots, which I looked up

23     afterwards, but the point I think your Honor cut through it is

24     any form of communication, whether it's a cipher from 1700s, or

25     I think there's a case, *U.S. v. Peterson*, where they talk about

N2GKBANC

1   telephones, any form of communication could be used improperly.

2   And what the government keeps doing in its papers is saying,

3   well, here's something he could have done, yes, he used it to

4   watch a football game, but it could have been done improperly.

5   On that standard, there's no limiting principle, your Honor.

6          THE COURT:  You know, you made me forget about the

7   football game.  What was he doing watching football games on a

8   VPN, if that's really what he was doing, that anybody could

9   turn on their television set and watch for nothing?

10          MR. COHEN:  I wish I had sent him a television from

11  Best Buy, your Honor.

12          THE COURT:  Well --

13          MR. COHEN:  There isn't a television in the house.

14          THE COURT:  How about this possibility:  You say --

15  and I'm not questioning your veracity at all; indeed, on this

16  point, I'm assuming he used it this way.

17          MR. COHEN:  Understood.

18          THE COURT:  So, on that assumption, the theory is that

19  he used it because he had the subscription from the provider to

20  an international license, which allowed him to watch the

21  football game provided he was outside the United States; yes?

22          MR. COHEN:  Yes.

23          THE COURT:  Okay.

24          So, what he was doing was sitting in California, in

25  the United States, using the VPN to create the impression that

N2GKBANC

1    he was going to use this international subscription from

2    somewhere outside the United States and getting the service

3    from the provider of the programming by using the VPN to

4    deceive as to location.

5              MR. COHEN:  Well, what a VPN does — and that's why we

6    put the declaration in to your Honor — we're open about what it

7    does and why lots of companies use it.

8              THE COURT:  Sure, I understand.

9              MR. COHEN:  And that's why we proposed to your Honor

10   that he not be allowed to use a VPN except to use the database

11   unless, as your Honor suggested, there's an alternative way.

12             I'm just worried because we got a communication from

13   company counsel this week when they saw the correspondence

14   between us and the government, they said, by the way, you know,

15   if you want to look at this database, your client needs to use

16   a VPN.  So, if there's an alternative that can be fashioned

17   along the lines your Honor suggested for looking at the

18   database, we would be fine with that, but, as of today, I don't

19   know that there is.

20             THE COURT:  Well, one of my problems here is that you

21   have (a) your client and (b) access to high-tech people who can

22   advise you about this; the government may also, I don't know; I

23   don't.  And viewing this from the perspective that it's your

24   burden to satisfy me here, what about the defense bearing the

25   cost of a consultant to the Court to advise me about this — not

N2GKBANC

1    to be a witness or anything like that, and you don't have to

2    give me an answer now — someone who could say, well, here's the

3    way you deal with that FTX database, or here is what the real

4    risk of a VPN or some other gizmo is, a security expert really,

5    in effect.

6          MR. COHEN:  Who would only work for the Court?

7          THE COURT:  Who would only work for me confidentially,

8    effectively like another law clerk.

9          MR. COHEN:  We will certainly come back to your Honor

10   right away on that.  We just need to, obviously, consult.

11         THE COURT:  Well, as I say, it's your burden, it's in

12   your interests for me to be content with this, if I can be.

13         Let me just consult my notes and see if there -- oh,

14   yes, of course.

15         What's your response to my concern about his presence

16   in a household with all sorts of unmonitored devices?  I assume

17   that, of course.  I know what's going on in my apartment, so I

18   suspect -- right.

19         MR. COHEN:  It's sort of a little bit ironic, your

20   Honor, because one of the reasons we worked out the package we

21   did with the government at the time we were presented before

22   the magistrate judge was that his parents would be with him.

23   And that was deemed to be another useful piece for purposes of

24   the bail package.

25         So, if he were living alone, then we might be before

N2GKBANC

1    you, your Honor, on other concerns.  So, I think, unless we can

2    explore him living alone, if that's what the Court would like

3    us to do, he needs to live with his parents, but, certainly,

4    there can be -- how would I put it?  I think we understand from

5    your comments today, your Honor, that there is no margin for

6    error, that if there's any, any violation of whatever order the

7    Court fashioned, we're going to be in a very different

8    proceeding.  I think your Honor has been very clear about that.

9         And I think we would just instruct the defendant and

10   discuss it with his parents and make sure that it didn't

11   happen.

12        THE COURT:  So, what do you propose, we take some more

13   time?

14        MR. COHEN:  We can come back to the Court on the issue

15   of a consultant for the Court, we can come back to the Court on

16   anything the Court would like us to.  If the Court would just

17   give us some guidance about what about our proposal and what

18   about the government's --

19        THE COURT:  Well, I've already given you a lot of my

20   concerns.  Obviously, high on the list is all these other

21   devices that would not be monitored, not accounted for, we

22   wouldn't know what's there, what's not there, or how they're

23   being used.

24        MR. COHEN:  Okay.

25        THE COURT:  The device monitoring software or whatever

N2GKBANC

1    it is that somebody proposed putting on the one or two devices

2    the defendant would have access to, I don't know what that is,

3    and I don't know how it works, and I don't know how effective

4    it is.  Nobody has addressed whether monitoring of the Wi-Fi

5    network, if there is one in the home, is something that ought

6    to be considered and whether it could be effective.

7            MR. COHEN:  If your Honor would like, we can come back

8    to your Honor with a letter that tries to address all these

9    things.  Would that be useful?

10           THE COURT:  Yes, I think it would, and I think the

11   government ought to respond, too, because I gather, from what

12   Mr. Roos said, in responding to one of my first questions to

13   him, that this isn't actually the proposal, this is — I'm

14   referring to the government's letter — the conceptual framework

15   of an order.

16           MR. COHEN:  That's right.

17           THE COURT:  And I got that right away when I asked the

18   cell phone question, and Mr. Roos said, well, yes, we would

19   define computers and cell phones and so on in such a way that

20   it would pick that up.

21           MR. COHEN:  Should we give your Honor a proposed order

22   with an explanation for the terms?

23           THE COURT:  Well, if you can't come to something you

24   both agree on, in which case you should address why the

25   concerns I've expressed are satisfied, or if you can't, then I

N2GKBANC

1  suppose I'm asking for two, and if you can get back to me by —

2  and I'll give you two different dates here — about a consultant

3  to the Court early in the week — I don't know how much time you

4  need to do that, but I'm guessing not very long — let's say

5  Monday —— no, Monday is a holiday —— Tuesday, that would be

6  ideal, and then by the end of next week on the other, or if you

7  need more time, I'll simply extend the order, and I will give

8  you what you need, within reason.

9          MR. COHEN:  That would be fine, your Honor.

10         THE COURT:  Okay.

11         MR. COHEN:  That would be fine.

12         I do have an unrelated scheduling question.

13         THE COURT:  Okay.  I might even have an unrelated

14 answer.

15         MR. COHEN:  I just want to know — and, of course, if

16 you need us here, we'll be here — if you expect to be needing

17 us here next week, because I am supposed to be at the American

18 College spring meeting, I'm the New York chair.  I'm supposed

19 to be there from Wednesday on, but, of course, I will be here

20 if you need me here.

21         THE COURT:  Well, I suppose as the New York chair, you

22 would tell me I'm supposed to be there, but I won't be, and,

23 no --

24         MR. COHEN:  That's above my level, your Honor.

25         THE COURT:  That's okay.  When Judge Rivkin was the

N2GKBANC

1    chair, he would tell me.

2          Anyhow, no, it looks like I'm going to have to extend

3    the order into the following week.

4          MR. COHEN:  But if you need me here, I'll be here.

5          THE COURT:  Look, I'm not going to do that.  You have

6    a commitment for good reason, and I will honor it, as long as

7    there's no problem on extending the existing restrictions.

8          MR. COHEN:  Oh, no, no, no, of course.  We're assuming

9    you'll extend the existing order until there's a new order.

10          THE COURT:  Yes.

11          So, I've charted out some things for both sides to

12    work on.  I want this to be tight — not tight just in

13    characterization, but tight in fact.

14          MR. COHEN:  Got it.

15          THE COURT:  Okay.

16          I thank you.

17          MR. COHEN:  Yes, your Honor.

18          THE COURT:  It's always a pleasure dealing with

19    professionals on both sides.

20          MR. COHEN:  Thank you.

21          THE COURT:  Thanks.

22                                    * * *

23

24

25