N3A1BANC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,

                  Defendant.            Conference
------------------------------x

                                        New York, N.Y.
                                        March 10, 2023
                                        11:02 a.m.


Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge


                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS ROOS, ESQ.
     DANIELLE R. SASSOON, ESQ.
     DANIELLE M. KUDLA, ESQ.
     Assistant United States Attorneys

COHEN & GRESSER, LLP
     Attorneys for Defendant
BY:  MARK S. COHEN, ESQ.
     CHRISTIAN R. EVERDELL, ESQ.

ALSO PRESENT:  KRISTIN M. ALLAIN, Special Agent, FBI
               LUKE BOOTH, Special Agent
               TUNDE ADIJERAN, Special Agent
```

N3A1BANC

1          THE COURT:  Good morning, everybody.

2          Okay.  Well, I have the letters.  Let me find out,

3     first of all, what's going on about the discovery.  So who's

4     going to address that for the government?

5          MR. ROOS:  I will, your Honor.  Do you want me to

6     speak from here or from the lectern?

7          THE COURT:  Let's do the lectern, please.

8          MR. ROOS:  So, your Honor, when we appeared before you

9     for the initial arraignment back in January, Ms. Sassoon

10    described the discovery and indicated that there was a

11    substantial volume that we'd be in a position to produce

12    quickly, largely productions of documents from third parties,

13    either from subpoena returns or voluntary productions, as well

14    as some information that had been seized, through search

15    warrants and other legal process, and we did that in January.

16    We produced all of the search warrants and affidavits that had

17    been sworn out to date, which are obviously important for

18    motion practice.

19          THE COURT:  I'm sorry.  All of the search warrants,

20    something that would be important for ——

21          MR. ROOS:  Search warrants and affidavits that would

22    be important for motion practice, suppression motions.  And we

23    produced approximately 2 million documents, which represented

24    the documents collected from third parties that the government

25    had at that time.

N3A1BANC

1          Now Ms. Sassoon also described at that initial

2     conference that this is a case that there was likely to be a

3     substantial tail, in terms of ongoing discovery production, and

4     that comes in really two forms.  Number one is, the

5     government's ongoing ——

6          THE COURT:  Let me ask you a question before we go

7     further.

8          MR. ROOS:  Sure.

9          THE COURT:  Is the production that you made in January

10    a complete production as of the date you made the production?

11         MR. ROOS:  The production we made in January was a

12    complete production as of the date of production of search

13    warrant —— of subpoena returns, search warrant applications,

14    third-party voluntary document productions, but there are a few

15    other things that were not produced at that time that I can get

16    into relating to basically electronic devices.

17         THE COURT:  Well, basically or exclusively?

18         MR. ROOS:  Well, there's a caveat to really

19    everything, your Honor.  Mostly electronic devices.  The reason

20    I'm hedging is twofold.  Number one, around that time we

21    obtained a warrant for approximately 30 Google accounts, and so

22    we got that right around then.  That requires privilege review

23    and also review for the responsiveness of the warrant, so

24    that's something that's ongoing.  And second is because the

25    amount of information coming in to the government is constant

N3A1BANC

1      —— literally every day we get a production, a response to a

2      subpoena or voluntary request —— for each discovery production

3      we have to freeze in a moment of time.  So literally when I

4      tell a vendor, please stamp a million subpoena —— a million

5      pages of subpoena returns, by the time they finish applying the

6      Bates stamps, we now have another 50,000 pages.  And so when I

7      say we produced everything we had at that time, literally, by

8      the time we're producing it, we already had a little bit more.

9      But that's why we're doing ——

10             THE COURT:  Let's call the "as of that time/date," the

11     "effective as of that date," or "the effective date."

12             MR. ROOS:  Yes, your Honor.

13             THE COURT:  Okay?  Whatever it is, the effective date.

14     So when you produced in January, you had produced —— with the

15     exception of electronic stuff, which we'll get to —— whatever

16     you had as of the effective date; is that correct?

17             MR. ROOS:  Correct, correct.

18             THE COURT:  Okay.  Now where does the Google

19     production stand in relation to that?

20             MR. ROOS:  Right.  So I think, basically, as I see it,

21     what remains, I'm going to put into four categories.  Number 1

22     are those electronic devices, which I can give your Honor more

23     detail on if you'd like.

24             THE COURT:  We'll get to that.

25             MR. ROOS:  Number 2 is the Google search warrant

N3A1BANC

return; Number 3 is the ongoing production of documents

pursuant to subpoena; and Number 4 are sort of what I'll just

call dribs and drabs.  They are, you know, documents the

government downloaded from the internet but are publicly

available but we're going to give them in Rule 16 discovery;

you know, reports maybe that —— from the FBI about the service

of a search warrant, things like that.  That's a very small

amount.  So principally, when we're talking about discovery,

we're talking about three things, which are the Google, the

devices, and then the ongoing production of subpoena returns

that have come after the effective date.  And I can go in

whatever order your Honor wants.

THE COURT:  Well, let's start with the electronic

devices.

MR. ROOS:  So the government produced some electronic

devices in discovery in January, and there are five devices

left, and the reason that those devices have not been produced

or a subset of the material from those devices have not been

produced ——

THE COURT:  Well, it's the latter, right?  It's not

the former.

MR. ROOS:  So certain of the devices —— three of the

devices were obtained on consent, and so we intend to produce

the entirety of the image of the device minus withholdings for

privilege.  So if the device holder had communications with

N3A1BANC

1   either counsel for the company or his or her individual

2   counsel, we won't be giving those to Mr. Bankman-Fried because

3   it's not Mr. Bankman-Fried's privilege, but we'll —— for those

4   on-consent devices, we'll be producing everything else.

5          THE COURT:  Okay.

6          MR. ROOS:  And then there are two devices —— so there

7   are three devices that fall into that category, and the holdup

8   there is simply either the —— the extraction and processing ——

9   these are large computers, people who do a lot of coding, and

10   so they're not the type of thing you can plug in and just copy

11   overnight, so the delays there have been the literal extraction

12   of these laptops, and then the privilege review.  And so that's

13   three of the devices.

14          The two other devices were obtained pursuant to

15   warrant.  They are not the defendant's devices, they are the

16   devices of a co-conspirator.  Those have been processed

17   electronically by the FBI, and they have gone through privilege

18   review, and so we are in the stage —— the final stage, which is

19   the responsiveness analysis, and we'll produce the subset of

20   the materials responsive to the warrant to the defense.

21          THE COURT:  When?

22          MR. ROOS:  Well, both of those responsiveness reviews

23   are fairly far along.  One of them we were actually effectively

24   done, although we recently realized there was an issue

25   basically with how some of the information was rendered so I

N3A1BANC

1   think we probably need to go back, look at the underlying

2   image, and that may take a few weeks, but I think we're sort of

3   in the ——

4          THE COURT:  All right.  For the sake of discussion, so

5   I can keep this straight in my mind and in my notes, let's call

6   the three devices you got on consent searches, devices A, B,

7   and C, and the other two that you got pursuant to a warrant, D

8   and E, okay?

9          MR. ROOS:  Correct.

10         THE COURT:  So you are going to produce essentially a

11  clone of the hard drives of A, B, and C, minus privileged

12  documents, without regard to responsiveness or with regard to

13  responsiveness?

14         MR. ROOS:  Without regard to responsiveness because

15  the device holders consented ——

16         THE COURT:  So is the privilege review on A, B, and C

17  done?

18         MR. ROOS:  No.  The privilege review on —— I'll say A

19  is effectively done, just needs to be finalized.  Privilege

20  review on B and C is still ongoing.  I'll say C literally just

21  finished sort of the extraction process and so I think the

22  privilege review has not begun on C.  So A, almost done; B, in

23  the middle; C, privilege review needs to start.

24         THE COURT:  And what's the target date for production

25  on A, B, and C?

N3A1BANC

1          MR. ROOS:  Well, my hope, your Honor, would be in the

2    next few weeks.  Because these are laptops, there's sometimes

3    issues, which is I'll say the case for device D, which I can

4    get into, but —— but certainly since these are on consent and

5    don't need to go through a responsiveness review, it shouldn't

6    be —— this should not be a long process.

7          THE COURT:  So we can rely on those being done in

8    March, huh?

9          MR. ROOS:  Yeah, I think so.

10          THE COURT:  Now what about D and E?

11          MR. ROOS:  So D is a laptop that was obtained pursuant

12    to warrant.  We did a review for privilege, which is done;

13    responsiveness, which is largely done; there was a very large

14    volume of documents within our review platform that basically

15    looked like they were gibberish, thousands and thousands of

16    these.  It could be they are just system files that are in

17    fact, you know, gibberish at least to a person just looking at

18    them in a document review platform, but we want to

19    double-check, since the defendant isn't getting the entirety of

20    the device, so we're going to go back and look at that.  But

21    otherwise D is, for all intents and purposes, done.

22          THE COURT:  So I would assume that can be produced in

23    March also, right?

24          MR. ROOS:  I think so.  I mean, the only caveat I want

25    to put on that one, your Honor, is just if that process of

N3A1BANC

going back, looking at the original image proves that there was

— something went wrong in terms of importing it into the

document review platform, then there could be delays.  But if

your Honor wants, we can advise you and talk to defense if that

happens.

THE COURT:  What about E?

MR. ROOS:  So E is a cellphone, and it's got a fairly

voluminous volume.  I guess that's redundant.  The volume on it

is substantial, your Honor.  But I think we're fairly far along

in the responsiveness review and we can complete that in March.

THE COURT:  So it sounds to me like it perhaps is not

as bad as I feared from the letter I got yesterday, I guess.

MR. ROOS:  Well, I don't want to create a

misimpression.  We should talk about the Google return and

then —

THE COURT:  Okay.  So let's talk about the Google

return.

MR. ROOS:  So —

THE COURT:  What a good idea the internet was.  I

mean, I remember the days when a big document case was 400.

And nobody ever had a lawsuit with more than four defendants

because you couldn't make enough carbon copies.

MR. ROOS:  Right.

THE COURT:  I'm dating myself a little, huh?

Go ahead.

N3A1BANC

1             MR. ROOS:  So, your Honor, the warrant —— the warrant

2    itself and the affidavit have been produced to the defense.  I

3    flagged that just as your Honor is thinking about motion

4    deadlines and motion practice.

5             THE COURT:  Sure.

6             MR. ROOS:  In terms of the actual return, Google has

7    been producing it on a rolling basis.  They've made five

8    productions.  Four of them I believe have been loaded to our

9    relativity document review platform, the fifth one is in the

10   process of being loaded now.  So by early next week it may be

11   loaded.  Three of those four that have been loaded have gone

12   through the privilege review.  And so the two remaining —— the

13   one that's been loaded but has not been privilege reviewed and

14   the one that's still being loaded —— need to be privilege

15   reviewed.  The privilege review of the Google returns is a lot

16   faster than it is of electronic devices because all the

17   materials are just loaded into a review platform and then the

18   filter team searches, for instance, Mr. Everdell's name in it

19   and just excludes those documents.

20            So in terms of the Court's thinking, I don't think the

21   privilege review should be a significant delay in the process.

22   Rather, the issue is the return on the warrant yielded I think

23   somewhere between 2-3 million documents, and those are subject

24   to a responsiveness review since it's a warrant.  So in order

25   to move this along as quickly as possible, we're making a

N3A1BANC

1     production —— I think it will come out next week —— to the

2     defendant of all of the emails in the email accounts that

3     belong to the defendant, irrespective of a responsiveness

4     review.  We think he's legally entitled to the entirety of the

5     accounts and so we're producing those, so he knows what we got

6     back.  And then we'll later give him a responsive set of both

7     his —— the responsive materials within his accounts and the

8     responsiveness materials from the other accounts that don't

9     belong to him, for which I don't think he would have standing

10    to litigate, but in any event, you know, of course we're still

11    doing our responsiveness review as required by the warrant.

12         THE COURT:  Now these five returns that Google has

13    made to date, is Google done producing, or are they still

14    rolling?

15         MR. ROOS:  We think they're done.

16         THE COURT:  Okay.

17         MR. ROOS:  And let me also just explain that the five

18    returns are not equal in size.  It seems like they were sort of

19    front-loaded.  So the defendant's accounts, for instance, were

20    in production 1, the latter productions are for other FTX or

21    Alameda employees and are for sort of a smaller set of

22    documents.

23         THE COURT:  Okay.  So when do you think you can

24    finish, on Google?

25         MR. ROOS:  So candidly, your Honor, I don't think that

N3A1BANC

1    will be done in March.  I think —— I think April is a more

2    realistic sort of time frame, and I think we can produce things

3    on a rolling basis and we can also prioritize the review.  For

4    instance, we can prioritize the responsiveness review of the

5    defendant's accounts first, which may make sense, as we're just

6    thinking about a schedule for motion practice, and then sort of

7    treat the other accounts afterwards.

8            THE COURT:  Okay.  And then we've had ongoing subpoena

9    returns.  Do you have outstanding subpoenas?

10           MR. ROOS:  So, yes, your Honor.  Obviously, as your

11   Honor knows, the government has superseded in this case.  We

12   have ongoing investigations, not just with respect to the

13   defendant; there's obviously four defendants on this particular

14   docket.  And so I think it's realistic to expect that we're

15   going to continue to make productions that come in through ——

16   by subpoena, past April.  I think this is going to be a thing

17   that keeps going, although I will say the volume is continuing

18   to shrink.  Obviously the first production was 1.7 million, the

19   next one is around 287,000, and then it's going to keep getting

20   smaller and smaller.

21           THE COURT:  I think what I'm getting at is, are all

22   the subpoenas on which you expect to get returns outstanding

23   now or you're saying there is some material outstanding and

24   that you'll be serving more subpoenas?

25           MR. ROOS:  I think the latter; not necessarily

N3A1BANC

1  subpoenas directed at the defendant's conduct directly,

2  although they would relate to potentially unindicted

3  co-conspirators of the defendant for which we would, of course,

4  have a Rule 16 obligation to produce the return.

5      THE COURT:  Now are there any outstanding subpoenas

6  where material is still due to come in?

7      MR. ROOS:  So I think the one to flag, which is not

8  actually a subpoena but is ongoing voluntary document

9  production, is from FTX itself, and that's because the

10 government made many requests for which FTX is continuing to

11 produce either because they are continuing to find —— this is

12 the estate, the debtor —— is continuing to find records or

13 because we're making new requests of them as our investigation

14 progresses.  I think that's the most significant.  There are

15 other —— a handful of other categories, but they're things

16 like, you know, a subpoena to American Express or some —— or to

17 a bank, and so not sort of the same size and potential

18 significance in the case.

19     THE COURT:  Okay.  Mr. Cohen, Mr. Everdell, who's

20 going to deal with this?  I just want to get your take on where

21 the discovery stands and where it's likely to go.

22     MR. COHEN:  Thank you, your Honor.  I guess I'll

23 start, and I may turn it over to Mr. Everdell.

24         The one point we raised in our letter, stepping back,

25 is we've heard a lot of detail from Mr. Roos today and I think

N3A1BANC

1    we just have to see now.  From the defense side, it sounds like

2    we're going to get a lot of material in March, and maybe, you

3    know, April, could mean early April or not, but we do

4    appreciate the update he gave to the Court.  The one thing that

5    it strikes us does need to move is the motion schedule, in

6    light of where we are in the discovery and also the superseding

7    indictment.  So ——

8          THE COURT:  The discovery schedule you proposed in

9    your March 8 letter, which you say is agreeable to the

10   government, and I assume so, is fine with me.

11         MR. COHEN:  Okay.

12         THE COURT:  All right.  What's not so fine is the

13   possibility of a request to move the trial.

14         MR. COHEN:  Right.

15         THE COURT:  But you haven't made it and it's down the

16   road.  And all I'm saying is, don't get your hopes up.  If I'm

17   really totally persuaded you need it, obviously, but in cases

18   like this, there's always an argument that you need it.

19         MR. COHEN:  Of course.

20         THE COURT:  We'll deal with that if and when you make

21   it.

22         MR. COHEN:  That's right.  We're not making an

23   application today.  We were the ones who asked for the October

24   trial date, and we still would like to proceed on that

25   schedule.  And by the way, we're not faulting the government

N3A1BANC

1    team here, but sometimes, as we all know, discovery does take

2    longer than anyone anticipated, so we'll see what happens.

3            THE COURT:  No, no.  I'm extremely happy about the

4    extent to which the lawyers on both sides are working

5    cooperatively and amicably, and I wish it were that way in all

6    my cases.  It isn't, I can assure you.

7            Okay.  So that takes care of the update on discovery,

8    that takes care of the motion schedule, and that brings us to

9    the bail conditions.

10           Now I received the proposal of March the 3rd, and

11   looked at it carefully, I hope.  And I've come to a broad

12   conclusion and then a list of questions.  The broad conclusion

13   that I think I have reached —— and it's provisional —— is that

14   even if we do all of these things and even if we modify this to

15   address a series of questions that I still have, there is no

16   hundred percent guarantee possible, in the sense that given the

17   nature of the restrictions, the defendant's continued, though

18   somewhat constrained, liberty, his residential circumstances,

19   and the limits of the conditions, if he's determined and

20   inventive —— and I suspect he's very inventive —— and

21   technologically savvy, he could find a way around it, and

22   conceivably not get caught.  Harder, certainly.  But does

23   anybody disagree with that overall conclusion?

24           MR. ROOS:  We do not disagree.

25           THE COURT:  Mr. Everdell?

N3A1BANC

1          MR. EVERDELL:  Your Honor, it is hard to give the

2     Court a 100 percent ironclad guarantee with any set of bail

3     restrictions.  What I think we've proposed and I think that is

4     a very good job of doing is restricting his access and his

5     usage in a way that is extraordinarily meaningful and that can

6     be tracked and, if there is a violation, can also reveal the

7     violation very easily to ——

8          THE COURT:  Well, that's true in part, but I'll get to

9     all the ways that it could be evaded that I know of.  But the

10     proposal is he's going to have a flip phone, and so he can call

11     up somebody and do verbally something along the lines of what

12     he did in that text or email that we were all arguing about

13     that I characterized as trying to achieve a choir singing out

14     of the same hymn book.  That's inescapable here if he has

15     access to telephonic voice communication, right?

16          MR. EVERDELL:  Well, your Honor, I would —— on that

17     point, I would say that if that's the concern, using normal

18     voice calls to call somebody inappropriately, the government I

19     think could very well, and I'm sure they will, get a pen

20     register on that phone number and know exactly who he's talking

21     to, and there already is a "no contact" provision that limits

22     the people he can actually speak to.  And so that will be

23     readily apparent in realtime to the government if they get a

24     pen register.

25          THE COURT:  That's a fair point, assuming that the

N3A1BANC

1   government knows all the relevant telephone numbers on the

2   other end, right?

3          MR. EVERDELL:  Yes, your Honor.  It's —— yes.  So

4   there is always going to be I think some margin that ——

5          THE COURT:  Right.  But there's no way around it.  I

6   mean, if he calls a pay phone —— if there still is one —— in

7   Salt Lake City by some kind of prearrangement and the person he

8   wants to try to influence shows up at that pay phone at the

9   appointed time, the pen register is meaningless, right?

10          MR. EVERDELL:  Your Honor, I understand the Court's

11   concern.  Yes, the answer to that is yes.  But I think in any

12   situation, with any defendant, given any bail conditions ——

13          THE COURT:  Always.

14          MR. EVERDELL:  —— there's always that possibility.

15          THE COURT:  But this defendant has given some pretty

16   strong reasons.  Pretty suspicious.

17          MR. EVERDELL:  Yes, and I think we've countered those

18   concerns with equally strong restrictions.  So I think what

19   we're looking for here, your Honor, is not a 100 percent

20   guarantee, because there's just no way to give that guarantee,

21   and nobody could do that.  We're looking for what the least

22   restrictive conditions are that will guarantee that he abides

23   by the bail conditions, right, and the safety of the community

24   is guaranteed.  So ——

25          THE COURT:  Those are two different things.

N3A1BANC

1          MR. EVERDELL:  Yes, I understand.  Well, the real

2     standard is that he will — the least restrictive conditions

3     that will make sure that the community is preserved, is

4     protected.  It cannot be a 100 percent guarantee, but I think

5     what we're striving for is a meaningful set of restrictions,

6     which I think we've given the Court, and I'm happy to explain.

7     If you want to talk in more detail about how these technologies

8     work, happy to do it.  I'm also joined in the gallery by David

9     Sun, who's our technology consultant, who can provide a bit

10    more detail if the Court wishes.

11          But that's what we're striving for.  I think the

12    conditions that we've imposed are extremely restrictive, and

13    what they guarantee, your Honor, fundamentally is we have to

14    balance the concerns that the Court has, I understand, with the

15    defendant's need to participate in his defense, and quite

16    frankly, your Honor —

17          THE COURT:  Of course that has to be done.  I

18    understand that.

19          MR. EVERDELL:  Yes.  And the other thing I would just

20    point out, your Honor, is — and I know the Court has to be

21    satisfied itself, but we've talked about it at great length

22    with the government, and they've consented to these conditions,

23    and this has been a product of quite a bit of negotiation and

24    discussion among ourselves and our respective technology

25    consultants.  This does represent I think a fairly inventive in

N3A1BANC

1   its own way and very restrictive way of restricting and

2   controlling the defendant's access so that he can participate

3   in his defense but also address the Court's concerns.

4           THE COURT:  Let me raise then some of the other

5   concerns.

6           And you don't have to answer this now.

7           MR. EVERDELL:  Yes, Judge.

8           THE COURT:  These don't address the possibility of

9   someone else bringing a device into the house that the

10  defendant could use.  I think that needs to be addressed.  And

11  not just a computer but storage media, and there may be things

12  I'm not thinking about.  There's no restriction on taking files

13  generated on what I'll call the approved device to refer to the

14  proposed new laptop out of the house, where it could go to

15  somebody who might cooperatively send out a whole bunch of

16  emails or other documents to who knows where for who knows what

17  purpose.  I'm not entirely clear on who prepares this approved

18  device, who verifies and certifies that it complies with the

19  order, and who exactly it is who's supposed to do the

20  monitoring, because our pretrial services team in the court is

21  wonderful, but they would be the first to say they are not

22  forensic cyber types.

23          Another point not addressed is, what happens to

24  whatever devices he's got now?  It's one thing to say he will

25  only use the approved device; on the other hand, if the others

N3A1BANC

1    are still there, I don't know what happens.  I don't understand

2    whether there is any realistic way to restrict the use of Zoom

3    as you propose it be limited.  Maybe there is a way.  I don't

4    know enough to know whether there's a way to keep track of

5    that.

6            And then a broader concern.  And I'm not being

7    critical of anybody by any means.  I know you're working hard

8    and trying to be as responsive as you can.  The way this

9    March 3 letter is framed, it for the most part is conceptual,

10   as opposed to specifying exactly what hardware, what software,

11   so that if I think it's appropriate, I can consult either

12   pretrial services or an outside expert to see whether they

13   agree that it does whatever you're effectively representing

14   that it does, or has other problems.  I'm not supposing that it

15   does.  I'm not suggesting bad faith.  What I'm really saying is

16   that if the four or five points I articulated as concerns were

17   addressed in a satisfactory way and I were to approve the rest

18   of what you've proposed conceptually, I don't have an order I

19   can sign.

20           MR. EVERDELL:  Yes, your Honor.

21           THE COURT:  So I guess the next step is either to

22   address the concerns I raised and then see if we're really all

23   in the same place and postpone doing a proposed order until we

24   get there, or go right to a proposed order, and that might be

25   more work than it's worth if it's not going to do the trick.

N3A1BANC

1          MR. EVERDELL:  Yes, your Honor.  The Court raises some

2     valid concerns.  I think the best way to proceed is for us to

3     take your Honor's points, work on them ⸺ I think there are

4     solutions to those questions.  Let us work on it together and

5     then come up with a proposed order for the Court that is, as

6     you said, more specific.

7          One thing I would note, your Honor, in terms of the

8     particular software that we plan to use, I'm happy to provide

9     that information to the Court.  I'm conscious of the fact that

10     there are malicious actors out there who would love to know

11     exactly what software we'd be using and how it's configured in

12     order to try to hack these devices, and so I wonder if it's

13     more prudent to submit those under seal to the Court.

14          THE COURT:  That's a good point.  I'm certainly, on

15     the basis of what you said, prepared to do that.  You, of

16     course, are aware that other people will object to that if they

17     wish.

18          MR. EVERDELL:  We'll have to decide whether we meet

19     the standard ⸺

20          THE COURT:  Yes, you're going to have to justify that.

21          MR. EVERDELL:  Yes.  And I will address ⸺ I don't

22     want to address the Court's concerns now.  I think it's better

23     if we ⸺

24          THE COURT:  Yes.

25          MR. EVERDELL:  The one thing I will address is

N3A1BANC

1  Number 4, you said what happens to the defendant's devices that

2  he has now.  The plan there is for us —— the lawyers, his

3  lawyers —— to take custody of those devices and take them out

4  of the house.  We can arrange something different if that's not

5  satisfactory, but they would be away from him and not in his

6  possession.

7          THE COURT:  No.  Okay.  I trust you.  You're

8  professionals and officers of the court, and if you say you're

9  going to segregate him from the machines, that works for me.

10 But I want it in the order.

11         MR. EVERDELL:  Yes, absolutely, your Honor.  We'll get

12 to work.

13         THE COURT:  What else?  Anything?  I know you want

14 some interim change, and I'll look at that.

15         MR. ROOS:  I don't think anything else from us, your

16 Honor.  We'll work with the defense on your questions and a

17 potential order.

18         THE COURT:  Yes.  I know you've asked me for an

19 interim change with respect to access to the VPN for the

20 database that you have that he needs to have in order to

21 prepare, and in principle I'm prepared to do that, but it seems

22 to me I need a more specific proposal.

23         MR. EVERDELL:  Yes, your Honor.  I think for that

24 maybe we could also prepare a separate order for that one

25 device and we'll specify exactly, to the extent we can

N3A1BANC

publicly, and we'll work that issue out separately, but we will
specify what capabilities it has and what, how it's restricted,
so the Court understands how it is ——

THE COURT:  Right.  I may well want to add to it some
of the points that are in your March 8th letter that are not
technical to broaden the interim production, because it was as
if you were negotiating a trust indenture here, I feel like,
and it takes time, you know, but we've got to have more relief
pending the hopefully successful outcome.  Okay.  I will think
about what those might be, but since you are, in principle, are
agreeable to all of them as a quote-unquote final interim
solution pending trial, I assume that whatever you've proposed
here is okay in the short-term interim while we generate a new
proposal.

MR. EVERDELL:  Yes.  So just so I'm clear what the
Court is saying, whatever is proposed in this letter would be
the interim bail conditions?

THE COURT:  Maybe not all of them, but I might very
well want to handle the question of anybody bringing equipment
into the house, his transmitting anything out of the house,
things like that, that don't involve software or monitoring or
any of that stuff, but just make it a little tighter.

MR. EVERDELL:  Right.  So there will be actually two
orders that we're going to give to the Court.  The first is the
immediate interim to deal with the laptop ——

N3A1BANC

1          THE COURT:  Yes.

2          MR. EVERDELL:  —— and a few other things ——

3          THE COURT:  And, you know, access to the parents'

4    machines.  I mean, some of that stuff has to be in place very

5    soon, like next week.

6          MR. EVERDELL:  Understood, your Honor.  Thank you.

7          THE COURT:  Okay.  Good.  I think we're all in the

8    same place, and I thank you.  And I'll put something that gets

9    docketed with the new motion schedule online.  And have a good

10   weekend.

11         ALL COUNSEL:  Thank you, your Honor.

12         THE LAW CLERK:  All rise.

13                        o0on.

14

15

16

17

18

19

20

21

22

23

24

25