

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SUPERSEDING INDICTMENT** |
| v. | S5 22 Cr. 673 (LAK) |
| SAMUEL BANKMAN-FRIED, a/k/a "SBF," | |
| Defendant. | |

## Overview

1.      From at least in or about 2019, up to and including in or about November 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, corrupted the operations of the cryptocurrency companies he founded and controlled—including FTX.com ("FTX") and Alameda Research ("Alameda")—through a pattern of fraudulent schemes that victimized FTX customers, investors, financial institutions, lenders, and the Federal Election Commission ("FEC"). Exploiting the trust that FTX customers placed in him and his exchange, BANKMAN-FRIED stole FTX customer deposits, and used billions of dollars in stolen funds for a variety of purposes, including, among other things, to support the operations and investments of FTX and Alameda; to fund speculative venture investments; to make charitable contributions; and to enrich himself. BANKMAN-FRIED also engaged in corrupt practices to advance his aims. In the United States, he tried to influence cryptocurrency regulation in Washington, D.C. by steering tens of millions of dollars of illegal campaign contributions to both Democrats and Republicans. He also conspired to bribe one or more Chinese government officials in order to regain access to Alameda trading accounts that had been frozen by Chinese law enforcement authorities.

2.     Founded in 2019, FTX, the global cryptocurrency exchange led by SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, grew quickly, and with it grew BANKMAN-FRIED's public profile, political influence, and personal fortune.  In promoting FTX and its smaller sister company FTX.US, which he also controlled, BANKMAN-FRIED represented himself as the figurehead of a trustworthy and law-abiding segment of the cryptocurrency industry that was focused not only on profits, but also on investor and client protection.  Likewise, in public statements, including in testimony before the United States Senate, BANKMAN-FRIED represented that FTX had a focus on "consumer protection," had adopted "principles for ensuring investor protections on digital asset-platforms," including "avoiding or managing conflicts of interest," and that "as a general principle FTX segregates customer assets from its own assets across our platforms."  As recently as late 2022, BANKMAN-FRIED boasted about FTX's profits and portrayed himself as a savior of the cryptocurrency industry, making venture investments and acquisitions purportedly to assist struggling industry participants.  BANKMAN-FRIED used FTX.US to further burnish his image, spending millions of dollars on celebrity advertisements during the 2022 Super Bowl that promoted FTX.US as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.

3.     In fact, and as SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, well knew, FTX—which by early 2022 claimed to handle approximately $15 billion in daily trading volume on its platforms—was not focused on investor or client protection, nor was it the legitimate business that BANKMAN-FRIED claimed it was.  Contrary to BANKMAN-FRIED's promises to FTX customers that the exchange would protect their interests and segregate their assets, BANKMAN-FRIED routinely tapped FTX customer assets to provide interest-free capital for his and Alameda's private expenditures, and in the process exposed FTX customers to massive,

2

undisclosed risk. In addition, while BANKMAN-FRIED publicly claimed that FTX operated independently from Alameda's cryptocurrency trading and investments in other companies, by his design, the reality was otherwise. BANKMAN-FRIED controlled FTX, FTX.US, and Alameda and used them to prop each other up, notwithstanding conflicts of interests and outright lies to the contrary.

4.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, perpetrated this multi-billion-dollar fraud through a series of systems and schemes that allowed BANKMAN-FRIED, through Alameda, to access and steal FTX customer deposits without detection. For instance, in 2021, FTX began to accept customer fiat deposits into an Alameda-affiliated bank account that itself was established through a fraudulent scheme that BANKMAN-FRIED directed. This account functioned as a mechanism for the routine and brazen misappropriation of those deposits. BANKMAN-FRIED also caused the creation of secret loopholes in the computer code that powered FTX's trading platform—loopholes that allowed Alameda to incur a multi-billion-dollar negative balance on FTX that BANKMAN-FRIED knew Alameda could not repay. Further, BANKMAN-FRIED concealed from both Alameda's lenders and FTX's equity investors the fact that Alameda had taken billions of dollars from FTX. At relevant times, BANKMAN-FRIED required his co-conspirators and others who worked for him to communicate using encrypted and ephemeral messaging platforms that self-deleted, thereby preventing regulators and law enforcement from later obtaining a record of his misdeeds.

5.     Over time, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, publicly distanced himself from Alameda, but in reality, continued to exercise supervisory control over it and to direct Alameda's criminal activity. BANKMAN-FRIED used the FTX customer funds he misappropriated and caused to be misappropriated to, among other things, support the trading and

operations of Alameda, fund acquisitions and venture investments, and finance in substantial part BANKMAN-FRIED's unlawful political influence campaign, which involved flooding the political system with tens of millions of dollars in illegal contributions to both Democrats and Republicans made in the names of others in order to obscure the true source of the money and evade federal election law.

6.      In addition, in or about 2021, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, authorized and directed a bribe of at least $40 million to one or more Chinese government officials.  The purpose of the bribe was to influence and induce one or more Chinese government officials to unfreeze certain Alameda trading accounts containing over $1 billion in cryptocurrency, which had been frozen by Chinese authorities.  BANKMAN-FRIED and others sought to regain access to the assets to fund additional Alameda trading activity, in order to assist BANKMAN-FRIED and Alameda in obtaining and retaining business.

7.      In or about early November 2022, an internet news organization leaked what appeared to be Alameda's balance sheet, revealing publicly that Alameda's solvency was dependent on the multi-billion-dollar valuation that Alameda assigned to its holdings of FTT, FTX's proprietary digital currency, which was illiquid and difficult to value.  Following this revelation, substantial numbers of FTX customers began seeking to withdraw their funds from FTX.  Knowing that FTX had misappropriated billions of dollars in customer funds, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, tried to reassure FTX customers, and slow customer withdrawals from FTX, with what he knew were false public claims about the ability of FTX to repay customer deposits, the security of FTX's customer assets, and the status of Alameda's balance sheet.  BANKMAN-FRIED also transferred funds putatively belonging to Alameda to fill an approximately $45 million hole in customer assets on FTX.US.

8.      In or about November 2022, in a last-ditch effort to secure sufficient liquid capital to satisfy FTX customer withdrawals, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, doubled down on his fraudulent schemes by soliciting billions of dollars in additional capital investments from existing and potential investors in FTX, many of whom he had previously defrauded.    In soliciting this additional capital, BANKMAN-FRIED made more false representations to potential investors about the source of the multi-billion-dollar hole in FTX's balance sheet caused by his misappropriation of customer deposits and his own knowledge of how the hole originated.

9.      The efforts of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, to raise sufficient capital to satisfy the demand for customer withdrawals failed.  In November 2022, FTX halted trading and entered bankruptcy along with Alameda, FTX.US, and dozens of related entities.  Left in FTX's wake were thousands of customers who had trusted BANKMAN-FRIED, FTX, and FTX.US with billions of dollars in savings and investment capital and found themselves overnight unable to withdraw their funds and unsure about whether they would ever be repaid.

## Background on Alameda Research and FTX

10.      In or about November 2017, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, a United States citizen, founded Alameda, a quantitative cryptocurrency trading firm incorporated in Delaware, which had operations in the United States, Hong Kong, and The Bahamas.  At the time, Alameda principally engaged in high-frequency cryptocurrency arbitrage trading, and also some market making, pooling of digital assets to earn interest (called yield farming), and other forms of cryptocurrency trading.    At times, Alameda was financially successful. In or about 2019, FTX described Alameda as the "largest liquidity provider and market maker" in the digital asset space, trading "$600 million to 1 billion a day" and accounting for

"roughly 5% of global volume" in digital asset trading. BANKMAN-FRIED and Gary Wang were the sole equity owners of the firm, and BANKMAN-FRIED was the CEO of Alameda from in or about November 2017 until in or around October 2021, at which time he passed the title to two Alameda employees. Even after BANKMAN-FRIED was no longer CEO, however, he remained Alameda's ultimate decisionmaker, and directed, among other things, trading strategy, investment decisions, and venture spending.

11.     In or around May 2019 and while still the CEO of Alameda, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, founded and served as the CEO of FTX Trading Ltd., a global cryptocurrency exchange that, through several subsidiary entities, did business as FTX. FTX offered customers the ability to trade in cryptocurrencies such as bitcoin, ether, and stablecoins, as well as crypto derivatives such as options, swaps, and futures. FTX also offered customers a "spot market" for trading cryptocurrency with other FTX customers in exchange for other cryptocurrencies or traditional currency, also known as fiat (referred to below generally as "dollars"), such as U.S. dollars. FTX also eventually added a "spot margin trading and borrowing" service, which permitted FTX customers who opted into the service to either lend their crypto assets to other customers for spot trading, or trade on credit using borrowed crypto assets by posting collateral and borrowing crypto assets through the spot market on FTX.

12.     From its launch, FTX grew rapidly. By in or about 2020, FTX was one of the largest digital asset exchanges in the world based on trading volume, and by in or about early 2022, FTX claimed to handle approximately $15 billion in daily trading volume on its platforms.

13.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, raised at least $1.8 billion dollars from investors, including investors based in the United States and the Southern District of New York, in exchange for various classes of stock in FTX. This money was raised

through multiple fundraising rounds, including: (1) a fundraising completed in or around August 2019 of approximately $8 million; (2) a fundraising completed in or around July 2021 of approximately $1 billion; (3) a fundraising completed in or around October 2021 of approximately $420 million; and (4) a fundraising completed in or around January 2022 of approximately $500 million. BANKMAN-FRIED continued efforts to fundraise for FTX at least up to and including November 2022.

### BANKMAN-FRIED's Multiple Criminal Schemes

#### At BANKMAN-FRIED's direction, FTX Fraudulently Opened and Used Bank Accounts Affiliated with Alameda to Receive Customer Deposits and Transmit Funds

14.     From FTX's founding in or about 2019, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, sought to use the United States financial system, and in particular, bank accounts in the United States, to promote FTX's business.  In particular, after FTX launched in or around May 2019, and in order to attract customers and their assets, including U.S. dollars, FTX needed bank accounts that would allow FTX customers to deposit dollars with FTX that could be used to purchase cryptocurrency assets and pay for transactions.   When FTX was founded, however, many U.S. banks were reluctant to do business with cryptocurrency companies, and those banks that were willing to open accounts for cryptocurrency companies had extensive customer due diligence and licensing requirements, with which FTX was not compliant.

15.     Because FTX did not have its own bank accounts for holding customer deposits, for a period of time in or around 2019 and 2020, FTX instructed customers to wire dollar deposits to bank accounts that were owned or controlled by Alameda, which at the time SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also controlled as the CEO.  These Alameda accounts had been opened as trading accounts and had been used almost exclusively for Alameda's trading purposes until they were also employed as accounts for FTX to receive and transmit its

customer deposits and withdrawals.  Alameda never informed the banks where these accounts were held that these accounts in Alameda's name began to be used in substantial part by FTX to accept customer deposits for, and as a vehicle for customer withdrawals from, FTX's cryptocurrency exchange.

16.     During the time period in which FTX was using Alameda bank accounts to receive and transmit customer deposits, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others, made efforts to open bank accounts for this purpose in FTX's name.  In particular, BANKMAN-FRIED, through Alameda employees, attempted to open an account for FTX at a bank in California ("Bank-1"), the deposits of which were insured by the Federal Deposit Insurance Corporation and where Alameda already had bank accounts.  Bank-1 made clear, however, that it would not open an account for customer deposits and withdrawals absent evidence that FTX was licensed and registered, including federal registration as a money services business, and that, in any event, Bank-1 would need to conduct an enhanced due diligence process before opening any account used to process customer deposits and withdrawals.

17.     In or about January 2020, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, contacted Bank-1 about opening an FTX account.  BANKMAN-FRIED learned from Bank-1 that BANKMAN-FRIED should not attempt to open an account for FTX, an international platform, at that time.  He was further told that if he wished to open an account to process customer deposits and withdrawals for FTX.US, FTX's business in the United States, FTX.US would need to register as a money services business.  While BANKMAN-FRIED did later register FTX.US as a money services business in 2020, no attempts were made to make FTX a licensed money services business and BANKMAN-FRIED never sought to have FTX or Alameda comply with the regulatory requirements of licensure.  Instead, FTX continued to use Alameda trading accounts to

accept customer deposits and process customer withdrawals.

18.     In part to obscure the relationship between FTX and Alameda, and in order to overcome Bank-1's refusal to open a bank account for FTX without extensive due diligence and licensing, in or about August 2020, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, directed the incorporation of a new U.S.-based entity, North Dimension. BANKMAN-FRIED was listed as sole owner, CEO, and president of North Dimension, which had no employees or business operations outside of its bank account. BANKMAN-FRIED and others chose the name "North Dimension" in part to conceal that there was a relationship between North Dimension and Alameda from FTX customers and from banks approving transactions with the North Dimension bank account. BANKMAN-FRIED also directed the creation of a website for North Dimension and used a credit card in his name to fund the hosting services for the website.

19.     Aware of the fact that Bank-1 would not open an exchange account or account for receiving customer deposits for an entity without the appropriate registration and enhanced due diligence, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and other Alameda employees told Bank-1 a false story, namely, that North Dimension sought to open an account to function as a trading account connected to Alameda's existing trading accounts, instead of the truth, which was that the North Dimension account would function as an account to receive and transmit FTX customer deposits. Under BANKMAN-FRIED's supervision, employees of Alameda completed an account application that falsely stated that the purpose of the North Dimension bank account was for "trading" and "market making." Bank-1 was also given a completed North Dimension due diligence questionnaire—which BANKMAN-FRIED signed— that falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account" and that North Dimension "also participates in direct peer-to-peer, OTC

purchases and sales with certain third parties for its own account." Furthermore, despite the fact that North Dimension was created for the purpose of transmitting customer deposits on and off the FTX exchange, the due diligence questionnaire falsely claimed that North Dimension was not a money services business.

20.     In or about April 2021, Bank-1 approved the opening of the North Dimension account, without enhanced due diligence or review by Bank-1's executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to Bank-1.

21.     Once the North Dimension bank account was opened, FTX directed customer dollar deposits to the North Dimension account.  Thereafter, when FTX customers deposited or withdrew fiat currency, Alameda personnel, who maintained control over the North Dimension account and acted under the direction and supervision of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators, manually credited or subtracted the customer's FTX account with the corresponding amount of fiat currency on an internal ledger system.  Customers could then convert their deposits to a range of cryptocurrencies and traditional currencies, engage in various types of trading, and make withdrawals denominated in various types of cryptocurrencies and traditional currencies.  FTX charged fees and generated revenues from many of these activities, using the fraudulently obtained access to a U.S. bank account.  Customers could also convert various cryptocurrencies and traditional currencies to dollars on their FTX account, and withdraw the dollars from FTX.  FTX sent customer withdrawals by wire transfer from the North Dimension bank account, and by at least summer 2021 charged a fee for dollar withdrawals.

BANKMAN-FRIED Directed the Misappropriation of Customer Deposits

22.     Despite representations SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, made and caused to be made to the contrary, FTX never held customer funds in

dedicated accounts for the benefit of customers or segregated from Alameda's assets. Rather, with the knowledge and under the supervision of BANKMAN-FRIED, Alameda commingled FTX customer funds with Alameda assets in Alameda accounts. With BANKMAN-FRIED's knowledge and at his direction, Alameda regularly took money from accounts funded by or that included funds from FTX customers, including the North Dimension account. Alameda ultimately spent billions of dollars of those FTX customer funds, among other things, to finance Alameda's trading and expenses, to make venture investments directed by BANKMAN-FRIED, and to bankroll tens of millions of dollars in campaign contributions made in the names of individuals but in fact funded from Alameda accounts.

23.    SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, was able to accomplish this scheme not only by causing FTX customers to deposit money into accounts controlled by Alameda, but also by secretly building Alameda's capacity to misuse FTX customer funds into the computer code that operated the FTX trading platform.

24.    In or about July 2019, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, publicly claimed that: "Alameda is a liquidity provider on FTX but their account is just like everyone else's." Such representations continued through 2022, with BANKMAN-FRIED asserting, for example, that "[t]here are no parties that have privileged access" on FTX, and that "Alameda is a wholly separate entity." Contrary to those representations, BANKMAN-FRIED had caused FTX's computer code and software to allow Alameda to accrue a negative balance on FTX's exchange. That modification to FTX's code, along with others implemented at BANKMAN-FRIED's direction, made Alameda's account unlike those of other customers. While FTX typically would have automatically liquidated a client's account once its negative balance exceeded the amount of any posted collateral, net of fees, FTX permitted Alameda to maintain a

negative balance, draw on a multi-billion-dollar line of credit, borrow funds from FTX without sufficient collateral, evade auto-liquidation, and withdraw funds off the exchange. Over time, BANKMAN-FRIED directed that Alameda's credit limit be raised to approximately $65 billion, which in practice permitted Alameda to draw on FTX accounts funded by customer assets on an unlimited basis—in amounts that exceeded FTX revenue and tapped into customer funds.

25.     Over time, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, hid the close relationship between FTX and Alameda and his continued involvement in and control of both FTX and Alameda in order to minimize the appearance of potential conflicts of interest and to prevent further scrutiny that might uncover his schemes. To publicly distance himself from Alameda, BANKMAN-FRIED stepped down as CEO of Alameda in or about October 2021, and named Caroline Ellison, a long-time associate and co-conspirator in the fraudulent scheme, and another individual as co-CEOs of Alameda. But in practice, BANKMAN-FRIED continued routinely to direct investment and operational decisions at Alameda and exercised supervisory control over it.

26.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also took steps to conceal that his multi-billion-dollar venture investments and expenditures were funded by transfers originating with Alameda, and therefore funded with FTX customer funds. For example, BANKMAN-FRIED directed Ellison to change the name of Alameda entities that were funding venture capital investments by FTX so that it would not be apparent that the money was coming from Alameda. Similarly, BANKMAN-FRIED personally borrowed more than $1 billion from Alameda and oversaw similar borrowing by other FTX executives, which was then principally used to make investments in the name of BANKMAN-FRIED and his associates, rather than in the name of Alameda. This conduct served to conceal the close connection to Alameda, as well

as the criminal source of the funds. At the same time, BANKMAN-FRIED falsely projected ignorance about Alameda's affairs.

27.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also deceived FTX investors about the exchange's relationship with Alameda, and about the safety of the exchange more generally, through the use of audited financial statements provided to investors. In the course of the audits underlying the financial statements, BANKMAN-FRIED and those acting at his direction misled auditors and avoided providing information about FTX customers, including Alameda, and about the commingling of customer assets with Alameda funds, as well as Alameda's enormous line of credit on the exchange. When one co-conspirator expressed concern to BANKMAN-FRIED about auditors disapproving of the commingling of customer assets with Alameda funds, BANKMAN-FRIED assured that co-conspirator that the auditors would not find out. The audited financials were then used to falsely reassure customers and investors that FTX had proper risk management controls and systems for storing customer assets.

## BANKMAN-FRIED Directed a Multi-Million Dollar Bribe to One or More Chinese Government Officials in Order to Unfreeze Alameda Trading Accounts

28.     In or around early 2021, Chinese law enforcement authorities froze certain Alameda cryptocurrency trading accounts (the "Accounts") on two of China's largest cryptocurrency exchanges (the "Chinese Exchanges") that collectively contained approximately $1 billion in cryptocurrency. SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, understood that the Accounts had been frozen by Chinese authorities as part of an ongoing investigation of a particular Alameda trading counterparty.

29.     After the Accounts were frozen, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others operating at his direction, considered and tried numerous methods to unfreeze the Accounts or otherwise to regain access to the cryptocurrency in the Accounts,

including retaining attorneys to lobby or otherwise advocate in China for Alameda's funds to be unfrozen; communicating with the Chinese Exchanges; and opening new accounts on the Chinese Exchanges using the personal identifying information of several individuals unaffiliated with FTX or Alameda (the "Fraudulent Accounts") and attempting to transfer the cryptocurrency from the frozen Accounts to the Fraudulent Accounts in an effort to circumvent the Chinese authorities' freeze orders.

30.     After months of failed attempts to unfreeze the Accounts, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, discussed with others and ultimately agreed to and directed a multi-million-dollar bribe to seek to unfreeze the Accounts.  In particular, BANKMAN-FRIED authorized and directed the illicit transfer of cryptocurrency intended to induce and influence one or more Chinese government officials to unfreeze the Accounts.  Following BANKMAN-FRIED's authorization and direction, an Alameda employee sent cryptocurrency payment instructions for at least a portion of the bribe payment to other Alameda employees, including at least one employee located in the United States.  As a result, in or about November 2021, BANKMAN-FRIED caused a bribe payment of cryptocurrency then worth approximately $40 million to be transferred from Alameda's main trading account to a private cryptocurrency wallet.  At or around the time of the $40 million bribe payment, the Accounts were unfrozen.  After confirmation that the Accounts were unfrozen, BANKMAN-FRIED authorized the transfer of additional tens of millions of dollars in cryptocurrency to complete the bribe.

31.     After the Accounts were unfrozen, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, Alameda used the unfrozen cryptocurrency to fund additional Alameda trading activity.

<u>BANKMAN-FRIED Directed Alameda to Misappropriate</u>
<u>Billions of Dollars in FTX Customer Funds to Repay Alameda's Lenders</u>

32.     In or around June 2022, the cryptocurrency markets experienced a downturn. SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, through Alameda, was heavily invested in the cryptocurrency industry through cryptocurrency trading and related illiquid venture investments.  As a result of the market downturn, Alameda faced demands for repayment from multiple third-party cryptocurrency lenders on substantial outstanding loans.  While Alameda was obligated to repay the loans on demand, Alameda lacked the funds to repay these lenders.

33.     Rather than allow Alameda to default on its loans, which would have jeopardized the survival of both Alameda and FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, authorized Alameda to draw down billions of dollars in customer assets from FTX and to use those assets to repay Alameda's lenders.  The billions of dollars that BANKMAN-FRIED caused Alameda to draw from FTX greatly exceeded FTX's revenue, liquid capital, and available funds under FTX's relatively small peer-to-peer lending program.  BANKMAN-FRIED was able to divert billions of dollars in FTX customer funds to Alameda undetected as a result of the features to benefit Alameda that he had directed be built into FTX's code and software.

34.     Shortly after authorizing the misappropriation of billions of dollars of FTX customer funds to repay Alameda's loans, in or about July 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, tweeted, "Backstopping customer assets should always be primary. Everything else is secondary."

35.     Even after SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had misappropriated billions of dollars of FTX customer funds to repay Alameda's lenders, BANKMAN-FRIED continued to direct discretionary investments, charitable contributions, and political donations using Alameda funds, including by directing that Alameda continue to draw on

its line of credit on FTX.

36.     Although SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had caused Alameda to repay lenders using FTX customer funds, Alameda still had at least hundreds of millions of dollars in outstanding loans, and had to provide financial information to its creditors. BANKMAN-FRIED directed Ellison to devise a way to mislead those creditors about the money Alameda had "borrowed" from FTX, as well as about the substantial personal loans Alameda had made to FTX executives, and together, BANKMAN-FRIED and Ellison provided false and misleading financial statements to creditors.

<u>BANKMAN-FRIED Made Unlawful Political Contributions to Acquire Bipartisan Influence</u>

37.     As he used Alameda to siphon off FTX's customer funds and deploy them for political causes, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, became one of the largest publicly reported political donors for the 2022 midterm elections. But his effort to influence politics did not stop there. To avoid certain contributions being publicly reported in his name, BANKMAN-FRIED conspired to and did have certain political contributions made in the names of two other FTX executives ("CC-1" and "CC-2"). Those contributions were made directly to candidates in the names of those FTX executives, but with FTX and Alameda funds.

38.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, perpetuated his campaign finance scheme at least in part to improve his personal standing in Washington, D.C., increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX or BANKMAN-FRIED's personal agenda, including legislation concerning regulatory oversight over FTX and its industry. To accomplish these goals, BANKMAN-FRIED caused substantial contributions to be made in support of candidates of both major political parties and across the political spectrum. BANKMAN-FRIED, however, did not want to be known as a left-

leaning partisan, or to have his name publicly attached to Republican candidates.  In those instances when he wanted to obscure his association with certain contributions, BANKMAN-FRIED and others conspired to and did have those contributions made in the names of CC-1 and CC-2.

39.     As part of this scheme, contributions were coordinated to be made in the names of the two FTX straw donors to candidates they did not necessarily support or know.  These straw donations were instead made for purposes of furthering the political agenda of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, while providing him cover to avoid being associated with certain contributions, and concealing that the source of the contributions was in fact Alameda.

40.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators selected CC-1 to be the face of BANKMAN-FRIED's and FTX's more left-leaning spending.  CC-1 ultimately became—at least in name—one of the largest Democratic donors in the 2022 midterm elections and made donations to further BANKMAN-FRIED's agenda that CC-1 otherwise would not have made.

41.     For instance, in or around 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others agreed that he and his co-conspirators should contribute at least a million dollars to a super PAC that was supporting a candidate running for a United States Congressional seat and appeared to be affiliated with pro-LGBTQ issues, and selected CC-1 to be the contributor. A political consultant working for BANKMAN-FRIED asked CC-1 to make the contribution and told CC-1, "in general, you being the center left face of our spending will mean you giving to a lot of woke shit for transactional purposes." CC-1 expressed discomfort with making the contribution in his name, but agreed there was not anyone "trusted at FTX [who was] bi/gay" in a position to

make the contribution. At the direction of BANKMAN-FRIED and individuals working for him, CC-1 nonetheless contributed to the PAC.

42.     Likewise, it was the preference of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, to keep contributions to Republicans "dark." In keeping with that preference, CC-2, who publicly aligned himself with conservatives, made contributions to Republican candidates that were directed by BANKMAN-FRIED and funded by Alameda.

43.     From at least in or around March 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators began coordinating political contributions paid for using FTX and Alameda funds through an encrypted, auto-deleting Signal chat called "Donation Processing." From time to time, BANKMAN-FRIED and his co-conspirators substituted other individuals in BANKMAN-FRIED's place for contributions originally intended to be made in BANKMAN-FRIED's name. For instance, shortly before the midterm elections, an FTX employee was directed to "wire $107k from [BANKMAN-FRIED] personal to New York State Democratic Committee," but then was asked by BANKMAN-FRIED to "update this to a 107k contribution from [CC-1]."

44.     In total, between in or about the fall of 2021 and the November 2022 election, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and the two FTX executives who served as straw donors as part of his scheme—CC-1 and CC-2—collectively made millions of dollars in contributions, including in "hard money" contributions to federal candidates from both major political parties.

45.     The money used to make these political donations originated from Alameda bank accounts, and included funds that had been deposited by FTX customers. Notwithstanding his awareness of the campaign finance laws, in order to conceal the true source of the funds, SAMUEL

18

BANKMAN-FRIED, a/k/a "SBF," the defendant, agreed with others that funds for contributions would be transferred from Alameda's bank accounts, which also contained FTX customer funds, to bank accounts in the name of the donors, and then quickly transferred from those individuals' bank accounts to political campaigns.

46.     In total, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,  and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. In dozens of instances, BANKMAN-FRIED's use of straw donors allowed him to evade contribution limits on individual donations to candidates to whom he had already donated.  As a result of this fraudulent conduct, BANKMAN-FRIED and his co-conspirators caused false information to be reported by campaigns and PACs to the FEC, which had the result of impairing and impeding the FEC's reporting and enforcement functions.

47.     To further conceal the scheme, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators recorded the outgoing wire transfers from Alameda to individuals' bank accounts for purposes of making contributions as Alameda "loans" or "expenses." But unlike other loans that were made to FTX executives, including to BANKMAN-FRIED, CC-1, and CC-2, these outgoing wire payments were not documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment.  While employees at Alameda generally tracked loans to executives, the transfers to BANKMAN-FRIED, CC-1, and CC-2 in the months before the 2022 midterm elections were not recorded on internal Alameda tracking spreadsheets.  Instead, an internal Alameda spreadsheet noted over $100 million in political contributions, even though FEC records reflect no political contributions by Alameda for the 2022 midterm elections to candidates or PACs.

48.     In or around November 2022, as FTX customer withdrawals were surging and FTX was experiencing a solvency crisis (as described below), and just days before the midterm elections, CC-1 messaged SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, that he was concerned about the "maybe 80m" of "donations/personal/etc that went through my bank [account] and are in my name." CC-1 proposed a back-dated transaction to undo any sort of debt he might owe as a result of wire transfers being recorded on Alameda's ledger as "loans." BANKMAN-FRIED asked CC-1 how they would go about doing it, and CC-1 proposed a retroactive sale of certain cryptocurrencies "earlier in 2022" to remove the $80 million liability CC-1 had to FTX/Alameda, which would have further concealed the campaign finance scheme. The transaction was not, however, completed before FTX's collapse.

### BANKMAN-FRIED's Lies During FTX's Collapse

49.     On or about November 2, 2022, an online news publication published an article that appeared to leak Alameda's balance sheet, disclosing that the predominant portion of Alameda's $14.6 billion of assets comprised Alameda's holdings of FTX's digital token, FTT. Prior to November 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had engineered the price of FTT, including by directing that Alameda buy large amounts of the token to maintain its price when it was dropping, and to keep such price manipulation a secret. Over time, FTT became a sizeable asset on Alameda's balance sheet despite its illiquidity, and Alameda began using it as collateral to obtain billions of dollars in loans from third-party lenders for Alameda, which exponentially increased Alameda's ability to obtain sizeable loans, while at the same time leaving Alameda exposed to significant financial risk.

50.     After the November 2, 2022 leak showing Alameda's assets comprised mostly FTT, commentary expressing fear, uncertainty, and doubt about the value of FTT, and in turn the

prospects of FTX as an exchange, spread across the internet.

51.     In an effort to tamp down those concerns about FTX, Alameda, and FTT, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, Ellison tweeted on or about November 6, 2022: "A few notes on the balance sheet info that has been circulating recently: - that specific balance sheet is for a subset of our corporate entities, we have > $10b of assets that aren't reflected there . . . . given the tightening in the crypto credit space this year we've returned most of our loans by now." This tweet was misleading in several respects. First, while Alameda had by that time repaid most of its loans to external lenders, it had done so by misappropriating billions of dollars of FTX customer funds that it still owed to FTX.  Second, the supposed additional $10 billion in assets included not only the loans Alameda had made to related-parties, like BANKMAN-FRIED and other FTX executives, but also the value of investments made by BANKMAN-FRIED with that money, even though those investments were not owned or controlled by Alameda.

52.     That same day, on or about November 6, 2022, the CEO of another cryptocurrency exchange tweeted that he had decided to liquidate approximately $2.1 billion of FTT held by his exchange.  Soon after, Ellison, in consultation with SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others, and in an effort to prevent the collapse of FTT's value, tweeted in response that if the CEO was "looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!"  The effort to blunt the effect of the threatened sale of FTT was unsuccessful.  The value of the FTT token fell and many FTX customers sought to withdraw their assets from FTX, resulting not only in the plummeting of FTT's value, but also the equivalent of a cryptocurrency bank run of several billion dollars.

53.     Because SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had misappropriated FTX customer assets for use by Alameda, however, FTX lacked the funds to meet surging customer demands for withdrawals of their deposits. At BANKMAN-FRIED's direction, Alameda began liquidating its assets and using the proceeds to satisfy FTX customer withdrawals. On or about November 6, 2022, BANKMAN-FRIED sent CC-1 a screenshot of a message from Ellison that read, in part: "I just had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with one way or another."

54.     In an attempt to stem the withdrawals from FTX and forego a solvency crisis, on or about November 7, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, posted a series of false and misleading tweets. First, he tweeted: "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine." He added in a second tweet, in part, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be." In a third tweet about FTX, BANKMAN-FRIED stated: "It's heavily regulated, even when that slows us down. We have GAAP audits, with > $1B excess cash. We have a long history of safeguarding client assets, and that remains true today."

55.     Despite his false assurances, the fraudulent scheme of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused significant negative price impact on the value of commodities in interstate commerce in the United States, including bitcoin and ether spot and future prices.

56.     Customer withdrawals continued to surge and threaten the solvency of FTX. Beginning on or about November 7, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the

defendant, and others acting at his direction, began contacting existing and potential investors for a multi-billion-dollar bailout. BANKMAN-FRIED supplied existing and potential investors with what purported to be FTX's balance sheet, showing that FTX had approximately $9.6 billion of assets versus approximately $8.9 billion of liabilities, which would yield a positive net equity of approximately $700 million. The balance sheet noted, however, that FTX had an additional liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account," and that FTX had experienced $5 billion in customer withdrawals on November 6, 2022. Beneath these two line items, BANKMAN-FRIED stated: "There are many things I wish I could do differently than I did, but the largest are represented by these two things: the poorly labeled internal bank-related account, and the size of customer withdrawals during a run on the bank."

57.     In fact, and as SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, well knew, the "[h]idden, poorly internally labled [sic] 'fiat@' account," was the multi-billion-dollar entry on FTX's ledger reflecting the amount of FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX, and of which BANKMAN-FRIED was aware throughout the relevant time period. The labeling of the account was deliberate: BANKMAN-FRIED had previously authorized moving the ledger entry of Alameda's fiat liability from an account with "fiat" in its name, into a subaccount under the last name of an Alameda intern. On or about November 6, 2022, in the course of directing CC-1 and others to calculate Alameda assets and liabilities for purposes of estimating available funds to meet customer withdrawal demands, BANKMAN-FRIED specifically told CC-

1 to include this subaccount in his calculations, describing it as the account that "has the old fiat@ account."

58.    On or about November 9, 2022, it became clear to FTX and Alameda employees that the companies would not survive the solvency crisis because there were not sufficient funds to cover customer withdrawals, and there was no third party willing to bailout FTX. That day, Ellison addressed Alameda employees in an all-hands meeting. Ellison acknowledged that earlier that year, she, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, Wang, and CC-1 had decided to use, and used, FTX customer assets to pay Alameda's debts to lenders.

59.    At the same time that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, was trying to address FTX's solvency crisis caused by the misappropriation of FTX customer assets, he prioritized certain disbursements at the expense of satisfying FTX customer withdrawals. For example, on or about November 8, 2022, the general counsel of FTX.US, in a Signal chat that included BANKMAN-FRIED and several close associates, demanded: "I need to know the fucking truth about FTX US right now." Soon thereafter, on or about November 9, 2022, BANKMAN-FRIED was told in the same Signal chat that there was an approximately $45 million deficit in FTX.US customer assets. BANKMAN-FRIED responded that he had transferred $46 million from Alameda to FTX.US. On or about November 8, 2022, FTX suspended customer withdrawals. Shortly thereafter, however, BANKMAN-FRIED reopened withdrawals only for customers in The Bahamas, resulting in millions of dollars being preferentially withdrawn from the exchange, while other customers of FTX had no true access to it.

60.    To conceal his activities and the activities of his co-conspirators during the unraveling of FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant communicated with his employees over Signal, an ephemeral messaging application. BANKMAN-FRIED had

previously instructed employees to communicate over Signal, and directed that employee Signal messages be set to auto-delete after brief periods of time, in part to prevent the preservation of evidence that could be used against him. In November 2022, the general counsel of FTX.US warned employees that they should preserve documents because of the involvement of regulators, and then posted in a company Slack channel that FTX would need to be shut down. BANKMAN-FRIED, however, deleted the general counsel's message about FTX being shut down, continued to use Signal messaging, and proceeded to delete some of his own statements on Twitter, including his tweets about customer assets being "fine."

61.    Before resigning from FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, met with one of FTX's in-house attorneys to discuss what, if any, legal explanation BANKMAN-FRIED could provide for the use of customer funds in response to questions from potential investors. BANKMAN-FRIED and the attorney discussed and dismissed several potential explanations as inadequate. In particular, they considered whether BANKMAN-FRIED could claim that Alameda had borrowed from customers who had opted in to FTX's peer-to-peer borrow/lend program. BANKMAN-FRIED and the attorney, however, quickly dismissed the explanation because Alameda's borrowing greatly exceeded the funds lent through the FTX borrow/lend program, even if Alameda had been the only borrower. BANKMAN-FRIED, however, later publicly embraced the explanation that he earlier had acknowledged privately was unsupported by the facts: that Alameda did not misuse FTX customer funds but permissibly borrowed funds that customers had opted in to FTX's peer-to-peer lending program.

62.    On November 11, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, resigned from FTX, and FTX and approximately one hundred affiliated entities, including FTX.US, and Alameda filed for Chapter 11 bankruptcy protection.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Commit Wire Fraud on Customers of FTX)

The Grand Jury charges:

63.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

64.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

65.     It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud on Customers of FTX)

The Grand Jury further charges:

66.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

67.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud customers of FTX by misappropriating those customers' deposits, and using those deposits to pay expenses and debts of Alameda to make investments, and for other purposes.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Conspiracy to Commit Fraud on Customers of FTX in Connection with Purchase and Sales of Derivatives)

The Grand Jury further charges:

68.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

69.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to commit an offense against the United States, to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

70.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, use and employ, and attempt to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (b) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (c) engaging, and attempting to engage in an act, practice, and course of business, which operated and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX trading or intending to trade futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

Overt Act

71.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about June 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,

and others misappropriated FTX customer deposits in order to, among other things, satisfy loan obligations owed by Alameda Research.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
**(Fraud on Customers of FTX in Connection with Purchase and Sales of Derivatives)**

The Grand Jury further charges:

72.    The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

73.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, to BANKMAN-FRIED, along with others, engaged in a scheme to defraud customers of FTX trading or intending to trade futures, options, swaps, and derivatives by

misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Conspiracy to Commit Securities Fraud on Investors in FTX)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

75.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

76.    It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly would and did, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice,

and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, BANKMAN-FRIED agreed with others to engage in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.

Overt Act

77.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: on or about September 18, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused an email to be sent to an FTX investor in New York, New York that contained materially false information about FTX's financial condition.

(Title 18, United States Code, Section 371.)

**COUNT SIX**
**(Securities Fraud on Investors in FTX)**

The Grand Jury further charges:

78.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

79.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b)

31

making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (Conspiracy to Commit Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

80.      The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

81.      From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Sections 1343.

82.      It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition.

(Title 18, United States Code, Section 1349.)

## COUNT EIGHT
### (Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

83.    The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

84.    From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
**(Conspiracy to Commit Bank Fraud)**

The Grand Jury further charges:

85.    The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

86.    From at least in or about October 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

87.    It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did execute, and attempt to execute, a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, as defined in Title 18, United States Code, Section 20, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, BANKMAN-FRIED, along with others, in order to open a bank account and to obtain customer deposits and fees, falsely represented to a financial institution that the account would be used for trading and market making, even though BANKMAN-FRIED knew that the account would be used to receive and transmit customer funds in the operation of a cryptocurrency exchange, and thereafter, in connection with using the account for the receipt and transmission of customer funds, omitted material facts in a manner that made what was communicated misleading.

(Title 18, United States Code, Section 1349.)

**COUNT TEN**
**(Conspiracy to Operate an Unlicensed Money Transmitting Business)**

The Grand Jury further charges:

88.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

89.     From at least in or about October 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

90.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, in violation of Title 18, United States Code, Section 1960.

Overt Act

91.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere: Alameda and FTX employees, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused FTX customers to send wire transfers and sent wire transfers to FTX

customers, some of which were received in and were transmitted through the Southern District of New York.

(Title 18, United States Code, Section 371.)

**COUNT ELEVEN**
**(Conspiracy to Commit Money Laundering)**

The Grand Jury further charges:

92.      The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

93.      From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

94.      It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, one or more monetary transfers, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

95.      It was a further part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, within the United States,

would and did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWELVE
### (Conspiracy to Make Unlawful Political Contributions and Defraud the FEC)

The Grand Jury further charges:

96.     The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

97.     From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States, in violation of Title 18, United States Code, Section 371, and willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States by engaging in violations of federal law involving the making, receiving, and reporting of a contribution, donation, or expenditure, in violation of Title 52, United States Code, Sections 30109(d)(1)(A) & (D).

98.     It was part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and

more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A) & (D).

99.     It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office and joint fundraising committees by a corporation, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30118 and 30109(d)(1)(A).

100.     It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did defraud the United States, and an agency thereof, by impairing, obstructing, and defeating the lawful functions of a department and agency of the United States through deceitful and dishonest means, to wit, the Federal Election Commission's function to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to corporate contributions and conduit contributions, in violation of Title 18, United States Code, Section 371.

<u>Overt Act</u>

101.     In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, was committed in the Southern District of New York and elsewhere: in or about 2022, SAMUEL BANKMAN-FRIED a/k/a "SBF," the defendant, and one or more other conspirators agreed to and did make corporate contributions to candidates and committees in the Southern District of New York that were reported in the name of another person.

(Title 18, United States Code, Section 371.)

## COUNT THIRTEEN
### (Conspiracy to Violate the Anti-Bribery Provisions
### of the Foreign Corrupt Practices Act)

The Grand Jury further charges:

102.    The allegations contained in paragraphs 1 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

103.    From at least in or about January 2021 up to and including in or about February 2022, in an offense begun and committed out of the jurisdiction of any particular State or district, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, at least one of whom was first brought to and will be arrested in the Southern District of New York, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, to violate the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2.

104.    It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, (1) being a domestic concern and an officer, employee, and agent of a domestic concern and a stockholder thereof acting on behalf of such domestic concern, would and did willfully and corruptly make use of the mails and a means and instrumentality of interstate commerce, and (2) being a United States person, would and did willfully and corruptly do any act outside the United States, in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of a thing of value to a foreign official, and to a person while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (A)(i) influencing an act and decision of such foreign official in that foreign official's official capacity; (ii) inducing such foreign official to do

and omit to do an act in violation of the lawful duty of such foreign official; and (iii) securing an

improper advantage; and (B) inducing such foreign official to use that foreign official's influence

with a foreign government and agencies and instrumentalities thereof to affect and influence an

act and decision of such government and agencies and instrumentalities, in order to assist

BANKMAN-FRIED, Alameda, and others in obtaining and retaining business for and with, and

directing business to, a person, in violation of Title 15, United States Code, Section 78dd-2, to wit,

BANKMAN-FRIED and others agreed to pay cryptocurrency to one or more foreign officials in

China to influence and induce them to unfreeze the Accounts, in order to assist BANKMAN-

FRIED, Alameda, and others in obtaining and retaining business for, and directing business to,

BANKMAN-FRIED, Alameda, and others.

Overt Act

105.    In furtherance of the conspiracy and to effect the illegal object thereof, the

following overt act, among others, was committed and caused to be committed abroad: in or about

November 2021, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others directed

and caused the transfer of at least approximately $40 million in cryptocurrency intended for the

benefit of one or more Chinese government officials in order to influence and induce them to

unfreeze the Accounts.

(Title 18, United States Code, Sections 371 and 3238.)

**FORFEITURE ALLEGATION**

106.    As a result of committing the offenses alleged in Counts One, Two, Seven, Eight,

Nine, and Thirteen of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that

40

constitutes or is derived from proceeds traceable to the commission of said offenses, including but

not limited to a sum of money in United States currency representing the amount of proceeds

traceable to the commission of said offenses, and the following specific property:

       a.    55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

       b.    $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

       c.    $49,999,500 in United States currency formerly on deposit in Account Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

       d.    $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

       e.    $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

       f.    $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

       g.    $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

       h.    Any and all monies, assets, and funds contained in Binance account number 94086678;

       i.    Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

       j.    Any and all monies, assets, and funds contained in Binance.us account number 35155204.

       107.    As a result of committing the offenses alleged in Counts Five and Six of this

Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United

States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

108.    As a result of committing the offenses alleged in Counts Ten and Eleven of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offenses, and the following specific property:

a.    55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

b.    $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

c.    $49,999,500 in United States currency formerly on deposit in Account Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

d.    $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

e.    $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

f.    $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

g.      $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

h.      Any and all monies, assets, and funds contained in Binance account number 94086678;

i.      Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

j.      Any and all monies, assets, and funds contained in Binance.us account number 35155204.

109.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON
3/07/23

DAMIAN WILLIAMS
United States Attorney

KENNETH A. POLITE, JR.
Assistant Attorney General
Criminal Division

3/27/23   Filed superseding Indictment under seal
          (SMO) Lehrburger   43
          MO