Exhibit 5


# JUDGMENT

## The Superintendent of Her Majesty's Foxhill Prison and The Government of the United States of America (Appellant) *v* Viktor Kozeny (Respondent)

### From The Court of Appeal of the Commonwealth of the Bahamas

before

**Lord Hope**
**Lady Hale**
**Lord Kerr**
**Lord Clarke**
**Lord Dyson**

## JUDGMENT DELIVERED BY
## LORD CLARKE AND LORD DYSON

## 28 March 2012

**Heard on 23-24 November 2011**

*Appellant*

Alun Jones QC
Howard Stevens


(Instructed by Charles
Russell LLP)

*Respondent*

Clive Nicholls QC
Hugo Keith QC
James Lewis QC


(Instructed by Davis & Co
Bahamas)

# LORD CLARKE AND LORD DYSON:

*Introduction and background*

1.      With special leave granted by the Judicial Committee, the appellants appeal against the dismissal by the Court of Appeal (Dame Sawyer P, Longley and Blackman JJA) of their appeal against the grant by the Supreme Court (Isaacs J) of a writ of habeas corpus ad subjiciendum in respect of the respondent.  It is contended on behalf of the respondent that the Judicial Committee had no jurisdiction to grant special leave to appeal.  Before the Board addresses the issue of jurisdiction, it is necessary to set the scene.  The facts are somewhat complex.  For present purposes, however, it is sufficient to give only a brief outline.

2.      The respondent, who is not a US national or resident, is accused in the United States of America ("US") of bribery of a foreign public official and of money-laundering.  By virtue of a request dated 28 November 2005, the second appellant sought his extradition from the Bahamas to stand trial in New York on a 27 count indictment.  Extradition between the US and The Bahamas is governed by the US/Bahamas Treaty dated 9 March 1990 and (by virtue of the Extradition (Application to the United States Order 1994: SI 59 of 1994) by the Extradition Act 1994 ("the 1994 Act").  Count 1 of the indictment alleges a conspiracy to violate the US Foreign Corrupt Practices Act 1977 ("FCPA").  Counts 2 to 13 allege substantive offences under the FCPA.  Count 21 alleges a related money-laundering conspiracy.  As will become clear, the Board is only concerned with counts 1, 11 and 21.   The FCPA offences concern the alleged bribery by the respondent and others of certain public officials of Azerbaijan in connection with the purchase of vouchers and options during the abortive privatisation of the State Oil Company of the Azerbaijan Republic.  It is common ground that the conduct alleged in the indictment does not concern the bribery of any US or Bahamian officials.  It is concerned solely with the bribery of Azeri officials.

3.      On 5 October 2005, the respondent was arrested in Nassau on a provisional warrant of arrest and remanded in custody.   On 2 December 2005, the Minister of Foreign Affairs issued his first Authority to Proceed ("ATP") asserting that the conduct alleged against the respondent, if it had occurred in The Bahamas, would have given rise to 30 offences contrary to Bahamian law.  On 1 February 2006, committal proceedings were commenced before the Stipendiary and Circuit Magistrate ("the Magistrate").  On 9 March 2006, during these proceedings, the Minister issued a second ATP stating that he was satisfied that the US offences alleged against the respondent were "offences provided for in the extradition treaty

with the [US]" and that the acts and omissions constituting those offences would constitute offences contrary to Bahamian law if they took place within The Bahamas. Counts 1 and 11 of the indictment were said to correspond with the offence of conspiracy to corrupt a public officer contrary to sections 89(1) and 462 of the Bahamian Penal Code ("the Penal Code"). Count 21 was said to correspond with the offence of conspiracy to commit money laundering, contrary to section 9(2) of the Money Laundering (Proceeds of Crime) Act 1996 and section 89(1) of the Penal Code.

4.      On 23 June 2006, the Magistrate dismissed all the first ATP charges as well as the money laundering charges which were the subject of the second ATP. But she ruled that all of the charges of corruption of a public official referred to in the second ATP were "made out". On 28 September, she confirmed her earlier ruling and ordered the committal of the respondent under sections 5(1)(b) and 10(5) of the 1994 Act in respect of the corruption charges in the second ATP. She rejected the second appellant's alternative submission that the conduct alleged against the respondent also constituted offences under Article VIII of the Inter-American Convention against Corruption ("IACC") and thus amounted to extradition offences under section 5(2) of the 1994 Act.

5.      On 10 October 2006, the respondent applied to the Supreme Court for a writ of habeas corpus pursuant to section 11 of the 1994 Act. On 16 July 2007, the US District Court of the Southern District of New York (Judge Scheindlin) ruled that all the FCPA and money-laundering counts were time-barred, save for counts 1, 11 and 21.

6.      The habeas corpus proceedings were heard by Isaacs J. On 24 October 2007, he held that by virtue of section 7(1)(d) of the 1994 Act, the respondent could only be extradited in respect of counts 1, 11 and 21, since the other counts were time-barred. He also held, inter alia that none of these counts was an "extradition offence" because (i) they did not give rise to an offence contrary to Bahamian law (as was required by section 5(1)(b) of the 1994); and (ii) it was not open to the second appellant (a) to re-introduce the money-laundering charges contained in the second ATP or (b) to rely in the alternative on section 5(2) of the 1994 Act. For these (and other reasons), the judge granted the application for a writ of habeas corpus and the committal order was set aside.

7.      The appellants appealed to the Court of Appeal under section 11(5) of the 1994 Act against the order for release of the respondent. On 26 January 2010, their appeal was dismissed. The Court of Appeal held inter alia that (i) in order to challenge the Magistrate's decision that no money-laundering extradition offences had been "made out", the appellants should have brought appeal proceedings by way of case stated pursuant to section 10(7) of the 1994 Act; (ii) it was not open to the requesting state to

argue, in defence of the legality of the respondent's detention, that his committal was lawful on the basis of other extradition offences that had not been established before the Magistrate; (iii) reliance could not be placed, in the alternative, on section 5(2) of the 1994 Act since that section had not been specified in the ATPs; and (iv) the transnational bribery conduct of which the respondent was accused in the US would not, if committed in The Bahamas, have constituted offences of corruption of a public officer (contrary to section 462 of the Penal Code) or related conspiracy charges (contrary to section 89(2) of the Penal Code).

8.      The respondent was, therefore, unconditionally discharged on 26 January 2010. On 11 February 2010, the appellants applied to the Court of Appeal for leave to appeal. This application was abandoned (and therefore dismissed) on 22 April after the Court of Appeal had made it clear that it had no jurisdiction to grant leave to appeal to the Judicial Committee of the Privy Council. On 2 July 2010, the appellants then applied to the Board for special leave. The respondents objected in writing on grounds which included that the Board has no jurisdiction to hear an appeal from the Court of Appeal of The Bahamas against an order made in habeas corpus proceedings for the release of a person who is detained. Permission to appeal was granted by Order in Council dated 9 February 2011. But this grant of permission did not (and could not) give to the Board jurisdiction to entertain an appeal if it did not in fact have jurisdiction to do so.

9.      Before the Board addresses the issue of jurisdiction, it is necessary to refer to the principal relevant provisions of the 1994 Act.

*The 1994 Act*

10.     Section 5(1)(b) provides that an offence of which a person is accused in a treaty State is an "extradition offence" in the case of an offence against the law of the treaty State if:

> "(i) it is an offence which is provided for by the extradition treaty with that State; and"
>
> (ii) the act or omission constituting the offence, or the equivalent act or omission, would constitute an offence against the law of The Bahamas if it took place within The Bahamas or, in the case of an extra-territorial offence, in corresponding circumstances outside The Bahamas."

11.     Section 5(2) provides:

"Any offence constituted by an act, including an act taking place in The Bahamas that is of a kind over which Contracting States to an international Convention to which The Bahamas is a party are required by that Convention to establish jurisdiction is an extradition offence for the purposes of this Act and shall be deemed to be committed within the jurisdiction of any such Contracting State that appears to a court in The Bahamas having regard to the provisions of the Convention, to be appropriate."

12. Section 10 contains detailed provisions regulating proceedings for committal. These include:

"(5) Where an authority to proceed has been issued in respect of the person arrested and the court of committal is satisfied, after hearing any evidence tendered in support of the request for the extradition of that person or on behalf of that person, that the offence to which the authority relates is an extradition offence and is further satisfied –

(a) where the person is accused of the offence, that the evidence would be sufficient to warrant his trial for that offence if the offence had been committed in The Bahamas; or …

The court of committal shall … commit him to custody to await his extradition under this Act …

(7) If the court of committal refuses to make an order under subsection (5) in relation to a person in respect of the offence or, as the case may be, any of the offences to which the authority to proceed relates, the approved State seeking the surrender of that person to it may question the proceeding on the ground that it is wrong in law by applying to the court to state a case for the opinion of the Supreme Court on the question of law involved.

(8) If the approved State immediately informs the court of committal that it intends to make such an application, the court shall make an order providing for the detention of the person to whom the authority to proceed relates, or directing that he shall not be released except on bail."

13. Section 11 contains provisions regulating applications for habeas corpus. As originally enacted section 11(5) provided, so far as relevant:

"(5)    An appeal shall lie to the Court of Appeal against the refusal of an application made under subsection (1) for an order of habeas corpus …"

The position at that time was that subsection (5) provided only for an appeal against the refusal of an order for habeus corpus.  However, subsection (5) was amended to provide for an appeal against the granting of such an order by section 2 of the Extradition (Amendment) Act 2004 ("the 2004 Act").  In addition, subsections (6) and (7), which did not appear in the 1994 Act as originally enacted, were added by the 2004 Act.

14.    As so amended section 11 provides, so far as relevant, as follows:

"(5)  An appeal shall lie to the Court of Appeal in any proceedings upon application for habeas corpus under subsection (1) against an order for the release of the person restrained as well as against the refusal of such order …

(6)   An appeal under subsection (5) shall not affect the right of the person restrained to be discharged in pursuance of the order under appeal and to remain at large pending the determination of the appeal unless an order under subsection (7) is in force.

(7)  Notwithstanding subsection (6), in the case of an application to the Supreme Court for habeas corpus where the applicant would, but for the decision of the Court, be liable to be detained, and immediately after that decision the respondent gives notice that he intends to appeal, the Court may make an order providing for the detention of the applicant, or directing that he shall not be released except on bail so long as any appeal under this Act is pending."

15.    So far as relevant, section 12 provides that, "where a person is committed to await his extradition and is not discharged by order of the Supreme Court, the Minister may, by warrant, order him to be extradited to the approved State …".

*The jurisdiction issue*

16.    The question for decision is whether the Judicial Committee has jurisdiction to hear an appeal by the appellants against the dismissal by the Court of Appeal on 26 January 2010 of their appeal against an order granting a writ of habeas corpus and the consequent setting aside of the committal order.  In this discussion it is convenient to describe the appellants as "the detainer" and the respondent as "the detainee".  As stated above, the detainee was unconditionally discharged pursuant to the order of the

Court of Appeal. It is submitted on his behalf that the detainer had no right to challenge that decision by appeal to the Judicial Committee. The detainer relies principally upon the provisions of the Judicial Committee Acts 1833 and 1834 ("the 1833 Act" and "the 1834 Act" respectively). It cannot point to any specific Bahamian statute which expressly confers a right of appeal to the Judicial Committee by a detainer against an order granting a writ of habeas corpus.

17.     The power of the Judicial Committee to grant special leave to appeal was originally founded upon the royal prerogative. However, a number of decisions of the Judicial Committee have shown that it is no longer founded upon the royal prerogative itself but instead arises under section 3 of the 1833 Act and section 1 of the 1844 Act: see eg the very recent decision in *Dany Sylvie Marie v The Electoral Commissioner* [2011] UK PC 45, at paras 27 to 36 and the cases there cited, notably *Campbell v The Queen (Jamaica)* [2010] UKPC 26, [2011] 2 AC 79 at para 6 and *Walker v The Queen* [1994] 2 AC 36 at 44. The Board emphasised at para 31 the broad and unqualified language of those provisions of the 1833 and 1844 Acts and then considered to what extent a state can act to restrict the jurisdiction of the Judicial Committee.

18.     It concluded that the power to grant special leave will remain intact unless and until the relevant state enacts legislation which removes the power, either expressly or by "necessary intendment". The expression "necessary intendment" derives from a number of cases, notably *British Coal Corporation v The King* [1935] AC 500 at 519 and 522, *De Morgan v Director-General of Social Welfare* [1998] AC 275 at 284 and *Grant v The Queen* [2004] UKPC 27, [2004] 2 AC 550. In *Grant* the Board said at para 4 that express words were not required to limit or abolish the right to entertain such appeals and that it was enough if the statute shows "either expressly or by necessary intendment" that the power to entertain such appeals should be abolished.

19.     In the instant case it was submitted on behalf of the detainee that the Judicial Committee would never have entertained an appeal by a detainer against an order for the unconditional discharge of a person pursuant to a writ of habeas corpus, especially after he had in fact been unconditionally discharged pursuant to the order, whether pursuant to the royal prerogative or under the 1833 or 1844 Acts, and that the Judicial Committee never had jurisdiction to entertain such an appeal. It was further submitted that the 1994 Act, both in its original form and as amended in 2004, excluded such jurisdiction, either expressly or necessary intendment. It is both logical and convenient to consider these issues in that order. However, it appears to the Board that it would be sensible to begin with the position of habeas corpus at common law.

*Habeas corpus at common law*

20.    It is submitted on behalf of the detainer that habeas corpus is a creature of the common law and that, at common law, the detainer had no right to challenge a writ of habeas corpus in the absence of an express statutory decision conferring such a right.

21.    The prerogative writ of habeas corpus was a summary and final process. Historically, once discharged pursuant to a writ of habeas corpus, a detainee was entitled to his liberty and the legality of that discharge could not be brought into question: section 5 of the Habeas Corpus Act 1679.  The detainee relies upon the decision of the House of Lords in *Cox v Hakes* (1890) 15 App Cas 506 for the proposition that, at common law, where a person has been discharged under a writ of habeas corpus, in the absence of an express statutory provision, the Court of Appeal has no authority to entertain an appeal by the detainer.  The Board accepts that, by a majority of five to two, *Cox v Hakes* is indeed authority for that proposition: see in particular per Lord Halsbury LC at p 514 and 522, Lord Bramwell at p 525 and Lord Herschell at p 534.

22.    Section 19 of the Judicature Act 1873 was in wide terms.  It provided:

> "The said Court of Appeal shall have jurisdiction and power to hear and determine appeals from any judgment or order, save as hereinafter mentioned, of Her Majesty's High Court of Justice, or of any judges or judge thereof, subject to the provisions of this Act, and to such rules and orders of Court for regulating the terms and conditions on which such appeals shall be allowed, as may be made pursuant to this Act. For all the purposes of and incidental to the hearing and determination of any appeal within its jurisdiction, and the amendment, execution, and enforcement of any judgment or order, made on any such appeal, and for the purpose of every other authority expressly given to the Court of Appeal by this Act, the said Court of Appeal shall have all the power, authority, and jurisdiction by this Act vested in the High Court of Justice."

In *Cox v Hakes* the House of Lords held that section 19, although in very wide terms, was not in specific enough terms to confer jurisdiction on the Court of Appeal to entertain an appeal against an order of habeas corpus pursuant to which the detainee had been discharged.

23.    Some of the speeches stated the proposition in ringing terms.  So, for example, Lord Halsbury said this at the beginning of his speech at p 514:

"My Lords, probably no more important or serious question has ever come before your Lordships' house. For a period extending as far back as our legal history, the writ of habeas corpus has been regarded as one of the most important safeguards of the liberty of the subject. If upon the return to that writ it was adjudged that no legal ground was made to appear justifying detention, the consequence was immediate release from custody. If release was refused, a person detained might - see *Ex parte Partington* 13 M&W 679, 684 - make a fresh application to every Judge or every Court in turn, and each Court or Judge was bound to consider the question independently and not to be influenced by the previous decisions refusing discharge. If discharge followed, the legality of that discharge could never be brought in question. No writ of error or demurrer was allowed: *City of London's Case* 8 Rep 121b."

24.     Lord Herschell further stressed at pages 530 and 534 that, even if the Court of Appeal had had power to entertain an appeal, that could not, as he put it at page 534, "in any wise affect the discharge or restore to custody the person liberated". He said at p 534:

"And I cannot think that it was ever contemplated that an appeal should be entertained from any class of orders when that which was effected by them could never be effectually interfered with. The jurisdiction of the Courts whose functions were transferred to the High Court, to discharge under a writ of habeas corpus, was well known; and if it had been intended that an appeal should lie against such an order, I think that provision would have been made to enable the Court of Appeal to restore to custody the person erroneously discharged. In the absence of such a power the appeal is futile, and this appears to me to be a sufficient reason for holding that the Legislature did not intend the right to hear and determine appeals to extend to such cases."

25.     In *Secretary of State for Home Affairs v O'Brien* [1923] AC 603 the House of Lords (by a four to one majority) applied the principle in *Cox v Hakes* to a case in which the Divisional Court had granted an order absolute for the issue of a writ of habeas corpus but the respondent had not been discharged. In similarly ringing tones to those used by Lord Halsbury in *Cox v Hakes*, the Earl of Birkenhead (at pp 609-610) dismissed the Attorney General's appeal as incompetent notwithstanding the wide terms of section 3 of the Appellate Jurisdiction Act 1876, which provided that "an appeal shall lie to the House of Lords from any order or judgment" of, inter alia, the Court of Appeal, and notwithstanding the fact that the respondent had not been discharged. Of section 3, he said at p 610:

"It is certainly true that in terms the words are wide enough to give an appeal in such a matter as the present. But I should myself, if I approached the matter without the assistance of the authority at all, decline utterly to believe that a section couched in terms so general availed to deprive the subject of an ancient and universally recognized constitutional right."

He added that the matter was in fact covered by authority, namely *Cox v Hakes*, which the House applied in *O'Brien*.

26.     In these circumstances, the Board accepts the submission made on behalf of the detainee that before the Administration of Justice Act 1960 ("the AJA 1960") the detainer could not appeal against the discharge of a detainee pursuant to a writ of habeas corpus in a criminal matter.  Section 15(1) of the AJA 1960 provided, however, for an appeal

"in any proceedings upon application for habeas corpus, whether civil or criminal, against an order for the release of the person restrained as well as against the refusal of such an order."

An appeal from an order for release in a criminal matter by the High Court lay from the Divisional Court to the House of Lords and now lies to the Supreme Court. Interim provisions were made for detention or bail "so long as an appeal is … pending" under section 5(1) of the AJA 1960.  Nothing turns on them.

27.     The position at common law was thus that the detainer had no right of appeal to the Court of Appeal or House of Lords and that remained the position in England until section 15 of the AJA 1960 came into force.

*The Judicial Committee*

28.     The relevant provisions of section 3 of the 1833 Act and section 1 of the 1844 Act are in very wide terms.  Section 3 of the 1833 Act provides:

"All appeals or complaints in the nature of appeals whatever, which either by virtue of this Act, or of any law, statute, or custom, may be brought before His Majesty or His Majesty in Council from or in respect of the determination, sentence, rule, or order of any court, judge, or judicial officer, and all such appeals as are now pending and unheard, shall from and after the passing of this Act be referred by His Majesty to

the said Judicial Committee of his Privy Council, and such appeals, causes, and matters shall be heard by the said Judicial Committee, and a report or recommendation thereon shall be made to His Majesty in Council for his decision thereon as heretofore, in the same manner and form as has been heretofore the custom with respect to matters referred to by His Majesty to the whole of his Privy Council or a committee thereof (the nature of such report or recommendation being always stated in open court)."

Section 1 of the 1844 Act provides, inter alia:

"It shall be competent to Her Majesty, by any order or orders to be from time to time for that purpose made with the advice of her Privy Council, to provide for the admission of any appeal or appeals to Her Majesty in Council from any judgments, sentences, decrees or orders of any court of justice within any British colony or possession abroad, although such court shall not be a court of errors or a court of appeal within such colony or possession; and it shall also be competent to Her Majesty, by any such order or orders as aforesaid, to make all such provisions as to her Majesty in Council shall seem meet for the instituting and prosecuting any such appeals …"

29.    It is submitted on behalf of the detainer that the Judicial Committee has an unlimited jurisdiction to grant special leave in any case in which it is appropriate to do so on the facts of a particular case.  It is further submitted that the provisions of the 1833 and 1844 Acts are amply wide enough to confer such jurisdiction in respect of an appeal against an order ordering the discharge of a detainee in the Bahamas pursuant to an order of habeas corpus.  Moreover, it is submitted that that is so, whether the appeal to the Judicial Committee is directly from the Supreme Court or (as in this case) from the Court of Appeal on appeal from the Supreme Court.

30.    The detainer relies upon a number of cases as distinguishing the position in the Judicial Committee from the common law position set out in *Cox v Hakes*.  It was sought to draw this same distinction in the comparatively recent past in *The Attorney General for St Christopher and Nevis v Radionov* [2004] UK PC 34, [2004] 1 WLR 2796.  The detainer sought special leave to the Privy Council to challenge an order under habeas corpus for the release of the detainee.  The Board held that, on the true construction of a number of local statutory provisions, it had no jurisdiction to grant the Attorney General's application for special leave to appeal to the Privy Council.

31.    An alternative point had arisen in the course of the argument.  The detainee relies upon what Lord Bingham (giving the judgment of the Board) described at para

17 as "a second and independent argument: that as a matter of fundamental common law principle no appeal will lie by the Crown against an order for the discharge of an applicant for habeas corpus". He relies upon what Lord Bingham described as a formidable body of authority including *Cox v Hakes*, *O'Brien* and *Sharpe on The Law of Habeas Corpus*, 2nd ed (1989), pp 201 et passim. It is submitted that it was for that reason that it was necessary to amend the law as was done in England and Wales by section 15 of the AJA 1960.

32.      Lord Bingham described the position thus:

"To this argument the Attorney General responded that, however clearly the common law rule might have been established in England and Wales, no such clear-cut rule had been applied overseas. He was able to rely on the authority of *Sharpe,* p 206:

'The only exceptions to the rule that an order of release could not be appealed were child custody cases and appeals to the Privy Council. In child custody cases, the issue is that of the child's interest rather than personal liberty and for this reason, an order transferring custody was appealable. Colonial appeals to the Judicial Committee of the Privy Council are in the nature of a petition to the royal prerogative. They do not require legislative sanction and the decision in *Cox v Hakes* does not prevent the Privy Council from hearing an appeal against an order of release on habeas corpus.'

The Board was addressed on certain of the cases cited as authority for this paragraph, among them *King−Emperor v Deshpande* (1946) 115 LJPC 71; *King−Emperor v Banerji* (1945) LR 72 Ind App 241; *Attorney General for The Dominion of Canada v Fedorenko* [1911] AC 735 and *United States of America v Gaynor* [1905] AC 128. But none of these authorities is entirely free of difficulty and it may be, as Mr Fitzgerald argued, that they can be distinguished. Since the Board has felt constrained to accept that it has no jurisdiction on the first ground argued by Mr Fitzgerald, it is unnecessary to resolve this second issue, which would be better resolved in a case where the outcome depended on it."

Essentially the same argument as that advanced by the Attorney General is advanced on behalf of the detainer in this appeal. Some reliance is also placed upon *The Attorney General for Hong Kong v Kwok-a-Sing* (1873) LR 5 PC 179.

33.     The following submissions are made on behalf of the detainee to the effect that the cases relied upon on behalf of the detainer are distinguishable.

  i)      In neither *USA v Gaynor* [1905] AC 128 nor *Attorney General for the Dominion of Canada v Fedorenko* [1911] AC 735 (which was decided ex parte) was the issue of jurisdiction in relation to appeals against the grant of habeas corpus raised at all.

  ii)     In *King-Emperor v Vimlabai Deshpande* (1946) 115 LJPC 71, at 72, it is notable that the Board, although concluding that it had jurisdiction to entertain an appeal against the grant of habeas corpus by the High Court of Judicature at Nagpur, entertained the appeal on two conditions, one of which was to the effect that the detainee should not be re-arrested in respect of the matters to which the appeal related.  It is therefore doubtful that this case is authority against the constitutional principle governing the finality of habeas corpus.  In any event, the Board appears to have proceeded on the erroneous basis that the royal prerogative could only be expressly curtailed by the King in Parliament, whereas it had already been established that it could be curtailed expressly by any Act of the Imperial Parliament or of the Dominion or Colonial Parliament in question, or by implication: *British Coal Corporation v The King* [1935] AC 500.

  iii)    Finally, in *Emperor v Sibnath Banerji* (1945) 48 BOMLR 1, it seems that special leave was not in fact granted by the Judicial Committee; it was granted instead by the Federal Court of India under the relevant provision of the Government of India Act 1936.

  iv)     *Kwok-a-Sing* was distinguished in *Cox v Hakes*.

34.     There is force in those submissions, although it is true that there are some indications in the cases relied upon which appear to provide support for the proposition that the Judicial Committee had jurisdiction to hear appeals by a detainer from a grant of habeas corpus.  However, the Board has concluded that the cases should be distinguished on a broader basis.  None of them is a clear decision to the effect that the Judicial Committee had such a jurisdiction and, critically, none of them considers the question whether to permit such an appeal would be contrary to "the ancient and universally recognized constitutional right" laid down in such ringing tones by the House of Lords in *Cox v Hakes* and in *O'Brien*, at p 610.  The reasoning in those cases was not considered in any of the cases relied upon on behalf of the detainer.

35.     The Board concludes that it is likely that, if that constitutional principle had been relied upon, the Judicial Committee would have refused jurisdiction for essentially the same reasons as were given by the House of Lords in those cases.  The Board can see no reason why any different conclusion should be arrived at in the exercise of the royal prerogative from that which would result from and application of the common law.  The constitutional rights of the citizen, at least in this respect, should in principle be the same in both cases.  After all, the writ of *habeas corpus* itself had its origins in the royal prerogative: see eg *Habeas Corpus, from England to Empire*, Paul D Halliday, 2010 at pp 3, 13-18.

36.     None of the cases relied upon on behalf of the detainer relies upon the 1833 or 1844 Acts.  Yet, as explained above, the jurisdiction of the Judicial Committee does not now depend upon the royal prerogative but upon those two statutes.  Section 3 of the 1833 Act and section 1 of the 1844 Act are in very broad terms.  They are not, however, in any broader terms than section 19 of the Judicature Act 1873 or section 3 of the Appellate Jurisdiction Act 1876, which were considered in *Cox v Hakes* and *O'Brien* respectively.  In both cases the breadth of the language was held not to be sufficient to defeat the constitutional principle that a detainer is not entitled to appeal against an order of habeas corpus, save where the rights of the detainee are removed or altered by an express statutory provision, as was done in England and Wales by section 15 of the AJA 1960.

37.     The Board sees no reason why the same constitutional principle should not apply in the instant case.  Thus the Judicial Committee has no jurisdiction to entertain an appeal by a detainer against a grant of habeas corpus in the Bahamas unless jurisdiction is conferred by a provision of the Constitution of the Bahamas of a Bahamian statute.  As appears below, there is no such provision of either.

*The exclusion point*

38.     If the Board had concluded, contrary to the views expressed above, that section 3 of the 1833 Act and section 1 of the 1844 Act were broad enough to confer jurisdiction on the Judicial Committee to entertain an appeal by a detainer against an order granting habeas corpus, the question would arise whether that right was removed either expressly or by necessary intendment, either by the Constitution of the Bahamas or by a Bahamian statute.

39.     There is nothing in the Constitution of the Bahamas to confer jurisdiction on the Judicial Committee to entertain an appeal of this kind.  Chapter VII of the Constitution is entitled "THE JUDICATURE".  Part III of Chapter VII is entitled "APPEALS TO THE COURT OF APPEAL AND HER MAJESTY IN COUNCIL". Articles 104 and 105 provide, so far as relevant, as follows:

"104(1) An appeal to the Court of Appeal shall lie as of right from final decisions of the Supreme Court given in exercise of the jurisdiction conferred on the Supreme Court by Article 28 of this Constitution (which relates to the enforcement of fundamental rights and freedoms).

(2) An appeal shall lie as of right to the Judicial Committee of Her Majesty's Privy Council or to such other court as may be prescribed by Parliament under Article 105(3) of this Constitution from any decisions given by the Court of Appeal in any such case.

105(1) Parliament may provide for an appeal to lie from decisions of the Court of Appeal established by Part 2 of this Chapter to the Judicial Committee of Her Majesty's Privy Council or to such other court as may be prescribed by Parliament under this Article, either as of right or with the leave of the said Court of Appeal, in such cases other than those referred to in Article 104(2) of this Constitution as may be prescribed by Parliament.

(2) Nothing in this Constitution shall affect any right of Her Majesty to grant special leave to appeal from decisions such as are referred to in paragraph (1) of this Article.

(3) Parliament may by law provide for the functions required in this Chapter to be exercised by the Judicial Committee of Her Majesty's Privy Council to be exercised by any other court established for the purpose in substitution for the Judicial Committee."

40.     Parliament has not made provision for an appeal to the Judicial Committee under either Article 104(2) or Article 105(2). Article 105(2) is in very similar terms to section 81(5) of the Constitution of Mauritius, which was considered by the Board in paras 39 to 41 of the *Dany Sylvie Marie* case, where the Board noted that section 81(5) was almost identical to section 110(3) of the Jamaican Constitution. At para 40 the Board further noted that section 110(3) had previously been considered in both *Grant* and *Campbell* and at para 41, it added that both those cases confirmed that the purpose of section 81(5) of the Constitution of Mauritius was to make it clear that nothing in section 81 was intended to abrogate or modify the power of the Judicial Committee to grant special leave. However, it held that the section does not positively confer jurisdiction on the Judicial Committee to grant special leave. The position is precisely the same in the case of Article 105(2) of the Constitution of the Bahamas. It is expressed in negative terms and does not itself confer jurisdiction on the Judicial Committee. It follows that there is no provision of the Constitution which confers jurisdiction upon the Judicial Committee to grant special leave to a detainer to appeal in a case of this kind.

41.     There is, however, nothing in the Constitution that excludes such a jurisdiction if it otherwise exists. The Board turns to the 1994 Act. It is not suggested that any express right of appeal was given to the detainer by the 1994 Act as originally enacted

and the Board has not been referred to any other Bahamian statute that might be relevant other than the 1994 Act as amended. The Board has reached the clear conclusion that there is nothing in the amended Act to create a right of appeal to the Judicial Committee. However, it has reached the equally clear conclusion that the terms of the 1994 Act as amended are wholly inconsistent with the possibility of a further appeal by the detainer to the Judicial Committee.

42.    Section 11(5) for the first time provided for the possibility of an appeal by the detainer to the Court of Appeal. Subsections (6) and (7) are illuminating. Subsection (6) provides that, unless an order under subsection (7) is in force, the right of the detainee to be discharged under the order the subject of the appeal and his right to remain at large pending the determination of the appeal shall not be affected by the appeal. Subsection (6) thus recognises the underlying right of a person whose application for habeas corpus has succeeded to be discharged. It further recognises that, absent an order under subsection (7), such a person has a right to remain at large pending the determination of the appeal. That is a plain reference to the determination of the detainer's appeal by the Court of Appeal. Thus, in such circumstances, the subsection contemplates that, if the detainer's appeal fails, the detainee will be entitled to remain free. On the other hand, if the appeal succeeds, the order for habeas corpus will be set aside and the detainee will again be liable to detention. In those circumstances, section 12 would apply to him and the Minister could issue a warrant for him to be extradited to the approved State.

43.    Subsection (7) applies to a case where the detainee's application for habeas corpus succeeds and, where, but for that success, he would be liable to be detained. If, immediately after the order, the detainer gives notice that he intends to appeal, the Supreme Court has power to provide for his detention or to direct that he shall not be released except on bail so long as an appeal under the 1994 Act is pending. The effect is thus that pending the appeal the court may give one or other of those directions. Once the appeal has been heard, the position will be the same as that explained above with regard to subsection (6).

44.    The result is that, if the detainer's appeal fails, as here, the detainee is unconditionally entitled, either to remain free or, where a subsection (7) direction has been given, to be discharged. In that event section 12 cannot apply because the detainee will have been discharged by the Supreme Court.

45.    The Board is of the opinion that, in these circumstances, the possibility of a further appeal to the Judicial Committee by the detainer, brought for the purpose of detaining the detainee and extraditing him, is contrary, if not to the express provisions of the 1994 Act, then to its necessary intendment. It is plain that careful thought was given to the avenues of appeal to be available to the detainer. If Parliament had intended that, if its appeal to the Court of Appeal failed, the detainer should have a

further avenue of appeal to the Judicial Committee, it would have so provided. In the opinion of the Board, the fact that it was expressly provided by section 11(6) and (7) that in such a case the detainee is unconditionally entitled to remain free or be discharged, as the case may be, is strongly indicative of the fact that there was to be no further right of appeal. This conclusion is also supported by section 12.

46.     The Board is unable to accept the detainer's submission to the contrary. It is equally unable to accept the submission that it might be possible for the detainer to appeal directly from the order of the judge at first instance to the Judicial Committee. Such a direct appeal would be wholly inconsistent with the detailed provisions for an appeal by the detainer to the Court of Appeal.

47.     It follows that if, contrary to the view expressed above, the Judicial Committee might have had jurisdiction to entertain an appeal under the 1833 or 1844 Acts, any such jurisdiction is excluded by the terms of the 1994 act, as amended. For all these reasons, the Board has concluded that it has no jurisdiction to grant leave to appeal against the order of the Court of Appeal for the release of the respondent.

*The substantive issues*

48.     The question of jurisdiction was not ordered to be heard as a preliminary issue. The Board has, therefore, heard full argument on all the substantive grounds of appeal that the appellants have sought to raise. The question now arises whether it should say anything about these grounds of appeal. Where a question of jurisdiction is raised, it is not uncommon for a court, before deciding that question, also to hear argument on the substantive merits de bene esse. Where this happens, it may well be inappropriate for the court to say anything about the substantive merits if it concludes that it has no jurisdiction to do so. The conclusion that it reaches on the merits will, at most, have some persuasive value. But in some circumstances, where the court has heard full argument on the merits, there is real value in the court expressing its views on the issues, especially if the court is (or but for the jurisdictional point, would be) the final court of appeal. In the present case, there is a particular reason for the Board to express its view about some of the principal points of substance that have been raised. It is possible that the appellants will make a further request to the Minister for an ATP. If that occurs, it will be of assistance to the courts in The Bahamas to have the views of the Board on some of the issues that are likely to arise again.

49.     In the light of the limited purpose for which the Board has decided to express views on the merits, it has decided to be selective and consider (relatively briefly) only those issues where its views may be of assistance in the future. The issues on which it will express an opinion are: (i) whether counts 1 and 11 of the indictment charged the respondent with acts which would constitute offences against the law of

The Bahamas (as required by section 5(1)(b)(ii) of the 1994 Act); and (ii) whether the appellants were entitled in the habeas corpus proceedings to challenge, by way of seeking an alternative justification for the detention of the respondent (a) the Magistrate's ruling that the money-laundering conduct comprised in count 21 would not, when transposed, give rise to an extradition offence under section 5(1)(b)(ii) of the 1994 Act or (b) her ruling that she could not consider the transnational bribery offences as extradition offences under section 5(2).

Counts 1 and 11: section 5(1)(b)

50.     Mr Keith QC submits that the evidence accompanying the request failed to establish the existence of offences which satisfied the requirements of section 5(1)(b)(i) of the 1994 Act on the grounds that the alleged conduct gives rise to no US offence.  The Board prefers to express no view on this submission.  He also submits that the requirements of section 5(1)(b)(ii) were not satisfied because transnational bribery is not a substantive offence under Bahamian law and a conspiracy to commit a transnational bribery is not one either.  Section 462 of the Penal Code provides:

> "Whoever corrupts or attempts to corrupt any person in respect of any duties as a public officer or juror is guilty of a misdemeanour".

Section 89 provides:

> "(1) If two or more persons agree or act together with a common purpose in committing or abetting an offence whether with or without any previous concert or deliberation, each of them is guilty of conspiracy to commit or abet that offence as the case may be.
>
> (2)    A person within the jurisdiction of the courts can be guilty of conspiracy by agreeing with another person who is beyond the jurisdiction for the commission or abetment of any offence to be committed by them or either of them, or by any other person, either within or beyond the jurisdiction; and for the purposes of this subsection as to an offence to be committed beyond the jurisdiction, 'offence' means any act which, if done within the jurisdiction, would be an offence under this code or an offence punishable on conviction under any other law."

51.     Section 6 provides:

"In this Code 'public officer' means any person holding any of the following offices, or performing the duties thereof, whether as a deputy or otherwise, namely—

    (1) any civil office, including the office of Governor-General….;

    (2) any office to which a person is nominated or appointed by    statute or by public election;

    (3) any civil office….;

    (4) any office or arbitrator  or umpire in any proceeding or matter submitted to arbitration by order or with the sanction of any court;

    (5) any justice of the peace. "

52.    It is clear that all of the offices and officers mentioned in section 6 are Bahamian.  All the specified officers are Bahamian.  The statute referred to in subsection (2) is defined in section 4 as including any Act of Parliament of the United Kingdom "which applies to The Bahamas".  The court referred to in subsection (4) is defined in section 4 as Bahamian courts.  Mr Jones QC does not dispute any of this.  He relies on the fact that the offices listed in subsection (1) are "any civil office, including…" (emphasis added).  He submits that the list that follows the word "including" is not exhaustive and that the phrase "any civil office" should be given a broad meaning so as to include any foreign office.  The Board would reject this submission as did the Supreme Court and the Court of Appeal.  If it had been intended to include public officials outside the Bahamian jurisdiction, the statute would have said so.  The distinction between persons and acts within and outside the jurisdiction was well understood by the draftsman of the Penal Code: see, for example, sections 8 and 9 as well as 89(2).   As the Court of Appeal said (para 39), the matter is put beyond doubt by section 3 of the Interpretation and General Clauses Act 1976, which defines "public officer", unless the context otherwise requires, as meaning "any person holding a public office"; and "public office" as meaning "subject to the provisions of the Constitution, any office of emolument under the Crown in right of the Government of The Bahamas, whether such office be permanent or temporary."

53.    It follows that the offences charged in counts 1 and 11 are not extradition offences because they are constituted by acts which would not constitute offences against the law of The Bahamas if they took place within The Bahamas.  That is plain from the wording of section 462 (the substantive Bahamian offence) as well as section

89, because the "offence" referred to in both section 89(1) and (2) is a substantive offence contrary to Bahamian law.

*No alternative justification for detention*

*Money-laundering: count 21*

54.     It will be recalled that the Magistrate dismissed the money-laundering charges in both ATPs and declined to commit under section 5(2).  The second appellant did not challenge either of these decisions on the ground that they were wrong in law. They could have applied to the court to state a case for the opinion of the Supreme Court pursuant to section 10(7) of the 1994 Act, but they did not do so.  The Board accepts the submission of Mr Keith that extradition procedures must be strictly observed.  The appellants cannot make good their failure to invoke the statutory procedure for challenging a refusal by the Magistrate to make an order under section 10(5) committing the respondent to custody to await his extradition by raising the issue during habeas corpus proceedings.

55.     That is a sufficient reason for holding (as the Supreme Court held) that the appellants could not pursue the issue of the money-laundering offences in the habeas corpus proceedings.  It is, therefore, unnecessary to address the argument raised by Mr Keith that the Magistrate was right to dismiss the money-laundering charges in both ATPs.  Suffice it to say that the basis for this argument is the fact that, although the allegation was that the respondent conspired to transport legitimate funds invested by US investors from the US to a place outside the US with intent to promote the carrying on of an unlawful activity, this does not give rise to an offence under section 9 of the Bahamian Money Laundering (Proceeds of Crime) Act 1996.  Section 9 provides that a person is guilty of an offence if he "uses, transfers the proceeds of, sends…..or otherwise deals with…..any property….with intent to conceal or convert that property….and knowing that all or part of that property…..was obtained or derived ….as a result of" the commission of a specified offence.  Mr Keith submits that there is no evidence that the monies invested by the US investors were themselves the proceeds of crime.  They had legitimate origins, and the fact that they were subsequently said to be used to further a crime is not relevant.  The Board finds this submission persuasive, but it is unnecessary to express a concluded view on it.

*Section 5(2)*

56.     The appellants sought to rely on section 5(2) before the Magistrate.  The argument was that the conduct alleged against the respondent had been criminalised by Article VIII of the Inter-American Convention against Corruption ("IACC") which is headed "Transnational Bribery" and provides:

"Subject to its Constitution and the fundamental principles of its legal system, each State Party shall prohibit and punish the offering or granting, directly or indirectly, by its nationals, persons having their habitual residence in its territory, and businesses domiciled there, to a government official of another State, of any article of monetary value, or other benefit, such as a gift, favour, promise or advantage, in connection with any economic or commercial transaction in exchange for any act or omission in the performance of that official's public functions."

57.     The Magistrate, Isaacs J and the Court of Appeal all rejected the appellants' argument on the grounds that no offences within the purview of section 5(2) were specified in either of the ATPs.  Indeed, the ATPs expressly referred to "offences provided for by the extradition treaty with the United States of America" and not offences provided for in an international convention to which The Bahamas was a party.  Mr Keith submits that the ATP forms the basis of the jurisdiction of the Magistrate and identifies the offences which the Magistrate has jurisdiction to investigate.  It is worth repeating section 10(5) of the 1994 Act is of central importance here.  It provides:

> "Where an authority to proceed has been issued in respect of the person arrested and the court of committal is satisfied, after hearing any evidence tendered in support of the request for the extradition of that person or on behalf of that person, *that the offence to which the authority relates is an extradition offence* and is further satisfied—
>
> ……………
>
> the court of committal shall………commit him to custody to await his extradition under this Act……." (emphasis added).

58.     The words that have been italicised clearly show that the ATP must refer to the offence that is said to constitute the extradition offence.  That it should be required to do so is hardly surprising, since it enables the fugitive to know the case against him: see, for example, *Government of Canada v Aronson* [1990] 1 AC 579, 594D per Lord Griffiths.  To permit the requesting state to rely on alleged offences that have not been specified in the ATP is contrary to the fundamental principle that any use of procedures that exist for depriving a person of his liberty must be carefully scrutinised.

59.     The Board is, therefore, of the view that the Magistrate, Isaacs J and the Court of Appeal were right.

60.     Mr Keith has advanced other reasons for holding that reliance on the IACC was misconceived.  In summary, these are: (i) the conduct occurred prior to The Bahamas ratifying the IACC on 13 April 2000; (ii) the IACC is not retroactive; and (iii) the alleged offences fall outside the scope of Article IV of the IACC.  The Board finds these reasons persuasive, but does not find it necessary to express a concluded view about them.

61.     Mr Jones submits that by virtue of Article XIX the IACC has retroactive effect. Article XIX provides:

> "Subject to the constitutional principles and the domestic laws of each State and existing treaties between the States Parties, the fact that the alleged act of corruption was committed before this Convention entered into force shall not preclude procedural co-operation in criminal matters between the States Parties.  This provision shall in no case affect the principle of non-retroactivity in criminal law…."

62.     But as Mr Keith points out, the reference to "procedural co-operation" is a reference to "Assistance and Co-operation" in Article XIV, rather than to extradition, which is addressed separately in Article XIII.  This is put beyond doubt by para 4 of the Rapporteur's report into the travaux preparatoires of the Convention which states in relation to the text of Article XIV: "the term 'international co-operation on criminal matters' did not include extradition or coercive co-operation measures".

63.     Conduct cannot, therefore, amount to an "extradition crime" under section 5(2) of the 1994 Act if it took place before the relevant Convention came into force. The subsection does not permit extradition in relation to conduct that was not criminalised by the Convention at that time.  The IACC cannot be relied on in the present case because the alleged conduct occurred before it came into force for The Bahamas.

64.     Furthermore, the alleged conduct falls outside the scope of Article IV of the IACC which provides: "This Convention is applicable provided that the alleged act of corruption has been committed or has effects in a State Party."  The conduct alleged against the respondent occurred either in Azerbaijan (not a state Party to the IACC) or the US (not a State Party at the time, since the second appellant did not deposit the instrument of ratification until 29 September 2000).

*Overall conclusion*

65.     It is not appropriate for the Board to discuss the issues in detail or indeed to say any more about them.   For the reasons given earlier, it has no jurisdiction to entertain this appeal.  It follows that the Board will humbly advise Her Majesty that the appeal be dismissed for want of jurisdiction.

66.     The parties will have twenty-eight days in which to lodge written submissions about the order to be made for the costs of the proceedings before the Board.