# Exhibit E

[PRIVY COUNCIL]

WERNER KURT REY . . . . . . . APPELLANT

AND

GOVERNMENT OF SWITZERLAND AND ANOTHER . . RESPONDENTS

[APPEAL FROM THE COURT OF APPEAL OF THE
COMMONWEALTH OF THE BAHAMAS]

1998  March 16, 17, 18, 19, 23;    Lord Goff of Chieveley, Lord Slynn of Hadley,
April 2                          Lord Steyn, Lord Hope of Craighead
and Lord Clyde

*Bahamas, The—Extradition—Committal proceedings—Applicant charged
with criminal offences in Switzerland—Whether accused of extradition
offences—Whether liable to extradition under Bahamian statute—
Whether magistrates under duty to give reasons—Whether unjust or
oppressive to extradite applicant—Extradition Act 1994 (No. 8 of
1994), ss. 5(1)(b)(ii), 6, 10(5), 11(3)*

The applicant was charged in Switzerland with commercial fraud, falsification of accounts and bankruptcy offences and he absconded to The Bahamas. Warrants for his arrest were issued in Switzerland and, since section 6 of the Extradition Act 1994[1] provided that a person found in The Bahamas who was accused of an extradition offence in any approved state was liable to extradition, a request for the extradition of the applicant was made by the Government of Switzerland. The Minister of Foreign Affairs granted authority under section 8 for extradition proceedings against the applicant to proceed, and he was arrested and remanded in custody. Subsequently further warrants for his arrest were issued in Switzerland, and in The Bahamas under section 8 two further authorities to proceed were granted. After hearing evidence given on behalf of the government and the applicant the magistrate, being satisfied in accordance with section 10(5) that the offences to which the authorities to proceed related were extradition offences within the meaning of section 5(1)(*b*)(ii) and that the evidence would be sufficient to warrant the applicant's trial for those offences if they had been committed in The Bahamas, committed him to custody to await his extradition. Pursuant to section 11(1) he applied to the Supreme Court of The Bahamas for habeas corpus. The judge dismissed the application holding, inter alia, that the applicant was not entitled to be discharged under section 11(3) on the ground that it would be

---

[1] Extradition Act 1994, s. 5(1)(*b*)(ii): see post, p. 63F–G.
S. 6: "Subject to this Act, a person found in The Bahamas who is accused of an extradition offence in any approved state ... may be arrested and returned to that state as provided by this Act."
S. 10(5): "Where an authority to proceed has been issued ... and the court of committal is satisfied ... that the offence to which the authority relates is an extradition offence and is further satisfied—(*a*) where the person is accused of the offence, that the evidence would be sufficient to warrant his trial for that offence if the offence had been committed in The Bahamas ... the court of committal shall ... commit him to custody to await his extradition under this Act ..."
S. 11(3): see post, pp. 67G–68A.

A  unjust or oppressive to extradite him. The Court of Appeal dismissed the applicant's appeal.

On the applicant's appeal to the Judicial Committee:—

*Held*, dismissing the appeal, (1) that in The Bahamas extradition was governed by the Extradition Act 1994, and so a request for extradition had to be considered exclusively in accordance with the provisions of that Act; that the applicant was an "accused" person within the meaning of section 6 and was
B  therefore a person liable to extradition under the Act of 1994; that section 5(1)(*b*)(ii) of the Act of 1994 imposed a broad conduct-based test, which was satisfied if what the accused had done in the treaty state would be an offence in The Bahamas had it been done there, and the ingredients of the offence in the law of the treaty state did not have to correspond with the ingredients of a Bahamian offence; and that, therefore, the applicant was accused
C  of extradition offences within the Act of 1994 (post, pp. 62B, 63C, H–64A, 65E).

*Government of Canada v. Aronson* [1990] 1 A.C. 579, H.L.(E.) distinguished.

(2) That there was no general duty on magistrates in extradition cases to give reasons in relation to all disputed issues of fact and law and in the proceedings for the extradition of the
D  applicant the principle of fairness did not require the magistrate to give reasons on all the contested issues; and that neither the magistrate's failure to give reasons with regard to disputed issues of fact nor the issue of three separate warrants to proceed had rendered the extradition proceedings unlawful (post, pp. 65F–G, 66G–H, 67A).

Dicta of Lord Donaldson M.R. in *Reg v. Civil Service Appeal Board, Ex parte Cunningham* [1992] I.C.R. 816, 825–826, C.A. and
E  of Lord Mustill in *Reg. v. Secretary of State for the Home Department, Ex parte Doody* [1994] 1 A.C. 531, 564, H.L.(E.) applied.

(3) That, since the Government of Switzerland had not deliberately deceived the authorities in The Bahamas as to the gravity of some of the charges against the applicant but had made the accusation against him in good faith in the interests of justice,
F  in all the circumstances it was not unjust or oppressive within section 11(3) for him to be extradited to Switzerland; and that, accordingly, the order committing the applicant to custody to await his extradition had properly been made (post, pp. 68C–D, F–G).

*Per curiam.* Authorities to proceed can properly be issued by the Minister of Foreign Affairs under section 8 of the Extradition Act 1994 and do not have to be signed by the Governor-General
G  (post, p. 61F–G).

*Quaere.* Whether in the great diversity of cases which come before magistrates in extradition proceedings the principle of fairness may in particular circumstances require a magistrate to give reasons (post, pp. 66H–67A).

Decision of the Court of Appeal of the Commonwealth of The Bahamas affirmed.

H

The following cases are referred to in the judgment of their Lordships:

*Canada (Government of) v. Aronson*, The Times, 24 December 1988, D.C.; [1990] 1 A.C. 579; [1989] 3 W.L.R. 436; [1989] 2 All E.R. 1025, H.L.(E.)

*Reg. v. Civil Service Appeal Board, Ex parte Cunningham* [1992] I.C.R. 816; [1991] 4 All E.R. 310, C.A.

*Reg. v. Governor of Ashford Remand Centre, Ex parte Postlethwaite* [1988] A.C. 924; [1987] 3 W.L.R. 365; [1987] 2 All E.R. 985, H.L.(E.)

*Reg. v. Secretary of State for the Home Department, Ex parte Doody* [1994] 1 A.C. 531; [1993] 3 W.L.R. 154; [1993] 3 All E.R. 92, H.L.(E.)

The following additional cases were cited in argument:

*City Equitable Fire Insurance Co. Ltd., In re* [1925] Ch. 407, C.A.

*Commonwealth of Australia v. Riley* (1984) 57 A.L.R. 249

*de Lasala v. de Lasala* [1980] A.C. 546; [1979] 3 W.L.R. 390; [1979] 2 All E.R. 1146, P.C.

*Hussien v. Chong Fook Kam* [1970] A.C. 942; [1970] 2 W.L.R. 441; [1969] 3 All E.R. 1626, P.C.

*Narain v. Director of Public Prosecutions* (unreported), 9 February 1987, Federal Court of Australia, New South Wales Registry, General Division

*Nielsen, In re* (1983) 79 Cr.App.R. 1, D.C.; [1984] A.C. 606; [1984] 2 W.L.R. 737; [1984] 2 All E.R. 81, H.L.(E.)

*Osman, In re* (unreported), 20 June 1990, D.C.

*Reg. v. Director of Public Prosecutions, Ex parte C.* [1995] 1 Cr.App.R. 136, D.C.

*Reg. v. Governor of Brixton Prison, Ex parte Armah* [1968] A.C. 192; [1966] 3 W.L.R. 828; [1966] 3 All E.R. 177, H.L.(E.)

*Reg. v. Governor of Brixton Prison, Ex parte Gardner* [1968] 2 Q.B. 399; [1968] 2 W.L.R. 512; [1968] 1 All E.R. 636, D.C.

*Reg. v. Governor of Pentonville Prison, Ex parte Osman* [1990] 1 W.L.R. 277; [1989] 3 All E.R. 701, D.C.

*Reg. v. Governor of Pentonville Prison, Ex parte Osman (No. 3)* [1990] 1 W.L.R. 878; [1990] 1 All E.R. 999, D.C.

*Reg v. Governor of Pentonville Prison, Ex parte Sinclair* [1991] 2 A.C. 64; [1991] 2 W.L.R. 1028; [1991] 2 All E.R. 366, H.L.(E.)

*Reg. v. Oldham Justices, Ex parte Cawley* [1997] Q.B. 1; [1996] 2 W.L.R. 681; [1996] 1 All E.R. 464, D.C.

*Reg. v. Secretary of State for the Home Department, Ex parte Hill* [1997] 2 All E.R. 638, D.C.

*Rex v. Governor of Brixton Prison, Ex parte Mehamed Ben Romdan* [1912] 3 K.B. 190, D.C.

*Rex v. Governor of Lewes Prison, Ex parte Doyle* [1917] 2 K.B. 254, D.C.

*Rex v. Kylsant (Lord)* [1932] 1 K.B. 442, C.C.A.

*United States of America (Government of the) v. Bowe* [1990] 1 A.C. 500; [1989] 3 W.L.R. 1256; [1989] 3 All E.R. 315, P.C.

*Williams (Kervin) v. The Queen* [1997] A.C. 624; [1997] 2 W.L.R. 910, P.C.

*Zoeller v. Federal Republic of Germany* (1989) 91 A.L.R. 341

APPEAL (No. 1 of 1998) with leave of the Court of Appeal of the Commonwealth of The Bahamas, by the applicant, Werner Kurt Rey, from the judgment of the Court of Appeal (Gonsalves-Sabola P., Carey and Hall JJ.A.) given on 31 October 1997 dismissing his appeal from the judgment of Strachan J. delivered on 21 March 1997 in the Supreme Court (Common Law Side), whereby he had refused the applicant a writ of habeas corpus ad subjiciendum in proceedings against the Government of Switzerland and the Superintendent of Her Majesty's Prison. The applicant had sought habeas corpus in respect of his committal on 16 September

A    1996 by the New Providence Stipendiary and Circuit Magistrate, Carolita Bethell, to custody to await extradition from The Bahamas to Switzerland.

The facts are stated in the judgment of their Lordships.

*Alun Jones Q.C., Philip Davis* (of the Bahamian Bar), *Elspeth Talbot Rice* and *Jewel Major* (of the Bahamian Bar) for the applicant. The authorities to proceed were invalid because they were not issued by the Governor-General of The Bahamas as required by the extradition treaties and agreements between The Bahamas and Switzerland.

*Clive Nicholls Q.C.* for the Government of Switzerland and the superintendent, intervening. The applicant should not be allowed to take this point for the first time now as it could have been taken earlier.

[LORD GOFF OF CHIEVELEY. Their Lordships are not minded to hear this point.]

*Jones Q.C.* The applicant was not "angeklagt," i.e., charged, under Swiss law, within the meaning of article I of the Treaty of 1880 between the United Kingdom and Switzerland as applied to The Bahamas. [Reference was made also to article VI; sections 2, 4, 17 of the Extradition Act 1870 (33 & 34 Vict. c. 52) and articles I, III of the Treaty of 1874 between the United Kingdom and Switzerland.] A person can be "angeklagt," only at the close of the preliminary investigations. The equivalent meaning in English law of "angeklagt" is "indicted" or "arraigned." Under the Treaty only persons who have been "angeklagt" can be extradited. In construing the Treaty of 1880 regard must be had to both versions of it: see *In re Nielsen* (1983) 79 Cr.App.R. 1. [Reference was also made to *Hussien v. Chong Fook Kam* [1970] A.C. 942.] Since it has not been modified by the minister pursuant to section 4 of the Extradition Act 1994, the Treaty continues to apply with full force.

The warrant for the applicant's detention contained three patent errors justifying the grant of habeas corpus. (1) It failed to state any statutory basis for the detention. (2) It recited the incongruity that the applicant was accused in Switzerland of having committed crimes against the law of The Bahamas. (3) It recited that the applicant was in custody because he failed to discharge a burden to show "cause." [Reference was made to *Government of Canada v. Aronson* [1990] 1 A.C. 579; *Government of the United States of America v. Bowe* [1990] 1 A.C. 500; *Reg. v. Director of Public Prosecutions, Ex parte C.* [1995] 1 Cr.App.R. 13; *Reg. v. Oldham Justices, Ex parte Cawley* [1997] Q.B. 1 and *Rex v. Governor of Lewes Prison, Ex parte Doyle* [1917] 2 K.B. 254.]

The warrant was also invalid because the minister had no jurisdiction to issue the three mutually inconsistent authorities to proceed. If he is returned to Switzerland the applicant will not know on what charges he is being extradited, and it will not be possible to enforce the specialty rule. Further, the request for extradition was made in bad faith so as to mislead the minister and the courts in relation to the charges, and the applicant should be discharged under section 11(3) of the Extradition Act 1994. In any event, there was insufficient evidence to commit the applicant for trial had the alleged offences been committed in The Bahamas and, therefore, insufficient evidence on which to extradite him: see section 5(1)(*b*)(ii) of the Extradition Act 1994. [Reference was also made to sections 58 and 371

of the Penal Code (Statute Law of The Bahamas, 1987 rev., c. 77); section 19 of the Theft Act 1968; *Rex v. Kylsant (Lord)* [1932] 1 K.B. 442; *Reg. v. Civil Service Appeal Board, Ex parte Cunningham* [1992] I.C.R. 816; articles II, VIII and X of the Treaty of 1880; sections 3(1)(2) and 10 of the Extradition Act 1870 and Schedules 1 and 2; sections 2, 5 and 9 of the Fugitive Offenders Act 1881 (44 & 45 Vict. c. 69); sections 1 to 8 of the Fugitive Offenders Act 1967; sections 2(1), 6(4) and 7(2) of the Extradition Act 1989; sections 5(1)(3), 8(3) and 10(5) of the Bahamian Extradition Act 1994; *In re Nielsen* [1984] A.C. 606; *Government of Canada v. Aronson* [1990] 1 A.C. 579; articles 2 and 8 of the Extradition Treaty 1990 between The Bahamas and the United States of America; sections 5 and 8 of the Jamaican Extradition Act (No. 7 of 1991); *Reg. v. Governor of Brixton Prison, Ex parte Gardner* [1968] 2 Q.B. 399; *Reg. v. Governor of Pentonville Prison, Ex parte Osman* [1990] 1 W.L.R. 277 and *Reg. v. Governor of Brixton Prison, Ex parte Armah* [1968] A.C. 192].

The Bahamian Act of 1994 is in all important respects in pari materia to the United Kingdom Fugitive Offenders Act 1967. Accordingly, section 5 of the Act of 1994 should be given the same meaning as was given to the similarly worded section 3(1)(c) of the Act of 1967 in *Aronson's* case [1990] 1 A.C. 579. The Judicial Committee should approach a decision of the House of Lords on similar legislation as if it was binding: see *de Lasala v. de Lasala* [1980] A.C. 546.

*Davis*, following, referred to *In re City Equitable Fire Insurance Co. Ltd.* [1925] Ch. 407.

*Clive Nicholls Q.C., Clare Montgomery Q.C.* and *James Lewis* for the Government of Switzerland and the superintendent. The meaning of "extradition offence" in section 5(1)(b)(ii) of the Act of 1994 must be sought without reference to the earlier legislation or case law. *Government of Canada v. Aronson,* The Times, 24 December 1988; [1990] 1 A.C. 579 was concerned with a different Act. The words "act or omission constituting the offence" are to be understood in a popular, non-legal sense, as referring, not to the ingredients or elements of the offence, but to the conduct of the fugitive. [Reference was made to the Treaty of 1990 between The Bahamas and the United States of America; *Reg v. Governor of Pentonville Prison, Ex parte Sinclair* [1991] 2 A.C. 64; Report of an Interdepartmental Working Party of the Criminal Justice Department of the Home Office, A Review of the Law and Practice of Extradition in the United Kingdom (May 1982), pp. 10, 93; the Secretary of State for the Home Department's Report on Extradition (February 1985) (Cmnd. 9421), pp. 9, 21; the Secretary of State for the Home Department's Criminal Justice, Plans for Legislation (March 1986) (Cmnd. 9658), p. 21, para. 51; Schedule 1 to the European Convention on Extradition Order 1990 (S.I. 1990 No. 1507); *Reg. v. Secretary of State for the Home Department, Ex parte Hill* [1997] 2 All E.R. 638; *Zoeller v. Federal Republic of Germany* (1989) 91 A.L.R. 341; *Reg. v. Governor of Brixton Prison, Ex parte Armah* [1968] A.C. 192 and *Reg. v. Governor of Pentonville Prison, Ex parte Osman (No. 3)* [1990] 1 W.L.R. 878.]

The minister was entitled to issue all three authorities to proceed under section 8 of the Act of 1994. The magistrate therefore properly committed the applicant on all of them.

The applicant is liable to be extradited since he was "accused" within the meaning of section 6 of the Act of 1994. The Act is a complete code governing extradition from The Bahamas to Switzerland. In determining whether a person is liable to be extradited it is unnecessary to have regard to the Treaty of 1880. Even if the Treaty applies, the applicant is liable to be extradited since he was "charged" within the meaning of the Treaty. The English version of the Treaty governs extradition from The Bahamas to Switzerland. [Reference was made to *Rex v. Governor of Brixton Prison, Ex parte Mehamed Ben Romdan* [1912] 3 K.B. 190 and *In re Nielsen* [1984] A.C. 606.]

In applying the conduct test the magistrate applied the proper test. The authorities to proceed satisfy both the conduct and the ingredients tests. If the conduct test applies, the first authority to proceed is sufficient, as it recites Bahamian offences, and the second and third authorities to proceed are only of academic interest. The warrant of commitment is sufficiently certain for the specialty rule to be effective. On the other hand, if the ingredients test applies, the warrant of commitment should be amended by deletion of the references to the Bahamian offences and substitution of the Swiss offences set out in the second and third authorities to proceed. The warrant would then create the necessary certainty for the specialty rule to be effective.

*Montgomery Q.C.* following. The ruling of the magistrate was found to be adequate by the Court of Appeal and, therefore, should be respected: see *Williams (Kervin) v. The Queen* [1997] A.C. 624.

To succeed under section 11(3) of the Extradition Act 1994 the applicant must prove that it is unjust or oppressive to extradite him because the accusation against him is not made in good faith: see *Narain v. Director of Public Prosecutions* (unreported), 9 February 1987, Federal Court of Australia, New South Wales Registry, General Division. [Reference was also made to *In re Osman* (unreported), 20 June 1990.] There is no evidence of injustice or oppression flowing from any bad faith.

*Jones Q.C.* in reply. Existing Caribbean and wider Commonwealth legislation gave a spread of models to The Bahamas, covering the range of possibilities between the 1870 and 1967 schemes. [Reference was made to *Commonwealth of Australia v. Riley* (1984) 57 A.L.R. 249.]

*Cur. adv. vult.*

2 April. The judgment of their Lordships was delivered by LORD STEYN.

This appeal concerns an order committing the applicant, Mr. Werner Rey, to custody to await extradition from The Bahamas to Switzerland which was made by a stipendiary magistrate under section 10(5) of the Extradition Act 1994 (No. 8 of 1994). Strachan J. refused an application for habeas corpus. The Court of Appeal dismissed an appeal. With the leave of the Court of Appeal the applicant now appeals to Her Majesty in Council.

*An outline of the offences alleged against the applicant*

Until 1990 the applicant was a prominent businessman in Switzerland. He had numerous corporate and other interests. By 1991 the applicant's

companies were in dire financial trouble. In September 1991 the applicant was formally declared bankrupt in Switzerland. The collapse of the applicant's business was headline news in the Swiss media. The Swiss authorities started to investigate whether the applicant had committed criminal offences. The outcome of those investigations was charges against the applicant of commercial fraud, falsification of accounts and concealment of assets to the detriment of his creditors.

The context of the criminal charges against the applicant can be stated briefly. The applicant was the beneficial owner of Inspectorate S.A. In 1985, with a view to the issue and sale of the shares in Inspectorate, the company entered into an agreement with a consortium of banks to underwrite the sale of the shares. The banks bought the shares before trading them on the open market. The firm of accountants Deloitte, Haskins and Sells carried out a statutory audit of the accounts of Inspectorate. In order to present a more attractive set of accounts the applicant caused substantial funds to be injected into Inspectorate which were presented in the accounts as ordinary trading income. The accounts therefore did not present a true and fair view of the profitability of Inspectorate. In this way the applicant misled the auditors, and the banks. The charges of fraud and falsification of documents flowing from these events can be described as "the Inspectorate charges."

In 1986 the applicant, as chairman and chief executive of Omni Holding A.G. ("OHAG"), obtained a syndicated loan from 12 banks to refinance OHAG after its purchase of a substantial part of the applicant's shareholding in Inspectorate. The merchant bank Merrill Lynch International Capital Markets acted as agents in the negotiations. The problem was that OHAG had made heavy losses in the first nine months of 1986. The applicant deceived the agents, and thus the banks, by means of falsely rewritten accounts which presented an untrue picture of OHAG's financial position. The charges of fraud and falsification based on these events can be described as "the OHAG charges."

Finally, the Swiss authorities alleged that at the date of his bankruptcy the applicant owned substantial assets which he concealed and misappropriated. These assets were the so-called "Simkins receivable," the applicant's interest in Anglo-Bahamian Bank and his beneficial interest in claims of Semifora A.G. against certain debtors. These charges can be described as "the bankruptcy charges."

*The applicant absconds to The Bahamas*

In April 1992 the Swiss authorities issued a warrant for the arrest of the applicant. Some time between April and September 1992 the applicant absconded to The Bahamas. In September 1992, at the request of the Swiss Government the police arrested the applicant in The Bahamas. The Swiss authorities set in motion steps to obtain the extradition of the applicant. In 1994, and acting on the legal advice of English Queen's Counsel, the Swiss prosecuting authorities announced the abandonment of extradition proceedings. Further investigation and consideration led to the present attempt by the Swiss Government in 1996 to extradite the applicant from The Bahamas to Switzerland.

A  *The request for extradition*

At the beginning of March 1996 and in Switzerland a special examining magistrate for the Canton of Berne issued three warrants for arrest in respect of the applicant. The three warrants dealt separately with the Inspectorate charges, the OHAG charges and the bankruptcy charges. Each warrant directed that the applicant should "be arrested and brought before the undersigned extraordinary special examining magistrate." On 18 March 1996 the Government of Switzerland submitted a request for the extradition of the applicant to the authorities in The Bahamas. On 25 March 1996 the Minister of Foreign Affairs of The Bahamas granted authority under section 8 of the Act of 1994 for extradition proceedings to proceed against the applicant. On the next day a magistrate in The Bahamas issued a warrant for the arrest of the applicant and he was duly remanded in custody. In the period 24 May 1996 to 9 July 1996 the Swiss authorities issued further warrants for arrest in respect of the applicant, and ministers in The Bahamas granted two further authorities to proceed under section 8 of the Extradition Act 1994.

*The hearing before the stipendiary magistrate*

Under section 10(1) of the Act of 1994 a hearing at which both sides were represented by counsel took place before a stipendiary magistrate sitting in Nassau. On 16 September 1996 she committed the applicant to custody to await his extradition.

*The hearings before Strachan J. and the Court of Appeal*

Under section 11(1) of the Act of 1994 the applicant had a right to make an application for habeas corpus. The applicant exercised that right. Strachan J. refused the application. He gave a detailed judgment.

The applicant appealed to the Court of Appeal. In three separate concurring judgments Gonsalves-Sabola P., Carey and Hall JJ.A. dismissed the appeal.

*The issues*

On the present appeal counsel for the applicant wished to take an entirely new point, namely that the three authorities to proceed were not signed by the Governor-General "as required by the extradition treaties and agreements between The Bahamas and Switzerland." Taking into account written argument in support of this contention, as well as rival oral arguments as to whether the point could be taken, their Lordships ruled that it was much too late to entertain the new argument and, in any event, that the point was bound to fail.

In these circumstances the issues to be examined can conveniently be divided as follows: (1) whether the applicant is a person liable to be extradited under the Act of 1994; (2) the true meaning of an "extradition offence" in section 5(1)(*b*)(ii) of the Act of 1994 and whether the applicant is accused of extradition offences; (3) whether the proceedings based on three separate authorities to proceed were irregular and unlawful; (4) whether the evidence in support of the request for extradition would be sufficient to warrant the applicant's trial if the offence had been

committed in The Bahamas; (5) whether the magistrate's reasons were sufficient in law; (6) whether the form and content of the warrant of commitment disclosed a lawful basis for the detention of the applicant; (7) whether the applicant ought to be discharged because it would be unjust and oppressive to return him under section 11(3) of the Act of 1994.

*Issue 1: "Accused" person*

Section 6 of the Act of 1994 renders liable to extradition a person who is "accused" of an extradition offence. Given the terms of the warrants of arrest issued in Switzerland, it is plain that the applicant is an "accused" person within the meaning of section 6 of the Act of 1994. This is conceded on behalf of the applicant.

Counsel for the applicant founded his argument on the German language version of the Treaty of 1880 between the United Kingdom and Switzerland. The English language version of the Treaty refers interchangeably in its preamble and substantive provisions to persons "charged" and "accused." The applicant is a person "charged" or "accused" in accordance with the English version of the Treaty. But counsel argued that the German version of the Treaty imposes a higher threshold: it requires something more than that the person is "accused" or "charged" with offences. In spelling out the purpose of the Treaty in its preamble the German version uses the term "beschuldigt." Counsel for the applicant acknowledged that this word means "accused." So far the two texts are therefore in line. But counsel for the applicant points out that in articles I and VI the German text uses the term "angeklagt" which he argued conveys "something like an indictment in the English sense." He argued that as used in the Treaty "angeklagt" is a term of art.

The foundation of this argument based on the use of the word "angeklagt" is fragile. Divorced from the specific context of this Treaty of 1880 "angeklagt" no doubt means something more than "beschuldigt." But in the context of a Treaty containing reciprocal extradition arrangements it is impossible to treat the word "angeklagt" as a term of art. That is demonstrated by the use of "beschuldigt" in the preamble. Following counsel's invitation to look at the texts in both languages their Lordships also have to observe that the English text shows that the words "charged" and "accused" are not terms of art. It is therefore implausible to suggest that "angeklagt" is a term of art. Taking into account the English language version, as well as the word "beschuldigt" in the preamble, the meaning of the two language versions can be reconciled. Moreover it would be wrong to approach this problem of construction exclusively from the perspective of Bahamian, or English criminal procedure. And the Treaty of 1880 must not be construed like a domestic statute. The Treaty was intended to serve the purpose of bringing to justice those who are guilty of grave crimes and it ought prima facie to be accorded a broad and generous construction so as to promote that objective: see *Reg. v. Governor of Ashford Remand Centre, Ex parte Postlethwaite* [1988] A.C. 924, 946H–947D, *per* Lord Bridge of Harwich. Viewed in context the word "angeklagt" in the German language version of the Treaty is wide enough to include persons against whom in a broad

A sense the criminal law has been invoked to commence a prosecution. After all, an acceptance of counsel's argument would mean that a person who is "accused" under Swiss law may escape extradition because he has absconded and is therefore unavailable for the purposes of formal and public charge in Switzerland. It follows that the argument based on the German version of the treaty must be rejected.

B In any event, the argument is fundamentally misconceived. The premise of the argument is that as between the Treaty and the Act of 1994 the former has primacy. That premise is wrong. Except in so far as the Act of 1994 incorporates by reference provisions of the Treaty into section 5(1)(*b*)(i) (list of offences) and section 10(4) (period for production of documents) of the Act of 1994, the Treaty is not part of the domestic law of The Bahamas. The Act of 1994 is the code governing extradition.

C A request for extradition must therefore be considered exclusively in accordance with the provisions of the Act. It is true that under section 4(1) the minister in making the Act applicable to a foreign state may do so "subject to such exceptions, adaptations or modifications, as the minister, having due regard to the terms of such Treaty, may deem expedient to specify in the order for the purposes of implementing such terms." The minister has imposed no exceptions, adaptations or modifications. The issues under consideration must therefore be decided not by reference to the Treaty but in the light of the provisions of the Act of 1994. Section 6 is the relevant provision. If the language of section 6 were ambiguous in a material sense, it would no doubt have been possible as a matter of law to take into account in the process of construction the Treaty provisions. But the language "a person ... who is accused" is unambiguous and there is no warrant for having recourse to the Treaty in order to construe section 6. For these further reasons the argument based on provisions in the German language version of the Treaty must be rejected.

*Issue (2): "extradition offence"*

F Section 5(1) of the Act of 1994 reads:

"Without prejudice to subsection (2) for the purposes of this Act, any offence of which a person is accused or has been convicted in an approved state is an extradition offence, if ... (*b*) in the case of an offence against the law of a treaty state ... (ii) the act or omission constituting the offence, or the equivalent act or omission, would constitute an offence against the law of The Bahamas if it took place within The Bahamas or, in the case of an extra-territorial offence, in corresponding circumstances outside The Bahamas."

The question is what is meant by the words "the act or omission constituting the offence?" Counsel for the applicant submitted that the words refer to the ingredients of the Swiss offence so that section 5(1)(*b*)(ii) is only satisfied if the definition of the offence in Swiss law corresponds with the ingredients of a Bahamian offence. Counsel for the respondents submitted that the words refer in a broad sense to the conduct of the accused so that section 5(1)(*b*)(ii) is satisfied if what the accused did in

Switzerland would amount to an offence in The Bahamas if committed there.

Counsel for the applicant submitted that the majority holding in *Government of Canada v. Aronson* [1990] 1 A.C. 579 concludes the question in his client's favour. It is true that the majority construed the words "act or omission constituting the offence" in section 3 of the Fugitive Offenders Act 1967 as requiring a comparison of ingredients of the offence under the legal systems of the requesting state and the requested state. The very same words appear in section 5(1)(*b*)(ii) of the Act of 1994. This is a powerful argument. But section 5(1)(*b*)(ii) is contained in a new and differently worded statute. And their Lordships consider it right to examine in the first place what is the best contextual interpretation of the critical words in the Act of 1994.

Taken in isolation the words "the act or omission constituting the offence" are capable of accommodating either meaning. But the purpose of the process of interpretation is to find the appropriate contextual meaning. There are a number of indications which support a broad conduct test. The two supplementary subsections which follow upon section 5(1), viz. 5(2) and 5(3), respectively speak of an "offence constituted by an *act*" and an "offence ... constituted by *acts*." These two provisions are inconsistent with an ingredient test, and support a broad conduct test. This view is supported by the explanatory memorandum to the statute, which under the heading "Objects and Reasons" states that "an extraditable offence is one whose *acts* constituting the offence would be an offence under the law of The Bahamas." Section 8(2) requires particulars of the person whose extradition is requested, and of "the facts upon which ... he is accused." The reference to facts as particulars which must be furnished in all cases, including those where extradition is sought after conviction, is consistent with a conduct test. These are indications of some weight. And there are no contrary indications of substance in the Act of 1994.

It is now necessary to consider the question from the broader perspective of the undoubted purpose of the Act of 1994, viz. to facilitate the extradition of persons accused of serious crimes. Two factors are of special importance. First, the ingredients test would often require a magistrate to hear and rule on evidence of foreign law. This consequence of the ingredients test complicates rather than facilitates extradition. Secondly, it must be taken into account that there are divergences in the definition of crimes between different national systems. Certainly, there are such divergences between the common law system in The Bahamas and the civil law system in Switzerland. A result of the strict application of an ingredients test would be that extradition would sometimes be refused despite the fact that the conduct of an accused amounts to an offence not only in the requesting state (Switzerland) but also in the state from which extradition is sought (The Bahamas). In any event, there can be no doubt that the adoption of the conduct test facilitates extradition. And it is not unfair since an accused can only be extradited if his conduct amounts to an offence in the state from which extradition is sought. No doubt these are the considerations which lead to the unambiguous adoption by Parliament of the conduct test in England: see section 2 of the Extradition Act 1989. If the point were untrammelled by authority, their Lordships

A would have had no difficulty in concluding that section 5(1)(*b*)(ii) of the Act of 1994 imposes a broad conduct test in order to determine what is an extraditable offence.

The majority holding in *Aronson's* case [1990] 1 A.C. 579 makes the decision on the meaning of section 5(1)(*b*)(ii) a difficult one. While the decision is not binding on the Privy Council on an appeal from an independent state, the decision is of high authority, notably because the critical words requiring construction were the same. On the other hand, there are differences. Negatively, there are material features in the legislation under consideration in *Aronson's* case which are absent in the Act of 1994. In his leading speech in *Aronson's* case Lord Lowry (with whom Lord Bridge of Harwich and Lord Elwyn-Jones agreed) attached importance to the provisions of section 3(2) of the Fugitive Offenders Act 1967. It provides that "any special intent or state of mind or special circumstances of aggravation which may be necessary to constitute that offence ... shall be disregarded." No similar provision appears in the Act of 1994. Moreover, Lord Lowry emphasised in his reasons the Commonwealth Scheme of Extradition. The Act of 1994 extends to foreign states as well as Commonwealth countries. In regard to the Act of 1994 the problem of divergence in definition of extradition crimes is therefore considerably greater. But there are also positive features of the Act of 1994 which influenced their Lordships' view that the context of section 5(1)(*b*)(ii) of the Act of 1994 points towards a broad conduct test. It will be recalled that their Lordships attached importance to the provisions of section 5(2) and (3) of the Act of 1994 as consistent only with a broad conduct-based test. No such provisions were present in the legislation under consideration in *Aronson's* case. Cumulatively, these differences justify the conclusion that the legislative context of the present case is materially different from that under consideration in *Aronson's* case. In agreement with the Court of Appeal their Lordships therefore hold that section 5(1)(*b*)(ii) of the Act of 1994 imposes a broad conduct-based test.

Given this conclusion it follows that the applicant is accused of extradition offences within the meaning of the Act of 1994.

*Issue 3: Three separate authorities to proceed*

Counsel for the applicant submitted that the existence of three separate authorities to proceed rendered the extradition proceedings unlawful. It is clear that the function of the second and third authorities was to provide for the contingency of a ruling by the magistrate that the ingredients test ought to be applied. Given that the conduct test, which the magistrate adopted, has now been upheld, the second and third authorities are as Gonsalves-Sabola P. observed in the Court of Appeal of academic interest only. The prudent course that was followed of obtaining the supplementary authorities caused no injustice to the applicant. The argument under this heading is rejected.

*Issue 4: The magistrate's reasons*

The magistrate gave detailed reasons on the questions of law canvassed before her. She explained in respect of one charge why she was not satisfied

that the evidence placed before her was sufficient. In respect of the other charges she simply listed the evidence and expressed herself satisfied that the evidence was sufficient to commit the applicant. Counsel for the applicant submitted that the magistrate's decision was unlawful in as much as she failed to give reasons on disputed issues of fact. Counsel acknowledged that there was no authority for the proposition that a magistrate seized with the duty under section 10(5) of the Act of 1994, or a like provision, to decide whether to commit an accused person to custody to await extradition is bound to give reasons for his or her decision.

The legal position in England and in The Bahamas can be summarised as follows. The law does not at present recognise a general duty to give reasons for an administrative decision: see *Reg. v. Secretary of State for the Home Department, Ex parte Doody* [1994] 1 A.C. 531, 564E, *per* Lord Mustill. But, as Lord Mustill observed in *Doody's* case, such a duty may in appropriate circumstances be implied. Lord Mustill with the concurrence of the other Law Lords sitting in *Doody's* case expressed agreement with the analyses of the Court of Appeal in *Reg. v. Civil Service Appeal Board, Ex parte Cunningham* [1992] I.C.R. 816 of the factors which will often be material to such an implication. In the present case the judicial nature of the magistrate's function is a factor that generally speaking tends to support an implied duty to give reasons. But in *Cunningham's* case Lord Donaldson of Lymington M.R. observed, at pp. 825-826:

> "I accept at once that some judicial decisions do not call for reasons, the commonest and most outstanding being those of magistrates. However, they are distinguishable from decisions by the board for two reasons. First, there is a right of appeal to the Crown Court, which hears the matter de novo and customarily does give reasons for its decisions. Second, there is a right to require the magistrates to state a case for the opinion of the High Court on any question of law. This right would enable an aggrieved party to know whether he had grounds for raising any issue which would found an application for judicial review, although his remedy would procedurally be different."

Despite a growing practice in England of stipendiary magistrates to give reasons in extradition proceedings it has not been held that magistrates are under a legal duty to do so. And the legal position in England is perhaps justified by the right of the fugitive to apply for habeas corpus to the Divisional Court if the decision of the stipendiary magistrate goes against him: see section 11 of the Extradition Act 1989. Turning to the position in The Bahamas, a person committed to custody for extradition has under section 11 of the Act of 1994 a right to apply for habeas corpus to the Supreme Court with a further right to appeal to the Court of Appeal if his application for habeas corpus is refused. In these circumstances their Lordships are not prepared to hold that there is a general implied duty upon magistrates to give reasons in respect of all disputed issues of fact and law in extradition proceedings. But their Lordships must enter a cautionary note: it is unnecessary in the present case to consider whether in the great diversity of cases which come before magistrates in extradition proceedings the principle of fairness may in particular circumstances

A   require a magistrate to give reasons. It did not so require in this case. It follows that in the present case the magistrate's failure to give reasons on disputed issues of fact was not unlawful.

*Issue 5: Sufficiency of evidence*

Counsel for the applicant advanced an argument based on the alleged insufficiency of evidence. He concentrated on the Inspectorate charges. And he referred their Lordships to the contemporary documents and evidence. Contrary to his argument it became abundantly clear that the case of commercial fraud and falsification of documents is strongly supported by contemporary documents. The counter arguments turned out to be technical and artificial. Their Lordships inquired from counsel what explanation there might be for the applicant falsely presenting funds injected into Inspectorate as trading receipts. Except for the somewhat lame explanation that he acted on advice, counsel was unable to explain what defence there might be to the Inspectorate charges. The sufficiency of the evidence on the Inspectorate charges is amply borne out by the documentary evidence.

Their Lordships were not invited in oral argument to explore the OHAG charges and the bankruptcy charges in any detail. Their Lordships have no reason to doubt the sufficiency of the evidence on these charges.

*Issue 6: The content of the warrant of commitment*

The arguments that the warrant of commitment was unlawful are technical in the extreme. First, counsel said that literally construed the warrant contemplates a trial in Switzerland for offences against the law of The Bahamas. Secondly, although the warrant refers to the Extradition Act 1994, counsel argued that it should have invoked the magistrate's powers under section 9 in express terms. Thirdly, counsel said that the warrant fails to state any statutory basis for detention. It is not necessary to discuss these arguments separately. The function of the warrant is to implement the court's order. The order of the magistrate was lawful and appropriate. In these circumstances it would be absurd to declare the warrant of commitment unlawful on the ground of technical defects which could have confused nobody and were incapable of causing any prejudice to the applicant: see *Sharpe, The Law of Habeas Corpus*, 2nd ed. (1989), pp. 56–57. It is true that the liberty of the individual is at stake but their Lordships must also bear in mind that they are administering law and justice. These arguments are rejected.

*Issue 7: section 11(3)*

Section 11(3) of the Act of 1994 provides:

"On any such application the Supreme Court may ... order the person committed to be discharged from custody if it appears to the court that—(*a*) by reason of the trivial nature of the offence of which he is accused or was convicted; or (*b*) by reason of the passage of time since he is alleged to have committed the offence or to have become unlawfully at large, as the case may be; or (*c*) because the accusation against him is not made in good faith in the interest of justice, it

Rey v. Government of Switzerland (P.C.) [1999]

68

Rey v. Government of Switzerland (P.C.) [1999]

would, having regard to all circumstances, be unjust or oppressive to extradite him."

It is rightly conceded that the charges against the applicant are not trivial. Indeed the charges are manifestly serious. There has been great delay in this case but most of it was due to the conduct of the applicant. In these circumstances counsel did not present an argument based on delay.

Counsel for the applicant did, however, mount a sustained argument that it would be unjust and oppressive to extradite him because the charges against him were not made in good faith in the interests of justice. This argument must be put in context. It was confined to the Inspectorate charges. It does not touch on the OHAG charges or the bankruptcy charges. Moreover, in respect of the Inspectorate charges the position is, as their Lordships have found, that there is a strong case against the applicant that he did indeed commit serious offences of commercial fraud and falsification of documents.

The gravamen of the argument for the applicant is that, in order to persuade the authorities in The Bahamas that the applicant should be extradited, the Swiss Government deliberately set out to deceive the authorities in The Bahamas about the gravity of the Inspectorate charges. The complaint falls into two parts. Undoubtedly, the documents submitted were misleading in the sense that it was said that shareholders lost their investment on the "liquidation" of Inspectorate. The true position is that Inspectorate was not put into liquidation but as a result of the merger between Inspectorate and a company called Adia S.A. was "dissolved or closed down" in accordance with Swiss law. This was patently a bona fide error. But the Swiss authorities appeared to say in a number of documents that large losses flowed from the alleged offences comprehended by the Inspectorate charges. There is force in the argument that the Swiss authorities substantially overstated the position. On the other hand, the case for the Government of Switzerland continues to be that shareholders of Inspectorate and Adia suffered a loss by the very fact of a merger involving Inspectorate which did not have a substantial surplus of assets over liabilities. Their Lordships cannot express a view on this point but are left with a distinct impression that there was an element of exaggeration about the aspect of loss in the documents produced by the Swiss Government. But their Lordships are confident that the complaint of deliberate deception about the Inspectorate charges is not warranted.

Counsel for the applicant said that there is reason to doubt that the Swiss authorities will honour the formal specialty arrangements. Their Lordships are confident that these arrangements will be meticulously honoured.

It follows that the argument based on section 11(3)(c) must fail. It is neither unjust nor oppressive that the applicant should be extradited to Switzerland.

*Conclusion*

Every possible legal or factual argument has been advanced on behalf of the applicant by most experienced English leading counsel as well as

A   Bahamian counsel who appeared for the applicant in the courts below. But their Lordships are satisfied that the stipendiary magistrate came to the right conclusion. The order for extradition must stand.

    Their Lordships will humbly advise Her Majesty that the appeal should be dismissed. The applicant must pay the costs of the respondents before their Lordships' Board.

B   *Solicitors: Cameron McKenna; Devonshires.*

                                        S. S.

---

[PRIVY COUNCIL]

D   ELLOY DE FREITAS . . . . . . . APPELLANT

AND

PERMANENT SECRETARY OF MINISTRY OF
AGRICULTURE, FISHERIES, LANDS AND
E   HOUSING AND OTHERS . . . . . . RESPONDENTS

[APPEAL FROM THE EASTERN CARIBBEAN COURT OF APPEAL]

1998 March 31;             Lord Browne-Wilkinson, Lord Lloyd of Berwick,
     June 30                           Lord Hoffmann and Lord Clyde

F   *Antigua and Barbuda—Constitution—Fundamental rights and freedoms— Freedoms of expression and assembly—Statutory prohibition on communication by civil servants of information or opinions on politically controversial matters—Whether unconstitutional—Antigua and Barbuda Constitution Order 1981 (S.I. 1981 No. 1106), Sch. 1, ss. 12(1)(4), 13(1)(2)—Civil Service Act (Laws of Antigua and Barbuda, c. 87), s. 10(2)(a)(4)*

G      The applicant, who was a civil servant, participated in peaceful demonstrations against government corruption. The permanent secretary of the ministry in which the applicant worked claimed that the applicant had acted in breach of section 10(2)(*a*) of the Civil Service Act,[1] which forbade the communication by civil servants to any other person of any information or expressions of opinion on matters of national or international political H   controversy, and interdicted him from exercising the powers and functions of his office pending disciplinary proceedings against him. The applicant applied to the High Court of Antigua and

[1] Civil Service Act, s. 10(2)(4): see post, p. 74B, C–D.