UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
:
UNITED STATES OF AMERICA :
: S5 22 Cr. 673 (LAK)
v. :
:
SAMUEL BANKMAN-FRIED, :
:
                              Defendant. :
------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF SAMUEL BANKMAN-FRIED'S MOTION TO DISMISS COUNTS 9, 10, 12 AND 13 AS VIOLATING THE RULE OF SPECIALTY, OR, IN THE ALTERNATIVE, FOR RELATED DISCOVERY**

<u>**PRETRIAL MOTION NO. 1**</u>

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND TO ALL MOTIONS ......................................................... 4

    A. The Cryptocurrency Industry and Its Rapid Growth ............................. 4

    B. FTX and Alameda ................................................................................ 5

    C. 2022: The Crypto Winter ..................................................................... 6

    D. Impact on FTX ..................................................................................... 6

    E. The Events of November 2022 ............................................................. 7

    F. The Original Indictment ....................................................................... 7

    G. The Extradition Proceedings ................................................................ 8

    H. The New Charges Were Improperly Brought ....................................... 8

STATEMENT OF FACTS ....................................................................................... 10

I. THE GOVERNMENT REQUESTS MR. BANKMAN-FRIED'S ARREST IN THE BAHAMAS ................................................................................................ 10

II. THE BAHAMAS EXTRADITES MR. BANKMAN-FRIED PURSUANT TO SIMPLIFIED EXTRADITION PROCEEDINGS. ......................................... 11

    A. Mr. Bankman-Fried Consents to Simplified Extradition After Considering the Charges in the Diplomatic Note and the Rule of Specialty. ........................... 11

    B. The Magistrate Commits Mr. Bankman-Fried to Custody for Extradition, Acknowledging That the Rule of Specialty Applies ............................................. 13

    C. The Minister of Foreign Affairs Issues a Warrant of Surrender On All Counts Except for the Campaign Finance Conspiracy Count (Count 12). ........... 13

III.    THE GOVERNMENT CHARGES MR. BANKMAN-FRIED FOR OFFENSES NOT ENCOMPASSED BY THE BAHAMAS'S WARRANT OF SURRENDER. ....... 14

ARGUMENT ................................................................................................................. 15

I.    THE BAHAMIAN WARRANT OF SURRENDER DOES NOT INCLUDE THE CAMPAIGN FINANCE CONSPIRACY CHARGE (COUNT 12) AND THUS IT MUST BE DISMISSED. ............................................................................... 15

II.    MR. BANKMAN-FRIED HAS STANDING TO INVOKE THE RULE OF SPECIALTY. ........................................................................................... 15

    A.    The Supreme Court Held in *United States v. Rauscher* that Individual Defendants Have Standing to Assert the Rule of Specialty................................ 16

    B.    The Second Circuit Has Interpreted *Rauscher* to Confer Standing on Defendants Where the Requested State Would Object........................................ 16

    C.    Holding That an Individual Defendant Does Not Have Standing Under These Circumstances Would Create Untenable Precedent................................... 18

    D.    Six Circuits Have Also Held that Individual Defendants Have Standing to Assert the Rule of Specialty.................................................................... 20

III.    THE BANK FRAUD, UNLICENSED MONEY TRANSMITTING, AND FCPA CONSPIRACY CHARGES (COUNTS 9, 10, AND 13) VIOLATE THE RULE OF SPECIALTY AND MUST BE DISMISSED. ................................................... 20

    A.    Counts 9, 10 and 13 Are "Separate Offenses" From Those on Which Mr. Bankman-Fried's Extradition Was Granted..................................................... 21

    B.    The Bahamas Has Not Given Its Express Consent to Counts 9, 10 and 13 as Required Under the Extradition Treaty.............................................................. 23

        1.    In the Defense's Understanding, the Government Has Not Provided Evidence Sufficient to Satisfy the Dual Criminality Requirement and the Bahamas is Thus Unable to Give Its Consent.................................... 24

IV.    ALTERNATIVELY, THE GOVERNMENT SHOULD BE ORDERED TO DISCLOSE MATERIALS RELEVANT TO MR. BANKMAN-FRIED'S EXTRADITION MOTION FOR DISCLOSURE AND INSPECTION OF DIPLOMATIC CORRESPONDENCE. .......................................................... 26

CONCLUSION................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fiocconi v. Attorney General of the United States*,
    462 F.2d 475 (2d Cir. 1972)............................................................................16, 17, 21

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
    Scotland Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015)..........................................................................10

*Johnson v. City of New York*,
    1:15-cv-8195-GHW, 2017 WL 2312924 (S.D.N.Y. May 26, 2017)......................................10

*Loughrin v. United States*,
    573 U.S. 351, 134 S. Ct. 2384 (2014).....................................................................22

*Superintendent of Her Majesty's Foxhill Prison and the Government of the United
    States of America v. Viktor Kozeny*, [2012] UKPC 10 Privy Council Appeal
    No. 0073 of 2010 ....................................................................................25

*United States v. Alvarez-Machain*,
    504 U.S. 655, 112 S. Ct. 2188 (1992)................................................................16, 19

*United States v. Barinas*,
    865 F.3d 99 (2d Cir. 2017)............................................................................17

*United States v. Fontana*,
    869 F.3d 464 (6th Cir. 2017) .........................................................................20

*United States v. Fowlie*,
    24 F.3d 1059 (9th Cir. 1994) .........................................................................12

*United States v. Henderson*,
    968 F.2d 1219 (7th Cir. 1992) ........................................................................22

*United States v. Khan*,
    993 F.2d 1368 (9th Cir. 1993) ........................................................................15

*United States v. Levy*,
    905 F.2d 326 (10th Cir. 1990) ........................................................................20

*United States v. Maniktala*,
    934 F.2d 25 (2d Cir. 1991)............................................................................26

*United States v. Najohn*,
    785 F.2d 1420 (9th Cir. 1986) ........................................................................20

*United States v. Nosov,*
   153 F. Supp. 2d 477 (S.D.N.Y. 2001) ................................................................21

*United States v. Paroutian,*
   299 F.2d 486 (2d Cir. 1962) ...............................................................................21

*United States v. Puentes,*
   50 F.3d 1567 (11th Cir. 1995) ...........................................................................20

*United States v. Ramanathan,*
   No. 8:07CR30, 2008 WL 650297 (D. Neb. Mar. 5, 2008) ...................................10

*United States v. Rauscher,*
   119 U.S. 407, 7 S. Ct. 234 (1886) ......................................................................16

*United States v. Saccoccia,*
   58 F.3d 754 (1st Cir. 1995) ................................................................................25

*United States v. Thirion,*
   813 F.2d 146 (8th Cir. 1987) .............................................................................20

*United States v. Thomas,*
   322 F. App'x 177 (3d Cir. 2009) ........................................................................20

*United States v. Urena,*
   989 F. Supp. 2d 253 (S.D.N.Y. 2013)..................................................................26

*United States v. Waknine,*
   No. CR 04-373(A)-DT, 2005 WL 8156937 (C.D. Cal. Oct. 11, 2005) ............ 21-22

*Yoo v. United States,*
   43 F.4th 64 (2d Cir. 2022) ...........................................................................18, 23

**Statutes and Rules**

Bahamas Extradition Act, Chap. 96 (2006) (Bah.) ............................................... *passim*

Convention Between the United States and the Dominican Republic for the
   Extradition of Criminals, June 19, 1909, 36 Stat. 2468, 1910................................17

Extradition Treaty between the Government of the United States of America and
   the Government of the Commonwealth of the Bahamas, Mar. 9, 1990, S.
   Treaty Doc. 102-17 ................................................................................2, 11, 12, 15

Fed. R. Crim. P. 16 ..............................................................................................26

<u>**PRELIMINARY STATEMENT**</u>

**I.     INTRODUCTION**

In 2022 the entire cryptocurrency sector underwent tremendous shocks due to a broad market crash dubbed the "crypto winter." Every major participant—including exchanges, banks, lenders, and hedge funds—cratered, with many ultimately going out of business by the end of the year. FTX, the non-U.S. exchange founded by Mr. Bankman-Fried and others, lasted far longer (paying back billions to customers and lenders during the course of the year), but ultimately succumbed to the same market forces, filing for bankruptcy on November 11, 2022.

The Government's response was dramatic—and troubling. Rather than wait for traditional civil and regulatory processes following their ordinary course to address the situation, the Government jumped in with both feet, improperly seeking to turn these civil and regulatory issues into federal crimes. In a classic rush to judgment, the Government brought the original indictment against Mr. Bankman-Fried on December 9, 2022, less than a month after FTX's bankruptcy. *See* Sealed Indictment, Dec. 9, 2022, ECF No. 1 (the "Original Indictment"). The Government did this before it had even *received,* let alone reviewed, millions of documents and other evidence directly relevant to the issues in this case, including detailed financial records of FTX and its counterparties. Not surprisingly, this resulted in an indictment containing eight vague and non-specific charges against Mr. Bankman-Fried. Each of the charges contained boilerplate recitals of statutory language, followed by literally one sentence purportedly describing the basis for the charge—nothing further.

Armed with its vague pleading, the Government sought to extradite Mr. Bankman-Fried from the Bahamas. But Mr. Bankman-Fried had not defrauded anyone, nor intended to defraud anyone. And he had been a lawful permanent resident of the Bahamas for two years. Nevertheless, the Government insisted that he be held in a Bahamian prison during the

proceedings and then sought to end-run around the extradition treaty between the United States and the Bahamas (the "Extradition Treaty").  After Mr. Bankman-Fried properly consented to a simplified extradition procedure, the Bahamian government agreed to release him to U.S. authorities and issued a warrant of surrender specifying that he be tried on seven of the eight counts in the Original Indictment—but *not* the count relating to alleged campaign finance violations.  Despite this clear direction from the Bahamian government, the Government now seeks to have Mr. Bankman-Fried tried on that charge as well.  And after Mr. Bankman-Fried returned to this country, the Government superseded the Original Indictment, not once but twice, improperly adding several new, unrelated charges without first obtaining the express consent of the Bahamian government.  The Court should not permit trial to proceed on the charges brought in violation of the Extradition Treaty and the rule of specialty.

The Government filed the Fifth Superseding Indictment on March 28, 2023.  Superseding Indictment, March 28, 2023, ECF No. 115 (the "S5 Indictment").  Even if the Court were to consider all of the charges in the S5 Indictment (notwithstanding the Government's violation of the Extradition Treaty), those charges suffer from multiple legal flaws.

As noted in Mr. Bankman-Fried's pretrial motions, several of the fraud charges are improperly premised on a "right to control" theory of property that the Solicitor General recently conceded is invalid in *Ciminelli v. United States*, No. 21-1170, a case currently pending before the Supreme Court.  Further, the wire fraud charges repeatedly assert that Mr. Bankman-Fried made actionable misstatements without identifying either the "property" that Mr. Bankman-Fried was allegedly trying to obtain through the fraud, or any intent to defraud.  To the extent the wire fraud charges focus on loans from FTX to Alameda, which the Government views as an improper use of customer assets that constitutes interference with the right of customers to

control their assets and have access to information necessary to make discretionary economic decisions, this is not a viable theory of wire fraud. Rather, this is the very theory of property fraud that the Solicitor General expressly abandoned and confessed was error before the Supreme Court in *Ciminelli*. In the wake of the "crypto winter," the Government, in hindsight, may dislike or disapprove of business practices of the cryptocurrency industry, FTX, or even Mr. Bankman-Fried—but this does not give it license to turn them into federal crimes. *See Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (the federal fraud statutes are "limited in scope to the protection of property rights" and do not "criminaliz[e] all acts of dishonesty").

As noted in the motions, the other charges suffer from additional flaws:

- The commodities fraud charges fail to satisfy the "in connection with" statutory requirement and in any event violate the prohibition on extraterritorial application of the statute;

- The unlicensed money transmitter charge is undercut by FinCEN's own rules;

- The campaign finance charge is not only self-contradictory, but fails to satisfy the relevant statutory requirements; and

- The Foreign Corrupt Practices Act (the "FCPA") charge is hopelessly vague and improperly pleaded.

In sum, the Government's haste and apparent willingness to proceed without having all the relevant facts and information has produced an indictment that is not only improperly brought but legally flawed and should be dismissed.

Further, the Government has failed to provide the required discovery and particulars needed to defend the case. As noted in the motions, the FTX Debtors have become so enmeshed in the investigation and prosecution of Mr. Bankman-Fried that they have become part of the "prosecution team." Accordingly, the defense is entitled to an order requiring a full review of the FTX Debtors' internal records for all discoverable material, including potentially exculpatory

materials under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Such discovery must be granted should the Court allow any of the charges to go forward.

## II.    BACKGROUND TO ALL MOTIONS

### A.    The Cryptocurrency Industry and Its Rapid Growth

The allegations in the S5 Indictment span roughly four years—a lifetime in the context of the cryptocurrency industry. In 2019, total global cryptocurrency transaction volume was an estimated $64 billion per day.[1] By late 2021, total daily trading volume had reached a peak of approximately $344 billion.[2] In the span of a single year, the combined market capitalization of all cryptocurrencies grew from less than $200 billion in 2020 to nearly $3 trillion in 2021.[3]

The applicable legal framework for the cryptocurrency industry developed much more slowly. During the period relevant to the S5 Indictment, there was debate within the United States as to whether certain cryptocurrencies could even be regulated under the law (an issue that continues to be litigated to this day). Further, U.S. regulators and policy makers debated whether existing regulations could be applied to the cryptocurrency markets, or whether new rules would need to be created, and whether any U.S. regulations could be applied to foreign-based cryptocurrency companies, generally deciding they would not be. Legal uncertainty and ambiguity were common.

Despite these limitations and lack of fully developed oversight, the cryptocurrency markets functioned and became increasingly popular, handling larger and larger trading volumes.

---

[1] *See Global Cryptocurrency Market Cap Charts*, COINGECKO, https://www.coingecko.com/en/global-charts (last visited on May 7, 2023).

[2] *See id.*

[3] *See id.*

### B.     FTX and Alameda

Alameda Research LLC ("Alameda") was a hedge fund founded by Mr. Bankman-Fried and others in 2017 that traded in cryptocurrencies.  As was common for such hedge funds, Alameda borrowed funds from third-party lenders and engaged in forms of margin trading. There was nothing improper with its engaging in these common practices.  Mr. Bankman-Fried began transitioning away from Alameda when he founded FTX in 2019, and formally resigned and handed off control of Alameda in 2021.

In 2019, Mr. Bankman-Fried and others founded FTX Trading Ltd. ("FTX.com" or "FTX"), a foreign-based cryptocurrency exchange incorporated in Antigua in 2019 and initially headquartered in Hong Kong.  FTX was an exchange, no more, no less; it brought together buyers and sellers.  Alameda was one of the hedge funds that traded on the FTX exchange and for a time served as its largest market-maker and liquidity provider, an entirely permissible role. The fact that Alameda traded on FTX was publicly—and frequently—disclosed.

In 2021, Mr. Bankman-Fried moved FTX's operations to the Bahamas specifically *because* the Bahamas had enacted a regulatory framework for cryptocurrency.  Mr. Bankman-Fried believed that by developing the exchange abroad, the concept could be fine-tuned and eventually brought within the U.S. legal framework.  While the cryptocurrency industry was skeptical of government regulation, Mr. Bankman-Fried and FTX sought to work constructively with global regulators, including the Securities Commission of the Bahamas, which became FTX's primary regulator.  FTX was never regulated in the United States and was available solely to non-U.S. customers.[4]  Mr. Bankman-Fried moved to the Bahamas himself to build the

---

[4] In 2020, U.S.-based customers (excluding New York and Washington state residents) were first accepted through a newly created sister company, West Realm Shires d/b/a FTX US ("FTX US").  This entity operated separately from FTX and is not the subject of the S5 Indictment.  *See* S5 Indictment ¶ 1 (defining "FTX" to mean "FTX.com"— which is the international entity that did not accept U.S. customers).

business.  FTX grew quickly, from roughly $10 million of revenue in 2019 to roughly $1 billion in 2021, as the industry around it grew.

### C.    2022: The Crypto Winter

But in 2022, global economic conditions deteriorated and publicly-traded technology stocks fell roughly 33%.[5]  The cryptocurrency market fell off even more dramatically.  Bitcoin (the flagship cryptocurrency) saw its price drop by more than 65%, from a high of approximately $67,000 in late 2021 to about $20,000 in the summer of 2022.[6]  During this prolonged market downturn, much of the cryptocurrency ecosystem became insolvent, with a series of companies––exchanges, banks, lenders and hedge funds—collapsing and filing for bankruptcy in the spring and summer of 2022.[7]  In fact, Mr. Bankman-Fried tried to step in and stabilize the collapse.

### D.    Impact on FTX

Ultimately, the fall became too pronounced and FTX was caught up in this same downturn.  Like many other cryptocurrency market participants, and many other start-ups that experience exponential growth in a short period, FTX did not have fully developed controls and risk management protocols.  FTX, like other market participants, was susceptible to a broader market collapse.  Over the course of mid-late 2022, FTX's and Alameda's assets steadily depleted as they paid back billions of dollars to their customers and lenders.

---

[5] *See Nasdaq Composite Index*, NASDAQ, https://www.nasdaq.com/market-activity/index/comp/historical (last visited May 7, 2023); *NYSE Composite Index*, WALL STREET JOURNAL, https://www.wsj.com/market-data/quotes/index/NYA/historical-prices (last visited May 7, 2023).

[6] *See Historical Prices: Bitcoin (BTC),* COINGECKO,  https://www.coingecko.com/en/coins/bitcoin (last visited May 7, 2023); *Nasdaq Composite Index*, NASDAQ, https://www.nasdaq.com/market-activity/index/comp/historical (last visited May 7, 2023); *NYSE Composite Index*, WALL STREET JOURNAL, https://www.wsj.com/market-data/quotes/index/NYA/historical-prices (last visited May 7, 2023).

[7] *See e.g.*, *In re Celsius Network LLC, et al.*, No. 22-10964 (MG), (Bankr. S.D.N.Y. May 2, 2023); *In re Three Arrows Capital*, No. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022); *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 6, 2022).

### E. The Events of November 2022

In November 2022, there was a run on FTX.  The price of FTT, FTX's exchange token which collateralized certain of the debt held by FTX, unexpectedly collapsed.[8]  As with a traditional bank run, numerous customers simultaneously sought to withdraw their assets, thus feeding fears that a collapse was inevitable.  FTX sought funding from interim liquidity providers, but ultimately ran out of time to negotiate a deal.  The market crash took down many of the major players in this sector, not just FTX.  It is a familiar story that echoes the 2008 global financial crisis and prior crises in the U.S. financial system.  In the early morning hours of November 11, 2022, Mr. Bankman-Fried stepped down as CEO of FTX.  FTX subsequently filed for bankruptcy.

### F. The Original Indictment

The Government filed its first indictment against Mr. Bankman-Fried on December 9, 2022, charging him with eight counts: wire fraud and conspiracy to commit wire fraud against FTX's customers, wire fraud and conspiracy to commit wire fraud against Alameda's lenders, securities fraud and conspiracy to commit securities fraud against FTX's investors, one count of money laundering conspiracy, and one count of conspiracy to violate the federal campaign finance laws.  The Original Indictment contained virtually no factual allegations and did not identify basic information about the Government's charging theory, such as the lenders, the loan agreements, or the allegedly false statements underlying the lender fraud counts, or the investors, the stock offerings, or the allegedly false statements underlying the investor counts.

---

[8] *Historical Prices: FTX Token (FTT)*, CoinGecko, https://www.coingecko.com/en/coins/ftx-token (last visited May 7, 2023).

### G.     The Extradition Proceedings

Unlike some FTX employees, Mr. Bankman-Fried made no attempt to flee the Bahamas, where he had been living and working for more than two years and was a permanent resident. Mr. Bankman-Fried repeatedly expressed his desire to remain in the Bahamas where he felt he could be helpful in assisting FTX in making customers whole, and he met actively with FTX's primary regulators there.[9]  Instead, the U.S. Government had him arrested and detained in prison pending extradition.  To avoid a lengthy extradition proceeding, Mr. Bankman-Fried agreed to an expedited procedure called "simplified extradition" under the Extradition Treaty.  Under this procedure, Mr. Bankman-Fried consented to be tried only on the charges in the Original Indictment for which the Government of the Bahamas agreed to extradition.  The Bahamian government consented to extradition for Mr. Bankman-Fried to be tried here on seven of the eight counts.  The Warrant of Surrender signed by the Minister of Foreign Affairs of the Bahamas included a schedule of charges on which Mr. Bankman-Fried's extradition was based. That schedule did *not* include the campaign finance charge.

### H.     The New Charges Were Improperly Brought

Yet almost as soon as he arrived this country, the Government sought to proceed against Mr. Bankman-Fried on all eight charges in the Original Indictment, even though the Warrant of Surrender had not specified the campaign finance charge.  The Government also added new charges that alleged criminal conduct far beyond the Original Indictment and which are improperly brought.

---

[9] *See, e.g.*, @SBF_FTX, TWITTER (Nov. 15, 2022, 11:40 PM) https://twitter.com/SBF_FTX/status/1592739393533792258  ("My goal—my one goal—is to do right by customers . . . I'm contributing what I can to doing so. I'm meeting in-person with regulators and working with the teams to do what we can for customers").

As noted in the motions, even if they are considered, the charges should be dismissed as legally flawed.  Further, the Court should order the Government to provide the defense with the requested discovery and particulars.

In sum, Mr. Bankman-Fried is here to fight these baseless charges and clear his name. For these reasons, we respectfully make the following motions:

Pretrial Motion No. 1: Motion to dismiss Counts 9-10 and 12-13 based on violation of the rule of specialty.  Mr. Bankman-Fried agreed to simplified extradition, reserving his rights under the rule of specialty.  The rule of specialty has been violated because Count 12 was not included in the Warrant of Surrender and Counts 9-10 and 13 were impermissibly added post-extradition;

Pretrial Motion No. 2: Motion to dismiss Counts 7-9 and 1-2 based on invalidity of the "right to control" theory of property fraud and because the S5 Indictment does not identify a valid property interest that Mr. Bankman-Fried obtained from Alameda's lenders or from FTX's customers in violation of the wire fraud statute;

Pretrial Motion No. 3: Motion to dismiss Counts 3-4 and 10 for failure to state an offense.  The commodities fraud charges allege facts occurring almost entirely outside the United States and fail to allege the required "connection with" regulated sales or transactions.  The unlicensed money transmitting charge fails because FTX was not required to register as a money services business solely for using a U.S. bank account;

Pretrial Motion No. 4: Motion to dismiss, or in the alternative sever, Counts 12 and 13. The S5 Indictment does not properly allege illegal campaign contributions or payments to Chinese officials to "obtain[ ] or retain[ ] business," and fails to establish venue for Count 13;

Pretrial Motion No. 5: Motion to compel additional discovery, including Rule 16, *Brady*, *Giglio* and Jencks Act materials, from the FTX Debtors on the basis that they are part of the "prosecution team";

Pretrial Motion No. 6: Motion for a bill of particulars and early disclosure of *Brady*, *Giglio*, and Jencks Act materials, a list of Government witnesses, and accelerated disclosure of FRE 404(b) evidence; and

Pretrial Motion No. 7: Motion to dismiss multiplicitous counts.  Counts 1 and 9, and Counts 3 and 1, are the same in fact and law.

## STATEMENT OF FACTS

### I.     The Government Requests Mr. Bankman-Fried's Arrest in the Bahamas

On December 10, 2022, the Government submitted a request via diplomatic channels to

the Bahamas to provisionally arrest Mr. Bankman-Fried for extradition to the United States

based on an indictment obtained the previous day.  *See* Ex. 1 (Extradition Affidavit of Mr.

Bankman-Fried) (attaching the "Diplomatic Note") at 11;[10] Original Indictment.[11]

Mr. Bankman-Fried was arrested in the Bahamas shortly thereafter on December 12, 2022.

Ex. 1 ¶ 1.

The Diplomatic Note stated that Mr. Bankman-Fried had been indicted in the Southern

District of New York ("SDNY") on two counts of wire fraud, two counts of conspiracy to

commit wire fraud, one count of conspiracy to commit commodities fraud, one count of

conspiracy to commit securities fraud, one count of money laundering conspiracy and one count

of conspiracy to defraud the United States and violate campaign finance laws.  *See* Ex. 1 at 4-11.

The Diplomatic Note also included a statement of the alleged facts underlying the charges.  The

Diplomatic Note alleged, *inter alia*, that Mr. Bankman-Fried had directed the misappropriation

of FTX customer assets for Alameda's use.  *See id.* at 5-6.  According to the Diplomatic Note,

Alameda was allegedly able to misappropriate customer assets by taking advantage of special

---

[10] Citations to "Ex. _" refer to exhibits attached to the Declaration of Christian R. Everdell in Support of Samuel Bankman-Fried's Pretrial Motions, dated May 8, 2023.

[11] The Court may take judicial notice of the Bahamas Treaty and other extradition materials cited in this memorandum of law.  Judicial notice of public documents is appropriate on a motion to dismiss, provided their contents are not "subject to reasonable dispute."  *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (citing Fed. R. Evid. 201(b)).  In matters pertaining to extradition, courts have taken judicial notice of materials produced in connection with the extradition process and relevant treaty materials.  *See, e.g., Johnson v. City of New York*, 1:15-cv-8195-GHW, 2017 WL 2312924, at *3 n.4 (S.D.N.Y. May 26, 2017) ("The Court takes judicial notice of the Waiver of Extradition Findings and Order.") (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *United States v. Ramanathan*, No. 8:07CR30, 2008 WL 650297, at *4 (D. Neb. Mar. 5, 2008) (on motion to dismiss raised under the rule of specialty, court took judicial notice of "the extradition package on file including the Order of Surrender").

features of its FTX account, such as accruing a negative balance and placing orders in excess of its posted collateral. *See id.* at 7. By contrast, there is no mention in the Diplomatic Note of (i) any political donations or campaign finance-related activity, (ii) any U.S. bank accounts, including any bank accounts affiliated with FTX or Alameda, (iii) any transfers of funds through the United States, (iv) any U.S. regulatory licenses that any FTX entity was purportedly required to obtain, (v) the freezing of Alameda's accounts on Chinese cryptocurrency changes or (vi) any payments Alameda allegedly made to unfreeze those accounts. The Diplomatic Note attached a copy of the arrest warrant issued in SDNY (the "SDNY Arrest Warrant"), which listed the criminal statutes on which the charges were based and specified that the conspiracy to defraud the United States was related to violating campaign finance laws (but included none of the factual allegations supporting that charge). Ex. 1 at 12.

## II. The Bahamas Extradites Mr. Bankman-Fried Pursuant to Simplified Extradition Proceedings.

### A. Mr. Bankman-Fried Consents to Simplified Extradition After Considering the Charges in the Diplomatic Note and the Rule of Specialty.

Mr. Bankman-Fried was subsequently extradited to the United States based on the first seven counts stated in the Diplomatic Note (corresponding to Counts 1-7 of the Original Indictment). On December 13, 2022, formal extradition proceedings were commenced in Magistrates' Court in the Bahamas. *See* Ex. 1 ¶ 2. On December 20, 2022, Mr. Bankman-Fried consented to extradition pursuant to the simplified procedures set forth in Article 15 of the Extradition Treaty and Section 17 of the Bahamas Extradition Act. *See* Ex. 1 ¶¶ 3-4; Ex. 2 (Warrant of Surrender attaching Extradition Treaty Between the Government of the United States of America and the Government of the Commonwealth of the Bahamas, Bah.-U.S., Mar. 9, 1990, S. Treaty Doc. No. 102-17) at SDNY_03_01098076; Ex. 3 (Bahamas Extradition Act)

§ 17; Declaration of Honourable James Lewis KC, May 8, 2023 ("Lewis Decl.") ¶¶ 4, 13, 28, 31, 33, 66.[12]

As set forth in his written consent, Mr. Bankman-Fried consented to simplified extradition after considering the description of the charges set out in the Diplomatic Note and the SDNY Arrest Warrant, the rule of specialty as incorporated into the Extradition Treaty, his desire to be released from custody in order to assist in efforts to make FTX customers whole, his right to formal extradition proceedings, and his right to be extradited without formal extradition proceedings. Ex. 1 ¶ 3. The rule of specialty is reflected in Article 14 of the Extradition Treaty, which provides:

> A person extradited under this Treaty may only be detained, tried, or punished in the Requesting State for the offense for which extradition was granted, or – . . . any offense in response of which the executive authority of the Requested State, in accordance with its laws, has consented to the person's detention, trial, or punishment; and for the purposes of this subparagraph the Requested State shall require compliance with the extradition procedures specified in Article 8 and the submission of the documents specified in that Article.

Ex. 2 at SDNY_03_01098074 to -8075. Article 14's requirement that the requested state's consent must be given "in accordance with its law" incorporates the "dual criminality requirement," which, as discussed below, provides that the requested state may only consent to the prosecution of the defendant for conduct that is considered criminal under its laws. Mr. Bankman-Fried's written consent did not in any way suggest that Mr. Bankman-Fried waived the protection of the rule of specialty or dual criminality; to the contrary, it indicated that he intended to preserve his rights thereunder.

---

[12] Courts may consider expert testimony in considering a defendant's specialty challenge. *See United States v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir. 1994) (district and circuit courts considered testimony of defendant's expert witness on Mexican law in deciding defendant's rule of specialty objection). Thus, accompanying this Memorandum of Law is the declaration of James Lewis KC, an U.K.-based barrister who is an expert in international and Bahamian extradition law, having appeared in extradition matters in Bahamian courts at all levels. *See* Lewis Decl. ¶¶ 5-6.

**B.      The Magistrate Commits Mr. Bankman-Fried to Custody for Extradition, Acknowledging That the Rule of Specialty Applies.**

The following day, the Magistrate committed Mr. Bankman-Fried to custody for extradition in accordance with the simplified extradition procedure set out in Section 17 of the Extradition Act.  Ex. 4 (Transcript of Dec. 21, 2022 Extradition Hearing) at 10:44-11:07.  During the hearing, Mr. Bankman-Fried's Bahamian counsel asked that the Magistrate ensure the rule of specialty applied.  *See id.* at 7:42-45.  The Magistrate acknowledged Bahamian counsel's request, confirming his understanding that the Minister of Foreign Affairs was obligated under the Extradition Act to obtain assurances from the United States that the rule of specialty would apply and that he would convey this understanding to the Minister.  *See id.* at 9:34-10:24.  The Magistrate also expressed confidence that the United States and the Bahamas would comply with the rule of specialty as set forth in the Treaty.  *See id.* at 10:12-21.

**C.      The Minister of Foreign Affairs Issues a Warrant of Surrender On All Counts Except for the Campaign Finance Conspiracy Count (Count 12).**

Following the Magistrate's hearing, the Minister of Foreign Affairs issued a Warrant of Surrender for Mr. Bankman-Fried under Section 17(3) of the Extradition Act, directing that Mr. Bankman-Fried be transferred into United States custody.  Ex. 2 at SDNY_03_01098055. The Warrant of Surrender included a schedule of charges on which Mr. Bankman-Fried's extradition was based, which reflected all the charges referenced in the Diplomatic Note, except for the charge of conspiracy to defraud the United States (Count 8 in the Original Indictment and now Count 12 in the S5 Indictment—to avoid confusion, this count will hereafter be referred to as "Count 12").  *Id.* at SDNY_03_01098056; Original Indictment ¶¶ 16-20; S5 Indictment ¶¶ 96-101.  Thus, Mr. Bankman-Fried's extradition to the United States was based solely on the first seven counts listed in the Diplomatic Note (corresponding to Counts 1-7 of the Original Indictment).

Mr. Bankman-Fried was extradited to the United States shortly thereafter.  At no point in the extradition process did Mr. Bankman-Fried, the Bahamian Magistrate or the Government suggest that the use of the simplified extradition process waived the protection of the rule of specialty (in fact, Mr. Bankman-Fried and the Magistrate acknowledged that the rule of specialty did apply).  Indeed, the Extradition Act requires the Minister of Foreign Affairs to confirm that the rule of specialty applies in simplified extradition.  Ex. 3 §§ 7(4)(a)(iii), 17(4) (providing that the Bahamian executive shall not order simplified extradition of defendant unless, *inter alia*, arrangement with the requesting state incorporates the rule of specialty and dual criminality requirement);[13] Lewis Decl. ¶¶ 4, 30-31, 34.

### III.  The Government Charges Mr. Bankman-Fried for Offenses Not Encompassed by the Bahamas's Warrant of Surrender.

After Mr. Bankman-Fried was brought to the United States, the Government obtained two superseding indictments against Mr. Bankman-Fried.  On February 23, 2023, the Court unsealed an indictment adding a substantive commodities fraud count (Count 4), a substantive securities fraud count (Count 6), a bank fraud conspiracy count (Count 9), and an unlicensed money transmitting conspiracy count (Count 10).  *See* Superseding Indictment ¶¶ 67-68, 73-74, 80-86, February 23, 2023, ECF No. 80 (the "S3 Indictment").  The Government superseded again on March 28, 2023, adding a FCPA conspiracy count (Count 13).  *See* S5 Indictment ¶¶ 102-05.  The defense's understanding is that the Government has notified the Bahamas of the S3 Indictment and the S5 Indictment but has not provided supporting documentation for the new charges, as required under the Extradition Treaty, to enable the Bahamas to make a determination as to whether it can consent to the new counts in those indictments.  *See* Letter

---

[13] The term "requesting state" is used herein to refer to the state seeking extradition of a defendant.  The term "requested state" is used to refer to the state from which extradition is sought.

from Nicolas Roos *et al.* to the Honorable Lewis A. Kaplan, Feb. 22, 2023, ECF No. 84; Sealed

Order at 1, Mar. 28, 2023, ECF No. 114; Ex. 2 at SDNY_03_01098074 to -8075.  The defense

understands that, to date, the Bahamas has not consented to the addition of the new charges.

Thus, including the campaign finance offense, Mr. Bankman-Fried now faces charges on four

counts that were not encompassed by the counts listed in the Bahamas's Warrant of Surrender

and to which the Bahamas has not consented.

**ARGUMENT**

**I.      The Bahamian Warrant of Surrender Does Not Include the Campaign Finance Conspiracy Charge (Count 12) and Thus It Must Be Dismissed.**

Extradition was granted solely on the first seven counts referenced in the Diplomatic

Note—not the final count for conspiracy to defraud the United States and violate the campaign

finance laws (now Count 12).  *See* Ex. 1 at 4-11; Ex. 2 at SDNY_03_01098056; Lewis Decl. ¶¶

4, 17, 37.  Article 14 of the Extradition Treaty incorporates the rule of specialty and provides that

a defendant "may only be detained, tried, or punished in the Requesting State for the offense for

which extradition was granted. . . ."  Ex. 2 at SDNY_03_01098074.  Since the Bahamas did not

grant extradition based on the campaign finance conspiracy offense, prosecuting Mr. Bankman-

Fried for it violates the rule of specialty under Article 14 and Count 12 should be dismissed.  *See*

*United States v. Khan*, 993 F.2d 1368, 1374-75 (9th Cir. 1993) (dismissing count for which the

United States sought extradition but was not referenced in Pakistani documents granting

extradition).  And, as noted below in Section II, Mr. Bankman-Fried has standing to assert the

rule of specialty with regard to Count 12, as well as Counts 9, 10 and 13.

**II.      Mr. Bankman-Fried Has Standing to Invoke the Rule of Specialty.**

Under Supreme Court and Second Circuit precedent, Mr. Bankman-Fried has standing to

object to Counts 9, 10, 12 and 13 as violating the rule of specialty and thus requiring dismissal.

Holding to the contrary would set a concerning precedent that would enable prosecutors to engage in a bait-and-switch, obtaining custody of a defendant based on charges on which they know the requested state will grant extradition and, once the defendant is in custody, adding charges on which the requested state would or could not order extradition.

### A. The Supreme Court Held in *United States v. Rauscher* that Individual Defendants Have Standing to Assert the Rule of Specialty.

Supreme Court precedent supports Mr. Bankman-Fried's standing to raise objections based on the rule of specialty here. In *United States v. Rauscher*, 119 U.S. 407, 7 S. Ct. 234 (1886), the Supreme Court held that the rule of specialty is a "right conferred upon persons brought from a foreign country into" the United States, even where, as there, the requesting state did not formally object to the prosecution for additional offenses. *See Rauscher*, 119 U.S. at 424, 430-31, 7 S. Ct. at 246 (noting that defendant may file a writ of error or writ of *habeas corpus* to challenge extradition treaty violations); *United States v. Alvarez-Machain*, 504 U.S. 655, 667, 112 S. Ct. 2188, 2195 (1992) (acknowledging *Rauscher*'s continuing applicability). The *Rauscher* Court explained that "it is impossible to conceive of the exercise of jurisdiction in such a case for any other purpose than that mentioned in the [extradition] treaty, and ascertained by the proceedings under which the party is extradited, *without an implication of fraud upon the rights of the party extradited*, and of bad faith to the country which permitted his extradition." *Rauscher*, 119 U.S. at 422, 7 S. Ct. at 242 (emphasis added).

### B. The Second Circuit Has Interpreted *Rauscher* to Confer Standing on Defendants Where the Requested State Would Object.

The Second Circuit has interpreted *Rauscher* to confer standing on defendants in certain instances. In *Fiocconi v. Attorney General of the United States*, 462 F.2d 475, 479-80 (2d Cir. 1972), the Second Circuit recognized that *Rauscher* provided the defendant with a remedy for violations of the rule of specialty, though it limited such remedy to instances where "the

surrendering state would regard the prosecution at issue as a breach."  More recently, the Second

Circuit in *United States v. Barinas*, 865 F.3d 99 (2d Cir. 2017) applied the test set forth in

*Fiocconi*.  In *Barinas*, the Second Circuit held that the rule of specialty "can afford 'the

extraditee' himself a 'remedy only if the surrendering government *would object*, since the

underlying substantive wrong, which grows out of international law, is only to the latter.'"  865

F.3d at 105 (quoting *Fiocconi*, 462 F.2d at 479-80 n.8) (emphasis added).

There, the Second Circuit considered the 1909 treaty between the United States and the

Dominican Republic.  *See* Convention Between the United States and the Dominican Republic

for the Extradition of Criminals, June 19, 1909, 36 Stat. 2468, 1910 WL 19359 (the "D.R.

Treaty").  The D.R. Treaty was signed in 1909 and is bare bones compared to more modern

extradition treaties.  While the D.R. Treaty incorporates the dual criminality requirement and the

rule of specialty, it does not require that the requested state expressly consent to any charges

added after extradition or lay out a procedure for determining whether the rule of specialty and

dual criminality requirement have been complied with following extradition.  *See* D.R. Treaty,

arts. I & IV.  Based on the text of the D.R. Treaty, the *Barinas* Court determined that the

defendant did not have standing to invoke the rule of specialty because the Dominican Republic

did not assert any objection to the charge added following extradition.  *See* 865 F.3d at 105.

By contrast, the Bahamas did not grant extradition on Count 12 and has indicated that it

"would object" to Counts 9, 10 and 13 in the form of a standing objection in the Extradition

Treaty to the addition of new charges following extradition.  As discussed above, the

Government requested Mr. Bankman-Fried's extradition for the campaign finance conspiracy

charge (Count 12) and the Minister of Foreign Affairs omitted it from the listed charges in the

Warrant of Surrender.  *See also* Lewis Decl. ¶¶ 4, 17, 37.  Further, Article 14(1)(b) of the

Extradition Treaty provides that a defendant may only be prosecuted for offenses other than those for which extradition was granted if the requested state's executive "has consented" to the defendant's "detention, trial, or punishment" on such offenses.  Ex. 2 at SDNY_03_01098074 to -8075.  Article 14 in effect creates a default standing objection by the requested state to any new charges that may be asserted against an extradited defendant unless and until it affirmatively provides its consent.  An expert in extradition law, including in the Bahamas, has confirmed this reading of the Extradition Treaty.  *See* Lewis Decl. ¶¶ 4, 55, 68.

Any other interpretation of the Extradition Treaty would reduce Article 14(1)(b) to surplusage, which must be avoided as a matter of statutory construction.  *See Yoo v. United States*, 43 F.4th 64, 71–72 (2d Cir. 2022) ("[A] court must refrain from amending [a treaty] because to do so would be to make, not construe, a treaty.").  Reading Article 14(1)(b) as not creating a standing objection would render it essentially meaningless, because the requested state would have to affirmatively object to any post-extradition charges to enforce its rights under the Extradition Treaty, regardless of whether the treaty included a provision requiring consent similar to Article 14(1)(b).

Thus, the omission of Count 12 from the Warrant of Surrender and the Extradition Treaty show that the Bahamas "would object" to prosecuting Mr. Bankman-Fried for Counts 9, 10, 12, and 13 and satisfy *Barinas*'s prerequisite to individual standing.

### C. Holding That an Individual Defendant Does Not Have Standing Under These Circumstances Would Create Untenable Precedent.

Holding that the circumstances present here—where the requested state has denied a request to extradite the defendant on a particular charge and a treaty provision expressly requires affirmative consent to charges added post-extradition—do not confer standing on an individual defendant would encourage prosecutorial overreach while trampling on requested states' treaty

rights. For example, such a holding will likely result in scenarios where prosecutors may circumvent the terms of treaties by obtaining extradition based on offenses that are considered criminal in the requested state, and once the defendant is in the government's custody, prosecuting the defendant for offenses that the requested state does not consider criminal. *See* Lewis Decl. ¶ 65; *cf. Alvarez-Machain*, 504 U.S. at 677, 112 S. Ct. at 2200 (Stevens, J. dissenting) (interpreting treaty as not incorporating the rule of specialty "would mean that a country could request extradition of a person for one of the seven crimes covered by the treaty, and then try the person for another crime, such as a political crime, which was clearly not covered by the treaty"—a result that would be clearly contrary to the treaty's purpose). This would place the burden on the requested state to monitor, and intervene as required, in the prosecutions of defendants it has extradited in order to ensure that its treaty rights are respected, which would defeat the purpose of consent provisions like the one contained in Article 14 of the Extradition Treaty.

The ongoing prosecution of Mr. Bankman-Fried on Count 12 demonstrates that the concern identified above is a real possibility. The Minister omitted Count 12 from the Warrant of Surrender, but, if Mr. Bankman-Fried is denied standing to raise this issue, the only way the Bahamas can vindicate its rights is by running an objection up the chain through the government bureaucracy and via diplomatic channels to the United States. Allowing the Government to do so would create a loophole it could improperly exploit to circumvent the United States' treaty obligations. Accordingly, we respectfully request that the Court find that Mr. Bankman-Fried has standing here to assert the rule of specialty.

### D. Six Circuits Have Also Held that Individual Defendants Have Standing to Assert the Rule of Specialty.

The above reading of *Barinas* is consistent with the approach taken by other circuits. Indeed, six other circuits have expressly interpreted *Rauscher* to confer individual rights on extradited defendants and accordingly held that individual defendants have standing to assert extradition treaty violations. *See, e.g.*, *United States v. Fontana*, 869 F.3d 464, 468 (6th Cir. 2017) ("[A]n extradited criminal defendant may not be tried for crimes not the basis for extradition, absent waiver by the treaty partner, when such is the intent of the treaty, and relief under such a treaty obligation can be obtained at the behest of counsel for the defendant in the criminal proceeding."); *United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987) (holding that defendant "may raise whatever objections to his prosecution that [the requested state] might have."); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (regarding the doctrine of specialty, "the person extradited may raise whatever objections the rendering country might have."); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990) ("*Rauscher* gave extradited defendants a right to claim the [rule of specialty's] protection.") (citation and quotation marks omitted); *United States v. Puentes*, 50 F.3d 1567, 1575 (11th Cir. 1995) (extradited individual "has standing under the doctrine of specialty to raise any objections which the requested nation might have asserted."); *United States v. Thomas*, 322 F. App'x 177, 180 (3d Cir. 2009) ("[W]e believe, as do the majority of other Circuits to rule on this issue, that a defendant . . . has standing to" raise the rule of specialty).

### III. The Bank Fraud, Unlicensed Money Transmitting, and FCPA Conspiracy Charges (Counts 9, 10, and 13) Violate the Rule of Specialty and Must Be Dismissed.

The bank fraud, unlicensed money transmitting, and FCPA conspiracy charges (Counts 9, 10 and 13) are offenses separate from the offenses specified in the Warrant of Surrender and thus violate the rule of specialty, unless the Bahamas affirmatively consents to the addition of those

charges under Article 14 of the Extradition Treaty. In the defense's understanding, the Bahamas has not provided such consent. Moreover, the Bahamas is likely unable to provide its consent because the Government has failed to provide it with sufficient information for it to determine that Counts 9, 10 and 13 satisfy the dual criminality requirement. Indeed, there is clear authority that the conduct underlying the FCPA conspiracy charge is not considered criminal in the Bahamas and thus *cannot* satisfy the dual criminality requirement.

### A. Counts 9, 10 and 13 Are "Separate Offenses" From Those on Which Mr. Bankman-Fried's Extradition Was Granted.

The rule of specialty precludes the Government from prosecuting Mr. Bankman-Fried on the bank fraud, unlicensed money transmitting, and FCPA conspiracy charges (Counts 9, 10, and 13, respectively). To determine whether the rule of specialty has been violated, courts in the Second Circuit consider whether the challenged charges are "separate offenses" from those on which extradition was granted. *United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir. 1962); *Fiocconi v. Att'y Gen. of the United States*, 462 F.2d 475, 480-81 (2d Cir. 1972) (applying the *Paroutian* test and noting that "[t]he 'principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government, especially for political crimes."). In determining whether charges added after extradition are "separate" for purposes of the rule of specialty, courts have considered whether the government seeks to add charges against a defendant that the requested state "was not aware [of] when it agreed to his extradition." *United States v. Nosov*, 153 F. Supp. 2d 477, 480 (S.D.N.Y. 2001) (holding that the rule of specialty was not violated where the superseding indictment added new counts implicating extradited defendant's co-defendants, and not the defendant); *see also United States v. Waknine*, No. CR 04-373(A)-DT, 2005 WL 8156937, at *3 (C.D. Cal. Oct. 11, 2005) (holding that charges based on newly alleged

specified unlawful activity in superseding indictment were not "of the same character" as those identified in extradition order where they were not "included in the original indictment or overlap [with] allegations contained therein") (quotation marks and citation omitted).

Here, the criminal statutes and the factual allegations underlying Counts 9, 10 and 13 are not referenced at all in the Warrant of Surrender or the Diplomatic Note. *See* Ex. 2 at SDNY_03_01098056; Ex. 1 at Ex. SBF 1 at 1-6. Neither of these documents reference the additional offenses by name or by statutory provision, and there is no reference to any U.S. bank accounts, including any bank accounts affiliated with FTX or Alameda, any transfers of funds through the U.S., any U.S. regulatory licenses that any FTX entity was purportedly required to obtain, any freezing of Alameda's accounts on Chinese cryptocurrency changes or any payments Alameda allegedly made to unfreeze those accounts. And there is no reason to believe the Bahamas would have understood that the Government intended to prosecute Mr. Bankman-Fried on these additional charges as they are substantively distinct from the charges laid out in the Diplomatic Note, and are premised on factual allegations that were not included in the Diplomatic Note. *See* Lewis Decl. ¶¶ 45, 47-52. This accords with the treatment of these offenses by U.S. courts, which generally view the mail, wire and bank fraud statutes as establishing separate offenses. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 359, 134 S. Ct. 2384, 2391 (2014) ("But the two statutes [the mail fraud and bank fraud statutes], as an initial matter, have notable textual differences."); *United States v. Henderson*, 968 F.2d 1219 (7th Cir. 1992) ("[W]ire fraud, mail fraud and bank fraud are separate offenses requiring separate and distinct elements of proof."). Thus, Counts 9, 10 and 13 are "separate offenses" for which Mr. Bankman-Fried may not be prosecuted absent the express consent of the Bahamas as discussed further below.

**B.** **The Bahamas Has Not Given Its Express Consent to Counts 9, 10 and 13 as Required Under the Extradition Treaty.**

The Government may only prosecute Mr. Bankman-Fried for Counts 9, 10 and 13 if it follows the procedure for obtaining the Bahamas's consent set forth in the Treaty, which the defense understands it has not. As stated above, Article 14 of the Extradition Treaty provides that an extradited defendant "may only be detained, tried, or punished in the Requesting State for the offense for which extradition was granted, or – . . . any offense in response of which *the executive authority of the Requested State, in accordance with its laws, has consented* to the person's detention, trial, or punishment. . . ." Ex. 2 at SDNY_03_01098074 to -8075 (emphasis added). Thus, the plain terms of the Extradition Treaty require that the Government obtain the express consent of the Bahamas to prosecute Mr. Bankman-Fried on any new charges brought after Mr. Bankman-Fried's extradition—silence cannot suffice for consent. *See Yoo*, 43 F.4th at 71–72 ("In interpreting both statutes and treaties, courts seek to avoid readings that render statutory language surplusage or redundant. But where the language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty.") (citations and quotation marks omitted); *see also* Lewis Decl. ¶¶ 4, 45, 54-65, 69 (Article 14(1)(b) of the Extradition Treaty and Section 7(4)(a)(iii) of the Extradition Act require the Bahamas's express consent to new charges different than those on which extradition was granted).

As noted above, the defense understands the Government has informed the Bahamas of the new charges added in the S3 Indictment and S5 Indictment, but the Bahamas has not consented to those charges. *See* Letter from Nicolas Roos *et al.* to the Honorable Lewis A. Kaplan, February 22, 2023, ECF No. 84; Sealed Order at 1, Mar. 28, 2023, ECF No. 114. That the Government felt the need to notify the Bahamas at all of the S3 Indictment and the S5

Indictment indicates it recognizes that Counts 9, 10 and 13 are distinct from the offenses and conduct encompassed by the Warrant of Surrender and that the Bahamas's consent is required to proceed on those charges.

       **1.**     ***In the Defense's Understanding, the Government Has Not Provided Evidence Sufficient to Satisfy the Dual Criminality Requirement and the Bahamas is Thus Unable to Give Its Consent.***

Moreover, a condition precedent to obtaining the Bahamas's consent is the Government's provision of information to the Bahamas to enable it to determine whether Counts 9, 10 and 13 satisfy the dual criminality requirement. The defense is not aware of the Government providing any such information to the Bahamas. Indeed, when asked to provide copies of any such communications, the Government declined to do, only producing the formal extradition documents in the possession of the United States Attorney's Office and the Federal Bureau of Investigation. Thus, the Bahamas lacks the information necessary to determine whether dual criminality is satisfied and *cannot* consent to the addition of Counts 9, 10 and 13.

Article 14(1)(b) of the Extradition Treaty provides that the Bahamas can only consent to the addition of offenses "in accordance with its laws" and after requiring the submission of documents under Article 8, including "a statement of the facts of the case" and "such evidence as would justify the committal for trial of the person if the offense had been committed in the Requested State or as would justify the committal for extradition of the person in accordance with the laws of the Requested State." Ex. 2 at SDNY_03_01098067, -8068, -8075. The Bahamas Extradition Act in turn provides that the Minister can give consent only for "extraditable offence[s]," meaning offenses for which "the act or omission constituting the offence, or the equivalent act of omission, would constitute an offence against the law of The Bahamas if it took place within The Bahamas," *i.e.*, the dual criminality requirement. Ex. 3, §§ 5(1)(b), 7(4)(a)(iii); Lewis Decl. ¶ 4, 56-65, 69. Read together, these provisions mean the

Government must submit to the Bahamas sufficient evidence to allow the Bahamas to determine whether the offenses on which extradition is sought satisfy the dual criminality requirement. That the Minister must conduct a dual criminality analysis prior to consenting to any new charges is another reason why, in addition to the express language of Article 14(1)(b), silence on the part of the Bahamas cannot be construed as consent. *See id.* ¶¶ 4, 63. Here, the defense is not aware of any information the Government has provided to the Bahamas that satisfies the Government's treaty obligations and enables the Bahamas to determine whether the conduct underlying the new charges would be considered criminal in the Bahamas and thus satisfy the dual criminality requirement.

The importance of holding the Government to its obligations under the Extradition Treaty is underscored by the fact that there is clear authority holding that conduct that may violate the FCPA is *not* considered criminal in the Bahamas. The United Kingdom's Judicial Committee of the Privy Council, the highest court of appeal for the Commonwealth of the Bahamas, held in 2012 that charges under the FCPA were not extraditable offenses because Bahamian law does not prohibit foreign bribery. *See* Ex. 5 (*Superintendent of Her Majesty's Foxhill Prison and the Government of the United States of America v. Viktor Kozeny*, [2012] UKPC 10 Privy Council Appeal No. 0073 of 2010 (appeal taken from Bah.) at [50]-[53]; Lewis Decl. ¶ 64. "[I]n mulling dual criminality concerns, courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable." *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995). Thus, the Privy Council's opinion in *Kozeny* must be accorded great deference and establishes that the FCPA charge against Mr. Bankman-Fried runs afoul of the dual criminality requirement. Allowing the Government to spurn its obligations to proffer evidence to satisfy the dual criminality requirement here would allow the United States

to substitute its own judgment for the clear directive from the requested state regarding interpretation of its own laws and violate principles of international comity. Thus, the bank fraud, unlicensed money transmitting, and FCPA conspiracy charges (Counts 9, 10 and 13) must be dismissed due to the Government's failure to proffer evidence sufficient to satisfy the dual criminality requirement under the Extradition Treaty.

**IV.    Alternatively, the Government Should Be Ordered to Disclose Materials Relevant to Mr. Bankman-Fried's Extradition Motion for Disclosure and Inspection of Diplomatic Correspondence.**

If the Court determines that it needs further information before ruling on the motion to dismiss Counts 9, 10, 12 and 13, Mr. Bankman-Fried respectfully requests an order pursuant to Rule 16(a)(1)(E)(i) directing the Government to produce materials concerning Mr. Bankman-Fried's extradition from the Bahamas. The materials sought include diplomatic correspondence and notes regarding, without limitation, the initial charges at the time of Mr. Bankman-Fried's extradition and the subsequent additional charges, as well as any notes, filings, or other communications with the Bahamas, Bahamian law enforcement officials, transcripts or recordings of the extradition proceedings in the Bahamian courts, and any documents signed by or provided to Mr. Bankman-Fried during the extradition process.

"An item is 'material to preparing the defense' under Rule 16 'if it could be used to counter the Government's case or bolster a defense.'" *United States v. Urena*, 989 F. Supp. 2d 253, 258 (S.D.N.Y. 2013) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180-81 (2d Cir. 1993)); *cf. United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) ("There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.") (quoting *United States v. Ross*, 511 F.2d 757, 762-63 (5th Cir. 1975)).

Here, the requested documents are material to the defense's contention that prosecuting Mr. Bankman-Fried for Counts 9, 10, 12 and 13 violates the Extradition Treaty, in that they breach the rule of specialty, the Government's obligation to provide supporting evidence to the Bahamas, and lack of consent of the Bahamian authorities. Mr. Bankman-Fried requested these documents from the Government, but the Government to date has only produced the formal extradition documents in the possession of the United States Attorney's Office and the Federal Bureau of Investigation, and has refused to produce any communications or other documents relating to Mr. Bankman-Fried's extradition. For example, the Government has not indicated whether it has in its possession communications between the Bahamas and any other U.S. government agency that have been forwarded to it. To the extent the Government has such communications, those materials would likely be relevant to clarifying the position of the Bahamas as to Counts 9, 10, 12 and 13. The Government therefore must produce those communications and the other requested materials to the defense and should be ordered to do so immediately. The alternative means of obtaining the requested documents—through subpoenas served on the Government, the U.S. Department of State, and unidentified witnesses, including witnesses abroad—would be impractical. The Government would likely move to quash any subpoena, requiring Court intervention; and it would be impossible to serve subpoenas on witnesses without knowing their names and locations. We therefore request that, if the Court believes it cannot dismiss the counts based on the facts currently before it, the Court direct the Government to produce these materials and permit the parties to submit additional briefing regarding the motion based on those materials.

## <u>CONCLUSION</u>

For the foregoing reasons, Counts 9, 10, 12 and 13 of the S5 Indictment should be dismissed; or, in the alternative, the Government should first be ordered to produce the materials requested above.

Dated:  May 8, 2023
       New York, New York

*/s/ Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*
