UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                       :

UNITED STATES OF AMERICA           :

                                 :   S5 22 Cr. 673 (LAK)

          v.                         :

                                 :

SAMUEL BANKMAN-FRIED,            :

                                 :

                    Defendant.       :

-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF SAMUEL BANKMAN-FRIED'S
MOTION TO DISMISS COUNTS 3-4 AND COUNT 10
IN THE S5 INDICTMENT**

<u>**PRETRIAL MOTION NO. 3**</u>

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY 10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

I.   STANDARD FOR DISMISSAL UNDER FEDERAL RULES OF CRIMINAL
     PROCEDURE RULE 12(B) ................................................................................... 3

II.  THE COMMODITIES FRAUD CHARGES (COUNTS 3-4) SHOULD BE
     DISMISSED FOR FAILURE TO ALLEGE A FRAUD "IN CONNECTION
     WITH" A COMMODITIES TRANSACTION AND BECAUSE THEY REQUIRE
     AN IMPERMISSIBLE EXTRATERRITORIAL APPLICATION OF THE CEA ........... 3

     A.   The Government Has Failed to Allege Fraud "In Connection With" a
          Commodities Transaction. .................................................................... 4

          1.   The "In Connection With" Requirement of the CEA. ................ 4

          2.   The Allegation That FTX's Customers Intended to Engage in
               Commodities Transactions Is Only Incidental to the Alleged Fraud .......... 5

     B.   The S5 Indictment Seeks an Impermissible Extraterritorial Application of
          the CEA ............................................................................................. 8

          1.   The CEA Does Not Apply Extraterritorially. ........................... 8

          2.   The Alleged Conduct Relevant to CEA Section 6(c)(1)'s Focus
               Occurred Abroad and thus the Commodities Fraud Charges
               (Counts 3-4) Allege an Impermissibly Extraterritorial Theory and
               Should Be Dismissed. ..................................................... 10

III. THE CHARGE FOR CONSPIRACY TO OPERATE AN UNLICENSED MONEY
     TRANSMITTING BUSINESS (COUNT 10) SHOULD BE DISMISSED
     BECAUSE FTX WAS NOT REQUIRED TO REGISTER AS A MONEY
     TRANSMITTING BUSINESS ............................................................................ 14

     A.   Relevant Allegations ........................................................................ 15

     B.   Applicable Law ............................................................................... 15

     C.   FTX Was Not Required to Register as a Money Transmitting Business
          Based Solely on the Use of a U.S. Bank Account. ............................... 17

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boudinot v. Shrader*,
    No. 09 Civ. 10163 (LAK), 2012 WL 489215 (S.D.N.Y. Feb. 15, 2012) .................................5

*Chan Ah Wah, et al. v. HSBC N. Am. Holdings Inc, et al.*,
    No. 15 CIV. 8974 (LGS), 2019 WL 859042 (S.D.N.Y. Feb. 22, 2019).................................12

*Chem. Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984)....................................................................................................7

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    395 F.3d 25 (2d Cir. 2005)..............................................................................................4, 5, 7

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................................7

*Kearney v. Prudential-Bache Sec. Inc.*,
    701 F. Supp. 416 (S.D.N.Y. 1988).........................................................................................5

*Laydon v. Cooperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) .....................................................................................................12

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014)...................................................................................................13

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247, 130 S. Ct. 2869 (2010)...............................................................................9, 12

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019)............................................................................................ *passim*

*RJR Nabisco, Inc., et al. v. Eur. Cmty., et al.*,
    579 U.S. 325, 136 S. Ct. 2090 (2016)...........................................................................8-9, 10

*Sec. and Exch. Comm'n v. Zandford*,
    535 U.S. 813, 122 S. Ct. 1899 (2002)....................................................................... *passim*

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012).......................................................................................................3

*United States v. Benjamin*,
    No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ....................................3

*United States v. Faiella,*
   39 F. Supp. 3d 544 (S.D.N.Y. 2014)...................................................................19

*United States v. Gasperini,*
   No. 16-CR-441 (NGG), 2017 WL 2399693 (E.D.N.Y. June 1, 2017) ....................................10

*United States v. Harmon,*
   474 F. Supp. 3d 76 (D.D.C. 2020) .....................................................................19

*United States v. Hoskins,*
   902 F.3d 69 ...................................................................................9-10

*United States v. Noyes,*
   No. 1:08-CR-55-SJM-1, 2010 WL 5139859 (W.D. Pa. Dec. 8, 2010)..................................12

*United States v. O'Hagan,*
   521 U.S. 642, 117 S. Ct. 2199 (1997).............................................................5, 7, 8

*United States v. Taveras,*
   504 F. Supp. 3d 272 (S.D.N.Y. 2020)................................................................3

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013).........................................................................9

## Statutes and Rules

17 C.F.R. 240.10b-5.............................................................................5, 7, 9

17 C.F.R. § 180.1 ...........................................................................*passim*

31 C.F.R. § 1010.100 *et seq.*................................................................16, 17

31 C.F.R. § 1022.380(a)(1).....................................................................16

76 Fed. Reg. 43585, 43588, 2011 WL 2881105 (Jul. 21, 2011).....................................17, 18, 19

7 U.S.C. Ch1 ("Commodity Exchange Act") ....................................................*passim*

18 U.S.C. § 371..............................................................................10

18 U.S.C. § 1960 ...........................................................................*passim*

31 U.S.C. § 5330 ("Bank Secrecy Act")......................................................*passim*

Fed. R. Crim. P. 12(b)......................................................................1, 3

Fed. R. Evid. 201(b)........................................................................11, 12

**Other Authorities**

Nelson Wang, *FTX Moves Headquarters From Hong Kong to Bahamas,*
  CoinDesk (Sept. 24, 2021).......................................................................................................11

<u>**PRELIMINARY STATEMENT**</u>

The commodities fraud charges (Counts 3-4) and the conspiracy to operate an unlicensed money transmitting business charge (Count 10) must be dismissed pursuant to Fed. R. Crim. P. 12(b)(3) for failure to state an offense.

Counts 3 and 4 of the Superseding Indictment, Mar. 28, 2023, ECF No. 115 ("S5 Indictment"), which allege that Mr. Bankman-Fried conspired to commit and committed commodities fraud on FTX ("FTX Trading" or "FTX.com") customers, should be dismissed for two reasons. *First*, the Government has failed to allege an essential element of the offense, namely, that the fraud was conducted "in connection with" a commodities transaction. Under established Second Circuit precedent, the "in connection with" requirement is not satisfied where, as here, the alleged fraud was incidental to, rather than "integral to," any commodities transaction. The gravamen of Counts 3 and 4 is that "FTX customer deposits" were misappropriated by Alameda Research Ltd. ("Alameda"), and used to pay expenses and debts, and for other purposes. S5 Indictment ¶¶ 70, 73. There is no allegation of any manipulation or deception in connection with any commodities belonging to or commodities transactions engaged in by FTX customers.

The Supreme Court has stated that misappropriation of assets does not satisfy the "in connection with" requirement if the thing being misappropriated had value to the defendant independent of its use in commodities transactions, and if the fraud was complete even in the absence of actual or contemplated commodities transactions. That is exactly what is alleged in Counts 3 and 4 of the S5 Indictment: customer deposits are alleged to have had value to Alameda and FTX in the alleged fraud scheme not because they were or would be used to trade in crypto assets or any other commodity trading, but because they were fiat deposits—that is, they were a source of funds from which Alameda could allegedly draw. And even assuming

those deposits were misappropriated, the fraud, if any, was complete when the deposits were transferred to or accessed by Alameda, without regard to any commodities transaction.

*Second*, as alleged, the commodities fraud charges would require an impermissible extraterritorial application of the Commodities Exchange Act (the "CEA") and its regulations. The Second Circuit has held that the CEA is only applicable to domestic conduct, and not to manipulative conduct or statements that take place predominantly outside the United States. Because the allegedly manipulative conduct relevant to the commodities fraud charges occurred almost entirely outside the United States, Counts 3 and 4 should be dismissed.

Count 10 must also be dismissed. The conspiracy to operate an unlicensed money transmitting business in Count 10 is charged as a conspiracy to violate Section 1960(b)(1)(B) of Title 18, which criminalizes a money transmitting business's failure "to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B). The implementing regulations for Section 5330 specify that an entity must register only if it provides the services of a money services business ("MSB") entirely or in substantial part in the United States. Crucially, the final rules promulgated in connection with same regulations also make clear that a foreign-located entity that merely maintains a U.S. bank account to provide MSB services solely to foreign-located customers is not required to register under Section 5330. Here, the Government alleges that FTX engaged in exactly the conduct that the final rules carve out from the registration requirement. Because the S5 Indictment alleges facts that do not trigger the predicate registration requirement with respect to the unlicensed money transmitting charge, Count 10 should be dismissed for failure to state an offense.

## I.  STANDARD FOR DISMISSAL UNDER FEDERAL RULES OF CRIMINAL PROCEDURE RULE 12(B)

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), that is, for failure to "allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see United States v. Taveras*, 504 F. Supp. 3d 272, 277-78 (S.D.N.Y. 2020) ("[A] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged.") (citation omitted).  In deciding whether the government has failed to allege a crime, the court may consider, "whether the facts, as alleged on the face of the indictment, satisfy the statutory definition of a crime." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *16 (S.D.N.Y. Dec. 5, 2022).

## II.  THE COMMODITIES FRAUD CHARGES (COUNTS 3-4) SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A FRAUD "IN CONNECTION WITH" A COMMODITIES TRANSACTION AND BECAUSE THEY REQUIRE AN IMPERMISSIBLE EXTRATERRITORIAL APPLICATION OF THE CEA.

Counts 3 and 4, which allege that Mr. Bankman-Fried conspired to commit and committed commodities fraud on FTX customers, should be dismissed for two reasons.  *First,* the Government has failed to allege an essential element of the offense, namely, that the fraud was conducted "in connection with" a commodities transaction, meaning "any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity."  17 C.F.R. § 180.1(a); *see also* 7 U.S.C. § 9(1).  *Second*, the substantive statute at issue in these counts, the CEA, cannot be applied to extraterritorial conduct, and the alleged conduct relevant to Counts 3 and 4 was predominantly foreign.

## A. The Government Has Failed to Allege Fraud "In Connection With" a Commodities Transaction.

To charge commodities fraud, the Government must allege a fraud that is "integral"—and not merely incidental—to a commodities transaction. *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005).[1] The "in connection with" requirement is not satisfied where the thing that is misappropriated has "value to the malefactor apart from [its] use" in a commodities transaction, and when the alleged fraud is complete even in the absence of any actual or contemplated commodities transaction. *Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 824-25, 122 S. Ct. 1899, 1905-06 (2002) (quoting *United States v. O'Hagan*, 521 U.S. 642, 656, 117 S. Ct. 2199, 2209 (1997)). The commodities fraud charges here turn on the alleged misappropriation of "customer deposits" with FTX (including deposits to Alameda bank accounts). S5 Indictment ¶¶ 70, 73. As further explained below, those deposits had value to Alameda and FTX independent of their use in any commodities transaction, and even if they were fraudulently misappropriated (they were not), the fraud would have been independent of, and not integral to, any commodities transactions. Accordingly, Counts 3 and 4 must be dismissed for failure to state an offense because the allegations in the S5 Indictment do not satisfy the statutory "in connection with" requirement.

### 1. The "In Connection With" Requirement of the CEA.

Rule 180.1 prohibits any person from engaging in certain fraudulent practices "directly or indirectly, *in connection with* any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity." 17 C.F.R. § 180.1(a) (emphasis added); *see also* 7 U.S.C. § 9(1) ("It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with

---

[1] *Vacated and remanded on other grounds*, 547 U.S. 71, 126 S.Ct. 1503 (2006).

any swap, or a contract of sale of any commodity . . . any manipulative or deceptive device or contrivance" in violation of CFTC regulations).

The "in connection with" language "is not limitless," CFTC Commentary, 17 C.F.R. § 180.1, at *41405-06, and the Supreme Court has acknowledged the risk that the "in connection with" requirement could be "stretched beyond reason" when "applied to the fraudulent use of money." *O'Hagan*, 521 U.S. at 657, 117 S. Ct. at 2210. Thus, the requirement "must not be construed so broadly as to convert every common-law fraud that happens to involve" commodities into a violation of the commodities fraud laws. *Zandford*, 535 U.S. at 820; 122 S. Ct. at 1903.[2] The alleged "fraud must be 'integral to'" the commodities transaction in question, rather than merely "incidental." *Dabit*, 395 F.3d at 37 (quoting *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986)); *Boudinot v. Shrader*, No. 09 Civ. 10163 (LAK), 2012 WL 489215, at *5 (S.D.N.Y. Feb. 15, 2012) (Kaplan, J.) (interpreting the phrase "in connection with" as used in the Private Securities Litigation Reform Act, and citing *Dabit*).

> **2.** ***The Allegation That FTX's Customers Intended to Engage in Commodities Transactions Is Only Incidental to the Alleged Fraud.***

Counts 3 and 4 of the S5 Indictment should be dismissed because the alleged fraud is merely incidental, not integral, to any commodities transaction. The S5 Indictment alleges a "scheme to defraud customers of FTX trading or intending to trade futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes." S5 Indictment ¶¶ 70, 73. The S5 Indictment alleges that FTX misappropriated customer deposits

---

[2] While *Zandford* and other authorities cited in this Section arose in the securities fraud context, they are highly persuasive here, as courts in CEA cases often rely on decisions interpreting the "in connection with" language in the context of § 10(b) of the Securities Exchange Act of 1934. *See, e.g., Kearney v. Prudential-Bache Sec. Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988). Moreover, the CFTC itself explicitly stated that it intends to be guided by *Zandford* in interpreting Rule 180.1. *See* CFTC Commentary, at *41406.

in two ways: (1) by commingling customer fiat deposits with Alameda assets in Alameda bank accounts and allowing Alameda to use the commingled funds to, *inter alia*, finance its trading and expenses and make venture investments and political donations, *id.* ¶ 22; and (2) by making changes to FTX's software code that permitted Alameda to borrow funds from FTX without sufficient collateral and withdraw funds, including customer funds, from the exchange. *Id.* ¶¶ 23-24. Even assuming that either of these theories could amount to fraud of any sort (they cannot), the S5 Indictment does not allege that either constituted fraud that is "integral" to a commodities transaction.

Under both theories, the alleged object of the scheme was to misappropriate FTX customer fiat deposits for Alameda's use. *See id.* ¶¶ 22-24, 70, 73. Nowhere does the Government allege that the allegedly fraudulent transactions directly at issue in Counts 3 and 4, *i.e.*, moving customer deposits into Alameda bank accounts and the withdrawal by Alameda of customer funds held by FTX, were integral to any "swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on and subject to the rules of any registered entity". 17 C.F.R. § 180.1(a).

By contrast, in *Zandford*, the Court found the "in connection with" requirement satisfied where the respondent broker sold customer assets from a discretionary account without his clients' knowledge or consent and misappropriated the proceeds. 535 U.S. at 820, 122 S. Ct. at 1903. Because the securities transactions themselves "enabled [the respondent] to convert the proceeds . . . to his own use," the Court reasoned that "respondent's fraud coincided with the sales themselves." *Id.* Here, the alleged commingling and borrowing of FTX customer funds was entirely separate from any commodities transactions FTX customers may have engaged in: FTX customers themselves chose when and what to trade on the platform, and there is no

allegation of any manipulation or deception in connection with any commodities or commodities transactions. *See, e.g., Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) ("in connection with" requirement not satisfied where no misrepresentations were made with respect to stock of company); *cf. In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361-63 (S.D.N.Y. 2011) ("in connection with" requirement satisfied where investor entrusted funds to a money manager with understanding that manager would invest them in securities, which manager failed to do); *see also* S5 Indictment ¶ 11 (describing the forms of trading customers could engage in on FTX at their own discretion).

Indeed, to the extent that the S5 Indictment alleges fraud at all, it alleges a fraud akin to a situation that the Supreme Court explicitly stated in *Zandford* would not satisfy the "in connection with" requirement. *See Zandford*, 535 U.S. at 825 n.4, 122 S. Ct. at 1906 n.4. Specifically, the Court indicated that if "a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to" a commodities transaction. *Zandford*, 535 U.S. at 825 n.4, 122 S. Ct. at 1906 n.4; *see also Dabit*, 395 F.3d at 37 & n.19 (noting that "outright embezzlement from the client's account" would not satisfy the "in connection with" requirement, and citing *Zandford's* "uncontradicted dictum" to that effect). This passage in *Zandford* draws from the Supreme Court's discussion in *O'Hagan* regarding the way in which the "in connection with" requirement imposes "limitation[s] on the forms of fraud" encompassed by § 10(b). *O'Hagan*, 521 U.S. at 656, 117 S. Ct. at 2209.

The Government's commodities fraud theory exceeds those limitations in precisely the manner discussed in *Zandford* and *O'Hagan*. The objective of the fraud alleged in Counts 3 and 4 of the S5 Indictment was to misappropriate customer fiat "deposits" (without regard to any

commodities transactions for which customers may have contemplated using those deposits) and to use the funds for various Alameda-related purposes (*i.e.*, for purposes wholly unrelated to potential commodities trades in which customers may have engaged). *See Zandford*, 535 U.S. at 824. This is counter to the principle discussed by the *O'Hagan* Court, that a fraud that is "complete" upon the embezzlement of funds cannot be converted to commodities fraud through a subsequent transaction. The Court illustrated this point by noting that the "in connection with" requirement would not be met if a person "defrauded a bank into giving him a loan . . . and then used the proceeds . . . to purchase securities." *O'Hagan*, 521 U.S. at 646. Just as in the quoted example, the allegedly misappropriated customer deposits in this case had value to the alleged co-conspirators "'apart from their use in a [commodities] transaction,'" and the alleged "'fraud would be complete as soon as the money was obtained.'" *Id.*

Thus, the alleged connection to commodities transactions was merely incidental, and not integral, to the alleged fraud and Counts 3 and 4 must be dismissed.

### B.     The S5 Indictment Seeks an Impermissible Extraterritorial Application of the CEA.

Even if the S5 Indictment satisfied the "in connection with" requirement necessary to state conspiracy and substantive commodities fraud offenses, Counts 3 and 4 should still be dismissed, because the Government's theory underlying those charges would require an extraterritorial—and thus impermissible—application of the CEA.

#### 1.     *The CEA Does Not Apply Extraterritorially.*

It is well-established that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc., et al. v. Eur. Cmty., et al.*, 579 U.S. 325, 335, 136 S. Ct. 2090, 2100 (2016) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869 (2010)). In *RJR Nabisco*, the Supreme

Court set forth a two-step framework for analyzing whether a party seeks to impermissibly apply a statute extraterritorially:

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. . . . If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 579 U.S. at 337, 136 S. Ct at 2101.[3] As to the first step, the Second Circuit has definitively concluded that Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), is a domestic statute that does not apply extraterritorially. *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 103 (2d Cir. 2019) (holding that Section 6(c)(1) of the CEA lacks "a clear statement of extraterritorial effect") (citation and internal quotation marks omitted).[4]

In addition, because "the extraterritorial reach of an ancillary offense like . . . conspiracy is coterminous with that of the underlying criminal statute," the conspiracy counts—Counts 1 and 3—cannot be used to expand the territorial reach of the substantive CEA provisions at issue. *United States v. Hoskins*, 902 F.3d 69, 96 (citation and quotation marks omitted) (affirming

---

[3] Because the presumption against extraterritoriality applies with the same force in the criminal and civil contexts, civil cases analyzing the scope of the wire fraud and commodities fraud statutes are relevant here. *See United States v. Vilar*, 729 F.3d 62, 98 (2d Cir. 2013) (holding that "Section 10(b) and Rule 10b-5 do not apply to extraterritorial conduct, regardless of whether liability is sought criminally or civilly").

[4] Section 6(c)(1) is the principal statute cited in connection with Count 4, the substantive CEA count. The S5 Indictment also cites to CEA Section 9(a)(5), 7 U.S.C. § 13(a)(5), which creates criminal liability for willful violations of Chapter 1 of the CEA, which encompasses Section 6(c)(1). While we are aware of no case determining whether Section 9(a)(5) applies extraterritorially, there is no language in Section 9(a)(5) that suggests its territorial reach is broader than that of Section 6(c)(1) or Section 9(a)(2), both of which the Second Circuit held do not apply extraterritorially. *See Prime Int'l Trading*, 937 F.3d at 103. The S5 Indictment also cites Rule 180.1, 17 CFR § 180.1, which was promulgated by the CFTC pursuant to the CEA, which likewise contains no broader language regarding territorial reach and applies only domestically. *Cf. Morrison*, 561 U.S. at 261-62, 130 S. Ct. at 2881 (holding that since Rule 10b-5 was promulgated under Section 10(b) of the Securities Exchange Act, "if § 10(b) is not extraterritorial, neither is Rule 10b-5").

dismissal of conspiracy charge under 18 U.S.C. § 371 where underlying statute had no extraterritorial application to alleged conduct); *see also United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *8 n.6 (E.D.N.Y. June 1, 2017) ("[T]here is no reason to differentiate the extraterritoriality analysis as between 'ancillary' offenses and the underlying substantive offense, and so the court's examination of the wire fraud violation applies equally to the related wire fraud conspiracy count.").

Thus, the inquiry proceeds to the second step of the *RJR Nabisco* framework and the Government's case may only proceed based on conduct "relevant to the statute's focus" that occurred within the United States. *RJR Nabisco*, 579 U.S. at 337, 136 S. Ct. at 2101.

### 2. The Alleged Conduct Relevant to CEA Section 6(c)(1)'s Focus Occurred Abroad and thus the Commodities Fraud Charges (Counts 3-4) Allege an Impermissibly Extraterritorial Theory and Should Be Dismissed.

The Second Circuit determined in *Prime International Trading* that the CEA's "focus is on rooting out manipulation and ensuring market integrity—not on the geographical coordinates of the transactions." *Prime Int'l Trading*, 937 F.3d at 107. The Second Circuit thus concluded that "Section 6(c)(1) centers on manipulation in commodities markets." *Id.* at 107. If "the conduct relevant to *that* focus occurred abroad, . . . then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* at 107-108 (emphasis in original) (citation and internal quotation marks omitted). Thus, whether the Government is seeking an impermissible extraterritorial application of the CEA turns on whether it alleges that sufficient "manipulative conduct or statements [were] made in the United States," *id.* at 108, that is, whether the alleged offense is "so predominately foreign as to be impermissibly extraterritorial." *Id.* at 106 (citation and internal quotation marks omitted). The Second Circuit determined in *Prime International* that the plaintiffs failed to allege a domestic

application of Section 6(c)(1) where they contended that defendants, while outside the United States, engaged in artificial trades in overseas commodities markets and data regarding such trades was incorporated into pricing assessments that were subsequently used to settle futures contracts that were traded on a U.S.-based commodities exchange. *See id.* at 100, 107-08.

Here, the Government alleges that commodities markets were manipulated when Mr. Bankman-Fried carried out a deceptive scheme in which he (1) represented to customers that FTX "would protect their interests and segregate their assets" from its own, but permitted customer assets to be commingled with Alameda assets, and (2) represented to customers that Alameda's "account is just like everyone else's" on FTX.com and that "Alameda is a wholly separate entity," even though Alameda was allegedly permitted to borrow funds from the exchange while having a negative account balance that exceeded its posted collateral. *See* S5 Indictment ¶¶ 2-3, 22-24. However, any alleged conduct potentially relevant to Section 6(c)(1)'s focus—"manipulation on commodities markets"—occurred almost entirely abroad. The commodities market at issue, FTX.com, was a foreign commodities market that was organized in Antigua and headquartered in the Bahamas, did not accept U.S. customers, and generally operated abroad. *See* S5 Indictment ¶¶ 2, 11, 17 (describing FTX Trading Ltd. dba FTX.com as "a global cryptocurrency exchange" and "an international platform"); Ex.[5] 6 (FTX Trading Certificate of Incorporation) at SDNY_03_00506266; Nelson Wang, *FTX Moves Headquarters From Hong Kong to Bahamas*, CoinDesk (Sept. 24, 2021 12:07 PM), (https://www.coindesk.com/business/2021/09/24/ftx-moves-headquarters-from-hong-kong-to-bahamas-report).[6]

---

[5] Citations to "Ex. _" refer to exhibits attached to the Declaration of Christian R. Everdell in Support of Samuel Bankman-Fried's Pretrial Motions, dated May 8, 2023.
[6] Under Federal Rule of Evidence 201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be

The only specific U.S. conduct or impact the Government alleges are (1) Mr. Bankman-Fried's statements to the United States Senate, S5 Indictment ¶ 2, (2) North Dimension's bank account at Bank-1, *id.* ¶¶ 16-21, and (3) "[the] significant negative price impact on the value of commodities in interstate commerce in the United States, including bitcoin and ether spot and future prices," *id.* ¶ 55—none of which constitute domestic conduct sufficient to support an application of the CEA here.

*First*, a single statement made in the United States is not a sufficient basis for the application of the CEA. In *Laydon v. Cooperatieve Rabobank U.A.*, the Second Circuit rejected the plaintiff's argument that his allegations of communications that were made from or passed through the United States, including an email that a trader sent in furtherance of the alleged conspiracy while on a two-day trip in the United States, were sufficient domestic conduct to support a CEA claim. *See Laydon v. Cooperatieve Rabobank U.A.,* 55 F.4th 86, 97 (2d Cir. 2022). Like the trader's email in *Laydon*, Mr. Bankman-Fried's statement to the U.S. Senate while on a brief trip here is not sufficient to support a domestic application of the CEA. As the *Morrison* Court noted, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266, 130 S. Ct. 2869, 2884 (2010) (emphasis in original); *see also Laydon*, 55 F.4th at 97 (finding an impermissible extraterritorial

---

questioned." Fed. R. Evid. 201(b)(2). Facts such as where a company is incorporated or headquartered fall squarely within the types of facts that may be judicially noticed under Rule 201(b). *See Chan Ah Wah, et al. v. HSBC N. Am. Holdings Inc, et al.*, No. 15 CIV. 8974 (LGS), 2019 WL 859042, at *1 (S.D.N.Y. Feb. 22, 2019) (taking judicial notice of where foreign companies were incorporated and headquartered); *United States v. Noyes*, No. 1:08-CR-55-SJM-1, 2010 WL 5139859, at *9 (W.D. Pa. Dec. 8, 2010) (noting that magistrate judge could have judicially noticed fact that email account providers were headquartered in Northern California). Thus, the defense respectfully requests that the Court take judicial notice of the fact that FTX is organized in Antigua and headquartered in the Bahamas.

application of the CEA in part because "the alleged manipulative conduct occurred *almost entirely abroad*") (emphasis added).

*Second*, the alleged use of North Dimension's U.S.-based bank account to receive and send customer funds was tangential to any commodities transaction or markets, rather than being "in connection with" a commodities transaction as required under the CEA. 7 U.S.C. § 9(1). That is, the ostensible focus of the alleged scheme as set forth in the S5 Indictment was on the bank accounts into which customers deposited funds, not on actual purchases or sales of commodities or any other manipulation of commodities markets. *Cf. Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (rejecting plaintiff's argument that wire transfers to defendant's New York bank account were domestic transactions for purpose of CEA claim— rather, "[t]hese transfers . . . were actions needed to carry out the transactions, and not the transactions themselves—which were previously entered into when the [investment] contracts were executed in Russia"). That customers (all of whom were supposed to be located abroad) may have deposited such funds with the intention they be used to trade commodities is too attenuated to satisfy the "in connection with" requirement.

*Third*, the alleged impact of the purported scheme on the prices of commodities in interstate commerce is too attenuated a connection to establish a domestic application of the CEA. *See Prime Int'l*, 937 F.3d at 100, 107-08 (plaintiff failed to allege a domestic application of CEA Section 6(c)(1) where plaintiff did not allege that defendants engaged in any manipulative conduct in the United States, only that defendants' foreign conduct "caused ripple effects across global commodities markets"). Any negative price impact of the allegedly fraudulent scheme relating to FTX—a foreign commodities market only open to non-U.S. residents—may have had on the U.S. commodities market was a "ripple effect" that cannot

sustain an application of the CEA.  As in *Prime*, the conduct alleged here—which relates to the use by foreign customers of a foreign trading platform, rather than to information relating to specific transactions or the value of "bitcoin and ether spot and future prices," S5 Indictment ¶ 55—is too far removed from the price at which any commodities were traded in the U.S. to alter the "predominantly foreign" nature of the alleged conduct here.  *Id*. at 107. Further, as noted, the focus of the relevant CEA provisions, for purposes of the extraterritoriality analysis, is on the site of the alleged "manipulative conduct," *id.* at 108, not on the attenuated effect of such conduct on commodities prices in the United States.

For these reasons, the Government has failed to allege a domestic application of the CEA, and Counts 3-4 should be dismissed in their entirety, or, in the alternative, to the extent the manipulative conduct in a foreign commodities market occurred abroad.

III.    **THE CHARGE FOR CONSPIRACY TO OPERATE AN UNLICENSED MONEY TRANSMITTING BUSINESS (COUNT 10) SHOULD BE DISMISSED BECAUSE FTX WAS NOT REQUIRED TO REGISTER AS A MONEY TRANSMITTING BUSINESS**

Count 10 of the S5 Indictment should be dismissed because the Government fails to allege that Mr. Bankman-Fried operated an unlicensed money transmitting business within the meaning of 18 U.S.C. § 1960.  The S5 Indictment alleges that Mr. Bankman-Fried conspired to violate Section 1960 by failing to register a money transmitting business with the Secretary of the Treasury as required by the Bank Secrecy Act.  *See* S5 Indictment ¶¶ 88-90; 18 U.S.C. § 1960(b)(1)(B) (violation to fail to comply with registration requirements of 31 U.S.C. § 5330). Even accepting the allegations in the S5 Indictment as true, FTX was not subject to the registration requirements because its only relevant domestic activity was the use of a U.S. bank account.  Accordingly, Count 10 fails to allege an offense and must be dismissed.

## A.    Relevant Allegations

As alleged in the S5 Indictment, Count 10 is premised upon an important distinction between FTX entities and their respective customer bases.  On the one hand, FTX.US, "FTX's business in the United States," served U.S. customers and registered "as a money services business in 2020."  S5 Indictment ¶ 17.  On the other hand, FTX, "an international platform," served non-U.S. customers engaging in foreign transactions.  *See id.* ¶ 17.  Those wholly foreign transactions involved a variety of currencies, "including U.S. dollars," and FTX therefore "needed bank accounts that would allow FTX customers to deposit dollars with FTX."  *See id.* ¶ 14.  Eventually, FTX allegedly "directed customer [U.S.] dollar deposits to" a U.S. bank account at Bank-1.  *Id.* ¶ 21; *see also* ¶ 15.  Unlike FTX.US, "no attempts were made to make FTX a licensed money services business" based on its activities in connection with its United States bank account or otherwise.  *Id.* ¶ 17.

## B.    Applicable Law

Section 1960 makes it a crime to operate an "unlicensed money transmitting business."  18 U.S.C. § 1960(a).  The term "money transmitting" in Section 1960 "includes transferring funds on behalf of the public by any and all means."  *Id.* § 1960(b)(2).  The statute sets forth multiple ways in which a business may qualify as an unlicensed money transmitting business.  *See id.* §§ 1960(a) & (b)(1).  As charged in Count 10 of the S5 Indictment, an unlicensed money transmitting business means (i) "a money transmitting business" that (ii) "affects interstate or foreign commerce in any manner or degree" and (iii) "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section."  *Id.* §§ 1960(a) & (b)(1)(B).

Section 5330 is a provision of the Bank Secrecy Act that requires the owner of a "money transmitting business" to register with the Secretary of the Treasury.  31 U.S.C. § 5330(a)(1).

The definition of a "money transmitting business" in Section 5330 includes both (i) a "money transmitting service," which includes persons "accepting currency, funds, or value that substitutes for currency and transmitting the currency, funds, or value that substitutes for currency by any means"; and (ii) "any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency." *Id.* §§ 5330(d)(2) & (d)(1)(A).

The implementing regulations for Section 5330 are administered by the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") in 31 C.F.R. § 1010.100 *et seq.* (together, the "FinCEN Regulations"). The FinCEN Regulations require that "each money services business . . . must register with FinCEN" except if it falls within certain enumerated exceptions. 31 C.F.R. § 1022.380(a)(1). A "money services business" ("MSB") is defined as "[a] person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities" enumerated in the FinCEN Regulations. *Id.* § 1010.100(ff). One such category of MSB is a "money transmitter," which is either (i) someone who provides "money transmission services," defined as "the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means"; or (ii) "[a]ny other person engaged in the transfer of funds." *Id.* § 1010.100(ff)(5)(i) (emphasis in original).

Key to the FinCEN Regulations (and, by extension, the criminalizing scope of Section 1960(b)(1)(B)'s registration requirement) is the limitation that MSBs must register only if the services they provide as an MSB occur "wholly or in substantial part within the United States." *Id.* § 1010.100(ff); *accord id.* § 1022.380(a)(2) (requiring "[e]ach foreign-located

person doing business. . . in the United States as a money services business" to designate an

agent for compliance with the FinCEN Regulations).

### C. FTX Was Not Required to Register as a Money Transmitting Business Based Solely on the Use of a U.S. Bank Account.

The allegations in the S5 Indictment as to FTX are insufficient to state an offense under

Section 1960(b)(1)(B) as charged.  At most, the S5 Indictment alleges that FTX—a foreign

cryptocurrency exchange that provided services exclusively to non-U.S. customers—used a U.S.

bank account to receive U.S. dollar deposits and process withdrawals for those customers.

*See* S5 Indictment ¶¶ 14, 17.  But the mere use of a U.S. bank account does not, by itself, bring

FTX within the scope of the registration requirements set forth in the FinCEN Regulations.

In 2011, FinCEN published a final rule concerning the registration requirements for

"foreign-located" MSBs in recognition of the fact that the Internet made it easier for companies

to offer MSB services in the United States from foreign locations.  *See* Bank Secrecy Act

Regulations; Definitions and Other Regulations Relating to Money Services Businesses, 76 Fed.

Reg. 43585, 43588 (Jul. 21, 2011), *available at* 2011 WL 2881105 (the "Final Rule").  Under the

Final Rule, a "foreign-located" entity was required to register if it operated as an MSB "wholly

or in substantial part within the United States," regardless of the physical location of the entity.

*Id*. (citing 31 C.F.R. § 1010.100(ff)).  The threshold for "substantial" activity "within the United

States" is dependent on "the facts and circumstances of each case, including whether persons in

the United States are obtaining MSB services from the foreign-located person, such as sending

money to or receiving money from third parties through the foreign-located person."  *Id*.

Crucially, the Final Rule identified a circumstance in which MSB activity in the United

States definitively is <u>not</u> "substantial" enough to trigger the registration requirement, stating in

relevant part: "a foreign-located person's mere maintenance of a bank account in the United

States should not cause that person to be defined as an MSB" within the meaning of the FinCEN Regulations. *See id*.

The S5 Indictment alleges that FTX engaged in precisely the conduct that the Final Rule provides does <u>not</u> require registration as an MSB. The S5 Indictment defines "FTX" as "FTX.com," *i.e.*, FTX's foreign-based exchange that was "an international platform" servicing exclusively non-U.S. customers. S5 Indictment ¶¶ 1, 17. FTX is distinct from "FTX.US," which the S5 Indictment acknowledges was "FTX's business in the United States" that serviced U.S. customers and registered as an MSB in 2020. *Id.* ¶ 17.

Thus, the S5 Indictment alleges, at most, that FTX, a *foreign* entity, used a U.S. bank account at Bank-1 to receive U.S. dollar deposits and make withdrawals for its *foreign* customers who wished to transact in U.S. dollars *abroad*. *See id.* ¶¶ 14–15, 17, 21; Final Rule at 43588 ("[M]ere maintenance of a bank account in the United States should not cause that person to be defined as an MSB."). Notably, the S5 Indictment does not allege activity within the U.S. that would normally require a foreign-located company to register as an MSB. For example, the S5 Indictment does not allege that FTX served U.S. customers, sent any U.S. customer's money to third parties, received money from third parties on behalf of a U.S. customer, or otherwise provided, as a foreign-located entity, any services of a money services business to a U.S. customer. *See* Final Rule at 43588.

Indeed, documents exchanged in discovery make clear that FTX sought and received the advice of outside counsel that FTX did not, in fact, need to register as a money services business. For example, a February 28, 2020 email from the law firm Fenwick & West LLP provided FTX's Chief Regulatory Officer and General Counsel with its conclusions regarding the application of the MSB registration requirements, citing FinCEN Guidance: "On its face, FTX is

not a customer 'located' in the United States," based on, *inter alia*, FTX's incorporation and operation outside the United States, rules not allowing "US persons to trade on its platform," lack of physical presence in the United States, and lack of business activities conducted within the United States." Ex. 7 (Feb. 28, 2020 Email from I. Voloshin (Fenwick) to D. Friedberg (FTX)) at SDNY_03_00567632.

As alleged, FTX's use of a U.S. bank account was purely incidental to facilitate otherwise entirely foreign transactions. *See* S5 Indictment ¶¶ 14, 17. Such "mere maintenance of a [U.S.] bank account" is the type of *de minimis* activity by a foreign company that FinCEN expressly carves out from any requirement to register under Section 5330 or the FinCEN Regulations. *See* Final Rule at 43585, 43588; *see also United States v. Harmon*, 474 F. Supp. 3d 76, 102 (D.D.C. 2020) (construing scope of Section 5330 as coextensive with the FinCEN Regulations and citing the Final Rule).[7] Absent any registration requirement for FTX, Mr. Bankman-Fried could not have violated Section 1960(b)(1)(B). Accordingly, Count 10 of the S5 Indictment must be dismissed.

---

[7] Courts routinely rely on FinCEN's final rules and other publications to determine whether the government adequately alleged that the defendant operated a "money services business" under Section 5330 and the FinCEN Regulations and, on that basis, whether the defendant violated the registration offense of Section 1960(b)(1)(B). *See, e.g., Harmon*, 474 F. Supp.3d at 102-03 (relying on FinCEN Final Rule to determine the scope of registration requirement of Section 5330 and the FinCEN regulations); *United States v. Faiella*, 39 F. Supp. 3d 544, 546–47 (S.D.N.Y. 2014) (relying on "specifically clarifying" FinCEN guidance to determine that business was a money services business).

## **CONCLUSION**

For the reasons set forth above, we respectfully request that the Court grant the motions presented in their entirety.

Dated:  May 8, 2023
       New York, New York

*/s/ Mark S. Cohen*

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*
