UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

UNITED STATES OF AMERICA           :

        - v. -                  :   22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,        
        a/k/a "SBF,"            :

                Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S OPPOSITION TO DEFENDANT SAMUEL BANKMAN-FRIED'S PRETRIAL MOTIONS


DAMIAN WILLIAMS
United States Attorney
Southern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division

Danielle Kudla
Samuel Raymond
Thane Rehn
Andrew Rohrbach
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
Jil Simon
Trial Attorney
     *- Of Counsel -*

i

# TABLE OF CONTENTS

FACTUAL BACKGROUND .................................................................................................. 1

ARGUMENT ..................................................................................................................... 4

I.   The Court Should Deny the Defendant's Motions to Dismiss ................................... 4

    A. Applicable Law ................................................................................................... 4

    B. Counts One, Two, Seven, Eight, and Nine Sufficiently Allege Schemes and
       Conspiracies to Defraud ....................................................................................... 6

        1.     Count Nine Alleges a Scheme to Obtain Property Under a Bank's Control ........... 7

        2.     Counts One and Two Allege a Scheme to Defraud FTX Customers of Money or
             Property ........................................................................................................ 10

        3.     Counts Seven and Eight Allege a Scheme to Defraud Alameda's Lenders ........... 13

    C. Counts Three and Four Sufficiently Allege Violations of the Commodities
       Exchange Act ..................................................................................................... 14

        1.     Counts Three and Four Allege CFTC Rule 180.1's "In Connection With"
             Requirement .................................................................................................. 15

        2.     Counts Three and Four Do Not Allege an Impermissible Extraterritorial
             Application of the CEA .................................................................................... 21

    D. Count Ten Sufficiently Alleges that the Defendant Conspired to Operate an
       Unlicensed Money Transmitting Business .............................................................. 26

    E. Count Twelve Sufficiently Alleges that the Defendant Conspired to Violate the
       Federal Election Laws .......................................................................................... 31

    F. Count Thirteen Sufficiently Alleges that the Defendant Directed and Authorized a
       Bribe in Order to Assist Alameda in Obtaining or Retaining Business ......................... 34

    G. Count Thirteen Sufficiently Alleges Venue in the Southern District of New York ........ 37

II.   The Defendant's Multiplicity Motion Should Be Denied ....................................... 41

III.  Counts Twelve and Thirteen Are Properly Joined with the Remaining Counts and
   Should Not Be Severed ......................................................................................... 45

    A. Applicable Law ................................................................................................. 45

    B. Discussion ........................................................................................................ 46

        1.     The Charges Are Part of a Common Scheme or Plan ...................................... 47

        2.     The Evidence to Prove the Charges Is Overlapping ............................................. 50

        3.     Evidence of the Conduct Underlying Counts Twelve and Thirteen Would Be
             Admissible at Trial Even if the Counts were Severed ........................................... 53

        4.     The Defendant Cannot Demonstrate Substantial Prejudice from Joinder .............. 55

IV. The Defendant's Disclosure Demands Should Be Denied ...................................................... 56

    A.  The Government Has No Obligation to Review the Files of the FTX Debtors .............. 56

    B.  The Court Should Deny the Defendant's Motion for a Bill of Particulars...................... 67

    C.  The Court Should Deny the Defendant's Motion for Immediate Production of *Brady* and *Giglio* Material ............................................................................................... 76

    D.  The Court Should Deny the Defendant's Motion for Immediate Production of Jencks Acts Material and a Witness List........................................................................ 79

    E.  The Court Should Deny the Defendant's Motion for Immediate Disclosure of Rule 404(b) Evidence ........................................................................................................ 82

CONCLUSION............................................................................................................................. 83

# TABLE OF AUTHORITIES

Page(s)

*Cases*:

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*,
 189 F.3d 321 (3d Cir. 1999)..................................................................................43
*Blockburger v. United States*,
 284 U.S. 299 (1932)..............................................................................................42
*Boyce Motor Lines, Inc. v. United States*,
 342 U.S. 337 (1952)................................................................................................4
*Brady v. Maryland*,
 373 U.S. 83 (1963)................................................................................................76
*Carpenter v. United States*,
 484 U.S. 19 (1987)................................................................................................11
*CFTC v. Gorman*,
 No. 21 Civ. 870 (VM), 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ..................24
*CFTC v. McDonnell*,
 287 F. Supp. 3d 213 (E.D.N.Y. Mar. 6, 2018) ......................................................17
*CFTC v. Reynolds*,
 No. 19 Civ. 05631 (MKV), 2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) ...............25
*CFTC v. Royal Metals Grp., LLC*,
 No. 18 Civ. 8407 (JMF), 2019 WL 1996307 (S.D.N.Y. Jan. 25, 2019)...........18, 19
*CFTC v. Vartuli*,
 228 F.3d 94 (2d Cir. 2000)....................................................................................19
*Chevron Corp. v. Donziger*,
 974 F. Supp. 2d 362 (S.D.N.Y. 2014)....................................................................35
*Ciminelli v. United States*,
 598 U.S. ___, 143 S. Ct. 1121 (2023)......................................................6, 7, 8, 14
*Costello v. United States*,
 350 U.S. 359 (1956)................................................................................................5
*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 395 F.3d 25 (2d Cir. 2005)....................................................................................17
*Giglio v. United States*,
 405 U.S. 150 (1972)..............................................................................................76
*Hamling v. United States*,
 418 U.S. 87 (1974)............................................................................................5, 16
*In re J.P. Jeanneret Associates, Inc.*,
 769 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................19
*Laydon v. Cooperatieve Rabobank U.A.*,
 55 F.4th 86 (2d Cir. 2022) ....................................................................................25
*Loginovskaya v. Batratchenko*,
 764 F.3d 266 (2d Cir. 2014)............................................................................16, 26
*Lotes Co. v. Hon Hai Precision Indus.*,

iv

753 F.3d 395 (2d Cir. 2014)..................................................................................... 23

*Loughrin v. United States*,
573 U.S. 351 (2014)......................................................................................... 9, 10

*Pasquantino v. United States*,
544 U.S. 349 (2005)............................................................................................. 13

*Prime Int'l Trad. v. BP PLC*,
937 F.3d 94 (2d Cir. 2019)............................................................................ 23, 24

*Russell v. United States*,
369 U.S. 749 (1962)............................................................................................... 5

*Saxe v. E.F. Hutton & Co.*,
789 F.2d 105 (2d Cir. 1986)................................................................................. 19

*SEC . Zandford*,
535 U.S. 813 (2002).......................................................................................16-22

*SEC v. Jackson*,
908 F. Supp. 2d 834 (S.D. Tx. 2016).................................................................... 37

*SEC v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)............................................................ 37, 74

*Shaw v. United States*,
580 U.S. 63 (2016)................................................................................................. 9

*SIFMA v. CFTC*,
67 F. Supp. 3d 373 (D.D.C. 2014)........................................................................ 23

*Spira v. Nick*,
876 F. Supp. 553 (S.D.N.Y. 1995) ...................................................................... 70

*United States v. Ajlouny*,
629 F.2d 830 (2d Cir. 1980)................................................................................. 53

*United States v. Akhavan*,
No. 20 Cr. 188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ................... 68

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998)................................................................................... 6

*United States v. Altman*,
48 F.3d 96 (2d Cir. 1995)..................................................................................... 70

*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994).............................................................. 45, 46, 50, 52

*United States v. Amendolara*,
No. 01 Cr. 694 (DAB), 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) ................ 69

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998)................................................................................. 57

*United States v. Avenatti*,
No. 19 Cr. 374 (JMF), 2022 WL 457315 (S.D.N.Y. Feb. 15, 2022)..................... 57

*United States v. Bagaric*,
706 F.2d 42 (2d Cir. 1983)................................................................................... 33

*United States v. Bagley*,
473 U.S. 667 (1985)............................................................................................. 79

*United States v. Basciano*,

v

599 F.3d 184 (2d Cir. 2010)..................................................................................... 42

*United States v. Bejasa,*
904 F.2d 137 (2d Cir. 1990)..................................................................................... 79

*United States v. Bellomo,*
263 F. Supp. 2d 561 (E.D.N.Y. 2003) ..................................................................... 75

*United States v. Bezmalinovic,*
No. 96 Cr. 97 (MGC), 1996 WL 737037 (S.D.N.Y. Dec. 26, 1996)....................... 50

*United States v. Blakney,*
941 F.2d 114 (2d Cir. 1991)......................................................................... 45, 50, 51

*United States v. Blaszczak,*
308 F. Supp. 3d 736 (S.D.N.Y. 2018).......................................................... 57, 59, 64

*United States v. Blaszczak,*
947 F.3d 19 (2d Cir. 2019)....................................................................................... 55

*United States v. Bonventre,*
646 F. App'x 73 (2d Cir. 2016) ................................................................... 47, 49, 75

*United States v. Bonventre,*
No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)..................... 72

*United States v. Bonventre,*
No. 10 Cr. 228 (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ..................... 58

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987)............................................................................... 68, 75

*United States v. Brewster,*
No. 19 Cr. 833 (SHS), 2021 WL 3423521 (S.D.N.Y. Aug. 5, 2021) ..................... 78

*United States v. Budovsky,*
No. 13 Cr. 368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) ................... 30

*United States v. Campo Flores,*
No. 15 Cr. 765 (PAC), 2016 WL 5946472 (S.D.N.Y. Oct. 12, 2016)..................... 79

*United States v. Canniff,*
521 F.2d 565 (2d Cir. 1975)..................................................................................... 57

*United States v. Cannone,*
528 F.2d 296 (2d Cir. 1975)..................................................................................... 80

*United States v. Carroll,*
510 F.2d 507 (2d Cir. 1975)..................................................................................... 73

*United States v. Catino,*
735 F.2d 718 (2d Cir. 1984).......................................................................... 38, 39, 40

*United States v. Chacko,*
169 F.3d 140 (2d Cir. 1999)............................................................................... 41, 42

*United States v. Chalmers,*
410 F. Supp. 2d 278 (S.D.N.Y. 2006)...................................................................... 57

*United States v. Chestnut,*
533 F.2d 40 (2d Cir. 1976)....................................................................................... 32

*United States v. Connolly,*
No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019)...................... 60

*United States v. Coppa,*

267 F.3d 132 (2d Cir. 2001)...................................................................... 78, 81

*United States v. D'Amico*,
734 F. Supp. 2d 321 (S.D.N.Y. 2010).................................................... 74

*United States v. Davis*,
No. 17 Cr. 610 (LGS), 2018 WL 4373998 (S.D.N.Y. Sept. 13, 2018).................... 79

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021)....................................................................... 6

*United States v. De La Pava*,
268 F.3d 157 (2d Cir. 2001)....................................................................... 5

*United States v. Dhafir*,
342 F. App'x 702 (2d Cir. 2009) ............................................................. 42

*United States v. Dixon*,
509 U.S. 688 (1993)................................................................................ 42

*United States v. Dubceac*,
No. 09 Cr. 1164 (RWS), 2011 WL 1458115 (S.D.N.Y. Apr. 14, 2011) ............... 10

*United States v. Dumitru*,
No. 18 Cr. 243 (LAK), 2018 WL 3407703 (S.D.N.Y. June 26, 2018) ................ 44

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006)..................................................................... 20

*United States v. Eisenstein*,
731 F.2d 1540 (11th Cir. 1984) .............................................................. 30

*United States v. Epksamp*,
832 F.3d 154 (2d Cir. 2016)..................................................................... 22

*United States v. Epps*,
742 F. App'x 544 (2d Cir. 2018) ............................................................. 47

*United States v. Felder*,
14 Cr. 546 (CM), 2016 WL 1659145 (S.D.N.Y. Apr. 22, 2016)..................... 53

*United States v. Feng*,
277 F.3d 1151 (9th Cir. 2002) ................................................................ 40

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987)......................................................... 73

*United States v. Feyrer*,
333 F.3d 110 (2d Cir. 2003)..................................................................... 49

*United States v. Freeman*,
No. 18 Cr. 217 (KMW), 2019 WL 2590747 (S.D.N.Y. June 25, 2019)............... 82

*United States v. Galestro*,
No. 06 Cr. 285 (ARR), 2008 WL 2783360 (E.D.N.Y. July 15, 2008) ............... 58

*United States v. Garcia*,
509 F. App'x 40 (2d Cir. 2013) .............................................................. 58

*United States v. Gillier*,
No. 11 Cr. 409 (PAE), 2022 WL 179204 (S.D.N.Y. Jan. 19, 2022) ................ 78

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985)....................................................................... 4

*United States v. Gole*,

21 F. Supp. 2d 161 (E.D.N.Y. 1997) ................................................................. 13

*United States v. Gonzalez*,
   No. 21 Cr. 288 (VM), 2022 WL 3684796 (S.D.N.Y. Aug. 24, 2022) ..................... 78

*United States v. Gordon*,
   655 F.2d 478 (2d Cir. 1981) ................................................................................ 51

*United States v. Gracesqui*,
   730 F. App'x 25 (2d Cir. 2018) ...................................................................... 52, 54

*United States v. Halper*,
   590 F.2d 422 (2d Cir. 1978) ................................................................................ 50

*United States v. Harris*,
   805 F. Supp. 166 (S.D.N.Y. 1992) ...................................................................... 50

*United States v. Helbrans*,
   547 F. Supp. 3d 409 (S.D.N.Y. 2021) ................................................................ 78

*United States v. Hilger*,
   867 F.2d 566 (9th Cir. 1989) ........................................................................ 39, 40

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020) ................................................................................ 35

*United States v. Hutcher*,
   622 F.2d 1083 (2d Cir. 1980) ....................................................................... 57, 77

*United States v. Ikoli*,
   No. 16 Cr. 148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) ..................... 77

*United States v. Jain*,
   No. 19 Cr. 59 (PKC), 2019 WL 6888635 (S.D.N.Y. Dec. 18, 2019) .................... 72

*United States v. Jimenez*,
   824 F. Supp. 351 (S.D.N.Y. 1993) ...................................................................... 73

*United States v. Josleyn*,
   206 F.3d 144 (1st Cir. 2000) ......................................................................... 65, 67

*United States v. Kay*,
   359 F.3d 738 (5th Cir. 2004) ................................................................... 34, 35, 36

*United States v. Kay*,
   513 F.3d 432 (5th Cir. 2007) .............................................................................. 36

*United States v. Kemp*,
   No. 21-1684-cr, 2023 WL 405763 (2d Cir. Jan. 26, 2023) ....................... 49, 52, 54

*United States v. Kerik*,
   615 F. Supp. 2d 256 (S.D.N.Y. 2009) ................................................................. 50

*United States v. Khalupsky*,
   5 F.4th 279 (2d Cir. 2021) .................................................................................. 21

*United States v. Kogan*,
   283 F. Supp. 3d 127 (S.D.N.Y. 2017) ................................................................ 73

*United States v. Korfant*,
   771 F.2d 660 (2d Cir. 1985) ......................................................................... 42, 44

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011) ............................................................................... 37

*United States v. Kukushkin*,

No. 22-666-Cr, 2023 WL 2396240 (2d Cir. Mar. 8, 2023) ................................................. 32, 33

*United States v. Lebedev*,
   932 F.3d 40 (2d Cir. 2019).................................................................................................. 9

*United States v. Levy*,
   2013 WL 664712 (S.D.N.Y. Feb. 15, 2013)........................................................................ 72

*United States v. Lopez*, No. 18 Cr. 736 (NSR),
   2019 WL 4733603 (S.D.N.Y. Sept. 27, 2019)..................................................................... 80

*United States v. Mahaffy*,
   446 F. Supp. 2d 115 (E.D.N.Y. 2006) ................................................................................. 67

*United States v. Males*,
   459 F.3d 154 (2d Cir. 2006).............................................................................................. 12

*United States v. Mandell*,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010)................................................................... 71, 72, 76

*United States v. Matos-Peralta*,
   691 F. Supp. 780 (S.D.N.Y. 1988) ..................................................................................... 82

*United States v. Maxwell*,
   534 F. Supp. 3d 299 (S.D.N.Y. 2021)................................................................................ 58

*United States v. Maxwell*,
   No. 20 Cr. 330 (AJN), 2021 WL 3591801 (S.D.N.Y. Aug. 13, 2021) ................................. 78

*United States v. Maxwell*,
   No. 20 Cr. 330 (AJN), 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022)................................... 43

*United States v. Mazza Alaluf*,
   621 F.3d 205 (2d Cir. 2010).............................................................................................. 30

*United States v. McNeil*,
   320 F.3d 1034 (9th Cir. 2003) ........................................................................................... 9

*United States v. Meregildo*,
   920 F. Supp. 2d 434 (S.D.N.Y. 2013)............................................................................ 58, 61

*United States v. Merlino*,
   349 F.3d 144 (3d Cir. 2003).............................................................................................. 58

*United States v. Middendorf*,
   No. 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018)..................................... 59

*United States v. Milton*,
   No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ..................................... 38

*United States v. Mitlof*,
   165 F. Supp. 2d 558 (S.D.N.Y. 2001)............................................................................ 68, 74

*United States v. Mora*,
   No. 19 Cr. 514 (JPO), 2020 WL 7496281 (S.D.N.Y. Dec. 21, 2020) ................................... 71

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016)................................................................................ 27

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000)............................................................................. 75, 76

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020)............................................................................................... 22

*United States v. Naranjo*,

14 F.3d 145 (2d Cir. 1994)..................................................................... 38

*United States v. Nejad,*
No. 18 Cr. 224 (AJN), 2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ..................................... 10

*United States v. Ng Chong Hwa,*
No. 18 Cr. 538 (E.D.N.Y.) (MKB) .................................................................. 78

*United States v. Nixon,*
418 U.S. 683 (1974)................................................................................ 78

*United States v. Norris,*
753 F. Supp. 2d 492 (E.D. Pa. 2010) ........................................................... 61

*United States v. Nouri,*
711 F.3d 129 (2d Cir. 2013)..................................................................... 17

*United States v. O'Donnell,*
608 F.3d 546 (9th Cir. 2010) .................................................................. 33

*United States v. O'Hagan,*
521 U.S. 642 (1997)............................................................................... 21

*United States v. Ohle,*
678 F. Supp. 2d 215 (S.D.N.Y. 2010)........................................................ 38, 41

*United States v. Ohle,*
No. 08 Cr. 1109 (JSR), 2011 WL 651849 (S.D.N.Y. Feb. 7, 2011)................................ 77

*United States v. Page,*
657 F.3d 126 (2d Cir. 2011)................................................................. 46, 55

*United States v. Panza,*
750 F.2d 1141 (2d Cir. 1984).................................................................. 68

*United States v. Parnas,*
No. 19 Cr. 725 (JPO), 2021 WL 2981567 (S.D.N.Y. July 14, 2021)................................ 78

*United States v. Patterson,*
No. 21-1678-cr, 2022 WL 17825627 (2d Cir. Dec. 21, 2022) .................................... 9

*United States v. Perez,*
575 F.3d 164 (2d Cir. 2009)................................................................... 22

*United States v. Peterson,*
357 F. Supp. 2d 748 (S.D.N.Y. 2005)........................................................... 38

*United States v. Pipola,*
83 F.3d 556 (2d Cir. 1996).................................................................... 54

*United States v. Pizarro,*
No. 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023) ...................................... 45

*United States v. Prado,*
933 F.3d 121 (2d Cir. 2019).................................................................. 21

*United States v. Provoo,*
215 F. 2d 531 (2d Cir. 1954).................................................................. 40

*United States v. Randazzo,*
80 F.3d 623 (1st Cir. 1996) .................................................................. 50

*United States v. Rigas,*
258 F. Supp. 2d 299 (S.D.N.Y. 2003).......................................................... 68

*United States v. Rittweger,*

259 F. Supp. 2d 275 (S.D.N.Y. 2003)............................................................ 68, 69

*United States v. Rivera*,
546 F.3d 245 (2d Cir. 2008)........................................................................ 56

*United States v. Rodriguez*,
No. 99 Cr. 367 (DLC), 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) .................. 70

*United States v. Rodriguez-Rodriguez*,
453 F.3d 458 (7th Cir. 2006) ....................................................................... 41

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007)........................................................................ 41

*United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998)........................................................................ 12

*United States v. Ruiz*,
894 F.2d 501 (2d Cir. 1990)............................................... 45, 47, 48, 49

*United States v. Russo*,
483 F. Supp. 2d 301 (S.D.N.Y. 2007).......................................................... 80

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015)........................................................................ 41

*United States v. Saad*,
380 F. Supp. 2d 286 (S.D.N.Y. 2005).......................................................... 49

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998).......................................................................... 55

*United States v. Salemo*,
499 F. App'x 110 (2d Cir. 2012) ................................................................. 47

*United States v. Sampson*,
898 F.3d 270 (2d Cir. 2018)........................................................................ 33

*United States v. Savin*,
No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)..................... 76

*United States v. Segovia-Landa*,
No. 20 Cr. 287 (JPO), 2021 WL 1966117 (S.D.N.Y. May 17, 2021) ................. 78

*United States v. Sezanayev*,
No. 17 Cr. 262 (LGS), 2018 WL 2324077 (S.D.N.Y. May 22, 2018) ................. 79

*United States v. Sharpe*,
193 F.3d 852 (5th Cir. 1999) ...................................................................... 42

*United States v. Shkreli*,
No 15 Cr. 637 (KAM), 2016 WL 8711065 (E.D.N.Y. Dec. 16, 2016) ................. 75

*United States v. Shteyman*,
No. 10 Cr. 347 (SJ), 2011 WL 2006291 (E.D.N.Y. May 23, 2011)..................... 73

*United States v. Sindona*,
636 F.2d 792 (2d Cir. 1980)........................................................................ 12

*United States v. Stein*,
429 F. Supp. 2d 633 (S.D.N.Y. 2006).......................................................... 38

*United States v. Stein*,
488 F. Supp. 2d 350 (S.D.N.Y. 2007).......................................................... 63

*United States v. Stringer*,

730 F.3d 120 (2d Cir. 2013)............................................................................... 5

*United States v. Tomasetta,*
No. 10 Cr. 1205 (PAC), 2012 WL 896152 (S.D.N.Y. Mar. 16, 2012)........... 63, 67, 69

*United States v. Trippe,*
171 F. Supp. 2d 230 (S.D.N.Y. 2001)............................................................ 69

*United States v. Turkish,*
458 F. Supp. 874 (S.D.N.Y. 1978) ................................................................ 81

*United States v. Turoff,*
853 F.2d 1037 (2d Cir. 1988)................................................................. passim

*United States v. Tuzman,*
301 F. Supp. 3d 430 (S.D.N.Y. 2017)............................................................ 72

*United States v. Valenzuela,*
849 F.3d 477 (1st Cir. 2017).......................................................................... 41

*United States v. Vaughn,*
No. 17 Cr. 125 (PX), 2018 WL 558617 (D. Md. Jan. 25, 2018) .................... 50

*United States v. Vilar,*
530 F. Supp. 2d 616 (S.D.N.Y. 2008)............................................................ 80

*United States v. Vilar,*
729 F.3d 62 (2d Cir. 2013)........................................................................ 5, 22

*United States v. Walsh,*
194 F.3d 37 (2d Cir. 1999)............................................................................ 68

*United States v. Weaver,*
860 F.3d 90 (2d Cir. 2017)............................................................................ 14

*United States v. Weigand,*
482 F. Supp. 3d 224 (S.D.N.Y. 2020)............................................................. 9

*United States v. Werner,*
620 F.2d 922 (2d Cir. 1980)..................................................................... 46, 51

*United States v. Wey,*
No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)............ 72, 81

*United States v. Williams,*
504 U.S. 36 (1992)......................................................................................... 6

*United States v. Wilson,*
512 F. App'x 75 (2d Cir. 2013) ........................................................ 45, 47, 48

*United States v. Yannotti,*
541 F.3d 112 (2d Cir. 2008)................................................................. passim

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.,*
No. 19 Civ. 7204, 2014 WL 3900565 (S.D.N.Y. Aug. 8, 2014) .................... 16

*Wong Tai v. United States,*
273 U.S. 77 (1927)........................................................................................ 43

*Zafiro v. United States,*
506 U.S. 534 (1993)................................................................................ 46, 56

**Statutes, Rules & Other Authorities:**

7 U.S.C. § 1a(47)(A)(iii)................................................................................ 23

7 U.S.C. § 2(i) ................................................................................................. 23
7 U.S.C. § 6(b) ............................................................................................... 19
7 U.S.C. § 9 ............................................................................................. passim
15 U.S.C. § 78dd-2 ................................................................................... passim
15 U.S.C. § 78(j)(b) ............................................................................................ 3
18 U.S.C. § 371 ...................................................................................... passim
18 U.S.C. § 1344(2) ..................................................................................... 7, 8, 9
18 U.S.C. § 1349 ......................................................................... 11, 14, 43, 44
18 U.S.C. § 1591 ............................................................................................. 44
18 U.S.C. § 1956(h) ......................................................................................... 4
18 U.S.C. § 1960 ............................................................................................. 44
18 U.S.C. § 1960(a) ....................................................................................... 27
18 U.S.C. § 1960(b)(2) ................................................................................... 28
18 U.S.C. § 2423 ............................................................................................. 44
18 U.S.C. § 3238 ............................................................................... 38, 39, 41
18 U.S.C. § 3500(a) ....................................................................................... 82
18 U.S.C. § 1343 .................................................................... 3, 6, 11, 44
18 U.S.C. § 1344 .................................................................... 4, 6, 44
31 U.S.C. § 5312(b)(1) ................................................................................... 30
31 U.S.C. § 5330 ............................................................................................. 28
31 U.S.C. § 5330(a)(1) ................................................................................... 27
31 U.S.C. § 5330(d)(1) ................................................................................... 28
52 U.S.C. § 30101(8)(A)(i) ........................................................................... 34
52 U.S.C. § 30118 .................................................................................... 4, 33
52 U.S.C. § 30122 ........................................................................................... 31
Fed. R. Crim. P. 7 ............................................................................................. 5
Fed. R. Crim. P. 8(a) ................................................................................ 45, 46
Fed. R. Crim. P. 12(b) ...................................................................................... 4
Fed. R. Crim. P. 12(b)(3)(A)(i) ................................................................... 38
Fed. R. Crim. P. 14(a) ....................................................................... 45, 46, 47
Fed. R. Crim. P. 16 ......................................................................................... 80
Fed. R. Crim. P. 16(a)(1)(E) ....................................................................... 57
17 C.F.R. § 180.1 ........................................................................ 3, 5, 16, 23
17 C.F.R. § 240.10b-5 ...................................................................................... 3
85 Fed. Reg. 56,924 (2020) ......................................................................... 24
31 C.F.R. § 1010.100(ff) (2011) .................................................................. 28
76 Fed. Reg. 43,585 (Jul. 21, 2011) ...................................................... 28, 29
76 Fed. Reg. 41,398 (2011) ..................................................................... 15, 17
78 Fed. Reg 45,292, 45,300 (2013) ............................................................ 24
H.R. Conf. Rep. No. 100-576 ....................................................................... 37

The Government submits this memorandum in opposition to defendant Samuel Bankman-Fried's pretrial motions. (Dkts. 140-145). For the reasons discussed below, the defendant's motions should be denied.

## FACTUAL BACKGROUND

As alleged in the superseding indictment (Dkt. 115 (the "Indictment")) returned on March 27, 2023, this case arises from the defendant's corruption of the operations of the cryptocurrency companies he founded and controlled—including global cryptocurrency exchange FTX.com ("FTX") and trading firm Alameda Research ("Alameda")—through a pattern of fraudulent schemes that victimized FTX customers, investors, financial institutions, lenders, and the Federal Election Commission ("FEC"). Exploiting the trust that FTX customers placed in him and his exchange, the defendant stole FTX customer deposits, and used billions of dollars in stolen funds for a variety of purposes, including, among other things, to support the operations and investments of FTX and Alameda; to fund speculative venture investments; to make charitable contributions; and to enrich himself. The defendant also engaged in corrupt practices to advance his aims. He sought to influence cryptocurrency regulation in Washington, D.C. by steering tens of millions of dollars of illegal campaign contributions to both Democrats and Republicans. He also conspired to bribe one or more Chinese government officials in order to regain access to Alameda trading accounts that had been frozen by Chinese law enforcement authorities. (Indictment ¶ 1).

As part of his scheme, the defendant represented himself as the figurehead of a trustworthy and law-abiding segment of the cryptocurrency industry that was focused not only on profits, but also on investor and client protection. In fact, as the defendant well knew, FTX—which by early 2022 claimed to handle approximately $15 billion in daily trading volume on its platforms—was not focused on investor or client protection, nor was it the legitimate business that the defendant

claimed it was. Contrary to the defendant's promises to FTX customers that the exchange would protect their interests and segregate their assets, the defendant routinely tapped FTX customer assets to provide interest-free capital for his and Alameda's private expenditures, and in the process exposed FTX customers to massive, undisclosed risk. In addition, while the defendant publicly claimed that FTX operated independently from Alameda's cryptocurrency trading and investments in other companies, by his design, the reality was otherwise. The defendant controlled FTX and Alameda and used them to prop each other up, notwithstanding conflicts of interests and outright lies to the contrary. (Indictment ¶¶ 2-3).

The defendant perpetrated this multi-billion-dollar fraud through a series of systems and schemes that allowed the defendant, through Alameda, to access and steal FTX customer deposits without detection. For instance, in 2021, FTX began to accept customer fiat deposits into an Alameda-affiliated bank account that itself was established through a fraudulent scheme that the defendant directed, and that functioned as a mechanism for the routine and brazen misappropriation of those deposits. The defendant also caused the creation of secret loopholes in the computer code that powered FTX's trading platform—loopholes that allowed Alameda to incur a multi-billion-dollar negative balance on FTX that the defendant knew Alameda could not repay. Further, the defendant concealed from both Alameda's lenders and FTX's equity investors the fact that Alameda had taken billions of dollars from FTX. (Indictment ¶ 4).

In or about early November 2022, an internet news organization leaked what appeared to be Alameda's balance sheet, revealing publicly that Alameda's solvency was dependent on the multi-billion-dollar valuation that Alameda assigned to its holdings of FTT, FTX's proprietary digital currency, which was illiquid and difficult to value. Following this revelation, substantial numbers of FTX customers began seeking to withdraw their funds from FTX. Knowing that FTX

had misappropriated billions of dollars in customer funds, the defendant tried to reassure FTX customers, and slow customer withdrawals from FTX, with what he knew were false public claims about the ability of FTX to repay customer deposits, the security of FTX's customer assets, and the status of Alameda's balance sheet. (Indictment ¶ 7). In a last-ditch effort to secure sufficient liquid capital to satisfy FTX customer withdrawals, the defendant doubled down on his fraudulent schemes by soliciting billions of dollars in additional capital investments from existing and potential investors in FTX, many of whom he had previously defrauded. In soliciting this additional capital, the defendant made more false representations to potential investors about the source of the multi-billion-dollar hole in FTX's balance sheet caused by his misappropriation of customer deposits and his own knowledge of how the hole originated. The efforts of the defendant to raise sufficient capital to satisfy the demand for customer withdrawals failed. In November 2022, FTX halted trading and entered bankruptcy along with Alameda, and dozens of related entities. Left in FTX's wake were thousands of customers who had trusted the defendant and FTX with billions of dollars in savings and investment capital and found themselves overnight unable to withdraw their funds and unsure about whether they would ever be repaid. (Indictment ¶¶ 8-9).

The thirteen-count Indictment charges the defendant as follows:

- **Counts One and Two:** Conspiring to commit, and committing, wire fraud on customers of FTX, in violation of 18 U.S.C. §§ 1343 and 2, and 1349.

- **Counts Three and Four:** Conspiring to commit, and committing, fraud on customers of FTX in connection with the purchase and sale of derivatives, in violation of 18 U.S.C. § 371, 7 U.S.C. §§ 9(1) and 13(a)(5), and 17 C.F.R. § 180.1.

- **Counts Five and Six:** Conspiring to commit, and committing, securities fraud on investors in FTX, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78(j)(b) and 78ff, and 17 C.F.R. § 240.10b-5.

- **Counts Seven and Eight:** Conspiring to commit, and committing, wire fraud on lenders to Alameda Research, in violation of 18 U.S.C. §§ 1343 and 2, and 1349.

- **Count Nine:** Conspiring to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349.

- **Count Ten:** Conspiring to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960.

- **Count Eleven:** Conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h).

- **Count Twelve:** Conspiring to make unlawful political contributions and to defraud the Federal Election Commission, in violation of 18 U.S.C. § 371, and 52 U.S.C. §§ 30118, 30122, and 30109(d)(1)(A) & (D).

- **Count Thirteen:** Conspiring to violate the anti-bribery provisions of the Foreign Corrupt Practices Act, in violation of 18 U.S.C. § 371 and 15 U.S.C. § 78dd-2.

## ARGUMENT

I. **The Court Should Deny the Defendant's Motions to Dismiss**

In arguments across several briefs, the defendant moves to dismiss eight of the thirteen charges in the Indictment on the basis that the Indictment's allegations are insufficient and legally defective. (Dkts. 140-142). These motions are meritless. As discussed below, the charges track the relevant statutes and the defendant's alleged misconduct falls within the heartland of what these statutes prohibit.

### A. Applicable Law

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).[1] The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its

---

[1] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

4

face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 n.16 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1)). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008). Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124-25; *Yannotti*, 541 F.3d at 127. Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not

5

subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see United States v. Williams*, 504 U.S. 36, 54 (1992). To that end, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

### B. Counts One, Two, Seven, Eight, and Nine Sufficiently Allege Schemes and Conspiracies to Defraud

The defendant seeks to dismiss five fraud charges from the Indictment on the basis that the defendant's schemes—which involved billions of dollars in unlawful proceeds—somehow do not involve obtaining "property." (Dkt. 140). Each of these counts in the Indictment tracks the relevant statutory language, which alone is a basis to deny the motion. *See Yannotti*, 541 F.3d at 127. Count Nine, the bank fraud conspiracy count, alleges a scheme to obtain "moneys, funds, credits, assets, securities, and other property" that was owned by, or in the custody and control of a financial institution, in the form of customer deposits and fees, tracking the language of 18 U.S.C. § 1344. The two wire fraud counts and the corresponding conspiracy counts all allege a scheme to defraud and to obtain "money or property" in the form of customers' or lenders' money, tracking the language of 18 U.S.C. § 1343.

Having no basis to challenge these counts as charged, the defendant instead conjures an imagined indictment premised on the "right-to-control" theory of wire fraud, and argues that such an indictment would not sufficiently allege a property interest under the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. ___, 143 S. Ct. 1121 (2023). In fact, as alleged in the Indictment, the defendant's bank fraud scheme was designed to obtain billions of dollars of

funds from the custody and control of Bank-1—an interest explicitly protected by Section 1344(2). And, as alleged in the Indictment, the defendant's wire fraud schemes deprived FTX customers and Alameda lenders of dollars and cryptocurrency—interests explicitly protected by Section 1343. Whatever arguments the defendant may make about an indictment alleging a scheme to defraud a victim of its right to control its assets have no relevance to the crimes actually charged in this case.

    1.   <u>Count Nine Alleges a Scheme to Obtain Property Under a Bank's Control</u>

Count Nine alleges that the defendant conspired to "obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution" by means of false representations that a bank account would be used for trading and market making, when in fact it would be, and was, used to receive and transmit FTX customer funds. (Indictment ¶ 87). Because paragraph 87 of the Indictment tracks the statutory language of 18 U.S.C. § 1344(2), it properly alleges that the defendant conspired to obtain "property" in violation of the bank fraud statute. *See Yannotti*, 541 F.3d at 127.

The defendant argues that Count Nine should be dismissed based on the mistaken premise that the "property" alleged to have been obtained was the bank's "right to control" its assets, which is no longer a viable theory of "property" in the wake of the Supreme Court's recent decision in *Ciminelli*. (Dkt. 140 at 5-6, 9-11; Dkt. 147 (supplemental letter)). *Ciminelli* rejected the "Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." 143 S. Ct. at 1125. The Supreme Court held that "'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest," and "not a valid basis for

liability under § 1343." *Id.* at 1124. *Ciminelli* has no bearing on the bank fraud charge here, which alleges a scheme to obtain money in the bank's custody, and not a scheme to defraud the bank by depriving it of "valuable economic information," as the defense mistakenly asserts. (Dkt. 140 at 10). Specifically, the Indictment alleges that the defendant conspired to fraudulently induce a bank to open an account so that he and FTX could obtain FTX customer deposits that were transmitted to the bank account, and then withdrawn from the bank's custody by the defendant and his co-conspirators. (Indictment ¶¶ 19-21). Unlike in "right to control" cases, where the alleged "property" that is obtained is the victim's right to control its assets, the property that was obtained here was money, which is indisputably "property" under all of the property fraud statutes, including 18 U.S.C. § 1344(2).

Attempting to shoehorn Count Nine into the "right to control" theory, the defendant conflates the "scheme" with the alleged "money or property." The defendant argues that because the Indictment "alleges that Bank-1 was misled about the true purpose of the North Dimension bank account and was therefore deprived of complete and accurate information bearing on its decision to open the account," "the only purported property interest Bank-1 was allegedly deprived of was the 'right to control' access to its bank accounts." (Dkt. 140 at 5-6). Certainly it is true that the Indictment alleges that as part of his scheme to defraud, the defendant misled Bank-1 about the use and purposes of the North Dimension account. (Indictment ¶¶ 18-21). But the Indictment alleges that the ultimate object of the scheme was money in the form of customer deposits, a traditional property interest protected by Section 1344(2). (*Id.* ¶¶ 19-21).

Further, to the extent the defendant claims that "the Government must establish that Mr. Bankman-Fried and his co-conspirators obtained the 'property' of Bank-1" (Dkt. 140 at 5), he is simply incorrect. The Supreme Court has held that "for purposes of the bank fraud statute, a

8

scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution,' at least where . . . the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds." *Shaw v. United States*, 580 U.S. 63, 67 (2016). There is no requirement under Section 1344(2) that in obtaining money and property, "the defendant's scheme created a risk of financial loss to the bank." *Loughrin v. United States*, 573 U.S. 351, 356 (2014).

Thus, an indictment properly alleges that money and property was "obtained" under Section 1344(2) where the money or property was customer funds that are held in the bank's custody or control. In *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019), for example, the defendant "caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with an unregistered Bitcoin exchange." The object of that scheme was to obtain property in the form of "funds under those institutions' custody and control; namely, funds in the customers' accounts." *Id.*[2] Similarly in *United States v. Weigand*, 482 F. Supp. 3d 224, 236 (S.D.N.Y. 2020), the indictment alleged that the defendants made false representations to banks to cause them to process customer transactions, which the court held sufficiently described a deprivation of property in the bank's custody under Section 1344(2). *See United States v. Patterson*, No. 21-1678-cr, 2022 WL 17825627, at *2 (2d Cir. Dec. 21, 2022) (affirming *Weigand* on appeal); *see also, e.g.*, *United States v. McNeil*, 320 F.3d 1034, 1039 (9th Cir. 2003) (affirming Section 1344(2) bank fraud conviction where defendant "used fake identification to open a bank account" and then obtained funds that were deposited into the account

---

[2] The wire fraud holding in *Lebedev* may have been abrogated by the Supreme Court in *Ciminelli*, but the Supreme Court did not address the Second Circuit's bank fraud holding.

by others); *United States v. Dubceac*, No. 09 Cr. 1164 (RWS), 2011 WL 1458115, at *1 (S.D.N.Y. Apr. 14, 2011) (defendant committed bank fraud by using false information to open bank accounts and then withdrawing funds that were wired to those accounts by third parties).[3]

Because Count Nine alleges a straightforward violation of the bank fraud statute, and describes "property" in the form of customers' funds in the bank's custody that fits squarely within the Supreme Court's and this Circuit's precedents, the defendant's motion should be rejected.

2.   Counts One and Two Allege a Scheme to Defraud FTX Customers of Money or Property

Counts One and Two should not be dismissed because the first two counts of the Indictment properly allege that the defendant conspired to and did scheme to defraud FTX's customers by misappropriating their deposits. (Indictment ¶¶ 63-67). The charges track the statutory language of 18 U.S.C. § 1349 and 18 U.S.C. § 1343, respectively, and allege that the objective of the scheme to defraud was to "obtain money and property." (*Id.* ¶¶ 65, 67). As the Indictment states dozens of times, the "money and property" the defendant sought to and did obtain were customers' deposits. And the Indictment further clarifies that the defendant conspired to and did scheme to defraud customers by misappropriating their deposits in two ways: by misappropriating customer funds from bank accounts into which customers made fiat deposits, and by misappropriating customer cryptocurrency funds that were on the FTX exchange. (*Id.* ¶¶ 22-24). The result was that billions

---

[3]  Because Section 1344(2) applies to a scheme to obtain money in a bank's custody and does not require a showing "that the defendant intended to defraud a bank," *Loughrin*, 573 U.S. at 356, the object of the scheme is the money, not the bank's right to control its assets. Thus, the "right to control" theory (and its overruling in *Ciminelli*) has no application to Count Nine. *See, e.g.*, *United States v. Nejad*, No. 18 Cr. 224 (AJN), 2020 WL 883500, at *3 (S.D.N.Y. Feb. 24, 2020) (applying the "right to control" theory to Section 1344(1), but not to 1344(2) and concluding that "*Loughrin* and *Lebedev* make clear that there are two elements to [Section 1344(2)], and that intent to cause harm is not one of them").

of dollars were improperly taken from customers. Because Counts One and Two track the language of the statute, and the Indictment alleges that the object of the scheme to defraud was obtaining customer deposits, which are both "money" and "property," the charges are legally sufficient. *See Yannotti*, 541 F.3d at 127. Indeed, it is hard to imagine a clearer example of "economic loss to the victim" (Dkt. 140 at 14), when the defendant and his co-conspirators misappropriated and spent billions of dollars.

Nonetheless, again aiming his arguments at a strawman indictment rather than the Indictment returned by the Grand Jury, the defendant moves to dismiss these counts, arguing that the Indictment does not identify a "property interest." (Dkt. 140 at 14). But the "property" is money in the form of customers' deposits, not "intangible losses" like the right to honest services or the right to control assets. (*Id.* at 15). The defendant asserts that the "core claim" in the Indictment is that he "misused FTX customer funds by providing improper loans to Alameda" (*id.* at 14), and then argues there is no alleged "economic loss" because the Indictment "does not allege that he never intended to pay back the loans to Alameda" (*id.* at 16). The defendant's argument is wrong both on the facts alleged and on the law.

Contrary to the defendant's claim, the Indictment alleges that the defendant did not simply borrow some money for Alameda, but that he misappropriated billions of dollars of customer money that were spent on cryptocurrency trading, venture investments, repaying lenders, and paying for political contributions. (Indictment ¶¶ 22, 33). The allegation is not that the defendant deprived customers of the "right to make informed decisions" about how their deposits were being used (Dkt. 140 at 16), but that he engaged in paradigmatic wire fraud through the "fraudulent appropriation to [his] own use of the money … entrusted to [his] care by another." *Carpenter v. United States*, 484 U.S. 19, 27 (1987).

11

And as a matter of law, it is not necessary for the Indictment to allege that the defendant never intended to pay back purported "loans" to Alameda. Where, as here, there is an "immediate intent to misapply and defraud," the offense is "complete," and what "might have later happened as to repayment is not material and could not be a defense." *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980); *see also United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from the defendant's fraudulent conduct") (quoting 2 Leonard B. Sand et al., Modern Federal Jury Instructions § 44.01 at 44-35 ("As the recommended instruction states, no amount of honest belief that the scheme will ultimately work out excuses any fraudulent actions or representations.")).

Indeed, to the extent that the defendant suggests that an intent to cause permanent loss of property is required to establish wire fraud, he is wrong. *See United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) ("The requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the *use* of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so."). It is therefore legally irrelevant whether the defendant hoped to return the billions of dollars he misappropriated, and there is certainly no legal requirement that the Indictment contain an allegation about such facts. Regardless, the Government expects the evidence to show that by at least the fall of 2022, the defendant understood that Alameda had borrowed and used more FTX customer money than it could ever reasonably expect to repay, and yet continued to accept customer deposits, and misappropriate customer funds, belying any assertion that the defendant had a realistic plan for repayment.

12

### 3.  Counts Seven and Eight Allege a Scheme to Defraud Alameda's Lenders

Counts Seven and Eight should not be dismissed because they properly allege that the defendant conspired to and did defraud Alameda's lenders of their "money and property" by providing them "false and misleading information . . . regarding Alameda's financial condition." Indictment ¶¶ 80-84). The Indictment alleges that after cryptocurrency markets experienced a downturn in June 2022, Alameda was required to repay billions of dollars in outstanding loans. (*Id.* ¶ 32). For those loans that were not called for repayment, Alameda was required to provide financial information to its creditors in order to retain its existing loans and secure new lending. (*Id.* ¶ 36). Among other things, the Indictment alleges that the defendant conspired to mislead Alameda's creditors about the money Alameda had "borrowed" from FTX, as well as about the substantial personal loans Alameda had made to FTX executives. (*Id.*). The allegations for Counts Seven and Eight track the statutory language of 18 U.S.C. §§ 1349 and 1343, respectively, and the Indictment alleges that the objective of the scheme to defraud was to obtain and keep money that had been lent to Alameda based on fraudulent representations and pretenses.

The defendant mistakenly argues that the Indictment fails to allege a "property interest." (Dkt. 140 at 11). In fact, the Indictment identifies the property that is the object of the scheme in Counts Seven and Eight as the lent money that was obtained or retained by Alameda through the making of false statements to its lenders. *See Pasquantino v. United States*, 544 U.S. 349, 355 (2005) (victim's right "to collect money" is "property" in its hands); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) (defendant's attempt to "obtain or retain money by use of misrepresentations that he knew were material" was a "paradigmatic scheme to defraud"), *aff'd*, 158 F.3d 166 (2d Cir. 1998). The defendant claims that "the Government is not alleging that Mr. Bankman-Fried provided false and misleading information to Alameda's lenders to induce them

to enter into loan agreements with Alameda in the first place." (Dkt. 140 at 12). But that is exactly the Indictment's allegation: the defendant fraudulently induced lenders to lend new money or to forbear from calling existing loans for immediate repayment. (*E.g.*, Indictment ¶ 36). The allegation is not—as the defendant claims without referencing relevant language in the Indictment—that the lenders were defrauded of their "right to valuable economic information needed to make discretionary economic decisions," *Ciminelli*, 143 S. Ct. at 1128, but that they were defrauded of "traditional property"—money—that they were induced to lend and to forbear from calling for repayment through fraudulent representations.

The defendant also takes issue with the fact that the Indictment does not "indicate which loans are at issue," the loan terms, or "any amounts on those loans that were not repaid." (Dkt. 140 at 12). While contractual documents, like loan agreements, can contain false statements that are part of a scheme to defraud, wire fraud is not limited by contractual terms and may include oral or other written misrepresentations. *See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (rejecting the argument that oral misrepresentations were immaterial when parties had signed contracts). The Indictment sufficiently alleges that the defendant and his co-conspirators made false and misleading representations to lenders relating to Alameda's financial condition. No more specificity is required. To the extent the defendant's motion is simply a request for additional particulars about the loans at issue, that request should be denied for the reasons discussed *infra* at 70-73.

## C.  Counts Three and Four Sufficiently Allege Violations of the Commodities Exchange Act

"In the wake of the financial crisis of 2008, Congress . . . provided the [Commodity Futures Trading Commission, "CFTC"] with additional and broad authority to prohibit fraud and

manipulation." 76 Fed. Reg. 41,398 (2011). This new statutory authority made it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance," in violation of rules promulgated by the CFTC. 7 U.S.C. § 9(1). The CFTC gave force to that law through CFTC Rule 180.1, which prohibits, "in connection with any swap, or a contract of sale of any commodity in interstate commerce" using "any manipulative device, scheme or artifice to defraud," making any "untrue or misleading statement" of fact or omission, or engaging in "any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1(a).

Counts Three and Four of the Indictment charge the defendant with violating Rule 180.1 by conspiring to commit, and committing, commodities fraud. The defendant moves to dismiss these counts on the basis that the Indictment does not sufficiently allege (1) that the fraud was "in connection" with the purchase or sale of a commodity; or (2) a domestic application of the statute. Neither argument has merit.

1. Counts Three and Four Allege CFTC Rule 180.1's "In Connection With" Requirement

The defendant argues that Counts Three and Four should be dismissed because they fail to adequately allege that the defendant's conduct met the "in connection with" requirement of CFTC Rule 180.1. But the Indictment does precisely that, charging that the defendant used a scheme to defraud, and made untrue and misleading material misstatements and omissions, "in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity." (Indictment ¶ 73). Count Three alleges that the defendant conspired to do the same. (*Id.* ¶ 70). These allegations track the relevant statutory and

regulatory language under 7 U.S.C. § 9(1) and 13(a)(5), and 17 C.F.R. § 180.1, and are therefore

sufficient. *See, e.g., Hamling*, 418 U.S. at 117. Disregarding these plainly sufficient allegations to

contend otherwise, the defendant's "in connection with" arguments are legally and factually

incorrect.

   Starting with the law, take the defendant's claim that the "in connection with" requirement

"is not satisfied where the thing that is misappropriated has 'value to the malefactor apart from

[its] use' in a commodities transaction." The defendant supports this pronouncement with a

quotation from *SEC v. Zandford*, but it is not the law in any courtroom. To the contrary, the

*Zandford* court made clear that it was *not* adopting this limitation, which had been relied upon by

the Court of Appeals below, in reversing that court's dismissal of the SEC's complaint. 535 U.S.

813, 824-25 (2002). The Supreme Court went on to make clear, "neither the SEC nor this Court

has ever held that there must be a misrepresentation about the value of a particular security in order

to run afoul" of the securities laws, and that in fact a much broader swath of deceptive conduct

was reachable under SEC Rule 10b-5. *Id.* at 819-20, 824.[4]

   Nor is the defendant correct to assert that the reach of CFTC Rule 180.1 is limited to fraud

in connection with a "commodities transaction." Although Rule 180.1 closely tracks the language

of SEC Rule 10b-5 and "courts have looked to the securities laws when called upon to interpret

similar provisions of the CEA," *Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014),

---

[4] The defendant's reliance on *Chem. Bank v. Arthur Andersen & Co.*, 726 F.20 930, 943 (2d Cir. 1984) (Dkt. 141 at 7), is therefore also misplaced. That case predated *Zandford* and its holding derived from the faulty premise, later rejected by *Zandford*, that the "in connection with" standard is only met if a fraud relates to the value of a security. *See, e.g., Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, No. 19 Civ. 7204, 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014) ("[J]udges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold.").

they are not identical. In particular Rule 180.1, and Section 6(c) of the CEA, 7 U.S.C. § 9 (1), under which Rule 180.1 was promulgated, prohibit fraud "in connection with any swap." There is no textual requirement that the fraudulent acts occur in connection with the purchase, sale, or creation of the swap. Consistent with the text, the CFTC has made clear that Section 9(1) and Rule 180.1 "reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, *pendency, or termination* of any swap." 76 Fed. Reg. 41,398, 41,406 (emphasis added).

Even if the Court were to consider the alleged facts under the "purchase or sale" case law that applies in the context of SEC Rule 10b-5 claims, the defendant's arguments would still fail. In construing the securities laws, the "Supreme Court has repeatedly held" that the "in connection with" requirement "is easily satisfied," *United States v. Nouri*, 711 F.3d 129, 143 (2d Cir. 2013), and "must be read flexibly, not technically and restrictively so that novel and atypical as well as garden type variety frauds do not escape its prohibitive scope," *Dabit v. Merrill Lynch*, *Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005), *vacated and remanded on other grounds*, 547 U.S. 71 (2006). *See also Zandford*, 535 U.S. at 819 (holding that Section 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes"). The Second Circuit has likewise embraced "an expansive construction to the 'in connection with' requirement." *Dabit*, 395 F.3d at 37.

Here, the Indictment alleges fraud "in connection with" commodities transactions in at least three respects.

*First*, as alleged, a portion of the customer deposits that were fraudulently misappropriated by the defendant were commodities, namely cryptocurrencies like bitcoin. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 227 (E.D.N.Y. Mar. 6, 2018) (holding that CFTC properly

alleged fraud related to misappropriation of victims' virtual currency, which the court classified as a commodity, and recognizing that the CFTC has anti-fraud authority under Section 6(c)(1) of the CEA and Rule 180.1 in connection with spot transactions "not directly involving future trades"). The defendant describes the object of the scheme as the misappropriation of "FTX customer *fiat* deposits for Alameda's use" (Dkt. 141 at 6) (emphasis added), but that ignores that customers made cryptocurrency deposits meant to be credited to their FTX accounts that were misappropriated as well (Indictment ¶¶ 21-24). The Government expects that the evidence at trial will show that at the defendant's direction, Alameda removed customer funds from the FTX platform in a variety of ways, including by accruing an undisclosed negative balance in bitcoin through Alameda's trading activity and transferring customers' bitcoin off the exchange to pay Alameda's expenses. Thus, as in *Zandford*, "the [commodities] transactions themselves," specifically FTX customers' transfers of their crypto assets to the platform, "'enabled [the defendant] to convert the proceeds . . . to his own use." (Dkt. 141 at 6 (quoting *Zandford*, 535 U.S. at 820)).

*Second*, even those customers who deposited fiat currency on the FTX exchange were induced to do so for the purpose of trading commodities, such as bitcoin, and crypto-based derivatives, such as swaps. (Indictment ¶¶ 10, 11, 21). As alleged, the defendant's false claims that FTX would facilitate commodities and swap transactions with an eye toward "consumer protection," "avoiding or managing conflicts of interest," and "segregat[ing] customer assets from its own" (Indictment ¶ 2), were central to his gaining access to the customer funds that he misappropriated and, by extension, to the success of the fraud. *See CFTC v. Royal Metals Grp., LLC*, No. 18 Civ. 8407 (JMF), 2019 WL 1996307, at *7 (S.D.N.Y. Jan. 25, 2019) (commodities fraud scheme where defendants "misappropriated their Clients' funds" intended for the purchase

18

of precious metals); *see also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110-11 (2d Cir. 1986) (holding that broker's misrepresentations relating to the "degree of risk" of commodities investing were made "in connection with" commodity futures contracts, under an analogous section of the CEA, 7 U.S.C. § 6(b) and noting that the "legislative history of the CEA indicates a congressional awareness that fraudulent conduct can occur during the solicitation of commodities accounts"); *CFTC v. Vartuli*, 228 F.3d 94, 101-02 (2d Cir. 2000) (misrepresentations regarding the effectiveness of a computer program advertised to make investment recommendations were made "in connection with" commodities contracts under 7 U.S.C. § 6(b)); *see also In re J.P. Jeanneret Associates*, *Inc.*, 769 F. Supp. 2d 340, 363 (S.D.N.Y. 2011) (holding that SEC Rule 10b-5's "in connection with" requirement "can be satisfied in circumstances . . . where the plaintiffs part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it") (citing cases).

The defendant and his co-conspirators offered customers a facility for the purpose of buying and selling commodities and derivatives, and—as alleged—made false representations about the risks associated with the exchange and the security of their funds to induce customers to part with their trading capital, to engage in commodities trading on the exchange, and not to withdraw their funds. (Indictment ¶¶ 2, 11, 21, 24, 34, 54). This case thus resembles *Royal Metals Grp.*, 2019 WL 1996307, at *2, in which Judge Furman entered a default judgment under Rule 180.1 against defendants who "misappropriated their Clients' funds" intended for the purchase of precious metals, including by falsely claiming that their business provided a "safe and secure online environment to make precious metal investments."

Nor did the defendant's fraudulent conduct cease at the solicitation stage. In order to ensure that customers would continue to trade crypto and swaps on his platform, and thus, unknowingly,

19

provide the capital to fund Alameda's speculative investments and leveraged borrowing, the defendant continued his pattern of material omissions, lies and half truths, loudly and publicly extolling the safety of FTX and its separation from Alameda. *See United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006) (scheme to defraud extends to those who are misled in assessing whether to "hold or sell" their investments).

The defendant relies on *Zandford* for the proposition that the "in connection with" requirement is not satisfied where a defendant misappropriates cash from a brokerage account, but that decision cannot bear the weight he places on it. While it is true that *Zandford* includes dictum in a footnote suggesting that Rule 10b-5 would not be violated where "a broker embezzles cash from a client's account," *Zandford*, 535 U.S. at 825 n.4, this appears to be a reference to comments by the Solicitor General that, in context, make clear that the "account" the Supreme Court contemplated was one "outside of the brokerage account." *See Zandford*, Tr. of Oral Arg. 16, *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2001/01-147.pdf. Moreover, nothing in the footnote suggests that the Supreme Court intended to foreclose liability in circumstances like this one where the broker solicited customer assets for securities trading with the expectation and intent of embezzling them at the time of solicitation. Rather, the *Zandford* court cited with approval the fact that the SEC had consistently "maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b–5." 535 U.S. at 819. Likewise, nothing in the *Zandford* footnote suggests that the Court contemplated a scenario like this one, in which the defendant used false statements and fraudulent omissions to induce customers to continue holding commodities and swaps on his platform rather than sell those assets and invest through an exchange that was not woefully undercapitalized.

*Finally*, in many instances, the defendant accomplished the misappropriation by using customer assets to engage in commodities and swap transactions for the benefit of Alameda, rather than for the benefit of the customers to whom those assets belonged. (*E.g.*, Indictment ¶¶ 10, 22). In those instances, the qualifying transaction under the CEA and the act of misappropriation were one and the same, making the "connection" clear. *See United States v. Khalupsky*, 5 F.4th 279, 290 (2d Cir. 2021) (holding that Rule 10b-5's "in connection with" requirement was satisfied where the fraudulent conduct—hacking into a computer system—"prompted and enabled the charged securities trading"); *United States v. O'Hagan*, 521 U.S. 642, 643 (1997) (finding Rule 10b-5's "in connection with" requirement satisfied where information was misappropriated through its use in buying and selling securities); *Zandford*, 535 U.S. at 822 ("It is enough that the scheme to defraud and the sale of securities coincide.").

Because the Indictment adequately alleged a scheme and conspiracy to commit commodities fraud, the defendant's motion should be denied.

2. Counts Three and Four Do Not Allege an Impermissible Extraterritorial Application of the CEA

The defendant also argues that Counts Three and Four should be dismissed because the charges involve an "extraterritorial—and thus impermissible—application of the CEA." (Dkt. 141 at 8). This argument is not a proper basis for a motion to dismiss and is in any event wrong on the merits.

Procedurally, the defendant's extraterritoriality argument must wait for full factual development at trial. The Second Circuit has held that whether an Indictment alleges an impermissible extraterritorial application of a statute "is a merits question." *United States v. Prado*, 933 F.3d 121, 138 (2d Cir. 2019). Because extraterritoriality is a merits question, it is not a basis

for dismissing an Indictment, particularly where, as here, the extraterritoriality issue requires a full presentation of evidence. *See United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (holding that weighing sufficiency of evidence underlying indictment not allowed unless the Government has made "a full proffer of the evidence it intends to present at trial"). The Second Circuit and courts in this district routinely evaluate extraterritoriality arguments based on the full record developed at trial. *See, e.g.*, *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020) (finding Government "presented ample evidence" at trial to show charge was not extraterritorial); *United States v. Epksamp*, 832 F.3d 154, 169 (2d Cir. 2016) (finding trial record contained sufficient evidence that charge was not extraterritorial); *Vilar*, 729 F.3d at 77 (same). Indeed, the defendant has not identified a single case in this District where a court has dismissed an indictment at the motion to dismiss stage on extraterritoriality grounds. Accordingly, given the fact-intensive nature of the extraterritoriality issue, resolving the matter at this stage would be inappropriate.

Even if this Court considered the merits—which is premature at this time—Counts Three and Four would easily pass muster. At least some of the derivatives contracts traded on FTX are "swaps" under the CEA, and the statute applies extraterritorially to fraudulent conduct in connection with such contracts. And even if that was not the case, the Counts charge a domestic application of the CEA.

Starting with the extraterritorial application, Counts Three and Four allege a permissible extraterritorial application of the CEA. While the CEA's prohibition on manipulation and deception set forth in 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 generally does not apply extraterritorially, there is a statutory exception for swaps. Under 7 U.S.C. § 2(i), the provisions of the CEA "relating to swaps" apply "to activities outside of the United States" if those activities "have a direct and significant connection with activities in, or effect on, commerce of the United

States." *See Prime Int'l Trad. v. BP PLC*, 937 F.3d 94, 102-03 (2d Cir. 2019) (quoting 7 U.S.C. § 2(i), and noting that for swaps, the CEA does contain "a clear statement of extraterritorial application"); *see also SIFMA v. CFTC*, 67 F. Supp. 3d 373, 388 (D.D.C. 2014) (Section 2(i) provides "for the extraterritorial application of the [CEA] provisions" related to swaps, which include Section 9(1)).

FTX offered customers cryptocurrency derivatives that it called, among other things, "perpetual swaps" and which plainly fall within the CEA's definition of "swaps" defined in 7 U.S.C. §§ 1a(47)(A)(iii) and (iv). As described above, the Indictment alleges that customers transacting in these swaps were defrauded by the defendant through the misappropriation of funds deposited by them for swaps trading, and by depriving them of the ability to withdraw the proceeds from their swaps trading.

This conduct by the defendant had a "direct" connection with activities in, and effect on, commerce in the United States. The CFTC has consistently explained that the term "direct" in Section 2(i) simply requires a "reasonably proximate causal nexus" between the swap activities and commerce in the United States. 78 Fed. Reg. 45,292, 45,300 (2013); 85 Fed. Reg. 56,924, 56,929 (2020); *accord SIFMA*, 67 F. Supp. 3d at 392. This is in line with Second Circuit case law interpreting the word "direct" in the context of a similar statute extending antitrust rules abroad. *See Lotes Co. v. Hon Hai Precision Indus.*, 753 F.3d 395, 410 (2d Cir. 2014) (defining "direct" as requiring a "reasonably proximate causal nexus").

The proof at trial will show that each part of the defendant's scheme had a direct and significant connection with, and effect on, commerce within this country. FTX marketed to United States persons; the scheme induced some of these U.S. customers to trade swaps on the FTX exchange; funds used to buy swaps were misappropriated from U.S. bank accounts;

misappropriated funds were used by the defendant and his co-conspirators for spending in the United States; many victims of the misappropriation are located in the United States; and the cryptocurrency markets in the United States were affected by the defendant's fraud. Therefore, Counts Three and Four allege permissible extraterritorial applications of the CEA.

Regardless of the CEA's swaps provision, Count Three and Four also charge a domestic application of the statute. To determine whether a charge involves a proper "domestic application of [a] statute," courts look to "whether the domestic activity pleaded is the focus of congressional concern." *Prime*, 937 F.3d at 102. Because the focus of Section 9(1) and Rule 180.1 is "manipulation" and "ensuring market integrity," the question is whether the alleged "manipulation" and "misleading statements and omissions" were "made wholly abroad to foreign actors" or instead were part of the domestic activity. *CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *12 (S.D.N.Y. Mar. 24, 2023) (citing *Prime*, 937 F.3d at 102-03). The defendant concedes as much, noting that his motion turns on whether the Indictment alleges that "sufficient manipulative conduct or statements were made in the United States." (Dkt. 141 at 10). Here, unlike in *Prime* and *Gorman*, the defendant is alleged to have made false and misleading statements both in the United States and directed at U.S. customers, including statements that he made while he was personally present here. Those statements include, among others, the representations he made to Congress and statements he made over Twitter, a U.S. social media platform, that reached U.S. customers.

In arguing that his conduct was wholly extraterritorial, the defendant focuses not on where or to whom his misleading statements were made, but instead on where FTX.com is registered. (Dkt. 141 at 11). But he cites no case for the proposition that the place of incorporation is determinative or even relevant to the extraterritoriality analysis. In any event, because the

24

Indictment alleges that the conduct that is the focus of the CEA took place in the United States or was directed to prospective U.S. customers, and much of the banking activity and customer transactions also took place in the United States, the Indictment sufficiently alleges a domestic application of the statute. *See CFTC v. Reynolds*, No. 19 Civ. 05631 (MKV), 2021 WL 796683, at *4 (S.D.N.Y. Mar. 2, 2021) (sufficiently alleging under civil pleading standard a "domestic application" of the CEA because "misrepresentations to prospective and existing customers" happened on and in connection with "a website in the United States").

Arguing that a "single statement" made in the United States is not a sufficient basis for the domestic application of the CEA, the defendant cites *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022). But this case involves far more than one domestic statement; it involves a pattern of fraudulent statements within the United States and directed at U.S. customers. (*E.g.* Indictment ¶¶ 2, 3). In any event, *Rabobank* is inapposite. In *Rabobank*, a private plaintiff sued under the CEA, arguing that the defendant's "conduct abroad" to manipulate "an index tied to a foreign market" had affected a position the plaintiff purchased on a "domestic market." *Id.* at 97. The Second Circuit rejected the claim as an impermissible extension of a provision that grants plaintiffs a private right of action under the CEA, not on the grounds that it was an impermissible extraterritorial application of the CEA's substantive provisions. *Id.* at 96-98. The Circuit allayed concerns that the decision would "undermine the ability of U.S. law and U.S. regulators to protect domestic markets and investors," by explaining that the decision "concerns private rights of action" and "has nothing to do with government enforcement." *Id.* at 98 n.11.

The defendant argues that the "alleged use of North Dimension's U.S.-based bank account to receive and send customer funds was tangential to any commodities transaction or markets, rather than being 'in connection' with a commodities transaction as required under the CEA."

(Dkt. 141 at 13). This merely recycles the defendant's mistaken argument that the Indictment fails to sufficiently allege the "in connection with" requirement of the CEA. As explained *supra* at 18-20, those intending to trade commodities on FTX were fraudulently induced to deposit their money into U.S.-based bank accounts, after which their money was misappropriated from those accounts and elsewhere. The defendant's reliance on *Batratchenko*, 764 F.3d at 275, which deemed certain incidental domestic wire transfers insufficient to overcome the presumption against extraterritorial application of the CEA, is also misplaced. In that case, unlike here, the relevant investment contracts were entered in Russia and the victim was solicited for investments while in Russia using materials written in Russia. As alleged, the defendant heavily marketed FTX in the United States, where he reached a wide U.S. audience with misrepresentations, and accepted customer deposits via transactions at a U.S. bank.

Finally, the defendant argues that the "alleged impact of the purported scheme on the prices of commodities in interstate commerce is too attenuated a connection to establish a domestic application of the CEA." (Dkt. 141 at 13). The defendant's argument about the strength of the proof of price impact on commodities shows once again why the motion to dismiss should be denied, or at a minimum deferred until after trial.

### D.  Count Ten Sufficiently Alleges that the Defendant Conspired to Operate an Unlicensed Money Transmitting Business

Tracking the language of 18 U.S.C. § 1960(a) and (b)(1)(B), Count Ten charges that the defendant conspired to operate an "unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section." (Indictment ¶¶ 89, 90). "The Indictment therefore satisfies the pleading

requirements of Rule 7(c)(1)," and accordingly is "sufficient with respect to allegations that [the business] was a money transmitting business." *United States v. Murgio*, 209 F. Supp. 3d 698, 710-11 (S.D.N.Y. 2016) (denying motion to dismiss section 1960 charge for defendant who operated a cryptocurrency exchange), *affirming conviction*, 32 F.3d 40, 49 (2d Cir. 2019).

The defendant argues that Count Ten should be dismissed because FTX, as a foreign cryptocurrency exchange, was not required to register as a "money transmitting business" with the Secretary of the Treasury, pursuant to 31 U.S.C. § 5330(a)(1), and therefore was not unlicensed within the meaning of Section 1960. (Dkt. 141 at 17). This argument is mistaken: the Indictment plainly alleges that a substantial part of the activities engaged in by the money transmitting business that the defendant and his co-conspirators operated, which included not merely FTX but also, at various times, U.S.-based companies Alameda and North Dimension, took place within the United States.

Section 1960 applies to the operation of a business that is required under 31 U.S.C. § 5330 or related regulations, to register with the Department of Treasury as a money services business ("MSB"), but fails to do so. In 2011, the Treasury regulations were amended to clarify that the term "money services business" is not limited to businesses physically located in the United States. 31 C.F.R. § 1010.100(ff) (2011).

Accepting the allegations in the Indictment as true, as he must, the defendant does not dispute that his business engaged in "money transmitting," as defined in 18 U.S.C. § 1960(b)(2), that it operated a "money transmitting business," as defined in 31 U.S.C. § 5330(d)(1), or that it was unlicensed. Instead, he argues that his business was not required by the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") to register as a "money services business" because its activities were not "wholly or in substantial part within the United

27

States." 31 C.F.R. § 1010.100(ff). While the defendant's description of the applicable statutory and regulatory requirements is generally correct, his characterization of the Indictment is not.

The defendant principally relies on FinCEN's clarification, in a 2011 amendment to Treasury regulations, that "mere maintenance of a bank account in the United States should not cause that person to be defined as a [money services business]." (Dkt. 141 at 17-18); *see* Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses, Final Rule, 76 Fed. Reg. 43,585, 43,588 (Jul. 21, 2011), *available at* 2011 WL 2881105. At the same time, however, FinCEN noted that the "the rule clarifies that certain foreign-located [money services businesses] with a U.S. presence, such as having U.S. customers or recipients, are subject to the [Bank Secrecy Act] rules." *Id.* FinCEN further explained that "[w]hether or not a foreign-located person's [money services business] activities occur within the United States depends on all of the facts and circumstances of each case, including whether persons in the United States are obtaining [money services business] services from the foreign-located person, such as sending money to or receiving money from third parties through the foreign-located person." *Id.*

Here, the Indictment more than adequately alleges that the money transmitting business the defendant conspired to operate had substantial activities in the United States and was thus required to register with the Department of Treasury. Beyond alleging that the defendant and his co-conspirators used United States-based bank accounts in the names of Alameda and North Dimension to conduct their money transmitting business, the Indictment alleges significant additional activity in the United States. Alameda and North Dimension were both companies that were incorporated in the United States and subject to Delaware law, and North Dimension was incorporated in the United States for the primary purpose of facilitating the scheme to engage in

28

unlicensed money transmitting. (Indictment ¶¶ 10, 18). The Indictment also alleges that wire transfers sent by customers or FTX were received in or transmitted through the Southern District of New York. (Indictment ¶ 91).

The Government expects that the evidence at trial will further establish the operation of the money transmitting business in the United States. Among other things, many employees who managed the money transmitting business (by manually crediting and debiting FTX customer accounts on an internal ledger system, sending FTX customer withdrawals by wire transfer, and performing other functions (Indictment ¶ 21)), worked from the United States. The business had substantial portions of its infrastructure based or hosted in the United States. FTX, Alameda, and North Dimension sent or received millions of dollars by domestic wire transfers to customers located in the United States or who had accounts at U.S. banks.

Moreover, considering the allegations concerning the use of U.S. bank accounts alone, that use went well beyond "mere maintenance" of accounts, and was instead core to the unlawful money transmitting activities. As alleged, the defendant and his co-conspirators used U.S.-based bank accounts in the names of Alameda and North Dimension to receive and transmit hundreds of millions of dollars to and from customers of FTX, who made deposits for credit on their FTX accounts. (Indictment ¶¶ 15–16, 21, 91). These accounts were therefore central to the defendant's unlawful money transmitting conspiracy because they were the primary mechanism by which FTX customers made U.S. dollar deposits to, and withdrawals from, the FTX trading platform.[5]

---

[5] When FinCEN agreed that "mere maintenance of a bank account in the United States" would not suffice to trigger an MSB registration requirement, it had something very different in mind. Specifically, FinCEN cited a ruling that a foreign-located currency exchanger whose only presence in the United States was a bank account was not required to register "when the currency exchange transactions occurred solely in a foreign country for foreign-located customers and the use of the

Where, as here, the use of U.S. bank accounts is central to the money transmitting business, the Second Circuit has recognized that a foreign-based business is subject to Section 1960 as a "domestic financial institution" within the meaning of the relevant statute, 31 U.S.C. § 5312(b)(1). *See United States v. Mazza Alaluf*, 621 F.3d 205, 210-11 (2d Cir. 2010) (holding that a money transmitter with its principal place of business in Chile was a "domestic financial institution," because it "engaged in action in the United States," including opening bank accounts in various states which received and transmitted tens of millions of dollars for customers); *see also United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir. 1984) (a foreign currency exchange was a "domestic financial institution" because it "perform[ed] functions within the United States by receiving dollars in the United States, by depositing the money in a U.S. bank, and by relaying information about each transaction from Miami to headquarters in Colombia."); *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *7-8 (S.D.N.Y. Sept. 23, 2015) (describing *Mazza-Alaluf* as "finding foreign-located money transmitting business qualified as a 'domestic financial institution' based on the maintenance of bank accounts in the United States," and denying motion to dismiss indictment charging overseas virtual currency business that "act[ed] in the United States" with unlicensed money transmitting).

Here, the alleged actions in the United States go beyond those recognized as adequate in *Mazza-Alaluf*: in addition to depending on bank accounts and wire transfers in the United States, the defendant's money transmitting business operated through companies incorporated here, employees working here, and key infrastructure based here.[6]

_____

U.S. bank account was limited to issuing and clearing dollar-denominated monetary instruments." 76 Fed. Reg. 43,585, 43,589 n.35 (citing FinCEN Ruling 2004-1).

[6] The defendant also points to a document produced by the Government in discovery in which an

30

**E.  Count Twelve Sufficiently Alleges that the Defendant Conspired to Violate the Federal Election Laws**

The defendant argues that Count Twelve should be dismissed for failing to make out a charge. His arguments are meritless. Count Twelve alleges that the defendant conspired to violate the federal election laws, specifically the prohibitions in 52 U.S.C. §§ 30122 and 30118. (Indictment ¶¶ 96-101). Section 30122 prohibits making "a contribution in the name of another person" and Section 30118 prohibits "any corporation" from making a "contribution" to any candidate. The Indictment alleges that the defendant conspired to violate the prohibition on conduit contributions by having contributions made in the names of two FTX executives, but paid for using funds from Alameda and/or FTX. (*Id.* ¶ 37). The Indictment also alleges that the defendant conspired to violate the prohibition on corporate contributions to candidates by funding contributions made in his name and the names of his co-conspirators using funds from Alameda and/or FTX. (*Id.*). As a further part and object of this conspiracy, the Indictment alleges that the defendant conspired to defraud the Federal Election Commission, in violation of 18 U.S.C. § 371, by causing candidates and political committees to incorrectly report the defendant and his co-conspirators as the makers of contributions when in fact Alameda and/or FTX were the true source of funds. (*Id.* ¶100). The defendant does not dispute that the Indictment sufficiently tracks the statutory language and provides notice of the charge against the defendant and the elements of the offense. No more is required. *Yannotti*, 541 F.3d at 127.

---

attorney provided information about whether FTX needed to register as an MSB. (Dkt. 141 at 18-19) (citing Decl. of Christian Everdell, Ex. 7). Of course, the defendant may seek at trial to offer evidence that he thinks undermines the Government's case, but such evidence or argument does not form a basis to dismiss an indictment. In any event, the opinion relied upon by the defendant was provided months before the incorporation of North Dimension and the creation of the account in its name at Bank-1, relies on incomplete facts, and does not purport to bless processing customer deposits and withdrawals through an unlicensed business operating from the United States.

Taking issue with the conduit contribution object of the conspiracy, the defendant argues that he was not the source of the funds, and that a person who "provides operational support or advice" has not "made" a contribution in violation of the statutes. (Dkt. 142 at 6-7). The defendant's argument would mean that an individual who directed corporate contributions through a conduit could never be liable under the statute because he or she was not personally the source of the funds. That, however, is not the law. *See United States v. Chestnut*, 533 F.2d 40, 45-46 (2d Cir. 1976) (rejecting defendant's challenge to the indictment and affirming his conviction under a predecessor statute where he caused a campaign to accept a contribution from a corporation). In any event, the Indictment alleges that the defendant controlled Alameda, which was the source of the funds for the contributions. And even if that were not the case, the defendant is charged in a conspiracy to make conduit contributions, and the jury may find him guilty if he agreed to participate in the conspiracy, irrespective of whether he was the true source of the funds or the ultimate maker of the contributions. *See United States v. Kukushkin*, No. 22-666-Cr, 2023 WL 2396240, at *1 (2d Cir. Mar. 8, 2023) (evidence was sufficient to prove that the defendant, who neither funded nor made the contributions, "agreed to participate in the conspiracy and facilitated transfers of money from [the source] to [the contributors], who in turn used the funds to donate to U.S. political campaigns on [the source's] behalf").

Turning to the second object of the conspiracy, the defendant points to two examples in the Indictment that he asserts are not unlawful corporate contributions. (Dkt. 142 at 9-10). The Government does not intend to argue that those contributions are illegal under 52 U.S.C. § 30118. Rather, as the Indictment specifies, the unlawful corporate contributions were those funded by Alameda and/or FTX, and made to "candidates for federal office and joint fundraising committees" in the names of Bankman-Fried and his co-conspirators. (Indictment ¶ 99). The defendant also

quarrels with the logic and plausibility of the defendant's motive alleged in the Indictment. (Dkt. 142 at 6, 10). Of course, the defendant is perfectly entitled at trial to make arguments about the Government's evidence of motive, but his rationalizations here do not provide a basis for dismissal, *see United States v. Sampson*, 898 F.3d 270, 285 (2d Cir. 2018), particularly given that "motive itself is not generally an element of a particular offense," *United States v. Bagaric*, 706 F.2d 42, 53 (2d Cir. 1983).

Next, the defendant argues that because his co-conspirators made contributions with "loans" from Alameda, "they used their own money—not Alameda's." (Dkt. 142 at 12-13). First, these arguments mistake the law. Tellingly, the cases cited by the defendant are bankruptcy decisions having nothing to do with election law. The Federal Election Campaign Act defines "contribution" to include any "loan, advance, or deposit of money … made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). Thus, if money comes from a source and is given to an intermediary for purposes of making a contribution, it does not matter if the funds are called a "loan," "advance," or some other term for a transfer of funds to be reimbursed later. *See Kukushkin*, 2023 WL 2396240, at *1 (where the source of the funds structured his money transfers as "loans" from his foreign companies to the contributing intermediaries, he still made "an indirect donation in violation of the statute");[7] *United States v. O'Donnell*, 608 F.3d 546, 551 (9th Cir. 2010) (conduit contribution prohibition "encompasses straw donor contributions, whether accomplished through the advancement or reimbursement of funds"). Second, the defendant is wrong on the facts. The Indictment alleges not that the co-

---

[7] Facts of the case are drawn from Brief of the United States of America, *United States v. Kukushkin*, No. 22-666-cr, 2022 WL 3154715 at 8 (2d Cir. Aug. 2, 2022) (describing the trial evidence concerning the use of "loans").

conspirators had a "contractual obligation to repay" (Dkt. 142 at 12), but that the wire transfers to them for purposes of making contributions were "not documented" and were merely described as "loans" in order to "conceal the scheme" (Indictment ¶ 47).

Because the Indictment sufficiently alleges violations of sections 30122 and 30118, no further inquiry is required at this stage. The nature of the payments, whether they were "loans," and what their purpose was are all ultimately questions for the jury.

### F. Count Thirteen Sufficiently Alleges that the Defendant Directed and Authorized a Bribe in Order to Assist Alameda in Obtaining or Retaining Business

Count Thirteen alleges that the defendant conspired to violate the FCPA by directing a $40 million bribe to one or more Chinese officials in order to regain use by Alameda of trading capital worth approximately $1 billion, which had been frozen and was therefore not available for Alameda to use in its business activities. Contrary to the defendant's argument, this Count sufficiently alleges that the bribe was made "in order to assist [a] domestic concern in obtaining or retaining business." (Dkt. 142 at 16). The "business nexus" or "business purpose" element of Section 78dd-2 requires proof that the unlawful payment was "to assist [the] domestic concern in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-2(a)(1). The Indictment tracks this statutory language in paragraph 104, which is ample ground on which to reject the defendant's motion. Because "the business nexus element … does not go to the FCPA's core of criminality," an indictment "paraphrasing" the statute without alleging "details regarding what business is sought or how the results of the bribery are meant to assist" passes the test for sufficiency. *United States v. Kay*, 359 F.3d 738, 761 (5th Cir. 2004) (reversing district court's dismissal of indictment that was barebones and did not recite any particularized facts concerning the business nexus element).

Even if the Court were to evaluate the factual allegations—which is unwarranted at this stage of the case, *see Yanotti*, 541 F.3d at 127—the Indictment sufficiently alleges that the bribes directed by the defendant were intended to assist the defendant, Alameda, and others in "obtaining or retaining business." The FCPA applies "broadly" to payments intended to assist the payor, "either directly or indirectly," in obtaining or retaining business. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 598-99 (S.D.N.Y. 2014). As the Fifth Circuit held in *Kay*, Congress intended "the statute to apply to payments that even indirectly assist in obtaining business or *maintaining existing business operations* in a foreign country." 359 F.3d at 756 (emphasis added); *see also United States v. Ho*, 984 F.3d 191, 200 (2d Cir. 2020) (citing favorably *Kay*'s observation that "Congress was concerned about both the kind of bribery that leads to discrete contractual arrangements and the kind that more generally helps a domestic payor obtain or retain business for some person in a foreign country"). The Indictment alleges that the bribe was paid to regain access to frozen trading funds and the funds, once unfrozen, were used by Alameda in its business investments. (Indictment ¶¶ 10, 30-31). These allegations make clear that the bribe was directly aimed at funding trading activity, Alameda's core business, and a jury could easily conclude that these facts prove the business nexus element of the charge.

Case law supplies several examples of the ways in which business can directly or indirectly be obtained or retained through bribery. For example, in *Donziger*, it was a payment by a plaintiff's attorney to a court-appointed expert to obtain favorable expert reports that indirectly made it more likely the attorney's contingency litigation business "would benefit from a favorable judgment." 974 F. Supp. 2d at 598-99. In *Kay*, the court hypothesized that more favorable tax treatment obtained through bribery indirectly could, for example, "reduce the beneficiary's cost of doing business as to allow the beneficiary to underbid competitors," "provide the margin of profit needed

to fend off potential competition," "make the difference between an operating loss and an operating profit," and "free up funds to expend on legitimate lobbying." 359 F.3d at 759-60. The *Kay* court explained that the "fact question" for the jury was whether lowering or removing the foreign government-imposed disadvantage was "of assistance to the payor in obtaining or retaining business" and held that "[e]ven a modest imagination can hypothesize myriad ways that an unwarranted reduction in duties and taxes … could *assist* in obtaining or retaining business." *Id.* at 749, 759.[8] The facts alleged in the Indictment set forth a more direct business nexus than the facts at issue in *Kay* and *Donziger*, because rather than paying for a reduction in taxes or favorable expert reports, here the defendant is alleged to have directed a bribe in order to release $1 billion in assets that Alameda intended to use, and in fact did use, to fund its trading activities, allowing it to continue to obtain and retain business.

In a variation on the same argument, the defendant claims that the payments must be to obtain or retain business to which the person "would not otherwise be entitled." (Dkt. 142 at 16). But this requirement is found nowhere in the statute, and runs counter to the plain meaning of "retain." *See* "Retain," *https://www.merriam-webster.com/dictionary/retain* (defining "retain" as to "continue to have something" or to "keep possession of" it); *see also* H.R. Conf. Rep. No. 100-576, at 918 ("retaining business" means the "carrying out of existing business"). And as the defense recognizes (Dkt. 142 at 17), the statute equally prohibits paying a bribe to accomplish an

---

[8] Following remand in *Kay*, the defendants were convicted of violating the FCPA, which was affirmed by the Fifth Circuit. *See United States v. Kay*, 513 F.3d 432, 439 (5th Cir. 2007). On appeal, the Fifth Circuit rejected the defendants' vagueness challenge to the FCPA's business nexus test. *Id.* at 441. In doing so, the court noted that "ARI ensured, through bribery, that it could continue to sell its rice without having to pay the full tax and customs duties demanded of it. Trial testimony indicates that ARI believed these payments were necessary to compete with other companies." *Id.*

"unlawful result" as a "lawful result by some unlawful method or means," *United States v. Kozeny*, 667 F.3d 122, 135 (2d Cir. 2011). The crime is properly pled, and therefore the defendant must await trial to challenge the Government's evidence.

Finally, the defendant's suggestion that Count Thirteen should be dismissed because the Indictment fails to identify the officials who froze the accounts or the bribe recipients by name, title, or government agency (Dkt. 142 at 16), should be swiftly rejected. Not only is there no requirement that an indictment contain those particulars, but the FCPA also does not require proof of the identity of the intended governmental recipient of a corrupt payment. *See* 15 U.S.C. § 78dd-2(a)(1). Indeed, given that the FCPA prohibits using "any person" to facilitate the bribe to any "foreign official" or "any foreign political party," the statute clearly contemplates situations in which the payor knows that a "foreign official" will ultimately receive a bribe but only the intermediary knows the foreign official's specific identity. 15 U.S.C. § 78dd-2(a)(3); *see, e.g.*, *SEC v. Straub*, 921 F. Supp. 2d 244, 265 (S.D.N.Y. 2013) (finding that a civil complaint alleging that bribes were paid to "Macedonian government officials" adequately pled the involvement of "foreign officials" under the FCPA where "there is no requirement that the 'foreign official' be specifically named and that reading such a requirement into the FCPA would be contrary to the statutory scheme"); *SEC v. Jackson*, 908 F. Supp. 2d 834, 850 (S.D. Tx. 2016) ("The Court seriously doubts that Congress intended to hold an individual liable under [the FCPA] only if he took great care to know exactly whom his agents would be bribing and what precise steps that official would be taking.").

**G.  Count Thirteen Sufficiently Alleges Venue in the Southern District of New York**

The defendant also seeks dismissal of Count Thirteen on the ground that venue is improper in this District. This argument ignores the plain language of 18 U.S.C. § 3238, the law in this

Circuit, and the facts of the defendant's arrest and arraignment in this District.

At trial, the Government must prove that venue is proper in this District by a preponderance of evidence. *See United States v. Naranjo*, 14 F.3d 145, 146 (2d Cir. 1994). Where venue is challenged on a pre-trial motion to dismiss, the government's burden is limited to showing that the indictment alleges facts sufficient to support venue. Fed. R. Crim. P. 12(b)(3)(A)(i); *see United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005); *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010). Outside the context of Section 3238, courts in this District have recognized that "as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied." *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006); *see also United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *3 (S.D.N.Y. Nov. 15, 2021). "The question of whether there is sufficient evidence to support venue is appropriately left for trial." *Ohle*, 678 F. Supp. 2d at 231.

Count Thirteen alleges that the defendant conspired to violate the FCPA "out of the jurisdiction of any particular State or district," and for that reason, venue is proper "in the district in which … he is arrested or is first brought." 18 U.S.C. § 3238.

Having been "first brought" to the United States on the original eight-count Indictment, prior to being charged with conspiring to violate the FCPA, venue for the FCPA charge is proper where the defendant was "arrested" on that charge. The Second Circuit has interpreted "arrest" under Section 3238 to mean "where the defendant is first restrained of his liberty *in connection with the offense charged*." *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984) (internal quotation marks and citations omitted) (emphasis in *Catino*). The defendant does not dispute that he was "arrested on the newly charged offenses immediately prior to the arraignment" in this District (Dkt. 142 at 22), and likewise does not dispute that he was located in this District when

his liberty was first restrained in connection with the FCPA charge. That is dispositive here. On March 30, 2023, after the Government requested an arraignment on a superseding indictment, the defendant appeared in this District and was arrested on Count Thirteen pursuant to an arrest warrant. (Dkt. 146). Following his arrest in this District, the defendant was arraigned on the Indictment, pled not guilty, and had his bail conditions extended to the new charge. (March 30, 2023, Tr. at 3, 12). At that point, while in the Southern District of New York, the defendant's liberty was first restrained in connection with the offense charged in Count Thirteen.

The defense unpersuasively attempts to distinguish *Catino* (and similar cases) on the basis that the defendant there was already in custody in this District on another offense at the time of his indictment and arrest for the offense at issue. (Dkt. 142 at 21-22). But that confuses the facts of *Catino* with its holding. The Second Circuit held that venue was proper in the Southern District of New York because that was where the defendant "was actually restrained in connection with" the new charge. *Catino,* 735 F.2d at 724-25. The same rationale applies equally here and does not turn on the defendant already being in custody in the District on another charge. Because Congress could have easily specified that the "arrested" provision under Section 3238 only applies to inmates—and the statute says nothing of the sort—it is plain that the venue provision was not intended to be so limited.

Next, the defendant asserts that venue is improper here because he "was required to travel and did travel to the Southern District of New York" for arraignment. (Dkt. 142 at 22). The defendant acknowledges that his position finds no support in any Second Circuit authority, *id.*, and instead relies on an over three-decades'-old Ninth Circuit decision that is not binding on this Court, is not on all fours with this case, is contrary to the text of Section 3238, and has remained disfavored even within the Ninth Circuit. (*See id.* at 22-23 (citing *United States v. Hilger*, 867 F.2d

566 (9th Cir. 1989)).

*Hilger* provided scant reasoning for its one-sentence conclusion that an arrest pursuant to a summons to appear was not an "arrest" for purposes of Section 3238. 867 F.2d at 568. That conclusion is contrary to the plain meaning of Section 3238, which specifies that venue is proper where the defendant was "arrested," and says nothing of *how* a defendant may have ended up in the venue in which he was arrested. The Ninth Circuit has since taken pains to limit *Hilger* to its facts, *see United States v. Feng*, 277 F.3d 1151 (9th Cir. 2002), and has largely avoided citing it altogether. There is no reason for this Court to ignore its own binding precedent and the plain statutory language in order to follow unpersuasive authority that depended on the Kafkaesque conclusion that "[a]lthough Hilger was *arrested* in the Northern District of California . . . he was *not 'arrested'* in that district within the meaning of that term as used in 18 U.S.C. § 3238." *Feng*, 277 F.3d at 1156 (emphasis added) (discussing *Hilger* and declining to follow it).

Central to *Hilger*'s holding, and by extension the defendant's motion, is that venue is not proper in the district of arrest where the defendant "had no choice" but to appear in the district. 867 F.2d at 568. But the purpose of Section 3238 "is not to fix the place of arrest but simply to have the place of trial conform to the place of arrest." *Catino*, 735 F.2d at 724 (quoting *United States v. Provoo*, 215 F. 2d 531, 538 (2d Cir. 1954)). Nothing in the text or purpose of the statute supports the defense's suggestion that venue for Count Thirteen should be restricted to the Northern District of California, a location relevant only because it was chosen as a suitable place for the defendant's post-indictment residence, but which otherwise has no connection to the charged offense that took place while the defendant lived abroad. Indeed, since *Hilger*, several Circuits, including this one, have rejected the argument that venue is improper if it has been "manufactured" by government action, even in cases with natural venue elsewhere in the United

40

States. *See United States v. Rutigliano*, 790 F.3d 389, 398-99 (2d Cir. 2015) (rejecting claim of "manufactured venue" even though "mailings were sent to the Southern District at the government's initiative" in order to establish venue) (citing *United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007)); *see also United States v. Valenzuela*, 849 F.3d 477, 488-89 (1st Cir. 2017) (rejecting the argument that the government "manufactured" venue because government cooperator drove the defendant on one occasion to the district where he was ultimately arrested); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (rejecting manufactured venue argument and noting that "prosecutors often have wide choice of venue").

Accordingly, the defendant's motion to dismiss Count Thirteen for improper venue should be denied, and any further dispute about whether these facts sufficiently support venue is appropriately left for trial. *See Ohle*, 678 F. Supp. 2d at 231 ("The question of whether there is sufficient evidence to support venue is appropriately left for trial.").

## II.    The Defendant's Multiplicity Motion Should Be Denied

The defendant's multiplicity motion is frivolous. He argues that Count One, which charges conspiracy to commit wire fraud on FTX customers, is multiplicitous with Count Nine, which charges conspiracy to commit bank fraud in connection with an account opening. (Dkt. 145 at 4-7). And he argues that Count Three, which charges conspiracy to commit commodities fraud, is multiplicitous with Count Ten, which charges conspiracy to operate an unlicensed money transmission business. (Dkt. 145 at 7-10). The object of each of the Counts is a different offense, with different elements, predicated on different facts. The motion should be denied, and if nothing else, as the defendant concedes, it is not ripe at this time.

An indictment is multiplicitous "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United*

*States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "To assess whether the two offenses charged

separately in the indictment are really one offense charged twice, the 'same elements' test or the

'*Blockburger*' test is applied." *Id.* at 146 (citing *Blockburger v. United States*, 284 U.S. 299

(1932)). "The *Blockburger* test examines whether each charged offense contains an element not

contained in the other charged offense." *Id.* "If there is an element in each offense that is not

contained in the other, they are not the same offense for purposes of double jeopardy, and they can

both be prosecuted." *Id.*

The defendant incorrectly states that the appropriate test for determining whether

conspiracy counts are multiplicitous is not *Blockburger*, but the multifactor test adopted in *United*

*States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985), for "determining the merits of double jeopardy

claims arising in the context of successive conspiracy prosecutions." Because *United States v.*

*Dixon*, 509 U.S. 688 (1993), precludes "fact-based analysis of double jeopardy claims based on

successive prosecutions under different statutes," the *Korfant* factors are only relevant to

"successive conspiracy charges brought *under the same statute*," but not to "conspiracy charges

brought under different statutes" for which the *Blockburger* test is appropriate. *United States v.*

*Basciano*, 599 F.3d 184, 198 n.11 (2d Cir. 2010) (emphasis in original).

Where, as here, the indictment charges violations of a general conspiracy statute, the

relevant elements of the violations include the elements of the substantive offense that is the

alleged object of the conspiracy. *See United States v. Dhafir*, 342 F. App'x 702, 705-06 (2d Cir.

2009) (two counts alleging conspiracies in violation of 18 U.S.C. § 371 "with different underlying

objects and non-overlapping elements and overt acts" were not multiplicitous); *United States v.*

*Sharpe*, 193 F.3d 852, 863-64 (5th Cir. 1999) (when comparing two conspiracy counts

for multiplicity analysis, court should examine the elements of the substantive offenses which

were the objects of the conspiracies). For good reason. Conspiracies charged under the "offense" clause of 18 U.S.C. § 371 and the conspiracy provision for Chapter 63 fraud offenses set forth in 18 U.S.C. § 1349 require the pleading of another criminal offense as the conspiracy's object. *See Wong Tai v. United States*, 273 U.S. 77, 81 (1927) (an indictment for conspiring to commit an offense it is necessary to "identify the offense which the defendants conspired to commit"). Thus, where a defendant is charged in two conspiracy counts with violating the same general conspiracy statute, but the objects of those conspiracies are different, multiplicity should be assessed under the *Blockburger* or "same elements" test, without further "fact-based analysis."[9]

Applying the *Blockburger* test to the charges here, the counts are plainly not multiplicitous. While Counts One and Nine both charge violations of 18 U.S.C. § 1349, they allege different objects, wire fraud under 18 U.S.C. § 1343 and bank fraud under 18 U.S.C. § 1344, respectively. A conspiracy to commit wire fraud requires proof of, among other things, a scheme to "defraud" involving "wires," while a conspiracy to commit bank fraud requires proof of, among other things, ownership or custody of funds by a "financial institution." *Compare* 2 Leonard B. Sand et al., Modern Federal Jury Instructions § 44.01 (elements of wire fraud) *with* 2 Leonard B. Sand et al., Modern Federal Jury Instructions § 44.02 (elements of bank fraud); *see also Bald Eagle Area Sch.*

---

[9] The defendant cites one case in which a court used the *Korfant* test to analyze multiple Section 371 "offense" clause conspiracies, all of which alleged different crimes as the objects of the conspiracies. *See United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 1294433, at *3 (S.D.N.Y. Apr. 29, 2022) (post-trial multiplicity challenge to three Section 371 counts, two predicated on different provisions of the Mann Act, 18 U.S.C. § 2423, and one based on the Trafficking Victims Protection Act, 18 U.S.C. § 1591). There, it appears the parties and the court assumed that the three conspiracies were the same "in law" without consideration of the different objects, and therefore "agree[d] that the Court's inquiry [was] guided by the Second Circuit's *Korfant* factors." *Id.*; *see also* Gov't Opp. to Def't Omnibus Post-Trial Motions, *United States v. Maxwell*, No. 20 Cr. 330 (S.D.N.Y. Feb. 25, 2022) (Dkt. 621) (agreeing that the court should enter judgment on only one of the Mann Act counts). Because *Maxwell* assumed the application of the *Korfant* factors, its approach should not guide the Court here.

*Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) ("the same set of facts can support convictions for mail fraud, wire fraud, bank fraud and securities fraud without giving rise to any multiplicity problems" because "[e]ach of those offenses requires proof of a fact which the others do not"). Similarly, while Counts Three and Ten both charge violations of 18 U.S.C. § 371, they allege different objects, commodities fraud under 7 U.S.C. §§ 9(1) and 13(a)(5), and operation of an unlicensed money transmission business under 18 U.S.C. § 1960, respectively. The objects of Counts Three and Ten share no common elements. *Compare* 7 U.S.C. § 9(1) and 13(a)(5) *with* 1 Leonard B. Sand et al., Modern Federal Jury Instructions § 50A.07 (elements of operation of an unlicensed money transmission business). Accordingly, these counts are not the same offense for purposes of double jeopardy, and they can all be prosecuted.

Even if the Court were to apply the *Korfant* test, the result would be no different. The purportedly multiplicitous conspiracies all involve different objects and have different elements. While there is some (but not complete) overlap in participants, time periods, and geographic scope, the factual allegations, alleged victims, overt acts, and means and methods of each conspiracy are different. *See Korfant*, 771 F.2d at 662 (discussing the eight *Korfant* factors). It is unnecessary to engage in an eight-factor test to understand that conspiring to commit wire fraud on customers is not the same as conspiring to obtain money or property in the custody of a bank. Likewise, conspiring to commit commodities fraud is plainly not the same as conspiring to operate an unlicensed money transmitting business.

Finally, if nothing else, the motion "at best is premature" in light of "the Circuit's controlling view that the question of multiplicitiousness is properly considered only at a later point in the proceedings"—that is, after trial. *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018). The defendant acknowledges that his motion is

44

premature, repeatedly mentioning that he brings this motion largely to preserve the issue for consideration after trial. (Dkt. 145 at 2, 10-11). Accordingly, if the Court does not deny the motion outright, it should defer it until after trial.

### III. Counts Twelve and Thirteen Are Properly Joined with the Remaining Counts and Should Not Be Severed

The defendant's argument that Counts Twelve and Thirteen are misjoined with the remaining counts in the Indictment under Federal Rule of Criminal Procedure 8(a), or should otherwise be severed under Federal Rule of Criminal Procedure 14(a), should be rejected. (Dkt. 142 at 23-24). Because the counts in the Indictment concern conduct that was part of a common scheme, and trying the counts together serves judicial economy without causing unfair prejudice, Counts Twelve and Thirteen are properly joined and should not be severed.

#### A. Applicable Law

Joinder under Rule 8(a) is appropriate where the counts "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Counts that have a "sufficient logical connection" to each other can be tried together, *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990), as can those "where the same evidence may be used to prove each count," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). Joinder of counts also is appropriate where the evidence proving the counts is "interconnected and overlapping." *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994), such as through "some substantial identity of facts or participants" or because they "arise out of a common plan or scheme," *United States v. Pizarro*, No. 19-2391, 2023 WL 3332539, at *2 (2d Cir. May 10, 2023). This Court has "interpreted Rule 8(a) as providing a liberal standard for joinder of offenses," *United States v. Wilson*, 512 F. App'x 75, 76 (2d Cir. 2013), which "reflects a policy determination that gains in trial efficiency outweigh the recognized

45

prejudice that accrues to the accused" when offenses are tried together, *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

If the joinder of offenses "appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Because Rule 8 joinder inherently "authorizes some prejudice," a defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *Amato*, 15 F.3d at 237. The defendant must show prejudice that is "unfair," and "not merely that [the defendant] might have had a better chance for acquittal at a separate trial." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011); *see also United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980) (substantial prejudice requires more than "the adverse effect of being tried for two crimes rather than one"). Furthermore, the prejudice must be "sufficiently severe to outweigh the judicial economy" of a joint trial. *Page*, 657 F.3d at 129.

Because Rule 14 explicitly permits a district court to "provide any other relief that justice requires," Fed. R. Crim. P. 14(a), the rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). Even in the rare circumstances where "the risk of prejudice is high," severance is not required, as "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539.

**B.  Discussion**

All of the counts in the Indictment are properly joined, as they are interconnected, share significant factual and evidentiary overlap, and reflect the continuation of criminal conduct by the defendant and his co-conspirators. The defense claims that the "campaign finance and FCPA charges in Counts 12 and 13 exist entirely outside [the] orbit" of the charges "tied to the alleged

'misappropriation' of FTX customer funds for use by Alameda and the relationship between Alameda and FTX." (Dkt. 142 at 24-25). Not so. The charges in the Indictment arise from the defendant's interconnected schemes to accelerate Alameda's and FTX's financial growth by corrupt and deceptive means, including fraud, foreign bribery, and illegal political contributions. In short, the crimes were conducted in connection with the same businesses, committed within the same timeframe, carried out by the defendant with an overlapping set of associates, and served the same overall purpose to enrich the defendant through Alameda and FTX. The facts here readily satisfy Rule 8(a)'s "liberal standard for joinder." *Wilson*, 512 F. App'x at 76-77.

    1.  The Charges Are Part of a Common Scheme or Plan

The charges are unified by a common scheme. Counts constitute parts of a common scheme or plan when, for example, they "all involved substantial alleged dishonesty," *Ruiz*, 894 F.2d at 505; they "involved corrupt schemes to commit crimes" of a "similar" nature, *United States v. Epps*, 742 F. App'x 544, 547 (2d Cir. 2018); they are of a "similar character" in that a defendant made misrepresentations "in order to gain benefits to which she might not have otherwise been entitled," *Wilson*, 512 F. App'x at 77; they involved means or methods that "display enough of a general likeness," *United States v. Salemo*, 499 F. App'x 110, 114 (2d Cir. 2012); "funds derived" from one offense "either are or produce" another offense, *Turoff*, 853 F.2d at 1043; or "one scheme stemmed from the other," *United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016). Counts Twelve and Thirteen are inseparable from the defendant's core criminal scheme, involve similar acts of dishonesty, arise from similar motives, and stem from or are funded by the criminal activity described in Counts One through Eleven of the Indictment.

Count Twelve alleges that the defendant conspired with others to make illegal conduit contributions funded by Alameda. Far from being an "incidental allegation" that money used for

political donations was "drawn from Alameda accounts that included customer funds" (Dkt. 142 at 27), FTX customer funds were a primary source for the defendant's illegal contribution scheme. Thus, the funds derived from the wire fraud—misappropriated customer funds—generated funds for making illegal contributions. Additionally, one of the ways in which the defendant conspired to conceal the proceeds of the wire fraud was by making political contributions through straw donors, and thus the conduit contributions were a core part of the money laundering offense alleged in Count Eleven. "The most direct link possible," for purposes of joinder of charges, "is that the funds derived from [one offense] either are or produce [the other offense]." *Turoff*, 853 F.2d at 1043 (joining non-tax crimes and tax fraud where the non-tax violations led to the unreported income). That is exactly what is alleged to have occurred here, and for that reason, Count Twelve is properly joined.

The same is true for Count Thirteen. One of the defendant's principal objectives—and an objective that unifies the charged crimes—was to obtain access to capital through criminal means in order to fund Alameda's trading activity. In particular, the defendant directed the bribery of a foreign government official in order to unfreeze Alameda trading accounts, so as to regain access to funds that would be used by Alameda for trading activity. It is no different for Counts One and Two, which allege misappropriation of customer assets, and Counts Seven and Eight, which allege fraudulent inducement to obtain and retain lenders' funds. Thus, the Counts are united by the fact that they all "involved corrupt schemes," *Ruiz*, 894 F.2d at 505, to increase Alameda's access to capital "to which [Alameda] might not have otherwise been entitled," *Wilson*, 512 F. App'x at 77.

There is further overlap amongst the schemes. The FCPA violation alleged in Count Thirteen involved some of the same participants alleged in the other Counts in the Indictment, reflecting "the continuation of criminal conduct by a common group of co-conspirators," which is

a basis for joinder. *See United States v. Kemp*, No. 21-1684-cr, 2023 WL 405763, at *7 (2d Cir. Jan. 26, 2023). Each of the Counts also involve spending out of the same Alameda account on FTX, and thus the involvement of the same "accounts served in some measure as a tie connecting . . .both schemes" because the accounts "served as the channels for illegal activity." *Turoff*, 853 F.2d at 1043-44 (joinder proper where both defendants opened accounts to be used to facilitate unrelated schemes). Additionally, the fact that approximately $1 billion of Alameda's trading assets were frozen on two Chinese cryptocurrency exchanges in early 2021, and for months, the defendant's efforts to unfreeze the accounts were unsuccessful, supplies part of the motive for the defendant's commission of the other crimes alleged in the Indictment. With these accounts frozen throughout 2021, the defendant sought access to additional capital elsewhere, explaining one of the motives for misappropriating customers' funds, which is itself a basis for joinder. *See Bonventre*, 646 F. App'x at 79-80 (joinder was appropriate because "insofar as the [Madoff] Firm's legitimate operations did not generate sufficient revenue to meet its expectations" it explained the defendant's use of a corporate credit card to pay personal charges, resulting in unreported income); *United States v. Saad*, 380 F. Supp. 2d 286, 288 (S.D.N.Y. 2005) (denying motion to sever proxy fraud from securities fraud counts because defendant "is alleged to have participated in both frauds, both are alleged to have occurred during her tenure as CEO of Impath, . . . Saad allegedly made use of her professional position to further both schemes" and both are connected by a "common motivation").

"[I]n the instant case," therefore, "a reasonable person would easily recognize the common factual elements that permit joinder," *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003), and there is a "sufficient logical connection" between the counts to justify joining them, *Ruiz*, 894 F.2d at 505. The common factual elements readily distinguish this case from several cited by the

defense, where the defendant was the only common link between charges that were deemed misjoined, *see United States v. Vaughn*, No. 17 Cr. 125 (PX), 2018 WL 558617, at *1 (D. Md. Jan. 25, 2018) ("Vaughn is charged with two distinct criminal schemes that are united almost exclusively by the fact that they both involve Vaughn."); *United States v. Kerik*, 615 F. Supp. 2d 256, 275 (S.D.N.Y. 2009) ("The charges are not related to all others by time, actors, places, or subject matter. The lone common link is Kerik himself."), or where dissimilar charges lacked unity within a common scheme, *see United States v. Harris*, 805 F. Supp. 166 (S.D.N.Y. 1992) (personal loan fraud and corporate loan fraud improperly joined); *United States v. Randazzo*, 80 F.3d 623 (1st Cir. 1996) ("it is very hard to describe adulterating or mislabeling shrimp as offenses 'similar' to tax fraud"); *United States v. Bezmalinovic*, No. 96 Cr. 97 (MGC), 1996 WL 737037, at *2 (S.D.N.Y. Dec. 26, 1996) (tax fraud improperly joined with contract and insurance fraud); *United States v. Halper*, 590 F.2d 422, 431-32 (2d Cir. 1978) (Medicaid fraud and personal income tax evasion improperly joined). In short, the cases on which the defendant relies bear no resemblance to this case. *See Blakney*, 941 F.2d at 116 (noting that with respect to joinder, "each case depends largely on its own facts").

### 2.  The Evidence to Prove the Charges Is Overlapping

Just as the counts are unified by a common scheme, so too the evidence to prove the counts will be "interconnected and overlapping," justifying joinder. *Amato*, 15 F.3d at 236. Count Twelve will require proving that funds for contributions came from Alameda, just as Counts One and Two will require providing that customer funds in Alameda's accounts were used for, among other things, contributions. Count Twelve will also require proving that certain of the defendant's co-conspirators were "conduits" through which to pass contributions, and similarly Count Ten will require proof that the defendant "concealed" the proceeds of the wire fraud, including through

conduit contributions. In proving Count Thirteen, the evidence will show that the bribe money came from Alameda, and that the frozen assets were returned to Alameda to fund additional Alameda trading activity. The wire fraud counts will similarly require proof about the total inflows and outflows from Alameda's accounts in proving misappropriation. And both the wire fraud and bank fraud counts will require analysis of the North Dimension bank account, which was also utilized in financial transactions involved in the FCPA conspiracy.

Moreover, Counts Twelve and Thirteen, just like the other charges, involve evidence that the defendant was effectively controlling decisions at Alameda—such as the payment of bribes from Alameda cryptocurrency wallets, the withdrawal of billions of dollars from FTX using Alameda's line of credit, and the transfers of millions of dollars from Alameda for political giving—even after he disclaimed such responsibility both publicly and to investors. *See United States v. Gordon*, 655 F.2d 478, 484-85 (2d Cir. 1981) (joinder proper, despite four separate fraud victims, because "Gordon allegedly misused his particular position to accomplish his fraudulent purposes in each of the counts charged"); *Werner*, 620 F.2d at 927 (theft and robbery counts properly joined, even though one involved violence and the other did not, because "both offenses arose out of [defendant's] scheme to use his position as an insider [at the airport] to obtain money or property").

The Government also anticipates substantial overlap among the witnesses who will be called to prove Counts Twelve and Thirteen and the remaining charges. *See Blakney*, 941 F.2d at 116 ("Joinder is proper where the same evidence may be used to prove each count."). Among other witnesses, the Government expects to call a witness who will testify about financial analysis of accounts belonging to FTX, Alameda, and the defendant, which will include testimony related to tracing the misuse of customer funds, the payment of bribes, and the source of political donations.

Several of the defendant's co-conspirators in the charged fraud schemes also participated in, or were aware of, the crimes charged in Counts Twelve and Thirteen and are expected to testify at trial. *See Kemp*, 2023 WL 405763, at *7 (joinder proper where, among other things, "the testimony of several government witnesses, including [cooperators], was necessary to prove" the charged crimes). Caroline Ellison, for example, played a role in the bribery scheme and pleaded guilty to her participation in defrauding FTX's customers and investors, as well as Alameda's lenders. Nishad Singh, CC-1 in the Indictment, was part of the defendant's inner circle that facilitated the defendant's fraud on FTX's customers, as well as a straw donor in the defendant's campaign finance scheme, whose political donations were funded in part with misappropriated FTX customer funds. *See United States v. Gracesqui*, 730 F. App'x 25, 29 (2d Cir. 2018) (although the two charged murders occurred at different times and places and were not part of a continuous scheme, joinder was proper where, among other things, both murders involved the same participants). In addition to cooperating witnesses, the Government expects to call other former employees of FTX and Alameda who will testify about conduct relevant both to Counts Twelve and Thirteen, as well as other related counts.

The defense contends that "a joint trial would offer only marginal—if any—gains in efficiency and judicial economy." (Dkt. 142 at 31). But joining the counts—and having these witnesses describe only once the business operations of FTX and Alameda, their relationships with the defendant, and the crimes they participated in or witnessed—would result in substantial "gains in trial efficiency" that favor joinder. *Turoff*, 853 F.2d at 1042; *see also Amato*, 15 F.3d at 237 ("considerations of economy and speed outweighed possible unfairness . . . and justified the

joinder" of counts).[10]  Severing the counts would waste Court and Government resources on two lengthy and complex trials, which would require many of the same witnesses—including more than one cooperating witness—to testify twice. A trial on Counts Twelve and Thirteen alone would still require extensive testimony about the nature of the defendant's business to provide background, context, and motive for the crimes. With respect to the election crimes charged in Count Twelve, the Government would still seek to prove that the contributed funds originated with misappropriated customer assets to establish the concealment motive for the crime, and that these funds were in fact corporate funds, and not the personal funds of the straw donors. The defense's assurances that two trials would not needlessly burden the court, or deplete judicial and prosecutorial resources, rings hollow.

    3.   <u>Evidence of the Conduct Underlying Counts Twelve and Thirteen Would Be Admissible at Trial Even if the Counts were Severed</u>

Although the defendant contends that the "disparate proof" of Counts Twelve and Thirteen is "unlikely to be independently admissible" in proving the other charged crimes (Dkt. 142 at 26), the counts should not be severed because even at separate trials, proof of the foreign bribery and election crimes would properly be admitted as direct evidence of the other charged crimes and under Federal Rule of Evidence 404(b) as proof of motive, intent, knowledge, lack of mistake, and a common scheme or plan.

The evidence underlying Counts Twelve and Thirteen is direct evidence of the other charges. The defendant's spending of misappropriated customer funds on political donations is

---

[10] In assessing joinder under Rule 8(a), the "Court may consider both what is alleged in the indictment, as well as the Government's pretrial representations of the evidence that will be presented at trial." *United States v. Felder*, 14 Cr. 546 (CM), 2016 WL 1659145, at *3 (S.D.N.Y. Apr. 22, 2016) (citing *United States v. Ajlouny*, 629 F.2d 830, 842 (2d Cir. 1980)).

direct proof of the fraud schemes, as well as of the laundering and concealment of crime proceeds charged in Count Eleven. Proof of a pattern of criminal activity the defendant committed at Alameda and FTX, alongside Caroline Ellison, Nishad Singh, and others, is relevant to establish the relationship of trust that existed between the defendant and his co-conspirators, and the course of conduct that culminated in the multi-billion-dollar fraud. *See Gracesqui*, 730 F. App'x at 29 (joinder of two murder charges was proper where evidence about the relationship between the defendant and his co-conspirator, and "their shared history of criminal activity that led to the murders, would have been relevant to both trials"); *Kemp*, 2023 WL 405763, at *7 ("evidence of [defendant and co-conspirators'] preexisting criminal relationship provided important context" for properly joined crimes and "shared history of criminal activity . . . provided context for the jury to understand why [the defendant] trusted [his co-conspirator] and confided in him"); *see also United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (holding that "legitimate purpose[s] for presenting evidence of extrinsic acts" include "explain[ing] how a criminal relationship developed" and "help[ing] the jury understand the basis for the co-conspirators' relationship of mutual trust"). Moreover, Ellison's association with the bribery scheme and Singh's role as a straw donor for the defendant, and his use of corporate funds for political donations, are part of these witnesses' criminal history that is covered by their cooperation agreements. For that reason alone, these topics are appropriate subject matter for direct examination, in anticipation of rigorous cross examination to impeach these witnesses' credibility.

In addition, the evidence underlying Counts Twelve and Thirteen is admissible under Rule 404(b), and the defense is therefore incorrect that a "joint trial would [] create an end-run around the improper use of character evidence." (Dkt. 142 at 30). A key disputed issue at the trial is likely to be the defendant's willfulness, knowledge, and intent. The defendant's motive to enlarge

Alameda's trading and spending power—as illustrated by the bribery of a foreign official to access

frozen funds—is highly probative of his intent to defraud FTX's customers and investors, and

Alameda's lenders. Similarly, the defendant's knowledge of the bribe payments is probative of his

knowledge of Alameda's other illicit activities. The Government expects the defense to argue that

the defendant was not involved in Alameda's day-to-day activities and was unaware that Alameda

borrowed such large sums to repay its lenders. The defendant's involvement in the bribe payments

even after he nominally stepped down as Alameda's CEO is probative of his knowledge and intent

with respect to other key decisions at Alameda around that time. Finally, the defendant's spending

of misappropriated funds on political donations is probative of the defendant's motive for

defrauding FTX's customers and investors: the defendant wanted access to capital that he could

use, in part, for political donations that would burnish his own image and improve the regulatory

prospects of his business in the United States.

### 4. The Defendant Cannot Demonstrate Substantial Prejudice from Joinder

For similar reasons, the defendant's argument for severance under Rule 14(a) should be

rejected. The defendant cannot demonstrate prejudice that would be "sufficiently severe to

outweigh the judicial economy" of a joint trial. *Page*, 657 F.3d at 129. Because the proof is

overlapping, any potential prejudice from a joint trial falls well short of being "unfair," *id.*: the

supposedly prejudicial evidence would be admissible even at separate trials, *see United States v.*

*Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (claim of prejudice is insupportable where supposedly

prejudicial evidence would be admissible at separate trial); *see also United States v. Blaszczak*,

947 F.3d 19, 44 (2d Cir. 2019) (joinder of insider trading charges was proper and, in any event,

harmless, where evidence about separate insider trading scheme would have been admissible in

separate trial as relevant and "useful background" on the defendant's methods and sources),

*vacated on other grounds by* 141 S. Ct. 1040 (Jan. 11, 2021). Moreover, any potential prejudice could be cured by means less drastic than severance, such as appropriate limiting instructions. *See Zafiro*, 506 U.S. at 537-39 (explaining preference for joint trials to promote efficiency and that limiting instructions can often cure any prejudice); *United States v. Rivera*, 546 F.3d 245, 254 (2d Cir. 2008) (similar). In light of overlapping proof, the substantial judicial economy from a joint trial, and the lack of unfair prejudice, the defendant's severance motion should be denied.

## IV.   The Defendant's Disclosure Demands Should Be Denied

The defendant asks the Court to compel the Government to make a variety of pretrial disclosures. (*See* Dkt. 144). Because these motions are legally unfounded, they should be denied.

### A.  The Government Has No Obligation to Review the Files of the FTX Debtors

The defendant moves the Court to "order the Government to review the files that are in the possession, custody, or control of the FTX Debtors and to disclose any materials that are discoverable pursuant to Rule 16, *Brady*, *Giglio*, and the Jencks Act." (Dkt. 143 at 2). This request seeks a breathtaking expansion of what materials are deemed within the Government's "possession, custody, or control" for purposes of its discovery and other disclosure obligations. To justify his sweeping demand that the Government comb through the files of the FTX Debtors— which surely comprise at least millions of documents and terabytes of data—in search of unspecified discoverable material, the defendant resorts to baseless assertions that the FTX Debtors and the Government have been working "hand-in-glove" to "investigate and prosecute Mr. Bankman-Fried," and that current FTX CEO John "Ray and the FTX Debtors' counsel have acted as a public mouthpiece for the Government." (Dkt. 143 at 1). That is more than hyperbolic. It is false. Because the FTX Debtors are simply a cooperative (in the colloquial rather than technical or formal sense) third party whose documents are not within the Government's

possession, custody, and control, and whose limited role in voluntarily responding to the Government's document requests without any formal agreement does not bring the FTX Debtors within the four corners of the prosecution team, this motion should be denied.

The Government has no *Brady* or discovery obligation to obtain and produce materials in the sole possession of the FTX Debtors. "[T]he *Brady* obligations of the prosecutors extend only to materials within prosecutors' possession, custody or control," or in appropriate cases, other components of the government. *United States v. Blaszczak*, 308 F. Supp. 3d 736, 742 (S.D.N.Y. 2018). Likewise, Rule 16 extends only to materials "within the prosecutor's possession, custody or control." Fed. R. Crim. P. 16(a)(1)(E); *see also United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) ("the Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases").[11] The notion of "possession" is not "so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980). "Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." *Id.* (quoting *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975)). Indeed, an "unlimited duty on prosecutors" to inquire about and obtain evidence not in their possession "would condemn the prosecution of criminal cases to a state of paralysis." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

The defendant does not claim the Government possesses the materials that he seeks.

---

[11] As discussed *infra* at 79-82, the Government's Jencks Act and *Giglio* obligations are not triggered until trial, but in any event, the same analysis applies to the determination of what qualifies as "in the possession of the United States" for purposes of the Jencks Act. *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *9 (S.D.N.Y. Feb. 15, 2022).

Instead, to justify a wide-ranging demand that the Government review each document in the FTX Debtors' possession, the defendant claims that the "FTX Debtors are part of the 'prosecution team' for purposes of the Government's" disclosure obligations. (Dkt. 143 at 2). The FTX Debtors, however, are a third party that has responded to requests from the Government, and it is well recognized that simply complying with requests from the Government does not render a third party an arm of the prosecution to which *Brady* and discovery obligations extend. *See United States v. Garcia*, 509 F. App'x 40, 43 (2d Cir. 2013) ("this Court has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Maxwell*, 534 F. Supp. 3d 299, 323-24 (S.D.N.Y. 2021) (documents "within the control of a civilian third party, not the Government … need not (and perhaps cannot)" be produced); *United States v. Meregildo*, 920 F. Supp. 2d 434, 442 (S.D.N.Y. 2013) ("While cooperating with the Government, the witness remained an independent actor and therefore could not be considered an agent of the Government.").

Thus, when it comes to collecting materials from third parties, "*Brady* . . . does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel." *Meregildo*, 920 F. Supp. 2d at 445; *see also United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014) (*Brady* "is not a discovery doctrine that could be used to compel the Government to gather information for the defense"). Without a "plausible showing that inspection of the items [the defendant] seeks will reveal material evidence favorable to him," he is not entitled to compel the government to "embark on an open-ended fishing expedition on his behalf." *United States v. Galestro*, No. 06 Cr. 285 (ARR), 2008 WL 2783360, at *19 (E.D.N.Y. July 15, 2008) (quoting *United States v. Merlino,* 349 F.3d 144, 154-55 (3d Cir. 2003)). In short, a desire to comply with a government investigation, or a failure to resist lawful investigative requests by an entity does not render that entity's files

subject to government intrusion at the whim of a defendant.

In an effort to overcome the fact that the FTX Debtors are not part of the prosecution team, the defendant claims that "FTX Debtors' work for the prosecution goes so far above and beyond standard company cooperation that the Government has effectively deputized the company to aid the prosecution." (Dkt. 143 at 5). This claim is based on unfounded assertions and baseless speculation, and is inconsistent with the actual nature of the Government's investigation and prosecution. As the discovery in this case makes clear, the Government has engaged in its own wide-ranging analysis of criminal conduct committed by the defendant and his co-conspirators. That investigation has included dozens of witness interviews, over one hundred subpoenas or voluntary requests, and numerous search and seizure warrants, among other steps.

The FTX Debtors and their counsel have had no involvement in any significant aspect of the Government's investigation or prosecution. They have not participated in any witness interview conducted by the Government; they "did not review documents gathered only by the prosecution"; no Rule 6(e) materials were shared with the FTX Debtors; no search warrant returns were shared with the FTX Debtors, except for purposes of allowing the FTX Debtors to determine whether to assert privilege over certain documents identified by a filter team as potentially privileged; they "did not develop prosecutorial strategy"; they did not "recommend action" against any of the charged defendants and had no role in the Government's "decision making process"; they did not have a role in the "presentation of the case to the grand jury"; they had no role in seeking any of the Indictments or pursuing any of the charges; and the FTX Debtors played no role in the arrest or extradition of the defendant. *Blaszczak*, 308 F. Supp. 3d at 742-43 (examining relevant considerations in determining whether a "joint investigation" occurred); *see also United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018)

(same).

The defendant invokes *United States v. Connolly*, No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), which is entirely inapposite. There, the defendant argued that when his employer interviewed him, it was attributable to the government and compelled, in violation of the right against self-incrimination. The facts in *Connolly* were unique—it "was no ordinary outside investigation"—and worlds apart from the circumstances here. *Id.* at *12. There, there was "very little evidence" that the government did its "own independent investigative efforts." *Id.* Instead, the government compelled the defendant's employer to interview him and "directed an experienced … former Assistant U.S. Attorney … on the precise manner in which he should ask questions" to aid the government's case. *Id.* Additionally, "rather than simply producing documents and providing interview summaries," the company "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect" in interviewing the defendant. *Id.* While it is not obvious that *Connolly* even applies to the question of when a corporation is an arm of the prosecution, the Court need not decide the question, because the facts are so different here, starting with the Government's extensive investigation outlined above, with which the FTX Debtors were not involved. *See United States v. Ng Chong Hwa*, No. 18 Cr. 538 (E.D.N.Y.) (MKB), Dkt. No. 84 at 131 (Sept. 3, 2021) (Redacted Order) (distinguishing *Connolly* where the Government "took significant independent investigative steps beyond seeking information from the [cooperating third party], including not only conducting its own interviews but also subpoenaing other individuals and entities and obtaining evidence through search warrants").

Beyond misstating the nature of the Government's investigation, many of the factual assumptions underlying the defendant's motion are inaccurate and warrant correction. In any

event, those purported facts do not establish as a matter of law that the FTX Debtors are an arm of the prosecution to which *Brady* and discovery obligations would attach.

Starting with the Government's documents requests to the FTX Debtors, the defendant is incorrect that those requests—which are routine in a corporate investigation—somehow convert the FTX Debtors to an arm of the prosecution. In November 2022, the Government served a document request on the FTX Debtors, seeking the voluntary production of records, including records that are located outside the United States and may not be attainable through compulsory legal process. As the Government's investigation progressed, it served additional document requests. In response, the FTX Debtors have made several document productions, which the Government has produced to the defendant. In some instances, the FTX Debtors have asked to narrow the scope of a Government request, resisted providing data because of security concerns, or declined to produce information based on claims of privilege. While, as the defendant notes, the Government has sometimes asked the FTX Debtors to "prioritize" requests (Dkt. 143 at 7-8), that is a routine way to streamline document productions, particularly in an investigation as wide and deep as this one. "Interacting with the prosecution team, without more, does not make someone a team member." *Meregildo*, 920 F. Supp. 2d at 441-42. Nor does the fact that the Government "could have possibly obtained the materials … give rise to any discovery obligation." *United States v. Norris*, 753 F. Supp. 2d 492, 530-31 (E.D. Pa. 2010) (denying request to treat corporation as part of the prosecution team).

The defendant asserts that the Government's requests "targeted material that the Government believes will be inculpatory" and that the Government and FTX Debtors have an "incentive" to avoid locating exculpatory material. (Dkt. 143 at 1-2, 11). Even if there were some legal claim against the Government for seeking inculpatory evidence—which there is not—the

suggestion that the Government and the FTX Debtors are collaborating to hide exculpatory material in order to unfairly "lay blame at [the defendant's] feet," is entirely baseless, and indeed contradicted by the material produced to date. (Dkt. 143 at 11). The defendant has not put forward any evidence showing that the Government's requests were somehow tailored to avoid *Brady* material, that the FTX Debtors are deliberately withholding *Brady* material, or that *Brady* material even exists but has not been produced. To the contrary, the Government has made numerous straightforward, neutral requests for, among other things, all of FTX's balance sheets and ledgers, customer agreements and terms of service, FTX database data, agreements with lenders, investment documents, and bank records for dozens of accounts.

The defendant's invocation of incentives to hide *Brady* also obscures the astonishing scope of his request. While the defendant refers to a few items in the FTX Debtors' possession that are of potential interest, the motion seeks to have the Government review *every* record in the FTX Debtors' possession and—despite the defendant's intimate knowledge of the debtor companies as the person who formerly controlled them—fails to identify with any particularity records that would be relevant, material, or exculpatory that have not already been produced. The defendant refers to the FTX codebase in the FTX Debtors' possession, but the Government has already produced code data extracted from Gary Wang's laptop, as well as screenshots of portions of the code obtained from Gary Wang, Nishad Singh, and the FTX Debtors, and has not identified what would be uniquely relevant or exculpatory about the FTX Debtors' copy of the code.[12]

---

[12] The defendant also asks for records concerning legal advice by Fenwick & West regarding ephemeral messaging applications. (Dkt. 143 at 12). Those documents are almost certainly privileged, so even if the Government was under a duty to collect materials from the FTX Debtors, those materials would still be beyond the Government's reach absent a waiver or a judicial determination.

The defendant tries to paint the FTX Debtors' compliance with the Government's document requests as somehow inappropriate, nefarious, or collusive based on the amount of money and time that has been spent on fulfilling the Government's requests. (Dkt. 143 at 5-6). The FTX Debtors' billing entries are irrelevant to whether they are an arm of the prosecution. Had the FTX Debtors been subpoenaed for the requested records, they would have been required to make the same document production and incur the same cost. "The fact that a third-party corporation is cooperating with the Government's investigation—as many do—does not turn it into an 'agent' of the Government." *United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 896152, at *4 (S.D.N.Y. Mar. 16, 2012). And there is nothing about the Government's relationship or interactions with the FTX Debtors that gives the Government an "unqualified" "legal right to obtain … documents" in the company's files. *See United States v. Stein*, 488 F. Supp. 2d 350, 360, 363 (S.D.N.Y. 2007).

The defendant points to four ways in which the FTX Debtors have attempted to provide assistance, which the defendant claims make them an arm of the prosecution. Each of these, however, are routine practices by companies cooperating in an investigation, and they in no way make the FTX Debtors part of the prosecution team. First, the defendant notes that the FTX Debtors have interviewed 19 employees and given some "read outs" of interviews to the Government. (Dkt. 143 at 6). None of those interviews was requested by the Government; the Government did not direct counsel to the FTX Debtors to ask any questions; the Government did not attend the interviews (which were scheduled without the Government's involvement); and the Government was not provided the interview notes. The FTX Debtors, who are involved in a complex bankruptcy proceeding and accompanying litigation, no doubt had ample independent business reasons to conduct these interviews, and the Government simply requested a "read out"

of information from certain interviews after learning that the FTX Debtors had conducted them. For those employees for which the Government did request an interview "read out," counsel for the FTX Debtors did not disclose any memoranda, indicate that they were reading from a memorandum, or disclose attorney work product. Thus, there is no basis to conclude that the "read outs" made the FTX Debtors an arm of the prosecutor. *Accord Blaszczak*, 308 F. Supp. 3d at 742 (joint interviews insufficient to "warrant[] the conclusion that the SEC's role" brought it "within the arm of the prosecutor").[13]

Second, the defendant claims that the FTX Debtors are part of the prosecution team because the Government requested certain factual presentations, some but not all of which were given by counsel for the FTX Debtors. (Dkt. 143 at 2, 7-8). The defendant's argument proceeds from multiple factual errors, and is also legally baseless. The FTX Debtors never "analyzed potential legal claims at the Government's request." (*Id.* at 2). The Government also never predicated charging decisions on receipt of any presentation from the FTX Debtors. For instance, the Government received factual presentations on aspects of the political donations and the financial deficit at FTX US *after* charges relating to such facts were brought. The December 16, 2022, email exchange cited by the defendant (Dkt. 143 at 9), was not about the FTX Debtors "suggesting further areas of investigation" (*id.* at 2), but rather included a response to a request from the Government about the hole in FTX US's balance sheet. And although the Government asked Debtors' counsel for a presentation about whether certain entities were acting as an unlicensed money transmission business, the FTX Debtors did not—contrary to the defendant's speculation (Dkt. 143 at 8)— provide such a presentation, the Government has withdrawn that request, and the

---

[13] The Government will provide its notes of the FTX Debtors' read outs when it makes Jencks Act disclosures.

Grand Jury charged the defendant with conspiring to commit unlicensed money transmission on the basis of the documents and other substantial evidence the Government had adduced. More generally, requests for presentations do not mean that the FTX Debtors are part of the prosecution team. *See Ng Chong Hwa*, No. 18 Cr. 538 (E.D.N.Y.) (MKB), Dkt. No. 84 at 131 (denying motion to consider a cooperating third party to be part of the prosecution team even though third party made "regular investigative updates and factual presentations," because Government had undertaken a substantive parallel investigation); *United States v. Josleyn*, 206 F.3d 144, 152 (1st Cir. 2000) (presentations by counsel for corporation that included "factual proffer" on documents and witnesses were not a basis to find that a corporation was part of the prosecution team). The defendant cites no authority suggesting otherwise.

Third, the defendant says that the FTX Debtors "selectively waived privilege only on certain topics to aid the Government in its prosecution." (Dkt. 143 at 2, 10). Were that true—and it is not—the defendant cites no authority and offers no explanation for why selective waiver would convert a corporation into part of the prosecution. Moreover, the defendant's assumption that the waivers were intended to "aid the Government" is incorrect. The Government understands that the FTX Debtors have waived on two topics, both of which relate to a potential advice of counsel defense. One, as the defendant notes, is whether the defendant or other employees received "legal advice concerning whether FTX, Alameda, or entities other than FTX.US needed to register as a money services business." (*Id.* at 10). That is a defense the defendant has already aired in his motion to dismiss that count. (Dkt. 141 at 18-19) (citing Decl. of Christian Everdell, Ex. 7). The other waiver concerned whether Chinese attorneys provided legal advice that could provide a reliance on counsel defense relevant to the FCPA charge. (Dkt. 143 at 10). While the Justice Manual does not confer any rights upon the defendant, in referring to the Justice Manual the

defendant overlooks a key part of the policy concerning corporate privilege waivers: "where an advice-of-counsel defense has been asserted, prosecutors may ask for the disclosure of the communications allegedly supporting it." JM 9-28.720. The defendant has not identified any particular topics or category of documents relevant to his defense that he has not received in discovery and that the FTX Debtors refuse to waive the privilege on.

Fourth, the defendant complains about the Government's collaboration with the FTX Debtors with respect to asset forfeiture. (Dkt. 143 at 8-9). But the Government has not directed the FTX Debtors to take any affirmative steps regarding the Government's seizures of property or the FTX Debtors' intended avoidance actions, and to date, it has not entered any formal collaboration agreement with the FTX Debtors. Instead, the Government has worked with the FTX Debtors to try to efficiently allocate resources to recover some of the billions of dollars the defendant and his co-conspirators stole or misdirected. The Government intends to return the hundreds of millions of dollars of property that it has seized to victims of the defendant's crimes, a choice that necessarily implicates the FTX Debtors' bankruptcy responsibilities of reorganization and receipt of creditor claims.

Lacking concrete facts to support his motion, the defendant falls back on innuendo about inappropriate collusion and selective statements from the FTX Debtors, particularly John Ray, about the work the FTX Debtors have done since declaring bankruptcy. (Dkt. 143 at 7). What the defendant describes as FTX's legal advisors going to the Government "to accuse Mr. Bankman-Fried behind his back without knowing the full facts" (Dkt. 143 at 1), was in fact the appropriate reporting of a potential crime, which—as it turned out—resulted in a grand jury finding probable cause that the defendant committed a slate of serious crimes. The defendant seizes upon Mr. Ray's statement that the FTX Debtors share responsibility for "the speed with which federal prosecutors

66

have been able to charge and arrest Mr. Bankman-Fried" and his co-conspirators (Dkt. 143 at 7), but that statement—which, contrary to the defendant's insinuation, the Government did not solicit, review, or approve—"is puffery" and there is "no evidence that [the company's] lawyers were, in any sense, prosecutors here," *Josleyn*, 206 F.3d at 152. By the same token, the defendant asserts with absolutely no basis in fact that the FTX Debtors serve as the Government's "mouthpiece." The Government has not encouraged a single public statement by the FTX Debtors, much less suggested that they "publicly label[] him 'the villain.'" (Dkt. 143 at 2). The reality is that "[c]ooperating parties have their own sets of interests … that are often far from identical to-or even congruent with-the government's interest in justice being served." *Tomasetta*, 2012 WL 896152, at *4. Those interests, particularly in a contested bankruptcy, include maximizing asset recovery while making the counsel for a debtor or creditor appear successful. Indeed, Mr. Ray has made clear—in the testimony selectively quoted by the defendant—that the FTX Debtors are "not sharing for sharing sake," but rather are cooperating with the Government while investigating themselves in order to "recover on avoidance actions" and "file actions related to … misfeasance or malfeasance against insiders." (Dkt. No. 137, Ex. 9 at 64-66).

Accordingly, the Government's discovery and disclosure obligations do not extend to materials in the FTX Debtors' possession and the defendant's motion should be denied without a hearing. *See, e.g.*, *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006) (the defendant's "conclusory assertions" that "the S.E.C. operated as a surrogate for the USAO, without more, do not warrant an evidentiary hearing").

### B.  The Court Should Deny the Defendant's Motion for a Bill of Particulars

The defendant's motion for a bill of particulars (Dkt. 144 at 7-11) should be denied as "an impermissible attempt to compel the Government to provide the evidentiary details of its case."

*United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003).

The defendant requests a grabbag of additional particulars, all of which should be denied. A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). That is not the case here. The 43-page indictment, as supplemented by well-indexed and searchable Rule 16 discovery and additional voluntary disclosures made by the Government, provides the defendant with more than enough notice about the charged crimes and ample information to adequately prepare his defense. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (court should consider the text of the Indictment, as well as discovery and other information supplied to the defendant). The law does not "allow [a] Defendant[] to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify [the] Defendant[] of the charges against [him]." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)).

*First*, the defense asks the Court to "compel pretrial disclosure of the identities of government witnesses and unnamed co-conspirators." (Dkt. 144 at 11). But the "wheres, whens and with whoms" of a crime are precisely the details that courts have deemed "beyond the scope of a bill of particulars." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001). The defense cites *United States v. Akhavan*, No. 20 Cr. 188 (JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020), where the court ordered the government to disclose the identity of co-conspirators. But in that atypical case, the "risk of surprise to the defendants [was] very high" because the indictment suggested that numerous co-conspirators from a variety of distinct organizations may

have been involved in a complex and long-running scheme. *Id.* at *2. Here, by contrast, the defense already has access to the identities and guilty plea transcripts of three co-conspirators who formed the defendant's inner circle and who are cooperating with the Government.

Beyond that, the Government has provided the defense with substantial information about some of the potential witnesses it has interviewed. In addition to providing the defense with discovery materials produced to the Government by dozens of individuals (and identifying the producing party to the defense), the Government has shared excerpts of notes of interviews of over 50 potential witnesses in a 60-page letter to the defense that included an enclosure of over 100 pages of additional interview notes in redacted form. The letter included excerpts from interview notes of co-conspirators, victims, and other potential trial witnesses. The Indictment, well-labeled discovery, and these disclosures more than meet the Government's obligations, and—as is routine—the Government here plans to disclose a witness list and 3500 material sufficiently in advance of trial for the defense to adequately prepare. *See United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."); *id.* (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to [the defendant] by the Government sufficiently facilitate

his ability to avoid surprise and prepare for trial"); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

*Second*, the defense requests a variety of granular detail about the charged fraud schemes, including statements to investors and lenders that the Government contends were false, information about which fundraising rounds are implicated by the defendant's investor fraud and which loan agreements were affected by the lender fraud, and details about the property the defendant obtained from customers and lenders. As an initial matter, the Government has provided ample information about the defendant's schemes to defraud.[14]  The 43-page Indictment and its 62 paragraphs of factual allegations, describes the defendant's fraudulent schemes in detail, including the nature of the misrepresentations to customers, investors, and lenders. The Indictment specifies the dates and amounts of four fundraising rounds completed by the defendant for FTX, as well as the defendant's continued efforts to fundraise for FTX at least up to and including November 2022. (*See* Indictment ¶¶ 13, 56-57). The Indictment specifies that the defendant provided false and misleading financial statements to creditors after he caused Alameda to repay some loans using FTX customer funds, beginning in or around June 2022. (*See* Indictment ¶¶ 32-36). This motion provides even further detail about the misrepresentations made to the defendant's

---

[14] While the defendant does not demand particulars with respect to specific misrepresentations made to FTX customers victimized by the wire fraud charged in Counts One and Two, it bears noting that the Government does not need to prove a specific misrepresentation to convict the defendant on those counts. *See, e.g.*, *Spira v. Nick*, 876 F. Supp. 553, 558 (S.D.N.Y. 1995) (while fraud "in most circumstances requires a false representation of a material fact, there is no such requirement under the mail and wire fraud statutes" when the scheme alleges "embezzlement by a fiduciary." (citing *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995))).

victims, and the property that was taken from them. *See supra* at 10-12. In addition, the Government has produced in Rule 16 discovery materials that were collected from Alameda's lenders and FTX's investors, identifying the producing parties in detailed indices, and has also disclosed excerpts from some witness interviews, including interviews of FTX investors. The discovery materials include due diligence materials and financial statements provided to investors and lenders, contractual agreements with the investors and lenders, and electronic correspondence between FTX and Alameda employees with investors and lenders. Nothing more is presently required. "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed," which is what the defendant seeks. *United States v. Mora*, No. 19 Cr. 514 (JPO), 2020 WL 7496281, at *1 (S.D.N.Y. Dec. 21, 2020).

This case is akin to *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010), where a defendant facing numerous fraud charges requested particulars with respect to thirteen categories of information that the court denied. As here, the defendant "[sought] to compel the Government to particularize the allegations in the Indictment regarding misrepresentations allegedly made to investors and to identify the allegedly defrauded investors," but the court found that the "level of detail sought demonstrate[d] that the request [was] nothing more than an ill-disguised attempt at general pretrial discovery." *Id.* at 372. The court was unpersuaded by the defendant's contention—similar to that made here—that "given the scope of the alleged conspiracy, the number of investors allegedly involved and the scope of discovery in [the] case, the defendant cannot navigate the discovery and prepare a defense without the requested particulars." *Id.* at 384. The court found that the defendant's "request for information regarding material misstatements [was] completely unfounded," because the "detailed information provided

in the thirty-four page Indictment [was] more than sufficient." *Id.* at 385. Similarly, the court found

that the defendant's request for a list of the defrauded victims was "simply a request to compel the

production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars,"

and collected cases where courts had previously denied requests for bills of particulars specifying

the names of defrauded investors. *Id.* at 384-85.

As in *Mandell*, other courts in this district have denied similar requests for a catalog of

misrepresentations and transaction-level details in a fraudulent scheme. *See United States v.*

*Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013) (in case

involving largest Ponzi scheme in U.S. history (Madoff), which spanned decades, denying request

for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a

defendant] was involved that the Government alleges are fraudulent," the "dates and stock names

for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to

in" a particular count, and all allegedly false documents and records); *see also United States v.*

*Jain*, No. 19 Cr. 59 (PKC), 2019 WL 6888635, at *2 (S.D.N.Y. Dec. 18, 2019) ("A bill of

particulars is also unnecessary to specify the false representations, false documents, or securities

at issue in this case."); *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19

(S.D.N.Y. Jan. 18, 2017) (disclosure of "trade-level detail" was "the very type of evidentiary

minutiae that is not appropriate in a bill of particulars"); *United States v. Tuzman*, 301 F. Supp. 3d

430, 452-53 (S.D.N.Y. 2017) (denying request for bill of particulars seeking "particularized trade

information"); *United States v. Levy*, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 15, 2013) (denying

a bill of particulars where indictment described "the types of material misrepresentations and

omissions that [the defendant] allegedly made"; "the extent of [the defendant's] financial

commitment to the target companies"; and "[the defendant's] participation in the manipulation of

the target companies' stock"). As in these cases, the Court should deny the defendant's request for a detailed preview of the Government's trial evidence.

*Third*, the defense asks the Court to compel the Government to specify which of the hundreds of campaign contributions the government contends were unlawful. This is effectively a request for a list of the campaign finance conspiracy's overt acts, but as the Second Circuit has observed, "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975); *see also United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts."); *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) ("[D]isclosure of all the overt acts in furtherance of the conspiracy is not properly the function of a bill of particulars.").

In support of its request, the defense cites only *United States v. Shteyman*, No. 10 Cr. 347 (SJ), 2011 WL 2006291, at *5 (E.D.N.Y. May 23, 2011) (Dkt. 144 at 10), but there the court ordered the Government to provide particulars about *how* Medicare claims submitted by the defendant were fraudulent, while denying a slate of other particulars requests. *See Shteyman*, 2011 WL 2006291, at *3 ("In short, a defendant is not entitled to preview, via a motion for bill of particulars, an extended trailer of the feature the Government plans to screen for the jury well in advance of the premiere."); *see also United States v. Kogan*, 283 F. Supp. 3d 127, 131 (S.D.N.Y. 2017) (denying defendants' request, in a case involving nearly 100,000 allegedly fraudulent Medicare claims, for the Government to "identify the alleged fraudulent claims and identify the manner in which each is false"). Here, the defendant is already on notice about the "*how*" of the

73

unlawful conspiracy: the defendant and others conspired to carry out their unlawful campaign finance scheme through illegal straw and corporate donations between in or about 2020 and in or about 2022. (*See* Indictment ¶¶ 96-100). The Indictment also refers to two co-conspirators in the scheme, whose identities and relevant donations are apparent from the Rule 16 discovery, which includes donation records from relevant campaigns and financial records documenting the transfer of corporate funds to the defendant and his co-conspirators for use in the scheme.

*Fourth*, the defendant argues that the Government should be required to provide additional particulars about the FCPA bribery conspiracy, specifically the "identities, positions, agencies, and official duties of the alleged recipients of the bribe payments." (Dkt. 144 at 10-11). As a threshold matter, the FCPA does not require proof that a bribe payment was received. Instead, it is the offer, promise, or authorization of the bribe that completes the crime. *See* Jury Charge, *United States v. Ng Lap Seng*, 15 Cr. 706 (VSB). Likewise, as discussed *supra* at 37, the FCPA does not require proof of the identity of the intended governmental recipient of a corrupt payment, and contemplates situations in which the payor knows that a "foreign official" will ultimately receive a bribe but only the intermediary knows the foreign official's specific identity. 15 U.S.C. § 78dd-2(a)(3); *see, e.g.*, *Straub*, 921 F. Supp. 2d at 265. Regardless, since the defense filed its pretrial motions, the Government has disclosed to the defense the identity of the foreign official that the bribes were intended to influence and induce in connection with Count Thirteen, although the Government has not yet determined whether it intends to introduce such evidence at trial.

With respect to each of these requests, while more information might be considered "helpful," the "ultimate test must be whether the information sought is necessary," *Mitlof*, 165 F. Supp. 2d at 569, and the information already provided by the Government—including the detailed Indictment, organized and searchable discovery, and various disclosures—is more than sufficient

to advise the defendant of the nature of the charged scheme. *See United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to . . . restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

None of the cases cited by the defense support the particulars requests here. The defendant cites *United States v. Shkreli*, No 15 Cr. 637 (KAM), 2016 WL 8711065, at *4-7 (E.D.N.Y. Dec. 16, 2016) (Dkt. 144 at 5), but in that case, the district court denied the defendant's particulars motions wholesale, including requests for details about the allegedly fraudulent transactions, the particulars of false or fraudulent statements and omissions, the identities of unindicted co-conspirators, and dates and details of undisclosed overt acts. The defendant's heavy reliance on *Bortnovsky* is misplaced. In *Bortnovsky*, the Government refused to identify at any point before trial which of 15 burglaries were alleged to have been fabricated and thus the subject of fraudulent insurance claims. 820 F.2d at 575. *See also Bonventre*, 646 F. App'x at 79 (affirming denial of bill of particulars in Madoff case, including because the case "present[ed] none of the concerns identified in . . . *Bortnovsky*").

And, in *United States v. Nachamie*, 91 F. Supp. 2d 565, 575-76 (S.D.N.Y. 2000), also cited by the defense, the Government refused to identify which of the 200,000 pages in discovery it "intend[ed] to rely on in its case-in-chief at trial." In other words, the Government there refused to provide an exhibit list, which the Government intends to do here. Moreover, although the district court in *Nachamie* granted the defendant's request for certain particulars, relying on *Bortnovsky*,

the district court denied multiple defense requests, similar to the defendants' request here, that "the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." *Id.* at 575. The defendant therefore places more weight on this case than it can bear in claiming that the "Government may not rely on voluminous discovery to fill in the gaps of an otherwise insufficient indictment." (Dkt. 144 at 6). The "mere existence of 'mountains of documents' does not entitle [a defendant] to a bill of particulars," particularly where, as here, there is "specificity" in the Indictment, and the Government intends to provide "further information . . . . at a date closer to trial." *Mandell*, 710 F. Supp. 2d at 385. This case is therefore also unlike *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (Dkt. 144 at 5-6), where only one paragraph in the indictment detailed the alleged wrongdoing and the defendant was otherwise required to "comb through [a] veritable mountain of documents . . . to guess" at the Government's allegations.

Because the details already provided by the Government go beyond what the law requires, the defendant's motion for a bill of particulars should be denied.

### C. The Court Should Deny the Defendant's Motion for Immediate Production of *Brady* and *Giglio* Material

The defendant moves for the immediate disclosure of materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). (Dkt. 144 at 12). The motion should be denied. The Government has already produced and will continue to produce potentially exculpatory material pursuant to *Brady*, and the Government is not required to produce impeachment material pursuant to *Giglio* at this time.

Starting with potential *Brady* material, the Government has already produced potentially exculpatory documents as part of its Rule 16 discovery production. There is no legal requirement

that the Government identify specific documents within its productions, and the defendant has not suggested otherwise. *See, e.g.*, *United States v. Ohle*, No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), *aff'd* 441 F. App'x 798, 804 (2d Cir. 2011) (summary order). As for potentially exculpatory witness statements, the Government previously invited defense counsel to share what information counsel would consider exculpatory in order to assist the Government in identifying witness statements that would be deemed material to the defense. To date, the defense has made little more than boilerplate *Brady* demands. Nonetheless, as the defense notes, the Government has provided a 60-page disclosure letter containing excerpts of notes and reports of witness interviews and attorney proffers, along with a 118-page attachment containing additional notes and reports. (Dkt. 144 at 13 n.4). Where, as here, the Government recognizes its obligations under *Brady*, has produced *Brady* material and made other, additional prophylactic disclosures, the defendant's request for an additional order pertaining to the disclosure of *Brady* material should be denied. *See, e.g.*, *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at *3 (S.D.N.Y. Jan. 26, 2017) (denying motion to compel where "the Government represents that it recognizes its obligations under *Brady*, and that while the Government is not aware of any *Brady* material, should the Government become aware of any, it will produce it promptly").

The only material identified in the motion that the defendant claims is potentially exculpatory that has not been produced is FTX's "codebase history," which is within the possession of the FTX Debtors. (Dkt. 144 at 13-14). There is no dispute that this code is not in the Government's possession, which places it outside the Government's *Brady* obligations. *See, e.g.*, *Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and it never possessed or inspected[.]"). And the Government is not required to obtain it from the FTX Debtors, which is not part of the prosecution team, as discussed *supra* at

77

56-67. In addition, the Government has already produced screenshots of portions of the code obtained from Gary Wang, Nishad Singh and the FTX Debtors, as well as code data extracted from Wang's laptop. The defendant has not identified what within the codebase history that has not already been produced is potentially exculpatory, and for that additional reason, the motion should be denied. The defendant's claims that the codebase history "would elucidate exactly who wrote any alleged loopholes [in the code] and when." (Dkt. 144 at 14). But the Government has alleged that the defendant directed certain code changes—not that he implemented them himself—and the defendant has already been provided computer code material to examine for details about when certain code changes were made and by whom.

With respect to impeachment or so-called *Giglio* material, such material need only be produced in time for its effective use at trial. *See United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) ("as a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant"). The Government has not yet determined who it will call as witnesses at trial, and for that reason as well, the request is premature. Courts in this Circuit therefore routinely refuse to compel early disclosure of impeachment material. *See, e.g.*, *United States v. Gonzalez*, No. 21 Cr. 288 (VM), 2022 WL 3684796, at *3 (S.D.N.Y. Aug. 24, 2022); *United States v. Gillier*, No. 11 Cr. 409 (PAE), 2022 WL 179204, at *3 (S.D.N.Y. Jan. 19, 2022); *United States v. Segovia-Landa*, No. 20 Cr. 287 (JPO), 2021 WL 1966117, at *5 (S.D.N.Y. May 17, 2021); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 3591801, at *6 (S.D.N.Y. Aug. 13, 2021); *United States v. Helbrans*, 547 F. Supp. 3d 409, 436 (S.D.N.Y. 2021); *United States v. Brewster*, No. 19 Cr. 833 (SHS), 2021 WL 3423521, at *7 (S.D.N.Y. Aug. 5, 2021);

78

*United States v. Parnas*, No. 19 Cr. 725 (JPO), 2021 WL 2981567, at *6 (S.D.N.Y. July 14, 2021); *United States v. Davis*, No. 17 Cr. 610 (LGS), 2018 WL 4373998, at *11 (S.D.N.Y. Sept. 13, 2018); *United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016). Citing *United States v. Bagley*, 473 U.S. 667, 676 (1985), the defendant argues that impeachment material should be produced because it "falls within the *Brady* rule." But *Bagley*—which pre-dates *Coppa* and all of the decisions from this District denying early production of impeachment material—concerned the failure to produce *Giglio* material altogether, not the ordering of early production. The defendant's request should be denied.

### D.   The Court Should Deny the Defendant's Motion for Immediate Production of Jencks Acts Material and a Witness List

The defendant also moves for immediate production of a witness list and Jencks Act materials. (Dkt. 144 at 14-16). Both requests should be denied.

Starting with the request for a witness list, as the defendant's motion concedes, Federal Rule of Criminal Procedure 16 "does not require the Government to furnish the names and addresses of its witnesses." *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). While a district court has inherent authority to compel pretrial disclosure of the identity of Government witnesses, there is a strong presumption against doing so. *Id.* Thus, "in the absence of a *specific* showing that disclosure [of a witness list is] both material to the preparation of the defense and reasonable in light of the circumstances surrounding the case," the request should be denied. *Id.* at 139-40; *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *10 (S.D.N.Y. May 22, 2018) ("Courts in the Second Circuit typically deny motions for the early disclosure of witness lists where, as here, defendants have not made a specific showing of need.").

No specific showing has been made here. Rather, the defendant has asserted, in general

terms, that the "broad scope of the charged offenses" and the "complex financial and digital data" make trial preparations more difficult. (Dkt. 144 at 17). Those highly general characterizations of the case are not reasons why a witness list needs to be produced months before trial, while the Government is continuing to investigate the defendant's conduct and interview witnesses, and has not yet formulated a witness list for trial. While the charged offenses certainly involve financial records and digital data, this is a case where the general universe of potential witnesses is apparent to the defense, consisting principally of former Alameda and FTX employees, FTX investors and customers, and Alameda lenders. The defendant is also aware of three potential witnesses who have pleaded guilty pursuant to cooperation agreements, as well as of potential trial witnesses who have been interviewed by the Government or who have produced documents pursuant to subpoenas or voluntary requests. This is therefore not an extraordinary case that overcomes the general presumption against requiring an early witness list. *See United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975) (an "abstract, conclusory claim that such disclosure [is] necessary to [the defendant's] proper preparation for trial" is insufficient); *United States v. Lopez*, No. 18 Cr. 736 (NSR), 2019 WL 4733603, at *10 (S.D.N.Y. Sept. 27, 2019) (mere "conclusory statements" about factors supporting witness list disclosure did "not establish how early disclosure would be *material*" to the defense case); *United States v. Russo*, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007) (rejecting the request for an early witness list where the defendants' argument was based solely on the "complexity of the case").

Moreover, early disclosure of a comprehensive witness list is especially unwarranted here, where the defendant's apparent effort to tamper with a potential witness resulted in additional restrictions on the defendant's bail conditions. *See United States v. Vilar*, 530 F. Supp. 2d 616 (S.D.N.Y. 2008) (relevant to a witness list deadline is whether there is a "realistic possibility that

80

supplying witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify" (quoting *United States v. Turkish*, 458 F. Supp. 874, 881 (S.D.N.Y. 1978))). The Court should reject the defendant's request to force the Government to furnish more information at this stage. *See, e.g.*, *United States v. Gatto*, 17 Cr. 686 (LAK) (four-week, three-defendant honest services fraud trial; witness list approximately 30 days before trial); *United States v. Blaszczak*, 17 Cr. 357 (LAK) (five-week, four-defendant insider trading trial; witness list approximately 30 days before trial).

For similar reasons, the Court should deny the defendant's request for immediate production of Jencks Act materials. The Jencks Act covers disclosure of statements or reports made by Government witnesses, and the rule mandates that such materials not be the subject of discovery or inspection "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). A district court does not have the authority to order disclosure inconsistent with the Act. *Coppa*, 267 F.3d at 145 (the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements").

As the Court knows, typically in this District the Government confirms that it will produce Jencks Act material and impeachment material reasonably in advance of trial. *See, e.g.*, *Wey*, 2017 WL 237651, at *23 ("[I]t is a widely recognized customary practice in this District that *Giglio* material is turned over at the same time as material under the Jencks Act . . . . Both types of material are typically produced a week or two before the start of trial, depending on the complexity of the case."); *United States v. Ulbricht*, No. 14 Cr. 68 (KBF) (Jencks Act material produced one week before trial); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (Jencks Act material produced seventeen days before trial); *United States v. Costanza*, No. 12 Cr. 725 (KMW) (Jencks Act material produced two weeks before trial); *United States v. Whitman*, No. 12 Cr. 125 (JSR) (Jencks

Act material produced two weeks before trial); *United States v. Silver*, No. 15 Cr. 93 (VEC) (Jencks Act material produced approximately three weeks before trial); *United States v. Gupta*, No. 11 Cr. 907 (JSR) (Jencks Act material produced three weeks before trial). It is particularly premature for the Court to intervene because the Government intends to engage in good faith discussions with the defense regarding a schedule for pretrial disclosures for this case, including for Jencks Act material.

### E.  The Court Should Deny the Defendant's Motion for Immediate Disclosure of Rule 404(b) Evidence

The defendant requests disclosure of evidence the Government will seek to admit under Rule 404(b). (Dkt. 144 at 17). Rule 404(b) only requires "reasonable notice in advance of trial" for the admission of bad acts. The rule establishes no minimum time, however, because "the evidence the government wishes to offer may well change as the proof and possible defenses crystallize." *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988). The Government proposes that it provide Rule 404(b) disclosures two weeks prior to the defendant's deadline for filing motions *in limine*. This representation is sufficient at this juncture. *See United States v. Freeman*, No. 18 Cr. 217 (KMW), 2019 WL 2590747, at *3 (S.D.N.Y. June 25, 2019). Accordingly, the motion should be denied.

## CONCLUSION

For the reasons set forth above, the defendant's motions should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division


By: /s/ Danielle R. Sassoon
    Danielle R. Sassoon
    Nicolas Roos
    Danielle Kudla
    Samuel Raymond
    Thane Rehn
    Andrew Rohrbach
    Assistant United States Attorneys
    Jil Simon
    Trial Attorney
    (212) 637-1115


Dated: May 29, 2023
       New York, New York