# Exhibit A

In the Commonwealth of the Bahamas
In the Supreme Court
Public Law Division

Claim No. PUB/jrv/00015 of 2023

**IN THE MATTER OF Sections 7, 12 and 17 of the Extradition Act, Chapter 96, Statute Laws of the Bahamas.**

**AND IN THE MATTER of Article 14 of the Extradition Treaty between the United States of America and the Government of the Commonwealth of the Bahamas dated 9th March, 1990.**

<u>BETWEEN</u>

SAMUEL BANKMAN-FRIED

Claimant

AND

The Honourable FREDERICK AUDLEY MITCHELL,
(Minister of Foreign Affairs and The Public Service of The Commonwealth of The Bahamas having responsibility for Extradition)

First Defendant

THE ATTORNEY GENERAL OF THE
COMMONWEALTH OF THE BAHAMAS

Second Defendant

| | |
|---|---|
| Before: | The Hon. Mr. Justice Loren Klein |
| Appearances: | Mrs. Krystal Rolle KC, with Ms. Kendrea Demeritte for the Claimant |
| | Mrs. Kayla Green-Smith for the Defendants |
| Hearing Date: | 9 June 2023 |

# RULING

**KLEIN, J.**

Judicial review—Application for leave pursuant to Part 54.3 (1) of the Civil Procedure Rules 2022 ("CPR 2022")—Test for the grant of leave—Sufficient interest—Arguable grounds with reasonable prospect of success—Discretionary Bars—Alternative remedy—Abuse of Process—Interim Relief—Injunction—Disclosure

Extradition Act 1994—Consent of Minister to "other offence" pursuant to s. 7—Extradition Treaty between the Bahamas and the United States of America, 1994—Extradition Principles—Double Criminality—Rule of Specialty—Whether claimant entitled to invoke specialty rights in Extradition Treaty—Alternative remedy—Abuse of Process

## INTRODUCTION AND BACKGROUND

[1]     This is an application for leave pursuant to Part 54.3(1) of the Supreme Court Civil Procedure Rules 2022 ("CPR 2022") by the claimant to commence judicial review proceedings against the defendants arising out of his extradition to the United States.

1

[2]   It is far removed from the routine fare of applications for leave which normally trouble the courts, however, as these proceedings are marked by several striking features. For one, it involves the pending high-profile trial of Samuel Bankman-Fried (a.k.a. "SBF") in the Southern District of New York ("SDNY") on a raft of charges arising out of the collapse of the global cryptocurrency exchange FTX, for which he was extradited from The Bahamas (with his consent) in December 2022. Further, it raises novel and difficult questions about the extradition process and in particular the interpretation of the so-called 'specialty' principle in the scheme of the Extradition Act 1994 ("the Extradition Act") and the Extradition Treaty between the Government of the United States of America and the Government of the Commonwealth of the Bahamas, signed 9 March 1990 and which entered into effect on 22 September 1994 ("the Extradition Treaty").

[3]   These issues arise because the United States ("the requesting state"), after reviewing additional documents and interviewing witnesses following his extradition, has returned two superseding indictments against SBF to try him for additional offences which were not covered under the original indictment. In this regard, they have sought the post-surrender consent of The Bahamas ("the requested state"), as is required under the Extradition Treaty and Act, to try him on the new offences.

[4]   The claimant asserts that he has a right to be heard before The Bahamas can consent to his prosecution on the additional offences for which he was not extradited. He has therefore launched these proceedings to challenge an email decision of 6 June 2023 from the second defendant, the effect of which he claims is to assert that the process by which that consent is given is a matter between states *inter se* in their role as sovereigns, and deny him a right to make representations (although the defendants through counsel dispute that this is the intended meaning).

[5]   While the determination of those issues remains for the substantive judicial review hearing (if leave is granted), the question for this court on the application before it is whether it should exercise its discretion to grant leave and any of the interim remedies sought to preserve the claimant's rights pending the substantive hearing.

*Factual and procedural background*

[6]   As indicated, the claimant is SBF, the famous (and perhaps now infamous) founder of FTX, who is currently in the custody of the US facing charges before the US District Court of SDNY, stemming from the collapse of the cryptocurrency companies he founded and controlled. It is alleged that the operation of these entities involved the defrauding of FTX customers, financial institutions and lenders, as well the perpetration of a number of other crimes.

[7]   Up to the time of his extradition, and approximately 2 years before that, SBF was a resident of The Bahamas, where he conducted operations involving FTX and other companies. On the 21 December 2022 he was surrendered to the US without formal extradition proceedings, having agreed in writing (by affidavit sworn by him on 20 December 2022) to the simplified extradition proceedings provided for at section 17 of the Extradition Act.

[8]   His extradition was sought pursuant to an indictment ("the Original indictment") (United States of America v. Samuel Bankman Fried, a/k/a/ "SBF", Case Number S5 22 Cr. 673) which contained

[8] eight counts: Count 1 (conspiracy to commit wire fraud on FTX customers); Count 2 (wire fraud); Count 3 (conspiracy to commit wire fraud on lenders); Count 4 (wire fraud on lenders); Count 5 (conspiracy to commit commodities fraud); Count 6 (conspiracy to commit securities fraud); Count 7 (conspiracy to commit money laundering); Count 8 (conspiracy to defraud the US and violate campaign finance laws). The warrant of surrender issued in support of the extradition process attached a schedule of all but one of the Counts on which SBF had been provisionally arrested (Count 8, which charged a conspiracy to violate the campaign finance laws of the United States of America).

[9] On 20 December 2022, SBF appeared before a stipendiary and circuit magistrate pursuant to his election of the simplified extradition process where he and his lawyers formally confirmed his consent to that procedure, as required under s. 17 of the Act, and at the end of which the magistrate duly committed him for extradition. During that process, specific reference was made to article 14 of the Treaty, which embodies the 'specialty' principle, and the contents of the indictment pursuant to which he gave his consent to be extradited.

[10] Following his extradition, the US obtained a series of superseding indictments, respectively on the 22 February 2023 (the "S3 Superseding Indictment) and 28 March 2023 (the "S5 Superseding Indictment") (together referred to as the "Superseding Indictment"), which charged him with the following new offences, with the consequential renumbering of the charges: Count Four (commodities fraud); Count Nine (bank fraud conspiracy); Count Ten (unlicensed money transmitting conspiracy); Count 13 (conspiracy under the Foreign Corrupt Practices Act) ("the FCPA").

[11] Based on documents which have recently been disclosed to the claimant's attorneys (of which more will be said later), the US requested by Diplomatic Note on 22 May 2023 the consent of the defendants ("The Bahamas") for the trial of SBF on the additional charges, described as a request for "a waiver of the Rule of Specialty", which was accompanied by an affidavit setting out the new charges and the basis for them.

[12] It is also important to note, as part of the background, that the preliminary stages of the trial of SBF on the extradition charges are already proceeding in the US District Court for the SDNY. In this regard, on 8 May 2023 the claimant filed pretrial motions to have a majority of the counts dismissed on various grounds, and in particular Counts 9-10 and 12-13 dismissed on the grounds that they violate the specialty rule.

[13] On 29 May 2023 the Government of the United States in its brief filed in the US District court of the SDNY stated that a formal application had been made to The Bahamas to request consent pursuant to Article 14 (1) (b) of the Treaty in respect of the additional charges in the Superseding Indictment that did not form part of the charges on which SBF was extradited.

[14] On 1 June 2023, the claimant's local counsel wrote the second defendant by email seeking an undertaking from him that the defendants would not consent to the prosecution of SBF on the offences that did not form the basis of the extradition request until he could make representations on why consent should not be granted. Failing obtaining such an undertaking, it was indicated that an application would be made to the Court for appropriate relief.

[15] The second defendant replied with a terse email on 6 June 2023 in the following terms:

3

> "Thank you for your email. As you can appreciate this matter is solely a matter between sovereign states. As such we cannot agree to you[r] request for an undertaking that The Bahamas will not consent to the United States' request to prosecute Mr. Bankman Fried for those offences without first affording you the opportunity to make legal and factual representations in this regard."

[16]  On 7 June 2023, the claimant filed an application pursuant to Part 54.3(2) of the CPR 2022, as well as the other relevant enabling provisions of Part 54, seeking leave to apply for judicial review for the orders which are summarized below. I should add that the claims at paragraphs (i), (ii), (iii), (v) and (vii), as well as ground (i), were added by amendment, and were not included in the original application. These amendments were foreshadowed during the hearing, and I subsequently granted leave for them after receiving the draft amendments over the weekend, which I directed were to be circulated to the court and the other side. The claim (as amended) is for the following reliefs:

(i)  a declaration that the granting of consent by the first defendant to try the claimant for additional offences other than the offences which formed the basis for the claimant's extradition would be an illegal/and or irrational exercise of the powers of the Minister under Article 14 of the Treaty and s. 7 of the Act and/or the prerogative powers, unless the First Defendant allows the claimant to make representations on whether such consent should be granted;

(ii)  an order of prohibition prohibiting the first defendant from consenting to the request to try the claimant for additional offences other than the offences which formed the basis for the extradition without first affording the claimant an opportunity to make representations on (a) whether the offence is an extradition offence within the meaning of s. 5 of the Act; (b) if the magistrate would have committed the claimant under s.10 of the Act if the offences had been disclosed pre-extradition and the claimant were in The Bahamas; and (c) if he would have ordered the claimant's extradition taking into account ss. 7 and 12 of the Act;

(iii)  an injunction restraining the first defendant from consenting to the request of the US to try the claimant for the additional offences other than the offences which formed the basis for the claimant's extradition to the US until the hearing of the claimant's application for judicial review and the matters identified in paras. (i) and (ii) above have been determined;

(iv)  a declaration that the claimant is entitled to make representations to the defendants on whether The Bahamas should consent to the request by the US pursuant to art. 14(1)(b) of the Treaty and s. 5 of the Act to try the claimant on the additional charges other than the offences which form the basis of the claimant's extradition to the US in December 2022;

(v)  an order of certiorari to move into the Supreme Court and quash the decision of the Attorney General dated 6 June 2023 that the decision of the First Defendant under s. 7(4)(a)(iii) of the Act is "*a matter solely between sovereign states*", in respect of which the claimant has no right to be heard;

(vi)  an injunction restraining the defendants from consenting to the request to try the claimant on the additional offences without affording an opportunity for the claimant to be heard on whether consent should be given;

4

    (vii)    an injunction restraining the defendants from communicating any decision on the request of the United States to try the claimant for additional offences other than the offences which formed the basis for the claimant's extradition to the US until the claimant has had a 14-day opportunity to apply for judicial review of any such decision;

    (viii)    an order pursuant to Part 54.3(10)(b) of the CPR 2022 requiring the defendants to disclose to the claimant any documents and communications between the defendants and the requesting state concerning the claimant's extradition or any offences which the requesting states seeks to add post-extradition, so as to enable the claimant to make representations;

    (ix)    an interim injunction pursuant to s. 21 of the Supreme Court Act 1996, or Part 54.3(10)(b) of the CPR 2022, or under the inherent jurisdiction of the court, that the defendants be restrained from consenting to the request of the US to try the claimant for additional offences other than the offences which formed the basis for the claimant's extradition until the final determination of the claimant's application for judicial review as set out in paragraphs (i) and (ii) above;

    (x)    a stay pursuant to Part 54.3(10)(b) of the CPR 2022 and under the inherent jurisdiction of the court, staying any decision of the Defendants purporting to give consent to try the claimant for additional offences other than the offences which formed the basis for the claimant's extradition until the final determination of the claimant's application for judicial review as set out in paras. (i) and (ii) above.

[17]    The claimant relies on three main grounds in his application, which may be summarized as follows:

    (i)    the refusal to hear the claimant on a decision to consent to the additional offences amounts to an illegal/irrational exercise of the discretion or power of the first defendant to give such consent, which must be exercised fairly and in line with the legislative intention of the Act (the illegality/irrationality ground);

    (ii)    the refusal to allow the claimant an opportunity to be heard on the decision to consent would be procedurally unfair and breach the claimant's right to procedural fairness and the right to be heard in matters which fundamentally affect the claimant (procedural unfairness ground);

    (iii)    the claimant has a legitimate expectation under both under the Treaty and the Act to invoke his specialty rights, which were not waived by the consent to the simplified extradition procedure (the legitimate expectation ground).

[18]    The application was supported by the affidavit of Wallace I. Rolle ("the Rolle Affidavit"), filed 7 June 2023, which exhibited the affidavit of SBF sworn on the 7 June 2023, as well as a certificate of urgency also filed on that date.

[19]    The matter came before me as an urgent matter on Friday 9 June 2023. The urgency is said to be justified on the basis that there is a pretrial hearing on 15 June 2023, when the US District Court of the SDNY will hear oral arguments on the claimant's motions as well as other pretrial matters, including the extradition issues. The claimant fears that the US will likely seek to procure the consent of The Bahamas in advance of the hearing scheduled for 15 June 2023, to facilitate the US Government's oral arguments for the hearing, and that the Bahamas will give its consent without

5

hearing him, having refused to give an undertaking in that regard. During the course of the hearing, the Defendants gave an undertaking not to make any decision on the issue prior to the Court's decision on the application.

*The legislative framework*

[20] The provisions of the Act and the Treaty against which the leave application is to be decided (and which are also relevant to the determination of the substantive issues) are set out below, so far as material.

*Extradition Act*

[21] Section 5 of the Act provides as follows:

> "5(1) Without prejudice to subsection (2), for the purposes of this Act, any offence of which a person is accused or has been convicted in an approved State is an extradition offence, if--
>
> (a)   [Commonwealth States]
> (b)   in the case of an offence of the law of a treaty State-
>   (i)   it is an offence which is provided for by the extradition treaty with that State; and
>   (ii)  the act or omission constituting the offence, or the equivalent act or omission, would constitute an offence against the law of The Bahamas if it took place within The Bahamas or in the case of an extraterritorial offence, in corresponding circumstances outside The Bahamas.
>
> (2) Any offence constituted by an act, including an act taking place in The Bahamas, that is of a kind over which Contracting States to an international Convention to which the Bahamas is a party are required by that Convention to establish jurisdiction is an extradition offence for the purposes of this Act and shall be deemed to be committed within the jurisdiction of any such Contracting State that appears to a court in The Bahamas having regard to the provisions of the Convention, to be appropriate."

[22] Together, section 5(1)(b)(i) and 5(1)(b)(ii) give effect to the rule of 'double criminality', which is to the effect that the conduct disclosed in the request must be criminal under the law of both the requesting and requested state.

[23] Section 7 of the Act enacts general restrictions on extradition, and the relevant part is subsection 4, which provides as follows:

> "(4) A person shall not be extradited to an approved State or be committed to or kept in custody for the purposes of such extradition, unless provision is made by the law of that State, or by an arrangement made with that State, for securing that he will not —
>
> (a)   <u>be tried or detained with a view to trial for or in respect of any offence committed before his extradition under this Act other than</u> —
>   (i)    the offence in respect of which his extradition is requested;
>   (ii)   any lesser offence proved by the facts proved before a court of committal or, in relation to a fugitive brought before a magistrate pursuant to section 17, any lesser offence disclosed by the facts upon which the request for his extradition is based; or
>   (iii)  <u>any other offence being an extraditable offence in respect of which the Minister consents to his being so dealt with;</u>

6

> (b) without the consent of the Minister, be returned or surrendered to another State or detained with a view to such return or surrender, unless he had first been restored to The Bahamas, or had had an opportunity of leaving the approved State.
>
> (5) Any such arrangement as is mentioned in subsection (4) may be an arrangement made for the particular case or an arrangement of a more general nature; and for the purposes of that subsection a certificate issued by or under the authority of the Minister confirming the existence of an arrangement with any approved State and stating its terms shall be conclusive evidence of the matters contained in the certificate". [Underlining supplied.]

[24] Section 12 of the Act provides in part:

> "12. (1) Where a person is committed to await his extradition and is not discharged by order of the Supreme Court, the Minister may by warrant, order him to be extradited to the approved State by which the request for the extradition was made unless the extradition of that person is prohibited, or prohibited for the time being, by section 7 or by this section, or the Minister decides under this section to make no order in his case.

[25] Section 17 deals with the position where the fugitive consents to extradition without formal extradition proceedings. It provides in part as follows:

> "(3) Subject to subsection (4), where a fugitive is committed to custody to await his extradition pursuant to subsection (2) [consent to be extradited], the Minister may, notwithstanding the provisions of s. 11, order him to be extradited forthwith to the approved State by which the request for extradition was made.
>
> (4) <u>In making an order under subsection (3) the Minister shall have regard to the provisions of section 7 and the requirements of section 12(2), (3), (4) and (5) relating to the making of an order under that section."</u> [Underlining supplied.]

*Treaty provisions*

[26] Article 14 of the Treaty enshrines what is called the rule of 'specialty' in extradition law. It provides as follows:

> "Article 14 Rule of Specialty
>
> (1) A person under this Treaty may only be detained, tried, or punished in the Requesting State for the offense for which extradition was granted, or—
> (a) any offense committed after the extradition;
> (b) any offense in respect of which the executive authority of the Requested State, <u>in accordance with its laws,</u> has consented to the person's detention, trial, or punishment; and for the purposes of this subparagraph the Requested state shall require compliance with the extradition procedures specified in Article 8 and the submission of the documents specified in that Article." [Underlining supplied.]

## DISCUSSION AND ANALYSIS

*Framework for the grant of leave for judicial review*

[27] Applications for judicial review are governed by Part 54 of CPR 2022, and s. 19 of the Supreme Court Act. Part 54.3 provides, so far as may be material to this application, provides as follows:

7

> **"54.3 Grant of leave to apply for judicial review**
>
> (1) No application for judicial review shall be made unless the leave of the Court has been obtained in accordance with this rule.
> (2) An application for leave shall be made without notice to a judge by filing in the Registry—
> (a) a notice in Form JR1 containing a statement of—
> (i) the name and description of the applicant;
> (ii) the relief sought and the grounds upon which it is sought;
> (iii) the applicant's address for service; and
> (iv) an affidavit which verifies the facts relied on.
> (3) The judge may determine the application without a hearing, unless a hearing is requested in the notice of application, and need not sit in open Court provided that in no case shall leave be refused or granted on terms not sought in the application without giving the applicant a hearing.
> […]
> (6) The Court hearing an application for leave may allow the applicant's statement to be amended, whether by specifying different or additional grounds of relief or otherwise, on such terms, if any, as it thinks fit provided that if the applicant shall fail to amend his statement within the time specified by the order of the court then such order shall cease to have effect unless the court orders otherwise.
> (7) The Court shall not grant leave unless it considers that the applicant has a sufficient interest in the matter to which the application relates.
> […]
> (10) Where leave to apply for judicial review is granted, then –
> (a) if the relief sought is an order of prohibition or certiorari and the Court so directs, the grant shall operate as a stay of the proceedings to which the application relates until the determination of the application or until the Court otherwise orders;
> (b) if any relief is sought the Court may at any time grant in the proceedings such interim relief as could be granted in an action begun by writ".

[28]  The jurisdiction of the Supreme Court to grant injunctions is codified at section 21 of the Supreme Court Act ("SCA") which provides for the court to grant an interlocutory or final injunction *"in all cases in which it appears just and convenient to do so"*. Section 19(2)(2) of the SCA provides in material part as follows:

> "A declaration may be made or an injunction granted under this subsection in any case where an application for judicial review seeking that relief, has been made and the Court considers that, having regard to—[…] (c) all the circumstances of the case, it would be just and convenient for the declaration to be made or the injunction granted."

*Principles relating to the grant of leave for judicial review*

[29]  In *Rosetta Foster et. al. v. The Attorney General et. al.* (2020/PUB/jrv/0005, 24 June 2020), this Court had occasion to point out that historically the justification for requiring a sufficient interest and the grant of leave was to weed out *"busybodies with misguided or trivial complaints of administrative error"* (per Lord Diplock in *R v Inland Revenue Commissioners ex parte National Federation of Self Employed and Small Businesses Ltd.* [1982] AC 617, pp. 642-643).

[30]  However, the test has evolved over time and the modern test approved by the Privy Council (and also applied by the UK courts) is somewhat more stringent, although it is still accepted that the

8

threshold is not very high (see *AG of Trinidad & Tobago v Ayers-Ceasar* [2019] UKPC 44, Per Lord Sales at para. 2). In *Sharma v Browne Antoine* [2007] 1 WLR 780 (at 787), the Privy Council formulated the test as follows (para. 14, pg. 787):

> "The ordinary rule now is that the court will refuse leave to claim judicial review unless <u>satisfied that there is an arguable ground for judicial review having a realistic prospect of success and not subject to a discretionary bar such as delay or alternative remedy</u>". See *R v Legal Aid Board, Ex p Hughes* (1992) 5 Admin LR 623, 628 and Fordham Judicial Review Handbook 4th ed. (2004), p. 426. But arguability cannot be judged without reference to the nature and gravity of the issue to be argued. It is a test which is flexible in its application. As the English Court of Appeal said with reference to the civil standard of proof in *R (N) v. Mental Health Review Tribunal (Northern Region)* [2006] QB 468 […] It is not enough that a case is potentially arguable: an applicant cannot plead potential arguability to 'justify the grant of leave to issue proceedings upon a speculative basis which it is hoped the interlocutory processes of the court may strengthen'."

[31] The purpose for leave is to filter out challenges where the applicant either does not have the necessary interest (*locus standi*) to maintain the challenge, where the claim has no real prospect of success, or where it is subject to discretionary bars such as delay or alternative remedy. To summarize the position, an applicant for judicial review has to establish three main things:

(i) that he or she has a sufficient interest to maintain the challenge being made;
(ii) that there is an arguable ground with a realistic (not fanciful) prospect of success; and
(iii) that there are no discretionary bars such as delay or alternative remedy that would lead the court to refuse the leave.

*Judicial review principles*

[32] It is important to point out another cardinal principle of judicial review, which is that the role of the supervisory court is confined to scrutinizing the decision-making process to determine its lawfulness or overall fairness (*Kemper Reinsurance Co. v Minister of Finance* [1998] 3 WLR 630 at 638). The administrative judge is not concerned with the merits of a decision (i.e., whether it is right or wrong) or even with making definitive findings of fact. Thus, the grounds for judicial review are normally expressed in terms of a decision being: (i) *illegal* (e.g., exceeding statutory powers); (ii) *irrational* or '*Wednesbury*' unreasonable (e.g., an outrageous decision that no sensible person considering all the material would have arrived at); (iii) *procedurally improper* (e.g., a decision arrived at by an unfair process), or (iv) in breach of a *legitimate expectation* (e.g., a decision that unfairly reneges on a practice or previous promise of a decision maker).

*(i) Sufficient interest*

[33] For the claimant, Mrs. Rolle KC contended that this limb is easily satisfied, as the claimant is the person who has been extradited and is facing additional charges which the requesting state wishes to pursue and, as such, the sufficiency of his interest is unchallengeable.

[34] To her credit, Mrs. Green-Smith did not contest the sufficiency of the claimant's interest, and I cannot conceive of any basis on which his interest could be denied. It is clearly the case, even without condescending to the details of any of the additional charges, that they will expose the claimant to greater penalties and a much longer period of imprisonment if he were to be tried and

convicted on them. Furthermore, if the claimant is right in the contention that he has a right to be heard, any decision to grant consent without allowing him to make representations would deprive him of the procedural guarantees under the combination of the Treaty and the Act relating to the making of such a decision.

[35] The claimant undoubtedly has a sufficient interest in this matter to pursue the claim.

*(ii)   Arguable ground with a realistic prospect of success*

[36] Not surprisingly, the bulk of the arguments centered on the arguability of the claimant's grounds, and whether they disclose any real prospect of success. As indicated, the claimant has advanced three main grounds for his claim, one of which has been added by amendment. To recapitulate, they are: (i) that the decision by email negating his right to be heard is irrational/illegal; (ii) that the refusal to allow an opportunity to be heard would breach his right to procedural fairness; and (iii) that he has a legitimate expectation that he would be able to invoke specialty rights to challenge the consent of The Bahamas to the addition of the new offences.

[37] The defendants argue that the claimant's application does not disclose any arguable grounds and furthermore that the application is an abuse of the process of the court (a point which I address below under discretionary bars). They advance a few arguments in support of their case, albeit these were not developed in any great detail. Firstly, they say that no decision has been made in respect of whether consent will be given, and therefore the application is premature. Secondly, they assert that, notwithstanding the terms of the email of 6 June 2023, this does not preclude the claimant from making representations. In this regard they indicate that they have (on 8 June 2023) provided the claimant's attorney with the Diplomatic Note and affidavit in support relative to the request by the US for consent to pursue the additional charges, which furnishes him with the information he needs to make legal and factual representations.

*Court's analysis of the arguability of the claims*

[38] In point of fact, other than suggesting that the question of consent was a *"matter between sovereign states"*—a point which was not developed by the defendants in oral or written submissions—the defendants did not advance any substantive arguments as to the arguability of the claims. For the brief reasons given below, I would hold that all of the grounds advanced by the claimants disclose arguable claims with a real prospect of success.

*Illegality and/or irrationality*

[39] Illegality is principally concerned with ensuring that the exercise of a particular statutory or prerogative power is used in accordance with the law or legal principles that regulate it. In *Council of Civil Service Unions v. Minister for the Civil Service* [1985] A.C. 374, ("CCSU case"), Lord Diplock in identifying illegality as a head of judicial review said [at 410] "...*the decision-maker must understand correctly the law that regulates his decision-making power and give effect to it.*"

[40] In the classic sense, irrationality refers to decisions which may be considered so illogical or unreasonable that no reasonable decision-maker could come to it (*Associated Provincial Picture*

10

*Houses Ltd. v Wednesbury Corp.* [1948] 1 KB 223), but it can also arise in circumstances where in exercising its powers, a decision-maker fails to take into account all considerations relevant to the decision being made, or considers irrelevant matters.

[41]  The central claim being made under these grounds is that the decision not to give the undertaking and to indicate that it was a *"matter solely between sovereign states"* amounts to both an illegal and irrational decision, as it does not accord with the legislative intention for how the Minister's power to give post-surrender consent is to be exercised on a proper interpretation of the Act.

[42]  As noted, s. 7 provides that a person "shall not be extradited" to an approved state unless provision is made by the law of that state, or some arrangement made by that state, for ensuring that he will not be tried for any other offence (i.e., other than those for which he was extradited), unless the offence is "an extraditable offence" *and* the Minister consents to it.  This reflects the specialty principle, subject to the qualifications provided therein.  To be an "extraditable offence", the offence must come within s. 5, which establishes a requirement for double criminality.  It is notable in this regard that s. 17, which deals with extradition where the person consents to the simplified procedure, also requires the court to have regard to, *inter alia*, s. 5 of the Act when an order is made for the extradition of a person under that section.

[43]  While the Act is silent on the procedure for the first defendant to give consent pursuant to art. 14 (1)(b) of the Treaty, that article requires that the requested state's consent must be given *"in accordance with its laws"*, which incorporates the dual criminality requirement.  Further, it also requires compliance with the *"extradition procedure"* set out in Article 8, which sets out a laundry list of documents and other information required to be submitted in a normal request for extradition—what the claimant describes as a "full request package".

[44]  The claimant contends that what is envisaged under the Act is a complex decision-making process, which must be exercised fairly and with procedural propriety, and requires the claimant to be heard.  In other words, it is not simply a matter between states.  In fact, the claimant goes so far as to contend that the process should operate similar to what pertains in the UK Extradition Act 2003 at s. 129, and which gives effect to the specialty provision at s. 95 of the UK Act, which it is contended is very similar to s. 7 of the Bahamian Act.  Extrapolating this to the Bahamian context, is submitted that the proper approach of the first defendant when exercising his power to grant consent as envisaged by s. 7(4)(a)(iii) of the Act and to be in line with the legislative intention would be to follow the procedure set out below:

(a) Serve notice of the application for consent on the claimant unless it was impractical to do so;
(b) Decide whether the offence is an extradition offence within the meaning of section 5 of the Extradition Act;
(c) Decide if the magistrate would have committed the claimant under section 10 of the Extradition Act to await his extradition if the claimant had been in the Bahamas;
(d) Decide if he would have ordered the Claimant's extradition taking into account s. 7 and 12 of the Extradition Act.

11

[45]   I make no observations about whether or not it would be appropriate to superimpose the UK statutory procedure on the Bahamian Act. The UK position is based on an extradition regime which is different from what pertains in The Bahamas and involve provisions that are different, notwithstanding that there are some similarities. But I am satisfied that the question of whether the provisions of the Act and the Treaty (to the extent that the Treaty provisions may be said to incorporated in the Act) may require some form of process that takes into consideration the matters adverted to by the claimant is an arguable issue with some reasonable prospect of success.

[46]   In coming to this conclusion, I bear in mind that The Bahamas is a dualist state as far as the reception of international law is concerned, and unimplemented treaties are not directly enforceable: see, for example, *Rey v. Switzerland* [1991] 1 AC 54, where the Privy Council said:

> "Except in so far as the Act of 1994 incorporates by reference provisions of the Treaty into section 5(1)(b)(i) (list of offence) and section 10(4) (period for production of documents) of the Act of 1994, the Treaty is not part of the domestic law of The Bahamas. The Act of 1994 is the code governing extradition. A request for extradition therefore must be considered exclusively in accordance with the provisions of the Act."

[47]   However, a key component of the claimant's arguments is that the Treaty provisions have been sufficiently incorporated by reference into the Act, so as to enable him to invoke legal rights arising from the Act itself. Furthermore, as the common law has developed, it is clearly no longer the thinking that unimplemented treaties are without any effect in domestic law, or even that executive or prerogative powers could be exercised willy-nilly.

[48]   In *Lewis v AG of Jamaica* [2001] AC 50, the Privy Council held that an unimplemented treaty (the American Convention on Human Rights) and the practice of Jamaica in the manner in which it had awaited the reports of human rights bodies before exercising the prerogative of mercy, created a due process right in domestic law which was subject to judicial review. The Board said [at pg. 79]:

> "Whether or not the provisions of the Convention are enforceable as such in domestic courts, it seems to their Lordships that the states' obligation internationally is a pointer to indicate that the prerogative of mercy should be exercised by procedures which are fair and proper and to that end are subject to judicial review."

(See, also, *R v Home Sec, ex parte Fire Brigades Union* [1995] 2 AC 513 (at 553D) on the reviewability of executive decisions.)

*Right to be heard*

[49]   Although the Act does not specifically confer any right on the extradited person—'fugitive' in the old parlance of the Act—to be heard on the Minister's exercise of the discretion to give consent to prosecution of other offences, the claimant points outs that it is a fundamental aspect of procedural fairness to give affected persons an opportunity to be heard. The claimant relies on the UKSC case of *Re Application for Judicial Review by JR17* [2010] UKSC 27, where Sir John Dyson SCJ said that the right to have a reasonable opportunity of learning what is alleged against him and putting

12

forward his answer to it "*is one of the fundamental rights accorded by the common law rules of natural justice*".

[50]  Reference was also made to the well-known authority of *R v Secretary of State for the Home Department, ex parte Doody* [1994] 1 A.C. 531 [at 560D-G], where Lord Mustill said:

> "Fairness will very often require that a person who may be adversely affected by the decision will have an opportunity to make representations on his own behalf either before the decision is taken with a view to producing a favourable result; or after the decision is taken, with a view to procuring its modification, or both".

[51]  While the defendants stopped short of conceding that the claimant has a legal right to be heard on the question of consent, they nevertheless accepted that the claimant could make representations. At several points during the hearing, counsel for the defendants stated that that there was nothing "*precluding the ... claimant from making representations through their counsel,*" which it was said could be done "*in the form of a letter, [or] through the form of submissions to the Honorable Attorney General*". It was also stated that: "*The claimant is entitled to make representation to the defendants on whether The Bahamas should give consent as requested by the United States of America pursuant to Article 14 of the Extradition Treaty.*"

[52]  As explained in some detail under the rubric of "abuse of process" below, I had some difficulties reconciling those statements with what I consider to be the plain meaning of the email. But in light of the acknowledgement that the claimant could or ought to be heard as part of the decision-making process, it seems to me that it could hardly lie in the mouths of the defendants to contend that the issue of the right to be heard is a meritless challenge.

*Legitimate expectation*

[53]  The final ground staked by the claimant is that he has a legitimate expectation that he would be heard if the US sought to use the procedure at article 14(1)(b) of the Treaty.

[54]  A legitimate expectation may arise from an express representation, promise or undertaking from a decision-maker as to future conduct (*Attorney General of Hong Kong v Ng Yuen Shi* [1983] 2 A.C. 629), from an implied representation based on past practice or conduct (*Rowland v Environmental Agency* [2003] EWCA Civ 1985), or where the claimant has an interest in some ultimate benefit which he hopes to retain and fairness dictates that he should be given an opportunity to make representations prior to any act or decision being made (*Council of Civil Service Unions v. Minister for the Civil Service* [1985] A.C. 374 at 401, per Lord Fraser. I assume that the latter covers the present case.

[55]  The central argument of the claimant in this regard is that although he consented to the simplified extradition procedure, he maintained his specialty rights and has a right to invoke the principle to challenge the consent of the requested state to the adding of any additional charges by the US.

[56]  Simply put, 'specialty' is a rule or principle of extradition law that a person extradited to a requesting state is not to be detained, prosecuted or punished by the requesting state for offences

13

other than those for which he was extradited. Some academic writers (M. Cherif Bassiouni, *International Extradition: United States Law and Practice* (4th Ed., 2001), go so far as to ascribe to it the status of customary international law: "*specialty is a principle so broadly recognized in international law that it has become a rule of customary international law.*" It is not absolute, however, and it is often qualified by provisions of extradition treaties or Acts (similar to those which are engaged here) that provide for the requested state to consent to such ulterior prosecution.

[57] The transcript of the hearing (exhibited to the Wallace Rolle affidavit) when SBF appeared before the magistrate pursuant to the simplified extradition procedure shows that the question of the observance of the specialty principle was specifically raised by counsel for SBF during these proceedings. In fact, the claimant's pretrial motion before the US Court [at pg. 13] puts the position somewhat higher:

> "During the hearing, Mr. Bankman-Fried's Bahamian counsel asked that the Magistrate ensure the rule of specialty applied. … The Magistrate acknowledged Bahamian counsel's request, confirming his understanding that the Minister of Foreign Affairs was obligated under the Extradition Act to obtain assurances from the United States that the rule of specialty would apply and that he would convey this understanding to the Minister….The Magistrate also expressed confidence that the United States and the Bahamas would comply with the rule of specialty as set forth in the Treaty…".

[58] Therefore, it is argued that the claimant, in consenting to the simplified process, was not waiving his right to the protection of the rule of specialty or dual criminality. He was only consenting and therefore waiving his rights to formal extradition proceedings in respect of the offences contained in the original indictment or, for that matter, only those contained in the warrant of surrender. The latter observation is explained by the fact that there is a dispute over whether Count 8 (violation of campaign finance laws), which was in the original indictment but not included in the warrant of surrender, formed part of the extradition offences.

[59] There is a debate in extradition law over whether the specialty rule is intended to protect the sovereign rights of states in surrendering persons within their territory, or is directed to the protection of the rights of person subject to extradition. In their approach to extradition matters, the courts will strive to give effect to both. As the Privy Council stated in *Cartwright and anor. v Superintendent of HM's Prison and anor* [2004] UKPC 10 [at 14]:

> "14. In extradition law the court must adopt a balanced approach. Throughout extradition law there are two principal threads. First, in exercising the powers of extradition courts of law must, as Isaacs J observed, be vigilant to protect individuals from the overreaching of their rights by the government. Justice to the individual is always of supreme importance. Secondly, the Board considers that it is imperative of legal policy that extradition law must, wherever possible, be made to work effectively."

[60] In *R v Misick and others (Extradition from Brazil)* (2021) 98 WIR 596, the Supreme Court of the Turks and Caicos Island (Agyemang CJ) held that the specialty principle was sufficiently incorporated under the Extradition Act to entitle the first defendant, the former Chief Minister and later Premier of the Turks and Caicos Islands, to successfully invoke the rule, in an application for a stay of the criminal proceedings against him and for declarations that the proceedings were an

14

abuse of process. As a result, the court ruled that, in accordance with the rule of specialty, the counts which were not the offences for which he was extradited, and which were included in a new information filed some years after his extradition (the original trial having been aborted due to the death of the judge) had to be excluded from the charges.

[61] In my judgment, the issue of whether the claimant is entitled to invoke the specialty rule as a basis for being heard on the exercise of the power by The Bahamas to consent to new charges is an arguable issue that has some real prospect of success. If the charges in the superseding indictment were put forward at the time of the request, the claimant would have had the opportunity and right to challenge them in formal extradition proceedings. Therefore, denial of a right to be heard would deprive the claimant of an interest or benefit to procedural rights to which he would otherwise have been entitled under the Act.

*Prematurity (no decision made)*

[62] On the prematurity argument, while I accept that the defendants have not yet made any determination on the question of whether they will give consent, I do not agree that a decision has not been made on which an application for judicial review can fasten. It is true that the original application did not specifically describe the 6 June 2023 email as the decision being challenged (although this was obvious from the context of the application), but this omission was repaired by virtue of the amendment. The claimant contends that the email made two decisions: (i) that the claimant had no right to be heard; and (ii) that the decision on consent was a matter solely between the states, both of which are challenged.

[63] Mrs. Green-Smith was at pains to point out that the email did not "preclude" the claimant from making representations, as it only said the defendants would not give an undertaking that they would not make the decision without hearing from him, not that they would not entertain representations if made. For my part, I think this is splitting hairs; a distinction without any difference. While it might be possible to argue that the refusal to give the undertaking is equivocal on the question of whether the claimant would be allowed to make representations, the assertion that the issue of granting consent was a matter between states is a clear indication that the state was staking a position that the claimant had no right to be heard on the matter.

(iii)    *Whether discretionary bar such as delay or alternative remedy*

[64] There is obviously no question of delay, as the application was filed one day after the claimant received the email of 6 June 2023. But the defendants claim it is an abuse of the process of this court, as the claimant has made a motion before the US District Court of the SDNY seeking to dismiss Counts 9, 10, 12 and 13 as violating the rule of specialty and seeking disclosure of materials relative to SBF's extradition. The defendants contend that these are the same issues raised before the court in the judicial review application. They further contend that the ability for the claimant to challenge the new charges as a preliminary matter before the US Court is also indicative that the claimant has alternative remedies.

15

[65] In this regard, it is axiomatic and accepted by all that judicial review is a discretionary remedy. The question whether and in what circumstances the court should exercise its discretion was canvassed in *R v Chief Constable of Merseyside Police, ex parte Calveley* [1986] QB 424, where Master of the Rolls, Sir John Donaldson (as he then was) said: "*...it is a cardinal principle that, save in the most exceptional circumstances, [the judicial review] will not be exercised where other remedies were available and have been used*" (quoting from his own judgment in *R v Epping and Harlow General Commissioners, ex parte Goldstraw* [1983] 3 All ER 257).

[66] For my part, I am not at all persuaded that this application raises any issues of abuse of process. The claimant is entitled to raise whatever preliminary objections or other issues are available to him under US law as part of his defence in the substantive trial for which he has been extradited. This is not a question of *forum conveniens*; he has been extradited for trial before the US District Court of the SDNY and is entitled to raise any objections available to him there. The fact that the specialty point is being taken to resist the addition of the new charges in that forum is not an issue which is cognizable by this court. Likewise, the issue of whether The Bahamas (acting through the defendants) has violated or will violate any procedural rights of the claimant under the Treaty and Act by granting consent to the additional charges without hearing him is a matter solely within the bailiwick of the courts of The Bahamas.

[67] Further, the court takes note (as appears from the pre-trial motions of the claimant and the government in the affidavit of SBF) that one of the preliminary issues is whether the claimant even has standing to raise the specialty argument. US jurisprudence on the point is not settled: on one side of the split, several federal circuits (Second and Seventh) have denied the right of the individual to raise a rule-of-specialty challenge, absent any "affirmative protest" from the surrendering state on the basis that extradition treaties only create rights between states. Other circuits (Sixth, Eight, Ninth, Tenth and Eleventh) have granted individuals standing separate and apart from any objections raised by the extraditing state. See, as examples of the two approaches, the Second Circuit in *United States v. Barina* (2nd Cir. 2017); and the Ninth Circuit in *United States v. Cuevas* (9th Cir. 1988). In fact, the point is taken in the Government's motion that the extraditing country's decision on a request to waive the rule of specialty is dispositive of the matter (*US v Guzman Loera*, 24 F. 4th 144, 152 (2d Cir. 2022). To my mind, this is a powerful imperative for the claimant to seek to make representations to the decision makers in The Bahamas *before* the decision on consent is made and communicated.

[68] By parity of reasoning, I also reject the suggestion that the pretrial motions can be viewed as an alternative remedy available to the claimant. I think it stands to reason that any alternative remedy can necessarily only arise by virtue of the laws or other legal or executive processes in the jurisdiction where the judicial review is being pursued. I therefore do not find that the claimant has failed to exhaust alternative remedies.

*Interim Relief*

[69] As indicated, the SCA and Rules provide for the court to grant various forms of interim relief during the grant of leave, depending on the nature of the relief sought, or "at any stage" if the relief is one which could be claimed in a writ action (54.3(10)).

[70]  It is common ground between the parties that the court will approach the grant of an interim or interlocutory injunction in a public law case on the familiar principles set out in *American Cyanamid Co. v Ethicon* [1975] AC 396 but *"with modifications appropriate to the public law element of the case"*, as one of the "special factors" referred to by Lord Diplock in that case (see *Belize Alliance of Conservation Non-Governmental Organizations v Department of the Environment (Interim Injunction)* [2003] UKPC 63 ("BACONGO case").

[71]  The *American Cyanamid* principles are often explicated by way of a four-part sequential test or questions as follows: Is there a serious issue to be tried? Is so, will damages be an adequate remedy for either party pending the outcome of the trial? If not, or if there are doubts about the adequacy of damages, where does the balance of convenience lie?

[72]  The court has found that the applicant has raised arguable issues with a reasonable prospect of success, and I hold that these meet the threshold of a serious issue to be tried within the meaning of the *American Cyanamid* criteria.

[73]  It is hardly ever the case that damages will be an adequate remedy for either party in public law proceedings. As matter of principle, there is generally no right to claim damages in respect of unlawful administrative action (unless other distinct causes of action such as torts or other rights are also disclosed) (*R (on the application of) Quark Fishing Ltd. v. Secretary of State for Foreign and Commowealth Affairs* [2005] UKHL 57. This is because the purpose of public law proceedings is to ensure that public authorities exercise their powers lawfully, not to compensate individuals affected by any misuse or mistake in the exercise of powers or punish public authorities for any failings.

[74]  As is often the case in public law proceeding (as in private claims), the most important issue in considering interim relief lies in determining where the balance of convenience lies, or in determining which course *"seems likely to cause the least irremediable prejudice to one party or the other"*, as put by the Privy Council in *National Bank of Jamaica Ltd. v. Olint. Corp Ltd.* [2009] UKPC 16. In doing so, account will be taken (as expressed in the BACONGO case), not only of the immediate interests of the parties, but also of the wider public interest.

[75]  The claimants argue that the balance clearly lies with the claimant, because if the Minister were to make a decision without hearing the claimant and communicated his decision to the requesting state, whatever procedural rights or legitimate expectations the claimant has under the Act would be abrogated. He will be exposed to further criminal penalties and sentences as a result, when it might turn out that some of the offences were not extradition offences in the first place (as is in fact claimed).

[76]  The defendants did not advance any specific arguments on the balance of convenience, but made three general observations: (i) no injunction is available to prevent the enforcement of the law (*Paradise Games & Ors. v The Attorney General of the Bahamas* (2013/CLE/gen/00150 & 2013/CLE/gen/00151); no permanent injunction is available against the Crown; and (iii) that the court should take into account as a special factor the international obligations of The Bahamas pursuant to the extradition treaty and the public interest in ensuring that the extradition regime works effectively.

[77] The first of these statements of principle is unexceptionable, but it has no relevance to the matter at hand. *Paradise Games* concerned the enforcement of criminal laws, which admitted of no discretion, and that is not the case here. As to the second, no permanent injunction is being sought, and in any event, the law is settled that a minister or other officer of the Crown is subject to injunctive relief (whether interlocutory or final) when acting in his official capacity: see *M v Home Office* [1994] A.C. 377.

[78] As to the latter principle, these are in fact valid considerations for the court to have regard to in determining where the balance of convenience lies. But in my view, they do swing the balance in favour of the defendants. The claimant is seeking a number of interlocutory injunctions (several of which admittedly overlap) to prevent a decision being taken pending the hearing of his judicial review application to vindicate his rights. If the defendants are not enjoined and make the decision without hearing from him, he apprehends that he might suffer irreparable harm. On the other hand, if the injunction is granted, the defendants would be delayed for a period in their ability to make a decision on the US request for consent, and in fact that process could (at least conceivably) be short-circuited by executive action to provide a proper opportunity for the claimant to be heard.

[79] I therefore find that the balance of convenience favours the claimant.

*Disclosure*

[80] As mentioned, there was also a request for disclosure of certain documents passing between the US and the Bahamas relating to the request and the extradition proceedings. However, in light of the voluntary disclosure of certain documents to the claimant just a day before the hearing, counsel indicated to the court that she would not be pressing the disclosure application at the time. Therefore, nothing more needs to be said of this.

## CONCLUSION AND DISPOSITION

[81] For the reasons given above, I would make the following orders (which counsel are invited to transpose into a draft Minute of Order):

(i) Leave is granted to the claimant to amend the application for judicial review in the terms indicated in the draft.

(ii) Leave is granted to the claimant to commence proceedings for judicial review against the defendants for the reliefs claimed and on the grounds indicated in the application for judicial review (as amended).

(iii) I grant the injunction sought at paragraph (ix) of the application that the defendants be restrained from granting consent to the request of the US to try the claimant for additional offences which did not form the basis for the claimant's extradition pending the hearing and determination of the claimant's claim for judicial review (as set out in paras. (i) and (ii) of the application). (The terms of the injunction sought at para. (iii) are materially the same as the formulation at para. (ix), and it is therefore duplicative and refused. I also refuse the injunction sought at (vi), as the practical result of the grant would be to pre-empt the substantive outcome of the judicial review. I also refuse the injunction sought at (vii)

        (iv)    as that would constitute the grant of an injunction *in futuro* and bypass the test set out in Part 54 of the CPR for obtaining leave and interim relief in relation to what would be a new decision. Further, the terms are too vague, as "any decision on the request" could conceivably include a decision refusing consent.)
        (iv)    No order is made on the application for disclosure (for the reasons given above).
        (v)    I further direct that the parties are to take steps to have the application for judicial review heard and determined in an expedited manner.

[82]    I will hear the parties on costs.

*[signature]*

Klein, J.

13 June 2023.