N6FDBANO

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,

            Defendant.                Conference
------------------------------x

                                      New York, N.Y.
                                      June 15, 2023
                                      10:30 a.m.


Before:

                   HON. LEWIS A. KAPLAN,

                                      District Judge


                        APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   NICOLAS ROOS, ESQ.
      DANIELLE R. SASSOON, ESQ.
      DANIELLE M. KUDLA, ESQ.
      SAMUEL RAYMOND, ESQ.
      NATHAN M. REHN, ESQ.
      JIL SIMON, ESQ.
      Assistant United States Attorneys

COHEN & GRESSER, LLP
      Attorneys for Defendant
BY:   MARK S. COHEN, ESQ.
      CHRISTIAN R. EVERDELL, ESQ.
      SRI KUEHNLENZ, ESQ.
      STEPHEN G. DICK, ESQ.
```

N6FDBANO

1            (Case called; appearances noted)

2            THE COURT:  Good morning.

3            Where I would like to begin this morning is with the

4    government's letter of last night in the wee hours or the

5    closing hours of Flag Day, and I have some questions about it.

6    If I were to agree with the government's position that the

7    defendant has no standing to raise any rule of specialty issue

8    that there may be, why would the government want or need a

9    waiver from the Bahamas?

10           MR. REHN:  Yes, your Honor.  From the perspective of

11   the defendant's right to object, we agree with the Court, and

12   it's well-established in the Second Circuit that the defendant

13   does not have a right to object.  The government, however, has

14   its own diplomatic obligations that it complies with, and one

15   of those includes an obligation to the Bahamas to comply with

16   the terms of the extradition treaty.  And in accordance with

17   those obligations, we have been seeking a waiver of the rule of

18   specialty.  The government would not proceed on those counts

19   absent that waiver, and so as the defense suggested in their

20   reply brief, as an alternative, severing those counts, and

21   going forward with the counts as to which extradition was

22   originally granted seems to be appropriate given the

23   developments this week in the Bahamas.

24           THE COURT:  But the government would not proceed on

25   the basis of a policy decision, which is essentially one -- a

N6FDBANO

1   mixed decision of law and foreign policy, hmm?

2           MR. REHN:  That's correct, your Honor.  The government

3   has an interest in observing diplomatic relationships for a

4   number of reasons, and it's the government's view that it would

5   not proceed on counts added post extradition if the extraditing

6   country has not consented to that.

7           THE COURT:  And that would be true, wouldn't it, in

8   the event that the Bahamas takes no position?

9           MR. REHN:  With respect to the new counts, that's

10  correct, your Honor.  With respect to the one count as to which

11  the extradition record arguably contains some ambiguity, it's

12  the government's view that it intends to proceed.  The United

13  States has notified the Bahamas of that interpretation of the

14  extradition record, and asked the Bahamas to timely object if

15  it views the facts differently, and it has not received any

16  objection.

17          THE COURT:  Is there any reason I have to make the

18  determination now?

19          MR. REHN:  The determination as to --

20          THE COURT:  As to severance.  If I were to agree for

21  the sake of argument with the defendant's position, as to the

22  legal sufficiency of any of the newly added counts, you would

23  not have any issue of specialty problem, if you have one now,

24  with respect to that count or counts.

25          MR. REHN:  Your Honor, if the Court were not to sever

N6FDBANO

1    the counts, I think the issue that would be created would be

2    that there would be -- the parties would be under some

3    uncertainty as to whether those counts would be included in the

4    trial or not, which would affect the parties' trial

5    preparation.

6          When the government initially sought the superseding

7    indictment, it had already had some communications with the

8    Bahamas, and it continued to have those communications after

9    seeking the superseding indictment and was under the view that

10   the executive authorities in the Bahamas would be able to

11   respond to that waiver request well in advance of trial.

12   Because of the development in the Bahamian court this week,

13   it's our view we can't realistically estimate the timeframe for

14   that, and so the more prudent course would be to acknowledge

15   now, so the parties can focus on original counts in the

16   indictment that we will not be proceeding to those counts in

17   October.

18         THE COURT:  Could you be ready to try the case in

19   October, even if I don't sever?

20         MR. REHN:  We have always been of the view that we

21   would be ready to try the case in October, provided that the

22   Bahamas grant a waiver in advance of that date, yes.

23         THE COURT:  What impact would a severance have on

24   trial duration?

25         MR. REHN:  Your Honor, I believe that it would shorten

N6FDBANO

1    the trial, although not significantly.  We would estimate that

2    the trial without these counts would take four to five weeks, I

3    think we've previously indicated, and we think a trial

4    including these counts would take five to six weeks, maybe

5    slightly more than that.  So it might take one to two weeks off

6    the trial time.

7              THE COURT:  Thank you, Mr. Rehn.

8              Mr. Cohen, anything that you'd like to add to this

9    discussion?

10             MR. COHEN:  Yes, your Honor, if I might, a couple of

11   points on the discussion the Court has been having.

12             In light of the government's letter last night, we

13   agree with your Honor that things have changed.  So, as we

14   argued in our papers to your Honor, we still believe that the

15   -- I'll call them the new charges that Mr. Rehn referred to,

16   should be dismissed.  There's law that we cited to your Honor

17   that calls for that, because, as of today, June 15, there is no

18   consent.  And, therefore, under those cases, there could be

19   dismissal.

20             In the altern --

21             THE COURT:  What consent are you referring to?

22             MR. COHEN:  The consent from the Bahamas Government,

23   as Mr. Rehn just laid out, and as the government conceded in

24   its papers.  So we think dismissal of those counts would be the

25   better outcome obviously from our point of view, and also as

N6FDBANO

1   warranted under the cases we cited to your Honor, but in the

2   alternative, as we stated in our reply, and as the government

3   essentially agrees to in its letter, it's obviously still in

4   the Court's discretion under Rule 14, then we think those

5   counts should be severed.  There is the matter of the campaign

6   finance count, and specialty, which I am happy to address now,

7   or to wait if the Court would like.

8           THE COURT:  No.  Let's take that later.

9           MR. COHEN:  Okay.

10          THE COURT:  Well, I'm not going to rule on this now.

11  I'm going to give it a little bit more thought.  And for

12  purposes of this morning's festivities, I'll hear argument on

13  everything that two days ago we were expecting to hear argument

14  about, and then we'll have some other business at the end of

15  those arguments.  I thank both sides for the letters of the

16  last couple of days.

17          That said, we can start with the rule of specialty.  I

18  don't expect it to take a long time on this, and I do not have

19  infinite time, though I'm sure you guys could fill it up.  So,

20  let's see, 45 minutes to a side, all in, with a short rebuttal.

21          So I will hear from Mr. Cohen, or Mr. Everdell, or

22  whoever's going to do the honors.

23          MR. COHEN:  Yes, your Honor.  Would you like me to be

24  at the podium?

25          THE COURT:  Absolutely.

N6FDBANO

1          MR. COHEN:  Given where I think the Court is in its

2     thinking, and as reflecting upon what we've called the new

3     charges, I won't address them in this argument unless your

4     Honor has further questions you'd like me to cover.  And,

5     instead, I would like to address the campaign finance count.

6          THE COURT:  Well, that's your call, and it's your

7     judgment --

8          MR. COHEN:  Thank you, your Honor.

9          THE COURT:  -- as to what I'm thinking.

10          MR. COHEN:  Well, I guess we'll know soon enough, but

11     yes, on the new charges, and let me briefly, for record

12     purposes, your Honor, just make that record on what everyone

13     has been calling the new charges, which is everything added in

14     S3 and S5, except the campaign finance count.  It is now

15     undisputed before this Court that the Bahamas U.S. Treaty

16     applies; that Article 14 of that treaty, which embodies the

17     rule of specialty, applies, as executed in the Bahamas by their

18     Extradition Act; that, under that rule, as the government has

19     stated today --

20          THE COURT:  Their Extradition Act doesn't bind the

21     United States.

22          MR. COHEN:  Correct.  It's executing for them, because

23     our treaties are self-executing, their's are not.  That's

24     right.

25          It's undisputed that the government, as Mr. Rehn just

N6FDBANO

1  repeated moments ago, has taken the position that it needs to

2  obtain consent from the Bahamas, and that consent has not been

3  obtained.  In fact, if your Honor -- I don't know if your Honor

4  has had the opportunity to see Justice Klein's decision from

5  the Bahamas that we sent to the Court.  It came out in a

6  decision that a formal request had not been made to the Bahamas

7  under the procedure required by the Bahamas until May 22nd,

8  which is three months after the S3 indictment was returned, two

9  months after the S5.

10         In light of all that, in light of the time, the

11  sequencing, which, by the way, is not a product of anything

12  this Court has done, or the defense has done, we think that

13  sequencing is another reason why, as we mentioned before, the

14  fair result here would be for the Court to dismiss the new

15  charges under the cases we cited in our briefs, and, in the

16  alternative, to set -- if need be, to sever them for another

17  trial.

18         Let me take up now the campaign finance charge, which

19  is --

20         THE COURT:  Well, before you leave this, I mean, you

21  have a major problem on standing.

22         MR. COHEN:  Well --

23         THE COURT:  Whatever the Bahamas' complaints against

24  the United States may or may not be, the question is whether

25  your client has any right to raise them.

N6FDBANO

| | |
|---|---|
| 1 | MR. COHEN:  Right.  Well, your Honor, again, we think, |
| 2 | as the government just pointed out, and it did in its letter, |
| 3 | in the facts of this case, the Court need not reach the issue, |
| 4 | because the government's taken the position, as your Honor just |
| 5 | brought out, for matters of policy and relations that it will |
| 6 | not proceed without consent. |
| 7 | So for purposes of this proceeding, in this case, the |
| 8 | Court need not reach the issue.  However, if you'd like to, I |
| 9 | can address our view on that. |
| 10 | THE COURT:  Well, I think you should. |
| 11 | MR. COHEN:  Okay.  Thank you, your Honor. |
| 12 | So, as we laid out in our papers, we think that under |
| 13 | the line of cases that begins all the way back with *Rauscher*, a |
| 14 | 1886 case of the Supreme Court, through *Fiocconi*, and into |
| 15 | *Barinas*, that there is a way in which a defendant situated like |
| 16 | our client does have standing to raise these claims.  And if |
| 17 | you look at what *Barinas* did, and that's the most recent |
| 18 | pronouncement on that, but the Court said, in the longer |
| 19 | passage, longer than the one that the government has been going |
| 20 | back and forth with us in the papers, what the Court said is |
| 21 | that absent -- this is at page 4 of my printout.  I will get |
| 22 | the Court after this the cite from the case itself, but the |
| 23 | formulation was, absent an express provision in the agreement |
| 24 | between the states, any individual rights are only derivative |
| 25 | through the states, and absent protest or objection by the |

N6FDBANO

1    offended sovereign, a defendant has no standing to raise the

2    violation of international law.

3         And then it goes on to the passage that we've been

4    fighting about, as to "would object."  And, your Honor, our

5    view is that when the Court said, the Second Circuit said,

6    absent an express provision and absent protest, here we have an

7    express provision, here we have a protest, the decisions on

8    this area are driven by --

9         THE COURT:  Where's the protest?

10        MR. COHEN:  The protest is, and I believe it's now

11   undisputed, is the Bahamas has a standing objection to the U.S.

12   proceeding on new charges without it giving explicit consent.

13        THE COURT:  But that's not what the case is talking

14   about.

15        MR. COHEN:  Well, your Honor, I think it is, because

16   it's protest or objection.  And, as I understood, at least the

17   government's original argument, they were arguing if the

18   Bahamas was silent, they could go forward.  And now I think

19   they have come to the position that we have submitted, which is

20   supported by our expert affidavit, that the government -- that

21   the Bahamas must expressly consent to the new charges.

22        So, in effect, it is objecting, and it would object.

23   And the fact --

24        THE COURT:  Well, I --

25        MR. COHEN:  I'm sorry, your Honor.

N6FDBANO

1          THE COURT:  I just don't get that at all, and,

2   furthermore, if you look at the treaty that was at issue in

3   *Barinas*, the treaty between the United States and the Dominican

4   Republic, I don't see a material difference in this respect

5   between the Bahamas treaty and the Dominican Republic treaty,

6   where the Second Circuit explicitly found no language

7   indicating that the Dominican Republic and the United States

8   intended the treaty to be enforceable by individuals.

9          MR. COHEN:  Right.  Your Honor, I think there's an

10  important difference, that 1909 treaty was much shorter.  This

11  one has a built out -- the Bahamas treaty we're talking about

12  is built out, and it builds in this concept of requiring

13  express consent from the Bahamas, which --

14         THE COURT:  But it does not address enforceability by

15  the individual.

16         MR. COHEN:  Well, under *Barinas*, the individual's

17  rights derive from, right, under that line of cases, derive

18  from the rights of the request state, and that's the passage

19  that I was --

20         THE COURT:  The individual's rights.

21         MR. COHEN:  Right.

22         THE COURT:  Such as they may be.

23         MR. COHEN:  Right.  So our position, your Honor, is

24  that under that line of -- under that language in *Barinas*, and

25  under *Fiocconi*, the defendant on these facts on this treaty,

N6FDBANO

1   the way it's now been construed, and I think both sides agree

2   on the construction, gives the defendant a right to be heard on

3   that and standing to proceed before your Honor.  That's our

4   argument.

5            THE COURT:  Okay.  Now, let's not take up all your

6   time with this.

7            MR. COHEN:  Okay.  Well, whatever your Honor would

8   like to cover, I'm happy to cover.  And, by the way, I

9   apologize for my voice, so --

10           THE COURT:  There's nothing to apologize for.

11           MR. COHEN:  I'm losing it.

12           Let me turn back to the campaign finance count, Count

13   12, because that's very important, your Honor.  And our view is

14   that in light of what's happened with the rule of specialty,

15   and the proceedings in the Bahamas, that count should not

16   proceed to trial.  That count should be dismissed.

17           There is an alterative approach that I will get to in

18   a moment that comes out of the government's letter last night

19   that we will also lay out for the Court.  The argument here,

20   your Honor, and I think the thing to really emphasize is the

21   operative document coming out of the Bahamas on extradition is

22   the warrant of surrender, and -- hold on.  If we look at the

23   warrant of surrender, which is Exhibit 2 to the Everdell

24   Declaration that we submitted with our opening papers, it has a

25   page, your Honor, called Schedule of Charges, and it lists --

N6FDBANO

1  starts, for example, fraud by mail, and then it lists the

2  analogous criminal law provision in the Bahamas.

3          THE COURT:  I'm familiar with it.

4          MR. COHEN:  Okay.  So it gives the Bahamas' analog,

5  the U.S. Code provision, and the charge.  It does not list the

6  campaign finance charge.

7          Now, we have submitted expert testimony by Mr. Lewis,

8  who's been an ex -- who's been in this area for 35 years, has

9  been, in fact, engaged by the DOJ and the U.S. government 100

10  times, that the operative document is this warrant of

11  surrender.  And that makes sense, your Honor, because this we

12  think reflects a determination by the Bahamas that those counts

13  do not meet the dual criminality requirement in the Bahamas.

14  They could also be simply a reflection that no submission was

15  made, because it wasn't, under Article 8 of the treaty of facts

16  and materials that would give the minister an ability to make a

17  determination as to dual criminality.

18          But fundamentally, for purposes of this argument, it

19  almost doesn't matter.  It's the warrant of surrender that

20  controls.  And what the government does is it tries to get

21  behind it and say, well, Judge, you know, it was a mistake; it

22  was inadvertent; if you look at the record as a whole, that

23  record as a whole says that Mr. Bankman-Fried in fact consented

24  to this charge.  And, again, under the interpretation of

25  Bahamian law that we have before this, with this uncontradicted

N6FDBANO

1   declaration from Mr. Lewis, that's just not how the analysis

2   proceeds.

3           But even if you were to take on these arguments, if we

4   were to take them on, your Honor, we don't think they carry the

5   day.  The government makes a lot about --

6           THE COURT:  Do you acknowledge that he did, in fact,

7   consent to it?

8           MR. COHEN:  What we acknowledge is he consented to

9   simplified extradition, which your Honor must have my notes in

10  front of you, because that was the next point I was getting to.

11  What the record shows is he consented to simplified

12  extradition, and what that meant was he consented to not having

13  a long, extensive, formal proceeding in the Bahamas.  The

14  charges he would be extradited on were then up to the minister

15  to decide in accordance with their laws of the Bahamas.

16          THE COURT:  Did he consent to the minister extraditing

17  him on what is now Count 12 I think?

18          MR. COHEN:  No, he did not, because he consented to

19  being extradited on what the operative document said he'd be

20  extradited on, which is the warrant of surrender.  The minister

21  could have decided -- all he did --

22          THE COURT:  So your position is when he consented to

23  the simplified extradition, he had no idea what he was being

24  extradited to face?

25          MR. COHEN:  He certainly had an idea of the counts

N6FDBANO

1   that he could be extradited on for sure, your Honor.  There

2   were eight counts presented.  The minister could have --

3          THE COURT:  One of them was the campaign finance.

4          MR. COHEN:  Yes, of course.  Of course.  So it wasn't

5   no idea, but it was then the minister made a determination.

6   That was our argument.

7          THE COURT:  So your view is that your client consented

8   to being extradited by simplified procedure on all of the then

9   extant counts, including what is now Count 12, and the

10  minister, for God knows what reason, executed this warrant, and

11  I'm not entitled to look at what your client consented to and

12  what the minister intended to do when he granted an unopposed

13  request?

14         MR. COHEN:  We're saying that the problem with look --

15  the problem with looking at it is there's now competing

16  arguments as to what the minister intended, and that's why we

17  cited the presumption of irregularity of these proceedings.

18  That's why we shouldn't be getting into, we, the parties or the

19  Court, shouldn't be getting into what he intended.

20         And your Honor's question leads me to our alternative

21  suggestion, which comes out of the letter of last night.

22         THE COURT:  Well, as to the alternative suggestion,

23  between the consent to the simplified extradition and the

24  minister's execution of the warrant, was any presentation or

25  communication made on behalf of the defendant to the minister

N6FDBANO

```
 1   or his subordinates with respect to the scope of the warrant
 2   that he should approve?
 3            MR. COHEN:  No, your Honor.
 4            THE COURT:  Okay.
 5            MR. COHEN:  I can't speak for what the government
 6   presented or not, but no.
 7            THE COURT:  I didn't ask you about that.
 8            MR. COHEN:  I know.
 9            The alternative approach, your Honor, if your Honor is
10   inclined to sever the new charges that we've been talking
11   about, we would suggest respectfully, and as an alternative,
12   that the Court also sever the campaign finance charge, because
13   here we are, all of us, trying to get at what the Bahamas
14   intended when it did not include this in the schedule of
15   charges, and the simplest way to find out what the Bahamas
16   intend is to ask them and to bring a proceeding in the Bahamas,
17   either the government or us or both, where we can get clarity
18   that we can then convey to the Court.
19            THE COURT:  Okay.
20            MR. COHEN:  All right.  Your Honor, I think I've used
21   up my time, so I'm going to turn it over to Mr. Everdell.
22            THE COURT:  Thank you.
23            MR. COHEN:  Thank you.
24            MR. EVERDELL:  Thank you, your Honor.
25            I'm going to address the motions to dismiss the bank
```

N6FDBANO

1    fraud, conspiracy count, Count 9, and the wire fraud counts

2    against Alameda's lenders, which are Counts 7 and 8, and the

3    wire fraud against FTX customers, which are Counts 1 and 2.

4              THE COURT:  I'm sorry.  So give me the numbers again.

5              MR. EVERDELL:  Sure.  The first is Count 9, which is

6    the bank fraud conspiracy; then Counts 7 and 8 are the wire

7    fraud and wire fraud conspiracy against Alameda's lenders; and

8    Counts 1 and 2 are the wire fraud and wire fraud conspiracy

9    against FTX customers.

10             THE COURT:  Thank you.

11             MR. EVERDELL:  Your Honor, as we set forth in our

12   motions, these counts do not allege a valid property interest

13   that can support federal fraud charges, and are based on the

14   now invalid right to control theory of property fraud that was

15   struck down by unanimous decision of the Supreme Court just one

16   month ago in *Ciminelli v. United States*.  The government, now

17   aware of *Ciminelli*, seems to recognize that the allegations in

18   the S5 indictment, do not allege valid fraud charges, and so

19   they're trying to pivot abruptly.  They assert for the very

20   first time in opposition brief new theories of fraud that were

21   not alleged in the S5 indictment and never presented to the

22   grand jury.  And they attempt to make the case that these

23   theories were in the S5 indictment all along, but that's simply

24   incorrect.

25             The Court not should not allow the government to

N6FDBANO

1    retroactively amend the indictment by asserting new allegations

2    and new charging theories in their opposition brief, and they

3    shouldn't allow the charges to proceed based on invalid and

4    insufficient theories, so they must be dismissed.

5            I will start first, Judge, with the bank fraud

6    conspiracy.  Mr. Bankman-Fried is charged under the second

7    subsection of the bank fraud statute, which is 18 U.S.C.

8    1344(2).  And, your Honor, what the government is trying to do

9    with this count is take what is fundamentally an allegation of

10   wire fraud against FTX customers and turn it into a bank fraud

11   charge, but this doesn't hold water for several reasons.

12           First, the bank fraud count, as it's actually pled in

13   the S5 indictment, is charged under the invalid right to

14   control theory.  The allegations concerning the bank fraud

15   count, your Honor, are found in paragraph's 14 to 21, but those

16   paragraphs are very clear.  They do not allege that

17   Mr. Bankman-Fried mislead bank one to steal money from the

18   bank, which is what the government is now claiming in their

19   opposition brief.

20           Those paragraphs allege that Mr. Bankman-Fried mislead

21   Bank One to trick the bank into opening a bank account for

22   North Dimension, so that it could receive deposits.  In other

23   words, the alleged bank fraud relates to the opening of the

24   bank account, not any misappropriation of customer funds.

25           THE COURT:  Well, I think you take a very narrow view

N6FDBANO

1    of Count 9 --

2              MR. EVERDELL:  Well, your Honor --

3              THE COURT:  -- and what goes before it in the

4    indictment.

5              MR. EVERDELL:  Your Honor, I'm looking at the

6    allegations, specifically in the bank fraud count, and it talks

7    about -- for example, I quote from paragraph 14, FTX needed

8    bank accounts that would allow FTX customers to deposit dollars

9    with FTX, and then it says that FTX -- the bank one told FTX

10   they wouldn't open the bank account for FTX.

11             THE COURT:  Right.

12             MR. EVERDELL:  So they gave them false information,

13   and, as a result, the bank approved the opening of the North

14   Dimension account.

15             THE COURT:  And he did all this, according to the

16   indictment as I read it, in order to create a vehicle secretly

17   under the control and influence of Alameda, which was, in turn,

18   under control of your client, and then used that control

19   regularly to take money from those accounts for his own

20   purposes.

21             MR. EVERDELL:  Your Honor, I think what you're

22   referring to there is sort of what I was saying before, that

23   refers to the fraud against the FTX customers.  What you're

24   describing there is the alleged fraud about taking the customer

25   deposits, but it's not referring to the fraud against the bank.

N6FDBANO

1          THE COURT:  You can't parse is that finely I don't

2   believe.

3          MR. EVERDELL:  Well --

4          THE COURT:  Furthermore, this idea, and I've voiced

5   the tentative conclusion, so that you know and you would have a

6   chance to respond to it, that the indictment has to allege a

7   theory as opposed to the elements, basically, it doesn't hold

8   water, at least in this circuit.

9          MR. EVERDELL:  Well, your Honor, I think the cases we

10  cite in our brief, including the *Piro* case, which says the

11  indictment requires -- the indictment clause of the Fifth

12  Amendment requires that an indictment contain some amount of

13  factual particularity to ensure that the prosecution will not

14  fill in elements of its case with facts other than those

15  considered by the grand jury.  And that's what I'm getting at

16  here, your Honor.  I'm looking at the indictment to see what

17  they actually allege, what facts they actually allege, and

18  whether those facts as they allege support a valid theory of

19  fraud.

20          And as I look at the allegations that relate to the

21  bank fraud count, they are targeted towards the opening of the

22  account.  And the cases are clear that if it's fraudulently

23  opening of the account, you're not depriving the bank of any of

24  the bank's property.  You're not taking funds, you're not

25  convincing the bank to release funds or divert funds elsewhere

N6FDBANO

```
1    by fraudulent means.

2              THE COURT:  He allegedly did it for the purpose of

3    getting his hands on the customer funds for the benefit of

4    Alameda and himself.

5              MR. EVERDELL:  Right, and I think --

6              THE COURT:  That's right in the paragraphs in the

7    complaint that are incorporated by reference in Count 9.

8              MR. EVERDELL:  But I guess where I'm respectfully

9    disagreeing with the Court is I don't see how that is taking

10   bank property, because to defraud the bank --

11             THE COURT:  Well, Shaw I believe dealt with that.

12             MR. EVERDELL:  Well, I don't think so, your Honor,

13   because I think we have a different situation here than in

14   Shaw.  In Shaw, the situation was that the defendant basically

15   impersonated an account holder, a different account holder.  He

16   had that person's identification and credentials, and told the

17   bank, impersonating this other person, to divert funds to a

18   different account, to himself, away from the actual account

19   holder.

20             So, in that case, the funds that were diverted, yes,

21   Shaw says that the bank has some property interest in customer

22   deposits, but, in that case, what was happening is the

23   defendant was misleading the bank to get the bank to divert

24   bank funds to himself, to another count from funds that were

25   held in the account of a different person.
```

N6FDBANO

1          Now, in this case, your Honor, Bank One, the account

2     was held in the name of North Dimension, and the customer

3     deposits were going into North Dimension.  So from Bank One's

4     perspective, the account was held by North Dimension.  They

5     were the lawful owners of those funds from Bank One's

6     perspective.  Right?

7          THE COURT:  Who were the lawful owners?

8          MR. EVERDELL:  North Dimension -- when the funds hit

9     the North Dimension account, from Bank One's perspective, those

10     are North Dimension's funds.  And so if account holders of the

11     North Dimension account, which is alleged to be Mr.

12     Bankman-Fried and others, then tell Bank One, we want to move

13     money out of this account, we want to withdraw it, we want to

14     transfer it, from Bank One's perspective, that's their money,

15     because -- they're allowed to do that, because --

16          THE COURT:  It's not exactly the bank's money.  You're

17     overlooking one of the key passages in *Shaw*, "when a customer

18     deposits funds, the bank ordinarily becomes the owner of the

19     funds, and consequently has the right to use the funds as a

20     source of loans that help the bank earn profits, though the

21     customer retains the right, for example, to withdraw funds."

22     So that property in a depositor account in a bank is property

23     in one sense of the bank's, and in another sense, of the

24     account holder.

25          When we all went to law school, we learned in property

1    one that the whole concept of property is a bundle of rights.

2              MR. EVERDELL:  That's correct.

3              THE COURT:  In this case, some of the bundle is the

4    bank's, and some of the bundle belongs to the customers.  Just

5    as if you owned 40 acres on which there was a driveway to your

6    neighbor's property across it, no doubt you own the 40 acres,

7    and if there's an easement that your neighbor has to get to his

8    house over your property, he owns the property right in the

9    right to use your property for the limited purpose of going to

10   his property.  It's no different.

11             MR. EVERDELL:  Yes, your Honor, but I think that the

12   bank's interest, whatever property the bank has in their

13   customer deposits, if we're talking about the customer's own

14   funds in their own account, that property interest ends at the

15   point when that customer says, I want to withdraw those funds,

16   or I want to transfer those funds.  So certainly while the

17   funds are sitting in that customer's account, as *Shaw* says, the

18   bank has a limited property interest.  They can use it to loan

19   it out, they can make money off of it, they can do other things

20   with it, but as soon as the customer tells -- the customer

21   whose funds those are, who is the holder of the account, says,

22   I want to retrieve those funds, the bank's interest in those

23   funds stops.  Those are the customer's funds.  They can

24   withdraw them.  And I think that is what *Shaw* says.

25             THE COURT:  They are the depositor's funds.

N6FDBANO

1          MR. EVERDELL:  In this case, it's not clear to me,

2     Judge, and I don't think it's alleged that they were held in

3     the North Dimension account for the benefit of the depositor.

4     I think they were given to North Dimension, they were given

5     obviously to fund the FTX account with an equivalent amount of

6     money, but those funds were belonging to North Dimension.  And

7     there's nothing in the indictment that says there's some sort

8     of lingering obligation or --

9          THE COURT:  The providers of the money, the ultimate

10     providers of the money, had no further property interest in it?

11     That's your position?

12          MR. EVERDELL:  Well, what they have, your Honor, what

13     the customers have at that point, is they are given an

14     equivalent amount of money on the FTX exchange, and they can

15     use that to trade.  So they have the right to use the money

16     that is leveraged over to FTX to make cryptocurrency trades.

17     Right?  They also have the right to withdraw an equivalent

18     amount.  Obviously when they send the funds in, money is

19     fungible, they don't get those specific deposits, but they can

20     withdraw an equivalent amount.  Right?

21          So certainly, if they want to, they can say I want my

22     money back, I want my cash back, and they have that right, too,

23     but --

24          THE COURT:  Which is property.

25          MR. EVERDELL:  Well, when they withdraw it, it's their

N6FDBANO

1   property.  But what the difference is I think with *Shaw* --

2           THE COURT:  The right to withdraw is property.

3           MR. EVERDELL:  The right to -- the right to get your

4   money back, it's a little like right to collect a debt, which I

5   think we're going to talk later.

6           THE COURT:  Which is also property.

7           MR. EVERDELL:  But what I think I'm getting at here

8   with the bank fraud count, your Honor, because I think we're

9   conflating what is the fraud against the alleged -- fraud

10  against the customers versus the alleged fraud against the

11  bank.  And the bank, in order to defraud the bank, what

12  *Ciminelli* says is there has to be a traditional property

13  interest that the bank has to be able to take the bank's

14  property, because you have to defraud the financial institution

15  under the bank fraud statute, so you have to be taking the

16  bank's property.

17          In this case, the bank doesn't have -- at the point

18  where the holders of the North Dimension account try to

19  withdraw the funds from the North Dimension account or transfer

20  it, the bank's interest in that property stops, because from

21  the bank's perspective, that money belongs to North Dimension.

22  And so we're not defrauding the bank of its property.  They

23  have the right to use it, to lend out, to make loans, and do

24  whatever they want to do with it while it is sitting in the

25  account, but when North Dimension account holders say they want

N6FDBANO

1    that back, or want to transfer it somewhere, from the bank's

2    point of view, they're not being defrauded from any of their

3    property interest.  Whatever it may be, what the providence of

4    those funds were, and the allegations of fraud on the

5    customers, we're talking about the bank's property when it

6    comes to the bank fraud statute.

7        And they have not been actually deprived of their

8    property at that point.  They've had the full use of whatever

9    property rights they had to lend out money while the money was

10   sitting there, but when the customer, in this case the North

11   Dimension account holders, comes to the bank and says, I would

12   like those monies transferred, it's not the bank's property

13   that's being defrauded, it's not the bank's property that's

14   being taken, separate and apart from anything to do with the

15   customer.

16       So, your Honor, I don't think that *Shaw* is controlling

17   here.  I think that under this situation, it's different, and

18   we don't have -- we do not have a bank fraud.

19       Your Honor, also, I would point out that there is

20   no -- in the indictment, there is no relational component

21   between the false statements and the movement of the funds out

22   of the bank, right, because *Loughrin v. the United States* says

23   that, it's not enough that a fraudster's scheme to obtain money

24   from a bank and that he made a false statement.  The provision

25   as well includes a relationship component.  The criminal must

N6FDBANO

1   acquire or attempt to acquire bank property by means of a

2   misrepresentation."

3           So there has to be a nexus between the

4   misrepresentation and the acquisition of the bank's property.

5   In the indictment, there is no allegation, as far as I can see,

6   of a misstatement given to Bank One in order to trick Bank One

7   to release funds from the North Dimension bank account.

8   There's no misrepresentations alleged that related to that at

9   all.  All of the misrepresentations that are in the indictment

10  relate to the opening of the account, not to the release of

11  funds.

12          So under *Loughrin*, there is no relational component

13  here.  It's simply been failed to be alleged here.  There is no

14  way that the indictment establishes the bank fraud, because all

15  of the misrepresentations that are there refer to the opening

16  of the account, the information given to Bank One to determine

17  whether or not to open the account.  And so under that

18  standard, your Honor, under that case, that is a separate and

19  independent reason why the allegations in the indictment do not

20  establish a valid bank fraud charge.

21          Your Honor, unless there's further -- in the interest

22  of time, I should probably move on to the next count.  Okay.

23  So now I'll address briefly the lender counts, your Honor,

24  which are 7 and 8.  And I think with these counts, Judge, the

25  government is trying to do what the Supreme Court cautioned

N6FDBANO

again in *Ciminelli*, which is trying to criminalized a

traditionally civil matter by turning a contract dispute into a

federal fraud crime.  So just like the bank fraud count, Your

Honor, they're trying to introduce a new charging theory in

their opposition brief.

Now, the new theory, as I see it, in opposition brief

contains two elements, right, that the lenders were deprived of

their new money in the sense that money of lenders would have

given Alameda as a part of the new loan agreements, right; and

the right to call existing loans.  So there's the existing

loans which they were deprived of the right to recall, and

according to what's alleged in the brief at least, there were

these rights to -- they approached them for new loans, so they

were seeking new money from the lenders.

Now, on that, your Honor, as to the new loans, there

is nothing whatsoever in the indictment alleging anything about

going to seek new loans from the Alameda lenders.  What the

indictment talks about is there is a downturn in the markets,

and the lenders want their funds returned, and so there's an

issue about this, and there's an attempt to deal with this

problem.  But it is all about the lenders and the existing

loans, and them trying to get back their existing loans.  It

says nothing about Mr. Bankman-Fried or anybody else going to

lenders to get new loans.  That's totally invented in the

opposition briefs, nowhere in the indictment.

N6FDBANO

1           And that's significant, your Honor, because that is, I

2      think, an attempt to try to get around *Ciminelli*, because that

3      alleges, theoretically, a fraud in the inducement, right?  So

4      they're going to the lenders to try to get new loans, making

5      false representations to get their money right from the get go,

6      fraud in the inducement.

7           That's not alleged, right?  If anything is alleged it

8      is this right -- it is the deprivation of this right to collect

9      an existing loan; and, your Honor, that is not an actual right

10     that is sufficient to sustain a property fraud claim, and

11     here's why.  What we have there, if the property interest is

12     anything, it is the right to collect.  Well, I think that's

13     based on a misunderstanding of what the lenders' rights

14     actually are.  The lenders' rights derive entirely from the

15     loan agreements, which the government does not cite in the

16     indictment.

17          They clearly don't have a property interest in the

18     specific funds that they gave to Alameda, right?  When lenders

19     loan money, when you loan money to somebody, the borrower owns

20     those funds.  It's the borrower's funds.  You do have a right

21     to collect your loan, and that's usually dictated by the terms

22     of the loan agreement of when and how and those terms, but the

23     money itself is with the borrower.  It's their property.  So

24     the specific loan funds, they do not have an interest in.

25          The only potential interest they have is the right to

N6FDBANO

1    collect at a later time, but here, your Honor, the lenders have

2    not been deprived of that right.  In fact, our understanding is

3    they are vigorously exercising those rights in the bankruptcy

4    proceedings.  As we speak, they are trying to collect the money

5    that's owed to them.  So the right to collect, to the extent

6    that it is a property right, has not been deprived, right?

7            And it is true that you do not have to cause actual

8    loss to have a wire fraud offense, but what you do have to

9    prove is that the scheme, if it were successful, would result

10   in economic harm to the victim.  And here, Judge, as alleged,

11   this scheme was successful in the sense that false financial

12   information caused the lenders to hold off calling the loans.

13   But lenders did not lose the right to collect.  They still have

14   it.  So that cannot form the basis of the property fraud

15   claims -- or the wire fraud claims against them.

16           THE COURT:  It's been impaired a little bit, don't you

17   think?

18           MR. EVERDELL:  Sorry, your Honor?

19           THE COURT:  It's been impaired a little bit, don't you

20   think?

21           MR. EVERDELL:  Well, I don't know if it's been

22   impaired.  The right itself exists.  Whether or not there are

23   sufficient funds to cover the outstanding amounts, I guess

24   that's up to the bankruptcy to decide.  But the right itself

25   exists, and the right is something that can be exercised.

N6FDBANO

1          And, to be honest, Judge, there certainly is not an

2   allegation I think that the intent of the scheme was to deprive

3   them of their rights to collect, right?  It was -- I mean, they

4   still have it, so that's -- that doesn't hold water in my view.

5          Your Honor, I think -- we cited the *Adler* case, which

6   I don't want to take time going through, because I'm sure your

7   Honor's read the briefs.  I think it's very much on point,

8   where Judge Luttig addressed a very similar situation, and said

9   the right to collect a debt is maybe a property right, but it

10  is not one that has been deprived here.  And so the same

11  situation applies here.

12         Your Honor, I'll finally move to the wire fraud

13  against the customers.  And what I think is going on here is

14  that, you know, the government is alleging that

15  Mr. Bankman-Fried deprived the FTX customers of funds they

16  deposited on the exchange.  But once again I think we need to

17  be clear about what the property right is, what rights and

18  interests did the FTX customers have once they deposited their

19  funds on FTX.

20         And the indictment alleges first that the customers

21  received a credit, a corresponding credit that they could use

22  to trade.  So this is not a situation like the *Merrill* case

23  that the government cited where the customers were actually

24  deprived of their funds, their funds were actually tied up and

25  they couldn't use them.  They could use them.  They used them

N6FDBANO

1   in the form of a credit to be able to trade.  It was an

2   equivalent amount.  And the customers had a contractual right

3   to be repaid an equivalent amount on demand, but, again, the

4   customers were not deprived of that right.  They have that

5   right.  They are looking to exercise that right.

6          Now, these, I don't think create a valid fraud theory.

7   And, again, in the interest of time, your Honor, I will rest on

8   the papers unless the Court has questions.

9          THE COURT:  Thank you.  I congratulate you on an

10  extraordinarily imaginative argument.

11         MR. EVERDELL:  Thank you, your Honor.

12         THE COURT:  Counsel.

13         I'm sorry.  You're rising, Mr. Cohen.  Are you --

14         MR. COHEN:  We had thought we had a bit more time,

15  your Honor.

16         THE COURT:  You have five minutes.

17         MR. COHEN:  We have five minutes.  All right.  Then

18  one moment, your Honor.

19         So, your Honor, in the four and a half minutes I now

20  have, let me briefly touch on the motion that we made for *Brady*

21  disclosures and discovery.

22         THE COURT:  Well, I'm going to deal with that

23  separately.

24         MR. COHEN:  Okay.  Your Honor doesn't need --

25         THE COURT:  We'll deal with that later.

N6FDBANO

1          MR. COHEN:  Okay.  Then --

2          THE COURT:  All right.  Who's going to argue this one

3   for the government?

4          MR. REHN:  Good morning, your Honor.

5          THE COURT:  Good morning.

6          MR. REHN:  I was planning to address any specialty

7   issues that the Court had, and also the fraud counts that took

8   up the majority of the defense counsels' time.

9          THE COURT:  Yes.  I think on the specialty, if you

10   would just address briefly the argument which, if I were to

11   adopt it, would ignore the fact that the defendant consented to

12   simplified extradition, and there was apparently no doubt in

13   anybody's mind, including his, as to what he was consenting to;

14   but I'm to blind myself to that, and focus on the omission of

15   what is now Count 12 in the documents signed by the minister.

16   Is that it?

17          MR. REHN:  Yes, your Honor.  I think, as to that

18   issue -- and we do think defendant's consent is important, but

19   leaving that aside for the moment, there's two reasons why it

20   -- that does not invalidate proceeding on the campaign finance

21   count.  The first reason, very importantly, is that the

22   defendant lacks standing to raise that issue in this court, and

23   I think that's especially warranted here.

24          This case kind of illustrates the wisdom of the Second

25   Circuit's rule on standing, because what the defense is asking

N6FDBANO

the Court to do is basically insert itself into a series of
Bahamian legal questions combined with issues of diplomatic
communications between two sovereign nations about the precise
meaning of the extradition that took place here.  And that's
really something that doesn't need to be done, because it's a
matter for the diplomatic relationship between the United
States and the Bahamas.

So just on the Second Circuit's standing
jurisprudence, the Court should deny the defendant's motion
challenging this count.

THE COURT:  Implicit in that argument is that I should
reject the defendant's argument with respect to all the other
new counts as to standing, yes?

MR. REHN:  That's correct, your Honor, and we think
that is a reason not to dismiss those counts.  As we discussed
earlier, the government would not proceed, in any event, on
those counts absent -- because the United States does take its
diplomatic obligations seriously.

THE COURT:  Yes, so that's a diplomatic policy
decision, not a concession on the legal point.

MR. REHN:  That's correct, your Honor.

THE COURT:  Okay.

MR. REHN:  Now, if the Court were to inquire into the
extradition record, I think we acknowledge there is ambiguity
here, but if you look at what the courts have done, and I think

N6FDBANO

the most important decision is the Second Circuit's decision in

the *Levy* case, where that case was actually less favorable to

the government than this case, because in that case, the

government's own extradition request did not even mention the

count being contested by the defendant; and then in the order

granting extradition from the country, it just referred to the

charges in the indictment, and there was no indication in the

record that the extraditing country had specifically been

notified of or had considered the contested count, because it

wasn't even in the government's initial extradition request.

And, nonetheless, the Second Circuit said, that's a sufficient

record, because we will not interpret the record narrowly;

we're going to assume that the -- the United States is

proceeding in accordance with an understanding of the

extraditing country that it can proceed on the charges for

which it sought extradition.

THE COURT:  Here the record supports the view what is

now in Count 12 was in the extradition request.

MR. REHN:  Certainly, and I don't think it's contested

the count was in the extradition request.  The defendant had a

copy of the extradition request, said in writing that he had

reviewed all of the counts in that, and that he was consenting

to extradition on those counts.  Then he goes to the Bahamian

court, and I think this is very important, because other cases

from other circuits who have looked at this have said, well,

N6FDBANO

1    did the courts consider whether this count was part of the

2    extradition or not, so to the extent that this Court were to

3    inquire into the extradition record, it would be appropriate to

4    look at what the Bahamian Court did, and the Bahamian Court

5    expressly listed all of the counts, including the campaign

6    finance count, and stated that this is one of the charges that

7    the defendant will have to answer to upon extradition.  So it

8    was the understanding of all of the parties involved that this

9    was part of the record of extradition.

10            Subsequently, after all of that happened, the minister

11   of foreign affairs issued this warrant, which is actually just

12   addressed to the Bahamian Police, authorizing them to turn over

13   the defendant to the United States.  It's not even expressed

14   directly to the United States.  And we acknowledge that warrant

15   does not specifically reference this count, although it does

16   reference the defendant's consent and the Bahamian Court's

17   order that listed this as one of the counts of extradition.

18            And so considering that record on the whole, we don't

19   think that the Court should narrowly focus on the omission of

20   this count in the attachments to the surrender warrant to the

21   exclusion of the other evidence that this was part of the

22   extradition.

23            THE COURT:  Okay.  Thank you.

24            MR. REHN:  Your Honor, with respect to the fraud

25   counts, I'll be brief, and I'm happy to address any particular

N6FDBANO

1    questions that the Court has, but I'll just go through them.

2    On the bank fraud count, I think that there's two separate

3    prongs to the defendant's argument as to both of which the

4    defendant is just misreading the case law.  So I think the

5    defense gives away the game when they said at one point in

6    their argument that, you have to defraud a financial

7    institution in order to succeed on this count.  That's directly

8    contrary to the Supreme Court's holding in *Loughrin* when it

9    says that for a prosecution under 1344(2) alleging a scheme to

10   obtain money or property in the custody of the bank, there is

11   no requirement that the government prove the defendant

12   defrauded a financial institution.

13         And that dovetails with the Supreme Court's decision

14   in *Shaw*, which the Court is very familiar with, saying that a

15   scheme to obtain property or money in the custody of the bank

16   is a bank fraud, regardless of whether the bank itself was

17   defrauded or suffered any loss, and that is exactly what is

18   alleged here.

19         THE COURT:  Well, of course, Mr. Everdell says it's

20   not property in the custody of the bank.  It is property that

21   belongs to the bank, for whatever analytical force that has.

22         MR. REHN:  And that's exactly the reason why the bank

23   fraud statute has this separate prong that criminalizes any

24   attempt to obtain property in the custody of the bank.

25   Basically, the bank fraud statute broadly applies to schemes to

N6FDBANO

obtain money that the bank has.  Whether it's the bank's

property or the property of depositors in the bank, the issue

is the defendant made false statements to a bank for the

purpose of obtaining property that the bank held.  And

certainly the indictment alleges the bank did withdraw funds

from that bank account for his own purposes, and that's

certainly sufficient under these cases that we've discussed in

our brief.

I would just highlight one case in particular, the

*Lebedev* case from the Second Circuit, which is very similar to

this case.  And just the very first paragraph of *Lebedev* says

in that case the defendant "opened bank accounts in the name

of," and then it lists a phoney company that the defendant

provided to the bank in that case when they opened that

account.  And then the defendant subsequently used that account

to facilitate, interestingly enough, customer deposits onto an

offer of -- cryptocurrency exchange.

*Lebedev* is exactly the theory that's at issue here

that the Second Circuit upheld, so the Court should also uphold

the theory in this case as well.  It has nothing to do with the

right to control that was the issue in *Ciminelli*.

With respect to the lender fraud, the defense is right

that there's two prongs -- there's two ways in which lenders

were defrauded.  They were defrauded by providing new money, to

the -- lending new money to the defendant's companies in

N6FDBANO

reliance on fraudulent misrepresentations, and they were
defrauded in forbearing their right to demand immediate
repayment of loans they had already made.  And the indictment,
conveniently enough, lists both of these in the account, money
and property.  Both of those are well-established property
interests that are alleged in the indictment, that the
defendant obtained by means of his fraud.

          Focusing on the second one, the right to call existing
loans, the indictment specifically alleges in paragraph 32 that
Alameda was required to repay its loans on demand.  So this
idea that the lenders were not deprived of a property interest
when they forbore on executing that immediate right to
repayment, simply doesn't hold water.  That ability to obtain
repayment on demand is an extremely important contractual
property right in the context of a loan that the lenders lost
as a result of the defendant's fraud.

          THE COURT:  Well, Mr. Everdell's argument is they
didn't lose it; they can demand all they want for the rest of
time.

          MR. REHN:  Well, there's a big difference between
demanding immediate repayment in July of 2022 and seeking
repayment now post bankruptcy.

          THE COURT:  His point really is they had the right,
they didn't exercise it, but they had the right.

          MR. REHN:  But not exercising a right is being

N6FDBANO

deprived of that right if the reason you don't exercise a

contractual property right is because of a defendant's

fraudulent statements.

THE COURT:  Your argument is the right to demand

payment was taken them by the fraud.

MR. REHN:  That's correct, your Honor.  And they've

lost obviously significantly.

And I would just highlight the *Pasquantino* Supreme

Court case from 2005, 544 U.S. 349, at 357, which says, the

right to be paid money has long been thought to be a species of

property.  Fraud at common law included a scheme to deprive a

victim of his entitlement to money.  And certainly that's

what's alleged here with respect to these lenders, in addition

to the fact that the lenders made additional new loans based on

the defendant's fraudulent statements in the summer of 2022.

And then just very briefly on the customer fraud, I

don't think the defense really has any argument here.  The most

traditional theory of wire fraud that has been long recognized

is misappropriation of funds that are entrusted to a defendant.

Misappropriation is exactly what's laid out in Counts 1 and 2.

The customers were certainly defrauded by a series of false

representations about how the customers' deposits would be

handled, about the customer protections that were purportedly

in place on the platform.  And they've made those deposits.

The defendant misappropriated those funds.  And that's about as

N6FDBANO

1     traditional wire fraud theory as you can get.

2             So unless the Court has questions on that --

3             THE COURT:  No.  Thank you.

4             Ms. Sassoon.

5             MS. SASSOON:  Your Honor, given that we have not I

6     don't think used up our 45 minutes, if your Honor does have

7     questions or concerns with any of our other arguments regarding

8     any of the motions to dismiss any of either counts, we can

9     address them.

10            THE COURT:  I don't think that will be necessary.  I

11    think we can turn to the questions that I had my deputy raise

12    with both sides, and to the discovery arguments.

13            I have the government's letter on the status of

14    discovery dated the 14th of June, so let me start there.  In

15    the second paragraph of the letter, the government states that

16    it has now made seven discovery -- I imagine the word

17    "productions" got lost -- which were accompanied by detailed

18    indexes, and include the materials discoverable under Rule 16,

19    et cetera.

20            I take it that means you are telling me you have made

21    all of the Rule 16 disclosures of everything in the possession,

22    custody, or control of the government?  Was that the other word

23    left out?

24            MR. ROOS:  Yes.  First of all, your Honor, apologies

25    for the missing words here.  Clearly the timing of the --

N6FDBANO

```
 1   timing of the letter betrays that probably we could have read

 2   it again.

 3              THE COURT:  At least you didn't blame it on one of

 4   these AI crypt devices.

 5              MR. ROOS:  That's right.  I'm sure --

 6              THE COURT:  I'd have to send you to Judge Castel

 7   immediately.

 8              MR. ROOS:  I'm sure it would have at least written a

 9   full sentence, if not cited a fake case.

10              To answer your Honor's question, the answer is yes,

11   subject to the various outstanding items that are listed on

12   pages 2 and 3 of the letter that we're providing -- that we

13   provided updates on --

14              THE COURT:  Yes, but the outstanding -- there are

15   almost no outstanding items listed.  There is the Slack data,

16   which needs to be converted into files loadable into Relativity

17   and screened, and then you're going to produce that; and there

18   are some documents identified in paragraph 3 that are in the

19   process of being translated.  So with the amendment of those

20   two items -- the exclusion, everything else that the government

21   is obliged to produce under Rule 16, and that is within its

22   possession, custody, or control, has by now been produced.

23              Is that right?

24              MR. ROOS:  I just wanted to add, highlight sort of the

25   two other caveats.  So in paragraph 2 at the end it notes a
```

N6FDBANO

1  very small volume of additional Google documents we're

2  anticipating getting from Google and producing.  Basically,

3  Google made an incomplete production.

4          THE COURT:  Yes.  I noted that, but what you say in

5  that paragraph is you currently don't have them.

6          MR. ROOS:  Correct, your Honor.

7          THE COURT:  Okay.

8          MR. ROOS:  And the other is paragraph 5 there is a

9  discussion of cell phones that were seized, one of which is

10  accessible.  And there's a -- I would say an ongoing

11  conversation about whether that's something that either party

12  would consider to be Rule 16 in this case.

13          The final caveat would be paragraph six, which is just

14  an acknowledgment that many parties, including the FTX debtors

15  and several parties who have been subpoenaed, continue to

16  produce these things.

17          THE COURT:  That's not in your possession, custody, or

18  control either.

19          MR. ROOS:  That's correct, your Honor.

20          So you're right, just the two paragraphs that you

21  highlighted are in the possession, custody, or control.

22          THE COURT:  All right.  Now, Mr. Cohen, is there any

23  dispute about that?  Or is it Mr. Everdell?

24          MR. COHEN:  Mr. Everdell will handle this, your Honor.

25          MR. EVERDELL:  Well, your Honor, I note that there are

1   ongoing subpoena return productions.

2            THE COURT:  So the second time I note we don't have to

3   talk about that.

4            MR. EVERDELL:  Sure.  I note that in paragraph 8, we

5   can talk about the FTX code.  I know the government is claiming

6   that they don't have an obligation to get this, but it seems

7   like they're agreeing now to obtain the FTX codebase and

8   codebase history, which is what we've been asking for.

9            THE COURT:  I'm sorry.  Finish.

10           MR. EVERDELL:  Yes.  The codebase history is what

11   we've been asking for.  This is no. 8.

12           THE COURT:  Well, they've agreed that they've talked

13   to FTX about it.

14           MR. EVERDELL:  Yes.

15           THE COURT:  They haven't agreed to give it to you.

16   They don't know whether they're going to get it I assume.

17           MR. EVERDELL:  Well, understood, your Honor.

18   Obviously we're very eager to get those, and --

19           THE COURT:  Well, I'm sure you are, but that doesn't

20   mean they have it.

21           MR. EVERDELL:  Yes.  That's true.  But to the extent

22   they're agreeing to request it and get it, then that's

23   something we need to get to.

24           THE COURT:  Right.  They've agreed to request it and

25   presumably have requested it.  All right.  That takes care of

N6FDBANO

1        that.

2               Now, you've already given the estimates as to trial

3        duration.  Have you folks given any thought to filing dates for

4        in limine motions, proposed voir dire, and requests to charge?

5               MS. SASSOON:  We have, your Honor.

6               THE COURT:  Is there a proposal?

7               MS. SASSOON:  Two days ago we outlined a proposal to

8        the defense that they are still considering, so we do not have

9        a joint proposal, but we are in discussions and expect to

10       continue to meet and confer.  We're happy to provide the Court

11       with our proposed schedule, but it has not been --

12              THE COURT:  I understand holey water has not yet been

13       sprinkled, but why don't you tell me what your proposal is,

14       because if I don't find it acceptable, it may change your

15       discussions.

16              MS. SASSOON:  Yes, your Honor.

17              Our proposal is that six weeks before trial, the

18       government would produce 3500 material, *Giglio*, and other

19       related witness materials; and that six weeks before trial as

20       well, the parties would provide expert notice.  Five weeks

21       before trial, the government would provide 404(b) notice.  Four

22       weeks before trial, the parties would provide rebuttal expert

23       notice; and the government would provide a witness list, and an

24       exhibit list, and the parties would file their motions in

25       limine.  Three weeks before trial --

1           THE COURT:  You're going a little fast for me.

2           MS. SASSOON:  I'll slow down.

3           THE COURT:  Four weeks before, you give 404(b) notice.

4           MS. SASSOON:  Five weeks before would be 404(b)

5    notice.

6           THE COURT:  Five weeks.

7           MS. SASSOON:  Four weeks before trial would be

8    rebuttal expert notice.

9           THE COURT:  Just hold off now.

10          So six weeks before trial would be expert notice,

11   right?

12          MS. SASSOON:  Yes, your Honor.

13          THE COURT:  Five weeks before would be 404(b).

14          MS. SASSOON:  404(b).

15          THE COURT:  Four weeks before --

16          MS. SASSOON:  Rebuttal expert notice, from both

17   parties.

18          THE COURT:  Uh-huh.

19          MS. SASSOON:  Motion in limine deadline for both

20   parties.

21          THE COURT:  Four weeks before?

22          MS. SASSOON:  Yes.  And government witness and exhibit

23   lists.

24          THE COURT:  Also, four weeks?

25          MS. SASSOON:  Yes.  Although, as explained to the

N6FDBANO

| 1 | defense, these proposals of government deadlines were

2   conditioned on the defense agreeing to a reasonable schedule

3   for their exhibits and disclosures, which I'll get to, because

4   that's also built into our proposal.

5          THE COURT:  Okay.

6          MS. SASSOON:  And as is also customary in our view, we

7   would anticipate that we would continue to update our exhibit

8   list and witness list in the weeks before trial, and that the

9   exhibit list four weeks before trial would not be final.

10          THE COURT:  Proposed charge?

11          MS. SASSOON:  So three weeks before trial would be

12   proposed charge, *Daubert* motions, voir dire, and the deadline

13   for defense exhibit list and witness list.

14          THE COURT:  Uh-huh.

15          MS. SASSOON:  Two weeks before trial, deadline for

16   opposition to motions in limine, and the deadline for defense

17   production of 26.2 material.

18          And, finally, we have proposed that one week before

19   trial, we'd have a final pretrial conference.

20          THE COURT:  All right.  Let me just make sure -- I

21   think your proposed schedule, with respect to *Daubert* motions,

22   which I fear are going to be extensive and complicated, it does

23   not give me nearly enough time.  The same is true for the

24   proposed charge, and for the motions in limine.  So I'm going

25   to ask you to go back to the drawing board on that.

N6FDBANO

1      MS. SASSOON:  Yes.  Thank you.  It's very useful to

2  have your Honor's input.

3      THE COURT:  I look here and I see four lawyers at the

4  back table, and, oh, a bunch at the front table, and Lord knows

5  how many more there are; and I have myself, and two law clerks,

6  and 300 other cases.

7      MS. SASSOON:  Do you have anything more specific in

8  mind when you say you'd like these materials sooner?

9      THE COURT:  Several more weeks earlier.

10      MS. SASSOON:  Yes, your Honor.

11      THE COURT:  Even that would be pressing it.  Okay?

12      MS. SASSOON:  Understood.

13      MR. COHEN:  Your Honor, on the schedule we have, we

14  have a couple of other points, if we might.

15      THE COURT:  Sure.

16      MR. COHEN:  And we're happy to first discuss this with

17  the government, and then come back to your Honor.  We're going

18  to talk internally, and with the government about their

19  proposed schedule for the defense exhibit list and the rebuttal

20  expert list from the defense or designation from the defense.

21  Given that we don't have an obligation to call an expert, we

22  think that may be a little too early, but we'll talk to the

23  government about it and come back to your Honor.

24      THE COURT:  Well, you of course have no obligation to

25  call an expert, and I will probably break out a bottle of

N6FDBANO

1    champagne if you elect to exercise your right not to call one.

2            MR. COHEN:  What kind of champagne, your Honor?

3            THE COURT:  Well, maybe not the very best, but it

4    would be high up there.

5            MR. COHEN:  The other thing is, we just raised it with

6    the government, and, in fairness, we should talk to them about

7    it first, and we may be asking the Court to use a jury

8    questionnaire.  And if the Court agrees to that, we'll have to

9    build it into the schedule.  We're not ready to --

10            THE COURT:  I will tell you it will take a good deal

11    of convincing --

12            MR. COHEN:  Okay.

13            THE COURT:  -- to push me that far, because I've used

14    them, and I've not used them, and I've seen what happens when

15    colleagues use them.  The administration of the process is

16    remarkably complicated and error prone.  Think of the *Maxwell*

17    case as one error --

18            MR. COHEN:  I am familiar with that case, your Honor.

19            THE COURT:  I bet you are.

20            Think of how much work the jury department has to do,

21    how much stuff has to be copied under extreme time pressure,

22    how many questionnaires are you going to get, what are you

23    going to do with them.  The only kind of jury questionnaires I

24    have been using, in my later years on the bench, on occasion,

25    and only on occasion, is directed only to the issue of

N6FDBANO

1   hardship.

2           MR. COHEN:  Uh-huh.

3           THE COURT:  Because you can very often screen that in

4   a lengthy trial right up front.

5           MR. COHEN:  Hardship arises from the length of the

6   trial.

7           THE COURT:  Length of the trial, but also travel,

8   commuting problems.  We do get Rockland County jurors and

9   Putnam County jurors, as I remember.

10          MR. COHEN:  Yes.

11          THE COURT:  It can be very difficult for those folks.

12  There are issues with employer payments.

13          MR. COHEN:  Yes.

14          THE COURT:  Now, this --

15          MR. COHEN:  Yes.  Like your Honor, we've used them,

16  and we've also not used them, your Honor.  We will take your

17  Honor's comments to heart.  We think, given the complexity of

18  this case and the issues that have arisen, there may well be an

19  appropriate use for them here, but we'll think about it and

20  come back, your Honor.

21          THE COURT:  Look, in my last trial, which everybody

22  knows something about, both sides wanted questionnaires.  I

23  said no.  I solicited voir dire questions.  They submitted

24  about 25 questions, and I had a questionnaire, but I used it in

25  court.  It had 70 or 80 or 90 questions, and nobody had

N6FDBANO

1    anything significant that they wanted me to ask about by the

2    time I got finished.

3              MR. COHEN:  Okay.

4              THE COURT:  So it will be a thorough voir dire, you

5    can be assured of that, but the added overlay of dealing with

6    the questionnaires is just a big cost.

7              MR. COHEN:  We hear your Honor.  We'll come back to

8    your Honor.

9              THE COURT:  All right.  Fine.  We're all determined to

10   get to the same place, which is a fair jury.

11             MR. COHEN:  Yes.

12             THE COURT:  One that can sit without worrying that

13   they're going to be able to pay for the paper towels on Friday.

14             Okay.  So much for that.  Now let me get to the

15   discovery-related motions.  I think our discussion of the

16   schedule may well have mooted everything but the question of

17   whether the FTX debtors are part of the prosecution team.

18             Am I right, that's all that's left?

19             MS. SASSOON:  The defendant made a bill of particulars

20   motion, but we think that our proposed schedule moots what we

21   view as essentially a request for an early exhibit list.

22             THE COURT:  I thought so, but is there any

23   disagreement about that?

24             MR. EVERDELL:  I mean, your Honor, I don't want to

25   reiterate our papers on the bill of particulars, or take too

N6FDBANO

1    much time about that, but we're still at a loss to understand

2    what the lenders we're --

3            THE COURT:  You know, the reason I ask you to use that

4    is because my hearing is no longer exactly what it was when I

5    was 23.

6            MR. EVERDELL:  I understand, your Honor.

7            I'll be brief on this.  I think the only point we'd

8    raise on the bill of particulars is we still don't have

9    information that we think is essential to understand, for

10   example, the lender accounts and the investors' accounts.  For

11   example, yes, there is a speaking indictment, it does talk

12   about a narrative, and, yes, we have a lot of discovery.  But

13   we don't know which lenders.  There are dozens of lenders.  We

14   have thousands of loan agreements.  Which loan agreements are

15   we talking about?

16           It's impossible for us to search and know what loans

17   were the ones that were allegedly at issue in the lender fraud

18   counts simply by searching the discovery.  We can't identify

19   which lenders and which loans we're talking about.  Same thing

20   with the investors' counts, dozens of investors, thousands if

21   not almost a million pages of documents.  How can we know what

22   offering is related to, or which perspective offering, which

23   potential investor, what is the misleading document.

24           I think these, in particular, your Honor, these are

25   things we don't know and don't really have a way of knowing

N6FDBANO

with the information we've been given, even with the voluminous

discovery, and so we would require a bill of particulars, or

ask for a bill of particulars on those issues, respectfully.

THE COURT:  I'll hear from the other side.

MS. SASSOON:  Your Honor, this is the type of request

that Courts in this district have routinely rejected as seeking

the evidentiary minutia of trial, particularly where, as here,

the government is prepared to provide early disclosure of an

exhibit list and of witness material.  The defense' requests

have no legal support, including from the only cases that they

cite in their brief, and I don't want to belabor the points

that we made in our opposition, but I'd like to just draw the

Court's attention to *Akhavan*, which is cited in the defendant's

reply brief.

They cite that case as an example where a bill of

particulars was ordered in a case with voluminous discovery,

but, in fact, in that opinion by Judge Rakoff, the Court

rejected precisely these kind of bill of particular requests.

For example, the Court denied a request for details about the

victim banks in a wide ranging bank fraud conspiracy,

explaining that this sought, at best, evidentiary detail.  And,

as Judge Rakoff noted, the goal of the alleged conspiracy in

that case was not to defraud any one bank in particular.

That's similar to this case here, where the indictment alleges

a general scheme with similar types of misrepresentations made

N6FDBANO

1      to lenders and investors.

2              The Court in *Akhavan* also denied a request for details

3      about specific actions, including misrepresentations made in

4      furtherance of the scheme, and Judge Rakoff held that this was

5      simply an attempt to pin the government to particular

6      evidentiary details; the indictment's description of the scheme

7      is sufficiently clear for the defendants to understand the

8      crime of which they are accused.

9              That's true here.  Despite what counsel has said about

10     the difficulty of discerning the nature of the government's

11     allegations, the indictment is very detailed about the nature

12     of the scheme, the types of misrepresentations being made

13     across the board to investors and lenders about FTX's financial

14     condition, about the relationship between FTX and Alameda,

15     about the secret misappropriation of customer money, about

16     secret aspects of the computer code that favored Alameda; and,

17     in this case, that are only four investment rounds that are at

18     issue, with a similar set of documents that were generally

19     provided to investors.

20             The defense has referenced dozens of lenders, dozens

21     of investors, but, in fact, the government has produced a

22     narrower set of material from specific investors and lenders

23     that produced documents to the government organized by

24     producing party.  And the government has also produced, among

25     other things, a 60-page disclosure letter that includes some

N6FDBANO

1     information provided to the government by investors.

2              The only bill of particulars granted in *Akhavan* was

3     for a list of the names of co-conspirators under circumstances

4     very different from those here, as we lay out in our opposition

5     brief.  And I'll just say that there's a bit of a mismatch here

6     between a description of the complexity of the case and the

7     discovery, versus the discovery that pertains specifically to

8     the lenders and investors.

9              As the defense notes in its own reply brief, they

10    identify only about 44,000 pages produced by a dozen different

11    investors, and about 900,000 pages produced by a dozen lenders.

12    That's not an unmanageable amount of material for the

13    defendants to -- I see your Honor is laughing.  In the scheme

14    of the white collar cases brought in this district where --

15             THE COURT:  I know, it's nothing.  We've got to go

16    back to carbon paper.

17             MS. SASSOON:  In the context of other cases where

18    Courts have rejected similar bill of particular requests, that

19    does not take this case outside of the norm for cases that are

20    being charged in the white collar field these days.

21             So unless your Honor has questions about that, it's

22    our position that this should be rejected.

23             THE COURT:  Thank you.

24             Any response to that, Mr. Everdell or --

25             MR. EVERDELL:  We rest on our papers, your Honor.

N6FDBANO

1          THE COURT:  Yes.  There will be no bill of

2     particulars.  That's denied.

3          So other than the FTX debtors being part of the

4     government team, that takes care of discovery, that and the

5     schedule discussions, yes?

6          Okay.  Everybody's nodding affirmatively.

7          So let's get to that argument.  Is that you,

8     Mr. Cohen?

9          MR. COHEN:  Yes, your Honor.

10          THE COURT:  Let's try and do it in the next 5, 10

11     minutes.

12          MR. COHEN:  Yes.  I'll be brief, your Honor.

13          So there's no dispute that the government is under an

14     order from this Court to produce *Brady* material that is known

15     to the government promptly in realtime.  As your Honor pointed

16     out in *Blaszczak*, that's a variance from the prior practice of

17     how *Brady* was evaluated, which was retrospective.

18          There's no question the government --

19          THE COURT:  I'm not sure I agree with that

20     characterization, but go ahead.

21          MR. COHEN:  Okay.  I may be shorthanding too much in

22     the interest of time, your Honor.

23          But moving on, the question is whether or not the

24     debtors have become part of the prosecution team, and I

25     couldn't really tell in the government's papers whether they're

N6FDBANO

1     taking the position that a third-party could never become a

2     part of the prosecution team, or they're position is less than

3     that.  We think it's clear under the *Martha Stewart* case,

4     *Blaszczak* from your Honor, and other cases in this circuit that

5     there is no per se test, that what Courts do is they look at

6     various factors to make a determination whether, in the

7     specific case before it, there is a basis for the finding.

8              And we submit, and as we laid out in our papers, when

9     you look at those factors, they're all present here.  The

10    government has, or the FTX debtors have controlled the

11    documents, they have reviewed documents in what they describe

12    as a circular effort with the government.  They've acted --

13    gone back and forth in terms of gathering facts.  We laid out

14    in our paper a very significant sequence with respect to the

15    charge of unlicensed money transmitter, in which the government

16    sent an email to the debtors and said, this is one of our top

17    priorities; we'd like you to gather everything on this; and

18    their response was, there are 6,000 documents we have to go

19    through them, and we'll make a presentation to you.  That's how

20    you would talk to someone who is on your team.

21             It doesn't matter whether the government leads the

22    team or not.  I think there's something to that effect in the

23    papers which I think misses the point.  It's whether they were

24    a part of the team.  And they then, at the end of this

25    sequence, the debtors waived privilege, and they said, we're

N6FDBANO

1    waiving it to assist in the investigation or its investigation.

2    So that's under the *Stewart*, *Blaszczak* factors, another

3    example.

4              The government has interviewed -- excuse me, the

5    debtors have interviewed witnesses, but, more importantly, for

6    purposes of this analysis, they've done readouts of those

7    interviews to the government attorneys.  Now, the government in

8    its papers says, well, they didn't give us any memorandum.

9    They just gave us readouts.  But, you know, they're reading --

10             THE COURT:  Who selected the people they interviewed

11   for whom readouts were given?

12             MR. COHEN:  As I understand it, the government

13   selected who they give the readouts to.

14             THE COURT:  My question is who decided to interview

15   those people.

16             MR. COHEN:  I don't know that, your Honor, but at

17   least the submission of the government said who did that -- who

18   made the decision of who they would interview.  In addition,

19   your Honor, they have -- the record reflects, and, again, we're

20   only getting bits and pieces of this from the bills filed in

21   the bankruptcy proceeding from certain materials that have been

22   produced to us in discovery.  That's why we're making this

23   application.  But it indicates that the government -- the

24   debtors have assisted the government in drawing conclusions

25   about how facts and materials relate to each other, such as the

N6FDBANO

1    allegation relating to the $45 million hole in the FTX U.S.

2    account.

3            So when you put all this together, we submit, your

4    Honor, it shows that for these facts, in this case, and we're

5    not advocating this as a uniform rule applicable in all cases,

6    given how involved this debtor was, spending 90 percent of its

7    time in the -- from the beginning of the case working with the

8    government, countless hours of its own and attorneys' time,

9    there's a basis to make the finding.  And the other thing we

10   wanted to stress to your Honor is --

11           THE COURT:  It's in the debtors' interest, is it not,

12   to further the prosecution for its own purposes?

13           MR. COHEN:  Well, the debtor has its own purposes, and

14   that's, in fact, your Honor, part of our argument.  They're a

15   third-party here that doesn't have a *Brady* obligation.  And to

16   the extent they've become involved with and enmeshed within

17   part of the team, that's being kept from the defense.  And I

18   think the best -- not the best, but one of the examples that is

19   most relevant, because there were letters about it today, and

20   your Honor just touched on it, was the codebase history.

21           THE COURT:  The what?

22           MR. COHEN:  The codebase history.  I'm sorry, your

23   Honor.  The codebase history.

24           Let me give the significance, your Honor, and the

25   sequence, and I think this ties right into the motion.  The

N6FDBANO

significance is, as I understand it, and I'm learning like your
Honor a lot about technology in this case, but the codebase
history reflects who worked on the code, what drafts there were
of the code, what edits were made to the code, who made them,
what comments were made when the edits were made, who had
access to and read those comments, and who didn't.

And given the allegations about Mr. Bankman-Fried
causing or directing an adjustment to the code in a nefarious
way, it's obviously highly relevant that this evidence may well
show or may tend to show that there are alternative
explanations for these edits and adjustments, that others,
including the cooperating witnesses, were aware of, and that
Mr. Bankman-Fried did not access.  This is all incredibly
relevant.

So here is the sequence, your Honor.  We asked the
government for it in our Rule 16 *Brady* letter.  They said to
us, no, you can't have it, because they're not -- FTX is not
part of the prosecution team.  We went to FTX, the debtor, and
asked them informally for it.  They said, no, you can't have
it.  We're here before your Honor, and I'm sure the next step
would be -- well, the next step would be if we filed a motion
like we did, like I'm sure your Honor's going to deal with on
the other issue, there would be an opposition to the motion on
Rule 16, Rule 17.  And all we've gotten is a statement in
today's letter, well, we'll ask them about it.

N6FDBANO

```
1            That's far different than an order from your Honor

2     saying, here's a schedule, you have to -- you have to ask them

3     about it, you have to ask them to provide it, you have to

4     provide it by X date, because otherwise, your Honor, we're

5     faced with a situation where they are, quote, asked about it;

6     they consider it for a month; they get back; they say they

7     can't do it, so on and so forth, and the clock has run out on

8     it us.  And this is potentially very important information that

9     would tend to exculpate our client.

10           So in the interest of time --

11           THE COURT:  Or inculpate him.

12           MR. COHEN:  Also possible.  Also possible.

13           And we took that into account in making this request,

14    your Honor, although I have a feeling if the government thought

15    it would inculpate my client, they would have the codebase

16    already.  But so in the interest of time, you know, I think

17    that's the gist of the argument, your Honor.

18           THE COURT:  Okay.  I'll hear from the government.

19           MS. SASSOON:  Just a few points, your Honor.

20           I'll start where Mr. Cohen ended.  The case law is

21    clear that the power to act on behalf of the government to

22    collect documents is not equivalent to a duty to act, and here

23    the government does not have a duty to review the entirety of

24    the materials in the possession of the FTX debtors, because

25    they're not part of the prosecution team.
```

N6FDBANO

1          I want to respond to a few things that Mr.  --

2          THE COURT:  Let me just get clear about one thing.

3    The FTX debtors are a group of a number of different entities,

4    right?

5          MS. SASSOON:  Yes, and they're all represented by

6    Sullivan & Cromwell.

7          THE COURT:  Where are they located?

8          MS. SASSOON:  The debtors?

9          THE COURT:  The debtors.  Are they in the United

10   States?

11         MS. SASSOON:  Some of the entities are in the United

12   States.

13         THE COURT:  Where are the others?  How many -- what's

14   the breakdown, U.S. versus foreign?

15         MS. SASSOON:  I don't have it at my fingertips.  It's

16   dozens of entities, your Honor, including foreign.

17         THE COURT:  Mostly U.S. or mostly foreign?

18         MS. SASSOON:  Mostly foreign.

19         THE COURT:  Go ahead.

20         MS. SASSOON:  So a few additional things.  5(f) in the

21   government's view does not change our constitutional

22   obligations with respect to *Brady* or our obligations under Rule

23   16.  This case does not require the Court to consider whether a

24   third-party can ever be part of the prosecution team, because

25   this is not a case that's far afield of the heartland of cases

N6FDBANO

1      in this district that have found that cooperating third parties

2      are not part of the prosecution team, and their materials are

3      not in the possession of the government.

4           Mr. Cohen said that all the factors that Courts

5      consider in deciding whether a third-party is part of the team

6      or present here, that just can't be squared with the facts

7      here.  Whereas the government has laid out, the debtors did not

8      participate in any of the investigative duties of the

9      government, did not participate in any strategic decision

10     making, had no role in pursuing charges against the people

11     being prosecuted here, had no role in the defendant's arrest,

12     did not attend a single witness interview.

13          In *Blaszczak*, which Mr. Cohen referenced, your Honor

14     found that the SEC was not part of the prosecution team even

15     though the SEC had participated in interviews with the

16     government and more materials had been shared between the

17     parties.  Here, the government has not shared any 6(e) material

18     with the debtors, they have not reviewed documents the

19     government has collected in its case, other than for purposes

20     of assessing privilege, and this case is just not different

21     from the many cases we've cited where a third-party cooperator

22     was not considered part of the prosecution.

23          As your Honor -- in response to your Honor's question

24     about who selected the interviewees for the FTX debtor

25     interviews, that was FTX.  After learning about who the debtors

N6FDBANO

interviewed, the government requested readouts related to some

of those interviews, which were conducted for the debtors' own

purposes.  And as your Honor noted, it is true that the debtor

has its own interests here in being cooperative and

investigating the fraud, and that is precisely why it would be

untenable to deem them part of the prosecution team.

In their reply brief, the defendants made light of the

scope of their request, which is not limited to the codebase.

It's a request that the government review all of the FTX files

for discoverable information, which necessarily would involve

millions of pages of document, and terabytes of data.  And they

claim that this burden on the government, quote, warrants no

consideration.  But, thankfully, the Second Circuit and Courts

in this district have been less sanguine about this, and

they've recognized, including the Second Circuit in *Avelino*,

that imposing that type of duty on prosecutors would result in

a state of paralysis in prosecutions, and would be untenable.

And we think that that's true here.

Unless your Honor has questions about the

circumstances of the debtors' cooperation that I can address,

or any other questions, we'll rest on our submission.

THE COURT:  Thank you.

Anything else, Mr. Cohen?

MR. COHEN:  Just briefly, your Honor.

One point I meant to mention in my initial comments on

N6FDBANO

1   this is how extraordinary this is, your Honor.  This is far

2   beyond what we typically see in a cooperation situation.

3          We have an entity that is not a target of an

4   investigation; as far as we know, has no other reason to do it;

5   that has been from literally day one involved with the

6   government in making presentations, controlling the documents.

7   Usually the government takes control of the documents.  It's

8   really extraordinary.  Waiving privilege when there is no

9   requirement that it do so.  Turning over the contents of

10  interview memos when there is no requirement to do so.

11         And on these facts, given the level -- the level at

12  which the debtor, by its own admission and public statements

13  that we cited to your Honor, has been enmeshed with the

14  government, what I keep asking myself is if the debtor hadn't

15  done these things, someone on the government team would have

16  done them, would have reviewed the unlicensed money transmitter

17  documents, work through the issues about whether there's a

18  potential charge there or not, work through the issue of the

19  $45 million hole.

20         Now, the government can say, we did that anyway.

21  Okay.  I understand that.  But somebody would have done that,

22  and somebody did do that, and that was the debtor.  So if we

23  look at, as the *Martha Stewart* case says, we look at what

24  people do rather than their status, on these facts, certainly

25  from the sequence from December to now, there's a basis for the

N6FDBANO

1    finding.  There's certainly a basis for the Court to order that

2    specific *Brady* request from the defense be considered, that the

3    government have the debtors respond to and consider specific

4    *Brady* requests from the defendant, like the one I mentioned

5    about the codebase history, and some of the others that are in

6    our papers.

7                THE COURT:  I understood that they have made that

8    request.

9                MR. COHEN:  Well, again, it's a far different thing to

10   make the request without the force of an order from your Honor

11   behind it, and a schedule.

12               THE COURT:  I request the Bureau of Prisons to do

13   things all the time.  There's an old Yiddish expression, *gar*

14   *nicht helfen*, which means "it doesn't help at all."

15               MR. COHEN:  Well, I can think of the comeback, but I'm

16   not going to say it here.

17               THE COURT:  Okay.  My father's long lost knowledge of

18   some Yiddish.

19               MR. COHEN:  Right.  So, and then I won't invoke the

20   *rachmones* doctrine here, your Honor.

21               THE COURT:  Right.

22               MR. COHEN:  But, yes, I think your Honor has the

23   argument.

24               THE COURT:  You're going to very much enjoy the court

25   reporter's transliteration of our discussion.

N6FDBANO

1          MR. COHEN:  We'll get ChatGPT to do that, your Honor.

2          THE COURT:  Yes.  Fine.  I will probably -- probably,

3     I don't promise, write something brief about this, but

4     substantially for the reasons that the government has advanced,

5     insofar as the motion is to require the government to review

6     the files of the FTX debtors, it's denied.  The bill of

7     particulars is denied.

8          The part of the motion that seeks immediate production

9     of *Brady* and *Giglio* material is denied without prejudice to

10     renewal in the event that's necessary after the parties work

11     out a schedule that is mutually acceptable to them and to me.

12     The same is true for the part of the motion seeking immediate

13     production of the Jencks Act material, and the witness list,

14     with the same qualification.  The same is also true of the

15     404(b) evidence disclosure part of the motion.

16          I think, then, that takes care of it for this morning,

17     yes?

18          MR. COHEN:  (Nodding)

19          THE COURT:  I really do appreciate counsels'

20     succinctness and responsiveness.  You wrote great papers.  You

21     made good, targeted arguments.  Now it's my turn.

22          Thank you.

23          (Adjourned)

24

25