UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

        -against-

SAMUEL BANKMAN-FRIED,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22-cr-0673 (LAK)

**MEMORANDUM OPINION**
**(Corrected)**[1]

Appearances:

           Danielle R. Sassoon
           Samuel Raymond
           Thane Rehn
           Nicolas Roos
           Danielle Marie Kudla
           Assistant United States Attorneys
           Jil Simon
           Trial Attorney
           DAMIAN WILLIAMS
           UNITED STATES ATTORNEY

           Mark Stewart Cohen
           Christian R. Everdell
           S. Gale Dick
           Sri K. Kuehnlenz
           COHEN & GRESSER LLP
           *Attorneys for Defendant*

---

[1]    This Corrected Memorandum Opinion corrects only the first line of page 18 of the Memorandum Opinion (Dkt 167), substituting the word "indictment" for "defendant."

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/29/2023

2

LEWIS A. KAPLAN, *District Judge.*

Defendant Samuel Bankman-Fried is charged in a thirteen-count superseding indictment with perpetrating an alleged multi-billion-dollar fraud relating to his operation of cryptocurrency companies that he founded and controlled.[2]  The matter is before the Court on the defendant's pretrial motions to dismiss or, in the alternative, to sever certain counts, as well as for additional discovery, a bill of particulars, and pretrial disclosures.  (Dkt 136)  For the reasons that follow, the defendant's motions are denied.

*Background*

I.      *Facts*

In evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment."[3]  The following facts are drawn from the superseding indictment filed March 28, 2023 (the "S5 Indictment").

In November 2017, the defendant founded Alameda Research ("Alameda"), a quantitative cryptocurrency trading firm incorporated in Delaware, which had operations in the United States, Hong Kong, and The Bahamas.[4]  He served as CEO of Alameda from its founding until October 2021, at which time he passed the title to two Alameda employees but remained

---

[2]      *See* Dkt 115, at ¶ 1 (hereinafter "S5 Indictment").

[3]      *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

[4]      S5 Indictment ¶ 10.

Alameda's "ultimate decisionmaker" until it filed for bankruptcy in November 2022.[5]  Throughout the relevant period, he was one of two equity owners of the company.

In May 2019, while still the CEO of Alameda, the defendant founded and installed himself as CEO of FTX.com ("FTX"), a global cryptocurrency exchange that offered customers the ability to trade in cryptocurrencies and crypto derivatives, among other crypto assets.[6]  He remained CEO of FTX until the company filed for bankruptcy in November 2022.[7]

From 2019 until 2022, both Alameda and FTX grew exponentially and with them grew the defendant's public profile, political influence, and personal fortune.[8]  By 2020, FTX already had become one of the largest digital asset exchanges in the world and Alameda accounted for "roughly 5% of global volume" in digital asset trading.[9]  By 2022, FTX claimed to handle approximately $15 billion in daily trading volume on its platforms.[10]  As the two companies evolved so too did their relationship with one another, with FTX describing Alameda as the "largest liquidity provider and market maker" in the digital asset space.[11]

The defendant promoted his companies as "trustworthy and law-abiding" and assured

---

[5]     *Id.*

[6]     *Id.* ¶ 11.

[7]     *Id.* ¶ 62.

[8]     *Id.* ¶ 2.

[9]     *Id.* ¶ 10.

[10]    *Id.* ¶ 12.

[11]    *Id.* ¶ 10.

the public that the relationship between FTX and Alameda was entirely above board.[12]  As early as July 2019, two months after FTX was founded, the defendant publicly stated that although Alameda was a liquidity provider on FTX, "their account [was] just like everyone else's."[13]  He made similar public representations through and until November 2022, stating, for example, that "[t]here are no parties that have privileged access" on FTX, and that "Alameda is a wholly separate entity."[14]

   The government claims that, in reality, the defendant "[e]xploit[ed] the trust that FTX customers placed in him and his exchange."[15]  Specifically, the government alleges that he "stole FTX customer deposits[] and used billions of dollars in stolen funds for a variety of purposes, including, among other things, to support the operations and investments of FTX and Alameda; to fund speculative venture investments; to make charitable contributions; and to enrich himself."[16]  Moreover, the government alleges that he engaged in corrupt practices to advance his fraudulent schemes, including attempting to influence federal cryptocurrency regulation via tens of millions of dollars in illegal campaign contributions and conspiring to bribe one or more Chinese government officials.[17]  Ultimately, the alleged multi-billion-dollar fraud victimized FTX's customers and

---

[12]   *See id.* ¶ 2.

[13]   *Id.* ¶ 24.

[14]   *Id.*

[15]   *Id.* ¶ 1.

[16]   *Id.*

[17]   *Id.*

investors, Alameda's lenders, financial institutions, and the Federal Election Commission ("FEC").[18]

The defendant's crypto empire collapsed in November 2022 when an internet news organization leaked what appeared to be a copy of Alameda's balance sheet. The leaked document revealed that Alameda's solvency was dependent on a multi-billion-dollar valuation that Alameda assigned to its holdings of "FTT," FTX's proprietary digital currency, which was illiquid and difficult to value. This revelation triggered what was essentially a bank run, as FTX customers hurriedly sought to withdraw their funds from the FTX exchange.[19] After several failed attempts to reassure the public and to secure sufficient liquid capital to satisfy customer withdrawals, the defendant resigned from FTX on November 11, 2022, and FTX and Alameda filed for Chapter 11 bankruptcy protection.[20]

## II.    Prior Proceedings

On December 9, 2022, the defendant was charged in the original eight-count indictment, which alleged a wide-ranging fraud on FTX's customers and investors and on Alameda's lenders. That indictment accused him of wire fraud and conspiracy to commit wire fraud against FTX's customers, wire fraud and conspiracy to commit wire fraud against Alameda's lenders, and conspiracies to commit commodities fraud, securities fraud, money laundering, and

---

[18]       *Id.* ¶¶ 1, 4.

[19]       *Id.* ¶ 7.

[20]       *Id.* ¶¶ 7-9, 62.

violations of the federal campaign finance laws.[21]

On December 10, 2022, the United States provided The Bahamas with a diplomatic note, attaching an arrest warrant issued in this district for arrest of the defendant.  Both the diplomatic note and the arrest warrant listed the eight counts with which the defendant had been charged in the original indictment.[22]

On December 12, 2022, the Royal Bahamas Police Force arrested the defendant on the provisional arrest warrant.[23]  He was detained in The Bahamas until, "having considered the charges set out in the . . . [d]iplomatic [n]ote and arrest warrant," he consented to extradition on December 20, 2022.[24]  The next day, the defendant appeared in a Bahamian court to enter his consent to extradition, which the Bahamian judge accepted and ordered him detained for extradition on the counts set forth in the United States' diplomatic note.[25]  After the court proceeding, the Bahamian Minister of Foreign Affairs executed a warrant of surrender of the defendant whereupon he was taken into U.S. custody.[26]  The warrant of surrender listed seven of the eight charges in the original indictment, but omitted the charge for conspiracy to violate the campaign finance laws.[27]

---

[21]   Dkt 1, at 1-12.

[22]   *See* Dkt 137-1, at 5-6, 13.

[23]   Dkt 4, at 1.

[24]   Dkt 137-1, at 3.

[25]   *See* Dkt 137-4, at 10-11.

[26]   Dkt 137-2, at 2-3; Dkt 36, at 2.

[27]   Dkt 137-2, at 2-3.

On December 22, 2022, the defendant was arraigned on the original indictment before Magistrate Judge Gorenstein.  Since then, the government has superseded the original indictment twice with respect to the defendant, the first time on February 23, 2023 (the "S3 Indictment") and the second on March 28, 2023 (the "S5 Indictment").[28]  The S3 Indictment added four charges to those already contained in the original eight-count indictment: a substantive commodities fraud count, a substantive securities fraud count, a bank fraud conspiracy count, and an unlicensed money transmitting conspiracy count.[29]  The S5 Indictment added a count for conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), yielding a total of thirteen counts in the operative indictment.[30]

On May 8, 2023, the defendant filed seven pretrial motions, set forth in Dkt 136, to dismiss Counts One through Four, Seven through Ten, and Twelve and Thirteen in the S5 Indictment, or in the alternative, to sever Counts Twelve and Thirteen, as well as for additional discovery, a bill of particulars, and pretrial disclosures.[31]  Among the motions was one seeking dismissal of the counts added by the two superseding indictments, as well as the campaign finance charge omitted from the defendant's warrant of surrender issued in The Bahamas, on the basis of the rule of specialty, a doctrine of international law that, broadly speaking, restricts a nation that obtains a defendant by extradition from a requested state to trying the defendant only on the charges

---

[28]    Dkt 80 (S3 Indictment); Dkt 115 (S5 Indictment).

[29]    *See* S3 Indictment ¶¶ 67-68, 73-74, 80-86.

[30]    S5 Indictment ¶¶ 102-05.

[31]    *See* Dkts 136-145.

8

on which extradition was sought.  The defendant contends that dismissal of those counts is appropriate because they were not bases upon which he was extradited from The Bahamas.  The motions are fully briefed.[32]

In his reply brief, the defendant for the first time sought an alternative remedy for the alleged rule of speciality violations:  severance of the post-extradition charges as well as the campaign finance charge.[33]  By letter dated June 14, 2023, the government consented to discretionary severance of the post-extradition charges, but not the campaign finance charge, under Federal Rule of Criminal Procedure 14.[34]

On June 15, 2023, the Court heard oral argument on the motions and subsequently issued an order denying Pretrial Motion Nos. 5, 6, and 7 and severing the post-extradition charges – Counts Four, Six, Nine, Ten, and Thirteen of the S5 Indictment.  For the reasons set forth below, the defendant's remaining pretrial motions are denied either as moot or on the merits.

*Discussion*

I.    *Rule of Specialty*

The defendant moves to dismiss the post-extradition charges (Counts Four, Six, Nine, Ten, and Thirteen) and the campaign finance charge (Count Twelve, and collectively, the "At-Issue Charges") because they allegedly were charged in a manner that violates the "rule of specialty" codified in Article 14 of the "Extradition Treaty between the Government of the Commonwealth of

---

[32]       *See* Dkts 148-149 (Gov't Opp. Brs.); Dkt 158 (Def.'s Reply Br.).

[33]       Dkt 158, 25-28.

[34]       Dkt 162, at 1-2.

The Bahamas and the Government of The United States of America," signed March 9, 1990 (the "Extradition Treaty").[35]  In the alternative, he moves to sever those counts pursuant to Federal Rule of Criminal Procedure 14 and for an order requiring the government to produce all diplomatic correspondence and notes relating to his extradition.[36]

###### A.    Motion to Dismiss At-Issue Charges

The rule of specialty "generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country."[37]  Moreover, a defendant that is extradited pursuant to an extradition treaty "can only be tried for one of the offences described in th[e] treaty [under which he is extradited], and for the offence with which he is charged in the proceedings for his extradition."[38]  "As a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused."[39]  Consequently, an extraditee lacks standing to seek relief for noncompliance with an extradition treaty "unless the treaty [contains] language indicating that the intent of the treaty drafters' was that such benefits could be vindicated through private

---

[35]    *See* Dkt 139.

[36]    *See id.*, at 31-32; Dkt 158, at 25-28.

[37]    *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003).

[38]    *United States v. Barinas*, 865 F.3d 99, 104 (2d Cir. 2017) (quoting *United States v. Rauscher*, 119 U.S. 407, 430 (1886)).

[39]    *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973).

enforcement."[40]

In the present case, the Extradition Treaty provides in relevant part that an extradited defendant "may only be detained, tried, or punished in the Requesting State for the offense for which extradition was granted, or . . . any offense in response of which the executive authority of the Requested State, in accordance with its laws, has consented to the person's detention, trial, or punishment . . . ."[41]  This language is substantially similar to the U.S.-Dominican Republic extradition treaty at issue in *United States v. Barinas*, which provided that "No person[] shall be tried for any crime or offence other than that for which he was surrendered."[42]  There, the Second Circuit held that the rule of specialty could be invoked only by the Dominican Republic because the extradition treaty "[did] not state that [the] provision [could] be enforced by an individual," and there was "no language indicating that the Dominican Republic and the United States intended the Treaty to be enforceable by individual defendants."[43]

*Barinas* is dispositive.  The Extradition Treaty here at issue does not provide that it may be enforced by an individual.  Nor is there any language indicating that The Bahamas and the United States intended it to be so enforceable.  Accordingly, under the Second Circuit's binding

---

[40]

    *Barinas*, 865 F.3d at 105 (quoting *United States v. Garavito-Garcia*, 827 F.3d 242, 247 (2d Cir. 2016)) (internal quotation marks omitted); *see also id.* (internal citations and quotation marks omitted) ("Absent an express provision in the agreement between the states, any individual rights are only derivative through the states, and absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law.").

[41]

    Dkt 137-2, at 21-22.

[42]

    *Barinas*, 865 F.3d at 105 (quoting Convention Between the United States and the Dominican Republic for the Extradition of Criminals, June 19, 1909, 36 Stat. 2468, 2472).

[43]

    *Id.*

precedent, the rule of specialty may be invoked here only by The Bahamas. The defendant lacks standing to do so.

The Court notes that the United States has notified The Bahamas of the additional charges in the S5 Indictment and is seeking a specialty waiver for the post-extradition charges.[44] It concedes that The Bahamas' "response will be dispositive," and that the government will not proceed on the new counts if The Bahamas denies its request.[45]  As to the campaign finance charge – Count Eight of the original indictment and Count Twelve of the S5 Indictment – the government maintains that the rule of specialty does not apply because the "extradition record as a whole suggests that the defendant was extradited on all counts in the original indictment."[46]  Nevertheless, "[i]n an abundance of caution," the United States "has conveyed to The Bahamas its understanding that the omission of the campaign finance charge [from the defendant's warrant of surrender] was inadvertent, and informed The Bahamas that, absent timely information to the contrary from The Bahamas," it intends to proceed on that charge.[47]  The government has represented that it will not

---

[44]
    *See* Dkt 148, at 4.

[45]
    *Id.*, at 4; *see also United States v. Guzman Loera*, 24 F.4th 144, 152 (2d Cir. 2022) ("[T]o the extent there is any disagreement among the circuits about a defendant's standing to raise a specialty objection in the absence of a waiver by the extraditing nation, there is no support for granting such standing in a case like this, in which [the extraditing country] has explicitly consented to having [the defendant] tried on the instant indictment."); *United States v. Suarez*, 791 F.3d 363, 367 (2d Cir. 2015) (explaining that the defendant "would only have prudential standing to raise the claim that his sentence violated the terms of his extradition if the [Requested State] first makes an official protest").

[46]
    Dkt 148, at 13.

[47]
    *Id.*, at 14 n. 5.

proceed on the campaign finance charge if The Bahamas objects.[48]

At this time, The Bahamas has not lodged any objection to these proceedings and the Court is not aware of any response to the request for a specialty waiver or for clarification regarding Count Twelve of the S5 Indictment. The Court notes also that the defendant has a pending application in the Bahamian courts for judicial review of the Bahamian Attorney General's determination that the defendant does not have a right to be heard before The Bahamas decides whether to grant the requested specialty waiver.[49] On June 13, 2023, the Supreme Court of The Bahamas issued a ruling enjoining the Bahamian Attorney General and the Bahamian Minister of Foreign Affairs from providing consent to the government's requested specialty waiver until a final determination is made on that pending application.[50]

In all the circumstances, the defendant lacks standing to invoke the rule of specialty and his motion is denied without prejudice to a renewed motion should The Bahamas object to any of the charges brought against him.[51] The defendant's request for discovery pertaining to his extradition likewise is denied. The parties are directed to keep the Court informed regarding the status of the specialty waiver and request for clarification.

---

[48]        *Id.*

[49]        See Dkt 160, at 1; Dkt 160-1, at ¶ 81(ii).

[50]        *See* Dkt 160, at 1; Dkt 160-1, at ¶¶ 16(ix), 81(iii).

[51]        *See United States v. Ralston*, No. 19-cr-774 (JSR), 2022 WL 769257, at *4 (S.D.N.Y. Mar. 14, 2022) (denying motion to dismiss on specialty grounds where the parties agreed that the pending "decision of the extraditing countries as to waiver of the rule of specialty will be dispositive").

B.    *Request to Sever Unlawful Campaign Contributions Conspiracy Count*

In the alternative, the defendant asks to sever the At-Issue Charges and schedule them for a separate trial from the other counts in the S5 Indictment.[52]  The defendant's motion is moot as to Counts Four, Six, Nine, Ten, and Thirteen, which already have been severed by the Court's order dated June 15, 2023.[53]  His motion to sever Count Twelve of the S5 Indictment is denied for the following reasons.

The defendant moves to sever Count Twelve, which charges him with conspiring to make unlawful campaign contributions and to defraud the FEC, on two grounds.[54]  First, he argues that joinder of Count Twelve was improper pursuant to Rule 8(a) because it is not "connected with" and is not "part of a common scheme or plan" with the other charged offenses.[55]  Second, even if joinder were proper, he argues that the count should be severed pursuant to Rule 14(a) because a joint trial would be unduly prejudicial.[56]

Federal Rule of Criminal Procedure 8(a) provides for joinder of offenses that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."[57]  The Second Circuit has "interpreted Rule 8(a)

---

[52]     Dkt 158, at 25-28.

[53]     Dkt 165, at 1.

[54]     S5 Indictment ¶¶ 96-101.

[55]     Dkt 158, at 63.

[56]     *Id.*, at 25-28, 63-66.

[57]     FED. R. CRIM. P. 8(A).

as providing a liberal standard for joinder of offenses,"[58] which "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused" when multiple offenses are tried together.[59]

Under Rule 14(a), a court "may order separate trials of counts . . . or provide any other relief that justice requires" if the joinder of offenses "appears to prejudice a defendant or the government."[60] Yet because Rule 8 inherently "authorizes some prejudice," a defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice."[61] Moreover, the defendant must show substantial prejudice that is "unfair" and "sufficiently severe to outweigh the judicial economy" of a joint trial.[62] Even if prejudice is shown, Rule 14(a) does not require severance and "the relief to be granted, if any, [is left] to the district court's sound discretion."[63]

Count Twelve is joined properly with the other pre-extradition charges in this case because they are unified by a common scheme, they will require "interconnected and overlapping" evidence,[64] and the defendant has not demonstrated prejudice that would be "sufficiently severe to

---

[58] *United States v. Wilson,* 512 F. App'x 75, 76 (2d Cir. 2013).

[59] *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

[60] FED. R. CRIM. P. 14(a).

[61] *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994).

[62] *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011).

[63] *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).

[64] *Amato*, 15 F.3d at 236.

outweigh the judicial economy" of a joint trial.[65]  First, the charges are united by a common scheme to accelerate the growth of FTX and Alameda and to enrich the defendant thereby.  Count Twelve is closely related to the other pre-extradition charges because it "stemmed from" or was committed with "funds derived" from the criminal conduct charged in the other counts.[66]  Count Twelve alleges that FTX customer assets were misappropriated to fund the defendant's illegal campaign contribution scheme.  For purposes of joinder, such a connection between the "funds derived" from one offense and the commission of another offense constitutes "[t]he most direct link possible" between charges.[67]  Accordingly, there is a "sufficient logical connection" among the counts to justify joining them.[68]

Second, joinder with all of the pre-extradition counts is justified because the evidence required to prove them will be "interconnected and overlapping."[69]  Both the wire fraud counts and the campaign contributions conspiracy will require detailed evidence and analysis of the inflows and outflows from Alameda's accounts.  Moreover, it is likely that there will be substantial overlap among the witnesses called to prove Count Twelve and the remaining charges.[70]  For example, the

---

[65]

   *Page*, 657 F.3d at 129.

[66]

   *See United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016); *Turoff*, 853 F.2d at 1043.

[67]

   *Turoff*, 853 F.2d at 1043.

[68]

   *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990).

[69]

   *Amato*, 15 F.3d at 236.

[70]

   *See United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991) ("Joinder is proper where the same evidence may be used to prove each count.").

government expects Nishad Singh, who is identified as "CC-1" in the S5 Indictment, to testify regarding his involvement in the campaign finance scheme and other fraudulent schemes charged in the indictment.[71]   Thus, judicial economy will be served by joining all of the pre-extradition charges in the S5 Indictment.

Third, and finally, the defendant has not satisfied his burden of showing that joinder of Count Twelve would cause him substantial and unfair prejudice.   He argues that it is uncertain whether he will be tried on the campaign finance charge due to the government's pending request for clarification from The Bahamas.[72]   Furthermore, he claims that such uncertainty will prejudice his preparation for trial and "raise[] questions about, *inter alia*, the length of the trial, who the Government witnesses are likely to be, the likely scope of their testimony, and which documents are relevant evidence[.]"[73]   Yet, as discussed above, there is significant overlap between the witness testimony and evidence that would be relevant and admissible with respect to Count Twelve and the other pre-extradition charges.[74]   There is nothing in the record to suggest that joinder of the campaign finance charge substantially will affect the length of trial.   Moreover, the defendant has not demonstrated any unfair prejudice because the campaign finance charge was contained in the original indictment on which he knowingly and voluntarily consented to extradition over nine

---

[71]    *See* Dkt 149, at 65.

[72]    Dkt 158, at 27.

[73]    *Id.*

[74]    *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (defendant's claim of substantial prejudice was "insupportable when the evidence would have been admissible against him in a separate trial").

months prior to his October trial date.[75]  Thus, this case is distinguishable from *United States v. Ramos*, cited by the defendant, in which the court held that a defendant would be prejudiced absent severance of three counts that "were added *on the eve* of a long-scheduled, already wide-ranging trial."[76]

Accordingly, in view of the substantial judicial economy from a joint trial and the lack of unfair prejudice to the defendant, the motion for severance of Count Twelve is denied.

II.      *Failure to State an Offense*

In arguments spread across three separate motions, the defendant moves to dismiss ten of the thirteen charges in the S5 Indictment on the bases that it fails to state an offense and that its allegations are defective as a matter of law.[77]  (Dkts 140-142)  As set forth below, these motions are meritless because the S5 Indictment satisfies the pleading requirements as to all ten of those charges.

---

[75]      On December 20, 2022, the defendant signed an affidavit in which he consented to extradition on all eight counts in the original indictment, which were included in the diplomatic note and the arrest warrant from this district.  *See* Dkt 137-1, at 2 ("[H]aving considered the charges set out in the said Diplomatic Note and arrest warrant, … I hereby consent, in writing, to be extradited without formal extradition proceedings.").  The following day, the defendant reiterated his consent to extradition on all eight counts in open court in The Bahamas.  *See* Dkt 137-4, at 6-7, 10-11.

[76]      No. 06-cr-172 (LTS), 2009 WL 1619912, at *2 (S.D.N.Y. June 5, 2009) (emphasis added).

[77]      Specifically, the defendant moves to dismiss Counts One, Two, and Seven through Nine in his second pretrial motion (Dkt 140), Counts Three, Four, and Ten in his third pretrial motion (Dkt 141), and Counts Twelve and Thirteen in his fourth pretrial motion (Dkt 142).

A.      *Legal Standard*

Because "federal crimes are solely creatures of statute, . . . a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."[78]  Nevertheless, a defendant faces a "high standard" in seeking to dismiss an indictment, because Federal Rule of Criminal Procedure 7 requires that the indictment provide "only a plain, concise, and definite written statement of the essential facts constituting the offense charged."[79]  To satisfy this rule, "an indictment need 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"[80]  Only in "very rare cases" must an indictment specify "how a particular element of a criminal charge will be met."[81]  Generally, "[a]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."[82]

---

[78]       *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (internal quotation marks and citations omitted).

[79]       *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (quoting FED. R. CRIM. P. 7(c)(1)).

[80]       *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)).

[81]       *Id.*, at 125-26; *see also Pirro*, 212 F.3d at 93 (quoting *United States v. Cruikshank*, 92 U.S. 542 (1875)) ("[W]here the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.").

[82]       *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)).

At the motion to dismiss stage, the Court "accept[s] as true all of the allegations of the indictment."[83]  Moreover, the Court will not "look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for 'the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss[.]'"[84]  "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."[85] That is so because summary judgment proceedings "do[] not exist in federal criminal procedure."[86]

Dismissal of charges "is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."[87]  Moreover, the Second Circuit has deemed dismissal an "extreme sanction"[88] that has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious criminal conduct is involved."[89]  Ultimately, "[a]n indictment 'need not be perfect, and common sense and reason are more important than technicalities.'"[90]

---

[83]

    *Goldberg*, 756 F.2d at 950.

[84]

    *United States v. Scully*, 108 F. Supp. 3d 59, 116-17 (E.D.N.Y. 2015) (quoting *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998)).

[85]

    *Costello v. United States*, 350 U.S. 359, 363 (1956).

[86]

    *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021).

[87]

    *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citing *United States v. Nai Fook Li*, 206 F.3d 56, 62 (1st Cir. 2000) (en banc)).

[88]

    *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978).

[89]

    *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979).

[90]

    *Id.* (quoting *De La Pava*, 268 F.3d at 162).

B.  *Counts One, Two, Seven, Eight, and Nine Sufficiently Allege Conspiracies to Defraud*

The defendant moves to dismiss Counts One, Two, Seven, Eight, and Nine of the S5 Indictment – offenses alleged under the federal wire and bank fraud statutes – on the theory that the indictment fails to allege a valid property right.  (Dkt 140)  He claims that those counts, as pleaded, are premised on the "right to control" theory of fraud that recently was invalidated by the Supreme Court in *Ciminelli v. United States*, 598 U.S. __ (2023).[91]  The defendant's motion is meritless, however, because each of those counts tracks the relevant statutory language and sufficiently alleges a scheme to obtain money or property.

1.  *Count Nine*

Count Nine charges the defendant with conspiracy to commit bank fraud, alleging that he conspired to "obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution" by means of false representations that a bank account "would be used for trading and market making," when in fact it was used to receive and transmit FTX customer deposits and fees.[92]  To establish an offense of bank fraud under 18 U.S.C. § 1344(2), the government must prove that the defendant "had an intent to deprive the victim of money or property."[93]  Count Nine tracks the statutory language of Section 1344(2) and

---

[91]

    *See* Dkt 158, at 31.

[92]

    S5 Indictment ¶ 87.

[93]

    *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019); *see also Kelly v. United States*, 140 S. Ct. 1565, 1566 (2020) (citing *Cleveland v. United States*, 531 U.S. 12, 26 (2000)) (under federal wire fraud statute, government must prove "not only that [the defendant] engaged in deception, but that an object of [the] fraud was money or property.")

sufficiently alleges that the defendant conspired to obtain "money or property" in violation of the statute.[94]

The defendant argues that Count Nine should be dismissed because it alleges a "right to control" theory of property that is no longer viable under *Ciminelli*.[95] But *Ciminelli* is inapposite because the S5 Indictment alleges that the defendant conspired to induce a bank to open an account, which was used to receive FTX customer deposits and from which the defendant and his co-conspirators "regularly took money" from the bank's custody.[96] There is no requirement under the bank fraud statute that a scheme to obtain money or property must "create[] a risk of financial loss to the bank."[97] Rather, the Supreme Court has held that "for purposes of the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution,' at least where . . . the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds."[98] Thus, the indictment plainly alleges a scheme to obtain "money or property," not a scheme to deprive a bank of "valuable economic information."[99]

---

[94] *Stringer*, 730 F.3d at 124.

[95] *See* Dkt 140, at 9-10.

[96] S5 Indictment ¶¶ 19-23.

[97] *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014).

[98] *Shaw v. United States*, 580 U.S. 63, 67 (2016).

[99] *See Ciminelli*, 143 S. Ct. 1121, 1125 (2023) (rejecting "'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions").

Putting *Ciminelli* to one side, the defendant argues also, on the basis of a dated out-of-circuit district court case, *Alkaabi,* that Count Nine must be dismissed because the government cannot "use its motion response to amend the charging theory alleged in the S5 Indictment to one that was never presented to the grand jury."[100]  As an initial matter, the defendant has presented no evidence regarding what charging "theory" was presented to the grand jury.  In fact, he instead argues in substance that the government's theory, as described in its motion papers, is not pleaded in the S5 Indictment.  But *Alkaabi* does not support his argument that the sufficiency of the indictment is measured against the "theory" on which – really, the facts by which – the government proposes to prove its case, is not binding on this Court, and in any case would be unpersuasive here for several reasons.  First, contrary to the defendant's argument, the theory advanced by the government in its response to defendant's motion *is* alleged sufficiently in the S5 Indictment and is incorporated by reference into Count Nine.[101]  Second, the Third Circuit decision relied upon by the district court in *Alkaabi* – *United States v. Panarella*[102] – has been

---

[100]

Dkt 158, at 33 (citing *United States v. Alkaabi*, 223 F. Supp. 2d 583, 589 (D.N.J. 2002)).

[101]

*See* S5 Indictment   19-23, 85; *see also United States v. Bastian*, 770 F.3d 212, 220-21 (2d Cir. 2014) (the Second Circuit has "never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment"); *United States v. D'Amelio*, 683 F.3d 412, 422 (2d Cir. 2012) ("[T]he *specific means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense and, therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." (emphasis in original)); *United States v. Ullah*, No. 18-cr-16 (RJS), 2021 WL 21902, at *7 (S.D.N.Y. Jan. 4, 2021) ("[T]he law is clear that the inclusion of a 'to wit' clause in an indictment does not bind the government to prove the exact facts set out therein.").

[102]

277 F.3d 678, 685 (3d Cir. 2002).

limited significantly by subsequent authority.  In light of *United States v. Vitillo*[103] and *United States v. Bergrin*,[104] courts in the Third Circuit have held that "an indictment need not allege facts to provide evidentiary support for a violation of a criminal statute.  Rather, the Indictment may simply track the language of the statute while providing sufficient factual orientation to the defendant for double jeopardy purposes."[105]  This is consistent with the pleading requirements articulated by the Second Circuit, which the S5 Indictment satisfies.[106]  Third, *Bergrin* further limited *Panarella* by clarifying that the latter case "merely held that courts should 'determine whether the specific facts alleged in the charging document fall beyond the scope of the relevant  criminal statute, *as a matter of statutory interpretation*.'"[107]  The scope of such an inquiry is limited to "whether the alleged conduct *could ever be alleged* in such a fashion so as to fall within the statute's ambit."[108]  In the present case, the S5 Indictment plainly alleges conduct that could be – and has been – alleged in such a fashion so as to fall within the bank fraud statute's ambit.

Finally, the defendant argues that Count Nine must be dismissed because the S5 Indictment alleges  no nexus between the alleged misrepresentations, which induced Bank-1 to

---

[103]

490 F.3d 314 (3d Cir. 2007).

[104]

650 F.3d 257 (3d Cir. 2011).

[105]

*See United States v. Mosberg*, 866 F. Supp. 2d 275, 303 (D.N.J. 2011) (citing *Vitillo*, 490 F.3d at 321).

[106]

*See Yannotti*, 541 F.3d at 127.

[107]

*Bergrin*, 650 F.3d at 271-72. (quoting *Panarella*, 277 F.3d at 685) (emphasis in original).

[108]

*Mosberg*, 866 F.Supp.2d at 303 (emphasis added).

open an account, and the withdrawal of funds from the bank's custody.[109]  He is mistaken.

Section 1344(2) requires that a defendant "acquire (or attempt to acquire) bank property 'by means of' the misrepresentation," which "typically indicates that the given result (the 'end') is achieved, at least in part, *through* the specified action, instrument, or method (the 'means')."[110]  Yet, the Second Circuit has upheld a bank fraud charge based on facts substantially similar to those alleged in the S5 Indictment.  In *United States v. Lebedev*, the defendant "caused false information to be sent to financial institutions" and thereby opened a bank account in the name of a "front company . . . to disguise the fact that [the bank's] customers were transacting business with an unregistered Bitcoin exchange."[111]  The Second Circuit held that Lebedev made those misrepresentations "with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' accounts."[112]  The S5 Indictment alleges that the defendant conspired to send false information to a financial institution to disguise the true nature of an account and to obtain funds from that account that were in the custody and control of the financial institution.[113]  Accordingly, the indictment sufficiently alleges a nexus between the alleged misrepresentations and the defendant's alleged procurement of property from the bank.  Count Nine is legally sufficient.

---

[109]
    Dkt 158, at 34.

[110]
    *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014) (emphasis in original).

[111]
    *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019).

[112]
    *Id.*

[113]
    *See* S5 Indictment ¶¶ 14-22.

2.      *Counts One and Two*

Counts One and Two charge the defendant with conspiring to commit and committing wire fraud on FTX customers.[114]  The charges track the statutory language of 18 U.S.C. §§ 1349 and 1343, respectively, and allege that the scheme sought to "obtain[] money and property by means of false and fraudulent pretenses."[115]   Specifically, the indictment alleges that the defendant schemed to misappropriate "billions of dollars" of FTX customers' funds, including both fiat deposits and cryptocurrency assets on the FTX exchange, and used those funds "to pay expenses and debts of Alameda, and to make investments, and for other purposes."[116]   Thus, the indictment sufficiently alleges a scheme to defraud, an object of which was obtaining customer funds, which plainly constitute both "money" and "property" within the meaning of Section 1343.

The defendant argues that these counts must be dismissed because the indictment does not allege any "economic loss" to FTX customers.[117]  That is so, he argues, because the "core claim" in the indictment is that he "misused FTX customer funds by providing improper loans to Alameda," but the indictment does not allege that he "never intended to pay back the loans to Alameda."[118]

The defendant is wrong both factually and as a matter of law.  The S5 Indictment

---

[114]
     *Id.* ¶¶ 63-67.

[115]
     *Id.* ¶¶ 65, 67.

[116]
     *See id.* ¶¶ 22-24, 65, 67.

[117]
     Dkt 140, at 18-19.

[118]
     *Id.*, at 18-20.

alleges that, at the defendant's direction, "Alameda regularly took money from accounts funded by or that included funds from FTX customers" and "spent billions of dollars of those FTX customer funds, among other things, to finance Alameda's trading and expenses, to make venture investments directed by [the defendant], and to bankroll tens of millions of dollars in [strawman] campaign contributions."[119]  In so doing, the defendant "allowed Alameda to incur a multi-billion-dollar negative balance on FTX that [he] knew Alameda could not repay."[120] Thus, the defendant's assertion that the indictment does not allege any "economic loss" to FTX customers appears to be factually incorrect.  Moreover, it is immaterial as a matter of law whether the defendant intended to repay the misappropriated funds because the offense is "complete" where, as alleged here, there is an "immediate intent to misapply and defraud."[121]  Accordingly, Counts One and Two are legally sufficient.

> 3.    *Counts Seven and Eight*

Counts Seven and Eight of the S5 Indictment charge the defendant with conspiring to commit and committing wire fraud on Alameda's lenders.[122]  The charges track the statutory

---

[119]

S5 Indictment ¶ 22.

[120]

*Id.* ¶ 4.

[121]

*United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980) ("The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a defense."); *see also United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) ("The requirement under § 1343 that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the *use* of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so.").

[122]

S5 Indictment ¶¶ 80-84.

language of 18 U.S.C. §§ 1349 and 1343, respectively, and state the time and place of the alleged crimes in approximate terms.  The indictment alleges that the defendant engaged in a scheme to defraud Alameda's lenders "by providing false and misleading information to those lenders regarding Alameda's financial condition."[123]  For example, the defendant allegedly directed Alameda to repay lenders using misappropriated FTX customer funds and provided false and misleading financial statements to lenders "to mislead [them] about the money Alameda had 'borrowed' from FTX, as well as about the substantial personal loans Alameda had made to FTX executives."[124]

The defendant argues that Counts Seven and Eight should be dismissed because they fail to allege a "property interest" that could form the basis for a wire fraud offense against Alameda's lenders.[125]  But the indictment alleges that the objective of the scheme, at least in part, was fraudulently to retain "hundreds of millions of dollars in outstanding loans" following the downturn in the cryptocurrency markets in June 2022.[126]  Such allegations sufficiently allege a property interest because the "right to be paid money has long been thought to be a species of property"[127] and a defendant's scheme to "obtain or retain money by use of misrepresentations that

---

[123]

Id. ¶¶ 82, 84.

[124]

Id. ¶ 36.

[125]

Dkt 140, at 15.

[126]

See S5 Indictment ¶ 36.

[127]

Pasquantino v. United States, 544 U.S. 349, 356 (2005).

he knew were material" is a "paradigmatic scheme to defraud."[128]   Thus, the S5 Indictment sufficiently alleges that the defendant "had an intent to deprive [Alameda's lenders] of money or property."[129]


    C.    *Counts Three and Four*

       Counts Three and Four charge the defendant with conspiring to commit, and committing, commodities fraud on FTX customers in violation of 7 U.S.C. §§ 9(1) and 13(a)(5) as well as 17 C.F.R. § 180.1.   The defendant moves to dismiss these counts on two independent grounds.

       First, he claims that the government has failed to allege an "essential element" of the offense – i.e., that the fraud was "in connection with" a commodities transaction.[130]  But Count Four of the S5 Indictment plainly alleges that the defendant engaged in a scheme to defraud FTX customers "in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity."[131]   Furthermore,

---

128

    *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997), *aff'd*, 158 F.3d 166 (2d Cir. 1998); *see also Pasquantino*, 544 U.S. at 355 (wire fraud victim's right "to collect money" is "property" in its hands).

129

    *See Calderon*, 944 F.3d at 85.

    The defendant's citation to *Alkaabi* for the proposition that the government cannot "amend the S5 Indictment through its opposition brief," Dkt 158, at 36 (citing *Alkaabi*, 223 F. Supp. 2d at 589), is unpersuasive as to Counts Seven and Eight for substantially the same reasons already articulated with respect to Count Nine.  *See supra* section II.B.1.

130

    *See* Dkt 141, at 8.

131

    S5 Indictment ¶ 73.

Count Three alleges that the defendant conspired to do the same.[132]  Because Counts Three and Four track the relevant statutory and regulatory language of 7 U.S.C. §§ 9(1) and 13(a)(5), and 17 C.F.R. § 180.1(a), apprise the defendant of the nature of the accusations against him, and – when read in conjunction with the "Overview" section of the indictment, which Counts Three and Four incorporate by reference – provide notice generally of where and when the crime occurred, both counts sufficiently allege a scheme and conspiracy to defraud "in connection with" a commodities transaction.[133]

Second, the defendant argues that "the alleged conduct relevant to Counts Three and Four was predominantly foreign" and that the Commodity Exchange Act ("CEA") cannot be applied to such extraterritorial conduct.[134]  The government counters that whether an indictment alleges an impermissible extraterritorial application of a statute "is a merits question"[135] and therefore "is not a basis for dismissing an [i]ndictment, particularly where, as here, the extraterritoriality issue requires a full presentation of evidence."[136]  Extraterritoriality typically is assessed after a full presentation of the evidence at trial.[137]  Indeed, the defendant has not identified and the Court is not

---

[132]

*Id.* ¶ 70.

[133]

*See Stringer*, 730 F.3d at 124.

[134]

*See* Dkt 141, at 8.

[135]

Dkt 149, at 34 (quoting *United States v. Prado*, 933 F.3d 121, 138 (2d Cir. 2019)).

[136]

*Id.*, at 34-35 (citing *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009)).

[137]

*See, e.g.*, *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020) (holding government "presented ample evidence" at trial that charge was not extraterritorial); *United States v. Epksamp*, 832 F.3d 154, 169 (2d Cir. 2016); *United States v. Vilar*, 729 F.3d 62, 77 (2d Cir. 2013).

aware of any case in this district where an indictment has been dismissed on extraterritoriality grounds at the motion to dismiss stage.[138]  In all events, the Court need not decide whether it would be premature to dismiss the indictment on extraterritoriality grounds at this stage because the S5 Indictment alleges a "sufficient domestic nexus" for the commodities fraud and conspiracy charges "to avoid the question of extraterritorial application altogether."[139]

To determine whether a charge involves a proper "domestic application of [a] statute," courts assess "whether the domestic activity pleaded is the focus of congressional concern."[140]  The focus of the CEA is "rooting out manipulation" and "ensuring market integrity."[141]  Thus, if "the conduct relevant to *that* focus occurred abroad, . . . then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S.

---

[138]

The Court notes, however, that courts in this district have denied motions to dismiss indictments on extraterritoriality grounds on the merits, rather than on procedural grounds. *See, e.g.*, *United States v. Halkbank*, No. 15-cr-867 (RMB), 2020 WL 5849512, at *6-7 (S.D.N.Y. Oct. 1, 2020), *aff'd sub nom. United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021), *aff'd* in part, vacated in part, remanded, 143 S. Ct. 940 (2023) (denying defendant's motion to dismiss indictment on extraterritoriality grounds because "[t]he Government counters persuasively that the Indictment involves a domestic, rather than an extraterritorial, application of the [International Emergency Economic Powers Act], the bank fraud statute, the money laundering statute, and [18 U.S.C.] § 371."); *see also United States v. Sindzingre*, No. 17-cr-0464 (JS), 2019 WL 2290494, at *10 (E.D.N.Y. May 29, 2019), rev'd in part, appeal dismissed in part *sub nom. United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021) (denying defendant's motion to dismiss indictment on basis that the alleged CEA charge is "impermissibly extraterritorial").

[139]

*United States v. Mostafa Kamel Mostafa*, 965 F. Supp. 2d 451, 469 (S.D.N.Y. 2013).

[140]

*Prime Int'l Trad. v. BP PLC*, 937 F.3d 94, 102 (2d Cir. 2019).

[141]

*CFTC v. Gorman*, No. 21-cv-870 (VM), 2023 WL 2632111, at *12 (S.D.N.Y. Mar. 24, 2023) (citing *Prime*, 937 F.3d at 102-03).

territory."[142]  The ultimate question is whether sufficient "manipulative conduct or statements [were] made in the United States."[143]

Count Four alleges that the defendant committed commodities fraud "in the Southern District of New York and elsewhere."[144]  Count Three similarly alleges that the defendant conspired to commit commodities fraud and committed overt acts in furtherance of that conspiracy in this district.[145]  The indictment alleges that the defendant made false and misleading statements both in the United States and directed at U.S. customers.  For example, the indictment alleges that the defendant made misrepresentations in testimony before the United States Senate, including that FTX had a focus on "consumer protection," had adopted "principles for ensuring investor protections on digital asset-platforms," and that "as a general principle FTX segregate[d] customer assets from its own assets across [its] platforms."[146]  The defendant allegedly spent millions of dollars on celebrity endorsements that aired throughout the United States during the 2022 Super Bowl, advertising FTX.US as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[147]  Furthermore, the defendant allegedly made false and misleading statements

---

[142]

    *Prime Int'l Trad.*, 937 F.3d at 107-108 (emphasis in original) (citation and internal quotation marks omitted).

[143]

    *Id.* at 108.

[144]

    S5 Indictment ¶ 67.

[145]

    *Id.* ¶¶ 69, 71.

[146]

    *Id.* ¶ 2.

[147]

    *See id.* ¶ 2; *see also United States v. Cornelson*, 609 F. Supp. 3d 258, 266 (S.D.N.Y. 2022) (internal quotation marks and citations omitted) ("[I]t is well settled that, when reviewing an indictment, common sense must control, and . . . an indictment must be read to include

on Twitter, a U.S.-based social media platform, including that FTX customer assets were "fine," that FTX had "enough to cover all client holdings," and that FTX did not "invest client assets (even in treasuries)."[148]   In all the circumstances, the government has pleaded a sufficiently domestic application of the commodities fraud and conspiracy statutes to call for a trial of the charges on the merits.[149]

D.      *Count Ten*

Count Ten charges the defendant with conspiring to operate an unlicensed money transmitting business ("MTB") in violation of 18 U.S.C. § 1960.[150]

Section 1960 makes it a crime knowingly to conduct, control, manage, supervise, direct, or own an "unlicensed money transmitting business."[151]   It defines money transmitting as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."[152]   Thus, an "unlicensed money transmitting business" comprises (i) "a money transmitting business" that (ii) "affects interstate or foreign commerce in any manner or degree" and (iii) "fails to comply

---

facts which are necessarily implied by the specific allegations made.")

[148]      S5 Indictment ¶¶ 34, 54, 60.

[149]      *See Costello*, 350 U.S. at 363 ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits.").

[150]      S5 Indictment ¶¶ 88-91.

[151]      18 U.S.C. § 1960.

[152]      18 U.S.C. § 1960(b)(2).

with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section."[153]

Count Ten tracks the language of 18 U.S.C. §§ 1960(a) and (b)(1)(B), alleging that the defendant conspired to operate an "unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section."[154]  The indictment alleges also the approximate dates and locations where the charged conduct took place.  Accordingly, the indictment "satisfies the pleading requirements of Rule 7(c)(1)" and is "sufficient with respect to allegations that [the business] was a money transmitting business" to survive the defendant's motion to dismiss.[155]

The defendant's argument for dismissal – that the "only relevant domestic activity" alleged in the indictment was FTX's "use of a U.S. bank account"[156] – goes beyond the pleading requirements and is without merit in all events.  To understand his argument, it is helpful first to provide a summary of the complex statutory and regulatory framework underlying Count Ten.

Section 1960 refers to registration requirements that can be found under Section 5330

---

[153]

See 18 U.S.C. § 1960(b)(1)(B).

Section 1960 provides two other potential definitions of an "unlicensed money transmitting business," neither of which is charged in the S5 Indictment and therefore is not addressed herein.  See 18 U.S.C. §§ 1960(b)(1)(A), 1960(b)(1)(C).

[154]

S5 Indictment ¶¶ 89, 90.

[155]

United States v. Murgio, 209 F. Supp. 3d 698, 710-11 (S.D.N.Y. 2016).

[156]

Dkt 141, at 19.

or regulations thereunder.[157]  Section 5330 is a provision of the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*, which states in relevant part that "any person who owns or controls a money transmitting business shall register the business . . . with the Secretary of Treasury[.]"[158] Section 5330 defines a "money transmitting business" as including both (i) a "money transmitting service," which includes persons "accepting currency, funds, or value that substitutes for currency and transmitting the currency, funds, or value that substitutes for currency by any means" and (ii) "any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency[.]"[159]

      The implementing regulations for Section 5330 are administered by the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") and are found in 31 C.F.R. § 1010.100 *et seq.* (together, the "FinCEN Regulations").  The FinCEN Regulations require that "each money services business . . . register with FinCEN" unless it falls within certain enumerated exceptions.[160]  A "money services business" ("MSB") is defined as "[a] person *wherever located* doing business, whether or not on a regular basis or as an organized or licensed business concern, *wholly or in substantial part within the United States*, in one or more of the capacities" enumerated in the FinCEN Regulations.[161]

---

[157]
      *See* 18 U.S.C. § 1960(b)(1)(B) (referencing 31 U.S.C. § 5330).

[158]
      31 U.S.C. § 5330(a)(1)

[159]
      31 U.S.C. §§ 5330(d)(2), 5330(d)(1)(A).

[160]
      31 C.F.R. § 1022.380(a)(1).

[161]
      31 C.F.R. § 1010.100(ff) (emphasis added).

The defendant's motion to dismiss Count Ten relies on the language of the FinCEN Regulations that limits their scope – and accordingly the scope of Section 1960(b)(1)(B)'s registration requirement – to argue that MSBs must register only if the services they provide as an MSB occur "wholly or in substantial part within the United States."[162]  In 2011, however, FinCEN issued a final rule (the "Final Rule") stating that whether or not a "foreign-located" entity operated as an MSB "wholly or in substantial part within the United States" depends on "all of the facts and circumstances of each case, including whether persons in the United States are obtaining MSB services from the foreign-located person, such as sending money to or receiving money from third parties through the foreign-located person."[163]  Moreover, FinCEN specifically carved out certain activity as not sufficiently "substantial" to trigger the registration requirement, stating in relevant part, "a foreign-located person's mere maintenance of a bank account in the United States should not cause that person to be defined as an MSB."[164]  The defendant argues that the S5 Indictment alleges that FTX "engaged in precisely the conduct that the Final Rule provides does <u>not</u> require registration as an MSB."[165]

The defendant's argument is unpersuasive for several reasons.  First, the alleged conspiracy to operate an unlicensed MTB involved not only FTX, but also U.S.-based companies

---

[162]

Dkt 141, at 21-22 (quoting 31 C.F.R. § 1010.100(ff)).

[163]

U.S. Dep't of Treasury, FinCEN, RIN 1506-AA97, Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses, 76 Fed. Reg. 43585, 43588 (July 21, 2011) (hereinafter, the "Final Rule").

[164]

*Id.*

[165]

Dkt 141, at 23 (emphasis in original).

Alameda and North Dimension.[166]  Second, the indictment alleges that wire transfers relating to the

unlicensed MTB were received in and were transmitted through this district.[167]  Third, the indictment

alleges that the conspiracy's use of U.S. bank accounts went well beyond "mere maintenance of a

bank account in the United States."[168]  Indeed, those bank accounts were central to the money

transmitting business, which allowed FTX customers to make millions of dollars of deposits to and

withdrawals from the FTX trading platform.  Accordingly, the S5 Indictment sufficiently pleads that

a substantial part of the services provided by the alleged MTB occurred within the United States.

Accordingly, Count Ten is legally sufficient.

### E.      *Count Twelve*

Count Twelve charges the defendant with conspiring to violate federal election laws,

specifically 52 U.S.C. §§ 30122 and 30118.[169]  Section 30122 provides that "no person shall make

a contribution in the name of another person" and Section 30118 prohibits "any corporation" from

making a "contribution" to any candidate.[170]

The indictment alleges that the charged conspiracy had three objects: (i) the

defendant conspired to violate Section 30122 by scheming to make contributions that were funded

---

[166]     S5 Indictment ¶¶ 18-21.

[167]     *Id.* ¶ 91.

[168]     Final Rule at 43588.

[169]     S5 Indictment ¶¶ 96-101.

[170]     52 U.S.C. §§ 30122, 30118.

by assets from Alameda or FTX in the names of two FTX executives;[171] (ii) the defendant conspired to violate Section 30118 by making contributions in his name and the names of his co-conspirators that were funded with FTX and Alameda assets;[172] and (iii) the defendant conspired to defraud the FEC by impairing its ability to administer federal law concerning source and amount restrictions in federal elections.[173]

Count Twelve tracks the relevant statutory language and "charges [the] crime with sufficient precision to inform the defendant of the charges he must meet."[174]

F.      *Count Thirteen*

Count Thirteen charges the defendant with conspiring to violate the FCPA by bribing one or more Chinese government officials in order to regain access to Alameda trading accounts that had been frozen by Chinese law enforcement authorities.[175]  The defendant moves to dismiss this count on two independent bases: (i) the government, he argues, has failed to allege properly that any alleged bribes were paid "in order to assist [a] domestic concern in obtaining or retaining business" and (ii) venue is improper in this district.[176]

---

[171]     S5 Indictment ¶¶ 37, 98.

[172]     *Id.* ¶¶ 37, 99.

[173]     *Id.* ¶¶ 46, 100.

[174]     *Yannotti*, 541 F.3d at 127.

[175]     S5 Indictment ¶¶ 28-31, 102-05.

[176]     *See* Dkt 142, at 20 (citing 15 U.S.C. § 78dd-2(a)).

1.      *The Business Nexus Element*

First, the anti-bribery provision that the defendant allegedly conspired to violate applies where, *inter alia*, a "domestic concern," such as a U.S. resident or a resident's agent, engages in certain conduct "in furtherance of" a payment to a foreign official "to assist . . . in obtaining or retaining business for or with, or directing business to, any person."[177]  This requirement commonly is referred to as the "business nexus element."[178]

Count Thirteen tracks the statutory language of Section 78dd-2(a) and alleges that the defendant conspired to bribe one or more Chinese officials "in order to assist [the defendant], Alameda, and others in obtaining and retaining business for, and directing business to, [the defendant], Alameda, and others."[179]  Moreover, the indictment provides sufficient detail about the time, place, and nature of the alleged bribe "to inform the defendant of the charges he must meet" and to enable him to "plead double jeopardy in a future prosecution based on the same set of events."[180]  Accordingly, the indictment sufficiently pleads the business nexus element and no further inquiry into the factual allegations is required at this stage.[181]

---

[177]

15 U.S.C. § 78dd-2(a).

[178]

*See United States v. Kozeny*, 493 F. Supp. 2d 693, 705 (S.D.N.Y. 2007).

[179]

S5 Indictment ¶ 104.

[180]

*See id.* ¶¶ 6, 28-31; *Yannotti*, 541 F.3d at 127 (quoting *Stavroulakis*, 952 F.2d at 693).

[181]

*See Stringer*, 730 F.3d at 124; *see also United States v. Kay*, 359 F.3d 738, 761 (5th Cir. 2004) ("[T]he business nexus element . . . does not go to the FCPA's core of criminality" and an indictment may be sufficiently pleaded if it "paraphras[es]" the statute without alleging "details regarding what business is sought or how the results of the bribery are meant to assist").

2.    *Venue*

Second, the defendant argues that venue in this district is improper for Count Thirteen because the government has failed to allege that he was "first brought" or "arrested" in this district within the meaning of 18 U.S.C. § 3238, which governs venue for certain offenses "begun or committed" outside of the United States.[182]

Section 3238 provides that in such circumstances:

"The trial of all offenses . . . shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia."[183]

The S5 Indictment alleges that the defendant conspired with "others known and unknown, at least one of whom was first brought to and will be arrested in the Southern District of New York."[184]

The defendant argues that the "first brought" portion of Section 3238 is inapplicable in this case because it "applies only in situations where the offender is returned to the United States already in custody" in connection with the offense at issue.[185]  The defendant claims that he was brought to this district from The Bahamas in connection with the original indictment, which did not include the FCPA offense, and therefore the "first brought" provision does not apply.  Furthermore,

---

[182]

Dkt 142, at 25; 18 U.S.C. § 3238.

[183]

18 U.S.C. § 3238.

[184]

S5 Indictment ¶ 103.

[185]

Dkt 142, at 26 (citing *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984); *United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir. 2021)).

he argues that the "arrested" portion of the statute also does not apply here because – although he was arrested on the FCPA offense in this district before his arraignment on the S5 Indictment – he was in California at the time the S5 Indictment was unsealed and he "had no choice but to come" to this district to be arraigned.[186]

At this juncture, the Court need not and does not decide whether the defendant was "first brought" or "arrested" in this district within the meaning of Section 3238 because the government sufficiently alleges that "at least one" of his co-conspirators "was first brought to and will be arrested" in this district.[187]  Therefore, "[t]he question of whether there is sufficient evidence to support venue is appropriately left for trial."[188]  Accordingly, the motion to dismiss for improper venue is denied without prejudice to renewal under Federal Rule of Criminal Procedure 29.[189]

---

[186]
    Dkt 142, at 27 (citing *United States v. Hilger*, 867 F.2d 566, 568 (9th Cir. 1989)).

[187]
    *See* S5 Indictment ¶ 103; *see also United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) ("[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied.").

[188]
    *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010).

[189]
    *See United States v. Valencia Rugeles*, No. 04-cr-363 (JGK), 2007 WL 1540981, at *3 (S.D.N.Y. May 24, 2007) ("Because the Government retains the burden of establishing venue by a preponderance of the evidence at trial, the dismissal is without prejudice to renewal under Federal Rule of Criminal Procedure 29.").

*Conclusion*

The Court has considered all of the arguments of the parties.  To the extent not addressed herein, the arguments are either moot or without merit.  For the foregoing reasons, the defendants pretrial motions (Dkt 136), to the extent not previously ruled upon, are denied.

The Clerk is directed to close Dkt 136.

SO ORDERED.

Dated:      June 29, 2023

Lewis A. Kaplan
United States District Judge