

**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
+1 (212) 957-7600
mcohen@cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

August 1, 2023

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:  *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

    On behalf of our client, Samuel Bankman-Fried, we write to respond to the Government's letter filed Friday evening regarding Mr. Bankman-Fried's communications with a reporter for the *New York Times* and requesting that the Court revoke Mr. Bankman-Fried's bail. (ECF No. 184).

    In an abrupt reversal of course, the Government now asks the Court to remand Mr. Bankman-Fried based on an alleged attempt at witness tampering by responding to a reporter who ultimately wrote an article that was unfavorable to the defense, and which cast the Government's witness, Caroline Ellison, in a sympathetic light. The Government further decided to not advise defense counsel in advance of the hearing that it had changed its position based on pen register data showing nothing more than that Mr. Bankman-Fried was in frequent contact with reporters, which is his constitutional right. Still, the Government asks the Court to infer, without any evidence whatsoever, that his comments must have been designed to intimidate witnesses or improperly influence the trial. This is simply wrong.

    The Government's proffered factual basis to revoke Mr. Bankman-Fried's bail is extremely thin and relies heavily on assumptions, unsupported inferences, and innuendo. The Government recognizes that, even under its view of the facts, Mr. Bankman-Fried's contact with the *New York Times* reporter by itself is not sufficient to justify detaining him. Instead, the Government resuscitates prior instances of alleged improper conduct by Mr. Bankman-Fried—namely, his contact with Witnesss-1 and his use of a Virtual Private Network ("VPN")—which the defendant disputed at the time and the Court already addressed by imposing additional bail conditions several months ago.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 2

      The Government is wrong.  Its version of events mischaracterizes the facts and removes them from their proper context to cast Mr. Bankman-Fried's actions and intentions in the most negative light possible.  The documents that have since been provided in discovery make clear that Witness-1 initiated the dialogue with Mr. Bankman-Fried and that Mr. Bankman-Fried's message to Witness-1 was not an attempt to tamper with his testimony, but an attempt to offer himself as a resource in the bankruptcy.  Mr. Bankman-Fried used the VPN to watch football and the Government has no evidence suggesting otherwise.  And Mr. Bankman-Fried's contact with the *New York Times* reporter was not an attempt to intimidate Ms. Ellison or taint the jury pool.  It was a proper exercise of his rights to make fair comment on an article already in progress, for which the reporter already had alternate sources.  The full record reflects that Mr. Bankman-Fried acted in good faith and without any improper or corrupt intent.  This record does not support detention under either Section 3148 or 3142 of the Bail Reform Act.

      The Government's position that it had nothing to do with the article in question is implausible.  The language of the story itself, which discusses when the Government will begin preparing its trial witnesses and describes documents that were not provided to the reporter by Mr. Bankman-Fried, strongly indicates it was a source.  To the extent this is relevant to the Court's determination, the defense is entitled to a hearing on this issue.

      Furthermore, detaining Mr. Bankman-Fried based on his communications with a reporter raises serious First Amendment concerns.  As the Government concedes, criminal defendants have a right to talk to the press about their case to influence their public image and try to protect their reputation, as long as the communications are not calculated to pervert the course of justice.

      Because of the Court's concerns about the First Amendment issues at play here (Tr. 7/26/2023 Conf. at 35), we have attached an expert affidavit from Professor Laurence Tribe of Harvard Law School discussing the constitutional considerations implicated by detaining Mr. Bankman-Fried on the current record.  (Attachment 1).

      Finally, detaining Mr. Bankman-Fried at the Metropolitan Detention Center ("MDC") would make it impossible for him to fully participate in his defense.  As discussed further below, the MDC is currently in a staffing crisis, which will make it impossible for the MDC to provide sufficient access to the discovery, which is unusually voluminous and complex.  Moreover, the prison does not permit inmates to have internet access, which will cut off Mr. Bankman-Fried from key parts of the discovery entirely and render the rest effectively unreviewable.

      We respectfully submit that the "least restrictive" method to address the Government's concerns is for the Court to impose the Temporary Order Governing Extrajudicial Statements (ECF No. 180) as a final order.  The defense is willing to agree to the order given the critical need to prepare for trial without distraction and the additional burden of collateral litigation.  We would ask, although it is not a condition to our agreement, that in fairness it should be extended to witnesses as well, as provided for by Local Criminal Rule 23.1(h).

The Honorable Lewis A. Kaplan
August 1, 2023
Page 3

      1.    <u>The Government Has Repeatedly Jumped to Conclusions About Mr. Bankman-Fried's Conduct That Are Not Based in Fact.</u>

          a.    *Mr. Bankman-Fried's Contact with Witness-1 Was About Assisting with the FTX Bankruptcy Proceedings, Not Witness Tampering.*

Mr. Bankman-Fried vigorously disputes that he was attempting to "tamper" with Witness-1. The defense objected to the Government's characterization when it first raised this issue. (Tr. 2/16/2023 Conf. at 17 ("[F]or record purposes, we dispute that that's what he was trying to do with the communication with Witness 1.")). The defense did not have to litigate the issue at that time because it was resolved as a practical matter by adding a bail condition. Moreover, the defense did not have access to the full discovery, nor had we completed collecting our own client's documents. These documents contain additional messages that provide the proper context for these communications. Because the Government has once again raised this issue as part of its basis for detaining Mr. Bankman-Fried, the defense can now supplement the existing record with these additional documents.

The context makes clear that the Government's characterization is entirely inaccurate and that it has not come close to carrying its burden of showing that Mr. Bankman-Fried was seeking to influence Witness 1's testimony. Rather, Mr. Bankman-Fried's message was the last of a series of messages that he sent to Witness-1 (General Counsel of FTX US), John Ray (CEO of the FTX Debtor entities), and lawyers for Sullivan & Cromwell (counsel to the FTX Debtor entities; hereinafter "S&C") to offer his help supporting FTX's creditors in the bankruptcy.

Critically, it was *Witness-1* who first reached out to Mr. Bankman-Fried using Signal on November 10, 2022, to encourage him to "align" his efforts to "support customer assets" with efforts by Witness-1 and other in-house FTX attorneys to do the same. The sequence began with Witness-1's Signal message to Mr. Bankman-Fried, which he sent over two months before the January 15, 2023 message, and which read as follows:

> There is a natural path where the work [another FTX in-house attorney] and I are preparing for and what Sam is working on (which I understand to be attempts to support customer assets) align…. Encourage Sam and his counsel to volunteer to join a call with the SullCrom and Fenwick teams, when practical to discuss appropriate alignment.

(Declaration of Christian R. Everdell ("Everdell Decl."), Exhibit A).

A few days later, after control of the FTX Debtor entities had passed to John Ray and he had placed the entities in bankruptcy, Witness-1 again contacted Mr. Bankman-Fried by Signal, to tell him that "John [Ray] would love to hear your thoughts and talk to you / consult with you"

The Honorable Lewis A. Kaplan
August 1, 2023
Page 4

about "how to best generate value from current assets." (*Id*.). Witness-1 added that he thought there would be "meaningful upside for preserving value for the companies if you [Mr. Bankman-Fried] can be a resource for this group (and others)." (Everdell Decl., Exhibit B). Mr. Bankman-Fried enthusiastically replied that he would "love to talk to [Mr. Ray]" (*id.*) and sent a follow-up Signal message to Witness-1 when Mr. Ray did not reach out to him. (Everdell Decl., Exhibit A). Mr. Bankman-Fried also sent multiple emails to Witness-1, Mr. Ray, and several S&C attorneys offering to talk to Mr. Ray. Mr. Bankman-Fried expressed that he thought "it would be very constructive and helpful for coordination between offices and entities [in The Bahamas and the United States] for us to have a productive communicative relationship." (Everdell Decl., Exhibit B).

Despite Witness-1 encouraging Mr. Bankman-Fried to engage with Mr. Ray and the S&C lawyers, they did not reciprocate. Mr. Bankman-Fried nevertheless continued to reach out to Mr. Ray periodically over the next several weeks, in good faith, to try to establish the productive relationship he thought would benefit FTX creditors. In his emails to Mr. Ray, Mr. Bankman-Fried reiterated his desire to "work constructively" together. (*Id*.).[1]

By mid-January 2023, it had become increasingly clear to Mr. Bankman-Fried that his overtures to Mr. Ray were falling on deaf ears. On January 15, 2023, Mr. Bankman-Fried tried one more time to make contact. This time, he reached out to several S&C attorneys and also to Witness-1. Mr. Bankman-Fried contacted Witness-1 by both Signal and email (sending the same message with each) because Witness-1 had used both of those methods to communicate with him about these same issues. His message to all of them was the same message he had delivered to Mr. Ray – he was sorry that "things had ended up on the wrong foot" and he wanted to find a way to "have a constructive relationship" so that he could be helpful in the bankruptcy process. (Everdell Decl., Exhibit C). Indeed, from the time of the bankruptcy forward, Mr. Bankman-Fried was very open and clear with Witness-1, Mr. Ray, and the S&C lawyers that his main focus was to help get funds back to customers.

Seen in the proper context, it is apparent that the Government has not carried its burden of establishing that Mr. Bankman-Fried was attempting to "tamper" with Witness-1's potential testimony. Instead, in response to an overture from Witness-1, Mr. Bankman-Fried made a good faith attempt to offer himself as a resource to help support FTX's creditors in the bankruptcy – something Mr. Bankman-Fried had been trying to do repeatedly since the bankruptcy. Moreover, the notion that Mr. Bankman-Fried would try to influence Witness-1—a former

---

[1] Among other things, Mr. Bankman-Fried offered his assistance with an apparent hack of a cryptocurrency wallet belonging to Alameda in late December 2022. In typical fashion, the Government raised this issue to argue for more restrictive bail conditions, even though it offered no evidence whatsoever—only supposition—that Mr. Bankman-Fried was responsible. (ECF No. 53 at 5; Tr. 2/16/2023 Conf. at 4-5). We can only assume that the Government's investigation into this incident has revealed that Mr. Bankman-Fried had nothing to do with it.

partner at S&C and the current General Counsel at FTX US, who would certainly report any contacts to the FTX Debtor entities, its outside counsel, and the Government—makes no sense.

In fact, this is a perfect example of how the Government mischaracterizes the relevant facts by cherry-picking a particular communication, ignoring the relevant context, and imputing bad faith or nefarious motives to Mr. Bankman-Fried when no such inference is warranted. For example:

- The Government emphasizes yet again that Mr. Bankman-Fried used Signal, an ephemeral messaging application, to contact Witness-1. (ECF No. 184 at 1-2). Yet it entirely disregards that Witness-1 used Signal to contact Mr. Bankman-Fried about these issues in the first place. Hence, it makes perfect sense that Mr. Bankman-Fried would use Signal to respond. The Government also glosses over the fact that Mr. Bankman-Fried sent the same message to Witness-1 by email, which is not ephemeral. The Government further attempts to tie this Signal message to the allegations in the S5 Indictment that Mr. Bankman-Fried directed the use of ephemeral messaging applications at FTX and Alameda to facilitate the alleged fraud (which the defense disputes). *Id*. But as we pointed out in a prior motion, FTX sought and received legal advice from Fenwick & West on the use of ephemeral messaging applications, which is consistent with a lack of improper intent. (ECF No. 151 at 7).[2]

- The Government argues that Mr. Bankman-Fried was trying to influence Witness-1's testimony because he expressed that he wanted to "have a constructive relationship" and "use each other as resources" and "vet things with each other." (ECF No. 184 at 1-2). But the Government ignores that Witness-1 initiated the dialogue and that Mr. Bankman-Fried's used the same or similar language in his numerous prior communications with Witness-1, John Ray, and the S&C attorneys, which are clearly related to his desire to be a resource in the bankruptcy process. Most explicitly, on December 12, 2022, Mr. Bankman-Fried emailed Mr. Ray saying, "I have potentially pertinent information concerning future opportunities and financing for FTX and its creditors. I also believe that I have relevant financial information about FTX US" and expressing his desire to "work constructively with you . . . to do what's best for customers." (Everdell Decl., Exhibit B).

- The Government notes that in the January 15, 2023 message, Mr. Bankman-Fried suggested to Witness-1 that they "get on a phone call." (Tr. 7/26/2023

---

[2] Apparently, the Government's view is that when an FTX (and former S&C) lawyer like Witness-1 uses an ephemeral messaging application, it is innocuous, but when Mr. Bankman-Fried uses the same ephemeral messaging application, he must be up to no good.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 6

Conf. at 6). According to the Government, this must have been to allow Mr. Bankman-Fried to have "undetected communications" with Witness-1 to influence his testimony. (*Id*.). Of course, FTX in-house and outside counsel would take notes of any calls with Mr. Bankman-Fried and report them to the FTX Debtors and the Government. But setting that aside, it was typical for Mr. Bankman-Fried to offer to have a phone call, as reflected in his numerous communications with Witness-1, John Ray, and the S&C attorneys. (Everdell Decl, Exhibits A-C). Furthermore, Mr. Bankman-Fried wrote to Mr. Ray on December 12, 2022, "I would love to talk to you, whether it's via email or phone," making it clear that he was happy to have the conversations on a recorded medium. (Everdell Decl., Exhibit B).

This record of Mr. Bankman-Fried's contact with Witness-1, now supplemented with additional communications that give the Court the proper context, does not support any inference of bad faith or improper intent. And for the reasons discussed in more detail below, it certainly does not support a finding of probable cause that Mr. Bankman-Fried committed the crime of witness tampering, much less a finding of clear and convincing evidence that there is a "serious risk" he will engage in witness tampering in the future.

> b. *Mr. Bankman-Fried, in Fact, Used a VPN to Watch Football and the Government Has No Evidence to Suggest Otherwise.*

As part of its effort to cobble together a basis for detention, the Government once again references Mr. Bankman-Fried's brief use of a VPN over six months ago, asserting that it was an attempt to prevent the Government from monitoring his internet activity. (ECF No. 184 at 2). The defense objected to this characterization when this issue was first raised and explained that Mr. Bankman-Fried used a VPN to access a subscription service, which he had purchased while he was a Bahamian resident, to watch the NFL playoffs and the Super Bowl. (Tr. 2/16/2023 Conf. at 19). The Government proffers no evidence to challenge Mr. Bankman-Fried's explanation for the use of the VPN, and instead offers only innuendo that Mr. Bankman-Fried's explanation is "unverifiable." (ECF No. 184 at 2). In fact, Mr. Bankman-Fried's account is entirely borne out by the record. The Government notes that the VPN was used on two dates: January 29, 2023, and February 12, 2023. (*Id*.). Those were the dates of the NFC and AFC Championship games and the Super Bowl, respectively.

Moreover, the Government's characterization of VPNs as inherently deceptive is erroneous. In fact, they are standard workplace *security* measures and are commonly used by companies—and the Government itself—to provide employees remote access to internal networks. Indeed, in response to his VPN usage, the Government requested new, stricter bail conditions which *require* Mr. Bankman-Fried to use a VPN to make it easier to track his behavior. Similarly, the FTX Debtors have insisted that Mr. Bankman-Fried use a VPN to access the AWS database for security purposes. The VPN episode therefore does not support a

The Honorable Lewis A. Kaplan
August 1, 2023
Page 7

finding that Mr. Bankman-Fried must be detained, especially when any concern about VPN usage has already been addressed by other bail conditions.

    c. *Mr. Bankman-Fried's Contact with a New York Times Reporter Was Not an Attempt to Intimidate a Witness or Taint the Jury Pool.*

  The only new issue before the Court is what gave rise to this latest round of bail litigation; namely, Mr. Bankman-Fried's contact with a reporter from the *New York Times* concerning an article about himself and Caroline Ellison that was published on July 20, 2023. The article was one of thousands of articles mentioning Ms. Ellison, as well as her relationship with Mr. Bankman-Fried, that have been published since the FTX bankruptcy. The article was ultimately favorable to Ms. Ellison and unfavorable to Mr. Bankman-Fried. The defense has already provided the Court with the factual background of Mr. Bankman-Fried's communications with the reporter as well as copies of the documents that he shared, none of which were produced in discovery and therefore were not covered by the protective order. For the sake of brevity, we will not repeat all of the facts here. However, now that the Government is relying on this as a basis to revoke Mr. Bankman-Fried's bail, a few points bear emphasis.

  First, the Government has not shown under any standard that Mr. Bankman-Fried's intent in speaking to the reporter was to "intimidate" or "discredit" Mr. Ellison or "taint" the jury pool. The reporter contacted Mr. Bankman-Fried about an article he was already writing that featured Ms. Ellison's personal diaries and writings. The reporter was already aware of these documents because he had written an article two months earlier in which he described Ms. Ellison's writings and reported that they contained her "raw reflections on SBF" and her "personal and professional resentment" towards him.[3] Hence, Mr. Bankman-Fried shared copies of writings that the reporter apparently already knew about, and which were not produced in discovery, to give his perspective and protect his reputation. In no way does this support a finding that Mr. Bankman-Fried acted in bad faith to intimidate or corruptly influence Ms. Ellison. Rather, it was a permissible exercise of Mr. Bankman-Fried's First Amendment right to make fair comment on a media story about himself.[4]

  Second, although the Government suggests that Mr. Bankman-Fried was the source for the earlier disclosure of Ms. Ellison's writings to the *New York Times* reporter, the Government offers no compelling evidence to substantiate that claim. (Tr. 7/26/2023 Conf. at 5). The Government instead asserts that because Mr. Bankman-Fried had several phone conversations with the reporter, it has "every reason to believe that he was a source for that article as well."

---

[3] *See* David Yaffe-Bellany and Matthew Goldstein, *Emails, Chat Logs, Code and a Notebook: The Mountain of FTX Evidence*¸ N.Y. Times (May 23, 2023), *available at* https://www.nytimes.com/2023/05/23/technology/ftx-evidence-sam-bankman-fried.html.

[4] Furthermore, it is hard to imagine how publication of documents in question could intimidate Ms. Ellison against testifying. She has already fully committed to doing so, having pled guilty pursuant to a cooperation agreement.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 8

(*Id*.).  But innuendo is not evidence.  In fact, it seems apparent that the Government or its agents were the source for at least some of the disclosures to the reporter.  The July 20, 2023 article reports that "[p]rosecutors are expected to begin preparing at least some witnesses in August, two people with knowledge of the matter said."[5]  That information could only have come from the Government.  Also, Mr. Bankman-Fried was not the source for Ms. Ellison's writings about Modulo Capital, in which (according to the recent article) she expresses "jealousy and resentment towards Modulo."[6]  That description came from "two people who have seen the documents," neither of whom are Mr. Bankman-Fried.

Third, it is implausible that the jury pool could have been tainted by this one article.  Indeed, the published article was unfavorable to Mr. Bankman-Fried.  As we pointed out in our prior submission, more than 1 million articles mentioning FTX have been published since the bankruptcy.  The overwhelming majority of them have been negative towards Mr. Bankman-Fried.  The Government is at least partially responsible for this deluge by repeatedly using the press to tout its evidence against Mr. Bankman-Fried.[7]  Hence, when the *New York Times* reporter approached Mr. Bankman-Fried to discuss an article he was writing about Mr. Bankman-Fried and Ms. Ellison, he had every reason to expect that the article would once again be negative.  It was in this context that Mr. Bankman-Fried engaged with the reporter to protect his reputation.  Not surprisingly, the published article was unfavorable to Mr. Bankman-Fried and favorable to Ms. Ellison.  Hence, any purported "taint" to the jury pool (and we dispute that there has been any), has been to the detriment of Mr. Bankman-Fried.

Fourth, the Government's point that Mr. Bankman-Fried had hundreds or even thousands of recent contacts with reporters—which apparently is what caused the Government to change its position and seek detention—is not evidence of misconduct.  Mr. Bankman-Fried has every right to speak to as many reporters as he likes, as often as he wants, as long as he is not seeking to pervert the course of justice.  If conduct is permitted, then doing it a lot does not make it wrong.

The record therefore does not support a finding of probable cause that Mr. Bankman-Fried engaged in witness tampering, nor is there clear and convincing evidence of a "serious risk" that he will attempt to intimidate a witness in the future.  Detention is unwarranted.

---

[5] David Yaffe-Bellany and Matthew Goldstein, *Inside the Private Writings of Caroline Ellison, Star Witness in the FTX Case*, N.Y. Times (June 20, 2023), *available at* https://www.nytimes.com/2023/07/20/technology/ftx-caroline-ellison-bankman-fried.html.

[6] *Id*.

[7] *See, e.g.*, David Yaffe-Bellany and Matthew Goldstein, *Emails, Chat Logs, Code and a Notebook: The Mountain of FTX Evidence*, N.Y. Times (May 23, 2023), (touting "the mountain of evidence [which] ranks among the largest ever collected in a white-collar securities fraud case prosecuted by the federal authorities in Manhattan"), *available at* https://www.nytimes.com/2023/05/23/technology/ftx-evidence-sam-bankman-fried.html.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 9

        2.      <u>The Government's Proffer Does Not Support Revocation of Mr. Bankman-Fried's Bail under the Bail Reform Act</u>.

In support of its theory that Mr. Bankman-Fried "tampered" with witnesses, the Government proffers evidence that consists of innuendo, speculation, and scant facts, as discussed above. The Government's showing is a far cry from the evidence presented in cases in this district where remand has been ordered in connection with alleged witness tampering, and in no way supports revocation of Mr. Bankman-Fried's bail under Sections 3148 or 3142 of the Bail Reform Act.

        *a.*      *Remand is Improper Under 18 U.S.C. 3148(b).*

In order to revoke a defendant's pretrial release under Section 3148(b), the court, after a hearing, must make the following two findings: *first*, that there is "probable cause to believe" that the defendant has committed a Federal, State or local crime while released on bail. 18 U.S.C. § 3148(b)(1)(A).[8] Probable cause under this section demands a "practical probability" that the evidence supports a finding that the defendant has committed a crime while released. *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000) (internal quotations omitted). And *second*, that there is either "no condition or combination of conditions of release" that will assure that the defendant will not flee or pose a danger to the safety of any person or the community; or that the defendant is "unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B). If probable cause is found, this raises a rebuttable presumption that no conditions will assure that the defendant will not pose a danger to the safety of the community. 18 U.S.C. § 3148(b)(2)(B). However, where the court finds that there are conditions of release that will assure the safety of the community, the court may amend the conditions of release accordingly. *Id.*

Revisiting issues that were addressed months ago and resolved on a practical basis without the need for further litigation, the Government now claims that Mr. Bankman-Fried has "twice attempted" to commit witness tampering in violation of 18 U.S.C. § 1512(b). (ECF No. 184 at 6). Section 1512(b) provides that a person engages in witness tampering when he or she "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to – (1) influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b). "To 'corruptly persuade' means to act knowingly with a wrongful or evil purpose to convince or induce another person to engage in certain conduct." 2–46 Leonard B. Sand et al., Modern Federal Jury Instructions–Instruction 46-58 (2015); *see also Arthur Andersen LLP v. U.S.*, 544 U.S. 696, 706 (2005) ("Only persons conscious of wrongdoing can be said to knowingly . . .

---

[8] The Government does not argue that there is "clear and convincing evidence" that Mr. Bankman-Fried has violated "any other condition" of his release on bail. *See* 18 U.S.C. § 3148(b)(1)(B). Nor could it. Mr. Bankman-Fried has precisely followed the terms of each of his bail orders since his arraignment in December 2022, even as the terms of those orders have become progressively more complicated and restrictive.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 10

corruptly persuad[e].") (internal quotation marks omitted). There is no evidence supporting probable cause to believe that Mr. Bankman-Fried engaged in any conduct over the past six months that fits the definition of witness tampering.

The Government first complains that Mr. Bankman-Fried's message to Witness-1 on January 15, 2023, was "an attempt to corruptly persuade that witness to 'vet things with each other.'" (ECF No. 184 at 6). The Government's proffer on this point is the same as it was when it raised this issue February – it points to the text of the message itself and the fact that Mr. Bankman-Fried was Witness-1's "boss" prior to FTX's bankruptcy filing in November 2022—an event which had occurred two months *before* this message was sent. *Id.*

The Court has previously described this message as an attempt by Mr. Bankman-Fried to coordinate with Witness-1 so that they will "sing from the same hymn book." (ECF No. 58 at 5). But the Court reached that determination before being presented with the surrounding context, which the defense has since received in discovery and now presented to the Court. Moreover, the issue was not fully litigated at the time, because it was resolved as a practical matter with a bail condition.

The additional context explained above makes clear that the dialogue was initiated by Witness-1 and the message to Witness-1 was a genuine offer of assistance in connection with the bankruptcy process that was unfolding for FTX; indeed, Mr. Bankman-Fried sent similar messages to John Ray and the S&C attorneys and had repeatedly expressed his desire to be of assistance to the FTX debtors. The purpose of the messages to Witness-1 and Mr. Ray was benign: to open a line of communication with the new top leadership at FTX in order to assist with asset recovery. There is simply no "practical probability" that Mr. Bankman-Fried contacted Witness-1—the former General Counsel of his company, whom he had no control over and whom Mr. Bankman-Fried knew and intended would share his message with debtors' counsel at S&C—in order to corruptly influence Witness-1's potential testimony.

For its second, equally flawed, theory of witness tampering, the Government contends that Mr. Bankman-Fried's showing of certain documents to a *New York Times* reporter was intended to "intimidate and corruptly persuade" Ms. Ellison with respect to her testimony, and more broadly "influence or prevent" the testimony of other potential witnesses. (*See* ECF No. 184, at 7; 18 U.S.C. § 1512(b)). The Government also raises a new theory, unmentioned at the hearing on July 26, 2023, that Mr. Bankman-Fried's actions "intentionally harass[ed]" Ms. Ellison in order to hinder, prevent or dissuade her from testifying in violation of 18 U.S.C. § 1512(d).

Mr. Bankman-Fried's actions do not constitute witness tampering under 18 U.S.C. § 1512. Prior to July 26, 2023, Mr. Bankman-Fried's bail conditions did not prohibit him from meeting with and speaking to members of the press, or publicly sharing materials that were not subject to the Government's protective order. (*See* ECF No. 118). The Government points to no

The Honorable Lewis A. Kaplan
August 1, 2023
Page 11

case law, and defense counsel is aware of none, where a defendant's provision of newsworthy information to a journalist has ever been construed as witness tampering. Nor do Mr. Bankman-Fried's actions implicate the provisions of Local Criminal Rule 23.1. (*See* ECF No. 178). The Government argues that witness tampering can be accomplished through an intermediary, citing *United States v. Amato* in support. But its reliance on *Amato* is misplaced because the context was dramatically different. There, the "intermediary" was not a journalist but an associate of the Gambino crime family, and the information conveyed was not a news article, but a "message" to a cooperating witness that he was a "rat." 86 F. App'x 447, 450 (2d Cir. 2004).

For both purported instances of witness tampering, the Government's proffered evidence is also plainly insufficient or unreliable to demonstrate probable cause. Although parties may proceed by proffer in bail hearings, the court must nonetheless "ensure the reliability of the evidence, by 'selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question.'" *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (quoting *United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986)). Moreover, it is not sufficient for the government's proffer to simply state in "general and conclusory terms what it hope[s] to prove," without referring to any "independent evidence, such as tapes, documents, or photographs," or providing any testimony or affidavits. *Id.* (quoting *Martir*, 782 F.2d at 1147).

The proffer in *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000) provides an instructive contrast to the Government's showing here. In finding probable cause that the defendant had engaged in witness tampering while released on bail, the *LaFontaine* court observed, among other things, that the defendant had **already been indicted for witness tampering** in a superseding indictment (*id.* at 129); the defendant had admitted to meeting with the witness, which was also a violation of her conditions of release (*id.* at 132); the tampered-with witness was the source for the government's proffer (*id.* at 129); and the government submitted extrinsic evidence of witness tampering, including a recorded conversation between the defendant and witness. *Id.* at 131; *cf. United States v. Brown*, No. 10-CR-230S, 2012 WL 4103857 (W.D.N.Y. Sept. 17, 2012) (finding probable cause where defendant had been charged with witness tampering in a superseding indictment, an informant passed evidence of witness tampering to law enforcement, and the defendant had been intercepted with cash attempting to rendezvous with and bribe the informant). No such evidence has been proffered here. On the record before the Court, there is no probable cause to believe that Mr. Bankman-Fried has committed any crime while released on bail.

Even if the Court were to find probable cause that Mr. Bankman-Fried committed a felony while released on bail, that would raise a rebuttable presumption that no conditions of release would assure that Mr. Bankman-Fried would not pose a danger to the safety of the community. 18 U.S.C. § 3148(b)(2)(B). This presumption would be readily rebutted by the terms of the Government's own proposed conditions of release submitted last week, a version of which are temporarily in effect. (*See* ECF No. 179-1 & ECF No. 180). These stringent

conditions build on the already extensive restrictions on Mr. Bankman-Fried while he awaits trial under house arrest. These bail conditions will preclude the types of press contacts that form the basis of the Government's present concerns and are the least restrictive conditions that will ensure the safety of the community. *See* 18 U.S.C. § 3142(c)(1)(B).

The Government will also fail to demonstrate that Mr. Bankman-Fried is "unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B). To date, Mr. Bankman-Fried has carefully followed the detailed terms of his bail orders, as modified over time. While alleging that Mr. Bankman-Fried exploited "gaps" in his release conditions, the Government does not argue that Mr. Bankman-Fried has violated his conditions of release. Nor could it. As an example, the visit from the *New York Times* reporter followed the bail conditions to the letter, with a security guard present and the reporter signing the electronic visitor log. It is therefore unclear on what basis Government maintains that Mr. Bankman-Fried is "unlikely" to abide by his conditions going forward. Tellingly, the cases the Government relies on for this point in their letter involved defendants who, unlike Mr. Bankman-Fried, had repeatedly violated their conditions of release. *See United States v. Fortunato*, 51 F. App'x 350, 350-52 (2d Cir. 2002) ("The government proffered extensive evidence of Fortunato's repeated violations of the terms of his release."); *LaFontaine*, 210 F.3d at 135 n.6 ("LaFontaine had previously disregarded court orders to stay away from Reyes Jr. and her latest violation of the trial process . . . would tend to suggest that she would do so again.") .

The Court therefore must deny the Government's request to detain Mr. Bankman-Fried under Section 3148 because there is no probable cause to believe that he has tampered with witnesses while released on bail, and conditions of release do exist which will continue to ensure against any danger to the community.

        b.        *Remand is Improper Under 18 U.S.C. § 3142.*

Under the Bail Reform Act, a defendant shall be granted pretrial release unless the court determines after a hearing that "no condition or combination of conditions" will reasonably ensure the defendant's appearance and the safety of the community. 18 U.S.C. §§ 3142(b) & (e). Where, as here, the government seeks pretrial detention on the basis that a defendant may "tamper" with witnesses, the government must show by clear and convincing evidence that (1) there is a "serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror," and (2) that no conditions of release can reasonably address this concern. 18 U.S.C. § 3142(f)(2)(B); *see United States v. Leon*, 766 F.2d 77, 82 (2d Cir. 1985) (applying clear and convincing standard when determining "serious risk" of witness tampering). To meet its burden that no conditions of release will ensure the safety of the community, the government must provide clear and convincing evidence under the factors in Section 3142(g), including "the nature and circumstances of the offense charged;" "the weight of the evidence against the person;" "the history and characteristics of the person;" and "the nature and seriousness of the

danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). "[I]n a case involving threats to witnesses, evidence of such threats is a significant factor [under Section 3142(g)]." *Leon*, 766 F.2d at 81–82.

Revocation of Mr. Bankman-Fried's bail under Section 3142(f) is improper because the Government has failed to show, by clear and convincing evidence, that there is a "serious risk" that Mr. Bankman-Fried will "threaten, injure, or intimate or attempt to threaten, injure, or intimidate, a prospective witness," and that, even if such a serious risk existed, that no combination of conditions of release could ensure the safety of the community. "[I]n order to warrant detention, the government must prove that going forward there is not just a risk, but 'a serious risk', of obstruction of justice or witness tampering by threats or intimidation." *United States v. Vendetti*, 2011 WL 720197 (W.D.N.Y. Feb. 22, 2011) (declining to revoke defendant's bail); *see also United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009) ("The question is not simply whether [the defendant's] actions can be considered obstruction, but whether there is a *serious risk* of obstruction in the future. The statute, by its nature, is always looking forward.") The Government appears to assume, without making any showing by clear and convincing evidence, that Mr. Bankman-Fried presents a "serious risk" of witness tampering. On this basis alone the Court should deny the Government's motion under Section 3142.

Taking for granted the "serious risk" of Mr. Bankman-Fried's release on bail, the Government proceeds to argue that the "totality of facts to date" shows by clear and convincing evidence that no release conditions will ensure against a risk of witness tampering going forward. (ECF No. 184 at 9). These arguments fall apart under light scrutiny. Under Section 3142(g)(1) (nature and circumstances of the offense charged) the Government argues that Mr. Bankman-Fried is facing a "slate of serious charges" that expose him to a potentially lengthy sentence. But the extent of the charges against Mr. Bankman-Fried has not increased since the Court's last modifications of Mr. Bankman-Fried's bail in March and April 2023, and the Government does not explain why the Court should weigh the charges differently now. On the contrary, the number of charges on which Mr. Bankman-Fried faces trial has *decreased* given the Government's submission that it "does not intend to proceed to trial on the campaign contributions count." (*See* ECF No. 181). Under Section 3142(g)(2) (weight of the evidence against the defendant), the considerations have similarly not changed since the Court's last modification of bail. And the Government does not argue any facts under Section 3142(g)(3) (the history and characteristics of the defendant), conceding that this factor does not weigh in favor of remand.

The final consideration under Section 3142(g)(4) (nature and seriousness of danger to the community) also does not support revocation of Mr. Bankman-Fried's bail. The Government relies extensively on the reasoning in *LaFontaine* to argue that Mr. Bankman-Fried's alleged witness tampering is a danger to the community and that no bail conditions will be sufficient. (*See* ECF No. 184 at 9-10). But *LaFontaine* addressed revocation of bail under a preponderance of the evidence standard under Section 3148, not the clear and convincing standard that the

The Honorable Lewis A. Kaplan
August 1, 2023
Page 14

Government must meet under Section 3142(f).  *Cf. United States v. Gotti*, 794 F.2d 773, 777–78 (2d Cir. 1986) ("[T]he government must prove the facts underlying danger to the community or to any other person by clear and convincing evidence [under] 18 U.S.C. § 3142(f) . . . [W]e do not believe that the government bears the same burden under § 3148(b)(2) when it seeks to revoke bail even if, as is the case here, it does so to prevent tampering with witnesses before trial.")  In any event, as discussed above, the factual basis for witness tampering in *LaFontaine* was considerably more extensive and substantiated than what the Government proffers here.

Mr. Bankman-Fried's situation more closely aligns with that presented in this Court's decision in *United States v. Stein*, 2005 WL 8157371 (S.D.N.Y. Nov. 14, 2005).  There, the government proffered the anticipated testimony of a cooperating witness who the government said would testify to the defendant participating in various fraudulent activities.  The government also proffered that after the defendant became aware of an investigation into his activities, he asked the cooperating witness to sign documents using different pens to create a false impression that they were signed at different times.  The government maintained that this demonstrated a danger to the community. *Id.* at *2.  While agreeing "in principle" that nonviolent witness tampering may pose a danger to the community, this Court declined to find that this danger could not be addressed by conditions of release:

> [T]he Court is not persuaded by clear and convincing evidence that a release of Greenberg pending trial could not be conditioned in a manner that would probably eliminate, and in any case greatly diminish, the risk of witness tampering or obstruction. Greenberg therefore will not be detained on the ground that his release would create a danger to the community.

*United States v. Stein*, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005).

In sum, the Government fails to meet its heavy burden under Section 3142(f)(2)(B) to show by clear and convincing evidence that Mr. Bankman-Fried poses a "serious risk" of witness tampering and that no combination of conditions will address the danger he allegedly poses to the community.  The Government's motion to revoke Mr. Bankman-Fried's bail must therefore be denied.  *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009) (denying motion to revoke bail).

3. <u>The Government's Expectations Regarding Communications with the Press are Incompatible with the First Amendment</u>.

As Professor Tribe explains in his expert affidavit (attached as Attachment 1), controlling First Amendment case law unambiguously affords Mr. Bankman-Fried the right to comment publicly on charges levied against him including statements about his accuser that implicate his own reputation.  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1058 (1991) ("[I]n some circumstances press comment is necessary to protect the rights of the [accused]"); *New York Times*

The Honorable Lewis A. Kaplan
August 1, 2023
Page 15

*Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (holding that "a defense of fair comment must be afforded for honest expression of opinion based upon . . . true[ ] statements of fact").

Under the Government's formulation, a defendant could never speak to the press because there is always some chance that doing so will impact the jury pool or a witness. For example, if a reporter were to ask a defendant if a witness' allegations about him are true, any denial of the allegations would imply that the accusers were lying and thereby constitute an effort to discredit and intimidate that witness or influence potential jurors. The same logic would apply any time a defendant spoke about his case—the very reason reporters would want to talk to him—such that a defendant could never speak to the press. This is not the law. *Gentile*, 501 U.S. at 1043 (a defense does "not begin inside the courtroom door" and one "cannot ignore the practical implications of a legal proceeding" for the accused); *Sheppard v. Maxwell*, 384 U.S. 333, 349-50 (1966) ("The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials' . . . A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field.") (internal citations omitted).

*Gentile* offers a useful example. In *Gentile*, the defense attorney professed his client's innocence at a press conference, where he provided very specific statements about the witnesses and the evidence that go far beyond anything alleged here. Among other things, he suggested that one of the police detectives was the real perpetrator and argued that the corroborating witnesses were not credible due to their own criminal histories. *Gentile*, 501 U.S. at 1063-64. In reversing the finding of disciplinary action against the attorney, the Court held that "[i]t cannot be said that petitioner's conduct demonstrated any real or specific threat to the legal process, and his statements have the full protection of the First Amendment." *Id.* at 1058.

The statements the Supreme Court held to be acceptable in *Gentile* were at least as "prejudicial" as the statements the Government now challenges here. Unlike *Gentile*, where the attorney made statements directly contradicting the indictment and impugned the credibility of key witnesses, here Mr. Bankman-Fried did not express any opinions as to Ms. Ellison's credibility or guilt. He merely showed a reporter Ms. Ellison's own prior writings, which the reporter apparently already possessed from other sources. The documents were then quoted in the published article, which ultimately painted Ms. Ellison in a favorable light and Mr. Bankman-Fried in a negative light. Remanding Mr. Bankman-Fried on this record would not only be unjust, it would "represent[ ] a limitation of First Amendment freedoms greater than is necessary or essential to the protection of the particular governmental interest." *Gentile*, 501 U.S. at 1058; *see also New York Times Co.*, 376 U.S. at 280.

To the extent the Court remains concerned that extrajudicial statements could interfere with a fair trial, the remedy is not to detain the defendant, which would have the effect of chilling free speech. Instead, it is to screen potential jurors through extensive *voir dire* and/or to impose a gag order on the parties—nothing more. *Gentile*, 501 U.S. at 1039; *Sheppard*, 384 U.S. at 359-

The Honorable Lewis A. Kaplan
August 1, 2023
Page 16

60; *see also* Rule 23.1(h) (authorizing Court to issue "a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury"). That is the remedy the Government had previously found sufficient and to which the defense consents.

    4.    <u>If He Were Detained, Mr. Bankman-Fried Would Be Unable to Prepare for Trial</u>.

If Mr. Bankman-Fried is remanded, he will be unable to participate in his defense in violation of his Sixth Amendment rights. *United States v. Tigano*, 880 F.3d 602, 618 (2d Cir. 2018). The volume of discovery in this case is potentially unprecedented. To date, the Government has produced over **4.3 million documents** (over **13.2 million pages**) in electronic discovery and roughly **4.5 terabytes of data**. Mr. Bankman-Fried is spending significant time, seven days a week, reviewing the discovery on his computer and sharing his thoughts and analysis with his lawyers via phone, email, zoom, and Google Docs. If he is detained, he will lose access to the Internet entirely, as well as significant portions of the discovery that can only be accessed in the cloud, and his access to a computer and his attorneys will be significantly curtailed. Put simply, Mr. Bankman-Fried cannot prepare for trial without uninterrupted access to an internet-enabled computer, which he will not have in the Metropolitan Detention Center ("MDC").

The Government offers boilerplate assurances that it "has plenty of experience coordinating with the MDC and the other prisons to get access to discovery to detained defendants." (Tr. 7/26/2023 Conf. at 27). But this assertion is meaningless. There is no way for the Government to ensure that Mr. Bankman-Fried will have sufficient access to the discovery and to his attorney to adequately prepare for trial. This is not about white collar defendants getting "special treatment" because their cases involve numerous documents, as the Government claims. For any case (white collar, blue collar, any collar) this is an historic amount of discovery, which requires a level of computer assisted access that is not possible in the MDC.

We begin first with his computer access. Inmates at the MDC typically do not have their own computers and have limited access to communal computers located in the law library. Although judges can order pretrial detainees to be given their own computer to review discovery, that does not solve the problem. Inmates are not allowed to keep their computers in their housing units. If they want to use their computers, they must be escorted by prison guards to the visitor room. But as the Court may be aware, there is currently a staffing crisis at the MDC and staffing levels are well below full capacity. (*See* Everdell Decl., Exhibit D.) Because of this staffing shortage, the MDC cannot cover basic prisoner movements and routinely locks detainees in their units with no ability to go to the visitor room. Hence, it is a virtual certainty that if Mr. Bankman-Fried is detained, his computer access will be a fraction of what he needs to prepare for trial.

Next, there is the problem of Internet access. Even if Mr. Bankman-Fried were given his own laptop, the MDC does not permit any computers used by inmates to have Internet access. The discovery in this case is housed on an online Relativity database, which requires an Internet-

The Honorable Lewis A. Kaplan
August 1, 2023
Page 17

enabled computer to access. While it may be possible to convert the discovery files to a different format so that the documents can be loaded onto a series of external hard drives that could be plugged into a laptop, that process would likely take weeks. But even then, substantial problems would remain. For example:

- Mr. Bankman-Fried would lose access entirely to the AWS database housing the FTX transactional database. This is a key portion of the discovery because it contains records of every financial transaction ever completed on the FTX exchange. For security reasons, the FTX Debtor entities have insisted that Mr. Bankman-Fried may only access the database online (using a VPN). The MDC would not permit this.

- Although most of (but not all of) the discovery could be downloaded to hard drives, the documents would no longer be indexed and searchable in that format. Given the enormous volume of discovery in this case, the only feasible way to review it is to use searches to isolate relevant documents. Indeed, the Government implicitly conceded this point in its opposition to our motion for a bill of particulars when they asserted that such relief was not necessary because the discovery was "well-indexed and searchable." (ECF 149 at 68, 74-75). If Mr. Bankman-Fried loses the ability to search the discovery, it becomes effectively unreviewable for him.

- The Government has designated certain critical discovery materials, including a 60-page *Brady* disclosure, as Attorneys' Possession Only ("APO"). We expect that the Government is likely to designate as APO material the Jencks Act disclosures they are scheduled to produce three weeks before trial, and which are likely to be voluminous. If Mr. Bankman-Fried is detained, it will make it extremely difficult to review these materials with him in time to prepare for trial.

Finally, there is the issue of access to counsel. If he is detained, Mr. Bankman-Fried would lose all Internet-enabled communication with his lawyers, including Zoom and Google Docs. At this point, roughly two months out from trial, defense counsel are in daily contact with Mr. Bankman-Fried, often multiple times a day. Given the complexity of the case, these discussions are critical for the preparation of the defense. If he is detained, Mr. Bankman-Fried's access to counsel will be significantly curtailed, which will hobble his ability to participate in his defense. In sum, detaining Mr. Bankman-Fried will mean that he will be unable to prepare for trial.[9]

---

[9] In light of the conditions at the MDC, which implicate Mr. Bankman-Fried's Sixth Amendment rights, we submit that the Government should be held to a higher standard of proof to establish the intent necessary for remand under Sections 3148 and 3142 of the Bail Reform Act.

The Honorable Lewis A. Kaplan
August 1, 2023
Page 18

     5.     <u>The Least Restrictive Remedy is to Impose the Court's Temporary Order</u>.

     As discussed above, the standards for detention under Sections 1348 and 1342 are not satisfied here.  Rather, Mr. Bankman-Fried must remain released on bail subject to the "least restrictive . . . combination of conditions" that "will reasonably assure the appearance of the person as required and the safety of any other person and the community…."  18 U.S.C. § 1342(c)(1)(B).  We submit that the existing Temporary Order Governing Extrajudicial Statements (ECF No. 180) achieves that goal.  The defense is willing to agree to the order given the critical need to prepare for trial without distraction and the additional burden of collateral litigation.  We would ask, although it is not a condition to our agreement, that in fairness it should be extended to witnesses as well.

                                                  Respectfully submitted,

                                           */s/ Mark S. Cohen*
                                           Mark S. Cohen
                                           Christian R. Everdell
                                           **COHEN & GRESSER LLP**
                                           800 Third Avenue, 21st Floor
                                           New York, New York  10022
                                           (212) 957-7600
                                           mcohen@cohengresser.com
                                           ceverdell@cohengresser.com

cc:    All counsel of record (via ECF)