Attachment 1

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States, | S5 22 Cr. 673 |
| v. | Judge Lewis A. Kaplan |
| Samuel Bankman-Fried. | |

## AFFIDAVIT OF LAURENCE H. TRIBE

I, Laurence H. Tribe, affirm under penalty of perjury that the foregoing is true and correct.

1.    I am a member in good standing of the Bars of California and Massachusetts and of the U.S. Supreme Court and all the U.S. Courts of Appeals, the recipient of eleven honorary degrees, and the Carl M. Loeb University Professor of Constitutional Law *Emeritus* at Harvard University, where I served for five decades as a Professor at Harvard Law School. I co-founded the American Constitution Society, served on the President's Commission on the Supreme Court of the United States, and authored, among other publications, *American Constitutional Law* (1978), a major treatise in the field. Attached hereto as Exhibit A is a true and correct copy of my *curriculum vitae*.

2.    I am currently *Of Counsel* at the law firm Kaplan Hecker & Fink LLP, which represents Joseph Bankman, Samuel Bankman-Fried's father. That said, I have played no role in the firm's work on Mr. Bankman's behalf—and I submit this affidavit in an independent capacity as an expert on constitutional law. The views I express are my own and are set forth to address the federal constitutional considerations implicated by the Government's motion to detain Mr. Samuel Bankman-Fried, *see* ECF No. 184, and by the requested relief, partially granted in this Court's temporary order governing extrajudicial

1

statements, *see* ECF No. 180. My primary goal in writing this affidavit is to respectfully present for judicial consideration what I regard as the correct legal framework to help guide the Court's inquiry into the potential modification of Mr. Bankman-Fried's bail, irrespective of the ultimate outcome.

3.      The Government offers two sources of statutory authority to detain Mr. Bankman-Fried pretrial, namely 18 U.S.C. §§ 3142 and 3148(b)(1).[1] Section 3142 governs the release or detention of a defendant pending trial, while Section 3148 addresses sanctions for the violation of a condition of release. The Court's consideration of the Government's motion will be grounded in the text of these Sections and the precedents elaborating their meaning. The Court's analysis must, of course, also adhere to the U.S. Constitution. I will principally focus on constitutional considerations in this affidavit but will address matters of statutory text and judicial precedent where necessary for context.

4.      Under 18 U.S.C. § 3142(e)(1), pretrial detention is warranted when the government establishes, by clear and convincing evidence, that the defendant poses a danger to the community, *and* that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." It is settled that "nonviolent witness tampering and obstruction poses a danger to the community," and may warrant pretrial detention if there is a "substantial risk" that a defendant will continue to engage in such behavior. *United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005); *see*

---

[1] These provisions, enacted as parts of the Bail Reform Act of 1984, reflect a philosophy of limiting pretrial detention to the degree consistent with the needs of justice and the public safety that I articulated in Laurence H. Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 U. Va. L. Rev. 371 (1970).

*also* 18 U.S.C. § 3142(f)(2)(B). A "changed situation or new information" may, of course, warrant altered release conditions. *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 1490417, at *2 (S.D.N.Y. Feb. 1, 2023); *see also* 18 U.S.C. § 3142(c)(3).

5.      Meanwhile, 18 U.S.C. § 3148(b) authorizes the revocation of pretrial release if, after a hearing, the Court finds that two conditions are met. *First*, the Court must find either "probable cause to believe" that the defendant has committed a federal, state, or local crime while released on bail, *or* "clear and convincing evidence" that the defendant has violated any other condition of his release. 18 U.S.C. § 3148(b)(1)(A)-(B); *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000). *Second*, the Court must find, by a preponderance of the evidence, *either* that the customary factors enumerated in 18 U.S.C. § 3142(g) establish that "there is no condition or combination of conditions of release that will assure" that the defendant will not flee or pose a danger to the community; *or* that the defendant "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(A)-(B). *See, e.g.*, *United States v. Gotti*, 794 F.2d 773, 777-78 (2d Cir. 1986) (preponderance of the evidence standard applies to Section 3148(b)(2)).

6.      Regardless of whether the Court is considering bail conditions under § 3142 or § 3148, "the law still favors pre-trial release subject to the least restrictive further condition, or combination of conditions." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quoting 18 U.S.C. § 3142(c)(1)(B)). Consequently, pursuant to the burdens of proof outlined above, the government in this case must: (1) prove by clear and convincing evidence that Mr. Bankman-Fried poses a danger to the community *or* show probable cause that he committed a crime while released on bail; *and* (2) prove that no less restrictive alternative will suffice other than revoking Mr. Bankman-Fried's liberty between the

present time and his trial in October, potentially damaging his ability to prepare his defense in accordance with his Sixth Amendment rights. Below, I describe what I regard as the proper constitutional framework that may inform the Court's assessment of whether the Government has met its burden.

7.      To start, Mr. Bankman-Fried has an affirmative right under both the Freedom of Speech Clause and the Freedom of the Press Clause to speak to the press—and, subject to certain limitations, to continue to do so throughout the pre-trial process.

8.      The constitutionally established presumption of innocence, *see In re Winship*, 397 U.S. 358 (1970), is not only a rule governing evidentiary burdens at trial. As I explained in my 1970 article, *see* Tribe, *supra* note 1, it reflects the principle—embodied in the Fifth Amendment's Due Process Clause—that charging an individual with a federal crime does not enlarge the Government's authority to restrict that individual's liberty any more than the needs of the criminal justice system require. That principle, in turn, demands that predictions of dangerousness (including predictions of future witness tampering) must be solidly grounded in fact and not predicated on invariably hazardous speculation. It also means that the protections of the First Amendment retain genuine vitality in this setting.

9.      The First and Sixth Amendments, when understood in light of the Fifth Amendment principle just noted, accordingly require that those accused of a crime presumptively be permitted to have whatever contact with the press they prefer—including a strategy of maximum availability to shape their public image, so long as that availability consists only of protected speech and is not demonstrably calculated to pervert the course of justice. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1043 (1991) (a defense does "not begin inside the courtroom door" and one "cannot ignore the practical implications of

a legal proceeding" for the accused); *see also id.* at 1058 ("[I]n some circumstances press comment is necessary to protect the rights of the client[.]"). Admittedly, *Gentile* addresses the rights of defense counsel rather than the defendant personally to speak to the press, but defendants must have free speech rights *at least* as broad as their attorneys to speak about their own case, especially in light of the Supreme Court's recognition that adverse pretrial publicity can defeat "a sober search for the truth." *Estes v. Texas*, 381 U.S. 532, 551 (1965).

10.    Here, the Government has recognized that Mr. Bankman-Fried "has the right to speak and defend himself to the press, even on hundreds of occasions." ECF No. 184 at 11. However, the Government has acknowledged that point even as it meticulously counted for the Court Mr. Bankman-Fried's communications with the media over every conceivable platform. *See* ECF No. 184 at 3. Moreover, it was only *after* the Government reviewed the volume of Mr. Bankman-Fried's press contacts, captured in a pen register, that it sought to revoke his pretrial release. *Compare* Gov't Letter *re* Extrajudicial Statements, ECF No. 176 (Jul. 20, 2023) *with* Gov't Letter *re* Motion to Revoke Bail, ECF No. 184 (Jul. 28, 2023). In these circumstances, there is a risk that the Government seeks to punish Mr. Bankman-Fried for the exercise of his rights under the First, Fifth, and Sixth Amendments—as described above—thus triggering heightened judicial vigilance.

11.    That conclusion is bolstered by additional principles drawn from precedent governing unconstitutional conditions. It is the law of the Second Circuit that conditioning anyone's pretrial liberty on refraining from press engagement is unconstitutional. This principle was articulated in *United States v. Sun Myung Moon*, 718 F.2d 1210, 1217 (2d

Cir. 1983), a case with which I had personal involvement.[2]   There, the defendant was convicted of conspiracy and filing false tax returns. *Id.* at 1216. On appeal, he argued that the government's reason for opposing his request for a bench trial was to punish him for exercising his First Amendment rights. *Id.* at 1217. The Second Circuit held that a government benefit "may not be conditioned or later revoked for a reason that infringes an individual's constitutional rights, especially First Amendment freedoms," but found that the defense had "presented no facts on this record that convince us that the government's reason for refusing to consent to a bench trial was impermissibly to punish Moon." *Id.* at 1218

12.     More broadly, the law of unconstitutional conditions recognizes that the Government cannot do indirectly what it also cannot do directly. Thus, the Government may not condition even entirely discretionary benefits on the beneficiary's relinquishment of a constitutional right. *See* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413 (1989). This principle goes beyond the proposition that the Government is forbidden to coerce anyone to give up a constitutional right in exchange for a benefit with an offer the individual cannot realistically refuse. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 220-21 (2013); Laurence Tribe and Joshua Matz, *Uncertain Justice: The Roberts Court and the Constitution*, 259-261 (2014). It also limits the Government's power to penalize defendants for exercising constitutional rights in diverse settings. *See, e.g.*, *United States v. Jackson*, 390 U.S. 570, 582 (1968) ("Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly

---

[2] I represented defendant Sun Myung Moon in the litigation leading to this ruling both in the Southern District of New York and in the Second Circuit. The analysis of unconstitutional conditions advanced in this affidavit thus reflects anything but an argument made to fit the needs of the present occasion.

chill the exercise of basic constitutional rights."); *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding that the government cannot penalize a defendant's decision to stay silent as permitted by the Fifth Amendment by commenting on that decision at trial); *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 439 (1963) (holding that regulatory measures, "no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights").

13.     The concept of unconstitutional conditions applies with enhanced force in a case where the Government's conduct risks distorting multiple legal rights—as is true here. Revoking Mr. Bankman-Fried's release has the potential (subject to this Court's own fact-finding) to undermine his Sixth Amendment right to be informed of the nature of the case against him and to take meaningful advantage of the assistance of counsel. *See United States v. Wade*, 388 U.S. 218, 224 (1967). The Bail Reform Act is not an island unto its own; it exists within the ecosystem of rights provided by our Constitution. Given current conditions at the Metropolitan Detention Center—at least, as I understand them—there is a credible risk that revoking Mr. Bankman-Fried's pretrial release could hinder his ability to access and review the ~13 million pages of discovery the Government has produced. *See* Tr.   23:9-21, July 26, 2023. Put differently, there is a risk on these facts that the Government's motion reflects an effort to improperly condition the full exercise of Mr. Bankman-Fried's Sixth Amendment rights on the curtailing of his First and Fifth Amendment rights. If that were so, the doctrine of unconstitutional conditions would bear directly on the analysis.

14.     In my view, these constitutional principles are an important part of the legal framework that should inform the resolution of the motion at hand. To the extent the Court

finds that it was the volume of Mr. Bankman-Fried's contacts with the press that triggered the Government's motion to seek detention—or that the Government sought this remedy based on Mr. Bankman-Fried's conversation with *The New York Times* journalist writing an article involving Ms. Ellison—the First, Fifth, and Sixth Amendments come into play and militate forcefully against granting the Government's motion. *See, e.g.*, *United States v. Murtari*, 2008 WL 687434, at *1 (N.D.N.Y. Mar. 11, 2008) (stating that the First Amendment "impose[s] certain limitations upon the right of a court to impose release conditions.").

15.     This leads to another, related point: Mr. Bankman-Fried has a constitutional right—when sought out by reporters for his perspective on stories they are writing—to avoid projecting a false image of someone who is media-shy or, worse, someone whose consciousness of guilt makes him shun the media rather than being forthcoming.[3] This right arises under the First Amendment but also vindicates Fifth and Sixth Amendment interests, and while it is not unlimited, it create a strong presumption in favor of press access.

16.     It is against this constitutional baseline that the relevant statutory framework requires clear and convincing evidence before a defendant's efforts to maintain contact with the press can be transmuted into the unprotected conduct of harassing or tampering with witnesses. Witness tampering occurs when a person "knowingly. . . corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward

---

[3] "Among the rights of personality that must be of central concern are those that relate to the presentation of self . . .the right to shape the 'self' that one presents to the world, and on the basis of which the world in turn shapes one's existence. 'Am I not what I am, to some degree in virtue of what others think and feel me to be?'," Laurence H. Tribe, *American Constitutional Law*, 1389-90 (2d ed. 1988) (quoting I. Berlin, *Four Essays on Liberty*, 155 (1969)).

another person, with intent to—(1) influence, delay, or prevent the testimony of any person in an official proceeding." *LaFontaine,* 210 F.3d at 132 (quoting 18 U.S.C. § 1512(b)). Under Second Circuit precedent, the Government must prove both conduct and intent to corruptly persuade. *United States v. Johnson*, 968 F.2d 208, 211 (2d Cir. 1992).

17.     Here, it appears to me from a study of the record—though of course these factual determinations are for the Court to make—that there is strong reason to doubt the Government's claim that Mr. Bankman-Fried's conduct "created the specter that [Ms. Ellison's] most intimate business [was] at risk of being reported in the press." ECF No. 184 at 7. Instead, it seems to me more accurate to say that Mr. Bankman-Fried acted as a supplemental source for a story on Ms. Ellison that *The New York Times* reporter had already obtained leaked discovery information for from other sources and had been working on for months. ECF No. 178 at 1, 4. If true, that matters because *The New York Times* article may well have been the sole trigger for the Government's request for further relief, *see generally* ECF No. 176—and if Mr. Bankman-Fried's engagement with that article did not clearly constitute witness tampering, then the Government may well be asking the Court to surmise nefarious intent (and to burden Mr. Bankman-Fried's rights) based on an otherwise lawful exercise of his constitutional rights to speak to the institutional press.[4]

18.     This concern is bolstered by recent cases addressing the circumstances in which otherwise protected speech may rise to the level of an unprotected "true threat." While speech constituting a "true threat" is of course not identical to speech constituting

---

[4] It seems to me particularly relevant here that Ms. Ellison *voluntarily* shared her diary with Mr. Bankman-Fried, who disclosed *only her own words* to a reporter rather than any narrative of his own.

"true witness intimidation," the concepts are reasonably analogous. And it is now clear that the Supreme Court has imposed a substantial *mens rea* showing, namely of recklessness, before it will find that protected speech crosses the line into unprotected territory.[5] That rule exists, in part, to safeguard free speech and combat an impermissible chill.

19.     That brings me to a final thought. In its interim order dated July 26, 2023, ECF No. 180, the Court prohibited Mr. Bankman-Fried (among others) from seeking to "influence public opinion regarding the merits of this case." As I understand it, that order was predicated on an allegation of witness tampering, coupled with the theory that talking to a reporter was the final straw in light of the frequency of defendant's press contacts. It thus effectively punished Mr. Bankman-Fried for the sheer volume of his press contacts.

20.     In light of the constitutional principles described above, I very much doubt that such an order can properly be maintained through the balance of the pre-trial process. In my view, it should be modified to more fully account for the freedoms of speech and press—freedoms that turn on what the Supreme Court in *New York Times v. Sullivan*, 376 U.S. 254, 271-72 (1964), described as "breathing space" for the exchange of ideas and information, breathing room that in turn depends on amplitude and breadth of opportunity,

---

[5] Indeed, it is now clear that the Supreme Court is employing recklessness as the mental state required to determine whether otherwise protected speech in a range of settings crosses the line to speech or expressive conduct that loses that protection. *See Counterman v. Colorado*, 143 S. Ct. 2106, 2113 (2023) ("To combat [] [impermissible] chill . . ., our decisions have often insisted on protecting even some historically unprotected speech through the adoption of a subjective mental-state element . . . [and] [a]gain guided by our precedent, we hold that a recklessness standard is enough."). *See also New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (holding that reckless disregard for falsity was required for speech defaming or disparaging the reputation of a public official to be unprotected); *Curtis Publishing Co.v. Butts*, 388 U.S. 130 (1967) (holding that a reckless lack of professional standards was required for a news agency to be liable for damages to an injured party that wasn't a public official); *Time v. Hill*, 385 U.S. 374 (1967) (holding that a publication could not be held liable for casting someone in a false light without proof of recklessness or worse).

not just on the qualitative avoidance of government censorship based on the viewpoint or content of particular instances of expression. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (striking down a tax on the gross receipts of newspapers with circulations of more than 20,000 copies per week); *Garland v. Torre*, 259 F.2d 545, 548 (2d Cir. 1958) (observing that, as a matter of original meaning, freedom of the press primarily connoted freedom from previous restraints upon publication); *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 592-93 (1983) (holding that the imposition of use tax on cost of paper and ink products consumed in production of publications violated the First Amendment by imposing a significant burden on freedom of the press).

21.     I raise this concern about the July 26 Order because it creates a startling and unusual asymmetry in Mr. Bankman-Fried's ability to associate with the press—while his detractors, including potential witnesses and defendants in related cases, remain free to add to the media maelstrom surrounding him. The order effectively precludes Mr. Bankman-Fried (as well as surrogates, family members, spokespersons, representatives, and volunteers who speak at his instigation) from saying anything that might influence the public's perception of him in ways that could help make the presumption of his innocence more than a slogan. In declining defense counsel's request to include potential witnesses or related defendants in its temporary gag order, the Court rightly noted that it could not "issue an order against the world." *See* Tr. 20:16-17, July 26, 2023. However, by gagging only *half* the relevant world, the Court has left Mr. Bankman-Fried unable to fend off attacks on his reputation in ways that might not only enhance his opportunity to secure an acquittal but preserve his ability to restore his reputation should he succeed in persuading a jury of his peers that he is innocent. Gag orders are usually issued in criminal cases to

11

protect the *defendant's* right to a free trial amidst a storm of negative publicity. *See, e.g.*, *Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 611 (2d Cir. 1988). Here, however, the temporary order risks adding to the harm defendant is suffering by silencing him and his supporters in the cacophony. Also silencing the Government has limited effect, since it is one of many detractors in the pack. It is difficult not to recall the late Labor Secretary Ray Donovan's famous question, upon being acquitted of the federal charges against him: "Which office do I go to to get my reputation back?" Selwyn Raab, *Donovan Cleared of Fraud Charges by Jury in Bronx*, N.Y. Times, May 26, 1987.

22.     For the reasons described above, I believe the First, Fifth, and Sixth Amendments define a constitutional framework with direct bearing on the issues currently before the Court. Under that framework, I believe the Court should presumptively refrain from modifying Mr. Bankman-Fried's bail conditions and curtailing his pretrial release based on the volume of his press contacts, his response to the questions put to him by a *New York Times* journalist, or his willingness to talk with reporters who seek him out, absent a finding that his conduct clearly rose to the level of unprotected activity.

Executed:     Cambridge, Massachusetts          Respectfully submitted,
              August 1, 2023

                                                 /s/ Laurence H. Tribe

# Exhibit A

LAURENCE H. TRIBE

Vita                                                                                      August 2023

Biographical Data

Personal:

Born: October 10, 1941, Shanghai, China
Parents: George and Polia Tribe; moved to San Francisco, California, March 1947
Citizenship: United States
Children: son Mark, born Dec. 11, 1966; daughter Kerry, born Jan. 12, 1973

Education:

A.B. with *summa cum laude* in Mathematics, Harvard College, 1962
Phi Beta Kappa *Junior Eight* (one of eight juniors elected from class of 1,100), 1961
*Detur Prize*, Harvard College (one of the two *Detur Prizes* awarded in class of 1,100), 1959
*National Science Foundation Fellow* and *Woodrow Wilson Fellow*, Graduate School of
     Mathematics, Harvard, 1962-63
J.D. *magna cum laude*, Harvard Law School, 1966
*Joseph Beale Prize*, Harvard Law School, 1966

Career:

Carl M. Loeb University Professor *Emeritus*, 2020-present
*Of Counsel*, Kaplan, Hecker, and Fink LLP, January 2023-present
Member, President's Commission on the Supreme Court of the United States 2021
Carl M. Loeb University Professor, 2004-2020 [*]
Ralph S. Tyler, Jr. Professor of Constitutional Law, 1982-2004
Professor of Law, 1972-82
Assistant Professor of Law, 1968-72
First Senior Counselor for Access to Justice, U.S. Dept. of Justice, 2010
Member, President's Commission on White House Fellowships 2009-2013
Constitutional Consultant to President Nelson Mandela of South Africa (assisted in drafting
     the nation's first democratic constitution), 1993-1994
Constitutional Consultant to Chief Justice Valery Zorkin of Russia, 1992
Member, U.S.-European Committee on Revision of the Czechoslovak Constitution, 1992
Constitutional Advisor to President Vaclev Havel of Czechoslovakia, 1992
Chair, Governor's Press Shield Law Task Force, 1983-85
Chair, Marshall Islands Judicial Service Commission, 1979-80
Consultant to Marshall Islands for drafting new constitution, 1978-79
Member, U.S. Supreme Court Bar, from 1978

---

[*] Harvard's University Professorships, created in 1935, represent the highest honor the university can accord a
member of its faculty and entitle the holder to teach without departmental limitation. Of the university's 1,108
tenured faculty members, only 24 currently hold University Professorships. Between 1935 and the present, a total of
just 43 others have held this title.
.

Member of the Bars of U.S. Courts of Appeals for the 1st, 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th,11th, and D.C. and Federal Circuits
Member, Bar of U.S. District Court for D. Mass., from 1978
Member, Bar of Massachusetts, from 1978
Member, Bar of California, from 1966
Executive Director of Technology Assessment Panel, Nat.'l Academy of Sciences, 1968-69.
Law Clerk to Justice Potter Stewart, United States Supreme Court, 1967-68.
Law Clerk to Justice Mathew O. Tobriner, California Supreme Court, 1966-67.
Research Associate in Mathematical Physics & Computer Science, Lawrence Radiation
        Laboratory, Berkeley, California, Summers 1959-64.

Honorary Degrees:

D. Litt., Columbia University, 2013
LL.D., Institute for Criminal Science, Government of Mexico, 2011*
LL.D., University of New Hampshire Law School, 2011
LL.D., University of Miami, 2010
LL.D., New York University, 2008
LH.D., Hebrew University, 1998
LL.D., Colgate University, 1997
LL.D., Illinois Institute of Technology, 1988
LL.D., American University, 1987
LL.D., University of the Pacific, 1987
LL.D., Gonzaga University, 1980

Elected to Membership in Academic Societies:

Member, American Philosophical Society, elected 2010
Fellow, American Academy of Arts and Sciences, elected 1980

Awards:

American Philosophical Society's *Henry Allen Moe Prize in Humanities,* 2018
20th Annual Clay Award (2016) for Public Interest Law (for successful pro bono
        representation of U.S. vets in *Valentini v. Shinseki*)
ABA's 2015 *Silver Gavel Honorable Mention Award* for *Uncertain Justice*: *The Roberts
        Court and The Constitution* (2014) (as one of the two best law-related books of 2014)
ABA Young Lawyers Division *Fellows Award*, 2014
American Philosophical Society's *Henry M. Phillips Prize in Jurisprudence,* 2013**
Boston Best Lawyers' *Appellate Lawyer of the Year*, 2012

---

* Awarded once each year since 1998. This was the first time Mexico awarded the degree to anyone from the United States.

** Previous recipients of this annual award have included Justices Ruth Bader Ginsburg, Sandra Day O'Connor, and John Paul Stevens; Senators George Mitchell and Hillary Rodham Clinton; Archbishop Desmond Tutu; and Attorney General Janet Reno.

Ramona Ripston *Liberty, Justice and Equality Award*, ACLU of Southern California, 2011*Outstanding Scholar of 2009*, Fellows of the American Bar Foundation
*Veritas Award* for 2009, Harvard Gay and Lesbian Caucus
*Albert D. Chernin Award for Public Service*, 2009, Jewish Council for Public Affairs
Anonymous $10 million gift made (by someone) to Harvard to create a professorship to be named, after my retirement, the *Laurence H. Tribe Professorship in Constitutional Law*, and to be named, until that time, after someone of my choosing. I chose to name the chair the *Thurgood Marshall Professorship in Constitutional Law*. The chair is currently held by Professor Vicki C. Jackson.
New York University Annual Survey of American Law Dedication, 2002[*]
*Sacks-Freund Award* for Excellence in Teaching, Harvard Law School, 2001
Second Annual *Spirit of Justice Award*, Gay & Lesbian Advocates & Defenders, 2001
Eleventh Annual *Honoring Our Allies Award*, National Gay and Lesbian Task Force, 2000
Listed as one of "America's 100 Most Influential Lawyers," National Law Journal, 1985, 1988, 1991, 1994, 1997, 2000, 2006
ABA's 1990 *Silver Gavel Award* for *Abortion: The Clash of Absolutes* (1990)
*Distinguished Lifetime Achievement Award*, National Gay Rights Advocates, 1988
11th Annual *William O. Douglas Award*, Public Counsel, 1987
*Legal Achievement Award*, Bay Area Lawyers for Individual Freedom, 1985
*Roger Baldwin Award*, Massachusetts Civil Liberties Union Foundation, 1985
*Triennial Coif Award*, Outstanding Work of Legal Scholarship in the U.S., 1980 (for *American Constitutional Law* (1978 ed.))
*Scribes Award* for *American Constitutional Law* (1978 ed.) (awarded once annually since 1961 by the American Society of Legal Writers)
Listed as "One of the Ten Most Outstanding Law Professors in U.S." by *Time Magazine*, 1977
National Intercollegiate Debate Champion, 1961
First Place, National Strathmore Pastel Competition (seascape), 1958

Named Lectureships:

Keynote on Separation of Powers, Harvard Law School, 2016
11th Annual *Robert H. Jackson Lecture*, Chautauqua, 2015
California State Bar *Morrison Lecture*, 2014
Keynote Address, Allan C. Lebow Supreme Court Review, UCLA School of Law, 2014
*Owen J. Roberts Memorial Lecture in Constitutional Law*, University of Pennsylvania Law School, 2013
*Wyant Lecture*, Emmanuel College, 2011
*Constitution Day Lecture*, U.S. Justice Department, 2010
*Hugo L. Black Lecture*, Wesleyan University, 2008
*Constitution Day Lecture*, National Archives of the United States, 2008
*Visiting Scholar*, National Constitution Center, 2007
*Constitution Day Lecture*, Harvard University, 2005
Keynote Address, 3rd Annual National Convention, American Constitution Society, 2005 (following Justices Ruth Bader Ginsburg and Stephen Breyer as Keynoters for 1st

---

[*] Awarded once every several years since 1895. This was the 25th time the award has been bestowed. Previous recipients have included Roscoe Pound, Karl Llewellyn, John Rawls, Willard Hurst, Ronald Dworkin, Martha Nussbaum, and Jeremy Waldron.

and 2nd Annual ACS Conventions)
*Tanner Lecture on Human Values*, Oxford University, 2002
*First Annual Louis D. Brandeis Lecture*, Israel Academy of Science and Humanities,
    Jerusalem, 1994
*Alexander Meiklejohn Lecture*, Brown University, 1998
Keynote Lecture, Bill of Rights Bicentennial, National Archives of the United States, 1991
*Fulbright Distinguished Lecturer*, India, 1991
Co-Lecturer with Justice William J. Brennan, Jr., Miami, Florida, 1991 and 1992
Co-Lecturer with Justice Anthony M. Kennedy, Salzburg, Austria, 1990
*Fulbright Distinguished Lecturer*, Brazil, 1982
43rd *Annual Cardozo Lecture*, Association of the Bar of the City of New York, 1989
*Inaugural Lecture, Richard Salomon Distinguished Lecture Series*, N.Y. City Public
    Library, 1988
*Tanner Lecture on Human Values*, University of Utah, 1986


Selected Bibliography


<u>Books</u>:


    <u>To End A Presidency: The Power of Impeachment</u> (with Joshua Matz) (Basic Books, 2018)
    <u>Uncertain Justice: The Roberts Court and The Constitution</u> (with Joshua Matz) (Henry Holt
    and Company, 2014)[*]
    <u>The Invisible Constitution</u> (Oxford University Press, 2008)
    <u>American Constitutional Law, Volume One</u> (Foundation Press, 3d ed. 2000) [**]
    <u>Constitutional Choices</u> (Universal Law Publishing Company, Central Asia ed. 2001) (India,
    Pakistan, Nepal, Bangladesh, Sri Lanka)
    <u>On Reading The Constitution</u> (with Michael C. Dorf) (Harvard University Press, 1991).
    <u>Abortion: The Clash of Absolutes</u> (W.W. Norton & Co., 1990)
    <u>American Constitutional Law</u> (Foundation Press, 2d ed. 1988)**
    <u>God Save This Honorable Court: How the Choice of Supreme Court Justices Shapes Our</u>
    <u>History</u> (Random House, 1985)
    <u>Constitutional Choices</u> (Harvard University Press, 1985)
    <u>American Constitutional Law</u> (Foundation Press, 1st ed. 1978)**
    <u>When Values Conflict: Essays on Environmental Analysis, Discourse, and Decision</u> (ed. with
    C. Schelling & J. Voss) (Ballinger, 1976)
    <u>Channeling Technology Through Law</u> (Bracton Press, 1973).
    <u>Environmental Protection</u> (with Louis L. Jaffe) (Bracton Press, 1971)
    <u>Technology: Processes of Assessment and Choice</u> (U.S. Govt., 1969)

---

[*] The No. 1 national bestseller for 2014 in its subject category (books about law) according to Bookscan.

[**] This treatise (including its 1978 and 1988 editions) was cited more often (5,351 times) from 1955 to 2000 than any other legal text or treatise published in the 20th century, according to *The Journal of Legal Studies* (Jan. 2000). See also *The American Lawyer* 107 (Dec. 1999).

Major Articles Since 1985:

**"**Transcending the *Youngstown* Triptych: A Multidimensional Reappraisal of Separation of
    Powers Doctrine," 126 The Yale Law Journal Forum  86 (2016).

"Equal Dignity: Speaking Its Name," Harvard Law Review Forum (online) (Nov. 2015)

"Dividing *Citizens United*: The Case v. The Controversy," 30 Constitutional Commentary
    463 (2015)

"An Ephemeral Moment: Minimalism, Equality, and Federalism in the Struggle for Same-
    Sex Marriage Rights," 37 N.Y.U Rev. L. & Soc. Change 199 (2013) [with Joshua
    Matz]

"The Constitutional Inevitability of Same-Sex Marriage," 71 Md. L. Rev. 471 (2012) [with
    Joshua Matz]

"The Constitutionality of the Patient Protection and Affordable Care Act: Swimming in the
    Stream of Commerce," 35 Harv. J. L. & Pub. Pol'y 873 (2012)

"Death by a Thousand Cuts: Constitutional Wrongs Without Remedies After *Wilkie* v.
    *Robbins*," Cato Supreme Court Review 23 (2006-07)

"The Inverted Constitution: Presidential Hegemony and the Eclipse of Privacy," 12 The
    Berlin Journal, 41 (2006)

"The Anti-Emergency Constitution," 113 Yale Law Journal 1801 (2004) [with Pat Gudridge]

"*Lawrence v. Texas*: The 'Fundamental Right' That Dare Not Speak Its Name," 117
    Harvard Law Review 1893 (2004)

"Public Rights, Private Rites," 6 The Green Bag 289 (2003)

"The Unbearable Wrongness of *Bush v. Gore*," 19 Constitutional Commentary 571 (2003)

"Lost at the Equal Protection Carnival: Nelson Lund's Carnival of Mirrors,"
    19 Constitutional Commentary 619 (2003)

"Waging War, Deciding Guilt: Trying the Military Tribunals," 111 Yale Law Journal
    1259 (2002) [with Neal Katyal]

"*eroG .v hsuB* and its Disguises: Freeing *Bush v. Gore* From its Hall of Mirrors,"171 Harvard
    Law Review 170 (2001)

"Disentangling Symmetries: Speech, Association, Parenthood," 28 Pepperdine L. Rev. 641
    (2001)

"*Saenz* Sans Prophesy: Does the 'Privileges or Immunities' Revival Reveal the Future—or
    Expose  the Hidden Structure of the Present?" 113 Harvard Law Review 110 (1999)

"Comment," in Justice Scalia's A Matter of Interpretation: Federal Courts and the Law 63-94
    (Princeton University Press, 1997)

"Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional
    Interpretation," 108 Harvard Law Review 1221 (1995)

"Levels of Generality in the Definition of Rights," 57 Chicago Law Rev. 1057 (1990) (with
    M. Dorf)

"The Curvature of Constitutional Space: What Lawyers Can Learn From Modern Physics,"
    103 Harvard Law Review 1 (1989)

"Remarks: Revisiting the Rule of Law," 64 N.Y.U. Law Review 726 (1989)

"Judicial Interpretation of Statutes: Three Axioms," 11 Harv. J. of Law and Public Policy 51
    (1988)

"On Reading the Constitution," 9 Tanner Lectures on Human Values (University of Utah
    Press, 1988), reprinted in 1988 Utah Law Review 747 (1988)

"Contrasting Constitutional Visions: Of Real and Unreal Differences," 22 Harvard C.R.-C.L.
    Law Review 95 (1987)

"The Idea of the Constitution: A Metaphor-morphosis," 37 Journal of Legal Education 170
    (1987)

"Substantive Due Process," in <u>Encyclopedia of American Constitutional Law</u> (L. Levy ed. 1987)

"In What Vision of the Constitution Must the Law be Color-Blind?," 20 John Marshall Law Review 201 (1986)

"The Abortion Funding Conundrum: Inalienable Rights, Affirmative Duties and the Dilemma of Dependence," 99 Harvard Law Review 330 (1985)

"Constitutional Calculus: Equal Justice or Economic Efficiency?," 98 Harvard Law Review 592 (1985)

<u>Other Published Work, 1970-2014</u>:

56 other articles in scholarly journals or compedia
35 prepared statements accompanying testimony in Congress
130 magazine articles and op-ed newspaper essays

<u>Lead Counsel in U.S. Supreme Court Cases</u> (clients underlined and in bold type):

Lost    Wilkie v. **Robbins**, 551 U.S. 537 (2007), argued 3/19/07—Rejecting *Bivens* damages action against federal officials for ongoing retaliation against rancher who refused to give their agency an easement.

Lost    Johanns v. <u>Livestock Marketing</u>, 544. U.S. 550 (2005), argued 12/8/04—Rejecting First Amendment challenge to the federal beef promotion program on a 'government speech' rationale not considered in *United Foods*.

Dismissed    <u>Nike</u> v. Kasky, 539 U.S. 654 (2003), argued 4/23/03—Declining on procedural/jurisdictional grounds to reach merits of First Amendment questions presented by citizen suit seeking to impose liability for statements made by Nike in course of public debate; cert dismissed as improvidently granted, but majority of Justices seemingly reject state court's holding that, because the speech in question could encourage purchase of speaker's products and had that purpose, it could be deemed 'commercial' and thus was wholly unprotected if misleading.

Lost    State Farm v. <u>Campbell</u>, 538 U.S. 408 (2003), argued 12/11/02—Reversing and remanding as excessive $145 million state court punitive damages award and establishing presumptive ceiling of 9:1 in ratio of punitive to compensatory damages as a matter of substantive due process, at least where state's highest court's decision to uphold the punitive award rested in part on defendant's out-of-state misconduct.

Won    FCC v. <u>NextWave</u>, 537 U.S. 293 (2003), argued 10/8/02—Rejecting FCC's cancellation of spectrum licenses held by debtor reorganizing in bankruptcy where licenses secured multi-billion dollar credit extended under installment purchase arrangement by FCC and holding that Bankruptcy Code's provision (sec. 525(a)) expressly banning revocation of license for nonpayment of dischargeable debt contains no implied exception for revocation motivated by regulatory purpose properly within FCC's jurisdiction.

Won    U.S. v. <u>United Foods</u>, 533 U.S. 405 (2001), argued 4/17/01—First Amendment

precludes forcing mushroom growers to pay for generic advertising campaign unrelated to substantive regulation of mushroom market.

Lost    <u>New York Times</u> v. Tasini, 533 U.S. 483 (2001), argued 3/28/01—Copyright Act requires permission from author of each contribution to composite publication reproduced in electronic database.

Remanded for clarification    Bush v. <u>Gore I</u> (Bush v. <u>Palm Beach County Canvassing Board</u>), 531 U.S. 70 (2000), argued 12/1/00—vacating and remanding decision of Florida Supreme Court establishing procedures for recounting ballots cast in 2000 presidential election, and directing state court to explain how its recount procedures could be reconciled with U.S. Const. Art. II, §1, Cl.2 (requiring state's *legislature* to establish method of selecting state's slate of presidential electors) and 3 U.S.C. §5 (setting relevant time frame). The Florida court did not respond to the Supreme Court's demand until after SCOTUS had decided to halt the state's recount after second argument (by David Boies) on 12/11/00.

Won    <u>Ortiz</u> v. Fibreboard, 527 U.S. 815 (1999), argued 12/8/98—invalidating $1.53 billion asbestos class action settlement as improperly certified on a limited fund theory under Rule 23 (b)(1)(B).

Won & Lost    AT&T v. <u>Iowa Utilities Board</u>, 525 U.S. 366 (1999), argued 10/13/98—upholding in part the Bell Operating Companies' challenge to FCC jurisdiction over interconnection with local exchange networks.

Won    <u>Baker</u> v. General Motors, Inc., 522 U.S. 222 (1998), argued 10/15/97—holding unenforceable, in Missouri trial in which plaintiffs sought to have expert testify against G.M., Michigan court's judgment purporting to enjoin that expert's testimony (as part of decree settling litigation between the expert and G.M.), where plaintiffs had neither been parties to nor represented in the Michigan litigation, inasmuch as full faith and credit to judgments does not include giving them binding effect against absent parties.

Won    Amchem Products, Inc. v. <u>Windsor</u>, 521 U.S. 591 (1997), argued 2/18/97—invalidating $1.3 billion asbestos class action settlement under Rule 23 (b)(3), where class was found by Court to be too heterogeneous for purposes of litigation by purported class representatives and accordingly ineligible for judicial approval for settlement at their behest.

Lost    Vacco v.<u>Quill</u>, 521 U.S. 793 (1997), argued 1/8/97—States may prohibit physician-assisted suicide for terminally ill patients nearing death even while empowering such patients to refuse or terminate life-extending medical procedures (including nutrition and hydration), where necessary pain relief is made available despite predictable but unintended death-hastening effect; Court leaves open question whether some applications of state law that bans provision of lethal medication for self-administration by terminally ill patients who ask to die without consciousness-destroying effects of pain medication, but that empowers patients to demand

termination of all life-extending procedures (even after "terminal sedation" is administered to render such patients unconscious), would violate due process or equal

protection.

Lost Timmons v. <u>Twin Cities Area New Party</u>, 520 U.S. 351 (1997), argued 12/4/96—States may limit each candidate on an election ballot to one nominating party.

Mooted U.S. v. <u>Chesapeake & Potomac Tel. Co.</u>; N.C.T.A. v. <u>Bell Atlantic</u>, 516 U.S. 415 (1996), argued 12/6/95—Congress may not ban video programming by telephone cos. (ruling won below) (mooted by 1996 Telecom. Act).

Lost Honda Motor Co. v. <u>Oberg</u>, 512 U.S. 415 (1994), argued 4/20/94—Right to judicial review of amount of punitive damages.

Won TXO v. <u>Alliance Resources</u>, 509 U.S. 443 (1993), argued 3/31/93—Rejecting due process attack on punitive damages award 526 times size of compensatory award where evidence would support finding that punitive award was much lower multiple of harm that defendant's conduct might have caused had plan succeeded.

Won <u>Cipollone</u> v. Liggett, 505 U.S. 504 (1992) (reargued 1/13/92)—Tort suits against cigarette companies for costs imposed by their behavior on smokers and on states not federally preempted by companies' compliance with Surgeon General's labeling requirements.

Lost <u>Rust</u>  v. Sullivan, 500 U.S. 173 (1991), argued 10/30/90—Abortion counseling may be banned in federally funded clinics where recipients of federal funds remain free to establish physically and fiscally separate, albeit wholly-controlled, facilities making such counseling available without support from public funds.

Won Adams Fruit Co. v. <u>Barrett</u>, 494 U.S. 638 (1990), argued 1/17/90—Department of Labor may not limit migrant farm workers' federal suits authorized by Congress.

Lost Granfinanciera, S.A. v. <u>Nordberg</u>, 492 U.S. 33 (1989, argued 1/9/89—Bankruptcy trustee's fraudulent transfer action is subject to Seventh Amendment.

Won <u>Sable Communications Co.</u> v. FCC, 492 U.S. 115 (1989), argued 4/19/89—Congress may not abolish non-obscene "dial-a-porn" services where methods of keeping children from accessing such services are not shown to be unavailable.

Lost Schweiker v. <u>Chilicky</u>, 487 U.S. 412 (1988), argued 3/1/88—No *Bivens* action for wrongful denial of social security disability benefits.

Won <u>Pennzoil</u> v. Texaco, 481 U.S. 1 (1987), argued 1/12/87—Federal court may not interfere with state court enforcement of multi-billion dollar judgment.

Lost * Bowers v. <u>Hardwick</u>, 478 U.S. 186 (1986), argued 3/31/86—No right of privacy for consensual sodomy.

Won Fisher v. <u>City of Berkeley</u>, 475 U.S. 260 (1986), argued 11/12/85—Local rent control is not preempted by Sherman Act.

Won Bd. of Ed. of Oklahoma City v. <u>Nat'l Gay Task Force</u>, 470 U.S. 903 (1985), argued

---

\* But the ***Hardwick*** decision was both expressly overruled, and held to have been wrong from the date it was decided, in ***Lawrence*** v. *Texas*, 123 S.Ct. 2472 (2003), in which I was counsel of record for the American Civil Liberties Union and the ACLU of Texas as *amici* for petitioner Lawrence

1/14/85—First Amd. protects gay rights advocacy in public schools (judgment for NGTF affirmed by equally divided Court).

Won      <u>Northeast Bancorp</u> v. Federal Reserve System, 472 U.S. 159 (1985), argued 4/15/85—States may limit bank mergers to several-state region.

Won      <u>Hawaii Housing Authority</u> v. Midkiff, 467 U.S. 229 (1984), argued 3/26/84—States may force landowners to sell privately held residential land to occupants at fair prices set by juries.

Won      Pacific Gas & Electric Co. v. <u>California Energy Resources Conservation and Development Commission</u>, 461 U.S. 190 (1983), argued 1/17/83—State moratorium on nuclear power plants not preempted.

Won      <u>White</u> v. Mass. Council of Construction Employers, 460 U.S. 204 (1983), argued 11/1/82—Commerce clause does not bar municipal hiring preferences.

Won      Larkin v. <u>Grendel's Den</u>, 459 U.S. 116 (1982), argued 10/4/81—Establishment Clause bars delegating licensing power to churches under statute permitting issuance of liquor licenses to establishments without regard to objections of neighbors but giving neighboring schools and churches in particular an automatic veto power over such liquor licenses.

Lost      <u>Crawford</u> v. Board of Education of City of Los Angeles, 458 U.S. 527 (1982), argued 3/22/82—State may limit court-ordered busing for purposes of racial integration to instances where such busing is required to satisfy U.S. Constitution while imposing no similar limits on court-ordered busing for other purposes.

Won*      <u>N.O.W.</u> v. Idaho, 455 U.S. 918 (1982), no oral argument—Federal courts may not interfere with Congress's time extension for Equal Rights Amendment.

Lost      Heffron v. <u>Internat'l Society for Krishna Consciousness</u>, 452 U.S. 640 (1981), argued 4/20/81—State may restrict speech and solicitation on fairgrounds through neutral rule confining such activity to fixed booths that interested fairgoers are free to enter or to avoid at their own option.

Won      <u>Richmond Newspapers</u> v. Virginia, 448 U.S. 555 (1980), argued 2/19/80—Press and public have right to attend criminal trials.

Won*      <u>Boston</u> v. Anderson, 439 U.S. 951, 1389 (1978), no oral argument—State court may not prohibit free speech by municipality on referendum issue pending before the people in statewide election.

---

\*      Won without oral argument, the Court having ruled on the basis of the briefs supporting review. Both cases became moot before argument was possible. In all of the other cases listed, I argued orally before the Court.