

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 3, 2023

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:    *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

The defense accuses the Government of drawing conclusions "without any evidence whatsoever," and relying "heavily on assumptions, unsupported inferences, and innuendo" (Dkt. 185 at 1), but neither party disputes that the defendant shared private writings of Caroline Ellison that he considered detrimental to her with the *New York Times* in order to affect the public's perception of her (and therefore of him), and that he did so after being admonished by the Court that his contact with Witness-1 in January 2023 suggested that "there may very well be probable cause to believe that he either committed or attempted to commit a federal felony while on release, namely witness tampering or attempted witness tampering." (Tr. 2/17/2023 at 14). The record here establishes that the defendant went beyond benignly exercising a constitutional right to speak to the press—he took covert steps intended to improperly discredit a trial witness and taint the jury pool. Far from committing an "abrupt reversal of course" (Dkt. 185 at 1), the Government seeks the only appropriate relief consistent with the defendant's escalating evasions of his bail conditions: that bail be revoked and the defendant be detained pending trial.

**A. The Defendant's Attempt to Tamper with Witness-1**

With respect to Witness-1, the defense claims that the Government's characterization of the defendant's Signal message is "entirely inaccurate" (Dkt. 185 at 3), because more than a month earlier, and prior to his arrest, the defendant had exchanged messages with Witness-1 and others about the FTX bankruptcy. But those messages, which the defendant claims provide "context," are from the days surrounding FTX's bankruptcy filing and relate to the company's consideration of potential paths forward (including whether to declare bankruptcy) and the immediate preservation of corporate assets—topics that were no longer at issue weeks later. In fact, other significant developments arose between those messages and the defendant's improper outreach on January 15, 2023: a criminal investigation resulted in charges against the defendant, some of his coconspirators pled guilty, he was arrested and extradited, and he had an opportunity to learn that

more than a dozen other former FTX and Alameda employees were willing to testify against him, among other things.  (Tr. 12/22/2022 at 7).

The defense also asks the Court to excuse the defendant's use of Signal, an encrypted messaging application, to contact Witness-1 because the Government supposedly "disregards that Witness-1 used Signal to contact Mr. Bankman-Fried about these issues in the first place."  (Dkt. 185 at 5).  This argument overlooks that Witness-1's November 10, 2022 message was via Signal only because the defendant had instructed his employees to communicate by this method.  Witness-1's message was within a Signal group called "small group chat" that the defendant used beginning on November 6, 2022, to communicate with his coconspirators and others about the unfolding crisis at FTX, and for which *the defendant* set an autodelete period of one week.  These messages were only recovered by the Government because some participants in "small group chat" preserved them before the autodeletion period began, and are just one example of how the defendant sought to destroy communications to obstruct a potential government investigation.

Moreover, while the defendant claims that the Court has been deprived of the context for the message to Witness-1, the parties' previous briefing addressed the defendant's simultaneous outreach to John Ray.  (*See* Dkt. 53).  As the Government then pointed out, there are significant differences between the defendant's contacts with Witness-1 and John Ray that are instructive.  First, Witness-1, unlike John Ray, is a witness to the charged crimes and not the steward of FTX's bankruptcy.  Second, the messages to Witness-1 are not of the same character as those to John Ray.[1]  Importantly, in reaching out to John Ray, the defendant copied his attorneys.  The defendant's messages to Witness-1 omit both his own and Witness-1's attorneys.  Moreover, the defendant's email to Ray explicitly stated that he wanted to assist with asset recovery.  But the defendant's message to Witness-1 made no mention of asset recovery, and used purposefully oblique language, referring to a "constructive relationship," "us[ing] each other as resources," and "vet[ting] things with each other."   The defendant referred to "resources" *plural*; he not only offered himself as a resource, but also asked Witness-1 to be a resource for him in return.  The language may be oblique, but its purpose is clear: an effort to improperly influence Witness-1.  Witness-1 was sufficiently alarmed by this message that he did not respond, and his attorneys promptly alerted the Government to the defendant's concerning overture.[2]

---

[1] It is notable just how much of the defendant's various letters focus on his interactions with or perceptions of John Ray, an individual who is not a witness in this case and whose communications have no relevance to any issue at stake here. The defendant's arguments should be seen for what they are: an attempt to deflect from his own conduct by pointing at another person whom the defendant apparently views in a negative light.

[2] As for the defendant's use of a VPN, he claims that his intention was merely to watch football, but does not deny that he used a device that thwarts the monitoring aspects of the conditions of release imposed by this Court. There also is some irony to the defendant's claim that the use of a VPN is not "inherently deceptive," when his proffered justification for using the VPN appears to be that it allowed him to deceive the National Football League and access a subscription service that does not permit viewing in the United States.  (*See* Dkt. 185 at 6).

### B.  The Defendant's Ongoing and Recent Attempt to Tamper with Witnesses

With respect to the defendant's more recent behavior, occurring after the Court admonished him for the outreach to Witness-1, the defense continues to insist that disclosing Ellison's private writings "was a proper exercise of his rights to make fair comment on an article already in progress, for which the reporter already had alternate sources."  (Dkt. 185 at 2).  This explanation does not hold up to even the slightest scrutiny.

As an initial matter, it is widely known that Ellison, who has pleaded guilty and is the defendant's former girlfriend, will be an important witness at the trial of this matter.  The defendant points to the amount of media attention on Ellison in support of his claim that his recently exposed efforts to discredit her are comparatively insignificant.  But that media atmosphere appears to be in part a product of the defendant's own creation and of his sustained effort to focus the media on Ellison's personal life and private writings.  The defense claims that the "reporter contacted Mr. Bankman-Fried about an article he was already writing that featured Ms. Ellison's personal diaries and writings," and points to "an article two months earlier in which [the reporter] described Ms. Ellison's writings and reported that they contained her 'raw reflections on SBF' and her 'personal and professional resentment' towards him."  (Dkt. 185 at 7).  But the suggestion that the reporter was therefore independently "already aware of these documents" (Dkt. 185 at 7) that no one disputes the defendant provided to the reporter flies in the face of common sense.  The only reasonable inference is that the defendant—who had ongoing communications with this reporter for months—first described these writings to the reporter in advance of the May 23, 2023 article so that the reporter could reference them, and then once referenced went many steps further by actually sharing the writings so that they could be described in the July 20, 2023 article (the "Article").  This is further supported by the defendant's pen register data—which shows frequent and lengthy communication with the reporter throughout this time period—and the facts that (1) the defendant admits he is the one who actually shared Ellison's documents with the reporter; (2) the defendant is among a small universe of people who have access to Ellison's private writings; and (3) among those people, the defendant is the only one with the apparent motive to plant these stories with the press.  As the defense has conceded, the defendant shared Ellison's documents in the course of an ongoing strategy to influence the public's perception of the case. (*See* Tr. 7/26/2023 at 31).

What is clear—regardless of whether the defendant was the first source for stories regarding Ellison—is that the defendant, rather than deny his guilt as he correctly now says it is his right to do, shared materials with the press obviously designed to intimidate, harass, and embarrass someone he knows is slated to testify against him, and to provoke an emotional response in potential jurors and color a potential juror's view of that witness.  The defendant was not giving "comment" or his "perspective" on information or accusations sourced elsewhere. (Dkt. 185 at 7). The Article was entitled, "Inside the Private Writings of Caroline Ellison"—without the defendant's leaking of private documents, there was no story.  And to the extent that the defense is conceding that the defendant shared these documents to "protect his reputation," he sought to do so by anonymously sharing personal documents of the sort that would naturally lead to embarrassment and ridicule, not by permissible means such as asserting his innocence (or—as he

did in January 2023 without any Government objection—by posting his version of events in a blog post on Substack[3]).

The suggestion, then, that the Government is trying to punish the defendant for his frequent contacts with the press completely misses the mark. The Government has been aware since the outset of the defendant's pretrial release that he has been speaking to reporters and having in-person visits with journalists and has never sought to interfere with any exercise of his First Amendment rights.[4] The frequency of the defendant's communications with the press *is* relevant to give the lie to the defendant's specious arguments that he was merely responding with comment to the *New York Times*, and not affirmatively planting stories meant to discredit Ellison. What happened here amounts to far more than the defendant "mak[ing] fair comment on a media story about himself." (Dkt. 185 at 7). And even if the defendant failed in his endeavor to smear Ellison (*see* Dkt. 185 at 7 (claiming that the Article "was ultimately favorable to Ms. Ellison and unfavorable to Mr. Bankman-Fried")), it was nonetheless his undisputed intent to accomplish the rehabilitation of his own reputation by discrediting a cooperating witness through the release of intimate writings the defendant had in his possession. The defendant's improper intent is reinforced by his methods: he avoided sharing the documents by email or by phone, instead showing them to the reporter in person and without going on the record. The defense continues its notable silence about whether the defendant has engaged in similar conduct on other occasions, with other journalists, and/or with these or other documents.

The defense's last-ditch claim that the defendant's intentional maligning of Ellison does not amount to trying to corruptly influence her (Dkt. 185 at 7), strains credulity, particularly where the defendant was previously Ellison's boss and boyfriend, and where the very documents the defendant chose to share themselves indicate that Ellison was susceptible to the defendant's influence, sensitive to his opinion of her, and deferential to his authority. As even the defense cannot ultimately dispute, a defendant's First Amendment rights are not limitless—they may not be "calculated to pervert the course of justice." (Dkt. 185 at 2). The defendant's actions here sought to pervert the course of justice by tampering with and harassing a witness, and by tainting the jury pool. The facts here are unlike those in *Gentile*, where the defense attorney gave a press conference the day after his client was indicted, and made statements that the Supreme Court concluded complied with the relevant state rules governing extrajudicial statements, and where no findings had been made explaining how the attorney's statements "had a substantial likelihood of causing material prejudice." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038 (1991). The defendant claims that his conduct was more blameless than that in *Gentile* because he "did not express any opinions as to Ms. Ellison's credibility or guilt." (Dkt. 185 at 15). To the contrary, the defendant's methods created an even greater prospect of taint: his plain aim was to use a reputable newspaper as his mouthpiece for discrediting a Government witness shortly before trial, rather than exposing his own hand in planting the story to rehabilitate his reputation at Ellison's

---

[3]   *See* https://sambf.substack.com/p/ftx-pre-mortem-overview.

[4]   *See, e.g.*,   https://nypost.com/2022/12/27/sam-bankman-fried-met-with-big-short-author-michael-lewis/ (reporting in December 2022 that the defendant was visited at home by Michael Lewis);   https://nypost.com/2022/12/28/sam-bankman-fried-optimistic-at-meeting-with-crypto-influencer/ (same for cryptocurrency journalist Tiffany Fong).

expense.  As more fully described in the Government's opening brief, the defendant's ongoing course of conduct, and the applicable case law, supports the revocation of bail and an order of detention.

In support of its argument, the defense purports to attach "an expert affidavit . . . discussing the constitutional considerations implicated by detaining Mr. Bankman-Fried on the current record." (Dkt. 185 at 2).  The so-called expert affidavit is, in substance, an amicus brief filed without a request for leave to do so, written by a professor who is affiliated with the law firm representing the defendant's father in connection with the Government's investigation.  It is within the Court's discretion what, if any, consideration to give an amicus brief.  *See, e.g.*, *Ass'n of Proprietary Colleges v. Duncan*, No. 14 Civ. 8838 (LAK), 2015 WL 1649146, at *1 (S.D.N.Y. Apr. 8, 2015) (denying leave to file an amicus brief).  Here, the declarant files on behalf of a defendant who is "represented competently," and the declarant has not established "an interest in some other case that may be affected by the decision in the present case," nor has he shared "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Lehman XS Tr., Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No. 12 Civ. 7935 (ALC), 2014 WL 265784, at *2 (S.D.N.Y. Jan. 23, 2014) (citation omitted).

Instead, the declarant repeats the governing statutory authority on pretrial detention and makes constitutional arguments premised on a mistaken understanding of the facts.  For example, in an attempt to cast the defendant's conduct as protected expression rather than an effort to subvert the integrity of the judicial process, the declarant writes: "Mr. Bankman-Fried has a constitutional right—when sought out by reporters for his perspective on stories they are writing—to avoid projecting a false image of someone who is media-shy or, worse, someone whose consciousness of guilt makes him shun the media rather than being forthcoming." (Dkt. 185-1 at 8).  Whether or not the Constitution does enshrine such a right, it is certainly not implicated here, where the defendant did nothing to counter a perception of being "media-shy" inasmuch as he shared Ellison's writings anonymously and declined to be cited or quoted in the Article at all.

The declarant also seizes on the Government's statements regarding the volume of the defendant's press contacts to opine that "there is a risk that the Government seeks to punish Mr. Bankman-Fried for the exercise" of his constitutional rights.  (Dkt. 185-1 at 5).  As noted above, however, the Government is relying on the volume of the defendant's press contacts only insofar as it rebuts the defendant's minimization of his role in the Article, which the declarant adopts wholesale in his own factual findings that he presses to the Court.  (*See* Dkt. 185-1 at 10 ("Instead, it seems to me more accurate to say that Mr. Bankman-Fried acted as a supplemental source for a story on Ms. Ellison that *The New York Times* reporter had already obtained leaked discovery information for from other sources and had been working on for months.").  The declarant's misapprehension of the record reinforces the wisdom that the "Court's criminal docket" should not be "a bulletin board for third-parties to opine on constitutional issues." *United States v. Keleher*, 475 F. Supp. 3d 80, 85 (D.P.R. 2020).

Finally, to the extent the defense falls back on arguments about conditions at the MDC, the defense has no answer to why such issues are not appropriately raised under 18 U.S.C. § 3142(i) in the event the Court deems detention warranted.  And assuming the defendant is detained and placed at the MDC, the MDC houses a large number of detainees awaiting trial, all of whom have

access to participate in their defense and are not deprived of a fair trial as a consequence of their detention.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ Danielle R. Sassoon
Danielle R. Sassoon
Nicolas Roos
Samuel Raymond
Thane Rehn
Danielle Kudla
Assistant United States Attorneys
(212) 637-1115

Cc:     Defense Counsel (by ECF)