UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                        :

UNITED STATES OF AMERICA          :

        - v. -                  :    S6 22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,
  a/k/a "SBF,"                      :

                 Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                       DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York


Danielle Kudla
Samuel Raymond
Thane Rehn
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
      *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   Certain Evidence Is Admissible as Direct Evidence Or Pursuant to Rule 404(b) ................... 2

    A. Applicable Law .......................................................................................................... 3

       1.   Direct Evidence ................................................................................................. 3

       2.   Rule 404(b) ...................................................................................................... 4

       3.   Rule 403 .......................................................................................................... 5

    B. Discussion ................................................................................................................. 5

       1.   Evidence of the Defendant's False Statements to Bank-1 Is Admissible ................ 5

       2.   Evidence of the Defendant's Illegal Campaign Finance Scheme Is Admissible ...... 8

       3.   Evidence of the Defendant's Foreign Bribery Scheme Is Admissible .................. 11

       4.   Evidence that the Defendant Created FTT and Manipulated its Value Is
          Admissible ...................................................................................................... 14

       5.   Evidence that the Defendant Selectively Prioritized Payments to Certain
          Creditors Is Admissible .................................................................................... 16

       6.   Evidence that the Defendant Instituted Autodeletion Policies for Business
          Communications Is Admissible ......................................................................... 17

II.  Statements of the Defendant's Co-Conspirators and Agents Are Not Barred by the Rule
    Against Hearsay ........................................................................................................... 18

    A. Applicable Law ........................................................................................................ 18

       1.   The Rule Against Hearsay ................................................................................. 18

       2.   Rule 801(d)(2)(D) ........................................................................................... 19

       3.   Rule 801(d)(2)(E) ........................................................................................... 19

       4.   Rule 804(b)(3) ................................................................................................. 20

    B. Discussion ............................................................................................................... 21

       1.   Ledgers, Notes, and Other Contemporaneous Documentation Are Not Hearsay... 21

       2.   Statements of Both FTX and Alameda Employees Are Not Hearsay .................. 24

       3.   Ellison's Statements at the November 9, 2022 All-Hands Meeting Are Not
          Hearsay .......................................................................................................... 25

       4.   Ryan Salame's Messages About Being a Straw Donor Are Not Barred by the
          Rule Against Hearsay ....................................................................................... 29

       5.   FTX Commercials Are Not Hearsay .................................................................. 32

III. The Court Should Permit the Authentication of Certain Records Under Rule 902(11) and

Limit the Scope of Cross-Examination of Record Custodians............................................. 32

   A.  Certain Third-Party Business Records May Be Authenticated Under Rule 902(11)...... 33

   B.  The Court Should Limit the Scope of Cross-Examination of Record Custodians .......... 35

IV. The Court Should Preclude the Defendant from Introducing Evidence and Arguments
That Are Irrelevant and Unfairly Prejudicial ........................................................................ 36

   A.  The Court Should Exclude Evidence and Claims That Victims of the Fraudulent
Schemes Were Negligent or Failed to Conduct Adequate Due Diligence..................... 36

   B.  The Court Should Exclude Evidence and Claims That Others in the Cryptocurrency
Industry Misused Customer Assets or Engaged in Misconduct..................................... 38

   C.  The Court Should Exclude Evidence and Claims That the Defendant's
Misrepresentations Were Immaterial Based on Disclaimers in FTX's Terms of
Service or Other Documents ......................................................................................... 40

   D.  The Court Should Exclude Evidence and Claims That the Defendant Intended to
Repay His Victims........................................................................................................ 41

   E.  The Court Should Exclude Claims that the Presence of Attorneys Is Relevant to the
Defendant's Intent Absent a Formal Advice of Counsel Defense ................................ 44

   F.  The Court Should Exclude Evidence and Claims That Regulators Are to Blame for
the Collapse of FTX ..................................................................................................... 46

   G.  The Court Should Exclude Evidence and Claims About the Speed of the
Government's Charging Decisions, the Cooperation of the Debtors' Attorneys, and
the Circumstances of the Defendant's Extradition........................................................ 47

   H.  The Court Should Exclude Certain Evidence and Claims about the FTX Bankruptcy .. 49

   I.  The Court Should Exclude Claims that the Defendant Is Not Guilty Because FTX
Was Not Regulated in the United States and FTX US Remained Solvent .................... 53

   J.  The Court Should Exclude Evidence of the Defendant's Good Acts To Prove His
Innocence..................................................................................................................... 54

   K.  The Court Should Exclude Evidence of the Defendant's Personal Circumstances
and Potential Punishment ............................................................................................. 56

V.  The Court Should Preclude the Defendant from Cross-Examining Witnesses About
Privileged Documents or Topics ......................................................................................... 57

VI. The Court Should Preclude the Defendant From Cross-Examining Witnesses About
Their Recreational Drug Use............................................................................................... 59

CONCLUSION...................................................................................................................... 60

# TABLE OF AUTHORITIES

Page(s)

*Cases*:

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .................................. 46

*Arlio v. Lively*,
474 F.3d 46 (2d Cir. 2007) .......................................................................................................... 39

*Bourjaily v. United States*,
483 U.S. 171 (1987) ......................................................................................................... 20, 22

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) .................................................................................................................... 59

*Feis v. United States*,
394 F. App'x 797 (2d Cir. 2010) ............................................................................................... 19

*George v. Celotex Corp.*,
914 F.2d 26 (2d Cir. 1990) .................................................................................................. 19, 32

*In re Reserve Fund Sec. Litig.*,
No. 09 Civ. 4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ................................. 25

*Neder v. United States*,
527 U.S. 1 (1999) ............................................................................................................... 41, 47

*Pappas v. Middle Earth Condo. Ass'n*,
963 F.2d 534 (2d Cir. 1992) .......................................................................................... 19, 24, 27

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
38 F.3d 627 (2d Cir. 1994) .......................................................................................................... 34

*Rogers v. United States*,
422 U.S. 35 (1975) ............................................................................................................... 56, 57

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................................................................................. 44, 45

*S.E.C v. Lek Sec. Corp.*,
No. 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) .................................. 45

*Shannon v. United States*,
512 U.S. 573 (1994) .................................................................................................................... 56

*United States v. Adelekan*,
567 F. Supp. 3d 459 (S.D.N.Y. 2021) ........................................................................................ 37

*United States v. Akefe*,
568 F. App'x 1 (2d Cir. 2014) ................................................................................................... 53

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) ........................................................................................................ 55

*United States v. Amico*,
486 F.3d 764 (2d Cir. 2007) ........................................................................................................ 37

*United States v. Andrews*,
166 F. App'x 571 (2006) ........................................................................................................... 14

*United States v. Ashraf*,
   320 F. App'x 26 (2d Cir. 2009) ......................................................................... 22

*United States v. Ayelotan*,
   917 F.3d 394 (5th Cir. 2019) ........................................................................... 33

*United States v. Bailey*,
   444 U.S. 394 (1980)......................................................................................... 36

*United States v. Bakhtiari*,
   913 F.2d 1053 (2d Cir. 1990)........................................................................... 36

*United States v. Bankman-Fried*,
   No. 22 Cr. 673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023).............................. 42, 51

*United States v. Barone*,
   114 F.3d 1284 (1st Cir. 1997) .......................................................................... 30

*United States v. Battaglia*,
   No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008)................................... 56

*United States v. Benedetto*,
   571 F.2d 1246 (2d Cir. 1978)........................................................................... 55

*United States v. Berger*,
   188 F. Supp. 2d 307 (S.D.N.Y. 2002)................................................................ 43

*United States v. Buckley*,
   101 F.3d 685, 1996 WL 282140 (2d Cir. 1996) ................................................ 42

*United States v. Burrous*,
   147 F.3d 111 (2d Cir. 1998)............................................................................. 18

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000).......................................................................... 3, 7

*United States v. Cardillo*,
   316 F.2d 606 (2d Cir. 1963)....................................................................... 57, 58

*United States v. Caruso*,
   225 F.3d 646, 2000 WL 1134359 (2d Cir. 2000) .............................................. 22

*United States v. Cheung Kin Ping*,
   555 F.2d 1069 (2d Cir. 1977)........................................................................... 46

*United States v. Colon*,
   880 F.2d 650 (2d Cir. 1989)............................................................................... 7

*United States v. Connolly*,
   No. 16 Cr. 370 (CM), 2019 WL 2125044 (S.D.N.Y. May 2, 2019)...................... 39

*United States v. Coonan*,
   938 F.2d 1553 (2d Cir. 1991)....................................................................... 3, 4

*United States v. Coven*,
   662 F.2d 162 (2d Cir. 1981)....................................................................... 57, 58

*United States v. Crowley*,
   318 F.3d 401 (2d Cir. 2003)............................................................................. 59

*United States v. Daly*,
   842 F.2d 1380 (2d Cir. 1988)............................................................................. 4

*United States v. Demosthene*,
   334 F. Supp. 2d 378 (S.D.N.Y. 2004), *aff'd*, 173 F. App'x 899 (2d Cir. 2006). ...................... 49

*United States v. Dendy*,
    995 F.2d 233, 1993 WL 175264 (9th Cir. May 25, 1993) .................................................. 23

*United States v. Desena*,
    260 F.3d 150 (2d Cir. 2001) .................................................................................................. 28

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999) ................................................................................... 4, 15, 16, 28

*United States v. Donovan*,
    55 F. App'x 16 (2d Cir. 2003) ......................................................................................... 22, 23

*United States v. Dupree*,
    706 F.3d 131 (2d Cir. 2013) ............................................................................................ 19, 32

*United States v. Dupree*,
    870 F.3d 62 (2d Cir. 2017) ......................................................................................... passim

*United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012),
    *aff'd*, 173 F. App'x 899 (2d Cir. 2006) ............................................................................... 55

*United States v. Figueroa*,
    618 F.2d 934 (2d Cir. 1980) .................................................................................................. 5

*United States v. Gelzer*,
    50 F.3d 1133 (2d Cir. 1995) ............................................................................................ 5, 13

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999) ............................................................................................. 20, 29

*United States v. Gonzalez*,
    110 F.3d 936 (2d Cir. 1997) .................................................................................................. 3

*United States v. Graham*,
    51 F.4th 67 (2d Cir. 2022) ............................................................................................... 7, 12

*United States v. Gupta*,
    747 F.3d 111 (2d Cir. 2014) ........................................................................................... 20, 38

*United States v. Harris*,
    491 F.3d 440 (D.C. Cir. 2007) ............................................................................................ 56

*United States v. Hsu*,
    669 F.3d 112 (2d Cir. 2012) ............................................................................................. 9, 11

*United States v. Inserra*,
    34 F.3d 83 (2d Cir. 1994) .................................................................................................... 15

*United States v. Jabar*,
    19 F.4th 66 (2d Cir. 2021) ............................................................................................... 9, 42

*United States v. Jackson*,
    792 F. App'x 849 (2d Cir. 2019) ..................................................................................... 7, 12

*United States v. Josephberg*,
    562 F.3d 478 (2d Cir. 2009) ................................................................................................ 46

*United States v. Kelley*,
    305 F. App'x 705 (2d Cir. 2009) ........................................................................................ 27

*United States v. Kelly*,
    551 F.3d 171 (2d Cir. 2009) ................................................................................................ 18

*United States v. Korogodsky*,
    4 F. Supp. 2d 262 (S.D.N.Y. 1998) .................................................................................... 38

*United States v. Kwong,*
    69 F.3d 663 (2d Cir. 1995)........................................................................................... 36

*United States v. Lang,*
    589 F.2d 92 (2d Cir. 1978)........................................................................................... 31

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016)........................................................................................... 43

*United States v. Lin,*
    225 F.3d 647, 2000 WL 1340361 (2d Cir. 2000) ....................................................... 57

*United States v. Males,*
    459 F.3d 154 (2d Cir. 2006).......................................................................................... 42

*United States v. McPartlin,*
    595 F.2d 1321 (7th Cir. 1979) ..................................................................................... 23

*United States v. Mendlowitz,*
    No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ........................ 39

*United States v. Miller,*
    626 F.3d 682 (2d Cir. 2010)......................................................................................... 36

*United States v. Miller,*
    954 F.3d 551 (2d Cir. 2020)......................................................................................... 29

*United States v. Miller,*
    No. 18 Cr. 202 (ARR), 2018 WL 4961458 (E.D.N.Y. Oct. 15, 2018) ........................ 33

*United States v. Milton,*
    No. 21 Cr. 478 (ER), 2022 WL 4110256 (S.D.N.Y. Sept. 8, 2022) ............................ 57

*United States v. Naiman,*
    211 F.3d 40 (2d Cir. 2000)........................................................................................... 14

*United States v. Nelson,*
    365 F. Supp. 2d 381 (S.D.N.Y. 2005).......................................................................... 59

*United States v. Paccione,*
    949 F.2d 1183 (2d Cir. 1991)....................................................................................... 56

*United States v. Padilla,*
    203 F.3d 156 (2d Cir. 2000)......................................................................................... 20

*United States v. Paul,*
    110 F.3d 869 (2d Cir. 1997)......................................................................................... 36

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011)........................................................................................... 21

*United States v. Persing,*
    436 F. App'x 13 (2d Cir. 2011) .................................................................................... 23

*United States v. Petit,* No. 19 Cr. 850 (JSR) (S.D.N.Y.) ............................................................. 45

*United States v. Pipola,*
    83 F.3d 556 (2d Cir. 1996)........................................................................................... 13

*United States v. Pitre,*
    960 F.2d 1112 (2d Cir. 1992)......................................................................................... 8

*United States v. Qualls,*
    613 F. App'x 25 (2d Cir. 2015) .................................................................................... 33

*United States v. Quinones,*

511 F.3d 289 (2d Cir. 2007)............................................................................................ 3

*United States v. Ramirez,*
894 F.2d 565 (2d Cir. 1990).......................................................................................... 4

*United States v. Reese,*
933 F. Supp. 2d 579 (S.D.N.Y. 2013)........................................................................ 49

*United States v. Regan,*
103 F.3d 1072 (2d Cir. 1997)...................................................................................... 48

*United States v. Rigas,*
490 F.3d 208 (2d Cir. 2007)........................................................................................ 15

*United States v. Rivera,*
22 F.3d 430 (2d Cir. 1994)................................................................................... 20, 23

*United States v. Rivera,*
791 F. App'x 200 (2d Cir. 2019) ................................................................................ 12

*United States v. Rivera,*
No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) .................... 55

*United States v. Roldan-Zapata,*
916 F.2d 795 (2d Cir. 1990)............................................................................. 5, 13, 18

*United States v. Rom,*
528 F. App'x 24 (2d Cir. 2013) .................................................................................. 33

*United States v. Romero-Padilla,*
583 F.3d 126 (2d Cir. 2009)........................................................................................ 11

*United States v. Rosa,*
11 F.3d 315 (2d Cir. 1993)..................................................................................... 16, 18

*United States v. Rosado,*
728 F.2d 89 (2d Cir. 1984).......................................................................................... 48

*United States v. Russo,*
302 F.3d 37 (2d Cir. 2002).......................................................................................... 24

*United States v. Saget,*
377 F.3d 223 (2d Cir. 2004)........................................................................................ 30

*United States v. Saldarriaga,*
204 F.3d 50 (2d Cir. 2000).......................................................................................... 48

*United States v. Saneaux,*
392 F. Supp. 2d 506 .................................................................................................... 21

*United States v. Sattar,*
No. 02 Cr. 395 (JGK), 2003 WL 22137012 (S.D.N.Y. Sept. 15, 2003)................... 58

*United States v. Scarpa,*
897 F.2d 63 (2d Cir. 1990).......................................................................................... 55

*United States v. Schlussel,*
No. 08 Cr. 694 (JFK), 2009 WL 536066 (S.D.N.Y. Feb. 27, 2009)......................... 59

*United States v. Scully,*
877 F.3d 464 (2d Cir. 2017)........................................................................................ 44

*United States v. Shea,* No. 20 Cr. 412 (AT) (S.D.N.Y.) ................................................. 45

*United States v. Sindona,*
636 F.2d 792 (2d Cir. 1980)........................................................................................ 44

*United States v. SKW Metals & Alloys, Inc.*,
   195 F.3d 83 (2d Cir. 1999)................................................................................ 23

*United States v. Sliker*,
   751 F.2d 477 (2d Cir. 1984)............................................................................. 12

*United States v. Snype*,
   441 F.3d 119 (2d Cir. 2006).............................................................................. 5

*United States v. St. John*,
   267 F. App'x 17 (2d Cir. 2008) ....................................................................... 58

*United States v. Stewart*,
   No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)................................ 49, 52

*United States v. Tanner*, 17 Cr. 61 (LAP)........................................................................ 57

*United States v. Tarantino*,
   846 F.2d 1384 (D.C. Cir. 1988) ...................................................................... 20

*United States v. Thai*,
   29 F.3d 785 (2d Cir. 1994)............................................................................ 4, 12

*United States v. Thomas*,
   116 F.3d 606 (2d Cir. 1997)........................................................................... 49

*United States v. Thomas*,
   377 F.3d 232 (2d Cir. 2004)........................................................................... 37

*United States v. Thomas*,
   581 F. App'x 100 (2d Cir. 2014) ..................................................................... 42

*United States v. Tocco*,
   200 F.3d 401 (6th Cir. 2000) ......................................................................... 30

*United States v. Tracy*,
   12 F.3d 1186 (2d Cir. 1993)........................................................................... 21

*United States v. Tussa*,
   816 F.2d 58 (2d Cir. 1987).............................................................................. 5

*United States v. Urena*,
   No. 11 Cr. 1032 (PAE), 2014 WL 1303114 (S.D.N.Y. Apr. 1, 2014) ................................ 59

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013)............................................................................. 41

*United States v. Vincent*,
   416 F.3d 593 (7th Cir. 2005) ......................................................................... 42

*United States v. Wagner*, No. 20 Cr. 410 (NSR),
   2022 WL 19179 (S.D.N.Y. Jan. 3, 2022) ...................................................... 35, 60

*United States v. Watts*,
   934 F. Supp. 2d 451 (E.D.N.Y. 2013) ............................................................ 43

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017)......................................................................... 37, 41

*United States v. Weigand*,
   No. 20 Cr. 188 (JSR), 2021 WL 568173 (S.D.N.Y. Feb. 14, 2021)............................... 34

*United States v. Westmoreland*,
   240 F.3d 618 (7th Cir. 2001) ......................................................................... 30

*United States v. Wexler*,


    522 F.3d 194 (2d Cir. 2008)..................................................................................... 30

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)..................................................................................... 30

*United States v. Zackson*,
    12 F.3d 1178 (2d Cir. 1993)....................................................................................... 4

*Williamson v. United States*,
    512 U.S. 594 (1994)............................................................................ 20, 30, 31, 32

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3505....................................................................................................... 33, 35

Fed. R. Evid. 104(a)........................................................................................................ 20

Fed. R. Evid. 402............................................................................................................ 36

Fed. R. Evid. 403....................................................................................................... 5, 36

Fed. R. Evid. 404(a)(2)(A).............................................................................................. 55

Fed. R. Evid. 404(b)......................................................................................................... 4

Fed. R. Evid. 405(a)....................................................................................................... 55

Fed. R. Evid. 608(b)....................................................................................................... 59

Fed. R. Evid. 611................................................................................................. 35, 36, 59

Fed. R. Evid. 801(c).................................................................................................. 18, 19

Fed. R. Evid. 801(d)(2)(D)...................................................................... 19, 24, 25, 27

Fed. R. Evid. 801(d)(2)(E)....................................................................................... *passim*

Fed. R. Evid. 802............................................................................................................ 18

Fed. R. Evid. 803(6)................................................................................................. 33, 34

Fed. R. Evid. 804(b)(3)................................................................................................... 20

Fed. R. Evid. 902(11)....................................................................................... 32, 33, 35

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Samuel Bankman-Fried scheduled to begin on October 3, 2023.

## FACTUAL BACKGROUND

On August 14, 2023, a Grand Jury in this District returned a seven-count superseding indictment charging the defendant with wire fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit commodities fraud, and conspiracy to commit money laundering (*See* Dkt. 202 (the "Indictment")). The charges arise out of the defendant's fraudulent misappropriation of billions of dollars of funds deposited by customers of FTX.com ("FTX"), and his related false and misleading statements to those customers, to investors in FTX, and to lenders to the defendant's trading firm Alameda Research ("Alameda"), all so that he could obtain their money. The defendant then used billions of dollars in stolen funds for a variety of purposes, including, among other things, to support the operations and investments of FTX and Alameda; to fund speculative venture investments; to make illegal campaign contributions; and to enrich himself.

The Government expects that three of the defendant's co-conspirators, who have each pleaded guilty under cooperation agreements with the Government, will testify at trial about conspiring to commit, and committing, fraud with the defendant. These cooperating witnesses— Gary Wang, Nishad Singh, and Caroline Ellison—formed the defendant's trusted inner circle during the course of the conspiracy. Wang co-founded FTX with the defendant and was FTX's Chief Technology Officer. Singh was FTX's Head of Engineering. Ellison was an Alameda employee, and later its CEO. These witnesses are expected to testify regarding the unlawful conduct directed and undertaken by the defendant, including and among other things, how, at the defendant's direction, Wang and Singh implemented features into FTX's code that the defendant

exploited to allow Alameda to misappropriate billions of dollars in FTX customer assets; how the defendant misrepresented the safety of FTX; how Alameda received special treatment on the exchange as part of a scheme to defraud FTX's customers and investors of billions of dollars; and how, contrary to the defendant's promises to FTX customers that the exchange would protect their interests and segregate their assets, the defendant routinely tapped FTX customer assets to provide interest-free capital for his and Alameda's private expenditures, and in the process exposed FTX customers to massive, undisclosed risk. Wang, Singh, and Ellison will also describe the events in November 2022 when FTX began to unravel and customer withdrawals surged, and how the defendant tried to maintain his charade, knowingly tweeting false assurances to FTX customers and trying to raise billions of dollars in investment capital even while he knew that FTX was facing a solvency crisis as a result of his fraud.

In addition to Ellison, Wang, and Singh, the Government expects to call, among other witnesses, multiple former employees of Alameda and FTX, several of the defendant's customer, lender, and investor victims, and an expert witness whose financial analysis will show the nature and extent of the fraud. The Government also intends to introduce documentary evidence of the defendant's crimes, including, among other things, financial records, Google documents and excel spreadsheets, and private communications.

## **ARGUMENT**

### I.   **Certain Evidence Is Admissible as Direct Evidence Or Pursuant to Rule 404(b)**

In furtherance of the criminal schemes for which the defendant is being tried in October and generally to advance his own interests and the interests of FTX and Alameda, the defendant, along with his co-conspirators, engaged in a broad array of deceptive and unlawful activities. As relevant to this motion, and during the timeframe relevant to this trial, the defendant and his co-

conspirators: (1) made false statements to a bank to access FTX customer deposits, (2) funneled millions of dollars of illegal campaign contributions into the U.S. political system using misappropriated funds, (3) engaged in foreign bribery to regain access to trading capital later used by Alameda in its business investments, (4) created the cryptocurrency token FTT and manipulated its value, (5) instituted autodeletion policies for company communications in an effort to destroy evidence, and (6) selectively prioritized the repayment of certain creditors during FTX's collapse to avoid detection of unlawful conduct by United States authorities. As discussed further below, evidence of this conduct is relevant and admissible at trial, both as direct proof of the charges and pursuant to Federal Rule of Evidence 404(b).

## A. Applicable Law

### 1. Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Thus, where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged

3

to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)).

2. Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79).

4

3. <u>Rule 403</u>

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

**B. Discussion**

1. <u>Evidence of the Defendant's False Statements to Bank-1 Is Admissible</u>

The Government intends to offer evidence that the defendant authorized false statements to a bank ("Bank-1") in order to obtain a bank account to receive FTX customer deposits. Indeed, FTX itself, for a lengthy period of time following its inception, was unable to obtain for itself a bank account in the United States to receive deposits. Because FTX had no account of its own to use for this purpose, in or around 2019 and 2020, FTX instructed customers to wire dollar deposits

5

to bank accounts that were owned or controlled by Alameda.

At least in part to hide the fact that customer deposits were being held by Alameda, in or about August 2020, the defendant directed the incorporation of a new U.S.-based entity, North Dimension, so that he could open a bank account in the name of North Dimension to receive FTX customer deposits. The defendant was listed as sole owner, CEO, and president of North Dimension, which had no employees or business operations outside of its bank account.

Because Bank-1 would not open a bank account for any entity it knew was receiving customer deposits for FTX, the defendant and other Alameda employees falsely represented to Bank-1 that North Dimension sought to open an account to function as a trading account connected to Alameda's existing trading accounts, instead of the truth, which was that the North Dimension account would function as an account to receive and transmit FTX customer deposits. Under the defendant's supervision, employees of Alameda completed an account application that falsely stated that the purpose of the North Dimension bank account was for "trading" and "market making." Bank-1 was also given a completed North Dimension due diligence questionnaire— which the defendant signed—that falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account" and that North Dimension "also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account." Furthermore, despite the fact that North Dimension was created for the purpose of transmitting customer deposits on and off the FTX exchange, the due diligence questionnaire falsely claimed that North Dimension was not a money services business. In or about April 2021, Bank-1 approved the opening of the North Dimension account.

The defendant's lies to Bank-1 to open a bank account that he intended be used to process FTX customer deposits is direct evidence of the defendant's fraud against FTX customers. The

6

false statements to Bank-1 resulted in the opening of the North Dimension account, which was a vehicle used to misappropriate FTX customer dollar deposits to pay for Alameda's expenses and fund Alameda's investments, as charged in Counts One and Two. The Government will establish at trial that some of the misappropriated funds were those maintained at banks including Bank-1, in the names of Alameda and North Dimension. The defendant's knowledge of the use of these various accounts and his ultimate control over them is therefore directly at issue at this trial. Accordingly, this evidence is inextricably intertwined with the evidence regarding the charged offenses and necessary to complete the story of the crime on trial. *See Carboni*, 204 F.3d at 44.

This evidence is also admissible under Rule 404(b) as evidence of the defendant's fraudulent intent and knowledge. The Government expects the defendant's guilty knowledge to be a disputed issue at trial. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989) (defendant's knowledge and intent are in issue unless the defendant has unequivocally expressed that he will not dispute these issues at trial). The defendant's false statements to Bank-1, and his efforts to conceal the true nature of the North Dimension bank account, are probative of his criminal intent and knowledge, and lack of mistake or accident, with respect to the misappropriation of customer assets because these statements demonstrate the defendant's intimate knowledge of the use of the accounts and his plan to mislead others regarding purposes and uses of funds to advance the aims of his companies. *See United States v. Graham*, 51 F.4th 67, 82 (2d Cir. 2022) (district court properly admitted evidence of concurrent fraudulent scheme as probative of fraudulent intent); *United States v. Jackson*, 792 F. App'x 849, 853 (2d Cir. 2019) (district court properly admitted prior conviction for bank fraud as proof of the defendant's knowledge and intent to commit wire fraud, and to rebut a defense that the defendant "blundered into the fraudulent transactions at issue because they were overly complex and he did not

7

understand them"); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) ("[W]here it is apparent that intent will be in dispute, evidence of prior or similar acts may be introducing during the government's case-in-chief . . . ."). The defendant's direction of false statements regarding the North Dimension account is also highly probative of his control over Alameda employees and his ability to cause subordinates to engage in deceptive conduct, and therefore provides compelling evidence of facts at issue in this trial.

Nor is the probative value of these false statements outweighed by any risk of unfair prejudice. Indeed, the central allegations in this case concern pervasive deception and the wholesale misappropriation of billions of dollars from customers, investors, and lenders. Evidence of a specific and narrow set of misleading statements made to a bank is certainly no more sensational or disturbing.

### 2. Evidence of the Defendant's Illegal Campaign Finance Scheme Is Admissible

Although the Government is precluded by treaty from seeking a separate conviction for campaign finance violations, evidence that (1) the defendant spent customer funds on political contributions, (2) used straw donors—specifically Singh and Ryan Salame, a high-ranking executive first at Alameda and then at FTX—in order to conceal the source of the funds, and (3) violated campaign finance laws in an effort to gain influence over political and regulatory decisions affecting the defendant's businesses is relevant and admissible at trial. Specifically, the making of political contributions using Alameda funds and doing so unlawfully in the names of straw donors is direct proof of wire fraud and money laundering conspiracy, and is also admissible under Rule 404(b).

Evidence of the defendant's spending of customer money on political contributions as well as his unlawful use of straw donors is direct proof of the wire fraud scheme because FTX customer

8

funds, misappropriated through Alameda, were the primary funding source for the defendant's political contributions. *See United States v. Jabar*, 19 F.4th 66, 79-82 (2d Cir. 2021) (evidence concerning how defendants misappropriated contract funds for personal use was directly relevant to establishing the defendants' fraudulent intent). Indeed, the fact that the defendant spent his customers' money, and how, itself proves that the money was indeed misappropriated. *See id.* at 80 (defendants' immediate conversion of contract funds for personal use, including the payback of numerous creditors, was evidence of misappropriation). And the fact that the contributions were made in a surreptitious manner that violated campaign finance laws corroborates that the defendant's use of customer funds was not consistent with the proper use of funds belonging to a company.

The defendant's spending of misappropriated funds on political donations is further probative of the defendant's motive for defrauding FTX's customers and investors: the defendant wanted access to capital that he could use, in part, for political donations that would burnish his own image and improve the regulatory prospects of his business in the United States. So too is evidence of the defendant's unlawful circumvention of campaign finance laws: the fact that the defendant engaged not in lawful giving on behalf of FTX but instead used straw donors to hide the true source of funds and deceptively increase his influence on policymaking demonstrates the strength of his desire to purchase political clout—a desire so great that he stole customer funds to satisfy it.

This case is akin to *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012), where the Second Circuit held that the district court did not plainly err in admitting evidence of a multimillion-dollar Ponzi scheme in a trial of campaign finance charges because the "schemes were connected: the evidence could be read by a jury as suggesting that [the defendant] used his

Ponzi investors as a source of campaign contributions, and used the connections to politicians to burnish his reputation for respectability so as to recruit and reassure potential investors."

Here, the evidence is also direct proof of money laundering. One of the ways in which the defendant conspired to conceal the proceeds of the wire fraud was by making political contributions through straw donors, and thus the conduit contributions were a core part of the money laundering offense charged in Count Seven. In order to prove concealment for the money laundering conspiracy, the Government intends to prove that misappropriated customer assets were routed through straw donors to disguise their source. And the mere fact that the defendant was trying to conceal the source of the funds is probative of his criminal intent and knowledge of the wire fraud.

Evidence of the making of political contributions using funds wired from Alameda and transferred through straw donors' bank accounts also tends to show that the defendant was effectively controlling decisions at Alameda, such as the transfer of millions of dollars from Alameda for political giving. And it corroborates the criminal relationship of trust between the defendant and Nishad Singh, who was part of the defendant's inner circle that facilitated the defendant's fraud on FTX's customers, as well as a straw donor in the defendant's campaign finance scheme, whose political donations were funded in part with misappropriated FTX customer funds. *See, e.g.*, *Dupree*, 870 F.3d at 76 (evidence of bad acts with coconspirators is admissible "to explain the mutual trust that existed between coconspirators").

As with the defendant's lies to Bank-1, the probative value of evidence of the defendant's unlawful political donations—which is great—is not outweighed by the risk of unfair prejudice—which is relatively small. While it is true that use of straw donors is different in nature than deceiving and misappropriating from customers, investors, and lenders, it is not more sensational

or connected with greater moral opprobrium and does not create a risk of unfair prejudice. *See Hsu*, 669 F.3d at 118-19 (admission of fraud evidence at trial of campaign finance charges not unfairly prejudicial).

### 3.   Evidence of the Defendant's Foreign Bribery Scheme Is Admissible

The S5 Indictment charges the defendant in Count Thirteen with conspiracy to bribe a foreign government official in violation of the Foreign Corrupt Practices Act. Although this count has been severed from the upcoming trial, evidence of this offense is nonetheless admissible as direct evidence and under Rule 404(b).

One of the defendant's principal objectives—and an objective that unifies his interconnected fraud schemes—was to obtain access to capital in order to fund Alameda's business activity. To that end, the defendant directed the bribery of a foreign government official in order to unfreeze Alameda trading accounts, so as to regain access to funds that would be used by Alameda for trading and other business activity. In early 2021, the Chinese government froze approximately $1 billion of Alameda's trading assets on two Chinese cryptocurrency exchanges. With these accounts frozen, the defendant sought access to additional capital elsewhere, including through cryptocurrency loans from some of the anticipated trial witnesses. After months of failed attempts to unfreeze Alameda's trading accounts through other means, the defendant authorized and directed a multi-million-dollar bribe to at least one Chinese government official and the trading accounts were then unfrozen.

These actions are inextricably intertwined with the defendant's core criminal scheme. *First*, the defendant's willingness to engage in foreign bribery to regain access to capital for Alameda shares a motivation for the misappropriation of FTX customer deposits: funding Alameda's business activity. *See United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009)

(affirming the admission of other crimes evidence as direct evidence where it shed light on the defendant's motivation to participate in the charged crimes). *Second*, the defendant's authorization of the bribe on behalf of Alameda is relevant to his level of control and oversight of the very company responsible for the misappropriation of FTX customer deposits, and rebuts his anticipated defense that he was not involved in Alameda decision-making. *See Thai*, 29 F.3d at 813 (affirming the admission of other crimes evidence as direct evidence where it established, among other things, the "leadership roles played by [defendants]"). *Third*, during the execution of the bribery scheme, the defendant involved Ellison—one of the same co-conspirators involved in defrauding FTX customers of billions of dollars. *See United States v. Rivera*, 791 F. App'x 200, 206 (2d Cir. 2019) (affirming the admission of other crimes evidence that was offered to enable the "jury to understand how the illegal relationship between the co-conspirators developed," noting that were evidence of the defendant's "longstanding criminal relationship [with co-defendants] stripped away, it might well seem improbable to a reasonable juror that the [defendant] would trust the [cooperating witnesses] with such combustible information and/or sensitive tasks.").

In the alternative, evidence of the defendant's foreign bribery scheme is admissible under Rule 404(b), as it is highly probative of the defendant's motive, criminal intent, knowledge, and absence of mistake with respect to the charged offenses. *See United States v. Sliker*, 751 F.2d 477, 486-87 (2d Cir. 1984); *Jackson*, 792 F. App'x at 853. The fact that approximately $1 billion of Alameda's trading assets were frozen on two Chinese cryptocurrency exchanges in early 2021, and for months the defendant's efforts to unfreeze the accounts were unsuccessful, supplies part of the motive for the defendant's misappropriation of customer funds to increase Alameda's access to capital. The bribery scheme also reinforces that the defendant was intent on expanding Alameda's trading and spending power, including by bribery and fraud. *See Graham*, 51 F.4th at

82 (affirming the admission of a separate fraud scheme committed "at the same time as the charged conspiracy, with the same coconspirators, and with the same hallmarks [of the charged conspiracy]—'unconventional' financial techniques used to purportedly discharge debt," as "probative of fraudulent intent," the lack of which was the defendant's "principal defense" at trial).

Based on the defendant's public statements and pre-trial filings, an anticipated defense is that the defendant was in the dark about the criminal actions of others at Alameda and FTX. That the defendant engaged in illegal conduct to access capital for Alameda with the assistance of at least one of the same co-conspirators involved in the trial offenses—at a time in late 2021 when the defendant was publicly distancing himself from the very same company—is highly probative of his knowledge and intent. *See Roldan-Zapata*, 916 F.2d at 804 (admission of Rule 404(b) evidence permissible to establish pre-existing relationship between co-conspirators and to explain the defendant's motivation in the charged crime); *United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (holding that "legitimate purpose[s] for presenting evidence of extrinsic acts" include "explain[ing] how a criminal relationship developed" and "help[ing] the jury understand the basis for the co-conspirators' relationship of mutual trust").[1]

This conduct, while serious, is not more inflammatory than the central conduct at issue here and evidence of the foreign bribery scheme should not be precluded under Rule 403. Evidence of improper payments to a foreign government official will have some prejudicial impact on the defendant, but that impact will not be unfair or beyond the purposes for which the evidence will be offered. *Gelzer*, 50 F.3d at 1139. Indeed, unlike with respect to the fraud charges, which directly

---

[1] Even if evidence of this conduct were not otherwise admissible, the defense may well open the door to it. Notably, Ellison's involvement in the bribery scheme is part of her criminal history that is covered by her cooperation agreement, and among the information Ellison voluntarily provided to the Government, and therefore may be put at issue with respect to Ellison's credibility.

harmed customers, investors, and lenders, evidence of the scheme to commit foreign bribery will not involve proof about individual victims. The Second Circuit has concluded in considering prejudicial spillover claims that evidence of bribery was not so inflammatory as to prejudice a jury's consideration of other fraud counts, and the same conclusion follows here. *See United States v. Naiman*, 211 F.3d 40, 43-45, 50 (2d Cir. 2000) (finding no prejudicial spillover from admission of evidence that the defendant directed bribes in the context of a larger misappropriation fraud scheme); *cf. United States v. Andrews*, 166 F. App'x 571, 572 (2006) ("evidence introduced to support the substantive bribery charge was no more inflammatory than the evidence submitted to support the conspiracy to bribe charge or the substantive fraud charges").

4. <u>Evidence that the Defendant Created FTT and Manipulated its Value Is Admissible</u>

The Government intends to offer evidence relating to the defendant's issuance, ownership, and price maintenance of the cryptocurrency token FTT, as well as his role in promoting cryptocurrency tokens such as Serum, of which he also amassed substantial holdings. In particular, the Government intends to prove that the defendant directed Alameda to acquire large quantities of these tokens in order to substantially increase Alameda's borrowing power through the use of these tokens as collateral. The defendant instructed Ellison to engage in trading to increase and maintain FTT's market price, and to keep such trading a secret, which enabled Alameda to use its accumulated holdings of FTT to secure billions of dollars in loans from its third-party lenders, collateralized by FTT. Similarly, as part of his promotion of the Serum token, the defendant and his associates took steps to conceal their ownership of a substantial percentage of existing Serum tokens. As a consequence of owning a large percentage of existing FTT and Serum, the defendant was able to pad Alameda's balance sheet with coins whose paper value vastly exceeded what the coins would be worth if attempts were made to liquidate these assets (*i.e.*, their liquid value), and

14

to enlarge Alameda's borrowing by billions of dollars.

This evidence provides direct proof of the charged crimes because it explains how the defendant put Alameda in a position to borrow billions of dollars from lenders, whom the defendant ultimately defrauded. *See Diaz*, 176 F.3d at 79 (an act "done in furtherance of the alleged conspiracy" is considered "part of the very act charged"); *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). The defendant's invention or promotion of cryptocurrency tokens that made up a substantial portion of Alameda's assets is just one of several techniques the defendant used to increase Alameda's borrowing and trading power. Alameda used FTT as collateral to borrow billions of dollars from third-party lenders, and also as collateral to borrow billions of dollars of FTX customer assets through FTX's borrow/lend program. Evidence of the discrepancy between these tokens' paper value and their liquid value will also help the jury understand how Alameda was able to maintain a supposedly positive net asset value even after borrowing billions of dollars of FTX customer funds in the Spring and Summer of 2022, and why publication of Alameda's balance sheet on November 2, 2022—whose positive value consisted principally of FTT—set off the chain of events that ultimately led to exposure of the defendant's crimes and FTX's collapse. *See United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007) (where indictment alleged schemes to defraud a company's investors and lenders, affirming admissibility of evidence relating to fraudulent transactions that "were recorded in [the company's] ledgers in a way that affected [its] financial statements"; this evidence was "inextricably intertwined with" proof of the charged offenses and "necessary to complete the story of the crime on trial").

The defendant's directive to Ellison to artificially maintain the price of FTT is also direct

15

evidence of the charged crimes. By inflating the price of FTT, the defendant sought to inflate the assets on Alameda's balance sheet, which created a deceptive picture for Alameda's lenders about the health of Alameda. This conduct is also probative of the defendant's relationship with Ellison: it shows both that he retained authority over her trading decisions at Alameda and that the two cultivated a secretive criminal relationship of trust over the course of the conspiracies. *See Diaz*, 176 F.3d at 79-80 (evidence of participation in prior bad acts with co-conspirators was directly admissible to show a defendant's participation in a shared criminal enterprise); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) (defendant's prior dealings with co-conspirator showed the development of their illegal relationship and their mutual trust).

Admission of evidence of the defendant's manipulation of a cryptocurrency token is not barred by Rule 403. Evidence of such price manipulation is far less sensational and raises far less risk of unfair or emotional response than does evidence of the main conduct at issue at this trial, and therefore the probative value of the evidence outweighs the risk of unfair prejudice.

5. Evidence that the Defendant Selectively Prioritized Payments to Certain Creditors Is Admissible

During and after FTX's collapse, the defendant made a number of public statements indicating that his priority was to do right by FTX's customers and to make them whole. In reality, during the collapse of FTX, the defendant and his co-conspirators took several steps that prioritized certain creditors at the expense of FTX customers as a whole and that were for the benefit of the defendant personally. For example, after the defendant halted withdrawals from FTX, he opened withdrawals exclusively for Bahamian customers in order to curry favor with the Bahamian government. Similarly, although the defendant was using Alameda assets in part to satisfy customer withdrawals, he instructed Ellison to repay certain Alameda lenders with funds that

would otherwise have been directed to FTX customers. In particular, the defendant told Ellison to prioritize repaying loans to a particular lender that was a U.S.-based entity in order to minimize the prospect of U.S. regulatory scrutiny. As customer withdrawals on the exchange surged, the defendant and his associates attempted to construct a balance sheet for FTX, as well as for FTX US. In doing so, they discovered an approximately $45 million hole at FTX US, which the defendant then informed his associates he had filled with a transfer of Alameda assets.

The defendant's selective distribution of assets and his prioritization of payments to certain creditors is relevant to demonstrate his criminal intent and the false nature of his representations to customers during the collapse and its immediate aftermath, where he claimed, for example: "what matters right now is trying to do right by customers. That's it,"[2] and "My goal—my one goal—is to do right by customers."[3] Evidence that the defendant sought to evade scrutiny by United State regulators demonstrates consciousness of guilt and therefore provides highly relevant evidence of the defendant's intent, which is expected to be centrally in dispute. Moreover, nothing about this conduct is any more sensational or unfairly prejudicial than the conduct underlying the charged crimes.

6. <u>Evidence that the Defendant Instituted Autodeletion Policies for Business Communications Is Admissible</u>

The Government intends to introduce evidence that in 2021 the defendant directed Alameda employees to communicate principally via Slack and Signal, encrypted and ephemeral messaging applications, and to set their messages to autodelete after a brief retention period. The evidence will show that the defendant implemented this policy in part to prevent incriminating

---

[2] Tweet on November 10, 2022, https://twitter.com/SBF_FTX/status/1590709194390659073.
[3] Tweet on November 15, 2022, https://twitter.com/SBF_FTX/status/1592604699693580289.

evidence from being preserved for a future criminal investigation. Such evidence is "an apparent attempt to suppress evidence of the crime and is plainly relevant to show [the defendant's] consciousness of guilt." *Roldan-Zapata*, 916 F.2d at 803-04; *see also United States v. Kelly*, 551 F.3d 171, 176 (2d Cir. 2009) ("A scheme to defraud may well include later efforts to avoid detection of the fraud."); *United States v. Burrous*, 147 F.3d 111, 117 (2d Cir. 1998) (in a robbery case, the defendant's attempted disposal of $128 in cash during his arrest could allow jury to infer his consciousness of guilt). This evidence is also admissible under Rule 404(b) as proof of knowledge and intent, and the defendant's role as the mastermind of the charged schemes. *See Rosa*, 11 F.3d at 334. Evidence of the defendant's desire to destroy evidence of the crimes with which he is charged is certainly not unfairly prejudicial or rendered inadmissible by Rule 403.

## II.   <u>Statements of the Defendant's Co-Conspirators and Agents Are Not Barred by the Rule Against Hearsay</u>

At trial, the Government will seek to introduce for their truth out-of-court statements by Wang, Singh, Ellison, and Salame, as well as other employees of Alameda and FTX. Such statements, including particular statements described below, are not barred by the rule against hearsay.

### A.  Applicable Law

1.  <u>The Rule Against Hearsay</u>

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is

18

not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

### 2. Rule 801(d)(2)(D)

Federal Rule of Evidence 801(d)(2)(D) provides that "[a] statement is not hearsay if … the statement is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

### 3. Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if … the statement is offered against an opposing party and … was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the

19

course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

       4.   <u>Rule 804(b)(3)</u>

Federal Rule of Evidence Rule 804(b)(3) excepts from the hearsay rule a statement by an unavailable declarant that: "(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness." This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

In evaluating whether a particular statement is admissible pursuant to Rule 804(b)(3), "the court conducts an adequately particularized analysis to determine whether a reasonable person in the declarant's shoes would have perceived the statement as detrimental to his or her own penal interest in light of all the surrounding circumstances." *Dupree*, 870 F.3d at 80. "A statement will satisfy [the Rule's] requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011).

### B. Discussion

#### 1. Ledgers, Notes, and Other Contemporaneous Documentation Are Not Hearsay

The Government intends to offer into evidence documents, including ledgers and notes, made contemporaneously with the conduct at issue in this trial by Wang, Singh, and Ellison, both in furtherance of the charged conspiracies and within the scope of their agent relationship with their superior, the defendant. These materials are therefore not precluded by the rule against hearsay.

As an initial matter, the evidence at trial readily will show by a preponderance that the defendant conspired with Wang, Singh, and Ellison, who all pleaded guilty to conspiracies that involved the defendant. The Court can make a preliminary ruling that these statements are admissible, subject to the introduction of trial evidence (including the statements themselves) that is sufficient to show the existence of a conspiracy. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.). The Court may also consider the co-conspirators' sworn plea allocutions to support a finding that a conspiracy with the defendant existed. *See United*

21

*States v. Saneaux*, 392 F. Supp. 2d 506, 513-14 & n. 10 (S.D.N.Y. 2005) (while proffer statements and plea allocutions are generally not admissible at trial, the court may consider them in determining that there was a conspiracy and that co-conspirator statements made in furtherance of the conspiracy may be admitted); *Bourjaily*, 483 U.S. at 178 ("Rule [104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.").

The Government will also establish that these co-conspirators made statements during the course of, and in furtherance, of these conspiracies. Among other things, the Government intends to offer into evidence statements made by Wang, Singh, and Ellison in the form of ledgers, notes, and other documentary evidence. With respect to ledgers, the defendant and his co-conspirators created and sometimes shared with each other excel documents that, among other things, kept track of illicit money flows between Alameda and FTX, and that tried to conceal Alameda's liability to FTX on its balance sheet. Financial ledgers are routinely admitted as co-conspirator statements under Rule 801(d)(2)(E). *See, e.g., United States v. Caruso*, 225 F.3d 646, 2000 WL 1134359, at *2 (2d Cir. 2000) (affirming trial court's conclusion in mail fraud conspiracy trial that "ledger entries were made in the course and furtherance of [the conspiracy]"); *United States v. Donovan*, 55 F. App'x 16, 21-22 (2d Cir. 2003) (affirming trial court's admission in securities fraud conspiracy trial of a "ledger and . . . list [that] were both made during the conspiracy, as ways to keep track of the commissions to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy"); *United States v. Ashraf*, 320 F. App'x 26, 28-29 (2d Cir. 2009) (detecting "no error" in trial court's admission of "drug ledgers" and "a co-conspirator's testimony as to the meaning of the ledgers" because the statements fell within Rule 801(d)(2)(E)).

Similarly, the Government intends to offer into evidence certain handwritten and typed notes that Ellison maintained to keep track of the conspiracy's activities. For example, Ellison took notes at meetings with her co-conspirators at which they discussed, among other things, the financial health of Alameda and its liabilities to FTX. Ellison's personal notes and to-do lists include entries such as a list titled "Things Sam is Freaking Out About," which delineates Ellison's understanding, from conversations with the defendant, of what remained the defendant's top business concerns, such as Alameda's trading hedges, bad press about the relationship between Alameda and FTX, and fundraising.

These writings are not inadmissible hearsay because Ellison took notes "to memorialize information supplied to [her]…and to provide a reference to help…carry out [her] role in the conspiracy." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999). For one, keeping track of Alameda's finances and objectives clearly constitutes a statement "designed to promote or facilitate achievement of the goals of [the] conspiracy." *Rivera*, 22 F.3d at 436; *see also United States v. Persing*, 436 F. App'x 13, 19 (2d Cir. 2011) (affirming the trial court's conclusion that co-conspirator's notes, which were "designed to assist him in conducting his loan-shark business . . . were taken during the course of and in furtherance of that conspiracy"). Moreover, like Ellison's financial ledgers, these notes were "ways to keep track of" important issues that could implicate the conspiracy's success, "thereby indicating that the documents furthered the operations and efficiency of the conspiracy." *Donovan*, 55 F. App'x at 22; *see also United States v. McPartlin*, 595 F.2d 1321, 1351 (7th Cir. 1979) (finding that "since [diary] entries were made so that [co-conspirator] could rely on them in carrying out his scheme, they aided and were in furtherance of the conspiracy"); *United States v. Dendy*, 995 F.2d 233, 1993 WL 175264, at *1 (9th Cir. May 25, 1993) (affirming trial court's conclusion that statements made in co-

conspirator's diary were intended to "keep [defendant] and/or other persons advised" of the conspiracy).

For many of the same reasons, these materials are also statements of the defendant's agents under Rule 801(d)(2)(D). As alleged in the Indictment and as the proof at trial will demonstrate, each of Wang, Singh, and Ellison were employees and agents of the defendant, and the defendant not only directed the operations of both FTX and Alameda but in particular directed the business activities of Wang, Singh, and Ellison. Moreover, as is apparent from the nature of the documents described above, these materials were created within the scope of those agency relationships, and are therefore not hearsay pursuant to Rule 801(d)(2)(D). *See, e.g.*, *Pappas*, 963 F.2d at 537.

To the extent the defense were to argue that the notes and ledgers document legitimate business discussions as opposed to discussions designed to further a criminal scheme, that fact (which the Government disputes) would not undermine the admissibility of those materials under Rule 801(d)(2)(D), because the rule authorizes the admission of statements designed to further a joint venture with the defendant, whether or not the goal of that venture is criminal. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.").[4]

### 2. Statements of Both FTX and Alameda Employees Are Not Hearsay

Statements made by FTX and Alameda employees while they were employed by either company, as reflected in documents or as described during their anticipated trial testimony, are statements of the defendant's agents under Rule 801(d)(2)(D) and therefore not hearsay.

An agency relationship existed between the defendant and the employees of both FTX and

---

[4] Certain of these materials may well also be covered by the so-called business records exception to the hearsay rule embodied in Federal Rule of Evidence 803(6).

Alameda. The defendant was the CEO of FTX and the owner of Alameda. A variety of anticipated evidence therefore falls under this rule: statements made by FTX employees to potential and existing FTX investors and customers, statements by Alameda employees to Alameda's lenders, and internal directives given by former FTX and Alameda employees during the course of their employment. *See In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against the person who controls the entity).

For example, an FTX employee involved in investor relations ("FTX Employee-1"), who acted at the defendant's direction and regularly consulted with the defendant about FTX's fundraising efforts, sent emails to FTX's investors and potential investors in response to due diligence questions. Some of those responses contained false representations, including that Alameda and FTX were "[c]ompletely separate entities." The statements made in those emails, and the statements that FTX Employee-1 is expected to describe during his trial testimony, to the extent they are offered for their truth, are admissible against the defendant under Rule 801(d)(2)(D). Likewise, statements made by Alameda employees in emails, documents, or messages to Alameda's lenders describing the planned use of the loaned funds or Alameda's financial condition are agent statements under Rule 801(d)(2)(D).

Accordingly, statements by FTX and Alameda employees during the course of their employment on matters related to their jobs are not hearsay pursuant to Rule 801(d)(2)(D).

### 3.   Ellison's Statements at the November 9, 2022 All-Hands Meeting Are Not Hearsay

The Government also seeks to admit statements that were made by Ellison during the course of her employment and related to Alameda business, as well as in furtherance of the charged conspiracies, and that are therefore not hearsay under Rules 801(d)(2)(D) and 801(d)(2)(E).

Among other things, the Government will offer a recording of Caroline Ellison's statements to Alameda employees at an all-hands meeting on November 9, 2022. At that time of these statements, FTX was facing a solvency crisis and had just announced a tentative deal for rival cryptocurrency exchange Binance to acquire FTX. Ellison addressed the Alameda employees to offer some explanation and reassurance, and the meeting was covertly recorded by an Alameda employee. During the meeting, Ellison told the employees that she wanted to provide a "general overview of the situation," and stated:

> starting last year, Alameda was kind of borrowing a bunch of money via open-term loans and used that to make various illiquid investments. . . . Then with crypto being down, the crash, the -- like, credit crunch this year, most of Alameda's loans got called. And in order to, like, meet those loan recalls, we ended up borrowing a bunch of funds on FTX which led to FTX having a shortfall in user funds.

Ellison explained that Binance "would be acquiring FTX International" and "paying enough cash to cover the entire, like, shortfall of user funds." Ellison went on to say:

> I guess, like, then -- yeah, what does this mean? I guess, mostly I wanna say, like, I'm sorry. This really sucks. It really sucks for all of you guys. I think it's, like, really not fair to you guys. Like, I think you've been doing a great job. You've been working really hard. (U/I). And I know this isn't your fault but you've kind of, like, ended up impacted by the situation anyway. I think my current default plan is that Alameda will likely wind down once we can, like, repay all of our creditors and sort of wind down a bunch of our, like, whatever remaining obligations we have. Yeah. Totally, like, definitely no pressure for anyone to stick around. Like, totally understood if you're like, I just like wanna (U/I) now. Also, even if you're like uncertain or you are sticking around or whatever, like, definitely feel free to take a break. Like, go sleep, like, whatever. This might take some time. But yeah, at the same time, do, like, super, super appreciate anyone who does wanna stick around and help out during this, like, transition period. I think -- yeah, I mean, I'll be here. I'll be, like, working on -- I think, basically, just making sure that all of our creditors get made whole and kind of doing whatever we can do though it's, like, somewhat out of our control to make sure all the FTX customers get made whole and don't end up losing their

26

> deposits. And yeah, I think there is a bunch of work to do there. So definitely appreciate it anyone does wanna help out. Yeah. And then, I guess for people who do stick around, I think it's, like, possible that there might be some kind of future thing. I don't know what that thing would like. . . .

Later in the meeting, an employee asked Ellison who else had been aware of the shortfall in FTX user funds. Ellison answered: "Yeah, I mean, I guess I talked about it with, like, Sam, Nishad, and Gary." An employee pressed Ellison: "Who made the decision on using user deposits?" Ellison answered: "Um . . . Sam, I guess."

These statements are not hearsay under Rule 801(d)(2)(D) because Ellison was an agent of the defendant and made the statements during and in connection with her employment. Although Ellison was eventually named CEO of Alameda, her employment agreement from March 2022 shows that as Alameda CEO, she reported to the Board of Directors (*i.e.*, the defendant) and she and other witnesses will testify that the defendant retained ultimate decision-making authority at Alameda up and until FTX declared bankruptcy in November 2022. *See, e.g.*, *United States v. Kelley*, 305 F. App'x 705, 708 (2d Cir. 2009) (forms signed by one business partner in the course of business admissible against another partner).

Under Rule 801(d)(2)(D), it does not matter whether the defendant specifically authorized Ellison to make "damaging statements," but rather, simply, whether Ellison had "authority to take action about which the statements relate." *Pappas*, 963 F.2d at 538. That authority is clear. The statements were made in the context of a standing meeting that Ellison routinely convened with Alameda employees. And although the defendant did not deputize Ellison to implicate him in the criminal conspiracy, he was aware that Ellison intended to address the ongoing crisis with Alameda employees and signed off on some of what she said. In advance of the all-hands meeting, Ellison sent Signal messages to the defendant and others on November 9, 2022, that stated:

> Thinking about what to tell people at Alameda all hands. Right now
> I'm thinking a vibe of "Alameda is probably going to wind down, if
> you don't want to stay or want to take some time off no pressure, if
> you do want to help with stuff like making sure our lenders get
> repaid it's super appreciated[.]" Does that seem right?

The defendant responded: "And maybe something about there being a future of some sort for those who are excited but that you cant know for sure what it is?" Ellison's solicitation of the defendant's input before the meeting, and her incorporation of his comments into the statements she ultimately delivered, reinforces that she acted as the defendant's agent when addressing Alameda employees.

Ellison's collaboration with the defendant about how to address the ongoing crisis demonstrates that her statements at the all-hands meeting are also co-conspirator statements under Rule 801(d)(2)(E). Ellison was trying to reassure Alameda employees and prevent them from quitting, which would have thwarted the defendant's efforts to keep FTX and Alameda afloat. The defendant's efforts to stem the bank run, raise capital, and smoothly complete the Binance sale with the assistance of any remaining employees was intertwined with his efforts to delay or prevent exposure of his crimes. Ellison tried to persuade employees to "stick around" by acknowledging the solvency crisis that was already becoming apparent, sharing news of the Binance acquisition, apologizing and accepting responsibility, and expressing appreciation for the employees. The defendant also suggested that Ellison entice employees with the possibility of future opportunities if they remained at Alameda. These statements served the dual goals of furthering the business interests of Alameda, a joint venture in which Ellison and the defendant were participants, and furthering their criminal conspiracy by "provid[ing] reassurance," *see, e.g.*, *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001), and "facilitat[ing and protect[ing]" the conspiratorial activities, *see Diaz*, 176 F.3d at 87. For both reasons, they are co-conspirator statements under

Rule 801(d)(2)(E).[5]

### 4. Ryan Salame's Messages About Being a Straw Donor Are Not Barred by the Rule Against Hearsay[6]

The Government seeks to admit statements by Ryan Salame, a co-conspirator in the defendant's illegal campaign finance scheme and unavailable declarant, about his agreement with the defendant to make political donations in his own name but paid for by the defendant. These statements are excepted from the rule against hearsay as statements against penal interest under Rule 804(b)(3).[7] For example, in a private message to a trusted family member in November 2021, Salame explained that the defendant "want[ed] to donate to both democtratic [sic] and republican candidates in the US," but the defendant would not do so "cause the worlds frankly lost its mind if you dontate [sic] to a democrat no republicans will speak to you and if you donate to a republican then no democrats will speak to you." Salame further explained that the purpose of these bipartisan donations would be "to weed out anti crypto dems for pro crypto dems and anti crypto repubs for pro crypto repubs," and that it was likely that the defendant would "route money through me to weed out that republican side."

Salame is unavailable as a witness,[8] and his statements were certainly detrimental to

---

[5] To the extent the defendant attacks Ellison's credibility in his opening statement or on cross examination, these statements are prior consistent statements under Rule 801(d)(1)(B) and therefore not hearsay.

[6] As discussed above, evidence of the defendant's use of straw donors is relevant and admissible as direct evidence of his fraud and money laundering schemes, or alternatively under Federal Rule of Evidence 404(b). *See supra* at 8-11.

[7] The Government may also seek to admit certain statements made by Salame in furtherance of the straw donor scheme under Rule 801(d)(2)(E). *See, e.g.*, *Gigante*, 166 F.3d at 82 (the conspiracy "need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial).

[8] Salame's attorney has represented that if subpoenaed, Salame would invoke his Fifth Amendment right against self-incrimination. *See, e.g.*, *United States v. Miller*, 954 F.3d 551, 561 (2d Cir. 2020) ("When a witness properly invokes his Fifth Amendment right against self-incrimination, he is unavailable for the purposes of Rule 804(a).").

Salame's penal interest because he is admitting to his role as a straw donor for the defendant. Salame's implication of the defendant in the crime is likewise admissible. While "non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson*, 512 U.S. at 600-01, self-inculpatory statements that implicate others as well may be admitted in full where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant against whom the statement was offered], or curry favor with authorities," *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007); *accord United States v. Wexler*, 522 F.3d 194, 203 (2d Cir. 2008). Thus, for example, in *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004), the Second Circuit approved the admission of statements by a non-testifying declarant describing conduct that the defendant committed alone because the declarant's descriptions to a trusted individual of "examples of how he and [the defendant] operated and why their scheme worked," tended to implicate the declarant in the scheme. *See also Dupree*, 870 F.3d at 80 (district court properly admitted evidence that the murder victim had told a witness several weeks before he was killed that the trial defendant had "broke[n] into [his] car and stole[n] his drugs and his money and [] had beaten him up"). So too here, Salame fully implicated himself too when describing the campaign finance scheme.

In addition, where, as here, statements demonstrate "an insider's knowledge of a criminal enterprise and its criminal activities," they are sufficiently against a declarant's penal interest to come within the exception, even when they implicate others. *United States v. Barone*, 114 F.3d 1284, 1297 (1st Cir. 1997); *accord United States v. Westmoreland,* 240 F.3d 618, 627 (7th Cir. 2001) ("[A] statement that implicates the declarant in a larger conspiracy tends to subject the declarant to criminal liability and thus is a statement against interest."); *United States v. Tocco*,

200 F.3d 401, 414-15 (6th Cir. 2000) (out of court declarant's statements implicating others in La Cosa Nostra were admissible as contrary to the declarant's penal interest, because they tended to show his own participation in the organization); *see also Williamson*, 512 U.S. at 606-07 (Scalia, J., concurring) ("[I]f a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some of the other actors and thereby inculpating himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest.").

Moreover, to qualify as a statement against penal interest under Rule 804(b)(3), the statement at issue, standing alone, need not be sufficient to convict the declarant of any crime, and it is not necessary for the declarant to be "aware that the incriminating statement subjects him to immediate criminal prosecution." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978). Here, it is enough that Salame was confiding that he was operating as the defendant's straw donor with the defendant routing money through Salame for the purpose of political donations that would benefit the defendant's pro-crypto policy agenda.

Finally, the statements are sufficiently corroborated to fall under Rule 804(b)(3)'s exception to the hearsay rule. This inquiry focuses on, among other things, the relationship between the declarant and his intended audience, whether the statement appears calculated to shift blame from the declarant, and whether independent evidence corroborates the facts in the proffered statement. *Dupree*, 870 F.3d at 81. The statements bear hallmarks of trustworthiness: they were made to Salame's family member in confidence, are inculpatory of Salame, and align with financial analysis that shows the routing of corporate money through Salame's accounts that was then used for political donations. As the Supreme Court has recognized, as a general matter, "reasonable people, even reasonable people who are not especially honest, tend not to make self-

inculpatory statements unless they believe them to be true." *Williamson*, 512 U.S. at 599.

     5.  <u>FTX Commercials Are Not Hearsay</u>

The Government seeks to admit videos of FTX commercials that advertised the exchange as safe and trustworthy, including as "the safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets. These videos are not hearsay first because they are not being offered for the truth of the matter asserted. On the contrary, these commercials misrepresented the safety and trustworthiness of the FTX exchange, where customer assets were misappropriated, rather than protected. These commercials are relevant to show that the defendant (who oversaw the marketing strategy for FTX) authorized public misrepresentations about FTX, and for the effect on the listeners, such as FTX customers, who were exposed to these commercials and misled to believe that FTX was a safe place to buy and sell digital assets. *See Dupree*, 706 F.3d at 136; *George*, 914 F.2d at 30.

Alternatively, the commercials are statements of the defendant's agents under Rule 801(d)(2)(D), because the commercials were created by agents of the defendant within the scope of their employment, and in order to fulfill the defendant's directive to promote FTX as a safe and trustworthy cryptocurrency exchange.

**III.**    **<u>The Court Should Permit the Authentication of Certain Records Under Rule 902(11) and Limit the Scope of Cross-Examination of Record Custodians</u>**

During meet-and-confer conferences, the defendant has not yet committed to the authentication of routine business records by stipulation. Accordingly, the Government intends to authenticate certain records that were created and maintained in the regular course of business by certain third parties pursuant to certifications that comply with Federal Rule of Evidence 902(11), and certain other records through records custodians, who, for the reasons set forth below, should be subject to limited cross-examination only, consistent with the Rules of Evidence.

### A. Certain Third-Party Business Records May Be Authenticated Under Rule 902(11)

Records of regularly conducted activity that meet the necessary conditions to qualify under the hearsay exception in Federal Rule of Evidence 803(6) may be authenticated, among other methods, by a certification that complies with Federal Rule of Evidence 902(11) for records stored domestically. Fed. R. Evid. 803(6)(D). "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Prior to trial, "the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." *Id.* Similarly, 18 U.S.C. § 3505 provides that a "foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that" the record meets the elements of Rule 803(6). *See also United States v. Qualls*, 613 F. App'x 25, 28 (2d Cir. 2015) (affirming admission of foreign records accompanied by certification of authenticity); *United States v. Miller*, No. 18 Cr. 202 (ARR), 2018 WL 4961458, at *3 (E.D.N.Y. Oct. 15, 2018) ("The language of § 3505 'tracks quite closely to the language of Federal Rule of Evidence 803(6)' and 'should be interpreted in the same manner as the comparable

language in Rule 803(6) is interpreted.'").[9]

A record of regularly conducted activity meets the necessary conditions to qualify as a business record under Rule 803(6) when (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity." Fed. R. Evid. 803(6). "A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994).

The Government expects to offer into evidence certain records that were created and maintained in the regular course of business by certain third parties, including: FTX.com user transaction records; transaction records, IP logs, and access logs produced by banks, credit card companies and brokerages; transaction records, IP logs, and access logs produced by cryptocurrency exchanges besides FTX, including exchanges based overseas; transaction records from cryptocurrency lenders; records from political campaign platforms; and subscriber information, device information, access logs, and IP logs from internet service providers; and call detail records, historical location data, subscriber information, and IP logs from telephonic service providers, which have been provided to the Government either pursuant to a subpoena or voluntarily. The Government has generally produced the relevant certifications for these records in discovery in this case and is unaware of any basis to challenge their status as business records;

---

[9] "[A] custodian's certification pursuant to Federal Rule of Evidence 902(11) is not testimonial," and therefore use of such certifications to authenticate business records does not violate the Confrontation Clause. *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *1 (S.D.N.Y. Feb. 14, 2021).

for any records for which the certification has not yet been produced, the Government will produce the relevant certification in advance of trial. In the event that no stipulations as to authenticity are reached, such evidence may be authenticated through a certificate under Rule 902(11) for domestic records under Rule 803(6), and 18 U.S.C. § 3505 for foreign records.

### B.  The Court Should Limit the Scope of Cross-Examination of Record Custodians

If the defendant will not agree to stipulate to the authenticity of certain other records, the Government will call custodians of records to provide the necessary authentication. In such cases, the Court should preclude cross-examination that exceeds the scope of direct examination pursuant to Federal Rule of Evidence 611(b).

For example, the Government may, in the absence of an appropriate stipulation, call as a witness a custodian of records for the FTX Debtors. If the custodian provided by the FTX Debtors is an attorney or vendor to the FTX Debtors, or a former employee of FTX involved in the maintenance of records, the Court should preclude cross-examination concerning other responsibilities of the witness, the bankruptcy proceedings, or other topics unrelated to authenticating records. Given the limited nature of this witness's testimony, broad cross-examination would "go beyond the subject matter of the direct examination," without relating to the specific "witness's credibility." *See* Fed. R. Evid. 611(b); *see also United States v. Wagner*, No. 20 Cr. 410 (NSR), 2022 WL 19179, at *4 (S.D.N.Y. Jan. 3, 2022) ("The fact that a witness is a law enforcement agent who had a broader involvement in an investigation of the defendant does not expand the scope of permissible cross-examination." (collecting cases)).

To the extent the defendant wishes to question records custodians about topics other than authenticating records, and the Court permits such inquiry, the defendant must disclose the name of the custodian on his witness list, ask questions that will call for admissible evidence, and conduct his examination in a non-leading manner as if on direct examination, as required by Federal Rules of Evidence 611(b) and (c).

## IV.  The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A.  The Court Should Exclude Evidence and Claims That Victims of the Fraudulent Schemes Were Negligent or Failed to Conduct Adequate Due Diligence

The defendant should be precluded from arguing or adducing evidence that FTX customers, FTX investors, and/or Alameda's lenders were negligent, gullible, or insufficiently vigilant. "The Court of Appeals routinely has rejected a gullible victim defense for wire-fraud

charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017)). That is because "reliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *Weaver*, 860 F.3d at 95-96. Accordingly, the defendant may not argue that FTX customers engaged in risky conduct by trading in cryptocurrency, that FTX investors knew that cryptocurrency companies and startups are risky and often fail, or that Alameda lenders were to blame for a lack of diligence.

In particular, the defendant should be precluded from cross-examining witnesses from the lenders to Alameda about whether they did adequate diligence on the loans to Alameda, or whether they were reckless, negligent, or irresponsible in running their business. Alameda's failure to repay loans to several lenders put those lenders under considerable financial stress and, in some cases, caused the ultimate bankruptcy of those lenders. For instance, BlockFi, Inc., an entity which lent millions of dollars to Alameda and also held millions of dollars on FTX, declared bankruptcy following Alameda's default on its loans. In the course of BlockFi's bankruptcy proceeding, unsecured creditors have accused BlockFi of failing to complete adequate due diligence into FTX and Alameda. Similarly, the cryptocurrency lending firm Genesis has been sued civilly for allegedly failing to conduct adequate due diligence and making false statements about its financial condition to its own customers. Because a defendant may not assert a victim's negligent failure to discover the fraud, *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004), the defendant here should not be permitted to cross-examine lender witnesses in a manner that implies that their due diligence was inadequate.

The defendant should also be precluded from cross-examining lender victim witnesses

about claims by third parties, including in some circumstances other parts of government such as the SEC, about the accuracy of those lenders' statements to their own customers. While some of the allegations against lenders appear to be no more than conclusory allegations, and therefore do not form a proper good faith basis for cross-examination, to the extent there is some substantiation, the defendant may not cross-examine witnesses in a way that implies that the lenders were negligent, or that the victims were engaged in their own misconduct. *See United States v. Korogodsky*, 4 F. Supp. 2d 262, 265-66 (S.D.N.Y. 1998) ("It is no defense that the victims of the fraud may have been engaged in some misconduct" and therefore "possible misconduct of the victim [is] not relevant . . . ."). Indeed, even if a lender did engage in misconduct, that is not alone a basis to impeach a witness. That is because the nature of the business's practices does not necessarily reflect on an individual witness's character for truthfulness. And particularly given the speculative and assumption-laden nature of this theory of impeachment, even with a limiting instruction, it would be exceedingly difficult for a lay juror to properly assess the minimal value of any such evidence, purportedly offered solely for impeachment. *Cf. Gupta*, 747 F.3d at 132 (Rule 403 requires the preclusion of statements for which it would be difficult for the jury to distinguish between that portion that could possibly go to state of mind or intent of the declarant, and the truth of the assertions themselves).

## B. The Court Should Exclude Evidence and Claims That Others in the Cryptocurrency Industry Misused Customer Assets or Engaged in Misconduct

Prior to and since the defendant's indictment, individuals and companies in the cryptocurrency industry have been subject to civil and criminal enforcement for misusing customer assets or otherwise committing fraud. The defendant should be precluded from arguing or adducing evidence that other companies or individuals were using customers' assets or otherwise

engaging in misconduct. Such evidence is irrelevant, is unduly prejudicial, and would confuse the jury.

The fact that conduct may be widespread in an industry—that "everyone is doing it"—is "not a defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everyone speeds' is not a defense if your car happens to get picked up on the radar." *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019); *see also United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019) ("the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of [the defendant], and is not a defense to wire fraud"). For that reason, whether or not misuse of customer assets or other forms of fraud are rampant in the cryptocurrency industry is not relevant to the issues at trial. Nor are other cryptocurrency exchanges' practices about how they keep customer assets relevant to the question of how the defendant and his coconspirators treated FTX customers' assets and the representations they made to their own customers.

Evidence or arguments about the conduct of other cryptocurrency industry participants is also inadmissible under Rule 403 because any probative value is substantially outweighed by the prospect of undue delay, unfair prejudice, confusion of the issues, and misleading the jury. Injecting the conduct of other cryptocurrency industry participants into the trial is likely to confuse the jury, and will force the Government to offer rebuttal evidence to put the defense evidence about the conduct of others in the cryptocurrency industry in proper context—all to contest issues that are wholly irrelevant to any element or material fact at issue in the charged offenses. Such a mini trial would be both significantly distracting and confusing to a lay jury. *Cf. Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("Admitting evidence about previous cases 'inevitably results in trying

39

those cases before the jury,' and 'the merits of the other cases would become inextricably intertwined with the case at bar.'") Because such risk of prejudice and confusion plainly outweighs the limited to nonexistent probative value of the evidence, the defendant should be precluded from offering it.

### C. The Court Should Exclude Evidence and Claims That the Defendant's Misrepresentations Were Immaterial Based on Disclaimers in FTX's Terms of Service or Other Documents

The defendant should be precluded from making arguments or cross-examining witnesses about contractual disclaimers or similar provisions in FTX's terms of service or other documents provided to victims or posted on FTX's website. There is no relevant purpose for such evidence or argument, and it is likely to confuse and mislead the jury as to the elements of wire fraud.

At trial, the Government expects to offer into evidence FTX's terms of service. Those terms state that all users' digital asset deposits remained the users' property, and were not the property of, and could not be loaned to, FTX. Specifically, section 8.2.6 of the terms of service provided in pertinent part:

> All Digital Assets are held in your Account on the following basis:
> (A) Title to your Digital Assets shall at all times remain with you
> and shall not transfer to FTX Trading. As the owner of Digital
> Assets in your Account, you shall bear all risk of loss of such Digital
> Assets. FTX Trading shall have no liability for fluctuations in the
> fiat currency value of Digital Assets held in your Account. (B) None
> of the Digital Assets in your Account are the property of, or shall or
> may be loaned to, FTX Trading; FTX Trading does not represent or
> treat Digital Assets in User's Accounts as belonging to FTX
> Trading. (C) You control the Digital Assets held in your Account.
> At any time, subject to outages, downtime, and other applicable
> policies (including the Terms), you may withdraw your Digital
> Assets by sending them to a different blockchain address controlled
> by you or a third party.

The same terms of service contained general disclaimers of liability and damages "arising

40

out of or in connection with the terms." Those disclaimers, which are directed explicitly at causes of action sounding in "contract, tort (including negligence), equity, [and] statute" do not (and could not) release FTX from criminal liability. Nor do the provisions disclaim liability for false representations or misappropriation of property.

Evidence and argument about these disclaimers would serve no relevant purpose and will be more prejudicial than probative. The "common-law requirements of justifiable reliance and damages plainly have no place in the federal fraud statutes." *Weaver*, 860 F.3d at 95 (citing *Neder v. United States*, 527 U.S. 1, 24-25 (1999)); *see also United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (reliance not an element of criminal securities fraud). And because "a disclaimer of reliance on certain representations" does not "mean that the oral representations were immaterial or without tendency to influence," *Weaver*, 860 F.3d at 95, they have no relevant purpose in the trial. Indeed, it would undermine the purposes of the fraud laws to permit "[f]raudsters [to] … escape criminal liability for lies told to induce gullible victims … to sign a contract containing disclaimers of reliance." *Id.* at 96.

Having no relevant purpose, evidence or arguments about disclaimers are also properly excluded under Rule 403 because they are likely to confuse the jury. Indeed, permitting argument relating to the disclaimers could incorrectly lead the jury to believe that civil or common law fraud principles apply to the case, or that disclaimers are somehow probative of materiality, which they are not.

### D.  The Court Should Exclude Evidence and Claims That the Defendant Intended to Repay His Victims

The defendant should be precluded from offering evidence or arguing that he intended to return or repay victims' funds and therefore that he did not act with intent to defraud. While the

crime of wire fraud requires a "contemplated harm to the victim," *Jabar*, 19 F.4th at 76, it does

not require that the defendant "intended to permanently deprive the victim's money or property,"

*United States v. Males*, 459 F.3d 154, 159 (2d Cir. 2006). Thus, "an intent to return money or

property is not a defense to the charge of embezzlement." *United States v. Thomas*, 581 F. App'x

100, 102 n.3 (2d Cir. 2014) (citing *United States v. Buckley*, 101 F.3d 685, 1996 WL 282140, at

*2 (2d Cir. 1996)). "Nor is it a defense to [wire fraud] that the accused voluntarily returned the

funds." *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005). Indeed, as this Court explained

in denying the defendant's motion to dismiss the wire fraud counts from the Indictment, "it is

immaterial as a matter of law whether the defendant intended to repay the misappropriated funds

because the offense is 'complete' where, as alleged here, there is an 'immediate intent to misapply

and defraud.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9

(S.D.N.Y. June 27, 2023).

Here, the defendant should not be permitted to argue that he intended to repay or return the

funds of his victims, or that he believed they would be made whole in the end. Starting with the

FTX customer victims, as the Court indicated when it denied the defendant's motion to dismiss,

the defendant may not argue that he intended to repay his customers, intended to return their funds,

or believed that even though he had misappropriated their funds he could ultimately repay them.

Because even temporary misappropriation of money or property is sufficient for conviction under

the wire fraud statues, arguments that the defendant believed he was going to be able to repay his

victims but for unexpected downturns in cryptocurrency market, the scheming of a competitor, or

an unforeseeable bank run are improper.

For the same reason, the defendant should not be permitted to argue that because he

ultimately intended to repay Alameda's lenders, he is not guilty of wire fraud. At the point in time

when the defendant made false representations to induce Alameda's lenders to issue new loans or not recall old ones, he obtained money or property based on false representations, which is sufficient to establish a scheme to defraud a victim of money or property. His belief that Alameda would ultimately find a way to pay the lenders back is immaterial as a matter of law. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid).

To the extent that the defendant seeks to argue that he believed that FTX investors would ultimately not be harmed because the value of FTX kept going up, and he expected that to continue, that would not be a permissible argument to the jury. Where a defendant and his co-conspirators "intended to immediately deprive investors of their capital through fraud," their belief, even if truly held, "that in the long-term [their companies] would ultimately succeed," is not a defense to securities fraud or wire fraud. *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *see also United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) ("Were a jury to find that [the defendant] intentionally caused others to issue materially false or misleading statements of the [company's] value to its investors . . . he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out.'"). Thus, the defendant should not be permitted to argue that he is not guilty because he thought investors would not ultimately be harmed.

Finally, the defendant should be precluded from offering evidence about the amount of assets that have been recovered through FTX's bankruptcy for purposes of suggesting to the jury that victims will be made whole, that the FTX Debtors' progress in securing and recovering estate assets somehow diminishes the scale of the fraud, or that, with more time, FTX could have satisfied

43

customer withdrawals. Such evidence is irrelevant, and of a piece with improper evidence of a defendant's own efforts to repay misappropriated funds. *See United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980) ("The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a defense."). It is also misleading, and should be precluded under Rule 403. The argument would necessitate a mini trial to value assets available through the bankruptcy and whether they cover customer and other creditor losses, as well as whether they were available to victims prior to the bankruptcy. Because this evidence has no bearing on the elements of the charged offenses, and would be highly prejudice and burdensome to the Court, jury, and parties, it should be precluded.

### E.  The Court Should Exclude Claims that the Presence of Attorneys Is Relevant to the Defendant's Intent Absent a Formal Advice of Counsel Defense

The defendant should be precluded from suggesting that the presence of attorneys at his company or the involvement of attorneys in certain decision-making demonstrates that he lacked criminal intent. The advice-of-counsel defense is a specific form of the defense of good faith, and to establish a colorable advice-of-counsel defense, the defendant must be able to identify evidence that before acting, he in good faith sought the advice of counsel, conveyed all material facts to the attorney, and acted strictly in accordance with the attorney's advice. *See United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017). But where such a showing has not been made, a defendant may not introduce evidence "solely to show that lawyers attended meetings or set up meeting," place "undue focus on the fact of a lawyer's presence at a meeting or that counsel reviewed disclosures," or "suggest that counsel blessed the relevant [materials]." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such evidence "would be confusing and unduly prejudicial" because a "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must

have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *Id.*; *see also S.E.C v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("the intimation that counsel has blessed a transaction or practice without waiver of the attorney-client privilege" is improper).

In his prior filings, the defendant has referred to the fact that FTX and Alameda "regularly consulted attorneys at Fenwick [& West] on legal issues," and he referenced specifically statements made to banks, the defendant's direction to FTX employees to use ephemeral messaging applications, and tax treatment of various loan payments. (Dkt. 151 at 2-4). If the defendant does not provide notice of his intent to assert an advice-of-counsel defense *and* establish the required elements of such a defense, he should be precluded from unduly focusing on the fact of attorneys' involvement in those matters or suggesting that attorneys blessed, for instance, the loans, bank documents, or message deletions. Additionally, the defendant should be precluded from referencing the involvement of attorneys in his opening statement, *see Tourre*, 950 F. Supp. 2d at 685, and if he attempts to introduce evidence of the involvement of attorneys during trial, the Court should provide a cautioning instruction as has been done in other cases in this District. *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.), Dkt. 245, May 31, 2022 Tr. at 787 ("A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer."); *United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Oct. 26, 2020 Tr. at 2402 ("there is no defense in this case of so-called reliance on counsel.").

### F.  The Court Should Exclude Evidence and Claims That Regulators Are to Blame for the Collapse of FTX

The defendant has made a number of public statements that suggest he may attempt to shift blame for the collapse of FTX onto regulatory agencies. While the defendant's statements about his view of regulators have not always been consistent, he has stated that regulators "make everything worse" and "don't protect consumers at all."[10] Arguments attempting to shift the blame for FTX's collapse onto regulators are improper and should be excluded because a supposed absence of sufficient regulatory protections would not excuse the defendant's fraud.

The Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public policy considerations." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977); *see id.* at 1073 (affirming instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"); *see also United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service was 'arrogant,' … and that because of this, Defendant should be acquitted"). This evidence would not only be irrelevant to the defendant's criminal intent, it would also be confusing to the jury to turn the trial into a referendum on the role of regulatory agencies in responding to recent cryptocurrency market events. *See Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about

---

[10] Kelsey Piper, *Sam Bankman-Fried Tries to Explain Himself*, Vox.com (Nov. 16, 2022), https://www.vox.com/future-perfect/23462333/sam-bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy. The defendant subsequently tried to clarify those remarks, but continued to criticize regulators. *See* https://twitter.com/SBF_FTX/status/1593014943255003137.

46

general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"). Because such evidence and argument would have no probative value, and would serve only to create a danger of undue prejudice, confusion of the issues, and misleading the jury, it should be precluded.

### G. The Court Should Exclude Evidence and Claims About the Speed of the Government's Charging Decisions, the Cooperation of the Debtors' Attorneys, and the Circumstances of the Defendant's Extradition

The defendant's pretrial motions sought repeatedly to deflect from the defendant's conduct with unfounded accusations directed at the Government's investigation and the cooperation of the FTX Debtors. (*See, e.g.*, Dkt. 139 at 1 (calling the Government's response to FTX's collapse "troubling," claiming that "the Government jumped in with both feet, improperly seeking to turn these civil and regulatory issues into federal crimes," and accusing the Government of a "classic rush to judgment"); *id.* at 2-3 (faulting the Government for "insist[ing] that [the defendant] be held in a Bahamian prison during the proceedings" and accusing the Government of seeking "to end-run around the extradition treaty between the United States and the Bahamas"); *id.* at 3 (asserting that "the Government's haste and apparent willingness to proceed without having all the relevant facts and information has produced an indictment that is not only improperly brought but legally flawed"); *id.* at 3 (claiming that "the FTX Debtors have become so enmeshed in the investigation and prosecution" of the defendant)). These claims were irrelevant to the pretrial motions and have no place at a criminal trial.

The defendant's accusations that the Government did not conduct a thorough and proper investigation have no basis in fact (and indeed are in notable tension with the defendant's complaints about the volume of evidence produced in this case). So are insinuations that the

defendant's arrest was timed to prevent his Congressional testimony, rather than to arrest the mastermind of a massive fraud living abroad as soon as an indictment was returned by the Grand Jury. Regardless, it is well established that the Government's motives for and conduct during the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (finding that defendant's trial arguments involving, *inter alia*, "invit[ation of] jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them for contempt" functioned as a defense "ploy for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"). The same is true of the Government's techniques in investigating and prosecuting crimes. *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) ("The jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged."). The defendant may not put the motivations or conduct of prosecutors or law enforcement agents in issue in order to invite the jury to acquit based on alleged governmental misconduct.

The defendant has also faulted the Government for "insist[ing] that [the defendant] be held in a Bahamian prison" during his extradition proceedings after he "made no attempt to flee the Bahamas," "repeatedly expressed his desire to remain in the Bahamas where he felt he could be helpful in assisting FTX in making customers whole during the proceedings," and "agreed to an

48

expedited" extradition procedure. (Dkt. 139 at 2, 8). Because these arguments, and the circumstances of the defendant's consent to extradition, are also irrelevant to the charges at issue, they should be precluded at trial.

In short, any evidence or argument concerning the reasons for or timing of the defendant's prosecution and extradition is irrelevant to the issues for the jury at trial, and would serve no purpose other than to seek to distract the jury from evidence of the defendant's guilt or to encourage jury nullification. It therefore should be precluded. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *see generally United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to 'render a true verdict *according to the law and the evidence*.' We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." (emphasis in original)); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

### H. The Court Should Exclude Certain Evidence and Claims about the FTX Bankruptcy

The defendant should be precluded from arguing about or introducing evidence regarding

whether FTX needed to declare bankruptcy, whether it was good for FTX and its customers to declare bankruptcy, whether the defendant supported the bankruptcy petition, whether the exchange would be operational today but for the bankruptcy, and/or whether the General Counsel of FTX US and outside attorneys at Sullivan & Cromwell caused FTX to declare bankruptcy so that they could benefit financially. Simply put, while the fact that the FTX and Alameda entities declared bankruptcy on November 11, 2022, will certainly be put before the jury, the bankruptcy proceeding itself is not relevant to whether the defendant is guilty of the charged offenses. Nor are individuals' views as to whether the bankruptcy has been or will ultimately be good for FTX's customers. Evidence about the bankruptcy is not probative of the defendant's mental state or the existence of a scheme to defraud, and therefore it has no place in the trial. The defendant's anticipated arguments that implicate this issue are discussed below.

First, prior to and since his indictment, the defendant has repeatedly claimed that it was a mistake for FTX to declare bankruptcy, that he was forced to place FTX into bankruptcy, and that customers would have been better off had bankruptcy not been declared. For instance, in his planned congressional testimony from December 2022, the defendant wrote that "FTX US has been and remains solvent, and could pay off all of its customers in full tomorrow" but "the Chapter 11 team has frozen the FTX US exchange, blocking customers' access to their account information and funds." [11] In the same prepared testimony, the defendant asserted that the bankruptcy

---

[11] After the collapse of FTX, the defendant was scheduled to appear before Congress. The defendant was arrested in the Bahamas before that testimony took place, but a prepared version of his remarks was publicly released.
*See* https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/?sh=170817dc3c47.
https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/?sh=170817dc3c47/.

documents were filed "against my express wishes and stated orders," and that shortly after authorizing the bankruptcy, he "received a potential funding offer for billions of dollars to help make customers whole," but the bankruptcy process prevented that from happening. In a blog post by the defendant after he was indicted, he similarly argued that "FTX US was and is solvent" and that customers could "be given access to their funds" but for the Chapter 11 bankruptcy.[12] These are not appropriate arguments for the jury. As the Court has already recognized, whether customers could be made whole "is immaterial as a matter of law" because the crime of wire fraud is complete where "there is an immediate intent to misapply and defraud." *Bankman-Fried*, 2023 WL 4194773, at *9. Such argument is also inadmissible under Rule 403 because it is certain to confuse the jury as to the relevance of later efforts at repayment, and will unnecessarily prolong the trial by focusing it on whether FTX customers could really have been repaid, whether there were viable alternatives to bankruptcy, and whether the defendant was going to get billions of dollars in bailout money that he could use to repay customers (as opposed to misappropriate in furtherance of what amounts to a Ponzi scheme).

Second, the defendant has argued that "while FTX was trying to raise money to make all customers whole, FTX's legal advisors went to the Government to accuse Mr. Bankman-Fried behind his back without knowing the full facts, and ultimately forced him to step down as CEO." (Dkt. 143 at 1). In addition to being baseless, these conspiracy theories have no relevant purpose at trial. As described above, evidence or argument concerning the cause for the charges against the defendant are irrelevant to the issues for the jury at trial, and would serve no purpose other than to distract the jury from evidence of the defendant's guilt or to encourage jury nullification. *See*

---

[12] https://sambf.substack.com/p/ftx-us-balance-update-2023-01-17.

*Stewart*, 2004 WL 113506, at *1 (precluding "arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]").

Third, the defendant has singled out FTX US's former general counsel, FTX's current CEO John Ray, and counsel for the FTX Debtors at Sullivan & Cromwell for purportedly causing FTX to collapse, wasting customer assets, and suffering from alleged conflicts of interest. In his prepared congressional remarks, the defendant wrote that the general counsel put "most" of the "extreme pressure to file for Chapter 11," that the general counsel sent messages that "range from adamant to mentally unbalanced," and insinuated that the general counsel had an inappropriately close relationship with Sullivan & Cromwell. Before the Court restricted the defendant's access to social media websites, the defendant retweeted a declaration by Daniel Friedberg, a former FTX attorney, that described supposed "inappropriate conduct" by the FTX Debtors and their legal counsel.[13] In court filings, the defendant has also asserted that Sullivan & Cromwell has charged high legal fees and that the FTX Debtors have taken actions in the bankruptcy that have failed to monetize certain recoverable property. None of these parties are on trial, and whether they have done a good or bad job with the Chapter 11 proceeding, or suffered from a conflict of interest, is not relevant to the defendant's guilt. Even if there were any evidence that FTX US's general counsel was improperly motivated in pushing for a Chapter 11 filing, such evidence would not be probative of his truthfulness, and therefore would also not a proper basis for impeachment.

Finally, the defendant should also be precluded from questioning witnesses about positions or claims that have been made in the bankruptcy proceeding. For instance, the FTX Debtors have filed preference and clawback claims against various parties, including likely trial witnesses, but

---

[13] https://twitter.com/htltimor/status/1616198326851981312.

the evidence of such claims is irrelevant to the issues at trial. Several of Alameda's lenders are creditors in the bankruptcy and are litigating their priority under the Bankruptcy Code. But there would be no proper basis for the defendant to cross-examine witnesses from these lenders about the contentious, and as yet unresolved, disputes in the bankruptcy court between the FTX Debtors and Alameda's lenders. Those disputes are wholly unrelated to the anticipated testimony in this case, which would relate to interactions these parties had with the defendant and others at FTX before the bankruptcy. *See United States v. Akefe*, 568 F. App'x 1, 4 (2d Cir. 2014) (limitation on cross-examination on allegations against law enforcement agent was appropriate given that the allegations were unsubstantiated and wholly unrelated to the case). Likewise, if the Government calls FTX customers as witnesses at trial, and if any of those customers have filed objections to the retention of Sullivan & Cromwell or the bankruptcy plan, those objections are not a proper basis for cross-examination.

Accordingly, all evidence and argument about the bankruptcy proceeding—besides the fact that FTX and Alameda declared bankruptcy—should be precluded.

## I.   The Court Should Exclude Claims that the Defendant Is Not Guilty Because FTX Was Not Regulated in the United States and FTX US Remained Solvent

The defendant should be precluded from advancing the legally incorrect and irrelevant argument that he is not guilty because FTX was not regulated within the United States and he followed the rules with respect to FTX US.

A common refrain from the defendant in the aftermath of FTX's collapse was that individuals in the United States were unaffected by the problems that plagued FTX.com. The defendant repeatedly insisted that FTX US was solvent and that if FTX US had not entered bankruptcy its customers could have been made whole. For example, on January 19, 2023, the

defendant tweeted that he was "waiting" for the new CEO of FTX to "finally admit FTX US is solvent and give customers back their money."[14] The defendant highlighted that one focus of his prepared Congressional remarks was to "shed what light I can on: FTX US's solvency and American customers."[15] In his pretrial motions, the defendant asserted that:

> Mr. Bankman-Fried believed that by developing the exchange abroad, the concept could be fine-tuned and eventually brought within the U.S. legal framework. While the cryptocurrency industry was skeptical of government regulation, Mr. Bankman-Fried and FTX sought to work constructively with global regulators, including the Securities Commission of the Bahamas, which became FTX's primary regulator. FTX was never regulated in the United States and was available solely to non-U.S. customers.

(Dkt. 139 at 5).

The fact that FTX was not regulated in the United States and the question of FTX US's solvency are both red herrings. Neither is relevant to the elements of the charged offenses. To prove the jurisdictional elements of the charged crimes, the Government need not prove that FTX was a U.S.-regulated exchange. The defendant should be precluded from arguing that he is not guilty of wire fraud because the Government has not alleged that he committed fraud with respect to the U.S. exchange specifically or because he adopted more careful practices for FTX US.

## J.  The Court Should Exclude Evidence of the Defendant's Good Acts To Prove His Innocence

To the extent that the defendant may seek to present evidence or argument concerning his prior commission of "good acts" or to offer evidence of his non-criminal activities to disprove his guilt of the crimes charged, he should be precluded from doing so. Specific-act propensity

---

[14] https://twitter.com/SBF_FTX/status/1616120980669366278. Such tweets also misleadingly omit that on or about November 9, 2022, the defendant transferred approximately $46 million of Alameda's assets to plug a hole in FTX US's balance sheet.

[15] Tweet on December 9, 2022, https://twitter.com/SBF_FTX/status/1601186249750245378.

evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendant should accordingly be precluded from offering evidence or argument,

including in his opening statement, that the defendant's charity, philanthropy, or any other specific instance or instances of his prior good acts, or the lack of commission of other bad acts, is proof of his innocence. For the same reasons, the defendant should be precluded from offering this type of argument insofar as it relates to the FTX Foundation, as any prior good acts by that entity similarly has no bearing on the defendant's guilt or innocence.

### K.  The Court Should Exclude Evidence of the Defendant's Personal Circumstances and Potential Punishment

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning his family background, health, age, pretrial detention, or any other similar factors. He should be precluded from doing so, and from mentioning such subjects in his opening statement, absent a showing that such a factor bears on his guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning

56

punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

## V.   The Court Should Preclude the Defendant from Cross-Examining Witnesses About Privileged Documents or Topics

FTX and Alameda have not waived their attorney-client privilege, and the FTX Debtors continue to assert the privilege over many topics. (*See* Dkt. 159). While the defendant does not have the power to waive the corporate privilege, he is undoubtedly familiar with privileged topics from his time at FTX, and it is possible he has access to materials subject to the corporate privilege that were or are in his email accounts. Nonetheless, the defendant should not be permitted to cross-examine witnesses about privileged topics or introduce privileged evidence at trial.

Government witnesses have a right to assert privilege on cross-examination. *See United States v. Coven*, 662 F.2d 162, 170 (2d Cir. 1981) ("It is clear that government witnesses have a right to assert the attorney-client privilege on cross-examination."); *United States v. Lin*, 225 F.3d 647, 2000 WL 1340361, at *2 (2d Cir. 2000) ("The Confrontation Clause does not deprive the trial judge of all discretion to set limits on cross-examination" and therefore "[i]t is within the court's discretion to limit cross-examination to the extent that it would violate the witness's attorney-client privilege."); *United States v. Tanner*, 17 Cr. 61 (LAP), Dkt. 116 (precluding cross-examination of witnesses on matters that are protected by attorney-client privilege). Privileged communications do not "become discoverable simply because a defendant wishes to use those communications in his defense." *United States v. Milton*, No. 21 Cr. 478 (ER), 2022 WL 4110256, at *6 (S.D.N.Y. Sept. 8, 2022). To be sure, "if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part." *United States v. Cardillo*, 316 F.2d 606, 611 (2d

Cir. 1963). However, "[w]here the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him." *Id.*; *see also Coven*, 662 F.2d at 171.

To the extent the defendant wishes to cross-examine witnesses about potentially privileged topics, he must raise the topic in advance, prior to cross-examination and outside of the presence of the jury. *See United States v. St. John*, 267 F. App'x 17, 22 (2d Cir. 2008) (rejecting defendants' argument that it was improper to allow party "to assert the attorney-client privilege outside the presence of the jury"). To permit the defendant to cross-examine on privileged topics without a prior discussion, only to cause the witness to invoke the attorney-client privilege, will be confusing for the jury and unfairly prejudicial to the Government. If a witness invokes the attorney-client privilege during cross-examination, the jury may not understand what is happening, may confuse the privilege invocation with a Fifth Amendment assertion, or may believe the witness is improperly hiding something. That would be unfairly prejudicial because neither the Government nor, in the case of FTX's corporate privilege, the witness controls the privilege.

To the extent the defendant believes inquiry into a matter over which the FTX Debtors have asserted privilege is appropriate, the proper course would be for him to raise it in advance and allow the Court to rule on whether the matter is in fact privileged or not. *See United States v. Sattar*, No. 02 Cr. 395 (JGK), 2003 WL 22137012, at *21 (S.D.N.Y. Sept. 15, 2003) (approving of process whereby "courts review materials *in camera* in criminal cases to determine whether they should be turned over to defendants or whether privileges apply").

## VI.     The Court Should Preclude the Defendant From Cross-Examining Witnesses About Their Recreational Drug Use

As materials produced in discovery reflect, and as will be disclosed in notes of witness interviews, several of the witnesses the Government expects to call engaged in recreational drug use. The defense should be precluded from cross examining witnesses about this.

Federal Rule of Evidence 608 bars the use of extrinsic evidence to prove specific instances of a witness' conduct, except for a criminal conviction or on cross-examination if probative of truthfulness. Fed. R. Evid. 608(b). Rule 608(b) "'does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness.'" *United States v. Schlussel*, No. 08 Cr. 694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (quoting *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005)). In addition, Federal Rule of Evidence 611 makes clear that the Court should "protect witnesses from harassment or undue embarrassment" and "cross examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611. Thus, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley,* 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

The Court should preclude cross examination of witnesses about past recreational drug use because it is not probative of a witness's truthfulness and would serve only to harass the witnesses and prejudice the jury against them. *See, e.g.*, *United States v. Urena*, No. 11 Cr. 1032 (PAE), 2014 WL 1303114, at *3 (S.D.N.Y. Apr. 1, 2014) (precluding cross-examination of witness who was twice convicted of misdemeanor marijuana possession because "[t]he mere fact of engaging

59

in such conduct, which by its nature is not inherently indicative of dishonesty, would not bear on [the witness'] credibility in this trial."); *United States v. Wagner*, No. 20 Cr. 410 (NSR), 2022 WL 19179, at *5 (S.D.N.Y. Jan. 3, 2022) ("It is well established that a witness's use of drugs or alcohol, in and of itself, is not probative of their character for truthfulness." (citations omitted)).

## CONCLUSION

For the reasons set forth above, the Court should grant the Government's motions *in limine*.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/ Danielle R. Sassoon
    Danielle R. Sassoon
    Nicolas Roos
    Danielle Kudla
    Samuel Raymond
    Thane Rehn
    Assistant United States Attorneys
    (212) 637-1115


Dated: August 14, 2023
      New York, New York