UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                :

UNITED STATES OF AMERICA          :

             :        S6 22 Cr. 673 (LAK)

      v.           :

             :

SAMUEL BANKMAN-FRIED,       :

             :

             :

          Defendant.    :

------------------------------------------------------------------x

**SAMUEL BANKMAN-FRIED'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS TO EXCLUDE DEFENDANT'S EXPERT WITNESSES**

**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
Phone:  (212) 957-7600

*Attorneys for Samuel Bankman-Fried*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ......................................................................................................................... 4

I.     LEGAL STANDARD ................................................................................................... 4

II.    THE GOVERNMENT'S EFFORT TO EXCLUDE EXPERT TESTIMONY FROM
BRIAN KIM AND THOMAS BISHOP IS IMPROPER ................................................... 5

       A.     Thomas Bishop ............................................................................................ 6

       B.     Brian Kim..................................................................................................... 7

III.   PROPOSED TESTIMONY FROM DR. JOSEPH PIMBLEY, PH.D. IS
ADMISSIBLE............................................................................................................. 9

IV.   BRADLEY SMITH'S PROPOSED EXPERT TESTIMONY IS ADMISSIBLE ........... 12

V.    PROFESSOR ANDREW DI WU'S PROPOSED TESTIMONY IS ADMISSIBLE....... 16

       A.     Blockchain and Cryptocurrency (Opinions 8 and 9) ............................... 17

       B.     Exchange-Issued Tokens (Opinions 10 and 11).................................... 18

       C.     Cryptocurrency Exchanges (Opinions 12 and 13)................................ 20

       D.     Boom and Bust of Crypto Markets (Opinion 14) ................................. 22

       E.     Professor Wu's Expert Testimony Will Not Be Cumulative of Testimony
from Percipient Witnesses..................................................................... 23

VI.   EXPERT TESTIMONY BY PETER VINELLA, PH.D., IS ADMISSIBLE.................. 23

       A.     Dr. Vinella is Qualified. ........................................................................ 25

       B.     The Government's Objections to Dr. Vinella's Methodology Are Not a Basis
for Disqualifying His Testimony........................................................... 27

       C.     Dr. Vinella's Testimony Will be Relevant, Helpful, and Permissible. ................. 28

             1.     Dr. Vinella's Testimony on the Cryptocurrency Sector and FTX
Within the Broader Context of the Financial Services Industry Is
Relevant and Admissible (Disclosure Sections A-C)................................ 29

2.      The Remainder of Dr. Vinella's Anticipated Testimony (Disclosure Sections D-H) Is Relevant and Admissible.................................................. 32

D.      A Daubert Hearing is Not Required........................................................ 36

VII.    LAWRENCE AKKA'S PROPOSED TESTIMONY IS ADMISSIBLE.......................... 37

CONCLUSION.................................................................................................................... 42

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AU New Haven, LCC v. YKK Corp.*, No. 15-CV-2411(GHW), 2019 WL 1254763

*Boykin v. W. Express, Inc.*,
   12-CV-7428 (NSR), 2015 WL 539423 (S.D.N.Y. Feb. 6, 2015) ...........................................26

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786 (1993)...............................................................................4, 23

*Dominion Resources SVC, Inc. v. Alstom Power, Inc.*,
   No. 16-CV-644, 2018 WL 3752878 (D. Conn. Aug. 6, 2018) ..............................................41

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   581 F. Supp. 3d 1029 (N.D. Ill. 2022) .................................................................................22

*In re Elysium Health-ChromaDex Litig.*,
   No. 17-CV-7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022)..............................13, 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   No. 12 Civ. 7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ......................21, 32, 36

*Hewitt v. Metro-N. Commuter R.R.*,
   244 F. Supp. 3d 379 (S.D.N.Y. 2017)...............................................................................5, 13

*Hous. Works, Inc. v. Turner, Inc.*,
   362 F. Supp. 2d 434 (S.D.N.Y 2005) ...................................................................................41

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992) ...............................................................................................41

*In re Initial Public Offering Secs. Litig.*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001) ....................................................................................41

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91, 131 S. Ct. 2238 (2011) ...........................26

*Illinois Liberty PAC v. Madigan*,
   No. 12-CV-5811, 2015 WL 5589630 (N.D. Ill. Sept. 21, 2015) ...........................................15

*Lion Oil Trading & Transp. Inc. v. Statoil Mktg. & Trading (US) Inc.*,
   Nos. 08-CV-11315, 09-CV-2081, 2011 WL 855876 (S.D.N.Y. Feb. 28, 2011)............... 25-26

*Marx & Co., Inc. v. Diner's Club, Inc.*,
   550 F.2d 505 (2d Cir.1977), *cert denied*, 434 U.S. 861, 98 S. Ct. 188 (1977) ..... 34-35, 36, 41

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  643 F. Supp. 2d 482 (S.D.N.Y. 2009) ........................................................................ 11-12, 14

*Olin Corp. v. Lamorak Ins. Co.*,
  No. 84-CV-1968 (JSR), 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) .................................21

*Pearlman v. Cablevision Sys. Corp.*,
  No. 10-CV-4992, 2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015) ...........................................41

*Peterson v. Islamic Republic of Iran*,
  No. 13-CV-9195 (KBF) (S.D.N.Y. Sept. 19, 2014) ...........................................................25

*Peterson v. Islamic Republic of Iran*,
  876 F.3d 63 (2d Cir. 2017) ......................................................................................25, 36

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) ...........................................................................................5

*Primavera Familienstiftung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2011) ............................................................................ 35-36

*In re Rezulin Prods. Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..............................................................................41

*Red Rock Commodities, Ltd. v. Std. Chartered Bank*,
  140 F.3d 420 (2d Cir. 1998) ...........................................................................................41

*SEC v. Ripple Labs, Inc.*,
  20-CV-10832 (AT), 2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) .................................. *passim*

*S.E.C. v. U.S. Envtl., Inc.*,
  94-CV-6608(PKL)(AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ................. 34-35, 36

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997) ............................................................................................26

*Teevee Toons, Inc. v. Rep Sales, Inc.*,
  03-CV-10148 (JGK), 2007 WL 5011652 (S.D.N.Y. Oct. 19, 2007) .............................. 27-28

*United Stated v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) .................................................................14, 15, 23, 34, 40

*United States v. Bronston*,
  658 F.2d 920 (2d Cir. 1981) ...........................................................................................41

*United States v. Cohen*,
  887 F.3d 77 (1st Cir. 2018) ...........................................................................................40

*U.S. v. Diakhoumpa,*
 171 F. Supp. 3d 148 (S.D.N.Y. 2016) ...................................................................37

*United States v. DiDomenico,*
 985 F.2d 1159 (2d Cir. 1993) ...............................................................................12

*United States v. Duncan,*
 42 F.3d 97 (2d Cir. 1994) ............................................................... 13-14, 19, 29

*United States v. Dupre,*
 462 F.3d 131 (2d Cir. 2006) .................................................................................39

*United States v. Fallon,*
 61 F.4th 95 (3d Cir. 2023)  ...................................................................................39

*United States v. Gil,*
 680 F. App'x 11 (2d Cir. 2017)  ...........................................................................36

*United States v. Kaziu,*
 559 F. App'x 32 (2d Cir. 2014) ............................................................................10

*United States v. Litvak,*
 808 F.3d 160 (2d Cir. 2015) ................................................................27-28, 32-33

*United States v. Lopez,*
 547 F.3d 364 (2d Cir. 2008) .................................................................................30

*United States v. Lundergan,*
 No. 18-CR-00106 (GFVT), 2019 WL 3804239 (E.D. Ky. Aug. 13, 2019)...................... 14-15

*United States v. Mendlowitz,*
 No. S2 17-CR-248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019).......................10, 11

*United States v. Mulder,*
 273 F.3d 91 (2d Cir. 2001) ...................................................................................32

*United States v. Newkirk,*
 684 F. App'x 95 (2d Cir. 2017) ......................................................................10, 11

*United States v. Newkirk,*
 No. 14-CR-534-02 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016) ..............................11

*United States v. Patel,*
 No. 21-CV-220 (VAB), 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ....................20, 29, 30

*United States v. Romano,*
 794 F.3d 317 (2d Cir. 2015) .................................................................................28

*United States v. Russo*,
    74 F.3d 1383 (2d Cir. 1996) ........................................................................ 33-34

*U.S. v. Saipov*,
    17-CR-722 (VSB), 2023 WL 4199415 (S.D.N.Y. June 27, 2023) .........................................37

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988) ...........................................................................41

*U.S. v. Teva Pharm. USA, Inc.*,
    13-CV-3702 (CM), 2019 WL 13244252 (S.D.N.Y. July 1, 2019) .........................................5

*Upstate Jobs Party v. Kosinski*,
    559 F. Supp. 3d 93 (N.D.N.Y. 2021) ...................................................................15

*Vale v. United States*, 673 F. App'x 114 (2d Cir. 2016) .................................................26

## Other Authorities

Fed. R. Crim. P. 16 .................................................................................28

Fed. R. Evid. 702 ...........................................................................4, 5, 16, 18

Fed. R. Evid. 704 ......................................................................11, 12, 16, 21, 34

Samuel Bankman-Fried respectfully submits this memorandum of law in opposition to 15the Government's Motions to Exclude the Testimony of the Defendant's Expert Witnesses.

## PRELIMINARY STATEMENT

The defense has provided disclosures for seven expert witnesses.[1]  All of them are highly qualified to provide relevant background information on the immensely complicated issues in this case as well as testimony directly pertinent to disputed issues.  None of the proposed testimony would be unduly prejudicial or usurp the functions of the Court or the jury.  Yet the Government takes the position that *none* of the experts should be permitted to testify on *any* of the topics they propose to cover.  As such, the Government's Motions to Exclude continue the theme illustrated by its motions *in limine*, namely, overreaching with regard to the rules of evidence and pretrial motions to thwart Mr. Bankman-Fried's fundamental right to present a defense or even to introduce evidence that might be inconsistent with the Government's theories. The Motions to Exclude should be rejected.

For example, the Government seeks to exclude all testimony by the defense's forensic accountant and e-discovery expert (Thomas Bishop and Brian Kim, Esq., respectively).  If made relevant by the Government's case, Mr. Bishop would provide financial calculations and Mr. Kim would testify on metadata associated with documents in evidence.  The Government asserts that both experts should be excluded because their disclosures do not specify the information they will address—information that is known only to the Government and has not been provided to the defense.  *See* Part II, below.  The Government also seeks to exclude testimony by the

---

[1] The testimony of three of the defense's proposed experts (Thomas Bishop, Brian Kim, Esq., and Dr. Joseph M. Pimbley) would principally be in the nature of rebuttal testimony if relevant in response to the Government's case. Professor Bradley A. Smith would testify only if the court were to grant the Government's motion in limine with respect to evidence relating to the Government's dropped campaign finance charge.  The defense disclosed all seven experts at this stage in an excess of caution to ensure that Daubert issues can be addressed before trial, consistent with that the defense understood to be the Court's directive in lengthening the amount of time for the exchange of expert disclosures and related motion practice.  *See* June 15, 2023 Hear'g Tr., ECF No. 168, at 47:20-49:4.

defense's eminently qualified financial database expert, Dr. Joseph H. Pimbley, relating to FTX's enormous and extraordinarily complicated databases in favor of two lay, cooperating witnesses, whose credibility will be very much at issue during trial.  *See* Part III, below.

Next, having vigorously argued that evidence regarding the dropped campaign finance charges is relevant and admissible, the Government now argues, with equal vigor, that expert testimony on this topic by Professor Bradley Smith, a former chair and commissioner of the Federal Election Commission is irrelevant and inadmissible.  *See* Part IV, below.  Professor Smith's testimony would, among other things, help the jury understand the complex regulatory scheme governing political campaign contributions and the real-world context in which contributions such as those alleged here are made.  Courts have often admitted similar expert testimony, and the Government offers no plausible basis to exclude it here.

In a similar vein, the Government attempts to prevent testimony from Professor Andrew Di Wu and Dr. Peter Vinella, the defense's experts on blockchain technology, cryptocurrency markets, and related industry practices.  *See* Parts V-VI below.  The Government complains that the testimony of these experts would be irrelevant, even though the Government will call its own expert on closely similar topics; that their methods are unreliable, even though the methodology of one of the Government's experts is identical to that of the defense experts, and the methodology of another of the Government's experts is not disclosed at all; that portions of Professor Wu's testimony would be confusing for the jury, even though he would address issues that the Government itself put directly at issue, such as the valuation and use of exchange-issued tokens as loan collateral; and that Dr. Vinella is not qualified, even though he has nearly 40 years of clearly applicable experience and is more qualified than the Government's expert.

The Government's objections to each of these experts share a few badly mistaken arguments. For example, the Government insists that experts may not testify on the background of complex issues and technologies or on practices and standards relevant in the financial services industry generally and the cryptocurrency sector. This position is contradicted by extensive and recent authority from within the Second Circuit and elsewhere. It is beyond dispute that reliable expert testimony on industry standards can be admitted to help juries understand unfamiliar but centrally relevant topics, including regulatory schemes, and to consider whether a party's conduct is consistent with or deviates from practices that are considered standard and appropriate.

Relatedly, as to almost every topic to be addressed by every defense expert, the Government raises the same specter—that expert testimony on industry practices (or on virtually anything else) will include improper opinion regarding Mr. Bankman-Fried's knowledge of crucial facts or his intent with respect to the crimes with which he is charged. The Government is seeing ghosts. *None* of the proposed testimony will include opinions regarding Mr. Bankman-Fried's state of mind or ultimate culpability. And courts routinely hold (and the Federal Rules of Evidence provide) that experts may offer testimony on factual issues, including industry practices and the nature of the legal and regulatory environment in which enterprises operate, that might be relevant to a defendant's state of mind or provide context for his alleged actions. Such testimony is admissible as long as the expert does not draw the final inference between relevant evidence and the ultimate conclusion the jury must reach. All proposed testimony of the defense's experts stays well within these liberal boundaries.

The adamance and frequency of the Government's protests on this and other issues does not make their arguments any less mistaken. Instead, it suggests a level of concern which makes

it even more important that the defense be permitted to probe these topics fully through the testimony of expert and fact witnesses.

Finally, as it did in its motions *in limine*, the Government again attempts to prevent evidence that would enable the jury to adequately understand FTX's Terms of Service, which governed the scope of FTX's relationship with its customers. The Government's motions *in limine* sought to exclude all portions of that document except a single section the Government views as incriminating. Here, the Government seeks to prevent expert testimony on principles of English law, which governs the Terms of Service, that would enable the jury to understand the context against which Mr. Bankman-Fried took certain actions and made certain statements that the Government claims were fraudulent. The Government seeks to preclude this evidence, because it could lead the jury to conclude that nothing in FTX's relationship with its customers restrained FTX from using customer fiat deposits, so long as it satisfied withdrawal requests when made. The Government therefore overstates the law, claiming that experts cannot provide any legal analysis in any context. But this expert will not give testimony about ultimate legal issues in the case, which is what the law prohibits. This expert will testify on topics that are clearly relevant, his testimony will aid the jury, and the Government cannot preclude his testimony simply because it would rather the jury not hear it.

## **ARGUMENT**

### I.    **LEGAL STANDARD**

Rule 702, which codifies the standard for admissibility set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony

is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Where expert testimony is "non-scientific," the standard is "whether the expert bases testimony upon professional studies or personal experience and employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *U.S. v. Teva Pharm. USA, Inc.*, 13-CV-3702 (CM), 2019 WL 13244252, at *1 (S.D.N.Y. July 1, 2019).[2] "The dispositive question under Rule 702 is whether the testimony will assist the trier of fact." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016).

Courts in the Second Circuit apply "liberal admissibility standards" with respect to expert testimony. *Id.* Exclusion of expert testimony is "the exception rather than the rule." Fed. R. Evid. 702, 2000 Advisory Committee Notes; *accord SEC v. Ripple Labs, Inc.*, 20-CV-10832 (AT), 2023 WL 5670711, at *3 (S.D.N.Y. Mar. 6, 2023). Thus, expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 385 (S.D.N.Y. 2017). "[A]ny other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.*

## II.   THE GOVERNMENT'S EFFORT TO EXCLUDE EXPERT TESTIMONY FROM BRIAN KIM AND THOMAS BISHOP IS IMPROPER

The Government's sole objection to the expert testimony of Thomas Bishop, a forensic accountant, and Brian Kim, Esq., an e-discovery expert, is that the defense's Rule 16 disclosures for these witnesses are inadequate. But the Government has not yet provided information that

---

[2] Except as otherwise noted, internal quotation marks, alterations, and citations have been omitted from cases cited.

would enable the defense to make more specific disclosures.  Both experts' testimony would

principally be in the nature of rebuttal testimony, which would necessarily depend on the

evidence the Government presents at trial through its own fact and expert witnesses.  The details

of the Government's case remain largely unknown to the defense beyond the broadest strokes.

Consequently, these defense experts cannot be expected to provide fully mapped out details of

opinions they will offer in response to the Government's unknown case.

### A.     Thomas Bishop

The defense disclosed that Mr. Bishop's testimony would address "[c]alculations of

financial figures and metrics (e.g., net asset value) for FTX Trading Ltd., Alameda Research

LLC, and other entities," based on "publicly available documents and records produced in

discovery in this case, including, but not limited to, balance sheets for Alameda Research LLC."

Ex. 1 (Expert Disclosure of Thomas Bishop) at 2.[3]

The Government objects that this disclosure (which was provided on the same day that

the Government provided its own expert disclosures) "does not state what calculations Mr.

Bishop has conducted" or "what opinions he has formed from those calculations," and that it

"does not state which opinions of the Government's expert Mr. Bishop intends to respond to,

what the nature of his opinion is, or the basis for his disagreement with the Government's

expert."  ECF No. 236 at 13.  The reason Mr. Bishop's disclosure does not set out this

information is that the Government has not provided it.  As of the date of this submission, the

Government has not identified any specific financial figures or calculations to be presented by its

expert beyond high-level approximations referenced in the Government's financial expert

disclosure for Professor Peter Easton—and even those vague statements are unaccompanied by

---

[3] Citations to "Ex. _" refer to the exhibits to the Declaration of Christian R. Everdell in Opposition to the
Government's Motions to Exclude Defendant's Expert Witnesses, dated September 11, 2023.

any explanation of the basis for the calculation and anything more than vague references to sources of data.  *See*, ECF No. 236-9 at 5 (describing a "multi-billion-dollar negative balance" in Alameda's "primary account" and a "substantial negative balance in Alameda Research's subaccounts" based on "records from FTX's transaction database"); *see also id.* (describing a "combined balance" of "approximately in excess of negative $10 billion" based on various sources).[4]

Until the financial calculations relevant to the Government's case come into clearer focus, Mr. Bishop is in no position to explain at this stage what calculations he plans to submit. And until the Government's experts (and perhaps other witnesses) present their own calculations and reveal the methods and data on which they are based, Mr. Bishop cannot be expected to preview specific calculations, methods, and sources he will offer in rebuttal.

## B.     Brian Kim

As to Mr. Kim, the defense expects that the Government will seek to draw inferences from certain document metadata that may be subject to challenge.  For example, the Government disclosed that it intends to call an unnamed FBI Special Agent to testify to "the content, metadata, and filepaths associated with Slack data and Google documents," including "the fields listing the author, custodian(s), and viewer(s), as well as the content created, modified, viewed, saved, and/or deleted dates."  Ex. 2 (Government's Disclosure of FBI Special Agent Witnesses ("Agent Disclosure")) at 1.  It thus appears likely that the Government will seek to draw inferences as to who created, modified, viewed, saved, and/or deleted documents based on

---

[4] The Government expressed its intention "to produce draft exhibits on September 8, 2023," in connection with Professor Easton's testimony, ECF No. 236-9 at 2.  At 12:51 a.m. on Saturday, September 9, the Government produced 1,362 exhibits without an index or consistent Bates numbers.  The defense has requested the Government to provide a workable index, without which the extensive exhibits cannot be readily searched and identified.  At present, it remains unclear which, if any, of these exhibits Professor Easton will rely on for his expert opinion.

metadata.  The defense therefore intends to call Mr. Kim principally as a rebuttal expert to provide "[b]ackground testimony concerning document metadata and potential or permissible inferences drawn therefrom," and "[r]esponsive analyses and conclusions to evidence, argument, or analyses presented by the Government of metadata associated with documents or information produced in this litigation."  Ex. 3 (Expert Disclosure of Brian Kim, Esq.) at 2.

The Government complains that Mr. Kim's disclosure "fails to specify what Mr. Kim's opinion is in response to the expected testimony by Government witnesses," and asserts that, should Mr. Kim "put[] forward arguments that metadata associated with documents are inaccurate," any supplemental disclosure "must specify which documents Mr. Kim contends have inaccurate metadata, and the bases for such a conclusion."  ECF No. 236 at 15 n.3.  There is simply no way to provide these details at this stage.  The Government's disclosures as to the FBI Special Agent contain no information that would allow the defense to identify which particular documents or metadata the Government will seek to introduce (where metadata will be at issue), and the Government has not otherwise identified documents it intends to use for this purpose. Nor is it possible for the defense to ascertain this information on its own, since the Government has produced more than 5 million documents, including millions of Google documents and Slack communications.

The Government also claims no expert on metadata is required at all, because metadata is "readily observable."  ECF No. 236 at 15.  If that were true, the Government presumably would not need to call an FBI agent to offer specialized knowledge as to "the electronic metadata typically associated with Slack and Google documents."  Ex. 2 (Agent Disclosure) at 1.[5]

---

[5] The defense notified the Government that it reserves all rights to object at trial if the Government seeks to elicit expert testimony from a witness not qualified as an expert.

In sum, the Government attempts to exclude Mr. Bishop and Mr. Kim on the basis that the defense was unable to divine the information that the Government has not yet disclosed.  The Government's motions to preclude Mr. Bishop and Mr. Kim's testimony on this basis should be denied.  In the alternative, the defense respectfully requests an opportunity to supplement its disclosures as to these expert witnesses within a reasonable time after Professor Easton gives his testimony and the Government's other witness testifies as to metadata.

## III.    PROPOSED TESTIMONY FROM DR. JOSEPH PIMBLEY, PH.D. IS ADMISSIBLE

The Government's motion to exclude Dr. Joseph Pimbley's anticipated testimony should be rejected as unfounded and misguided.  The defense disclosed Dr. Pimbley as an expert in financial databases for three purposes:  (1) to offer opinions on deficiencies in FTX's software infrastructure, in particular with respect to its reporting, testing, and quality assurance functionalities; (2) to present information concerning FTX's trading database and output therefrom, as well as analyses and calculations derived from its data; and (3) to rebut evidence or analysis presented by the Government on these two topics.

The Government's motion purports to seek the exclusion of *all* of Dr. Pimbley's testimony, but only addresses one of these three areas.  The Government nowhere objects to Dr. Pimbley's anticipated presentation of data and analyses from the FTX database or rebuttal of the Government's similar evidence.  Accordingly, the Government's motion to exclude Dr. Pimbley's testimony should be denied with respect to these topics.

The Government does seek to exclude Dr. Pimbley's proposed testimony regarding FTX's software infrastructure, but its objections are easily rejected.  *First*, the Court should reject the Government's assertion that Dr. Pimbley's expert testimony is unnecessary because Gary Wang and Nishad Singh will be able to answer questions from the defense about FTX's

9

code.  In effect, the Government seeks to limit evidence on a complex set of issues relating to sophisticated software infrastructures—including issues that could bear directly on crucial disputed questions—to testimony from two lay witnesses who are cooperating in the Government's prosecution.  The credibility of those witnesses is expected to be directly at issue, as will problems with the software infrastructure they allegedly created.  And Mr. Wang and Mr. Singh lack the objectivity and deep expertise that Dr. Pimbley will bring to bear on these questions.  In contrast, Dr. Pimbley's eminent qualifications are unchallenged.  Excluding Dr. Pimbley's testimony on this basis would be fundamentally unfair and lead to a less rigorous examination of an important trial issue.  *See United States v. Kaziu*, 559 F. App'x 32, 38 (2d Cir. 2014) (declining to exclude expert where "a lay witness could not have attested to the same issues as [the expert], who based his testimony on specialized research and training removed from the instant case.").

The Government's authorities on this issue do not move the needle.  ECF No. 236 at 18 (citing *United States v. Newkirk*, 684 F. App'x 95 (2d Cir. 2017) and *United States v. Mendlowitz*, No. S2 17-CR-248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019)).  In both cases, courts excluded expert testimony on industry practices principally because it would not be relevant to any disputed issue.  *Mendlowitz,* 2019 WL 6977120, at *5 (citing *Newkirk*, 684 F. App'x at 97). The expert testimony in *Mendlowitz* was also excluded as improper state of mind evidence and because it would be duplicative of testimony from "many" available fact witnesses, at least some of whom (unlike Mr. Singh and Mr. Wang) were not cooperating witnesses.  In addition, the defendant in *Newkirk* "did not object when lay witnesses provided the minimal necessary explanation of these business terms and concepts, none of which were beyond the capacity of a

reasonable juror to understand." *United States v. Newkirk*, No. 14-CR-534-02 (JSR), 2016 WL 1659149, at *2 (S.D.N.Y. Apr. 19, 2016).

In terms of the complexity of the issues, the depth and rigor of the witness's expertise, and the likelihood that expert testimony could be helpful to the jury, Dr. Pimbley's proposed testimony cannot be compared with the industry background that could adequately be replicated by non-adverse lay witnesses at issue in *Mendlowitz* and *Newkirk*.  The Court should reject the Government's reasoning and deny its motion to exclude Dr. Pimbley.

*Second,* the Government characterizes Dr. Pimbley's testimony as an improper opinion on Mr. Bankman-Fried's "knowledge or intent," a purported violation of Rule 704(b).  This is pure fiction.  Dr. Pimbley's discussion of the reporting, testing, and quality assurance functionality of FTX's software infrastructure says nothing at all about "whether [Mr. Bankman-Fried] did or did not have a mental state . . . that constitutes an element of the crime charged." Fed. R. Evid. 704(b).  The disclosure does state that Dr. Pimbley may testify that the system had "insufficiently robust reporting and insufficient testing and quality assurance of data integrity and code" and that many of these deficiencies "were not visible to external users or to recipients of infrastructure generated risk and financial reports, including, for example, the fiat@ programming."  Ex. 4 (Expert Disclosure of Joseph Pimbley, Ph.D.) at 2.  And this factual conclusion could, if accepted by the jury, support the inference that Mr. Bankman-Fried was not aware of issues such as the balance of the fiat@ account or the total amount of customer assets loaned to Alameda.  The Government understandably may wish to avoid any evidence that would support such an inference.  But that is not a basis for excluding it.  To the contrary, an expert "may opine that a defendant had access to information, but she may not opine that the defendant knew that information or that the information was sufficient for or material to a legal purpose."

11

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 505 (S.D.N.Y. 2009). Nothing in Dr. Pimbley's disclosure comes close to indicating he will provide an opinion on Mr. Bankman-Fried's state of mind or otherwise run afoul of Rule 704(b).

The Government's sole authority in this regard is inapposite. *See United States v. DiDomenico*, 985 F.2d 1159, 1161 (2d Cir. 1993) (excluding expert testimony that the psychological implications of the defendant's "childhood" and relationships prevented from her knowing that certain computer equipment was stolen). The Government's related position—that testimony concerning what information was or was not revealed by outputs from FTX's system somehow is not relevant to determining what Mr. Bankman-Fried knew about the system—does not withstand scrutiny.

*Finally,* the Government complains that Dr. Pimbley's disclosure is insufficiently specific because he does not define terms such as "reporting," "testing," "insufficiently robust" and other terms—indeed, seemingly most of the words in this portion of the disclosure. But the Government cites no authority requiring such definitions, and the terms are not particularly esoteric.[6] Should the Court determine that Dr. Pimbley's disclosure is insufficient, Mr. Bankman-Fried respectfully requests a reasonable amount of time to supplement the disclosure.

## IV.    BRADLEY SMITH'S PROPOSED EXPERT TESTIMONY IS ADMISSIBLE

Having dropped the campaign finance charge against Mr. Bankman-Fried to comply with the United States' treaty obligations to The Bahamas, the Government has shoehorned the issue

---

[6] The Government is also not well positioned to cry foul over alleged vagueness in expert disclosures. Its disclosure for Professor Easton indicates that virtually all of his testimony will be based upon FTX database records, including opinions regarding the size of various balances. *See* ECF No. 236-9 at 4-5. But the disclosure does not specify which data or the methodology used to retrieve it. Given the size of the database and the complexity of coding queries to retrieve data, this lack of specificity strips away any informative value Professor Easton's disclosure might otherwise have. *See* ECF No. 234 at 3-5.

back into the case by alleging in the S6 Indictment that Mr. Bankman-Fried used FTX customer funds for political contributions and "used straw donors . . . to conceal the source of the funds." S6 Indictment ¶ 5.  The Government seeks to prove not just that such contributions were made but also that they "violate[d] campaign finance laws."  ECF No. 204 at 8.  These allegations do not belong in the case at all.  *See* ECF No. 246 at 9-13.  But to the extent the Government is permitted to proceed to trial on them, the defense must be permitted to respond.

The Government sensibly does not dispute the qualifications of Professor Smith, a former Chair and Commissioner of the Federal Election Commission ("FEC").  Professor Smith is prepared to testify on the background of relevant federal campaign finance laws and their administration by the FEC and of various forms of political contributions, including those allegedly made by and at the direction of Mr. Bankman-Fried.  *See* Ex. 5 (Expert Disclosure of Bradley Smith, Esq.) at 2-3.  His testimony will be helpful to the jury in understanding a complex regulatory scheme and the Government's campaign finance theories, easily satisfying the "permissive" standard of admissibility for expert testimony.  *Hewitt*, 244 F. Supp. 3d at 385.  The Government also does not dispute the reliability of Professor Smith's methods.  The arguments the Government does make for excluding this testimony are self-contradictory and contrary to settled law and should be rejected.

*First*, the Government argues that expert testimony on "issues of law is inadmissible," full stop.  ECF No. 236 at 19.  This is incorrect.  Although an expert may not "opine on any of the ultimate legal issues in the case," *In re Elysium Health-ChromaDex Litig.*, No. 17-CV-7394 (LJL), 2022 WL 421135, at *25 (S.D.N.Y. Feb. 11, 2022), courts regularly admit expert testimony that draws from or discusses legal standards as "groundwork" to "enable the jury to make its own informed determination."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.

1994).[7]  Indeed, the Government's position is refuted by the only decision it cites for a purported blanket prohibition on testimony on "issues of law."  In *United Stated v. Bilzerian*, the Second Circuit upheld the trial court's decision to permit an expert to testify on "general background on federal securities regulation and the filing requirements of Schedule 13D."  926 F.2d 1285, 1294–95 (2d Cir. 1991).

The testimony described in Professor Smith's disclosure stays well within the bounds of permissible expert opinion.  Professor Smith will provide general background on various aspects of campaign finance laws and their enforcement by the FEC, as well as factual background on various types of donations.  His disclosure gives no indication that he will opine on whether Mr. Bankman-Fried violated the law or believed his actions were lawful.  His testimony thus will "not draw the final inference between relevant evidence and the ultimate conclusion the jury will be asked to make"—which is "[t]he crucial distinction" between impermissible "legal opinions" and permissible expert testimony.  *Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d at 505.

Recognizing that federal campaign finance law involves a "complex regulatory scheme" on which expert testimony can be especially helpful, courts have refused to exclude opinions similar to Professor Smith's.  *United States v. Lundergan*, No. 18-CR-00106 (GFVT), 2019 WL 3804239, at *3 (E.D. Ky. Aug. 13, 2019) (permitting expert testimony on "the mission, processes, and practices of the FEC" related to disclosure of certain campaign contributions while noting that testimony on whether the defendant's own contributions were subject to

---

[7] *See also, e.g.*, *Ripple Labs*, 2023 WL 5670711 at *6 (admitting expert opinion on "general registration and disclosure requirements" under the securities laws and "how the SEC has historically brought actions against novel or innovative investment products, including digital assets"); *Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *26 (admitting expert opinion that described "the general background of FDA regulation and the specific requirements and regulations" at issue in the case," because the testimony did not include "opinions as to whether Elysium's advertising was false or misleading as a matter of law.").

reporting obligations would be improper); *see also Upstate Jobs Party v. Kosinski*, 559 F. Supp. 3d 93, 126-127 (N.D.N.Y. 2021) (declining to exclude expert testimony "describing the nature of New York State election law [and] opining about the compliance requirements created in various hypothetical scenarios" "except to the extent that it offers legal conclusions"); *Illinois Liberty PAC v. Madigan*, No. 12-CV-5811, 2015 WL 5589630, at *5 (N.D. Ill. Sept. 21, 2015) (admitting expert testimony regarding "Illinois campaign finance system" and related "possibilities and incentives for corruption").

Professor Smith's disclosure indicates that he may discuss enforcement actions in which *other persons* were "found to have acted in good faith." The Government's alarmist response—that Professor Smith's testimony will implicitly be an opinion on Mr. Bankman-Fried's actions or invite jury nullification "based on policy views regarding the federal election laws or FEC," ECF No. 236 at 19—has no grounding in law or fact. Nor is there any indication that Professor Smith will "draw conclusions as to the significance of [the defendant's] conduct or evidence in the particular case." *Id.* at 20. To the extent that these concerns are anything but straw men, they can easily be addressed through appropriate limiting instructions. *See Bilzerian*, 926 F.2d at 1295.

*Second*, the Government contends that Professor Smith's testimony is "irrelevant, confusing, and a waste of time, especially now that the trial will no longer include" a campaign finance charge. ECF No. 236 at 19. This is an especially audacious position in light of the Government's own insistence on introducing evidence related to the dropped campaign finance charge. ECF No. 204 at 8-10.[8] Evidence on that issue cannot be both relevant and admissible

---

[8] This reasoning is also yet another illustration of the Government's pretzel logic, under which evidence the Government views as favorable should be admitted, no matter how prejudicial or how far afield from the actual issues in the case, but Mr. Bankman-Fried may not introduce evidence to support any defense, contradict any Government theory, or rebut any opinion by a Government expert.

and irrelevant and confusing.  To the extent the issue is relevant, there is no principled basis to

exclude only expert testimony.  Similarly, the Government cannot plausibly be heard to complain

that evidence of "whether others may have committed uncharged crimes" is a "waste of time and

thus is totally irrelevant."  ECF No. 236 at 20.  It is the Government, not the defense, that wants

to introduce evidence of "uncharged" crimes—indeed, crimes the Government concedes it *may*

*not* charge under the Rule of Specialty.  Professor Smith's testimony is offered solely in response

to the Government's improper end-run around a barrier of its own creation.

     *Third,* the contention that Professor Smith's testimony is improper under Rule 704(b) is

refuted by the rule itself.  Rule 704(b) prevents expert witnesses in criminal cases from stating an

opinion about a mental state or condition on the part of the defendant "that constitutes an element

of the crime charged or of a defense."  Fed. R. Evid. 704(b).  But a violation of the campaign

finance laws is not "the crime charged."  And whether Mr. Bankman-Fried did or did not have

the requisite intent to violate those laws is not an element of any of the offenses that are charged

in the S6 Indictment.  In any event, Professor Smith will not opine about Mr. Bankman-Fried's

mental state or whether the evidence proves any element of a charge against him.

     In short, Professor Smith's expert testimony is relevant and admissible under Rule 702,

and the Government has offered no plausible basis to exclude it.  The Government's true concern

seems to be that his opinion may lead the jury to doubt its arguments concerning alleged political

contributions and campaign finance violations.  But this is a reason to permit this testimony, not

exclude it.

## V.    PROFESSOR ANDREW DI WU'S PROPOSED TESTIMONY IS ADMISSIBLE

     The Government does not appear to contest Professor Wu's qualifications, nor could it.

Professor Wu is an assistant professor of both Business Administration and Technology and

Operations at the University of Michigan School of Business, where he is also an endowed

fellow and research scholar.  Ex. 6 (Expert Disclosure of Andrew Di Wu, Ph.D. ("Wu

Disclosure")) at 1.  He has an extensive background researching, publishing, and teaching on,

among other things, fintech issues including blockchain, cryptocurrencies, and the business

operations of cryptocurrency exchanges.  *Id.*

Despite Professor Wu's obvious qualifications, the Government again seeks to exclude

every aspect of his testimony.  And again, this blunderbuss rejection of any evidence proffered by

the defense is contrary to law and common sense.

### A.      Blockchain and Cryptocurrency (Opinions 8 and 9)

Professor Wu is prepared to provide background testimony regarding the technology,

uses, and functions of blockchain technology and cryptocurrency.  *Id.* at 2.

The Government argues generally that "much" of this testimony is irrelevant and

inadmissible for "many" of the same reasons asserted in connection with Dr. Peter Vinella, *see*

Part VI, *infra*, without providing specifics.  ECF No. 236 at 35.  The Government's principal

complaint regarding background testimony regarding blockchain and cryptocurrency is that its

relevance to issues at trial is "not apparent," and that it "would only serve to confuse the jury."

*Id.*  The Government cannot genuinely believe this argument, because its own expert, Dr. van der

Merwe, is expected to offer testimony on the same topics, i.e., a general overview of

cryptocurrency and the blockchain."  Ex. 7 (Government's Disclosure of Andria van der Merwe,

Ph.D. ("Van der Merwe Disclosure")) at 1.  This unabashed self-contradiction illustrates yet

again the core principle animating the Government's pretrial motions—that evidence is relevant

and admissible only if offered by the Government and if the Government believes it is

17

incriminating, and any evidence that could potentially be undercut the Government's case or support a defense must be excluded *in toto*.[9]

Background testimony is admissible if it "would assist the jury in understanding a technical and specialized industry," even if it does not "directly address the central issue in the case." *SEC v. Ripple Labs, Inc.*, No. 20-CV-10832 (AT), 2023 WL 5670711, at *6 (S.D.N.Y. Mar. 6, 2023; *see* Fed. R. Evid. 702, 2000 Advisory Committee Notes (explaining that expert testimony may be permissible "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.").

The Government's professed concern about jury confusion is also misplaced.  The entire point of Professor Wu's background testimony would be to *avoid* confusion among jurors about highly technical matters.[10]

## B.     Exchange-Issued Tokens (Opinions 10 and 11)

The Government's motions *in limine* seek to admit evidence concerning "the defendant's issuance, ownership, and price maintenance" of FTT and promotion of other cryptocurrency tokens.  ECF No. 204 at 14-15.  The Government also purportedly hopes to show at trial that the "paper value" of these holdings, as reflected in Alameda's balance sheet and used as loan collateral, was artificially "inflated" relative to the tokens' "liquid value," which allegedly explains how Alameda was able "to borrow billions of dollars from lenders" as well as FTX

---

[9] At a minimum, if Dr. van der Merwe's testimony is admitted, Professor Wu must at least be permitted to offer rebuttal expert testimony on the same subjects.  The defense disclosed Professor Wu as a potential rebuttal witness on August 21, 2023.

[10] At this stage, the defense has little or no visibility into the details of the case the Government will try to present.  If—as indicated by the Government's Motion to Exclude—the jurors will not need background information about blockchain and cryptocurrency, the scope of Professor Wu's expert testimony will be more limited.  But if—as indicated by the Government's expert disclosures—those topics are addressed in the Government's case in chief, the Government cannot plausibly dispute the relevance and helpfulness of expert testimony that would explain the core concepts to lay jurors.

customers through the borrow/lend program.[11]  *Id.*  In other words, the Government seeks both to place the valuation of these tokens and their use as loan collateral directly at issue—and to exclude expert testimony on this exact subject.

For example, Professor Wu is prepared to provide background testimony on the role and valuation of exchange-issued tokens such as FTT, including the "difficulty of isolating an 'intrinsic value'" and "the inapplicability of standard valuation models."  Ex. 6 (Wu Disclosure) at 2-3.  Professor Wu will also provide testimony on "common practices in the cryptocurrency industry" relating to loans in which tokens are used as collateral.  *Id.* at 3.

The Government seeks to exclude this testimony "in its entirety" on the ground that expert testimony on "'common practices' and 'industry practices'" is, as a blanket matter, "inadmissible under Rules 402 and 403."  ECF No. 236 at 35.  The Government is wrong; courts frequently permit expert testimony on industry practices for precisely the reasons Professor Wu's testimony should be admitted here—to help the jury understand general principles regarding complex and novel subjects.  *Ripple Labs*, at 2023 WL 5670711, at *6; *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

Next, the Government argues that Professor Wu "should not be permitted to argue that lenders somehow acted inappropriately or were not sufficiently diligent."  ECF No. 236 at 36.  Again, the Government is invoking the apparition of testimony that has not been and will not be proffered by any defense expert.  Nothing in Professor Wu's Rule 16 disclosure implies otherwise.  In addition, expert testimony about industry standards and practices is often admissible to help a jury's assessment of a disputed issue such as state of mind —provided the

---

[11] For the reasons stated in Mr. Bankman-Fried's opposition to the Government's motions *in limine*, such evidence should be excluded pursuant to Fed. R. Evid. 403.  ECF No. 246 at 15-16.

expert does not opine on the defendant's intent or other matters within the jury's purview.  *See, e.g.*, *Ripple Labs*, 2023 WL 5670711, at *6 (admitting expert testimony about "industry norms and practices, and how Defendants' actions deviated from such norms and practices" as relevant to the jury's assessment of the defendants' "knowledge or reckless disregard"); *United States v. Patel*, No. 21-CV-220 (VAB), 2023 WL 2643815, at *34 (D. Conn. Mar. 27, 2023) (admitting expert testimony as "evidence of an industry practice that would be relevant to determining whether Defendants' conduct and intent were more consistent with [an antitrust conspiracy] or unilateral action by Company A"); *id.* at *39 ("while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind") (citing cases).

In addition, as argued in the defense's opposition to the Government's motions *in limine*, testimony regarding practices among cryptocurrency exchanges could help the jury understand and assess evidence relevant to the materiality of alleged misrepresentations to Alameda's lenders and the credibility of testimony by lenders regarding, for example, whether they would have recalled their loans had certain information been disclosed.  *See* ECF No. 246 at 31-33; *see also* pp. 32-33, *infra*.

### C.     Cryptocurrency Exchanges (Opinions 12 and 13)

Professor Wu is prepared to testify about, among other things, the "principal operations" of centralized cryptocurrency exchanges, including as deposit and withdrawal mechanisms; the role of "market makers" in ensuring liquidity; the nature of exchange ledgers; and the use of omnibus wallets for storing customer digital assets.  Ex. 6 (Wu Disclosure) at 3.  He can also provide a comparison of "business models and practices" among exchanges.  *Id.* at 3-4.

The Government's arguments for excluding this testimony mirrors those relating to exchange-issued tokens.  It argues that all of Professor Wu's proffered testimony regarding

cryptocurrency exchanges would be "irrelevant and improper" because (1) "this trial does not concern how other exchanges operate" and (2) "[i]t is … improper state of mind evidence masquerading as industry practice evidence."  ECF No. 236 at 36.  Both arguments are mistaken.

As with other aspects of Professor Wu's testimony, these opinions are admissible as helpful background to aid the jury's understanding of complex issues relating to how cryptocurrency exchanges function.  Expert testimony on practices and norms among cryptocurrency exchanges will also "give a jury a baseline to help evaluate" the conduct of Mr. Bankman-Fried and alleged co-conspirators.  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372 (AT), 2020 WL 4251229, at *5–6 (S.D.N.Y. Feb. 19, 2020) (permitting expert testimony about "industry practice and deviations from such practice" because it "g[a]ve the jury a baseline to help evaluate" defendants' conduct).  Such testimony is fully admissible, provided Professor Wu does not (as he will not) offer an opinion as to any individual's "intent, motive, or knowledge."  Fed. R. Evid. 704(a)-(b).  That industry practice and norms may not be relevant to the *Government's* theory of the case does not mean they are irrelevant or should be excluded.  "The testimony of a party's expert must be evaluated within the context of that party's own theory of the case."  *Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968 (JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018); *see Ripple Labs*, 2023 WL 5670711, at *18 (declining to exclude defense expert opinion regarding the classification of virtual currency by the IRS because it is relevant to the defendants' theory of the case).  The practices followed by other cryptocurrency exchanges are relevant for largely the same reason as industry practices and standards regarding cryptocurrency lending and valuation discussed immediately above.  *See also* ECF No. 246 at 24-26 (explaining the relevance of evidence of industry practice).

The Government also argues that Professor Wu's proposed testimony on cryptocurrency exchanges "lack[s] any reliable basis or methodology," because, for example, he may not have "conducted a first-hand study of exchanges and their features."  ECF No. 236 at 36-37.[12]  As discussed *infra*, however, courts routinely admit expert opinions that, like Professor Wu's, are grounded in the expert's professional experience and training.  *See* Section VI.A, *infra*.

### D.      Boom and Bust of Crypto Markets (Opinion 14)

The Government asserts that Professor Wu's proposed testimony regarding the timeline of the crypto markets' boom and bust would be "mere narration" of facts and thus an improper subject for expert testimony.  ECF No. 236 at 37.  But this argument conflates an expert's opinions and the facts that support it.  Professor Wu would explain the recent timeline of crypto markets in the service of his opinion regarding, for example, "the responses of different cryptocurrency exchanges . . . to these rapidly unfolding events" and the resulting "confusion" among market participants.  Ex. 6 (Wu Disclosure) at 4.  *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig*., 581 F. Supp. 3d 1029, 1075 (N.D. Ill. 2022) (denying motion to exclude "three hundred pages of 'factual' advocacy" in expert report and noting that "it was appropriate—and indeed necessary—for [the expert] to disclose the factual basis for her opinions.").[13]

The Government's remaining arguments regarding Opinion 14 are easily rejected.  *First*, the Government argues that his testimony would be improper "if he did not do any form of analysis."  ECF No. 236 at 37.  But Professor Wu's disclosure specifies that his opinions will be based on his academic and professional education and training and his review of certain

---

[12] Of course, the same could be said of Dr. van der Merwe's testimony on the same subjects.  And Professor Easton's disclosure is entirely silent as to the bases and methods for his opinion.  *See* Ex. 7 (Van der Merwe Disclosure) at 2-3; ECF No. 236-9 at 4-6.

[13] Because *In re Dealer Mgmt. Sys.* was a civil case, disclosure of the factual basis for the expert's opinion was partly necessitated by Fed. R. Civ. P. 26(a)(2)(B).  However, the general principle that experts may, and often must, explain the factual basis for their opinions is equally true in the criminal context.

material—which, as explained in Section VI.B, is presumptively an appropriate basis for expert

opinion. *Cf.* Ex. 7 (Van der Merwe Disclosure) at 1-2 (stating that her opinions will be based on

"her research and experience" and "explanatory documents" from public sources).

*Second*, the Government asserts without basis that that an opinion about "confusion"

among market participants would be an improper intent opinion. Nothing in Professor Wu's

disclosure indicates that he would testify to Mr. Bankman-Fried's state of mind. And there is

nothing improper about expert testimony that would allow a jury to make inferences about what

a defendant's state of mind *could have* been under the circumstances.

### E. Professor Wu's Expert Testimony Will Not Be Cumulative of Testimony from Percipient Witnesses.

Finally, the Government asserts that Professor Wu's expert testimony should be excluded

because all of the topics on which he is prepared to testify will be covered by percipient

witnesses, such as witnesses from Alameda's lenders and former FTX employees.[14] ECF No.

236 at 37-38. But that is not the standard for admitting expert testimony, particularly in

"complex cases" involving "unfamiliar terms and concepts." *Bilzerian*, 926 F.2d at 1294.

Professor Wu's testimony is relevant and admissible because it will "assist the trier of fact to

understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms.*, 509

U.S. at 591, 1135 S. Ct. at 2795.

## VI. EXPERT TESTIMONY BY PETER VINELLA, PH.D., IS ADMISSIBLE

The Government trains much of its fire on the proposed expert testimony of Dr. Peter

Vinella, Ph.D. Dr. Vinella will provide expert testimony on the customs, practices, and standards

---

[14] By that yardstick, most or all of the testimony of both Government experts would be needlessly cumulative. *See, e.g.*, Ex. 7 (Van der Merwe Disclosure) at 2-3 (topics to be covered include how users traded on FTX and products offered by FTX); ECF No. 236-9 at 2-4 (anticipated opinions include how FTX.com received customer deposits, whether they were held in segregated bank accounts, and details regarding Alameda's balance sheet and loans).

of care used in traditional and decentralized financial systems, as relevant to the cryptocurrency market issues involved in the case, and typical patterns and challenges relating to innovations in the financial sector, including cryptocurrency exchanges.  Ex. 8 (Expert Disclosure of Peter Vinella, Ph.D. ("Vinella Disclosure")) at 3.  The Government moves to exclude Dr. Vinella's proposed testimony in its entirety on several grounds, including:  that Dr. Vinella is not sufficiently qualified; that his methods, which draw from his indisputably extensive background and training, are not clear or reliable; that every one of his proposed areas of testimony is irrelevant; and that his testimony would include improper opinions regarding Mr. Bankman-Fried's state of mind.

   None of these arguments has merit.  As to Dr. Vinella's qualifications, he has extensive relevant professional experience and training, as detailed below and in his CV, and is as or more qualified than the experts proffered by the Government.  As to his methodology, his proposed opinions will be based upon his indisputably extensive background—an approach that is routinely endorsed by courts and mirrors the methodology proposed by the Government's expert, Dr. van der Merwe.  As to relevance, Dr. Vinella's proposed testimony will be helpful and pertinent in several ways long recognized by courts as valid bases for expert testimony on industry practices, including as general background on complicated and unfamiliar topics and to provide jurors with a baseline against which to evaluate specific conduct.  As to the Government's oft-repeated, never valid concern regarding expert opinion on Mr. Bankman-Fried's state of mind and other ultimate issues, Dr. Vinella's testimony on industry standards and the relevant legal and regulatory environment is entirely within the boundaries of permissible expert testimony that may be relevant to—but does not directly opine on—disputed issues such as intent and materiality.

## A. Dr. Vinella is Qualified.

Dr. Vinella is amply qualified to opine on all topics covered in his disclosure, including the cryptocurrency industry. Dr. Vinella has a Ph.D. in mathematics and nearly forty years of experience in the financial services industry, including serving as chief executive of Wilmington Trust Company and prominent positions at major broker dealers; acting as a consultant to financial services businesses and startups on issues including trading, risk management, operations, and technology; working with U.C. Berkeley's Center for Risk Management; and has spent the last three years developing expertise in the emerging field of decentralized finance, including cryptocurrency markets, through research. Ex. 8 (Vinella Disclosure) at 3. The Government asserts that this "experience in the financial services industry does not qualify him to be an expert on cryptocurrency topics." ECF No. 236 at 24.[15] But the Government protests too much—its own expert, Dr. van der Merwe, has (substantially less) professional background in financial services generally, and her proposed testimony will also cover both "traditional" markets and cryptocurrency and include descriptions of FTX's operations and products. Ex. 7 (Van der Merwe Disclosure) at 2-3.

In addition, the Government's view of Dr. Vinella's (but apparently not Dr. van der Merwe's) qualifications is overly narrow. "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question," the expert's testimony should not be excluded "solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Ripple Labs*, 2023 WL 5670711, at *4; *accord Lion Oil Trading & Transp. Inc. v. Statoil Mktg. & Trading (US) Inc.*, Nos. 08-CV-11315, 09-CV-

---

[15] The Government's selective quotation from *Peterson v. Islamic Republic of Iran*, No. 13-CV-9195 (KBF) (S.D.N.Y. Sept. 19, 2014) is irrelevant, since, as the Government acknowledges, the court there admitted Dr. Vinella's expert testimony without holding a *Daubert* hearing. *See* 876 F.3d 63, 75, 85-86 (2d Cir. 2017).

2081, 2011 WL 855876, at *1 (S.D.N.Y. Feb. 28, 2011) (noting that an expert should not be not disqualified "merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.").[16]  Rather, assertions that the expert "lacks particular educational or other experiential background, go to the weight, not the admissibility, of the testimony." *Ripple Labs*, 2023 WL 5670711, at *4.

The Government next attacks Dr. Vinella's qualifications by pointing to purported "errors in his recitation of information relating to cryptocurrency."  ECF No. 236 at 23-24.  Any such "errors" are, as the Government concedes, "an appropriate subject for cross-examination," *id.* at 24, and in any event go to the weight, not the admissibility, of the expert's opinion.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) *aff'd*, 564 U.S. 91, 131 S. Ct. 2238 (2011) (noting that "the correctness of facts underlying an expert's testimony" is an issue "for the jury."); *Boykin v. W. Express, Inc.*, 12-CV-7428 (NSR), 2015 WL 539423, at *9 n.9 (S.D.N.Y. Feb. 6, 2015) (an alleged "factual error that is largely irrelevant to the ultimate opinion does not render an expert's testimony inadmissible").

The Government mistakenly relies on *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) for the argument that an expert should be disqualified based on purported factual errors in pretrial disclosures.  *Vale* did not address purported factual errors at all.  Rather, the Second Circuit held it was not error to exclude an expert from testifying as to the standard of care for specific medical conditions because the expert was trained in an entirely different field (anesthesiology), did not possess a valid license to practice medicine, had not practiced medicine in 16 years, and, critically, was not familiar with condition in question.  *Id.*

---

[16] *See also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (holding that district court erred by excluding engineer with expertise in designing machines for human use from opining on the design of a baggage carousel for lack of experience with baggage carousels, because requiring this "degree of specificity" was improper).

Moreover, what the Government characterizes as "errors" are merely mischaracterized and cherry-picked statements from Dr. Vinella's disclosure.  For example, the Government claims that Dr. Vinella "asserts that FTX was essentially an innovator without parallel," despite the existence of other cryptocurrency exchanges when FTX launched in 2019.  ECF No. 236 at 23.  Dr. Vinella does characterize FTX as "innovative," Ex. 8 (Vinella Disclosure) at 15, but not as "without parallel" or unique in all respects.  *Id.*  The Government also contests Dr. Vinella's statement "there are few legal or regulatory underpinnings" governing cryptocurrency markets, noting that U.S. regulators have brought civil and administrative actions against "cryptocurrency market participants."  ECF No. 236 at 23-24.  But the existence of enforcement actions does not mean there is a well-defined regulatory framework.  Indeed, an SEC Commissioner recently characterized the Commission's approach to cryptocurrency as "regulation-by-enforcement" and acknowledged the lack of clear statutory authority "to regulate certain crypto tokens and to require crypto trading platforms to register with us."  *See* Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), *available at* https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023.

### B.    The Government's Objections to Dr. Vinella's Methodology Are Not a Basis for Disqualifying His Testimony.

The Court should also reject the Government's objection that there is "no scientific or technical methodology evident" in Dr. Vinella's opinions, such as an "investigation of underlying financial data" or specific studies. ECF No. 236 at 28, 29

An expert opinion need not be premised on a scientific or technical study to be admissible.  Rather, experts routinely "testify as to certain industry customs and practices, based upon [their] experience working in the [relevant] industry[.]" *Teevee Toons, Inc. v. Rep Sales, Inc.*, 03-CV-10148 (JGK), 2007 WL 5011652, at *1 (S.D.N.Y. Oct. 19, 2007).  "[T]he reliability

inquiry may . . . focus upon personal knowledge and experience of the expert." *United States v. Litvak*, 808 F.3d 160, 180 n. 25 (2d Cir. 2015) (citing, *inter alia*, *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (finding no abuse of discretion in admission of expert testimony regarding coin valuation even though "it is possible that [the expert's] methods are not entirely replicable because they are based in part on his personal experience as a coin dealer").

Dr. Vinella's opinions are "based on [his] experience," including decades of professional service and research in a range of financial services areas as well as ongoing research into decentralized finance and the cryptocurrency industry, as well as the materials he reviewed in this case.  Ex. 8 (Vinella Disclosure) at 3, 5.  As noted, his testimony will include comparisons and contrasts between the traditional financial services industry—an area in which he undisputedly has decades of experience—and emerging issues relating to the cryptocurrency markets—an area in which he has developed substantial expertise.  The Government's general complaint about Dr. Vinella's methodology would apply equally to Dr. van der Merwe, whose opinions will reportedly be based on her experience and review of certain material rather than scientific or technical studies.  Ex. 7 (Van der Merwe Disclosure) at 1-2.  And the Government's expert disclosure for Professor Easton includes no explanation whatsoever of his methods or the basis for his opinions.  *See* ECF No. 234 at 3-4.

Further, Dr. Vinella's disclosure is not "a verbatim recitation of the testimony [he] will give at trial."  *See* Fed. R. Crim. P. 16 Advisory Committee Notes, 2022 Amendment.  Dr. Vinella therefore may testify as to his methodology in greater detail at trial, and the Government remains free to cross-examine him as to how his experience informs his conclusions.

### C.    Dr. Vinella's Testimony Will be Relevant, Helpful, and Permissible.

The Government raises an overlapping series of arguments concerning every one of the specific topics of testimony described in Dr. Vinella's disclosure.  Virtually all of these concerns

are also raised in connection with other defense experts and are invalid for similar reasons.  And together, they repeat the Government's now-familiar refrain—only evidence supportive of the Government's theories is relevant, and any effort by Mr. Bankman-Fried to introduce evidence in pursuit of his fundamental right to present a defense must be excluded.  Individually and collectively, the Government's motions to exclude should be rejected.

> 1. *Dr. Vinella's Testimony on the Cryptocurrency Sector and FTX Within the Broader Context of the Financial Services Industry Is Relevant and Admissible (Disclosure Sections A-C).*

The Government objects to testimony proposed in Sections A, B, and C of Dr. Vinella's disclosure, which will address innovation in the financial services industry, the development of the cryptocurrency markets, and FTX combining aspects of both traditional and decentralized finance in its services.  This information will help the jury by providing background that situates FTX within the financial services industry more broadly.  *See also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (noting that experts are often helpful "in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

Dr. Vinella's background testimony will also aid the jury in understanding evidence on FTX's approach and operations in comparison with other innovations in financial services.  Such context would assist the jury to assess and weigh testimony regarding whether Mr. Bankman-Fried's "conduct and intent" were consistent with a fraudulent scheme, as the Government alleges, or instead with common issues facing new entities offering novel products in an emerging sector.  *Patel*, 2023 WL 2643815, at *34 (admitting expert testimony on industry practice as relevant to "determining whether Defendants' conduct and intent were" more consistent with charged offense).

For example, the testimony previewed in Section A of Dr. Vinella's disclosure will describe challenges often faced by firms rolling out innovative financial products or services and

ways in which FTX's actions were consistent with—and why they may have differed from—historical innovations in the traditional financial industry.  Ex. 8 (Vinella Disclosure) at 5-10.  In arguing that such testimony is irrelevant, ECF No. 236 at 27, the Government appears to confuse relevance for consistency with its own theory of the case.  *See* p. 21, *supra*.  But expert testimony on parallels and inconsistencies with industry practice and historical norms could be relevant to the jury's assessment of Mr. Bankman-Fried's state of mind.  *See Patel*, 2023 WL 2643815, at *34; *see also Ripple Labs*, 2023 WL 5670711, at *6 (noting that expert's "testimony about industry norms and practices, and how Defendants' actions deviated from such norms and practices, may be relevant to the fact finder's assessment of [Defendants'] knowledge or reckless disregard for whether Ripple's scheme violated" the securities laws); *see generally United States v. Lopez*, 547 F.3d 364, 373-74 (2d Cir. 2008) (Rule 704(b) does not prohibit expert background testimony that could support an inference of lack of intent so long as that inference is "left to the . . . trier of fact.").

Dr. Vinella's proposed testimony regarding the operational features of cryptocurrency markets and the limited legal and regulatory underpinnings governing such markets (Section B), Ex. 8 (Vinella Disclosure) at 10-13, would provide the jury with additional context regarding a complex industry, and should thus be admitted.[17]  *See Ripple Labs*, 2023 WL 5670711, at *6. The Government asserts that such testimony would improperly suggest "that there were no rules that applied to the defendant," but Dr. Vinella expressly states that he will not "offer[] an opinion

---

[17] The Government also suggests incorrectly that the heading in Section B, which states that "[t]he philosophy, practices, and rules of crypto-markets are radically different from those of a traditional financial system" is incompatible with establishing that "the attributes and features of financial service providers apply to a company like FTX."  ECF No. 236 at 26.  The Government is simply taking statements out of context.  As the first paragraph under the heading states, "many widely accepted customs, practices, and standards of the incumbent financial system do not fit or apply to crypto markets." Ex. 8 (Vinella Disclosure) at 11.  This is entirely consistent with the later observation that "FTX provided a number of services that would be typically provided by multiple financial utilities which was to be expected given the dearth of such utilities in the crypto markets," including serving as "a. user; b. market maker; c. backstop liquidity provider of last resort; and d. cash management agent."  *Id.* at 18.

to as to whether or not FTX was subject to US or state laws or regulations." Ex. 8 (Vinella Disclosure) at 19.

Finally, Section C of Dr. Vinella's disclosure addresses his opinion that the services FTX provided "exist at the crossroads between traditional and decentralized finance." *Id.* at 13.  This will provide necessary context to aid the jury's understanding of how the services FTX provided customers compared with and differed from traditional financial services.

The Government objects to Dr. Vinella's observation that "FTX appears to have been a functioning crypto-exchange (as opposed to a shell)" as a "vehicle for the transmission of hearsay" and more properly addressed by fact witnesses.  *See* ECF No. 236 at 28.  This is an apt description of the Government's disclosure for Professor Easton, *see* ECF No. 234 at 3-4, but not Dr. Vinella's disclosure, which explains that his opinions are based on a review of specific material and his own extensive professional and academic background.  The Government also contends that proposed testimony that "FTX's operations reflected a genuine and viable financial services provider," Ex. 8 (Vinella Disclosure) at 18, would be irrelevant.  ECF No. 236 at 29.  At the same time, the Government has stated its intent to assert that FTX functioned as a fraudulent scheme to misappropriate customer funds.  *See, e.g.*, Gov't Proposed Charge, ECF No. 214 at 8-9 ("[T]he scheme to defraud involves fraudulently embezzling or misappropriating money or property.").  Dr. Vinella's opinion that FTX was not a "shell" is therefore directly relevant to a disputed issue.  More broadly, the topics in Section C will aid the jury in understanding how the services FTX provided align and compare with those provided by other financial services businesses.[18]

---

[18] The Government's claim that such evidence would "confuse" the jury by implying Mr. Bankman-Fried's "innocence through proof of the absence of criminal acts on other [specific] occasions" is a non-sequitur.  ECF No. 236 at 29.  Dr. Vinella's disclosure makes no mention of innocence or criminality by Mr. Bankman-Fried.

2.   *The Remainder of Dr. Vinella's Anticipated Testimony (Disclosure Sections D-H) Is Relevant and Admissible.*

a.   Overview

The remainder of Dr. Vinella's anticipated testimony will address the absence of a clear legal and regulatory framework governing the cryptocurrency industry, especially outside the United States (Section D); operational challenges this uncertainty posed to FTX (Section E); the general purview of senior executives at fintech startups who are not software engineers (Section F); commercially reasonable steps taken by FTX (Section G); and FTX's use of widely-accepted practices in the financial services industry (Section H).

Dr. Vinella's expert opinion on these subjects will aid the jury in assessing the how FTX's practices and challenges compared with those found elsewhere in the financial services industry. *See Putnam Advisory Co.,* 2020 WL 4251229, at *5–6 (permitting expert testimony regarding industry standards and practices, and deviations from them, to give the jury "a baseline to help evaluate" defendants' conduct) . Such comparisons, against a backdrop of regulatory uncertainty, may be relevant to, among other things, whether Mr. Bankman-Fried could reasonably have believed his actions—and the challenges confronting FTX—were consistent with industry norms and historical trends rather than with unlawful conduct. *See* ECF No. 246 at 23-24, 25.  Dr. Vinella will not opine on Mr. Bankman-Fried's state of mind; rather he will speak to background factors that the jury may conclude could have influenced his state of mind.  Dr. Vinella's testimony is therefore admissible on this basis.  *See* discussion and authorities cited on p. 30; *see also United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (affirming admission of expert testimony on history and general practices of labor coalitions that "bore on the issue of intent").

Dr. Vinella's proposed testimony comparing and contrasting FTX's practices with those in the broader finance industry also may be relevant to, among other things, assessing the

materiality of alleged misrepresentations to consumers, lenders, and investors.  *See Litvak*, 808

F.3d at 183-84 (in case alleging fraud in the sale of residential mortgage-backed securities

("RMBS"), finding the district court erred by excluding expert testimony regarding general

RMBS valuation standards and the likely impact on purchase price, because such testimony

"would have been highly probative of materiality, the central issue in the case").  Indeed, without

this expert testimony, Mr. Bankman-Fried would be in the "untenable position" of being "left

with only the 'victims' of his conduct as sources of potential testimony on this issue," which the

Second Circuit considers "an odd limitation where the jury is to evaluate materiality in an

objective manner."  *Id.*

> b.    Specific Disclosure Sections

The Government's specific objections to these sections are addressed in turn below.

Section D.  The Government mischaracterizes Dr. Vinella's potential testimony regarding

the lack of a clear legal and regulatory framework governing the cryptocurrency sector and the

financial services industry more generally as an improper attempt to blame regulators and to

opine on Mr. Bankman-Fried's mental state.  ECF No. 236 at 29-30.  This is not accurate.  Again,

Dr. Vinella will not "offer[] an opinion as to whether or not FTX was subject to US or state laws

or regulations" or otherwise "blame regulators, Ex. 8 (Vinella Disclosure) at 19, nor does his

disclosure offer conclusions as to anyone's intent.  It is a straightforward explanation of the

impact of regulatory uncertainty on operations within the cryptocurrency industry and as such is

admissible.  *Id.*; *see United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996) (finding expert

testimony was properly admitted where securities expert "gave no opinion as to whether the

appellants had violated the securities laws and did not make any statements about their intent; he simply described certain stock transactions and his opinion of their effect on the market").[19]

Aside from potential relevance to issues such as intent, expert testimony of this sort is regularly admitted "to assist the trier of fact in understanding . . . [relevant] industry regulations and complicated terms and concepts inherent" in the industry. *S.E.C. v. U.S. Envtl., Inc.*, 94-CV-6608(PKL)(AJP), 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *Marx & Co., Inc. v. Diner's Club, Inc.*, 550 F.2d 505, 511 (2d Cir.1977), *cert denied*, 434 U.S. 861, 98 S. Ct. 188 (1977)).

Section E.  The Government objects to Dr. Vinella's opinions that various of FTX's operational practices and shortcomings were "predictable," Ex. 8 (Vinella Disclosure) at 22, again quibbling with word choice in the section headings.  ECF No. 236 at 31.  Dr. Vinella's disclosure makes clear that his opinion addresses whether these practices and shortcomings were "common to providers offering new financial products and services."  Ex. 8 (Vinella Disclosure) at 22.  The Second Circuit deemed similar expert testimony in *Marx*, which concerned alleged manipulative trading practices in violation of the securities laws.  There, the court held that an expert may tell the fact-finder "whether he thinks the method of trading was normal, but not . . . whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934."  *Marx*, 550 F.2d at 511; *cf. U.S. Envtl.*, 2002 WL 31323832, at *3 (holding admissible

---

[19] The Government's repeated assertion that evidence of this sort could be interpreted as an improper opinion on intent in violation of Rule 704(b) ignores Dr. Vinella's explicit statement to the contrary as well as the text of the rules.  *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue"); Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did not have a mental state . . . that constitutes an element of the crime charged or a defense.").

expert opinion on whether specific "wash trades" "were inconsistent with those of a lawful market maker" as "indirect evidence" of "market manipulation").  Here, Dr. Vinella would opine on whether specific practices were normal but not whether they amounted to violations of law.

Section F.  The same is true with respect to Dr. Vinella's opinions as summarized in Section F, that "senior executives who are not software engineers typically do not know or direct the inner workings of their company's software."  Ex. 8 (Vinella Disclosure) at 24.  The Government claims this is an improper opinion on Mr. Bankman-Fried's state of mind, ECF No. 236 at 32, but it is merely an opinion, based on Dr. Vinella's experience, on the purview of senior finance executives more generally.  It will aid the jury in weighing testimony regarding whether Mr. Bankman-Fried could be expected to know certain facts and comes nowhere near violating Rule 704(b)'s bar on conclusions regarding criminal intent.

Section G.  Dr. Vinella is prepared to testify on his "opinion that FTX apparently used commercially reasonable measures to protect the assets and other interests of its customers," including by appearing to "execute[] customer trades on a first come/first served, best price basis without preferential treatment."  Ex. 8 (Vinella Disclosure) at 24.  The Government again characterizes this as impermissible statement of intent, relying on *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2011).  But *Primavera* undermines the Government's position rather than support it.  The court there expressly affirmed that "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards."  *Primavera Familienstiftung*, 130 F. Supp. 2d at 529 (S.D.N.Y. 2001).  Because the complaint in that case alleged breach of contract and violations of a UCC provision requiring commercially reasonable conduct, the court excluded proposed expert testimony that a party's conduct constituted breach of a contract and

was "commercially unreasonable." *Id.* Dr. Vinella's disclosure states only that certain actions appeared to be commercially reasonable (which is not an applicable legal standard in this case); it says nothing about legality. Ex. 8 (Vinella Disclosure) at 23.

Section H. Finally, the Government objects to Dr. Vinella's statement that much of FTX's alleged conduct is consistent with "widely-accepted practices in the financial services industry" more generally. *Id.* at 24. As discussed above, courts regularly allow expert testimony on industry practices and norms, particularly in complex and unfamiliar industries, including testimony that particular conduct "deviated from such practices and norms." *Ripple Labs*, 2023 WL 5670711, at *6; *see, e.g.*, *Marx*, 550 F.2d at 511 (permitting expert testimony regarding "an ultimate fact," including whether trading patterns were "normal" relative to industry "practices and usages" ); *U.S. Envtl., Inc.*, 2002 WL 31323832, at *2 (same as to whether trading pattern raised "red flags" relative to "normal trading activity" based on expert's industry experience); *Putnam*, 2020 WL 4251229, at *5–6 (same as to "industry practice and deviations from such practice," which "g[a]ve the jury a baseline to help evaluate" defendants' conduct). The Government provides no reason to exclude this relevant and appropriate expert testimony.

### D.  A *Daubert* Hearing is Not Required.

A *Daubert* hearing is not necessary to admit Dr. Vinella's expert testimony. *See United States v. Gil*, 680 F. App'x 11, 13-14 (2d Cir. 2017) (affirming decision to admit expert ballistics testimony without first holding *Daubert* hearing). As set forth above and in the defense's expert disclosures, Dr. Vinella is qualified and his proffered opinions are relevant and appropriate to aid the jury in its fact-finding. Courts in this district, have allowed Dr. Vinella's expert testimony without a *Daubert* hearing. *See, e.g.*, *Peterson*, 876 F.3d at 85-86; Dec. 7, 2020 Hear'g Tr. at 22:23-24:2 (ECF No. 24), *In re Citibank Aug. 11, 2020 Transfers*, 20-CV-6539 (JMF) (S.D.N.Y.).

36

Moreover, Dr. Vinella relied on materials that are either publicly available or available in the record of this case and discovery, *see* Ex. 8 (Vinella Disclosure) at 3-4, and the Government may conduct additional questioning at trial of Dr. Vinella's reliability and qualifications. *See U.S. v. Saipov*, 17-CR-722 (VSB), 2023 WL 4199415, at *11 (S.D.N.Y. June 27, 2023) (finding no *Daubert* hearing was required because government's expert relied on various maps, photos, video, and a report, "all of which have been provided to the Defense"); *U.S. v. Diakhoumpa*, 171 F. Supp. 3d 148, 153 (S.D.N.Y. 2016) (denying motion for a *Daubert* hearing and noting, "[t]o the extent Diakhoumpa has questions concerning the Government expert's reliability and qualifications, he may conduct additional questioning of the witness at trial."). Accordingly, the Government's alternative request for a *Daubert* hearing should be denied.

## VII.    LAWRENCE AKKA'S PROPOSED TESTIMONY IS ADMISSIBLE.

The Government plans to argue that FTX was a fraudulent scheme used by Mr. Bankman-Fried to misappropriate customer fiat deposits and that Mr. Bankman-Fried made related misrepresentations—a case that the Government has indicated it plans to make, in part, by relying on certain provisions in FTX's Terms of Service. ECF No. 204 at 40-41. Despite the relevance of the Terms of Service, the Government moves to exclude expert testimony that would assist the jury in properly evaluating and understanding the Terms of Service.[20] The defense disclosure for Lawrence Akka KC, a highly qualified UK barrister, sets forth the background and applicable English legal principles of the Terms of Service as applied to customer fiat deposits at FTX so the jury can understand the background against which the Government brings its case and, among other things, assess potential trial testimony that FTX

---

[20] The Government took a similar tact in its motions *in limine* by seeking to preclude the defense from arguing or eliciting testimony about certain portions of the Terms of Service. The Government's attempt to "have its cake and eat it too" when it comes to the Terms of Service should be roundly rejected by the Court for the reasons stated above and in Mr. Bankman-Fried's opposition to the Government's motions *in limine*. *See* ECF No. 246 at 20-23.

(and Mr. Bankman-Fried) might have acted in good faith relating to their treatment of the customer deposits.  The Government's position that any testimony addressing legal issues should be excluded overreaches and is not the law.  Mr. Akka should be permitted to present his opinion.  Any claim of undue prejudice can be addressed with appropriate limiting instructions from the Court if necessary.

Mr. Akka's disclosure nowhere opines on the legality of Mr. Bankman-Fried's conduct or runs afoul of principles governing expert opinions on legal issues.  Mr. Akka will not opine on whether Mr. Bankman-Fried did or did not perform any act; whether any alleged act by Mr. Bankman-Fried was criminal; or whether FTX breached any agreement or law governing its relationship with customer.  Mr. Akka's anticipated testimony is limited to (i) providing the relevant principles of English law that govern FTX's Terms of Service[21] with its customers with respect to certain customer assets (fiat deposits), and (ii) explaining how those principles apply to FTX's relationship with its customers as governed by the Terms of Service.  *See* Ex. 9 (Expert Disclosure of Lawrence Akka, KC ("Akka Disclosure")) at 3.  By itself, this background testimony on relevant legal standards would be helpful, relevant, and admissible.  The same is true of Mr. Akka conclusion that FTX's Terms of Service give rise "only to a contractual creditor-debtor relationship" and that "FTX was obliged to honour customer withdrawals (i.e. to repay the debt of fiat currency that it owed), but was not constrained to use fiat currency for any particular purpose in the interim."  *Id.*

Mr. Akka's testimony will undeniably provide helpful context to jurors assessing the Government's charges and evidence presented at trial.  In addition to alleging that Mr. Bankman-Fried made false or misleading statements concerning FTX's treatment of customer fiat deposits,

---

[21] FTX's May 2022 Terms of Service contain a choice-of-law clause for English law.  Ex. 10 (FTX Terms of Service dated May 13, 2022) at § 38.11.

the Government intends to press at trial that FTX was a fraudulent scheme to misappropriate customer fiat funds deposited for use on FTX.  *See, e.g.*, ECF No. 214 (Gov't Proposed Charge) at 8-9 ("the scheme to defraud involves fraudulently embezzling or misappropriating money or property").  Whether FTX was constrained—and whether FTX employees (including Mr. Bankman-Fried) thought FTX was constrained—by its commercial relationship with its customers in using customer fiat assets is squarely relevant to the issues arising in this case. *See, e.g.*, *United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006) ("good faith constitutes a complete defense to charges of wire fraud").  Specifically, if FTX witnesses testify at trial regarding whether or not FTX was constrained by the Terms of Service from using customer fiat assets in the period between their deposit and request for withdrawal, Mr. Akka's opinion is squarely helpful to the jury's assessment whether the defendant's views of permissible conduct was objectively reasonable and genuinely held.  *See United States v. Fallon*, 61 F.4th 95, 109 (3d Cir. 2023) ("Appellants are correct that expert testimony opining on the objective reasonableness of a given interpretation may be relevant to a good faith defense, and thus not categorically barred by Rule 401 or Rule 702.").[22]  Mr. Akka's testimony will provide similar essential context to statements made by Mr. Bankman-Fried concerning customer fiat deposits that the Government may contend were intentionally false or misleading.

   The Government's claim that experts cannot provide *any* legal analyses in *any* context goes too far.  That the Government disagrees with the view that nothing in FTX's relationship with its customers restrained FTX from using customer fiat deposits, so long as it satisfied withdrawal requests when made, is not a basis for excluding Mr. Akka's testimony.  Expert

---

[22] To support a defense of good faith to wire and mail fraud, the defense in *Fallon* sought to present expert testimony from a law professor opining that there was a reasonable interpretation of a contract at issue that was consistent with the defendants' good faith.  61 F.4th at 108-09.  The Third Circuit affirmed the opinion's exclusion under Rule 403 and thus did not further assess arguments under Rule 702.  *Id.* at 110 n.37.

testimony on legal issues that does not assess the ultimate legal question in the case can be admitted, where, as here, it provides essential background for the context of the Government's charges.  *See United States v. Cohen*, 887 F.3d 77, 85 (1st Cir. 2018).  In *Cohen*, a prosecution over theft from the government involving attorney IOLTA accounts, the court affirmed the admission of expert testimony (offered by the government) explaining the rules governing lawyer IOLTA accounts and how the rules permit transactions involving third-party funds.  *Id.* The Court explained that the testimony "assisted the jurors by informing them of features of the accounts that could have facilitated" the defendant's ability to launder funds and was also probative of the defendant's intent.  *Id.*  This case is no different, except here the Government is arguing the other side.  Understanding the features of customer fiat deposits at FTX would unquestionably help the jury here assess FTX's and Mr. Bankman-Fried's alleged actions with respect to those fiat deposits and whether FTX executives may have reasonably believed that FTX had not done anything wrong in using deposits before withdrawal requests were made.  *See also Fallon*, 61 F.4th at 109 (expert contract interpretation probative of good faith).

The authorities cited by the Government do not compel a different result.  The Government's brief quotes general language picked from Second Circuit decisions that expert testimony on issues of law is generally inadmissible, ECF No. 236 at 8-9, but the Government omits the full rule that "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating *ultimate* legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294  (emphasis added).  Applying this line, the Court in *Bilzerian* permitted a securities law professor to testify about "general background on federal securities regulation and the filing requirements of Schedule 13D," while declining to permit another expert testify whether a particular phrase in the securities industry would give rise mandatory

disclosure on Schedule 13D, *i.e.*, the ultimate legal conclusion in the case.[23]  *Id.* at 1294-95.  The trial court alleviated any undue prejudice with an appropriate limiting instruction.  *Id.* at 1295.

The Government's objection that Mr. Akka's testimony is unreliable is undercut entirely by the only authority it cites for this point.  The Government's complaint appears to be that Mr. Akka should have considered whether "a different and less formal meaning" of a "trust" should or could apply in the crypto context.  ECF No. 236 at 10.  Significantly, the Government cites no authority for the proposition that the requirements for creating a trust under English law should be relaxed in connection with crypto assets, and the Law Commission Consultation Paper (the "Consultation Paper"), cited by the Government, references the same "three certainties" standard described in Mr. Akka's report.[24]  The Government's brief also fails to note that the Consultation Paper describes scholarship co-authored by Mr. Akka in the crypto space as

---

[23] The cases cited by the Government's brief excluding expert legal opinions all involved opinions on the ultimate legal question facing the court, which, as explained above, Mr. Akka will not provide.  *See, e.g.*, *United States v. Bronston*, 658 F.2d 920 (2d Cir. 1981) (affirming exclusion of expert opinion on whether defendant breached fiduciary duty as charged in indictment); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 509-10 (2d Cir. 1977) (excluding opinion that contract was breached in breach of contract action); *Red Rock Commodities, Ltd. v. Std. Chartered Bank*, 140 F.3d 420 (2d Cir. 1998) (noting expert opinion on "how to decide" breach of contract was unnecessary to summary judgment decision); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) (holding inadmissible expert testimony that "individuals engaged in a manipulative and fraudulent scheme"); *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) (excluding expert testimony in § 1983 action that police officer's actions were not warranted in the circumstances or define deadly physical force); *Hous. Works, Inc. v. Turner, Inc.*, 362 F. Supp. 2d 434, 448 (S.D.N.Y 2005) (holding expert could not testify on the "proper measure of damages"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004) (excluding expert opinion concerning a drug manufacture's duty to warn in product liability actions); *In re Initial Public Offering Secs. Litig.*, 174 F. Supp. 2d 61, 63, 69 (S.D.N.Y. 2001) (excluding expert opinion on whether federal statute requires recusal on judicial recusal motion); *Dominion Resources SVC, Inc. v. Alstom Power, Inc.*, No. 16-CV--644, 2018 WL 3752878 at *1, 7, 11 (D. Conn. Aug. 6, 2018) (excluding expert testimony that insurance policy met contract requirements for breach of contract action claiming policy did not meet contractual requirements); *Pearlman v. Cablevision Sys. Corp.*, No. 10-CV-4992, 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) (excluding testimony construing terms of service where "[t]he sole issue in this case is whether Cablevision breached the Terms of Service"); *AU New Haven, LCC v. YKK Corp.*, No. 15-CV-2411(GHW), 2019 WL 1254763 at *7, 10 (expert cannot opine that patent is invalid for failing to meet enablement and definiteness of several nations' patent laws).

[24] *Compare* Ex. 9 (Akka Disclosure) at 7 ("For an express trust to be created, there must exist what are commonly referred to as the 'three certainties'" *with* Law Commission of England and Wales, Digital Assets: Consultation Paper, No. 256 (July 28, 2022) ("Consultation Paper"), at pp. 341-42 ("However, for a particular arrangement, including a direct custody arrangement over crypto-tokens, to be effective as a trust it needs to satisfy the 'three certainties' necessary to create a trust under the general law."), *available at* https://shorturl.at/foNO8.

containing "a detailed and accurate account of the current law in relation to crypto tokens, which was subsequently adopted by the courts of England and Wales, as well as other common law jurisdictions." Consultation Paper at 6. It appears that the Government is complaining that Mr. Akka's testimony is inconsistent with his writings. The defense disagrees, but even so, this issue is best addressed through cross examination rather than excluding the testimony in full.

Finally, the Government's Rule 403 argument has it exactly backwards. The Government's primary argument is that permitting Mr. Akka to testify on the principles of English law that establish the commercial and legal relationship between FTX and its customers would deprive the Government of the ability to present evidence of *additional* facts, such as the non-legal "trust" customers held in FTX or the course of dealing between FTX and its customers. *See* ECF No. 236 at 11-12. But nothing prevents the Government from presenting evidence in this regard, and any confusion over the background role that Mr. Akka's testimony would provide can be cured with a limiting instruction. And preventing the jury from understanding the underlying legal and commercial relationship between FTX and its customers in a prosecution claiming that FTX criminally abused that relationship would deprive the jury of one of the most important steps to the course of dealing that the Government wishes to elicit at trial, and would unduly prejudice Mr. Bankman-Fried's defense.

Accordingly, the Government's motion to exclude Mr. Akka's testimony should be denied. Should the Court, however, grant the Government's motion in whole or material part, Mr. Bankman-Fried respectfully requests an opportunity to submit a proposed jury charge to instruct the jury on the legal relationship between FTX and its customers.

## **CONCLUSION**

For the reasons set forth above, Mr. Bankman-Fried respectfully requests that the Court deny the Government's motions to exclude testimony of Defendant's expert witnesses from trial.

Dated:  September 11, 2023
        New York, New York

Respectfully submitted,

*/s/ Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
David F. Lisner
Sri K. Kuehnlenz
Sharon L. Barbour
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
Phone:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
dlisner@cohengresser.com
skuehnlenz@cohengresser.com
sbarbour@cohengresser.com

*Attorneys for Samuel Bankman-Fried*