

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 30, 2023

**By ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Samuel Bankman-Fried,* S6 22 Cr. 673 (LAK)

Dear Judge Kaplan:

  The Government respectfully submits this letter motion *in limine* regarding certain anticipated testimony from witnesses the Government intends to call at trial. First, the Government anticipates that some customers of FTX, who deposited funds on the FTX platform to fund their accounts, will testify regarding their expectations and understandings that the company would hold their deposited funds for them, and make them available for withdrawal by the customers at any time. Second, the Government anticipates that certain investors who purchased shares in FTX will testify about representations by the defendant that FTX was a "custodian" of its customer's funds, along with similar representations, and their understanding of the meaning of this term in connection with a cryptocurrency exchange. Third, the Government anticipates that certain cooperating witnesses, who have pled guilty to participating in a conspiracy to commit fraud with the defendant, will testify about their interactions with the defendant and their understanding of the purpose of certain statements and actions of the defendant.

  In each of these cases, the anticipated testimony about how the witnesses understood their relationship with the defendant and his companies, and their interpretation of statements made by the defendant and his agents, is directly relevant to the issues in dispute at trial, and is probative of how reasonable persons would have interpreted and understood representations made by the defendant regarding FTX's treatment of customer assets and other issues.

  **A.  Applicable Law**

  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have

that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). So long as evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence," it is relevant. *United States v. Quinones*, 417 Fed. Appx. 65, 68 (2d Cir. 2011).

The Indictment charges the defendant with wire fraud and conspiracy to commit wire fraud on FTX customers by misappropriating those customers' deposits. To prove these offenses, the Government can prove either that the scheme involved "embezzlement, which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another," *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995), or that the scheme involved a material misrepresentation or omission. *Spira v. Nick*, 876 F. Supp. 553, 558 (S.D.N.Y. 1995). Under the wire fraud statute, a false statement or omission is material "if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999).

The Indictment also charges the defendant with conspiracy to commit commodities fraud on FTX customers by misappropriating those customers' deposits. And the Indictment further charges the defendant with securities fraud for his alleged misrepresentations to investors in connection with the purchase and sale of shares in FTX. To prove these offenses, the Government must show that the defendant "employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud." *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018) (commodities fraud); *United States v. Hild*, No. 19-CR-602 (RA), 2022 WL 17484992, at *9 (S.D.N.Y. Dec. 7, 2022) (similar for securities fraud). Materiality for purposes of commodities fraud and securities fraud is substantively the same as the standard for wire fraud. "A misstatement in a securities transaction is material if there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'" *United States v. Gramins*, 939 F.3d 429, 444-45 (2d Cir. 2019) (quoting *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018)); *see also McDonnell*, 332 F. Supp. 3d at 720 (for purposes of commodities fraud, a "statement of fact is material if a reasonable investor would consider it important in deciding whether to make an investment."). "A misrepresentation is important to a reasonable investor, in turn, if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Gramins*, 939 F.3d at 445 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

### B. Discussion

#### A. Customer Witnesses

The Government anticipates that multiple FTX customers, including retail customers who transferred tens of thousands of dollars worth of assets to FTX, and institutional customers who transferred tens of millions of dollars worth of assets to FTX, will testify that they did so with the expectation and understanding that FTX would custody their assets separate from those of the company, would not transfer customer assets to Alameda Research, and would not use their assets for FTX's or Alameda's own expenses. These customers' testimony will be based on, *inter alia*, their understanding of public statements by the defendant, their review of or knowledge of FTX

advertisements, and their understanding about the defendant's putative pro-regulatory and pro-transparency stance.

Testimony from FTX customers regarding their expectations of how their deposits would be handled by FTX is directly relevant to whether the customers had a "fiduciary or similar relationship" to FTX for purposes of the misappropriation theory charged in the Indictment. Such a relationship arises when "one person depends on another—the fiduciary—to serve his interests." *United States v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991). The beneficiary of the relationship "may entrust the fiduciary with custody over property of one sort or another," and the fiduciary "becomes duty-bound not to appropriate the property for his own use." *Id.* The nature of this relationship depends on the facts giving rise to the relationship and the expectations of the parties when entering into the relationship. As relevant here, the question is whether customers entrusted their property to FTX to have custody over it for their benefit, such as to use it for trading on the FTX platform. Accordingly, courts in misappropriation cases have routinely permitted evidence regarding how the party whose property was allegedly misappropriated regarded that property. For example, in *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012), an insider trading case, the Government charged the defendants with misappropriating certain "block order" information from certain brokerage firms. The Second Circuit held that the prosecution's misappropriation theory required the jury to consider whether "the brokerage firms regarded the block order information … as confidential and treated it as such." *Id.* The Court then discussed at length the trial testimony of various employees of the brokerage firms regarding how they viewed this information and whether it was entrusted to the defendants to hold for the firms' benefit. *Id.* at 127-30; *see also Carpenter v. United States*, 484 U.S. 19, 23 (1987) (discussing trial evidence of newspaper's "policy and practice" with respect to use of misappropriated information). Similarly here, FTX customers who deposited funds with FTX should be permitted to testify about how they regarded the deposited funds, their expectation of how FTX would treat the funds, and the basis for their understanding of these issues.

This customer testimony is additionally admissible because it relates to the materiality of statements by the defendant and his employees about how FTX treated customer assets, such as that customers' assets were held in custody by FTX, that the assets would be safe on FTX, and that customers would be able to withdraw their assets on demand. When a defendant uses particular terminology, as with terms like "custody" or statements regarding assets being kept "safe," trial testimony regarding how customers in the relevant market understood those terms is admissible to show materiality. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding' of the information conveyed." *McDonnell*, 332 F. Supp. 3d at 717-18. Thus, in *McDonnell*, the court permitted customers of a cryptocurrency company to testify about their understanding of statements by the defendant that they could "withdraw at any time" and that "everything was safe." *Id.* at 682. Customers in this case should likewise be permitted to testify about how they understood and expected their deposits would be treated on FTX based on their understandings of the statements made by the defendant and by others at his direction, even if they did not personally review each of those statements. *See, e.g.*, S6 Indictment ¶ 3 (in public testimony, the defendant claimed that FTX had a focus on "customer protection," that it had adopted "principles for ensuring investor protections" and that "as a general principle FTX segregates customer assets from its own assets"), S5 Indictment ¶ 54 (defendant tweeted "Assets are fine" and "[w]e don't invest client assets"); *Litvak*, 889 F.3d at 65 ("The reasonable investor

in a market in which many individual investors trade will be deemed to be somewhat less schooled and sophisticated than a reasonable investor in a market . . . in which only institutions trade with the help of complex computer programs and professional traders.").

### B. Investor Witnesses

In addition, FTX investors who purchased FTX shares should be permitted to testify regarding their understanding of representations made by the defendant and his employees about FTX's role as a "custodian" of its customer's funds, a term that was used in multiple FTX investor pitches, along with similar statements. To prove the materiality of these representations, the Government must prove that "there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." *Gramins*, 939 F.3d at 445. The testimony of actual investors regarding their expectations for how FTX would operate as a "custodian" for its customers, as the defendant represented, is directly relevant to how a reasonable investor would have viewed those representations when made about a cryptocurrency exchange. *See id.* at 450 (affirming admission of testimony from three trial witnesses who had "testified similarly as to their expectations of broker-dealer employees purporting to act in a 'broker' capacity").

### C. Coconspirator Witnesses

The Government expects to call certain witnesses who entered guilty pleas to participating in a conspiracy to commit wire fraud with the defendant and who are testifying pursuant to cooperation agreements, as well as witnesses who will testify pursuant to grants of immunity for their testimony. The Government anticipates that these witnesses will testify regarding their interactions and conversations with the defendant, including their understanding of the meaning of statements and instructions given to them by the defendant. This coconspirator testimony is probative of the manner in which the conspirators agreed to perpetrate the scheme and the method by which they communicated in furtherance of the scheme. Courts routinely permit coconspirators to testify not only about the specific statements or acts of a defendant, but the coconspirators interpretation of those statements and acts. *See, e.g., United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (affirming admission of coconspirator testimony about the meaning of defendant's use of expressions like "I get it," "this arrangement," and "cover," because those expressions were "ambiguous without the context that [the coconspirator witness] supplied"); *United States v. Borrero*, 630 F. App'x 20, 23 (2d Cir. 2015) (affirming admission of cooperating witness's testimony "regarding his interpretation of [the defendant's] statements" because the witness was a coconspirator and his testimony "was rationally based on his experience with [the defendant], and the testimony assisted the jury in understanding ambiguous or slang terms" used by the defendant);

*United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) ("[I]ndividuals engaging in illicit activities rarely describe their transactions in an open or transparent manner and the government may call witnesses to provide insight into coded language through lay opinion testimony."). Thus, coconspirators should be permitted to testify about their interpretation of statements made by the defendant in connection with the charged offenses.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York

By:    /s Thane Rehn
        Danielle R. Sassoon
        Nicolas Roos
        Danielle Kudla
        Samuel Raymond
        Thane Rehn
        Assistant United States Attorneys
        (212) 637-2354

Cc: Counsel of Record (via ECF)