```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6           Defendant.                  Trial
    ------------------------------x

7
                                        New York, N.Y.
8                                       October 12, 2023
                                        9:30 a.m.
9

10  Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13
                            APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    COHEN & GRESSER, LLP
20       Attorneys for Defendant
    BY:  MARK S. COHEN
21       CHRISTIAN R. EVERDELL
         SRI K. KUEHNLENZ
22       DAVID F. LISNER

23  Also Present:
    Luke Booth, FBI
24  Kristin Allain, FBI
    Arjun Ahuja, USAO Paralegal Specialist
25  Grant Bianco, USAO Paralegal Specialist
```

 1                (Trial resumed; jury present)

 2                THE COURT:  The defendant and the jurors all are

 3    present, as they have been throughout.

 4                Ms. Ellison, you are still under oath.

 5                Mr. Cohen, you may proceed.

 6                MR. COHEN:  Thank you, your Honor.

 7    CAROLINE ELLISON, resumed.

 8    CROSS-EXAMINATION (cont'd)

 9    BY MR. COHEN:

10    Q.  Good morning, Ms. Ellison?

11    A.  Good morning.

12    Q.  I want to just briefly touch on what we were speaking about

13    yesterday?

14    A.  Yes.

15    Q.  That's the difference between the fiat@ account and the

16    info@ account.

17    A.  OK.

18    Q.  Now, the fiat account was an account that received fiat

19    dollars, British pounds, so on, correct?

20    A.  Are you referring to the bank account?

21    Q.  Yes.  I didn't mean to interrupt.

22    A.  You're referring to the bank account?

23    Q.  Yes.

24    A.  Which bank account?

25    Q.  The Alameda bank account or the North Dimension bank

1  account.

2  A.  Yes.  Alameda and North Dimension both had several bank

3  accounts.

4  Q.  Those are the accounts that received the fiat deposits,

5  correct?

6  A.  Yes.  At times they received fiat deposits for at least

7  some FTX customers.

8  Q.  Now, explain to us what the term fiat underscore -- FTX

9  underscore fiat referred to.

10  A.  That referred to Alameda's account on FTX that tracked the

11  fiat deposits that Alameda was receiving in its North Dimension

12  bank accounts.

13  Q.  That was on the Alameda account on FTX, correct?

14  A.  That's right.

15  Q.  The info account?

16         THE COURT:  Excuse me.  Let's try to clarify a little.

17         When you talk about the FTX underscore fiat account,

18  are you talking about a bank account or an account on the books

19  and records maintained by FTX, or both?

20         THE WITNESS:  I was referring to an account on FTX,

21  not a bank account.

22         THE COURT:  Let's try to be clear.

23  Q.  You meant a ledger entry, correct?

24  A.  Yeah.

25  Q.  Now, the info@ account was Alameda's account for trading on

1   FTX, the exchange, is that correct?

2   A.  It was our main account for trading on FTX, yes.

3   Q.  Fair enough.  It was a main account and it also had sub

4   accounts.

5   A.  Yes, that's right.

6   Q.  And it had about 200 subaccounts?

7   A.  I don't know the exact number.

8   Q.  Ballpark.

9   A.  Yeah.  It had at least dozens of subaccounts, I would say.

10          THE COURT:  Again, just for clarity, the info@ account

11   was an account in the sense of a customer account with FTX,

12   right?

13          THE WITNESS:  That's correct.

14          THE COURT:  Not a bank account and not a ledger

15   account on somebody's books.  Yes?

16          THE WITNESS:  Yes, that's right.

17          THE COURT:  OK.

18   Q.  So when Alameda made trades on the FTX exchange, they would

19   be reflected -- to follow up on your Honor's question, they

20   would be reflected in the info@ account?

21   A.  Most of our trades, yes.  We also do trades on other

22   accounts at various times.

23   Q.  And you also did trades on other exchanges?

24   A.  That's right.

25   Q.  Now, I want to go back, Ms. Ellison, to some of the

1   testimony you gave here on Tuesday about sort of the early

2   days.  I don't intend to repeat all of it, but there are a few

3   things I would like to go over with you, if that's OK.

4   A.  Yup.

5   Q.  You testified that you joined Alameda in about 2018, is

6   that correct?

7   A.  That's right.

8   Q.  And you testified that sometime after you joined you

9   learned that there had been prior issues at Alameda, correct?

10  A.  That's right.

11  Q.  And you were concerned with the defendant not telling you

12  about them, correct?

13  A.  Yes, I was.

14  Q.  And one of the issues you mentioned was that there had been

15  disputes among the various people at Alameda, correct?

16  A.  That's right.

17  Q.  Is it fair to say, Ms. Ellison, that after you had been at

18  Alameda for a time you came to understand more about what had

19  happened?

20  A.  Yes, that's fair to say.

21          MS. SASSOON:  Objection.  Relevance.

22          THE COURT:  It has been answered.  Overruled.

23  Q.  Did you come to a view that Sam had been correct about many

24  of the issues he first talked to you about?

25          MS. SASSOON:  Objection.  Relevance.

1            THE COURT:  What's the relevance, Mr. Cohen?

2            MR. COHEN:  Your Honor, can we come up to the sidebar?

3            THE COURT:  We are not going -- yes, but we are not

4    going to do this on every question.

5            MR. COHEN:  I would prefer not to.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 (At sidebar)

2                 MR. COHEN:  It's one more question, first of all.

3                 THE COURT:  Always good to know.

4                 MR. COHEN:  The implication or the inference that the

5     government sought yesterday in its examination about this topic

6     was that Mr. Bankman-Fried had a pattern of being reckless and

7     deceitful that went back even to the early days of Alameda.

8                 What this witness I believe will answer, certainly if

9     she is consistent with the 3500, is that after she came to

10    understand what had happened, she believed he was right about

11    the dispute.

12                MS. SASSOON:  This information was elicited yesterday

13    or Tuesday from the witness with respect to her relationship

14    with the defendant and his failure to disclose to her the

15    financial state of Alameda when she joined or when she

16    apologized after for concealing from her, not the merits of any

17    underlying dispute that gave rise to Alameda being in a worse

18    financial situation when she arrived which had not been shared

19    with her.

20                Her view on that situation, whatever view she formed,

21    was formed on hearsay conversations with the defendant, no

22    firsthand knowledge of what actually occurred.  It's

23    irrelevant, it's based on hearsay, and the pending question is

24    vague because I think the question was:  And what was your view

25    about the things that were talked about.  Who even knows what

1   that is referring to.

2          MR. COHEN:  The issue with that proffer is that's not

3   what she elicited.  She elicited testimony about a dispute

4   between employees.  It wasn't just about the financial

5   situation of Alameda.  That just wasn't -- could have been

6   limited that way, but it wasn't.

7          So we are left with the implication that from jump my

8   client was misleading her about fundamental things that,

9   according to the 3500, when she came to understand it, she

10  didn't believe he was misleading her.  That's fair cross, your

11  Honor.

12         MS. SASSOON:  Your Honor, the appropriate way to

13  address that was to make an objection and ask for a limiting

14  instruction that it wasn't being offered for the truth.  To now

15  get into the underlying merits of that dispute and any view she

16  formed based on self-serving hearsay statements from the

17  defendant is irrelevant and based on hearsay.

18         MR. COHEN:  Your Honor, we are not limited to the

19  government's theory of the case.  We are allowed to put on a

20  defense.  We are allowed to cover topics that have been covered

21  before and to put our view of what happened across.

22         I have to say, I can't think of a trial I've done

23  where we are being told we have to limit our cross to only what

24  was on the direct.

25         THE COURT:  I can't think of that actually occurring

1    in this case.

2              MR. COHEN:  Then I withdraw that remark.

3              THE COURT:  And properly so.

4              I will allow the one additional question and the

5    question pending, but that's it.

6              MR. COHEN:  That's all I wanted to do.

7              THE COURT:  All right.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. COHEN:  Would you read the question back, please.

3    yes, sure.

4          (Record read)

5    A.  Yes, I did come to that view.

6    Q.  Now, on Tuesday you gave us your views -- some of your

7    views about Mr. Bankman-Fried.  I want to just talk about a few

8    of them.  You described him to us.  You told us he was

9    ambitious and driven.

10         Do you recall that, Ms. Ellison?

11   A.  Yeah.  At least I recall saying that he was ambitious, but

12   I would also agree that he was driven.

13   Q.  We can stay with ambitious.  He worked very hard?

14   A.  Yes.

15   Q.  You worked very hard?

16   A.  Yes, I did.

17   Q.  Gary and Nishad also worked very hard?

18   A.  Yes.  I agree with that.

19   Q.  You were all ambitious in your way, correct?

20         MS. SASSOON:  Objection.  Form.

21   Q.  Were you ambitious, Ms. Ellison?

22         THE COURT:  Overruled.

23   A.  I didn't think of myself as ambitious before I started at

24   Alameda, but I think I became more ambitious as Sam encouraged

25   me in that.

1    Q.  After all, you and Sam and Gary and Nishad built two

2    companies within three years, correct?

3    A.  That's right.

4    Q.  And prior to 2022, both of those companies were worth

5    billions of dollars, correct?

6    A.  Yes.

7              MS. SASSOON:  Objection.

8              THE COURT:  Sustained.

9    Q.  You also told us, Ms. Ellison, on Tuesday that you had --

10   you come to a view, based on your interactions with Sam, about

11   his view of risk.

12             You recall that testimony?

13   A.  Yes, I do.

14   Q.  Would it be fair to say that when it came to risk, business

15   risk, you were more conservative than he was.

16   A.  Yes, that's fair to say.

17   Q.  In your view, he was willing to take more business risk

18   than you were?

19   A.  Yes, that's right.

20   Q.  Did you have a view about Gary's willingness to take risks

21   from a business perspective?

22             MS. SASSOON:  Objection.  Foundation.

23             THE COURT:  Sustained.

24   Q.  Based on your interaction -- let me back up.  How long did

25   you know Gary for?

 1    A.   I met him when I started at Alameda, so in 2018.

 2    Q.   Based on your interactions with Gary, did you come to a

 3    view about his views about risk?

 4    A.   I don't think I ever had a very clear impression of what

 5    his views on risk were.

 6    Q.   Let's go back to your views of Sam.  Is it fair to say,

 7    Ms. Ellison, that sometimes he took risks that you would not

 8    have taken?

 9    A.   Yes, that's right.

10    Q.   For example -- let me rephrase.  Do you recall, in 2019,

11    when Alameda was already established, Mr. Bankman-Fried wanted

12    to start FTX?

13    A.   Yes, I do.

14    Q.   And you didn't think that was a good idea?

15    A.   That's right.

16    Q.   You thought that FTX might have problems getting customers,

17    for example?

18    A.   Yes, I did.

19    Q.   And that it might be a waste of time to start it?

20    A.   Yes.

21    Q.   That was one way in which you and he differed on the risk

22    around starting FTX?

23    A.   Yes, that's right.

24    Q.   Do you recall there was some testimony I think on Tuesday

25    and also Wednesday you gave about a token call -- not a token.

1    About Solana.

2    A.  Yes, that's right.

3    Q.  What was Solana, just to remind us all?

4    A.  Solana was a Blockchain that Alameda built a token called

5    Serum on and it was also a coin that Sam wanted to invest in.

6    Q.  You recall that, in your view, Solana at the time was not a

7    good investment?

8    A.  I don't recall my exact view.  I definitely recall that I

9    was less excited about investing in Solana than Sam was.

10   Q.  Fair enough.

11          And you were not excited about him buying it for one

12   dollar, correct?

13   A.  I don't remember having an opinion on the one dollar price.

14   I do remember that there was a swap of Solana for Serum that I

15   was against because I thought it involved selling Serum at too

16   low of a price relative to Solana.

17   Q.  Is it fair to say that over time, when you looked back,

18   sometimes your view of risk was correct compared to his?

19   A.  Yeah.

20   Q.  And sometimes his view of risk was correct compared to

21   yours?

22   A.  Yeah.  I think that's right.

23   Q.  Now, you spoke, I think, Tuesday and also yesterday about

24   the fact that at times the job at Alameda could be very

25   stressful, is that correct?

1   A.  Yes, I did.

2   Q.  Now, would you agree with me that you and Sam had different

3   ways of reacting to stress?

4   A.  Yeah, I think so.

5   Q.  Now, you also told us Tuesday, and I think yesterday, you

6   talked to us about Sam's interaction with the media.

7          Do you recall that, ma'am?

8   A.  Yes, I do.

9   Q.  To contrast your styles, you were more of a

10  behind-the-scenes, not-be-out-in-the-media person?

11  A.  That's right.

12  Q.  That was your business style?

13  A.  Yeah.

14  Q.  His business style was to be more out in the media, more in

15  the public attention?

16  A.  Yes, that's right.

17  Q.  In and of itself, you didn't think there was anything wrong

18  with that?

19          MS. SASSOON:  Objection.

20          THE COURT:  What's the objection?

21          MS. SASSOON:  Her view of whether there was anything

22  wrong with that.

23          THE COURT:  Sustained.

24  Q.  Now, you testified, I think it was Tuesday, maybe it was

25  Wednesday, that, in your view, Mr. Bankman-Fried also had a

1    certain personal style in terms of the kind of clothing he

2    wore, correct?

3    A.  Yes.

4    Q.  And that was the T-shirts and shorts and so on?

5    A.  That's right.

6    Q.  And that was obviously different from your style?

7    A.  That's right.

8    Q.  And I think you told us that, in your view, this was

9    something being done trying to promote the business of FTX?

10             MS. SASSOON:  Objection.  Misstates her testimony.

11             THE COURT:  Sustained.

12   Q.  Did you have a view of the style and whether it would

13   promote the business of FTX?

14             MS. SASSOON:  Objection.  Relevance.

15             THE COURT:  Overruled.

16   A.  I don't recall having a strong opinion on whether his style

17   was good or not for FTX.  I thought it had some pros and cons.

18   Q.  OK.  Fair enough.

19             Let me move forward to some of the other topics you

20   covered on Tuesday.  I am not going to go into them in the same

21   detail, but I want to go over a few things.

22             You came to Alameda in 2018, and I believe you told us

23   your first position was as a trader, is that correct?

24   A.  Yes, that's right.

25   Q.  And that you got the title of CEO or co-CEO in the summer

1    of 2021?

2    A.   That's right.

3    Q.   Let me step back a moment and call your attention to 2022.

4    There is a person we have talked about in the case named Sam

5    Trabucco.

6              Do you recall that?

7    A.   Yes.

8    Q.   I think for convenience we are all referring to him as

9    Trabucco because there is a lot of Sams.

10   A.   Yeah.

11   Q.   Is it fair to say, ma'am, that, in 2020, you and Trabucco

12   began running Alameda's day-to-day operations on a de facto

13   basis?

14   A.   I would say, in 2020, Trabucco and I began handling a lot

15   of Alameda's day-to-day business.

16   Q.   Mr. Bankman-Fried would check in with you?

17   A.   Yes, he would.

18   Q.   He might tell you things to do?

19   A.   Yes.

20   Q.   But he would also be absent for long periods of time,

21   correct?

22   A.   There were periods of time when he wasn't paying much

23   attention to Alameda or talking to us much.

24   Q.   And he would leave it to you and Trabucco?

25   A.   Yeah.

1          MR. COHEN:  Can we pull up GX-25B in evidence.

2    Q.   You discussed this on your direct, Ms. Ellison.  This is an

3    example of some of the Google Docs entry you made, correct?

4    A.   Yes, that's right.

5    Q.   And I believe you told us it was your regular practice to

6    make business-related notes in your Google Docs, correct?

7    A.   That's right.

8    Q.   And 25B is an example of that.

9    A.   Yes, it is.

10         MR. COHEN:  Can we take that down for a moment and

11   pull up GX-64.

12         It's a multipage document.  Can you please show

13   Ms. Ellison the multiple pages so she can see the whole thing.

14   And go back to the beginning, Brian, when you are done.

15   Q.   Quick question.  Is this another example, Ms. Ellison, of

16   the kind of business-related notes you would take in the Google

17   documents?

18   A.   This looks like an update document that I would send to

19   Sam, as opposed to the personal notes I would just keep for

20   myself.

21   Q.   This would be to update him on the business of Alameda,

22   correct?

23   A.   Yes, that's right.

24   Q.   And it was your regular practice to keep these kinds of

25   notes as well?

 1    A.  Yes, that's right.

 2              MR. COHEN:  Can we now call up just for the witness

 3    DX-10 for identification.

 4    Q.  Take a moment to go through DX-10, Ms. Ellison.  You can

 5    see the whole document.  I just have some preliminary questions

 6    for you.

 7              THE COURT:  Does this correspond to a tab in the book

 8    you have given me?

 9              MR. COHEN:  Yes, your Honor.  I'm sorry.  Tab 5.

10              THE COURT:  Thank you.

11    A.  Could I see the second page again?

12    Q.  Of course.

13    A.  OK.

14    Q.  Ms. Ellison, is it fair to say this is another entry in

15    your Google Docs relating to your views on the Alameda and FTX

16    business?

17    A.  This is a Google Doc that I wrote to share with Alameda

18    employees.

19    Q.  It is in connection with your business, correct?

20    A.  Yes.

21    Q.  Was it your regular practice to keep these kinds of

22    documents as well?

23    A.  I wouldn't say I did this very frequently, but this was

24    addressing some upset feelings that various Alameda employees

25    had.

1   Q.  And did it reflect your intent and state of mind at the

2   time relating to that situation with the employees?

3            MS. SASSOON:  Objection.  Vague.

4            THE COURT:  Sustained as to form.

5   Q.  Did it reflect your intent regarding the business purposes

6   of running the business of Alameda?

7            MS. SASSOON:  Same objection.

8            THE COURT:  Same ruling.  Try again.

9   Q.  What did it reflect?

10  A.  It was a message that I wanted to share with Alameda

11  employees to encourage them and improve their morale.

12  Q.  And you were sharing it as a CEO of Alameda?

13  A.  I don't recall if I was CEO already at the time or not.

14  Q.  I believe we have a date.  I am just looking for the date.

15  Let's see if that helps you, Ms. Ellison.

16            According to stipulation 2003 as to authenticity, this

17  is a document entitled EV of Alameda, dated July 22, 2021.

18            Does that help you, ma'am?

19  A.  Yeah.  My recollection is that I wasn't appointed co-CEO

20  until August of 2021.  I am not totally sure about that.

21  Q.  But it's in connection with your role in Alameda?

22  A.  With my role in Alameda, yes.

23            MR. COHEN:  Your Honor, we offer DX-10.

24            MS. SASSOON:  Objection.  This does not satisfy 803(6)

25  or 803(3) and it's hearsay.

1          THE COURT:  Tell me what you think the 803(6) problem

2     is, please.

3          MS. SASSOON:  Yes, your Honor.  You'd like me to

4     explain?

5          THE COURT:  Yes.

6          MS. SASSOON:  Although Ms. Ellison testified that she

7     wrote this while at Alameda, a foundation has not been

8     established that satisfies the four prerequisites of the rule.

9     This document is unlike the others shown to Ms. Ellison.  It is

10    not on her to-do list.  It's not an update document to the

11    defendant.

12         THE COURT:  A little slower.

13         MS. SASSOON:  It's a document she said she wrote to

14    some of her Alameda employees, which she said she did not do

15    routinely, and in that sense it resembles an email created as

16    part of a business practice which your Honor in *DLA Piper* said

17    does not alone satisfy 803(6).

18         THE COURT:  And the other rule counsel cited was?

19         MS. SASSOON:  He did not cite 803(3), but one of the

20    sustained questions seemed to gesture at 803(3), and no

21    foundation with respect to this document overall or even a part

22    of it has been established as going to state of mind at this

23    time.

24         THE COURT:  Mr. Cohen.

25         MR. COHEN:  Yes, your Honor.

1              With respect to the 803(6) ground, as I'm sure counsel

2     is aware, the witness only has to say that it's part of the

3     regular practice.  It doesn't have to be done every day or

4     every week or so forth, and I think there is sufficient

5     foundation for that.

6              With respect to 803(3) it goes to that existing state

7     of mind.

8              THE COURT:  What's the relevance of her then existing

9     state of mind?

10             MR. COHEN:  Your Honor, can we approach?

11             THE COURT:  All right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At sidebar)

2              MR. COHEN:  Thank you, your Honor.

3              A couple of things.  There has been a lot of testimony

4    elicited that Ms. Ellison was not running Alameda, that she was

5    just taking instruction from the defendant.

6              So on the relevancy ground we believe this document

7    shows -- rebuts that.  The government is free to argue that it

8    doesn't, but we believe that it does.  And as I am sure your

9    Honor knows, we don't have to show that this was done once a

10   week, once a day, so forth.  We just have to show there was a

11   regular practice of it.

12             As to her state of mind, this is a conspiracy case, as

13   I was reminded of by counsel yesterday, and I made an objection

14   to evidence coming in as to her state of mind, and her state of

15   mind as to what her relationship with Mr. Bankman-Fried was, in

16   particular when it came to running Alameda was relevant to the

17   case.  The government says she really didn't run it.  It's

18   their argument.  We would like to put in evidence to show that

19   she did.

20             MS. SASSOON:  I'll start with 803(3) first.  That's

21   not an exception to the hearsay rule meant to swallow the rule

22   to put in any past statements by a witness.

23             This document has a number of assertions, like FTX

24   just raised a $18 billion valuation.  How that goes to

25   Ms. Ellison's intent, plan or preparation under 803(3) is

beyond me, and that's true with a lot of the statements in this document, and defense counsel has not pointed to anything here that directly goes to Ms. Ellison's then present state of mind or intent under 803(3).

As for 803(6), there are four requirements and it's not just that you created a document in the course of the business.  It has to be shown that this type of document was maintained in the regular course of business, that it was a regular practice and it was made in the course of a regularly conducted business activity.  I don't think that that foundation has been established.  This is more equivalent to an email of encouragement to her employees, as she described it.

And, finally, to the extent that defense counsel said it is being offered to rebut the implication that she was not running Alameda, they haven't said it's being offered as a prior inconsistent statement or to impeach, and to establish that additional questions would have to be asked that would show this to be inconsistent with her testimony.

MR. COHEN:  Your Honor, if it will make it easier for the Court, the only passage I'm interested in is this one.  I'm interested in all, but primarily this one.

THE COURT:  Counsel is referring to the page with the Bates stamp ending in 470, starting with the sentence that reads:  The truth is, both have really high upside, and ending with the word often three paragraphs later.

1          MS. SASSOON:  May I respond to this?

2          THE COURT:  Let me just read it.

3          MS. SASSOON:  I believe the witness just testified

4    that there were periods of time where the defendant was not

5    paying attention to Alameda, so I don't think that any of her

6    testimony at this point is inconsistent with this document.

7          I think it would be appropriate to ask questions to

8    elicit the type of information that's in this document, but I

9    don't think there is an admissible basis at this point for this

10   portion of the document itself, whether to impeach as a prior

11   consistent statement or under the other rules we have been

12   discussing.

13         MR. COHEN:  With respect, she gave the answer.  Then

14   she qualified it.

15         THE COURT:  What answer did she qualify?

16         MR. COHEN:  She said that he was absent for long

17   periods of time but that she qualified that she wasn't sure

18   about that, which is inconsistent with this.

19         MS. SASSOON:  I don't remember that testimony.

20         THE COURT:  Nor do I.  But the transcript will

21   reflect.

22         If there is a specific part that you want to offer,

23   let's address that, but at the moment you've offered the whole

24   thing.

25         MR. COHEN:  Just the part that I showed your Honor is

1    fine.

2         MS. SASSOON:  Your Honor, as now explained by the

3    defense, they are trying to offer this for its truth.  It

4    certainly would not be admissible under 803(3).

5         THE COURT:  I agree with the last statement.  My

6    recollection of the testimony is that this was a document that

7    she created to address what she understood to be some upset

8    feelings at AR and that this was not something she regularly

9    did.  Am I mistaken?

10        MR. COHEN:  I think -- as your Honor says, the

11   transcript controls, but I think what she said was that this is

12   not something she did, the kind of thing she did every day or

13   every month, but she did do on a regular basis at Alameda.

14        THE COURT:  Do you agree with that?

15        MS. SASSOON:  No.  Mr. Cohen showed her three totally

16   different categories of documents, attempted to conflate the

17   three, and the witness resisted that and said no.  This is not

18   like my update docs.  This is not like my to-do list.  This is

19   something maybe every once in a while I shared with my

20   employees for a specific purpose.

21        THE COURT:  Objection sustained.

22        MR. COHEN:  Thank you, your Honor.

23        (Continued on next page)

24

25

```
 1                (In open court)

 2                MR. COHEN:  Could I have the question read back,

 3    question and answer read back from before the colloquy for the

 4    Court.

 5                MS. SASSOON:  Objection, your Honor.  It pertained to

 6    a document not in evidence.

 7                MR. COHEN:  Before that, before the document was

 8    offered.

 9                THE COURT:  Then I don't know what you're asking.

10                The very last question and answer before we wound up

11    in the sidebar was:

12    "Q.  But it's in connection with your role in Alameda?

13    "A.  With my role in Alameda, yes."

14    Q.  Let me continue, Ms. Ellison, with the period in which you

15    and Mr. Trabucco, in 2020 going into 2021, when you were

16    handling day to day for Alameda.

17                Did you have a view -- did you know Mr. Trabucco?

18    A.  Yes, I did.

19    Q.  Did you have a view of him as a trader?

20    A.  Yes.  I thought he was a very good trader.

21    Q.  Did you have a view of how he handled extreme situations?

22                MS. SASSOON:  Objection.  Form.

23                THE COURT:  Sustained as to form.

24    Q.  From time to time, did you have the opportunity to observe

25    Mr. Trabucco in various situations?
```

 1    A.   Yes.

 2    Q.   Did you observe him in situations you considered to be

 3    extreme?

 4              MS. SASSOON:   Objection.  Vague.

 5              THE COURT:   I'll allow it.

 6    A.   Yes, I did.

 7    Q.   And did you form a view of how he handled those?

 8    A.   Yes, I did.

 9    Q.   What was that?

10    A.   I thought that he was good under pressure and good at

11    handling extreme trading situations.

12    Q.   Now, moving forward to 2021, you and he officially became

13    co-CEOs, I think you said, in the summer of 2021, is that

14    right?

15    A.   That's right.

16    Q.   And then toward the end of that year, is it fair to say

17    that he stopped coming to the office?

18    A.   Yes, that's right.

19    Q.   And he sort of stepped away from handling the job.

20    A.   That's right.

21    Q.   Leaving it to you.

22    A.   That's right.

23    Q.   And he officially resigned as co-CEO in August of 2022, is

24    that correct?

25    A.   Yes.  I recall him resigning sometime around then.

 1    Q.  I didn't mean to interrupt.

 2        You remained the sole CEO from that point on until

 3    November of 2022?

 4    A.  That's correct.

 5    Q.  During that period did there come a time that the topic of

 6    adding another co-CEO came up?

 7    A.  Yes, it did.

 8    Q.  Who did it come up with?

 9    A.  I believe Sam brought it up.

10    Q.  What do you recall about that topic?

11    A.  When we were talking about the idea of Trabucco stepping

12    down, Sam asked whether we should add Ben Xie, who was the head

13    of trading at Alameda, as co-CEO, and I said that I didn't

14    think it made sense.

15    Q.  I think we talked about Ben Xie.  That's X-i-e, right?

16    A.  Yes.

17    Q.  He had been a trader at Alameda?

18    A.  Yes.

19    Q.  And the discussion was about whether he would become co-CEO

20    with you?

21    A.  Yes, that's right.  He was already head of trading, I

22    believe.

23    Q.  In your view, was it better if you continued as the sole

24    CEO, correct?

25    A.  Yes, I expressed that.

1    Q.  I want to move on to another topic related to the beginning

2    years at Alameda.  Actually, it's all the years at Alameda.

3            I apologize.  Let me start again.

4            I want to go over with some more detail some of your

5    responsibilities as the CEO of Alameda.

6    A.  OK.

7    Q.  By, call it, 2021, 2022, about how many employees did

8    Alameda have?

9    A.  Around 30.

10   Q.  And you have mentioned yesterday of course it had traders?

11   A.  That's right.

12   Q.  It had people called settlement people.  Can you explain to

13   the jury what that was.

14   A.  Yes.  This was the team that handled things like sending

15   wire transfers or sending cryptocurrency between different

16   accounts.

17   Q.  And it also had people called developers?

18   A.  Yes, that's right, software developers, so they handled the

19   technology side of Alameda.

20   Q.  Those were the computer people?

21   A.  Yes, that's right.

22   Q.  And accountants?

23   A.  Yes.  We had one accounting person starting in, I think,

24   2021 and hired two more junior people in 2022.

25   Q.  And during the 2020 to '21 time period, you and

 1  Mr. Trabucco and then you managed these employees, correct?

 2  A.  Yes, that's right.

 3  Q.  I think you told us yesterday that along with Sam you and

 4  Sam also determined the trading strategies for Alameda.

 5          MS. SASSOON:  Objection.  Two Sams, I think.

 6          THE COURT:  Sustained.

 7  Q.  Did you determine the trading strategies for Alameda?

 8  A.  I would say that Sam gave the ultimate direction on what he

 9  thought we should do, and then Trabucco and I also made trading

10  decisions for Alameda ultimately deferring to Sam, and of

11  course other traders did as well.

12  Q.  You had input into the trading decisions?

13  A.  Yes, that's right.

14  Q.  Did you also deal with matters relating to HR?

15  A.  Yes.  I did things like hiring and firing employees and

16  having meetings with them.

17  Q.  Did you also deal with data security for Alameda?

18  A.  I wouldn't say I dealt much with it directly.  That was

19  more the developers.

20  Q.  And, to your understanding, what data security issues were

21  dealt with?

22  A.  Things like keeping our passwords and our API keys secure,

23  preventing people from hacking our systems.

24  Q.  Was hacking of the systems a risk to Alameda?

25  A.  Yes, it was.  It happened a few times.

1   Q.  It actually happened.

2   A.  Yes, that's right.

3   Q.  Now, coming back to accounting matters, when you first

4   joined Alameda, even before you became CEO, did you, as part of

5   your job, handle accounting matters?

6   A.  Yes, I did.  From not too long after I started at Alameda,

7   Sam asked if I could handle some of the accounting and

8   calculating things like daily trading panels, things like that.

9   Q.  You took it on?

10  A.  That's right.

11  Q.  Fair to say no one else wanted to do it?

12  A.  No one else wanted to at the time.  At various times other

13  people did take on some of these responsibilities.

14  Q.  Fair enough.  But you early on you would hire accounting

15  people and they would leave?

16  A.  Yes.  We did have a few people that we tried to give these

17  accounting responsibilities to, and they found they couldn't or

18  didn't want to handle it.

19  Q.  Over the course of your time at Alameda, one of the things

20  you wanted to do was try to improve the accounting systems?

21  A.  Yeah, definitely.

22  Q.  You found it to be a difficult or hard task?

23  A.  I did.

24  Q.  Fair to say there were processes to be built out relating

25  to accounting?

1    A.   Yeah.

2    Q.   Now, I think you testified on Tuesday that another one of

3    your responsibilities was preparing balance sheets.  Is that

4    correct?

5    A.   Yes, that's right.

6    Q.   And is it fair to say that, in 2019 or so, Ryan Salame

7    prepared the balance sheets for Alameda?

8    A.   He did prepare balance sheets for Alameda for some time

9    period.  I thought that it was more like 2020 or 2021, but I'm

10   not sure.

11   Q.   Regardless of timing, there came a time where you sort of

12   took it over from Mr. Salame?

13   A.   Yes, that's right.

14   Q.   Can you describe for us the process you would go through to

15   prepare a balance sheet in the 2020 and 2021 period.

16   A.   Yes.  There was an automated spreadsheet that had a bunch

17   of macros that would pull data from Alameda's databases, and

18   this would produce a balance sheet.  But in practice just

19   running the automated spreadsheet wasn't enough.  There was a

20   lot of manual reconciliation that I had to do.  So basically

21   looking for discrepancies and fixing mistakes, things like

22   that.

23   Q.   So you had to pull the data first, correct?

24   A.   Yeah.

25   Q.   Then you had to manually go in and check for discrepancies?

1   A.   Yes, that's right.

2   Q.   During 2021, you prepared, I guess, four balance sheets,

3   four quarterly balance sheets?

4   A.   Yes, that's right.  I think I also maybe prepared other

5   nonquarterly balance sheets.

6   Q.   And then a year-end balance sheet?

7   A.   That would be one of the quarterly balance sheets.

8   Q.   OK.  Fine.

9        Did you regard any of those balance sheets as

10   misleading?

11   A.   No.  Not intentionally so, that I can recall.

12   Q.   And those balance sheets were one page?

13   A.   Yes, that's right.

14   Q.   They had summary categories for assets?

15   A.   That's right.

16   Q.   Summary categories for liabilities?

17   A.   That's right.

18   Q.   Then they'd would have retained earnings, correct?

19   A.   Yes, that's correct.

20   Q.   Just for the jury's benefit, retained earnings is

21   synonymous with what we have been calling net asset value,

22   right?

23   A.   Yes.

24   Q.   For NAV?

25   A.   Yes.

1    Q.   And one of the purposes for preparing the balance sheets in

2    2021 was to send them to various lenders that Alameda had,

3    correct?

4    A.   That's right.

5    Q.   So you would send them these one-page balance sheets on a

6    quarterly basis?

7    A.   Yes, that's right.

8    Q.   Would they ever ask you any questions about them?

9    A.   Sometimes.

10   Q.   Would they ever ask you for additional information?

11   A.   Yeah, sometimes.

12   Q.   And if they did, you would provide it?

13   A.   Sometimes.  Sometimes we said that it wasn't something --

14   sometimes we said that it wasn't something we could or would

15   provide.

16   Q.   Now, I think another one of your responsibilities at

17   Alameda was to interact with the lenders, correct?

18   A.   Yes, that's right.  Eventually, we hired someone to be head

19   of borrowing and lending, so at that point I didn't interact

20   much with lenders directly.

21   Q.   That person was Richard Chang, who we talked about

22   yesterday?

23   A.   Yes, that's correct.

24   Q.   And he was head of borrowing and lending?

25   A.   Yes.

 1   Q.  And you supervised him?

 2   A.  Yes, that's right.

 3   Q.  From time to time would you also have direct contact with

 4   lenders?

 5   A.  Yes, I would.

 6   Q.  Now, I just want to ask you something I meant to ask you

 7   earlier.  One of the ways that Alameda -- let me back up.  Who

 8   were the owners of Alameda?

 9   A.  Sam was the main owner, and I believe Gary also owed 10

10   percent of it.

11   Q.  There were no outside investors?

12   A.  That's correct.

13   Q.  It was a private company owned by Sam and Gary?

14   A.  That's right.

15   Q.  The way that Alameda got capital was by borrowing from

16   lenders, correct?

17   A.  That was the primary way, yes.

18   Q.  We heard some of the names yesterday, but just to refresh,

19   so it would be lenders like Voyager, Genesis, and I am going to

20   pronounce this wrong.  Ledn?

21   A.  That's right.  Those were all lenders to Alameda.

22   Q.  So Alameda was a hedge fund that was structured in a way

23   where it got its capital from third-party lenders?

24   A.  I didn't generally refer to us as a hedge fund.  This was a

25   trading firm.

 1   Q.   That's a better answer.

 2               Did you have a view about this structure?

 3               MS. SASSOON:  Objection.  Vague.

 4               THE COURT:  Overruled.

 5   A.   Do you have anything more specific.

 6   Q.   Sure.  Let me try again, Ms. Ellison.

 7               Did you feel that this structure was proper?

 8               MS. SASSOON:  Objection.

 9               THE COURT:  Sustained as to form.

10   Q.   Did you come to a view about the use of this structure of

11   having third-party lenders?

12   A.   I thought it was a way for Alameda to get capital and had

13   advantages over some other potential ways, such as have a hedge

14   fund structure with investors in that form.

15   Q.   I believe you testified yesterday that you had been an

16   intern at Jane Street?

17   A.   Yes.  As well as a full-time trader there.

18   Q.   And Jane Street was a Wall Street firm, trading firm?

19   A.   Yes, that's right.

20   Q.   Did you ever learn about whether Jane Street -- how Jane

21   Street received its capital?

22               MS. SASSOON:  Objection, 401.

23               THE COURT:  I'm sorry.  What did you say?

24               MS. SASSOON:  401.

25               THE COURT:  Sustained.

 1    Q.  Now, in terms of Alameda's relationship with its

 2    third-party lenders -- let me ask this question.  What could

 3    Alameda do with the funds that it borrowed from the lenders?

 4    A.  We could trade.  We could pay expenses.

 5    Q.  I'm sorry.  I didn't mean to interrupt.

 6    A.  No.  Sorry.  Nothing else.

 7    Q.  You could use the funds for business purposes?

 8    A.  Yeah.

 9    Q.  So the lenders didn't restrict the particular business

10    purposes?

11    A.  No.

12            MR. COHEN:  Your Honor, I'd like to go to what is tab

13    13 in your binder, DX-155 for identification.  I have a hard

14    copy for the witness which, if I can approach, I'll hand to the

15    witness.

16            THE COURT:  You may.

17    Q.  I don't have a lot of questions for you about this, ma'am,

18    but just take a look and look through DX-155 for

19    identification.

20            Do you recognize this document?

21    A.  Yes, I do.

22    Q.  What is it?

23    A.  This is a master loan agreement between Alameda and

24    Voyager, who is one of our lenders.

25    Q.  If you could turn to page 28, ma'am.

1          Did you sign that document?

2     A.  Yes, I did.

3          MR. COHEN:  The defense offers Exhibit 155.

4          MS. SASSOON:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 155 received in evidence)

7     Q.  If you could turn to the first page, Ms. Ellison.  You used

8     the first master loan agreement.  Could you describe for the

9     jury what that is?

10    A.  That's a loan agreement between two parties that states the

11    general terms, and then further loans between the two parties

12    would be subject to those terms but might have different

13    details, such as different amounts of currency or interest

14    rates or prepayment dates.

15    Q.  Would the idea be that this was a lender you were going to

16    have an ongoing relationship with?

17    A.  Yes, that's right.

18    Q.  First, you did the master loan agreement and then, as you

19    took down additional loans, you'd have additions to that

20    agreement.

21    A.  Yes, that's right.

22    Q.  You can put that to one side, ma'am.

23         Now I want to talk about something in connection with

24    your job responsibilities.  We talked about your

25    responsibilities at Alameda.  Now I want to talk briefly about

```
 1   what you did or did not do in regard to FTX.  OK?

 2   A.  OK.

 3   Q.  Who was Ramnik Arora?

 4   A.  He was the head of ventures and investor relations at FTX.

 5   Q.  And did he handle, along with Sam, investments for FTX?

 6              MS. SASSOON:  Objection.  Foundation.

 7              THE COURT:  Lay a foundation.

 8              MR. COHEN:  I thought the previous question did, but

 9   OK.

10   Q.  Did you know Mr. Arora?

11   A.  Yes, I did.

12   Q.  Did you interact with him?

13   A.  Yes.

14   Q.  Based on those interactions, did you have a view of what he

15   did in relation to investors?

16   A.  Yes.  I heard from him that he had a lot of interactions

17   with investors and a lot of fundraising calls.

18   Q.  And based on your interactions with Sam, did you have a

19   view about whether he had interactions with investors?

20   A.  Yes.  There were times we shared an office and I heard him

21   having lots of calls with investors.

22   Q.  Now, is it fair to say, Ms. Ellison, that from 2019 to

23   2022, FTX did a number of equity offerings?

24   A.  Yes.  That's accurate.

25              (Continued on next page)
```

1   BY MR. COHEN:

2   Q.   And can you explain to the jury what an equity offering is.

3   A.   That means that FTX was selling shares in the company and

4   investors were buying them, giving FTX, you know, money to

5   spend on expenses or other things.

6   Q.   Now you were not involved in preparing any materials for

7   those investors, correct?

8   A.   Not that I recall.

9   Q.   You didn't participate in any presentations made to those

10  investors, correct?

11  A.   I had a couple of conversations with investors that were

12  sort of as part of a due diligence, but for the most part, no.

13  Q.   That was handled by others at FTX.

14  A.   That's right.

15  Q.   Now on Tuesday you were asked some questions about your

16  compensation at Alameda, and I don't want to repeat all of it;

17  I just want to go over a few things.

18  A.   Mm-hmm.

19  Q.   Your salary was $200,000 a year?

20  A.   That's right.

21  Q.   Okay.  And I believe there was a system at Alameda called

22  the semester system?

23  A.   That's right.

24  Q.   Can you explain to us what that was.

25  A.   That means that people would get bonuses twice a year; they

1    could be in the form of either US dollars or equity tokens,

2    some combination of the above.

3    Q.  And so semester was six months, six months.

4    A.  That's right.

5    Q.  Okay.  And I think you told us that your compensation, your

6    bonus compensation for 2021 was about $20 million, correct?

7    A.  Yes, that's right.

8    Q.  And you'd also had compensation going into the beginning of

9    2022 of 2 million in US dollars, correct?

10   A.  I don't recall the exact amount.  I thought maybe it was

11   like 3 million for the first half of 2022, but something like

12   that.

13   Q.  Okay.  Fair enough.  Fair enough.  And you had an account

14   at FTX where your compensation went into, correct?

15   A.  That's right.

16   Q.  And this account would have your bonuses?

17   A.  Yes, my bonuses were deposited into this account.

18   Q.  It would have the value——it would have tokens you had

19   received?

20   A.  Yes, that's right.

21   Q.  And just to remind everyone, tokens would be things like

22   FTT.

23   A.  That's correct.

24   Q.  Or Serum was another token, correct?

25   A.  That's right.

1  Q.  Is Serum sometimes abbreviated as SRM?

2  A.  That's right.

3  Q.  And I believe you told us that you received equity in FTX.

4  A.  I did.

5  Q.  And equity means ownership.

6  A.  That's right.

7  Q.  Okay.  And prior to November 2022, I think you told us that

8  the total value of all these items in your FTX account was

9  around $1 billion.

10  A.  Yes, that's right.

11  Q.  Now you also told us, moving ahead, that during your time

12  at Alameda you had a romantic relationship with

13  Mr. Bankman-Fried; is that correct?

14  A.  Yes, that's right.

15  Q.  And I believe you described it as an on-again, off-again

16  kind of relationship.

17  A.  That's right, I did.

18  Q.  Okay.  And just to hit it at a high level, I believe you

19  told us that in 2018 you and he had started to sleep together.

20  A.  That's right.

21  Q.  And then in the summer of 2020 to 2021, you dated for a

22  time?

23  A.  Mm-hmm.

24  Q.  And then in the fall of 2021 to I think you said May 2022,

25  you dated again.

1   A.  Yeah.  I thought maybe it was April, but——

2   Q.  Maybe April.  Okay.

3          MS. SASSOON:  Your Honor, we've now had several

4   minutes of simply repeating the direct examination.

5          THE COURT:  I understand that.  I would like it to——

6          MR. COHEN:  I'm sorry.  I can't hear you.

7          THE COURT:  I said I understand that and I'd like you

8   to go on to something else.

9          MR. COHEN:  Yes, mm-hmm.

10  BY MR. COHEN:

11  Q.  After you and Mr. Bankman-Fried broke up for the last time,

12  did it affect your ability to communicate with him?

13  A.  Yes, it did.

14  Q.  Can you describe how that happened.

15  A.  I——I found it difficult to have in-person, one-on-one

16  conversations with him and so I tried to avoid those and avoid

17  spending much time with him in social settings, but I still

18  continued to have work communications with him over Signal as

19  we always had and continued to have group meetings with him.

20  Q.  And this was about May, you said, May of 2022?

21  A.  I think I said around April.

22  Q.  I'm sorry.  April.

23          Is it fair to say at that point you weren't talking

24  outside of work?

25  A.  We talked sometimes outside of work.  I mean, he still——we

1  still lived in the same apartment so it's hard to avoid that

2  entirely.

3  Q.  Is it fair that you were only talking inside of work when

4  you needed to?

5  A.  I don't know if I would say that.

6       MR. COHEN:  Can we call up 3550-28, just for the

7  witness, please.  Page 16.

8  Q.  Before you look at it, let me just ask a few foundation

9  questions.

10       Is it fair to say, Ms. Ellison, that you were

11  interviewed many times by the prosecutors in this case?

12  A.  Yes, that's right.

13  Q.  And is it fair to say that you were interviewed on

14  April 3rd——

15       MS. SASSOON:  Your Honor, object.  There's been no

16  testimony of a lack of recollection.

17       THE COURT:  Well, there's been no question about

18  refreshment either.

19       MS. SASSOON:  And there's a document up for the

20  witness that we'd object to.

21       MR. COHEN:  We can take the document down for the

22  moment.

23       I'm sorry.  Can we have the prior question and answer

24  read back, please.

25       THE COURT:  Yes.  Please.

 1              I can do it for you.

 2              The question is:  "Is it fair that you were only

 3    talking inside of work when you needed to?"

 4              "A.  I don't know if I would say that."

 5    BY MR. COHEN:

 6    Q.  Okay.  Do you recall being interviewed by the prosecutors

 7    on April 3, 2023?

 8    A.  I don't recall the exact date, but I recall speaking to him

 9    around that time period.

10    Q.  And do you recall telling them that you were——as of the

11    last breakup, you were only talking inside of work when you

12    needed to?

13    A.  Not particularly.

14              MR. COHEN:  Can we now call up 3550-28, page 16.

15    Q.  I'm going to call your attention to a specific passage so

16    you don't have to read the whole page.

17              If you could look at the second paragraph from the

18    bottom, ma'am.

19    A.  Uh-huh.

20    Q.  And the——yeah, those sentences.  Read them to yourself.  My

21    question is whether it refreshes your recollection as to what

22    you told the prosecutors.

23              MS. SASSOON:  Objection to form.

24              THE COURT:  Overruled as to form, but it's a yes/no

25    question.

1   A.  No.

2          MR. COHEN:  All right.  We can take that down.

3   Q.  Now yesterday you told us about a call you had on

4   November 9th on that all hands meeting.  Do you recall that,

5   ma'am?

6   A.  Yes.

7   Q.  I'm going to come back to that in a little bit.  I'm just

8   raising it now because I'd like to set a time frame.

9          MR. COHEN:  Okay.  Could we have the calendar for

10  November 9th pulled up, please.

11  Q.  And I believe you told us you had been in Japan on

12  vacation?

13  A.  The previous week.

14  Q.  And then you went to Hong Kong.

15  A.  That's right.

16  Q.  There was an office there that Alameda had?

17  A.  Yes, it was shared by Alameda and FTX.

18  Q.  Okay.  And that was the meeting you testified about

19  yesterday at the end of your testimony.

20  A.  Yes, that's right.

21  Q.  Now did you learn, after that meeting, or before or after

22  that meeting, whether or not there was any investigation going

23  on with respect to FTX and Alameda?

24  A.  I don't recall learning about any investigation before that

25  meeting.  I certainly learned of it after that meeting.

1  Q.  When did you learn about it?

2  A.  I don't recall exactly.  I mean, it was sometime within

3  the, you know, week or so following that.

4  Q.  Okay.  Now you returned to the United States on

5  November 11th; is that correct?

6  A.  Yes, that's right.

7  Q.  And you stayed at your parents' house, correct?

8  A.  That's right.

9  Q.  I don't want to say where it is, but we'll just say it's

10  outside New York, correct?

11  A.  It is not in New York.

12  Q.  Okay.  And it's in a relatively quiet community.

13  A.  Yeah.

14  Q.  And on November 16th, is it fair to say FBI agents came to

15  your house?

16  A.  I don't recall the exact date, but I remember them coming

17  sometime around then.

18  Q.  How many?

19  A.  I don't remember the exact number.  I think like four or

20  five, maybe.

21  Q.  And were you home when they came?

22  A.  Yes, I was.

23  Q.  Were other people in the house?

24  A.  Yes.

25  Q.  Who was that?

```
 1              MS. SASSOON:  Objection, 401, and 403.

 2              THE COURT:  Overruled.

 3   A.  My boyfriend was there as well as my mom's cleaner, who

 4   came once a week.

 5   Q.  And the agents had a search warrant.

 6   A.  Yes, that's right.

 7   Q.  And that permitted them to conduct certain searches in the

 8   house, correct?

 9   A.  That's right.

10   Q.  Okay.  They seized three computers that belonged to your

11   mother?

12   A.  I remember them seizing at least one computer that belonged

13   to my mother.

14   Q.  Did they seize computers that belonged to your boyfriend?

15              MS. SASSOON:  Objection, your Honor.  401 and 403.

16              THE COURT:  No.  I'll allow it.

17   A.  Yes, they did.

18   Q.  Okay.  And without getting into names, had your boyfriend

19   worked at Alameda and FTX?

20   A.  Yes, he had.

21   Q.  You mentioned that you kept a physical notebook.  Do you

22   recall that, ma'am?

23   A.  Yes.

24   Q.  Okay.  And I think we looked at some pages from it I want

25   to say yesterday.  Do you recall that?
```

1    A.  Yes, that's right.

2    Q.  Was that notebook also taken by the agents?

3    A.  Yes, it was.

4            THE COURT:  Mr. Cohen, this was covered almost

5    verbatim previously.

6            MR. COHEN:  Well, I don't think this part was, your

7    Honor.  The part about the search warrant was not brought up at

8    all, so—

9            THE COURT:  It certainly was.

10           MS. SASSOON:  Objection.  That misstates the record.

11           THE COURT:  It certainly was.

12   BY MR. COHEN:

13   Q.  All right.  Now—

14           THE COURT:  Obviously if it's a matter of controversy,

15   cross is appropriate, but you're just repeating it.

16           MR. COHEN:  It goes to credibility, your Honor.

17           THE COURT:  Repeating it goes to credibility.

18           MR. COHEN:  Not repeating it; the topic, of course.

19           THE COURT:  And you've got it already, so let's just

20   move on.

21           MR. COHEN:  Okay.  I'll move on.

22   BY MR. COHEN:

23   Q.  Now I believe you testified yesterday that sometime after

24   that you engaged counsel.

25   A.  It was before that.

1   Q.  Okay.  And your counsel met with the prosecutors in the

2   case, correct?

3   A.  That's right.

4   Q.  Okay.  I think you told us yesterday that one of your goals

5   was to see if you could get a cooperation agreement.

6   A.  Yes, that's right.

7   Q.  And did you have an understanding about whether or not that

8   was on the table?

9   A.  Yes, my understanding was that there was a potential for me

10  to get a cooperation agreement.

11  Q.  And there was also potential that you might not get it.

12  A.  That's right.

13  Q.  And then you had——

14          MR. COHEN:  If we could put up the calendar for

15  December, please.

16          Is that not in?  Can we call up DX 1616 for

17  identification.

18          THE COURT:  I'm sorry.  I couldn't make out——

19          MR. COHEN:  I'm sorry.  1616 for identification, your

20  Honor.

21          THE COURT:  Government or defendant's?

22          MR. COHEN:  Defendant's.

23          THE COURT:  Thank you.

24          MR. COHEN:  We offer 1616, which is a calendar of

25  December 2022.

```
 1           MS. SASSOON:  No objection.  We just ask that the
 2   markings that were applied to the prior calendar be taken off.
 3           THE COURT:  All right.  1616 is received without the
 4   markings.
 5           (Defendant's Exhibit 1616 received in evidence)
 6   BY MR. COHEN:
 7   Q.  Now there came a time when you had a series of in-person
 8   meetings with the government, correct?
 9   A.  That's right.
10   Q.  And that was on December 8th, 12th, 14th, and 15th,
11   correct?
12   A.  I don't remember the exact dates, but I know it was
13   sometime around then.
14   Q.  Does that sound about right to you?
15   A.  Sure.
16   Q.  About how long were those meetings?
17   A.  A few hours each.
18   Q.  And as I understand it, you didn't have a cooperation
19   agreement at that point.
20   A.  That's right.
21   Q.  And you were being interviewed to see if you would qualify
22   for one.
23   A.  Yes, that's right.
24   Q.  And you ended up entering into a cooperation agreement and
25   pleading guilty, correct?
```

1    A.  Yes, I did.

2    Q.  And that was on December 19th?

3    A.  Don't remember the exact date, but I know it was sometime

4    in mid-December.

5    Q.  Okay.  And prior to that was there any back-and-forth about

6    the charges you would plead guilty to?

7    A.  I believe there was some discussion about the charges.

8    Q.  Okay.  And I think you told us yesterday that you pleaded

9    guilty—you ended up agreeing in your cooperation agreement to

10   plead guilty to charges relating to conspiracy to commit wire

11   fraud and wire fraud relating to customers.

12   A.  That's right.

13   Q.  Conspiracy to commit wire fraud and wire fraud relating to

14   lenders, correct?

15   A.  That's right.

16   Q.  And conspiracy to commit commodities fraud relating to

17   customers.

18   A.  That's right.

19   Q.  And conspiracy to commit securities fraud with respect to

20   investors.

21   A.  That's right.

22   Q.  And a money laundering count.

23   A.  Yes, that's right.

24   Q.  And for all of those charges you faced a maximum sentence

25   of 110 years of imprisonment.

1    A.   That's correct.

2    Q.   Okay.  And as the back-and-forth took place, was it your

3    understanding that in order to be considered for a cooperation

4    agreement you'd have to plead to all seven charges?

5    A.   Not necessarily.

6    Q.   Okay.  What was your understanding?

7    A.   My understanding was that these were the charges that I

8    think the prosecutors suggested but that I should only plead

9    guilty to the ones that I, you know—plead guilty to them if I

10   believed that I was guilty of them.

11   Q.   And you ended up pleading to all of those charges, correct?

12   A.   Yes, that's right.

13   Q.   Okay.  Now one of the charges, Count Six, related to fraud

14   on investors, correct?

15   A.   That's right.

16   Q.   Was it your understanding as of the period before

17   December 19th that you had not had communications with

18   investors in mind?

19             MS. SASSOON:  Objection, form.

20             THE COURT:  Sustained as to form.

21   Q.   What was your understanding as to investors prior to your

22   plea?

23             MS. SASSOON:  Objection, form.

24             THE COURT:  Sustained.

25   Q.   What was your understanding with regard to investors?

1      MS. SASSOON:  Objection.

2      THE COURT:  Sustained as to form.

3   Q.  Now just one more point on this.  I believe you said

4   yesterday, or might have been the day before, that one of the

5   things you were seeking at a cooperation agreement is something

6   called a 5K motion; is that correct?

7   A.  Yes, that's right.

8   Q.  And what is your understanding of that?

9   A.  My understanding is that it's a letter that the prosecution

10  writes to the judge at my sentencing that details the crimes

11  that I've committed, the wrongdoing that I've told them about,

12  and the cooperation and assistance that I've provided in their

13  case.

14  Q.  And if the prosecution writes such a letter, you can

15  qualify for a potential reduction in your sentence.

16  A.  Yes, that's right, though it's ultimately up to the judge's

17  discretion.

18  Q.  But whether to write the letter is up to the government,

19  correct?

20  A.  That's right.

21  Q.  In your understanding, does it matter how many counts you

22  pled to?

23  A.  I'm not aware of whether that's taken into account.  Like

24  officially, I think it's up to the judge's discretion.

25  Q.  So whether you pled to four counts or five or six, you

1    could still qualify.

2              MS. SASSOON:  Objection, form.

3              THE COURT:  Sustained as to form.

4    Q.  Could you qualify for a 5K motion if you pled to fewer than

5    seven counts?

6              MS. SASSOON:  Objection, form.

7              THE COURT:  Overruled.

8    A.  I believe it's up to the government's discretion whether

9    they want to write the letter.

10   Q.  So you could still qualify.

11   A.  Yeah.

12   Q.  Now in addition to the four meetings we talked about in

13   December, is it fair to say, Ms. Ellison, that you've had a

14   number of meetings with the prosecutors since then?

15   A.  Yes, it is.

16   Q.  Okay.  So you had meetings in January, and that was

17   January 3rd, 20th, and 24th?

18   A.  Don't remember the exact dates.

19   Q.  Sound about right?

20   A.  Sounds possible.

21   Q.  Okay.  What about March 14th, April 3rd, April 20?

22   A.  Again—I'm sorry—I don't remember the dates.

23   Q.  Okay.  Let me try and do it this way.  I don't want to make

24   this a numbers test for you.  Is it fair to say you had

25   meetings with the prosecutors in January, March, April, and

1    June?

2    A.  That sounds right.

3    Q.  Is it fair to say you had meetings with them in July?

4    A.  Probably.  I don't remember which exact months I met with

5    them in.

6    Q.  Okay.  August and September?

7    A.  Yeah, I believe I met with them in August and September.

8    Q.  And October, this month, prior to the trial.

9    A.  Yes, I did.

10   Q.  In total, is it fair to say you've had more than 20

11   meetings with the prosecutors?

12   A.  That sounds right, though I don't know the exact number.

13   Q.  Okay.  And please answer this question, the next question

14   yes or no.  Yes or no:  Have your attorneys had calls or

15   meetings with the prosecutors without you being present?

16   A.  Yes.

17   Q.  And again, how many of those meetings or calls have they

18   had, to your knowledge?

19          MS. SASSOON:  Objection.

20          THE COURT:  Ground?

21          MS. SASSOON:  I rose before he said "to your

22   knowledge," so I'll withdraw it.

23   A.  I don't know.

24   Q.  You think it was more than 20?

25   A.  I don't know.

1  Q.  Have you had any meetings with the prosecutors this past

2  week?

3  A.  Yes, I have.

4  Q.  When did you meet with them?

5  A.  I last met with them on Monday.

6  Q.  Okay.  That was before you gave your direct examination.

7  A.  That's right.

8  Q.  How long was that meeting for?

9  A.  Maybe like three or four hours.

10  Q.  Did they go over the topics we'd be discussing in court?

11  A.  They asked questions, some of which were questions that

12  ended up being in the direct testimony.

13  Q.  And you gave the answers you would give.

14  A.  Yeah.

15            MR. COHEN:  Okay.  Your Honor, I'm about to start a

16  new topic.  Would it make sense to take our morning break?

17            THE COURT:  I'm willing to do that.  Do you have any

18  idea how long you're going to be?

19            MR. COHEN:  I will know better after the break.

20            THE COURT:  Okay.  Fifteen minutes, folks.

21            THE DEPUTY CLERK:  All rise.

22            (Recess)

23

24

25

```
 1                (In open court; jury not present
 2                THE COURT:  Okay.  Please be seated.
 3                Mr. Cohen, I'm not rushing you, but in almost 30
 4    years, most cross-examinations of cooperators I have seen have
 5    ended with what you just did, which is why I asked you how much
 6    longer.  You don't have to do it that way, but I'm just trying
 7    to get an idea of how to schedule this case.
 8                MR. COHEN:  Sure.  I thought I would mix it up, your
 9    Honor.
10                My goal is to finish the cross today.
11                THE COURT:  Okay.
12                MR. COHEN:  It may trickle over to tomorrow, but
13    that's my goal.
14                MS. SASSOON:  One request we made of the defense, your
15    Honor, was to give us about 30 minutes' notice before it's
16    done, if possible, so that we can make sure that we have a
17    witness here to efficiently use the Court's time.
18                THE COURT:  I'm sure he'll cooperate.
19                Let's get the jury.
20                (Continued on next page)
21
22
23
24
25
```

```
 1                    (Jury present)
 2              THE COURT:  The defendant and the jurors all are
 3   present, as they have been throughout.
 4              Mr. Cohen, you may continue.
 5              MR. COHEN:  Thank you, your Honor.
 6   BY MR. COHEN:
 7   Q.  Ms. Ellison, I'd like to move to a new topic.  Actually,
 8   it's a topic from this morning, and I realized I forgot to ask
 9   you something.
10              Do you recall giving testimony about Alameda as a
11   customer of FTX?
12   A.  Yes, I do.
13   Q.  And that was in our discussion earlier today about the
14   info@ account.
15   A.  Yes, that's right.
16   Q.  As a customer of FTX, did Alameda enter into terms of
17   service?
18   A.  Yes, I believe it did.
19   Q.  Did you ever review those?
20   A.  Not that I recall.
21   Q.  Please answer the next question yes or no.  Did you ever
22   discuss those with anyone?
23   A.  Yes.
24              MR. COHEN:  Your Honor, may we come up?
25              THE COURT:  Because?
```

1        MR. COHEN:  I'm thinking of your Honor's pretrial

2   rulings.

3        THE COURT:  Come.

4        (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        MR. COHEN:  If her answer to the question is an

3   attorney, I don't want her to say it in open court without the

4   Court having a chance to rule, so I can come back to this after

5   the break if your Honor would like me to.

6        THE COURT:  Without having a chance to rule on whether

7   she can say the word "attorney"?

8        MR. COHEN:  Yes, yes.

9        THE COURT:  Well, she can say the word "attorney," but

10  it's likely that if you want to know what was said, you're

11  going to have a problem because—

12       MR. COHEN:  No, no.  I don't want to know that.  I

13  just want to know the who.

14       MR. ROOS:  Well, then that raises the question of the

15  pretrial rulings, which is, merely just saying did you talk to

16  attorneys about this, period, moving on, can give a misleading

17  impression to the jury.  I think that goes to your Honor's

18  ruling about specificity.

19       And I'll just flag one other issue on this, which is,

20  FTX the company has not waived privilege on this issue, so

21  there were various documents they didn't produce, so it's not—

22       THE COURT:  Well, I assumed that was true, which is

23  why I said something to the effect that I assumed it would be a

24  problem.

25       What's the relevance, standing alone, with whether she

1    discussed it with an attorney?

2          MR. COHEN:  Well, the relevance is what she did.

3    Look, it's the defense's view that this is an important

4    document in the case, and it's relevant whether or not she

5    discussed it with anyone to understand the rights and

6    obligations of Alameda.

7          MS. SASSOON:  She also just testified she never

8    reviewed them.

9          THE COURT:  Yeah.

10         MR. COHEN:  She then testified that she spoke to

11   people about them, and I didn't want to elicit——

12         THE COURT:  What exactly are you trying to elicit from

13   her and why?

14         MR. COHEN:  Sure.  I'm trying——if she knows——and

15   obviously I haven't had access to her before.  This is

16   inconsistent with her 302s, your Honor, by the way, so——

17         THE COURT:  What exactly do you want to elicit and

18   why?

19         MR. COHEN:  Got it, yeah.  What I'm trying to elicit

20   is who she spoke to about it, if it was attorneys, if it was

21   Sam, if it was someone else at the company, and what that did

22   in terms of her understanding of how the terms of service

23   operated, with the exception of attorneys, because of the

24   issues Mr. Roos has raised.

25         MS. SASSOON:  Your Honor, I don't see the relevance.

1    She didn't work at FTX, she didn't have direct access to FTX

2    customers, she didn't review the terms of service, and we're

3    certainly not claiming that Alameda was a victim of the fraud

4    because they accepted the terms of service here.

5            MR. COHEN:  She was the CEO of the company.

6            THE COURT:  Hmm?

7            MR. COHEN:  She was the CEO of the company.

8            THE COURT:  Of Alameda.

9            MR. COHEN:  Of a customer of FTX, so her understanding

10   of how those terms of service worked is relevant.

11           THE COURT:  I'm not sure that would be true in a civil

12   contract case.

13           MR. COHEN:  Well, you asked for a proffer, your Honor.

14           MS. SASSOON:  I still don't understand the relevance

15   whether——

16           THE COURT:  We're not going to do it here.

17           MR. COHEN:  Okay.  Thank you.

18           THE COURT:  That ruling relates to only this question.

19           (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2    BY MR. COHEN:

3    Q.  I also meant to ask you earlier, in connection with your

4    testimony about Alameda as a customer, have you ever heard the

5    term "Chinese wall"?

6    A.  Yes, I have.

7    Q.  What does it mean to you?

8    A.  I understand it to refer to the general practice of having

9    information barriers between two parts of a company where there

10   may be conflicts of interest between the two parts.

11   Q.  Okay.  Were there issues relating to Chinese walls with

12   respect to Alameda and FTX?

13   A.  Yes, it was a topic we discussed sometimes.

14   Q.  Okay.  What was discussed?

15   A.  How much separation we should have between Alameda and FTX

16   in various ways, like whether we should have separate offices

17   or the same office, separate Slack work spaces or the same work

18   space.

19   Q.  And what was the——if you know, what was the purpose, from a

20   trading point of view, of having a Chinese wall?

21   A.  I wouldn't have really said it was from a trading point of

22   view.  I would have thought it was more from FTX——sort of the

23   point of view of fairness for FTX customers.

24   Q.  What do you mean by that?

25   A.  What I mean by that is that if Alameda had special

1    privileges on FTX or access to FTX's customer information, that

2    would give Alameda a benefit over other FTX customers.

3    Q.  Understood.  Okay.  Thank you.

4         Now there was also a lot of testimony about Alameda's

5    role as a market maker for FTX, and I don't plan to repeat all

6    of that, but let me ask you this:  Was Alameda—well, was

7    Alameda paid for its role as a market maker?

8    A.  Not directly, though we did receive special privileges on

9    FTX that I've discussed.

10   Q.  Did it receive stipends or rebates?

11   A.  We did receive market maker, like, fee rebates on some of

12   our trades in accordance with the general fee policy of FTX.

13   Q.  Okay.  And was that because you were taking risk as a

14   market maker?

15   A.  Yeah, I think that was one of the reasons.

16   Q.  So if you came in and took on a position that no one else

17   wanted to buy, there was a risk you might not be able to trade

18   out of it.

19   A.  Yes, that's true.

20   Q.  I believe you also discussed that as part of its market

21   maker duties, Alameda would help to create a market for new

22   tokens.  Do you recall that?

23   A.  Yes, we would.

24   Q.  Can you explain what you mean by that.

25   A.  If a coin initially listed on FTX that hadn't been trading

1    on FTX before, Alameda would be prepared to hold inventory of

2    this coin, if possible, and put out bids and offers on this

3    coin so that as soon as the market opened, if a customer wanted

4    to come to FTX and trade, they would be able to do so.

5    Q.   So if it was coming new to the market, Alameda to buy it in

6    case other customers wanted it.

7    A.   Potentially either buy or borrow or simply use our line of

8    credit on FTX.

9    Q.   Now you also mentioned in connection with Alameda's role as

10   a market maker that Alameda had a line of credit.  Do you

11   recall that testimony?

12   A.   Yes.

13   Q.   Okay.  And I think you told us that at a certain point your

14   understanding was the line of credit was $65 billion; is that

15   correct?

16          MS. SASSOON:  Objection.  Misstates the testimony.

17   There was no such testimony.

18          MR. COHEN:  I'm sorry, your Honor.  I didn't hear.

19          THE COURT:  No, I was thinking.

20          MR. COHEN:  Oh, sorry.  I'm hanging on every word.

21          THE COURT:  I'm going to overrule the objection, but

22   say to the jury obviously it's your recollection that controls.

23          Answer the question, please.

24   A.   I don't recall testifying to any $65 billion amount.

25   Q.   Okay.  Based on your experience as first a trader and then

1    CEO of Alameda, did you have—based on your experience, what

2    was its typical drawdown on a line of credit prior to June

3    2022?

4    A.   I think it was in the—a few-billion-dollar range.

5    Q.   So let's talk for a moment about a topic we spoke about

6    yesterday relating to FTT.  Do you recall speaking about FTT?

7    A.   I do.

8    Q.   Okay.  And just to orient everyone, FTT was an exchange

9    token?

10   A.   That's right.  It was the exchange token of FTX.

11   Q.   Okay.  Can you explain to the jury what that is.

12   A.   The—FTX would take a third of its fee revenue and use it

13   to buy the token FTT, meaning that the—a third of the value

14   from this revenue would go to the holders of this token.

15   Q.   So FTX was in effect issuing FTT tokens?

16   A.   I think Alameda was the one who issued the tokens.

17   Q.   Correct.  But they were supported by FTX because of this

18   program.

19   A.   That's right.  FTX did support them.

20   Q.   Did you ever hear the term the "buy and burn" program?

21   A.   Yes.

22   Q.   Is that—does that refer to this policy of FTX buying the

23   tokens?

24   A.   Yes, it does.

25   Q.   Now, if you remember, when was FTT created?

 1  A.  It was in 2019.

 2  Q.  Okay.  And do you know who created it?

 3  A.  I would say Sam created it.

 4  Q.  Okay.  Did you ever hear of the term "white paper"?

 5  A.  Yes.

 6  Q.  What is your understanding of that term?

 7  A.  It's a document that is published when a token is first

 8  created, generally explaining what the token is.

 9  Q.  Do you know if a white paper was issued with respect to

10  FTT?

11  A.  Yeah.

12  Q.  And was that available on the internet?

13  A.  Yes, it was.

14  Q.  Now I think you mentioned yesterday—and I just wanted to

15  clarify—that you knew of another token called BNB.  Do you

16  recall that testimony?

17  A.  Yes.

18  Q.  Can you explain to the jury what that was.

19  A.  BNB was the exchange token of Binance, so similar to FTT's

20  relationship to FTX.

21  Q.  So Binance had issued its own token called BNB.

22  A.  Yes, that's right.

23  Q.  Do you know if there was a white paper about that?

24  A.  I don't specifically recall one.

25  Q.  Now after FTT was issued, was it listed publicly?

1    A.   Yes, it was, initially on FTX and then eventually on many

2    other exchanges as well.

3              (Continued on next page)

1    Q.  So it was listed on exchanges other than FTX?

2    A.  That's right.

3    Q.  And have you ever heard the term mark-to-market price?

4    A.  Yes.

5    Q.  What's that?

6    A.  That means valuing an asset at its current market price, so

7    whatever you can currently buy or sell it for on exchanges.

8    Q.  After it was listed and traded on other exchanges, did FTT

9    have a mark-to-market price?

10   A.  Yes, it did.

11   Q.  You mentioned yesterday that from time to time Alameda

12   would trade on exchanges other than FTX, correct?

13   A.  Yes.  Most of our trading was on exchanges other than FTX.

14   Q.  Would it ever post FTT as collateral on those exchanges?

15   A.  I don't recall any instances of us doing so.

16   Q.  What about in terms of your interactions with lenders,

17   third-party lenders like Genesis or Voyager, would Alameda post

18   FTT as collateral?

19   A.  Yes, we would.

20   Q.  Would they accept it?

21   A.  Yes.

22   Q.  Have you ever heard in the trading field the term a

23   haircut?

24   A.  Yeah.

25   Q.  It has a different meaning than I think we all think of.

1    Can you tell us what it is?

2    A.  I have heard it used referring to marking down assets to

3    less than their market value.

4    Q.  Does liquidity factor into that at all?

5    A.  One might give a haircut because of an assets liquidity,

6    yeah.

7    Q.  So if an asset is worth $100 but it's hard to sell, it

8    might get marked down to $80?

9            MS. SASSOON:  Objection to the term worth.

10           THE COURT:  Yes.  Sustained.

11   Q.  If an asset trades for $80 it might -- $100, it might get

12   marked down to 80 as a haircut?

13   A.  Yes, in some contexts.

14           THE COURT:  If an asset trades for $80 --

15           MR. COHEN:  I meant a hundred, your Honor.

16           THE COURT:  Perhaps.

17           The answer is stricken.  You can put a new question.

18   Q.  If an asset trades for $100 and it receives a haircut, it

19   might get marked down to $80, for example, just as an example?

20   A.  Yes.  That might happen.

21   Q.  Now, you had many interactions with Voyager, Genesis, and

22   the other lenders, correct?

23   A.  Yes, I did.

24   Q.  Do you know if they ever used haircuts when they evaluated

25   FTT?

1    A.   I don't recall hearing what their internal methodology for

2    valuing FTT was.

3    Q.   That's not my question.  I'm sorry.

4         Do you know whether they in fact gave discounts for

5    FTT?

6    A.   No, I don't.

7         THE COURT:  Excuse me.  By gave discounts for FTT, is

8    it correct or incorrect to say what that means is, did they

9    ever value FTT as collateral posted for loans by the lender at

10   less than the mark-to-market price?

11        THE WITNESS:  Yeah.  That's what I understood the

12   question to be asking, and I said I do not know.

13        THE COURT:  Let's go on.

14        MR. COHEN:  Thank you, your Honor.

15   Q.   One more trading question.  Then we will move on.

16        Have you ever heard the term buy on the way down?

17   A.   Yeah.  I don't know if I would say it is a term, but I have

18   heard people talking about people buying things on the way

19   down.

20   Q.   What does it mean to you?

21   A.   To me, it means if an asset -- to buy an asset while the

22   price is going down.

23   Q.   And the idea is to let it go down further and buy it when

24   the price gets lower.

25   A.   Sorry.  The idea of what?

1  Q.  Buying on the way down.

2  A.  I don't think that's how I would understand it.

3  Q.  Give me your understanding.

4  A.  I guess I wouldn't say I understand buy on the way down as

5  a common trading term, but my understanding would just be sort

6  of the straightforward interpretation of buying something as it

7  is going down.

8  Q.  So you are giving us just sort of a lay understanding.

9  It's not a special term to you.

10  A.  Not that I can think of.

11  Q.  Then we will move on.

12          We talked yesterday and earlier today about another

13  topic.  With respect to the fiat, Alameda would receive fiat

14  from customers in its bank accounts or North Dimension

15  accounts.

16          Do you recall that?

17          MS. SASSOON:  Objection.  This has been asked and

18  answered yesterday, today.

19          THE COURT:  Sustained.

20  Q.  You came to a view, I believe this is what you told us

21  yesterday, in 2019 or 2020 that you believed that you and Sam

22  were acting improperly with regard to fiat, the fiat account.

23          Do you recall that, ma'am?

24  A.  I don't recall saying that with respect to the fiat

25  account.

1  Q.  Let me rephrase.  I think you told us yesterday that you

2  came to a view that, by 2019, 2020, you and Sam were acting

3  improperly in regard to customer funds.

4          Do you recall that?

5  A.  Yes, I do.

6  Q.  If you could describe that for us, please.

7  A.  Yeah.  I was saying that I felt that by Alameda having the

8  ability to borrow FTX customer funds and use them for our own

9  trading, without customers being aware of this, that this was

10  an improper advantage that Alameda had on FTX and something

11  that put customers at a disadvantage if Alameda was to lose

12  that money.

13  Q.  Was your concern the funds coming into the Alameda account

14  in the first place?

15  A.  I don't recall being concerned about that.

16  Q.  Was your concern about whether or not there was security or

17  collateral with the funds?

18          MS. SASSOON:  Objection.  Form.

19          THE COURT:  Sustained as to form.

20          Rephrase it.

21  Q.  What was the basis -- let me rephrase.

22          Does whether or not there was collateral for the funds

23  weigh into your view?

24          MS. SASSOON:  Objection.  Form.

25          THE COURT:  Yeah.  Collateral has been used in various

1  ways here, Mr. Cohen, I think.

2  Q.  If customer funds were transferred out of Alameda and there

3  weren't Alameda assets to pay for them, was that part of your

4  concern?

5  A.  Sorry.  Can you repeat the question.

6            MR. COHEN:  Can we read that back, please.

7            (Record read)

8  A.  I don't think I know what you mean by customer funds were

9  transferred out of Alameda.

10 Q.  Let's use your language, if they were used by Alameda.  Was

11 your concern -- did it factor into your concerns as to whether

12 they were in, for example, liquid assets that can be used to

13 pay them back?

14           THE COURT:  I'm sorry.  Could you clarify.  Customers

15 of whom?

16           MR. COHEN:  Let me try this again.

17 Q.  Tell me if I'm wrong, Ms. Ellison.  I believe you testified

18 yesterday that you had a concern about Alameda's use of

19 customer funds, is that correct?

20 A.  Yes, that's right.

21 Q.  Tell me if I'm wrong, part of your concern was that the

22 funds were then used for other purposes, like venture

23 investments?

24 A.  That's right.

25 Q.  So did this concern include what happened to those

1  investments?

2  A.  Yeah.  I mean, I would say there was a risk that the

3  investments would go down or go to zero and that risk was part

4  of the reason that I was concerned.

5          THE COURT:  And the customer funds you were talking

6  about were customers of which firm?

7          THE WITNESS:  I was talking about FTX customer funds.

8          THE COURT:  Thank you.

9  Q.  Would you have the same concern if the funds -- if the

10  funds were just to be kept in the account as cash?

11  A.  No.  That would be less concerning or not concerning to me.

12  Q.  Now, I think you told us yesterday that you came to these

13  concerns after conversations with Sam, is that correct?

14          MS. SASSOON:  Objection.  Misstates the testimony.

15          THE COURT:  I think so.  Put it another way, please,

16  Mr. Cohen.

17          MR. COHEN:  No problem, your Honor.

18  Q.  What was the basis for your concern?

19  A.  I would say the basis for my concern was that Alameda was

20  borrowing customer funds and putting them at risk without, to

21  my knowledge, disclosing this to customers.

22  Q.  And you discussed this with Sam?

23  A.  Yes, I did.

24  Q.  Did you discuss it with anyone else?

25  A.  Sorry.  What time frame are we talking about?

1    Q.  Well, we will make it easy for you.  Did it change?  Let's

2    start from 2019 to 2020, when you first learned of this.

3    A.  I don't recall discussing it with anyone else at that time.

4    Q.  So let's complete the time frame from then until November

5    2022.

6    A.  Yeah.  I discussed my concerns about Alameda's use of

7    customer funds with Gary and Nishad as well during that time

8    frame.

9    Q.  Did you discuss it with anyone else?

10   A.  Not that I can recall, no.

11   Q.  Now, this was a concern -- hold on.

12           From 2019 to November 2022, did you ever consider

13   resigning from Alameda?

14   A.  Yes, I did, on some occasions.

15   Q.  In light of these concerns?

16   A.  Due to a combination of factors.

17   Q.  But you didn't resign?

18   A.  I did not.

19   Q.  You told us yesterday that there were certain times when

20   Mr. Bankman-Fried told you to delete Signal chats.

21           Do you recall that, ma'am?

22   A.  Yes.

23   Q.  And that in November of 2022, you decided to preserve some

24   of those chats on your own?

25   A.  I think Sam had also turned off his disappearing messages

1  at that point.

2  Q.  Let me ask about you.  Did you decide to preserve any

3  messages during the November 2022 time frame we talked about?

4  A.  Yes.  I started turning off disappearing messages in

5  November of 2022.

6  Q.  So you would have a record of what happened.

7  A.  It was because I thought that it was the proper thing to

8  do.

9  Q.  Did you do that in any prior time from 2019 to 2022?

10  A.  Turning off disappearing messages on Signal?

11  Q.  Yes.  Keeping screenshots.

12  A.  I don't recall any time I turned off disappearing messages.

13  I think I took screenshots of chats at various points, and I

14  don't remember any specific ones.

15  Q.  Now, earlier we talked about the fiat@ account and you

16  mentioned the pointer system.

17          Do you recall that?

18  A.  Yup.

19  Q.  Can you just briefly described how that worked?

20  A.  Pointer was Alameda's internal system that stored data and

21  was a user interface for accessing that data and allowed people

22  to do things like manually trade or move cryptocurrency between

23  different exchanges.

24  Q.  With respect to the fiat deposits, were there ever issues

25  with reconciling them?

1    A.  Yes, definitely.

2    Q.  Can you describe that for the jury.

3    A.  Yes.  There were large and increasing over time number of

4    fiat deposits into Alameda's accounts.  And they -- at some

5    point Alameda stopped having access to records of all of the

6    deposits, so there was no way for us to compare the balances in

7    the fiat@ account to the records of all the transfers that had

8    been made.  We eventually hired an accounting person who went

9    back over the past couple of years of transfers and attempted

10   to reconcile them all and found lots of discrepancies.

11   Q.  And one of the things you were looking for was to reconcile

12   what had come in from customers, what funds had come in from

13   customers from what had come in otherwise, correct?

14   A.  The funds from customers generally went into different bank

15   accounts from our other transfers.  I would say the more

16   pressing problem was reconciling the funds that we thought had

17   come in from customers, the ones that were reported on the FTX

18   ledger, and whether those bank transfers had actually arrived.

19   Q.  And this took some work, correct?

20   A.  Yes.

21   Q.  Reconciling between Alameda and FTX fiat balances when this

22   project started was a bit of a mess, correct?

23   A.  Yes, that's right.

24   Q.  Now, FTX eventually got its own bank accounts, correct?

25   A.  Yes, it did.

1   Q.   That was at the end of 2021 into 2022?

2   A.   I don't know the exact time frame, but that sounds

3   plausible.

4   Q.   Once that happened, customers could deposit their fiat

5   directly to FTX, is that correct?

6   A.   That's right.

7   Q.   Was there an issue with customers who had been customers

8   before the changeover?

9   A.   Yes, there was.  Some of them didn't want to change to

10   using new bank account instructions.

11   Q.   But they were sort of legacy customers?

12   A.   Yeah, that's right.

13   Q.   And they would continue to wire the funds to the old

14   Alameda accounts.

15   A.   To the North Dimension accounts.

16   Q.   Do you recall ever reviewing that topic with Sam?

17   A.   Yes, I do.

18   Q.   What do you recall?

19   A.   I recall finding out from the settlement team that there

20   were still many of these legacy customers depositing funds into

21   North Dimension accounts, and I brought up -- I brought this

22   issue up with Sam and said, we should probably stop people

23   depositing into North Dimension and switch them all over to

24   FTX, right.  And he said, yeah, that sounds good.

25   Q.   What was his demeanor?

1    A.  I think this was over Signal.  I don't recall, really

2    notice a demeanor.

3    Q.  From your perception, was he aware that this was still

4    going on?

5    A.  I don't remember getting an impression of whether he was

6    aware or not of this.

7                MR. COHEN:  Can we call up 3550-31, please.  I'm

8    sorry.  Wrong document.  I apologize.  3550-03.

9                THE COURT:  Mr. Cohen, tab?

10               MR. COHEN:  I'm sorry, your Honor.  It is tab 3.

11               THE COURT:  Thank you.

12               MR. COHEN:  Page 7, your Honor.  It's the first

13   paragraph at the top.

14   Q.  Just read it to yourself.  The question is whether this

15   refreshes your recollection as to whether you told the

16   prosecutors about this issue.

17               MS. SASSOON:  Objection.  That wasn't the question

18   prior.

19               THE COURT:  Agreed.

20               Rephrase.

21               MR. COHEN:  Let me back up.

22   Q.  Do you recall speaking with the prosecutors on December 8?

23   A.  I recall generally speaking with the prosecutors.

24   Q.  And is it fair to say that you were asked about

25   Mr. Bankman-Fried's reaction when you informed him that funds

1    were still being sent to the Alameda accounts?

2    A.  Yeah, I remember being asked about that.

3    Q.  You recall what you told the prosecutors.

4           MS. SASSOON:  We can take the document off.

5           MR. COHEN:  Yes.  Take the document down.

6    A.  I don't recall exactly what I told the prosecutors.

7           MR. COHEN:  Now can I bring the document up?

8           THE COURT:  Yes.

9    Q.  Read that paragraph to yourself.  The question is, yes, no,

10   whether it refreshes your recollection.

11   A.  Yeah, it does refresh my recollection.

12   Q.  What is your recollection, Ms. Ellison?

13   A.  Yeah.

14          MS. SASSOON:  Can we take the document down, your

15   Honor?

16          THE COURT:  Yes.

17   A.  Yeah.  I recall -- I think I recall saying that it seemed

18   like he might not know that this was happening, something like

19   that.

20   Q.  I want to move forward --

21          MS. SASSOON:  Your Honor, just because of the

22   vagueness of the question.

23          MR. COHEN:  Can we have nonspeaking objections please,

24   your Honor.

25          MS. SASSOON:  This objection --

1    THE COURT:  Is everybody prepared to take the pledge

2    on that on both sides?

3    MR. COHEN:  I am, and I did.

4    MS. SASSOON:  This is a difficult one to not explain.

5    THE COURT:  Sidebar.

6    MS. SASSOON:  This doesn't warrant a sidebar, your

7    Honor.  I don't want to waste time.

8    THE COURT:  The objection is withdrawn.

9    MS. SASSOON:  Yes.

10   Q.  Let's move to a new topic, Ms. Ellison.

11   I am going to move forward to the summer of 2021.  Do

12   you recall yesterday giving testimony about interactions you

13   had with Sam about whether he ought to make a new venture

14   investment?

15   A.  Yes, I do.

16   MR. COHEN:  Can we please call up Government Exhibit

17   48B in evidence.

18   Q.  Do you recall seeing this document yesterday, Ms. Ellison?

19   A.  Yes, I do.

20   Q.  Just to orient us and the jury, can you describe what this

21   was.

22   A.  This document generally was a document of personal notes

23   and to-do lists that I kept.

24   Q.  This was in connection with the issue of whether to make

25   the additional venture investment?

1    A.   I don't think I recall whether these notes were in

2    connection with that.

3    Q.   Do you recall that Sam asked you to do an analysis in

4    connection with the venture investment?

5    A.   Yeah.

6    Q.   Was this analysis at all referenced in 48B?

7    A.   I don't remember if this is the same -- part of the same

8    conversation about the investments or if this was a separate

9    conversation about a similar scenario.

10   Q.   We used yesterday the phrase, the 10th percentile scenario.

11   Maybe I misheard.   Was that in connection with the venture

12   investment?

13   A.   I don't recall if these notes were in connection with the

14   conversation specifically about venture investments, but there

15   were similar notes in the other document we looked at that I do

16   recall being in connection with a conversation about venture

17   investments.

18   Q.   I don't have many more questions on this, but was this

19   something, notes you made, after interactions with Sam?

20   A.   Yeah.   I believe this was a message that Sam sent that I

21   copied and pasted into this document.

22   Q.   It set forth assumptions you should make for your analysis.

23   A.   Yes, that's right.

24   Q.   Item 1:   Most of crypto down 50 percent, correct?

25   A.   Yeah.

1  Q.  In your time as a trader and CEO of Alameda, had crypto

2  gone down 50 percent?

3  A.  Yeah, it did.

4  Q.  When was the last time it had done that?

5  A.  I think the last time was in 2022.

6  Q.  Other than 2022.  Fair point.

7  A.  Before that, maybe March of 2020.

8  Q.  Item 4 says:  Stocks down 25 percent, and I think you

9  testified that referred to the general stock market?

10 A.  Yeah, that's right.

11 Q.  And growth tech stocks down 50 percent.  What do you mean

12 by growth tech?

13 A.  I think Sam was the one who wrote this.

14 Q.  What was your understanding?

15 A.  My understanding was, this was more volatile technology

16 stocks.

17 Q.  So the assumption here was that they would go down by 50

18 percent.

19 A.  Yes, that's right.

20 Q.  And on item 2, and that's my last question on this, the

21 assumption was that the venture investment would go all the way

22 down 100 percent?

23 A.  Yes.

24        MR. COHEN:  You can take that exhibit down.

25 Q.  Mr. Bankman-Fried asked you to do various risk-analysis

1   scenarios with respect to the venture investment, correct?

2   A.  That's right.

3   Q.  Did you think it was an appropriate thing for him to ask

4   you to do that?

5   A.  Yeah.

6   Q.  Why?

7   A.  Because I was a trader at the time, so talking to me about

8   trading issues seemed appropriate.

9       MR. COHEN:  Let's take a look at Government Exhibit 36

10  in evidence.

11      If we can call out the middle page, main question.

12      Brian, it's column F.  F and G together.

13  Q.  Ms. Ellison, can you just remind us again what you were

14  doing in that spreadsheet.

15      Let me back up.  This was a spreadsheet that you

16  created?

17  A.  Yes, that's right.

18  Q.  This was part of the analysis you were doing of the risk of

19  making a venture investment?

20  A.  Yes.

21  Q.  What did that refer to, those questions?

22  A.  Those questions were questions that I had for Sam that I

23  was trying to analyze about ways to potentially reduce the risk

24  of these venture investments.

25  Q.  So there are different things that you could do to reduce

1    the risk?

2    A.  That's right.

3    Q.  Raise more equity, sell more FTT, and so on, correct?

4    A.  That's right.

5         MR. COHEN:  Brian, if we could look at column A, line

6    2, just line 2, and go all the way across.

7    Q.  You see an entry, raised at 18B with FTT 24 dash and

8    greater than sign.  Now it's 52.

9         Can we have a translation, Ms. Ellison.

10   A.  Yes.  That means that FTX raised equity at a valuation of

11   $18 billion when FTT was at a price of $24, and then at the

12   time I was making the spreadsheet FTT had gone up to a price of

13   $52.

14   Q.  What does it mean to raise equity at a price of $18

15   billion?

16   A.  That means that FTX had sold stock in the company at a

17   price that meant that the sort of price of the entire company's

18   stock would be $18 billion.

19   Q.  So in valuing the offering to investors, the company was

20   valued at $18 billion?

21   A.  That's right.

22        MR. COHEN:  We can take that one down.

23        Can we call up DX-48 only for identification for the

24   witness.

25        Your Honor, it's tab 37 in your binder.

1    THE COURT:  Thank you.

2    Q.  Ms. Ellison, do you recognize this document?

3    A.  Yes.  This is a spreadsheet that I made.

4    Q.  What was your purpose in making it?

5    A.  This was as part of discussions with Sam about whether we

6    should hedge more, that is, sell either Bitcoin or NASDAQ

7    futures in order to reduce Alameda's risk.

8    Q.  And was this the sort of spreadsheet you would prepare in

9    the course of your duties at Alameda?

10   A.  Yeah.

11   Q.  Was it your regular practice to do so?

12   A.  No, I wouldn't say it was a regular practice.  This was

13   sort of a special circumstance of a time period when we were

14   discussing hedging a lot.

15   Q.  So this was only something you did once?

16   A.  I think I made a few spreadsheets around this time to

17   analyze the question of how much we should hedge.

18   Q.  How many did you make?

19   A.  Two or three that I can recall.

20        MR. COHEN:  Let's take it down so the witness can't

21   see it.

22        You may bring it back up in a moment.

23   Q.  Do you recall ever doing an analysis of the costs of not

24   hedging?

25   A.  Yeah.

1    Q.  Can you tell us what that analysis was.

2    A.  I recall doing such analyses.  One example is the

3    spreadsheet that we were just looking at earlier from 2021,

4    where one of the questions is whether -- what the various ways

5    to reduce risk are.

6    Q.  Do you recall ever trying to do a calculation -- one

7    second.

8           We are going to stay in 2021, but just for this

9    question let me move to September 2022, Ms. Ellison.

10          Do you ever recall trying to do a calculation of what

11   the costs would be of not hedging in Alameda?

12   A.  Yes, I do.

13   Q.  What do you remember about that?

14   A.  I remember that my calculation ended up suggesting that we

15   should sell several billion dollars to hedge, but it was fairly

16   sensitive to various parameters and there were a lot of things

17   I was uncertain about.

18   Q.  In connection with that analysis, did you ever look at what

19   the probability per month would be of Alameda suffering losses

20   depending on what happened to its NAV?

21   A.  Yes, I think I did.

22   Q.  What do you remember about that?

23   A.  I think I recall looking at historical crypto volatility to

24   determine the probability of some sort of specific down move

25   per month and then comparing that to Alameda's overall crypto

1    position in various scenarios, whether we hedged or not.

2    Q.  Did you consider what might happen in that scenario to the

3    NAV if Alameda lost $5 billion?

4    A.  I don't remember if that was one of the specific scenarios.

5    Q.  Did you consider what would happen if Alameda lost $10

6    billion?

7    A.  I don't remember.

8    Q.  Let's move to 2022, Ms. Ellison.

9    A.  OK.

10             THE COURT:  I thought we were just in September 2022.

11             MR. COHEN:  We were back and forth, but here we are.

12   Q.  I think you told us yesterday that in about May something

13   called UST fell below a dollar.

14             Do you recall that?

15   A.  I don't recall mentioning that.

16   Q.  Do you recall giving testimony about Terra and Luna

17   yesterday?

18   A.  Yes.  I recall mentioning that the coin Luna went down a

19   lot in May of 2022.

20   Q.  Did you ever hear of the term -- of the token UST?

21   A.  Yes.

22   Q.  What was that?

23   A.  It was an algorithmic stablecoin that was related to Luna.

24   Q.  When Luna went down, did it also fall?

25   A.  Yes, it did.

1    Q.  Did Alameda own UST?

2    A.  Yes, we did.

3    Q.  And it owned it before it went down in price, correct?

4    A.  That's right.

5    Q.  Did Alameda end up taking a loss on the UST?

6    A.  Yes, we did.

7    Q.  How much?

8    A.  I think it was ballpark of $100 million.

9    Q.  What was your understanding of why Alameda took that loss?

10   A.  I'm sorry.  I don't know what you mean.

11   Q.  Well, as the CEO of Alameda, did you have occasion to

12   review what had happened in connection with the UST investment?

13   A.  Yes, I did.

14   Q.  What did you conclude?

15   A.  I concluded that it had been a bad idea, a mistake at the

16   time to own UST.

17   Q.  Did you look at whether or not Alameda should have sold it

18   at any point in time?

19   A.  Yes.  After the fact I came to believe that Alameda should

20   have sold it.  Maybe that's an easy thing to say in retrospect.

21   Q.  It's always easier in hindsight.

22         MS. SASSOON:  Your Honor, we move to strike that.

23         THE COURT:  Strike Mr. Cohen's remark, however true it

24   may be.

25         MR. COHEN:  At least something I said.

1       I lost my place.  Hold on.

2       Can we call up Government Exhibit 25B in evidence.

3  Q.  I think you testified yesterday that 25B were some of your

4  notes that you made about Alameda, correct?

5  A.  Yes, that's right.

6  Q.  And the first page we are looking at listed work

7  priorities.

8  A.  Um-hum.

9  Q.  Do you recall approximately when these notes were from?

10  A.  Yeah.  Sorry.  Could you zoom out?

11      Yeah.  I think this is from the fall of 2022.

12  Q.  Could it have been August of 2022?

13  A.  Yeah, it might have been August.

14  Q.  At the top you listed work priorities, correct?

15  A.  That's right.

16  Q.  What did that refer to?

17  A.  That referred to things I thought were important in my job.

18  Q.  The first item you listed was hedging getting more capital.

19      Do you see that?

20  A.  Yes.

21  Q.  What did that refer to?

22  A.  So hedging referred to ways to reduce Alameda's risk by

23  selling assets that were correlated with Alameda's portfolio,

24  and getting more capital referred to ways to raise more money,

25  whether it was by getting loans or selling equity for FTX.

1  Q.  And this is from, we will call it, August, September of

2  2022, correct?

3  A.  Yes, I believe so.

4  Q.  Prior to that time, in the period of 2022 and before that,

5  had Alameda hedged against the crypto market?

6  A.  We had hedged some.

7  Q.  Do you recall having a discussion with Sam about your

8  hedging prior to August, September?

9  A.  Yeah.  I recall having various discussions with him about

10  hedging over time.

11  Q.  And what was the discussion?

12         MS. SASSOON:  Objection, form.  She said various

13  discussions over time.

14         THE COURT:  Sustained as to form.

15         MR. COHEN:  Let me break it down.

16  Q.  I want to focus on discussions on hedging in the period

17  from, let's call it, January 2022 to the date of this document.

18  A.  Yes.  Sorry.  What about them?

19  Q.  You said you had a number of conversations with him about

20  hedging.  Were any in that time period?

21  A.  Yes.

22  Q.  How many?

23  A.  I don't remember.

24  Q.  What was the gist of those conversations?

25  A.  Earlier in the year we had some conversations about whether

1    Alameda should hedge our positions more.  Sam suggested that we

2    might want to sell stocks or more specifically NASDAQ futures

3    to hedge our long exposure, and I was more skeptical of that

4    idea, and we didn't end up doing anything.  Then later in the

5    year we had more conversations and started to sell more NASDAQ

6    futures.

7    Q.  Just for everyone's benefit, what is a long exposure?

8    A.  That means that we owned a lot of cryptocurrency.  So if

9    the crypto market went down, we would lose a lot of money.

10   Q.  One way to try to offset that might be to buy hedges.

11   A.  Yeah.  I guess to put on hedges.  In this case we were

12   selling instruments.

13   Q.  Do you recall ever speaking with Sam and Gary together

14   about hedging in that period?  By speaking, I mean in a chat.

15          THE COURT:  Which period are we talking about?

16          MR. COHEN:  From January to August 2022.

17   A.  Nothing comes to mind.

18   Q.  Now, is it fair to say that, starting in September, you did

19   put on some hedges with respect to the crypto market moving

20   down?

21   A.  In September, we put on several billion dollars of hedges

22   in NASDAQ futures.

23   Q.  Did you also put on hedges in Bitcoin?

24   A.  Yes, we did sell some amount of Bitcoin and I think

25   Ethereum, those smaller amounts.

1    Q.  Let me move to a new topic, Ms. Ellison.

2         I believe you testified, I think it was yesterday,

3    about the period in June of 2022.  I think you said it was June

4    13 when you learned about a bug relating to the fiat@ account.

5         Do you recall that?

6    A.  I don't think I said it was on June 13 that I learned about

7    this bug.  My recollection is that I learned about it earlier,

8    maybe in May, but June 13 I was aware of the bug.

9    Q.  Fair enough.  OK.

10        MR. COHEN:  Can we call up GX-64, please.

11   Q.  Just to remind everyone, what is GX-64, Ms. Ellison?

12   A.  This was one of the update documents that I would write

13   about Alameda and send to Sam.

14        MR. COHEN:  Can we go, Brian, to the bottom of the

15   page, the last paragraph.  Can we call that out, pull that up.

16   Q.  It says:  A lot of expensive trading bugs.

17        Do you see that, Ms. Ellison?

18   A.  Yes, I do.

19   Q.  Then there is I think about -- you don't have to highlight

20   them, Brian, but my count, eight different examples.

21        Do you see that?

22   A.  Yes.  I agree.

23   Q.  What does that relate to?

24   A.  Those were various bugs that caused Alameda to lose money

25   around the end of 2021.

1    Q.  So these were different bugs in the system?

2    A.  Yes, that's right.

3    Q.  And going to the next page, I meant to show it to you, I

4    apologize, so we can be complete.

5            MR. COHEN:  Go to the very top, Brian, the first two

6    bullet points.

7    Q.  The first entry says:  Commonalities in trading bugs.

8            Do you see that?

9    A.  Yes.

10   Q.  What did that refer to?

11   A.  Those referred to what I saw was common factors in how

12   these bugs were able to happen.

13   Q.  So there had been at least eight bugs and it related to not

14   having enough trading coverage, for example?

15   A.  Yeah.  The common factors that I saw were not having enough

16   traders on and having recently hired a lot of new people who

17   were making mistakes as they were still learning our systems.

18   Q.  Going to the next bullet point, fixes, were these your

19   ideas on how to try to keep these bugs from happening?

20   A.  Yeah.  These were ideas that I and others had.

21          MR. COHEN:  While we are on this document, we might as

22   well not to put it back up again.

23          Can you go, Brian, to the second-to-last page.

24          Brian, call out the paragraph called limiting factors

25   in scaling.

NCASE 1:22-cr-00673-LAK   Document 362   Filed 12/12/23   Page 97 of 207   1059

1   Q.   Take a moment and look at that for a minute, Ms. Ellison.

2   That way, we won't have to come back to it.

3   A.   Um-hum.

4   Q.   What did you mean by the phrase limited factors in scaling?

5   A.   By limiting factors in scaling, I meant those were things

6   that were preventing Alameda from doing as well and making as

7   much money as we could.

8   Q.   The first one you put down was called management and

9   vision.

10          You see that?

11  A.   Yes.

12  Q.   What do those entries refer to?

13  A.   In that I was saying I thought the biggest factor was that

14  Trabucco and I weren't as good managers or leaders as we could

15  be, and we weren't pushing other -- pushing employees to make

16  new things or do better in the way that I wished we were.

17  Q.   Then the next item was about the pros and cons of being in

18  different locations, is that correct?

19  A.   Yes, that's right.

20  Q.   The last item was your thoughts on the trading team.

21  A.   Yes, that's right.

22          MR. COHEN:   We can take that down.

23  Q.   Now, coming back to the bug we have been discussing from

24  June 2022, how did you first learn about it?

25  A.   I learned about it in a meeting with Sam, Gary, and Nishad.

1    This was an in-person meeting in the Alameda Bahamas office.

2    We came into this meeting to discuss Alameda's capital

3    situation because at the time I believed Alameda's NAV to be

4    negative or at least close to negative, that we were insolvent,

5    and I wanted to discuss what to do about the situation, whether

6    we would need to declare bankruptcy.  But Gary came into this

7    meeting and said, oh, by the way, there is a bug in Alameda's

8    fiat liability, so your NAV numbers are actually off by several

9    billion dollars.

10   Q.  When did you first become concerned that Alameda might be

11   insolvent?

12   A.  I think this was in around May of 2022, when the crypto

13   market was going down.

14   Q.  Is this what led to meeting with Gary, Sam, and Nishad?

15   A.  Yes, that's right.

16   Q.  Now, during this period in June, did you have other

17   meetings with just Gary and Nishad?

18               MS. SASSOON:  Your Honor, objection to this period in

19   June.

20   Q.  We will just say June.

21   A.  None that come to mind.

22   Q.  Did you have any Signal or other Slack communications with

23   Gary and Nishad about the bug?

24   A.  Yeah.  I think we had some Signal communications in the

25   chat that we shared with Sam.

1    Q.  I'm asking now, ma'am, a different question, whether you

2    had Signal or Slack communications with Gary and Nishad that

3    Sam was not on.

4    A.  Not that I recall.

5    Q.  You don't recall that.

6    A.  No.

7    Q.  Now, you just told us that Gary took a look at this and

8    concluded that there had been a bug in the system, correct?

9              MS. SASSOON:  Objection, form.

10             THE COURT:  Sustained.

11   Q.  Go over what Gary told you.

12   A.  He said that he had found a bug in the calculation of

13   Alameda's fiat liabilities.  That meant that our current

14   numbers were off by several billion dollars.

15   Q.  And when the account was adjusted for the impact of the

16   bug, did that have an impact on whether or not Alameda was

17   solvent, in your view?

18   A.  It made our NAV significantly positive.

19   Q.  The NAV was significantly positive; it wasn't solvent?

20   A.  I think that depends on market conditions and whether we

21   could realistically sell our assets.

22   Q.  What was your reaction when Gary told you this?

23   A.  At first, I was a bit skeptical and confused about how such

24   a large bug could have happened and no one had noticed or

25   caught it before now.  But once I became convinced that it was

 1    real, I was quite relieved.

 2    Q.  So you had not known about the bug previous to this

 3    sequence you just told us about?

 4    A.  That's right.

 5    Q.  I think you told us one of your concerns -- withdrawn.  Let

 6    me start again.

 7          After the bug was discovered, what happened in terms

 8    of going forward?

 9    A.  There was a period of time where we were aware of the bug,

10    but it hadn't been fixed yet, so I tried to adjust for it in my

11    balance sheet calculations, and then eventually the bug was

12    fixed.

13    Q.  What about the accounting in relation to the bug, what

14    happened to that?

15    A.  Can you specify what you mean by that?

16    Q.  Sure.  After the bug was discovered, there had to be

17    another reconciliation of the fiat@ account, correct?

18    A.  Yes, that's right.

19    Q.  To your knowledge, did that happen?

20    A.  Yes, it did.

21    Q.  Do you know when that happened?

22    A.  No.

23    Q.  Moving to a period after the bug, did you ever come to a

24    view about whether the accounting for the fiat bug was in a

25    better situation than it had been before?

1    A.   Yes.   After the bug had been fixed, I believe that our

2    accounting was in a better situation.

3            MR. COHEN:   Your Honor, I am about to start another

4    topic.   This might be a good time for our lunch break.

5            THE COURT:   OK.   We will come back at 20 minutes to 2,

6    please.

7            (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                              1:44 p.m.

 3               (In open court; jury present)

 4          THE COURT:  Okay.  The defendant and the jurors all

 5   are present, as they have been throughout.

 6          THE DEPUTY CLERK:  Please be seated.

 7          THE COURT:  You may continue, Mr. Cohen.

 8          MR. COHEN:  Thank you, your Honor.

 9   CROSS-EXAMINATION CONTINUED

10   BY MR. COHEN:

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  I want to move to another topic, Ms. Ellison.

14               Yesterday you testified about a period, I believe you

15   said it was beginning in June, when you became concerned that

16   lenders might recall their loans.  Do you recall that?

17   A.  Yes, that's right.

18   Q.  And I believe you testified that one of the things you

19   started to do was to create balance sheets in which you made

20   calculations as to Alameda's assets.  Do you recall that?

21   A.  I mean, it was part of my practice to create balance sheets

22   before that, but I created more than usual in June.

23   Q.  And one of your concerns as you were doing this was,

24   according to your calculations, Alameda did not have enough

25   liquid assets to repay all its lenders, correct?
```

1   A.  Yes, that's right.

2   Q.  Okay.  And in that analysis did you take into account

3   Alameda's illiquid assets?

4   A.  I——I put those on the balance sheet as well.

5   Q.  And did you take a view about how long it would take to

6   sell those assets?

7   A.  Yeah, I had the view that it would take certainly longer to

8   sell the assets than, you know, the few days in which we had to

9   repay loans once they were recalled.

10  Q.  Okay.  Now I think——well, let me ask it this way.  When

11  did——to your memory, ma'am, when did the lenders first recall

12  the loans?

13  A.  The first ones that I recall were around the beginning or

14  middle of June.

15  Q.  And is it fair to say that those recalls continued through

16  July and August?

17  A.  Yes, I believe there continued to be some in July and

18  August.

19  Q.  Okay.  In your memory what was the whole period of the

20  recalls?

21  A.  I——well, there were further recalls in November as well.

22  Q.  Okay.  We'll get to those, but prior to November.

23  A.  I don't remember when the last recall was prior to

24  November.

25  Q.  Okay.  And I believe you testified that ultimately——well,

1   rephrase.

2          You testified that the loans were repaid by drawing on

3   the Alameda line of credit, correct?

4   A.  Yes, I did.

5   Q.  Okay.  Now is it fair to say that when Alameda drew on its

6   line of credit, the amount of the borrowing on the line of

7   credit would go up?

8   A.  Yes, that's right.

9   Q.  Okay.  How many——how much was repaid in the loans during

10  this June, July, August period?

11  A.  I think it was in the range of 5 to $10 billion.

12  Q.  And that would be reflected in a 5 to $10 billion increase

13  in the line of credit?

14  A.  No.  I think I testified that drawing on the line of credit

15  was one of the ways in which Alameda repaid its lenders, but we

16  also used other liquid assets as well.

17  Q.  And do you recall the amount of the loans that were

18  recalled just in the June period?

19  A.  I think maybe ballpark of $5 billion.

20  Q.  In June.  It wasn't less than that.

21  A.  I'm not sure if it was less than that.

22  Q.  Okay.  Now one thing that was happening, if I understand

23  this correctly, was the value of cryptocurrencies was going

24  down, correct?

25  A.  Yes, that's right.

1    Q.  And a lot of the loans were in cryptocurrencies, correct?

2    A.  Yes, that's right.

3    Q.  Did that have an impact on the value of the loans?

4    A.  Yes, it caused the value of the loans to go down somewhat,

5    though a lot of the loans were in US dollars as well.

6    Q.  So, but if Alameda had a loan in cryptocurrency and the

7    value of that cryptocurrency went down, then the value of the

8    loan would go down.

9    A.  That's correct.

10   Q.  Okay.  Now in your experience as the CEO of Alameda, have

11   you ever heard of the term rolling over a loan?

12   A.  Yeah.  That referred to, when the term of a loan ended,

13   taking out a new loan with similar terms.

14   Q.  Were some of the loans you've just been talking about in

15   fact rolled over?

16   A.  I don't specifically remember rolling over any loans during

17   this time period.  I do remember there were I think a few loans

18   for small size, like new loans, that we did get in the summer

19   and fall of 2022.

20   Q.  So you don't remember one way or the other whether any of

21   the existing loans were rolled over.

22   A.  That's right.

23   Q.  Okay.  And the loans that we're talking about from the

24   June, July period, those were repaid, correct?

25   A.  Yes, that's right.

1    Q.  Okay.  In your experience in Alameda as the CEO, did you

2    ever—withdrawn.

3         Did you ever have occasion to renegotiate a loan?

4    A.  Yes, we did sometimes.

5    Q.  What does that mean?

6    A.  That means to ask for different terms on the loan.

7    Q.  For example, putting out the date that the loan might be

8    due?

9    A.  Yeah, or asking for a different interest rate or something

10   like that.

11   Q.  Okay.  Fair enough.

12        Now you didn't do that with respect to the loans in

13   June that we've been talking about, June and July.

14   A.  I don't recall doing that, no.

15   Q.  Now you gave testimony yesterday about an exchange you'd

16   had with Matt Ballensweig of Genesis.  Do you recall that?

17   A.  Yup.

18        MR. COHEN:  Okay.  If we could pull up Government

19   Exhibit 1649, please.

20   Q.  And that's the chain where you were having a discussion

21   with Mr. Ballensweig about recalling—about Genesis recalling

22   the loan.

23   A.  This looks like our discussion about us sending a balance

24   sheet to Genesis.

25   Q.  Fair enough.  I was thinking of the one before that.

1        So this is on June 18th; is that correct?

2   A.  That's right.

3   Q.  Okay.  And Mr. Ballensweig is asking you for a balance

4   sheet, correct?

5   A.  Yes, he is.

6        MR. COHEN:  Okay.  If we could go to the second page,

7   Brian.

8   Q.  Okay.  If you look at the last entry, Mr. Ballensweig says,

9   "basic works—really trying to get a sense of overall equity

10  and liquid capital (non locked)."  What did you understand that

11  to refer to?

12  A.  Overall equity refers to the net asset value of Alameda;

13  liquid capital refers to their liquid assets, things that could

14  be sold easily; and by basic works, I understood him to mean

15  that he didn't need me to put anything together that was formal

16  or took a lot of effort and he would prefer to get it faster.

17  Q.  Faster, more informal.

18  A.  Yes, that's right.

19  Q.  About overall equity and liquid capital.

20  A.  Yeah.

21       MR. COHEN:  Okay.  Now can we pull up Government

22  Exhibit 44, please.

23  Q.  Okay.  Now I promise you we're not going to go through this

24  whole thing again, but I just want to understand something.

25       You testified yesterday that this was a spreadsheet

1    that you shared with Mr. Bankman-Fried; is that correct?

2    A.  Yes, I did.

3    Q.  Okay.  And again, what was your reason for sharing it with

4    him?

5    A.  He suggested that I should put together some alternative

6    presentations of our balance sheet and run them by him.

7    Q.  And as I understand it, these are seven different versions

8    of the balance sheet?

9    A.  Yes, or maybe eight, including the main tab.

10   Q.  Right.  Because main would be its own, right?

11   A.  Mm-hmm.

12   Q.  Okay.  Which was the one you ended up sending to

13   Mr. Ballensweig?

14   A.  Alt 7.

15   Q.  Now did you discuss——

16          THE COURT:  Just so the record is clear, I want to

17   make sure the reporter got Alt, A-L-T, as opposed to all,

18   A-L-L.

19          MR. COHEN:  Thank you, your Honor.

20          THE COURT:  Thanks.

21   Q.  Did you discuss each of these balance sheets with

22   Mr. Bankman-Fried?

23   A.  I don't remember if I discussed all of them with him.  I

24   know we discussed at least some.

25   Q.  You don't remember whether you discussed the pros and cons

1    of each of them with him.

2    A.   I don't remember if we discussed the pros and cons of each

3    one, just that we discussed the pros and cons of some.

4    Q.   Now you told us yesterday that one of the distinguishing

5    factors was that some versions had a category called Exchange

6    Borrows.

7              MR. COHEN:   If we could call up——are we on Alt 7?

8    Excuse me.   Not on Alt 7, Alt——I believe it's Alt 1.

9              Right.

10   Q.   Okay.   And I believe you told us that referred to borrows

11   that Alameda had made from the FTX exchange.

12   A.   That's right.

13   Q.   Okay.   This was——by the way, this was a balance sheet that

14   you——series of balance sheets that you sent to

15   Mr. Bankman-Fried.

16   A.   That's right.

17   Q.   Just the two of you had access to them?

18   A.   Yes.

19   Q.   Just the two of you spoke about them.

20   A.   Yes, that's right.

21   Q.   But you told us you felt the need to put them into a code

22   by using the phrase "Exchange Borrows"; is that correct?

23   A.   Yeah.   I mean, I wouldn't consider "Exchange Borrows" that

24   much of a code, but it's a little more——a little less direct

25   than saying "FTX Borrows."

 1  Q.  But not really——

 2            MS. SASSOON:  I would ask that the witness be allowed

 3  to finish her answer.

 4            THE COURT:  Had you finished?

 5            THE WITNESS:  Yes, I think I've finished now.

 6  Q.  And on Alt 1, the other provision that you spent some time

 7  about was under——row 14, Brian——related-party loans.

 8  A.  Mm-hmm.

 9  Q.  And that, I believe——you'll tell me if I'm wrong——related

10  to the loans that had been made to Mr. Bankman-Fried and Gary

11  and so forth, correct?

12  A.  That's right.

13  Q.  These were loans made by Alameda to the founders and other

14  individuals.

15  A.  And other entities, yes.

16  Q.  Okay.  Now your concern about Alt 7 and some of the other

17  balance sheets was that it didn't include exchange borrows and

18  related-party loans.

19  A.  Yes, that's right.

20  Q.  Okay.  Because in fact, the NAV was the same on all of

21  them.

22  A.  That's right.

23  Q.  So the overall equity shown was the same.

24  A.  Yes, that's right.

25  Q.  And I believe you told us one of your concerns about the

1   exchange borrows was that these reflected loans from the FTX

2   exchange that might themselves be in illiquid assets; is that

3   correct?

4   A.  No, I don't recall that.

5   Q.  Let me rephrase.  I'm sorry.  I didn't mean to cut you off.

6   Finish your answer.

7   A.  Sorry.  I just said, "No, I don't recall that."  Yeah,

8   rephrasing would be helpful.

9   Q.  Then let me rephrase.

10          What were your concerns about the exchange borrows

11  category?

12  A.  My concerns were (1) that it reflected that Alameda had a

13  high level of risk because these were funds that FTX customers

14  could withdraw at any time and Alameda would need to repay the

15  assets to FTX; and (2) that it reflected poorly on FTX and

16  would make FTX customers concerned about the safety of putting

17  their funds on FTX.

18  Q.  And was part of the level of risk you were considering that

19  the assets──some of them, anyway──had been put in illiquid

20  investments?

21  A.  Yes, that's right, that the assets Alameda had borrowed had

22  been invested in illiquid investments.

23  Q.  And would it have been a factor in your analysis if some of

24  those had instead been put into things like Bitcoin?

25  A.  Yeah.

1    Q.  Now just to complete that, Bitcoin being a more liquid

2    cryptocurrency?

3              MS. SASSOON:  Objection, 401, 403.

4              THE COURT:  Overruled.

5              MR. COHEN:  I'll move on, your Honor.

6    Q.  Now the concern you had——let me just do it this way.

7              What was your concern about the related-party loans?

8    A.  My concerns were that they had been invested in illiquid

9    assets, meaning that they weren't loans that Alameda could get

10   back easily, and that it——the fact that the number was so large

11   might make it look to lenders as if Alameda was giving or

12   funneling money to FTX executives.

13   Q.  And again, one factor that you would have considered would

14   be if they were not in illiquid investments, correct?

15   A.  Yes, that's right.

16   Q.  Okay.  And so your concern was not about the total NAV,

17   correct?

18   A.  That's right.

19             MR. COHEN:  All right.  We can take that one down.

20   Q.  After the June and July loans were paid back, we came into

21   August.  I believe you told us earlier today that you would do

22   midyear reviews of Alameda; is that correct?

23   A.  Yes, we had a twice-a-year review process.

24   Q.  And did you do one in August of 2022?  Excuse me.  July,

25   August?

1  A.  What do you mean exactly by did I do one?

2  Q.  Let me rephrase.

3       Do you recall preparing an Alameda 2022 overview in

4  July of 2022?

5  A.  I recall writing a Google Doc around that time to share

6  with Alameda employees about what had been going on in Alameda,

7  if that's what you're referring to.

8  Q.  Okay.  I think it is.

9       Okay.  Now what was your view as of that period as to

10 how Alameda had done so far during the year?

11 A.  I thought it had done very badly and was now in a very bad

12 position.  I thought that we had lost billions of dollars on

13 our positions and that we had borrowed money from FTX customers

14 that we were currently unable to pay back.

15 Q.  Isn't it fair to say that you indicated in that document

16 you thought Alameda had executed really well in 2022?

17      MS. SASSOON:  Objection, form.

18      THE COURT:  No, I'll allow the question.

19 A.  Yeah, I recall giving a much more positive take in that

20 document than my true opinion of how Alameda was doing.  It was

21 a—a document that was written for Alameda employees and so

22 partly I wanted to help keep their morale up, partly I did

23 think that Alameda employees had executed well over the past

24 six months and that the problems in Alameda were coming from

25 the management decision-making level.

1    Q.  Was your purpose to keep their morale up?

2    A.  That was one of my purposes.

3    Q.  Were you also misleading them?

4    A.  Yeah, I'd say I was misleading them about my true feelings

5    about the state of Alameda in this document.

6           MR. COHEN:  Can we call up GX 25, please.

7           MS. SASSOON:  I just want to clarify because this is

8    not in evidence.

9           THE COURT:  What's to clarify?

10          MS. SASSOON:  That it's being pulled up only for the

11   witness.

12          THE COURT:  Yes.  Thank you.

13          MR. COHEN:  I'm sorry.  Can we instead pull up 25B,

14   Government Exhibit.

15          Brian, can you—well, before we get to the pages. . .

16   BY MR. COHEN:

17   Q.  Again, this was one of the Google Docs you prepared about

18   Alameda's business, correct?

19   A.  Yes, this was a part of one of my personal to-do list

20   documents.

21   Q.  Okay.  And I believe you said this was prepared around

22   August of 2022; is that correct?

23   A.  Yes, I said August or fall.

24          MR. COHEN:  Okay.  Can we now go to the last page,

25   please.

1        And right above the blackout portion, can you pull

2   that up, Brian.  Thank you.

3   Q.  You told us yesterday you made a list about things Sam is

4   freaking out about.  This was in August or fall of 2022.  The

5   first entry was hedging; is that correct?

6   A.  That's right.

7   Q.  And does that relate to the conversation we had earlier

8   before the break about hedging?

9   A.  Yes, that's right.

10  Q.  Okay.  There is also——if you look down five bullets,

11  there's something called "Raising from MBS."  Do you see that?

12  A.  Yes.

13  Q.  What did that refer to?

14  A.  That referred to selling FTX equity to Mohammed bin Salman,

15  a Saudi prince, to raise money.

16  Q.  Do you know if Mr. Bankman-Fried had been planning to go to

17  the Middle East?

18  A.  Yes, I did.

19  Q.  Okay.  What did you know about that?

20  A.  He told me that he went to the Middle East and tried to

21  raise funds there, but it didn't sound like he had had success.

22  He also told me that he wanted to——he had met some people from

23  Telegram there and wanted to make a large investment in

24  Telegram.

25  Q.  Let me back up.  Did the topic of Mr. Bankman-Fried

1    attending an investors conference in the Middle East ever come

2    up?

3    A.   I don't recall hearing specifically about an investors

4    conference.

5    Q.   Okay.  Now if you look at the two bullet points below that,

6    there's something called Alameda/Modulo relationship.  Do you

7    see that?

8    A.   Yeah, Alameda/Modulo relationship.

9    Q.   Modulo.  Excuse me.  What does that relate to, Ms. Ellison?

10   A.   That relates to the hedge fund called Modulo that Alameda

11   had invested in and Sam had said on a few occasions and written

12   Google Docs that he thought we should——Alameda should do a

13   better job of working together with Modulo.

14   Q.   Okay.  And Modulo was a trading firm?

15   A.   Yes, that's right.

16   Q.   It was similar in structure to Alameda?

17   A.   I don't know if I would say it was that similar.  It had a

18   hedge fund structure as opposed to Alameda's proprietary

19   trading firm structure.  And it was much smaller; it only had

20   about four people.

21   Q.   Did you view Modulo as a competitor to Alameda?

22   A.   Yeah, I did, in some ways.

23   Q.   What ways?

24   A.   I think there was some level of competition over hiring.  I

25   also thought there might be some amount of competition over

1   trading.  I didn't really know how much because I didn't know

2   what types of trading strategies they were doing.

3   Q.  Was there also a concern that capital might be sent to

4   Modulo instead of Alameda?

5   A.  Yes, that's right.  That's another way in which they were

6   somewhat competitive.

7   Q.  Is it fair to say that you would prefer that Alameda

8   receive capital over Modulo?

9   A.  I mean, I thought that it made more sense to keep capital

10  in Alameda than invested in Modulo.

11  Q.  Who were the people who ran Modulo?

12  A.  Lily Zhang and Duncan Rheingans-Yoo.

13  Q.  And please answer this yes or no.  Did you have any

14  personal competition with them?

15  A.  Yeah.

16  Q.  And as between them, you wanted to succeed if it meant at

17  their expense, correct?

18  A.  Sorry.  Can you repeat the question.

19  Q.  If it came down to you succeeding—you meaning Alameda—at

20  their expense, you wanted to succeed, correct?

21  A.  I mean, I think it depends on how much it was to their

22  expense.  If it—if the question is would I rather have a

23  dollar in Alameda or in Modulo, I would prefer it to be in

24  Alameda.

25  Q.  Didn't part of you want to crush them?

 1   A.  Yeah.  I remember having feelings like that at some point.

 2           MR. COHEN:  We can take that down.

 3   Q.  Do you recall earlier today and yesterday we talked about

 4   venture investments?  Do you recall that?

 5   A.  That's right.

 6   Q.  And those were investments that Alameda had made in

 7   different kinds of ventures.

 8   A.  Yes, that's right.

 9   Q.  Okay.  Do you recall an investment in a company called

10   Robinhood?

11   A.  Yes, I do.

12   Q.  Okay.  How did that investment work, if you remember?

13   A.  Sam said that he thought Robinhood was a good value and

14   that he wanted Alameda to buy it.  We did buy many shares over

15   a period of time and eventually, before having to disclose

16   those purchases, transferred them to another entity in a

17   different name.

18   Q.  Okay.  So the shares were purchased by Alameda, correct?

19   A.  Yes, that's right.

20   Q.  But they were placed in a different entity.

21   A.  That's right.

22   Q.  Do you remember the name of that entity?

23   A.  I think it was Emergent Fidelity Technologies.

24   Q.  Okay.  And who controlled Emergent?

25   A.  Sam.

1  Q.  Okay.  Did you have a view about whether or not Emergent

2  would lend those shares to Alameda if it needed them?

3  A.  Yes, I thought it would.

4  Q.  Okay.  Did you have a view about whether Sam would lend or

5  provide other assets he owned to Alameda if necessary?

6          MS. SASSOON:  Objection.

7          THE COURT:  Sustained.

8  Q.  All right.  Let me move to——I might come back to that, but

9  let me move to another topic now.

10          Let me call your attention to the first week of

11  November 2022.  Okay?

12  A.  Mm-hmm.

13  Q.  Do you recall that on November 2nd, an article came out in

14  CoinDesk?

15  A.  Yes.

16  Q.  Do you recall you were shown parts of that article

17  yesterday?

18  A.  Yes.  Or actually——sorry——I don't recall being shown the

19  CoinDesk article yesterday, but——

20  Q.  Okay.  Your understanding, what was the article about, in

21  general?

22  A.  The article was about Alameda's balance sheet.

23  Q.  And somebody had leaked Alameda's balance sheet to

24  CoinDesk?

25  A.  That's right.

1    Q.  What was your response upon learning of that?

2    A.  I was concerned that this would cause negative market

3    sentiment about Alameda.  I considered whether to give a

4    comment for the article, but Sam, I, and others in a group chat

5    decided not to.

6    Q.  Now around the time this article came out, did you forward

7    certain balance sheets to Mr. Bankman-Fried?

8    A.  Yeah, I think I did.

9        MR. COHEN:  Okay.  Can we pull up Government

10   Exhibit 10, please.

11   Q.  Was this one of the balance sheets you forwarded to him

12   around the time of the CoinDesk article?

13       MS. SASSOON:  Objection to the time frame.

14       THE COURT:  Sustained.  Be more specific, please.

15   Q.  Do you remember, Ms. Ellison, when you forwarded this to

16   Mr. Bankman-Fried?

17   A.  I don't for certain.  There are other——I know there are a

18   few balance sheets around this time period that look similar.

19       MR. COHEN:  Let's pull up Government Exhibit 11 and

20   see if that helps you at all.

21   Q.  And looking at that, does that help you remember when you

22   forwarded it to Mr. Bankman-Fried?

23       THE COURT:  Sustained as to form.  Does looking at

24   this refresh her recollection as to when she forwarded exactly

25   what to the defendant?  This or the last one?

1          MR. COHEN:  This one, GX 11.

2          THE COURT:  Did you forward GX 11 to the defendant?

3          THE WITNESS:  I remember sharing it with him at some

4     point.

5          THE COURT:  Okay.  Now ask your question, please.

6     BY MR. COHEN:

7     Q.  To follow up on his Honor's question, does this refresh

8     your recollection about when you forwarded it to him?

9          MS. SASSOON:  Objection.

10    A.  No.

11         MS. SASSOON:  The witness hasn't said anything that

12    requires refreshing of her recollection.

13         MR. COHEN:  Can we have nonspeaking objections,

14    please.

15         MS. SASSOON:  Form.

16         THE COURT:  Sustained.

17    Q.  Now when the CoinDesk article first came out, do you

18    remember what your reaction was, Ms. Ellison?

19    A.  Yeah.  As I think I've said, I was—

20         MS. SASSOON:  Objection, your Honor.  This was asked

21    on direct, it's been asked on cross.

22         THE COURT:  It was asked just a couple of minutes ago.

23    Sustained.  Asked and answered.

24         MR. COHEN:  Okay.

25    Q.  Let's move forward to November 6th, okay?

 1   A.  Okay.

 2   Q.  All right.  Now I think you testified that you ended up

 3   putting up a tweet in response to the CoinDesk article,

 4   correct?

 5   A.  Yes, I did.

 6           MR. COHEN:  Can we look at GX 875.

 7   Q.  And this is the tweet that you put up?

 8   A.  Yes, it is.

 9   Q.  Okay.  I just want to go look at a couple pieces there.

10           At the bottom, it said that——the last line, Brian, the

11   last paragraph——"given the tightening in the crypto credit

12   space," and the next line.

13           "We've returned most of our loans by now."  By now

14   being November 6th.  Had Alameda returned most of its loans by

15   then?

16   A.  No.  We had returned most of our third-party loans, but to

17   do so we had taken out new loans from FTX.

18   Q.  So it had returned most of its third-party loans, correct?

19   A.  That's right.

20   Q.  Going up to the paragraph on top of that.

21           MR. COHEN:  If you could highlight that, Brian.

22   Q.  It says, "we obviously had hedges that aren't listed."

23   A.  Mm-hmm.

24   Q.  Did Alameda in fact have hedges that were not listed on the

25   balance sheet?

 1    A.  Yes, we did.

 2    Q.  Okay.  And going up to the very top, it says that "we have

 3    greater than $10 billion of assets that are not reflected

 4    there," there being the balance sheet.  In fact, did Alameda

 5    have greater than 10 billion not reflected on the balance

 6    sheet?

 7    A.  Alameda did not; Sam personally did.

 8    Q.  Okay.  And FTX did.

 9    A.  If you're considering FTX equity as an asset——

10    Q.  Yes.

11    A.  ——then yes, it——I mean, there was——Sam owned greater than

12    $10 billion of FTX equity.

13            MR. COHEN:  Okay.  We can take that down.

14    Q.  Now if we can move forward during the week, there came a

15    time that——well, let me back up.

16            Just to refresh everyone, who was CZ?

17    A.  The CEO of Binance.

18    Q.  And Binance was the largest crypto exchange?

19    A.  That's right.

20    Q.  Okay.  There came a time that he put up a tweet with regard

21    to FTT.  Do you recall that?

22    A.  Yes, I do.

23            MR. COHEN:  Can we pull up Government Exhibit 874,

24    please.

25    Q.  So in this exhibit, CZ is saying that Binance is planning

 1   to liquidate its remaining FTT; is that correct?

 2   A.  Uh-huh, yes, that's right.

 3   Q.  Okay.  And what was your reaction, or your response to

 4   that?

 5   A.  I was very concerned.  I thought that this would cause the

 6   price of FTT to go down a lot and cause a lot of increased

 7   worry about the safety of assets on FTX and likely cause a lot

 8   of customers to withdraw from FTX.

 9   Q.  Did you end up putting up a tweet responding to that?

10   A.  Yes, I did.

11       MR. COHEN:  Okay.  Can we put that one up.  Can we put

12   up GX 876.

13   Q.  This was the tweet you put up in response to CZ's tweet,

14   correct?

15   A.  That's right.

16   Q.  Okay.  And you said that "Alameda would happily buy all of

17   your FTT for $22."

18   A.  Yes, I did.

19   Q.  Okay.  Now $22 was the market price of FTT, correct?

20   A.  I don't remember what the exact price was around the time,

21   but I think it was somewhere around $22.

22   Q.  All right.  In fact, 22 had been the six-month low; is that

23   correct?

24   A.  I don't remember.

25   Q.  Now did you really think that CZ was planning to buy

1    these—sell these shares?

2              MS. SASSOON:  Objection.

3              THE COURT:  Ground?

4              MS. SASSOON:  Calls for speculation about CZ's plans.

5              THE COURT:  Why is it relevant, Mr. Cohen?

6              MR. COHEN:  It's relevant to the response to the

7    tweet, your Honor.

8              THE COURT:  Sustained.

9    BY MR. COHEN:

10   Q.  Did you have any discussions with Mr. Bankman-Fried about

11   how to respond to the tweet?

12   A.  Yes, we did.

13   Q.  Okay.  Did those discussions include the topic of whether

14   CZ was really going to sell?

15   A.  I don't recall.  I know it did include the topic of CZ's

16   motivations in sending the tweet.

17   Q.  Okay.  Well, tell us what you remember about that.

18   A.  We—we both agreed that his motivations were most likely to

19   try to hurt Alameda and FTX even if it was at the expense of

20   getting a better price for his FTT.

21   Q.  Okay.  Now let's move forward—you can take that down—to

22   later in the week, and take a look at GX 21.

23              Ms. Ellison, what was the—what did GX 21 relate to?

24   A.  This is a Google Doc or a document that Sam wrote about his

25   plans to raise money for FTX.

 1  Q.  And I want to focus on the first page, items 1 through 14.

 2          MR. COHEN:  At the top, Brian.

 3  A.  Mm-hmm.

 4  Q.  Just the first page.

 5          What was your understanding of what they referred to?

 6  A.  My understanding was that these were people that Sam or

 7  others were planning to ask about making an emergency

 8  investment into FTX.

 9  Q.  So these were potential sources of capital?

10  A.  Yes, that's right.

11  Q.  To keep FTX going as an ongoing business.

12  A.  That's right.

13  Q.  Were you asked to contact anyone?

14  A.  Yes, Sam asked me to contact Dustin Moskovitz.

15  Q.  That would be the person——where was he?

16  A.  I don't know where he was at the time.

17  Q.  And also, if you look at No. 3, you were asked to contact

18  Genesis.

19  A.  Yes, I do recall Sam asking me to talk to Genesis.

20  Q.  Do you recall——yes or no——whether you contacted Genesis?

21  A.  I was talking a lot to Genesis during this time period, but

22  I——I don't recall if I brought up the issue of them investing

23  in FTX.  They were already, you know, trying to recall their

24  loans from us.

25  Q.  What about Dustin?

 1   A.  Yeah, I did talk to him.  Or sorry.  Sorry.  I talked to

 2   one of his representatives.  I didn't talk to him directly.

 3   Q.  About the topic of raising capital.

 4   A.  Yes, that's right.

 5           MR. COHEN:  All right.  We can take that down.

 6   Q.  Now you also testified that you participated in something

 7   you called an all hands meeting on November 9th.  Do you recall

 8   that?

 9   A.  Yes, I do.

10   Q.  And those kinds of meetings were held on a regular basis;

11   is that correct?

12   A.  They were typically held every two weeks.

13   Q.  At Alameda.

14   A.  Yes, that's right.

15   Q.  Who participated in those meetings?

16   A.  All the employees at Alameda.

17   Q.  Okay.  Where was Alameda's offices at the time?

18   A.  Our main offices were in the Bahamas and in Hong Kong.

19   Q.  And where were you when this meeting took place?

20   A.  I was in Hong Kong.

21   Q.  Now prior to the meeting did you have any conversations

22   with Mr. Bankman-Fried or others?

23           MS. SASSOON:  Objection.

24           THE COURT:  It's a little broad.

25   Q.  Did you have any conversations with Mr. Bankman-Fried about

1    what to discuss at the meeting?

2    A.  Yes, I did.

3    Q.  What do you recollect about that?

4           MS. SASSOON:  Objection, hearsay.

5           MR. COHEN:  Let's pull up Government Exhibit 414A in

6    evidence.

7    Q.  Now, Ms. Ellison, if you could just——let's call your

8    attention to the top in blue.  You say, "thinking about what to

9    tell people at Alameda all hands.  Right now I'm thinking a

10   vibe of 'Alameda is probably going to wind down, if you don't

11   want to stay or want to take some time off no pressure, if you

12   do want to help with stuff like making sure our lenders get

13   repaid it's super appreciated.'"  And then you write, "does

14   seem right?"

15          MR. COHEN:  You can put it to normal size, Brian.

16   Q.  What did you mean by that?

17   A.  What I meant was I was thinking about what to say at this

18   meeting.  A lot of the employees had been asking me what was

19   going on, or what the implications were for them, and I was

20   asking whether it made sense to express this to them that

21   Alameda was going to wind down and that they shouldn't feel

22   pressured to stay and continue working.

23   Q.  Was your goal to get them to stay?

24   A.  No.  I was hoping that some might stay, but I think if my

25   goal had been to get them to stay, I would have told them to

 1   stay.  I was trying to be honest and help them do whatever was

 2   in their best interest.

 3   Q.  What was your goal going into this meeting?

 4   A.  My goal was to inform Alameda employees what had been going

 5   on and what the implications for them were.

 6   Q.  And looking at the response from Mr. Bankman-Fried at the

 7   bottom, he says, "maybe something about there being a future of

 8   some sort for those who are excited but that you can't know for

 9   sure what it is."  What was your understanding as to that,

10   Ms. Ellison?

11   A.  My understanding was that Sam was suggesting maybe he would

12   start a new company or maybe Alameda would continue in some

13   form and that he might want to hire Alameda employees for that.

14   Q.  Now did the meeting take place?

15   A.  Yes, it did.

16   Q.  Now please answer my next question just by topic, not by

17   what was said.  Do you recall the topics you covered?

18   A.  Yes.

19   Q.  Can you tell us.

20   A.  I recall telling employees how Alameda and FTX had gotten

21   into that financial——into our financial situation, and I recall

22   telling people that Alameda was likely going to wind down and

23   they didn't need to keep working.

24   Q.  Did the topic——yes or no:  Did the topic——

25               THE COURT:  Excuse me.  Had you finished your answer?

```
 1            THE WITNESS:  Yeah, those were the only topics that
 2  come to mind for the moment.
 3            MR. COHEN:  I'm sorry.  I thought she had finished.  I
 4  apologize.
 5            THE COURT:  Yes, of course you did.  And she had.
 6  BY MR. COHEN:
 7  Q.  Did the topic of Alameda's accounting come up at all, yes
 8  or no?
 9  A.  I don't specifically remember.
10  Q.  Did the topic of the pointer system come up at all, yes or
11  no?
12  A.  I don't remember.
13  Q.  Did the topic of Alameda's interactions with its lenders
14  come up, yes or no?
15  A.  Yeah.
16  Q.  Now what happened after the meeting?
17  A.  Sorry.  Can you be more specific.
18  Q.  Sure.  I think that's a fair point.  A lot of things
19  happened.
20            What happened in regard to the meeting?  Did you
21  discuss it with anyone afterward?
22  A.  Yes, I——I think I told——I mentioned in this small group
23  chat on Signal that I had had the meeting and conveyed these
24  things to the employees and that I thought it had gone well.
25  Q.  Now in your view in this meeting were you revealing
```

1    wrongdoing to the employees?

2    A.  Yes, I was.

3    Q.  But you were also asking them to stay at the company.

4    A.  I don't remember if I asked them to stay at the company.  I

5    said that it would be appreciated if they could help as we

6    wound down and returned capital to our lenders.

7    Q.  Even after you told them about wrongdoing.

8    A.  Yes, that's right.

9            MR. COHEN:  Your Honor, may I have a moment.

10           THE COURT:  Yes.

11           MR. COHEN:  I have nothing further.

12           THE COURT:  All right.  Thank you.

13           Any redirect?

14           MS. SASSOON:  Yes, your Honor.

15   REDIRECT EXAMINATION

16   BY MS. SASSOON:

17   Q.  Good afternoon, Ms. Ellison.

18   A.  Good afternoon.

19   Q.  I'd like to pick up on the subject of this all hands

20   meeting in November.  At that meeting what, if anything, did

21   you explain to Alameda's employees about why there was a

22   shortfall in FTX customer funds?

23   A.  I explained that Alameda had made billions of dollars of

24   venture investments and had bought back FTX equity from Binance

25   using open-term loans and that when the loans had been

1    recalled, we had to use or we did use FTX customer funds to

2    repay them, which had caused the shortfall.

3    Q.  Were you asked any follow-up questions by Alameda employees

4    at this meeting?

5    A.  Yeah, I was asked many follow-ups.

6    Q.  And were you asked any questions related to who was

7    involved in this wrongdoing that you described?

8    A.  Yes, I was.

9    Q.  And did you answer that question?

10   A.  Yes, I said that Sam, Gary, Nishad, and I had been aware of

11   the situation and the decision to repay loans with customer

12   funds was Sam's.

13   Q.  Do you recall in that meeting saying that "The decision was

14   Sam's, I guess"?

15           MR. COHEN:  Objection.  Beyond the scope.

16           THE COURT:  I'm sorry.  I can't hear you.

17           MR. COHEN:  I don't have my microphone.

18           THE COURT:  Whoever is speaking.

19           MR. COHEN:  Sorry.  I need my microphone.  Objection,

20   beyond the scope.

21           MS. SASSOON:  She was asked about this meeting, your

22   Honor.

23           THE COURT:  Yes, indeed.  Overruled.

24   BY MS. SASSOON:

25   Q.  Do you recall at this meeting saying the decision had been

1    "Sam's, I guess"?

2    A.   Yeah, I do.

3    Q.   And why did you say "Sam's, I guess"?

4    A.   It was a—the words I guess were a vocal tick.  I felt sort

5    of uncomfortable.  I hadn't gone into the meeting intending to

6    cast blame on anyone, but I also wanted to be honest and open

7    in answering my employee's questions.

8    Q.   And I believe you were asked this on cross-examination, but

9    to be clear, did this meeting take place before you learned of

10   any government investigation into wrongdoing?

11   A.   Yeah, it did.

12   Q.   Now were you aware of anyone recording this meeting while

13   it was taking place?

14   A.   No, I was not.

15   Q.   Have you been played or heard any recording of this

16   meeting?

17   A.   No, though I've heard that a recording was made

18   subsequently.

19   Q.   And so is your testimony sitting here today based on your

20   best recollection of that meeting?

21   A.   Yes, that's right.

22   Q.   You were asked on cross-examination about telling the

23   defendant that the meeting went well afterwards?

24   A.   That's right.

25   Q.   Why, if you admitted in this meeting to wrongdoing, did you

1   describe the meeting as having gone well?

2   A.  Because employees seemed, I mean, upset about the

3   wrongdoing but they seemed grateful that I had been open and

4   honest with them, and I felt good that I had disclosed this to

5   employees.

6   Q.  You were asked by Mr. Cohen about an earlier document to

7   Alameda employees from months or maybe even a year earlier that

8   you described as misleading Alameda employees about Alameda's

9   positive situation.  Do you recall those questions?

10  A.  Yes, I do.

11  Q.  And if at back in that time you had been misleading your

12  employees, why did you come clean at this meeting, in November?

13          MR. COHEN:  Objection.

14          THE COURT:  Sustained.

15  Q.  Why, if as you testified you had made misleading statements

16  to your employees in the past, why at this meeting did you, as

17  you described it, disclose wrongdoing?

18  A.  Yeah, I mean, I didn't——I never liked misleading my

19  employees.  I felt really bad about it, but I felt sort of

20  trapped in the summer of 2022, because I was worried that if I

21  revealed Alameda's actual financial situation to anyone,

22  including our employees, that the news would get out and that

23  people would withdraw their funds from FTX, causing Alameda and

24  FTX to collapse.  By the time of this all hands

25  November——meeting in November, it had already happened, so I

1    felt free to be honest with employees at that point, as, I

2    mean, I had wanted to before but felt like I couldn't.

3    Q.  You were asked some questions on cross-examination about

4    the different attitudes you and the defendant had about risk.

5    Do you recall that?

6    A.  Yeah.

7    Q.  And you were asked about the defendant's decision to start

8    FTX, which you had disagreed with.  Do you recall that?

9    A.  Yeah.

10   Q.  And I believe Mr. Cohen asked you if in hindsight you

11   viewed the risks that he took there as correct.  Do you

12   remember that?

13   A.  Yeah.

14   Q.  What about in 2022?  Do you view the risks that were taken

15   in 2022 by the defendant as correct?

16   A.  No, I think they were terrible mistakes.

17   Q.  You were asked some questions about the defendant's

18   absences from Alameda in 2020.  Do you recall that?

19   A.  Yes, I do.

20   Q.  How did that compare to the defendant's level of engagement

21   in Alameda from May of 2022 onward?

22   A.  In May of 2022, he started becoming much more engaged in

23   Alameda than he had been for the past months.  The fact that we

24   were losing a lot of money naturally made him much more, you

25   know, concerned and wanting to keep closer track of what was

1    going on.

2         MS. SASSOON:  Mr. Bianco, can you pull up Government

3    Exhibit 64.

4    Q.  Ms. Ellison, you were shown this document a number of times

5    on cross-examination.  Is this an update document you sent to

6    the defendant in late 2021?

7    A.  Yes, it is.

8         MS. SASSOON:  And if we could just focus on "notable

9    idiosyncratic pnl stuff," the third black bullet, and highlight

10   that section.  Zoom in on that section.

11   Q.  Can you just remind us what "notable idiosyncratic pnl

12   stuff" refers to.

13        MR. COHEN:  Objection.  Beyond the scope.

14        MS. SASSOON:  Your Honor, this document was pulled up

15   numerous times on cross.

16        MR. COHEN:  Not that section.

17        THE COURT:  Just give me a moment.

18        MS. SASSOON:  To the extent it's relevant, I plan to

19   ask about the fifth bullet, the fifth white bullet.

20        And your Honor, there's another basis beyond just this

21   document being shown that the door was opened to this on cross.

22        THE COURT:  Please give me a moment.

23        What's the other basis?

24        MS. SASSOON:  Ms. Ellison was asked about her guilty

25   plea to investor fraud, and this bullet pertains to the

1   defrauding investors.

2           THE COURT:  Overruled.

3   BY MS. SASSOON:

4   Q.  Ms. Ellison, I'd like to direct your attention to the fifth

5   bullet that says "negative 850m from BTMX thing."  What does

6   that refer to?

7   A.  That refers to losses that FTX sustained and then passed on

8   to Alameda in early 2021 from a malfunctioning in the FTX

9   margin system.

10  Q.  And what, if anything, did the defendant say to you about

11  transferring that loss to Alameda?

12  A.  He said that he didn't want the loss on FTX's books, that

13  it would look bad to investors.

14          MS. SASSOON:  You can take that down.

15  Q.  On cross-examination Mr. Cohen asked you a question related

16  to a $65 billion line of credit for Alameda.  Do you recall

17  that?

18  A.  Yeah.

19  Q.  During your time at Alameda did anyone ever tell you that

20  Alameda had a $65 billion line of credit with FTX?

21  A.  Not that I can recall.

22  Q.  Did you specifically request or authorize a $65 billion

23  line of credit for Alameda?

24  A.  No.

25  Q.  You were asked some questions about Government Exhibit 44.

1          MS. SASSOON:  Mr. Bianco, if you could please pull up

2    that exhibit and display the main tab alongside the Alt 7 tab.

3    Q.  And like Mr. Cohen, I'm not going to go through this whole

4    spreadsheet again.

5          Mr. Cohen asked you about the total NAV on this

6    spreadsheet.  Do you recall that?

7    A.  Yeah.

8    Q.  How did the total assets and total liabilities on the main

9    tab and Alt 7 compare?

10   A.  They were quite different.  On the main tab there's

11   $21 billion of assets and 15 billion of liabilities; on the Alt

12   7 tab, there is 16.5 billion of assets and 10 billion of

13   liabilities.

14   Q.  And what effect, if any, did that have on the appearance of

15   Alameda's NAV, and the strength of that NAV?

16   A.  It—having the assets and the liabilities lower makes

17   Alameda look like it's in a less risky position than it

18   actually is.

19   Q.  And why is that, even if the NAV is 6 billion on both?

20         MR. COHEN:  Objection.  Asked and answered.

21         THE COURT:  Overruled.

22   A.  Because the—having—having more loans and then having the

23   assets that were borrowed invested in illiquid investments

24   makes it harder for Alameda to repay those loans if they're

25   called.

1          MS. SASSOON:  We can take that down.

2   Q.  You were asked some questions about CZ potentially trying

3   to harm FTX in November.

4          Do you recall that?

5   A.  Yeah.

6   Q.  In your view, did FTX collapse because of a tweet from CZ?

7   A.  I wouldn't say that was the main reason, but I think it

8   contributed to the situation.

9   Q.  What would you say was the main reason?

10  A.  I would say the main reason was the fact that Alameda had

11  borrowed over $10 billion of FTX customer funds that it wasn't

12  able to repay.

13  Q.  Since the events of mid-November 2022, have you spoken with

14  the defendant?

15  A.  No, not since mid-November 2022.

16  Q.  What about with Gary Wang?

17  A.  No.

18  Q.  What about with Nishad Singh?

19  A.  No.

20  Q.  You were asked some questions about not resigning from

21  Alameda.

22          Do you remember that?

23  A.  Yeah.

24  Q.  Did you consider resigning in the summer or fall of 2022?

25  A.  Yeah, I did.

1    Q.  Ms. Ellison, why didn't you resign?

2    A.  I told Sam that I wanted to quit, and he told me that I

3    couldn't, that I was too important to keep at Alameda, and he

4    thought I needed to stay at Alameda.

5    Q.  After he told you that, why didn't you resign?

6    A.  Because I trusted his opinion, and I didn't want FTX and

7    Alameda to collapse.  If he thought that my resigning might

8    cause that, then I didn't want to do that.

9            MS. SASSOON:  No further questions.

10           THE COURT:  Thank you.

11           Any recross?

12           MR. COHEN:  No, your Honor.

13           THE COURT:  The witness is excused.  Thank you.

14           (Witness excused)

15           THE COURT:  Why don't we break until 3:00, and then we

16   will proceed with another witness.

17           I'm sorry, counsel.

18           MS. KUDLA:  Your Honor, we may want to address a

19   couple of issues during the break.

20           THE COURT:  Five after 3, folks.

21           (Jury not present)

22           THE COURT:  Counsel.

23           MS. KUDLA:  Your Honor, for the next witness the

24   government intends to offer a limited number of clips from the

25   all-hands meeting that was recorded in reference on

cross-examination, and I believe we had raised this in our

motion *in limine* and provided two bases for the admission of

those clips, pursuant to 801(d)(2)(D) as a statement of an

agent and also 801(d)(2)(E) as a statement of a coconspirator.

At the time your Honor deferred ruling on that until you could

hear more further trial testimony.

We now believe that the record supports three

independent and equal bases for admission of these clips, the

two that I have just mentioned, and now that Ms. Ellison has

cross-examined specifically as well, under 801(d)(1)(B) as a

prior consistent statement.  She has testified today that she

learned about the investigation after the all-hands meeting.

In light of that, on November 9, the time that she

talked to the employees, she discussed the situation and who

was involved and named the people who were aware of the

individuals who had knowledge of Alameda borrowing FTX customer

deposits to repay its loans.

Now, your Honor, in the transcript, as a statement of

an agent there has been ample evidence --

THE COURT:  First of all, could you tell me whether it

is only Ms. Ellison who speaks on these clips or whether there

are other speakers?

MS. KUDLA:  Your Honor, in almost -- there are six

clips.  In five of the six clips there are people asking

Ms. Ellison questions, and then she responds to those

 1    questions.

 2              THE COURT:  Presumably, you're offering the questions

 3    not for the truth of anything contained in the question, but to

 4    demonstrate the questions she was asked so as to give meaning

 5    to her answer.

 6              MS. KUDLA:  That is correct, your Honor.

 7              THE COURT:  What about the sixth?

 8              MS. KUDLA:  The sixth, she had begun the meeting to

 9    tell the employees what the situation was and why there was an

10    issue and a solvency crisis at Alameda.  It was part of the

11    remarks that she just talked about about why she was providing

12    a sense of common reassurance to the Alameda employees.

13              THE COURT:  Let me hear from the other side.

14              MR. EVERDELL:  Thank you, your Honor.

15              I think on the agency point the comments made at the

16    meeting by Ms. Ellison were beyond the scope of the agency.  In

17    fact, we know exactly what her agency scope was because that

18    prior group chat, small group chat messaging where she talks to

19    Mr. Bankman-Fried about what she plans to say at the meeting,

20    she tells them -- this is Government's Exhibit 414A, which is

21    already in evidence -- she says:  I'm thinking about what to

22    tell people at the Alameda all hands.  Right now I am thinking

23    that Alameda --

24              THE COURT:  You spoke to fast for me to understand.

25              MR. EVERDELL:  I'm sorry, your Honor.

1           Maybe we could bring it up on the screen too so you

2   can see it.

3           If we can just pull up Government Exhibit 414A.

4           THE COURT:  Go ahead.

5           MR. EVERDELL:  This is the small group chat where the

6   top messages is what she is telling Sam her anticipated remarks

7   are going to be at this meeting.  She says:  Thinking about

8   what to tell the people at Alameda all hands.  Right now I am

9   thinking about a vibe of 'Alameda probably is going to wind

10  down, if you don't want to stay or want to take some time off

11  no pressure, if you do want to help with stuff like making sure

12  lenders get repaid it's super appreciated.  Does that seem

13  right?  He does respond:  He says:  And maybe something about

14  there being a future of some sort for those who are excited but

15  that you can't know for sure what it is.

16          What she tells Mr. Bankman-Fried ahead of the meeting

17  is, this is what I am going to say.  I am just going to say,

18  Alameda is probably going to be winding down.  Love you to stay

19  if you could, and it would be greatly appreciated if you could.

20  Sam says OK.  Maybe you can add:  There might be a future here.

21  That's what the scope of the agency is.  That's at least what

22  Sam says.  I understand what you are going to say, and here is

23  my understanding as well.  But they don't talk at all about

24  whether she is going to divulge anything about who did what,

25  about customer funds and this sort of thing.

1          This is not within the scope of the agency.  To the

2     extent an agency existed here, she went well beyond the scope

3     of that agency in making comments.  I Think she testified to

4     that just now herself.

5          THE COURT:  Who is the principal in the agency

6     relationship here?

7          MR. EVERDELL:  I think that the government is claiming

8     that she is acting as an agent of my client's.  I suppose the

9     government is claiming that she is acting -- that my client is

10    the principal and she is acting on behalf of him, as an agent

11    of him.  I think they are going to have to articulate what the

12    basis of the agency is.

13         MS. KUDLA:  Your Honor, in order for this exception to

14    apply, there has to be the existence of an agency relationship,

15    the statement was made during the course of the relationship,

16    and it relates to the scope.

17         And here what we have is, we have the existence of an

18    agency relationship.  The principal here is Mr. Bankman-Fried,

19    and his agent is Ms. Ellison.  She has stated in the testimony

20    that although she handled day-to-day decisions for any major

21    decision, she would always run them by Sam, and she would

22    always ultimately always defer to Sam if he thought that

23    Alameda should do something.

24         Specifically with respect to this all-hands meeting,

25    she said, with that, she consulted the defendant's input

1  because she generally sought his input on important decisions

2  at Alameda, and she thought like what to tell Alameda employees

3  about what was happening was one of those important decisions.

4  The other important thing about this rule is that she

5  just has to have the authority to take the action with which

6  the statements relate.  It does not have to be authorized by

7  the principal itself.

8  And here Mr. Bankman-Fried, as Mr. Everdell has

9  acknowledged, was aware that she was going to have this meeting

10  with her employees.  She has testified that this is a biweekly

11  Alameda employee meeting and that it was going to happen.  She

12  was going to address all employees.  He did not seek to remove

13  her as CEO at that time.  He did not seek to prevent her from

14  addressing the group in the scope of her employment as CEO to

15  address these employees.  Instead, he provided input.

16  So at that point in time, when she was addressing

17  these employees about what was going on, she was doing so

18  within the scope of her employment at Alameda, as it has been

19  described in the testimony.

20  THE COURT:  Why isn't Alameda the principal?

21  MS. KUDLA:  The defendant owns Alameda.

22  THE COURT:  I understand that, of course, but it was a

23  corporation.  Yes?  It is a corporation, I guess.

24  MS. KUDLA:  Your Honor, there has been ample testimony

25  that --

1          THE COURT:  He owned 90 percent of it.  I understand

2     that.

3          MS. KUDLA:  Your Honor, under *United States v. Kelley*,

4     forms signed by one of the business partners in the course of a

5     business is admissible against another partner showing that

6     Mr. Bankman-Fried, in the action of being the owner of Alameda,

7     is, in effect, also the principal here.

8          THE COURT:  Let me ask Mr. Everdell to go to your

9     second point, 801(d)(1)(B).

10         MR. EVERDELL:  Sorry.  The prior consistent statement,

11    your Honor?

12         THE COURT:  Yes.

13         MR. EVERDELL:  There, your Honor, I think this just

14    proves too much.  It is too general.

15         I think what the government's theory is is that

16    because Ms. Ellison later divulged information to the

17    government, right, about Mr. Bankman-Fried, that anything she

18    says prior to when she had that motivation to cooperate,

19    anything that she said about Sam or anybody else is therefore a

20    prior consistent statement and then it can be admitted.  I

21    think that's way too broad a reading --

22         THE COURT:  Is the defense conceding that what she

23    told the government and what she has testified to here in court

24    about what she said at that meeting is true?

25         MR. EVERDELL:  No, your Honor.

1          THE COURT:  Of course not.

2          You have spent the last day and a half doing your

3    level best -- and I'm not criticizing.  I understand it's your

4    job.  You should have been doing it -- trying to impugn her

5    credibility.  You did that in the opening statement.  You are

6    going to do it in closing.  Why isn't the fact that she said

7    the same thing before there was even a government investigation

8    admissible as a prior consistent statement?

9          MR. EVERDELL:  I think my point is only, what is the

10   same thing.  It seems like what they are saying is that any

11   statement she makes --

12         THE COURT:  They are not saying any statement.  They

13   are saying the specific things she told them about what

14   happened and who made the decision about what happened is --

15   are the relevant prior statements.  What's wrong with that

16   analysis?

17         MR. EVERDELL:  Understood, your Honor.  There are

18   other statements in here that are really going to go beyond

19   just who did what in the clips that they are seeking to play.

20         THE COURT:  What are they?

21         MS. KUDLA:  Your Honor, you have a transcript binder

22   too which may assist.

23         THE COURT:  I have enough binders here to go into

24   business.

25         Transcript binder.  This is these transcripts, yes?

1          MS. KUDLA:  Correct.  These are the clips that the

2    government intends to play, government Exhibits 433A through F.

3          What you will notice here is that these clips are

4    limited to very specific ways that Alameda had -- describing

5    Alameda's borrowing of FTX customer deposits to repay the

6    loans.  It explains that that means of misappropriation was not

7    through the spot-margin program, which has been alluded to by

8    the defense, it goes to the fact of what Alameda used those

9    customer deposits for, and then it goes to who knew that

10   Alameda was using FTX customer deposits.

11         THE COURT:  Let's handle this piece of it in the

12   following way.  We are going to have a recess in a minute or

13   two.

14         If there is anything in here, Mr. Everdell, that you

15   think is not a prior consistent statement on the theory that I

16   just articulated to you, I'd like to know what it is when I

17   come back.

18         MR. EVERDELL:  Yes, your Honor.

19         The other thing is, we have our own clips that we

20   might like to add as well, if the Court is inclined to allow

21   these in.

22         THE COURT:  That's a rule-of-completeness issue and it

23   is a separate issue, and I don't know what they might be, and I

24   can't rule on that in the abstract.

25         MR. EVERDELL:  Yes.

1          THE COURT:  What about 801(d)(2)(E)?

2          MR. EVERDELL:  Your Honor, on that --

3          THE COURT:  I'd like to hear from Ms. Kudla on that

4    first.  I'll come back to you.  I promise.

5          MS. KUDLA:  Your Honor, I'll circle back on our

6    objections to the rule of completeness.  But focusing on --

7          THE COURT:  Don't do that yet.  I can only do one

8    thing at a time.

9          MS. KUDLA:  I am going to focus right now on

10   801(d)(2)(E) for statements in furtherance of the conspiracy by

11   a coconspirator.

12         The evidence at trial has already established that

13   Mr. Bankman-Fried wanted to keep Alameda afloat, wanted to keep

14   it going.  One of the ways that that was occurring was by

15   keeping Alameda employees at Alameda in processing customer

16   withdrawals at that time.

17         We have evidence in the record talking about the fact

18   that this was not the first occasion that had occurred in

19   Alameda.  Ms. Ellison testified that when she began her

20   employment in 2018, she found out that there was a similar

21   incident.  Investors had left.  Half of the employees had left.

22   By not telling her that, she accepted employment.  She

23   continued to work at Alameda.

24         Now we are in 2022.  We have testimony from Gary Wang

25   saying, on November 12, that the defendant instructed him to

1    transfer the remaining customer assets to the Bahamian

2    authorities because, quote, they seemed friendly and seemed

3    willing to let him stay in control of the company.

4              THE COURT:  I remember that testimony.

5              MS. KUDLA:  Evidencing that Mr. Bankman-Fried's intent

6    was to keep Alameda going.

7              And the statements that we see in Government Exhibit

8    414 is the single chat with Ms. Ellison and the defendant where

9    he responds that she should add that there may be a future

10   opportunity of some sort for those who are excited, and

11   Ms. Ellison just testified that it would be helpful to have

12   Alameda employees help wind down the company or -- and she also

13   during this meeting referenced the points made by the defendant

14   in this very text.

15             I think this goes to the fact that it is in fact

16   coconspirator statements being used in furtherance of the

17   conspiracy, which is to keep Alameda afloat while there are

18   opportunities to ensure that potentially the Binance deal goes

19   through, that the customers get paid back, which would lessen

20   the chance of an investigation or anything else.

21             THE COURT:  Mr. Everdell.

22             MR. EVERDELL:  Your Honor, I think there is an

23   inherent inconsistency in that theory, which is, she is talking

24   to a room full of people who are not alleged to be

25   coconspirators.

1          If all they want to do in furtherance of the

2    conspiracy, to further the conspiracy, is to try to keep

3    employees there and working so that maybe the company can

4    survive if the Binance deal goes through, the last thing you

5    are going to do is start divulging things about who knew what

6    and when about the crime that you allegedly committed.

7          It would be enough to simply say what

8    Mr. Bankman-Fried said in the text, which is, we want you all

9    to stay.  There may be a future here.  We would like you guys

10   to stay if you like.  If you want to argue that is in

11   furtherance of the conspiracy to keep people working, so the

12   company doesn't collapse in the meantime, OK.  But everything

13   else about these sort -- the government is going to

14   characterize this as an admission.  It is certainly not in

15   furtherance of the conspiracy because you wouldn't do that in

16   front of people who you didn't think were part of it.

17         I don't see how any of those statements would be under

18   801(d)(2)(E) as coconspirators.

19         THE COURT:  I am going to take it at least as a prior

20   consistent statement.

21         When I come back, I want to know any part of it

22   specifically that Mr. Everdell claims is not a prior consistent

23   statement, as we discussed a few minutes ago.  I would give a

24   limiting instruction if I take it on that basis.

25         MR. EVERDELL:  Understood, your Honor.

```
 1              THE COURT:  If you can agree on what that instruction
 2    ought to say, so much the better, but it's not my first rodeo.
 3              MR. EVERDELL:  Do you want the clips that the defense
 4    would propose as well?
 5              THE COURT:  No.  I am not up to the rule of
 6    completeness.
 7              MR. EVERDELL:  Understood.
 8              THE COURT:  I'll see you in ten minutes.
 9              (Recess)
10              THE COURT:  Rule of completeness.
11              MR. EVERDELL:  Yes, your Honor.
12              THE COURT:  The defense has handed up Defendant's
13    Exhibit 415A-T and 415B-T for identification.
14              MR. EVERDELL:  Yes, your Honor.  Those are provided by
15    the government.
16              THE COURT:  I appreciate that.
17              Can you tell me where in the sequence by reference to
18    the government exhibits that I've been given these would
19    supposedly be relevant?
20              MR. EVERDELL:  These fall at the end of the meeting.
21    But I will -- for A, these relate to the portions of the
22    government's clips that refer to the open-term loans, which
23    are -- there are several.  For example, their first clip, which
24    starts on page 15 of the transcript, talks about, on 15, line
25    14 and 15 --
```

1           THE COURT:  You're losing me.  Where?

2           MR. EVERDELL:  Government Exhibit 433A, which is their

3  first clip.

4           THE COURT:  Where?

5           MR. EVERDELL:  It's page 15, line 14 and 15.

6           THE COURT:  I think we are not communicating.

7           I am looking in the first clip at page 1.  Is that the

8  page I am supposed to be looking at?

9           MR. EVERDELL:  Your Honor, if it's the clip that

10 starts OK, let's get started --

11          THE COURT:  Yeah.

12          MR. EVERDELL:  That's the clip.  If you go down a few

13 lines, I don't know if you have the line numbers on the side,

14 but my line number --

15          THE COURT:  I do.

16          MR. EVERDELL:  14 and 15.  Where it says:  Alameda was

17 kind of borrowing a bunch of money via open-term loans and use

18 that to make various illiquid investments.

19          THE COURT:  Yup.

20          MR. EVERDELL:  That's one.

21          There are other references, I can try to find them for

22 you as well, where they talk about these open-term loans.  But

23 there is some general discussion in a few of the clips about

24 the open-term loans and the nature of the repayment of the

25 open-term loans.

1          Your Honor, our clip, which is the first of the two

2     clips, talks about -- it's Ms. Ellison talking about how the

3     loans were obtained.

4          You can see on our exhibit, Defendant's Exhibit

5     415A-T, there is a question posed:  How is Alameda able to get

6     all of those loans made?  How were we able to get that much

7     money?  And the response is:  I don't know.  Do you ever read

8     about like Celsius or Three Arrows or whatever, like the crypto

9     lending space is kind of wild for a long time.  People have a

10    lot of money.  Didn't really like to read your balance sheet.

11    Just lent you a lot of money.

12         THE COURT:  What's the government's position on that?

13         MS. KUDLA:  Your Honor, Rule 106 is not a mechanism to

14    basically bypass the hearsay rules on self-serving testimony,

15    and that's what this is here.  All of the clips that the

16    government is introducing are firsthand knowledge from

17    Ms. Ellison about Alameda's actions.

18         Here in this, which occurs an hour later from --

19    approximately an hour later from the first statements that you

20    see in 433A, Ms. Ellison is being asked about the mindset of

21    other crypto lenders.  She is being asked to opine about their

22    mindset, which is directly in conflict with your Honor's motion

23    *in limine* ruling that the idea of the gullibility or negligence

24    of the victims is simply not relevant to criminal intent here.

25         This does not complete in any way the clips that the

1    government is choosing to put into evidence, and it's simply

2    intended to go through to lenders such as Celsius or Three

3    Arrows Capital, what they would have been looking at when

4    lending money to Alameda.  That's, you know, not within the

5    clips that we are admitting.

6              THE COURT:  What about 415B, Mr. Everdell?

7              MR. EVERDELL:  Yes, your Honor.

8              So this is really more of -- it goes to all the clips

9    as a whole because it's more about the amount of Ellison's

10   state of mind or her emotion at the time.

11             This clip is on the next page.  It starts at line 19,

12   where she posed the question:  I am sure this is not that fun

13   for you, but certainly appreciate how open you've been.  And

14   her response is:  Thanks.  I mean, it was kind of fun.  I don't

15   know.  Then the response to that is:  OK then.  Never mind.

16   She sort of giggles at this and laughs a bit, chuckles almost.

17             I think, independent of being a rule of completeness

18   issue -- the clips that the government plans to play, I think,

19   they intend to argue from it that this is a sober, unburdening

20   and admission by Ms. Ellison of what she had done.

21             This clip tends to show that she has a very different

22   emotional state and reaction to what she is telling the people

23   at the meeting and that it is not some confession on her part

24   but that she has a different emotional reaction.

25             On that front, your Honor, I think it's also

 1    admissible separately under 803(3) to show the emotional state

 2    of the declarant.

 3              THE COURT:  If that's true, it would be something that

 4    would arise on your case, if there is one.

 5              The second argument doesn't cut it.

 6              I'll take it on the first basis, but -- I don't want

 7    to get these pieces of papers mixed up.  But I am not going to

 8    take 415A.  It's not rule of completeness material.  And even

 9    if it was, it wouldn't be admissible because it's just wild

10    speculation.

11              That's where we are.

12              MR. EVERDELL:  Sorry, your Honor.  Just so I'm clear,

13    neither of the two clips are coming in.

14              THE COURT:  No.  The second one, 415B-T, I'll let you

15    play at the end of whenever the government plays its clips.

16              MR. EVERDELL:  Right.  On a matter of logistics, I

17    assume the government is going to be playing their clips in a

18    row.  Ours actually follows at the end of the transcript.

19              THE COURT:  That's what I understood.  Then you will

20    get a chance to play 415B-T.

21              MS. KUDLA:  Your Honor, can we address 415B.

22              The government's position is that if this is being

23    admitted to show Ms. Ellison's then existing mental state, she

24    was on cross-examination for six hours.  They clearly could

25    have asked her about that.  Now you are going to have a witness

1   who cannot comment -- they can comment on her demeanor during

2   the meeting, but they certainly cannot comment on her mental

3   state.  If they were going to elicit this, they should have

4   done it on cross-examination.

5        THE COURT:  That's probably right.  But it is very

6   rare that a judge has the privilege of trying a case with so

7   many really smart and accomplished lawyers, and an argument can

8   be made for almost anything.  That doesn't mean they are all

9   necessarily right.

10        But 415B-T just doesn't matter in this case, in my

11   humble opinion.  It doesn't matter because -- this is only my

12   take on what I heard today and only the tiniest part of it.

13   The witness testified at length, it was the worst week of her

14   life, and she said it was the worst day of her life and never

15   had she felt so relieved in her life.  If she chuckled or said

16   it was fun, there are plenty of explanations of that.

17        All things considered, I am going to give the

18   defendant the benefit of the doubt on that excerpt.

19        MR. EVERDELL:  Thank you, your Honor.

20        Just on logistics then, do we play it when the

21   government plays its clips --

22        THE COURT:  The government is going to play six clips.

23        MS. KUDLA:  Correct, your Honor.

24        THE COURT:  You have told me sequentially your clip

25   comes way after that.

1          MR. EVERDELL:  That's correct, your Honor.

2          THE COURT:  You will get to play it after they play

3  their sixth clip.  OK.

4          MR. EVERDELL:  Yes, Judge.

5          THE COURT:  Are these clips going to come all

6  together?

7          MS. KUDLA:  No, your Honor.  They will be done in

8  sequential fashion, and I'll go one by one.

9          THE COURT:  The next witness is going to be who?

10          MS. KUDLA:  Christian Drappi.

11          (Jury present)

12          THE COURT:  The jurors and the defendant all are

13  present, as they have been throughout.

14          Call your next witness.

15          MS. KUDLA:  The government calls Christian Drappi.

16          THE COURT:  Before you begin, let me just say to the

17  jury, sorry for the longer intermission, but it will yield

18  dividends in time saved later this afternoon and overall.

19  CHRISTIAN DRAPPI,

20      called as a witness by the government,

21      having been duly sworn, testified as follows:

22          THE COURT:  You may proceed.

23          MS. KUDLA:  Thank you, your Honor.

24  DIRECT EXAMINATION

25  BY MS. KUDLA:

1    Q.  Good afternoon, Mr. Drappi.

2    A.  Good afternoon.

3    Q.  Where did you work a year ago?

4    A.  Alameda Research.

5    Q.  When did you start working at Alameda?

6    A.  May 31, 2021.

7    Q.  What Alameda office locations did you work at?

8    A.  Hong Kong, the Bahamas, and San Francisco.

9    Q.  What was your job there?

10   A.  I was a software engineer.

11   Q.  What do you do as a software engineer?

12   A.  Write code to support Alameda's trading.

13   Q.  Now, who owned Alameda?

14   A.  For the most part, Sam Bankman-Fried, he owned the

15   majority.

16   Q.  What were the main categories of Alameda employees,

17   Mr. Drappi?

18   A.  There were software engineers, like myself, there were

19   traders, and then there were settlers and operations people.

20   Q.  So you told us what software engineers do.  Just briefly,

21   what do traders do?

22   A.  Traders are there to monitor Alameda's trading activity and

23   to set the models for how we would trade different

24   cryptocurrencies.

25   Q.  What did settlers do?

1    A.   They were responsible for moving around capital.

2    Q.   Now, as a software engineer, did you have any

3    communications with Alameda traders?

4    A.   Yes.  Every day.

5    Q.   And why did you need to communicate with traders

6    frequently?

7    A.   They helped decide what I should be working on.

8    Q.   So let's focus for a moment on how you communicated with

9    your Alameda colleagues.  What were the most common forms of

10   communication amongst Alameda employees?

11   A.   For one, a lot of it was face to face; second, there was a

12   teleconferencing that existed between the Hong Kong office and

13   the Bahamas office; third, we all used Slack; and, fourth, we

14   all used Signal.

15   Q.   Now, when you first started at Alameda in late May 2021,

16   what was the defendant's title there?

17   A.   CEO of Alameda Research and CEO of FTX.

18   Q.   Did the defendant's title at Alameda Research ever change?

19   A.   Yes.

20   Q.   Approximately when did that occur?

21   A.   This is in the third quarter of 2021.

22   Q.   And who, if anyone, was appointed CEO of Alameda at that

23   time?

24   A.   Caroline Ellison and John Samuel Trabucco were appointed

25   co-CEOs of Alameda Research.

1   Q.  Mr. Drappi, did the defendant announce these co-CEO

2   appointments publicly?

3   A.  Yes.

4           MS. KUDLA:  The government offers Government Exhibit

5   828, pursuant to the stipulation 2001.

6           THE COURT:  Received.

7           (Government Exhibit 828 received in evidence)

8           MR. EVERDELL:  No objection.

9           THE COURT:  Did you say objection?

10          MR. EVERDELL:  I said no objection, your Honor.

11          THE COURT:  Thank you.

12          MS. KUDLA:  Your Honor, may we publish to the jury?

13          THE COURT:  Yes.

14  Q.  Mr. Drappi, who tweeted this message?

15  A.  Sam Bankman-Fried.

16  Q.  What is the date of this message?

17  A.  August 3, 2021.

18  Q.  The tweet reads:  1.  Long overdue, and bringing titles in

19  line with what reality has been for a while.  Congraulations to

20  some of the most impressive people I know:  @alamedatrabucco.

21  and carolinecapital, the CEOs of @AlamedaResearch, and

22  nateparke its CTO.

23          Who is @carolinecapital?

24  A.  Caroline Ellison.

25  Q.  Who is @alamedatrabucco?

 1   A.  John Samuel Trabucco.

 2   Q.  Who is Nate Parke?

 3   A.  Nathaniel Parke is my boss.

 4   Q.  Who did Ms. Ellison and Mr. Trabucco report to?

 5   A.  Sam Bankman-Fried.

 6           MR. EVERDELL:  Your Honor, can we get a time frame.

 7   Q.  After they were appointed co-CEOs, who did Ms. Ellison and

 8   Mr. Trabucco report to?

 9           MR. EVERDELL:  Objection.  Foundation.

10           THE COURT:  Sustained.

11   Q.  Mr. Drappi, do you have any knowledge of who Ms. Ellison

12   and Mr. Trabucco reported to after they were appointed co-CEOS

13   of Alameda?

14   A.  Yes.

15           MR. EVERDELL:  Objection.

16           THE COURT:  I'm sorry.  I couldn't hear you.

17           MR. EVERDELL:  I said objection.

18           THE COURT:  Overruled.

19   Q.  You said that you did have knowledge.

20           Mr. Drappi, who did they report to?

21   A.  Sam Bankman-Fried.

22           THE COURT:  Sir, the next question is, how did you

23   gain whatever knowledge you have?

24           THE WITNESS:  This was common knowledge in the firm,

25   often conversations I would just hear about this.

1                MR. EVERDELL:  Objection.

2                THE COURT:  I am going to strike the witness' answer:

3       Sam Bankman-Fried.

4                Counsel, *tempus fugit*.  I don't know why we are doing

5       this.

6                MS. KUDLA:  The government offers at this time

7       Government Exhibit 849, pursuant to stipulation 2001.

8                THE COURT:  Received.

9                (Government Exhibit 849 received in evidence)

10               MS. KUDLA:  May we publish to the jury?

11               THE COURT:  Yes.

12      Q.  Mr. Drappi, do you see the middle tweet with someone with

13      the user name bennetttomlin@mstdnsocial?

14      A.  Yes.

15      Q.  Mr. bennetttomlin@mstdnsocial states:  Hey, @SBF_FTX, I

16      just wanted to inform you that your hedge fund seems to be

17      invested in a scheme that is transparently going to falter

18      again --

19               Do you see that tweet?

20               MR. EVERDELL:  Your Honor, if we could clarify that

21      these comments are not being offered for the truth.

22               THE COURT:  Yes, that's correct.

23               The jury is not to consider the statement by Mr.

24      Tomlin for the truth, just for the fact that it was said in

25      order to set up the reply.

1    Q.  Did the defendant ever reply to that tweet?

2    A.  Yes.

3    Q.  What's the date of his response?

4    A.  May 28, 2022.

5    Q.  Mr. Drappi, what was the defendant's response in May 2022

6    in point 1?

7    A.  I don't run Alameda anymore, you should ask them.

8    Q.  Now, at that point in time how long had you been working at

9    Alameda?

10   A.  Had been about a year.

11   Q.  Based on your employment at Alameda in your communication

12   with Alameda employees, was that statement that

13   Mr. Bankman-Fried didn't run Alameda anymore true?

14   A.  Yes.

15              MR. EVERDELL:  Objection.

16              THE COURT:  Sustained, at least in that form.

17   Q.  Mr. Drappi, in the course of your employment, did you

18   observe interactions with Alameda employees?

19   A.  Yes.

20   Q.  Did you ever observe Mr. Bankman-Fried personally while you

21   were working at Alameda?

22   A.  Yes.

23   Q.  And did he ever work in the same office location as you?

24   A.  Yes.

25   Q.  And what office locations were those?

1    A.   In Hong Kong we shared the same exact office.  He in fact

2    worked maybe 40 feet from where I was for a period of one to

3    two months.  In the Bahamas, Alameda -- most of my time in the

4    Bahamas, Alameda was in one small building and directly across

5    the street was FTX's main office.

6    Q.   Outside of work did you ever interact with

7    Mr. Bankman-Fried?

8    A.   Yes.

9    Q.   How?

10   A.   Various social events.  We spent a lot of time in

11   particular on the paddle courts, which is a game like tennis.

12   Q.   Based on your employment at Alameda and your day-to-day

13   interactions and then also your knowledge of Mr. Bankman-Fried

14   in social activities outside of the work, in what ways, looking

15   at this tweet, I don't run Alameda, in what ways, if any, was

16   that not true?

17           MR. EVERDELL:  Objection.  It's also cumulative, your

18   Honor.

19           THE COURT:  It's cumulative why?

20           MR. EVERDELL:  It is getting to the point your Honor

21   made before, which is --

22           THE COURT:  I am not going to say it in front of the

23   jury.

24           MR. EVERDELL:  I will say it's a foundation objection

25   to start with.

1          THE COURT:  Counsel, come here.

2          (Continued on next page)

1              (At sidebar)

2              THE COURT:  You both get A plus in evidence law, but

3    this is a colossal waste of time.  There is absolutely no doubt

4    he owned the company.  Ellison, the ostensible co-CEO or CEO,

5    runs all these decisions through him.  He was obviously the

6    boss.  What are we wasting this time for?

7              MS. KUDLA:  Your Honor, the employee is a low-level

8    employee, and even from his level of employment he could see,

9    based on this day-to-day --

10             THE COURT:  So what.  So what.

11             MS. SASSOON:  Your Honor, this is a misrep.  The tweet

12   is him saying --

13             THE COURT:  Of course it is.  It's a misrep, no matter

14   what this guy says.

15             MS. SASSOON:  They don't seem to be conceding that

16   these are misreps.

17             MR. EVERDELL:  I don't concede that this witness has

18   the basis to be able to make this statement.  That's all, your

19   Honor.

20             THE COURT:  If you want to play this out this way,

21   fine.  I will let you run evidence for introducing introductory

22   trial lawyers, but this is a joke.

23             MR. EVERDELL:  I understand, your Honor.  I am not

24   trying to waste time.

25             MS. KUDLA:  Your Honor, we are only making very

1    limited points here that even in his low-level position, the

2    minimal things that he saw that he observed with Sam

3    Bankman-Fried providing direction.

4              THE COURT:  Why don't you ask him that.

5              MS. KUDLA:  I am getting to that point.  It will only

6    take about ten minutes.

7              THE COURT:  Some people don't have ten minutes left to

8    live.

9              MS. KUDLA:  Fair.

10             MS. SASSOON:  Your Honor, we can't assume that the

11   jury credits everything a cooperating witness says.  It's

12   appropriate to corroborate the cooperator and to establish --

13             THE COURT:  If your case rises and falls on whether

14   this guy believed that Sam Bankman-Fried was running the show,

15   you've got troubles.  Could we move along.  There doubtless are

16   things he saw perhaps.  I say doubtless.  I wasn't there.

17             MS. KUDLA:  That's fine, your Honor.

18             (Continued on next page)

19

20

21

22

23

24

25

1    (In open court)

2         MS. KUDLA:  We can take Government Exhibit 849 down

3    for a moment.

4    Q.  Mr. Drappi, I want to focus on your employment.  During

5    your employment at Alameda, including your interactions with

6    the defendant, were there any ever any ways that the defendant

7    remained involved in Alameda's management and operation after

8    he had stepped down as CEO?

9    A.  Yes.

10   Q.  And what are some of the general categories that you

11   observed in your employment?

12   A.  He maintained direct communication with Alameda employees,

13   he weighed in on a number of large trades, and he still had

14   access to Alameda data.

15   Q.  Let's take those one at a time.  You said that he remained

16   in communication with Alameda employees.  How did he do that?

17   A.  Mainly through Signal chats.

18   Q.  And then the next category of information that you had

19   mentioned was that he had access to Alameda trading data.  What

20   type of Alameda trading data did the defendant have access to?

21   A.  He had access to both Alameda's internal user interface

22   that all traders would use, and he also had access to back-end

23   data as well.

24   Q.  When you say Alameda's internal user interface, was there a

25   name for that?

1    A.   Yes.  It was called pointer.

2    Q.   How did you know that the defendant had access to pointer?

3    A.   So there was one moment where the defendant asked me to

4    regrant him access after an office IP address changed.

5    Q.   Did pointer have any type of log-in credentials?

6    A.   Yes.

7    Q.   As a software engineer, did you have the ability to view

8    what Alameda employees had log-in privileges?

9    A.   Yes.

10   Q.   During the course of your employment from 2021 until later,

11   did the defendant always have access to Alameda pointer?

12   A.   Yes.

13   Q.   Did FTX employees have access to Alameda pointer data?

14   A.   Very few of them did.

15   Q.   Now, you also mentioned that Mr. Drappi, the third example

16   was that he provided direction on Alameda trading decisions.

17   Did I hear you correctly?

18   A.   Yes.

19   Q.   So you were a software engineer.  How do you know that the

20   defendant provided Alameda trading direction?

21   A.   Every single day I spoke to Alameda traders.

22   Q.   And were these the Alameda traders that were responsible in

23   the scope of their duty for executing trades?

24   A.   Yes.

25   Q.   So focusing on 2022 as the time period, did you ever learn

1    that there were trades taken as a result of the defendant's

2    direction?

3    A.  Yes.

4    Q.  And what is an example of a trade that you learned was

5    taken at the direction of the defendant?

6    A.  There was one trade that was posted about in Alameda's

7    Slack channel that involved selling Japanese bonds and buying

8    the currency.  I might have reversed the directions.  It was

9    posted about and afterwards it became clear -- I talked to the

10   author, the poster.

11            MR. EVERDELL:  Objection.  Hearsay.

12            THE COURT:  Ms. Kudla.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. KUDLA:

2  Q.  Mr. Drappi, who did you talk to about this specific trade?

3  A.  Ben Xie.

4  Q.  And who is Ben Xie?

5  A.  Ben Xie was a senior trader at Alameda Research.

6  Q.  And did you ever ask Mr. Xie about this Japanese bond

7  trade?

8  A.  I believe in the comments of the post or in real life.  I

9  can't remember which.  But we had talked about it.

10 Q.  What, if anything, did Mr. Xie say with respect to why

11 Alameda was executing this trade?

12         MR. EVERDELL:  Objection.

13         THE COURT:  Overruled.

14 A.  He said it was—Sam wanted to do it.

15 Q.  Was there ever any other occasion in 2022 when you learned

16 that a Alameda trade was taken at the defendant's direction?

17 A.  Yes, there was one other.

18 Q.  And what was that at the time?

19 A.  There was a moment where Alameda wanted to sell a bunch of

20 their NASDAQ—the NASDAQ index, and the idea behind that was to

21 hedge its exposure to crypto.

22 Q.  And Mr. Drappi, how did you learn about this NASDAQ trade?

23 A.  Ben Xie was the one who led the trading, and also Ben Xie

24 was the person who said that Sam was the one who wanted to do

25 this.

1    Q.   Now, Mr. Drappi, let's move forward now to November 2022.

2    Did there come a time in November 2022 when you learned about

3    an increase in customer withdrawals at FTX?

4    A.   Yes.

5    Q.   And what Alameda office location were you working at at

6    that time?

7    A.   I was in the new Hong Kong office in Wan Chai.

8    Q.   During this time period how, if at all, were you working to

9    respond to these increased customer withdrawals?

10   A.   I was working on modifying some of our code to send more

11   capital in an automated way to FTX, helping our settlement team

12   to sell.

13   Q.   Did there ever come a point in time where you stopped

14   making these efforts to assist processing withdrawals?

15   A.   Yes, there did.

16   Q.   And where were you when that happened?

17   A.   I was in the Hong Kong office, seated at my desk.

18   Q.   Was this in the daytime or in the evening?

19   A.   It was around 11 p.m. Hong Kong time, night.

20   Q.   Was anyone else present with you at the office?

21   A.   Yes.  Tony Qian was an Alameda trader seated directly

22   behind me; Caroline Ellison was present, she was seated to

23   Tony's right; and David Nyeste, also another trader who was

24   there as well.

25              MR. EVERDELL:  Your Honor, do we have a date for this?

```
 1              THE COURT:  November of 2022.

 2              MR. EVERDELL:  Any more specific?

 3              THE WITNESS:  November 8th.  I believe it's 11 p.m.

 4              THE COURT:  Can counsel agree on what time and date

 5    that was in the Bahamas?

 6              MS. KUDLA:  Your Honor, I believe the witness has said

 7    he was in the Hong Kong office.  And I'll clarify date and

 8    time.

 9              THE COURT:  Yes, I know he was in the Hong Kong

10    office.  That's exactly why I made the request.

11              MS. KUDLA:  Oh.

12    BY MS. KUDLA:

13    Q.  Mr. Drappi, do you know what time that was in the Bahamas?

14    And if you don't know, that's okay.

15              THE COURT:  And what date.

16    Q.  And what date.

17    A.  I'm certain it was a Tuesday.  I'm pretty sure that Tuesday

18    was November 8th.  Bahamas is a 12-hour or 13-hour time

19    difference.  I think it was 12.  But we can look at calendars,

20    I guess.

21              THE COURT:  So was it November 8th in Hong Kong or

22    November 8th in the Bahamas?

23              THE WITNESS:  It was November 8th both, or both times,

24    or both──

25              THE COURT:  Both places.
```

 1          THE WITNESS:  Yeah.

 2   BY MS. KUDLA:

 3   Q.  And to be clear, Mr. Drappi, where were you?

 4   A.  I was in Hong Kong.

 5   Q.  And to orient us, you had just mentioned a number of names

 6   of the people who were at the Hong Kong office with you.  Did

 7   this include all Alameda employees or just a handful?

 8   A.  No, just the people that worked nights.

 9   Q.  Now what was the first thing that caused you to stop

10   working, Mr. Drappi, that night?

11   A.  Tony kind of said something that was along the lines of

12   like, *What's this?  Are you seeing this?*  You know, some

13   expletive, kind of, you know——

14   Q.  And what did Mr. Qian refer to when he said, *Are you seeing*

15   *this?*

16   A.  He referred to a post on Twitter.

17   Q.  And what did that Twitter post say?

18   A.  Twitter was a post by Sam Bankman-Fried saying something

19   like——

20          MR. EVERDELL:  Objection.  Hearsay.

21          MS. KUDLA:  Your Honor, it's being offered for the

22   effect on the listener.

23          THE COURT:  All right.  On that limited basis.

24   Q.  What did the tweet say?

25   A.  *Our first investors are now our last, and Binance is buying*

1    *FTX,* with maybe another sentence in there.

2    Q.  What was your reaction that Binance was being——was

3    purchasing FTX, as tweeted by Mr. Bankman-Fried?

4    A.  I was utterly shocked.

5    Q.  What happened at the Hong Kong office that night after this

6    news was announced?

7    A.  Well, when Tony said that, he said it out loud, but he also

8    really said it as a question to Caroline, to be like, what,

9    what's going on?  And she replied that there was——

10           MR. EVERDELL:  Objection, hearsay.

11           MS. KUDLA:  Your Honor, this goes to the exact

12   arguments that we had made before.  It's being offered under

13   801(d)(2)(D) and also 801(d)(2)(E) and 801(d)(1)(B) as a prior

14   consistent statement.

15           THE COURT:  Run through the numerical soup for me,

16   please.

17           MS. KUDLA:  Yes, your Honor.  First, under

18   801(d)(1)(B).

19           THE COURT:  B as in banana?

20           MS. KUDLA:  Correct.  Prior consistent statement with

21   a declarant's testimony——

22           THE COURT:  That's (d) as in some other kind of fruit.

23           MS. KUDLA:  No.  801(d) as in dog, not a fruit.  And

24   then B as in——

25           THE COURT:  All right.  (d)(1)(B).  Is that what you

1    said?

2              MS. KUDLA:  Correct.  As a prior consistent statement.

3              THE COURT:  And this is a statement by Ms. Ellison?

4              MS. KUDLA:  Correct.  And there also are alternative

5    bases under 801(d)(2)——

6              THE COURT:  I will take it, and if there's a request

7    for a limiting instruction, I'll consider it later.

8    BY MS. KUDLA:

9    Q.  At that time, Mr. Drappi, what did Ms. Ellison say?

10   A.  She said that FTX had a shortfall of user funds and that

11   this was caused by Alameda borrowing user funds from FTX to

12   repay its prior loans, and it had used those prior loans to

13   make illiquid investments in various different ventures and

14   just companies, basically.

15   Q.  Prior to Ms. Ellison's statement that night——

16             THE COURT:  Okay.  Now I'm ready to give the limiting

17   instruction right now.

18             MR. EVERDELL:  Thank you, your Honor.

19             MS. KUDLA:  Your Honor?

20             THE COURT:  Yes.

21             MS. KUDLA:  May we be heard at sidebar regarding a

22   limiting instruction?

23             THE COURT:  All right.

24

25

 1                (At the sidebar)

 2                THE COURT:  Okay.

 3                MS. KUDLA:  Your Honor, the government does not

 4    believe that a limiting instruction is necessary.  Under the

 5    2014 amendments, this rule was modified as a prior consistent

 6    statement to be added as substantive evidence, and therefore,

 7    it's also under the nonhearsay, so it should be admitted for

 8    all purposes without a limiting instruction.

 9                THE COURT:  Here's the instruction I'm going to give,

10    from the Third Circuit model instructions.

11                I perhaps was ill advised in using the word

12    "limiting."

13                MS. KUDLA:  Yes.

14                MR. EVERDELL:  Thank you.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2              THE COURT:  Okay.  Folks, you have just heard evidence

3     that Ms. Ellison, long before this trial and, according to her

4     testimony, before she had any awareness of any government

5     investigation, if indeed there was any, on November the 8th of

6     2022, made statements that were the same or similar to what she

7     said here on the witness stand.  You may consider evidence of

8     that statement in deciding the facts of this case.

9              In addition, the evidence may help you decide whether

10    you believe Ms. Ellison's testimony.  If she said essentially

11    the same thing before trial and before awareness of anything

12    that would give her a motive to give a false account, that may

13    be reason for you to believe her trial testimony on the same

14    subject.

15             Now this is going to come up this afternoon and maybe

16    tomorrow morning repeatedly, with Ms. Ellison and maybe others,

17    so on those occasions I may give you a very shorthand reference

18    to what I've just said, and we will all know what I'm talking

19    about, I trust.  And if counsel disagree, at that time we all

20    know that they will quickly let me know that they disagree.

21             So we'll go on.

22    BY MS. KUDLA:

23    Q.  Mr. Drappi, going back to the night of November 8th at the

24    Hong Kong office, prior to that evening and Ms. Ellison's

25    statement that Alameda had borrowed FTX customer deposits to

1   repay its loan, had you had any knowledge of that before?

2   A.  No.

3   Q.  And what was your reaction to learning this information?

4   A.  I was utterly shocked.

5   Q.  Now that evening, Mr. Drappi, did Ms. Ellison say who did

6   have prior knowledge about Alameda's borrowing?

7   A.  Not that evening.

8   Q.  Did there come another time when Ms. Ellison addressed all

9   Alameda employees about this issue?

10  A.  There did, yes.

11  Q.  And when did that occur?

12  A.  The very next night, about exactly 24 hours later.

13  Q.  And to be specific then, the very next night would be what

14  date?

15  A.  Wednesday, November 9th, around 11 p.m.

16  Q.  And is this Hong Kong time?

17  A.  Hong Kong time, yes.

18  Q.  All right.  Now where——how did she address all Alameda

19  employees?

20  A.  We had what was called an all hands meeting that just so

21  happened to be scheduled every other Wednesday, and this was

22  every other Wednesday.  And we all sat in a circle.  She sat on

23  a beanbag that was kind of on one edge of the circle, and, you

24  know, most of us were on a couch that was like in a half-circle

25  shape couch.

1    Q.  How many people were there?

2    A.  About 15 people that were physically present in the Hong

3    Kong office.

4    Q.  And Mr. Drappi, who, if anyone, led that meeting?

5    A.  Caroline Ellison led the meeting.

6    Q.  And did anyone ask questions during the meeting?

7    A.  Yes, several.

8    Q.  And who, if anyone, was responding to those questions?

9    A.  Caroline.

10   Q.  And where were you in relationship to Ms. Ellison during

11   the meeting?

12   A.  I was seated fairly, fairly close to her; like I could see

13   her completely.  I was, you know—to my left there was one

14   person and then to that person's left was her.

15   Q.  Were you in a position that allowed you to see Ms. Ellison

16   as she spoke?

17   A.  Yes.

18   Q.  And were you also in a position that allowed you to see

19   others who were present?

20   A.  I could see every person that was in the meeting.

21   Q.  Now during this all hands meeting did Ms. Ellison say who

22   knew Alameda used FTX customer deposits to repay its loans?

23   A.  She did say that, yes.

24   Q.  Who did she say knew?

25   A.  Sam Bankman-Fried, Gary Wang, Nishad Singh, and herself.

1    Q.  Mr. Drappi, was this all hands meeting audio recorded?

2    A.  It was.

3    Q.  And who recorded the meeting?

4    A.  Rick Best.

5    Q.  And who's Rick Best?

6    A.  He's an Alameda trader that joined three days prior to this

7    all going down.

8    Q.  Were you aware that Mr. Best was recording?

9    A.  I was not aware.

10   Q.  And did Mr. Best announce during the meeting that he was

11   recording it?

12   A.  He did not.

13   Q.  During the meeting where was Mr. Best located in

14   relationship to Ms. Ellison?

15   A.  He was directly to Ms. Ellison's right, which is also to my

16   left.

17   Q.  And Mr. Drappi, did you ever obtain a copy of this

18   recording?

19   A.  I did.

20   Q.  And how did you get that copy?

21   A.  Rick sent it to me.

22   Q.  Did you provide the recording to the government through

23   your attorney?

24   A.  Yes.

25   Q.  And Mr. Drappi, in front of you there should be a binder,

1    and if you open that binder, in the inside jacket there should

2    be a CD.  Do you see that?

3    A.  Yes.

4    Q.  And that CD, it's marked Government Exhibits 433A through

5    F.  Do you see that?

6    A.  Mm-hmm.

7    Q.  Okay.  And prior to your testimony here today have you

8    reviewed Government Exhibit's 433A through F?

9    A.  Yes.

10   Q.  What are they?

11   A.  They are audio clips of this all hands meeting.

12   Q.  And are they accurate audio clips?

13   A.  Yes.

14   Q.  Now also in that same binder——

15           MS. KUDLA:  Well, the government offers Government

16   Exhibits 433A through F at this time.

17           THE COURT:  Received.

18           (Government's Exhibits 433A through 433F received in

19   evidence)

20           THE COURT:  And——well, we'll get to it later.  Go

21   ahead.

22   BY MS. KUDLA:

23   Q.  And Mr. Drappi, in front of you there's a binder with

24   exhibits labeled 433-T with subparts A through F.  Do you see

25   those?

1    A.  Yes.

2    Q.  What are those?

3    A.  These are transcripts of the exact audio.

4    Q.  And have you reviewed these transcripts prior to your

5    testimony here today?

6    A.  Yes, I have.

7    Q.  And do these transcripts accurately transcribe the audio

8    recordings in Government Exhibits 433A through F?

9    A.  Yes, they do.

10        MS. KUDLA:  Now, your Honor, the jurors have under

11   their seat a binder containing the transcripts of Government

12   Exhibits 433-T-A through F.  So with your Honor's permission,

13   they may read along.

14        THE COURT:  You're offering them?

15        MS. KUDLA:  Yes, we are, your Honor.

16        THE COURT:  Received.

17        (Government's Exhibits 433A-T through 433F-T received

18   in evidence)

19        THE COURT:  Now, members of the jury, the evidence of

20   what was said at the meeting in part are the recordings, the

21   excerpted recordings, the sound.  The transcripts are simply as

22   aides to your following the audio.  And in the event that your

23   hearing of the sound leads you to believe that what was

24   actually said is at some variance with the transcript, it's the

25   sound recording that counts, not the transcript.  You consider

1  the sound recording.  This, of course, comes up all the time in

2  cases in which tons of evidence are in foreign languages where

3  there are translations, but the instruction is appropriate here

4  as well.

5      Further, I will instruct you that these excerpts

6  contain recordings of things that Ms. Ellison said, which are

7  all subject to the instruction I just gave you a few minutes

8  ago about what happened on the night of November 8th, and in

9  some cases, you will hear other voices saying things or asking

10 questions.  Those other voices are evidence of what those

11 people said but not for the truth of what they said.  It's so

12 that you can understand what Ms. Ellison said as a result of

13 whatever was said to her.

14      Okay.  Let's go.

15      MS. KUDLA:  All right.  Your Honor, may we please

16 publish Government Exhibit 433A to the jury, and it's

17 Tab 433A-T.

18      (Audio played)

19 BY MS. KUDLA:

20 Q.  So Mr. Drappi, let's start with the basics.  Who was

21 speaking on that recording?

22 A.  Caroline Ellison.

23 Q.  And when Ms. Ellison said that there was "FUD" about the

24 FTX shortfall caused by Alameda borrowing using FTX user

25 deposits, what does the term "FUD" mean?

1  A.  It's an acronym that stands for fear, uncertainty, and

2  doubt, and it's often used in the crypto world when, you know,

3  people are saying that about you.

4  Q.  Now how would you describe Ms. Ellison's demeanor as she

5  addressed the group?

6  A.  She was sunken, you know, kind of slouching, you know, did

7  not display confident body language.

8  Q.  After Ms. Ellison's initial remarks to the group did anyone

9  ask questions?

10  A.  Yes.

11        MS. KUDLA:  Can we please now publish Government

12  Exhibit 433-B.

13        (Audio played)

14  Q.  Who asked Ms. Ellison whether there was a plan for Alameda

15  to pay back FTX customers?

16  A.  I did.

17  Q.  And did Ms. Ellison's response that FTX was trying to raise

18  money from investors to fill this hole caused by borrowing

19  concern you in any way?

20  A.  Yes.

21  Q.  Why did that concern you?

22  A.  Generally when a company raises money, it's about, you

23  know, an exciting, you know, future growth and not to fill a

24  hole in a balance sheet.

25  Q.  At this time, Mr. Drappi——

 1                MS. KUDLA:  Well, can we please play, publish

 2       Government Exhibit 433C.

 3                (Audio played)

 4       Q.  Who asked Ms. Ellison if Alameda's loan on FTX was

 5       collateralized through the spot margin book?

 6       A.  I did.

 7       Q.  And is there any difference, Mr. Drappi, between a spot

 8       margin book and the borrow/lend program?

 9       A.  No, they're synonyms.

10       Q.  So when Ms. Ellison responded that it was not through the

11       normal spot margin, you replied, "That seems pretty bad."  What

12       did you mean by that?

13                MR. EVERDELL:  Objection.

14                THE COURT:  Sustained.

15       Q.  You responded to Ms. Ellison.  What did you respond?

16       A.  I said, oh——

17                MR. EVERDELL:  Objection.  The transcript speaks for

18       itself, your Honor.

19                THE COURT:  Sustained.

20       Q.  Mr. Drappi, did you have any concerns when Ms. Ellison said

21       that it was not through the spot margin——

22                MR. EVERDELL:  Objection, relevance.

23                THE COURT:  Sustained.

24                MS. KUDLA:  Can we please publish Government

25       Exhibit 433D now.

1          (Audio played)

2   Q.  In Government Exhibit 433D, Ms. Ellison had laughed.  Did

3   Ms. Ellison appear to be having a good time at the meeting,

4   based on your observation?

5          MR. EVERDELL:  Objection.

6          THE COURT:  Overruled.

7   A.  No.  I would characterize that as nervous laughter.

8   Q.  At this point in time how long had you known Ms. Ellison?

9   A.  About a year and a half.

10  Q.  How frequently had you been able to observe Ms. Ellison

11  over that year and a half?

12  A.  On average, six days out of seven per week.

13  Q.  And was it common—you characterize it as a nervous laugh.

14  Was that something common to Ms. Ellison, based on your

15  relationship?

16  A.  Yeah, that was quite often.

17          MS. KUDLA:  Can we please publish Government

18  Exhibit 433E.

19          (Audio played)

20  Q.  Mr. Drappi, when you first asked Ms. Ellison who was aware

21  about this issue, did she identify any names?

22  A.  No.  She dodged the question the first time.

23  Q.  You then used the term "YOLO" when you asked again who was

24  explicitly aware about this.  What does the term "YOLO" mean?

25  A.  It's an acronym for "you only live once."

1   Q.  What did you mean when you said, "I'm sure this wasn't like

2   a YOLO thing"?

3   A.  When you do a YOLO thing, it's something that's spontaneous

4   and not premeditated, and I wanted to have Ms. Ellison confirm

5   that indeed, you know, they had meetings about this and there

6   was a deliberate decision, as I suspected it would be.

7         MS. KUDLA:  Now can we please publish Government

8   Exhibit 433F.

9         (Audio played)

10  Q.  Who asked Ms. Ellison whose decision it was to use FTX user

11  deposits?

12  A.  Diana Ma.

13  Q.  And is there a reason that that question is so faint on the

14  audio recording?

15  A.  Yes.  There are two.  Most importantly, she was seated

16  pretty far away from the recording; and second, she's just a

17  naturally very soft-spoken person.

18  Q.  When Ms. Ellison said that FTX had always allowed Alameda

19  and only Alameda to borrow FTX user funds, who owned FTX,

20  Mr. Drappi?

21  A.  Sam Bankman-Fried owned FTX.

22  Q.  After the all hands meeting did you continue to work for

23  Alameda?

24  A.  No.  I resigned within 24 hours.

25        MS. KUDLA:  Your Honor, no further questions.

1    THE COURT:  Mr. Everdell?

2    CROSS EXAMINATION

3    BY MR. EVERDELL:

4    Q.  Good afternoon, Mr. Drappi.

5    A.  Good afternoon.

6    Q.  You were asked a few questions on your direct examination

7    about the pointer system, correct?

8    A.  Correct.

9    Q.  Okay.  I think you testified that that is Alameda's

10   database?

11   A.  It's Alameda's internal tool for a lot of things.

12   Q.  Okay.  Well, there's a lot of data that's on pointer; is

13   that right?

14   A.  Yes.

15   Q.  Okay.  For example, data about Alameda's trades, right?

16          MS. KUDLA:  Objection.

17          THE COURT:  Ground?

18          MS. KUDLA:  It goes beyond the scope.

19          THE COURT:  Not so far.  Overruled.

20   A.  Could you repeat the question.

21   Q.  It had, for example, data about Alameda's trades that it

22   was making?

23   A.  Yes.

24   Q.  It had data about transfers that Alameda makes from one

25   exchange to another?

1    A.  Yes.

2    Q.  And you said that Sam Bankman-Fried had access to this

3    database, right?

4    A.  Yes.

5    Q.  But you, sitting here today, don't know the data that he

6    was accessing, right?

7    A.  No.

8    Q.  Okay.  You said that others——

9            THE COURT:  No, it's not right or no, he didn't have

10   access, he didn't access it, or nobody accessed it?

11           THE WITNESS:  I know he requested access.  For me, I

12   wasn't watching him when he accessed it.

13   Q.  Right.  So you know he requested access, but you don't know

14   what data he was looking at.

15   A.  No.

16   Q.  Okay.  You also requested——or you also I believe testified

17   that there were others at FTX who had access to the pointer

18   system, correct?

19           MS. KUDLA:  Objection.  Mischaracterizes his

20   testimony.

21           THE COURT:  Sustained.

22   Q.  I believe that you said he wasn't the only one, Sam wasn't

23   the only one that had access to the pointer system?

24           MS. KUDLA:  Objection, vague.

25           THE COURT:  Well, there's nothing vague about it.

1       Answer the question if you can, Mr. Drappi.

2           MS. KUDLA:  Objection, your Honor.  He has not

3   identified what entity, FTX or Alameda.

4   Q.  I believe you testified, Mr. ——

5           THE COURT:  Fair point.  Fair point.  Sustained.  Try

6   again.

7   Q.  I believe you testified, Mr. Drappi, that Sam was not the

8   only one at FTX who had access to the pointer data system.

9           MS. KUDLA:  Objection.  Mischaracterizes his

10  testimony.

11          THE COURT:  Do you remember, Mr. Drappi, saying that,

12  in this courtroom this afternoon?

13          THE WITNESS:  To me?

14          THE COURT:  Yes.

15          THE WITNESS:  Oh, yeah.  I could just resay what I

16  said before.  Yeah, there were very few people at FTX.  I think

17  I could even list you who I think had access.

18  BY MR. EVERDELL:

19  Q.  Okay.  There were others who had access.  So who else had

20  access?

21  A.  To my knowledge, Gary Wang, Nishad Singh, and potentially

22  Ryan Salame.

23  Q.  Okay.  Now let me ask you a little bit just about the

24  November time frame that we were discussing, okay?

25          All right.  I believe you testified a bit about prior

1   to the all hands meeting there was an occurrence on

2   November 8th, 11 p.m. time, Hong Kong time, right?

3   A.  Yes.

4   Q.  Okay.  And you were in the Alameda offices in Hong Kong at

5   that time?

6   A.  Yes.

7   Q.  All right.  And you said Caroline was there as well, right?

8   A.  She was, yes.

9   Q.  Okay.  And this is when she came out——this is the day that

10  it was announced that Binance was going to be acquiring FTX,

11  right?

12  A.  Yes.

13  Q.  Okay.  And you said that she made a statement, or she came

14  out and made a statement to the people that were there, right?

15  A.  Yes.

16  Q.  Okay.  So you were there, you said.  Who else was there?

17  A.  Tony Qian, David Nyeste, Caroline, and then there might

18  have been a few people on the settlement team, but they were on

19  a different row and so they weren't in my direct eyesight.

20  Q.  So Caroline, David Nyeste, and Tony, right?  Yourself?

21  That's four.  Did I get that right?  And then the settlement

22  team, how many of those were there?

23  A.  They weren't in direct eyesight so I don't actually——I

24  couldn't actually tell you who was there, who wasn't.

25  Q.  Okay.  But did Ms. Ellison make her comments addressed to

1    the whole floor?

2    A.  Really just to us.  Like, Alameda had its own row, and it

3    was clearly meant for the people in Alameda's row to hear.

4    Q.  Okay.  It was meant for you all to hear, right?

5    A.  Yes, she addressed us.

6    Q.  Okay.  And you said that this came as a shock to you,

7    right?

8    A.  Yes.

9    Q.  Okay.  The fact that Binance was going to be buying FTX.

10   A.  Absolutely, yeah.

11   Q.  Okay.  Why did that come as a shock to you?

12   A.  In the, you know, first sense, it was a shock to me that

13   FTX was going to be acquired by anyone; and on top of that,

14   Binance being the acquirer was like the least, you know—the

15   thing I'd expect the least.  This was essentially a rival.

16   Q.  It was—I'm sorry.  I didn't mean to interrupt.  It was

17   FTX's main competitor, wasn't it?

18   A.  I think there were a few other competitors out there, but

19   Binance was certainly the leader in cryptocurrency exchanges.

20   Q.  Okay.  One moment.

21        Okay.  Now let me just jump ahead to the next day, all

22   right?  So this is now November 9th, correct?

23   A.  Yes, that's the next day.

24   Q.  And this is when you said there was an all hands meeting,

25   right?

1    A.   Yes.

2    Q.   Okay.  And you were still in the Hong Kong office, right?

3    A.   Yes.

4    Q.   This was a regularly scheduled meeting?

5    A.   Every other Wednesday, and this happened to be that every

6    other Wednesday.

7    Q.   Okay.  And you said that Ms. Ellison came out and gave her

8    comments about what was happening, right?

9    A.   Yeah.

10   Q.   And that's some of the recordings we heard, right?

11   A.   Yes.

12   Q.   All right.  I think you said that there were approximately

13   15 people present; is that right?

14   A.   Yeah, approximately.

15   Q.   Okay.  Were those just the people that were physically

16   present in the room?

17   A.   Yes, that was just physically present in the room.  We had

18   also teleconferenced in maybe any teammate who could join.

19   Q.   Okay.  So others were joining remotely.

20   A.   Yes.

21   Q.   And about how many people were joining remotely?

22   A.   I—I couldn't see on the laptop, but I do know the screen

23   was basically filled out, so I would approximate at 10.  I

24   mean, the company really only had 30, so you have a maximum

25   there.

1    Q.   Okay.  So close to the 30 employees that were——or roughly

2    30 that were employed by Alameda were there.

3    A.   Yeah, close to it.

4    Q.   Okay.  All right.  And you had commented on Ms. Ellison's

5    demeanor as she delivered her remarks?

6    A.   Yes.

7    Q.   Now isn't it true that you thought she was speaking

8    matter-of-factly when she delivered the remarks?

9    A.   Yeah, for the majority of it, I think she was speaking

10   matter-of-factly.

11   Q.   Okay.  Now after Ms. Ellison spoke——well, no.  I'll take

12   this——we heard a number of clips of the audio from that

13   meeting, right?

14   A.   Yes.

15   Q.   They were played here.  Okay.  And I just want to play one

16   more clip for you, Mr. Drappi, all right?

17           MR. EVERDELL:  If we could cue up Defense Exhibit 415A

18   and——sorry.  B.  I take it back.  415B.  And the transcript

19   associated with that is 415B-T.  And we could put that——we

20   offer those in evidence, your Honor.

21           MS. KUDLA:  No objection.

22           THE COURT:  They are received on the same basis that I

23   received the other recording and transcripts, and I take it

24   counsel have agreed that this was recorded on the same

25   occasion, later than the ones you heard earlier; is that right?

 1              MS. KUDLA:  Agreed, your Honor.

 2              THE COURT:  Mr. Everdell, it's agreed that this was

 3   recorded on the same occasion only later than the others, yes?

 4              MR. EVERDELL:  That's correct, your Honor.  Same

 5   occasion, later in the meeting.

 6              (Defendant's Exhibits 415B and 415B-T received in

 7   evidence)

 8              MR. EVERDELL:  All right.  Go ahead and play it.

 9              (Audio played)

10              MR. EVERDELL:  All right.  I have no further

11   questions, your Honor.

12              THE COURT:  Thank you.

13              Anything else, Ms. Kudla?

14              MS. KUDLA:  No, your Honor.

15              THE COURT:  Okay.  Thank you.

16              Mr. Drappi, you are through and excused.

17              (Witness excused)

18              THE COURT:  Do we have another witness?  And if so,

19   are we ready to go on that?

20              MR. ROOS:  We do, and we have eight minutes, and I can

21   do part of the direct.

22              THE COURT:  Okay.

23              MR. ROOS:  The government calls Zac Prince.

24              (Witness sworn)

25              THE DEPUTY CLERK:  Thank you.  Please be seated.

1          Please state your name and spell your first and last

2     names for the record.

3          THE WITNESS:  Sure.  My name is Zac Prince.  Z-A-C,

4     P-R-I-N-C-E.

5          THE COURT:  You may proceed, Mr. Roos.

6          MR. ROOS:  Thank you, your Honor.

7      ZAC PRINCE,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MR. ROOS:

12    Q.  Good afternoon, Mr. Prince.  Where are you from?

13    A.  I'm originally from San Antonio, Texas.

14    Q.  Where are you living now?

15    A.  I live in Brooklyn.

16    Q.  When did you move to the New York City area?

17    A.  I moved to New York City in February of 2010, after

18    finishing college.

19    Q.  Why did you move to New York?

20    A.  I had a job offer at a technology startup that was

21    attractive and wanted to live in New York City.

22    Q.  Did there come a time where you started a company of your

23    own called BlockFi?

24    A.  Yes, I founded BlockFi in the fall of 2017.

25    Q.  What was BlockFi?

1    A.  BlockFi was a crypto lending platform was how we were most

2    commonly thought of.  Our first product was a product that

3    enabled people to borrow dollars with their Bitcoin as

4    collateral, and after launching that first product, we expanded

5    into some other products and lines of business, but broad

6    strokes, we were a crypto lending platform.

7    Q.  So by that, people could borrow cryptocurrency?

8    A.  Correct.  So we had—we had different products for

9    different types of clients.  Specifically, we had products for

10   what we called retail clients, which could be normal people or

11   also businesses in some cases but smaller businesses, and then

12   we had products for institutional clients.  On the retail side,

13   the only lending that we did was lending dollars with

14   cryptocurrency as collateral; on the institutional side, our

15   institutional clients could also borrow cryptocurrency in

16   addition to being able to borrow dollars.  So they could borrow

17   Bitcoin and have a loan denominated in Bitcoin, whereas on the

18   retail side, it was just borrowing dollars, with Bitcoin as

19   collateral.

20   Q.  So if BlockFi was lending out cryptocurrency, where was it

21   getting the cryptocurrency from?

22   A.  When we were lending out cryptocurrency, that was always

23   coming from products that we had where clients would hold their

24   cryptocurrency on our platform in exchange for interest, so the

25   most popular product we had in this regard was the called the

1    BlockFi interest account.  That product offered, you know,

2    various interest rates at various times that folks could earn

3    if they held cryptocurrency in that product.  For lending out

4    cash, we at times used the company's equity, at times used debt

5    from institutional credit investors, and also funds from those

6    interest-bearing products that we had on the platform.

7    Q.  So you mentioned customers who lent out money for interest.

8    Who were some of those customers?

9    A.  Sure.  So on the, you know, on the retail side of our

10   platform, I think at our—at our peak we had around 650,000

11   clients that had funds in a—in a BlockFi account.  The vast

12   majority of those were individuals, and they could have

13   accounts ranging from, you know, on the low end, tens or

14   hundreds of dollars in value, up to, on the high end, tens of

15   millions of dollars in value.  So it could be just a, you know,

16   kind of normal everyday investor investing a couple thousand

17   dollars or it could be a rather affluent individual or family

18   office or small business holding, you know, significant capital

19   on our platform.

20   Q.  Did BlockFi tell its customers it was lending out their

21   money for interest?

22   A.  Absolutely.  This is something that we were very clear

23   about.  Everyone knew us as a crypto lending platform.  The

24   whole idea was that the way we were able to offer people

25   interest on the funds they were holding on our platform was

1    that we were going to do something with those funds to generate

2    that interest and specifically what we were going to do was

3    lend those funds out to borrowers, and this was clear in our

4    marketing, in our——in our terms of service, and, you know,

5    podcasts that I went on, everywhere.  It was very well known

6    and described.

7    Q.  Now in terms of the parties that BlockFi was lending to,

8    what types of people or entities was BlockFi lending to?

9    A.  So as I said earlier, you know, on the retail side of our

10   platform, folks could borrow cash with cryptocurrency as

11   collateral.  So that, you know, that ranged——that had a very

12   similar range in terms of the types of borrowers as the types

13   of folks who were holding funds on the platform.  It could be,

14   you know, relatively small investor up to a, you know, larger

15   investor or medium-sized business.  On the institutional side

16   of our platform, we worked with different types of clients.

17   The most common was trading firms.  The trading firms could

18   either be traditional trading firms, so, you know, firms like a

19   Jane Street or a Susquehanna that you might be familiar with in

20   traditional financial markets.  They could also be

21   cryptocurrency-specific trading firms.  In addition to trading

22   firms, we worked with hedge funds, we worked with different

23   types of corporates in the cryptocurrency world, so exchanges

24   or Bitcoin miners, for example.  So on the institutional side

25   of the platform, there's a broader range of the types of——of

 1   businesses that we would lend to.

 2   Q.   Did you ever lend to a trading firm called Alameda?

 3   A.   Yes, we did.

 4   Q.   When did you start lending to Alameda?

 5   A.   The relationship with Alameda I believe started in the

 6   first half of 2021, or maybe there were a few small

 7   transactions towards the end of 2020, but, you know, first half

 8   of 2021, roughly.

 9   Q.   And we'll come back to that.

10        Did there come a time when BlockFi stopped lending to

11   Alameda?

12   A.   Well, there—there came a time that we called back all of

13   the open-term loans that we had to Alameda, which was in June

14   of 2022, and, you know, also a lot of things were terminated as

15   a result of the FTX-Alameda bankruptcy and then subsequently

16   our bankruptcy, but yes, there was a point in time in the

17   summer of 2022 where the loans we had out to Alameda were all

18   called back.

19   Q.   So focusing on the bankruptcy, at the time of—or when was

20   the Alameda-FTX bankruptcy that you're referring to?

21   A.   Early November of 2022.

22   Q.   At that point in time how much money had BlockFi lent out

23   to Alameda?

24   A.   At that point in time, when they filed for bankruptcy, the

25   principal outstanding, you know, the amount that they owed us

1    was around $650 million worth of value.  A week before that it

2    had been a little higher than that, 800 million, but there had

3    been some payments, you know, in that week leading up to their

4    filing, but $650 million was the amount that Alameda owed us at

5    the time of their filing.

6    Q.  So just to be clear, when they filed their bankruptcy, was

7    that paid, had that been paid back to BlockFi, as a lender?

8    A.  No.  No, that was the——the outstanding balance that to date

9    has still not been paid.

10   Q.  And then just one more question before we break, if that's

11   okay with your Honor.  What happened to BlockFi after that?

12   A.  As a result of FTX and Alameda's bankruptcy, because of our

13   lending to Alameda but also some exposure we had to the FTX

14   platform, BlockFi was forced into——into bankruptcy, and so the

15   clients on our platform have, you know, currently, in any of

16   the interest-earning products, an uncertain outcome in terms

17   of, you know, how much of the funds that they had on our

18   platform they will see back.  Our shareholders——

19           MR. COHEN:  Objection, your Honor.

20           THE COURT:  What's the objection?

21           MR. COHEN:  Speculative and beyond the question.

22           THE WITNESS:  I'm sorry.

23           THE COURT:  The question was:  "What happened to

24   BlockFi after that?"  The answer——

25           MR. ROOS:  I think he was describing——

1          THE COURT:  Just a moment.

2          MR. ROOS:  Yes.

3          THE COURT:  The answer began:  "As a result of FTX and

4   Alameda's bankruptcy, because of our lending to Alameda but

5   also some exposure we had to the FTX platform, BlockFi was

6   forced into bankruptcy."  That you may consider.  Everything he

7   said after that is stricken and is to be disregarded.

8          And this is where we will stop for the day.

9          MR. ROOS:  Thank you, your Honor.

10         MR. COHEN:  Thank you, your Honor.

11         (Continued on next page)

1           (Jury not present)

2           THE COURT:  Be seated, folks.

3           Anything else we need to do this evening?

4           MR. RAYMOND:  Your Honor, I just wanted to flag one

5  point.  Over the lunch break, we received a letter from defense

6  counsel, filed on ECF.

7           THE COURT:  Yes.

8           MR. RAYMOND:  So our intention is to file a brief

9  response, hopefully well before midnight, but no promises.

10          THE COURT:  Not before midnight.  Before 8:00, or

11  tomorrow, because I'm not going to read it after 8:00.

12          MR. RAYMOND:  Thank you, your Honor.

13          MR. ROOS:  Judge, if it's okay, we'll just file it

14  tomorrow, unless there's some sort of urgency from the defense

15  perspective.

16          THE COURT:  That's fine with me.

17          MR. COHEN:  Yes, that's fine.

18          THE COURT:  I can't hear you, Mr. Cohen.

19          MR. COHEN:  I was agreeing, your Honor.

20          THE COURT:  Okay.  Good.

21          MR. COHEN:  A rare point of agreeance.

22          THE COURT:  No, that's not true.  You guys work

23  together reasonably well.  I have no complaints.

24          We might break a little short of 1:00 tomorrow, but

25  not much.

1        MR. ROOS:  Okay.  Your Honor, we have this witness and

2   then two other witnesses.  The last one is a law enforcement

3   witness so won't be a problem holding him over to the following

4   week if your Honor either wants to stop after the second

5   witness or just get the first witness, get that one started.

6        THE COURT:  We'll see where we are.

7        MS. SASSOON:  Your Honor, just for planning purposes,

8   can we leave it at those witnesses or do you want us to have

9   people on deck?  It might involve some travel, and if you're

10  considering ending early——

11       THE COURT:  I'm not thinking about more than 15 or 20

12  minutes.

13       MS. SASSOON:  Okay.

14       THE COURT:  Okay.  Thank you.

15       THE DEPUTY CLERK:  All rise.

16       (Adjourned to October 13, 2023, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    Examination of:                                    Page

3    CAROLINE ELLISON

4    Cross By Mr. Cohen . . . . . . . . . . . . . 964

5    Redirect By Ms. Sassoon  . . . . . . . . . .1093

6    CHRISTIAN DRAPPI

7    Direct By Ms. Kudla  . . . . . . . . . . . .1120

8    Cross By Mr. Everdell  . . . . . . . . . . .1152

9     ZAC PRINCE

10   Direct By Mr. Roos . . . . . . . . . . . . .1160

11                         GOVERNMENT EXHIBITS

12   Exhibit No.                                    Received

13    828   . . . . . . . . . . . . . . . . . . .1123

14    849   . . . . . . . . . . . . . . . . . . .1125

15    433A through 433F   . . . . . . . . . . . .1145

16    433A-T through 433F-T   . . . . . . . . . .1146

17                         DEFENDANT EXHIBITS

18   Exhibit No.                                    Received

19    155   . . . . . . . . . . . . . . . . . . .1000

20    1616   . . . . . . . . . . . . . . . . . . .1013

21    415B and 415B-T   . . . . . . . . . . . . .1159

22

23

24

25