NAD1BAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                          22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6                     Defendant.              Trial
    ------------------------------x
7
                                             New York, N.Y.
8                                            October 13, 2023
                                             9:26 a.m.
9

10  Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                             District Judge
13
                            APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    COHEN & GRESSER, LLP
20       Attorneys for Defendant
    BY:  MARK S. COHEN
21       CHRISTIAN R. EVERDELL
         SRI K. KUEHNLENZ
22       DAVID F. LISNER

23  Also Present:
    Luke Booth, FBI
24  Kristin Allain, FBI
    Arjun Ahuja, USAO Paralegal Specialist
25  Grant Bianco, USAO Paralegal Specialist

NAD1BAN1

1          (In the robing room)

2          THE COURT:  Okay.  I wanted to raise with you,

3    Mr. Cohen, whether the Marshals are in fact getting your client

4    over here early in the morning as I ordered them to do, and

5    whether you're availing yourself of that or not, or whether

6    it's too much or too little.

7          MR. COHEN:  We are, your Honor.  We saw him this

8    morning.  I think we've seen him every day that he was

9    available because he's not available after weekends because we

10   have the opportunity to see him in the MDC, which we've also

11   been doing.

12         Now I know this isn't fully within your Honor's

13   control, but we've had serious issues continuing with his

14   medication.  He has ADHD.  He has other conditions as well,

15   which I haven't burdened the Court with.  He really cannot

16   focus without his medication.  They give him one dose at 4 in

17   the morning when they wake him up to come to court.  It wears

18   off in about three hours.  So by the time we see him in the

19   cell block or we see him before your Honor, it's already worn

20   off.  They refuse to give him another dose at lunchtime.  So he

21   spends the entire court day without medication that is

22   specifically designed to help him focus.  And he gets his next

23   dose when he gets back, and last night he got back at 9:00 at

24   night.

25         THE COURT:  He surely does not look unfocused to me in

NAD1BAN1

the courtroom.  But obviously I'm not professionally qualified.

MR. COHEN:  I'm not either, your Honor.  I can only go by what my client tells me, and obviously not knowing before this, so——

THE COURT:  Have you been in touch with Mr. Bork at the Bureau of Prisons as I asked?

MR. COHEN:  Every day.

THE COURT:  So what's the story about giving him the dose?  I mean——

MR. COHEN:  As I understand it, we even offered that we would bring it and give it to him at lunchtime, if the Marshals would permit us.  One of the——well, two things.  As I understand it, the Bureau of Prisons is not willing to do it at lunchtime because the dose is considered a narcotic substance and they don't want one of the Marshals transporting it or——that's what I understand.  But I'm not purporting to speak for the Bureau of Prisons.  I know they have their rules, but that's what we've heard from them.  So it puts us and our client in just a very difficult position.  So your Honor is asking, so that's why I'm——

THE COURT:  I'm sorry.  I couldn't hear.

MR. COHEN:  Your Honor is asking, so that's why I'm——

THE COURT:  Well, yes, and I will either speak directly to Bork or have someone do it and see whether that condition can be changed, if indeed that's a condition.

NAD1BAN1

```
 1              What does the government have?

 2              MR. ROOS:  So, your Honor, we're aware of the issue.

 3   One of our colleagues, Danielle Kudla, has been dealing with

 4   the MDC directly.  Our understanding——my understanding in

 5   speaking with her this morning——I'll also suggest I just go get

 6   her in a moment——is that the MDC is going to put him on an

 7   extended tablet or dose of ADHD, one of those sort of——

 8              THE COURT:  ADHD is the malady, not the drug.

 9              MR. ROOS:  Adderall.  Sorry.  One of those extended

10   release, but if it's okay with your Honor, I'll go get her,

11   since she's the one speaking with the MDC.

12              THE COURT:  Sure.

13              MR. COHEN:  And I should say, your Honor, we are not

14   faulting the efforts of the prosecution team.  We know they've

15   been trying also.  It's just not happening.

16              THE COURT:  Look, I know that both sides have been

17   doing their level best about everything in this matter, and I

18   have no doubts about that.

19              (Pause)

20              THE COURT:  Good morning, Ms. Kudla.

21              MS. KUDLA:  Good morning, your Honor.

22              THE COURT:  What's going on with the Bureau of Prisons

23   in relation to the Adderall?

24              MS. KUDLA:  Yeah.  So I spoke with——I've been in

25   communication with the BOP frequently to try and find a
```

NAD1BAN1

1   solution that allows Mr. Bankman-Fried to get his Adderall

2   added dose during the day.  I spoke to Sophie Papapetru at the

3   BOP this morning at 8 a.m.  She said that the BOP has worked it

4   all the way up the chain.  They have approved an extended dose

5   release.  They've ensured——

6          THE COURT:  Extended-release dose.

7          MS. KUDLA:  Extended-release dose.  They've modified

8   the schedule of a BOP employee to ensure that they can

9   administer this dose at 6 a.m. before he arrives at court and

10  that the dose will be administered to him and the extended

11  release would go for approximately 12 hours, which would then

12  provide the Adderall up until about 6 p.m., and that they have

13  ordered this and they're hoping to have it for him for the

14  first dose available on Monday.  That is the easiest way for

15  the BOP to comply with how they administer controlled

16  substances, and their regulations on that, and allow

17  Mr. Bankman-Fried to ensure that he has his medication during

18  the trial.

19         THE COURT:  Okay.  Please report to me on Monday

20  whether it's happened.

21         MS. KUDLA:  I will.  I'm going to keep in touch with

22  her.

23         (Continued)

24         (Pages 1175-1176 SEALED by order of the Court)

25

NAD1BAN1

1          MS. KUDLA:  Your Honor, one point on the Adderall that

2     I think would be important for the record.  I asked BOP, they

3     confirmed that they spoke with Mr. Bankman-Fried about the

4     extended-release dose, and he's the one who consented to it.

5     They said that they go through the defendant, not the

6     attorneys, because it's related to medical procedures.  So I

7     wanted the Court just to be aware of that.

8          THE COURT:  That last part is not part of the sealed

9     transcript.

10          MR. COHEN:  And I don't know whether this has to be on

11     the record.  It's just a logistical question, your Honor.

12     Judge Garaufis has asked me to come to chambers by 1:30 today,

13     so would it be possible for us to break at 12:30 or 12—

14          THE COURT:  Yes, yes.

15          Okay.  Thank you.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

NAD1BAN1                    Prince - Direct

1              (In open court; jury present)

2              THE COURT:  The jurors and the defendant are present,

3    as they have been throughout.

4              Mr. Prince, you're still under oath.

5              Mr. Roos, you may proceed.

6              MR. ROOS:  Thank you, your Honor.

7     ZAC PRINCE, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MR. ROOS:

10   Q.  Mr. Prince, when we left off yesterday, you were describing

11   the lending aspects of BlockFi's business, and I wanted to ask

12   you, just picking up there, in the course of your work running

13   a lending——crypto lender, did you ever deal with cryptocurrency

14   exchanges?

15   A.  Yes, we did.

16   Q.  How would you deal with cryptocurrency exchanges?

17   A.  I would say in two primary ways.  So we had some

18   cryptocurrency exchanges that were borrowers that would, you

19   know, borrow assets from BlockFi, and we also used

20   cryptocurrency exchanges to place trades, effectively trades

21   that were on behalf of our clients because we had a trading

22   product that was available to our clients and then we needed to

23   reproduce those trades on an exchange on behalf of our clients.

24   So lending to exchanges and also trading on them.

25   Q.  Can you explain what that trading product was that BlockFi

NAD1BAN1                         Prince - Direct

had.

A.   Sure.  So essentially on our retail platform, users could buy and sell cryptocurrencies.  BlockFi was not an exchange, though, we——which basically meant that we weren't matching buyers and sellers.  We were more like a——a broker or an intermediary, so we would add a little bit of a spread to the price of the cryptocurrency that someone was looking to buy or sell.  After the user placed the trade in our app, that trade was done, and then on the back end of that, we would place a similar trade offsetting the user's trade on a cryptocurrency exchange.

Q.   And so just to be clear, what's the difference between BlockFi as a lender and a cryptocurrency exchange?

A.   Well, I think there's a few things.  So certainly the, you know, the key function that crypto lenders played in the market was very different than what exchanges played in the market.  So crypto lenders were, you know, primarily providing a lending function, providing debt capital to different market participants, providing yield to, you know, other market participants who wanted to earn yield, whereas an exchange, their primary purpose is to match buyers and sellers and, you know, find accurate clearing prices for the——for the different currencies that were being traded.  There was also a very important distinction in terms of how assets that were deposited with either a cryptocurrency lending platform or an

NAD1BAN1                    Prince - Direct

1    exchange were understood to be treated, based on——

2              MR. COHEN:  Objection.  Move to strike.

3              THE COURT:  Why?

4              MR. COHEN:  Your Honor, this is the subject of our

5    letter to the Court yesterday.  Might we be heard at the

6    sidebar?

7              THE COURT:  Yes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAD1BAN1                          Prince - Direct

1              (At the sidebar)

2              MR. COHEN:  Your Honor, I believe where this answer is

3     going and where the rest of this is going is an effort to get

4     an opinion from the witness, who's here as a fact witness,

5     about how he believes crypto exchanges should operate.  He just

6     said that BlockFi was not a crypto exchange.  I don't have a

7     problem with them asking about BlockFi's practices as to its

8     own business, which counsel did ask, but now we're getting into

9     an effort to, to use a legal word, shimmy, to expert——

10             THE COURT:  I'm sorry?

11             MR. COHEN:  Shimmy.

12             THE COURT:  Shimmy?

13             MR. COHEN:  Yeah, shimmy over to expert testimony,

14    where he's not been offered as an expert, no pretrial

15    disclosures have been made.  This was the subject of our letter

16    yesterday.  I didn't think this would be dealt with until the

17    Court had ruled on it, but here we are.  So we would object to

18    Mr. Prince giving testimony about how he thinks a crypto

19    exchange should or should not have operated with regard to

20    customer assets, or otherwise.

21             MR. ROOS:  So if I understand the objection correctly,

22    it's a 701 objection, which is a lay opinion objection, and

23    there are several reasons——

24             MR. COHEN:  Before you——it's also a relevance and 403

25    objection.

NAD1BAN1                    Prince - Direct

1          MR. ROOS:  Yeah.  So I'll take each of them in turn.

2     The witness, before giving this answer, testified that he runs

3     a cryptocurrency lender and that as a cryptocurrency lender,

4     they dealt with numerous——

5          THE COURT:  Keep your voice down, please.

6          MR. ROOS:  Sorry.  They dealt with numerous

7     cryptocurrency exchanges, including as a customer on those

8     exchanges, and as a——including as a lender on those exchanges.

9     He testified yesterday that they deposited similar assets on

10     the FTX, so he is the equivalent of a customer.  And the

11     question is, is he allowed, based on that foundation, to

12     testify about what his understanding was of how assets were

13     going to be treated.  And I think there's two for our purposes

14     here.  One is the obvious one, which is that in a trial about

15     fraud, defrauding customers, lenders, those witnesses should be

16     permitted to testify about what their understandings were.  It

17     goes to the issues of misappropriation, it goes to the issues

18     of misrepresentation.  Second, it's relevant, helpful for the

19     jury to understand what the difference is between a

20     cryptocurrency lender, which is a business of lending out

21     assets, versus cryptocurrency exchange, which may not.  They of

22     course can cross-examine on those topics.

23          Taking up the 701 objection, the rule for 701 is not

24     that any type of opinion is impermissible.  It's that it has to

25     be grounded in their perceptions.  This is something he

NAD1BAN1                        Prince - Direct

1      certainly observed because he dealt with it directly.  It's not

2      the subject of scientific or technical testimony.  That's in

3      fact one of the arguments we made in excluding experts is that

4      you do not need expert testimony on these questions.

5            And I don't see the 403 reason here.  It's totally

6      permissible.  There's nothing prejudicial about that.

7            MR. COHEN:  Taking up the 403 point, having this

8      witness speculate about how he thinks an exchange he didn't run

9      in a field where he didn't run an exchange should or should not

10     have worked is substantially prejudicial, given the other

11     witnesses that the government has already called on this topic.

12           THE COURT:  Why is it different from asking an

13     automobile mechanic, what's the difference between a car and a

14     truck?

15           MR. COHEN:  Because that's not really——your Honor,

16     with respect, that's not really what he's doing.  He's asking

17     an automobile mechanic, how should General Motors be run?

18           THE COURT:  But that wasn't the question.  The

19     question was:  What's the distinction between an exchange and a

20     lender?

21           MR. COHEN:  Right.  And he started to answer that and

22     I didn't say anything, and then he moved on to where they're

23     going, which is this back-door expert testimony about how

24     crypto exchanges should or should not be run.

25           THE COURT:  It seems to me that's the subject of

NAD1BAN1                      Prince - Direct

1    cross.

2              MR. COHEN:  Well, your Honor, we would object to it

3    being introduced in the first place.

4              THE COURT:  I understand.  But you are entitled on

5    cross to find out what the basis of his testimony was and to

6    challenge whether he's in a position to make a general

7    statement like that.

8              MR. COHEN:  Well, your Honor has our position, and I

9    don't want to belabor it.

10             THE COURT:  Yes, I understand.  Okay.  Let's go.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  The testimony stands, and Mr. Prince, if

3     you remember where you were, you can complete your answer.  And

4     if not, Mr. Roos will take care of it.

5     A.   I remember where I was.  I was starting to talk about the

6     second important distinction between cryptocurrency lenders and

7     cryptocurrency exchanges, which was in how the market and

8     customers understood what would happen with assets that they

9     placed on those platforms.

10          THE COURT:  Well, let's start with how you understood.

11          THE WITNESS:  Sure.

12    A.   So on crypto lending platforms, generally there was a

13    interest rate that was being earned when you held assets there,

14    and there was an understanding that the reason you were earning

15    that interest rate was because the lending platform was going

16    to take those funds and further lend them on.  And there were

17    generally words that describe this; in BlockFi's terms of

18    service there were words that very clearly described this; in

19    our marketing materials there were words that very clearly

20    described this.  We will lend, relend, pledge, rehypothecate,

21    which is a fancy legal word that means relend assets that

22    you're given.  Contrast that to cryptocurrency exchanges,

23    where——

24          THE COURT:  Let's focus on contrast it to

25    cryptocurrency exchanges with which you dealt.

NAD1BAN1                        Prince - Direct

1          THE WITNESS:  Sure.

2    A.  Contrast that with cryptocurrency exchanges with which I

3    dealt personally or BlockFi dealt with.  The expectation——

4          MR. COHEN:  With which he dealt personally, your

5    Honor.

6          MR. ROOS:  Well, he is the CEO of BlockFi, so I think

7    it's appropriate.

8          MR. COHEN:  There's no foundation.

9          THE COURT:  I think another question and you might be

10   there, Mr. Roos, okay?

11   BY MR. ROOS:

12   Q.  So before you answer what your understanding of how

13   cryptocurrency exchanges with which you dealt treated assets,

14   let me just ask you:  As the CEO of BlockFi, were you involved

15   in decisions about lending and where to deposit assets?

16   A.  Yes, absolutely.

17   Q.  And did you oversee aspects of BlockFi depositing assets

18   with cryptocurrency exchanges?

19   A.  Yes, I was heavily involved in those decisions.

20   Q.  So then based on all of that work at BlockFi, what was your

21   understanding of how cryptocurrency exchanges dealt with

22   customer assets?  And I'm referring to the exchanges to which

23   you dealt with directly, not generally the overall market.

24   A.  Sure.  To put it simply, the assets stayed within the

25   exchange environment.  They weren't re-lent on or taken off of

1    the exchange to be used by some——by some third party.  They

2    stayed within the——whatever the custodial setup was of the

3    exchange.

4    Q.  What do you mean——I just want to ask about a few terms.

5    You said the term "custodial setup."  What is that?

6    A.  It's, you know, whatever——whatever technical or, you know,

7    security infrastructure the exchange had to hold the assets

8    that the users had deposited and keep them safe.

9    Q.  And you used the word a few moments ago "rehypothecate,"

10   which I think you said was a fancy legal term.  What does

11   rehypothecate mean?

12   A.  Rehypothecation effectively means you're taking collateral

13   from one party and then using that collateral to make a loan to

14   another party.  And I was using the term to describe, you know,

15   crypto lending platforms.  So crypto lending platforms, BlockFi

16   was very clearly doing rehypothecation and disclosing that we

17   were doing rehypothecation.

18   Q.  Now when it came to making loans, what was BlockFi's

19   process in deciding whether to lend to a particular borrower?

20   A.  Sure.  So we had a couple of, you know——going back to what

21   I was talking about yesterday, a couple different kind of loan

22   products.  We had our retail-facing loan products and our

23   institutional-facing loan products.  In both cases there were,

24   you know, steps that borrowers had to go through before they

25   could take a loan with us.  On the retail side, the steps were

NAD1BAN1                          Prince - Direct

1     basically that they had to go through what was called our

2     KYC——which stands for "know your customer"——checks; they had to

3     sign the loan agreement; and they had to transfer the

4     collateral that they were posting for the loan on to the

5     BlockFi platform.  And on the retail side of our platform, all

6     borrowers accessed loans at effectively the exact same terms.

7     On the institutional side of our platform, there was a bit more

8     customization available to the borrowers, and there was a——an

9     even more thorough underwriting and diligence process that went

10    into how we evaluated counterparties that we would essentially

11    work with as borrowers on the institutional side.  So there was

12    "know your customer"——KYC——checks, those are generally more

13    thorough for businesses, because you have to look at the

14    identities of anyone who's an owner of the company greater than

15    a certain percentage, but we also did diligence around what

16    type of business, you know, the potential institutional

17    borrower was, what the financial health of that business was,

18    and we would, you know, try to underwrite any and all financial

19    documents that we could get our hands on from the institutional

20    clients.  We also would at times, depending on the nature of

21    their business, do some security or technology underwriting of

22    their business.  And then our risk management team developed

23    very robust policies and procedures that, based on our

24    underwriting, would categorize institutional, potential

25    institutional clients into different risk tier buckets, and

NAD1BAN1                        Prince - Direct

1    then those risk tier buckets kind of dictated under what terms

2    we would be able to lend to that institutional borrower if they

3    were approved onto the platform; so at what collateral levels,

4    at what interest rates, etc.

5    Q.  Let me just ask you a few follow-ups.

6         You mentioned the word "diligence."  What did you mean

7    by that?

8    A.  "Due diligence" is a common term used to describe—I mean,

9    it's effectively kind of like research to—to make an informed

10   decision about, you know, whether you should do something, and

11   sometimes you might use the word "due diligence" to describe

12   the work you're doing to decide if an investment is one you

13   should make.  In our case, the due diligence we were doing was

14   to try and make an informed decision around whether we should

15   be lending to a certain counterparty or not and under what

16   terms we would be comfortable lending to them.

17   Q.  Now did BlockFi ever do due diligence and then decide not

18   to borrow or not to lend to a customer?

19   A.  Yes, absolutely.

20   Q.  When you were doing due diligence—and I think you

21   mentioned financial due diligence—of an institutional

22   customer, what kinds of financial research were you doing?

23   A.  So we, you know, we had—we would ask for effectively any

24   and all financial information that the potential borrower was

25   willing to share with us.  In some cases the information that

NAD1BAN1                    Prince - Direct

they were comfortable sharing would be relatively limited, so,

for example, a net asset value statement that would just

describe for, you know, for a fund, for example, how many

assets were in the fund.  In other cases we received audited

financials, which could be income statements and balance

sheets, and then everything, you know, kind of in between, so

unaudited financials would be in between those two things, but

you know, financial—financial reporting, financial—financial

documents that showed the health of the business.

Q.  And just on those terms, when you said like a NAV

statement, what were you referring to?

A.  NAV stands for net asset value.  And it's a common—it's a

common document that's produced by asset managers or funds,

where they're saying, you know, here's how many assets we have

in our fund vehicle.

Q.  And you also mentioned audited financials.  What were you

referring to there?

A.  So, you know, audited financials refers to financials that

are produced and verified by a third-party accounting firm.

Q.  In 2022, how many employees did BlockFi have doing this

type of research and due diligence?

A.  I mean, across our, you know, risk management, compliance,

and security teams, depending on, you know, what point in time

in 2022, probably between a hundred and 200 people, and these

were, you know, generally folks that they came from

sophisticated financial industry backgrounds, so, you know,

think folks who worked at large banks doing similar roles or

large asset management companies doing similar roles before

they joined BlockFi.

Q.   Did BlockFi ever approve loans without doing any due

diligence?

A.   No.

Q.   Now in terms of lending, what involvement did you have in

making lending decisions?

A.   So our lending decision-making process, especially for

institutional loans, became relatively, you know, robust and

sophisticated over time.  So there were, you know, risk

management policies and procedures that, you know, that were

governed at the board level.  We had a board—we had a board

audit and risk committee that I was, you know, that I was a

part of, as CEO.  Beneath that we had an executive investment

and lending committee that I was also a part of, and then we

had, you know, teams of people underneath the executive part of

the org who had certain levels of permissions to, you know,

make new loans that fit within the frameworks that had already

been approved.  But I was heavily involved across, you know,

kind of every layer of that matrix of decision-making for

lending.

Q.   And in terms of the types of loans that BlockFi made, did

BlockFi make different types of loans to institutional

NAD1BAN1                        Prince - Direct

1    customers?

2    A.   Sure.  I mean, different types of loans, certainly versus

3    the retail side of the platform I mentioned yesterday, on the

4    institutional side of the platform we also would make loans

5    denominated in cryptocurrency, so you could have a loan that

6    was denominated in Bitcoin or denominated in Ethereum.

7    Additionally, we had a, you know, variety of structures in

8    which we would lend to institutional clients based on our view

9    of their counterparty risk or creditworthiness.  So to give a

10   simple example, let's take, you know, the best potential

11   financial firm that we could potentially face.  Maybe that's

12   BlackRock or something.  And we would potentially lend them a

13   certain amount of money without them needing to post collateral

14   back to us.  Contrast that with, you know, a counterparty where

15   we weren't——they weren't in as strong of a financial position.

16   We might require them to post collateral.  And we would charge

17   different interest rates, we would have different, you know,

18   terms in the agreement around how fast margin calls needed to

19   be met or how fast loans could be called back.  So there were a

20   number of different variables that——that were managed on

21   individual loans and at the counterparty level.

22   Q.   So a few follow-ups.  What's collateral, as you're using

23   it?

24   A.   Collateral is——it's something that a borrower would post

25   as, you know, security for a loan.  So like a simple example of

NAD1BAN1                         Prince - Direct

collateral would be when you get a mortgage on a house, the

house is, you know, acting as collateral for the loan and

protection for the bank.  In a scenario where you don't pay the

loan, the bank can take the house.

          So in cryptocurrency land, we were taking collateral

in the form of cryptocurrency.  So someone could, you know,

give us one Bitcoin worth, just to use small numbers, $10,000.

We make them a $5,000 loan.  If they don't pay off the $5,000

loan, we had the ability to sell their Bitcoin to make sure we

got paid back.

Q.  You also used the word, or the phrase "margin call."  What

were you referring to there?

A.  So let's stick with that same example.  You've got one

Bitcoin, Bitcoin is worth $10,000.  We made a $5,000 loan, with

that one Bitcoin as collateral.  There would be in the loan

agreement preset margin call levels.  So if that Bitcoin that

was worth $10,000 when we started the loan declined in value

and was worth, just for illustrative purposes, let's say

$7,000, that might be the trigger level at which in the loan

agreement we would issue a margin call.  And what the margin

call does is it says to the borrower, you need to either post

additional collateral, pay down some of your loan, or run the

risk of us needing to liquidate some of your collateral in

order to pay off the loan because that—that is us managing our

risk.

NAD1BAN1                        Prince - Direct

1           And this term "margin call" folks might be familiar

2      with from just like a traditional stock brokerage account.  You

3      know, if you——if you buy stocks and then you use margin from

4      the broker, they have a similar type of function, where if the

5      value of the stocks that you purchase goes down, you could get

6      a margin call and potentially have your securities liquidated

7      if you don't take action.

8      Q.  Now I think you mentioned terms.  Did BlockFi have——why

9      don't you describe what sort of terms existed for institutional

10     customer borrowers.

11     A.  Sure.  I mean, just as a baseline, these were, you know,

12     very robust loan agreements.  I don't know off the top of my

13     head how many pages our loan agreements were in 2022, but it

14     was, you know, probably more than 30 or 40 pages.  I mean,

15     these were, you know, robust legal documents.

16     Q.  Let me——I'm sorry.  I think my question wasn't clear.  In

17     terms of the length of the loan or——

18     A.  Oh, okay.

19     Q.  Did BlockFi have open-term or closed-term loans?

20     A.  Yeah, sorry about that.  Understood.  The majority of the

21     loans that we made on the institutional side of our platform

22     were what we referred to as open term, which meant that either

23     the lender——BlockFi——or the borrower could elect to end the

24     loan with relatively short notice——generally, you know, two to

25     five business days' notice.  We did also make some loans that

1    went out to——on the institutional side.  The longest I think we

2    ever did was a two-year term, which would mean, you know, the

3    borrower is able to keep the loan out for a full two years

4    before the lender would have the ability to ask for repayment.

5    But the vast majority of the loans that we did were on an

6    open-term structure, which meant that either side could end the

7    loan with just a few days' notice.

8    Q.  Now did BlockFi have any offices in New York?

9    A.  We did.

10   Q.  Where?

11   A.  We——we had three different offices in New York.  The first

12   was at 86 Chambers Street in Tribeca; and then subsequently we

13   had two different offices in the Financial District at 115

14   Broadway and 150 Broadway.

15   Q.  Where did you work, principally?

16   A.  Principally out of those offices.

17   Q.  So switching topics, I want to talk about Alameda Research.

18   Did BlockFi lend money to Alameda Research?

19   A.  Yes, we did.

20   Q.  Do you know when BlockFi started lending to Alameda?

21   A.  I don't know the exact date, but it was either towards the

22   end of 2020 or first half of 2021.

23   Q.  And during that time period how much money was BlockFi

24   lending out across the company, not just to Alameda?

25   A.  High single-digit billions.  You know, if we're talking

NAD1BAN1                    Prince - Direct

1    early 2021, I think the, you know——depending on the day, the

2    principal outstanding of the overall lending that BlockFi was

3    doing was probably between 5 and $10 billion.

4    Q.  So to give us a sense, that being the total lending, how

5    much of that was Alameda getting when it first started out with

6    BlockFi?

7    A.  When it first started, you know, like a lot of our

8    institutional borrowers, they were relatively small

9    relative——they were small relative to that overall amount of

10   lending that we were doing.  So, you know, initially probably

11   10 to 15 million——10 to $50 million for the first, you know,

12   three or six months of the relationship.

13   Q.  Did there ever come a time when Alameda reached out to

14   BlockFi about increasing its lending?

15   A.  Yes.

16   Q.  Do you remember approximately when that was?

17   A.  Approximately, you know, Q2 or Q3 of 2021.

18   Q.  How did the request first come in?

19            THE COURT:  Excuse me.  I think everybody knows, but

20   please, Mr. Prince, tell the jury what you mean by Q2 and Q3.

21            THE WITNESS:  Oh, sure.  Sorry.  The second quarter or

22   third quarter.  So second quarter would be like April, May,

23   June; third quarter would be July, August, September.

24   Q.  Thank you.

25            How did the request from Alameda for more borrowing

1    first come in?

2    A.   Yes.  So, you know, initially the relationship was started,

3    and the request for more borrowing was coming in through our

4    APAC team, which stands for the Asia-Pacific region.  So we had

5    a team in Singapore, and our MD there was the individual on our

6    team responsible for managing the Alameda relationship at the

7    time.

8            THE COURT:  And I'm reasonably confident MD doesn't

9    stand for medical doctor.  Could you tell the jury what it

10   stands for.

11           THE WITNESS:  Yeah.  MD stands for managing director.

12   So he was——you know, the managing director was basically like

13   the head of our Asia-Pacific office and the lead person

14   responsible for managing relationships with the institutional

15   clients that we had in that region.

16   BY MR. ROOS:

17   Q.   So focusing on the period that you mentioned for us

18   earlier, the second or third quarter of 2021, was there ever a

19   time when you spoke to Sam Bankman-Fried?

20   A.   Yes.  So the, you know, the request had come in for them to

21   borrow more, and there was a suggestion made at some point

22   that, you know, it would be a good idea for the CEOs of each of

23   the respective companies, myself and Sam, to have a call

24   together, which we——which we set up.

25   Q.   What do you remember of the conversation?

NAD1BAN1                       Prince - Direct

A.  My memory of the conversation is that it was, you know,

very similar to a lot of calls that I had done like this

before.  So, you know, Sam and I each did five- to ten-minute

introductions of our, you know, respective companies, there was

a, you know, discussion around Alameda's desire to borrow more,

and a discussion around, you know, whether there were any other

ideas of things that our——that our firms could potentially do

together.

Q.  After——sometime after that conversation did BlockFi ever

start lending more money to Alameda?

A.  We did.  So in the, you know, back half of 2021 and first

half of 2022, our lending to Alameda increased significantly.

Q.  Now did Alameda ever provide audited financials to BlockFi?

A.  No.

Q.  In terms of the financial information you got, what kind of

financial information did Alameda provide to BlockFi, if any?

A.  I think the——the primary thing that they provided that, you

know, our team reviewed regularly was unaudited balance sheet

statements, which we received on I think a regular quarterly

basis, roughly, you know, once a quarter.  They also provided

information at one point around cryptocurrency wallets.  There

was an exercise our risk management team did to verify, you

know, cryptocurrency wallet information that they had given us.

And then there were numerous conversations that were had

between our risk management team and representatives of

Alameda.

Q.  As part of these loans, to what extent did BlockFi get
collateral?

A.  I think for——for every loan, if not almost every loan that
BlockFi made to Alameda, that we had collateralization
requirements, so there would be some——some form of collateral
posted.  The most common and largest type of collateral that
they posted was FTT, but they also at times posted other
cryptocurrencies as collateral.

Q.  Can you describe how, if at all, the amount of lending
BlockFi was doing to Alameda changed from, say, May 2021 to May
2022.

A.  Yeah.  It increased substantially by a factor of, you know,
roughly 10X or a little more.  So in May of '21, we were
probably lending them, like I said earlier, around 50 million;
maybe a little more or less than 50 million.  By May of 2022,
the lending had increased to, you know, a principal outstanding
balance of a little over a billion.  I think it was around
1.1 billion.

Q.  What, if anything, did Alameda do to make BlockFi feel
confident lending a billion dollars?

A.  Well, the, you know, the information that they provided to
our team, financial statements and other information that we
relied on in evaluating their risk as a counterparty; they also
posted significant amounts of collateral and, you know,

NAD1BAN1                          Prince - Direct

1   throughout that time period, adhered to all the terms in the

2   lending agreements like, you know, like we would expect a good

3   borrower to do.  They made their interest payments on time; if

4   there were ever margin calls, they met them.

5   Q.  Now moving ahead to May 2022, were there any changes to the

6   strength of the cryptocurrency market during that period?

7   A.  Yeah.  In May and——May and June of 2022, the cryptocurrency

8   market was experiencing downward volatility.  The prices of

9   major cryptocurrencies were declining.  There were, you know, a

10  few notable failures or blowups of cryptocurrency firms.

11  Initially there was a——a firm called——or a cryptocurrency

12  called Luna.  The Terra Luna ecosystem blew up.  Subsequently a

13  hedge fund——

14           THE COURT:  What do you mean by Terra Luna ecosystem,

15  please?

16           THE WITNESS:  Yeah.  So Luna was a——was a

17  cryptocurrency.  And think of like Bitcoin or Ethereum.  Call

18  it a competitor to Bitcoin or Ethereum.  Terra was a——it was

19  like a——what we call a stablecoin in cryptocurrency land.  It's

20  another cryptocurrency trying to mimic the value of a dollar.

21  And each of these had their own kind of blockchain protocols

22  and they were connected to each other.  One of the mechanisms

23  that was used to try and keep the coin that was supposed to

24  mimic a dollar at a value of a dollar was the other

25  cryptocurrency Luna.  And this——that whole concept came

NAD1BAN1                    Prince - Direct

crashing down.  The dollar coin became not worth a dollar, the

Luna coin, you know, declined in price dramatically as well.

BY MR. ROOS:

Q.  And what effect, if any, did these changes to the

cryptocurrency market in May 2022 have on BlockFi?

A.  So Three——Three Arrows Capital was a——a kind of trading

firm or hedge fund that was also a borrower at BlockFi.  They

defaulted on loans that they had with us in late May or early

June of 2022.  So we had a very large collateral liquidation

process with them and ultimately, at the end of that process,

were sitting on——were sitting on some losses.

        I'm not sure if I'm supposed to go into June of 2022.

Q.  Let me stop you there.  I'll ask another question.

        So after that, were there any additional changes in

the cryptocurrency market that affected BlockFi's lending?

A.  Sure.  Well, the——the, you know, bigger than Three Arrows,

what had a big impact on us at that time is that two of the

other top cryptocurrency lending platforms, Voyager and

Celsius, paused their platforms, and ultimately both of them

filed for bankruptcy.  But they, you know, they paused the

ability of consumers to be able to withdraw money from——from

their platform.  So you can imagine what, you know, what effect

that had on——on BlockFi if you have a couple of crypto lending

platforms shutting——shutting their doors.  You know, we were

experiencing the highest level of withdrawals that we had——that

NAD1BAN1                        Prince - Direct

1    we had ever experienced in our——in our history as a company.

2    So consumer confidence in cryptocurrency lending platforms and,

3    you know, the broader cryptocurrency market was not in a great

4    spot at that time.

5    Q.   So in light of those withdrawals on BlockFi, how, if at

6    all, did that affect the lending BlockFi was doing?

7    A.   We——so, you know, if you think about our model, when folks

8    are holding funds on our platform to earn interest, we're then

9    lending that out to borrowers over here.  If the folks that

10   were holding the funds go to withdraw their assets, we have to

11   close out the loans with the——with the firms that were

12   borrowing.  And so, you know, in June of 2022, I believe we

13   called back, you know, essentially every single open-term loan

14   that we had on our——on our platforms.  This was, you know,

15   billions of dollars in withdrawals from consumers and then

16   loans that were called back so that we could meet those

17   withdrawals.

18   Q.   Did that include loans to Alameda?

19   A.   It did.

20   Q.   And when did you start calling back loans from Alameda?

21   A.   I don't know the exact date, but it would have been last

22   week of May or first two weeks of June of 2022.

23   Q.   And how was it that BlockFi was able to call these loans

24   back on such a short basis?

25   A.   Because the structure of the loans was that they were, you

NAD1BAN1                          Prince - Direct

1    know, open-term loans, so we had the right as the lender to

2    terminate the loan with, you know, a few days' notice.

3    Q.  Did Alameda repay the loans?

4    A.  Yes, in full.

5    Q.  Now around this time did BlockFi enter into an agreement to

6    potentially sell itself to FTX?

7    A.  Yes.  In the——in the back half of June——

8            MR. COHEN:  Objection.  Could we have clarity by which

9    FTX entity we're talking about.

10            THE COURT:  Sure.

11            MR. ROOS:  Sure.

12   Q.  Which FTX entity are we talking about?

13   A.  It was the FTX.US entity, which I'm not a hundred percent

14   certain about this, but I think it——I think the FTX.US entity

15   had a corporate name of like WRS.  I could have that wrong.

16   But it was——FTX.US was the, you know, counterparty that we did

17   that transaction with.

18   Q.  I think you were in the middle of giving an answer about

19   this agreement to sell.  So I'll pick back up there.

20            How did it come about that you were potentially going

21   to sell to one of the FTX entities?

22   A.  Sure.  So, you know, we——given the market volatility and

23   the action——the activity that we were seeing on our platform

24   and a, you know, hyperawareness that for a business like ours,

25   consumer sentiment and confidence was——was, you know, really

1    important for the health of our platform, we decided that if we

2    could bring additional capital into the business to help with

3    that consumer confidence, that would be a valuable thing.  And

4    so we ran a, you know, a process talking to potential

5    investors, and ultimately a deal that was presented to us by

6    FTX was, you know, the deal that BlockFi determined was best to

7    proceed with.  And the deal that we did had two parts.  There

8    was a $400 million credit facility that was junior to BlockFi

9    client funds in the capital stack and then an option for—

10              THE COURT:  Would you explain what you meant by that.

11              THE WITNESS:  Sure.  So junior in the capital stack

12   would mean they get paid back after.  So in a scenario where

13   something, you know, bad happened to BlockFi and it had to file

14   for bankruptcy, if BlockFi owes $10 to people but there's only

15   $5 there, and the clients had $5 but then we had this $5 loan,

16   the $5 would go to the clients, not to the loan.  That's what

17   being junior means.  It's the order of repayment within a

18   capital structure.

19              THE COURT:  So the $400 million credit facility, in

20   simple terms, was a proposed loan from some FTX entity to

21   BlockFi, which would be subordinate to BlockFi customer funds,

22   yes?

23              THE WITNESS:  Yes.

24              THE COURT:  Okay.

25              MR. ROOS:  Thank you.

NAD1BAN1                         Prince – Direct

1    BY MR. ROOS:

2    Q.  And then what was the other aspect?

3    A.  The other aspect of the transaction was a option to acquire

4    BlockFi for a price of between 15 to $240 million, based on

5    certain performance targets, and the way that part of the

6    agreement was structured was FTX had the ability to fully

7    acquire BlockFi starting, you know—the first time they could

8    fully acquire BlockFi was one year after we entered into the

9    transaction.  So the transaction was finalized in early July

10   and FTX had the option to acquire BlockFi for the first time in

11   July of 2023.  And the orientation that, you know, BlockFi had,

12   based on our understanding of the deal, is that, you know, that

13   was going to be exercised at the, you know, at the first

14   window.

15   Q.  So just to be clear about a few things, was the option ever

16   exercised?

17   A.  No.

18   Q.  So did FTX end up ever acquiring BlockFi?

19   A.  No.

20   Q.  Okay.  Now during the period we're talking about, the

21   summer of 2022, you had, however, reached this agreement with

22   FTX, right?

23   A.  Yes.

24   Q.  Okay.  So did that agreement with FTX influence the lending

25   decisions BlockFi was making with respect to Alameda?

1   A.  I wouldn't say that there was a——I wouldn't say that there

2   was like a quantitative, you know, direct association between

3   the two things, but it was another qualitative data point that,

4   you know, our team had around the, you know, capital and

5   actions of the FTX enterprise as a——as a market participant.

6   So——

7   Q.  Let me just ask you a follow-up question about that.

8          To be clear, were you extending loans to Alameda you

9   otherwise wouldn't have because of the sale, because of the

10  deal with FTX?

11  A.  No.

12          MR. COHEN:  Objection.  Leading.

13          THE COURT:  Sustained.

14  Q.  What, if at all, did the potential deal with FTX do with

15  respect to your decision to extend loans to Alameda you might

16  not otherwise?

17          MR. COHEN:  Same objection.

18          THE COURT:  Overruled.

19  A.  There weren't——there wasn't anything that we, you know,

20  changed fundamentally in terms of our risk management policies

21  and procedures or the way that we were classifying Alameda as a

22  borrower and the types of loans that we would make to them post

23  that transaction versus before.

24  Q.  Okay.  Did there come a time in 2022 when BlockFi began

25  making new loans to Alameda?

NAD1BAN1                          Prince - Direct

1    A.  Yes.  So, you know, after this transaction completed and

2    our platform kind of stabilized and the withdrawals, you know,

3    returned to kind of normal levels, we did start lending, we did

4    start making new loans to Alameda.

5    Q.  And what new loans——in what months were new loans made in

6    2022?

7    A.  I believe it started maybe at the end of August——or

8    sorry——maybe at the end of July but more likely probably in the

9    August or September time frame is when we started making the

10   new loans to Alameda.

11   Q.  And to what extent did loans continue into 2022?

12   A.  They continued, you know, up through early November of

13   2022.

14   Q.  How much in new loans did BlockFi lend Alameda during this

15   period of approximately July to November 2022?

16   A.  Roughly 800——between roughly 800 or 850 million worth of

17   new loans.

18   Q.  With the changes to the cryptocurrency market, did BlockFi

19   get any new financial information from Alameda?

20   A.  Yes, we received, you know, updated quarterly balance

21   sheets.

22   Q.  And from your review of those updated quarterly balance

23   sheets, how did Alameda's financial position appear?

24   A.  It appeared strong.  I mean, in the balance sheets that we

25   had, they, you know, they had assets that were greater than

NAD1BAN1                    Prince - Direct

1    liabilities of many billions of——of dollars.

2    Q.  Let's take a look at a balance sheet.

3         MR. ROOS:  Can we please——well, this is in evidence so

4    we show everyone, Government Exhibit 419.

5    Q.  And do you recognize this, Mr. Prince?

6    A.  Yes, this is the Q2 balance sheet that Alameda provided to

7    BlockFi.

8    Q.  And when you say Q2, what period does that refer to?

9    A.  Yes.  So Q2 refers to April, May, June, and generally we

10   would receive quarterly statements from counterparties, you

11   know, a few weeks after the end of the quarter, so we would get

12   the Q2 balance sheet from a counterparty, you know, sometime in

13   early July, for example.

14   Q.  Okay.  So generally speaking——let's start with the asset

15   portion of this balance sheet.  Generally speaking, what does

16   BlockFi look for when it examines a potential borrower's

17   assets?

18   A.  Looking at the size and composition of the——of the asset

19   base.

20   Q.  So when you say composition, what are you referring to?

21   A.  What are the——what are the actual, you know, assets, is it

22   cash, is it cryptocurrency, is it other things.

23   Q.  Are you familiar with the term "liquid asset"?

24   A.  Yes.

25   Q.  And are you familiar with the term "illiquid asset"?

NAD1BAN1                        Prince - Direct

1    A.  Yes.

2    Q.  What's the difference?

3    A.  A liquid asset is one that you can, you know——there's an

4    active market for that you can sell, and an illiquid asset

5    would be something that there's not an active market for and

6    it's——and it's harder to sell.

7    Q.  And how, if at all, does the makeup of liquid and illiquid

8    assets matter to BlockFi?

9    A.  I would say it's definitely something that——that our team

10   would take into account in its evaluation of——of the assets

11   that a counterparty had.

12   Q.  Why is that?

13   A.  To——to help understand, you know, to——to have as fulsome of

14   an understanding as——as we could have about how liquid a

15   portfolio was and therefore a counterparty's ability to either

16   post collateral or pay down a loan.  These types of things were

17   informed by how many assets they had and what those assets

18   were.

19   Q.  Now let's look at the bottom of the balance sheet.  Where

20   it says Liabilities, what did you understand that to refer to?

21   A.  So liabilities are——are generally things that companies,

22   you know, are going to need to pay for, so loans are

23   liabilities, tax bills are liabilities, so liabilities are

24   generally things that a business, you know, needs to——needs to

25   pay.

NAD1BAN1                        Prince - Direct

1    Q.  And then do you see the bolded words Retained Earnings?

2    A.  Yes.

3    Q.  What did you understand that to relate to?

4    A.  This is, you know, kind of like a——kind of like a net asset

5    value, but it's, you know, assets minus liabilities, what's

6    the, you know, what's the equity of the entity after accounting

7    for all the liabilities that it has against the assets.

8               MR. ROOS:  If we can zoom out.

9    Q.  And upon receiving this, what was your view as to whether

10   Alameda remained a good candidate for lending?

11   A.  That they were still a good candidate for lending and were

12   well capitalized.

13   Q.  Why is that?

14   A.  If you look at the retained earnings line, they have 6

15   point——can't tell if it's a 6 or an 8, but north of 6 billion,

16   north of 6 billion in, you know, retained earnings or north of

17   6 billion of assets even after accounting for all of their

18   liabilities.

19              MR. ROOS:  And let's zoom in on the Assets portion.

20   Q.  What about the Assets portion made you think that Alameda

21   remained a good candidate for lending?

22   A.  I mean, largely that the quantum of assets, you know, over

23   14——over 14 billion of——of assets with, you know, a significant

24   portion of that, I mean, over 130 million of just cash and cash

25   equivalents.  I mean, this was a——based on this balance sheet,

1    my view was that this was a well-capitalized entity.

2    Q.  Let's look at the Liabilities section.

3            Do you see where it says Loans?

4    A.  Yes.

5    Q.  What did you understand those loans to be?

6    A.  We——I understood those loans to be loans from BlockFi and

7    other crypto lending firms.

8    Q.  And what was that understanding based on?

9    A.  Based on conversations that——that BlockFi had had with

10   representatives of Alameda, that, you know, for——for a period

11   of time we were told that we were, you know, their——their

12   smallest lender and that our——

13           MR. COHEN:  Objection.

14           THE WITNESS:  Oh, sorry.

15           THE COURT:  Yeah, let's hold it right there and ask

16   another question, Mr. Roos.

17           MR. ROOS:  Okay.

18   BY MR. ROOS:

19   Q.  You said things you were told.  Did you ever speak to the

20   defendant about this?

21   A.  Other than that——other than that conversation that, you

22   know, Sam and I were both on in mid-2021, I don't know that Sam

23   and I ever had direct conversations about that Loans line item

24   or what comprised the rest of it.

25   Q.  Okay.  And what about individuals at Alameda?

NAD1BAN1                         Prince - Direct

1    A.   Absolutely.  So I spoke to Caroline Ellison about it; there

2    was a gentleman at Alameda named Richard Chang, who, you know,

3    had very frequent conversations with members of the BlockFi

4    team.

5               MR. ROOS:  Now we can take this whole balance sheet

6    down.

7               And can we publish Government Exhibit 418, which is in

8    evidence, and zoom in on the top.

9    Q.   Do you recognize this as another balance sheet from

10   Alameda?

11   A.   Yes, I do.  It's the Q3 2022 Alameda balance sheet that we

12   received.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NADMBAN2                     Prince - Direct

1    Q.  So what period is Q3?

2    A.  July, August, September.

3    Q.  So typically when you get a balance sheet for a quarter,

4    when in the quarter do you get that balance sheet?

5    A.  Usually, shortly after the quarter ends.

6    Q.  So it reflects the three months that are in that quarter?

7    A.  That's right.  It's like the end -- at the end of the third

8    quarter this was -- this was the balance sheet.  This was the

9    financial condition --

10           THE COURT:  Just to be clear, a balance sheet gives

11   the financial condition of the entity as of a specific date in

12   time, in this case June 30, 2022, as opposed to a

13   profit-and-loss statement which gives profit and loss for a

14   longer period.  Isn't that correct?

15           THE WITNESS:  Yes.

16           THE COURT:  Thank you.

17   Q.  And so for the 2022 Q3 balance sheet what approximate date

18   is that for?

19   A.  It's the third quarter.  So July -- end of September.  I

20   would think it would be as of 9/30 or whatever the last day of

21   September is.

22   Q.  Let's look at the liability section.  Do you see where it

23   says loans?

24   A.  Yes.

25   Q.  What were you told by people at Alameda regarding what

1    these loans were?

2    A.  Same as for Q2, that they were loans from other crypto

3    lenders.

4               MR. ROOS:  We can take this down.

5    Q.  In addition to looking at the balance sheets for Q2 and Q3,

6    did BlockFi undertake any additional analysis of Alameda's

7    financials?

8    A.  As I said earlier, there were -- I know there were

9    exercises where the BlockFi team received information about

10   specific cryptocurrency wallets from Alameda.  There were

11   conversations we had with them where information was shared

12   more about the composition of some of the specific line items.

13   I think those are the --

14   Q.  Earlier in your testimony you talked about BlockFi's risk

15   team and due diligence team.  To what extent did they evaluate

16   these numbers on the balance sheet?

17   A.  They evaluated them fulsome.  This was probably the primary

18   thing we were relying on -- our team was relying on and

19   evaluating to understand the financial health of Alameda as a

20   counterparty.

21   Q.  Let me ask you about a term.  What is stress testing?

22   A.  Stress testing is taking some piece of data and then

23   saying, you know, if a certain scenario were to happen what

24   impact on this data would that scenario have.  So in a

25   financial context our team would run stress tests on all kinds

1  of things.  We would stress test what would happen to our loan

2  portfolio if Bitcoin declined by a certain amount at a certain

3  period of time.  There was a time where we did stress tests

4  specifically on Alameda's balance sheet for certain scenarios.

5          MR. ROOS:  Can we please now show the witness what has

6  been marked for identification as Government Exhibit 417.

7  Q.  Mr. Prince, what type of document are we looking at?

8  A.  This is a credit memo.  So credit memos were frequently

9  produced by our risk management team.  They were basically

10  analyses of certain scenarios, sometimes with recommendations,

11  but the scenario could be, there is a new potential borrower,

12  we have just completed our underwriting, here is what that

13  looks like, or the scenario could be, the quarterly review of a

14  certain borrower or it could be a market-related review that

15  they conducted, and then these credit memos would be sent

16  around so that they were socialized and understood by key

17  decision makers and executives within the company, myself

18  included.

19  Q.  Let's go to the last page of this.  Just yes or no, does

20  this depict a stress-testing scenario like the one you

21  testified about?

22  A.  Yes.

23  Q.  Were credit memos and stress testing something you just did

24  for Alameda Research or was it a regular part of BlockFi's

25  business operations?

NADMBAN2                        Prince - Direct

1   A.   Regular part of our business operations.

2   Q.   Were credit memos like this made and maintained as part of

3   those business operations?

4   A.   Yes.

5           MR. ROOS:  The government offers 417.

6           MR. COHEN:  No objection.

7           THE COURT:  Received.

8           (Government Exhibit 417 received in evidence)

9           MR. ROOS:  We can publish this to the jury.

10          Why don't we go back to the first page.

11  Q.   Just at a high level, now that the jury can see it, what

12  kind of document is this?

13  A.   Credit memo.

14  Q.   This is the credit memo you were just testifying about?

15  A.   Yes.

16          MR. ROOS:  Why don't we look at the last page of this

17  document.

18  Q.   Mr. Prince, can you describe what we are looking at here.

19  A.   Sure.  This is in the -- in the second column, underneath

20  the green where it says consolidated in green, these are the

21  exact same numbers as the Q3 balance sheet from Alameda.  So

22  it's the Q3 balance sheet from Alameda.  Then in the subsequent

23  columns, the subsequent three columns, our risk team was

24  applying a stress scenario.  On the far right column there are

25  some notes about what they were stressing and what their

NADMBAN2                          Prince - Direct

1    understanding was of the composition of certain line items on

2    the balance sheet.

3           What they were stressing here was FTT, which was that

4    primary collateral type that we received from Alameda, Serum,

5    and Solana.  They were stressing those coins going down in

6    price.

7           So the first column in blue is a 35 percent down

8    stress test, the next column in yellow is a 50 percent down

9    stress test, and then the final column is stressed a hundred

10   percent, which is saying, if FTT just went to zero, what then

11   happens to the balance sheet of Alameda.

12   Q.  Just to orient us, the different colors refer to different

13   scenarios of stressing cryptocurrencies, is that right?

14   A.  That's right.  Then you can see, when that color appears

15   further down in the column, it's because the numbers changed

16   based on the stress scenario from the original balance sheet,

17   which is in the first column.

18   Q.  When you say stress, I'll just use an example from what you

19   said.  When you say stressing FTT, what does that mean?

20   A.  Running a scenario where the price of FTT declined by a

21   certain amount.

22          THE COURT:  Let's see if we can get this in plainer

23   terms for the sake of understanding.

24          The collateral you had for these loans that you had

25   made to Alameda was cryptocurrency that Alameda basically

NADMBAN2                         Prince - Direct

1  pledged, not in a technical sense, but basically pledged to

2  secure the repayment of the money you lent them, right?

3          THE WITNESS:  Yes.

4          THE COURT:  And what you were looking at is what

5  happens to the collateral that secures repayment of our loan if

6  the quoted market value of the cryptocurrency that Alameda held

7  drops, right?

8          THE WITNESS:  If I may, your Honor, you said we were

9  looking at what happens to the collateral.  What we were

10  looking at was what happens to the overall Alameda balance

11  sheet if the collateral has specific price declines.

12          THE COURT:  Fair point.

13          It's as if you had a car loan and the bank had

14  extended a car loan and, all of a sudden -- of course the car

15  is security for repayment of the loan.  They can come and

16  repossess it, right?

17          THE WITNESS:  Yes.

18          THE COURT:  And, all of a sudden, the bottom falls out

19  of the market for used cars for some reason.  You are looking

20  at that kind of situation.  It's a what-if analysis.  Yes?

21          THE WITNESS:  Yes.

22          THE COURT:  Thank you.

23          MR. ROOS:  Thank you, your Honor.

24  Q.  Looking at the conclusions from these various scenarios,

25  let's look at the worst-case scenario, the stress on 100

1    percent.  What color is that in?

2    A.  That's in red.

3    Q.  And what was BlockFi's conclusion about Alameda's balance

4    sheet in that worst-case scenario?

5    A.  Our conclusion was basically that they would still have --

6    even in a scenario where FTT went to zero and Serum went to

7    zero, they would still have positive equity to the tune of 638

8    million and change.  They would still be solvent.  They would

9    still have much more assets than liability, 600 million, 638

10   million more assets than liability.

11   Q.  We may need to zoom out for this, but under that scenario

12   what assets would Alameda still have?

13   A.  Well, if you look at the top of that row, the line items

14   that still have numbers next to them, just calling out one of

15   the biggest ones, crypto held, which is the second line

16   underneath current assets, crypto held, which was represented

17   to us to be 50 percent stablecoins, 50 percent BTC and ETH.

18   They would still have 4.1 billion of assets there.  And then

19   all the other assets that have corresponding numbers next to

20   them in that column are the assets that they would still have.

21   Q.  So in calculating then in this stress 100 percent scenario,

22   the retained earnings, what was your understanding the loan

23   number was?

24   A.  That number there is taking 8.316 billion of total assets

25   minus 7.677 of total liabilities.

NADMBAN2                    Prince - Direct

1    Q.   Now, if the loan number was higher, how would have affected

2    that scenario?

3    A.   It depends on how much higher.  If it were -- it depends on

4    how much higher.

5    Q.   Let's say if it was $5 billion higher.

6    A.   If it were $5 billion higher, then this would show negative

7    equity in quite a few scenarios, which would be very different

8    than positive equity, and it would certainly have an impact on

9    our lending decisions.

10   Q.   So if Alameda had additional liabilities that were not on

11   its balance sheet, would that have affected BlockFi's lending

12   decisions?

13   A.   If they were of a material size, absolutely.

14   Q.   What do you mean by that?

15   A.   I mean just, if they were -- call it like material

16   percentage, let's say like greater than 5 percent of the

17   overall size of the balance sheet here, then surely it would

18   have -- it would absolutely have an impact.

19   Q.   If the loan number was double where it was, so say 14

20   billion --

21             MR. COHEN:  Objection.

22             THE COURT:  I have not heard the question yet.

23             MR. COHEN:  Sorry, your Honor.

24   Q.   How, if at all, would a loan number that was double have

25   affected your lending decision?

1           MR. COHEN:  Objection.

2           THE COURT:  Overruled.

3  A.  We probably wouldn't have lent to them at all because I

4  think even without doing a stress test, if they had twice as

5  many loans as what's represented here, they might be insolvent.

6  Q.  Now, when BlockFi made loans to Alameda in July through

7  November, was it aware of any borrowing Alameda was doing from

8  FTX?

9  A.  No.

10 Q.  Had you known that Alameda was borrowing from FTX, would

11 that have affected your lending decision?

12          MR. COHEN:  Objection.

13          THE COURT:  What's the objection?

14          MR. COHEN:  Calls for speculation.

15          THE COURT:  Rephrase the question.

16 Q.  You just testified that you were unaware of any borrowing

17 from FTX.

18          THE COURT:  By Alameda.  Is that the question?

19 Q.  By Alameda.  Is that right?

20 A.  Correct.

21 Q.  Had borrowing by Alameda from FTX been listed on the

22 balance sheet, how would that have affected you?

23          THE COURT:  If at all.

24 Q.  If at all.

25 A.  Again, it depends on the quantum, but I think that -- I

NADMBAN2                          Prince - Direct

1  think there would have been a lot of questions about why that

2  was happening and under what structure it was happening.  And

3  depending on the answers to those questions, it could have

4  potentially made us completely unwilling to lend to Alameda.

5  Q.  At the time BlockFi made these loans from July through

6  November of 2022, was it aware of any loans that Alameda had

7  made to Sam Bankman-Fried or other FTX or Alameda executives?

8          MR. COHEN:  Same objection.

9  Q.  It's a yes-or-no question.

10          THE COURT:  Overruled.

11 A.  No.

12 Q.  How, if at all, would have loans to FTX or Alameda

13 executives affected your lending decision?

14 A.  Similar answer.  It would depend on the quantum of the

15 loans and it would depend on Alameda's responses to the

16 questions that our team surely would have had.  But BlockFi's

17 business went through a lot of things where we were under a

18 microscope, whether it was a regulatory microscope or

19 otherwise, so we were very familiar with rules and extra

20 attention that existed around any type of dealings between a

21 company and the company's insiders and how that's not a

22 generally accepted activity.  I think that scenario that you

23 proposed would have given us a lot of pause at a much smaller

24 dollar number because it's just a really hard thing to explain

25 a good reason for that to happen.

NADMBAN2                         Prince - Direct

1    Q.   How, if at all, would have Alameda's assets being less

2    liquid affected BlockFi's lending position?

3    A.   Hard to say.  It depends on the specific asset and the

4    quantum, but it was something that we took into account in

5    making the decisions of whether or not to lend and then under

6    what terms.  We wanted to see -- we could be comfortable

7    lending to someone that had a lot of illiquid assets if we were

8    comfortable that the size of lending we were doing to them was

9    at a level where they would be able to continue posting more

10   collateral and we were confident in that asset long term.

11        The converse could also be true if it was a very, very

12   illiquid asset that we weren't confident we could sell under

13   any scenario.  It really just depends on the details.

14   Q.   At any time did BlockFi know that Alameda -- withdrawn.

15        Did you ever know that Alameda was using, if at all,

16   customer money?

17   A.   No, absolutely not.

18   Q.   How, if at all, would that information have affected your

19   lending decision?

20   A.   I think we wouldn't have worked with them because that's

21   not something that's appropriate.

22   Q.   Changing topics, was BlockFi a customer of FTX?

23   A.   Yes.  BlockFi used the FTX platform to store some of the

24   assets that were posted to us as collateral by Alameda.

25   Specifically, a portion of the FTT that we received as

1    collateral for loans that we were making to Alameda we held on

2    FTX.  We also placed funds on FTX that we used for trading for

3    that client trading scenario that I talked about earlier.  FTX

4    was an exchange where we -- FTX was an exchange where we traded

5    cryptocurrencies.

6    Q.  Just to break down your answer, can you explain to us how

7    it was that you had Alameda's collateral on FTX?  What does

8    that mean?

9    A.  So using small numbers here, BlockFi is making a loan to

10   Alameda.  We are lending them one dollar.  They are giving us

11   $2 worth of FTT.  There were periods of time, including in the

12   second half of 2022, where our storage method for some of those

13   to FTT that Alameda had given us as collateral was to hold it

14   in the BlockFi account on the FTX exchange.

15   Q.  I just want to be clear about how collateral works in these

16   contexts.

17   A.  Alameda would send the collateral to us.  The way that

18   works is, BlockFi provides a cryptocurrency wallet address to

19   the Alameda team.  The Alameda team would then send the tokens

20   to that address.  Once they were there, the BlockFi team would

21   move a portion of them to the FTX exchange where BlockFi had an

22   account and there were different wallet addresses associated

23   with that account.  So you have two transactions that show up

24   on the Blockchain, one with the coins coming from Alameda to

25   BlockFi and then another with a portion of the coins going from

NADMBAN2                    Prince - Direct

1   BlockFi to FTX.

2   Q.  So BlockFi would actually get the collateral?

3   A.  Yes.

4   Q.  The second part of your answer related to putting customer

5   funds on FTX.  What were you referring to?

6   A.  We would place cash or stablecoins in various

7   cryptocurrencies on FTX so that we had currency there to be

8   able to place the trades that we needed to make effectively on

9   behalf of our customers for our trading product.

10  Q.  How much money did BlockFi have on FTX on behalf of its

11  customers in the period of June through November 2022,

12  approximately?

13  A.  Approximately $350 million worth of assets in our FTX

14  account.

15  Q.  When BlockFi deposited money on FTX on behalf of its

16  customers, what were its expectations about how those funds

17  would be used by FTX, if at all?

18  A.  That they would only be used for the purposes of affecting

19  trades that BlockFi made on the FTX exchange, not that they

20  would ever be rehypothecated or anything like that.  They would

21  just stay at the exchange and be available for us to trade.

22  Q.  Jumping ahead to 2022, at that time approximately how much

23  in loans did BlockFi have out to Alameda?

24  A.  I'm sorry.  What period of time, did you say?

25  Q.  Focusing on November 2022.

NADMBAN2                    Prince - Direct

1   A.   November 2022, at the very beginning of November of 2022,

2   our loans to Alameda were between 800 and 850 million in total

3   value.  At the time of FTX's bankruptcy filing, in

4   mid-November, about 150 million had been paid back, so it was

5   around 650 million.

6   Q.   We will get to that.

7        I want to ask you, though, starting sort of the

8   beginning of November of 2022, what sort of collateral did

9   BlockFi have for its outstanding loans?

10  A.   Primarily FTT, but we also had some Solana.

11  Q.   Now, did there come a time in November 2022, and this can

12  be yes or no, when the value of FTT began to drop?

13  A.   Yes.

14  Q.   When that started happening what, if anything, did BlockFi

15  do?

16  A.   Same thing we always do.  So we, in accordance with the

17  loan agreement, based on certain price levels, issued margin

18  calls, and initially it was a couple of margin calls that were

19  met.  Subsequently, we also sought to recall the loans in the

20  open-term loans.

21  Q.   Just to be clear, did Alameda repay some of its loans?

22  A.   Some, yes.

23  Q.   Approximately how much?

24  A.   Roughly 150 million was repaid.

25  Q.   Did Alameda repay all of its loans in November 2022?

NADMBAN2                        Prince – Direct

1   A.  No.  There were still approximately $650 million worth of

2   loans that were outstanding.

3   Q.  Did Alameda ever post or offer to post additional

4   collateral?

5   A.  Yes.

6   Q.  And what did Alameda offer to post?

7   A.  I believe it was more FTT.  I believe they in fact, in

8   November, did once, or maybe twice, through the process of

9   receiving margin calls, post additional FTT.  In the second

10  week of November, they also posted Robinhood, shares of

11  Robinhood stock and shares of Grayscale trust shares.

12          It's kind of like a cryptocurrency vehicle that you

13  can trade in a brokerage account, in a traditional brokerage

14  account.

15  Q.  You mentioned that Alameda and FTX declared bankruptcy at

16  some point.  At that time how much did BlockFi have on the FTX

17  exchange on behalf of its customers?

18  A.  I mean the total amount that we have is roughly 350

19  million.  It's hard to say exactly.  I don't know off the top

20  of my head exactly what amount of that was customer funds

21  versus collateral that they had posted.

22  Q.  I just want to be clear about this.  What was the total

23  amount of money that BlockFi had either loaned to Alameda or

24  had on the FTX exchange that was not returned?

25  A.  A little over a billion dollars worth.

NADMBAN2                        Prince - Direct

Q.  What was the breakdown of, on the FTX exchange versus had

been lent to Alameda?

A.  About 650 million lent to Alameda, about 350 million on the

FTX exchange.

Q.  Yesterday, right before we broke, you testified that after

FTX and Alameda declared bankruptcy, BlockFi declared

bankruptcy.  Can you explain why BlockFi had to declare

bankruptcy?

A.  Sure.  I mean, once it became clear that repayment of the

Alameda loans and being able to access the funds that we had on

FTX was impaired, once it became clear that that was not going

to be possible, our view of the financial health of BlockFi's

business was such that we needed to declare bankruptcy.

          MR. ROOS:  No further questions.

          THE COURT:  All right.  We will take 15 minutes.

          For your information, ladies and gentlemen, we are

going to break at 12:30 today.

          (Recess)

          THE COURT:  OK, folks.  Let's go.  Get the witness,

please.

          Defendant and the jurors are all present, as has been

true throughout.

          Cross-examination, Mr. Cohen.

          MR. COHEN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Good morning, Mr. Prince.

A.  Good morning.

Q.  Please answer this question yes or no, if you can.  Do you
recall earlier today, in responses to questions from counsel,
you gave some testimony about your views of how crypto
exchanges operate?

A.  Yes.

Q.  Now, is it fair to say, sir, that you have never been the
CEO of a crypto exchange?

A.  Correct, I have never been the CEO of a crypto exchange.

Q.  You have never run a crypto exchange?

A.  No.  We had a trading product at BlockFi, but we were not
an exchange.

Q.  During your time running BlockFi, about how many crypto
exchanges were there in the marketplace?

A.  I don't know an exact number, but probably between 50 and a
hundred that mattered.  But total number of crypto exchanges,
it could have been much higher than that.

Q.  So 50 to a hundred that mattered, correct?

A.  Directionally speaking.

Q.  In giving the testimony you did about crypto exchanges, I
take it you didn't review the inner workings of those 50 to a
hundred crypto exchanges?

A.  Certainly not of every single one of them.

NADMBAN2                    Prince - Cross

1  Q.  You didn't review their customer agreements?

2  A.  Just to be clear, for exchanges that we worked with,

3  reviews were done.

4  Q.  Did you review the customer agreements for FTX?

5  A.  Our team certainly did.  I learned about them through our

6  team.

7  Q.  Let's break this down.  By customer agreements you mean the

8  terms of service?

9  A.  Yes.  And any other agreements that were entered into

10  between BlockFi and exchanges.

11  Q.  Fair enough.  So any agreement that governed the commercial

12  relationship between BlockFi and FTX, correct?

13          MR. ROOS:  Objection to the characterization of the

14  relationship.

15          THE COURT:  Sustained.

16  Q.  And you said that your team reviewed the FTX terms of

17  service, is that correct?

18  A.  Yes.  I mean, lawyers or compliance people on our team,

19  either internal counsel or external counsel, would have

20  reviewed terms of service, full review of terms of service for

21  any platform that we worked with.

22  Q.  What were the names of the lawyers who did this review?

23          THE COURT:  If lawyers did the review and if you know.

24  A.  I couldn't say exactly which lawyer for which exchange

25  specifically, but our general counsel is Jonathan Mayers.  He

1    had three deputy general counsels, and then they had teams

2    beneath them.

3    Q.  Without running down the whole teams, what were the names.

4    Of the deputies?

5    A.  Alice Lu, Ross Kirschner, and Usec Rho.

6    Q.  Were they based in New York with you, Mr. Prince?

7    A.  Yes.

8    Q.  Now, yesterday you testified about a product that BlockFi

9    had called an interest-only account.  Do you recall that, sir?

10   A.  Yes.  The BlockFi interest account, which we frequently

11   referred to as a BIA.

12   Q.  Briefly, can you just explain how that account worked

13   again.

14   A.  Sure.  So the BlockFi interest account had published rates

15   on our website, which were interest rates or yields that folks

16   who held funds in the BlockFi interest account could earn.  The

17   interest that they earned was paid out to their account on a

18   monthly basis.  And the way that BlockFi generated the interest

19   that we were paying to folks who held funds in those accounts

20   was by lending the assets that were placed into the BlockFi

21   interest accounts.

22   Q.  When customers wanted to join that or have an account like

23   that, they would enter into a customer agreement with BlockFi?

24   A.  Yes.

25   Q.  And that agreement would define the terms of the

NADMBAN2                        Prince - Cross

1    relationship?

2    A.   That's correct.

3    Q.   Now, I believe you testified, sir, that BlockFi began to

4    make loans to Alameda in around the middle of 2021, is that

5    correct?

6    A.   I believe what I said was that I think the first loans that

7    BlockFi made to Alameda occurred sometime towards the tail end

8    of 2020 or the first half of 2021, sometime in that window.

9    Q.   And you described the process that your team went through.

10   I think you called it a due diligence process, is that correct?

11   A.   Yeah.  We would refer to it as our underwriting process or

12   counterparty onboarding process, and that process included us

13   doing due diligence on the counterparty.

14   Q.   That would involve reviewing factors that BlockFi thought

15   were important to the decision making, correct?

16   A.   Yes.

17            MR. COHEN:  Can we call up Defendant's 816 for

18   identification for the witness only.

19   Q.   I think you also testified earlier today that BlockFi had a

20   practice of creating credit memos.  You recall that, sir?

21   A.   Yes.

22   Q.   Could you take a moment and look through Defendant's

23   Exhibit 816, please.  Just tell me when you are done.

24   A.   I'm done.

25   Q.   This is a credit memo dated August 13, 2021, correct?

NADMBAN2                         Prince - Cross

1   A.  Correct.

2   Q.  It relates to Alameda Research as a counterparty?

3   A.  Correct.

4   Q.  And this was the sort of memo that the members of your

5   credit team would prepare for you and the other members of the

6   executive committee to consider in coming to your loan-making

7   decisions, correct?

8   A.  Correct.

9   Q.  And this was prepared by your credit team, correct?

10  A.  Yes.  The credit team was a group that was within the risk

11  management team.  If I say risk management team, I'm also

12  talking about the credit team, which was a subgroup --

13  Q.  Got it.  And it was prepared at or near the time of the

14  conversation with your credit team, correct?

15          THE COURT:  I'm sorry.  At or near the time of what

16  conversation?

17          MR. COHEN:  Let me withdraw.  I'll get to the

18  conversation.

19  Q.  This credit memo was prepared in the course of BlockFi's

20  regularly conducted business activity, correct?

21  A.  Yes.

22  Q.  And it was BlockFi's regular practice to make such memos,

23  correct?

24  A.  Yes.

25          MR. COHEN:  We offer DX-816, your Honor.

NADMBAN2                         Prince - Cross

1           MR. ROOS:  No objection, provided the info about

2   Alameda and provided by Alameda is not for its truth.

3           THE COURT:  Do you have a problem with that?

4           MR. COHEN:  That's fine, your Honor.

5           THE COURT:  It is received save that the information

6   attributed to Alameda is not something you can consider for the

7   truth of what's said.

8           (Defendant's Exhibit 816 received in evidence)

9           MR. COHEN:  Can we publish it to the jury, your Honor?

10          THE COURT:  Yes.

11  Q.  Mr. Prince, this memo was prepared at a time when you and

12  your team were considering whether to increase the amount of

13  loans to Alameda, correct?

14  A.  Yes.  I mean, underneath the request, the first bullet is

15  that the sales team, that refers to our institutional sales

16  team, they are requesting capacity to borrow more in general,

17  potentially up to 1 billion gross over collateralized by

18  FTT/SOL/SRM.

19  Q.  You had not made a decision yet, and you and your team were

20  considering these factors, correct?

21  A.  We had already -- at this point in time, if you look at the

22  next bullet, we had already started lending to Alameda, but,

23  yes, there was -- we were having discussions and going through

24  a decision-making process for whether or not to increase that

25  lending and, if we were to increase it, at what terms.

NADMBAN2                         Prince - Cross

1    Q.  If you can take a look, sir, at the next page.

2              MR. COHEN:  And call out, Brian, the stress scenarios

3    methodology box.

4    Q.  What does that refer to, Mr. Prince?  What does stress

5    scenarios methodology refer to?

6    A.  It's our risk team describing the way they think about

7    certain stress scenarios for whatever they are writing the

8    credit memo about.  So depending on what the credit memo is

9    about, they would -- they could have different stress

10   scenarios, if certain things were -- if certain things were to

11   occur that would make the loan riskier, what would those be,

12   and then they would try to analyze scenarios.

13   Q.  Just going through different scenarios, correct?

14   A.  Sure.  Based on what they thought would create potential

15   risk for the loans.

16   Q.  You can go down to the fourth bullet point that's tiled FTT

17   liquidity.  You see that, sir?

18   A.  I see it.

19   Q.  Is it fair to say that in 2021, August 2021, one of the

20   forms of collateral that Alameda would be posting for the loan

21   was FTT?

22   A.  Yes.

23   Q.  And to remind everyone, what was FTT?

24   A.  FTT was the FTX exchange token.  So my understanding and

25   our team's understanding of the FTT token was that it was -- I

NADMBAN2                         Prince - Cross

1    think somewhere else on this doc that we have up here it talks

2    it being an equity-like instrument.  And the reason that the

3    team would have said that is that the way the FTT token -- the

4    way we understood the FTT token to work was that a portion of

5    the profits made, that the FTX exchange made, would be used to

6    buy FTT tokens on the open market, and that model of exchanged

7    profits buying the token was something that was not unfamiliar

8    in the cryptocurrency market more broadly at the time because

9    of a different exchange.  Binance had a token, BNB, which was

10   designed directionally the same way, and BNB had been one of

11   the best performing -- if we go back to this point in time,

12   2021, BNB I think had performed better than even Bitcoin over

13   the last one-year period.

14   Q.  So it was a fairly common structure in the market to have

15   these tokens.

16   A.  I don't know that I would necessarily describe it as fairly

17   common because out of a hundred exchanges, I don't think more

18   than necessarily half would have this setup.  But it wasn't --

19   we weren't unfamiliar with the concept because there was

20   already an example of another token that had this type of model

21   and done well.

22   Q.  Got it.  The other example being BNB, the Binance token?

23   A.  Yes.

24   Q.  Is it fair to say that at this time, in August of 2021, you

25   considered FTT to be one of the top 10 percent of

 1   cryptocurrency that could be offered on a platform or lent

 2   against?

 3   A.   Just so I understand, when you say considered to be top 10

 4   percent, what are you -- top 10 percent, like by market cap?

 5   Q.   Top 10 percent in value.

 6   A.   Top 10 percent in market value?

 7   Q.   Security.

 8             THE COURT:  Which is the question you were trying to

 9   have him answer?

10             MR. COHEN:  Let me try again, your Honor.  Thank you.

11   Q.   From the point of view of a lender evaluating collateral,

12   is it fair to say that, in 2021, August, you viewed FTT as one

13   of the top 10 percent of cryptocurrencies as a form of

14   collateral?

15   A.   I wouldn't say with certainty that I viewed it as within

16   the top 10 percent, but it was reputable.

17             MR. COHEN:  Could we pull up, please, 3571-001 and go

18   to page 5.

19             MR. ROOS:  Objection.  Foundation.

20             MR. COHEN:  Don't put it up yet.  I'm sorry.

21             THE COURT:  What was the number you said, counsel?

22             MR. COHEN:  Your Honor, it's --

23             THE COURT:  Tell me the number again.

24             MR. COHEN:  It's 3571-001 at page 5.

25             THE COURT:  Do you have a question to ask?

1          MR. COHEN:  I do, your Honor.

2     Q.  Mr. Prince, do you recall being interviewed by prosecutors

3     in this case?

4     A.  Yes.

5     Q.  Do you recall being interviewed in July of 2023, this past

6     July?

7     A.  Yes.

8     Q.  Do you recall being asked your view of FTT as a form of

9     collateral?

10    A.  Yes.  I know that was something that was discussed.

11    Q.  And saying you considered it in the top 10 percent?

12    A.  The way I remember referring to top 10 and FTT in that

13    conversation and others that I've had is that I think there was

14    a point in time where FTT was a top 10 cryptocurrency by market

15    cap.  And maybe I would have said top 10 percent, but I wasn't

16    trying to be -- I am not trying to be -- I am not trying to say

17    it's not a legitimate currency, but my memory was that I said

18    at some point FTT was even in the top 10 cryptocurrencies by

19    market cap.

20    Q.  Fair enough.

21         THE COURT:  Would you tell the jury what market cap

22    is?

23         THE WITNESS:  Sure.  So market cap is like total

24    value.  It's a term that comes from the stock market.

25         If Amazon is a company that's worth $800 billion, that

1   means their enterprise value, their market cap is 800 billion.

2   In the cryptocurrency market there was a ranking of the

3   different cryptocurrencies by market cap, and the way you

4   calculated market cap was by taking the price of the coin that

5   it was trading at times the total number of coins in existence,

6   and then you have the market cap.  And there were numerous

7   websites where you could go and see a ranking of the different

8   cryptocurrencies by market cap.  Generally, Bitcoin is number

9   one, it's got the largest market cap, and then the subsequent

10  positions move around a bit.

11  Q.  And FTT, in your view, had a high market cap?

12  A.  High -- it was one of the top cryptocurrencies for sure.

13  Q.  Now, let's go back to DX-816.  Continuing on the next page,

14  the next page, the same -- go back, Brian.  I'm sorry.  The

15  stress scenarios methodology.

16        If you look at the last bullet point, it says

17  wrong-way risk.  You see that, Mr. Prince?

18  A.  Yes.

19  Q.  Can you explain to the jury what wrong-way risk meant in

20  connection with the lending?

21  A.  Sure.  So wrong-way risk -- I'll try and use an example

22  from the real world to make it simple.  Wrong-way risk is a

23  term that is used in risk management parlance to describe

24  getting a type of collateral from a borrower whose performance

25  has an impact on the type of collateral.

NADMBAN2                          Prince - Cross

1           And the easiest example to think of for this is like

2    making a loan to Apple, the company Apple, and taking their

3    stock as collateral.  That transaction would present wrong-way

4    risk because you're lending to Apple and you are taking their

5    stock as collateral.  A type of collateral that Apple could

6    post that would not present wrong-way risk would be if they

7    posted U.S. Government bonds.  If Apple gave you treasuries as

8    collateral for a loan, that would not present wrong-way risk

9    because how Apple does isn't going to have an impact on how

10   U.S. treasuries do in a super correlated nature.

11          What the risk team is highlighting here is that they

12   believed that there was wrong-way risk present here.  It says

13   Alameda enters into a default and all lenders start liquidating

14   FTT collateral.  We think it's possible that FTT could drop 60

15   to 75 percent in a day.

16   Q.  Sort of in laymen's terms, the wrong-way risk was that FTT

17   was correlated with FTX.  If something happened to FTX, it

18   could affect FTT.

19   A.  Correct.

20   Q.  That was something you and your team were considering in

21   August of 2021.

22   A.  Yes.

23          MR. COHEN:  Can we go back to the first page.

24   Q.  Under request, if you could give us a translation of how

25   much more the sales team -- how much more is being considered

NADMBAN2                        Prince - Cross

1   for borrowing by Alameda.

2   A.   Sure.  It's saying that the sales team is requesting, which

3   would have been -- which would mean that they were getting that

4   request from the client.  Internally the sales team is bringing

5   a request that's coming from the client to borrow potentially

6   up to 1 billion gross, which means like total gross lending of

7   1 billion.  The current exposure, which is the second bullet,

8   is 114 million gross.

9        At the time that this credit memo was produced, we had

10  lent $114 million gross to Alameda and the composition of that

11  is the third bullet.  We had lent them $50 million worth of

12  USDC, $43 million worth of Ethereum, and $20 million worth of

13  Bitcoin.  And against that, next bullet, they had posted 179

14  million of collateral, 135 million of that collateral was FTT,

15  35 million of the collateral was SOL, 5 million of USD, and 2.7

16  million of USDT.

17  Q.   Got it.  Thank you, sir.

18       What that meant is, they were looking to borrow up to

19  a billion dollars, correct?

20  A.   Yes.  They wanted to increase the borrow.

21  Q.   They had already borrowed 114 million.

22  A.   Correct.

23  Q.   And against that 114 million Alameda had put up collateral

24  of 179 million, correct?

25  A.   Correct.

NADMBAN2                        Prince - Cross

1   Q.   Did you ever hear the term overcollateralized?

2   A.   Yes.

3   Q.   What does that mean?

4   A.   It means that the amount of collateral that's posted is

5   larger than the loan amount.

6   Q.   And here your credit team and you were considering that

7   this $114 million loan was overcollateralized.

8   A.   Yes.

9   Q.   And $135 million of that was being collateralized by the

10  FTT.

11  A.   That's correct.

12          MR. COHEN:  Now, if we could continue on in this

13  document and proceed to the third page in.

14  Q.   Now, if you see at the bottom there is something called

15  consolidated balance sheet, 2021.

16          MR. COHEN:  Can we pull up the whole document.  It

17  continues onto the next page, Brian.

18  Q.   Now, Mr. Prince, you mentioned earlier that one of the

19  items that you and your team would consider would be balance

20  sheets, correct?

21  A.   Yes.

22  Q.   And sometimes companies had audited financial statements,

23  correct?

24  A.   Yes.  We frequently received audited financials from -- I

25  mentioned earlier we worked with traditional trading firms and

NADMBAN2                          Prince - Cross

then crypto-specific trading firms.  The traditional firms
often had audited balance sheets.  Crypto firms, it was much
less common to have audited balance sheets because of issues
with getting audits as a cryptocurrency firm.

Q.  Just to be clear, some of the balance sheets you received
from crypto firms were what is called unaudited balance sheets.

A.  I would say the majority of balance sheets that we received
from cryptocurrency firms were unaudited.

Q.  It was up to you and your team to decide whether or not you
wanted to consider that information, correct?

A.  We always considered the information, and we always relied
on the information that we were given by counterparties as
being truthful and accurate.

Q.  Let me ask a better question.  If you decided we only want
to consider making loans to companies who have audited
financial statements, you could have done that, correct?

        MR. ROOS:  Objection.

        THE COURT:  Overruled.  It's obvious.  Answer, please.

A.  Yeah.  If within the risk policies and procedures of
BlockFi, if a decision was made that we would only lend to
companies -- it is possible that a decision could have been
made that we would only lend to companies with audited
financials, sure.

Q.  Now, continuing on with this balance sheet that we are
looking at, this is about one page long, one and a half pages?

NADMBAN2                        Prince – Cross

1    A.  Yes.

2    Q.  And what was on the table was whether or not to increase

3    the borrowing amount from 114 million to as high as a billion

4    dollars, correct?

5    A.  That was one of the bullets on the first page.

6    Q.  And if you see here, sir, at the bottom of the second page

7    there is an entry called retained earnings.

8            Do you see that, at the very bottom?

9    A.  Yes.

10   Q.  And in your world is retained earnings synonymous with net

11   asset value?

12   A.  For me personally, as a nonaccountant and I guess a

13   bigger-picture thinker in most scenarios, I think of them as

14   roughly the same, but I'm also aware that they are not

15   precisely the same if I were an accountant.

16   Q.  I'm not holding you to a technical definition.  I want to

17   get your understanding.

18           Going back to the first page, Mr. Prince, there is a

19   heading called assets.

20           Do you see that, sir?

21   A.  Yes.

22   Q.  And underneath the heading current asset it lists cash and

23   cash equivalents.  I think that is easy enough to understand.

24   Then it lists crypto held, about $3.2 billion of crypto held.

25           What was your understanding of that?

A.   I'm not sure, off the top of my head, what my understanding
was of it at the point in time that we received this balance
sheet, but there is a four there, so I would imagine there is a
footnote somewhere.

              (Continued on next page)

1   MR. COHEN:  Why don't we put up the 4, Brian.

2   A.  Yeah, so it says "an immaterial amount of locked tokens

3   from various yield farming projects are held in this balances,

4   determined to be too small to break into a line item."

5   Q.  So is it fair to say that was a summary of cryptocurrencies

6   held by Alameda with the caveat about footnote 4, which you

7   pointed out?

8   A.  Yeah, I mean, they were representing it as crypto, you

9   know, the crypto——crypto held.

10   Q.  Right.  It wasn't broken out for you on this balance sheet.

11   A.  Well, there were some cryptocurrencies that were broken

12   out, but I think——the assumption is, looking at this, that any

13   cryptocurrency that was not broken out on a subsequent line

14   item would have been included in the Crypto Held line item.

15   Q.  And if you'd wanted that broken out, you could have

16   certainly asked for it.

17   A.  Yeah, and there were times, you know, where our team did

18   ask and received information or, you know, representations

19   about what constituted certain line items.

20   Q.  Okay.  And continuing under Assets, at the bottom there's

21   something called Unlocked FTT.  Can you explain to us what that

22   was.

23   A.  So there's a——there's a concept with cryptocurrencies where

24   they can either be locked or unlocked.  So think of it——an

25   example from the traditional world would be, let's say you go

1  work at a company and that company, as part of the compensation

2  that they offer to employees, grants some shares or, you know,

3  equity in the company.  Most of the time when you receive that

4  equity in the company, it has a vesting agreement or some type

5  of structure where you get, you know, a certain amount of the

6  equity after you've worked at the company for a year, a certain

7  amount after two years, etc.  This locked and unlocked concept

8  in crypto was—was similar to that.  So, you know, protocols

9  would give their employees tokens or, you know, use tokens to

10  pay for services that the cryptocurrency protocol was using,

11  and sometimes those tokens that they were giving out to

12  employees or others would be locked, which basically meant that

13  the receiver of them was not going to be able to access or sell

14  them until the end of that locked period of time.  So what

15  unlocked would mean here is that these were tokens that were

16  not subject to any restrictions and that they were free to be

17  sold or otherwise utilized.

18  Q.  Okay.  Thank you, Mr. Prince.

19          MR. COHEN:  If we could bring up the pages of the

20  balance sheet side by side.

21          THE COURT:  I'm sorry.  Let's clarify that.  Back up,

22  please.

23          MR. COHEN:  Yeah.

24          THE COURT:  And how would that relate to the Crypto

25  Held line with the $3 billion figure on it?

NAD1BAN3                    Prince - Cross

1          THE WITNESS:  Well—well, my—so these—where it

2     says—

3          THE COURT:  If you know.

4          THE WITNESS:  My understanding, you know, just based

5     on what we've looked at right now, is that the line items below

6     Crypto Held are calling out specific cryptocurrencies, and

7     they're reflecting unlocked amounts.  Crypto Held is a line

8     item for any other cryptocurrency that's an asset of Alameda

9     that is not listed with its own line, and then the footnote 4

10    was making a representation that basically the vast majority,

11    almost the entirety of this Crypto Held line item was unlocked

12    tokens, because if I'm remembering our reading of—of

13    bullet—of footnote 4, it said there's a de minimis amount of

14    locked tokens in this Crypto Held line.

15    BY MR. COHEN:

16    Q.  And just to sort of maybe simplify it, unlocked FTT could

17    be traded, locked FTT was still not able to be traded, correct?

18    A.  Correct, that's my understanding.

19    Q.  And if you could look at the next page under Long-Term

20    Assets, the balance sheet highlights in line 2, Locked FTT.

21    A.  Correct.

22          MR. COHEN:  Okay.  Now if we could go to the next

23    page, please.

24          The one after that.

25          Okay.  Just that one, Brian.  If you could pull up

NAD1BAN3                        Prince - Cross

"Summary of underwriting challenges - for exception approval."

Let's just go to that line.

BY MR. COHEN:

Q.   What did that line mean, sir, "Summary of underwriting

challenges - for exception approval"?

A.   Sure.  So what that meant was that for the folks writing

this report, they did not——they were not able to approve,

under——at their level of authority, within our risk management

policies and procedures, they were not able to approve this

transaction.  It also probably meant that there wasn't a clear

box that the transaction fit into in our risk framework at the

time, so there would be this exception process, and what the

exception process basically meant is that the executive team

and oftentimes also the board risk committee would look at

certain scenarios and they would look at the scenario and say,

okay, is this something we should do or not do, and to the

extent that a scenario that came up for exception approval

happened multiple times, sometimes decisions would be made to

adjust our overarching risk framework to increase certain types

of activity or decrease certain types of activity.

Q.   Okay.  So when an exception approval was included, that

meant the credit team doing the sort of on-the-ground work

couldn't say "yea" or "nay" to the loan, correct?

A.   That's one of the reasons, yes.

Q.   And it had to go up the chain of command.

NAD1BAN3                          Prince - Cross

1    A.  Correct.

2    Q.  Ultimately to the executive committee, I believe you said?

3    A.  Well, ultimately exceptions would go all the way up to

4    the——we had a committee that was called BARC.  It stood for

5    Board Audit and Risk Committee.  And that was a board level

6    committee.

7    Q.  And you were a member of that committee.

8    A.  I think——I was certainly always at the meetings.  Depending

9    on the time frame, I think there were times where I was an

10   official member and times where I was just like an attending

11   observer, but——

12   Q.  Fair enough.  As CEO——

13   A.  I was always there and I always had a voice.

14   Q.  As CEO of BlockFi, did you have input into the decision

15   about whether to increase the credit line, the credit limit

16   here?

17   A.  Absolutely.

18   Q.  Okay.  Now you see in the next bullet points the credit

19   team has laid out what it viewed as the underwriting

20   challenges, correct?

21   A.  Yes.

22   Q.  And I think we've talked about these so I'll just hit them

23   briefly.

24           1 is that there were unaudited financials.

25           2, that——well, I'll come back to 2.

3, that there was wrong way risk, which you've already
talked about.

And 4, we have——well, let me ask, 4, volatile
collateral, can you explain that, Mr. Prince.

A.   Sure.  Volatile collateral, I mean, volatility is a term
used to refer to how much the price of a——of an asset, you
know, moves.  So an asset that is volatile, you know, goes up
or down in price in larger percentages than an asset that is,
you know, less volatile.

Q.   And that's what we've been talking about with respect to
FTT, correct?

A.   Yeah.  I mean, in general, cryptocurrency——I would say the
cryptocurrency asset class as a whole was a——is a volatile
asset class.

Q.   And there's a fifth bullet point on the next page.  I
wanted to make sure I showed you the whole thing, but I don't
think we have to spend a lot of time on this.  This is illiquid
tokens.  Sir, this is what we've just been talking about,
correct?

A.   Yeah.  Just to——just to read it for folks, "FTT/SRM
collateral is illiquid relative to major coins.  FTT ADV
roughly 60 million on each of Binance and FTX."  That means FTT
is the coin, ADV is the average daily volume, so what they're
saying here is that FTT is trading roughly 60 million per day
on Binance and FTX, while trading can support only 25 million

NAD1BAN3                    Prince - Cross

1   per day.  And the reason they would say that is, you know, the

2   certain asset trades a certain amount on an exchange per day,

3   and you're just one buyer or seller of that asset.  You never

4   want to assume that you can have all of that volume for

5   yourself.  You're only going to be able to get a portion of it.

6   Q.  Okay.

7            THE COURT:  Going back for a minute to volatility,

8   Mr. Prince, the concept of volatility includes not only the

9   magnitude of fluctuation of price but also the magnitude of

10  fluctuation of price per unit, time; in other words, it implies

11  it goes up or down quickly.

12           THE WITNESS:  Yes, I believe that's——that's exactly

13  correct, your Honor.  It's price, price and, you know, the time

14  component of how fast is it moving.

15           THE COURT:  Okay.  Let's go on.

16  BY MR. COHEN:

17  Q.  To his Honor's point, how fast it could move over a given

18  period of time, correct?

19  A.  Yeah.

20  Q.  Okay.  Okay.  Going back to the prior page, pick up the one

21  bullet we missed, it says, over credit limit.  Do you see that,

22  sir, under summary of underwriting challenges?

23           MR. COHEN:  Could we call that up, Brian.

24  Q.  Just, can you briefly explain to us what that refers to.

25  A.  Sure.  So, you know, a credit limit——a credit limit was

NAD1BAN3                         Prince - Cross

a—an amount of exposure that within our risk framework BlockFi

was willing to take to a certain category, you know, certain

classification of counterparty at a—at a point in time.  So,

you know, if a counterparty was Tier 1—just using super simple

examples, if they were Tier 1, we might have a credit exposure

of a hundred million; if they were Tier 3, which was a

lower-credit-quality tier, we would have a lower credit

exposure maximum of maybe 10 million.  Not saying those are the

actual numbers, but—

Q.  No, I understand, sir.  And here, for the loan under

consideration, what was the tier you were looking at?

A.  So what it says here is, "Our current limit for crypto

native funds Tier 1C is 45 million.  A proxy for crypto native

exchanges is 100 million limit.  [Note:  Underwriting hasn't

done a credit assessment of FTX yet, as FTX is not a borrower

themselves.]"

        One thing I would just point out here, if I may, about

how this exposure works, the amount of exposure, you know—when

BlockFi is talking about exposure, the amount of exposure it

has could be an amount of exposure where we don't have any

collateral, and in that case it's really easy to calculate.  If

we lent someone $50 million and they didn't give us any

collateral, our exposure is $50 million.  The calculation of

how much exposure we had when someone was posting collateral

was a bit more complex of an exercise.  So if we lent someone

NAD1BAN3                          Prince - Cross

1  $50 million and they gave us a hundred million dollars of

2  collateral, you could say, oh, well, our exposure is 0.  The

3  loan is overcollateralized.  But our risk team, you know—a lot

4  of what you're seeing here is that they would do analyses to

5  try and estimate some level of exposure even in scenarios where

6  the loans were overcollateralized, and so—

7  Q.  And again, this was all part of summarizing for you and the

8  board the reasons to consider going over making an exception

9  and going higher in the amount loaned, correct?

10  A.  Yeah.  I mean, I think they're—they're raising this and

11  saying this is something that could be—that should be

12  considered for exception approval.

13          MR. COHEN:  All right.  We can pull that one down.

14          Let's take a look now at Defendant's Exhibit 817 for

15  identification, just for the witness.

16          MR. ROOS:  No objection, provided it has the same

17  limitation.

18          THE COURT:  Are you offering it?

19          MR. COHEN:  I would like to.

20          THE COURT:  It's received on the same basis as the

21  last one—in other words, not for the truth of anything

22  attributed to anyone other than BlockFi.

23          MR. COHEN:  Can we publish it to the jury, your Honor.

24          THE COURT:  Yes.

25          (Defendant's Exhibit 817 received in evidence)

1  BY MR. COHEN:

2  Q.  All right.  Now, Mr. Prince, this is a credit memo from,

3  about two weeks later, on August 31, 2021.  Do you see that,

4  sir?

5  A.  Yes.

6       MR. COHEN:  Okay.  We can drop that, Brian.

7  Q.  And can you translate for us what the request is that is

8  being asked of BlockFi.

9  A.  Sure.  So this request is for a 10K so 10,000 Bitcoin loan,

10  which at the time was worth roughly 470 million, with

11  110 percent FTT/SRM collateral with a 100 percent margin call

12  level, no liquidation trigger, open term.

13       Next bullet, our current exposure was that we had lent

14  them 267 million of gross, so the──here's why I brought up the

15  exposure.  You start to see a little bit of a nuance.  Our

16  gross exposure was 267 million but 0 net, which means the

17  267 million of lending was overcollateralized.  That

18  267 million was 200 million of USDC, 45 million of ETH, and

19  21 million of BTC.

20       I can keep going if you want.

21  Q.  No.  Just for our purposes, is it fair to say, sir, that as

22  of the period between the 15th and the 31st──I didn't want to

23  interrupt you──BlockFi has now loaned 267 million to Alameda,

24  correct?

25  A.  Yes.  So we──we've increased from the other credit memo

NAD1BAN3                     Prince - Cross

1    that I just looked at.

2    Q.  And now this credit memo is considering the request to make

3    a further loan, correct?

4    A.  Correct.

5    Q.  Up to the $1 billion limit we were talking about in

6    connection with the last memo.

7    A.  Well, this specific request is asking for a new loan of

8    approximately 470 million and the current loan size was 267, so

9    it doesn't get you all the way up to a billion, but you're at

10   730 million.

11   Q.  Even I can follow that math.

12          Okay.  So it's asking for an additional 470 million,

13   sir.

14          MR. COHEN:  If you could go to the last page, Brian.

15          And go to the bottom, pull out "Summary of

16   underwriting challenges."

17   Q.  Now we don't need to go through them again.  Is it fair to

18   say, Mr. Prince, these are the same challenges that the team

19   had flagged for you and the board the previous, you know—about

20   two weeks earlier?

21   A.  Yeah.  Without reading it word for word, it looks like it's

22   the same ones.

23   Q.  Okay.  And then go up to the top of this document.  It says

24   Approval Challenges/Recommendations.  Do you see that, sir?

25   A.  I do.

NAD1BAN3                          Prince - Cross

1            MR. COHEN:  And if you—Brian, if you could highlight

2       the first two sentences.

3       Q.  "Credit team recommends not to approve this trade because

4       it increases our exposure to FTT collateral which is already

5       very significant (we hold 367 million FTT collateral).  We do

6       not recommend increasing our exposure to FTT collateral."  Do

7       you see that, Mr. Prince?

8       A.  I see that.

9       Q.  So the team is telling you and other executives, their

10      recommendation is not to go forward.

11      A.  A part of the risk management team that produced this memo

12      was saying that.  I wouldn't—that wasn't the whole team's

13      view, but the authors of this, that was their view, at the

14      time.

15      Q.  The authors of this credit memo, that was their view.

16      A.  Correct.

17      Q.  That's the view they took of the risk of increasing a loan,

18      correct?

19      A.  Correct.

20            MR. ROOS:  Objection.  Asked and answered.

21      Q.  Now did in fact the loan get made?

22      A.  This loan; no, this loan did not get made.

23      Q.  Did additional loans get made above the 267 amount?

24      A.  Additional loans were made, but I think there's—there's

25      two important things about those that I'd like to highlight, if

NAD1BAN3                          Prince - Cross

1    I can.

2    Q.  Sure.

3    A.  One is that if we go to the——back to the beginning of this

4    doc, the, you know, the request that's being discussed in this

5    credit memo is with 110 percent collateralization level.  So if

6    we lent them a hundred dollars, they would post 110 worth of

7    collateral.  The incremental loans that got made were at much

8    higher collateral levels than that.  So the amount of

9    collateral that we required them to post as we were increasing

10   the lending was substantially higher than what's talked about

11   in this credit memo.

12   Q.  Fair enough.  From the time——

13   A.  Additionally——

14   Q.  I'm sorry.

15   A.  ——the other point I wanted to make was that the loans at

16   this time that were made were all paid back, in June of 2022.

17   Q.  Mr. Prince, is it fair to say that from time to time the

18   credit team would take a different view of risk than you might,

19   or the executive committee might?

20   A.  Yeah, I think it's——that's——that's fair to say.  It's also

21   fair to say that it——I think you're——I think you're not running

22   a good risk organization if you don't facilitate——if you don't

23   have disagreements.  If you're not having any disagreements,

24   then people aren't talking about things.  So, you know, there

25   were times where people had different views at all different

1    levels of the decision matrix, and those views were, you know,

2    discussed and evaluated and decisions were made.

3    Q.  So you could form different business judgments, correct?

4    A.  Sure.

5    Q.  And you and the executive committee could decide as a

6    matter of business judgment that these loans were worth

7    continuing with even if the credit team had reservations?

8    A.  Yes.

9    Q.  And that's what happened here.

10   A.  No.  I already——I already told you what happened here.

11   What happened here is, this credit memo is——is for a loan with

12   110 percent collateral.  That loan was not made.

13   Q.  But——and I don't want to belabor this——later loans were

14   made, correct?

15   A.  Yes, but this, you know——you're showing me a credit memo

16   where they're saying "we recommend not making this loan," and

17   I'm telling you we did not make this loan.

18          MR. COHEN:  Now we can take this one down, Brian.

19          Can we call up Defense Exhibit 815 for identification,

20   just for the witness.

21   Q.  Before you look at it, let me just ask you a few questions,

22   Mr. Prince.

23          MR. ROOS:  If it's helpful, no objection.

24          MR. COHEN:  Okay, fine.

25          THE COURT:  It's received.

NAD1BAN3                      Prince - Cross

1           MR. COHEN:  Thank you.

2           (Defendant's Exhibit 815 received in evidence)

3    Q.  So Mr. Prince, is this the amended and restated master loan

4    agreement dated January 26, 2022, between BlockFi International

5    and Alameda Research?

6    A.  Based on what I'm seeing, I believe it is.

7    Q.  Okay.  If you're not comfortable and you want to go through

8    it, we can let you go through it, sir.

9    A.  I mean——

10   Q.  I can give you a hard——a hard copy if that would be easier.

11   A.  Assuming this is, you know, the loan agreement that was

12   provided through to, you know, in discovery by our legal teams,

13   then yes, I'm comfortable saying.

14   Q.  And if we could turn——well, before I do that, can you

15   explain to the jury what a master loan agreement is.

16   A.  Sure.  So we would frequently enter into master loan

17   agreements with institutional counterparties, and the master

18   loan agreement would be like a——like an overarching agreement

19   that would govern all of the subsequent transactions which

20   could typically be done with much shorter agreements.  So you'd

21   have this master loan agreement, which was a universal

22   agreement, and then let's say an institutional counterparty

23   did, you know, ten loans throughout the course of the year;

24   each of those subsequent loans would have, you know, either a,

25   like a one-page term sheet that got signed or a trade confirm

NAD1BAN3                          Prince - Cross

1      or something else, but it basically was a master agreement that

2      enabled you to do ongoing transactions with a counterparty

3      with——without having to do a big agreement every time you

4      wanted to do one incremental loan.

5      Q.   Right.  So the idea was if you had a counterparty, a

6      borrower who you thought you might do a number of loans with,

7      you didn't have to do a new agreement every time.

8      A.   That's right.

9      Q.   Can you take a look, Mr. Prince, at page——

10               MR. COHEN:  Brian, 92485.

11     Q.   Okay.  And you see it's signed for BlockFi international by

12     David Olsson.  Who was he?

13     A.   David Olsson was a senior vice president on our

14     institutional——our institutional client coverage team.

15     Q.   Okay.  And it was signed for Alameda by Caroline Ellison as

16     co-CEO.  Do you see that, sir?

17     A.   Yes, I see that.

18     Q.   Okay.  Now if we could turn to page 92462.

19               MR. COHEN:  And if you could call out, under Loan

20     Procedure, Brian, the paragraph underneath that that begins,

21     "Unless parties agree."  Or you could bring the whole thing up

22     through the subbubble.  Keep going below.  Yeah.

23     Q.   And just very quickly, Mr. Prince, is this a summary of the

24     process you were just describing for taking down individual

25     loans?

NAD1BAN3                        Prince - Cross

1  A.   Yeah.   I mean, it seems like this——without having read this

2  whole thing, the——this is the section of the agreement where

3  it's talking about the procedure for getting a new loan within

4  the master loan agreement.

5  Q.   So BlockFi would discuss with Alameda what type of loan it

6  was going to be——the amount it was going to be for?

7           THE COURT:   Mr. Cohen, the witness just said he hadn't

8  read the whole thing.

9           MR. COHEN:   Sorry, your Honor.

10           THE COURT:   And the jury has the document.   So let's

11  move along.

12           MR. COHEN:   Okay.   Okay.

13           Then I think we might move along from this document.

14  All right.   Let's take it down.

15           Okay.   Now I don't think we need a document to do

16  this.

17  BY MR. COHEN:

18  Q.   Mr. Prince, do you recall giving testimony about the period

19  in November 2022 and the relationship between BlockFi and

20  Alameda?

21  A.   I assume you're referring to like testimony here?

22  Q.   Yeah, today.

23  A.   Yeah, I do.

24  Q.   Okay.   And I want to narrow it.   Do you recall you talked

25  to us earlier this morning about an entity called Robinhood?

A.   Yeah, I mentioned that in November there was a——a pledge,
additional pledges of collateral to BlockFi and that part of
that additional collateral that was pledged in November
included Robinhood shares.

Q.   So this was additional collateral that Alameda was pledging
to BlockFi to secure its loan, correct?

A.   Correct.

Q.   Did you know who owned the Robinhood shares?

A.   I'm not——I'm not sure, you know, I——I don't believe that I,
at the time that the Robinhood shares were pledged, understood
some of the nuance that I've now become aware of in terms of
what entity the Robinhood shares were held in.  That being
said——

Q.   I'm interested in your recollection at the time, sir.

A.   My recollection at the time was that Alameda was posting
shares to secure the loans that BlockFi had made to it.

Q.   Okay.  And that was being done by Caroline Ellison as CEO
of Alameda at the time?

A.   At——my understanding was that it was, you know, Caroline
who signed the doc but at Sam's instruction, so I was messaging
and emailing with Sam at the time.

Q.   And however that went down, those Robinhood shares were
part of what was being put out as collateral for Alameda,
correct?

          MR. ROOS:  Asked and answered.

NAD1BAN3                         Prince - Cross

1      THE COURT:  Sustained.

2   Q.  Now Mr. Prince, you testified that there came a time, I

3   think it was in the summer of 2022, that BlockFi ended up

4   receiving a loan from FTX.US.  Do you recall that?

5   A.  Yes.

6   Q.  Okay.  And I think you said that what had happened was

7   there was stress in the market, correct?

8   A.  Yes.

9   Q.  Other lenders, like Voyager, Genesis, were having problems?

10      MR. ROOS:  Objection.  Cumulative.  This is the

11   direct.

12      THE COURT:  Sustained.

13   Q.  Tell us why BlockFi reached out to FTX and ultimately got

14   the——FTX.US and ultimately got the loan.

15      MR. ROOS:  Same objection.

16      THE COURT:  You're just repeating.  You're asking him

17   to repeat, right?

18      MR. COHEN:  Well, I have a question that I think I

19   need to ask this so I can set up the question, your Honor.

20      THE COURT:  Go ahead.

21   A.  BlockFi made——BlockFi made the decision that we were

22   interested in bringing additional capital into the business,

23   and that we thought if there was an option to do that, that

24   that would be the right thing to do for the business.  So, you

25   know, we ran——we ran a process where we reached out to

NAD1BAN3                          Prince – Cross

1    investors, you know, other crypto firms to see what capital we

2    could potentially raise and at what terms.

3    Q.  Were you concerned at the time, Mr. Prince, that BlockFi

4    might go bankrupt?

5    A.  I think that——I think that the range of my concerns as CEO

6    of BlockFi pretty much always included everything from, you

7    know, complete failure to extreme success, and part of the job

8    of CEO I think is to be evaluating decisions that you're making

9    within the context of the spectrum of things that could happen

10   to a company.

11   Q.  But you had no specific concern in the summer of 2022 that

12   you might go bankrupt.

13   A.  Well, we certainly had——we certainly had a lot of eyes,

14   very capable, professionals inside and outside the firm that

15   were looking at the company's position, and there was never,

16   you know——we always viewed the business as being solvent and

17   operational, and in fact, throughout that period of time, we

18   operated the same as we had in less volatile market times.

19   Q.  So you operated, you continued to pay your debts, you

20   considered to have positive assets, correct?

21   A.  That's correct.

22   Q.  But you felt the need to take in this capital, correct?

23   A.  I don't know that I would use the word "need," but we

24   decided that it was better for the business to do this

25   transaction than for the business to not do the transaction.

NAD1BAN3                         Prince - Redirect

1    Q.  And you looked at various options, correct?

2    A.  Yes, we evaluated other options.

3    Q.  And you felt that the 400 million being offered by FTX.US

4    was the best option.

5    A.  We looked at the entirety of it, of the transaction.  So

6    there was a loan component to the transaction and there was a

7    acquisition component to the transaction.

8             MR. COHEN:  One moment.

9             Mr. Prince, I just want to thank you for your time.

10   We have nothing further.

11            THE COURT:  Thank you.

12            Any redirect?

13            MR. ROOS:  I think just one or two questions.

14            Could we pull up Defense Exhibit 816.  And we can flip

15   through this to the page where it mentions wrong way risk.

16   REDIRECT EXAMINATION

17   BY MR. ROOS:

18   Q.  And Mr. Prince, you were asked a question on

19   cross-examination about wrong way risk with respect to FTX.  I

20   just want to be clear.  Did this memo here refer to wrong way

21   risk about FTX or about Alameda or something else?

22   A.  Well, you know, what it's saying is that the loan——making a

23   loan to Alameda with FTT collateral, in our——in our team's

24   view, presented a wrong way risk.  That transaction had wrong

25   way risk associated with it.

NAD1BAN3                        Prince – Redirect

1    Q.   And transaction with Alameda or FTX?

2    A.   Well, what we were contemplating here was loans to Alameda.

3    Q.   Okay.  And you testified about overcollateralized loans.

4    Why would you overcollateralize a loan that involved FTT?

5    A.   Well, you're always——in general, when you're taking

6    collateral for a loan, you're trying to reduce your risk

7    associated with that loan, and so the more collateral you take,

8    the less risk you have, generally speaking.

9    Q.   And you were asked some questions about risk at the end of

10   cross-examination, including about your bankruptcy risk in the

11   summer of 2022.  Why did you go into bankruptcy in November

12   2022?

13             MR. COHEN:  Objection.

14             THE COURT:  What's the objection?

15             MR. COHEN:  It relates to the prior motion practice in

16   the case, your Honor.

17             MR. ROOS:  I'm asking about his bankruptcy.

18             THE COURT:  I don't understand what that's all about.

19   Is there something else you want to say?

20             MR. COHEN:  No.  Just, it was briefed before.  I don't

21   think we need to discuss it again.

22             THE COURT:  Well, I don't think it was briefed before.

23   Overruled.

24             THE WITNESS:  I'm sorry, Nick.  Could you say the

25   question again, please.

1              MR. ROOS:  Sure.

2    BY MR. ROOS:

3    Q.   The end of the question was:  Why did you go into

4    bankruptcy in November 2022?

5    A.   Sure.  Well, I mean, the——once——once our view became that

6    the Alameda loans and assets that we had at FTX weren't going

7    to be either repaid or accessible, then we did not have a view

8    that the business was solvent and therefore we engaged with

9    professionals and proceeded towards a bankruptcy filing.

10             MR. ROOS:  No further questions.

11             THE COURT:  Thank you.

12             Anything else, Mr. Cohen?

13             MR. COHEN:  Yes, your Honor.

14   RECROSS EXAMINATION

15   BY MR. COHEN:

16   Q.   Mr. Prince, are you saying that the sole reason BlockFi

17   went into bankruptcy was the Alameda loans?

18   A.   I don't——I mean, let me try and say it a different way.  I

19   just want to be careful with——with language.  If——I don't think

20   BlockFi would have filed for bankruptcy in November of 2022 if

21   the Alameda loans were still in good standing and the funds we

22   had at FTX were accessible.  I do not think, in a scenario

23   where those two things were not impaired, that the company

24   would have needed to file for bankruptcy.

25   Q.   But it might have had to file later, correct?

NAD1BAN3                          Prince - Recross

1           MR. ROOS:  Objection.  Calls for speculation.

2           THE COURT:  Sustained.

3           MR. COHEN:  That's all I have.

4           THE COURT:  Thank you.

5           Mr. Roos, anything else?

6           MR. ROOS:  No, your Honor.  Thank you.

7           THE COURT:  Mr. Prince, thank you.  You're excused.

8           (Witness excused)

9           THE COURT:  Members of the jury, have a great weekend.

10   9:30, Monday morning.

11           Counsel, remain for a minute, please.

12           (Continued on next page)

NAD1BAN3

```
 1              (Jury not present)

 2              THE COURT:  Be seated, folks.

 3              Who are the witnesses to follow next week?

 4              MR. ROOS:  So because we didn't get to two today, we

 5      have to figure out a revised order, but I'll give your Honor

 6      the next seven or eight.

 7              So the two that were supposed to be today, Dekel and

 8      Busick, and then Nishad Singh, Ramnik Arora, Delaney Ornelas

 9      Tareq Morad.

10              THE COURT:  After Ramnik Arora, who were the two?

11              MR. ROOS:  Delaney Ornelas.

12              THE COURT:  That's——

13              MR. ROOS:  Delaney is the first name.

14              THE COURT:  Okay.  Thanks.

15              MR. ROOS:  And Ornelas is the last name.

16              THE COURT:  Okay.

17              MR. ROOS:  And Tareq, T-A-R-E-Q, Morad, M-O-R-A-D.

18              THE COURT:  Okay.  And in broad strokes, some, of

19      course, I recognize.  I recognize Nishad Singh, I recognize

20      Arora.  Who are the rest of them?

21              MR. ROOS:  Sure.  So Delaney Ornelas was an Alameda

22      employee involved in banking; Tareq Morad and Dekel, who was

23      supposed to be on today, are both FTX customers; Busick is an

24      FBI agent who would testify about historical cell site

25      analysis.
```

NAD1BAN3

1          THE COURT:  Okay.  When does the government expect to

2     rest?

3          MR. ROOS:  So I think, your Honor, that we still

4     remain on the pace that Ms. Sassoon advised you of a few days

5     ago.  I think the vast majority of the government's case will

6     conclude next week.  There are I think maybe two or three folks

7     that we have set for the 26th.  I think there's a real

8     possibility that right after our break we would put those folks

9     on and rest.  So sort of in the middle of our short week, our

10    two-day week.

11         THE COURT:  Right.  I understand.  Okay.

12         MR. ROOS:  So I would just say, for defense planning

13    purposes, I think it's possible that the defense case would

14    begin, if there is one, as soon as, say, afternoon of that

15    Thursday, the 26th.

16         THE COURT:  Okay.

17         MR. COHEN:  Your Honor, for planning purposes, could

18    we know the order of the witnesses that counsel just

19    identified.

20         MR. ROOS:  Yes.  We will let them—we'll give them a

21    list of everyone we think for next week and we'll also give

22    them at least the beginning of that order so they can plan for

23    Monday and Tuesday.

24         THE COURT:  Okay.  Anything else we need to do today?

25         MR. ROOS:  There's one thing, your Honor, which is, I

NAD1BAN3

1      think there may be some disputes over the admissibility of a

2      few things or lines of cross over the first few witnesses.  I

3      think the parties are going to try to work those out, but we

4      may have to put a letter in to your Honor.  We'll try not to

5      burden you with more than one.

6              I think in terms of the——one of the witnesses who was

7      going to go today, Ms. Kudla has an issue she just wanted to

8      raise.

9              MS. KUDLA:  Your Honor, there are just a few minor

10     evidentiary issues that, if we can handle them now, it would

11     make on Monday the efficiency go very smoothly, so if there's

12     any exhibits that have to be changed, we do them now over the

13     weekend and we can get the witness on and no sidebars.

14             THE COURT:  Well, let's see if we can do it in five

15     minutes.

16             MS. KUDLA:  And your Honor, I think it will be helpful

17     if you had the witness binder with some of the exhibits.

18             THE COURT:  Thank you.

19             MS. KUDLA:  So your Honor, these exhibits relate to

20     Rich Busick, who's a cell site analyst, and I'll allow

21     Mr. Everdell to raise the objections to the exhibits that he

22     would like to raise.

23             MR. EVERDELL:  Thank you, your Honor.

24             So my understanding, your Honor, is that these emails

25     and invites that are government exhibits, the ones in your

NAD1BAN3

1        binder, they relate to the cell site analysis.  I believe the

2        government is going to try to show that on the dates of the

3        emails and of the calendar invites, that they relate to when

4        the defendant's cellphone is in New York and having phone calls

5        I guess for purposes of venue.  However, I think some of

6        them——I have relevancy and hearsay objections to a few of them.

7        Not to the first few, but Government's 282——282, 287, and 290,

8        291, I think you should consider those first.

9               Starting with 282, this appears to be a calendar

10       invite for an invitation, it looks like, for a photo shoot for

11       a *Forbes* story on September 9th of 2021.  Don't see how this is

12       relevant to the issues in the case.  Some of these others I

13       understand, because they are meetings with investors or

14       meetings with other people, but this one, I don't necessarily

15       see the relevance of this one.

16              THE COURT:  Ms. Kudla, quickly.

17              MS. KUDLA:  Your Honor, the *Forbes* article is already

18       in evidence, and it's been presented as evidence of the

19       defendant's public image that he was cultivating.  And it's

20       part of the marketing and revenue for FTX.

21              THE COURT:  Yes.  But if you've got the magazine in

22       already, why do you need an email inviting him to show up for

23       the photograph?

24              MS. KUDLA:  Your Honor, that occurred here in New

25       York.  These are related to venue.  These are all public events

NAD1BAN3

1    that occurred in Manhattan.

2              THE COURT:  Okay.  That will come in.  Unless you're

3    conceding venue.

4              MR. EVERDELL:  Oh, we're not, your Honor.

5              THE COURT:  Okay.

6              MR. EVERDELL:  Your Honor, 287, this one is the invite

7    for dinner with the Mayor.  Don't see how that's relevant for

8    the case.

9              THE COURT:  Same thing, right?

10             MS. KUDLA:  Same thing, and he also publicly tweeted

11   about that in Government Exhibit 873.

12             THE COURT:  Same ruling.

13             MR. EVERDELL:  I believe we have an agreement on

14   290——is that correct?——with the government, that can come out?

15             MS. KUDLA:  That is correct, yes.  290 is correct.

16             THE COURT:  What do you mean it's correct?

17             MS. KUDLA:  Your Honor, we have an agreement.  The

18   government is removing——

19             THE COURT:  Okay.  So we're crossing that off the

20   list.

21             MS. KUDLA:  It's 289, Mr. Everdell, that we have the

22   agreement on.

23             MR. EVERDELL:  I'm sorry.

24             THE COURT:  So somebody please tell me whether we

25   still have a dispute over 290 or not.

NAD1BAN3

1          MS. KUDLA:  Over 290, the answer is up to

2   Mr. Everdell.  That relates to an investor meeting.

3          MR. EVERDELL:  Got it.  That was FTX.US related?

4          MS. KUDLA:  It's 289, Mr. Everdell.

5          THE COURT:  Okay.  We're not doing this now.  You work

6   it out.

7          Okay.  Thank you.

8          THE DEPUTY CLERK:  All rise.

9          (Adjourned to October 16, 2023, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      ZAC PRINCE

 4     Direct By Mr. Roos . . . . . . . . . . . . .1178

 5     Cross By Mr. Cohen . . . . . . . . . . . . .1229

 6     Redirect By Mr. Roos . . . . . . . . . . . .1266

 7     Recross By Mr. Cohen . . . . . . . . . . . .1268

 8                       GOVERNMENT EXHIBITS

 9     Exhibit No.                               Received

10      417   . . . . . . . . . . . . . . . . . .1216

11                       DEFENDANT EXHIBITS

12     Exhibit No.                               Received

13      816   . . . . . . . . . . . . . . . . . .1234

14      817   . . . . . . . . . . . . . . . . . .1254

15      815   . . . . . . . . . . . . . . . . . .1260

16

17

18

19

20

21

22

23

24

25
```