1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6               Defendant.                  Trial
    ------------------------------x
7
                                            New York, N.Y.
8                                           October 30, 2023
                                            9:30 a.m.
9

10  Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                            District Judge
13
                            APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    COHEN & GRESSER, LLP
20       Attorneys for Defendant
    BY:  MARK S. COHEN
21       CHRISTIAN R. EVERDELL
         SRI K. KUEHNLENZ
22       DAVID F. LISNER

23  Also Present:
    Luke Booth, FBI
24  Kristin Allain, FBI
    Arjun Ahuja, USAO Paralegal Specialist
25  Grant Bianco, USAO Paralegal Specialist

1                (Trial resumed; jury not present)

2                THE COURT:  I am going to tell the jury that it's

3       unclear whether we will finish by the end of Thursday and see

4       if any of them has a real serious problem about sitting on

5       Friday, if we are not done, and to be aware that we may go into

6       next week.

7                Let's get the witness on the stand.

8                (Jury present)

9                THE COURT:  Good morning, everyone.  I hope you had a

10      nice weekend, especially that wonderful day we had Saturday.

11               It is not clear that we will be able to finish by

12      Thursday afternoon.  I would appreciate it if after the morning

13      break, if any of you would be very seriously inconvenienced by

14      holding court this coming Friday, if we are not done, that you

15      let me know in a note, and let me know what the problem is.

16      And be aware that if we are not finished this week, we will go

17      into next week at that point.

18               Mr. Bankman-Fried, you are still under oath.

19               Mr. Cohen, you may continue.

20               MR. COHEN:  Thank you, your Honor.

21      SAMUEL BANKMAN-FRIED, resumed.

22      DIRECT EXAMINATION (cont'd)

23      BY MR. COHEN:

24      Q.  Good morning, Mr. Bankman-Fried.

25      A.  Good morning.

1    Q.   Mr. Bankman-Fried, when we left off last week we were

2    speaking about the period of September and October of 2022.

3    During your time as CEO of FTX, did you prepare priorities

4    lists?

5    A.   Yes, I did.

6    Q.   What were those?

7    A.   They were lists that I would post in Slack every couple of

8    weeks of what I and the company were working on.

9    Q.   Did you prepare such lists in September and October of

10   2022?

11   A.   Yup.

12   Q.   What was the purpose of these lists?

13   A.   They had a few purposes.  One was so that I could

14   communicate to the company what I was and wasn't focusing my

15   attention on.  One was so that the employees could give

16   feedback on it if there are things they thought I should be

17   changing, things I should be more highly prioritizing.  One was

18   that I could get updates from employees on the things I was

19   paying attention to.

20   Q.   Would you prepare them on a regular basis?

21   A.   Yup.  Every couple of weeks.

22   Q.   In the ordinary course of FTX's business?

23   A.   Yup.

24          MR. COHEN:  Can we call up DX-5 for identification,

25   please, just for the witness only.

1   Q.  Mr. Bankman-Fried, take a moment and go through this

2   document and let me know if you recognize it.

3   A.  Yes, I do.

4   Q.  What is it?

5   A.  That is one of the priority lists from late September,

6   early October of 2022.

7           MR. COHEN:  The defense offers Exhibit 5.

8           MS. SASSOON:  No objection.

9           THE COURT:  Received.

10          (Defendant's Exhibit 5 received in evidence)

11          MR. COHEN:  May we publish it, your Honor?

12          THE COURT:  Yes.

13  Q.  Looking at first page where it says priorities, there are a

14  number of names, Mr. Bankman-Fried.  I don't want you to read

15  them all out, but who are these folks generally?

16  A.  These are generally managers at FTX or people who had

17  self-directed work.

18          MR. COHEN:  If we could continue to the next page.

19  Brian, if we can make the whole page a bit larger.

20  Q.  You see there is 16 items on this page?

21  A.  Yup.

22  Q.  Were these the priorities that you were talking about?

23  A.  Yes, they are.

24          MR. COHEN:  Brian, condense the page again.

25  Q.  If you look at the top it says:  Priorities, Sam

1   Bankman-Fried, and then it says 10/9/22.  What does that refer

2   to?

3   A.  That's the date that this post was last updated on.

4   Q.  Below that it says currently live issues.  What does that

5   refer to?

6   A.  That was how we referred to the priorities, priorities that

7   were still live, as in still ongoing, not yet completed.

8           MR. COHEN:  If we can come back to the list, Brian.

9   Q.  I am not going to go through all 16 items with you,

10  Mr. Bankman-Fried, but just a few.

11          MR. COHEN:  If we can call out number 1, data.

12  Q.  It says:  Data.  Then there is some entries and:  Close to

13  done.

14          What did that refer to?

15  A.  The FTX data team was building out a second database for

16  FTX in Google Cloud to complement the main AWS database.  I was

17  told that the purpose of this was so that nondevelopers could

18  have database access as well, including myself.

19          MR. COHEN:  If we could continue to number 4, call out

20  number 4.

21  Q.  API throughput @Gary Wang, @Lelia Clark.  ETA, 10/15.

22          What did that refer to?

23  A.  During busy times, when markets were moving a lot, FTX's

24  core systems would get backlogged and our largest customers

25  were consistently saying they would trade much more, multiples

1  more on the exchange if they could send more orders, especially

2  during busy periods.  So this is a project which had been

3  ongoing for six months or so to roughly 5X, the number of

4  orders that we could process as an exchange.

5  Q.  When you said to 5X the orders, what did you mean by that?

6  A.  There is -- at the core of FTX is what's called the

7  matching engine, which is the piece of computer code where

8  people send orders to buy and sell cryptocurrencies and it

9  pairs those off against each other.  So it's what determines --

10  if you send an order saying, I'd like to buy one Bitcoin for

11  $11,000, there is a seller willing to sell at that price to

12  you.  And that piece of computer code could handle -- could

13  basically run through a certain number of orders the user had

14  submitted, of trades they had submitted per second.  That

15  number was in the thousands to tens of thousands per second,

16  and this project was to increase by a factor of five, roughly,

17  the number of trades per second that our systems could handle.

18  Q.  You've indicated @Gary Wang and @Lelia Clark.

19        What did that mean?

20  A.  Those were the people who were chiefly responsible for this

21  project.

22        MR. COHEN:  If we can call out item 15, please.

23  Q.  Latency reduction, and then it calls out a person.  What

24  did that refer to?

25  A.  So this was a similar project.  Rather than talking about

1   the number of trades per second the exchange could handle, this

2   was talking about how long it took to handle a single trade.

3   So if you sent an order to buy this one Bitcoin and there was a

4   seller, basically how long was it between when you told FTX

5   that you wanted to buy and when FTX said congratulations, you

6   are successful, you bought.  That was on the order of 10 to 100

7   milliseconds, which is to say a tenth of a second or a

8   hundredth of a second, and this project was to make that much

9   faster.

10          MR. COHEN:  Now if we could call out number 6, please.

11   Q.  It says:  User risk score and then @Nishad Singh, @Alfred

12   Xue, 10/10.  How's this going.

13          What does this refer to?

14   A.  There were a number of areas on FTX where users would have

15   some ability if we were acting with bad intent to try abuse the

16   system.  Credit card fraud was one of the most prominent areas.

17   We were trying to be on the lookout for users who might have

18   stolen someone else's credit card and then trying -- be trying

19   to use it to buy crypto.  And we had a lot of speed bumps in

20   place to limit how much new users could take actions that were

21   susceptible to fraud until we determined that they were in fact

22   legitimate.  User risk score was an attempt to come up with a

23   single metric for how confident we were that a particular user

24   was not attempting to do anything malicious.

25   Q.  And it says @Nishad Singh, @Alfred Xue.

1              Who was that?

2   A.   So Nishad, obviously, was the head of engineer.  Alfred was

3   one of the developers at FTX who worked for Nishad.

4              MR. COHEN:  We can take that down.

5              Finally, if you can call up number 9, item 9, please.

6   Q.   Getting accounting right on FTX @Andrea Lincoln ETA, 10/15,

7   what did this refer to?

8   A.   This was a significant and long-running project to overhaul

9   FTX's accounting infrastructure.  The core goal was for the

10  developer team to have at all points in real time displayed

11  what FTX's revenue was, what its expenses were, how much was in

12  each bank account and how much it had invested, how much

13  funding it had received, everything else that went into its

14  financial statements.

15  Q.   Go ahead.

16  A.   Prior to this, each year there were -- it took months of

17  work to get the developer team and the accounting team and

18  finance team on the same page about what each of the terms

19  meant about exactly what we are trying to calculate for

20  financials in the first place.  So the goal here was to clean

21  all of that up.

22  Q.   Again, who was Andrea Lincoln?

23  A.   She was one of the developers at FTX.

24  Q.   Had she been one of the people who worked on the bug-fix

25  project we talked about?

1   A.  She had been involved, yeah.

2   Q.  How, if at all, did getting accounting right relate to the

3   bug fix project?

4   A.  It did to some extent.  Part of getting accounting right

5   meant that the dev team had to understand the fiat@ account

6   very well.  Otherwise, the accounting wouldn't have been right,

7   since this project required it, but it was also much broader

8   than that and included, among other things, making it easier to

9   calculate and display FTX's total revenue ever.  It was

10  prompted by, in part, the fiat@ bug, but also, in part, general

11  concerns about it being messy to figure out exactly what --

12  reconciling FTX's finances each year.

13       MR. COHEN:  Brian, you can take down number 9.

14  Q.  Just looking at this page, Mr. Bankman-Fried, there are 16

15  items.  How much of your personal item did they take up?

16  A.  I was probably spending 30 minutes to an hour per day on

17  each one of these, so maybe 12 hours a day total on these.

18  Q.  What would you do with your personal time on these

19  projects?

20  A.  It depended on the project.  There were a few of these for

21  which the time I spent was effectively doing the project

22  itself.  Those were things for which it was mostly having

23  conversations with people.  So if there is a deal that needed

24  to be negotiated, I might be directly involved in that.

25       For most of these, however, what I would do would be,

1    at a high level, manage the people who were themselves

2    implementing this project and, once they had something built,

3    give feedback on how it felt.  I might say, hey, I think it

4    would be cool if we had this sort of feature for users.  A

5    developer would build it out.  And then I would test it out and

6    say:  I found it confusing where this button was.  I found this

7    language confusing.  Did other people have the same impression.

8    Q.  In total, how much revenue did these 16 items relate to?

9    A.  So obviously many of them didn't end up getting done.

10              MS. SASSOON:  Objection.  Form.

11              THE COURT:  Sustained.

12   Q.  What was the impact, if any, of these items on revenue?

13   A.  At the time my belief was that, put together, these would

14   roughly double FTX's revenue.

15   Q.  From what to what?

16   A.  From roughly 1 billion per year to roughly 2 billion per

17   year.

18              MR. COHEN:  We can take DX-5 down.

19   Q.  Mr. Bankman-Fried, in the September, October period, did

20   you have an understanding of what constituted customer funds?

21   A.  Yes, I did.

22   Q.  Can you tell us what it was?

23   A.  Yeah.  If you have a purely spot exchange, no margin, no

24   futures, no leverage, no borrowing, then customer one deposits

25   ten Bitcoins, customer two deposits five Bitcoins, the customer

1    funds are those 15 Bitcoins.

2          If you have a margin exchange, like FTX, then customer

3    one deposits ten Bitcoins, customer three withdraws three

4    Bitcoins, going to negative three Bitcoins, likely

5    collateralized by some other asset, the customer funds would be

6    the seven Bitcoins remaining; in other words, the net between

7    all users put together.

8    Q.  On FTX's system, when the customer withdrew these Bitcoins,

9    what could the customer do with them?

10   A.  They could do anything with those Bitcoins.  Those were not

11   customer funds anymore.  When a customer withdrew those

12   Bitcoins, that was the customer's Bitcoins.  So customer two in

13   that hypothetical could spend the three Bitcoins on rent, they

14   could spend it on food, they could spend it on vacation or

15   anything.  FTX's goal was to manage risk, to as best we could.

16          MS. SASSOON:  Objection.  Beyond the scope of the

17   question.

18          THE COURT:  Yes.  Strike FTX's goal and so forth after

19   that.

20   Q.  Let me ask another question.  In connection with the

21   customer borrows, did FTX attempt to manage risk?

22   A.  Yes, it did.

23   Q.  How did it do that?

24   A.  The core risk that FTX faced related to borrows was what

25   would happen if there was an account that went overall negative

1   for which that customer could not or would not be able to have

2   enough value.  So if all of the customers' assets became less

3   than all of the customers' liabilities, that could potentially

4   create a hole in the system.  That was the core risk that FTX

5   was trying to manage.

6   Q.  And how was it trying to do that?

7   A.  It was trying to do that generally with the risk engine and

8   related processes whereby it would look at users' accounts,

9   look at users' assets, in some cases context on the users, and

10  if we became concerned that the user might end up running out

11  of assets, that the user might end up with an overall negative

12  value, that we would begin to margin call that user, to sell

13  off their positions, close them down and potentially using

14  backstop liquidity providers and have the goal, if possible, of

15  avoiding having to claw back or socialize losses.

16  Q.  Let's continue on, Mr. Bankman-Fried.  We talked a lot last

17  week about conversations you had about hedging.

18  A.  Yup.

19  Q.  Up through the middle of 2022.

20          From June, July, 2022 to September 2022, did you have

21  conversations about hedging?

22  A.  Yes, I did.

23  Q.  Who did you have them with?

24  A.  Chiefly with Caroline Ellison.  In some cases, Ben Xie and

25  Sam Trabucco were also on the thread.

1   Q.  Let's take your conversations first with Ms. Ellison

2   between June and September.  About how many times did you speak

3   with her about the topic of hedging?

4   A.  I spoke -- in June and July, I spoke chiefly once, followed

5   up a few times, and then in September we spoke a few times.

6   Q.  Let's go to the June, July conversation.  Where was that

7   conversation?

8   A.  That was in the Orchid 6 apartment in the study.

9   Q.  What did you say to her and what did she say to you?

10  A.  I had organized the conversation.  This was after the

11  market crash in mid June, when Bitcoin fell to $20,000.  This

12  is after the fiat bug had been found and fixed.  So this was

13  when Alameda's net asset value was about $10 billion, down

14  from --

15          MS. SASSOON:  Objection.

16          THE COURT:  Yes.  All of that is stricken.  It's

17  unresponsive.

18  Q.  Just say what you said to Ms. Ellison and what she said to

19  you.

20  A.  Understood.

21          I called the meeting with Caroline, and I told her

22  that I was very concerned about Alameda, about, to some extent,

23  its historical failure to hedge, but much more so about its

24  current market exposure.

25  Q.  Go on.

1    A.   I said that I was very concerned that its NAV had fallen

2    from 40 billion to 10 billion over the prior year, and that, as

3    far as I could tell, it still had not hedged against the risk

4    of a market collapse, that the 70 percent crash to that point

5    had led to the decrease in NAV, and I said that if there were

6    another 50 percent broad market decrease, I was worried that

7    Alameda might become insolvent.

8    Q.   What did she say?

9    A.   She started crying.  She agreed.  And she agreed that

10   Alameda should have hedged.  She also said that maybe it

11   shouldn't have made some of the venture investments.  She said

12   she was also concerned about it.  And she also offered to step

13   down.

14   Q.   How did you react?

15   A.   Well, I kind of took them point by point.  On the last

16   point, I said it was her decision what she wanted to do.  On

17   the other points, you know, what I said was that, at the end of

18   the day, I was worried maybe I hadn't communicated clearly

19   enough with her about hedging earlier and that it wasn't about

20   like blame for me.  I didn't -- that's not how I thought of it,

21   and that the past wasn't what mattered the most, that what

22   mattered the most was that going forward Alameda protect

23   against a future market collapse that, by far, my biggest

24   concern was that if Alameda remained unhedged that it might go

25   bankrupt.  And so I said that I thought the focus should be on

1    urgently putting on the hedges that would protect against that.

2    Q.  Did you respond to her offer to step down?

3    A.  Yeah.  I said that that was obviously her decision about

4    what to do, that I hadn't been asking her to do that.  That's

5    not what I intended at all.  But ultimately that wasn't my

6    decision to make.

7    Q.  You said you had another conversation or conversations with

8    Ms. Ellison about hedging in September, is that correct?

9    A.  Yes.

10   Q.  Where were those conversations?

11   A.  Those conversations were chiefly over Google Docs sent, I

12   think, via Signal.

13   Q.  What did you say to her and what did she say to you?

14   A.  I checked in again on the status of Alameda's hedging and

15   was told that Alameda had hedged after our prior conversation.

16   I had also seen some of that in progress.

17   Q.  What did you talk to Ms. Ellison about and what did she

18   talk to you about?

19   A.  Yes.  I asked what the scale of hedges was.  She calculated

20   what Alameda's hedges were at that point, gave me the number.

21   I said that first I was very glad that that had happened.  It

22   definitely made me less concerned but that my instinct had been

23   that it would actually have been a bigger number, that Alameda

24   would have hedged about twice as much as it seems like it

25   actually had.  And subsequent to that Caroline sent me some

1  spreadsheets trying to calculate how much Alameda should hedge.

2  Q.  Was there any further discussion after that about hedging?

3  A.  Yeah.  After a back and forth on those spreadsheets,

4  Caroline ultimately agreed that Alameda should hedge more than

5  it had, and Alameda did in fact do so.

6  Q.  You mentioned in this period from June to September you

7  also had conversations about hedging with Sam Trabucco.

8       Do you recall those?

9  A.  He was on the Signal thread that this was often discussed

10  on.

11  Q.  What about Ben Xie?

12  A.  He was also on that same Signal thread.  Trabucco at this

13  point was not commenting much.  He was effectively out of the

14  picture and had been for a little while.  Ben Xie would

15  sometimes comment on it.

16  Q.  You are referring to the thread you had with Ms. Ellison?

17  A.  Yes, that's correct.

18  Q.  Now, continuing in September, do you recall last week we

19  talked about a memorandum you had written about the possibility

20  of shutting down Alameda?

21  A.  Yes.

22  Q.  I am not going to go over that again, but I will ask you,

23  around the time of that memorandum, do you recall a discussion

24  about the size of the liability that Alameda owed to FTX?

25  A.  I recall some time during that month a discussion.  I don't

1    recall exactly in what context it came.

2    Q.  Do you recall whether it was in person or over a chat?

3    A.  I know that -- I don't recall confidently, no.

4    Q.  Who was it with?

5    A.  Caroline, Gary, and Nishad were all involved.  I believe a

6    few other people were as well, but I am not a hundred percent

7    confident.

8    Q.  What did you say and what did Gary, Caroline, and Nishad

9    say?

10   A.  Just to clarify, with respect to the thread about shutting

11   down Alameda?

12   Q.  The size of the liability.

13   A.  The size of the liability.  I remember looking into it to

14   some extent myself.

15          THE COURT:  Sorry, Mr. Bankman-Fried.  The question

16   was, what did you say and what did they say?

17          THE WITNESS:  I remember numbers a bit north that -- I

18   don't remember specifically which one of them said the

19   number -- a bit north of $10 billion of total liability being

20   discussed then.

21          MR. COHEN:  Can we call DX-5 back up again.  We can go

22   to the second page and call out the first entry, entry number

23   1.

24   Q.  You just told us that was a project to get you and other

25   nondevelopers further access, correct?

```
 1   A.   That's correct.

 2   Q.   Did there come a time that you did get such access?

 3   A.   Yes.

 4   Q.   When was that?

 5   A.   In October of 2022.

 6   Q.   Did there come a time that you used the new access to

 7   review the database?

 8   A.   Yup.

 9   Q.   What did you determine?

10   A.   I did a number of queries, but most relevantly in one of

11   them I found an account called something like Seoyun, a

12   Seoyun88, which had something with fiat in the name and a

13   roughly $8 billion liability.

14   Q.   What did you do after you found this account?

15   A.   I reached out to a few people to confirm what this account

16   was.

17   Q.   Who did you reach out to?

18   A.   I don't remember the full list.  I believe that it was a

19   few FTX developers.

20   Q.   What did you do after reaching out to them?

21   A.   So after reaching out to them, I learned that this was --

22            THE COURT:  I'm sorry.  The question is, what you did

23   after you spoke to them?

24            THE WITNESS:  Yes.  After I spoke to them, I started

25   to compile a list myself of all accounts on FTX that were
```

1    affiliated with Alameda, what their balances were, and tried to

2    put together a full picture of what not just Alameda's

3    financials were and FTX's financials but also Alameda's

4    accounts on FTX.

5    Q.  Did you come to a view of how, if at all, the fiat@ account

6    related to this analysis?

7    A.  Yes, I did.

8    Q.  What was that?

9    A.  So the view that I came to was that the fiat@ account, this

10   $8 billion liability, had always been built into Alameda's

11   financials, that Alameda's NAV and balance sheets already

12   reflected it, and so the NAV was in fact roughly positive 10

13   billion.  This didn't make the NAV 2 billion instead.

14            I came to the view that, on FTX, for at least almost

15   all of the period, the info@ account, Alameda's primary trading

16   account on FTX, had not reflected this liability, that this had

17   been, for most of FTX's existence, a separate ledger that

18   didn't appear on info@ and didn't appear on the admin user's

19   dashboard that I could see, and that the total scale of

20   liabilities was on the ballpark of $10 billion that Alameda had

21   to FTX.

22   Q.  How did you react when you determined that?

23   A.  I reacted.  I felt like I needed to do a further analysis.

24   I felt like it was neither -- that if it had been far smaller,

25   I would not have been concerned at all.  If it were far larger,

1    I would have been calling it a crisis.  It was neither of

2    those.  It was at a level where I wanted to make sure I

3    understood the context and I understood what was securing it.

4    Q.  Last week we talked about the concept of liquidity.

5            Do you recall that, sir?

6    A.  Yes.

7    Q.  What, if anything, did that have to do with this analysis

8    you did?

9    A.  Yeah.  There are two parts of the analysis.  One was

10   solvency effectively.  The other was liquidity.  The liquidity

11   piece of it that you were referencing was effectively if FTX

12   users requested withdrawals, how much could we process.  Any

13   time that you have a margin exchange, customer assets include

14   both customers' assets but also their borrows, their

15   liabilities.  If you need to fill old customer positive assets,

16   you would need to recall all loans and liquidate all positions,

17   which leaves a practical question of, which I looked into at

18   the time, of effectively how many liquid assets FTX had on

19   hand, how many Alameda had on hand, if necessary, and I believe

20   the answer was 5 to $10 billion worth.

21   Q.  What, if anything, did that mean to you?

22   A.  That felt like a lot more than had ever been required

23   before by a factor of 10 or more.  It was also far less than it

24   had been a year ago.  And I certainly didn't feel like Alameda

25   was in a position where it could do a $4 billion expenditure,

1   for instance.

2   Q.  You also mentioned a concept called solvency.

3   A.  Yes.

4   Q.  Can you explain that and how, if at all, it factored into

5   your analysis.

6   A.  Yes.  So solvency, at least as I was thinking of it,

7   referred to -- effectively to net-asset value, to whether -- to

8   the relationship between assets and liabilities.  If a company

9   had more assets than liabilities, it was solvent.  If it had

10  fewer assets than liabilities, it was insolvent.  If Alameda

11  were insolvent, that, in my mind, would have been a very

12  significant problem.  That would have been similar to the few

13  hours of crisis prior to the fiat@ bug fix in June.

14  Q.  And in September, October, was it your view that Alameda

15  was insolvent?

16  A.  No.  My view was that it had about positive $10 billion of

17  net-asset value, which is to say that whatever its liabilities

18  were, it had all of that and then another $10 billion of

19  assets, and that that also wasn't counting some other assets

20  that were securing the position as well.

21  Q.  Staying in October, did there come a time that you took a

22  trip?

23  A.  Yes.

24  Q.  Where did you go?

25  A.  I took a few trips.  The longest was to the Middle East.

1  Q.  Before we get to the Middle East trip, I should ask you, in

2  your duties as CEO of FTX, how often did you travel?

3  A.  Probably too much in retrospect.  About half the time I was

4  gone, more than a hundred days in 2022.

5  Q.  What was the primary place you went to?

6  A.  I went all over, but the single place I went to the most

7  was Washington, D.C.

8  Q.  Why was that?

9  A.  To meet with senators, with policy makers, with regulators

10 there, both about general crypto regulation of the United

11 States and about FTX US derivatives licensing application.

12 Q.  Let's come back.  You said you took a trip to the Middle

13 East in October, is that correct?

14 A.  Yup.

15 Q.  Did anyone go with you?

16 A.  Yeah.

17 Q.  Who was that?

18 A.  From the company, Ramnik did.

19 Q.  Just to remind everyone, what was Ramnik's role?

20 A.  He was effectively -- he was the head of product base.

21 Also effectively the person in charge of both venture investing

22 and fundraising.

23 Q.  What was the purpose of your trip to the Middle East?

24 A.  There were multiple purposes.  I had been invited to speak

25 at a conference there which was happening that month.  I had

1    earlier that year, or possibly late 2021, I don't remember the

2    exact date, been invited to visit Dubai and meet with the

3    regulators there.  FTX had just secured a license with the

4    Dubai financial regulators, but I had cancelled that trip.  And

5    the Dubai regulators I understood to have been asking that I

6    come visit them at some point, so I owed them a trip as well.

7            On top of that, there were prospective investors in

8    the Middle East who had wanted to meet in person, and there

9    were some government officials who wanted to talk about the

10   growth of the Blockchain industry, and we also had a few

11   employees in the Middle East and an office there that I wanted

12   to check out.

13   Q.  Have you ever heard the term sovereign wealth fund?

14   A.  Yup.

15   Q.  What's that?

16   A.  It's an investment firm or venture capital firm that is

17   funded by a government.

18   Q.  Did that relate at all to your Middle Eastern trip?

19   A.  Yeah.

20   Q.  Can you tell us how?

21   A.  Yeah.  One of our larger investors had been a sovereign

22   wealth fund, Temasek, from Singapore, and in the Middle Eastern

23   trip we were going to meet with a few sovereign wealth funds

24   there.

25   Q.  You just told us that in September you had done an analysis

1   of this $8 billion liability relating to the fiat@ account.

2            Do you recall that, sir?

3   A.   Yup.

4   Q.   Why did you go on a trip to the Middle East in October?

5   A.   Because I viewed Alameda as solvent and FTX as solvent and

6   as decently liquid.  Had that analysis come up the other way,

7   had it come up the way we briefly thought things were in June

8   of 2022, with Alameda being essentially bankrupt or borderline

9   bankrupt, I would have been in full-on crisis mode.  But in my

10  view at the time that wasn't the case.

11  Q.   Did you speak with any FTX employee before you went on the

12  trip?

13  A.   Yeah.  I spoke with a number, probably the most with Adam

14  Yedidia.

15  Q.   Can you tell us what you said to Mr. Yedidia and what he

16  said to you.

17  A.   Yeah.  I described the trip that I was at that time

18  planning to go on, and he said that he was skeptical that I

19  should go on it, that it wasn't worth the time and wasn't worth

20  some other counterparty complications associated with it.  I

21  laid out the reasons that I found it compelling but said I

22  wasn't confident.  After hearing that, he said, oh, that

23  changed his mind, that particularly the excitement of investors

24  there.  He didn't feel like it was worth the trip.

25  Q.   You used the phrase counterparty complications.

1    A.   Yeah.

2    Q.   Maybe you could explain that.

3    A.   So FTX's largest competitor was Binance.  Binance was the

4    largest crypto exchange in the world.  It had 40 percent of

5    global roughly.  Binance was headquartered in the Middle East

6    and the relationship between FTX and Binance was frosty at that

7    point and had been for a little while.  So by traveling to the

8    Middle East, there is a risk that I would be upsetting Binance

9    by quote/unquote stepping on their turf.

10   Q.   At the end of your conversation with Mr. Yedidia, what was

11   his view on whether you should go on the Middle Eastern trip?

12   A.   He said he thought it definitely made sense.

13   Q.   Did you take the trip?

14   A.   I did.

15   Q.   How did you regard the trip?

16   A.   I thought it was overall pretty successful.

17   Q.   Did you end up speaking with any investors?

18   A.   I did.

19   Q.   What was the reaction?

20   A.   They were interested.  They were going to do more

21   diligence.

22              MS. SASSOON:  Objection.

23              THE COURT:  Pardon?

24              MS. SASSOON:  For him to speculate whether they were

25   interested.

```
 1              THE COURT:  The answer is stricken.
 2   A.  They expressed --
 3              THE COURT:  Excuse me.  Stop.  I have ruled.
 4              THE WITNESS:  Understood.
 5   Q.  After you came back from your trip -- let's do it this way.
 6   Let's move ahead now, Mr. Bankman-Fried, to November of 2022.
 7              MR. COHEN:  Can we call up, please, GX-1087.
 8              This is a calendar of November 2022.  I am going to
 9   circle November 11.
10   Q.  What happened on November 11, Mr. Bankman-Fried?
11   A.  That was the day that FTX filed for bankruptcy.
12   Q.  Now I am going to ask you a series of questions that relate
13   to the period from the 1st up through the 11th, OK?
14   A.  Yup.
15   Q.  Let me start with November 2.  Did anything happen on that
16   day?
17   A.  Yes.
18   Q.  Why don't you tell us.
19   A.  A CoinDesk article came out.  CoinDesk is a crypto industry
20   news site which leaked an old copy of an Alameda Research
21   balance sheet.
22   Q.  What, if anything, was your response to this CoinDesk
23   article?
24   A.  I reached out to Caroline to ask if she wanted to comment
25   on it.
```

1   Q.  Finish your answer.

2   A.  She was traveling and didn't get back to me until after the

3   article came out, and then we and others talked about whether

4   she wanted to send a tweet in response to it.

5   Q.  Did there come a time that a tweet was sent?

6   A.  Yup.

7          MR. COHEN:  Let's take a look at Government Exhibit

8   875 in evidence.

9   Q.  Mr. Bankman-Fried, what is this?

10  A.  This is that tweet.

11  Q.  I want to go through a couple of parts of that tweet with

12  you.  This is, first of all, from November 6.  It says at the

13  top:  A few notes on the balance sheet info that has been

14  circulating recently.  That specific balance sheet is for a

15  subset of our corporate entities.  We have 10 billion of assets

16  that aren't reflected there.

17         What was your understanding of that statement?

18  A.  My understanding is that was true.

19  Q.  Why was it true?

20  A.  Among other things, Paper Bird had far more than that

21  amount of assets, chiefly equity holdings in FTX.  That was not

22  reflected on the Alameda balance sheet.

23  Q.  You used the phrase Paper Bird?

24  A.  Yes.

25  Q.  Which I think you used last week.  Just to remind everyone,

1    what was that?

2    A.   That was a company that held my and my Gary's equity stakes

3    in FTX.

4    Q.   Continuing down to the next --

5              THE COURT:  Who owned Paper Bird?

6              THE WITNESS:  Gary and I did.

7              THE COURT:  Go ahead.

8    Q.   Continuing down to the next entry, it says:  The balance

9    sheet breaks out a few of our biggest long positions.  We

10   obviously have hedges that aren't listed.

11             What was your reaction to that, Mr. Bankman-Fried?

12   A.   That seemed self-evidently true to me.

13   Q.   Why was that?

14   A.   There were no hedges listed on that balance sheet, and

15   Alameda had put on hedges.

16   Q.   And continuing to the last entry:  Given the tightening in

17   the crypto credit space this year, we returned most of our

18   loans by now.

19             What was your reaction to that, sir?

20   A.   That seemed true to me.

21   Q.   Why is that?

22   A.   The loans that Alameda had taken out from third-party desks

23   had fallen by far more than 50 percent over the prior year.

24             MR. COHEN:  We can take this exhibit down.

25   Q.   Now, continuing in that period in November, let's go to

1    November 6.

2              MR. COHEN:  Let's pull up Government Exhibit 874 in

3    evidence.  Brian, if we can expand that.

4    Q.  Looking at the top of it, it says -- first of all, who is

5    this from?

6    A.  That is CZ, Changpeng Zhao, the CEO of finance.

7    Q.  It says:  As part of Binance's exit from FTX equity last

8    year, Binance received roughly $2.1 billion USD equivalent in

9    cash, BUSD and FTT.  Due to recent revelations that have come

10   to light, we have decided to liquidate any remaining FTT on our

11   books.

12             Do you see that, sir?

13   A.  Yes.

14   Q.  I want to take it in steps.  The first sentence says --

15             MR. COHEN:  If you can highlight it Brian.

16   Q.  -- as part of Binance's exit from FTX equity last year,

17   Binance received roughly $2.1 billion and so on.

18             What does that refer to?

19   A.  So in mid 2021, we had bought out Binance's equity holdings

20   of FTX.  It had been the seed investor in FTX.

21   Q.  Continuing on he says:  Due to recent revelations that have

22   come to light, we have decided to liquidate any remaining FTT

23   on our books.

24             What did that refer to?

25   A.  CZ was declaring that they were going to sell off the FTT

1  that they had gotten from this equity buyout, which was around

2  $500 million worth.

3         MR. COHEN:  You can take that down, Brian, and you can

4  take down the slide.

5  Q.  What, if anything, was your response to this tweet from CZ?

6  A.  I discussed, again with Caroline and others, about whether

7  any of us should send a tweet in response to it.

8  Q.  What, if anything, happened with respect to customer

9  withdrawals?

10 A.  They increased massively.

11 Q.  Can you explain to us what happened.

12 A.  Yeah.  Historically, FTX had seen roughly $50 million per

13 day of net deposits or withdrawals.  On Sunday, November 6, it

14 saw about $1 billion of net withdrawals.

15 Q.  What was your reaction, if anything, to the size of those

16 withdrawals?

17 A.  I was concerned.

18 Q.  Why were you concerned?

19 A.  It signaled a potential, what I viewed to be a potential

20 run on the bank and a risk of a liquidity crisis if that

21 increased.

22 Q.  Let me stop you.  You used the phrase, run on the bank.

23 A.  Yeah.

24 Q.  What did that mean to you?

25 A.  So what that meant to me was, if there is a bank and all of

1    its customers --

2             MS. SASSOON:  Objection.

3             THE COURT:  Sustained.

4    Q.  What did it mean to you in connection with FTX?

5    A.  What it meant to me in connection with FTX was that it

6    was -- FTX was a marketing exchange.  That meant that there

7    were borrows, that there was leverage, and that, because of

8    that, if many customers all at once wanted to close down their

9    positions and withdraw everything from the exchange, that would

10   necessitate closing down the other side of those positions and

11   recalling all borrows.

12            In other words, the only way to return all funds, the

13   only way to process all withdrawals for all users was to

14   liquidate every open margin position on the exchange and shut

15   down the business.  Obviously, that would be in a most extreme,

16   100 percent withdrawals scenario.  But $1 billion was already

17   about ten times as much as I had ever seen in a given day.

18   Q.  Did you discuss with anyone responding to CZ's tweet?

19   A.  Yes.

20   Q.  Who did you discuss it with?

21   A.  I don't remember the exact list, but I know that Caroline,

22   Zane, Ramnik, Nishad, and Gary were all at least tangentially

23   involved.

24   Q.  I think we all know the names.  You mentioned Zane.  Who

25   was that?

1   A.  Zane was the head of institutional customer relationships

2   for FTX.  Basically, that meant that he was the point person

3   that large trading firms would talk to.

4   Q.  What was his last name?

5   A.  Tackett.

6   Q.  Did there come a time that a response was put out to CZ's

7   tweet?

8   A.  Yup.

9   Q.  Let's take a look at Government Exhibit 876 in evidence.

10  Take a moment.

11          Mr. Bankman-Fried, do you recognize this?

12  A.  I do.

13  Q.  What is it?

14  A.  This is that response.

15  Q.  And it was put out by Ms. Ellison, correct?

16  A.  Yup.

17  Q.  Why did she put out the response?

18  A.  Because ultimately the response was an offer from Alameda,

19  and she put it out as Alameda's CEO.

20  Q.  Continuing in the next, it says:  CZ Binance, if you're

21  looking to minimize the market impact on your FTT sales,

22  Alameda will happily buy it all from you at 22.

23          Do you see that?

24  A.  Yup.

25  Q.  What did that refer to?

1    A.  So our understanding was that CZ was signaling that he was

2    going to sell $500 million of FTT roughly over a three-month

3    period, roughly, and FTT had been trading above $22 per token

4    and had been above that level for a fairly long time.  This

5    represented a level that we had discussed and decided it would

6    make sense and be profitable for Alameda to buy those FTT

7    tokens at and an offer for CZ to do it in one big chunk to

8    Alameda rather than by working it out over the course of months

9    and hopefully saying hassle on both sides.

10   Q.  In your view, did Alameda have the funds to purchase the

11   FTT at $22?

12   A.  Yeah.  I remember checking and seeing that Alameda had $5

13   billion, roughly, of liquid assets at hand.

14            MR. COHEN:  We can take this slide down.

15   Q.  As we move from November 6 into November 7, what, if

16   anything, did you observe with respect to withdrawals?

17   A.  They didn't just continue at the pace of -- they increased

18   further.  On Monday, Monday November 7, FTX saw about $4

19   billion of net withdrawals from the platform.  That was about

20   100 times an average day.

21   Q.  What, if anything, did that mean to you?

22   A.  That meant that we were -- that we might be, in my view at

23   the time, days away from a liquidating crisis if this

24   continued.

25            MR. COHEN:  Let's move now to November 7, to the

1    morning of November 7.

2              Can we call up Government Exhibit 878, please.

3              THE COURT:  Sorry.  We were just on November 7.

4              MR. COHEN:  Yes.  We were merging into it.  We are now

5    in the morning, your Honor.

6    Q.  Do you recall, Mr. Bankman-Fried, seeing Government Exhibit

7    878 before?

8    A.  Yup.

9    Q.  What is it?

10   A.  This was a tweet thread that FTX's Twitter account sent out

11   in response to concern about slow withdrawal processing on FTX.

12   Q.  Were you part of the people who worked on this?

13   A.  Yup.

14   Q.  Who else worked on it?

15   A.  Gary Wang and Nishad provided the technical input for it,

16   and then FTX's customer support team, I believe Keith in

17   particular, were involved in terms of actually posting it.

18   Q.  So at the top it says:  Support updates, number 1.  Number

19   2, it says:  Matching engine, etc., all running smoothly.  BTC

20   withdrawals:  Chunk through them.  Node is throughput limited.

21   We're switching it to process from both ends, which should help

22   speed it up.

23              What did that refer to, sir?

24   A.  So I was told by Gary at the time that FTX -- Bitcoin

25   withdrawals were backlogged, which meant that if a customer

1    requested to withdraw one Bitcoin, it would take hours for us

2    to actually send them that Bitcoin, whereas usually we were

3    processing them in seconds to minutes, and that the cause of

4    that was that we were seeing so many withdrawals so quickly

5    that we basically hit various speed bumps in the code that had

6    been written to process Bitcoin withdrawals, that there were

7    pieces of it that just weren't built to send them that quickly,

8    but that Gary was rewriting it to be that much faster.

9    Q.  Continuing, finally, with number 3:  Stablecoins processing

10   of the banks are closed for the weekend, though.  USD

11   stablecoin creations redemptions might be slower until wires

12   clear tomorrow, especially for some coins/chains.

13        What did that refer to, Mr. Bankman-Fried?

14   A.  This came on -- late on a Sunday night.  Most bank

15   functions don't happen during weekends.  They only happen

16   during weekdays.  So if a customer wanted to do a wire transfer

17   withdrawal from FTX, unless they happened to bank at a very

18   specific bank, they would have to wait until Monday for it.

19        In addition to that, if there were massive stablecoin

20   withdrawals, which there were that day, FTX potentially -- FTX

21   would have to use dollars in a bank account to create those

22   stablecoins in order to send them for customer withdrawals and

23   that, in turn, involved a bank wire transfer which also

24   couldn't happen until the week started.  So those were two

25   reasons that U.S. dollar and stablecoin withdrawals were at

1    least to some extent delayed for a day or so.

2            MR. COHEN:  We can take this down.

3    Q.  Continuing into the evening of November 7, did there come a

4    time, sir, that you put up a tweet?

5    A.  Yup.

6            MR. COHEN:  Let's take a look at GX-866, please.

7            If you could expand the top part, Brian.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. COHEN:

Q.  So the entry says, No. 1, "A competitor is trying to go after us with false rumors."

Then below that it says, "FTX is fine.  Assets are fine."

Do you see that, Mr. Bankman-Fried?

A.  Yup.

Q.  What was the first entry a reference to?

A.  Binance.

Q.  And what false rumors are you referring to?

A.  There had been a number over the prior month or so.  My impression had been that Binance was running a number of campaigns against us online, chiefly targeted at attacking FTX for working with regulators, and paying people on Twitter to say——

MS. SASSOON:  Objection to that last portion about foundation with respect to paying people on Twitter.

THE COURT:  Yes.  The jury will disregard the impression.  It's stricken.

Q.  Okay.  Let's move to the next entry.  You said F——

MR. COHEN:  No.  Go back to No. 1, Brian.

Q.  Underneath it, you said, "FTX is fine.  Assets are fine." What did you mean by that?

A.  So at the point——so this——this tweet was posted in the morning of November 7th.  At the point where I posted it,

1    Alameda still had a net asset value of roughly positive

2    10 billion.  FTX had no holes on its balance sheet.  And there

3    had been no attack on the customer assets.  And so my view at

4    the time was that the exchange was okay and that there, you

5    know, there was no——no hole in terms of assets.

6         MR. COHEN:  Okay.  Now let's call out No. 2, Brian.

7    Q.  You said here, "FTX has enough to cover all client

8    holdings.  We don't invest client assets (even in treasuries).

9    We have been processing all withdrawals and will continue to

10   be.  Some details on withdrawal speed."

11        What does this all refer to, Mr. Bankman-Fried?

12   A.  Yeah.  So the last thing——the prior thing we looked at was

13   the BTC notes and the banking and stuff.  The first pieces of

14   that, FTX itself had effectively no liabilities and just

15   assets.  And FTX did not do any investments with customer

16   assets.  So FTX just kept the customer assets it held in

17   wallets and bank accounts.  We had discussed whether to invest

18   in treasuries.  Hadn't done that.  And as of the time this was

19   sent, Alameda, which was obviously a large customer on FTX,

20   still had far more in assets than in liabilities.

21        MR. COHEN:  Okay.  Okay.  You can take that down.

22   Q.  Going into the evening of November 7th, what, if anything,

23   did you observe with respect to customer withdrawals?

24   A.  Yeah.  They accelerated to about $4 billion over the course

25   of the day.

1   Q.  And what did this mean to you?

2   A.  It meant that we were on the verge of a liquidity crisis.

3   Q.  Okay.  Now we've spoken several times about hedges.  Do you

4   recall that, sir?

5   A.  Yes.

6   Q.  And I think you told us hedges got put on in September.

7   A.  That's right.

8   Q.  What effect, if any, did they have now in November?

9   A.  Well, so far they hadn't been relevant because there hadn't

10  been any market move.  Alameda's assets and liabilities had

11  not, in my understanding at the time, moved that much since

12  mid-June.  That would soon change, though.

13  Q.  All right.  So you said you thought there was a liquidity

14  issue.  What did you mean by that?

15  A.  So effectively, going into this, there had been roughly 5

16  to $10 billion of liquidity on hand, which means ability to

17  immediately process or promptly process liquid customer

18  withdrawals.  That was far more than had been needed before,

19  but in a two-day period, customers had withdrawn about

20  $5 billion of liquid assets.

21  Q.  What happened going into November 8th in terms of

22  withdrawals?

23  A.  They were continuing at that same 3-to-$4 billion-a-day

24  clip.

25  Q.  And did anything else happen that—did anything happen that

1    changed your view of Alameda at that point?

2    A.  Yes.

3    Q.  What was that?

4    A.  On the evening—so beginning on the evening of November 7th

5    and continuing into the morning of November 8th, there was a

6    market crash.

7    Q.  Can you explain what you mean by that.

8    A.  Yeah.  So assets that I understood to be associated with

9    Alameda declined massively in value.  FTT, over a 12-hour

10   period or so, fell I think roughly 80 percent.  Solana fell

11   roughly 50 percent.  This was—overall, this led to an

12   approximately 50 percent crash in Alameda's assets, and that

13   was the 50 percent crash that drove its net asset value from

14   close to $10 billion to only a little bit above 0.

15   Q.  Okay.  And what, if anything, did that mean to you?

16   A.  That meant that Alameda was still solvent but that there

17   was very little margin for error left, that we were risking a

18   solvency crisis.

19   Q.  And now coming back to the hedges we talked about.

20   A.  Yes.

21   Q.  What, if any, effect did they have?

22   A.  Unfortunately none.

23   Q.  Why was that?

24   A.  The hedges had been in general market instruments, both

25   cryptocurrency and equities, things like Bitcoin.  However,

unlike all of the previous market crashes, the 70 percent

crashes over the first half of the year that had led to the

large decline in Alameda's NAV from 40 billion or so to

10 billion or so, this crash was not a broad crash.  Bitcoin

had been down 70 percent over the first half of the year, but

on November 7th and 8th, 2022, Bitcoin basically didn't move.

Even though FTT was down over 50 percent, Solana was down

around 50 percent, Bitcoin was down maybe 10 percent, and

stocks basically didn't move at all.  The hedges, which would

have been helpful against the prior crashes to protect income,

had effectively no benefit for what happened here.

     MR. COHEN:  Let's call up again Government

Exhibit 866.  And call out the first entry.

Q.  Where you say, "FTX is fine.  Assets are fine."

A.  Yup.

Q.  Once you learned the information you just related, what, if

anything, did you do?

A.  I took down this tweet thread.

     MR. COHEN:  All right.  At this time, your Honor, I'd

like to read from Government Exhibit 2001, which is a

stipulation agreed upon by the parties, and in evidence.

     "The exhibits set forth in attachment B below are

authentic copies of tweets and retweets posted at the dates and

times indicated on the exhibits, but which were later deleted

at dates and times listed in attachment B."  And it lists

Government Exhibit 866, deleted November 8, 2022, at 5:37 p.m.

BY MR. COHEN:

Q.   Okay.  All right.  Now I want to pick up——well, let me just ask you one question, and then we'll come back to it.

On November 8th, what, if anything, were you thinking, what, if anything, did you do with respect to FTX and Alameda?

A.   A few things.  The first was, effectively began liquidating Alameda.  It had reached that critical threshold where its NAV was barely positive, and started to get all liquidity it could put together, begun closing down positions, and potentially closing down the company entirely.  And at the same time I had calls with potential investors.

Q.   Why were you calling potential investors?

A.   Because in my view at the time, while Alameda was still solvent, as was FTX, it was potentially going to be a lengthy process to close down the company, to liquidate its holdings, and with the run on the bank, customers——

MS. SASSOON:  Objection.  "Run on the bank."

THE COURT:  Pardon me?

MS. SASSOON:  "With the run on the bank."

MR. COHEN:  He defined it in terms of FTX.

THE COURT:  I don't think exactly, but I'll let it stand.  I think everybody understands what he's saying.

A.   With the run on FTX.  The——customers were requesting billions of dollars immediately of——of withdrawals.  And if we

1   didn't want to have delays, then that was—potentially

2   significant delays, that was going to potentially need

3   significant amounts of outside capital, and so—

4   Q.  When you—finish your answer, sir.  I'm sorry.

5   A.  And so I was calling prospective investors about that.

6   Q.  We'll come back to it, but from November 8th forward, did

7   you continue to call investors?

8   A.  I did.

9   Q.  Okay.  Now continuing in that week, that week of

10  November 1st to November 11th, during that week did you have

11  any conversations with Nishad Singh?

12  A.  I did, yes.

13  Q.  What were the topics of those conversations?

14  A.  There were chiefly two topics.  One topic, which was the

15  operational topic, was just on doing everything that we could

16  to support FTX and its customers.  The other was on Nishad's

17  personal finances and situation.

18          MR. COHEN:  Okay.  Let's call up Government

19  Exhibit 480A in evidence.

20  Q.  Okay.  And this is a chat between you and Nishad; is that

21  right?

22  A.  Yup.

23          MR. COHEN:  Okay.  If we can, Brian, expand what's in

24  blue.

25  Q.  This is him talking.  "One thing that'd seriously help me

1   is if I didn't have debts.  I think most of them are loans.

2   500m for me exercising, more for US investments.  I hope we can

3   unwind these but not sure."

4           "Maybe 80m extra or so are donations/personal/etc.

5   that went through my bank acc and are in my name."

6           And then continuing to the bottom, he said, "would you

7   be ok letting me trade to get rid of the 80?  The only change

8   in deliverable is the taxable amount, since the rest was

9   already delivered.  Sorry.  I know this is not an important

10  thing to focus on and not the point, I'm just having a really

11  hard time, and I think this may help me get back, idk."

12          Do you see that, Mr. Bankman-Fried?

13  A.  Yes.

14          MR. COHEN:  Continuing on in the document, Brian.

15  Q.  You say, "will think about this."  He says "thanks."

16          You say, "what does 'trade' mean?"  He says, "sell FTT

17  or SRM earlier in 2022."  And you say, "I think that's probably

18  fine."

19          What does that refer to, Mr. Bankman-Fried, that

20  exchange?

21  A.  So I wasn't sure exactly what he had intended.  I

22  understood, at a high level, that he wanted to get out of his

23  own personal loans at that point in time.

24  Q.  Okay.  What was his demeanor during these conversations,

25  this week?

1   A.  He was actively suicidal.  He had expressed that explicitly

2   to myself and to others.  We had a——a therapist on call and

3   meeting with him and overseeing him more or less constantly.

4   Q.  Don't say anything more about that.

5   A.  Yeah.

6   Q.  Okay.  How did you——what did you mean when you said, "I

7   think that's probably fine"?

8   A.  I meant two things.  The first thing was that assuming that

9   we got through the crisis, I would do what I could in good

10  faith to get his personal finances in a more comfortable

11  situation.  I wasn't sure exactly what form that would take.

12  And the second was that I wanted to be reassuring to him, so I

13  wanted to make sure he didn't take any actions against himself.

14  Q.  Did you agree to backdate any documents with him?

15  A.  No.

16          MR. COHEN:  Okay.  If we can take that down and pull

17  up GX 480C.

18  Q.  Okay.  This is another chain between you and Nishad.

19          MR. COHEN:  Brian, if we could call up the blue.

20  Q.  "When I briefly called Dan he was very upset with us and

21  blamed basically the three of us and said it was super F'd up."

22          MR. COHEN:  Continuing on the next blue, Brian.  I'm

23  sorry.  Drop that.  Okay.  No, no, no.  I'm sorry.  Back up.

24  Give me the whole page again; I'll tell you what to pull up.

25  From here to here.  Okay.  Forgive my bad handwriting.

1   Q.  You say——back and forth with Mr. Singh, you say, "makes

2   sense.  I don't hate the idea of them being pissed at me.

3   There were pros and cons, mostly cons, but it might help move

4   on."

5        Then he says, "this is wildly selfish of me, but they

6   may need to know that it wasn't a ton of people orchestrating

7   it.  I think it makes sense to more likely to want to be here

8   to help save the situation, at least.  Even if you did think

9   that was a good idea, idk how you say it, I don't really have a

10  strong rec."

11       You say, "yup.  Fwiw I don't think that's super

12  selfish, I think that's probably correct."

13       What did you understand him to be saying here and what

14  did you mean with your response?

15  A.  I understood him to be saying that he wanted me to tell

16  people that he was not involved in it, in causing the crisis,

17  and to be——and him to be claiming that employees at FTX would

18  be more comfortable working with him if they heard that was the

19  case.

20  Q.  And what did you mean by your response?

21  A.  I agreed with the second part of that, that it very well

22  might be, you know, make it easier for people to work together

23  to the extent that they weren't blaming Nishad.

24       MR. COHEN:  Okay.  We can take that down.

25  Q.  During your conversations in that first week of November,

1   did Zane Tackett come up?

2   A.  Yes.

3   Q.  Can you tell us how that came up.

4           MS. SASSOON:  Objection.  Form.  Which conversation?

5           THE COURT:  Form.

6   Q.  Let me take it in steps.

7           During the week of November——well, it's more than a

8   week——the period of November 1 to November 11th, did you have a

9   conversation with Nishad about what he should say to Zane

10  Tackett?

11  A.  Yes.

12          MS. SASSOON:  Objection.  Sidebar, your Honor.

13          THE COURT:  Okay.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. SASSOON:  I'm not entirely sure where this is

3    going, but I asked for a sidebar because there is a

4    conversation described in Michael Lewis's book that is sourced

5    to the defendant that we consider a false exculpatory and

6    inadmissible hearsay, and I don't know if that is where you're

7    going, but I would ask for a preview outside the presence of

8    the jury to lodge any hearsay objections.

9          MR. COHEN:  Sure.

10          THE COURT:  Mr. Cohen.

11          MR. COHEN:  Where this is going is, he had a

12    conversation——he, the defendant, had a conversation with Nishad

13    who said, *What do I tell Zane Tackett,* who was the person

14    dealing with institutional investors, and the defendant said, *I

15    don't think we did anything wrong.  I don't think you did*

16    *anything wrong.*  And Nishad said, *That's not good enough.*  And

17    that's what I'm seeking to elicit.

18          MS. SASSOON:  Your Honor, we would object to that as

19    hearsay.  Does not go to his state of mind because it does not

20    meet the contemporaneous requirement of the state of mind rule.

21    It's after the collapse had effectively happened, the

22    defendant's been exposed, he's trying to cover his tracks and

23    he's trying to prevent——

24          MR. COHEN:  That's the government's interpretation of

25    the evidence.  We're entitled to bring it out and argue the

1    opposite interpretation, which is that our client was

2    continuing to say that he thought neither he nor Mr. Singh had

3    done anything wrong, then Mr. Singh is acting in an opposite

4    way.  It's really a relevancy objection.

5         THE COURT:  Give me the offer of proof again exactly?

6         MR. COHEN:  Sure.  It's—I don't think it's the

7    passage counsel was thinking of, but anyway, the offer of proof

8    is, it speaks to Mr. ── Nishad says to him, *I need to know what

9    to say to Zane Tackett,* who was head of institutional invest──

10        THE COURT:  I know.

11        MR. COHEN:  Okay.  And Mr. Bankman-Fried says, *Well, I

12   will say tell him we didn't do anything wrong.  I didn't, you

13   didn't.*  And Mr. Singh says, *That's not good enough.*  That's

14   the sum and substance I'm trying to elicit.

15        THE COURT:  And you say that "that's not good enough"

16   is not admissible because?

17        MS. SASSOON:  The whole thing of "we didn't do

18   anything wrong" is not admissible.  It's not a statement of his

19   then-existing state of mind as to future intent or plan.  It's

20   a retrospective statement to try to absolve himself of

21   responsibility and under the cases that interpret Rule 803(3),

22   like *Cardascia*, the state of mind exception focuses on the

23   contemporaneity of the statement and the unlikelihood of

24   deliberate or conscious misrepresentation.  This conversation

25   has every indicia of deliberate or conscious misrepresentation,

 1    and this does not pertain to future intent or plans.  It's

 2    after the scheme has been exposed.

 3            MR. COHEN:  It's after the bankruptcy filing, your

 4    Honor, on November 11th, when, according to the government, the

 5    conspiracy is still in effect.  This is the first time I've

 6    heard in this trial that the conspiracy ended the first week of

 7    November.

 8            THE COURT:  I don't think you heard that.  I certainly

 9    didn't.

10            MS. SASSOON:  And——

11            MR. COHEN:  Can I finish, please.

12            MS. SASSOON:  I'm sorry.

13            MR. COHEN:  And the fact that the defendant is

14    testifying to his own state of mind, that he believed he had

15    not done anything wrong during that period before the filing,

16    that he didn't think Mr. Singh had done anything wrong before

17    the filing, is certainly relevant to the issues in this case,

18    and certainly goes to his state of mind.

19            MS. SASSOON:  Your Honor, there's no general exception

20    that any statement during a conspiracy is admissible under

21    803(3).  Only the government is permitted to put in

22    co-conspirator statements.  What the defense has to show is

23    that the statement itself pertains to future intent or plan.

24    The bankruptcy happened later, but at this point employees are

25    demanding answers, the defendant is in hot water, he's lying on

1    Twitter, he's trying to cover——

2            MR. COHEN:  That's their interpretation.

3            THE COURT:  Stop interrupting, please.

4            MR. COHEN:  I'm sorry.  I'm sorry.  I'm sorry.

5            MS. SASSOON:  And if he wants to get on that stand and

6    say, "I didn't think I was doing anything wrong," that's one

7    thing, but to offer a self-serving hearsay statement that he

8    gave to his employee, who he wanted to enlist in not exposing

9    his crimes, does not meet Rule 803(3).

10           MR. COHEN:  We just heard the government's summation

11   on that point.  They're entitled to give it, your Honor, but

12   the defendant is entitled to say, at the time, not after the

13   fact, he didn't think——he did not think he did anything wrong,

14   and that's what he said to Mr. Singh.  And Mr. Singh objected

15   to that.  It goes to the weight of this, and not admissibility.

16           MS. SASSOON:  Are you trying to offer this under

17   803(3) or another rule?

18           MR. COHEN:  His statement comes in as 803(3), the

19   defendant's state of mind.  How could it not?

20           MS. SASSOON:  It requires that it be a statement of

21   the declarant's then-existing state of mind, such as motive,

22   intent, or plan, or emotional, sensory, or physical condition,

23   but not including a statement of memory or belief to prove the

24   fact remembered or believed.  And——

25           THE COURT:  Sustained.

 1          (In open court)

 2          THE COURT:  Objection sustained.

 3   BY MR. COHEN:

 4   Q.  Okay.  Mr. Bankman-Fried, you mentioned that during this

 5   week, starting around November 8th, you started to contact

 6   investors.

 7   A.  Yup.

 8   Q.  Did you have any contact with Binance?

 9   A.  Yes.

10   Q.  What was that contact?

11   A.  Beginning with the market crash, late on the 7th and early

12   on the 8th, I reached out to CZ, the CEO of Binance, about

13   potentially acquiring FTX.

14   Q.  Did anything happen with respect to that potential

15   acquisition?

16   A.  Yeah.  Later that day they signed a letter of intent to

17   acquire FTX.

18   Q.  And what happened with respect to that letter of intent?

19   A.  About a day later they backed out of it.

20   Q.  Okay.  Did you speak with other investors that week?

21   A.  I did, yes.

22   Q.  Okay.  Let me call your attention to the end of that week.

23   Did there come a time when you had a conversation with Can Sun?

24   A.  Yes, I did.

25   Q.  And just to remind everyone, who was he?

 1    A.  He was the general counsel of FTX.

 2    Q.  Okay.  And I meant to ask you this.  During the week or the

 3    period November 1st to November 11th, where were you working?

 4    A.  I was working from a—the apartment that I was renting in

 5    Albany after I moved out of the Orchid 6 penthouse.

 6    Q.  Okay.  Did there come a time that you changed to a

 7    different location?

 8    A.  Yeah.  Midway through that week, my apartment became

 9    overfull with people and so we moved to the Conch Shack, which

10    was a house in Albany that some employees lived in.

11    Q.  And about how many employees wore working in the Conch

12    Shack?

13    A.  20 to 40 over time.

14    Q.  And how many hours were you working?

15    A.  22 a day, 23 a day, roughly.

16    Q.  Okay.  Now did there come a time during the end of this

17    week where you had a conversation with Mr. Sun?

18    A.  Yes.

19    Q.  Okay.  How did that come about?

20    A.  I had had a call with Apollo, who was a potential source of

21    liquidity investor, or lender for FTX, about an emergency line

22    of credit.  I had in that call given them a spreadsheet which

23    summarized the financial state of FTX and of Alameda and of the

24    fiat account and other things.

25    Q.  Did the spreadsheet include the $8 billion liability we've

1    been discussing?

2    A.   Yeah.

3    Q.   Okay.  All right.  Please continue.

4    A.   And they were—they told me that they were considering

5    whether or not to make an investment of a few billion dollars,

6    and that they had a series of questions, one of which was on

7    what the compliance framework or context was for the fiat@

8    account.

9    Q.   And what, if anything, did you do after you heard that?

10   A.   I had a follow-up call with them, and before that call, I

11   asked to talk to Can.

12   Q.   And where did your conversation with Mr. Sun take place?

13   A.   I think we were walking around Albany.

14   Q.   Okay.  Why weren't you in the work area?

15   A.   It was overflowing at that point in time.

16   Q.   Okay.  And as best you can remember, why don't you tell us

17   what you said to Mr. Sun and what he said to you.

18   A.   Yeah.  I described the call I had had with Apollo to him

19   and relayed the question that they had asked around the

20   compliance framework for the fiat@ account.  I said that I

21   wanted to make sure that I didn't say anything wrong, or

22   incorrect on the call I had with Apollo, so I wanted to talk

23   with Can about it.

24   Q.   What topics did you go over with him?

25             Take your water.  In fact, I'm going to simplify it

1    instead of trying to finish.  Do you know——

2    A.  I'm good.

3    Q.  Why don't you tell us what you said to Can and what he said

4    to you.

5    A.  Yeah.  So I——after I described the context in the call to

6    Can, Can said that he had been trying——been thinking about

7    that, very recently, over the past day or so, that in his view,

8    there were different buckets of assets, effectively, that there

9    were different buckets of balances and positions on FTX,

10   depending on what users were doing with them, how they were

11   using the system; and that those would be treated differently

12   with respect to borrowing that Alameda had done.  Can said that

13   he had——that for assets that were lent out to earn interest on

14   the spot margin order book, those clearly could be borrowed.

15   He said that for assets that were used as collateral for margin

16   trading, those were also borrowable.  He said that for user

17   assets that were staked out, they probably were, but it

18   depended on the exact format of that.  Staking is various forms

19   of interest-earning activity.  But that for assets that were

20   purely spot assets, at least for digital assets that were

21   purely spot assets, with no margin and no futures trading, that

22   he wasn't sure that, in his view, the terms of service

23   supported borrowing those assets.

24   Q.  And what did you say, if anything?

25   A.  I said that that lined up at a high level with my

1    understanding.  We then briefly discussed the size of those

2    buckets and how they compared to Alameda's borrowing.

3    Q.  And what did Can say, if anything?

4    A.  Can said that the—that the—that he had gotten a number

5    for specifically the interest-earning assets lent out in the

6    spot margin borrow/lending order book and that those might be

7    enough to cover all of the info@ accounts borrowing but not the

8    info@ plus fiat@ accounts, borrowing those put together, but

9    that he didn't have numbers on the top of his head for the

10   other buckets—I think there were some other smaller buckets I

11   didn't mention there that he discussed as well—and wasn't sure

12   off the top of his head how those compared to the full scale of

13   Alameda's borrowing.

14   Q.  And did the topic of what to tell Apollo come up?

15   A.  Yeah.  I mean, I was—the context for the conversation was

16   me figuring out what to tell them, and as we went through this,

17   I told Can that my plan was just to relate my best

18   understanding of the framework to Apollo in our call that was

19   coming up and that I didn't disagree with anything that Can had

20   said and, you know, wouldn't say anything that was contrary to

21   it.

22   Q.  Did you subsequently have the call with Apollo?

23   A.  Yes, I did.

24   Q.  Did Can participate in that call?

25   A.  No, he wasn't on the call.

1    Q.   Okay.  Now continuing to November 9th of that week.

2    A.   Yeah.

3    Q.   Did there come a time that you became aware that there was

4    going to be an Alameda all hands meeting?

5    A.   Yes.

6    Q.   How did you learn that?

7    A.   Caroline sent me a message saying there's going to be one.

8            MR. COHEN:  If we could call up Government

9    Exhibit 414A in evidence.

10           Okay.  If we could pull up the blue at the top, Brian.

11   Q.   This is Caroline speaking.  "Thinking about what to tell

12   people at Alameda all hands."

13           "Right now I'm thinking a vibe of 'Alameda is probably

14   going to wind down, if you don't want to stay or want to take

15   some time off no pressure, if you do want to help with stuff

16   like making sure our lenders get repaid it's super

17   appreciated.'  Does that seem right?"

18           MR. COHEN:  And if we can show the gray now, Brian.

19   Q.   And you respond, "and maybe something about there being a

20   future of some sort for those who are excited but that you

21   can't know for sure what it is."

22           What did you understand her to be saying and what are

23   you saying here?

24   A.   I understood her to be describing what she was planning to

25   say at the all hands meeting coming up, that she was going to

1   tell Alameda employees that Alameda was probably going to be

2   shutting down as a business and, you know, closing down its

3   positions, and that she, you know, wanted help doing so.  And I

4   threw out a suggestion about, you know, maybe there would be a

5   future venture for people who are staying that we're excited

6   about, but I didn't actually have anything concrete.

7   Q.  Now did you attend that all hands meeting?

8   A.  No, I did not.

9   Q.  Did you speak with Caroline after the meeting?

10  A.  She sent me a message after the meeting, yeah.

11          MR. COHEN:  Let's call up Government Exhibit 414B.

12          If you can call up the——well, I don't think——we don't

13  need to expand it.  I'm looking at the bottom part.

14  Q.  She says, there, "Did this, think it went well, people

15  seemed——"

16          MS. SASSOON:  Object.  This is not yet in evidence,

17  your Honor.

18          THE COURT:  All right.

19          MR. COHEN:  Oh, I thought it was.  I'm sorry.

20          Okay.  Let's take it down.

21  Q.  Did you speak with Caroline after the meeting?

22  A.  She sent a message.

23  Q.  What did she say to you?

24  A.  She said that the meeting had gone well and that——no other

25  content about what meeting had been about, really.

1    Q.  And sometime after the meeting did you speak with Constance

2    Wang?

3    A.  Yeah.

4    Q.  Who is that?

5    A.  The COO of FTX.

6    Q.  And after you spoke with Constance Wang, what, if anything,

7    did you do?

8    A.  I looked into data to check the history of Alameda's

9    accounts on FTX.

10   Q.  Okay.  Did you look at anything in particular?

11   A.  Yeah.  I looked at what had happened with the info@ account

12   and fiat@ accounts over the course of June 2022.

13   Q.  All right.  Now moving forward, Mr. Bankman-Fried, on

14   November 11th you stepped down from the company; is that

15   correct?

16   A.  Yes.

17   Q.  Okay.  And after stepping down did there come a time that

18   you spoke to any journalists?

19   A.  Yeah.

20   Q.  Okay.  Why did you do that?

21   A.  I felt like it was the right thing for me to do to try and

22   talk about what had happened.

23   Q.  Okay.  Did there come a time that you spoke with George

24   Stephanopoulos?

25   A.  Yup.

1   Q.  And who was he?

2   A.  He was a host of *Good Morning America*.

3   Q.  And why did you speak with him?

4   A.  The same reason.  I wanted to tell people, tell the world

5   what I knew.

6   Q.  Okay.  This conversation, which I think the government

7   played a portion of, took place when?

8   A.  I think it was early December of 2022.

9   Q.  And in early December 2022 what information did you have

10  available to you?

11  A.  I had my memory.  I had very little beyond that.  I'd been

12  cut off from nearly all systems shortly after the bankruptcy

13  filing.

14  Q.  Okay.  Who did you go with to speak with

15  Mr. Stephanopoulos?

16  A.  I mean, I——it was me.

17  Q.  Did he tell you, or his team tell you in advance what

18  questions he would ask?

19  A.  No.

20  Q.  So why did you go?

21  A.  I felt like I wanted to apologize for what had happened and

22  I wanted to explain, as best I could, given what I did and

23  didn't know at the time.

24  Q.  Okay.  Now going back to November 12th, did there come a

25  time that you met with the Securities Commission of the

1    Bahamas?

2    A.   Yeah.

3    Q.   Okay.  And where was the meeting?

4    A.   We had multiple meetings.  They were at the headquarters of

5    the Securities Commission.

6    Q.   Who was there?

7    A.   Christina Rolle, the head of the Securities Commission of

8    the Bahamas; her staff; the joint provisional liquidators;

9    myself; Krystal Rolle, my Bahamian attorney; and my father; and

10   then for the first meeting there were others in the

11   headquarters but not in the meeting itself.

12   Q.   Okay.  And after the meeting what happened next?

13   A.   Just to clarify, because there were multiple meetings, are

14   you—you're referring to the November 12th meeting?

15   Q.   November 12th, yes.  I'll get to the others.

16   A.   Yeah.  So in that meeting in particular, Gary Wang was at

17   the headquarters as well, although not in the interview itself.

18            THE COURT:  Sorry.  Mr. Bankman-Fried, the question

19   was:  What happened next?

20            THE WITNESS:  Yes.  Understood.

21   A.   So after that, most of the people who had been at the SCB

22   headquarters drove down to the FTX office.

23   Q.   And what, if anything, happened at the FTX office?

24   A.   At the FTX office, Gary and I were directed to help

25   transfer the remaining assets under FTX's custody to a custody

1  system set up by the Securities Commission, the Bahamian

2  regulators.

3  Q.  And yes or no:  After November 12th did you have additional

4  meetings with the members of the SCB and the joint provisional

5  liquidators?

6  A.  Yes, many.

7  Q.  What were you trying to do?

8  A.  I was trying to help customers, help bankruptcy process, be

9  helpful any way I could.

10            MR. COHEN:  One moment, your Honor.

11            Thank you, Mr. Bankman-Fried.  I have nothing further.

12            THE COURT:  Okay.  We'll take our morning break here.

13  Fifteen minutes.

14            THE DEPUTY CLERK:  All rise.  Jury, please come this

15  way and bring your notebooks with you, please.

16            (Recess)

17            (Continued on next page)

18

19

20

21

22

23

24

25

1                    (In open court; jury not present)

2                    MS. SASSOON:  Your Honor, what did you have in mind

3     for timing of lunch, just for my planning purposes?

4                    THE COURT:  Somewhere between 12:30 and 1.

5                    MS. SASSOON:  Great.  Thank you.

6                    THE COURT:  Juror No. 3 has a flight Friday morning

7     that she would like to keep for her uncle's 70th birthday.

8                    And Juror No. 8 has indicated that she'll have to let

9     us know tomorrow, because she needs to consult her calendar at

10    home.

11                   Andy, you'll mark that next in order, please.

12                   And we'll bring in the jury.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)

 2                    THE DEPUTY CLERK:  Please be seated, everyone.

 3                    THE COURT:  The defendant and the jurors all are

 4       present, as they've been throughout.

 5                    Ladies and gentlemen, I'll be in a better position to

 6       let you know about Friday probably tomorrow, but as soon as I

 7       can, I will.

 8                    The defendant is reminded he's still under oath.

 9                    Ms. Sassoon, you may proceed.

10                    MS. SASSOON:  Thank you, your Honor.

11       CROSS EXAMINATION

12       BY MS. SASSOON:

13       Q.  Mr. Bankman-Fried, you testified a bunch about Alameda.  Up

14       through November of 2022, you owned 90 percent of Alameda,

15       correct?

16       A.  Yes.

17       Q.  And until FTX and Alameda declared bankruptcy, that never

18       changed, right?

19       A.  That's correct.

20       Q.  Fair to say then that Alameda was an entity that was

21       affiliated with FTX?

22                    MR. COHEN:  Objection.

23                    THE COURT:  Form.

24       Q.  Would you agree, Mr. Bankman-Fried, that Alameda was an

25       entity affiliated with FTX?
```

```
 1                MR. COHEN:  Objection.

 2                THE COURT:  Ask it a different way.

 3   Q.  You owned both Alameda and FTX, correct?

 4   A.  I owned substantial stakes in both.

 5   Q.  And you talked a lot about Alameda as a customer of FTX.

 6   If Alameda made money, that meant that you would make money,

 7   right?

 8   A.  Essentially, yes.

 9   Q.  And for a period of time you were a billionaire, correct?

10   A.  Yup.

11                MS. SASSOON:  And if we could briefly pull up

12   Government Exhibit 67, which is in evidence.

13   Q.  Mr. Bankman-Fried, does this fairly show that you were

14   90 percent owner of Alameda?

15   A.  Yup.

16   Q.  Mr. Bankman-Fried, would you say that you were not involved

17   at all in Alameda trading in 2022?

18   A.  I was not involved as a general principle in day-to-day

19   trading.  I had some involvement in some higher-level

20   discussions and hedging-related trading discussions.

21   Q.  So you would not say that you were not at all involved in

22   Alameda trading?

23   A.  Depends on how you define "trading."

24   Q.  Yes or no, Mr. Bankman-Fried:  In 2022, would you say that

25   you were not at all involved in Alameda trading?
```

1   A.  I would say I was not involved for the most part.  I would

2   not say I was not involved at all in any way.

3   Q.  You were receiving some information about Alameda

4   throughout 2022, correct?

5   A.  Yes.

6   Q.  And so you were not walled off from Alameda trading

7   decisions, right?

8          MR. COHEN:  Objection, form.

9          THE COURT:  Overruled.

10  A.  I was not generally making trading decisions, but I was not

11  walled off from information from Alameda.

12  Q.  You named Caroline and Sam Trabucco co-CEOs around August

13  of 2021, right?

14  A.  That's correct.

15  Q.  And after they were named co-CEOs, you continued to meet

16  with them to talk about Alameda business, right?

17  A.  With Caroline, at least.

18  Q.  And sometimes with Sam Trabucco as well, correct?

19  A.  For the first period.

20  Q.  When you say the first period, we're talking about after

21  August 2021, right?

22  A.  Yes.

23  Q.  And Caroline would send you updates about Alameda's trading

24  profits and losses, right?

25  A.  Yup.

1   Q.  And sometimes you continued to give input on trading

2   decisions, yes?

3   A.  Yes.

4   Q.  You participated in a chat group called Vertex, correct?

5   A.  Yup.

6   Q.  And that was with Caroline Ellison, Sam Trabucco, and Ben

7   Xie?

8   A.  Yes.

9   Q.  And in that chat group the four of you would sometimes

10  discuss Alameda trading, right?

11  A.  Yup.

12  Q.  After you stepped down as CEO, you also still told Caroline

13  when to buy certain cryptocurrencies from time to time, right?

14  A.  I'm not sure exactly what that's referring to.

15  Q.  Well, do you recall giving instructions to ever buy

16  cryptocurrencies after you named Caroline co-CEO?

17  A.  I don't recall an instance.  I'm not confident there wasn't

18  one.

19  Q.  MAPS, that's a cryptocurrency, correct?

20  A.  Yes.

21          MS. SASSOON:  Mr. Bianco, can you show the witness

22  what's marked as Government Exhibit 1630.

23  Q.  Do you see that this is a chat between you, Ms. Ellison,

24  and Sam Trabucco?

25  A.  Yup.

1          MS. SASSOON:  The government offers Government

2     Exhibit 1630.

3          MR. COHEN:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 1630 received in evidence)

6          MS. SASSOON:  Mr. Bianco, if you could publish that.

7     BY MS. SASSOON:

8     Q.  Mr. Bankman-Fried, do you see this is dated January 24,

9     2022?

10    A.  Yup.

11    Q.  And do you see at the top you wrote, "On OXY/MAPS how much

12    have we bought the last few days?"  When you said "we," you're

13    referring to Alameda, correct?

14    A.  Yup.

15    Q.  And do you see beneath that, you said, "Guessing we should

16    twap longer, 1 to $2 million of each over the next day or two,"

17    do you see that?

18    A.  Yup.

19    Q.  And you gave direction to Caroline and Sam Trabucco to buy

20    OXY and MAPS, correct?

21    A.  No.

22    Q.  You're giving them direction with respect to the trading of

23    MAPS, correct?

24    A.  No.

25    Q.  Do you see Caroline Ellison's response, "Yup, that sounds

```
 1   good, 200K of MAPS"?

 2   A.  Yup.

 3   Q.  And you wrote back "lol"?

 4   A.  Yup.

 5   Q.  January 2022, that's after you announced Caroline and

 6   Trabucco as co-CEOs, right?

 7   A.  Yup.

 8   Q.  You also told Caroline around the summer of 2022 to buy

 9   something called JGBs, right?

10   A.  I'm not sure if it was buy or sell, but it was related to

11   the hedging, yes.

12   Q.  And that stands for Japanese government bonds?

13   A.  Yes.

14   Q.  And so you gave her directions with respect to either the

15   buying or selling of JGBs, correct?

16   A.  Yes.

17   Q.  And you also testified that you had some heated discussions

18   with Caroline Ellison in 2022 about hedging, right?

19   A.  Yeah.

20   Q.  And she sent you spreadsheets with analysis of the hedging,

21   correct?

22   A.  Yup.

23   Q.  And hedging, that's a form of trading, isn't it?

24   A.  Yeah.

25   Q.  FTX declared bankruptcy on November 11, 2022, right?
```

```
 1   A.  Yes.

 2   Q.  And you were arrested in this case on December 13, 2022,

 3   correct?

 4   A.  Yes.

 5   Q.  And I believe you touched on this in your direct.  After

 6   FTX declared bankruptcy but before your arrest, you made

 7   certain public statements, correct?

 8   A.  Yup.

 9   Q.  And you did public interviews.

10   A.  Yes.

11   Q.  I think you said you wanted to get out there and tell what

12   you knew?

13   A.  Mm-hmm.

14   Q.  You wanted to tell the truth?

15   A.  Yup.

16   Q.  And when you spoke publicly about FTX, you understood it

17   was important to tell the truth, right?

18   A.  Yup.

19   Q.  And that you had to be precise about what you said, right?

20   A.  As best I could, given what I knew and didn't know.

21   Q.  And it was important to be careful in what you said,

22   correct?

23   A.  As best I could.

24   Q.  Once you became a high-profile CEO, you understood that

25   people would be watching what you said, correct?
```

```
 1              MR. COHEN:  Objection, form.

 2              THE COURT:  Overruled.

 3    A.   Yes.

 4    Q.   And you understood that you had to be careful about what

 5    you said in public, right?

 6    A.   Yeah.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.  And sometimes you even ran what you said through a public

2    relations filter, correct?

3    A.  Yes.

4    Q.  And that was to make sure that you were precise about what

5    you said, right?

6    A.  In general.

7    Q.  And you testified about this, but on December 1, 2022, you

8    did an interview, for example, with George Stephanopoulos on

9    Good Morning America, right?

10   A.  Yes.

11   Q.  We saw a clip from that interview, didn't we?

12   A.  Yes.

13   Q.  You also did an interview hosted by someone named Mario

14   Nawfal.  I don't know if I'm pronouncing that right.  Do you

15   recall that?

16   A.  Not specifically, but I am not saying I didn't.

17   Q.  Did you do an interview on something called Twitter Spaces?

18   A.  Yeah, I did a couple.

19   Q.  And those were live streamed?

20   A.  Yup.

21   Q.  And one of the ones that you did was arranged December 1 of

22   2022, right?

23   A.  Sounds about right.

24   Q.  So that's after the bankruptcy was declared, correct?

25   A.  Yup.

1   Q.  And this interview covered topics related to the collapse

2   of FTX, right?

3   A.  They did, yes.

4   Q.  And isn't it true, yes or no, that you stated on this

5   podcast that you were not involved at all in Alameda trading

6   and hadn't been for years?

7   A.  I don't recall what I said.

8            MS. SASSOON:  Your Honor, the government offers

9   Government Exhibit 2508.

10           We can pull up, Mr. Bianco, 2508-T for the Court and

11   counsel.  If we could also offer 2508-T as an aid to the jury.

12           THE COURT:  Any objection?

13           MR. COHEN:  Your Honor, may we have a sidebar, please?

14           THE COURT:  Yes.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1             (At sidebar)

 2             MR. COHEN:  Your Honor, the parties have had a

 3    practice of sharing exhibits that they will be using in

 4    examination the night before.  This was not shared with us, so

 5    it's the first I am seeing it in connection with this.  I just

 6    want to know what purpose it's being offered for before we say

 7    whether we have an objection or not.

 8             MS. SASSOON:  Your Honor, the defense at no time asked

 9    us to share exhibits that we intended to use on

10    cross-examination.  I think it's obvious that we are going to

11    introduce exhibits during cross-examination.  It's also

12    necessary because he denied recalling making the statements.

13    It's the defendant's own statement and it is being used to

14    impeach.

15             THE COURT:  Any objection?

16             MR. COHEN:  No.

17             (Continued on next page)

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MS. SASSOON:  The government offers Government Exhibit

 3    2508 and 2508-T as an aid.

 4              THE COURT:  2508 is an audio?

 5              MS. SASSOON:  Yes.

 6              THE COURT:  They are received.

 7              (Government Exhibits 2508 and 2508-T received in

 8    evidence)

 9              THE COURT:  So far as 2508-T, the transcript, ladies

10    and gentlemen, the instruction I gave you earlier in the trial

11    about transcripts as compared with recordings, audio and video,

12    applies here too.  It's the audio or the video, whichever it

13    is, that is the evidence.

14              MS. SASSOON:  Mr. Bianco, you can now play government

15    Exhibit 2508 for the jury.

16              (Audio played)

17    Q.  The statement, I was intentionally not getting involved in

18    it because I was concerned about a conflict of interest, that's

19    your voice, Mr. Bankman-Fried, correct?

20    A.  Yeah.  It sounds like it.

21    Q.  In early December 2022, you spoke to a journalist at the

22    Financial Times, correct?

23    A.  I am not sure.

24    Q.  Do you recall speaking to a journalist by the name of

25    Joshua Oliver?
```

1    A.  At various points, yes.

2    Q.  Do you recall speaking to him after FTX declared

3    bankruptcy?

4    A.  Yes.

5    Q.  Isn't it true that Mr. Oliver asked you questions about

6    FTX's collapse?

7    A.  I don't remember.

8    Q.  Do you recall telling Mr. Oliver that you had walled

9    yourself off from trading and risk management at Alameda?

10   A.  I don't remember what I said.

11            MS. SASSOON:  Mr. Bianco, if you could please pull up

12   Government Exhibit 2503, what's marked as Government Exhibit

13   2503.

14            The government offers Government Exhibit 2503.

15            Mr. Bianco, if you could scroll down.

16            MR. COHEN:  Your Honor, is this being offered for its

17   truth?

18            THE COURT:  I'm waiting to find out.

19            MS. SASSOON:  For the fact that it was said, your

20   Honor, not for its truth.

21            MR. COHEN:  On that basis, no objection.

22            THE COURT:  Received, not for the truth, but the fact

23   that the statements were made.

24            (Government Exhibit 2503 received in evidence)

25            MS. SASSOON:  Mr. Bianco, if you could publish this

1    and start at the first page.

2    Q.  Mr. Bankman-Fried, do you see that this is an article by

3    Joshua Oliver, dated December 4, 2022?

4    A.  It looks like it.

5         MS. SASSOON:  Mr. Bianco, if we can go to the second

6    page.

7    Q.  I am going to read to you from the top here:  The FTX

8    founder insisted that he had walled himself off from trading

9    and risk management at the Alameda Research trading firm, which

10   he majority owned, for conflict-of-interest reasons related to

11   his role as guardian of customer assets as chief executive of

12   the exchange FTX.

13        Do you see that, Mr. Bankman-Fried?

14   A.  I see that.

15        MS. SASSOON:  You can take that down.

16   Q.  These statements to Joshua Oliver and on the podcast we

17   listened to, they were before you knew you had been indicted in

18   this case, correct?

19   A.  That's correct.

20   Q.  And at that time you were aware that your private Signal

21   messages with Caroline, Nishad, and Gary that predated November

22   2022 had been auto deleted, correct?

23        MR. COHEN:  Objection to form.

24        THE COURT:  Overruled.

25   A.  Some of them.

```
 1    Q.  In fact, all of them from the hashtag organization chat,

 2    for example, correct?

 3    A.  Probably.

 4              MS. SASSOON:  Mr. Bianco, let's pull up Government

 5    Exhibit 1083.

 6    Q.  Mr. Bankman-Fried, I'll direct your attention to row 1,

 7    hashtag organization.  Do you see the auto-deletion status

 8    column?

 9    A.  Yup.

10    Q.  Do you see where it says that, as of May 11, 2021, messages

11    would be deleted after one week?

12    A.  Yup.

13              MS. SASSOON:  Let's go to row 2.

14    Q.  Do you see the group name of that chat was Sam/Gary/Nishad?

15    A.  Yup.

16    Q.  When was auto delete for those messages set to 24 hours,

17    Mr. Bankman-Fried?

18    A.  I can read the document.  It says 2021.

19              MS. SASSOON:  You can take that down.

20    Q.  Looking at the third row, the group name SBF Caroline

21    Nishad, do you see that that was set to four weeks auto

22    deletion?

23    A.  Yup.

24    Q.  And row 4, the fantastic three whose participants were Gary

25    Wang, Nishad Singh, and Sam Bankman-Fried, that had a one-week
```

1    auto deletion, correct?

2    A.  Yes.

3         MS. SASSOON:  We can take that down.

4    Q.  At the time you made these statements that we just looked

5    at on the podcast and to Joshua Oliver, you did not know that

6    Caroline Ellison would be cooperating with the government,

7    correct?

8    A.  I didn't know with confidence.

9    Q.  There was no public information that Caroline Ellison was

10   cooperating with the government, correct?

11   A.  Just rumors.

12   Q.  And at that time as well Gary Wang had not yet pleaded

13   guilty as a cooperating witness, correct?

14   A.  To my knowledge, yeah.

15   Q.  And in fact it was not until January of 2023 that you

16   learned Nishad Singh had pleaded guilty to a cooperation

17   agreement, correct?

18   A.  I don't remember exactly when I learned that with

19   confidence.  That sounds roughly correct.

20   Q.  These public statements before your arrest were also before

21   you knew the government had obtained a search warrant for your

22   Twitter account, correct?

23   A.  I had no knowledge one way or another.  Yes.

24   Q.  And at that point you had no knowledge that the government

25   might obtain a search warrant for your Google account, right?

1   A.  I suspected.  I didn't know.

2   Q.  You did not know that the government, one way or the other,

3   whether it had obtained a search warrant for your Google

4   account, correct?

5   A.  That's correct.

6   Q.  And you didn't know at that point that the government had

7   subpoenaed millions of documents, correct?

8   A.  I am not sure whether I knew that at that point.

9   Q.  Is it your testimony that you may have known in early

10  December 2022 that the government had subpoenaed millions of

11  documents?

12  A.  I can't recall exactly when.  I heard rumors about it at

13  some point.

14  Q.  And this point in early December 2022 was before you knew

15  that the government had copies of documents that show you were

16  involved in Alameda trading decisions, correct?

17  A.  I am not sure I would phrase them that way, but it was

18  before I had specific knowledge of that.

19  Q.  This was also before you knew the government had Caroline

20  Ellison's journal with her notes about Alameda, correct?

21  A.  I don't know whether I knew that at that point.  I might or

22  might not have.  I can't remember exactly when I learned that.

23  Q.  You think you may have learned that by December 1, 2022?

24  A.  I may have heard rumors.  I can't remember when.

25  Q.  And these interviews after FTX's collapse in early December

1    2022 was before you knew that the government had Google

2    metadata showing you had been accessing Alameda balance sheets

3    in 2022, correct?

4    A.  Yeah.

5    Q.  These statements in early December, they were before you

6    prepared for your testimony at this trial, right?

7    A.  That's correct.

8    Q.  Let's talk about what you did before you testified today

9    and last week.  After you were arrested, but before this trial,

10   the government produced documents to you, correct?

11   A.  Yup.

12   Q.  Is it fair to say that you carefully reviewed some of those

13   documents?

14   A.  Yup.

15   Q.  And you've had months at this point with most of the

16   government's evidence, correct?

17          MR. COHEN:  Objection.

18          THE COURT:  Form.

19   Q.  The government produced evidence in this case to you

20   beginning several months ago, correct?

21   A.  Yes.

22   Q.  And, among other things, you saved the transcript from

23   Caroline Ellison's guilty plea to your Google Drive, correct?

24   A.  Yeah, that's correct.

25   Q.  You looked at the Signal messages that were preserved,

1   correct?

2   A.   Some of them.

3   Q.   You reviewed some of your emails too, right?

4   A.   Some of them.

5   Q.   And you reviewed some Google documents from Caroline

6   Ellison's drive that the government produced to you, correct?

7   A.   Yup.

8   Q.   And you looked at Excel spreadsheets that were shown during

9   this trial, didn't you?

10  A.   Yes.

11  Q.   You ran queries in FTX's AWS database, right?

12  A.   Right.

13  Q.   And you have known for weeks what exhibits the government

14  marked for use at this trial because the government disclosed

15  those to you, correct?

16          MR. COHEN:   Objection.

17          THE COURT:   Overruled.

18  A.   No.

19  Q.   No, the government did not disclose the exhibits to you?

20  A.   My understanding is that I was not aware until very shortly

21  before and often not at all of what exhibits.   I don't

22  particularly assign blame to one party on that.

23  Q.   Isn't it true that the government produced a drive to you

24  that had all the exhibits it marked for potential use at this

25  trial?

1    A.  My understanding is, there are multiple different versions

2    of that over time.

3    Q.  And you received multiple versions of that over time,

4    correct?

5    A.  Yes.

6    Q.  And you reviewed the content of those drives, right?

7    A.  Some of it.

8    Q.  The government also produced to you notes from its

9    interviews with witnesses, correct?

10   A.  Yes.

11   Q.  And you reviewed many of those notes, didn't you?

12   A.  Yup.

13   Q.  And you have also sat here throughout this trial, right?

14   A.  Yup.

15   Q.  And you listened to the testimony of the witnesses, haven't

16   you?

17   A.  Yup.

18   Q.  Caroline Ellison?

19   A.  Yup.

20   Q.  Gary Wang?

21   A.  Yup.

22   Q.  Nishad Singh?

23   A.  Yup.

24              MR. COHEN:  Objection.

25              THE COURT:  What's the objection?

 1                MR. COHEN:  Are we going to go through every witness?

 2                MS. SASSOON:  That was three, your Honor.

 3                THE COURT:  Overruled.

 4   Q.  You were here for the testimony at the very start of the

 5   trial of Adam Yedidia, correct?

 6   A.  Yup.

 7   Q.  And that was all before your own trial testimony, right?

 8   A.  That is correct.

 9   Q.  Mr. Bankman-Fried, would you agree that you know how to

10   tell a good story?

11   A.  I don't know.  It depends on what metric you use.

12   Q.  Let's talk about when you were CEO of FTX.  You were in

13   charge of raising money from investors, right?

14   A.  I was one of the people involved in that.

15   Q.  And in your role as CEO, you participated pitching the

16   company to potential investors, right?

17   A.  In some of the calls, yes.

18   Q.  And the purpose of some of these meetings with potential

19   investors was to persuade them to give you money for your

20   company, right?

21   A.  Essentially.

22   Q.  And you did this dozens of times, right?

23   A.  Yup.

24   Q.  And in those pitches you would tell a story about your

25   company, right?

1   A.  I would tell what I thought was the truth about the

2   company.  You could call it a story.

3   Q.  You would talk about, for example, how FTX was innovative,

4   correct?

5   A.  Yes.

6   Q.  As another example, you would talk about how FTX used an

7   automated liquidation protocol that set it apart from other

8   exchanges, right?

9   A.  Yup.

10  Q.  And you would tell that story over and over again to all

11  different kinds of potential investors, right?

12  A.  Yup.

13  Q.  And you were good at that, right?

14  A.  I'm not sure I'm the person to judge.

15  Q.  Didn't you raise more than a billion dollars for FTX from

16  investors?

17  A.  Yup.

18  Q.  Fair to say you are pretty good at this?

19          MR. COHEN:  Objection.

20          THE COURT:  Overruled.

21  A.  Perhaps.  Perhaps the company was valuable.  I can't

22  confidently say where credit is due for that.

23  Q.  Among other things, you raised millions of dollars, for

24  example, from Alfred Lin at Sequoia, right?

25  A.  Yes.

1   Q.  And were you aware at the time that Sequoia was one of the

2   most respected venture capital funds?

3   A.  Yup.

4   Q.  You also made a pitch to Congress, right?

5   A.  I testified before Congress.

6   Q.  And you testified before Congress about the merits of your

7   business, didn't you?

8   A.  That was one of the topics I was asked about, yes.

9   Q.  You would sometimes fly out to D.C. on a private plane,

10  correct?

11  A.  Yes.

12  Q.  And you would put on a suit, right?

13  A.  Pretty much the only time.

14  Q.  And you would testify under oath, correct?

15  A.  Yup.

16  Q.  And in part that testimony was to convince Congress that

17  FTX operated as a safe cryptocurrency exchange, right?

18  A.  I'm not sure I viewed that particularly as my goal there.

19  Q.  Is that one thing you described before Congress under oath?

20  A.  It may have been.

21  Q.  Do you recall one way or the other whether you described

22  before Congress that FTX was a safe cryptocurrency exchange?

23  A.  I'm sure I said something similar to that.  I don't recall

24  the exact phrasing.

25  Q.  While you were CEO of FTX, you also made a pitch to

1    potential customers, yes?

2    A.  I was involved in discussions about potential customers and

3    sometimes spoke to them.

4    Q.  I think on direct examination you described how FTX spread

5    and grew somewhat organically at the beginning, right?

6    A.  Yup, that's right.

7    Q.  And one way that it grew was through your interactions with

8    customers on social media, fair?

9    A.  Yeah.

10   Q.  You posted on Twitter?

11   A.  Yup.

12   Q.  And your Twitter account was at SBF_FTX?

13   A.  Yup.

14   Q.  You knew that some FTX customers followed you on Twitter,

15   didn't you?

16   A.  Yup.

17   Q.  You also knew that your followers included people who could

18   potentially be customers of FTX, right?

19   A.  Yup.

20   Q.  You're familiar with the phrase crypto Twitter, right?

21   A.  Yup.

22   Q.  And does that refer to people on Twitter who are interested

23   in crypto?

24   A.  Yup.

25   Q.  And would you say your followers on Twitter included people

NEURAL_2.2-cr-00673-LAK  Document 378  Filed 12/12/23  Page 88 of 239    2593

1    who were part of crypto Twitter?

2    A.   Yup.

3    Q.   And did you understand that crypto Twitter included people

4    who were also customers on FTX?

5    A.   Yup.

6    Q.   You were pretty proud that FTX caught on so quickly, right?

7    A.   Yeah, I was.

8    Q.   You attracted a lot of users through social media alone,

9    didn't you?

10   A.   We attracted most of our original users through word of

11   mouth and social media.

12   Q.   You also spoke to reporters as part of your job as CEO,

13   right?

14   A.   Yup.

15   Q.   And you understood when you did that that some of those

16   statements would be published in articles available to the

17   public, right?

18   A.   Yup.  That's right.

19   Q.   And the public that could include your investors, right?

20   A.   Yup.

21   Q.   Existing customers of FTX?

22   A.   Yup.

23   Q.   Potential customers of FTX?

24   A.   Yup.

25   Q.   I believe you said on Friday something like that you were

 1    surprisingly good with the press.

 2              Do you remember that?

 3              MR. COHEN:  Objection.

 4              THE COURT:  What's the objection?

 5              MR. COHEN:  Mischaracterizes the testimony.

 6              THE COURT:  Give me a moment.

 7              MS. SASSOON:  Transcript 2416.  I can do an exact

 8    quote.

 9    Q.  Didn't you say on Friday:  I took a few interviews and

10    those ended up going better than I thought they would after not

11    too long there was more demand for me to do interviews.

12              Do you recall that testimony?

13    A.  Yup.

14    Q.  Fair to say you did a good job with the press?

15    A.  Certainly relative to what I had expected.

16    Q.  You did a good job winning over customers, right?

17    A.  FTX did a good job.  I was probably part of that.

18    Q.  And over time FTX acquired millions of users, didn't it?

19    A.  Yup.

20    Q.  And billions of dollars of customer assets were deposited

21    onto the platform, right?

22    A.  Yup.

23    Q.  By the start of November 2022, assets on the exchange,

24    excluding Alameda, were worth about $15 billion?

25    A.  As of when?  Sorry?

1    Q.  As of the start of November 2022.

2    A.  That sounds plausible.

3    Q.  Let's talk a little bit more about some things you were

4    telling the public prior to November 2022.

5            As CEO of FTX you made representations about how FTX

6    as an exchange would operate, right?

7    A.  Yeah.

8    Q.  And you made representations about how customer assets

9    would be treated, yes?

10   A.  Yup.

11   Q.  You made statements on Twitter?

12   A.  Probably.

13   Q.  And to journalists?

14   A.  Probably.

15   Q.  And before Congress.

16   A.  Yup.

17   Q.  When you say probably, are you uncertain whether you made

18   statements on Twitter about how FTX operated?

19   A.  I wasn't sure if I spoke specifically to the part about

20   customer assets or not.

21   Q.  Yes or no, do you recall tweeting about how customer assets

22   would be treated on FTX?

23   A.  I don't recall in particular, but I suspect I did.

24   Q.  But you don't recall?

25   A.  No.

1    Q.  Isn't it true that you wanted potential customers on FTX to

2    view FTX as trustworthy?

3    A.  That would have been good, yes.

4    Q.  And you wanted customers to view FTX as transparent?

5    A.  Yup.

6    Q.  And you wanted potential customers to view FTX as safe

7    compared to other crypto exchanges, right?

8    A.  Yup.

9    Q.  You wanted customers to trust you with their money, didn't

10   you?

11   A.  Yeah.

12   Q.  You said publicly while you were CEO of FTX that FTX had

13   reformed how crypto exchanges worked, didn't you?

14   A.  I don't recall that, but I may have.

15   Q.  You recall saying that you had built a responsible system?

16   A.  No.  But I may have.

17   Q.  Do you recall describing FTX as a thoughtful exchange?

18   A.  No.  But I may have.

19   Q.  Do you recall describing FTX as having a healthy take on

20   risk management?

21   A.  No.  But it may have.

22   Q.  Do you recall saying that you were providing clarity and

23   transparency to the crypto system?

24   A.  No.  But I may have.

25   Q.  Do you recall saying that when it came to risk customers on

1    FTX would only be exposed to what they think they are being

2    exposed to?

3    A.   I remember something roughly at that point, but not

4    details.

5    Q.   FTX had a podcast, right?

6    A.   Yes.

7    Q.   And Tristan Yver, was he an FTX employee who hosted the

8    podcast?

9    A.   Yes.

10   Q.   You appeared from time to time on the podcast?

11   A.   Yes, a couple of times.

12   Q.   One of those times was on September 15, 2022, correct?

13   A.   Could be.

14   Q.   Do you recall going on the podcast in September 2022?

15   A.   I don't recall exactly.  That sounds plausible.

16             MS. SASSOON:  At this time, Mr. Bianco, if you could

17   pull up Government Exhibit 2570.

18             And the government offers this clip from the podcast.

19             THE COURT:  Any objection?

20             MR. COHEN:  No, your Honor.

21             THE COURT:  Received.

22             (Government Exhibit 2570 received in evidence)

23             MS. SASSOON:  Mr. Bianco, if you could play that.

24             (Video played)

25   Q.   That was you, Mr. Bankman-Fried, speaking, correct?

1    A.  Yup.

2    Q.  As CEO of FTX, you told customers that you believed the

3    crypto ecosystem was more innovative than traditional markets,

4    did you?

5    A.  I said things in that direction.  I am not sure

6    specifically what.

7    Q.  Did you talk about the crypto ecosystem being more

8    equitable?

9    A.  Yup.

10   Q.  And more transparent?

11   A.  Yup.

12   Q.  Isn't it true you also told customers that there has always

13   hauls been regulation in crypto and we have always had duties?

14   A.  I may have.

15   Q.  Do you recall saying that?

16   A.  Not specifically, but it doesn't surprise me.

17            MS. SASSOON:  Mr. Bianco, can you pull up Government

18   Exhibit 825.

19            The government offers Government Exhibit 825.

20            MR. COHEN:  No objection.

21            THE COURT:  Received.

22            (Government Exhibit 825 received in evidence)

23            MS. SASSOON:  Mr. Bianco, if you could publish that.

24   Q.  Mr. Bankman-Fried, this is a tweet you posted on July 30,

25   2021, correct?

1   A.   Yup.

2   Q.   Do you see where you wrote:  The industry is evolving, as

3   are regulators' stances, but the truth is, there's always been

4   regulation in crypto and we've always had duties.

5   A.   Yup.

6              MS. SASSOON:  You can take that down.

7   Q.   You also marketed FTX as a safe crypto exchange compared to

8   your competitors, didn't you?

9   A.   With FTX US I think that may be the case.  I am not sure

10  about FTX International.

11  Q.   Did you or did you not market FTX International as safe

12  compared to other crypto exchanges?

13  A.   I don't specifically remember that.  I am not sure.

14             MS. SASSOON:  If we could pull up Government Exhibit

15  900A.

16             The government offers Government Exhibit 900A.

17             THE COURT:  Hearing no objection, it's received.

18             (Government Exhibit 900A received in evidence)

19             MR. COHEN:  I thought it was in already.

20             THE COURT:  No harm, no foul.

21             MS. SASSOON:  I believe the full video is in.  This is

22  just a screenshot.

23             Mr. Bianco, if you could publish that, please.

24             We can go ahead and take that down.

25  Q.   You publicly described FTX as the most regulated crypto

exchange by far, didn't you?

A.  I think that's right.

Q.  And you also acted like you cared about customer

protections, right?

A.  I think I did care about them, yes.

Q.  And you made public statements to that effect, didn't you?

A.  I probably did.

Q.  I didn't hear you.

A.  I probably did.

Q.  Yes or no, do you recall making statements that you cared

about customer protections?

A.  Yes.

Q.  In fact, over and over again in public forums you described

FTX platform as safe, correct?

A.  I am not sure specifically what that is referring to.  I

may have.

Q.  Yes or no, do you recall making numerous public statements

to the effect that the FTX platform was safe?

A.  I recall with respect to FTX US.  It may be true with

respect to FTX International, but I don't specifically recall,

no.

Q.  You were CEO of FTX International, yes?

A.  Yes.

Q.  Sitting here today, you cannot recall one way or the other

whether you made public statements that FTX was a safe

1   platform?

2   A.  I am not sure exactly what you are referring to.  I made a

3   lot of public statements.

4   Q.  Yes or no, do you recall making public statements that FTX

5   was a safe platform?

6   A.  I can't think of a specific one off the top of my head.

7   Q.  Generally, do you recall in substance making statements

8   that FTX was a safe platform?

9           MR. COHEN:  Objection.

10          THE COURT:  Overruled.

11  A.  Some things that were sort of like that, yes.  I am not

12  sure exactly what you are referring to.  But I am not saying --

13          THE COURT:  Mr. Bankman-Fried, the issue is not what

14  she is referring to.

15          Please answer the question.

16  Q.  Putting aside what I'm referring to, I'm asking whether you

17  recall making statements as CEO of FTX that in substance stated

18  that the FTX platform was safe.

19  A.  I remember things around specific parts of the FTX platform

20  that were related to that.  I don't remember a general

21  statement to that effect.  I am not sure there wasn't one.

22  Q.  In media interviews isn't it true that you insisted on that

23  FTX had protections for retail customers?

24  A.  Yup.

25  Q.  You told your customers that users' funds and safety come

1    first, didn't you?

2    A.   Something to that effect, yes.

3    Q.   And you also made statements that you would always allow

4    withdrawals, didn't you?

5    A.   Yup.

6         MS. SASSOON:   If we could pull up what's marked as

7    Government Exhibit 829.

8         The government offers Government Exhibit 829.

9         MR. COHEN:   No objection.

10        THE COURT:   Received.

11        (Government Exhibit 829 received in evidence)

12        MS. SASSOON:   Mr. Bianco, can you publish that.

13   Q.   Mr. Bankman-Fried, can you read the first line of your

14   tweet from August 9, 2021.

15   A.   Sure.  And, as always, our users' funds and safety come

16   first.

17   Q.   Beneath that do you see where it says, we will always allow

18   withdrawals except in cases of suspected money

19   laundering/theft/etc.?

20   A.   Yup.

21        MS. SASSOON:   We can take that down.

22   Q.   You also told customers that backstopping customer assets

23   should always be primary, right?

24   A.   It wasn't specifically directed at customers, but, yes, I

25   did say that.

1    Q.  You did say that on Twitter, didn't you?

2    A.  Yup.

3    Q.  I believe you testified that you understood that FTX

4    customers followed you on Twitter, right?

5    A.  Yup.

6    Q.  You also told customers that the core of crypto is the

7    freedom to own your own assets, right?

8    A.  Yup.

9    Q.  You made that statement in October of 2022, right?

10   A.  I don't recall exactly when.

11          MS. SASSOON:  Let's pull up Government Exhibit 857,

12   what's marked as 857.

13          And the government offers this exhibit.

14          MR. COHEN:  No objection.

15          THE COURT:  Received.

16          (Government Exhibit 857 received in evidence)

17          MS. SASSOON:  Mr. Bianco, if you could publish that.

18   Q.  Mr. Bankman-Fried, what's the date of this tweet which

19   includes the lines, thanks particularly to everyone who

20   highlighted the core of crypto:  Economic freedom.  The freedom

21   to own your own assets, to own your own data, to build your own

22   programs.  What's the date of that?

23   A.  It says October 23, 2022.

24   Q.  According to your testimony in court, by this time you knew

25   that Alameda owed FTX about $8 billion for spending customer

1   fiat deposits, right?

2   A.  It's not how I phrased it, but I did know there was an $8

3   billion liability.

4   Q.  And that $8 billion liability was for customer fiat

5   deposits that had gone to Alameda, right?

6   A.  It was related to that, yes.

7   Q.  And if Alameda had repaid that money, the liability would

8   not have been there, correct?

9   A.  Yup.  That's right.

10  Q.  And you knew that as of October 23, 2022, didn't you?

11  A.  Yup.

12          MS. SASSOON:  You can take that down.

13  Q.  In October you also told the public that customers mattered

14  more than anything, didn't you?

15  A.  Excuse me.  I didn't hear the second half of that.

16  Q.  You stated publicly in October as well that customers

17  mattered more than anything, right?

18  A.  I may have.

19          MS. SASSOON:  Let's pull up Government Exhibit 858.

20  It's marked.

21          And the government offers this exhibit.

22          MR. COHEN:  No objection.

23          THE COURT:  Received.

24          (Government Exhibit 858 received in evidence)

25  Q.  You see on October 30, 2022 you tweeted:  I deeply

1   appreciate when policymakers engage constructively and

2   optimistically with the people who matter the most for the

3   industry's direction, the customers.

4           You tweeted that?

5   A.  Yes.

6           MS. SASSOON:  You can take that down.

7   Q.  You also tweeted that the acceptable number of issues when

8   it comes to a client's money is zero, correct?

9   A.  I am not sure.

10  Q.  Do you recall saying that that was a huge focus for FTX?

11  A.  I'm not sure what that's referring to.

12          MS. SASSOON:  Mr. Bianco, can you publish Government

13  Exhibit 766, which is in evidence.

14  Q.  Mr. Bankman-Fried, do you see this tweet from FTX official?

15  A.  I do.

16  Q.  What's the date of that tweet?

17  A.  April 18, 2022.

18          MS. SASSOON:  We can take that down.

19  Q.  Mr. Bankman-Fried, fair to say that you wanted FTX's

20  customers to trust you?

21  A.  That would have been ideal, yeah.

22  Q.  And you even tweeted that lying to customers breaks sacred

23  rules of conduct everyone knows to follow, didn't you?

24  A.  I may have.  I don't recall that.

25  Q.  You mentioned during your testimony earlier that you

1    testified before Congress, right?

2    A.   Yup.

3    Q.   And that included written and oral testimony?

4    A.   Yup.

5    Q.   That testimony was under oath, wasn't it?

6    A.   I believe so.

7    Q.   You submitted to Congress FTX's key principles document,

8    right?

9    A.   Yup.

10   Q.   And FTX's key principles had the stated goal to ensure

11   customer and investor protection, right?

12   A.   That sounds right.

13   Q.   And those principles, they weren't limited to FTX US,

14   correct?

15   A.   Various principles refer to the industry, some refer to

16   FTX, some to FTX US.

17   Q.   FTX's key principles, was that document limited to FTX US?

18   A.   Not all of it, no.

19   Q.   The name of the document was FTX US key principles,

20   correct?

21   A.   They were not key principles for FTX.  They were key

22   principles by FTX for the industry.  Many of them, but not all

23   of them, refer to FTX as a business.

24   Q.   Isn't it true that in those key principles you stated that

25   FTX offered the protections laid out in the principles today to

1  its customers?

2  A.  Maybe something to that effect.

3  Q.  So isn't it true that FTX held out this document as key

4  principles for its own exchange?

5  A.  I am not sure.

6  Q.  You were involved in reviewing this document, weren't you?

7         MR. COHEN:  Objection to this document.

8  Q.  FTX's key principles that you submitted to Congress under

9  oath, you reviewed it, right?

10  A.  I read through it.

11  Q.  And you were involved in crafting it, weren't you?

12  A.  I don't remember being very involved in crafting it.

13  Q.  You submitted it under oath to Congress, right?

14  A.  Yes.

15         MS. SASSOON:  Let's pull it up.  Let's pull up

16  Government Exhibit 914A.  Let's go to the second page.

17  Q.  Do you see here this refers to the key principles document

18  and it says:  FTX released this week FTX's key principles for

19  ensuring investor protections on digital-asset platforms where

20  we identified the most important components of an

21  investor-protection regime.

22         Can you read the next words after the parenthetical.

23  A.  And how FTX offers those protections today with the direct

24  membership model.

25         MS. SASSOON:  You can take that down.

1    Q.  Let's actually pull it up back up and go to the second

2    page.

3           Among these principles you told Congress -- let's read

4    the first bullet -- these components include maintaining

5    adequate liquid resources to ensure the platform can return the

6    customer's assets upon request.

7           Do you see that?

8    A.  Yup.

9    Q.  And the next bullet says:  Ensuring the environment where

10   customer assets are custodied including digital wallets are

11   kept secure.

12          Do you see that?

13   A.  Yes.

14   Q.  Third bullet:  Ensuring appropriate bookkeeping or

15   ledgering of assets and disclosures to protect against misuse

16   or misallocation of customer assets.

17          Do you see that?

18   A.  Yes.

19   Q.  On the next page, at the top:  Ensuring appropriate

20   management of risks, including market, credit counterparty and

21   operational risks.

22          Do you see that?

23   A.  Yup.

24   Q.  And can you read the last bullet.

25   A.  Avoiding or managing conflicts of interest.

1    Q.  Conflicts of interest are not a good thing, right?

2    A.  They are a potential problem.

3    Q.  And they are a potential problem that customers cared

4    about, right?

5    A.  Yup.

6    Q.  And a potential problem that your investors cared about,

7    right?

8    A.  Right.

9    Q.  And you wanted to reassure customers that you were not

10   going to use Alameda to profit at FTX at other customers'

11   expense, right?

12   A.  Not in an improper way.

13   Q.  We will come back to that.

14         Let's go to the eighth page of this PDF.  I want to

15   direct you to the bottom of the page that starts with FTX has

16   policies and procedures.  Do you see where it says:  FTX has

17   policies and procedures for its platforms today that reflect

18   this basic principle by maintaining liquid assets for

19   customers' withdrawals, including a sufficient balance of

20   digital assets funded by the company for its non-U.S. platform.

21         Do you see this?

22   A.  Yup.

23   Q.  This is not about FTX US, correct?

24   A.  That part is not.  That's correct.

25   Q.  Reading on it says:  The resources are funded to provide

 1    sufficient cover against user losses to ensure a customer

 2    without losses can redeem its assets from the platform on

 3    demand.

 4            Do you see that?

 5    A.  Yup.

 6            MS. SASSOON:  You can take that down.

 7    Q.  In addition to submitting the FTX key principles document

 8    to Congress, there was a press release put out by FTX that

 9    accompanied the release of these principles, right?

10    A.  I believe so, yes.

11    Q.  And in the press release you stated that, quote, the

12    protection of investors in the public was a top priority for

13    the FTX exchanges, right?

14    A.  Sounds about right.

15    Q.  And the key principles were also posted on FTX's policy

16    blog, correct?

17    A.  Yup.

18    Q.  That was on the FTX website?

19    A.  Yup.

20    Q.  And you posted links to the policy papers on your Twitter

21    account, right?

22    A.  Yup.

23    Q.  And you also publicized your congressional testimony on

24    Twitter to your followers, right?

25    A.  Yup.

1   Q.  You publicly advocated for crypto regulation, correct?

2   A.  Yup.

3   Q.  And you told your customers on Twitter in October 2022 that

4   your support for regulation was contingent upon protecting he

5   customers, right?

6   A.  I don't recall the context for that.

7   Q.  Do you recall, yes or no, telling your followers on Twitter

8   in October that your support for regulation was contingent upon

9   protecting customers?

10  A.  I don't recall that specifically, no.

11          MS. SASSOON:  Let's pull up what's marked as

12  Government Exhibit 855.

13          Government offers Government Exhibit 855.

14          MR. COHEN:  No objection.

15          THE COURT:  Received.

16          (Government Exhibit 855 received in evidence)

17          MS. SASSOON:  Mr. Bianco, can you publish that.

18  Q.  On October 19 of 2022, you tweeted that your support for

19  regulation was contingent upon protecting customers, right?

20  A.  Yup.

21  Q.  You wanted your followers to think that consumer

22  protection, customer protection was important to you, right?

23  A.  Sure.

24  Q.  But this was really just for PR, wasn't it?

25  A.  No.

1    Q.  In private you said things like fuck regulators, didn't

2    you?

3    A.  I said that once.

4    Q.  And you also said in private that the stuff you said about

5    wanting good regulations was just PR, didn't you?

6    A.  I said something that was related to that, yes.

7    Q.  Let's look.

8         MS. SASSOON:  Let's pull up Government Exhibit 803C,

9    which is in evidence.

10   Q.  Do you see at the top a message from @Kelsey Tuoc that says

11   you had a lot of stuff about how you wanted to make

12   regulations, just good ones.

13        Was that pretty much just PR too?

14   A.  I see that.

15   Q.  Can you please read your last two messages.

16   A.  Yeah.  Just PR.  Fuck regulators.

17        MS. SASSOON:  Take that down.

18   Q.  You called members of crypto Twitter, which included your

19   own followers and customers, dumb motherfuckers, right?

20   A.  On one instance I called a specific subset of them that in

21   a private conversation to someone.

22   Q.  So yes?

23   A.  To a specific subset of them, yes.

24   Q.  You testified last week that some of your donations to

25   politics were to foster regulatory structure for crypto.

```
 1              Do you recall that?
 2   A.  Yup.
 3   Q.  At the time Binance was one of your largest competitors,
 4   right?
 5   A.  Yup.
 6   Q.  And you wanted regulators to crack down on Binance, didn't
 7   you?
 8   A.  In some ways, yes.
 9   Q.  Isn't it true that you thought regulation would help you
10   take more market share away from Binance?
11   A.  I thought that would be one of the pros.  There were pros
12   and cons.
13   Q.  I want to talk a little bit about muffins.
14              You testified last week that FTX didn't have
15   restrictions on what people could do with funds they borrowed,
16   right?
17   A.  Yup.
18   Q.  And I think you said they could buy muffins with the money
19   if they wanted, right?
20   A.  Yup.
21   Q.  Isn't it true though that FTX had rules for when customers
22   could withdraw money from the exchange to buy muffins or
23   anything else?
24   A.  Yeah.
25   Q.  For example, a customer could withdraw their account
```

1   balance, right?

2   A.  Customers could always withdraw their account balance,

3   that's correct.

4   Q.  And a customer, as another example, could opt into the

5   spot-margin program, right?

6   A.  Yup.

7   Q.  Under certain circumstances a customer with spot margin

8   enabled could withdraw money from the exchange to buy muffins,

9   right?

10  A.  Um-hum.

11          THE COURT:  Sorry.  Excuse me, Ms. Sassoon.

12          We need a word.

13          THE WITNESS:  Sorry.  Yes.

14          MS. SASSOON:  I thought I heard that.  Apologize, your

15  Honor.

16  Q.  Now, yes or no, Mr. Bankman-Fried, a customer was not

17  permitted, for example, to deposit $10 and then withdraw assets

18  worth a billion dollars to buy millions of muffins, right?

19  A.  Depends on the context.  In general, no.

20  Q.  In general, no, you could not, taking those facts as the

21  facts, deposit $10 to withdraw a billion dollars to buy muffins

22  or anything else?

23  A.  Not without further context.

24  Q.  When you say further context, you mean other assets on the

25  FTX exchange, right?

1    A.   Or potentially off the exchange.

2    Q.   Let's talk about that, Mr. Bankman-Fried.

3         I wrote this down.  This is from your testimony

4    earlier today.

5    A.   Um-hum.

6    Q.   You were giving an example about a customer withdrawing

7    three Bitcoins, and you said that to withdraw those three

8    Bitcoins the customer would likely be collateralized by some

9    other asset on the exchange.

10        Do you recall that testimony?

11   A.   Yup.

12   Q.   Isn't it true that the rules you publicized for the FTX

13   exchange said that the collateral had to be on the exchange?

14   A.   I am not sure exactly what we said.  It usually did.

15   Q.   Isn't it true that what you said publicly was that it

16   always did?

17   A.   It's possible.

18   Q.   Yes or no, do you recall any instance where you publicly

19   said, there are exceptions to collateralizing your withdrawals

20   on the exchange?

21   A.   I am not sure.  I don't specifically recall either.

22   Q.   Can you identify a single one sitting on the stand right

23   now?

24   A.   I can't recall a specific instance in that direction, no.

25   Q.   Let me help you.

1          Is it your testimony that a customer did not have to

2    post their collateral to the exchange itself in order to

3    withdraw money?

4    A.   In general, a customer had to have collateral on the

5    exchange in order to withdraw money.

6    Q.   And you said that over and over again to the public, didn't

7    you?

8    A.   I said things related to that.  I am not sure if I said

9    exactly that.

10   Q.   This was an essential feature of the automatic liquidation

11   engine, right?

12   A.   Yes.

13   Q.   For an automatic liquidation engine to know to liquidate an

14   account, the collateral had to be on the exchange, right?

15   A.   The risk engine had to be at least aware of the collateral.

16   Q.   And the risk engine, that's not a person, right?

17   A.   No.  There is a core computer process, that's right.

18   Q.   And the core computer process only has information about

19   what assets are on the exchange, right?

20   A.   Not necessarily.

21   Q.   When it comes to liquidation, the liquidation protocol,

22   this computer process is evaluating collateral on the exchange,

23   correct?

24   A.   It's evaluating the number that it is given in the

25   database.  Those, in general, were assets held on the exchange.

1    It also includes lines of credit and other things.

2    Q.  We will turn to lines of credit, but I want to talk more

3    about collateral.

4    A.  Um-hum.

5    Q.  In marketing FTX, didn't you claim that FTX's risk engine

6    insulates users from the risk management of any other

7    counterparties by custodying collateral?

8    A.  Yup.

9    Q.  And custodying collateral, that means the collateral is

10   with FTX, correct?

11   A.  It means there is collateral with FTX, yes.

12   Q.  Didn't you testify under oath before Congress that, quote,

13   FTX's risk management program requires that digital asset

14   collateral be placed on the platform itself, rather than

15   pledged, but not delivered to the platform to ensure the

16   platform has immediate access to the collateral for purposes of

17   managing market risks?

18   A.  I don't remember the details.  It probably had roughly

19   that.

20   Q.  That's because that's how you marketed FTX, correct?

21   A.  Sometimes, yes.

22   Q.  Were there other times that you said, actually, just

23   kidding?

24            MR. COHEN:  Objection.

25            THE COURT:  Argumentative.

1    Q.  Did you ever amend your testimony before Congress under

2    oath to say actually not all users have to post collateral to

3    withdraw money?

4    A.  No.

5    Q.  You also testified under oath before Congress that FTX,

6    quote, stored collateral from our users in a way which is not

7    always done in the traditional financial ecosystem to backstop

8    positions?

9    A.  Yup.

10   Q.  Now, you also testified before Congress about the FTX US

11   application in May of 2022, right?

12   A.  Yup.

13   Q.  And in your testimony you described how the risk and

14   clearing model for FTX International's platform worked, right?

15   A.  I may have.

16   Q.  And you testified that FTX's risk model on its

17   international platform would work well for its U.S. business

18   too, right?

19   A.  A modified version of it.

20   Q.  And didn't you testify under oath that FTX used, quote,

21   prefunded collateral deposits instead of credit extensions.

22   That was your testimony, wasn't it?

23   A.  It may have been.

24          MS. SASSOON:  Mr. Bianco, can you show the witness

25   what's been marked as Government Exhibit 2583.

1            The government offers Government Exhibit 2583.

2            MR. COHEN:  Assuming it's not for its truth, no

3  objection.

4            THE COURT:  Is it for its truth?

5            MS. SASSOON:  Your Honor, it's the defendant's own

6  statements.

7            THE COURT:  I understand.  But I'm asking you how

8  you're offering it.

9            MS. SASSOON:  We don't think the representations were

10  accurate, so, no, it's not being offered for its truth.

11            THE COURT:  It's received, not for its truth.

12            (Government Exhibit 2583 received in evidence)

13            MS. SASSOON:  Mr. Bianco, can you publish that.

14  Q.  Mr. Bankman-Fried, do you see this is testimony of Sam

15  Bankman-Fried, cofounder and CEO of FTX, dated May 12, 2022?

16  A.  Yes.

17            MS. SASSOON:  If we could go to the second page.

18  Q.  I want to direct your attention to the second full

19  paragraph.

20            Do you see where it says prefunded collateral deposits

21  instead of credit extensions?

22  A.  Yup.

23  Q.  And the next sentence says:  Second, the system also

24  requires that customers transfer the required collateral to

25  support their trading to the FTX platform before they can begin

1    trading.

2         Do you see that?

3    A.  Yup.

4         MS. SASSOON:  You can take that down.

5    Q.  In early December 2022, you did an interview with Andrew

6    Ross Sorkin from the New York Times, right?

7    A.  Yup.

8    Q.  In that interview didn't you describe FTX's borrow/lend

9    program as a program where, quote, users were lending billions

10   of dollars to each other collateralized by assets on the

11   exchange?

12   A.  I don't remember exactly what I said.

13        MS. SASSOON:  Mr. Bianco, if you could pull up just

14   for the witness Government Exhibit 2585-T.

15        Actually, pull up Government Exhibit 2568-T.  If you

16   could go to page 8 of the PDF.

17   Q.  Mr. Bankman-Fried, I direct your attention to the bottom of

18   page 8 and to page -- sorry -- page 7 of the transcript, page 8

19   of the PDF.

20        Do you see where it says, there is the?  There is the

21   borrow lending facility.  Do you see that?

22   A.  Yes, I see it.

23        MR. COHEN:  Are you on 7 or 8?  I see.

24   Q.  If you could read from there to the end of the sentence.

25   Look up when you're done.

1    A.  All right.

2    Q.  Do you now recall that you told Andrew Ross Sorkin that,

3    quote, there is the borrow/lending facility where users were

4    lending billions of assets to each other collateralized by

5    assets on the exchange?

6    A.  Yup.

7           MS. SASSOON:  Take that down.

8    Q.  Mr. Bankman-Fried, a typical customer on the FTX exchange

9    could go negative in certain types of assets, right?  I think

10   you testified about that.

11   A.  Yup.

12   Q.  But to do so, their overall account balance across all

13   assets had to stay above zero, right?

14   A.  That's generally true, yes.

15   Q.  Otherwise, if their whole account balance approached zero

16   or was approaching going negative they would be liquidated,

17   right?

18   A.  Right.

19   Q.  That was the whole selling point of FTX's innovative

20   liquidation engine?

21   A.  That was part of it, yes.

22   Q.  A typical customer, for example, would not be permitted to

23   hold an overall negative account balance for days, right?

24   A.  That is usually correct, yes.

25   Q.  Or months, right?

1    A.   Yup.

2    Q.   They would be liquidated before that happened, right?

3    A.   In most cases, yes.

4    Q.   And the typical customer could not, for example, pledge

5    their house as collateral to trade on FTX, right?

6    A.   There is no standard program for that, no.

7    Q.   And they couldn't pledge their equity in an outside

8    investment, right?

9    A.   Not without discussing it with FTX.

10   Q.   The general rules did not allow for pledging an outside

11   investment as collateral in the exchange, right?

12   A.   I am not sure that's true.

13   Q.   Can you name any customers that were allowed to pledge

14   outside investments as collateral for withdrawing money on FTX

15   apart from Alameda?

16   A.   I can name a couple of instances where we considered or in

17   fact did do that.

18   Q.   When did you in fact do that?

19   A.   I believe that we did that with a firm called Crypto Lotus,

20   and I believe that we considered that with Three Arrows.

21   Q.   Crypto Lotus, you said, is one customer that was allowed to

22   pledge an outside investment.  What was the size of that

23   investment?

24   A.   I don't recall the exact amount.  I think it may have been

25   a hundred million.

1  Q.  A hundred million?

2  A.  My guess.

3  Q.  Can you recall any other instance where a customer other

4  than Alameda and Crypto Lotus with this 100 million was

5  permitted to post as collateral an outside investment?

6  A.  Not off the top of my head.

7  Q.  Sitting here today, the answer is no?

8  A.  Correct.

9  Q.  When Crypto Lotus was allowed to pledge this outside 100

10  million, was that disclosed to the public?

11  A.  Not specifically, no.

12  Q.  And you were friends with the head of Crypto Lotus, weren't

13  you?

14  A.  I don't think so.

15  Q.  You had a personal relationship with the head of Crypto

16  Lotus?

17  A.  Who are you referring to?

18  Q.  Yes or no.

19  A.  There was someone from Crypto Lotus who I had talked to.

20  Q.  Was that person your friend?

21  A.  We didn't have nonwork discussions.

22  Q.  So it's your testimony that you have no personal

23  relationship with anybody at Crypto Lotus?

24  A.  There was a more junior employee who I had been friends

25  with.

1   Q.  Now, apart from this one occasion with Crypto Lotus and

2   putting aside Alameda, customers were not permitted, for

3   example, to pledge crypto that they held on another exchange as

4   collateral for FTX withdrawals, right?

5   A.  I can't think of a case where we -- another case where we

6   went through with that.

7   Q.  So no other instance, putting aside Alameda, where that was

8   permitted?

9   A.  I can't think of any, no.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. SASSOON:

2    Q.  And for a typical customer on FTX, the amount the customer

3    could borrow off the exchange corresponded to the collateral

4    that customer deposited, right?

5    A.  Plus lines of credit and other things, but yes.

6    Q.  I'd like to ask you some questions about lines of credit,

7    but first, let me ask you this:  Before November 2022, isn't it

8    true that you assured customers that Alameda played by the same

9    rules as other traders on FTX?

10   A.  I said some things to that extent.

11   Q.  Meaning you told customers in substance that Alameda played

12   by the same rules as other traders on FTX, correct?

13   A.  I remember saying that Alameda had the same trading access

14   as other customers.

15   Q.  Is that all you recall saying?

16   A.  I don't know the details of what I said.  That is the core

17   of what I recall.

18   Q.  So sitting here today, you don't recall assuring customers

19   that Alameda generally played by the same rules as other

20   traders on FTX?

21   A.  I'm not sure.

22   Q.  Do you recall any instance of making those assurances?

23          MR. COHEN:  Objection.

24          THE COURT:  Overruled.

25   A.  I'm not sure.  I don't recall any right now.  I'm not sure

1  exactly what you're referring to.

2  Q.  Let's pull up Government Exhibit 817, which you testified

3  about.  I think you said this was about front running—

4  A.  Yup.

5  Q.  ——right?  Now in your response, you wrote, "Alameda is a

6  liquidity provider on FTX, but their account is just like

7  everyone else's."  Do you see that?

8  A.  Yup, I do.

9  Q.  Where in your response, if anywhere, does it say front

10 running?

11 A.  At the time, I thought it was implicit from the question

12 that it was responding to.

13 Q.  Mr. Bankman-Fried, it does not say front running anywhere

14 in your tweet, right?

15 A.  It says liquidity provider in my tweet, and in the tweet it

16 was responding to, it described trading against the market.

17 Q.  Does your tweet identify any way in which Alameda's account

18 was not like everybody else's?

19 A.  No, it doesn't.

20      MS. SASSOON:  Let's pull up what's marked as

21 Government Exhibit 318.

22 Q.  This is an email that you sent on March 22, 2022, correct?

23 A.  Yup.

24      MS. SASSOON:  The government offers Government

25 Exhibit 318, not for its truth.

```
 1              MR. COHEN:  No objection.

 2              THE COURT:  Received.

 3              (Government's Exhibit 318 received in evidence)

 4              MS. SASSOON:  Mr. Bianco, can you publish that.

 5    BY MS. SASSOON:

 6    Q.  This is an email dated March 22, 2022, correct?

 7    A.  Yup.

 8    Q.  And I want to direct your attention to the email at the

 9    bottom from Rob Creamer at genevatrading.com.  And do you see

10    where he wrote, "One issue that was brought up to me

11    individually is the role of Alameda in the ecosystem and how

12    conflicts of interest are managed."  Do you see that?

13    A.  Yup.

14    Q.  Does this email anywhere mention front running?

15    A.  No.  He had mentioned it to me in person.

16    Q.  My question was:  Does this email anywhere mention front

17    running?

18    A.  No.

19              MS. SASSOON:  Okay.  Let's take that down.

20    Q.  Look at the top.  Does your email response mention anywhere

21    front running?

22    A.  Not explicitly.

23    Q.  The answer is no.

24    A.  Not explicitly.

25    Q.  The words "front running" are not in your email, correct?
```

1    A.  I agree with that.

2    Q.  And do you see where you wrote, "The rough answer is:  1)

3    Alameda is a trader on FTX 2) Alameda does not have any special

4    access; its account is like everyone else's"?  Do you see that?

5    A.  Yup.

6           MS. SASSOON:  We can take that down.

7    Q.  And didn't you tell journalists in 2022 that Alameda played

8    by the same rules as other traders on the exchange?

9    A.  I'm not sure exactly what I said.

10   Q.  Zeke Faux, he's a journalist, right?

11   A.  Yup.

12   Q.  He works at Bloomberg?

13   A.  I think that's right.

14   Q.  And you've met him before, right?

15   A.  Yup.

16   Q.  You've given him interviews before?

17   A.  Yup.

18   Q.  You met with him several times, didn't you?

19   A.  Yup.

20   Q.  And among other times, you met with him in early 2022,

21   correct?

22   A.  I don't remember exactly when.  That sounds about right.

23   Q.  And he came to the Bahamas?

24   A.  Yup.

25   Q.  And didn't you tell him in early 2022 that Alameda played

 1   by the same rules as other traders?

 2   A.  I don't remember exactly what I said.

 3   Q.  Are you denying that you said to Zeke Faux, "Alameda plays

 4   by the same rules as other traders"?

 5   A.  I'm not denying that.  I'm saying I don't remember.

 6   Q.  So you might have said that.

 7   A.  I'm not sure what I said.

 8           MS. SASSOON:  Mr. Bianco, can you pull up Government

 9   Exhibit 2511B.

10   Q.  And Mr. Bankman-Fried, I want to direct your attention to

11   the middle paragraph and ask you to read from the word "but"

12   that's at the end of the fourth line of the second paragraph

13   until the word "FTX."  Actually, could you just read that one

14   sentence.

15           MR. COHEN:  To himself?

16           MS. SASSOON:  Yes.

17           THE COURT:  Yes.

18   A.  I've read that.

19   Q.  Now do you remember telling Zeke Faux in early 2022 that

20   Alameda played by the same rules as other traders?

21   A.  Not in that wording, no.

22   Q.  So you don't recall that.

23   A.  No.

24   Q.  Do you recall telling him that in other wording?

25   A.  I recall saying that Alameda wasn't front running other

1  customers, that its trading access was like other customers.  I

2  don't remember exactly how I said it.

3  Q.  And did you tell Zeke Faux that Alameda received special

4  treatment in other respects?

5  A.  I don't remember talking about it.

6  Q.  So you didn't say that to him.

7  A.  I don't remember doing so.

8  Q.  You told other members of the media that Alameda's account

9  access on FTX was the same as other users, didn't you?

10 A.  I'm not sure about the phrasing.

11        MS. SASSOON:  Let's pull up Government Exhibit 2525,

12 just for the witness and the Court and counsel.

13        And if we could go to the second page.

14        And the government offers Government Exhibit 2525.

15        THE COURT:  Received.

16        (Government's Exhibit 2525 received in evidence)

17        MS. SASSOON:  Mr. Bianco, if you could publish the

18 second page for the jury.

19 BY MS. SASSOON:

20 Q.  Mr. Bankman-Fried, do you see the February 8, 2022, email

21 you sent to Patricia Kowsmann at wsj.com?

22 A.  Yup.

23 Q.  Could you read the fifth bullet point here.  Out loud,

24 please.

25 A.  Yup.  "While Alameda is a user on FTX, their volume is a

1   very small fraction of overall exchange volume, and their

2   account's access is the same as others'.  It and its traders

3   does not have any special access to client information, market

4   data, or trading."

5          MS. SASSOON:  Okay.  We can take that down.

6   Q.  While you were CEO of Alameda, you also claimed that

7   Alameda had no special privileges on FTX, didn't you?

8   A.  I'm not sure about the phrasing.

9   Q.  In substance, did you claim that Alameda had no special

10  privileges on FTX?

11  A.  I'm not sure.  I don't remember doing so in those words.

12  Q.  Do you remember doing so in other words?

13  A.  I remember saying that I did not believe Alameda would be

14  front running or preying on user's information on the exchange,

15  that their trading access was just like other users'.  I'm not

16  sure.  I did thousands of interviews.  I don't honestly

17  remember the details.

18  Q.  That's the limit of what you recall describing about

19  Alameda being the same as other customers?

20  A.  That's the limit of what I can remember off the top of my

21  head.

22  Q.  Isn't it true you said Alameda and FTX operated separately?

23  A.  I'm not sure about the exact phrasing.

24  Q.  Did you make representations that in substance conveyed

25  that Alameda and FTX operated separately?

 1   A.  In some ways, yes.

 2   Q.  What do you mean "in some ways"?

 3   A.  I remember that coming up in some specific instances with

 4   respect to specific ways in which they could operate

 5   separately.  I'm not sure about the more general context.

 6   Q.  Isn't it true that in September of 2022 you claimed that

 7   Alameda was a wholly separate entity from FTX?

 8   A.  I remember saying—using that phrase at some point.

 9   Q.  And that was published in an article by *Bloomberg*, right?

10   A.  I don't remember where.

11   Q.  But you remember saying it.

12   A.  I remember that phrase.  I don't remember what the context.

13   Q.  Do you remember that being a public statement of yours?

14   A.  I think so.

15   Q.  You also told the public that FTX viewed Alameda as a

16   "neutral piece of market infrastructure."  Do you recall that?

17   A.  No, I don't.  I'm not sure I didn't say it, though.

18           MS. SASSOON:  Mr. Bianco, can you pull up Government

19   Exhibit 906.  It's marked but not in evidence.

20           Can you go to the next page.

21           Mr. Bianco, do you have a redacted version of this

22   exhibit?

23           Why don't we take that down.  We'll come back to it.

24   BY MS. SASSOON:

25   Q.  Sitting here today, Mr. Bankman-Fried, do you deny that

1   Alameda was the only FTX customer that accepted FTX customer

2   fiat deposits directly into its own bank account?

3   A.   FTX has other payment processors.

4   Q.   That's not what I asked.  I asked you whether you denied

5   that Alameda was the only FTX customer that accepted FTX

6   customer deposits directly into its own bank account.

7   A.   I'm not sure.  I'm not sure if there were other payment

8   processors that were also FTX customers.

9   Q.   Can you identify a single one sitting here today?

10  A.   I'm not confident.

11  Q.   So no, you cannot?

12  A.   Not with hundred percent confidence.

13  Q.   Sitting here today, do you deny that Alameda's main trading

14  account had a $65 billion line of credit that no other customer

15  had?

16  A.   Yup, that was the maximum withdrawable size.

17  Q.   So you agree that Alameda was the only customer with a

18  $65 billion line of credit.

19  A.   In terms of maximum size, yes.

20  Q.   And sitting here today, do you deny that Alameda's main

21  trading account had an "Allow Negative" flag?

22  A.   I——I'm not sure which account that applied to in

23  particular.  It may have.

24  Q.   Sitting here today, isn't it true that you know that the

25  info@alamedaresearch account had an "Allow Negative" flag?

1    A.  I don't remember which subaccounts did and didn't.

2    Q.  Sitting here today, do you deny that Alameda had some

3    accounts with an "Allow Negative" flag?

4    A.  I believe that's correct.

5    Q.  And that flag did not apply to other FTX customers,

6    correct?

7    A.  Not to my knowledge.

8         THE COURT:  Not to your knowledge.  There's a double

9    negative there.

10         THE WITNESS:  I'm sorry.  I don't know of any other

11   customers that weren't FTX related in some way that it applied

12   to.

13         THE COURT:  Thank you.

14   BY MS. SASSOON:

15   Q.  Sitting here today, do you deny that Alameda could withdraw

16   billions of dollars from the FTX exchange using a line of

17   credit without risk of being liquidated?

18   A.  I think that might be right.  I'm not sure about the risk

19   of being liquidated part.

20   Q.  Let me ask it this way:  Alameda—do you deny that Alameda

21   could withdraw billions of dollars from the FTX exchange using

22   a line of credit without being subject to the typical

23   auto-liquidation protocol?

24         MR. COHEN:  Objection, form.

25         THE COURT:  Overruled.

1    A.   That might be right.

2    Q.   You don't deny it.

3    A.   I don't deny it, no.

4          MS. SASSOON:   Your Honor, I'm at a natural breaking

5    point, but I can continue if you'd prefer that I do.

6          THE COURT:   Okay.  1:45, folks.

7          THE DEPUTY CLERK:   All rise.  Will the jury please

8    come this way and bring your notebooks with you.

9          (Luncheon recess)

10          (Page 2636 SEALED by order of the Court)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court; jury not present)

 2                    THE COURT:  Let's bring in the jury.

 3                    (Jury present)

 4                    THE COURT:  The defendant and the jurors all are

 5       present, as they've been throughout.

 6                    Mr. Bankman-Fried, you're still under oath.

 7                    You may proceed, Ms. Sassoon.

 8                    MS. SASSOON:  Thank you, your Honor.

 9       BY MS. SASSOON:

10       Q.  Mr. Bankman-Fried, I want to touch briefly on a few things

11       you said in your testimony last week.

12                    You testified, didn't you, that you didn't cut your

13       hair because you were busy and lazy, right?

14       A.  That sounds about right.

15       Q.  Isn't it true that while you were CEO of FTX, you told your

16       employee Andy Croghan that it was "negative EV for me to cut my

17       hair"?

18       A.  I thought it might have been.

19       Q.  Did you say that to your employee?

20       A.  I don't remember whether or not I said it.

21       Q.  Do you recall saying to Andy Croghan you kept your hair

22       long because it was important for the business "for people to

23       think I look crazy"?

24       A.  I don't think I said that in that way.

25                    MS. SASSOON:  Mr. Bianco, can you pull up Government
```

1    Exhibit 907.

2             The government offers Government Exhibit 907.

3             MR. COHEN:  I assume not for its truth, your Honor?

4             MS. SASSOON:  That's correct.

5             MR. COHEN:  No objection.

6             THE COURT:  Received on that basis.

7             (Government's Exhibit 907 received in evidence)

8             MS. SASSOON:  Mr. Bianco, can you go to page 3,

9    please, and publish that for the jury.  Actually, please first

10   publish the first page for the jury.

11   BY MS. SASSOON:

12   Q.  Mr. Bankman-Fried, do you recognize this article from *The*

13   *New York Times*?

14   A.  Vaguely.

15   Q.  And do you see it's dated May 14, 2022?

16   A.  Yup.

17            MS. SASSOON:  And Mr. Bianco, can we go to page 3.

18   First can we go to page 2.

19            Page 3?

20            Mr. Bianco, is page 3 not loading or just not on my

21   screen?

22            Okay.  Let's go to page 4.

23   BY MS. SASSOON:

24   Q.  And Mr. Bankman-Fried, do you see at the top where it says,

25   "'I was like, "Sam, you've got to cut your hair, dude—-it looks

1  ridiculous,"' Mr. Croghan said.  "And he said, 'I honestly

2  think it's negative EV for me to cut my hair.  I think it's

3  important for people to think I look crazy.'"" Do you see

4  that?

5  A.  I see that on the screen.

6  Q.  Do you deny that you said that to Mr. Croghan?

7  A.  I have no memory of saying it in that way and don't think I

8  would have.  I may have said parts of that or that with other

9  context.

10 Q.  At the time this article was published did you put out any

11 statement denying what was published by *The New York Times*?

12 A.  I don't remember reading this at the time.

13 Q.  Didn't you just testify that you recognized the article,

14 Mr. Bankman-Fried?

15 A.  Vaguely.

16        MS. SASSOON:  We can take that down.

17 Q.  You testified last week that you wore shorts and T-shirts

18 because they were comfortable, right?

19 A.  Yeah.

20 Q.  Anthony Scaramucci, he was one of your investors, right?

21 A.  I believe so.

22 Q.  And he actually traveled with you to the Middle East to

23 meet with additional investors to raise money, right?

24 A.  Yup.

25 Q.  And when you were in the Middle East, didn't he tell you

 1    that you needed to wear a suit and tie to your meetings?

 2    A.  For some of them, yeah.

 3    Q.  And didn't you tell him that T-shirt and shorts were part

 4    of your brand?

 5    A.  I don't remember saying that.  I may have.

 6    Q.  Yes or no:  Do you recall saying that?

 7    A.  I don't recall it, no.

 8    Q.  The name Alameda Research, you testified last week that you

 9    chose that name in order to be under the radar from your

10    competitors, right?

11    A.  Yeah.

12    Q.  That's not what you said in 2021, right?

13    A.  I'm not sure.

14    Q.  In 2021 didn't you say that you used the name Alameda

15    Research to mislead banks?

16    A.  I don't remember saying that.

17            MS. SASSOON:  Mr. Bianco, can you please play

18    Government Exhibit 917 in evidence.

19    Q.  And this is a clip from a podcast you did in April, on

20    April 1, 2021.

21            (Video played)

22    Q.  That was you talking in that video, Mr. Bankman-Fried,

23    correct?

24    A.  Yup.

25    Q.  You testified that you stumbled your way into Michael

1    Kives's Super Bowl party.  Do you recall that?

2    A.  The seats at the actual physical Super Bowl, yes.

3    Q.  And you flew to the Super Bowl in a private jet, didn't

4    you?

5    A.  I don't remember.

6    Q.  You don't recall flying to the Super Bowl in a private

7    plane?

8    A.  I don't recall how I got there.

9    Q.  Is that because you traveled on private planes so

10   frequently?

11   A.  It's because I traveled over a hundred times that year.  I

12   can't recall how I went any particular time.

13   Q.  And many of those times on a private plane, correct?

14   A.  Some of them, yes.

15   Q.  You spent around $15 million on private jet travel while

16   you were FTX CEO, correct?

17   A.  I'm not sure what the number is.

18            MS. SASSOON:  Mr. Bianco, can we show the witness

19   what's been marked as Government Exhibit 1473.

20   Q.  That's a photo of you, correct?

21   A.  Yup.

22            MS. SASSOON:  The government offers Government

23   Exhibit 1473.

24            MR. COHEN:  No objection.

25            THE COURT:  Received.

1              (Government's Exhibit 1473 received in evidence)

2              MS. SASSOON:  Mr. Bianco, can you publish it for the

3    jury.

4    BY MS. SASSOON:

5    Q.  Mr. Bankman-Fried, is that you in shorts and a T-shirt on a

6    private plane?

7    A.  Chartered plane, at least, yes.

8    Q.  You also hired planes to fly Amazon packages to the Bahamas

9    for FTX, correct?

10   A.  Not me personally.  I think FTX did something of that sort.

11   Q.  And you authorized that, right?

12   A.  Yeah.

13   Q.  And that cost hundreds of thousands of dollars to fly

14   packages on planes to FTX in the Bahamas?

15   A.  I'm not sure exactly how much it cost.

16   Q.  How much would you approximate it cost?

17   A.  I don't know.

18              MS. SASSOON:  We can take that down.

19   Q.  So you authorized it but you didn't know what it cost.

20   A.  That's—that's correct.

21   Q.  You testified about some money you donated to charity.  Do

22   you recall that?

23   A.  Yup.

24   Q.  And isn't it true that you thought it would be good for FTX

25   public relations to spend millions of dollars in donations each

1    year?

2    A.   I thought that some donations could have public—positive

3    public relations value.  Those were separate from what I was

4    testifying about, but yes.

5    Q.   You also testified about a document retention policy at

6    FTX.  Do you recall that?

7    A.   Yup.

8    Q.   Isn't it true that you set your Signal messages with FTX

9    employees to auto-delete before any such policy went into

10   effect?

11   A.   Yeah.

12   Q.   You testified that investors invested in FTX in the last

13   investment round at a valuation of $40 billion.  Do you recall

14   that testimony?

15   A.   Yup.

16   Q.   And isn't it true that for FTX International, the valuation

17   was actually 32 billion?

18   A.   You're right.  32 plus 8 for FTX.US.

19   Q.   So just to be clear, in that round, FTX International is

20   valued at 32 billion, correct?

21   A.   Yup, that's correct.

22   Q.   You also testified that you wished FTX had done a better

23   job managing risk.  Do you recall that?

24   A.   Yeah.

25   Q.   While you were CEO of FTX, isn't it true that you said the

opposite?

A.  There were times when I did.  Rather, I never said I didn't

want it to do well at managing risk; there were times I said I

thought it had done well.

Q.  And isn't it true that you made statements such as FTX

meeting the highest risk standard around the world?

A.  I'm not sure.  I said things like that.  I'm not sure about

that one in particular.

Q.  Didn't you testify before Congress that "the FTX model

should be able to fit into any regulatory framework with the

highest of risk standards around the world"?

A.  I may have.

          MS. SASSOON:  Mr. Bianco, can you pull up Government

Exhibit 913B.  The government offers Government Exhibit 913B.

          MR. COHEN:  What is this part of?

          MS. SASSOON:  This is an excerpt from congressional

testimony.

          MR. COHEN:  Is it from an exhibit that's already in?

          MS. SASSOON:  No.  The government offers Government

Exhibit 913B.

          MR. COHEN:  Okay.  Your Honor, I'm not sure what's

actually being offered.

          THE COURT:  What's on the screen.

          MR. COHEN:  Yeah.  Can we have some foundation of what

it is then.

1        THE COURT:  Ms. Sassoon?

2        MS. SASSOON:  So I believe 913 is in evidence, and

3   this is another excerpt from that same testimony.

4        MR. COHEN:  Then no objection, your Honor.

5        THE COURT:  Received.

6        (Government's Exhibit 913B received in evidence)

7        MS. SASSOON:  Mr. Bianco, if you could publish that.

8   BY MS. SASSOON:

9   Q.  Do you see, Mr. Bankman-Fried, where it says, "As a result,

10  the FTX model should be able to fit into any regulatory

11  framework with the highest of risk standards around the world"?

12  A.  That's part of the sentence.

13  Q.  Can you see that?

14  A.  Yeah.

15  Q.  And didn't you testify before Congress under oath that a

16  key principle of FTX was performing adequate risk management to

17  protect customer assets?

18  A.  Yup.

19  Q.  You also claimed that FTX had a conservative approach to

20  managing risk, didn't you?

21  A.  On—I'm not sure exactly what that was referring to.

22  Q.  You don't recall saying that?

23  A.  I don't remember the context.

24  Q.  Do you recall saying that in any context?

25  A.  I'm not confident.

1          MS. SASSOON:  Mr. Bianco, if you could pull up what's

2    marked as Government Exhibit 2583.

3          And the government offers Government Exhibit 2583.

4          MR. COHEN:  No objection if it's not for its truth.

5          MS. SASSOON:  Not for its truth, your Honor.

6          THE COURT:  Received on that basis.

7          (Government's Exhibit 2583 received in evidence)

8          MS. SASSOON:  Mr. Bianco, can you scroll down.

9          Can you go up a page, please.

10   BY MS. SASSOON:

11   Q.  Do you see the heading here, Mr. Bankman-Fried, "The FTX

12   risk management system is tested safe and conservative"?

13   A.  I do see that.

14         MS. SASSOON:  We can take that down.

15   Q.  During your time as CEO of FTX, you went so far as to

16   publicly criticize other businesses in the industry that you

17   considered less than maximally responsible in terms of their

18   actual underlying financial health.  Do you recall that?

19   A.  I don't recall that quote.  I recall the sentiment.

20   Q.  And you expressed that publicly, didn't you?

21   A.  At some times.  I'm not sure what you're referring to in

22   particular.

23   Q.  For example, you went on a podcast with Matt Levine in July

24   of 2022 and you criticized other businesses that you said were

25   less than maximally responsible in the industry.  Do you recall

1    that?

2    A.   Vaguely.

3    Q.   And you criticized other crypto businesses that you said

4    had poor risk management.  Do you recall that?

5    A.   Not that phrasing, but I may have.

6    Q.   So yes or no:  Do you recall expressing that sentiment

7    publicly on a podcast with Matt Levine?

8    A.   Yeah, I do.

9    Q.   We've talked a lot about margins.  FTX also had customers

10   who engaged in spot trading, right?

11   A.   Yup.

12   Q.   Customers, for example, like Marc-Antoine Julliard, right?

13   A.   I believe so.

14   Q.   And an example of spot trading is using US dollars, for

15   example, to buy one Bitcoin, right?

16   A.   Yup.

17   Q.   And spot trading does not involve leverage, right?

18   A.   That's correct.

19   Q.   And a customer could join FTX and decide not to opt into

20   the spot margin, right?

21   A.   That's right.

22   Q.   And they could decide not to loan out their assets,

23   correct?

24   A.   That's right.

25   Q.   And isn't it true that in November of 2022, FTX did not

1  prioritize in any way the withdrawals of customers who only did

2  spot trading on the exchange?

3  A.  We didn't get around to doing that at that time, that is

4  correct.

5  Q.  Prior to November 11, 2022, you were at all times the CEO

6  of FTX, correct?

7  A.  Yup.

8  Q.  You worked very hard, right?

9  A.  Yup.

10  Q.  You cared a lot about your business.

11  A.  Yup.

12  Q.  You had a vision for the business, right?

13  A.  Yup.

14  Q.  And you were so focused on the success of your business

15  that you had very little time for anything else, right?

16  A.  Generally, yeah.

17  Q.  For example, you didn't have a lot of time for dating.

18  A.  That's right.

19  Q.  And sometimes I believe you testified you were working 22

20  hours a day, correct?

21  A.  During particularly crazy times, yes.

22  Q.  And is it fair to say you wanted FTX to grow?

23  A.  Yeah.

24  Q.  And you wanted it to be successful.

25  A.  Yup.

1   Q.  And as the owner of Alameda, you also wanted Alameda to

2   make money, right?

3   A.  Yup.

4   Q.  You wanted Alameda to be successful, correct?

5   A.  Yup.

6   Q.  Correct?

7   A.  Yes.

8   Q.  One feature FTX offered was margin trading; is that right?

9   A.  Yes.

10  Q.  And if a customer deposited money, they could trade with

11  some leverage on FTX, correct?

12  A.  Yup.

13  Q.  And margin trading refers to making trades on the FTX

14  exchange, correct?

15  A.  In this context, yes.

16  Q.  I'm asking you about margin trading generally on FTX.  That

17  refers to trading on the FTX exchange, doesn't it?

18  A.  Yup.  Yes.

19  Q.  And FTX had limits for how much leverage a customer could

20  trade with; isn't that right?

21  A.  In general, yes.

22  Q.  And for example, the larger the trade, the less leverage

23  was generally permitted on FTX, correct?

24  A.  Generally; not always.

25  Q.  That was the general rule for the exchange, correct?

1    A.   In many circumstances, yes.

2    Q.   Didn't you advertise that the larger the trade, the lower

3    the leverage?

4    A.   At least at some points in time, that is—I think at many

5    points in time that was true.

6    Q.   And that would include in 2022, correct?

7    A.   I believe so.

8    Q.   Now when you founded FTX, a big selling point was FTX's

9    superior liquidation engine, right?

10   A.   Yup.

11   Q.   You were very proud of that?

12   A.   Yeah.

13   Q.   You marketed it to your customers?

14   A.   Yup.

15   Q.   And to your investors?

16   A.   Yup.

17   Q.   And to Congress.  You described it to Congress?

18   A.   We mostly described the perspective of the FTX.US engine,

19   which had many similarities to the FTX International one.

20   Q.   The FTX.US model was modeled after the FTX International

21   superior liquidation engine, right?

22   A.   That sounds about like what I would have said.

23   Q.   And you marketed this liquidation engine to the public too,

24   right?

25   A.   Yeah.

1   Q.  And sometimes you referred to this as FTX's "risk-reducing

2   market structure"; is that right?

3   A.  I'm not sure about that.

4   Q.  So you have the liquidation engine, sometimes it was

5   referred to as the risk management engine?

6   A.  Yup.

7   Q.  And I want to return to your testimony before Congress.

8          MS. SASSOON:  If we could pull up 913A.

9          And this is testimony before Congress on December 8,

10  2021.  This is in evidence, so if we could publish this for the

11  jury.

12  Q.  And isn't it true that in this testimony before Congress,

13  in December of 2021, you described FTX's "risk-reducing market

14  structure"?

15         MS. SASSOON:  And we could go to the next page.

16  A.  Yeah.

17  Q.  And you talked about its "resilient risk-reducing

18  platform," right?

19  A.  Yup.

20         MS. SASSOON:  And if we could go to the fifth page of

21  this pdf.

22  Q.  Isn't it true that you testified that FTX's "automated risk

23  management systems helped to minimize risk and protect

24  investors"?

25  A.  Yup.

1  Q.  You also testified that "automated risk management systems

2  ensure customer accounts trading multiple different assets do

3  not go net negative across customer positions."  Do you see

4  that?

5  A.  Yup.

6  Q.  And this was a way to prevent losses to other customers on

7  the exchange, correct?

8  A.  Yup.

9  Q.  And when we talk about liquidating an account using the

10 risk engine, that means selling the collateral posted for the

11 account to cover any trading losses, right?

12 A.  In general.

13 Q.  And you claimed to Congress and elsewhere that this

14 liquidation model was safe and conservative, right?

15 A.  That's what I believed.

16 Q.  So yes, you said that publicly, right?

17 A.  Yeah.

18 Q.  And you told the public, for example, that this

19 automatic——and we can take that down——that this automatic

20 liquidation process at FTX would prevent clawbacks, right?

21 A.  Would——I don't think it went quite that far.  That it would

22 help reduce or prevent clawbacks.

23 Q.  So yes or no:  You made statements that your liquidation

24 engine would prevent clawbacks?

25 A.  I don't remember saying it with exactly that phrasing.

1          THE COURT:  Did you say it in words or in substance?

2          THE WITNESS:  With a qualifier, yes.

3    BY MS. SASSOON:

4    Q.  Well, let's pull up your exhibit, Defense Exhibit 6, and

5    look at page 2.

6          This is the white paper for FTT, right?

7          MS. SASSOON:  If we could go to the first page,

8    Mr. Bianco.

9    Q.  I believe you testified on direct exam that it was the FTT

10   white paper?

11   A.  Yup.

12   Q.  And this was posted publicly?

13   A.  Yup.

14         MS. SASSOON:  And if we could go to the second page.

15   Q.  Do you see under "FTX Features" where it says "Preventing

16   Clawbacks"?  Do you see that?

17   A.  I see it saying that it significantly reduces the

18   likelihood of clawbacks.

19   Q.  Do you see the heading "Preventing Clawbacks"?

20   A.  Yes.

21   Q.  And beneath that, as you noted, it says, "FTX significantly

22   reduces the likelihood of clawbacks from ever occurring by

23   using a three-tiered liquidation model."  Do you see that?

24   A.  Yup.

25         MS. SASSOON:  We could take that down.

1    Q.  Isn't it true that you also told the public that there was

2    never a day when FTX customer losses exceeded FTX daily

3    revenue?

4    A.  Yeah.

5    Q.  And you stated that because of that, FTX risk management

6    did not have any big issues, didn't you?

7    A.  That it had not yet had any, yeah.

8    Q.  And you told the public that unlike other exchanges,

9    because of its risk engine, FTX had never had clawbacks, right?

10   A.  I——yeah, I think I probably said that.

11   Q.  And you marketed——I believe you testified that you marketed

12   this engine, and in doing so, didn't you criticize poorly

13   designed exchanges that "lost hundreds of millions of dollars

14   of customer funds to clawbacks"?

15   A.  Yup.

16   Q.  And you claimed that FTX was solving that issue by

17   preventing clawbacks with the three-tiered liquidation model,

18   right?

19   A.  Not without qualifiers.

20          MS. SASSOON:  Well, let's pull up what's marked as

21   Government Exhibit 2534.

22          And Mr. Bianco, if you could scroll.

23   Q.  This is a marketing deck for FTX, correct?

24   A.  I'm not sure.  It looks like one.

25   Q.  And did FTX have marketing decks?

 1   A.  It did sometimes have marketing decks.

 2   Q.  And those decks were shared with people external to FTX,

 3   correct?

 4   A.  Generally, yes.

 5          MS. SASSOON:  The government offers Government

 6   Exhibit 2534.

 7          MR. COHEN:  Objection, foundation.

 8          MS. SASSOON:  Your Honor, we can offer it subject to

 9   connection.

10          THE COURT:  I'll take it subject to connection.

11          (Government's Exhibit 2534 received in evidence)

12          MS. SASSOON:  If we could go to page 4.

13   BY MS. SASSOON:

14   Q.  Do you see here it says, "current futures exchanges are

15   designed really poorly"?

16   A.  I see that.

17   Q.  And do you see the first bullet says those exchanges "lost

18   hundreds of millions of dollars of customer funds to

19   clawbacks"?

20   A.  Yup.

21          MS. SASSOON:  Let's go to page 6.

22   Q.  Do you see at the top where it says "How is FTX Solving

23   These Issues?"

24   A.  Mm-hmm.

25   Q.  And what does it say underneath that?

```
 1              THE COURT:  Sorry.  We need a word.

 2   A.  Yes.

 3   Q.  And what does it say right underneath that?

 4   A.  "Preventing Clawbacks," that it "significantly reduces the

 5   likelihood of clawbacks."

 6   Q.  Mr. Bankman-Fried, what are the two words under the

 7   question of "How is FTX Solving These Issues?"

 8   A.  The first word is "Preventing," the second word is

 9   "Clawbacks."

10   Q.  And in marketing FTX, you said that FTX's three-tiered

11   liquidation model was one way to prevent clawbacks, right?

12   A.  I remember saying that it would——that I believed it would

13   reduce likelihood of them.

14   Q.  And do you not consider reducing the likelihood of

15   clawbacks the same thing as preventing clawbacks?

16   A.  I think it's ambiguous.

17   Q.  And does this page say both?

18   A.  Yeah.  One is as a general header, the other is as a

19   specific statement.

20   Q.  And in describing how FTX would reduce clawbacks, you

21   marketed FTX's fast liquidation process, right?

22   A.  Yeah.  In substance.

23   Q.  And the unique backstop liquidity provider program, right?

24   A.  Yup.

25   Q.  And you also referred to FTX's insurance fund, which you
```

1   stated would prevent customer losses, right?

2   A.  Yup.

3   Q.  Now I think you said you didn't recognize this deck

4   specifically.  Is this consistent with how you marketed the

5   liquidation engine?

6   A.  At a high level, yes.

7   Q.  Is there anything on this page that is different from how

8   you marketed the liquidation engine?

9   A.  I mean, I——I don't think I would have used the phrase "we

10  leverage the insurance fund to prevent customer losses"

11  verbatim, but similar sentiment.

12  Q.  So the substance here is consistent with how you marketed

13  the liquidation engine, correct?

14  A.  More or less.

15  Q.  I believe you testified that you had some involvement in

16  responding to customer support tickets.  Do you recall that?

17  A.  Yup.

18  Q.  And FTX had some internal written guidance for how to

19  respond to customers, didn't it?

20  A.  It may have.

21  Q.  Were you familiar with written guidance for how to respond

22  to customer inquiries?

23  A.  I'm familiar with one or two early documents, or at least I

24  vaguely remember them.  I don't remember the details of them.

25  Q.  Were you aware that FTX had written guidance for frequently

1   asked questions?

2   A.   That rings a bell.

3   Q.   And did you see that type of document?

4   A.   I at least glanced at it.  I don't know whether I read it

5   in detail.

6   Q.   And so you were aware that your employees relied on written

7   guidance to respond to customer support questions.

8   A.   I'm not sure about that.

9   Q.   Well, did you review written guidance for frequently asked

10  questions or not, Mr. Bankman-Fried?

11  A.   I——I remember at one point seeing a document that had a

12  title something like that.  I'm not sure whether it was

13  something employees relied on.

14  Q.   When you saw it, what did you believe it related to?

15  A.   Someone's thoughts——I can't remember if it was mine or

16  someone else's——on ways to respond to some customer support

17  questions.

18  Q.   So did you personally write some thoughts for how to

19  respond to customer support questions?

20  A.   I don't remember.

21  Q.   Didn't you just testify that you wrote your own thoughts

22  for how to respond to customers?

23  A.   I don't think I said that.

24  Q.   So the document that you recall seeing, what was it?

25  A.   I don't remember any details about it.

1    Q.  So yes or no, Mr. Bankman-Fried:  Are you aware that

2    written guidance for responding to customer questions included

3    the statement "FTX doesn't have clawbacks"?

4    A.  That particular phrasing doesn't ring a bell for me.

5    Q.  I'll move on.

6         Mr. Bankman-Fried, you never disclosed to the public

7    that Alameda was not subject to the same automatic liquidation

8    process as other FTX customers, right?

9    A.  I'm not sure we did.

10   Q.  Sitting here today, do you recall ever publicly disclosing

11   that?

12   A.  No.

13   Q.  And in 2022—in 2020, isn't it true that you directed Gary

14   and Nishad to change the rules in the code so that the

15   auto-liquidation rules that applied to other customers on the

16   exchange would not apply in the same way to Alameda?

17   A.  I suggested that they make some alteration to it, yes.

18   Q.  For that purpose, correct?

19   A.  Yup.

20   Q.  And so by 2020, you knew that Alameda had distinct rules

21   for liquidation, correct?

22   A.  Yeah.

23   Q.  And you certainly knew that in May 2022 when you authorized

24   the FTX terms of service, correct?

25   A.  At a high level, yeah.

1    Q.  And you didn't tell FTX customers about this change in the

2    code, correct?

3    A.  I don't think so.

4    Q.  And you didn't tell your investors about this change to the

5    code, correct?

6    A.  I'm not sure.

7    Q.  Do you recall ever telling your investors that you directed

8    this change in the code?

9    A.  No.

10   Q.  And when you told Congress about FTX's liquidation

11   protocol, did you make clear that Alameda's accounts were not

12   subject to the same rules?

13   A.  No.

14   Q.  And what we've just been talking about, that's the "Allow

15   Negative" flag, correct?

16   A.  I'm not sure.

17   Q.  Sitting here today, you're not sure?

18   A.  That's correct.

19   Q.  That's your testimony?

20          MR. COHEN:  Objection.

21          THE COURT:  Overruled.

22   A.  That's correct.

23   Q.  You were CEO of FTX, right?

24   A.  Yes.

25   Q.  And you called the shots as the CEO, didn't you?

```
 1    A.  I called some of them.

 2    Q.  And you're a pretty smart guy, right?

 3              MR. COHEN:  Objection.

 4              THE COURT:  Sustained.

 5    Q.  You think of yourself as a smart guy?

 6              MR. COHEN:  Same objection.

 7              THE COURT:  Overruled.

 8    A.  In many ways.  Not in all ways.

 9    Q.  You went to MIT, correct?

10    A.  Yup.

11    Q.  You studied physics there?

12    A.  Yup.

13    Q.  And as CEO of FTX, you thought highly of yourself, right?

14    A.  I did.

15    Q.  And you were dedicated to the success of your business,

16    right?

17    A.  That's right.

18    Q.  So much so that sometimes you worked seven days a week.

19    A.  Usually.

20    Q.  So much so that sometimes you were too busy to get a

21    haircut, right?

22    A.  Yup.

23    Q.  And I believe you testified that the auto-deleveraging

24    event that preceded this change to the code was potentially

25    catastrophic to the exchange, right?
```

1   A.   That's right.

2   Q.   It presented systemic risk to the entire system and all of

3   its platforms, right?

4   A.   That's right.

5   Q.   And it was potentially very bad for the platform, right?

6   A.   Yup.

7   Q.   So is it your testimony that as CEO of FTX, after this

8   catastrophic event, you did not learn the details of the code

9   change that you directed?

10   A.   That's correct.  I trusted Gary and Nishad.

11   Q.   You testified on direct that FTX had an AWS database,

12   correct?

13   A.   Yup.

14   Q.   And you described its content, right?  For example, it

15   stored customer account information?

16   A.   Yup, that's right.

17   Q.   And it had information about trades?

18   A.   Yup.

19   Q.   And customer balances?

20   A.   Yup.

21   Q.   And as CEO, you had access to the database, correct?

22   A.   Nope.

23   Q.   Your testimony is that you did not have the ability to

24   access the database?

25   A.   I never did.  To my knowledge, I didn't have access to it.

1    Q.  I'm asking you whether you had authorization to search the

2    database.

3    A.  I have no idea whether someone had created an account in my

4    name that in theory was designed for me.  If so, I never used

5    it.

6    Q.  And so it's your testimony that until October 2022, you

7    never looked in the database.

8    A.  That's correct.  And even as of then, I never looked in the

9    AWS database.

10   Q.  After FTX declared bankruptcy, isn't it true that one of

11   the first things you did was try to restore your administrative

12   access to the AWS database?

13   A.  That's not how I would put it.

14   Q.  Isn't it true that in the weeks following the bankruptcy,

15   you asked to have your access to the AWS database restored?

16   A.  Not—I was not specifically looking for my personal access

17   to the AWS database.

18   Q.  Isn't it true you were requesting AWS access?

19   A.  I was requesting it on behalf of the joint provisional

20   liquidators in the Bahamas.

21   Q.  So yes or no:  You made requests to restore access to the

22   AWS database?

23   A.  I'm not sure exactly what you're referring to here.

24          THE COURT:  Look, could you just answer the question

25   instead of trying to ask the questioner what she's referring

1    to?

2              THE WITNESS:  Okay.

3    A.  No.

4    Q.  Isn't it true that you made to-do lists after FTX's

5    collapse that included things like "try to get AWS access"?

6    A.  Probably.

7    Q.  And so isn't it true that you were trying to get AWS access

8    after FTX declared bankruptcy?

9    A.  Yes.

10   Q.  Now putting aside the AWS database, you did know that

11   Alameda had a line of credit with FTX while you were CEO,

12   correct?

13   A.  Yes.

14   Q.  And it's true, isn't it, that most customers of FTX did not

15   have a line of credit, right?

16   A.  That's correct.

17   Q.  Most customers had to post actual assets with FTX in order

18   to borrow money, right?

19   A.  Yes, that's correct.

20   Q.  But you permitted Alameda to borrow without requiring that

21   it post collateral to the exchange, right?

22   A.  To my knowledge, a number of market makers had lines of

23   credit.

24   Q.  That wasn't my question, Mr. Bankman-Fried.  My question

25   was:  You permitted Alameda to borrow from FTX without

1    requiring that it post collateral to the exchange.

2    A.   That was not my understanding at——I'm not sure what time

3    period you're referring to.

4    Q.   Yes or no:  While you were CEO of FTX, you permitted

5    Alameda to borrow from the exchange without requiring it to

6    post collateral in the same fashion as other FTX customers.

7    A.   That does not describe my understanding for most of my

8    tenure as CEO of FTX.

9    Q.   Didn't you just testify that most customers did not have a

10   line of credit?

11   A.   That's correct.

12   Q.   And wasn't the effect of Alameda's line of credit

13   permitting it to borrow without posting collateral?

14   A.   That is correct.

15   Q.   And isn't it true that at least by May of 2022, you

16   understood that Alameda's line of credit permitted Alameda to

17   withdraw money from the exchange without posting collateral?

18   A.   I'm not sure I understood that as of then, no.

19   Q.   You testified under oath in this courtroom before, didn't

20   you?

21   A.   Yup.

22   Q.   And you were asked "In May of 2022, could Alameda's

23   collateral take the form of assets that were not posted to the

24   exchange," correct?

25           MR. COHEN:  Objection.

1          THE COURT:  Could I have a page reference.

2          MS. SASSOON:  Transcript page 2260-61.

3          THE COURT:  What's the objection?

4          MR. COHEN:  For the reasons previously stated, your

5  Honor, we object to the use of this transcript in this fashion.

6          THE COURT:  Overruled.

7  BY MS. SASSOON:

8  Q.  Mr. Bankman-Fried, you testified under oath in this

9  courtroom previously, correct?

10  A.  Yup.

11  Q.  And you were asked, "In May of 2022, could Alameda's

12  collateral take the form of assets that were not posted to the

13  exchange?"  You were asked that, correct?

14  A.  I don't remember exactly what I was asked or what I

15  answered.

16          MS. SASSOON:  Mr. Bianco, can you please pull up

17  Transcript 2260-61.

18  Q.  I want to direct your attention to line 24 on page 2260.

19  You were asked:  "I'm asking about Alameda only.  In your view,

20  in May of 2022, that Alameda's collateral could take the form

21  of assets that were not posted to the exchange."

22          "A.  I had the view that it potentially could."

23          Do you see that?

24  A.  Yes.

25  Q.  And that was your testimony, right?

1    A.  Yeah.

2            MS. SASSOON:  We could take that down.

3    Q.  Now the size of Alameda's line of credit was $65 billion,

4    correct?

5    A.  I believe that was the maximum.

6    Q.  And you testified during your direct about the account

7    info@alameda-research.com, right?

8    A.  Yup.

9            (Continued on next page)

1    Q.  That was Alameda's main trading account, correct?

2    A.  Yup.

3    Q.  And despite your testimony that you never looked in the

4    database, you were familiar with that account, weren't you?

5              MR. COHEN:  Objection to form.

6              THE COURT:  Sustained.

7    Q.  Mr. Bankman-Fried, you were familiar with that account

8    during your time as CEO of FTX, correct?

9    A.  Yup.

10   Q.  And you testified that you understood that the info@

11   account had a negative balance in the billions at various

12   points in time, correct?

13   A.  I don't remember which points in time that was referring

14   to.

15   Q.  Yes or no, you testified that you understood that the info@

16   account had a negative balance in the billions at various

17   points in time?

18   A.  That is not how I remember my testimony.

19   Q.  Didn't you testify, Mr. Bankman-Fried --

20             THE COURT:  There was a court reporter.  So if there

21   is a page and a line --

22             MS. SASSOON:  Yes.  2355, your Honor.

23   Q.  And the quote is, quote:  My understanding was that it was

24   around $2 billion on average of borrowing through the info@

25   account.

1        Did you give that testimony?

2    A.  That sounds about right.

3    Q.  You knew that during your time as FTX CEO, right?

4    A.  Yup.

5    Q.  Just to be clear, you understood that this account had a

6    negative balance in the multiple billions while you were CEO?

7    A.  Overall positive, but negative in some assets.

8    Q.  Wasn't it your testimony that it was your understanding

9    that it was around $2 billion on average of borrowing through

10   that account?

11   A.  Yeah.

12   Q.  You testified last week that you gave Gary and Nishad some

13   instructions to increase Alameda's line of credit on FTX,

14   correct?

15   A.  I gave them suggestions, and I believe that's how they were

16   interpreted, yes.

17   Q.  Isn't it true you testified that you told them it probably

18   made sense to increase the line of credit such that it would be

19   able to continue providing orders.

20        That was your testimony, right?

21   A.  Yeah.

22        MS. SASSOON:  If we could publish Government Exhibit

23   644 in evidence.

24   Q.  This is a snapshot from the AWS database.  I want to direct

25   your attention to the first row, Mr. Bankman-Fried.

1          Just to be clear, in advance of this trial you spent

2   time searching the AWS database, correct?

3   A.  That is correct.

4   Q.  You ran queries in the database?

5   A.  Yup.

6   Q.  You knew how to do that?

7   A.  I learned how to do that, yes.

8   Q.  So, yes, you ran queries?

9   A.  Yes.

10  Q.  And here, for account the user name

11  info@AlamedaResearch.com, Do you see where it says borrow

12  roughly 65 billion?

13  A.  Yup.

14  Q.  Do you see that for this account the allow-negative column

15  is checked?

16  A.  Yes, I do.

17  Q.  Do you see, under spot margin enabled, that is not checked?

18  A.  I do see that.

19  Q.  And spot margin enabled, that's the program that allowed

20  customers who posted collateral to withdraw borrowed funds from

21  the exchange, right?

22  A.  That was the most frequent way, yes.

23  Q.  But spot margin is not enabled for this account?

24  A.  Not on that particular subaccount.

25  Q.  When you say for that particular subaccount, we are talking

1    about the info@AlamedaResearch.com account that you said had a

2    negative balance, correct?

3    A.  We are talking particularly about account 9, one of the

4    accounts on that issuer, yes.

5    Q.  Without spot margin enabled for this account, this account

6    was borrowing using a special line of credit, right?

7    A.  I'm not sure if that's -- I'm not sure if that's exactly

8    the right pricing.  It may be.

9    Q.  It says $65 billion under borrow, right?

10   A.  Yes, I see that.

11   Q.  As CEO, you were aware of lines of credit, correct?

12   A.  Yup.

13   Q.  And that they were not extended to most customers at the

14   exchange, right?

15   A.  Yup.

16   Q.  And I think you testified that lines of credit were

17   provided to other market makers on the exchange.

18          Do you recall that?

19   A.  Yup.

20   Q.  And when we are talking about market makers, I just want to

21   be clear, the typical or average customer of the exchange was

22   not given a line of credit, right?

23   A.  That's essentially correct.

24   Q.  And isn't it true that for other market makers on the

25   exchange with lines of credit, they were prohibited from

1    withdrawing money off the exchange through their line of

2    credit?

3    A.  I'm not a hundred percent confident in that.

4    Q.  Didn't you sign lines-of-credit agreements for market

5    makers of FTX?

6    A.  Um-hum.  Yes, I did.

7    Q.  Didn't those agreements say that the money could not be

8    withdrawn off of the exchange?

9    A.  I think some of them did say that.

10   Q.  And as far as you know, there was no other customer in the

11   exchange with a $65 billion line of credit, correct?

12   A.  That is correct.

13   Q.  And there were no other customers with a line of credit of

14   a billion dollars or more, right?

15   A.  That's correct.

16   Q.  And these other market makers, you didn't own those

17   companies, right?

18   A.  That's correct.

19   Q.  They were not affiliated entities of FTX, correct?

20   A.  That's correct.

21   Q.  So if those market makers made money, you were not the

22   recipient of the profits, right?

23   A.  That's correct.

24            MS. SASSOON:  Now I want to pull up Government Exhibit

25   5, which is in evidence, which the parties have stipulated is a

document called LOCs, dated September 5, 2022.

Q.  Mr. Bankman-Fried, you created this document, right?

A.  It looks like a document I made.

Q.  When you say it looks like a document you made, is the content here the content of a document that you created?

A.  I believe so.

Q.  And you are aware, aren't you, that Google metadata obtained from a search warrant by the government shows that you created this spreadsheet?

        MR. COHEN:  Objection.

        THE COURT:  Sustained as to form.

        MS. SASSOON:  Let's pull up Government Exhibit 5M.

Q.  This is metadata for Government Exhibit 5, correct?

A.  I'm not sure.

Q.  What's the email address associated with the creation information for Government Exhibit 5M?

A.  Sam@alameda-research.

        MS. SASSOON:  We can take that down and if we can pull back up Government Exhibit 5.

Q.  In this document you created, do you see row 2?

A.  I do.

Q.  What is the email in column A?

A.  Info@AlamedaResearch.com.

Q.  What is the number in your spreadsheet in column B in row 2?

1    A.   About 65 billion.

2    Q.   What is the next largest line of credit listed in this

3    spreadsheet you made?

4    A.   150 million.

5    Q.   So Alameda's line of credit was more than $64 billion

6    larger than any other customer, correct?

7    A.   Yup.

8    Q.   Now, by September of 2022, Alameda was only about 2 to 3

9    percent of trades on FTX, right?

10   A.   Yup.

11   Q.   You had successfully gotten a number of other market makers

12   besides Alameda to trade on FTX, right?

13   A.   Yup.

14   Q.   And Alameda was just one of 10 or 15 core market makers, I

15   think you testified?

16   A.   By volume, yes.

17   Q.   So none of those other core market makers ever had a line

18   of credit more than $150 million, right?

19   A.   That's right.

20   Q.   And the purpose of this line of credit was to help FTX

21   customers meet bids and offers on the exchange, right?

22   A.   That was my understanding.

23   Q.   So this was for trading on the exchange, wasn't it?

24   A.   That was my original understanding, yes.

25             MS. SASSOON:   Let's look at Government Exhibit 96 in

evidence.

Q.  You see this says FTX line of credit?

A.  Yup.

Q.  And the first sentence says:  This line of credit

agreement.

         Do you see that?

A.  Yup.

Q.  And the size of this line of credit is $250,000.

         Do you see that?

A.  Yup.

         MS. SASSOON:  Now, let's go to the second page.

Q.  You signed this, right?

A.  Yup.

Q.  And in extending lines of credit to market makers besides

Alameda, this was the type of contract that market makers

signed, right?

A.  At least in some cases.  I am not sure beyond that.

         MS. SASSOON:  Let's go back to the first page.

Q.  Can you name another market maker that did not sign a

line-of-credit agreement?

A.  I'm honestly not sure who did and didn't.

Q.  Let's look at item number 4, funds advanced through the

line of credit.

         Can you read item B.

A.  May not be withdrawn from FTX exchange and.

1   Q.   With respect to this line-of-credit agreement, the line of

2   credit could not be used to withdraw money from the FTX

3   exchange, correct?

4   A.   Yeah.  Or at least that's what the agreement said, yeah.

5   Q.   And Alameda never signed one of these agreements, right?

6   A.   I'm not sure.

7   Q.   Are you aware of a line-of-credit agreement signed by

8   Alameda?

9   A.   I am not aware for almost anyone.

10  Q.   So the answer is no?

11  A.   That's correct.

12  Q.   And Alameda was permitted to use its line of credit to

13  withdraw money from the exchange, right?

14  A.   I now believe that was probably true.

15  Q.   And that was never publicly disclosed, correct?

16  A.   Not that I know of.

17  Q.   Instead, you told the public that FTX viewed Alameda as a

18  neutral piece of market infrastructure, right?

19          MR. COHEN:  Objection to form.

20          THE COURT:  Sustained as to form.

21          MS. SASSOON:  Let's put up what's marked as Government

22  Exhibit 906.

23          The government offers Government Exhibit 906.

24          MR. COHEN:  If it's not offered for its truth, no

25  objection, your Honor.

1           THE COURT:  Received on that basis.

2           (Government Exhibit 906 received in evidence)

3           MS. SASSOON:  If we could publish the first page of

4   Government Exhibit 906.

5   Q.  Mr. Bankman-Fried, do you see this is an article by Kate

6   Rooney published on September 19, 2022?

7   A.  Yup.

8           MS. SASSOON:  If we could go to the next page.

9   Q.  Looking at the second paragraph, do you see where it says:

10  Bankman-Fried said he's worked over the past few years to

11  eliminate conflicts of interest at Alameda.  I don't run

12  Alameda anymore.  None of FTX does.  We view it as a neutral

13  piece of market infrastructure.

14          Do you see that?

15  A.  I do see that.

16  Q.  And you said that, right?

17  A.  Presumably.

18  Q.  Do you recall saying that?

19  A.  Only vaguely.

20  Q.  You deny that you said that?

21  A.  I'm not saying I didn't say it.

22  Q.  Mr. Bankman-Fried, you agree, don't you, that Alameda could

23  never have accumulated a multibillion dollar negative balance

24  in FTX if it had been a regular customer of the exchange,

25  right?

 1          MR. COHEN:  Objection to form.

 2          THE COURT:  Overruled.

 3   A.  I disagree.

 4   Q.  You disagree.

 5          MS. SASSOON:  Mr. Bianco, if you can pull up what's

 6   marked as Government Exhibit 2554.

 7          For the witness, if you could pull up the unredacted

 8   version of this document.

 9   Q.  Mr. Bankman-Fried, this is a document that you wrote after

10   FTX collapsed, right?

11   A.  It looks like one.

12          MS. SASSOON:  The government offers the redacted

13   version of Government Exhibit 2554.

14          MR. COHEN:  No objection.

15          THE COURT:  Received.

16          (Government Exhibit 2554 received in evidence)

17          MS. SASSOON:  Mr. Bianco, if you could publish

18   Government Exhibit 2554.  Let go to page 8.  If we could zoom

19   in on item number 48.

20   Q.  Didn't you write, Mr. Bankman-Fried:  If Alameda had been a

21   100 percent separate completely unrelated trading firm in every

22   way, this wouldn't have happened.  At least it wouldn't have

23   happened to FTX.  Alameda wouldn't have had the fiat@

24   relationship and it wouldn't have had on nearly as large of a

25   position.

1          You see that?

2   A.  I do.

3   Q.  Mr. Bankman-Fried, isn't it true that from the early days

4   of FTX Alameda was allowed to exceed normal borrowing limits on

5   the exchange, yes or no?

6   A.  I am not sure.

7   Q.  Well, as you testified, after FTX collapsed and before you

8   were arrested, you spoke to a number of reporters, right?

9   A.  Yup.

10  Q.  That was before you knew you would be facing criminal

11  charges, correct?

12  A.  Yeah.

13  Q.  Back in early December 2022, didn't you admit to several

14  reporters that Alameda had been allowed to exceed normal

15  borrowing limits on the FTX exchange since its early days, yes

16  or no?

17  A.  I don't remember saying it in that way.

18          MS. SASSOON:  Let's pull up Government Exhibit 2503,

19  which is in evidence.

20  Q.  Do you see this is the article by Joshua Oliver on December

21  4, 2022?

22  A.  Yup.

23          MS. SASSOON:  If we could go to the second page and

24  continue.

25  Q.  Do you see there where it says:  He admitted that Alameda

1    had been allowed to exceed normal borrowing limits on the FTX

2    exchange since its early days.

3              Do you see that?

4    A.  I can read that, yeah.

5    Q.  Are you denying that you said that?

6    A.  I don't think I would have said that in that way.  I am not

7    sure exactly what's that is referring to.

8    Q.  In early December 2022, did you put out any public

9    statement disputing this article?

10   A.  I don't remember.  Probably not.  I disagreed with nearly

11   every article written about me then.

12   Q.  You voluntarily gave interviews to a number of reporters,

13   correct?

14   A.  Yup.

15   Q.  And you made statements on the record, correct?

16   A.  Yup.

17   Q.  Is it your testimony that Josh Oliver wrote something you

18   didn't say?

19   A.  I'm not sure.  That appears to be linking to something.  I

20   am not sure what that is.  I'm not sure the context.

21             MS. SASSOON:  We can take that down.

22   Q.  Fair to say that you never disclosed to customers anything

23   about Alameda being allowed to exceed normal borrowing limits

24   on FTX, right?

25   A.  I think that's right.

1   Q.  You never posted that to Twitter?

2   A.  That's right.

3   Q.  You didn't say it to Congress?

4   A.  That's right.

5   Q.  You didn't say it in advertisements for FTX?

6   A.  That's right.

7   Q.  And you didn't disclose it on the FTX website, right?

8   A.  Not to my knowledge.

9   Q.  And isn't it true that as CEO of FTX you were aware that

10  Alameda had more leeway than other traders on the exchange?

11          MR. COHEN:  Objection.

12          THE COURT:  Sustained as to form.

13  Q.  Mr. Bankman-Fried, isn't it true that you used those words

14  that you knew that Alameda had more leeway than other traders

15  on the FTX exchange?

16  A.  As of when?

17  Q.  Yes or no, do you recall saying that?

18  A.  Not in those words specifically, and I don't know what

19  context it was in.

20          THE COURT:  Sir, do you remember saying that in words

21  or in substance?

22          THE WITNESS:  Referring to -- referring to some

23  particular things in some particular time periods, yes.

24          THE COURT:  Go ahead.  Thank you.

25  Q.  When you say referring to some particular things and time

1   periods, in what ways were you referring to Alameda having more

2   leeway on the exchange?

3   A.  Well, it is certainly the case that -- it is certainly the

4   case that eventually I came to know that Alameda had put on a

5   far larger position than I had anticipated and that that was a

6   result of the, among other things, fiat@ relationship.

7   Q.  It was also the result of the margin rules that did not

8   apply to Alameda, correct?

9   A.  I'm not sure that's how I see it, no.

10  Q.  Zeke Faux, he's a journalist, right?

11  A.  Yes.

12  Q.  I believe you testified you spoke with him a number of

13  times, right?

14  A.  Yes.

15  Q.  In early December 2022, you spoke with Zeke Faux on the

16  record, right?

17  A.  When?

18  Q.  December of 2022.

19  A.  Yes.

20  Q.  He came to your penthouse in the Bahamas, right?

21  A.  Yup.

22  Q.  You spoke with him for hours?

23  A.  I don't remember how long.

24  Q.  It was about 11 hours, wasn't it?

25  A.  No.

1   Q.  More than five, wasn't it?

2   A.  No.

3   Q.  He was at your penthouse for upwards of 10 hours, wasn't

4   he?

5   A.  I am not sure how long he was around there.  I think we

6   spoke for roughly one hour.

7   Q.  And in that in-person meeting didn't you tell him that

8   Alameda did not have to follow the same margin rules as other

9   traders at FTX?

10  A.  I am not sure.  I may have.

11          MS. SASSOON:  Your Honor, permission to approach the

12  witness.

13          THE COURT:  Yes.

14  Q.  I'm handing you Government Exhibit 2511, what's been marked

15  as that.

16          Do you recognize this?

17  A.  No.

18  Q.  You have never seen it before?

19  A.  No.

20          MS. SASSOON:  Then let's pull up what's marked as

21  Government Exhibit 2511A.

22  Q.  Do you recognize this?

23  A.  I recognize -- I didn't read it, but I recognize it.

24  Q.  And this is an article written by Zeke Faux about his time

25  with you in the penthouse, correct?

1  A.  Yes.

2         MS. SASSOON:  The government offers Government Exhibit

3  2511A.

4         MR. COHEN:  As long as it's not for its truth, no

5  objection.

6         THE COURT:  Received on that basis.

7         (Government Exhibit 2511A received in evidence).

8  Q.  If you could turn to page 224 of the book that I handed

9  you.

10         MS. SASSOON:  Mr. Bianco, if you could go to page 6 of

11  the article.

12  Q.  For ease, let's just look at page 6 of the article.  It

13  should be up on your screen.

14         Do you see it says here an article by Zeke Faux --

15         THE COURT:  This is not in evidence, I believe.

16         MS. SASSOON:  I apologize.  The government offers

17  2511A.

18         THE COURT:  Counsel.

19         MR. COHEN:  On the same grounds as before, your Honor.

20         MS. SASSOON:  Mr. Bianco, if you could publish the

21  first page.

22         THE COURT:  No, he can't.  I have not ruled yet.

23         MS. SASSOON:  I apologize, your Honor.

24         THE COURT:  Come to the sidebar, please.

25         (Continued on next page)

1                    (At sidebar)

2                    THE COURT:  If it's not for the truth, what's its

3      relevance?

4                    MS. SASSOON:  Your Honor, it's to impeach because it's

5      inconsistent with his trial testimony.  I think it also is

6      admissible for its truth because it's an adoptive admission.

7                    THE COURT:  How is it an adoptive admission?

8                    MS. SASSOON:  Because this was published publicly, and

9      he never said anything to dispute what's in that article.

10                   THE COURT:  Did you establish that he even read it?

11                   MR. COHEN:  It's in the book that he just said he

12     never saw.

13                   THE COURT:  This is not the book.

14                   MS. SASSOON:  He said there were a number of articles

15     and he didn't like them, so I could ask a follow-up question.

16                   THE COURT:  I think you should.  You know the fact

17     that something appears in a magazine, I have a problem with it.

18                   MR. ROOS:  Judge, is the issue that he is disputing

19     that he said that?  Because if it's two levels of hearsay, his

20     statement is not for the truth or it's the defendant's

21     statement.

22                   THE COURT:  That's a statement to the reporter.  But

23     hearsay as to the reporter saying he said it.

24                   MR. ROOS:  That's what the objection is to.

25                   THE COURT:  That wasn't really his objection.  His

1    objection was, as long as it's not for the truth.  But I'm

2    raising the point, then what's its relevance if it's not for

3    the fact of what the reporter said he said?

4             MR. ROOS:  There are obviously two levels, as your

5    Honor appreciates, of hearsay.  I was understanding his

6    objection to be to the defendant's statement, not for its

7    truth.

8             MR. COHEN:  It's also getting pretty commutative, if

9    you ask me.

10            THE COURT:  I don't know about that.  That's the

11   point.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)

 2          MS. SASSOON:  Mr. Bianco, if you could pull up 2511A

 3  just for the witness.

 4          MR. COHEN:  Your Honor, if we might.  We are having a

 5  technical issue at the defense table.  One minute.

 6          THE COURT:  It's five to 3.  Let's take our afternoon

 7  break, and we will get the plugs resolved.

 8          (Recess)

 9          THE COURT:  Everything plugged back in?

10          MR. COHEN:  Yes, your Honor.  Thank you.

11          (Jury present)

12          THE COURT:  The defendant and the jurors all are

13  present, as they have been throughout.

14          The witness is reminded he is still under oath.

15          You may continue, Ms. Sassoon.

16          MS. SASSOON:  Thank you, your Honor.

17  BY MS. SASSOON:

18  Q.  Mr. Bankman-Fried, yes or no, did you tell Zeke Faux that

19  Alameda did not follow the same margin rules as other traders

20  on FTX and that it had more leeway on the exchange?

21  A.  I don't remember.

22  Q.  I handed you a book marked 2511 before the break.  If you

23  could turn to page 224 and take a look at the bottom.

24          MS. SASSOON:  And for the Court's benefit, Mr. Bianco

25  and defense counsel's benefit, if you could pull up 2511.
```

1    Q.  If you could read to yourself at the bottom of the page,

2    starting what FTX is and ending with he said.

3    A.  I've read that.

4    Q.  Does that refresh your memory about whether you told Zeke

5    Faux that Alameda did not follow the same margin rules as other

6    traders on FTX and that it had more leeway on the exchange?

7    A.  No, it doesn't.

8         MS. SASSOON:  We could take that down.

9    Q.  I want to talk to you about MobileCoin.

10   A.  OK.

11   Q.  You testified about an incident involving MobileCoin,

12   right?

13   A.  Yup.

14   Q.  And that was around April of 2021?

15   A.  That sounds about right.

16   Q.  And you were still CEO of Alameda at the time?

17   A.  Yup.

18   Q.  And on that occasion an FTX customer exploited a loophole

19   in the risk engine, correct?

20   A.  A few of them, yes.

21   Q.  When I say a few of them, you mean a few loopholes?

22   A.  Yes.

23   Q.  And the automatic liquidation engine or risk engine did not

24   shut down the position in time, correct?

25   A.  It didn't shut it down as quickly as I would have wanted it

 1   to.

 2   Q.  And because of that, by the point that you were shutting

 3   down the position, it was too big for any of the backstop

 4   liquidity providers to step in, right?

 5   A.  Outside of Alameda, correct.

 6   Q.  And you said that Alameda stepped in but that was not

 7   through an automatic process, right?

 8   A.  That's right.

 9   Q.  That was a manual intervention, correct?

10   A.  Yup.

11   Q.  And you testified that Alameda was willing to take on the

12   large position of tokens, right?

13   A.  Right.

14   Q.  When you said Alameda was willing, you meant you decided

15   that Alameda would do this, right?

16   A.  Effectively, yes.

17   Q.  Because you were the CEO, correct?

18   A.  Yup.

19   Q.  You testified that the insurance fund wasn't involved

20   because the account still had a positive net asset value,

21   right?

22   A.  Among other reasons.

23   Q.  That was a reason you gave in your testimony, correct?

24   A.  That was one of them, yup.

25   Q.  To be clear, when you decided to transfer this account to

1  Alameda, Alameda ultimately ended up losing about $800 million

2  on this position, right?

3  A.  That wasn't my memory, but I am not sure.

4  Q.  You recall that Alameda lost hundreds of millions of

5  dollars from taking over this account.

6  A.  I recall that it might have.  I don't recall what

7  ultimately happened.

8  Q.  Do you have any memory of Alameda losing any money in

9  taking over this position?

10  A.  I don't recall how it turned out months later.

11  Q.  I didn't hear you.  I'm sorry.

12  A.  I don't recall how it ultimately turned out.  I knew that

13  was a risk.

14  Q.  And so you have no memory one way or the other whether

15  Alameda lost or made money on that position?

16  A.  I wouldn't say I have no memory.  I don't feel confident.

17  I could take a wild guess if you wanted me to.

18  Q.  I don't want you to take a wild guess.

19  A.  OK.

20          MS. SASSOON:  One moment.

21  Q.  And you testified that the tokens in this account that

22  Alameda took over were illiquid, right?

23  A.  At least many of them were at least relatively illiquid.

24  I'm sorry.  That's correct.

25  Q.  What that meant was, if you wanted to sell the tokens, you

1    couldn't get the price at which the tokens has been trading in

2    the very near recent past, correct?

3    A.  That's right.

4    Q.  And so you knew, when you transferred this account to this

5    account to Alameda, that Alameda was going to lose money on the

6    account, right?

7    A.  I don't think I knew it would.  I thought it very well

8    might.

9    Q.  There was no other backstop liquidity provider that would

10   take on this account, correct?

11   A.  That's correct.

12   Q.  That's because it was a loser, right?

13   A.  I'm not sure I'd put it that way.

14   Q.  That's because no other backstop liquidity provider was

15   willing to take on the risk of losing hundreds of millions of

16   dollars on this position, correct?

17   A.  That sounds right.

18   Q.  In this instance, the positive net value of the coin did

19   not translate into millions of available dollars, correct?

20   A.  I suspected that it very well might not.

21   Q.  And yes or no, if Alameda, if you had not transferred this

22   account to Alameda, FTX would have ended up with a loss, right?

23   A.  If I hadn't taken any of my actions, I don't think FTX

24   would have ended up with a loss.

25   Q.  If the account ended up having a negative value, the

1   insurance fund of FTX would have to cover that loss, correct?

2   A.  Yes.

3   Q.  And assuming that loss was in the hundreds of millions of

4   dollars, that would have been a loss larger than daily revenue,

5   correct?

6   A.  Yup, that's right.

7   Q.  And if FTX covered that loss, covered a loss of hundreds of

8   millions of dollars, that would have shown up on FTX's books,

9   correct?

10  A.  Yeah.

11  Q.  And investors would have seen that, correct?

12          MR. COHEN:  Objection.

13          THE COURT:  What's the objection?

14          MR. COHEN:  Speculation.

15          THE COURT:  Sustained as to form.

16  Q.  Mr. Bankman-Fried, in the event that FTX suffered a

17  multihundred million dollar loss, that would show up on FTX's

18  books, right?

19  A.  I presume that it came in a form of like an insurance fund

20  loss, yes.

21  Q.  And FTX sent its financial information to its investors,

22  correct?

23  A.  It ultimately did end up sending them.  I am not sure

24  contemporaneous to that time period.

25  Q.  But it sent financial information about FTX revenue, right?

1    A.  Yeah, that's right.

2    Q.  And expenses, correct?

3    A.  It eventually started sending them.  I am not sure as of

4    then.

5          MS. SASSOON:  If we can pull up Government Exhibit 64.

6    This is in evidence.

7          Mr. Bianco, if you could publish this for the jury,

8    please.

9    Q.  Do you recall Caroline Ellison testified that this was an

10   Alameda update document that she sent to you?

11   A.  I think so.

12         MS. SASSOON:  Mr. Bianco, if you could zoom in on the

13   section:  Notable idiosyncratic PNL stuff.

14   Q.  Do you see where it says negative 850 million from BTMX

15   thing?

16   A.  Yup.

17   Q.  And the MobileCoin exploit, that also involved BTMX,

18   correct?

19   A.  I believe so, yes.

20         MS. SASSOON:  We can take that down.

21   Q.  You did not disclose to FTX's investors that the

22   liquidation engine had been exploited, correct?

23         MR. COHEN:  Objection.  Form.

24         THE COURT:  What's the objection?

25         MR. COHEN:  Form.

1            THE COURT:  Yes, I heard that.  What's wrong with the

2     form?

3            MR. COHEN:  Leading.

4            THE COURT:  Overruled.  It's cross-examination.

5  A.  I had screwed up there as well.

6  Q.  Yes or no, did you disclose to your investors that a

7  customer had exploited FTX's liquidation engine?

8  A.  No.  Although I am not sure that's exactly how I would

9  describe that incident.

10 Q.  A moment ago didn't you say that a customer exploited

11 loopholes in the risk engine?

12 A.  Yes.  I can explain, if you want.

13 Q.  That's all right.

14            You also didn't disclose to customers that a customer

15 had exploited loopholes in the risk engine, correct?

16 A.  Same response.

17 Q.  What's the answer, Mr. Bankman-Fried?

18 A.  No.  That's not exactly how I would phrase it, but that's

19 correct.  I did not.

20 Q.  And this incident in April 2021, soon thereafter, in July

21 2021, you raised about $900 million from investors, right?

22 A.  That's right.

23 Q.  That was from highly respected VC firms?

24 A.  Among others, yes.

25 Q.  You publicized that to your Twitter followers, right?

1    A.   Yup.

2    Q.   You continued to raise money in 2021 and early 2022, right?

3    A.   Yup.

4         MS. SASSOON:   Mr. Bianco, if we could pull up

5    Government Exhibit 1023, which is in evidence, so publish it to

6    the jury.

7    Q.   Mr. Bankman-Fried, do you recall Professor Easton's

8    testimony that this is a list of investors whose funds were

9    transferred from FTX to Alameda between July 2021 and January

10   2022?

11   A.   I don't remember -- I remember at a high level him arguing

12   that.   I don't remember the specifics.

13   Q.   When you say you remember him arguing that, do you recall

14   testimony to that effect?

15   A.   I remember testimony on that topic, yeah.

16   Q.   Ryan Salame, he was one of your trusted employees, right?

17   A.   Yeah.

18   Q.   You considered him a loyal employee?

19   A.   I think I did.

20   Q.   And after you raised more than a billion dollars from

21   investors, you told Ryan Salame to transfer that money to

22   Alameda, didn't you?

23   A.   Nope.

24   Q.   Didn't you tell Ryan Salame something to the effect of, why

25   would you leave the fucking funds just sitting there?

 1  A.  I have no memory of that.

 2  Q.  You have no memory of that?

 3  A.  That's correct.

 4  Q.  Let's talk about EcoSerum.  You testified on direct that in

 5  late 2021 you had some discussions about getting FTX revenue to

 6  a billion dollars, right?

 7  A.  Yup.

 8  Q.  I believe you said you wanted revenue for 2021 to be over a

 9  billion because it's just a round number, right?

10  A.  Ideally, yes.

11  Q.  And you testified that those conversations were in late

12  2021 or early 2022, correct?

13  A.  Sometime around then.  I don't remember exactly when.

14  Q.  And you testified that, around late 2021, Nishad told you

15  that, quote, he had dealt with it?

16  A.  Something to that effect, yes.

17  Q.  And I believe you also testified that at that time Nishad

18  told you he dealt with it by including $50 million worth of

19  EcoSerum staking awards in revenue, correct?

20  A.  Fees on those, yes.

21  Q.  And that got revenue above $1 billion?

22  A.  I believe so.

23  Q.  You testified that when Nishad described this you, you were

24  surprised?

25  A.  Yup.

1    Q.  You had not thought about this at all prior to that?

2    A.  That's right.

3    Q.  As part of your role in raising money for FTX, you sent FTX

4    revenue numbers to your investors, right?

5    A.  That's right.

6    Q.  Something called an FTX stat sheet was among the financial

7    information you sent, right?

8    A.  Yup.

9    Q.  And you sent FTX revenue stats to investors multiple times

10   during 2021, right?

11   A.  Yeah, I believe so.

12         MS. SASSOON:  If we could publish what's in evidence

13   as Government Exhibit 320.

14   Q.  This is an email that you sent to Paradigm, which is one of

15   your VC investors, correct?

16   A.  Yup.

17   Q.  And the attachment to this email on April 25, 2021 says FTX

18   stats, 2021-04-23 Excel.

19         Do you see that?

20   A.  Yes.

21   Q.  And this is that FTX stat sheet we have been talking about?

22   A.  I think so.

23         MS. SASSOON:  Let's take a look at that.  If we could

24   pull up Government Exhibit 320A, the email attachment.

25   Q.  If we look at column E, row 8, at that point, in April of

1    2021, FTX revenue was $705 million.

2            Do you see that?

3    A.   Annualized, yes.

4    Q.   And at that point in time that figure did not include any

5    money from Serum staking fees, right?

6    A.   I'm not sure.  I could guess, make an educated guess, but I

7    am not sure.

8    Q.   What's your educated guess?

9    A.   It probably did.

10           MS. SASSOON:  If we go to the FTX data tab.

11   Q.   This is a breakdown of sources of revenue, right?

12   A.   Yup.

13   Q.   And there is futures revenue, spot fees revenue.

14           MS. SASSOON:  If we could scroll to the right.

15   Q.   There is no column for staking revenue, correct?

16   A.   I don't obviously see one.  There are other things I don't

17   see here as well.

18   Q.   But you don't see a column for staking fee revenue,

19   correct?

20   A.   No.  Not unless it is folded into some other column here.

21           (Continued on next page)

22

23

24

25

 1          MS. SASSOON:  And if we can now pull up Government

 2   Exhibit 51, which is in evidence.

 3   BY MS. SASSOON:

 4   Q.  Do you see that, Mr. Bankman-Fried?

 5   A.  Yup.

 6   Q.  This is also an FTX stat spreadsheet, right?

 7   A.  Yes.

 8   Q.  And this, in column E, row 8, has revenue above a billion

 9   dollars for 2021, right?

10   A.  Yeah.

11   Q.  So this is an FTX stat spreadsheet as of the end of 2021,

12   right, or later?

13   A.  I'm not sure when it's as of.

14   Q.  This would be by the end of the year or later?

15          MR. COHEN:  Objection.

16          THE COURT:  Overruled.

17   A.  It looks like it was—if you scrolled over, I could give

18   you more information about when it was from.

19          MS. SASSOON:  Mr. Bianco, if you could scroll over.

20   A.  Looks like this is from sometime around the fall of 2022.

21   Q.  And so this is after year end 2021 at some point.

22   A.  Yup, by a fair bit.

23   Q.  And this was also sent to investors, right?

24   A.  I'm not sure if this one in particular was.  It may have

25   been.  Some of them were.

1  Q.  And you continued to send FTX stat spreadsheets to

2  investors after 2021, right?

3  A.  Yup.

4  Q.  And the $1 billion revenue figure here includes the

5  EcoSerum staking fees, right?

6  A.  I'm not sure.  Probably.

7  Q.  Didn't you testify that that's what got revenue above a

8  billion dollars?

9  A.  The revenue numbers that I was getting on the FTX

10  spreadsheet were not quite in line with the revenue numbers

11  that were popping up on the financials.  I'm not entirely sure

12  why.

13  Q.  Let's take a look.

14          MS. SASSOON:  Mr. Bianco, there's a tab here called

15  Financials.  If you can keep going among the tabs.  Right

16  there.

17  Q.  And do you see column C, row 31 and 32, you have staking

18  fees of 69 plus million dollars?

19  A.  Yup, I see that.

20  Q.  And so this spreadsheet sent after the end of 2021 does

21  include the staking fees, right?

22  A.  I include some staking fees.  I'm not sure if that's just

23  EcoSerum or if that's also other things.

24          MS. SASSOON:  Now let's pull up Government

25  Exhibit 323, which is in evidence.

```
 1   Q.  Now this document, which says Rewards Agent Agreement, is

 2   about EcoSerum staking fees, right?

 3   A.  Sorry.  Can I read it?

 4   Q.  Sure.  And if you'd like the page turned, let me know and

 5   Mr. Bianco will facilitate that.

 6   A.  All right.  Turn the page.

 7             Turn the page.

 8             Turn the page.

 9             Turn the page.

10             All right.  Yes, that's what this looks like.

11   Q.  And you signed this, right?

12   A.  Yup.

13   Q.  And if we could go back to the first page of the document.

14   It's dated January 1, 2021, right?

15   A.  That's when it's effective as of.

16   Q.  But you didn't sign it on January 1, 2021, right?

17   A.  I probably not.

18   Q.  This document wasn't created until the end of 2021,

19   correct?

20   A.  I'm not sure exactly when it was created, but probably.

21   Q.  Probably because you signed it much later than January 1,

22   2021, correct?

23   A.  That's my guess.

24   Q.  And that's your guess because you don't recall signing it

25   on January 1, 2021, right?
```

1    A.  It's my best guess that I don't specifically recall when I

2    signed this, but given how things unfolded, my guess is that I

3    signed it roughly when you're saying.

4    Q.  And isn't that your guess because, as you testified, you

5    weren't thinking about EcoSerum staking fees at all until late

6    2021, when you wanted to get revenue above a billion dollars?

7    A.  Yup, that's right.

8    Q.  And this wasn't the first time that you signed a document

9    more than a year after its supposed effective date, correct?

10   A.  I think it was not.

11   Q.  Meaning you had signed other documents more than a year

12   after their supposed effective date, correct?

13   A.  Yup, that's right.

14           MS. SASSOON:  We could take that down.

15   Q.  You testified about a conversation with Caroline Ellison

16   where you discussed maybe Alameda shouldn't have made venture

17   investments.  Do you recall that testimony?

18   A.  Yeah, I remember that.

19   Q.  Now when we're talking about maybe Alameda shouldn't have

20   made venture investments, you made the decision for those

21   venture investments, right?

22   A.  For some of them.

23   Q.  It was your decision to spend several billions of dollars

24   on venture investments in 2021 and 2022, correct?

25   A.  Yeah, I think a few billion——excuse me.  Sorry.  I think a

1   few billion of them were my decision.

2   Q.  For example, it was your decision to buy out Binance's

3   equity stake in FTX for about $2 billion in July of 2021,

4   right?

5   A.  I was heavily involved in those discussions.  There

6   were——the discussions of what to do, I likely was the one who

7   ultimately pulled the trigger.

8   Q.  You were the final decision-maker, correct?

9   A.  Yeah.

10  Q.  And some of the investments that you directed depended for

11  their success on the crypto market continuing to perform well,

12  correct?

13  A.  Yeah.

14  Q.  For example, I think you said the crypto mining company GDA

15  was one example of that.

16  A.  Yup.

17  Q.  And when I say GDA, I mean Genesis Digital Assets.

18  A.  Yup, that's right.

19  Q.  And you thought those investments were worthwhile, right?

20  A.  I did.

21  Q.  And you were willing to take on the risk of a market

22  downturn and make those investments.

23  A.  I was——I was excited to do so if they were hedged.

24  Q.  Well, you made many of these investments before Alameda was

25  hedged, right?

1   A.   My understanding at the time I made them, that Alameda

2   would be promptly hedging them.

3   Q.   Well, yes or no:  You made some of those investment

4   decisions before Alameda was actually hedged.

5   A.   Before they actually hedged, yes.

6   Q.   And you thought that there was a chance those investments

7   could make a lot of money, right?

8   A.   Yeah.

9   Q.   And when Alameda wasn't hedged, there was also risk

10   associated with these investments, right?

11   A.   Yeah.

12   Q.   And even with hedging, there was still risk, correct?

13   A.   Yes, risk never goes to zero.

14   Q.   You considered yourself risk neutral while you were CEO of

15   FTX, right?

16   A.   I——in particular contexts, yes.

17   Q.   For example, in the context of investment decisions, right?

18   A.   It depends on the size of the investment.

19   Q.   For some of these venture investments you took a

20   risk-neutral approach, correct?

21   A.   On noncorrelated small factors, yes.

22   Q.   So I want to understand what you mean by that.  Put in

23   simple terms, didn't you consider yourself more comfortable

24   than other people doing things, making investment decisions

25   that might backfire if there was a chance at making a lot of

money?

1

2          MR. COHEN:  Objection, form.

3          THE COURT:  Overruled.

4  A.  As a general matter, in many contexts, at least compared to

5  many people, I think that was true.

6  Q.  And let's just talk about a few of your other investments.

7          You spent about $23 million buying out your favorite

8  video game, right?

9  A.  Not at the time that I——that we made the acquisition, but

10 yes.

11 Q.  I didn't follow that.  Yes or no:  Did you buy out

12 Storybook Brawl?

13 A.  Yes.

14 Q.  And was that about a $23 million investment?

15 A.  I don't remember the exact number.  That sounds about

16 right.

17 Q.  You also made investments in the media, right?

18 A.  I think there were a few small ones, yeah.

19 Q.  For example, you invested in The Block, which is a

20 cryptocurrency news site, right?

21 A.  Yup.

22 Q.  And among other things, didn't you provide about

23 $16 million to finance the purchase of an apartment in the

24 Bahamas for the CEO of The Block?

25 A.  I don't remember the details.  I know that I was asked if

1   we would loan money with respect to it.  I don't remember what

2   came of that.

3   Q.  So yes or no:  Do you recall helping finance the purchase

4   of an apartment for The Block's CEO?

5   A.  I remember there were discussions around that.  I don't

6   remember what the conclusion was.

7   Q.  So sitting here today, do you recall whether you provided

8   financing for the CEO of The Block to get an apartment?

9          MR. COHEN:  Asked and answered.  Objection.

10          THE COURT:  Overruled.

11   A.  I don't recall for sure.

12   Q.  You might have?

13          MR. COHEN:  Same objection.

14   A.  Yeah, we might have.

15          THE COURT:  Go ahead.

16          MS. SASSOON:  If we could publish Government

17   Exhibit 1029.

18   Q.  This slide refers to a company called Dave Inc.  It was

19   your decision to invest in Dave Inc., correct?

20   A.  I was not the one leading that initiative.

21   Q.  You were part of the decision to invest in Dave, correct?

22   A.  I was part of the decision, yes.

23          MS. SASSOON:  And if we could publish Government

24   Exhibit 1028.

25   Q.  Do you see where it says Skybridge Capital?

 1   A.  I see that.

 2   Q.  You directed the investment in Skybridge Capital, correct?

 3   A.  I wouldn't say I directed it.  I think I approved it.

 4   Q.  You approved it, right?  And you signed the agreement?

 5   A.  I——I probably did.

 6          MS. SASSOON:  And if we could go to Government

 7   Exhibit 1033.

 8   Q.  Do you see where it says Modulo Capital, Inc.?

 9   A.  Yup.

10   Q.  You directed the investment in Modulo, correct?

11   A.  Yeah, I think that's effectively correct.

12          MS. SASSOON:  And we could take that down.

13          Mr. Bianco, if you could publish Government

14   Exhibit 1030.

15   Q.  Do you see where it says K5 Global Holdings?

16   A.  I see that.

17   Q.  You directed the investment in K5, correct?

18   A.  I directed an investment.  I want to be clear.  I'm not

19   saying I directed this investment as displayed there,

20   necessarily, but I did direct an investment in it.

21   Q.  You were the one who decided to provide money to K5, right?

22   A.  Yup.

23          MS. SASSOON:  And if we could publish Government

24   Exhibit 1032.

25   Q.  See where it says Robinhood shares?

A. I see that.

Q. That was your decision to invest in Robinhood, right?

A. Yeah, that's right.

Q. And after those shares were purchased, you transferred them to yourself, right?

A. I'm not sure what you mean by that.

MS. SASSOON: Well, let's pull up Government Exhibit 200 in evidence.

Q. And do you see at the top where it says "Alameda Research, Unanimous Consent of Board of Directors, Stock Transfer"?

A. Yup.

Q. And this is transferring the Robinhood stock to yourself, right?

A. Transferring it from one company that I was a partial owner of to another company I was a partial owner of. Sorry. I'm not sure it says it's transferred to me.

Q. Well, you owned the company that it was transferred to, right?

A. I was one of the owners of both of the companies transferred from and to.

Q. So the company it was transferred to, the only two owners were you and Gary Wang, right?

A. I don't recall whether Nishad was also an owner or not.

Q. So at most, it was you, Gary, and Nishad?

A. Yeah, same as——that's correct, yes.

1   Q.  And this says, "Unanimous Consent of Board of Directors."

2   Looking at the bottom, you were the only member of the board,

3   correct?

4   A.  It looks like it.

5   Q.  Well, were you in fact the only member of the board?

6   A.  I'm not sure which board of directors this is referring to.

7   Q.  Were you the only member of the board of directors of

8   Alameda?  And I'll direct your attention to the second sentence

9   of this document.

10  A.  Of some Alameda entities, not of others.  And my memory, my

11  belief at that point was that I was not——that that was not the

12  case for most Alameda entities.  It appears it was for this one

13  as of then.

14  Q.  So the entity here, Alameda Research Ltd., you were the

15  sole member of the board of directors, correct?

16  A.  This makes it seem like I was as of then.  I probably was

17  as of then.  It wasn't my intention to be.

18  Q.  You said it wasn't your intention to be.  You signed this

19  document, right?

20  A.  Yes.

21  Q.  And this document says you were the chairman and sole

22  member of the board of Alameda Research Ltd., correct?

23  A.  Yup.

24          THE COURT:  You owned 90 percent of the stock, right?

25          THE WITNESS:  That is correct, yes.

```
 1              THE COURT:  So did you become director by mistake or

 2   accident or something else?

 3              THE WITNESS:  No.  I'm not saying I didn't approve

 4   this transfer.  I absolutely did approve this transfer.

 5              MS. SASSOON:  If we could show the witness what's been

 6   marked as Government Exhibit 933.

 7              And Mr. Bianco, if you can scroll.  And my colleagues

 8   can correct me if this is already in evidence.

 9              My colleagues have indicated this is in evidence, so

10   we can go ahead and publish it.

11   BY MS. SASSOON:

12   Q.  This is an affidavit that you filed in court, right?

13   A.  I'm not sure.

14   Q.  You don't recognize it?

15   A.  I recognize the topic.  I haven't read through the——I don't

16   know.  Sorry.  I didn't read through this one.

17   Q.  Do you see on this page we're looking at here, it says

18   Affirmation of Samuel Bankman-Fried?

19   A.  Yup.  Yup.  I see that.

20   Q.  And this was submitted to a judicial court, correct?

21   A.  Yes.

22   Q.  And is it your testimony that you submitted an affirmation

23   to a court without reading it?

24   A.  Sorry.  I was saying I had not just now read it.  I hadn't

25   gotten to the point of seeing what this was yet.
```

 1   Q.  Oh, go ahead.  Take your time.  And if you'd like me to

 2   turn the page, that's fine.  Just let us know.

 3   A.  Flip the page.

 4   Q.  And my question——I'm not going to quiz you on the document,

 5   just whether you recall filing this affirmation in court.

 6   A.  Yup, yeah, I do.

 7   Q.  And you filed this after FTX declared bankruptcy, right?

 8   A.  Yup.

 9   Q.  And the purpose of this affirmation was to lay claim to the

10   Robinhood shares, correct?

11   A.  That wasn't how I understood it at the time.

12   Q.  Well, let's look at page 3, paragraph 8.

13          And it says:  "I confirm that there has been no change

14   in the shareholding and that the shares are still legally and

15   beneficially owned as to 90% by me and 10% by Gary."  Do you

16   see that?

17   A.  I see that.

18   Q.  And as stated in this affidavit, those shares were worth

19   about $650 million, right?

20   A.  Something like that, yeah.

21   Q.  And you were asserting that these shares belonged to you,

22   right?

23   A.  That the shares of Emergent belonged to myself and Gary,

24   ultimately mostly for the purposes of the bankruptcy estate,

25   yes.

1  Q.  Here you're saying that the bankruptcy estate doesn't own

2  the shares, you do, correct?

3  A.  It is saying that they were owned, according to Antiguan

4  law, by myself and Gary, yes.

5  Q.  And that entity controlled the Robinhood shares, right?

6  A.  I—that was my understanding at the time.  I'm not sure if

7  it was actually true.

8  Q.  And at the time you filed this affidavit, many FTX

9  customers could still not access their funds that were on the

10  exchange, right?

11          MR. COHEN:  Objection.

12          THE COURT:  Ground.

13          MR. COHEN:  Relevance.

14          MS. SASSOON:  May I proffer the relevance, your Honor.

15          THE COURT:  Come to the sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. SASSOON:  Your Honor, it goes to intent and proof

3   of the crimes because customer money was spent to buy these

4   shares, and after the bankruptcy, he was trying to get ahold of

5   this money for himself.

6          MR. COHEN:  The government made a pretrial motion that

7   the Court granted not to get into the post-bankruptcy

8   proceedings and prohibiting the defense from offering proof

9   that he was seeking to make customers whole and in fact, they

10  had not suffered the losses that they claimed.  I don't know

11  how the government could have it both ways here, Judge.

12         THE COURT:  It's not a matter of both ways.

13  Overruled.

14         (Continued on next page)

1          (In open court)

2          THE COURT:  The objection is overruled.

3   BY MS. SASSOON:

4   Q.  Mr. Bankman-Fried, at the time that you asserted ownership

5   over these shares, you were aware, weren't you, that many FTX

6   customers were still unable to access their funds in FTX?

7   A.  Extremely aware.

8   Q.  And isn't it true that after FTX collapsed you considered

9   calling the Robinhood broker to see if the broker would give

10  you the shares without thinking about it?

11  A.  When are you referring to?

12  Q.  After FTX declared bankruptcy, isn't it true that you

13  considered calling the Robinhood broker to see if the broker

14  would give you the shares without thinking about it?

15  A.  Yeah.  My intention was to hand it to the provisional

16  liquidators.

17  Q.  That wasn't my question, Mr. Bankman-Fried.

18          THE COURT:  Answer stricken.  Answer stricken.  Pose

19  the question again, please.

20  Q.  After FTX declared bankruptcy, you considered calling the

21  Robinhood broker to see if the broker would give you the shares

22  without thinking about it, correct?

23  A.  I didn't actually consider doing that.

24          MS. SASSOON:  Mr. Bianco, can you pull up Government

25  Exhibit 2556.

1    Q.  Mr. Bankman-Fried, do you recognize this as portions of a

2    document that you wrote in December of 2022?

3    A.  Yup.

4           MS. SASSOON:  The government offers Government

5    Exhibit 2556.

6           MR. COHEN:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 2556 received in evidence)

9           MS. SASSOON:  Mr. Bianco, for now, if you could just

10   publish from the date at the top through item No. 3.  If you

11   could zoom in on that and publish it.

12   BY MS. SASSOON:

13   Q.  Mr. Bankman-Fried, you wrote this document, right?

14   A.  Yup.

15   Q.  And the date here is 2022-12-25, right?

16   A.  Yup.

17   Q.  And item No. 3 says, "Should I try calling up the broker

18   HOOD is with and see if they'll just give me the shares without

19   thinking about it?"

20   A.  I see that.

21   Q.  And HOOD, that stands for Robinhood?

22   A.  Yup.

23          MS. SASSOON:  We could take that down.

24   Q.  Would you agree, Mr. Bankman-Fried, that ultimately,

25   Alameda's venture investments were too large?

1    A.  Given that it didn't hedge them, yes.

2    Q.  And would you agree that Alameda's venture investments used

3    up too much of Alameda's balance sheet?

4    A.  Given that it didn't hedge them, yes.

5    Q.  And would you agree that they used up too much of Alameda's

6    balance sheet, especially if you considered the risk of a

7    crash?

8    A.  Same answer.

9    Q.  If you could answer the question, Mr. Bankman-Fried.

10   A.  I——given that it did not end up hedging them, yes.

11          MS. SASSOON:  Mr. Bianco, if you could pull up

12   Government Exhibit 2554 for the witness.  And scroll down.

13          I believe this is in evidence, so if we could publish

14   this page, please.

15   Q.  I want to direct your attention to the top,

16   Mr. Bankman-Fried.

17          And you wrote this, right?

18   A.  Yup.

19   Q.  And do you see where it says:

20          "Alameda's VC investments. . . were too large and used

21   up too much balance sheet, especially once you think about the

22   real crash scenarios that could come"?

23   A.  Yup.

24   Q.  Does it say anywhere here, "because of the failure to

25   hedge"?

1   A.  Not in those two sentences it doesn't.  It does in the rest

2   of the document.

3   Q.  Does it say in this sentence anything about hedging?

4   A.  Not in that sentence, no.

5         MS. SASSOON:  If we could take that down.

6   Q.  So I want to talk to you about hedging.  This is something

7   you were concerned about throughout 2022, right?

8   A.  Yup.

9   Q.  You discussed it with Caroline, right?

10  A.  Yes, that's right.

11  Q.  It's your testimony that you told her to hedge, right?

12  A.  I—I suggested it, yes.

13  Q.  And in May, when Terra and Luna collapsed, you were unhappy

14  that Caroline had not hedged, right?

15  A.  Yup.

16  Q.  You knew in May that the failure to hedge had a negative

17  effect on Alameda's net asset value, right?

18  A.  Yup.

19  Q.  Caroline would send you balance sheets, I think you

20  testified, right?

21  A.  Yup.

22  Q.  And she did that about once every couple months?

23  A.  Yup.

24  Q.  And you would review them.

25  A.  Yup.

1    Q.  And so you knew that Alameda's positive assets included

2    substantial holdings in what we've been calling Sam coins,

3    right?

4    A.  Yes.

5    Q.  Things like FTT?

6    A.  Yup.

7    Q.  And Serum?

8    A.  No.

9    Q.  Solana?

10   A.  Yes.

11   Q.  And Alameda was a large holder of FTT and Solana, right?

12   A.  Yup.

13   Q.  And this failure to hedge that you've talked about, that

14   continued throughout 2022, right?

15   A.  Not through all of 2022.  Eventually Alameda did hedge.

16   Q.  And that was after June, right?

17   A.  Yup, that's right.

18   Q.  And so when crypto prices crashed in May 2022, you were

19   aware that Alameda at that time was not hedged, right?

20   A.  I'm not sure exactly what I was aware of.  I suspected it

21   had not hedged.  It depends on exactly when you're asking as

22   of.

23   Q.  Well, in May 2022, you learned that Alameda still had not

24   hedged, right?

25   A.  Yup, that's right.

 1   Q.  And so you knew that the value of its cryptocurrencies had

 2   gone down.

 3   A.  Yup.

 4   Q.  And you knew also that Alameda was highly leveraged around

 5   that time, right?

 6   A.  I don't know what you mean by "highly."  I knew it was

 7   leveraged.

 8   Q.  I think you testified that Alameda had been leveraged long

 9   the market for the prior year, right, yes or no?

10   A.  Yes.

11   Q.  And that was because of investments in crypto?

12   A.  Yup.

13   Q.  Including venture investments, right?

14   A.  Yup.

15   Q.  And so it was leveraged in part as a result of the venture

16   investments you directed, correct?

17   A.  Yes.

18   Q.  And in June of 2022, you were aware that Alameda's

19   third-party loans were being recalled, right?

20   A.  I was aware that some fraction of them were.

21   Q.  And you were aware that billions of dollars in loans were

22   being recalled, weren't you?

23   A.  It depends on when in June you're talking about.  One

24   to—1 billion roughly at the beginning was my understanding.

25   Q.  So by the beginning of June you knew that around a billion

1   dollars had been recalled?

2   A.   Sorry.  By shortly after the bug fix meeting.

3   Q.   And so what date do you give to the bug fix meeting?

4   A.   I think that was, I think——so June 13th is I think the date

5   that the coin crashed, so I think it was——it was that date plus

6   or minus a day.

7   Q.   And so within a day or two of that, you knew that about a

8   billion dollars of loans had been recalled?

9   A.   Yeah, I——something to that effect, yes.

10  Q.   When you say "something to that effect," do you mean within

11  a day of that or——

12  A.   Within a day of that was what my knowledge was as of.  I'm

13  not sure if I'm recalling a figure from like a week-long period

14  or a month-long period, going into that.

15  Q.   So——

16  A.   Like how long looking back that billion was over.

17  Q.   So sitting here today, what's your best memory of when you

18  understood that about a billion dollars of loans had been

19  recalled?

20  A.   Oh, yeah.  Within a few days of the mid-June crash, I was

21  aware that about a billion had been recalled.

22  Q.   That was a stressful time, wasn't it?

23  A.   Yeah, it was a——a relatively stressful time and extremely

24  stressful few hours.

25  Q.   And when you talk about "extremely stressful few hours,"

1    are you talking about Caroline telling you that Alameda might

2    be bankrupt?

3    A.  Yup.

4    Q.  And Alameda's assets had plunged, right?

5    A.  Yup.

6    Q.  And the crypto markets overall were not doing well?

7    A.  Yup.

8    Q.  And several crypto companies that were fairly large were on

9    the verge of collapsing, right?

10   A.  Roughly.  I don't know exactly what you're referring to,

11   whether they had just collapsed or were going to soon or were

12   on the verge of, but roughly, yes.

13   Q.  The whole industry was at risk, right?

14   A.  Much of it was, yeah.

15   Q.  And you, around that time, were having some calls with some

16   of Alameda's lenders?

17   A.  Yup.

18   Q.  And I think you said the situation was so concerning that

19   you actually canceled a trip to Washington, DC, right?

20   A.  I pushed it back before the bug was discovered.

21   Q.  And you understood in the discussions you were having

22   around that time that to repay Alameda's lenders would require

23   Alameda to borrow more money from FTX, right?

24   A.  No.

25   Q.  That's your testimony?

1    A.   That's correct.

2    Q.   So it's your testimony that you did not know repaying

3    Alameda's lenders would involve borrowing money from FTX.

4    A.   That is correct.

5    Q.   Isn't it true that you had a meeting in FTX's Bahamas

6    office with Caroline and other employees?

7    A.   There were discussions, yeah.

8    Q.   And during this meeting didn't you discuss that Alameda's

9    access to third-party loans was being pulled back and it might

10   need to borrow more from FTX?

11   A.   That's not my memory of it.

12   Q.   We talked earlier about an interview you did with Josh

13   Oliver.  Do you recall that?

14   A.   Which—is this the December interview?

15   Q.   Yes.

16   A.   Yup.

17   Q.   And this is before you were under indictment, right?

18   A.   I'm not sure if it was before I was under indictment.  I

19   think it's before I was aware that I certainly was.

20   Q.   It was before you were arrested, correct?

21   A.   Yup.

22   Q.   Before you had any knowledge of a federal indictment,

23   correct?

24   A.   Certainly before I had confident knowledge.

25   Q.   And in this interview with Josh Oliver, didn't you state

1    that you met with employees who said that Alameda's access to

2    third-party loans is being cut back and it might need to borrow

3    more money from FTX?

4    A.  I don't remember exactly what I said to him or the context.

5    I did not believe that Alameda did need to borrow from FTX in

6    order to process the loan repayments.

7    Q.  Yes or no:  Do you recall saying that in the meeting it was

8    stated that Alameda would need to borrow more from FTX to repay

9    its loans?

10   A.  I'm not sure whether that——whether or not that was floated

11   out at one point or another.  My memory is that was ultimately

12   decided that that was not the case and that the financials

13   confirmed that was not the case.

14         MS. SASSOON:  If we could pull up Government

15   Exhibit 2503 in evidence.  Go to the third page.

16   Q.  And I want to direct your attention to where it says, "He

17   recalled at least one meeting."  Do you see that paragraph?

18   A.  I'm not sure what that's referring to.

19         MS. SASSOON:  We can take that down.

20   A.  Among other things, it says May.

21         THE COURT:  There's no question pending,

22   Mr. Bankman-Fried.

23         THE WITNESS:  Understood.  Sorry.

24   Q.  Isn't it true that in these meetings about Alameda's loan

25   recalls, you decided, in your words, to extend Alameda more

1    credit?

2    A.   That's not exactly how I remember it.

3    Q.   How do you remember it?

4    A.   My memory is that the level of credit utilization by

5    Alameda did not substantially increase.

6    Q.   So yes or no:  Do you recall saying that you decided to

7    extend Alameda more credit at this time?

8    A.   I don't recall saying that.  I'm not sure I didn't say

9    something sort of like that.

10   Q.   Do you recall saying that to Zeke Faux in December of 2022?

11   A.   Not particularly, no.

12   Q.   You didn't say it or you don't recall saying it?

13   A.   I don't think I said it in those words.  I can't recall

14   saying it in any words, but I can't recall some of what I did

15   say, so I'm not sure.

16   Q.   If you could take a look at that book that I handed you.

17   Is it still up there?

18           MS. SASSOON:  And for the Court, Mr. Bianco, can you

19   pull up Government Exhibit 2511.

20   Q.   And Mr. Bankman-Fried, I want to direct you to page 227.

21   A.   Okay.

22   Q.   Okay.  Mr. Bankman-Fried, did you tell Zeke Faux that after

23   the Luna crashed, when Alameda repaid its debts, that this was

24   the point at which Alameda's margin position on FTX got more

25   leveraged substantially?

1    A.  I don't remember that, and I'm not sure exactly what that's

2    referring to and whether it's referring to——

3    Q.  I'm not asking you to refer to the document, which is not

4    in evidence.  I'm asking you if you recall saying that to Zeke

5    Faux.

6    A.  I don't, no.

7         MS. SASSOON:  You can take that down.

8    Q.  At the time that Alameda was repaying its debts, you told

9    Caroline Ellison that she should repay the lenders in June,

10   right?

11   A.  I agreed that it likely made sense to.

12   Q.  And when you agreed that it made sense to repay Alameda's

13   lenders, you knew at that time that this put the FTX exchange

14   at risk, didn't you?

15   A.  That's not how I was thinking of it.

16   Q.  I'm not asking how you were thinking of it.  I'm asking,

17   did you know that this put the FTX exchange at risk?

18   A.  No, I did not.

19   Q.  So your testimony is that you didn't know at the time that

20   there was a risk that Alameda would never be able to repay its

21   debts to FTX.

22        MR. COHEN:  Objection.  Asked and answered.

23        THE COURT:  Overruled.

24   A.  I did not at that time think that the odds of that were

25   significant.

1   Q.  So when you say you didn't know at the time that the odds

2   were significant, you understood that that was a risk, correct?

3   A.  There's always a risk with margin trading that there would

4   be clawbacks.

5   Q.  That's not my question, Mr. Bankman-Fried.  My question is

6   whether, in June of 2022, you knew that there was a risk that

7   Alameda specifically might not be able to repay its debts to

8   FTX.

9   A.  I don't remember thinking of it that way.  If you'd asked

10   me, I wouldn't have said that zero was the right number then or

11   ever for margin trading.  I didn't think of there as being a

12   significant risk at that point in time.  But it was not——I

13   would not have said that there was absolutely no risk.

14   Q.  Mr. Bankman-Fried, I didn't ask you about margin trading.

15   I'm asking about Alameda's debt to FTX and whether you

16   understood, in June of 2022, that there was a risk that Alameda

17   could not repay that debt.

18   A.  Okay.  I did not think of that at the time as being a

19   significant risk, but I would not have said that there was no

20   risk at all.

21   Q.  Just to be clear, Mr. Bankman-Fried, taking money from FTX

22   to pay back lenders, that's not margin trading, is it?

23   A.  I'm not——I don't think that's what happened, and I'm also

24   not saying that's not margin trading.

25          THE COURT:  Would you please answer the question.

 1   A.   I'm not sure I agree.   I don't think I agree.

 2   Q.   If Alameda took money off FTX to repay its lenders, that's

 3   not a margin trade, correct?

 4   A.   I'm not sure I agree with that.

 5   Q.   It's your testimony that that's a margin trade.

 6   A.   It's my testimony that it depends on the details, but that

 7   that very well could be a margin trade.   I'm sorry.   It's a

 8   hypothetical.   I'm speculating here.

 9   Q.   You were CEO of FTX, right?

10   A.   Yeah.

11   Q.   And you know what margin trading is, correct?

12   A.   Yeah.   I'm telling you that sounds like a margin trade to

13   me, but it is speculative, so I don't know what to say about

14   that.

15   Q.   Well, this is the question, Mr. Bankman-Fried.

16   A.   Yup.

17   Q.   Is withdrawing money from FTX to repay a lender within your

18   definition of a margin trade?

19   A.   Potentially, yeah.   I can explain if you want.

20   Q.   Do you recall telling Zeke Faux in December of 2022 that

21   when Alameda repaid its third-party lenders, you understood

22   that there was a risk to FTX?

23   A.   I don't recall that, no.

24   Q.   Do you recall saying to Zeke Faux, we were all

25   aware—withdrawn.

1      Do you recall being asked whether you were all aware

2 there was a chance this would not work and saying, "That's

3 right, but I thought the risk was substantially smaller"?

4 A.  I don't recall that in particular, no.

5      MS. SASSOON:  If we could take a look at Government

6 Exhibit 2511.

7 Q.  I'm going to direct you to page 226-227.

8      And I want to direct your attention to the middle of

9 the page, where it starts, "You were."  And just ask you to

10 read those two sentences to yourself.

11 A.  Sorry.  Page 226, you said?

12 Q.  Sorry.  To 227.  You could look at your screen if it might

13 be easier.

14 A.  I don't see anything on it.

15      Okay.

16 Q.  Once you've had a chance to read that, you can look up.

17      Does that refresh your recollection about whether you

18 told—whether Zeke Faux said to you, "You were all aware there

19 was a chance this would not work?"  And you said, "That's

20 right, but I thought that the risk was substantially smaller"?

21 A.  I—it doesn't; not in particular, no.

22 Q.  Isn't it true that after the Terra/Luna crash and Alameda

23 repaying its debts, you understood there was a risk of a hole

24 in FTX customer funds?

25 A.  I didn't believe there was a hole.  I always believed there

1    was a risk of a hole.

2    Q.  And so at that time you understood there was a risk of a

3    hole in FTX customer funds.

4    A.  Just to be clear, I thought there was a risk that at some

5    point in the future there could become a hole as a product of

6    leverage in general.  I don't remember anything more specific

7    to that period of time.

8    Q.  At the time that Alameda repaid its lenders, you knew that

9    Alameda was not hedged, right?

10   A.  I knew around then.  I can't remember the exact sequencing.

11   Q.  Mr. Bankman-Fried, at the time that you agreed to repay

12   Alameda's loans, you had no information at that point in time

13   that Alameda had put on any hedges, correct?

14   A.  That's correct.

15   Q.  And you agreed to repay the lenders anyway, right?

16   A.  That's right.

17              MS. SASSOON:  Now let's pull up Government Exhibit 44.

18   Q.  And let's start at the main tab, which is the first tab.

19   Caroline sent this document to you, correct?

20   A.  She sent a document that at least looked like one of the

21   tabs.  It was probably this document.

22   Q.  You received a document with many alternative tabs from

23   Caroline, correct?

24   A.  I don't remember whether there were many alternative tabs

25   on it.  There very well may have been.

1    Q.  So yes or no:  Do you recall receiving this document from

2    Caroline Ellison?

3    A.  I——I don't recall specifically receiving this document as a

4    whole from her.  I may have, but I don't recall it being in

5    particular this document.

6    Q.  And so what about this document makes you think that you

7    received it from Caroline?

8    A.  I remember receiving a document that at least looks like

9    one of the tabs on it.

10   Q.  And which tab is that?

11   A.  When I looked at Alt 7, that at least looked like the thing

12   I received, but honestly, some of the other tabs could have

13   been it as well.  I don't remember exactly what it said.

14   Q.  So this main tab——

15   A.  Yup.

16   Q.  ——yes or no:  Do you recall seeing this?

17   A.  I don't have a recollection of seeing it, no.

18   Q.  And I want to direct your attention to row 5, columns E and

19   F.

20   A.  Yup.

21   Q.  Where it says "Exchange Borrows," $9.9 billion, do you see

22   that?

23   A.  I see that.

24   Q.  And I just want to compare that to bank balances.  Do you

25   see where it says $525 million?

1    A.  Yup, I see that.

2    Q.  And so it's apparent from this tab that Alameda does not

3    have $8 billion sitting in a bank, correct?

4    A.  I think that's—I think that's right.  I'm not a hundred

5    percent sure how the assets are subdivided, but I think that's

6    right.

7    Q.  It's your testimony you never saw this?

8    A.  I don't think I said I never saw this.  I don't recall

9    whether I saw this.

10   Q.  Do you recall receiving a document from Caroline that had

11   eight tabs?

12   A.  I'm not sure.

13   Q.  Well, yes or no, do you recall receiving a document with

14   eight tabs?

15   A.  I don't recall how many tabs the document I received had.

16   Q.  Do you recall receiving from Caroline a balance sheet with

17   multiple tabs?

18   A.  I assume you mean on or around late June of 2022?

19   Q.  On or around late June 2022, do you recall receiving a

20   spreadsheet with eight tabs?

21   A.  I don't—I don't—I don't specifically recall there being

22   eight-ish tabs on it.  There very well may have been.

23   Q.  Now yesterday you testified about alternative 7.

24   A.  Yup.

25   Q.  And you said you think you recalled seeing that tab, right?

```
1    A.  Or something like that, yeah.

2    Q.  And that's the second tab of this spreadsheet.

3    A.  That's right.

4    Q.  Now by the time you testified, you knew that the government

5    had obtained Google metadata showing that you had viewed this

6    spreadsheet on June 19, 2022; isn't that right?

7              MR. COHEN:  Objection.

8              THE COURT:  Ground?

9              MR. COHEN:  Lacks foundation.

10             THE COURT:  Overruled.

11   A.  I'm not sure how to interpret the metadata.

12   Q.  Yes or no, Mr. Bankman-Fried.

13             THE COURT:  You were not asked how to interpret the

14   metadata.

15             THE WITNESS:  I'm sorry.  Can you repeat the question.

16   I'm sorry.

17   Q.  At the time you testified at this trial, you knew that the

18   government had obtained Google metadata showing that you viewed

19   this spreadsheet, this eight-alternative spreadsheet on

20   June 19, 2022, correct?

21             MR. COHEN:  Objection.

22             THE COURT:  What's the objection?

23             MR. COHEN:  Same objection, your Honor.

24             THE COURT:  Same ruling.

25   A.  I know that—I know that the—there was metadata that
```

1    suggested that—that in my view suggested that I may have

2    viewed it.

3    Q.  So yes, by the time you testified, you were aware of Google

4    metadata related to this exhibit?

5    A.  Yes.

6    Q.  And this exhibit specifically, not a spreadsheet that looks

7    like this exhibit, correct?

8    A.  That's right.

9         MS. SASSOON:  We could take that down.

10   Q.  After June 2022, you continued to direct additional venture

11   investments, right?

12   A.  Yeah.

13   Q.  And you traveled to the Middle East to try to raise

14   billions of dollars, right?

15   A.  Among other things, yeah.

16   Q.  And by September, you knew that Alameda owed FTX more than

17   $10 billion, right?

18   A.  Yup.

19         MS. SASSOON:  And let's pull back up Government

20   Exhibit 5.

21   Q.  And this is the spreadsheet that you acknowledged creating,

22   correct?

23   A.  Yeah.

24   Q.  And I want to direct your attention to columns G and H.

25   A.  Yup.

1    Q.  And you wrote this part of the spreadsheet as well,

2    correct?

3    A.  I believe so, yes.

4    Q.  And looking at row 2, columns G and F, where it says info@,

5    that's a reference to Alameda's info@ trading account, correct?

6    A.  Yup, that's right.

7    Q.  And where it says 55 billion, that's the number you got

8    adding Alameda's account balance to the $65 billion line of

9    credit, correct?

10   A.  Effectively——this——that's the number that was displayed to

11   me and that's where the system had——what the system had done to

12   produce it.

13   Q.  So when you say it was displayed to you, this is a query in

14   the database that you ran, correct?

15   A.  No.  The admin user's dashboard.

16   Q.  I see.  So the admin user dashboard showed a negative

17   $10 billion balance that became $55 billion when you added the

18   line of credit, correct?

19   A.  My memory is that the admin user's dashboard showed a

20   positive $55 billion balance and showed somewhere else a

21   $65 billion line of credit, and they subtracted those out to

22   find the balance net line of credit.

23   Q.  And we can actually see you did that work in row 9.  Do you

24   see where it says net?

25   A.  Yup.

1   Q.   And it says negative 5 billion?

2   A.   Yup.

3   Q.   And the reason it's negative 5 billion and not 10 is

4   because you also added the Cottonwood Grove account of

5   4.477 billion, right?

6   A.   Yes, that's right.

7   Q.   And ventures of 600 million.

8   A.   Yup.

9   Q.   But if you excluded Cottonwood and ventures, you'd get

10  negative 10 billion, correct?

11  A.   That's right.

12  Q.   And you put this together, right?

13  A.   Yup.

14  Q.   And so when you put this together, you had that financial

15  information, didn't you?

16  A.   Yup.

17          MS. SASSOON:   Now we can take that down.

18  Q.   In September, you testified that you considered shutting

19  down Alameda, right?

20  A.   That I suggested that we consider doing it, yes.

21  Q.   And one thought you had was to replace Alameda with Modulo,

22  right?

23  A.   Not fully replace but that perhaps it could hold some of

24  the shares.

25  Q.   And you said to the extent there's a niche for a trading

1    firm, that firm should be Modulo, right?

2    A.   That was part of the argument.  It wasn't something I had

3    confidence in.

4    Q.   And one reason you considered Modulo was because you said

5    it had a much lower PR cost than Alameda, right?

6    A.   I think that's——I don't——I don't remember exactly what I

7    said.

8             MS. SASSOON:  Well, let's pull up Government

9    Exhibit 18.

10   Q.   And if you look at item 6, it says, "To the extent there's

11   a niche for a trading firm, that firm should be Modulo."  And

12   one reason was "it has a much lower PR cost."  Do you see that?

13   A.   Yup, I do.

14   Q.   And by comparison——if we could take that down——your first

15   reason was "the PR hit from Alameda and FTX both existing is

16   really large."  Do you see that?

17   A.   I do.

18   Q.   And the difference between Alameda and Modulo was that it

19   was not as publicly known that you owned a big piece of Modulo,

20   right?

21   A.   That wasn't the only difference.

22   Q.   But in fact, you did own a large piece of Modulo, correct?

23   A.   Significant though far smaller than Alameda.

24   Q.   And the PR hit from Alameda and FTX both existing was

25   because it looked bad that you might still be involved in

1   Alameda, right?

2   A.  At least some of it.  I'm not sure I fully understood the

3   exact causes of the PR hit.

4   Q.  Well, you understood that people considered it suspicious

5   that you owned FTX and also Alameda, a customer on the

6   exchange, right?

7   A.  Yup.

8   Q.  And that's because as the owner of Alameda, you would

9   profit if Alameda profited, right?

10  A.  Yup.

11  Q.  And if Alameda had special privileges on FTX, you would

12  ultimately profit, right?

13  A.  I——it depends.

14  Q.  Well, that's part of the conflict of interest that you were

15  often addressing, right?

16  A.  Yup.

17  Q.  At the same time, though——and we can zoom out——you

18  recognized that you couldn't really shut Alameda down, right?

19  A.  Recognized that when?

20  Q.  Well, in this document, you said, "the main downside here

21  is that given the amount Alameda is doing, we can't really shut

22  it down," right?

23  A.  Yeah, that's right.

24  Q.  And at that point Alameda wasn't the largest market maker

25  on the exchange anymore, right?

1    A.  Well, not by volume.

2    Q.  Right?  There were 10 to 15 other market makers, right?

3    A.  By volume, yes.  Not by some other metrics.

4    Q.  By the metric of volume, Alameda was not the largest market

5    maker anymore, right?

6    A.  That's correct.

7    Q.  And that was actually something you marketed, that Alameda

8    was not a significant market maker anymore, correct?

9    A.  I don't think I would have used quite that phrasing, but

10   yes.

11   Q.  Well, you told that to investors, right?

12   A.  I told that——investors that it was no longer a dominant

13   market maker in terms of volume, yeah.

14   Q.  And you told that to investors in terms of questions you

15   got about conflicts of interest between FTX and Alameda, right?

16   A.  It was in response to a few different things.  That was one

17   of them.

18   Q.  You testified that you had a conversation with Nishad,

19   Gary, and Caroline where you discussed that Alameda had a

20   liability of about 10 billion, right?

21   A.  Yeah.

22   Q.  Where did that conversation happen?

23   A.  I remember at least something roughly to that extent

24   happening in a——an in-person conversation.

25   Q.  Didn't you testify just this morning that you couldn't

1    recall whether it was in person or on Signal?

2    A.  I'm not sure exactly which conversation is being referred

3    to here.  There was an in-person conversation that I was

4    present at which I think something at least roughly to that

5    extent came up.  There may also have been Signal chats.  I

6    can't remember the details.

7          MS. SASSOON:  Your Honor, this is a natural point for

8    me to break, if that's all right with the Court.

9          THE COURT:  It certainly is.

10          Ladies and gentlemen, 9:30 tomorrow morning, please.

11    Counsel remain.

12          THE DEPUTY CLERK:  Jury, come this way, please.  Bring

13    your notebooks with you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1                  (Jury not present)

 2            THE COURT:  Please be seated, everybody.

 3            Mr. Bankman-Fried, you can go back to counsel table.

 4            Time estimate, please, Ms. Sassoon?

 5            MS. SASSOON:  Yes, your Honor.  Certainly expect to

 6       finish before lunch and likely just two more hours or less.

 7            THE COURT:  And then just so I'm clear, the defense

 8       will rest; is that right?

 9            MR. COHEN:  Well, we will have some redirect, your

10       Honor, but yes.

11            THE COURT:  How long, please?

12            MR. COHEN:  I'll know better once I see the transcript

13       tonight, but I would say one to two hours.  Then we will rest.

14            THE COURT:  Thank you.

15            Where does the government think it stands in terms of

16       a rebuttal?

17            MR. REHN:  We're looking at likely one and possibly

18       two witnesses in rebuttal, each of which would be short—less

19       than a half hour on direct.

20            THE COURT:  I don't know where you and Mr. Cohen had

21       left it on identifying people to each other, but fill me in,

22       please.

23            MR. REHN:  Your Honor, we did disclose the identity of

24       the witnesses earlier today during the lunch hour.

25            THE COURT:  So tell me.

1          MR. REHN:  Yes.  One is Rosanne Libretti, who is an

2    FBI data analyst; and the other is Zachary Allen.

3          THE COURT:  Who is that?

4          MR. REHN:  He's an employee of Apollo.

5          THE COURT:  Okay.  So we're going to be well into the

6    afternoon tomorrow, yes?

7          MR. EVERDELL:  Your Honor, just to raise an issue

8    about the two witnesses.  The first witness mentioned by the

9    government, Rosanne Libretti, is a new name for us.  We've

10   never heard of this person before.  I don't know if we have

11   materials for this person.  Possibly we got some during lunch,

12   but we haven't been able to look at them, and it's also my

13   understanding from Mr. Rehn that this——she may be called in

14   rebuttal to Joseph Pimbley, so this may be in the form of a

15   rebuttal expert, in which case we haven't gotten the materials

16   and can't look at them till tonight, so we may have an

17   objection.

18         THE COURT:  Mr. Rehn?

19         MR. REHN:  I informed Mr. Everdell of her testimony at

20   the beginning of the lunch hour and offered she would be in

21   rebuttal to Mr. Pimbley.  He asked me to expedite the

22   disclosure and I sent him the disclosure materials before the

23   end of the lunch hour.

24         THE COURT:  How voluminous?

25         MR. REHN:  They are not voluminous.  It's about a

1    two-page expert disclosure and a single spreadsheet with two

2    charts attached.

3              MR. EVERDELL:  Your Honor, in order to actually

4    understand what these materials are, we're going to have to

5    give them to our expert.  I want to make sure he's available to

6    do this.  This is quite short notice for a rebuttal expert, so

7    we may have an objection to this witness.

8              THE COURT:  Well, look, if you have an objection, I'll

9    deal with it.

10             MR. EVERDELL:  Yes, your Honor.

11             THE COURT:  But you can't expect something other than

12   short notice when you haven't rested your case yet.  I

13   understand it's Mr. Pimbley and he's gone, but it wasn't that

14   much there.

15             Okay.  So in any case, we're going to be probably done

16   with evidence late tomorrow.  All right.  And we'll see what

17   the availability of the jurors for Friday is.

18             Okay.  Anything else we can usefully accomplish

19   tonight?

20             MR. ROOS:  Just if your Honor knows, I know we're not

21   done with the evidence, but a charge conference?

22             THE COURT:  Well, as I said last week, after——

23             MR. ROOS:  I'll withdraw.

24             THE COURT:  After the fat lady sings.  When it's all

25   over, it's all over, not before.

1              You're entitled to it before you sum up, and that's

2     when you're going to find out.

3              Okay.  Thank you very much.

4              THE DEPUTY CLERK:  All rise.

5              (Adjourned to October 31, 2023, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

SAMUEL BANKMAN-FRIED

Direct By Mr. Cohen  . . . . . . . . . . . .2507

Cross By Ms. Sassoon . . . . . . . . . . . .2569

DEFENDANT EXHIBITS

Exhibit No.                              Received

  5   . . . . . . . . . . . . . . . . . . . .2509

1                        GOVERNMENT EXHIBITS

2      Exhibit No.                                    Received

3      318  . . . . . . . . . . . . . . . . . . . . .2627

4      825  . . . . . . . . . . . . . . . . . . . . .2598

5      829  . . . . . . . . . . . . . . . . . . . . .2602

6      855  . . . . . . . . . . . . . . . . . . . . .2611

7      857  . . . . . . . . . . . . . . . . . . . . .2603

8      858  . . . . . . . . . . . . . . . . . . . . .2604

9      900A  . . . . . . . . . . . . . . . . . . . . .2599

10     906  . . . . . . . . . . . . . . . . . . . . .2677

11     907  . . . . . . . . . . . . . . . . . . . . .2638

12     913B  . . . . . . . . . . . . . . . . . . . . .2645

13     1473  . . . . . . . . . . . . . . . . . . . . .2642

14     1630  . . . . . . . . . . . . . . . . . . . . .2573

15     2503  . . . . . . . . . . . . . . . . . . . . .2581

16     2508 and 2508-T  . . . . . . . . . . . . . . .2580

17     2511A  . . . . . . . . . . . . . . . . . . . . .2684

18     2525  . . . . . . . . . . . . . . . . . . . . .2630

19     2534  . . . . . . . . . . . . . . . . . . . . .2655

20     2554  . . . . . . . . . . . . . . . . . . . . .2678

21     2556  . . . . . . . . . . . . . . . . . . . . .2715

22     2570  . . . . . . . . . . . . . . . . . . . . .2597

23     2583  . . . . . . . . . . . . . . . . . . . . .2619

24     2583  . . . . . . . . . . . . . . . . . . . . .2646

25