# EXHIBIT J

Message
---

| | |
|---|---|
| From: | Lloyd, Colin D. [lloydc@sullcrom.com] |
| on behalf of | Lloyd, Colin D. <lloydc@sullcrom.com> [lloydc@sullcrom.com] |
| Sent: | 8/10/2022 10:22:12 PM |
| To: | Sloan, Scott [SSloan@CFTC.gov] |
| CC: | Zach Dexter [zach@ftx.us]; zzext-ryne [ryne@ftx.us]; Donovan, Eileen A. [edonovan@CFTC.gov]; Polley, Theodore [TPolley@CFTC.gov] |
| Subject: | RE: Clearing Policy Follow Up Questions |

Thanks, Scott. We and FTX will review and come back shortly

Colin D. Lloyd
Sullivan & Cromwell LLP
T: (212) 558-3040 | M: (202) 341-1684

**From:** Sloan, Scott <SSloan@CFTC.gov>
**Sent:** Wednesday, August 10, 2022 6:02 PM
**To:** Lloyd, Colin D. <lloydc@sullcrom.com>
**Cc:** Zach Dexter <zach@ftx.us>; zzext-ryne <ryne@ftx.us>; Donovan, Eileen A. <edonovan@CFTC.gov>; Polley, Theodore <TPolley@CFTC.gov>
**Subject:** [EXTERNAL] Clearing Policy Follow Up Questions

Hi Colin,

Below is a list of follow up questions from the your July 12th stay letter submission. I have removed any questions that I had about the risk management framework and will send any that are still relevant after reviewing the new version Brian sent yesterday.

Please let me know if you need additional information or need anything clarified.

Thanks,
Scott

Clearing Policy Questions:

1.      Please explain FTX's and Sam Bankman-Fried's relationship with Alameda Research.
2.      Please provide an update on the current ownership of Ledger Prime and any plans for the organization to be spun off.
3.      On page four of the July 12 stay letter submission, FTX referenced measures that will be put in place to ensure no BLP will have access to confidential information.  Please provide the details of what measures will be put in place.
4.      What is FTX's plan if the BLP capacity replenishment process does not provide the amount of BLP capacity FTX has determined it needs?
5.      Will there be dedicated internal audit staff or will audits be conducted by individuals with other primary responsibilities?
6.      In its internal audit procedures, FTX mentioned a remediation procedure. Which document is the remediation procedure located in?
7.      Please provide a current count of FTX US Derivatives employees and contractors by department or business unit and indicate what if any additional hires are planned if the Commission approves FTX's application.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_001394924
SDNY_06_00632769

8.      Does FTX US Derivatives currently rely on any affiliate for staffing or to conduct any of the processes or functions required to operate the DCO?

---

**This is an external message from: prvs=2146a91c2=SSloan@cftc.gov **

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

CONFIDENTIAL TREATMENT REQUESTED BY FTX

FTX_001394925
SDNY_06_00632770

1. <u>Liquidations may create transaction execution unrelated to price discovery. Liquidations may also increase the potential for a procyclical deleveraging spiral</u> (CP4 (Prevention of Market Disruption), Section 4c-prohibited transactions including the reporting of non bona fide transactions, CP6 (Emergency Authority), and CP9 (Execution of Transactions))

   We infer that this question relates to on-market de-risking transactions rather than transfers of positions to Backstop Liquidity Providers (BLPs). These de-risking transactions on FTX are bona fide, at-risk and arms length transactions. They are not wash sales or fictitious sales or trades used to cause a false or non bona fide price. FTX has implemented controls (described below) and a well-defined process for de-risking accounts; these elements are designed to prevent disruptive trading. We also would note that the controls and parameters that FTX places around its de-risking transactions are generally in excess of what other DCMs have in place to control liquidation transactions entered by FCMs with respect to their customers' positions.

   ### Anti-Procyclicality Controls: Price Banding

   FTX's price bands automatically limit the amount that the price of a traded contract can move in a certain period of time. Price bands are calibrated to approximate the probable "true" clearing price of the traded contract - ensuring that price can move enough to encourage continued trading and liquidity provision - but not so much that a procyclical spiral occurs.

   ### Anti-Procyclical Margin Model Parameters

   FTX includes various add-ons in its margin model, including a concentration charge, stress charge and liquidity charge, designed to facilitate orderly markets and control for procyclicality.

   ### Mechanics of On-Market De-Risking Orders

   When an account falls below its Maintenance Margin Fraction, FTX employs rate-limited on-market de-risking orders to limit the total volume of de-risking orders placed on the order book per interval of time. This limits the impact of on-market de-risking transactions on prices.

   Furthermore, on-market de-risking limit orders are priced such that they are slightly aggressive (buys are priced slightly above the best ask, and sells are priced slightly below the best bid). This helps to attract liquidity to the order book, ensuring an orderly market. Given that these prices are within the context of the market and designed to attract liquidity to the order book, we consider them to be bona fide. We also believe that this approach helps protect the price discovery process.

In sum, the rate-limited nature of on-market liquidations, combined with the slightly aggressive on-market de-risking order pricing, both limit the possibility of procyclicality through on-market liquidations.

2. <u>Customer Protection</u> (CP12 (Protection of Markets and Market Participants))
     i. i.   How did FTX arrive at its proposed margin and auto-liquidation levels?

   **How FTX arrived at margin levels**

   FTX set its proposed margin levels for cash-settled futures contracts according to CFTC Regulation 39.13(g), which specifies a minimum margin period of risk of one day for futures contracts.

   To calculate margin levels in a manner compliant with Regulation 39.13(g), FTX will employ a risk-based methodology primarily driven by a Filtered Historical Simulation (FHS) framework which takes past returns and adjusts them to resemble current and stressed market conditions. FHS is a time-tested and heavily relied upon risk estimation methodology across the industry.

   FTX's implementation results in very conservative estimates of potential 1-day market moves because it uses volatility floors and effectively over weights stress scenarios to address excessive pro-cyclicality. Additional charges cover bid-offer spreads, position concentration, and the potential for excessive stress losses on large portfolios.

   **Background and difference between derisking (on-market) and close-out (off-market) liquidations**

   On-market de-risking orders are initiated when an account's margin fraction drops below its maintenance margin fraction, which is determined based on the margin requirements as described above. Off-market / close-out liquidations are initiated when an account's margin fraction drops below its auto-close margin fraction.

   **How FTX arrived at maintenance margin/on-market de-risking levels**

   Maintenance margin requirements generated by FTX's FHS model ensure that participants post more than enough collateral to cover an orderly 1-day liquidation horizon, even though de-risking a position on FTX usually takes only seconds or minutes. Thus, FTX's compliance with Regulation 39.13(g) results in a far more

FTX-CFTC-0000004880
SDNY_06_00951793

conservative margin requirement than is actually necessary, which decreases the likelihood that de-risking or account close-out takes place. FTX is very confident that markets will remain orderly and well capitalized with respect to open positions.

### How FTX arrived at close-out/off market liquidation levels

The auto-close margin fraction is set at the larger of 25% of the maintenance margin fraction and 3%, to allow for sufficient opportunity to reduce the risk positions of the liquidating account on the order book and thereby increase its margin fraction. The determinants of the auto-close margin fraction may be changed by FTX from time to time as appropriate to manage liquidations in an orderly manner.

### FTX requires appropriate margin levels, boosting customer protections

Some brokers offering competing crypto futures products do not require traders to post the full initial margin level when establishing a position. FTX requires traders to post the full initial margin level before they can place an order.

Specifically, many brokers add leverage to the system by permitting traders to trade on very low "intraday margin" levels that may be fixed amounts per contract, and can be as low as 30% of the initial margin levels required to keep positions overnight.

Traders using these brokerage services face both a) auto-margin calls and b) high liquidation fees, typically by 3:45pm, unless they post the entire amount of initial margin, which can be as high as 300% of the "intraday" margin level. Users typically have no way to get collateral onto these traditional platforms, which do not support crypto transfers, so late in the day.

On FTX, participants must post an appropriate amount of margin - the "inter-day" level - to enter into trades in the first place.

### FTX solves weak customer protections on traditional platforms, which offer crypto products with dangerous auto-margin calls, which can lead to unlimited loss

Retail traders on traditional platforms offering crypto derivatives products may face margin calls, whereby risk positions remain open and accumulate potentially unlimited losses, including during

overnight hours, when traditional derivatives markets remain closed but underlying prices of crypto continue to move.

FTX's model dispenses with this practice in favor of requiring more margin from users, so that under-margining events are more rare, given the same level of price movement.

While on-market de-risking orders may be inconvenient for some institutional traders in traditional markets, they are the only safe approach to use on platforms with large amounts of retail traders.

In fact, the danger of allowing risk positions to remain open (by allowing for margin calls) is so great that both regulators and industry are moving away from the margin call system for retail traders. For example, Interactive Brokers has long disallowed margin calls.

German regulators have begun to ban futures trading using any margining methodology *other than* the methodology FTX uses, on the grounds that margin-call based systems are too risky for retail investors, due to the lack of auto-derisking orders that limit customer losses:
https://www.reedsmith.com/en/perspectives/2022/02/bafin-proposed-ruling-to-prevent-trade-in-futures-with-margin-calls

For all these reasons, FTX provides stronger customer protections against harmful liquidation practices and under-margining than traditional platforms do.

ii. How will the margin/leverage model provide sufficient protection for 24/7/365 trading, e.g.:
   1. During periods of lower liquidity (for example overnight);

      Market-making firms in the crypto derivatives space typically operate around the clock.

      Nonetheless, the calibration of margin levels contemplates all periods during the day.

      As described above, FTX sets margin levels to cover a one day margin period of risk of an account's entire risk position as of 4 pm Eastern. To the extent that price moves thereafter necessitate on-market de-risking orders, they typically only involve reducing a fraction of the account's risk positions, so as to sufficiently increase its margin fraction.

> The real-time risk management engine starts by generating a mildly-aggressive on-market liquidation order for roughly 10% of an account's position, and generally follows up with additional, similar orders as frequently as every second, as necessary. The pricing of on-market de-risking orders should incentivize market makers to provide liquidity to accounts being de-risked.
>
> Further, FTX margin levels are minimum requirements and participants can, and do, typically employ lower levels of leverage than maximally permitted. Consequently, the typical outcome of a significant market move at any hour of any day is typically limited to on-market de-risking orders for a small percentage of participants.

2. When it may be more difficult for customers to add margin during off-business hours, because of when funds from traditional US banks typically clear (e.g., not during the weekend).

   > **24x7 Collateral Transfer Mechanisms**
   >
   > ACH and Stablecoin: FTX plans to support instant transfers from FTX US, which accepts 24x7 cash deposits via stablecoin, ACH and other common payment rails. These instant transfers will work in roughly the same way that FTX plans to credit Kalshi customers for ACH deposits at its clearinghouse: by maintaining a pre-funded facility that fully collateralizes cash settlement risk.
   >
   > Instant bank transfer networks: FTX will continue to support instant bank transfer networks, such as Silvergate Exchange Network and Signature Bank's Signet, which permit 24x7 transfer of fully settled US dollar funds.

   iii. Has FTX performed an analysis to estimate the likelihood and timing of liquidations and adjusted the proposal accordingly to eliminate, or minimize, that likelihood? Specifically, do the models reflect how many days after a trade traders' positions: a) would likely be subject to liquidation; b) be completely liquidated.

   > The typical de-risking transaction is an on-market de-risking limit order, that partially closes a user's position, until the collateral remaining in their account can support the remaining position. This is a desirable transaction from both a retail customer perspective and a venue perspective, because it protects the customer the

against unlimited losses that could otherwise accumulate if the customer were to stay in a position they do not have the collateral to support. Naturally, these transactions also protect the venue by reducing fellow customer risk.

While having to re-enter a position due to auto-derisking might be inconvenient for a traditional institutional trader without access to crypto rails, who may have large amounts of off-platform capital that is hard to move on-venue, it is the only liquidation methodology that is appropriate for retail trading, where accumulation of potentially unlimited losses would be extremely dangerous for the customer.

### General background on probability of liquidation

The probability of liquidations is primarily determined by realized price volatility and the amount of leverage a participant chooses to employ. The margin model adopted by FTX is conservative in that it ensures there is enough margin in the account to cover a one day margin period of risk, even though the actual margin period of risk is much lower due to the real-time nature of the risk system.

### Background: Automated de-risking (on-market liquidation)

However, in practice, if realized price volatility is high and the account's margin fraction drops below its maintenance margin fraction, the de-risking process will be initiated immediately to reduce the risk positions in the account by trading out of them, returning proceeds to the user.

Subject to capacity thresholds, an account may have de-risking orders generated for roughly 10% of its risk position each second while it is in liquidation status.

Importantly, in this case, traders experience a return of remaining collateral, an increase in free collateral available for withdrawal, and retain proceeds from the de-risking order executions, minus normal trading fees.

This automated de-risking is designed to stabilize the user's account and return them to above-water status.

### Background: Close-out/full liquidation

If, despite those on-market de-risking orders, the account's margin fraction drops below its Auto-Close Margin Fraction, it will have its positions closed down against BLPs each second, in size inversely

proportional to the relative level of the account's margin fraction.

Consequently, partial de-risking may be completed within seconds, and full close-out of positions in accounts may be completed within minutes, depending on factors such as the size of the positions, the number of other liquidating accounts, and the margin fraction of the liquidating account.

FTX has no evidence that liquidations (of either type) take 24 hours or more on FTX International, which employs a very similar risk management approach.

For the reasons described below, this fact translates into a relatively high price movement being required prior to liquidation.

**Conclusion: Relationship of margin levels to de-risking and close-out probabilities**

In general, a participant's margin fraction represents the percentage price move they could withstand before the account's collateral is lost. Similarly, the difference between an account's initial margin fraction and their maintenance margin fraction is roughly the percentage price move that would need to occur to move an account into liquidating status. FTX intends to launch with the initial margin fraction scaled at 1.1 times the maintenance margin fraction. However, FTX may later modify the scalar between the initial and maintenance margin fractions as appropriate to ensure the orderly operation of the exchange.

Participants who wish to reduce the probability of having a portion of their account automatically de-risked or closed out can choose to deposit margin in excess of their margin requirements. Stated differently, participants can choose to employ less leverage than is extended to them through the calculation of margin requirements.

In fact, the median account on FTX International does not use any leverage at all.

Also on FTX International, only 5% of accounts use 10x leverage or greater. This means that on FTX.com, relatively few users choose to use leverage levels equivalent to the very low, intra-day margin levels available on traditional US brokers offering crypto futures products. And of course, on FTX US Derivatives, only inter-day margin levels will be available.

iv. After any liquidation has started, if prices move in favor of the trader, will the liquidation process be halted and profits be "returned" to the trader?

Yes, if prices moved such that the trader's account value exceeds the Maintenance Margin Fraction again.

**Detailed explanation**

Profit and loss (P&L) is realized every 30 seconds. P&L realization is automatically paused, however, if there are ongoing liquidations, and resumed when those liquidations finish.

If prices move in favor of the trader, such that the trader's account exceeds the Maintenance Margin Fraction, while an on-market de-risking is ongoing, the liquidation will halt. In this case, yes: a trader will retain unrealized P&L.

**On-market de-risking acts as a protection against further losses in retail customer accounts**

Note that most liquidations - any liquidation when an account is between the Auto-Close Margin level and the Maintenance Margin level - are merely de-risking transactions that result in a sale of the relevant position and a return of remaining collateral to the trader, without liquidation fees beyond normal trading fees.

On-market de-risking orders are priced aggressively by 1-5 basis points relative to the best bid or offer on the order book, and thus do not generate significant losses for the liquidating account. This is a significant customer protection improvement versus traditional exchanges and brokers, many of whom charge extremely high liquidation fees, sometimes up to the entire notional of a contract.

3. <u>Potential abusive trading practices by Backstop Liquidity Providers and other Market Participants</u> (CP 2 (Compliance With Rules), CP3 (Contracts Not Readily Subject to Manipulation), CP12, CP16 (Conflicts of Interest))
    i. To the extent that the proposal intends to utilize Backstop Liquidity Providers, what protections will be implemented to conduct surveillance and enforce against abusive practices, such as activity designed to trigger liquidations?

**Background**

Because of the significant distance, due to Regulation 39.13(g)

margin requirements, between the Auto-Close Margin Fraction ("ACMF", where BLPs are invoked) and the maintenance margin fraction, triggering on-market de-risking orders does not in itself benefit BLPs. This proper calibration of the Auto-Close Margin Fraction is a primary control against abusive practices.

Note that mere auto-derisking orders (also called 'on-market liquidation orders') do not result in users losing collateral or P&L. They are merely returned to cash positions at then-prevailing market prices. Only when an account is past its ACMF, does the BLP program (also called 'off-market liquidation') kick in. This is a significant fact that should provide a high level of comfort with respect to controls against abusive practices, given our conservative calibration of the ACMF.

### Surveillance and Monitoring

Despite the high level of difficulty in abusing a high ACMF-to-maintenance-margin distance, FTX is actively developing and refining, along with its surveillance vendor Eventus, screens and detection algorithms to identify BLPs that may be attempting to generate price volatility so as to trigger off-market liquidations. Some of the screens in particular use a "momentum ignition" framework to identify participants contributing to price volatility, but are then further customized to the BLP program.

### Incentive Structures

Further, FTX notes that there is an element of both price and quantity risk for BLPs in generating price volatility, which may alone disincentivize them from doing so. BLPs share in the positions of closed accounts proportionally to their available capacity, so the benefits from the attempt of one BLP to generate price volatility, if successful, may not accrue to that BLP alone.

BLPs also face price risk connected to the closing of positions. If participant accounts are closed down with a positive margin fraction, then the provider price at which BLPs take over closed positions is advantageous compared to the mark price. But if instead participant accounts are closed down with a close-to-zero or negative margin fraction, then the provider price received by BLPs includes only a small discount relative to the mark price (as small as 30 basis points given current parameterization). BLPs taking over closed positions at this smaller discount may incur losses greater than this amount in risk managing those positions.

<span style="color:red">

As BLPs will not know the distribution of participant account sizes, margin fractions, and auto-close margin fractions at the beginning of a volatility event, they will not know that a given percentage price move will cause an account's margin fraction to drop below its ACMF, and by how much.

Note, too, that the draft BLP Agreement states that each BLP provider "will be subject to market surveillance by [FTX] to monitor its trading activities for compliance with applicable laws and regulations, the Rulebooks and [FTX's] policies and procedures. PROVIDER further acknowledges and agrees that [FTX] may require PROVIDER to return, and PROVIDER agrees to return, collateral received by PROVIDER in connection with the transfer of positions to PROVIDER, in its capacity as a backstop liquidity provider, in connection with the close-out of another participant's positions, if [FTX] determines, in its sole discretion, that (i) PROVIDER engaged in intentional or reckless trading that, directly or indirectly, resulted in the close-out of such other participant's positions or (ii) PROVIDER otherwise violated applicable laws and regulations, [FTX's] Rulebooks or any other applicable [FTX] policies and procedures." This provision of the agreement is designed to ensure that any BLP attempting to trigger liquidations or engage in other abusive practices will face significant economic penalties for doing so, even above and beyond FTX's normal enforcement of its rulebook.

</span>

ii. For example, can you address the following scenarios:
   1. 24/7/365 liquidation means BLPs and other market participants could attempt to take advantage of periods of low liquidity (e.g., night) to trigger liquidations.

      <span style="color:red">**Higher distance between ACMF and Maintenance Margin**

      For FTX US Derivatives, we have floored the Auto-Close Margin Fraction at 3%. Recent backtesting puts typical margin levels, by comparison, much higher - in the double digit percentage range. This results in a much greater distance from the point of auto-derisking, compared to FTX.com, to the point where accounts are closed out. Thus, even if market participants wanted to move the price to trigger automated de-risking, it will be very difficult to move the price enough to gain from that movement by triggering BLP program invocation.

      **Price banding and deeply liquid index methodology**</span>

FTX-CFTC-0000004888
SDNY_06_00951801

Price bands are designed to mitigate this form of potentially abusive practice by bounding the acceptable range of new order prices on FTX, specifically in relation to prices on multiple venues, over short time intervals (e.g., 5-minute increments) including periods with low levels of liquidity. Multiple cryptocurrency spot and futures exchanges are included in the index sources within the FTX price band methodology. Therefore, any market participants seeking to "take advantage of low liquidity" on FTX would need to influence multiple exchange spot and futures price indices as part of their attempted "activity designed to trigger liquidations".

Note too that crypto market makers participate 24x7, not just during traditional market hours, making indices much harder to manipulate.

2. What are the relationships between the current BLPs and FTX?
    1. What steps have been taken to minimize/eliminate conflict of interest concerns?

LedgerPrime is both a wholly owned subsidiary of the parent company of LedgerX LLC (dba FTX US Derivatives), and a Backstop Liquidity Provider. Compliance manual section 10.3 addresses LedgerPrime Conflict of Interest Mitigation. Among other things, those provisions prohibit LedgerX employees from providing LedgerPrime with access to material, non-public information. It also requires such information to be stored in a manner that renders it inaccessible to LedgerPrime. Moreover, DCM Rule 2.5 discloses that LedgerPrime is a wholly-owned subsidiary of the parent company of LedgerX, and that "LedgerPrime does not receive any preferential pricing from the Company and does not have an inherent advantage over any other Participant with respect to latency or Order execution speed." It further states that "LedgerPrime traders are subject to the same access criteria and must abide by the same rules as all other Participants."

Alameda Research LLC ("AR") is not owned by any FTX entity, but is majority owned by Sam Bankman-Fried in his personal capacity (although he is not involved in the day-to-day activities of AR, does not offer trading suggestions, advice, or have control over AR's trading activities). AR also holds approximately 1% of the interests

in the holding company of FTX.com. AR is one amongst many other professional trading participants transacting on both FTX International and FTX.US. In both instances, AR has no preferential fee structures or special or unique access to the exchange, to exchange data, or to any other feature of either exchange, versus that which is available to any other professional trading participant (e.g., AR does have access to the fee schedule tiers available to any user that meets the relevant requirements). Similar to any other professional trading participant, AR may participate in FTX US's borrow-lend book as well as the FTX US letter of credit program, and AR may participate in similar programs on FTX.com. AR also provides liquidity through the over-the-counter and "convert" (i.e., crypto to USD) functionality on the FTX crypto exchanges.

AR does not currently trade on FTX, but FTX expects that AR will be one of the Primary BLPs on FTX following approval of our forthcoming amended application to revise our DCO registration order.

FTX technology is segmented from technology used by affiliates, including any affiliates who may be BLPs, using industry standard access control technology. In addition, FTX communication channels with sensitive information (such as Slack channels and email) are not shared with affiliates, including affiliates that may be BLPs.

3. Does FTX have a draft sample contract/term sheets that FTX expects to sign with BLPs?

   Yes. FTX submitted Letters of Intent totaling $226M from 10 different firms along with our recent submission. We are providing those here; the firms are willing to commit once we have an approved rulebook.

   We've also attached our expected form of BLP Agreement.

4. <u>Apparent broad authority to tear-up trades</u> (CP2, CP11 (Financial Integrity of Transactions)
    i. Proposed DCO Rule 14.3 suggests that FTX has the authority to engage in partial tear-up of trades (referred to as "secondary BLPs") instead of other liquidation methods, including using BLPs, though FTX has stated that this will only be used as a last resort. Our understanding is that secondary BLPs are traders on the right

side of a trade that happen to hold a large position; any market participant could theoretically become a secondary BLP, depending on market circumstances.

Please see revised DCO Rule 14.3 from our August 2022 submission, which clarifies that Secondary BLPs are, absent extraordinary circumstances, called upon only if Primary BLPs are out of capacity. Our revised Operations Manual, included in the same submission, contains policies and procedures for monitoring and replenishing BLP capacity, to protect against this unlikely event.

If the Secondary BLP layer is invoked, it is not any trader on the right side of a defaulting position who is partially torn up first. Rather, it is the largest positions opposite the defaulting positions (starting with the 10 largest opposite-side positions) who face partial tear-up first. Further details can be found in Exhibit G of our revised application for a DCO order amendment.

Note that the DCO must, in its rules, have a mechanism for reducing open interest to balance the clearinghouse's books, as part of its default resolution procedures. This is why the Secondary BLP layer is included; FTX does not intend to utilize the Secondary BLP mechanism in the normal course of operations. In this regard, FTX is similar to the many other DCOs that have included partial tear-up authority within their default waterfalls; moreover, FTX has adopted a more transparent approach than many of those other DCOs by providing additional rules around which participants' positions may face tear-up, as noted above.

ii. Trade adjustments and cancellations (CP2). Regulation 38.157 provides that DCM rules must provide clear, fair, and publicly available trade cancellation standards.
   1. Are you planning any changes to your DCM rules to account for this possibility?

      Partial tear-ups in the FTX waterfall are not cancellations of particular trades, but rather a default resolution mechanism that reduces open interest at the clearinghouse. Accordingly, FTX addresses partial tear-ups in the DCO rulebook. We note that FTX's approach is consistent with the practice of other DCMs and DCOs (e.g., the rulebooks for CME and ICE Clear US both include partial tear-ups as default resolution mechanisms).

5. <u>DCM order for FTX/LedgerX may need to be amended</u>
    i. Does FTX plan to submit a proposal to amend their DCM registration order in connection with the proposed changes to the DCO order?

    <span style="color:red">No; the existing DCM order is sufficient to allow for directly clearing these products without FCMs. (Our revised application, submitted to DCR and the Commission Secretary in August 2022, does not contemplate clearing by FCMs, and only contemplates direct clearing, which is consistent with the existing DCM order.)</span>

6. <u>Operational and Financial Risks to DCM (CP20 (System Safeguards), CP21 (Financial Resources))</u>
    i. Regulation 38.1050 require DCMs to establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk.
        1. Will the liquidation function or BLPs pose unique operational risks? If so, does FTX have policies and procedures in place to manage them? (CP20)

        <span style="color:red">The liquidation function (including the BLP program) is highly automated; thus, operational risks are largely not unique to the liquidation process per se, and are thus addressed through FTX's standard program of controls, including its Enterprise Risk Management framework.

        To the extent these risks differ from risks addressed using other policies and procedures, FTX's draft Operations Manual, submitted as part of our application for an amended DCO order, contains procedures for dealing with manual aspects of the risk waterfall, including capacity monitoring and refills for the Guaranty Fund and BLP program.

        FTX's Margin Parameter Risk Manual, submitted as part of our application for an amended DCO order, contains a description of the parameters involved in the initial margin model and the liquidation process, including information on the procedures and considerations involved in adjusting these parameters.

        Finally, FTX's "Implementation of the Initial Margin Model for Real-time Settlement" document, also submitted as part of</span>

<span style="color:red">our application for an amended DCO order, contains a detailed procedural description of how the automated risk management system functions, and how it applies our risk management policies.</span>

    ii. Regulation 38.1100 requires DCMs to have adequate financial, operational and managerial resources to discharge its responsibilities as a DCM.
        1. Does the operation or facilitation of any proposed liquidation and liquidity pool impose financial or operational costs on the DCM? (CP21)

<span style="color:red">FTX's default waterfall is largely automated, and thus does not impose additional financial or operational costs typically associated with margin management, such as personnel to handle margin calls, etc. FTX has appropriate financial and operational resources to facilitate default waterfall management, including liquidations.</span>

7. Data Reporting
    i. Regulations 16.00, 17.00, and 17.01 include provisions shifting reporting responsibilities from clearing members to DCMs for "exclusively self-cleared contracts." If trading in a particular contract is offered to traders with clearing intermediation, then that contract would no longer meet the "exclusively self-cleared contract" definition.
        1. If FTX onboards FCMs for clearing intermediation (in which case FTX contracts would not meet the definition of "exclusively self-cleared contracts"), will FTX commit to providing all Part 16 and 17 reporting on behalf of retail participants?

<span style="color:red">FTX does not currently plan to onboard FCMs for clearing intermediation. FTX's application to DCR does not contemplate clearing FCMs.</span>

        2. If FTX onboards FCMs for clearing intermediation, does FTX intend to provide Part 16 and 17 reporting only on behalf of non-intermediated retail customers, or would FTX also report on behalf of customers with clearing intermediation?

<span style="color:red">FTX does not currently plan to onboard FCMs for clearing intermediation.</span>

3. Does FTX intend to request that any Part 16 and 17 reporting commitments be included in any amended DCM designation order?

   FTX does not plan to seek an amended DCM order to support the exclusively self-cleared model we have proposed to DCR.

8. <u>Position Limits and Market Surveillance</u> (CP3, CP4, CP5 (Position Limitations or Accountability)
   i. Has FTX analyzed whether the proposed transition to offering margined derivative products would necessitate changes to its approach to position limits and surveillance?

   For margined products, FTX has proposed an approach to position limits and position surveillance that is appropriate for margined derivatives products. We have attached that analysis to these responses.

   Note that physically settled products will not interact with cash settled products from a margin perspective. That is, fully collateralized physically-settled products will not be used to margin the new cash-settled products.