UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :
       :
    - v. -      :
       :  22 Cr. 673 (LAK)
SAMUEL BANKMAN-FRIED,    :
  a/k/a "SBF,"      :
       :
    Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL

SEAN BUCKLEY
Attorney for the Government
Southern District of New York

Danielle Kudla
Thane Rehn
Nicolas Roos
Assistant United States Attorneys

*- Of Counsel -*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

I.      PROCEDURAL HISTORY ........................................................................................... 3

II.     THE GOVERNMENT'S CASE AT TRIAL .................................................................. 3

ARGUMENT ........................................................................................................................ 11

I.      APPLICABLE LAW .................................................................................................. 11

        A.  Motion for a New Trial under Rule 33 ............................................................ 11

        B.  Motion for a New Trial Based on New Evidence ............................................ 12

II.     BANKMAN-FRIED'S MOTION FOR A NEW TRIAL SHOULD BE DENIED .......... 13

        A.  The "Customers Were Made Whole" and "Liquidity Not Solvency" Claims Are
            Both Factually Incorrect and Legally Irrelevant ............................................ 13

        B.  The Defendant's Proffered Evidence is Not "Newly Discovered" And is
            Immaterial ................................................................................................... 16

        C.  The Defendant's Claims of Witness Intimidation Do Not Excuse His Lack of
            Diligence in Presenting this Evidence at Trial ............................................... 34

        D.  The "Newly Discovered" Evidence Would Not Have Resulted in an Acquittal
            Because the Evidence at Trial Was Overwhelming ....................................... 37

        E.  The Defendant's Other Claims Are Meritless ............................................... 40

CONCLUSION ..................................................................................................................... 44

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      Page(s)

*Buie v. Sullivan,*
   923 F.2d 10 (2d Cir. 1990).........................................................................35

*In re Aguinda,*
   241 F.3d 194 (2d Cir. 2001)......................................................................43

*In re Drexel Burnham Lambert, Inc.,*
   861 F.2d 1307 (2d Cir. 1988)....................................................................43

*Liteky v. United States,*
   510 U.S. 540 (1994).................................................................................43

*Smith v. Phillips,*
   455 U.S. 209 (1982).................................................................................35

*U.S. ex rel. Jones v. DeRobertis,*
   766 F.2d 270 (7th Cir. 1985).....................................................................37

*United States v. Bayless,*
   201 F.3d 116 (2d Cir. 2000)................................................................42, 43

*United States v. Bergstein,*
   788 F. App'x 742 (2d Cir. 2019)................................................................16

*United States v. Calderon,*
   944 F.3d 72 (2d Cir. 2019)........................................................................21

*United States v. Cruz,*
   481 F. App'x 650 (2d Cir. 2012).................................................................42

*United States v. Cuevas Pimentel,*
   815 F. Supp. 81 (D. Conn. 1993)...............................................................34

*United States v. DiPaolo,*
   835 F.2d 46 (2d Cir. 1987)........................................................................27

*United States v. Ebbers,*
   458 F.3d 110 (2d Cir. 2006)......................................................................36

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)......................................................................12

*United States v. Forbes,*
   790 F.3d 403 (2d Cir. 2015)......................................................................17

*United States v. Gambino,*
   59 F.3d 353 (2d Cir. 1995)........................................................................11

*United States v. Guang,*
   511 F.3d 110 (2d Cir. 2007)......................................................................12

*United States v. Lange,*
   834 F.3d 58 (2d Cir. 2016)........................................................................32

*United States v. Middlemiss,*
   217 F.3d 112 (2d Cir. 2000)......................................................................26

*United States v. Owen,*
   500 F.3d 83 (2d Cir. 2007)..................................................................passim

*United States v. Pinto,*
   850 F.2d 927 (2d Cir. 1988)......................................................................37

*United States v. Pisani,*
   773 F.2d 397 (2d Cir. 1985) .................................................................................... 43

*United States v. Polanco,*
   510 F. App'x 10 (2d Cir. 2013) ............................................................................... 36

*United States v. Polo,*
   No. 94 Cr. 219 (RPP), 1998 WL 691221 (S.D.N.Y. Sept. 30, 1998) ................................ 28, 31

*United States v. Praetorius,*
   622 F.2d 1054 (2d Cir.1979) ................................................................................... 36

*United States v. Saint Clair,*
   No. 22-2100-CR, 2024 WL 413422 (2d Cir. Feb. 5, 2024) ...................................... 21

*United States v. Sanchez,*
   969 F.2d 1409 (2d Cir. 1992) .................................................................................. 12

*United States v. Siddiqi,*
   959 F.2d 1167 (2d Cir. 1992) .................................................................................. 12

*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006) .................................................................................... 12

*United States v. Stewart,*
   907 F.3d 677 (2d Cir. 2018) .................................................................................... 36

*United States v. Turkish,*
   623 F.2d 769 (2d Cir.1980) ..................................................................................... 36

*United States v. Vargas,*
   961 F.3d 566 (2d Cir. 2020) .................................................................................... 42

*United States v. Vavages,*
   151 F.3d 1185 (9th Cir. 1998) ................................................................................. 37

*United States v. Wallach,*
   935 F.2d 445 (2d Cir. 1991) .................................................................................... 34

*United States v. Wedd,*
   993 F.3d 104 (2d Cir. 2021) .................................................................................... 43

*United States v. Williams,*
   205 F.3d 23 (2d Cir. 2000) ................................................................................. 36, 37

*United States v. Wong,*
   78 F.3d 73 (2d Cir. 1996) ....................................................................................... 12

*United States v. Yannai,*
   791 F.3d 226 (2d Cir. 2015) .................................................................................... 12

*United States v. Zagari,*
   111 F.3d 307 (2d Cir. 1997) ............................................................................... 12, 38

<u>Statutes</u>

7 U.S.C. §§ 9(1) ......................................................................................................... 3
15 U.S.C. §§ 78j(b) ................................................................................................... 3
18 U.S.C. § 371 ......................................................................................................... 3
18 U.S.C. § 1349 ....................................................................................................... 3
18 U.S.C. § 1956(h) .................................................................................................. 3
18 U.S.C. §§ 1343 ..................................................................................................... 3
28 U.S.C. § 455(a) .................................................................................................... 42

Rules

Federal Rule of Criminal Procedure 17 ........................................................................ 26
Federal Rule of Criminal Procedure 33 ................................................................. passim
Federal Rules of Evidence 613(b) and 801 ................................................................ 34

## PRELIMINARY STATEMENT

A jury convicted Samuel Bankman-Fried on all counts following a four-week trial. The trial featured the testimony of three of his coconspirators with direct, first-hand knowledge of his massive fraud; expert analysis of FTX's insolvency and the defendant's use of funds; thousands of contemporaneous documents, including spreadsheets, Signal messages, balance sheets, and code repositories; and perjurious testimony from the defendant himself. The jury deliberated for fewer than five hours before returning a unanimous verdict.

The defendant now moves under Federal Rule of Criminal Procedure 33 for a new trial on the basis of alleged newly discovered evidence. (Dkt. 584 ("Mot")). The motion is a transparent attempt to relitigate questions the jury decided, reassert factual claims the record refutes, and advance a political narrative the defendant committed to writing before his arrest.

The purported evidence on which Bankman-Fried relies for his motion does not come close to meeting the standard for a new trial. The proffered witnesses were fully known to the defense before trial, and are therefore not "newly discovered." The defense's decision not to put the witnesses on his witness list or compel their testimony forecloses any claim that their post-trial views are newly discovered. Moreover, the defendant has not shown that any of this evidence would have been material to the outcome of trial, as it would have been both factually irrelevant and legally inadmissible. The defendant has also failed to show that this evidence would have likely led to an acquittal on any count, as the evidence of his guilt was and remains overwhelming.

The motion's most aggressive claim—that FTX was solvent, that customers have since been made whole, and that the prosecution therefore rested on a lie—is factually wrong, legally irrelevant, and deeply misleading. The solvency argument rests on dubious accounting methodologies that have been rejected by experts, restructuring professionals, and most notably the jury. FTX did not have the Bitcoin, Ethereum, and other cryptocurrency that customers had

deposited. The fact that FTX had illiquid assets on its books—like FTT tokens (a currency the defendant manipulated) that were unsellable but the defendant claimed were worth billions, or illiquid venture investments that later appreciated in value—does not mean the company was solvent. The defendant's claim is no different than saying "Lehman Brothers was not insolvent, just illiquid"—after all, the underlying assets in those mortgage-backed securities have long since recovered in value. As this Court observed previously, criminal fraud is complete at the moment of misappropriation. The defendant directed Alameda Research to take customer funds, had his engineers code undisclosed privileges enabling that extraction, and used financial documents designed to mislead Alameda's largest lenders. All of this occurred before the bankruptcy filing. What successor management recovered afterward, through years of litigation, asset monetization, and a rising crypto market, does not reach back and render the defendant's misappropriation lawful. A bank robber is not acquitted because the stolen funds were eventually recovered. The jury rejected the defendant's solvency narrative after hearing the trial evidence. Rule 33 does not authorize the defendant to retry the question.

Finally, the defendant's weaponization narrative offers no basis for a new trial. For one thing, the defendant's claim to political victimhood is incoherent on its own terms: The defendant was one of the largest Democratic donors in 2020 and 2022, and his campaign finance crimes were in furtherance of making those contributions, so the notion he was targeted for his Democratic politics by the prior presidential administration is fanciful. For another, the defendant planned to make these complaints even before he was convicted at trial as part of a cynical, pre-planned strategy to seek leniency. His list of things to do included appearing on Tucker Carlson's program, "coming out as a Republican," criticizing the bankruptcy lawyers as a "cartel," and leveraging private political donations as the foundation for a political repositioning. He is now moving

2

through his list. In an interview with Tucker Carlson, through articles that he has seeded, and in his own X.com posts, the defendant has denied criminal liability, attacked the bankruptcy administration, and cast himself as the victim of a politicized prosecution. The present motion, which the defendant immediately posted on X.com and circulated to the press, is merely the judicial phase of the same public relations campaign. Rule 33 does not provide for new trials whenever it would be public relations boon to have one, however, and the defendant has failed to come forward with facts or law showing his trial was unfair.

Accordingly, the motion should be denied.

## **BACKGROUND**

### I.    **Procedural History**

The defendant was charged in indictment S6 22 Cr. 673 (LAK) (the "Indictment") in seven counts: Counts One and Three charged him with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Counts Two and Four charged him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Five charged him with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78j(b) and 78ff. Count Six charged him with conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 371 and 7 U.S.C. §§ 9(1) and 13(a)(5). Count Seven charged him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (*See* Indictment, Dkt. No. 1.)

Following a four-week trial, the jury returned a guilty verdict on all seven counts.

### II.    **The Government's Case at Trial**

The defendant was convicted of orchestrating one of the largest frauds in history, stealing more than $8 billion from the customers of his cryptocurrency exchange, FTX.com. The defendant represented FTX as a safe and trustworthy exchange where customer money was protected. In

3

reality, the defendant covertly diverted billions of dollars of FTX customer money to his crypto-currency trading firm, Alameda Research. He spent the money on Alameda's expenses, speculative investments, and charitable donations, and used it to repay Alameda's lenders, make illegal political campaign contributions, and enrich himself. The defendant's misappropriation of his customers' deposits was exposed in November 2022, when FTX declared bankruptcy after customers attempted to withdraw more money from FTX than the exchange had on hand, revealing a multi-billion-dollar shortfall in FTX's balance sheet.

The evidence at trial included seventeen witnesses, among them three cooperating witnesses who conspired with the defendant to commit fraud, other former FTX and Alameda employees, a financial expert who traced the defendant's misappropriation and spending of FTX customer funds, and customer, investor, and lender victims of the defendant's scheme. The Government also presented documentary evidence including portions of the FTX codebase, financial records, internal company emails and financial analysis, fraudulent balance sheets, the defendant's tweets and testimony before Congress, and private messages between the defendant and his co-conspirators.

### A.  The Defendant's Fraud on FTX Customers

In 2019, the defendant founded FTX, which he controlled until FTX declared bankruptcy in November 2022. (Tr. 464, 650).[1] On FTX, customers from all over the world could buy and sell cryptocurrencies, such as Bitcoin, convert dollars to cryptocurrency and vice versa, and trade in cryptocurrency derivatives. (Tr. 65-66, 109, 141-42, 319-21). At the time he founded FTX, the defendant was also CEO of Alameda, a cryptocurrency trading firm that he had founded in 2017. (Tr. 107-08, 312). The defendant held out FTX and Alameda as separate entities, but in fact took

---

[1] Citations to "Tr." refer to the trial transcript.

money that FTX customers deposited with that exchange, and secretly transferred it to Alameda.

### 1. The Defendant Moves FTX Customer Deposits to Alameda

The defendant directly, and through FTX, represented to customers that their funds would not be used by FTX. (*See, e.g.*, Tr. 658, 1289). These misrepresentations were made in FTX's advertisements (Tr. 111; GX-900, 905), its terms of service (Tr. 1915; GX-558), on its website and in its policy documents (Tr. 80-81, 339-40, 1901; GX-340), and in the defendant's public statements, such as his tweets and Congressional testimony (Tr. 1899). The defendant testified before Congress that FTX had a robust risk management system and protected customer deposits by "maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request," ensuring "customer assets are custodied," and protecting "against misuse or misallocation of customer assets." (GX 914A, 916T). The defendant repeatedly asserted on Twitter, in response to reporters' inquiries, in statements to his investors, and in other fora, that Alameda did not have privileged access to FTX, that customer assets were safe, and that Alameda operated as a wholly separate entity from FTX. (Tr. 279, 400-08, 420, 867-70, 1367; *see, e.g.*, GX 817, 850).

Contrary to those representations, the defendant viewed FTX customer funds as "a good source of capital, and he set up [a] system that allowed Alameda to borrow from FTX" (Tr. 654), intentionally using FTX's infrastructure to misappropriate billions of dollars. At the time FTX declared bankruptcy, Alameda had borrowed approximately $8 billion of customer money from the exchange that could not be repaid to meet customer withdrawal requests. (Tr. 351, 355).

The defendant misappropriated funds deposited by FTX customers both in the form of fiat currency (like dollars) and cryptocurrency. (Tr. 132-39, 644-45). He accomplished this in two ways:

*First*, at the defendant's direction, FTX told customers to deposit fiat currency into bank accounts that were in fact controlled by Alameda. (Tr. 156-57, 654-55; GX 568). Alameda regularly spent these funds, resulting in a multi-billion-dollar deficit of FTX customer funds. (Tr. 656; GX 1050).

*Second*, the defendant secretly introduced special features into FTX's computer code, which permitted Alameda to spend and withdraw unlimited amounts of customer money from FTX. (Tr. 304-09, 358-59, 390-91). Cooperating witness Gary Wang implemented changes to FTX's codebase at the defendant's direction, as did Nishad Singh, another cooperator and high-level FTX executive. (Tr. 322, 358). The specific code changes included an "allow negative" feature, which permitted Alameda to accrue a negative balance when making transfers and withdrawals; a $65 billion line of credit; and an exemption from the automatic liquidation feature on FTX. (Tr. 307-09, 358-59, 373, 1361-64; GX-644). As the defendant publicly touted, FTX would automatically liquidate a typical client's account once its negative balance exceeded the amount of any posted collateral. But the secret code features the defendant implemented permitted Alameda to maintain a negative balance, borrow funds from other FTX customers and withdraw funds from the exchange without sufficient collateral using a multi-billion-dollar line of credit, and evade auto-liquidation. (Tr. 349-75, 381-96, 658-59).

Taking advantage of these hidden capabilities, the defendant "borrowed" billions of dollars of FTX customer funds, accruing a multi-billion-dollar negative balance in Alameda's account—money that was now owed to FTX customers, unbeknownst to them. (Tr. 355, 664, 1464-65, GX 1004). By spending customer funds, FTX created a significant deficit in its cryptocurrency wallets and in the accounts that were supposed to be holding customer fiat deposits (GX-1051), while customers were kept in the dark, believing that they could withdraw the balance in their account

at any time. (Tr. 79-81, 339-40, 1289-93, 1760; GX 425, 539). Customers never agreed for their funds to be transferred this way, and doing so contradicted what the defendant said publicly about how FTX treated customer funds. (*See, e.g.*, Tr. 438-39, 1225).

### 2. The Defendant Secretly Uses FTX Customers' Deposits

To conceal his control of Alameda, the defendant named co-conspirator (later, cooperating witness) Caroline Ellison as CEO of Alameda in 2021. (Tr. 683-87). When FTX collapsed, the defendant falsely claimed he was walled off from Alameda and was unaware of the extent of Alameda's spending of FTX customer funds. (*See, e.g.*, GX 2503, 2508, 2508-T). The trial evidence established, however, that the defendant directed Alameda's borrowing and spending of FTX customer funds, which resulted in the multi-billion-dollar hole in FTX's balance sheet. In particular, in the Fall of 2021, the defendant decided that Alameda should spend an additional $3 billion on venture investments. (Tr. 707-10). At the time, Alameda's trading operations were funded primarily through open-term loans by third-party cryptocurrency lenders, who could request repayment on demand. (Tr. 692, 809, 815). Ellison advised the defendant against making additional investments, presenting him with analysis showing that in the event of a market downturn and the recall of Alameda's loans, the only way to repay third-party loans would be to borrow billions more from FTX customer funds. (Tr. 703-06, 712-15, 717-19, 693-98; GX 36).

Nonetheless, from late 2021 into 2022, the defendant directed billions of dollars in spending, using FTX customers' money. That included investing hundreds of millions of dollars each into a crypto-mining company, an online bank, an investment firm the defendant used to connect with politicians and celebrities, the companies Anthropic and Robinhood, real estate in the Bahamas (including a $30 million penthouse apartment for Bankman-Fried and his friends), and political donations. (Tr. 706-29, 1315-41, 1710-56; GX 1017A-K, 1044, 1045).

### 3.   The Defendant Repays Alameda's Lenders Using FTX Customer Funds

In June 2022, instability in the cryptocurrency market caused Alameda's lenders to recall nearly all their loans, requiring Alameda to repay over $6 billion. (Tr. 752-61, 779; GX 1018). Ellison was "very stressed out" because "we didn't have the liquid assets to pay all of the money back" and "in order to repay all of our loans, we would have to borrow money using our FTX line of credit," meaning that the money "would be coming from customer funds." (Tr. 761). After reviewing a spreadsheet that showed Alameda had a negative $11 billion balance on FTX and was borrowing $13 billion in FTX customer funds (GX 50; Tr. 424-40, 771-77, 1359), the defendant "continued to direct [Ellison] to repay loans," meaning to use Alameda's access to FTX customer funds to repay the loans, which she did. (Tr. 764-65, 780, 440-42, 1772; GX 017A-K). Of the $6.5 billion repaid to Alameda's lenders, almost 70 percent was FTX customer money. (GX 1018). This was far from unexpected—it was precisely why Ellison had advised against additional venture investing. (Tr. 780-82).

As of September 1, 2022, Alameda was borrowing approximately $13.7 billion in customer money from FTX (GX 19; Tr. 449-50, 823, 847, 1403). Alameda's internal balance sheets showed that "in an event that all of FTX's customers wanted to withdraw their money," Alameda's liquid assets were not sufficient to meet customer withdrawals. (Tr. 791-92; *see also* Tr. 443-46, 1403). Singh privately expressed concern to the defendant about the deficit and urged him to refrain from additional spending. (Tr. 1406-09). But the defendant continued to spend customer funds. (Tr. 850, 888-91, 1414-19; GX 14B, 141A, 1089).

### 4.   The Defendant Lies During FTX's Collapse

Following the online publication of a leaked Alameda balance sheet on November 2, 2022, customers began rapidly withdrawing funds from FTX. (Tr. 452, 891-92, 896-97). As FTX

customer withdrawals surged, the defendant made a series of false and misleading statements to deter FTX customers from trying to withdraw their money. (Tr. 1292, 1467, 1847-48). On November 7, 2022, the defendant tweeted: "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine." (GX 866). He added, in part, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be." (GX 866). In a third tweet, the defendant wrote, "We have a long history of safeguarding client assets, and that remains true today." (GX 866).

Those statements were false because, as the defendant knew, at that time FTX had a multi-billion-dollar shortfall and insufficient assets to cover customer withdrawals. (Tr. 461-63 ("FTX did not in fact have enough assets to cover all client holdings . . . [b]ecause Alameda had withdrawn a lot of it," and "FTX was lending client assets to Alameda"), 919-20, 1464-66). In an internal document that he authored the day before these tweets, the defendant wrote that FTX only had "enough to process ~1/3 of remaining client assets," and just hours before his tweets, the defendant acknowledged internally that FTX had an $8.1 billion shortfall. (Tr. 909-11, 917-18; GX 21, 406). He nonetheless posted what he called a "confident tweet thread" to lull FTX's customers into keeping their funds on FTX. (GX 21). As a result of the defendant's false statements, many FTX customers did not withdraw their money and left it on the exchange. (Tr. 89, 1292).

As FTX struggled to meet customer demands, the defendant halted customer withdrawals from the exchange. On November 11, 2022, FTX and Alameda filed for bankruptcy and the defendant resigned as CEO. (Tr. 450).

### B.  The Defendant's Fraud on Alameda's Lenders

The defendant also defrauded Alameda's lenders of more than $1 billion. In the summer of 2022, after Alameda repaid its third-party lenders using FTX customer funds, Alameda sought

new loans from these same lenders, who requested that Alameda provide an updated balance sheet. (Tr. 783). Ellison and the defendant were reluctant to share Alameda's balance sheet because "it showed that Alameda was in a very risky position" and was "borrowing . . . around $10 billion from FTX," which might create "more widespread concern about Alameda" and "cause people to start withdrawing their money from FTX." (Tr. 785-86; *see also* Tr. 789).

The defendant therefore told Ellison to "prepare some alternative ways of presenting the information and send them to him." (Tr. 786). Ellison prepared seven alternatives to the real balance sheet (GX 44), which omitted or hid Alameda's borrowing from FTX, so that lenders would not "know the truth" (Tr. 786-87). The defendant chose one of the alternatives whose "intended effect was to make Alameda look less risky than it really was and to hide the fact that we were borrowing around $10 billion from FTX customers" (Tr. 795-800). Ellison sent the deceptive balance sheet to Alameda's lenders and continued to send them similarly fraudulent balance sheets in the months that followed. (Tr. 800-04, 810-23; GX 17, 419). Alameda's lenders then extended new loans, which they would not otherwise have done. (Tr. 808-09, 1206-07, 1217-24, 1768; GX 1014). When Alameda entered bankruptcy, Alameda's defaults on its loans sent several lenders into financial crisis. (Tr. 1227-28).

### C. The Defendant's Fraud on FTX Investors

The defendant also defrauded equity investors who had purchased shares in FTX stock. (GX 26). The defendant represented to FTX investors that FTX acted as a custodian of its customers' deposits. (Tr. 273-74). Several FTX investors were falsely told by the defendant and others acting at his direction that Alameda received no special treatment on FTX and that FTX and Alameda were fully independent and separate companies. (Tr. 278-81, 1945, 2011-14). Had FTX's equity investors known about the misuse of customer funds or Alameda's special treatment, they

would not have invested in FTX. (Tr. 274, 280-82, 2014-15).

The defendant engaged in additional deceptive conduct to mislead investors, shifting losses on the FTX platform to Alameda to conceal these losses from investors (Tr. 414-15, 939-41, 1455-56), publicly displaying a fake overstated value for FTX's insurance fund (Tr. 408-12; GX-751), and falsely inflating FTX's 2021 revenue with backdated documents provided to FTX's auditors (Tr. 1445-54; GX 323). The defendant also used FTX investor money to finance Alameda's operations and cover expenses, including a house for the defendant's parents. (Tr. 937, 1726, 2016-17; GX 1023, 1050).

### D. The Defendant's Concealment Money Laundering

At trial, the Government proved the defendant's involvement in a conspiracy to make over $100 million in political donations to federal and state officials, as well as political action committees, with funds from Alameda (and ultimately FTX customers). Around 2020, the defendant began donating large sums to political candidates, at least in part to improve his personal standing in Washington, D.C., increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX. (GX-477, 505; Tr. 1437). The defendant concealed the source of the funds by passing donations through accounts belonging to Ryan Salame and Singh, making unlawful straw and corporate donations. (Tr. 1420-38; GX 28, 475, 1088-90).

## ARGUMENT

### I.    Applicable Law

#### A.  Motion for a New Trial under Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most

extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). In order for such a motion to have merit, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134; *see also United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial."). A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

### B. Motion for a New Trial Based on New Evidence

Where a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears a particularly high burden, and must establish that: (1) the evidence is genuinely "new," meaning "discovered after trial"; (2) the evidence could not, with the exercise of due diligence, have been discovered before or during trial; and (3) the evidence "is so material that it would probably produce a different verdict." *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (citing *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992)). Such an exercise of discretion "is ordinarily not favored" and a new trial motion "should be granted only with great caution." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (citations and quotation marks omitted); *see also United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (recognizing that new trial motions based on new evidence should be granted only "in the most extraordinary circumstances") (citation and quotation marks omitted). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007)

(citations and quotation marks omitted).

## II.    The Defendant's Motion for a New Trial Should Be Denied

The defendant's motion fails at every level. His three proffered witnesses—Daniel Chapsky, Ryan Salame, and Nishad Singh—were known to the defense well before trial, their potential testimony was either foreclosed by the defense's own strategic decisions or is based on unsworn, post-conviction statements, and none of it would have been material to the outcome in any event.

### A.    The "Customers Were Made Whole" and "Liquidity Not Solvency" Claims Are Both Factually Incorrect and Legally Irrelevant

The motion's most prominent factual contention—that FTX creditors received 119% to 143% of their petition-date claims, and that FTX was not insolvent—is both a significantly misleading description of the actual experience of FTX's customers and legally irrelevant to the criminal charges.

Starting with the facts, the "119-143%" figure is a nominal dollar recovery calculated against November 11, 2022 petition-date cryptocurrency valuations—among the lowest in the post-FTX-collapse crypto market. Many FTX customers did not deposit dollars; they deposited cryptocurrency, and their deposits were being held in cryptocurrency. They are not receiving that cryptocurrency back; they are receiving the dollar equivalent of what their holdings were worth at or near the worst day of the collapse. The gap between the nominal recovery figure and customers' actual losses is significant. At the time of the bankruptcy filing, Bitcoin was trading at approximately $16,871; by the time the defendant filed his motion, it was trading above $65,000 (and it was even higher in 2025). Solana, held by FTX and Alameda in significant quantities, traded at roughly $14 at the time of bankruptcy and now exceeds $80 (with significantly higher values in 2025). Based on the change in cryptocurrency values, that means creditors are recovering between

13

approximately 10% and 50% of the value of the assets they deposited, depending on the composition of their holdings. (*See* Dkt. 410 at 44).

The motion's solvency figures also depend on valuation methodologies the jury specifically evaluated and rejected. At the time of the bankruptcy, FTX was not merely illiquid. As the FTX estate has confirmed, at the time FTX declared bankruptcy "there were only 105 bitcoins left on the FTX.com exchange, against customer entitlements of nearly 100,000 bitcoin." (Dkt. 415 at 5). In other words, FTX held only 0.1% of the Bitcoin, and a similar amount of Ethereum, that customers believed they held on FTX. That is not merely a liquidity issue: FTX simply did not own or possess cryptocurrency it promised its customers it held—the direct consequence of the defendant's misappropriation. Because the bankruptcy estate lacked the actual cryptocurrency, it assembled creditor recovery from other sources: venture stakes in Anthropic, Robinhood, and other companies that appreciated after the collapse; retained Solana holdings; and litigation clawback recoveries. The estate's ability to satisfy nominal dollar claims is not evidence of pre-collapse solvency; it is the product of a multi-year recovery effort, the fortuitous timing of the 2022-2024 cryptocurrency bull market, and aggressive litigation against third parties. (Dkt. 415).

The defendant's claim that FTX held approximately $93 billion in assets against $15 billion in debts rests on marking illiquid, undisclosed, and thinly-traded assets—FTT token positions (which the defendant owned and manipulated), Solana holdings, and venture stakes—at full market prices that collapsed immediately upon disclosure of the fraud. The defendant, however, knew that these assets were not worth the marked-up values he assigned to them. At trial Ellison testified that the defendant himself, in late 2021, explicitly recognized that FTT and related tokens were too illiquid and subject to massive depreciation and therefore could not be counted as real assets when calculating net asset value. (Tr. 706-711; GX-36). Without those tokens, as the defendant

knew, and contrary to his post-trial claims, liabilities exceeded assets. (Tr. 710). Similarly, in 2022, the defendant asked Ellison to make the seven-alternative balance sheet because the actual balance sheet showed that without FTT, liabilities exceeded assets. (Tr. 795-96; GX-44). Wang also testified that FTT was illiquid and it was impossible to achieve mark to market prices. (Tr. 378-89). Indeed, after the defense tried to establish that FTX had positive assets when counting the illiquid investments in FTT and other tokens (Tr. 524-25), Wang rejected the argument, indicating the FTT could not be sold at the marked prices and that without it they would have been "negative 16 billion." (Tr. 618-20). In fact, on cross-examination the defendant conceded that the FTT that is a significant part of the defendant's calculation could not be sold at market prices. (Tr. 2781-82).

Notably, the defendant has a history of lying about the reason for FTX's shortfall. Prior to indictment, he blamed issues with margin trading, but the trial evidence demonstrated that that was a manufactured excuse. (Dkt. 410 at 27). Similarly, the defendant lied during his trial testimony, resulting in a perjury finding against him. Rather than accepting his post-bankruptcy explanations, it is not necessary to look any further than the defendant's own words in September 2022; they are the most probative evidence of his actual understanding of the financial situation. When Singh pressed him about the $13 billion Alameda had borrowed from FTX customers, the best the defendant could offer as "deliverable" to customers on short notice was approximately $5 billion—less than 40% of what was owed. (Tr. 1407). If FTX actually had $93 billion in assets (liquid or not) against $15 billion in liabilities there is no reason why the company's CEO would only be able to deliver $5 billion when $13 billion was demanded. That is not a liquidity mismatch, but rather the consequence of the underlying assets having been spent on venture investments, political donations, real estate, loan repayments to Alameda's creditors, and trading losses. The assets were absent, not illiquid.

The motion is also silent about FTX customers who, unable to wait for the conclusion of the bankruptcy proceedings, sold their claims on the secondary market at steep discounts, often for a fraction of nominal value. Billions in claims were sold by distressed creditors before the bankruptcy plan became effective. Those customers received neither the nominal 119-143% nor anything approaching the actual value of the cryptocurrency they deposited.

Finally, the motion is also wrong on the law. The defendant frames the case as resting on a theory of technical balance-sheet insolvency, and argues that evidence of solvency undermines the charges. But the charges did not depend on any solvency determination: the defendant was convicted for deliberate misappropriation of customer funds, his material misrepresentations about how those funds were held to customers and investors, his direction of fraudulent balance sheets to lenders, and his systematic concealment of those acts. Those offenses did not depend on the insolvency of FTX, and they are not negated by any solvency argument, however framed. A defendant who misappropriates property and whose victim is later compensated from unrelated sources has nonetheless committed the underlying offense. (Tr. 952-53 ("THE COURT: … the crime is the misappropriation…. it's finished the minute the misappropriation happens, whether its used wisely, foolishly, or whatever."). Post-conviction recoveries achieved through bankruptcy proceedings, cryptocurrency price appreciation, and clawbacks do not retroactively negate criminal conduct complete at the time of commission. *Cf. United States v. Bergstein*, 788 F. App'x 742, 747 (2d Cir. 2019) (where defendant had misappropriated funds invested in company, affirming district court's decision not to reduce the loss amount by the funds subsequently recovered by the company).

### B. The Defendant's Proffered Evidence is Not "Newly Discovered" And is Immaterial

The evidence proffered by the defendant is emphatically not "newly discovered." As the

Second Circuit has held, "One does not 'discover' evidence after trial that one was aware of prior to trial." *United States v. Owen*, 500 F.3d 83, 89–90 (2d Cir. 2007). Accordingly, the Second Circuit has held that where the defendant had direct knowledge of the information prior to trial, that evidence cannot be "newly discovered" so as to warrant a new trial. *Id.* at 84 ("Because [Owen's co-defendant's] testimony related to his direct dealings with Owen, Owen was—or certainly should have been—aware of the substance of [the co-defendant's] testimony prior to trial, and, thus, it was not 'newly discovered' within the meaning of Rule 33 when it was offered by [the co-defendant] at sentencing."); *United States v. Forbes*, 790 F.3d 403, 409 (2d Cir. 2015) ("[I]f the reason that testimonial evidence was unavailable at trial was the defendant's failure to call a witness that he knew could provide exculpatory testimony, a new trial on the basis of newly discovered evidence would not be warranted.").

### 1. The Chapsky Declaration is Not Newly Discovered Evidence, Is Immaterial, and Would Not Have Produced an Acquittal

The declaration of Daniel Chapsky attached to the defendant's Rule 33 motion fails to meet any of the four prongs of newly discovered evidence, and thus cannot be the basis for a new trial.

*First*, the evidence is not "newly discovered" because it is clear that the defendant was aware of this evidence well in advance of trial. Indeed, the Chapsky declaration itself states that Chapsky was in contact with the defendant's counsel in advance of trial, and the defendant's own motion states that his counsel asked Chapsky to testify for the defense. (Mot. 5). That alone ends the inquiry because a defendant does not "discover" evidence that he was "aware of prior to trial." *Owen*, 500 F.3d at 90. Moreover, even if the defendant's attorneys had not been in contact with Chapsky prior to trial, the nature of Chapsky's proffered testimony makes it clear that the defendant was fully aware of this evidence. Chapsky was one of the defendant's employees and his testimony is entirely about the financial health of FTX and Alameda, two companies that the

defendant owned and controlled throughout the charged time period. The notion that this information was not known to the defendant at the time of trial is both incredible and contrary to his own allegations in his motion.

The defendant argues that Chapsky was unwilling to testify out of a concern of "media attacks and … potential retaliatory action by the prosecution." (Mot. 5). Chapsky's affidavit does not allege that there were any actual such threats, however, and as discussed in more detail below, does not come close to alleging facts that would give rise to a claim of witness intimidation. But even if he had, that would not give rise to a right to a new trial under Rule 33. The defendant did not attempt to call Chapsky to testify, did not subpoena him, and did not seek any relief from the Court to facilitate his testimony. The Second Circuit, in addressing a claim that a trial codefendant could have offered exculpatory testimony, has held that a defendant's "inability to procure that testimony before or during trial should not be redressed by granting the defendant a new trial when the codefendant asserts his willingness to exculpate the defendant after the original trial is over." *Owen*, 500 F.3d at 92. The logic of *Owen* applies even more strongly here, where the purportedly exculpatory witness is not a codefendant with an acknowledged Fifth Amendment right, but a fact witness who the defendant never sought to call at trial and who has never asserted any privilege against testifying. The fact that the defendant was aware of this testimony prior to trial is fatal to his claim that it is "newly discovered" evidence.

*Second*, the defendant's claim fails because he could have easily discovered the information in the Chapsky declaration through the exercise of minimal diligence. The Chapsky declaration relies principally on a report that Chapsky prepared for the FTX bankruptcy proceedings, which listed FTX's assets and liabilities. (Mot. 7-8). But the FTX Debtors' counsel published a summary of that report on January 17, 2023, through a filing on the docket in the

bankruptcy case. *In re FTX*, No. 22-11068, Dkt. 507-1 (Bankr. D. Del. Jan. 17, 2023) (the "Debtors' Report"). The Debtors' Report contains the very facts on which the defendant now relies for his claim that FTX was supposedly "solvent" when it declared bankruptcy. In his motion, the defendant argues that the Debtors' Report gave an "incorrect impression" because it marked down the value of the illiquid cryptocurrency holdings and Alameda's venture portfolio. (Mot. 8). That argument is belied by the Debtors' Report, which discloses the very facts that Chapsky highlights. With respect to the illiquid cryptocurrency holdings, the Debtors' Report explains that these holdings were "not included in located crypto value estimates," and then goes on to itemize these illiquid crypto holdings by token and explains what their value would be at the spot market price as of the bankruptcy petition date. Debtors' Report at 11. The Debtors' Report also lists the holdings in the venture portfolio and identifies their book value of $4.6 billion, exactly the number that Chapsky gives in his declaration. Debtors' Report at 13; (*see* Chapsky Declaration ¶ 16). Thus, in addition to being actually aware of the testimony that Chapsky could have provided, Bankman-Fried was plainly on notice of these facts, which were the subject of a public filing in the bankruptcy case. And, in any event, the defendant of course knew about his own companies' crypto holdings and venture portfolio even if they hadn't been disclosed in the bankruptcy filings. Thus, he has failed to allege any facts "from which the court can infer due diligence on the part of the movant to obtain the evidence" prior to trial, which is a second independent reason to deny his motion. *Owen*, 500 F.3d at 89.

*Third*, the defendant has failed to show how this evidence is material, or even how it would have been admissible at trial. Several paragraphs of the Chapsky declaration relate to the solvency of FTX US, and other regulated FTX entities, which were not the subject of the fraudulent schemes proven at trial. (Chapsky Decl. ¶¶ 13, 14, and 17). And as for the FTX international exchange,

Chapsky does not deny that the exchange was short "roughly $8 billion" in customer funds in November 2022. In other words, Chapsky's testimony corroborates the Government's evidence and arguments at trial that, instead of keeping customer funds safely in custody as the defendant had represented FTX would do, the defendant instead moved billions of dollars' worth of customer funds out of the exchange and into various investments and other places.

Rather than denying the multi-billion dollar shortfall that was the primary issue at trial, Chapsky simply expresses disagreement with the bankruptcy estate over how long it should have taken to liquidate those investments to repay the customers. (*See* Chapsky Decl. ¶ 14). Chapsky asserts that it is his "professional opinion" that this could have been done in "months," rather than the "years" that it has taken in the bankruptcy proceeding. (*Id.*). That testimony, however, would have been inadmissible at trial on multiple grounds.

To begin with, the fraudulent scheme proven at trial was that FTX's customers were told that their money would be held in custody for them and available for them to withdraw on demand. Bankman-Fried repeatedly made this representation to his customers and to the public. (*E.g.*, Tr. 80-81, 111, 279, 339-40, 400-08, 658, 866-70, 1289, 1366-67, 1899, 1901; *see, e.g.*, GX-340, 558, 817, 850, 900, 905). As one example, Bankman-Fried testified in Congress that FTX protected customer deposits by "maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request," ensuring "customer assets are custodied," and protecting "against misuse or misallocation of customer assets." (GX-914A, 916T). Even up to the very end of the fraud, Bankman-Fried was publicly making the false claim that "We don't invest client assets (even in treasuries)." (GX-866). Accordingly, FTX's customers testified that they understood they could withdraw their deposits when they chose and that they had not agreed to the use of their deposits for investments by Bankman-Fried. (Tr. 81-82, 1289-90). And yet, when they tried to

withdraw, it turned out that FTX did not have the money in custody, and they could not be repaid on demand. Thus, Chapsky's testimony that the customer deposits were tied up in illiquid investments that would have taken "months" to liquidate would not have been relevant to disprove the fraud as charged and proven at trial—if anything, it would be further inculpatory evidence.

Moreover, as the Court held during trial, evidence of whether FTX customers would ultimately be repaid was inadmissible and irrelevant, because the fraud was complete when the misappropriation occurred, and "no amount of honest belief on the part of the defendant that the victim ultimately would be benefitted will excuse false representations that a defendant willfully made or caused to be made." (Tr. 3159); *see, e.g.*, *United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019); *United States v. Saint Clair*, 2024 WL 413422, at *4 (2d Cir. Feb. 5, 2024) (affirming this type of no-ultimate-harm instruction). It was thus irrelevant as a matter of law whether the customers could have been repaid from those investments—the fraud was complete when Bankman-Fried misappropriated customer money to make the investments in the first place.

Additionally, even if the potential recovery for FTX customers could have somehow been considered at trial, the premise of Bankman-Fried's arguments—and Chapsky's declaration—fails to account for a realistic measure of customer losses. As explained above, many if not most FTX customers who held cryptocurrency on the exchange will not recover either the amount they deposited in FTX nor the cryptocurrency they were falsely told their deposits had been used to purchase. (Dkt. 410 at 43-45). The purported repayment of their claims is based on taking FTX customers' cryptocurrency balances, converting them to the dollar value of those cryptocurrencies on the date FTX declared bankruptcy, and then repaying that amount over time based on the appreciation in Alameda's various investments while freezing the value of the customers' claims

in place.[2]

Chapsky's testimony would also be inadmissible because it is plainly expert opinion testimony that Chapsky is unqualified to provide. Chapsky is not a percipient witness, as he states that he "did no work related to Alameda nor any Alameda related code on the platform" and he "had no knowledge of the 'special features' that were added to the Alameda 'info@' account on FTX." (Chapsky Decl. ¶ 2). Lacking any firsthand knowledge about Alameda's business or investments, Chapsky instead can only offer his personal opinion based on his review of company records. In particular, Chapsky states that it is his "professional opinion" that FTX customers "could have been made whole within months—not years—had the exchanges not been placed into omnibus bankruptcy proceedings and abruptly shut down." (Chapsky Decl. ¶ 12). But Chapsky is not qualified to render such a "professional opinion," as by his own description, he is a data scientist who previously worked at the marketing department of Meta (Facebook). (Chapsky Decl. ¶ 1). Chapsky does not appear to have any professional experience in managing or liquidating significant investments of any sort, much less the complex holdings of illiquid cryptocurrency tokens and venture investments at issue here. Nor does he offer any reliable basis—aside from his own say-so—for his opinion that these investments could have been liquidated on the time frame he estimates, and if he had attempted to offer this testimony at trial, it would have been rightly precluded.

For similar reasons, Chapsky's attempts to criticize the expert testimony of Peter Easton

---

[2] It is ironic that Bankman-Fried's motion cites an article by Matt Levine regarding the bankruptcy recoveries given that the article highlights the absurdity of Bankman-Fried's position. (*See* Motion at 1, 6 (citing Matt Levine, "FTX Found the Money," Bloomberg, May 8, 2024)). That same article concludes by saying that Bankman-Fried's "theory that there were no losses" is "wrong both factually (Bitcoin customers lost money) and legally (if you take customer money to buy yourself a house, and then the bankruptcy estate seizes the house, you still weren't supposed to take the money)."

would not have been admissible at trial. (Chapsky Decl. ¶¶ 22-34). As an initial matter, a Rule 33 motion is not an opportunity to relitigate potential responses to expert testimony that could have been raised at trial. The Government disclosed the voluminous data on which Easton relied in advance of trial, and the defense vigorously cross-examined Easton and tried to argue to the jury that it should not credit his conclusions. Bringing in a new witness to disagree with Easton now is not "newly discovered evidence" in any way. And even setting aside that issue, Chapsky is not a financial or accounting expert and is unqualified to offer the opinions he advances in his declaration. Moreover, Chapsky offers no documentation to support his claims. For instance, Chapsky's attacks on Easton rest almost entirely on what Chapsky describes as a "separate analysis prepared for one of FTX's international regulators," that purportedly "showed that Alameda's user balance on FTX was significantly positive for almost all of its existence." (Chapsky Decl. ¶ 26). Chapsky does not provide a copy of this "separate analysis" or provide any more information about how it was conducted or by whom—he does not even say which "regulator" it was prepared for.[3] He simply asks the Court to credit his say-so while ignoring that Easton's testimony was rooted in large volumes of financial data and was also consistent with the testimony of all three cooperating witnesses, each of whom testified based on direct knowledge about Alameda's balances that Chapsky concedes he does not have. (*E.g.*, Tr. 436 (Wang testimony that Alameda's total balances on FTX were "approximately negative $11 billion" in June 2022)).

Unsurprisingly, given his lack of any expertise and the absence of any documentation to support his claims, Chapsky's attacks on Easton fall apart upon examination. For example, Chapsky claims that two of Easton's charts, GX 1002 and GX 1005, "cannot be reconciled."

---

[3] Needless to say, FTX's own reports are not a particularly reliable source, given the defendant's repeated doctoring of documents throughout the charged time frame.

23

(Chapsky Decl. ¶ 27). Chapsky argues that GX 1002 showed the aggregate balance of Alameda accounts with the "allow negative" feature, while GX 1005 showed the aggregate balance of all Alameda accounts, and yet there were points in time where the aggregate balance in GX 1005 was more negative than the balance reflected in GX 1002. (Chapsky Decl. ¶ 27). But Chapsky's own affidavit then offers an obvious explanation for this claimed "mistake"—he acknowledges that Easton was cross-examined on this point and explained that he was "tracking different variables in the two graphs." (Chapsky Decl. ¶ 27). Chapsky goes on to acknowledge that GX 1002 "included only Fiat, USDT, BTC, and ETH," while GX 1005 offered a more complete accounting of the total aggregate balance, which could easily account for periods of time when the total negative balance reflected in GX 1005 was greater than the total reflected in GX 1002. (Chapsky Decl. ¶ 28). In short, by its own terms, Chapsky's declaration reveals an explanation for the very discrepancy that he claims to have identified.

Similarly, Chapsky argues that Easton erred in his calculation of the fiat@ account, because the "liability of FTX" reflected in that account was "mirrored" by "corresponding bank balances and other off-exchange assets." (Chapsky Decl. ¶ 29). Here, it is Chapsky who is confused again. As Caroline Ellison explained at trial, the fiat@ account represented fiat cash deposits made by FTX customers into FTX, and Alameda was supposed to maintain cash or other safe assets to reflect that liability to customers, but instead Alameda spent the money on investments and trading, which "meant that those assets were at risk." (Tr. 655-58; *see also* Tr. 1352-53 (Singh testimony that until FTX got its own bank accounts, fiat@ account was supposed to represent "exactly what should be in Alameda bank accounts"). Easton's analysis was consistent with that description, as he identified a large deficiency between FTX and Alameda's cash assets and the fiat@ liability. (Tr. 1721-22; GX-1004). Thus, there was ample witness and documentary evidence supporting

Easton's conclusions on this point, and Chapsky's bare assertions to the contrary appear to be grounded in a misunderstanding of how the accounting worked. Chapsky's misapprehension is perhaps understandable given his candid admission that he never did any work "related to Alameda." (Chapsky Decl. ¶ 2). But his uninformed speculation about these issues offers no basis for a new trial.

*Fourth*, even apart from these issues, and even if Chapsky's proffered testimony had been admitted in full at trial, it is limited in scope and fails even to address the detailed testimony of multiple cooperating witnesses implicating the defendant and the overwhelming documentary evidence of the defendant's guilt that was presented at trial, as described below. As further described below, the defendant has failed to show that Chapsky's testimony would have resulted in an acquittal.

### 2. Ryan Salame's Post-Conviction Statements Are Not Newly Discovered Evidence and Carry No Evidentiary Weight

Ryan Salame was a senior FTX executive who worked directly with the defendant, was well known to defense counsel, and was a recognized potential source of testimony well before trial. His post-trial public commentary does not represent newly discovered evidence; it reflects a change of position motivated by dissatisfaction with his 90-month sentence and the subsequent indictment of his fiancée, Michelle Bond. A witness's decision not to testify at trial, on advice of his own counsel, does not render his subsequent public statements "newly discovered evidence" within the meaning of Rule 33.

*First,* the motion's newly-discovered-evidence claim fails at the threshold. Salame was not a hidden or unknown figure—he was one of the most senior executives at FTX, worked alongside the defendant throughout the period charged, and had already pleaded guilty to two federal felonies by September 2023, a full month before trial began. His name appeared during *voir dire*,

demonstrating that defense counsel was aware of him as a significant participant in the events at issue. (Trial Tr. 102). He came up at the beginning of the trial, during the testimony of Adam Yedidia. (Trial Tr. 158). And the Government produced attorney proffer notes relating to Salame on May 4, 2023—five months before trial—materials that would have informed the defense of his potential testimony. There is nothing newly discovered here. *See Owen*, 500 F.3d at 87-89 (co-defendant's post-trial statement was "not newly discovered, but merely newly available" and not a basis for a new trial).

*Second,* to the extent any of the information referenced in the defendant's motion was not known to the defense or was not presented at trial, that is a product of the defense's own choices. It could have easily been discovered with minimal diligence. The record contains no indication that the defense took any steps to secure Salame's appearance. Defense counsel did not call him as a witness, does not appear to have served him with a trial subpoena under Federal Rule of Criminal Procedure 17, and did not seek judicial immunity to compel his testimony. A defendant who makes no diligence in obtaining a witness cannot later claim that witness's absence constitutes newly discovered evidence. *United States v. Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000) (because the defendant knew about the witness before trial "counsel with due diligence could have discovered the evidence").

*Third,* the defendant has failed to show how this evidence would be material or admissible at trial. The motion relies on posts from Salame's X.com account and appearances on podcasts and television programs. None of this material is sworn testimony. None carries the indicia of reliability that courts require to sustain a new trial motion. All of it stands in direct contradiction to Salame's under-oath statements that he was guilty of conspiracy to make unlawful campaign contributions and conspiracy to operate an unlicensed money-transmitting business, that he

26

pleaded guilty because he is guilty, that his plea was not coerced, and that no side promises were made. Salame is a convicted felon expressing personal grievances, and he has already demonstrated, in proceedings before this Court, a willingness to make false statements under oath. His public advocacy—unsworn, unexamined, and self-interested—provides no basis for a new trial. *See United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987) ("Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'").

Had Salame testified, the testimony he would have purportedly given for the defense would have been merely cumulative and certainly not material to the trial's outcome. The defendant contends that Salame could have testified that FTX's fiat bank account arrangement with Alameda was disclosed to lawyers and was legally structured. That claim was squarely contested at trial and rejected by the jury. Multiple witnesses testified that the routing of FTX customer fiat deposits into Alameda's bank accounts was deliberately concealed from customers and investors. Caroline Ellison testified that customer fiat deposits were received directly into Alameda's bank account and used for Alameda's trading purposes, without customer knowledge or consent. (Tr. 644). Gary Wang confirmed that Alameda's ability to receive those deposits directly was one of the four undisclosed privileges that distinguished it from every other FTX customer. (Tr. 350). Can Sun, who was FTX's general counsel, testified that he was not aware that Alameda was receiving FTX customer deposits into its bank accounts. (Tr. 1906). One of the customers who testified also stated that he believed the account he sent his funds to was connected to FTX. (Tr. 1286). Even if Salame had testified that the arrangement was disclosed and lawful, it would have been cumulative of other evidence. It also would not have been material to the outcome: deception about Alameda's access to customer fiat funds was just one of many ways the defendant defrauded his customers.

27

And Salame would not have been able to counter the overwhelming evidence at trial because, according to Salame's own sentencing submission, "he was duped" by the defendant and "had absolutely no knowledge that the four people at the center of Alameda and FTX had conspired to lie and steal from their customers." (Dkt. 433 at 6).

The defendant also contends that Salame would have offered favorable character testimony—that the defendant dislikes personal extravagances and could not have emotionally coerced Caroline Ellison. But as a general matter, a "failure to present potential character witnesses does not lead to the loss of evidence so material that it would have altered the outcome of the trial." *United States v. Polo*, No. 94 Cr. 219 (RPP), 1998 WL 691221, at *2 (S.D.N.Y. Sept. 30, 1998) (citations omitted). And here it is not clear that any of the testimony the defendant believes he could have elicited from Salame would even be admissible under Federal Rule of Evidence 404(a)(1), which bars character evidence to prove or disprove the defendant acted in conformity with a character trait.

Nor would Salame's testimony have assisted the defense with respect to the campaign finance conduct. His September 2023 plea allocution before this Court included his sworn admission that political contributions he made were "funded by transfers from the bank accounts of an Alameda subsidiary," that they were "supported by Sam Bankman-Fried," and that he "never intended to repay" the loans he received, and that he "knew it was prohibited by campaign finance laws." (Salame Plea Tr. at 22). His own defense counsel's sentencing submission described Salame as being in a "conspiracy" with the defendant and Singh. (Dkt. 433 at 22, 24). Any trial testimony in which Salame sought to walk back those sworn statements and his counsel's representations would have been subject to comprehensive impeachment, and would have raised serious credibility issues that render such testimony far from material to the outcome.

*Fourth,* there is no basis for a purported due process violation. The Government did not interfere with Salame's choice whether to testify. Quite the opposite, according to Salame's own sentencing submission, even "[a]fter his guilty plea … on September 7, 2023, [Salame] further offered assistance and cooperation to the government as it prepared for the Bankman-Fried trial." (Dkt. 433 at 15). To the extent Salame at some point declined to testify at trial on advice of his counsel—weighing his own legal exposure, his interest in involving himself in the trial, and strategic considerations specific to his own case—his decision reflects the independent judgment of his private attorneys, not governmental interference. The motion characterizes the investigation of Michelle Bond's campaign finance violations as improper leverage used to coerce Salame's guilty plea, but that is a fabricated allegation, contrary to Salame's under-oath statements at his plea that he had not been coerced and there were no side promises. There is no evidence that the charges against Bond were spurious or that the Government lacked probable cause to bring them or that the Government's investigation of Bond owed to anything other than evidence of her misconduct. Regardless, the defendant's motion fails to establish governmental bad faith or direct interference with Salame's free choice.

*Finally*, there is likewise no *Brady* violation. The defendant claims that the Government met with Salame's counsel on April 28, 2023, but produced "no record of this meeting" or "details of what transpired." (Mot. at 27). But his motion omits mention of the prior production of notes of Salame's counsel's attorney proffers, and misrepresents what transpired during the April 28 call. On May 4, 2023—five months before trial—the Government disclosed its notes of three attorney proffers by Salame's counsel. On April 28, 2023, the Government had a call—not a meeting— with Salame's counsel after the FBI executed searches on Salame's and Bond's property. During that call, the Government gave Salame's counsel information about how the Government viewed

Salame and his areas of potential criminal exposure. There was no material information disclosed by Salame's counsel on that call that should have been produced to the defendant. Since the Government produced the notes of Salame's counsel's attorney proffers, there was certainly no suppression, and therefore no *Brady* violation.

### 3. The Nishad Singh Proffer Materials Do Not Support a New Trial or a *Brady* Claim

The defendant also seeks a new trial or the disclosure of material based on the unfounded allegation that Nishad Singh changed his testimony following "threats from the Government." That argument is as unoriginal as it is meritless. Defense counsel attempted to advance the same baseless narrative through cross-examination of Singh at trial. The motion now omits Singh's own under-oath statements that directly refuted the claim. In any event, the alleged inconsistencies between Singh's early and later accounts were known to the defense, were presented to the jury, and were rejected. There is neither a basis for a new trial or a *Brady* claim.

The defendant's argument begins with a false premise. He claims that at the time of his indictment, the Government coerced Singh to provide information against the defendant by threatening him with years in prison unless he cooperated. The record tells a different story. Singh began cooperating almost immediately—before the defendant's indictment and before Ellison began cooperating. (Dkt. 526 at 11). He was prepared from the outset to plead guilty and accept responsibility. Bankman-Fried tries to paint a picture otherwise, arguing that certain Jencks Act material shows Singh "contradicting the Government's narrative." Bankman-Fried's trial counsel attempted the same approach, using the same Jencks Act material to advance the same argument through cross-examination; the jury rejected it. Unable to accept that result, the defendant recycles his arguments here. None of these arguments is new. None is correct.

The defendant begins his motion by suggesting based on fragments of Jencks Act materials

that Singh was originally providing testimony helpful to the defense. Close examination shows otherwise. All of these quotations from the Jencks Act were raised on cross-examination. The jury had them. The jury convicted. There is no basis to conclude that Singh changed his testimony.

Starting with notes from a January 4, 2023, interview, the defendant selectively quotes notes in which Singh is said to have stated that, "at the time" a particular document was created, he "didn't see a hole" and "wouldn't have seen a hole that could be plugged as a major concern." (3501-021). But the defendant omits the very next sentence from the notes explaining why Singh had not seen a hole and would not have been concerned: "it wasn't until September of 2022 that Singh understood that there were no funds to plug the hole." (*Id.*). Similarly, Singh's statement that before September 2022 he "didn't see borrowing as wrong in the context of Alameda's market making function" reflects nothing more than Singh's limited visibility into Alameda's finances from his engineering perch. (*Id.*). It says nothing about what the defendant knew. Singh testified at trial that when he learned of the hole in September 2022, he was "blindsided and horrified." (Tr. 1409). On the other hand, in the same conversation, the defendant told Singh that the shortfall had merely been "taxing" him "5 to 10 percent" of his productivity for a year. (Tr. 1407). Singh's limited early awareness thus stood in stark contrast to the defendant's long-standing knowledge, which the defendant acknowledged to Singh when Singh confronted him. When defense counsel cross-examined Singh on these very notes at trial and asked about the specific lines the motion now quotes, Singh rebutted the accusation, clarified that in some instances he did not "remember saying that," and explained he was discussing a different topic altogether. (Trial Tr. 1509-11).

The defendant selectively quotes notes from January 19, 2023, for the proposition that even shortly before FTX's bankruptcy Singh "believed everything would be okay." (3501-029). That too is out of context. Singh's trial testimony was far more specific. He testified that by September

2022 he knew the money was simply gone, and that he believed there had been "wrongdoing." (Trial Tr. 1512-13). Even if the defendant or others believed things would have worked out in the end at FTX, that sort of Ponzi schemer's logic would not be a defense to fraud. *See United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) (a belief that ultimately everything would work out is not a defense to fraud).

As to Singh's testimony about political donations, the defendant quotes from January 19, 2023 notes in which Singh stated he "believed he was the donor" for contributions made in his name and "knew that he would owe the donation made through his bank account." (3501-028). But he omits the context. That portion of the proffer notes concerns why Singh had asked Bankman-Fried to cancel certain loans before FTX's bankruptcy—including purported loans tied to donations. As the notes reflect just a few sentences later, Singh was "pointing out to Bankman-Fried that there were expenditures for which Singh would be on the hook" and "was trying to undo loan transactions that were not actually performed by Singh." (3501-028). Singh's trial testimony was clear about his participation in a conspiracy to violate the campaign finance laws with the defendant: he testified that he signed blank checks drawn on his bank accounts, which Bankman-Fried's team used to make donations in Singh's name. Salame funded and had direct access to those accounts and would log in to execute the transfers. (Tr. 1429-33). Singh understood that those donations were funded with customer money. (Tr. 1433). The interview notes are not evidence of innocence; they concern a different topic.

Finally, the defendant takes a sentence out of context from notes of a November 22, 2022, interview of Singh, in which he is quoted as saying "nobody asked him to create a backdoor." (3501-012). Two things are immediately apparent. First, those notes predate the period when Bankman-Fried now claims Singh began fabricating testimony. That alone exposes the perjury

theory as incoherent: Singh was supposedly lying before the lying started. Second, the notes address Singh's understanding of a term, not his substantive account of the code. At trial, Singh testified without equivocation that the allow-negative feature and related modifications gave Alameda undisclosed advantages—the ability to withdraw without limitation, to hold negative balances in any currency, and to avoid liquidation entirely, all hidden from customers and investors. (Tr. 1361-70). The proffer notes and the trial testimony are entirely consistent. A semantic preference about the word "backdoor" does not contradict sworn testimony about what the features did.

Bankman-Fried's claim that Singh was threatened is likewise false. Relying on snippets of notes of a call between Singh's counsel and prosecutors, the defendant asserts that prosecutors were "banging on the table" and threatened Singh into changing his story. (3501-053). That finds no support in the record cited. Singh confirmed under oath at his plea that no threats or promises had been made to induce his plea and that he was acting voluntarily. (Singh Plea Tr. at 25). And the Jencks Act material itself contradicts the defendant's characterization: 3501-053 reflects that one AUSA noted, in substance, that while the government did not credit all instances of asserted memory failure, the prosecutors did not "storm out" or "bang[] on [the] table." That is not a threat. It is a description of how a meeting proceeded.

The defendant's accusation that Singh perjured himself is unsupported. The only basis for it is a misreading of 3500 materials that are not verbatim transcripts. This argument is wishful thinking—and it is, to put it plainly, shameful that the defendant makes such accusations against a witness who already testified truthfully under cross-examination about these topics.

In any event, there is no basis for relief on either theory that the defendant advances. To obtain a new trial based on allegedly false testimony, a defendant must demonstrate that the

testimony was actually false, that the prosecution knew it was false when presented, and that the false testimony was material to the verdict. *See United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). Bankman-Fried has failed to establish any of those elements. He cannot show the testimony was false—Singh's trial testimony is fully consistent with the documents and with his contemporaneous conduct. He cannot show the Government knew of any falsity. And he cannot show materiality given two other cooperating witnesses, thousands of documents, and the defendant's own admissions during cross-examination.

There is no *Brady* violation either. *Brady* requires actual suppression of favorable evidence. Where defense counsel received the proffer materials, cross-examined the witness using those materials, and placed the alleged inconsistencies before the jury, there is no suppression. That not every word spoken during proffer sessions was independently transcribed does not establish suppression. The proffer notes were produced. The defendant identifies no gap. His complaint is that he wishes there were additional notes that might serve as impeachment material. But any such notes would be cumulative of what he already had, and would be independently inadmissible as unsworn out-of-court extrinsic evidence that is inadmissible under Federal Rules of Evidence 613(b) and 801. *See United States v. Cuevas Pimentel*, 815 F. Supp. 81, 83 (D. Conn. 1993) (Rule 613(b) does not permit attorney statements made during proffer to impeach witness as prior inconsistent statement). Cumulative, inadmissible material does not give rise to a *Brady* obligation.

### C. The Defendant's Claims of Witness Intimidation Do Not Excuse His Lack of Diligence in Presenting this Evidence at Trial

The defendant's witness intimidation theory fails at the threshold and on the merits, and the cases he relies on cut against him. Bankman-Fried comes nowhere near showing that these witnesses' decisions not to testify, which were reached in consultation with their lawyers, were based on any improper Government action, let alone Government action that prevented a fair trial,

or, as outlined above, would have provided evidence that was material, exculpatory, and not cumulative of any other source.

Bankman-Fried cannot dispute that he knew about and had access to Chapsky and Salame well in advance of trial. He attempts to excuse his failure to call them by asserting that they refused to testify on his behalf because they feared "potential retaliatory action" by the Government. (Mot. at 5, 16). That is not a claim of "newly discovered" evidence and thus is not properly before the Court on this Rule 33 motion. Rather, the proper remedy would have been a motion to compel the Government to immunize these witnesses in advance of trial—a remedy the defendant never sought. *See Owen*, 500 F.3d at 92-93 & n.5 (even if defendant had been unable to call a codefendant, the proper remedy would have been immunity for the codefendant's testimony, which was not "newly discovered within the meaning of Rule 33" and not a basis for a motion for a new trial). Having elected not to raise the issue before trial, he cannot repackage it now as a basis for a new one.

Even if the claim were cognizable in this posture, it would fail on the merits. To establish that prosecutorial conduct violated his due process right to present a defense, a defendant must show that the government deprived him of material and exculpatory evidence that could not have been obtained by other means, that the government acted in bad faith, and that the absence of the evidence rendered the trial fundamentally unfair. *See Buie v. Sullivan*, 923 F.2d 10, 11-12 (2d Cir. 1990). As the Supreme Court has recognized, the "touchstone" of the due process inquiry is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The defendant satisfies none of these requirements.

The Government's conduct here was entirely appropriate. Before trial, the Government communicated with counsel for Chapsky and Salame to understand their knowledge of the charged

conduct. In the course of those conversations, particularly with respect to Salame, the Government discussed these individuals' potential criminal exposure in light of the evidence known to the Government. All of that was disclosed to the defendant before trial in the form of proffer notes and notes of calls produced as Jencks Act materials. Courts have consistently held that conduct of that kind does not constitute prosecutorial intimidation. The Government does not violate a defendant's constitutional rights by interviewing potential defense witnesses (or speaking to their counsel), warning them of the consequences of perjury, or advising them of their criminal exposure based on the substance of their prior conduct. *See, e.g.*, *United States v. Williams*, 205 F.3d 23, 29-30 (2d Cir. 2000) ("a due process violation does not arise merely because the prosecutor interviews a potential defense witness" or "warns a defense witness of the consequences of committing perjury"); *United States v. Polanco*, 510 F. App'x 10, 12 (2d Cir. 2013) (denying motion for a new trial based on alleged prosecutorial misconduct allegations where the government had a legitimate reason to interview the witness). Chapsky and Salame made their decisions in consultation with their own attorneys, based on their own legal interests. That is the adversarial system working as it should.[4]

The defendant has also failed to show bad faith or materiality—each an independent basis to deny relief. As set out above, Chapsky's proffered testimony would have been legally irrelevant, factually incorrect, cumulative of the evidence in the record, or otherwise inadmissible. Salame's post-conviction statements are unsworn and flatly contradicted by his own plea allocution. Neither

---

[4] If the defendant's complaint is that the Government should have immunized Chapsky and Salame, that argument fares no better. The Government has no general obligation to grant use immunity to witnesses the defendant designates as potentially helpful. *See United States v. Stewart*, 907 F.3d 677, 685-86 (2d Cir. 2018); *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006); *United States v. Turkish*, 623 F.2d 769, 774 (2d Cir.1980); *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir.1979).

witness' absence deprived the defendant of a fair trial.

The defendant's cited authorities provide him no support. *United States v. Pinto*, 850 F.2d 927 (2d Cir. 1988), and *United States v. Williams*, 205 F.3d 23 (2d Cir. 2000), are the most telling. In *Pinto*, government interviewed an in-custody defense witness without counsel present, without *Miranda* warnings, and without notifying defense counsel, who had specifically requested the inmate's production. 850 F.2d at 931. The Second Circuit nonetheless held that such conduct "did not result in impermissible prosecutorial intimidation that violated the defendant's due process rights and warranted a new trial." *Id.* at 933-34. In *Williams*, the government called a defense witness in its rebuttal case and accused him of perjury, prompting a recantation of his earlier testimony. 205 F.3d at 27, 29. The Circuit found no misconduct, observing that the defendant's right to present a defense did not entitle him to "allow false testimony to go unchallenged." *Id.* at 30. In another case relied on by the defendant, *U.S. ex rel. Jones v. DeRobertis*, 766 F.2d 270 (7th Cir. 1985), the Seventh Circuit found that the witnesses there had refused to testify based on their own volition, precisely the situation the defendant faces here. Finally, *United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998), is inapposite. There, the prosecutor warned a defense alibi witness that he would be prosecuted for testifying and threatened to withhold the witness's own pending plea agreement, without "any substantial basis in the record for believing the witness [was] lying." *Id.* at 1188, 1190-91. Nothing remotely comparable is alleged here. *Vavages* is also a third-year-old, out-of-circuit decision. That it represents the strongest case the defendant can marshal confirms the weakness of his position.

### D. The "Newly Discovered" Evidence Would Not Have Resulted in an Acquittal Because the Evidence at Trial Was Overwhelming

Even setting aside the threshold defects in the defendant's newly-discovered-evidence claim, his motion fails on the merits because he cannot satisfy the most demanding requirement of

Rule 33: that the "newly discovered" evidence is "so material that it would probably produce a different verdict." *Zagari*, 111 F.3d at 322. That standard requires more than a showing that the evidence might have been useful at trial—the defendant must demonstrate that it would probably have produced an acquittal. The evidence of Bankman-Fried's guilt was so overwhelming at trial that he cannot make such a showing.

Over the course of a weeks-long trial, the Government called seventeen witnesses, including three cooperating witnesses—Caroline Ellison, Gary Wang, and Nishad Singh—each of whom testified from independent vantage points to the same core facts: that the defendant secretly diverted billions of dollars of FTX customer funds to Alameda Research, spent those funds on venture investments, political donations, real estate, and loan repayments, and repeatedly lied to customers, investors, and lenders about what he was doing. Their testimony was corroborated by contemporaneous documentary evidence including FTX's codebase, internal financial records, fraudulent balance sheets, private messages between Bankman-Fried and his co-conspirators, and Bankman-Fried's own public statements, including his tweets. The jury also heard from customers, investors, and lenders, and from Peter Easton, a financial expert, who traced Bankman-Fried's misappropriation and spending of customer funds. Against that record, no single piece of newly proffered evidence, standing alone or in combination, could probably have produced a different result.

The specific evidence Bankman-Fried now proffers does not come close to meeting that bar. Chapsky's proposed testimony goes to solvency—whether FTX's assets, on certain accounting methodologies, exceeded its liabilities. But FTX's purported solvency is not a defense to any of the charged offenses. The jury convicted Bankman-Fried because he misappropriated customer funds, made material misrepresentations to customers, investors, and lenders, directed

the preparation and transmission of fraudulent balance sheets, and orchestrated systematic concealment, none of which is negated by a post-hoc accounting exercise. Indeed, the jury was already presented with the solvency argument: Bankman-Fried himself testified and advanced precisely that theory from the witness stand. The jury considered it and rejected it. Chapsky's purported testimony would have been cumulative of the defendant's own testimony on this point, and cumulative evidence, however styled, does not satisfy Rule 33.

Salame's proposed testimony, as described in X.com posts, fares no better. The purported character evidence he would offer does not speak to any element of any charged offense. Because Salame has claimed ignorance of the fraud at FTX, he would be unable to contradict the mountain of direct evidence establishing Bankman-Fried's knowledge and intent. And whatever marginal relevance his testimony might theoretically have carried would have been obliterated by his prior under-oath statements and his admitted perjury before this very Court—a fact that would have invited significant impeachment and left his credibility in ruins before the jury.

Examined count by count and element by element, the purported newly discovered evidence addresses nothing the jury was actually required to find. The jury found that Bankman-Fried knowingly and intentionally defrauded FTX customers by misappropriating their deposits—a finding established by the testimony of three cooperating witnesses, corroborated by the FTX codebase itself, by Alameda's internal balance sheets showing a multi-billion-dollar negative balance, by spreadsheets maintained by Ellison, by Signal chats with Singh, and by Bankman-Fried's own internal acknowledgment, authored the day before his "FTX is fine" tweets, that the exchange had a multi-billion shortfall. The jury found that he defrauded Alameda's lenders by directing Ellison to prepare and transmit false balance sheets that hid Alameda's borrowing of customer funds—a finding established by Ellison's testimony, the seven alternative balance sheet

drafts Bankman-Fried reviewed and chose among, and the lenders' testimony that they would not have extended new loans had they known the truth. The jury also found that he defrauded FTX equity investors by misrepresenting Alameda's relationship to FTX, its treatment on the platform, and FTX's treatment of customer funds. And the jury found that he directed and concealed over $100 million in unlawful political contributions and engaged in money laundering. No accounting declaration from a lay witness (Chapsky) and no testimony from a witness who admittedly knew nothing of the fraud (Salame) touches any of those conclusions.

### E.  The Defendant's Other Claims Are Meritless

#### 1.  The Weaponization Claim is Meritless

The motion's "weaponization" narrative is not a legal argument supported by evidence, and certainly is not a cognizable claim under Rule 33. Rather, it is a political strategy the defendant pre-planned and committed to in writing before he was convicted, and one he is now executing from prison in an insincere attempt to obtain leniency.

Contrary to his claim that he has been targeted for his politics, the public record establishes unambiguously that the defendant was a major, publicly identified financial supporter of Democratic causes. He was one of the largest donors to President Biden's 2020 presidential campaign and was the second-largest individual donor to Democratic-aligned causes in the 2022 midterm election cycle, contributing in excess of $40 million to Democratic candidates, party committees, and progressive organizations. His mother ran Mind the Gap, a 501(c)(4) organization focused on supporting Democratic candidates, and his brother led Guarding Against Pandemics, a PAC that primarily supported Democratic candidates. The defendant was also publicly celebrated as a Democratic megadonor, appeared at Democratic events and conferences, and was profiled extensively in that context by major media. The defendant was indicted for committing some of the largest

campaign finance offenses in United States history, which resulted in contributions to candidates from both parties, but certainly favored Democratic candidates and causes. The motion's suggestion that he was somehow prosecuted because of his party affiliation inverts the factual reality: he was a major donor, not a political adversary.

The defendant pre-planned his public relation efforts and political repositioning prior to his conviction. He is now attempting to execute on his plan, which shows how brazenly dishonest his claims of "targeting" or "weaponization" are. In a Google document written by the defendant in the aftermath of FTX's collapse he mapped out a rehabilitation and pardon campaign. His ideas included "Go on Tucker Carlsen [sic], come out as a republican," "come out against the woke agenda," blame "SullCrom, lawyers, and Chapter 11," "focus almost exclusively on the fact that we could give value back to customers," go on X.com, and claim he had hidden Republican donations. (Dkt. 410-3). That checklist is being executed with near-perfect fidelity. In March 2025, the defendant gave an interview to Tucker Carlson in which he portrayed himself as a disaffected Democrat who had become sympathetic to Republicans before his arrest, suggested his political reorientation contributed to his prosecution, criticized the bankruptcy lawyers, and stated he had not committed criminal offenses. He has made similar claims on X.com. The present motion is the judicial phase of the same campaign. It does not present a legal argument based on newly discovered evidence; it presents items from the defendant's pre-arrest strategic plan in the form of a Rule 33 motion, which he has since attempted to disseminate over the internet.

Evidence, not politics, drove the Government's prosecution of the defendant. The charges were filed within weeks of FTX's November 2022 collapse, after career prosecutors reviewed evidence that approximately $8 billion in customer funds had been misappropriated. That evidence was presented to a grand jury, which returned an indictment, and to a petit jury, which returned a

unanimous verdict on all seven counts in fewer than five hours. The motion offers no credible reason to believe that any prosecutorial decision—from the first grand jury subpoena to the last argument at the trial—was influenced by politics, that any evidentiary ruling reflected political motivation, or that the conduct of the trial deviated in any respect from the ordinary adversarial process.

## 2.  There is No Basis for Recusal

By merely citing back to his appeal brief, (Mot. at 28), which relied primarily on cherry-picked examples of critical comments that largely pertained to the Court's discretionary measures to oversee an efficient trial and were directed at both parties, (Tr. 821-22, 1125, 1127, 1823-24, 2163), and a handful of limited inquiries by the Court of counsel or witnesses that occurred during examination of both parties, (Tr. 637-41, 1033-34, 1037-38), Bankman-Fried has failed to establish any basis that would require this Court to recuse itself from deciding this Motion, let alone, reassign this case in its entirety. *See United States v. Bayless,* 201 F.3d 116, 126 (2d Cir. 2000) (noting that the relevant inquiry under 28 U.S.C. § 455(a), which governs recusal, is whether "an objective, disinterested observer fully informed of the underlying facts" would "entertain significant doubt that justice would be done absent recusal."); *United States v. Vargas*, 961 F.3d 566, 584 (2d Cir. 2020) ("Remanding a case to a different judge is a serious request rarely made and rarely granted.").

Whether a court must recuse itself or reassign a case is centered on a partiality analysis. *See* 28 U.S.C. § 455(a) (a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned[.]"); *United States v. Cruz*, 481 F. App'x 650, 652-53 (2d Cir. 2012) (determining the need to reassign a case on remand involves a three-prong inquiry, the first of which, is whether the "original judge would be reasonably expected upon remand to have

substantial difficult putting out of his or her mind previously-expressed findings determined to be erroneous"). Here, particularly where there has been no finding of reversible error, the defendant has not—and cannot—point to any fact in the record which seriously questions this Court's partiality.

First, comments to both parties to move the trial along efficiently, do not in any way cast doubt on the Court's partiality. *See United States v. Wedd*, 993 F.3d 104, 116 (2d Cir. 2021) (Section 455(a) will not require recusal based on a "judge's comments during a proceeding that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases."); *Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (noting that partiality cannot be established through "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display."). Similarly, there was nothing improper about the Court's inquiries of counsel or witnesses, which occurred during examination by both parties. *See United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985) (a district court is permitted to ask questions to "clarify[] ambiguities, correct[] misstatements, or obtain[] information needed to make rulings."). Finally, there is no basis to conclude that "an objective, disinterested observer fully informed of the underlying facts" would "entertain significant doubt that justice would be done absent recusal," *Bayless*, 201 F.3d at 126, where the Court merely provided the jury with an option for continuing deliberations in the evening while making clear he was "not commenting on how long this should take or how quickly you should be done one way or the other," (Tr. 3112).

Under these circumstances, the Court "is as much obliged *not* to recuse [itself] when it is not called for as [it] is obliged to when it is." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) (emphasis added); *see also In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001)

("Where the standards governing disqualification have not been met, disqualification is not optional; rather it is prohibited.").

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied in its entirety.

Dated: New York, New York
March 11, 2026

Respectfully submitted,

SEAN BUCKLEY
Attorney for the Government

By: _Nicolas Roos_____
Danielle Kudla
Thane Rehn
Nicolas Roos
Assistant United States Attorneys
(212) 637-2304 / -2354 / -2421

44